# Exhibit C

**APPENDIX OF NON-FEDERAL AND UNPUBLISHED FEDERAL AUTHORITIES CITED IN VISA USA INC.'S PETITION TO COMPEL ARBITRATION**

Westlaw.

Slip Copy
Slip Copy, 2006 WL 2691418 (N.D.Cal.)
**(Cite as: Slip Copy)**

Page 1

**C**Poponin v. Virtual Pro, Inc.
N.D.Cal.,2006.
Only the Westlaw citation is currently available.
United States District Court,N.D. California.
Vladimir POPONIN, Ph.D., Plaintiff,
v.
VIRTUAL PRO, INC., Defendant.
**No. C 06-4019 PJH.**

Sept. 20, 2006.

Ilana S. Rubel, Michael J. Sacksteder, Fenwick & West LLP, San Francisco, CA, for Plaintiff.
Richard C. Darwin, Buchalter Nemer, Attorneys at Law, San Francisco, CA, for Defendant.

**ORDER GRANTING MOTION TO DISMISS AND DENYING MOTION FOR PRELIMINARY INJUNCTION**
PHYLLIS J. HAMILTON, District Judge.
*1 Plaintiff's motion for a preliminary injunction, and defendant's motion to dismiss the action, or in the alternative, to stay arbitration, and motion for a protective order, came on for hearing before this court on August 30, 2006. Plaintiff appeared by his counsel Michael J. Sacksteder, and defendant appeared by its counsel Richard C. Darwin. Having read the parties papers and carefully considered their arguments and the relevant legal authority, and good cause appearing, the court hereby DENIES the motion for preliminary injunction, GRANTS the motion to dismiss, and DENIES the motion for a protective order.

**BACKGROUND**

This is an action seeking declaratory and injunctive relief, and vacatur of an interim arbitration award, and also alleging breach of contract.

Plaintiff Vladimir Poponin, Ph.D., is a Russian-born theoretical physicist. He originally came to the United States at the invitation of Stanford University's Chemistry Department, to do research into the spectroscopy of DNA. He became a permanent resident of the United States in 1995, and subsequently left Stanford to pursue private ventures.

In 1998, Dr. Poponin filed a provisional application in the United States Patent and Trademark Office for a patent on one of his inventions. As the deadline approached for filing a utility patent application to claim priority to the provisional application, he met Martti Vallila ("Vallila"), the President of defendant Virtual Pro, Inc. (Virtual Pro"). Dr. Poponin alleges that Vallila told him that Virtual Pro was in the business of commercializing intellectual property owned by Russian citizens, and that Vallila suggested that Virtual Pro help Dr. Poponin with the funding and development of his first patent.

On September 20, 1999, Dr. Poponin entered into an agreement with Virtual Pro. He signed two documents-an "Agreement" and an "Assignment." In the Agreement, Dr. Poponin agreed to assign all rights in one of his inventions (specified in the "Assignment") to Virtual Pro, and Virtual Pro agreed to complete the process of obtaining a patent on the invention, to commercialize it, and to pay Dr. Poponin 50% of the revenues. The Agreement provided for the submission of any disputes "arising in connection with the present Agreement" to binding arbitration under the Rules of Arbitration of the International Chamber of Commerce ("ICC") Court of Arbitration.

In the Assignment, Dr. Poponin assigned all ownership and rights in an invention described as "A New Method for the Analysis of Nuclic Acids Hybridization on High Density NA Chips."Dr. Poponin made the Assignment "consistent with my Agreement with Virtual Pro."The Assignment also provided that "[a]ny claims or legal actions relating to this assignment and the transactions to which it relates shall be commenced and maintained in a state or federal court located in the State of California."

Virtual Pro subsequently financed and otherwise supported the issuance of U.S. Patent No. 6,376,177 ("the 177 patent"), based on the technology described in the provisional application filed by Dr. Poponin. Virtual Pro retained an attorney to prosecute the patent application, which was filed on October 6, 1999. The patent issued on April 23, 2002.

*2 At some point after he entered into the Agreement with Virtual Pro, Dr. Poponin began to develop

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 2
Slip Copy, 2006 WL 2691418 (N.D.Cal.)
**(Cite as: Slip Copy)**

additional inventions ("the unrelated inventions") that he claims were not described in the provisional application and were not covered by the terms of the Agreement or the Assignment. Dr. Poponin subsequently filed a number of U.S. and foreign patent applications covering those new inventions.

On June 14, 2005, Virtual Pro filed a claim with the ICC Court of Arbitration, asserting that Dr. Poponin had breached the Agreement by, *e.g.*, failing to copy Vallila with e-mail correspondence and refusing to answer Vallila's questions; excluding Virtual Pro's representative from negotiations or meetings with potential commercial and/or scientific partners; failing to assign to Virtual Pro patent applications containing inventions deriving from the subject matter of the invention referenced in the Agreement/Assignment; and secretly initiating negotiations relating to the possibility of assigning the 177 patent to some Japanese company.

Among other things, Virtual Pro demanded an accounting of all contracts signed by Dr. Poponin relating to the subject matter of the Agreement, and payment of 50% of all sums received by Dr. Poponin in connection with any such contracts. According to Dr. Poponin, Virtual Pro is attempting to assert rights over the unrelated inventions.

Dr. Poponin submitted a response to the ICC on August 24, 2005. Dr. Poponin and Virtual Pro each nominated a co-arbitrator, and the ICC nominated a third member of the panel. On October 7, 2005, the ICC confirmed the nomination of the arbitrators proposed by Dr. Poponin and Virtual Pro, and formally determined to allow the matter to proceed in accordance with the ICC Rules.

On January 20, 2006, Dr. Poponin (through his then-attorney Frank Sommers) filed a brief in support of his request to dismiss the arbitration for lack of jurisdiction, arguing that the arbitrators did not have jurisdiction over the dispute because he had never agreed to the arbitration. He asserted that the Agreement and the Assignment were part of an integrated whole, and that the Assignment expressed the parties' primary intent that disputes be settled by a court, not by arbitration. He also asserted that the consent to arbitration was part of a contradictory section of an integrated document. Virtual Pro filed a response on January 25, 2006.

On January 30, 2006, Mr. Sommers sent the tribunal an e-mail stating that he had been removed as counsel because Dr. Poponin was unable to pay his fees, and that Dr. Poponin would be representing himself in the arbitration. On February 3, 2006, Dr. Poponin filed a reply brief on the jurisdictional issue.

On March 13, 2006, the ICC arbitral tribunal issued an interim award determining that it had jurisdiction, and reserving all other decisions to a future award. The tribunal found that the Agreement and Assignment were separate documents-and that while the Agreement made reference to the Assignment, it did not incorporate the Assignment by reference, and that the Agreement stated that its provisions "constitute[ ] the sum total of the [A]greement." The tribunal also noted that the Assignment was executed only by Dr. Poponin, not by Virtual Pro, and contained a submission to jurisdiction provision as to "[a]ny claims or legal actions relating to this [A]ssignment and the transactions to which [the Assignment] relates."

*3 The tribunal found that the claims asserted by Virtual Pro and the general relief requested fell within the scope of the Agreement, which contained a broad arbitration clause submitting such disputes to arbitration under the ICC Rules of Arbitration. The tribunal concluded that it had jurisdiction to hear the disputes submitted in the matter before it.

Dr. Poponin also filed counterclaims against Virtual Pro in the arbitration. However, the counterclaims were dismissed by the ICC because Dr. Poponin failed to pay the required $106,000 filing fee by the deadline imposed by the ICC. In addition, during the time that Dr. Poponin was not represented by counsel (from January 30 to May 24, 2006), the discovery deadline passed and the tribunal subsequently found that Dr. Poponin was precluded from seeking any discovery in the arbitration.

Dr. Poponin filed the complaint in the present action on June 28, 2006. Dr. Poponin alleges that the attorney hired by Virtual Pro to prosecute the 177 patent failed to claim priority to the provisional application, and unnecessarily narrowed the scope of the claims of the patent during prosecution. Dr. Poponin asserts that he made numerous requests to Virtual Pro to remedy the errors of its patent prosecution attorney, to no avail. Dr. Poponin also claims that Virtual Pro refused to pursue an international filing of the 177 patent, further

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

diminishing its value. When Dr. Poponin tried to remedy the alleged errors himself, by filing amended claims, he claims that Virtual Pro-which was required to sign off on the filing because it was the assignee-refused to do so. Dr. Poponin claims that Virtual Pro has failed to take any steps to commercialize the patent, and that he has received no revenue from his invention.

Dr. Poponin asserts seven causes of action:
(1) a claim seeking a declaratory judgment that the ICC lacks jurisdiction because there is no valid agreement requiring arbitration of Virtual Pro's pending claims;
(2) a claim seeking a declaratory judgment that Virtual Pro has no rights in any invention referenced in the Agreement and Assignment;
(3) a claim seeking a declaratory judgment that Virtual Pro has no rights in the inventions and patents created subsequent to the execution of the Agreement and Assignment, or to monies from Dr. Poponin's contracts and agreements relating to the unrelated inventions;
(4) a claim seeking a declaratory judgment that the Agreement and Assignment as construed by defendant are null and void as contrary to public policy;
(5) a claim seeking a declaratory judgment that any obligations Dr. Poponin might owe pursuant to the Agreement or Assignment are excused by Virtual Pro's material breach;
(6) a claim alleging breach of contract by Virtual Pro; and
(7) a claim seeking vacatur of the Interim Arbitration award, with regard to the issue of arbitrability.

He also seeks a stay of the arbitration or an order preliminarily enjoining any further proceedings in the ICC pending resolution of whether arbitrability was properly determined by the arbitrator.

*4 On July 5, 2006, Dr. Poponin notified the ICC tribunal that he had filed the present action, and requested a stay of the arbitration proceedings pending resolution by this court of his claim that the dispute is not arbitrable. The tribunal denied the request. Dr. Poponin also asked Virtual Pro to agree to a stay, but Virtual Pro declined.

On July 17, 2006, the tribunal held a telephonic conference to discuss discovery rulings and to set the date for the final hearing. The same day, the tribunal issued a prehearing procedural order, ordering Dr. Poponin to produce to Virtual Pro all agreements with third parties having to do with the 177 patent and also with the subsequent unrelated inventions. The tribunal denied Dr. Poponin's application to submit a request for production of documents and to take Virtual Pro's deposition; and ordered the parties to exchange witness statements, witness lists, and exhibits. The tribunal set a date of September 20-22, and 25-26, 2006, for the final arbitration hearing.

On July 25, 2006, Dr. Poponin filed an application for a temporary restraining order in the present action. Following briefing by the parties and a hearing, the court denied the application in an order issued August 3, 2006.

Dr. Poponin now seeks a preliminary injunction, enjoining Virtual Pro from proceeding against him in the ICC arbitration. Virtual Pro seeks an order dismissing the complaint either for lack of subject matter jurisdiction or for failure to state a claim. In the alternative, Virtual Pro seeks an order staying this case pending the completion of the arbitration. Virtual Pro also seeks a protective order prohibiting Dr. Poponin from proceeding with discovery in this action while the arbitration is proceeding.

### DISCUSSION

#### A. Motion for Preliminary Injunction

##### 1. Legal Standard

To prevail on a motion for preliminary injunction, plaintiff must show (1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest (in certain cases).See Rodde v. Bonta, 357 F.3d 988, 994 (9th Cir.2004). Alternatively, injunctive relief can be granted if the plaintiff merely "demonstrate[s] ... a combination of probable success on the merits and the possibility of irreparable injury."Id.

##### 2. Plaintiff's Motion

Dr. Poponin argues that he is likely to succeed on the merits, asserting that it is the court, not the arbitrators that must decide the question of arbitrability; that the parties did not agree to arbitrate this dispute (based on lack of agreement in the Assignment); that the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

contract is procedurally unconscionable because his English skills are limited and he was at a disadvantage when presented with an agreement written in English, which he was pressured to sign by Vallila; and that the contract is substantively unconscionable and therefore unenforceable, because it seeks to "enslave" Dr. Poponin for life with regard to all contracts and inventions developed from the 177 patent, even if not directly related to the patented invention.

*5 Dr. Poponin contends that absent injunctive relief, he will suffer irreparable harm, as he will be deprived of his right to trial by jury. He also asserts that his business will be damaged because the ICC tribunal has ordered him to turn over documents of a highly confidential nature to Virtual Pro. He claims that the information in those documents relates to his current business endeavors, which involve inventions that are not covered by the terms of the Agreement or the Assignment.[FN1] Dr. Poponin asserts that he should not be compelled to provide Vallila with information that Vallila can use to interfere with his (Dr. Poponin's) current business.

> FN1. In his declaration, Dr. Poponin describes his recent work as "research into the cost-effective, rapid, and individualized mapping of the human genome." He asserts that this research has nothing to do with the technology represented in the 177 patent.

In a supplemental declaration, Dr. Poponin states that he was informed by one of his principal investors that the investor is withholding financing because of the pending arbitration, because the investor is concerned that Dr. Poponin will be compelled to disclose a confidential agreement that he has with "third parties" relating to the funding of his current research. Dr. Poponin contends that without the expected financing, his business will fold.

Dr. Poponin asserts that it is unlikely that he could recover damages from Virtual Pro, as Virtual Pro appears to be without domestic assets, and appears to be operated solely through the person of Martti Vallila in Paris.

Dr. Poponin also contends that he cannot fully present his case to the ICC tribunal, because his request to serve document requests on Virtual Pro was denied.

Finally, Dr. Poponin contends that the balance of hardships favors him, because the hardship of having to continue with the arbitration pending a final determination by this court as to the arbitrability question would be enormous.

In opposition, Virtual Pro makes four arguments. First, Virtual Pro asserts that this court has no subject matter jurisdiction to determine arbitrability, because the parties agreed that all disputes arising in connection with the Agreement would be decided in accordance with the ICC rules, which provide that arbitrability (or the "existence, validity or scope" of the agreement to arbitrate) is to be decided by the arbitrators.[FN2]

> FN2. Rule 6(2) of the ICC Rules provides, in part,
> If the Respondent does not file an answer, ... or if any party raises one or more pleas concerning the existence, validity or scope of the arbitration agreement, the Court may decide, without prejudice to the admissibility or merits of the plea or pleas, that the arbitration shall proceed if it is prima facie satisfied that an arbitration agreement under the Rules may exist. In such a case, any decision as to the jurisdiction of the Arbitral Tribunal shall be taken by the Arbitral Tribunal itself. If the Court is not so satisfied, the parties shall be notified that the arbitration cannot proceed.
> ICC Rule 6(2).

Second, Virtual Pro argues that if this court *does* decide to address the question of arbitrability, it should find that the dispute is arbitrable and deny the request for preliminary injunction. Virtual Pro contends that the Agreement and Assignment are separate documents and should be interpreted differently, and that the forum selection clause in the Assignment relates only to claims and legal actions relating to the Assignment itself. Virtual Pro asserts that the present dispute-whether either party has breached its obligations under the Agreement-is governed by the Agreement, not the Assignment.

Third, Virtual Pro contends that the arbitration provision is neither procedurally nor substantively unconscionable. Virtual Pro asserts that the Agreement does not bear any of the characteristics of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

an adhesive or unenforceable contract, and that Dr. Poponin had the draft Agreement in his possession for at least a day because he was encouraged by Vallila to take it home and think about it before he signed it. Virtual Pro also notes that it was Dr. Poponin who held the rights to the intellectual property, not Virtual Pro, and that Dr. Poponin cannot now argue that the parties' bargaining strength was unequal. Virtual Pro asserts that the arbitration provision is mutual, requiring each side to submit any disputes under the Agreement to the ICC.

*6 Finally, Virtual Pro argues that Dr. Poponin has not met his burden of demonstrating a need for a preliminary injunction. Virtual Pro contends that Dr. Poponin cannot establish likelihood of success, because the court does not have jurisdiction over the claims alleged in the complaint. Virtual Pro also asserts that Dr. Poponin has not established a possibility of irreparable harm. Virtual Pro contends that the argument that the anonymous investors will withdraw their financial support if the case proceeds to arbitration could apply equally to the case if it proceeds to litigation. Similarly, if the case proceeds to litigation, Virtual Pro will request the same documents it has requested in the arbitration, so any temporary relief that Dr. Poponin receives from that obligation to produce documents will be short-lived.

With regard to the claim that Dr. Poponin will be irreparably harmed by the loss of his right to a jury trial, Virtual Pro argues that Dr. Poponin agreed to the jurisdiction of the ICC, rather than the courts, when he signed the Agreement with its broad arbitration provision, and confirmed that decision when he participated in the ICC arbitration, filed counterclaims, and affirmatively submitted the jurisdictional questions to the arbitrators.

In reply, Dr. Poponin argues that this court has exclusive jurisdiction to determine whether the dispute is arbitrable. Dr. Poponin contends that he has raised serious questions of validity that require a judicial inquiry into the substance and circumstances of the Agreement, and whether there was any agreement to arbitrate whatsoever.

Dr. Poponin argues that Virtual Pro has failed to rebut his showing that the parties never clearly and unmistakably agreed to arbitrate this matter. He argues that because the Assignment states that any claims or legal actions relating to the Assignment "and the transactions to which it relates" shall be commenced in a state or federal court in the State of California, the arbitration provision in the Agreement is ineffective. He asserts that the disputes that are presently before the arbitrators are clearly claims relating to the Assignment "and the transactions to which it relates," because the Agreement was executed at the same time as the Assignment and is "defined in scope" by the Assignment.

He argues that under California Civil Code § 1642, the Agreement and the Assignment are legally part of the same contract because they relate to the same matters, were made between the same parties, and were made as substantially part of the same transaction. He also argues that the terms of one agreement are incorporated into another whenever the reference to the second agreement is clear and unequivocal, and that the words "incorporated by reference" are not necessary. He claims that the presence of two different dispute resolution provisions in this "unitary contract" creates an inherent conflict giving rise to an irreconcilable ambiguity as to whether the parties agreed to arbitrate. He contends that this ambiguity should be construed against Virtual Pro, the drafter of the contract documents, and that the court should find that the parties did not agree to arbitrate.

*7 Second, Dr. Poponin asserts that his actions in connection with the arbitration do not constitute a waiver of his right to challenge the ICC's jurisdiction in this court. He contends that in addition to filing a motion to dismiss, he informed the tribunal shortly after he had been "forced" to act as his own counsel (January 30, 2006) that he did not accept the ICC's jurisdiction. He claims that he further expressed his unwillingness to be bound by arbitration by refusing to sign the Terms of Reference provided by the ICC tribunal He asserts that in the light of such clear statements and actions, he cannot be seen as having waived his right to object in this court to the tribunal's jurisdiction simply because he took the same action-moving to dismiss the arbitration for lack of jurisdiction-that the courts have held do not result in a waiver of the right to litigate.

He contends that the ICC tribunal's ruling should be discounted because the tribunal did not have the benefit of Dr. Poponin's current attorney's arguments in connection with these motions. At the time the issue of jurisdiction was presented to the tribunal, Dr. Poponin had dismissed his attorney because he could not afford to pay him, and he asserts that his brief

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

filed with the tribunal did not mention the cases cited by his attorney in this motion; did not mention Civil Code § 1642 or the body of California case law relating to the reading together of related documents executed together; did not mention the California rule regarding the construing of ambiguities against the drafter; and did not mention any of the arguments relating to procedural or substantive unconscionability. He also asserts that it is clear from the brief he did file that he had little familiarity with English or with legal concepts or language.

Third, Dr. Poponin argues that the arbitration provision is both procedurally and substantively unconscionable. He claims that the circumstances under which the Agreement was executed caused it to be similar to a contract of adhesion, and demonstrate procedural unconscionability. He asserts that the "language imbalance" created a "differential in the parties' respective bargaining strength," because Dr. Poponin, with his limited English skills, was forced to rely on Vallila's description of the Agreement's terms. He also contends that the parties were unequal financially, because Dr. Poponin was on the verge of losing his patent rights for lack of funding, and Virtual Pro had the money he needed to save his application. He asserts in addition that, contrary to Virtual Pro's assertion, there was no period of negotiation. He claims that Vallila did not give him a day to review the agreement, but rather pressured him to sign it immediately-to "take it or leave it."

Dr. Poponin also argues that the arbitration provision is substantively unconscionable, because there was "unfair surprise" inherent in Virtual Pro's assertion of an entitlement to all his subsequent work. He asserts that Virtual Pro's reading of the Agreement is also substantively unconscionable, as Virtual Pro is essentially asserting ownership of 50% of his labors indefinitely for a $4,000 patent prosecution payment (referring to the $4,000 that Virtual Pro allegedly paid the patent attorney to obtain the 177 patent on Dr. Poponin's invention).

*8 Finally, Dr. Poponin asserts that he has satisfied the requirements for issuance of a preliminary injunction. He claims that continued, unwarranted participation in the arbitration is "per se irreparable harm." He also claims that he will suffer irreparable financial harm, as his reasearch, and the company he founded in anticipation of receiving funding, cannot continue if he is unable to meet his payroll obligations and pay the rent on the building housing his laboratories.

He disputes Virtual Pro's assertion that it does not matter whether the action proceeds in litigation in this court or in arbitration-insofar as the disclosure of documents in discovery is concerned-because, he argues, he can get a protective order in a court case that will protect his intellectual property in all circumstances, while the arbitrators have no jurisdiction to enforce a protective order on non-parties to this action. He also argues that this court is the only forum in which he can pursue his counterclaims, as the ICC tribunal dismissed the counterclaims after he failed to pay the required $106,000 advance in costs.

The court finds that the motion for a preliminary injunction must be DENIED. Dr. Poponin has not met his burden of showing either a likelihood of success or irreparable harm, or that the balance of hardships tips in his favor.

The threshold question is whether there is a valid agreement to arbitrate. Arbitration is fundamentally a creature of contract. United Steelworkers v. Warrior and Gulf Navigation Co., 363 U.S. 574, 582 (1960)."[A]rbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration."AT & T Techs., Inc. v. Communication Workers, 475 U.S. 643, 648-49 (1986) (citation omitted). The Federal Arbitration Act makes written agreements to arbitrate "valid, irrevocable, and enforceable" on the same terms as other contracts. 9 U.S.C. § 2.

Courts generally apply ordinary state-law principles governing contract formation in deciding whether an agreement to arbitrate exists. First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995). Here, Dr. Poponin does not argue that there is no objective intent (expressed in the Agreement) that all disputes will be arbitrated. Rather, he argues that under California law the Agreement and the Assignment must be considered one contract, and that because there are two conflicting dispute resolution provisions in that "single contract," the agreement to arbitrate is not effective.

The court finds, however, that the two agreements are separate. Both parties signed the Agreement, which provides for arbitration of "all disputes arising in connection with the present Agreement."In addition,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the Agreement states that it "constitutes the sum total of the [A]greement." Dr. Poponin's assignment of his rights in the invention was a separate contract, which was not signed by Virtual Pro, and which was not incorporated by reference into the Agreement. However, even if Dr. Poponin is correct that under California law, the Agreement and the Assignment must be considered together as one "unitary contract," that single contract clearly provides that any disputes relating to the Agreement are to be arbitrated, while any disputes relating to the actual Assignment itself are to be brought in a state or federal court in California.

*9 While the Federal Arbitration Act contains a general presumption that arbitrability should be decided by the court, both state and federal cases hold that the issue may be referred to the arbitrator if there is clear and unmistakable evidence from the arbitration agreement that the parties intended that the question of arbitrability should be decided by the arbitrator. See Id. at 944-45; see also Contec Corp. v. Remote Solution Co., Ltd., 398 F.3d 205, 208 (2nd Cir.2005); Dream Theater, Inc. v. Dream Theater, 124 Cal.App. 4th 547, 550-57 (2004)).

Moreover, the cases hold that where the parties' agreement to arbitrate includes an agreement to follow a particular set of arbitration rules-such as the ICC Rules-that provide for the arbitrator to decide arbitrability, the presumption that courts decide arbitrability falls away, and the issue is decided by the arbitrator. See The Shaw Group, Inc. v. Triplefine Int'l Corp. 322 F.3d 115, 121-22 (2nd Cir.2003); Apollo Computer, Inc. v. Berg, 886 F.2d 469, 473 (1st Cir.1989); The Daiei, Inc. v. United States Shoe Corp., 755 F.Supp. 299, 303 (D.Haw.1991)); Dream Theater, 124 Cal.App. 4th at 557.

Because Dr. Poponin cannot show that there is no agreement to arbitrate, he cannot establish a likelihood of success on the merits. In short, Dr. Poponin cannot prevail because this court has no subject matter jurisdiction to determine arbitrability. By agreeing to arbitration under the ICC Rules, Dr. Poponin and Virtual Pro clearly and unmistakably agreed that questions of arbitrability would be submitted to arbitration. Moreover, Dr. Poponin affirmatively submitted the issue of jurisdiction to the tribunal, by filing a request to dismiss the claims on January 20, 2006. This confirmed his intent to arbitrate the question of arbitrability. The fact that he stated in his reply brief that he did not accept the ICC's jurisdiction does not negate that fact that he submitted the question to the arbitral panel for decision. Moreover, he was represented by counsel when he did so.

Dr. Poponin argues that under Kaplan, "merely arguing the arbitrability issue to an arbitrator does not indicate a clear willingness to arbitrate that issue, i.e., a willingness to be effectively bound by the arbitrator's decision on that point." Kaplan, 514 U.S. at 946. While true, this proposition is irrelevant in the context of the present case. In Kaplan, there was no clear and unmistakable evidence that the parties intended to submit the question of arbitrability to the arbitrators. Dr. Poponin's attempt to apply the Kaplan result-the Kaplans did not clearly agree to submit question of arbitrability to arbitration, and thus question of arbitrability was subject to independent review by the courts-in the present case is therefore unavailing.

Dr. Poponin's argument that the Agreement is both procedurally and substantively unconscionable is also without merit. Under California law, unconscionability has both a procedural and a substantive component. The former focuses on "oppression" or "surprise" resulting from unequal bargaining power, while the latter focuses on " overly harsh" or "one-sided" results. Discover Bank v. Superior Court, 36 Cal.4th 148, 160 (2005).

*10 Generally, a contract that is procedurally unconscionable is one that is a contract of adhesion, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to accept the contract or reject it. Id. Here, however, the parties were of equal bargaining strength. Dr. Poponin's limited facility with English did not make him a "weaker party" for purposes of this analysis. He could have asked a third party to assist him with his English. Moreover, while Virtual Pro had access to potential funding sources, Dr. Poponin was the owner of the invention. Thus, each side had something the other side wanted.

Dr. Poponin characterizes the Agreement as having been presented to him on a "take-it-or-leave-it-basis," but this is not entirely accurate. Even if Dr. Poponin's version of events is true, and Vallila urged him to sign the contracts immediately, the complaint reflects that Vallila presented the contracts to him following some period of negotiation and discussion. If Dr. Poponin was uncomfortable about signing the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Agreement, he could have asked for more time to review it. There is no evidence that the arbitration provision was included in the Agreement on a true "take-it-or-leave-it" basis (as in bank account or credit card agreements, or cellular phone service contracts).

Substantive unconscionability takes many forms, but may generally be described as "unfairly one-sided." *Id.* One such form is an arbitration agreement's lack of a "modicum of bilaterality" wherein the employee's claims against the employer, but not the employer's claims against the employee, are subject to arbitration. *Little v. Auto Stiegler, Inc.*, 29 Cal.4th 1064, 1071-72 (2003). The paramount consideration in assessing substantive unconscionability is mutuality. *Abramson v. Jupiter Networks, Inc.*, 115 Cal.App. 4th 638, 664 (2004); *see also Armendariz v. Foundation Health Psychcare Servs., Inc.*, 24 Cal.4th 83, 120 (2000) (arbitration agreement imposed in adhesive context lacks basic fairness and mutuality if it requires one contracting party, but not the other, to arbitrate all claims arising out of the same transaction or occurrence or series of transactions or occurrences).

Here, the arbitration provision governs "[a]ll disputes arising in connection with" the Agreement. It does not distinguish among types of claims, or suggest that claims likely to be brought by one party in connection with the Agreement will be arbitrated, while claims likely to be brought by the other will not. Because of the nature of the Assignment, it is likely that only Virtual Pro would potentially have been situated to bring a claim under the Assignment- *e.g.*, to compel Dr. Poponin to execute the necessary documents to effectuate the assignment. Nevertheless, the fact that the Assignment provides that "any claims or legal actions relating to" the Assignment will be brought in a state or federal court in California does not create a lack of mutuality in the arbitration provision found in the Agreement, because the arbitration provision applies to the entire Agreement (though not to the Assignment, which, in any event, was a fait accompli well before the 177 patent issued). There is no suggestion in the Agreement that only one party will be compelled to arbitrate.

*11 Dr. Poponin's claim that Virtual Pro's alleged interpretation of the Agreement is unconscionable because Virtual Pro is asserting ownership of 50% of Dr. Poponin's intellectual property is without merit.

The scope of the Agreement is what is to be decided by the arbitrators. The fact that Virtual Pro is arguing for a particular interpretation of the Agreement does not make the agreement unconscionable.

Nor has Dr. Poponin established that he will be irreparably harmed if the injunction does not issue. He argues, essentially, that his business will fail if he is compelled to proceed with arbitration, but not if he can proceed with litigation in the court. However, the opinions of his investors with regard to the relative merits of a court action as opposed to arbitration are irrelevant. In addition, he will have to cooperate with discovery in any court action, and the parties will be bound by protective orders whether they proceed in arbitration or a court action.

His claims that he will be harmed because he will be denied the opportunity to argue his counterclaims and because he was not permitted to take discovery are without merit. He was not precluded from filing counterclaims in the arbitration. Rather, his counterclaims were dismissed by the arbitrators because he failed to pay the required costs. Similarly, he was not prevented from taking discovery, but simply chose not to before the deadline had expired. These are not valid grounds for enjoining Virtual Pro from proceeding with the arbitration.

B. Motion to Dismiss

1. Legal Standard

Federal courts are courts of limited jurisdiction, and can adjudicate only those cases which the Constitution and Congress authorize them to adjudicate-those involving diversity of citizenship or a federal question, or those to which the United States is a party. *See Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (1994). Federal courts are presumptively without jurisdiction over civil actions, and the burden of establishing that a cause lies within this limited jurisdiction rests upon the party asserting jurisdiction. *Id.*

Subject matter jurisdiction cannot be waived, and the court is under a continuing duty to dismiss an action whenever it appears that the court lacks jurisdiction. *Billingsly v. C.I.R.*, 868 F.2d 1081, 1085 (9th Cir.1989). The plaintiff bears the burden of demonstrating that subject matter jurisdiction exists over this complaint when challenged under

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Fed.R.Civ.P. 12(b)(1). *See, e.g., Tosco Corp. v. Communities for a Better Env't,* 236 F.3d 495, 499 (9th Cir.2001).

### 2. Defendant's Motion to Dismiss

For the reasons stated in its opposition to the motion for preliminary injunction, Virtual Pro argues that the court should dismiss this action for lack of subject matter jurisdiction. In the event that the court determines that some claims are not arbitrable, Virtual Pro seeks an order staying the action pending the completion of the arbitration.

**\*12** Dr. Poponin opposes the motion, making the same arguments as in his motion for preliminary injunction.

The court finds that the motion must be GRANTED. The court has no jurisdiction to decide the question of arbitrability, because the parties agreed to arbitrate any disputes arising under the Agreement pursuant to the ICC Rules of Arbitration, which provide that arbitrability is for the arbitrators to decide. The ICC tribunal having determined that it has jurisdiction to decide all disputes arising from the Agreement, the claims asserted by Dr. Poponin herein are subject to arbitration.

### C. Defendant's Motion for Protective Order

Virtual Pro seeks a protective order precluding plaintiff from conducting discovery in this action while the arbitration is on-going. This motion is DENIED, as moot.

### CONCLUSION

In accordance with the foregoing, plaintiff's motion for a preliminary injunction is DENIED, and defendant's motion to dismiss is GRANTED.

**IT IS SO ORDERED.**

N.D.Cal.,2006.
Poponin v. Virtual Pro, Inc.
Slip Copy, 2006 WL 2691418 (N.D.Cal.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit D

**APPENDIX OF NON-FEDERAL AND UNPUBLISHED FEDERAL AUTHORITIES CITED IN VISA USA INC.'S PETITION TO COMPEL ARBITRATION**

LEXSEE


Caution
As of: Nov 28, 2007

**DREAM THEATER, INC., et al., Plaintiffs and Respondents, v. DREAM THEATER et al., Defendants and Appellants.**

B174152

**COURT OF APPEAL OF CALIFORNIA, SECOND APPELLATE DISTRICT, DIVISION FOUR**

124 Cal. App. 4th 547; 21 Cal. Rptr. 3d 322; 2004 Cal. App. LEXIS 2010; 2004 Cal. Daily Op. Service 10522; 2004 Daily Journal DAR 14254

November 30, 2004, Filed

**NOTICE:**

As modified Dec. 28, 2004.

**SUBSEQUENT HISTORY:** Modified and rehearing denied by Dream Theater, Inc. v. Dream Theater, 2004 Cal. App. LEXIS 2232 (Cal. App. 2d Dist., Dec. 28, 2004)

**PRIOR HISTORY:** [***1] Superior Court of Los Angeles County, No. LC067280, Ruth Essegian, Judge.

**DISPOSITION:** Order reversed; remanded with instructions. Costs awarded..

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellant buyers sought review of an order from the Superior Court of Los Angeles County (California), which, in response to respondent sellers' motion for an order determining the arbitrability of a contractual dispute, stayed arbitration proceedings on the basis of a finding that the parties' dispute was not arbitrable.

**OVERVIEW:** The dispute arose from an alleged failure of disclosure by the sellers. The arbitration clause was located in a portion of the contract regarding indemnity. The sellers contended that the arbitration clause was limited to third party indemnity claims. The court observed, however, that the contract did not contain any provision that specifically limited the arbitration clause to third party claims. Cal. Civ. Code § 2772, which stated that indemnity could apply to either direct or third party claims, did not support the sellers' argument. The contract provided for arbitration of all contested claims of loss, and nothing in the indemnity provisions or the arbitration clause was expressly limited to third party lawsuits. The arbitration provision referred to commercial arbitration rules specifying that the arbitrator would decide disputes over the scope of the arbitration agreement. Hence, the court concluded that the parties' agreement to arbitrate according to these rules provided clear and unmistakable evidence of the parties' intent that the arbitrator would decide whether a contested claim was arbitrable.

**OUTCOME:** The court reversed and remanded with instructions to vacate the order and to enter a new order staying the action pending the arbitrator's determination of the scope of his or her jurisdiction.

**CORE TERMS:** arbitration, seller's, buyer's, arbitrator's, arbitrability, arbitration clause, indemnity, arbitration agreement, party claims, indemnification, indemnify, notice, arbitrable, indemnitor, contested, arbitrate, collective bargaining agreement, specify, unmistakably, disclose, parties agreed, dispute resolution, own jurisdiction, unmistakable, venue, consulting agreement, settlement, commercial contract, subject to arbitration, credit line

**LexisNexis(R) Headnotes**

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > Arbitrability*
*Civil Procedure > Alternative Dispute Resolution > Validity of ADR Methods*
*Contracts Law > Contract Conditions & Provisions > Arbitration Clauses*
[HN1]The issue of who should decide arbitrability turns on what the parties agreed in their contract.

*Civil Procedure > Alternative Dispute Resolution > Validity of ADR Methods*
*Contracts Law > Contract Conditions & Provisions > Arbitration Clauses*
*Contracts Law > Contract Interpretation > General Overview*
[HN2]Where the parties have introduced no extrinsic evidence, a trial court's ruling regarding arbitrability is a conclusion of law, and an appellate court independently interprets the contract.

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > General Overview*
*Civil Procedure > Alternative Dispute Resolution > Validity of ADR Methods*
*Contracts Law > Contract Conditions & Provisions > Arbitration Clauses*
[HN3]Arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > Arbitrability*
*Civil Procedure > Alternative Dispute Resolution > Validity of ADR Methods*
*Contracts Law > Contract Conditions & Provisions > Arbitration Clauses*
[HN4]The question of arbitrability is for judicial determination unless the parties clearly and unmistakably provide otherwise.

*Civil Procedure > Alternative Dispute Resolution > Validity of ADR Methods*
*Contracts Law > Contract Conditions & Provisions > Arbitration Clauses*
*Labor & Employment Law > Collective Bargaining & Labor Relations > Arbitration > Authority*
[HN5]Regardless of policy considerations, the parties' agreement determines what disputes will be arbitrated.

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > Arbitrability*
*Contracts Law > Defenses > Ambiguity & Mistake > General Overview*
*Contracts Law > Formation > Ambiguity & Mistake > General Overview*
[HN6]Arbitration is simply a matter of contract between the parties. When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally should apply ordinary state-law principles that govern the formation of contracts. It should not be assumed the parties intended the arbitrator to decide whether their dispute was arbitrable unless there is clear and unmistakable evidence that they did so. The question of who decides whether a dispute is subject to arbitration is rather arcane and may not have been considered and agreed upon by the parties. Where the agreement is silent or ambiguous on that question, the court and not the arbitrator should decide arbitrability so as not to force unwilling parties to arbitrate a matter they reasonably thought a judge, not an arbitrator, would decide.

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > Arbitrability*
*Contracts Law > Contract Interpretation > General Overview*
*Labor & Employment Law > Collective Bargaining & Labor Relations > Arbitration > General Overview*
[HN7]California courts often look to federal law when deciding arbitration issues under state law. California law is consistent with federal law on the question of who decides disputes over arbitrability. California courts use the same principles of contract interpretation whether the arbitration clause is in a collective bargaining agreement or a commercial contract.

*Contracts Law > Contract Conditions & Provisions > Arbitration Clauses*
*Contracts Law > Contract Interpretation > General Overview*
*Labor & Employment Law > Collective Bargaining & Labor Relations > Arbitration > Authority*
[HN8]Unless a claim of arbitrability is wholly groundless, a court should stay proceedings pending the arbitrator's determination of his or her own jurisdiction. This necessarily requires the courts to examine and, to a limited extent, construe the underlying agreement.

*Contracts Law > Contract Conditions & Provisions > Indemnity*

*Contracts Law > Third Parties > General Overview*
[HN9]Indemnification agreements ordinarily relate to third party claims. But this general rule does not apply if the parties to a contract use the term "indemnity" to include direct liability as well as third party liability. An indemnity agreement is to be interpreted according to the language and contents of the contract as well as the intention of the parties as indicated by the contract.

*Contracts Law > Contract Conditions & Provisions > Indemnity*
[HN10]See Cal. Civ. Code § 2772.

**SUMMARY:**

CALIFORNIA OFFICIAL REPORTS SUMMARY

In a contractual dispute arising from an alleged failure of disclosure by the sellers of a business, the trial court stayed arbitration proceedings on the basis of a finding that the parties' dispute was not arbitrable. The arbitration clause was located in a portion of the contract regarding indemnity. (Superior Court of Los Angeles County, No. LC067280, Ruth Essegian, Judge.)

The Court of Appeal reversed and remanded for stay of the action pending an arbitrator's ruling on arbitrability. The arbitration clause was not limited to third party indemnity claims, because the contract did not contain any provision that specifically limited the arbitration clause to third party claims. Civ. Code, § 2772, which states that indemnity can apply to either direct or third party claims, did not support such a limitation. The contract provided for arbitration of all contested claims of loss, and nothing in the indemnity provisions or the arbitration clause was expressly limited to third party lawsuits. The arbitration provision referred to commercial arbitration rules specifying that the arbitrator would decide disputes over the scope of the arbitration agreement. Hence, the court concluded that the parties' agreement to arbitrate according to these rules provided clear and unmistakable evidence of the parties' intent that the arbitrator would decide whether a contested claim was arbitrable. (Opinion by Grimes, J.,* with Epstein, P. J., and Curry, J., concurring.)

    * Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**HEADNOTES**

CALIFORNIA OFFICIAL REPORTS HEADNOTES
Classified to California Digest of Official Reports

**(1) Arbitration and Award § 5--Arbitration Agreements--Construction and Effect--Arbitrability.**--The issue of who should decide arbitrability turns on what the parties agreed in their contract; hence, an arbitration provision referring to commercial arbitration rules specifying that [*548] the arbitrator would decide disputes over the scope of the arbitration agreement established, in accordance with the parties' intent, that the arbitrator would decide whether a contested claim was arbitrable.

[6 Witkin, Cal. Procedure (4th ed. 1997) Proceedings Without Trial, § 510.]

**(2) Arbitration and Award § 5--Arbitration Agreements--Construction and Effect--Arbitrability--Standard of Review.**--Where the parties have introduced no extrinsic evidence, a trial court's ruling regarding arbitrability is a conclusion of law, and the appellate court independently interprets the contract.

**(3) Arbitration and Award § 5--Arbitration Agreements--Construction and Effect--Necessity of Agreement to Arbitrate.**--Arbitration is a matter of contract, and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.

**(4) Arbitration and Award § 5--Arbitration Agreements--Construction and Effect--Arbitrability.**--The question of arbitrability is for judicial determination unless the parties clearly and unmistakably provide otherwise.

**(5) Arbitration and Award § 5--Arbitration Agreements--Construction and Effect--Arbitrability.**--Regardless of policy considerations, the parties' agreement determines what disputes will be arbitrated.

**(6) Arbitration and Award § 5--Arbitration Agreements--Construction and Effect--Arbitrability.**--Arbitration is simply a matter of contract between the parties. When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally should apply ordinary state law principles that govern the formation of contracts. It should not be assumed the parties intended the arbitrator to decide whether their dispute was arbitrable unless there is clear and unmistakable evidence that they did so. The question of who decides whether a dispute is subject to arbitration is rather arcane and might not have been considered and agreed upon by the parties. Where the agreement is silent or ambiguous on that question, the court and not the arbitrator should decide arbitrability so as not to force unwilling parties to arbitrate a matter they reasonably thought a judge, not an arbitrator, would decide.

**(7) Arbitration and Award § 5--Arbitration Agreements--Construction and Effect--Federal Precedents.**--California courts often look to federal law when deciding arbitration issues under state law. California law [*549] is consistent with federal law on the question of who decides disputes over arbitrability. California courts use the same principles of contract interpretation whether the arbitration clause is in a collective bargaining agreement or a commercial contract.

**(8) Arbitration and Award § 5--Arbitration Agreements--Construction and Effect--Arbitrability.**--Unless a claim of arbitrability is wholly groundless, a court should stay proceedings pending the arbitrator's determination of his or her own jurisdiction. This necessarily requires the court to examine and, to a limited extent, construe the underlying agreement.

**(9) Contracts § 28--Construction and Interpretation--Intention of Parties--Indemnity.**--Indemnification agreements ordinarily relate to third party claims. But this general rule does not apply if the parties to a contract use the term "indemnity" to include direct liability as well as third party liability. An indemnity agreement is to be interpreted according to the language and contents of the contract as well as the intention of the parties as indicated by the contract.

**COUNSEL:** Latham & Watkins, Kristine L. Wilkes, Russell F. Sauer, Jr., and Lauren S. Kim for Defendants and Appellants.

Castle & Associates, Nomi L. Castle, Farzad Tabatabai and Robert S. Blonstein for Plaintiffs and Respondents.

**JUDGES:** Grimes, J., with Epstein, P. J., and Curry, J., concurring. (article VI, section 6 of the California Constitution.)

**OPINION BY:** GRIMES

**OPINION**

[**323] **GRIMES, J.**--This is an appeal from an order staying proceedings before the American Arbitration Association (AAA) based on the finding that the parties' commercial dispute is not arbitrable and jurisdiction lies with the court. We hold that (1) the parties' agreement determines whether the court or the arbitrator decides if the dispute is subject to arbitration; (2) where the parties do not offer evidence extrinsic to the contract, on appeal we review the contract independently; and (3) the parties state a clear and unmistakable agreement that the arbitrator will decide whether the dispute is subject to arbitration when they incorporate [***2] into their agreement the AAA Commercial Arbitration Rules which specify the arbitrator will decide arbitrability, and [**324] nothing in the parties' agreement excludes from the jurisdiction of the arbitrator the decision whether the dispute must be submitted to arbitration.

[*550] **FACTUAL BACKGROUND**

*The Contract and the Arbitration Clause*

Appellants are the buyer of an Internet-based multimedia and entertainment business and its managing agents. The buyer is Dream Theater, LLC. Its managing agents are The Dupuis Group, LLC, Donald J. Esters, and Steven Dupuis (Buyers). Respondents are the seller Dream Theater, Inc. and its shareholders Ali Davoudian, Mohammed Davoudian, and Darren Chuckry (Sellers). On October 17, 2001, Buyers executed an asset purchase agreement (the Contract) pursuant to which buyer Dream Theater, LLC acquired assets and liabilities of the Dream Theater business from Sellers. The parties executed various schedules and exhibits to the Contract, including a consulting agreement between buyer Dream Theater, LLC and Ali Davoudian, a former shareholder of seller Dream Theater, Inc. Among the liabilities that Buyers assumed was a credit line of $ 100,000 from Bank [***3] of America to Dream Theater, Inc., guaranteed by its shareholders.

The Contract has comprehensive dispute resolution provisions contained in nine separately numbered paragraphs spanning four pages of single-spaced text. The parties used broad language to express their agreement to avoid litigation as a means of dispute resolution. The Contract identifies the parties' respective obligations to indemnify one another from any and all losses, including losses arising from either party's breach of the Contract as well as those arising from third party claims. It sets forth the means to assert a claim of loss by giving an indemnification notice, provides for the enforcement of an uncontested claim by way of stipulated judgment, establishes a period of time to pursue settlement, and establishes procedures for "mandatory, final and binding arbitration" after the settlement period elapses. The Contract specifies that arbitration will be in accordance with the AAA Commercial Arbitration Rules. These rules provide that the arbitrator "shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement."

[***4] *The Nature and Procedural History of the Parties' Disputes*

Buyers hired Mr. Chuckry, a former officer of seller Dream Theater, Inc. to run the business. Some months after the purchase, Buyers learned that Mr. Chuckry had multiple sclerosis, which they believed to have nega-

Case 3:07-cv-05585-JSW   Document 6-3   Filed 11/28/2007   Page 16 of 19

124 Cal. App. 4th 547, \*; 21 Cal. Rptr. 3d 322, \*\*;
2004 Cal. App. LEXIS 2010, \*\*\*; 2004 Cal. Daily Op. Service 10522

tively affected his ability to run the business. Buyers claimed that Sellers knew about Mr. Chuckry's illness and had a duty to disclose it to Buyers before the purchase was consummated, and that Sellers' failure to disclose his disability caused Buyers to suffer losses "approaching $ 500,000."

[\*551] Buyers served Sellers with an indemnification notice on February 11, 2003, stating their intent to offset their claimed losses by withholding any further payments on the Bank of America credit line, which had an outstanding balance due of $ 88,855.16. Buyers made no more payments on the credit line. In due course, Bank of America recovered the balance owing on the credit line from Sellers. On December 16, 2003, Sellers filed this lawsuit in superior court seeking recovery from Buyers of the [\*\*\*5] $ 88,855.16 and other damages, including [\*\*325] payments allegedly due under the consulting agreement.

After Sellers filed this lawsuit, Buyers allegedly discovered another breach of the Contract by Sellers. Buyers claimed to have learned in February 2004 that Sellers' largest customer, FX Networks, had given notice of termination of its contract with Sellers some days before the sale to Buyers, and that Sellers failed to disclose the loss of this customer. Sellers had represented in the Contract with Buyers that FX Networks generated revenues of over $ 1 million in 2001 (the year the Contract was executed), which was more than five times what Sellers' next largest customers generated that year. On about February 11, 2004, Buyers served Sellers with a second indemnification notice asserting losses of about $ 1 million as a result of Sellers' failure to disclose the loss of the FX Networks business. Sellers contested this second indemnification notice on February 13, 2004. Buyers demanded arbitration of this dispute on February 23, 2004.

On March 9, 2004, Sellers obtained an ex parte order shortening time for the hearing of Sellers' motion for an order determining the arbitrability of Buyers' [\*\*\*6] claim of damages arising from the alleged failure to disclose the loss of the FX Networks contract. On March 18, 2004, the trial court ordered that the claim was not arbitrable and stayed the arbitration. This timely appeal followed.

## DISCUSSION

### A. *Standard of Review*

(1) [HN1]The issue of who should decide arbitrability turns on what the parties agreed in their contract. ( *First Options of Chicago, Inc. v. Kaplan* (1995) 514 U.S. 938, 943 [131 L. Ed. 2d 985, 115 S. Ct. 1920]; *Freeman v. State Farm Mut. Auto. Ins. Co.* (1975) 14 Cal.3d 473, 480 [121 Cal. Rptr. 477, 535 P.2d 341].) [HN2](2) Since the parties here introduced no extrinsic evidence, the trial court's ruling regarding arbitrability is a conclusion of law, and we independently interpret the Contract. ( *Merrick v. Writers Guild of America, West, Inc.* [\*552] (1982) 130 Cal. App. 3d 212, 217 [181 Cal. Rptr. 530]; *Coast Plaza Doctors Hospital v. Blue Cross of California* (2000) 83 Cal.App.4th 677, 684 [99 Cal. Rptr. 2d 809].)

B. *The Arbitrator and Not the court Will Decide What Disputes Are Arbitrable if the Parties Clearly and Unmistakably State That is Their Intent*

(3) In *AT&T Technologies v. Communications Workers* (1986) 475 U.S. 643 [89 L. Ed. 2d 648, 106 S. Ct. 1415], [\*\*\*7] the court reaffirmed the basic principles of arbitration. The first two principles guide our conclusion in this case. The first principle is that "[HN3] 'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.' [Citation.]" ( *Id.* at p. 648.) (4) The second principle is that [HN4]the question of arbitrability is for judicial determination "[u]nless the parties clearly and unmistakably provide otherwise." ( *Id.* at p. 649.)

(5) The arbitration clause at issue in *AT&T Technologies v. Communications Workers, supra,* 475 U.S. 643 was part of a collective bargaining agreement. The court reasoned that the presumption of arbitrability furthers the national policy of peaceful resolution of labor disputes and achieves the parties' presumed objectives in collective bargaining. ( *Id.* at p. 650.) The court recognized, however, that parties would be less inclined to enter collective bargaining agreements if arbitrators were empowered to decide disputes the [\*\*326] parties never agreed to submit to arbitration. ( *Id.* at p. 651.) Accordingly, [HN5]regardless of policy considerations [\*\*\*8] such as those at stake in collective bargaining agreements, the parties' agreement determines what disputes will be arbitrated.

(6) In *First Options of Chicago, Inc. v. Kaplan, supra,* 514 U.S. 938, the court applied the same basic principles of arbitration in a case involving a commercial contract. The court found that "[HN6]arbitration is simply a matter of contract between the parties." ( *Id.* at p. 943.) "When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally ... should apply ordinary state-law principles that govern the formation of contracts." ( *Id.* at p. 944.) The court qualified this principle by finding it should not be assumed the parties intended the arbitrator to decide whether their dispute was arbitrable unless there is clear and unmistakable evidence that they did so. ( *Ibid.*) The *First Options* court recognized that the question of who

decides whether a dispute is subject to arbitration is "rather arcane," and may not have been considered and agreed upon by the parties. (*Id.* at p. 945.) The court held that, where the agreement is silent or ambiguous [***9] on that question, the court and not the arbitrator should decide arbitrability so as not to force unwilling parties to arbitrate a matter they reasonably thought a judge, not an arbitrator, would decide. (*Ibid.*)

[*553] (7) [HN7]California courts often look to federal law when deciding arbitration issues under state law. (See, e.g., *Pour Le Bebe, Inc. v. Guess? Inc.* (2003) 112 Cal.App.4th 810, 829-835 [5 Cal. Rptr. 3d 442].) California law is consistent with federal law on the question of who decides disputes over arbitrability. California courts use the same principles of contract interpretation whether the arbitration clause is in a collective bargaining agreement or a commercial contract. "Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." (*United Public Employees v. City & County of San Francisco* (1997) 53 Cal.App.4th 1021, 1026 [62 Cal. Rptr. 2d 440] [construing a collective bargaining agreement]; accord, *Parker v. Twentieth Century-Fox Film Corp.* (1981) 118 Cal. App. 3d 895, 901-904 [173 Cal. Rptr. 639] [parties to a commercial contract did not expressly provide [***10] that arbitrator would decide the scope of his authority].) (8) [HN8]Unless a claim of arbitrability is wholly groundless, the court should stay proceedings pending the arbitrator's determination of his or her own jurisdiction. (*McCarroll v. L. A. County etc. Carpenters* (1957) 49 Cal.2d 45, 65 [315 P.2d 322].) This necessarily requires the courts to examine and, to a limited extent, construe the underlying agreement. (*Freeman v. State Farm Mut. Auto. Ins. Co., supra,* 14 Cal.3d 473.)

C. *The Parties Here Clearly and Unmistakably Agreed That the Arbitrator Will Decide the Scope of the Arbitration Agreement*

The Contract in issue here does not have a "common broad form" of arbitration agreement. [1] The parties used the term [**327] "indemnification" in section 7 of the Contract to define their respective obligations to pay for "any and all claims, losses, damages of any kind, liabilities, obligations, Actions, [2] deficiencies, demands, costs, and expenses (whether or not arising out of third [*554] party Claims), including, without limitation, all interest, fines, penalties, amounts paid in settlement, costs of mitigation, reasonable attorneys' fees, court costs and all amounts paid [***11] in investigation, defense or settlement of any of the foregoing (collectively, 'Losses') ... ."

---

1 The authors of California Practice Guide: Alternative Dispute Resolution (The Rutter Group 2003) paragraphs 5:215.3-5:215.10, at pages 5-121 to 5-123, cite examples of common "broad" versus "narrow" arbitration clauses. An arbitration clause that covers *any claim arising out of or relating to* the contract or the breach thereof "is very broad." (*Larkin v. Williams, Woolley, Cogswell, Nakazawa & Russell* (1999) 76 Cal.App.4th 227, 230 [90 Cal. Rptr. 2d 195].) But omission of the phrase *or relating to* has been found to exclude arbitration of some claims. (See *Tracer Research v. Nat. Environ. Services Co.* (9th Cir. 1994) 42 F.3d 1292, 1295.) An arbitration clause that covers *all disputes arising in connection with the agreement* was interpreted broadly in *Simula, Inc. v. Autoliv, Inc.* (9th Cir. 1999) 175 F.3d 716, 720-725. These cases demonstrate how similar language used to describe the scope of an arbitration clause has been interpreted quite differently by the courts.

[***12]

2 "Action" is defined elsewhere in the Contract to mean "any action, arbitration, audit, demand, claim, complaint, dispute, hearing, inquiry, investigation, litigation, prosecution or suit (whether civil, criminal, administrative, judicial or investigative, whether formal or informal, whether public or private)."

The parties' obligations to indemnify complement one another. Sellers agreed to indemnify buyer Dream Theater, LLC against (a) any breach by Sellers of any representations or warranties made in the Contract; (b) any breach of any covenant in the Contract or ancillary documents; and (c) all liabilities except those buyer assumed. Buyer Dream Theater, LLC agreed to indemnify seller Dream Theater, Inc. against (a) any breach by buyer of any representations or warranties made in the Contract; (b) any breach of any covenant in the Contract or ancillary documents; and (c) all liabilities buyer assumed.

The Contract defines the party seeking recovery of losses as the "Indemnified Party" and defines the party against whom losses are sought as the "Indemnitor." The Contract specifies procedures [***13] by which an Indemnified Party may obtain a stipulated judgment to enforce an "Uncontested Claim." [3] The Contract also specifies procedures by which an indemnitor may contest a claim, including a period for settlement discussions and, as the last resort, arbitration.

---

3 The Contract provides that "[i]n the event that, within thirty (30) calendar days after an Indemnification Notice is received by the Indemni-

tor, the Indemnitor does not contest such indemnification in writing to the Indemnified Party as provided in Section 7.7(b) (an 'Uncontested Claim'), the Indemnitor will be conclusively deemed to have consented, to the recovery by the Indemnified Party the full amount of Losses specified in the Indemnification Notice in accordance with this Section 7, and, without further notice, to have stipulated to the entry of a final judgment for damages against the Indemnitor for such amount in any court having jurisdiction over the matter where venue is proper."

The indemnity provisions are in section 7 of the [***14] Contract, and the arbitration clause is also in section 7. It provides initially that, "Each Party agrees that any Contested Claim [⁴] will be submitted to mandatory, final and binding arbitration in the County of Los Angeles, California, in accordance with the Commercial Arbitration Rules of the American Arbitration Association then in effect." The arbitration clause addresses various topics, including payment of costs, burden of proof and other matters, and it concludes that [**328] "except as specifically otherwise provided in this Agreement, arbitration conducted in accordance with this Agreement will be the sole and exclusive means of resolution of any Contested Claim made pursuant to Section 7."

    4   The Contract provides that a "Contested Claim" arises "[i]n the event that the Indemnitor gives the Indemnified Party written notice contesting all or any portion of an Indemnification Notice."

[*555] Sellers contend that the arbitration clause is limited to third party indemnity claims. Sellers' position is plausible, since [***15] the term "indemnify" ordinarily relates to third party claims. In support of their argument, however, Sellers rely on cases that construe contracts that are dissimilar to the Contract in issue here. *Varco-Pruden, Inc. v. Hampshire Constr. Co. (1975) 50 Cal. App. 3d 654 [123 Cal. Rptr. 606]* (*Varco-Pruden*), involved construction contracts that provided for indemnity of tort claims arising from the contractor's and subcontractor's performance of the work. *Myers Building Industries, Ltd. v. Interface Technology, Inc. (1993) 13 Cal.App.4th 949 [17 Cal. Rptr. 2d 242]* (*Myers Building*), also involved construction, architectural, and related contracts entirely unlike the Contract here, with provisions that the court found to be standard third party indemnification clauses.

(9) Both *Varco-Pruden* and *Myers Building* recognized that "[HN9][i]ndemnification agreements ordinarily relate to third party claims." (*Myers Building, supra,* 13 Cal.App.4th at p. 949; *Varco-Pruden, supra,* 50 Cal. App. 3d at p. 660.) But this general rule does not apply if the parties to a contract use the term "indemnity" to include direct liability as well as third party liability. "An indemnity agreement is to [***16] be interpreted according to the language and contents of the contract as well as the intention of the parties as indicated by the contract." (*Myers Building,* at p. 968.) Here, buyer Dream Theater, LLC agreed to indemnify seller Dream Theater, Inc. against not only third party claims but also any breach of buyer's obligations to seller: for example, buyer must indemnify seller against any breach of the covenant to pay off the Bank of America credit line. To interpret seller's rights under the indemnity agreement to include direct claims against buyer as well as third party claims, but to limit buyer's rights to third party claims, makes no sense in light of the complementary structure of the indemnity clauses. Yet, to accept seller's contention that it is only obligated to indemnify against third party claims would require that the Contract be interpreted to extinguish the parties' reciprocal obligations to indemnify one another against their own wrongdoing.

Sellers do not point to any language of the Contract which specifically limits the arbitration clause to third party claims or otherwise excludes from arbitration the parties' dispute over Sellers' alleged breach of the representations [***17] and warranties concerning the FX Networks business. Sellers rely on the venue provisions in both the Contract and in the consulting agreement that was executed at the same time as the Contract as indicating an intent to limit the arbitration clause. The Contract and the concurrently executed [*556] consulting agreement both specify that any action arising out of the agreements may be brought in any state or federal court in Los Angeles having jurisdiction over the dispute, and the parties waive any objection to venue in a Los Angeles court.

These venue provisions do not expressly limit the scope of the arbitration clause, and enforcement of the arbitration clause does not, as Sellers contend, nullify the venue provisions. No matter how broad the arbitration clause, it may be necessary to file an action in court to enforce an arbitration agreement, or to obtain a judgment enforcing an arbitration award, and the parties may need to invoke the jurisdiction of a court to obtain other remedies, [**329] such as a preliminary injunction, appointment of a receiver, or a writ of attachment or of possession. (See, e.g., *Code Civ. Proc., §§ 1281.2 & 1281.8* [***18] , subd. (b).)

Sellers also rely on the last of three definitions of "indemnity" in Black's Law Dictionary which on its face is limited to tort liability. Black's Law Dictionary defines "indemnity" as follows: "1. A duty to make good any loss, damage, or liability incurred by another. 2. The right of an injured party to claim reimbursement for its

loss, damage, or liability from a person who has such a duty. 3. Reimbursement or compensation for loss, damage, or liability in tort; esp., the right of a party who is secondarily liable to recover form the party who is primarily liable for reimbursement of expenditures paid to a third party for injuries resulting from a violation of a common-law duty." (Blacks Law Dict. (7th ed. 1999) p. 772, col. 2.) Thus, the term "indemnity" encompasses any duty to pay for another's loss or damage and is not limited to reimbursement of third party claims. [5]

> 5   Sellers cite Civil Code section 2772, which provides that indemnity "[HN10]is a contract by which one engages to save another from a legal consequence of the conduct of one of the parties, or of some other person." Section 2772 plainly states that indemnity may apply to either direct or third party claims and does not support Sellers' argument.

[***19] The terms "Indemnification," "Indemnified Party," and "Indemnitor" in the Contract, in and of themselves, do not limit the scope of the arbitration clause to third party claims. To the contrary, section 7.1 of the Contract states that Sellers are obligated to indemnify against all losses "whether or not arising out of third party Claims." The Contract here provides for arbitration of all contested claims of loss, and nothing in the indemnity provisions or the arbitration clause is expressly limited to third party lawsuits. Thus, Sellers have not shown that only third party claims of loss are arbitrable. (See [*557] _Wilshire-Doheny Associates, Ltd. v. Shapiro_ (2000) 83 Cal.App.4th 1380, 1396 [100 Cal. Rptr. 2d 478].)

It is difficult to imagine how parties could state any more comprehensively than they did in the Contract the intent to avoid litigation at every step of the dispute resolution process. The Contract provides that if a contested claim is not settled within the contractual deadline, then it must be submitted to binding arbitration in accordance with the AAA Commercial Arbitration Rules. These rules specify that the arbitrator will decide disputes over the scope of the arbitration agreement. [***20] We conclude that the parties' agreement to arbitrate according to this rule is clear and unmistakable evidence of the intent that the arbitrator will decide whether a Contested Claim is arbitrable.

In _Shaw Group Inc. v. Triplefine Intern. Corp._ (2d Cir. 2003) 322 F.3d 115, the court vacated an injunction prohibiting an arbitration of certain claims. The court found the parties' contract clearly and unmistakably evidenced an intent to arbitrate questions of arbitrability. "Because the arbitration agreement at issue in this case provides for all disputes between the parties to be referred to the International Chamber of Commerce (ICC), and because the rules of that organization expressly provide for the International Court of Arbitration (ICA) to resolve in the first instance any disputes about its own jurisdiction, we conclude that the arbitrability of [the claim] was a question for the arbitrator rather than the court." (_Id._ at p. 118.) We conclude, as the _Shaw_ court did, that where the Contract provides for arbitration in conformance with rules that specify the arbitrator will decide the scope of his or her own jurisdiction, the parties' [***21] [**330] intent is clear and unmistakable, even without a recital in the contract that the arbitrator will decide any dispute over arbitrability.

The parties here dispute what claims are arbitrable and what claims no longer present live controversies. Sellers' complaint concerns Buyers' offset of claimed damages arising from Mr. Chuckry's disability, a claim which Buyers contend Sellers waived by not contesting it pursuant to the dispute resolution provisions of section 7.7 of the Contract. The complaint also asserts claims under the consulting agreement, which does not have an arbitration clause. Buyers' arbitration demand concerns Sellers' alleged failure to disclose the loss of the FX Networks business. On remand, the trial court shall stay this entire action pending the arbitrator's determination of the scope of his or her jurisdiction to decide the various disputes among the parties.

[*558] **DISPOSITION**

The order staying arbitration is reversed and remanded with instructions to vacate the order finding that AAA has no jurisdiction over the arbitration demand and to enter a new order staying this action pending the arbitrator's determination of the scope of his or her jurisdiction. [***22] Buyers are awarded costs on appeal.

Epstein, P. J., and Curry, J., concurred.

A petition for a rehearing was denied December 28, 2004, and the opinion was modified to read as printed above.