# Exhibit E

**APPENDIX OF NON-FEDERAL AND UNPUBLISHED FEDERAL AUTHORITIES
CITED IN VISA USA INC.'S PETITION TO COMPEL ARBITRATION**

LEXSEE 140 CAL. APP. 4TH 1238



Caution
As of: Nov 27, 2007

**CHARLES HIGGINS II et al., Petitioners, v. THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent; DISNEY/ABC INTERNATIONAL TELEVISION, INC., et al., Real Parties in Interest.**

**B187818**

**COURT OF APPEAL OF CALIFORNIA, SECOND APPELLATE DISTRICT, DIVISION EIGHT**

*140 Cal. App. 4th 1238; 45 Cal. Rptr. 3d 293; 2006 Cal. App. LEXIS 972; 2006 Cal. Daily Op. Service 6057*

**June 27, 2006, Filed**

**SUBSEQUENT HISTORY:** Modified by *Higgins v. Superior Court, 2006 Cal. App. LEXIS 1061 (Cal. App. 2d Dist., July 10, 2006)*

**PRIOR HISTORY:**    [***1] ORIGINAL PROCEEDING in mandate. Superior Court of Los Angeles County, No. BC338017, Paul Gutman, Judge.

**SUMMARY:**

CALIFORNIA OFFICIAL REPORTS SUMMARY

Five siblings sued various entities involved with the production and broadcast of a reality-based television series for, among other things, breach of contract. The siblings had appeared in an episode of the series. With respect to the television defendants, the siblings' complaint appeared to allege that the television defendants breached promises to provide the siblings with a home, exploited the siblings, and portrayed the siblings in a false light. The trial court compelled the siblings to arbitrate most of their claims against the television defendants. The siblings then filed a petition for a writ of mandate challenging the trial court's order. (Superior Court of Los Angeles County, No. BC338017, Paul Gutman, Judge.)

The Court of Appeal granted the petition for writ of mandate. The court held that the arbitration clause was procedurally unconscionable. The siblings were young and unsophisticated, and had recently lost both parents.

The arbitration provision appeared in one paragraph near the end of a lengthy, single-spaced document. No words were printed in bold letters or larger font, nor were they capitalized. Although the siblings were required to place their initials in boxes adjacent to six other paragraphs, no box appeared next to the arbitration provision. The arbitration provision was also substantively unconscionable. The arbitration provision required only the siblings to submit their claims to arbitration. Furthermore, only the television defendants, not the siblings, could compel arbitration. The arbitration provision also barred only the siblings from seeking appellate review of the arbitrator's decision. The harsh, one-sided nature of the arbitration provision, combined with the elements of procedural unconscionability, led the court to conclude that the arbitration provision was unconscionable and, therefore, unenforceable. Accordingly, the trial court erred in granting the television defendants' petition to compel arbitration. (Opinion by Rubin, J., with Cooper, P. J., and Boland, J., concurring.) [*1239]

**HEADNOTES**

CALIFORNIA OFFICIAL REPORTS HEADNOTES
Classified to California Digest of Official Reports

**(1) Arbitration and Award § 7--Agreements to Arbitrate--Rescission--Federal Arbitration Act.**--Federal law applies to arbitration provisions in contracts involving interstate commerce (*9 U.S.C. § 2*). Arbitration is generally favored under both the Federal Arbitration Act

140 Cal. App. 4th 1238, *; 45 Cal. Rptr. 3d 293, **;
2006 Cal. App. LEXIS 972, ***; 2006 Cal. Daily Op. Service 6057

(FAA) (*9 U.S.C. § 1 et seq.*) and California law. Although there is a strong public policy in California in favor of resolving disputes by arbitration, *Code Civ. Proc., § 1281*, makes clear that an arbitration agreement is to be rescinded on the same grounds as other contracts or contract terms. In this respect, arbitration agreements are neither favored nor disfavored, but simply placed on an equal footing with other contracts.

**(2) Arbitration and Award § 3--Arbitration Agreements--Federal Arbitration Act--Validity.--**Under both the Federal Arbitration Act (*9 U.S.C. § 1 et seq.*) and California law, arbitration agreements are valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

**(3) Arbitration and Award § 3--Arbitration Agreements--Unconscionability--Contract of Adhesion.--**California's strong public policy in favor of resolving disputes by arbitration does not extend to an arbitration agreement permeated by unconscionability. With respect to whether an arbitration agreement is unconscionable, a court's analysis begins--although it does not end--with whether the arbitration agreement is a contract of adhesion. A contract of adhesion is a standardized contract that is imposed and drafted by the party of superior bargaining strength and relegates to the other party only the opportunity to adhere to the contract or reject it. If a court finds a contract to be adhesive, it must then determine whether other factors are present which, under established legal rules--legislative or judicial--operate to render it unenforceable. A court need not enforce an adhesion contract that is unconscionable.

**(4) Arbitration and Award § 3--Arbitration Agreements--Federal Arbitration Act--Unconscionability.--**Because defenses to arbitration provisions under the Federal Arbitration Act (FAA) (*9 U.S.C. § 1 et seq.*) are on equal footing with defenses to any other contract, unconscionability is neither favored nor disfavored as a reason to refuse enforcement of [*1240] an arbitration clause. Under the FAA, a court may not consider a claim that an arbitration provision is unenforceable if it is a subterfuge for a challenge that the entire agreement (in which the arbitration clause is only a part) is unconscionable. That contention must be presented to the arbitrator.

**(5) Contracts § 13.4--Legality--Enforceability--Unconscionable Contracts--Elements--Procedural and Substantive.--**Unconscionability has both a procedural and a substantive element, the former focusing on oppression or surprise due to unequal bargaining power, the latter on overly harsh or one-sided results. Procedural and substantive unconscionability must both be present in order for a court to exercise its discretion to refuse to enforce a contract or clause under the doctrine of unconscionability. But they need not be present in the same degree. Essentially, a sliding scale is invoked which disregards the regularity of the procedural process of the contract formation, that creates the terms, in proportion to the greater harshness or unreasonableness of the substantive terms themselves. The more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable and vice versa. Procedural unconscionability focuses on the factors of surprise and oppression, with surprise being a function of the disappointed reasonable expectations of the weaker party. Substantively unconscionable terms may generally be described as unfairly one-sided. An agreement may lack a modicum of bilaterality and therefore be unconscionable if the agreement requires arbitration only for the claims of the weaker party but a choice of forums for the claims of the stronger party.

**(6) Arbitration and Award § 8--Petition to Compel Arbitration--Unconscionability--Burdens of Proof.--**The party petitioning to compel arbitration bears the burden of proving the existence of a valid arbitration agreement by a preponderance of the evidence. The party opposing the petition must meet the same evidentiary burden to prove any facts necessary to its defense. The party opposing arbitration has the burden of proving the arbitration provision is unconscionable.

**(7) Contracts § 13.4--Legality--Enforceability--Unconscionable Contracts--Harsh One-sided Arbitration Provision.--**In a case in which five siblings, who had appeared in an episode of a reality-based television series, sued various entities involved with the production and [*1241] the broadcast of the program, the harsh, one-sided nature of an arbitration provision contained in a written agreement that the siblings executed before the program was broadcast led to the conclusion that the arbitration provision was unconscionable and, therefore, unenforceable.

[1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 330.]

**COUNSEL:** Mesisca, Riley & Kreitenberg, Patrick A. Mesisca, Jr., Dennis P. Riley and Mike N. Vo for Petitioners.

No appearance for Respondent.

Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, Patricia L. Glaser, Mark L. Block and Jeffrey D. Dermer for Real Parties in Interest.

140 Cal. App. 4th 1238, *; 45 Cal. Rptr. 3d 293, **;
2006 Cal. App. LEXIS 972, ***; 2006 Cal. Daily Op. Service 6057

**JUDGES:** Rubin, J., with Cooper, P. J., and Boland, J., concurring.

**OPINION BY:** Rubin

**OPINION**

[**295] **RUBIN, J.**--In this writ proceeding, five siblings who appeared in an episode of the television program *Extreme Makeover: Home Edition* (*Extreme Makeover*) challenge an order compelling them to arbitrate most of their claims against various entities involved with the production and broadcast of the program. Petitioners claim the arbitration clause contained in a written agreement they executed before the program was broadcast is unconscionable. We agree. Accordingly, we grant the petition for writ of mandate.

**FACTUAL AND PROCEDURAL BACKGROUND**

Petitioners Charles, Michael, Charis, Joshua, and Jeremiah Higgins are siblings. In February 2005, when they executed the agreement whose arbitration [***2] provision is at issue, they were 21, 19, 17, 16, and 14 years old, respectively.

Real parties in interest, to whom we refer collectively as the television defendants, are (1) American Broadcasting Companies, Inc., the network that broadcasts *Extreme Makeover*; (2) Disney/ABC International Television, Inc., [*1242] which asserts it had no involvement with the *Extreme Makeover* program in which petitioners appeared; (3) Lock and Key Productions, the show's producer; (4) Endemol USA, Inc., which is also involved in producing the program; and (5) Pardee [**296] Homes, which constructed the home featured in the *Extreme Makeover* episode in which petitioners appeared.

Petitioners' parents died in 2004. The eldest sibling, Charles, became the guardian for the then three minor children. (To avoid confusion with his siblings, we refer to Charles Higgins by his first name.) Shortly thereafter, petitioners moved in with church acquaintances, Firipeli and Lokilani Leomiti, a couple with three children of their own. The Leomitis are defendants in the litigation but are not involved in the present writ proceeding.

According to Charles, after moving in with the Leomitis, he was advised by members of his church [***3] that producers of *Extreme Makeover* had contacted the church and had asked to speak to him about the production of a show based on the loss of petitioners' parents and that petitioners were now living with the Leomitis. [1] In July or August 2004, Charles called and spoke with an associate producer of Lock and Key about the program and petitioners' living situation.

1 Lock and Key's executive producer describes *Extreme Makeover* as a " 'reality' based television series" whose "premise ... is to find needy and deserving families who live in a home which does not serve their needs. The Program takes the selected families' existing homes and land and radically improves them by demolishing and rebuilding the home."

Over the next several months, there were additional contacts between petitioners and persons affiliated with the production of the program, including in-person interviews and the filming of a casting tape. By early 2005, petitioners and the Leomitis were chosen to participate in the program in which the [***4] Leomitis' home would be completely renovated.

On February 1, 2005, a Lock and Key producer sent by Federal Express to each of the petitioners and to the Leomitis an "Agreement and Release" for their signatures. [2] The Agreement and Release contains 24 single-spaced pages and 72 numbered paragraphs. Attached to it were several pages of exhibits, including an authorization for release of medical information, an emergency medical release, and, as exhibit C, a one-page document entitled "Release." [*1243] To avoid confusion with the one-page exhibit C Release, we refer to the 24-page Agreement and Release simply as the "Agreement," and to exhibit C as the "Release."

2 The version of the agreement intended for the three minor petitioners was slightly different than the one intended for the two adult petitioners and the Leomitis. The slight variations between the two versions are not relevant to the issue before us. In this opinion, we quote from, and cite to, the adult version.

At the top of the first page of the Agreement, [***5] the following appears in large and underlined print: "NOTE: DO NOT SIGN THIS UNTIL YOU HAVE READ IT COMPLETELY." The second-to-last numbered paragraph also states in pertinent part: "I have been given ample opportunity to read, and I have carefully read, this entire agreement. ... I certify that I have made such an investigation of the facts pertinent to this Agreement and of all the matters pertaining thereto as I have deemed necessary ... . I represent and warrant that I have reviewed this document with my own legal counsel prior to signing (or, IN THE ALTERNATIVE, although I have been given a reasonable opportunity to discuss this Agreement with counsel of my choice, I have voluntarily declined such opportunity)."

The last section of the Agreement, which includes 12 numbered paragraphs, is entitled "MISCELLANE-OUS."[3] None of the [**297] paragraphs in that section

140 Cal. App. 4th 1238, *; 45 Cal. Rptr. 3d 293, **;
2006 Cal. App. LEXIS 972, ***; 2006 Cal. Daily Op. Service 6057

contains a heading or title. Paragraph 69 contains the following arbitration provision: "69. I agree that any and all disputes or controversies arising under this Agreement or any of its terms, any effort by any party to enforce, interpret, construe, rescind, terminate or annul this Agreement, or any provision thereof, [***6] and any and all disputes or controversies relating to my appearance or participation in the Program, shall be resolved by binding arbitration in accordance with the following procedure ... . All arbitration proceedings shall be conducted under the auspices of the American Arbitration Association ... . I agree that the arbitrator's ruling, or arbitrators' ruling, as applicable, shall be final and binding and not subject to appeal or challenge. ... The parties hereto agree that, notwithstanding the provisions of this paragraph, Producer shall have a right to injunctive or other equitable relief as provided for in *California Code of Civil Procedure [section] 1281.8* or other relevant laws."

> 3    Because of an apparent typographical error, the third-to-last paragraph and the last paragraph of the Agreement are both numbered 69. Our references to paragraph 69 are to the former.

There is nothing in the Agreement that brings the reader's attention to the arbitration provision. Although a different font is used occasionally to highlight certain terms in the Agreement, that is not the case with the paragraph containing the arbitration provision. [4] Six paragraphs in the Agreement contain [*1244] a box for the petitioners to initial; initialing is not required for the arbitration provision.

> 4    Three other paragraphs in the Agreement are printed in bold and capitalized letters, substantial portions of four other paragraphs are printed in bold letters, and a few words in other paragraphs are printed in bold or capitalized letters.

[***7] The Agreement also contains a provision limiting petitioners' remedies for breach of the Agreement to money damages.

The one-page Release is typed in a smaller font than the Agreement. It consists of four single-spaced paragraphs, the middle of which contains the following arbitration clause: "I agree that any and all disputes or controversies arising under this Release or any of its terms, any effort by any party to enforce, interpret, construe, rescind, terminate or annul this Release, or any provision thereof, shall be resolved exclusively by binding arbitration before a single, neutral arbitrator, who shall be a retired judge of a state or federal court. All arbitration proceedings shall be conducted under the auspices of the American Arbitration Association, under its Commercial Arbitration Rules, through its Los Angeles, California office. I agree that the arbitration proceedings, testimony,

discovery and documents filed in the course of such proceedings, including the fact that the arbitration is being conducted, will be treated as confidential ... ."

There is no evidence that any discussions took place between petitioners and any representative [***8] of the television defendants regarding either the Agreement or the Release, or that any of the television defendants directly imposed any deadline by which petitioners were required to execute the documents.

On February 5, 2005, a field producer from Lock and Key and a location manager for the program went to the Leomitis' home and met with the Leomitis. Although physically present at the house, petitioners did not participate in the meeting. During the meeting, one of the Leomitis asked about the documents they [**298] had received, and the producer and location manager advised the Leomitis that they should read the documents carefully, call if they had questions, and then execute and return the documents.

According to Charles, after this meeting, the Leomitis emerged with a packet of documents, which they handed to petitioners. Mrs. Leomiti instructed petitioners to "flip through the pages and sign and initial the document where it contained a signature line or box." Charles stated that from the time Mrs. Leomiti "handed the document to us and the time we signed it, approximately five to ten minutes passed." The document contained complex legal terms that he did not understand. He did [***9] not know what an arbitration agreement was and did not understand its significance or the legal [*1245] consequences that could flow from signing it. He did not specifically state whether or not he saw the arbitration provisions contained either in paragraph 69 or the Release before he signed the documents.

Each of the petitioners executed the Agreement and signed all exhibits, including the Release.

On February 16, 2005, representatives from the show appeared and started to reconstruct the Leomitis' home. When the new home was completed, it had nine bedrooms, including one for each of the five petitioners. The existing mortgage was also paid off.

The program featuring petitioners and the Leomitis was broadcast on Easter Sunday, 2005.

Petitioners allege that, after the show was first broadcast, the Leomitis informed petitioners that the home was theirs (the Leomitis'), and the Leomitis ultimately forced petitioners to leave. Charles contacted Lock and Key's field producer and asked for help. The producer responded that he could not assist petitioners. Sometime thereafter, the *Extreme Makeover* episode was rebroadcast.

140 Cal. App. 4th 1238, *; 45 Cal. Rptr. 3d 293, **;
2006 Cal. App. LEXIS 972, ***; 2006 Cal. Daily Op. Service 6057

In August 2005, petitioners filed this action against the television [***10] defendants and the Leomitis. According to the record before us, the complaint includes claims for, among other things, intentional and negligent misrepresentation, breach of contract, unfair competition (*Bus. & Prof. Code, § 17200 et seq.*), and false advertising (*Bus. & Prof. Code, § 17500 et seq.*). With respect to the television defendants, the complaint appears to allege that those defendants breached promises to provide petitioners with a home, exploited petitioners, and portrayed petitioners in a false light (by rebroadcasting the episode when they knew the episode no longer reflected petitioners' living situation).

The television defendants petitioned to compel arbitration pursuant to the Federal Arbitration Act (FAA) (*9 U.S.C. § 1 et seq.*). The television defendants maintained that all claims against both them and the Leomitis should be arbitrated. The Leomitis joined in the petition. [5]

> 5    The memorandum of points and authorities filed in support of the petition to compel arbitration appears to rely exclusively on the arbitration provision in the Agreement, and not on the arbitration provision in the one-page Release. Our uncertainty is caused by the fact that the legal memorandum mentions paragraph 69 on a number of occasions, makes no references to the one-page Release, yet uses the term "release," which, as we have observed, could refer to the exhibit C "Release" or the "Applicant Agreement and Release." The fact that two documents contain an arbitration provision does not affect our analysis.

[*1246]

[***11]  Petitioners opposed the petition, claiming, among other things, that the arbitration provision was unconscionable. They claimed it was procedurally unconscionable [**299] because the parties had unequal bargaining power, the arbitration provision was "buried" in the Agreement, petitioners were given only five to 10 minutes before they were asked to sign the Agreement, none of the television defendants explained the Agreement to them, and copies of the executed documents were "withheld" from them. [6]

> 6    There is no evidence that anyone refused to give petitioners a copy of the Agreement. The withholding claim appears to be based on the fact that petitioners did not receive an additional copy of the Agreement, either before or after signing it.

Petitioners also argued the Agreement was substantively unconscionable because its terms were so one-sided as to shock the conscience. They claimed the Agreement requires only them and not the television defendants to arbitrate, limits petitioners' remedies to

damages (while [***12] the television defendants' remedies are not so limited), precludes only petitioners from appealing, provides that the arbitration will be in accordance with the rules of the American Arbitration Association (which unfairly requires arbitration costs to be borne equally by the parties), and allows the television defendants to change the terms of the Agreement at any time.

After argument, the trial court issued an order granting the petition in most respects, conditioned on the television defendants' paying all arbitration costs. The court denied the petition as to the claims against the Leomitis and the unfair competition and false advertising claims against the television defendants, rulings not presently challenged. The court reasoned that although petitioners "argue that the 'arbitration agreements' are enforceable [presumably the court meant 'unenforceable'], their argument is directed not at the arbitration provisions but at the releases themselves." [7] The court then cited United States and California Supreme Court decisions holding that under the FAA, where a party seeks to avoid application of an arbitration provision on the ground that the agreement in which the provision [***13] is contained is unenforceable, that claim must be considered by the arbitrator, not the court. The trial court also stated that "since defendants have shown that plaintiffs signed the releases having had an opportunity to read them, the arbitration provisions are found by this court to be enforceable." The court did not address petitioners' other specific claims of unconscionability, presumably because it construed petitioners' opposition to the petition to compel arbitration as an attack only on the entire Agreement and one-page Release, not on the arbitration provisions contained in those documents.

> 7    The court's use of the term "releases" appears to refer to the Agreement. See footnote 5, *ante.*

[*1247]

Petitioners then filed this writ petition challenging the trial court's ruling. We issued an alternative writ, received additional briefing from the parties, and heard oral argument.

## DISCUSSION

A. *Unconscionability as a Defense to Enforcement of Arbitration Provisions*

(1)  The trial court [***14] ruled, and petitioners do not dispute, that the enforceability of the arbitration clause is governed by the FAA. Federal law applies to arbitration provisions in contracts involving interstate commerce. (See *9 U.S.C. § 2; Cronus Investments, Inc. v. Concierge Services* (2005) 35 Cal.4th 376, 380, 383-384 [25 Cal. Rptr. 3d 540, 107 P.3d 217] (*Cronus In-*

140 Cal. App. 4th 1238, *; 45 Cal. Rptr. 3d 293, **;
2006 Cal. App. LEXIS 972, ***; 2006 Cal. Daily Op. Service 6057

*vestments*).) Numerous cases observe that arbitration is [**300] generally favored under both the FAA and California law. (E.g., *Balandran v. Labor Ready, Inc. (2004) 124 Cal.App.4th 1522, 1527 [22 Cal. Rptr. 3d 441]*; *Ruiz v. Sysco Food Services (2004) 122 Cal.App.4th 520, 538 [18 Cal. Rptr. 3d 700]*.) At the same time, our Supreme Court has emphasized that "although we have spoken of a 'strong public policy of this state in favor of resolving disputes by arbitration' [citation], *Code of Civil Procedure section 1281* makes clear that an arbitration agreement is to be rescinded on the same grounds as other contracts or contract terms. In this respect, arbitration agreements are neither favored nor disfavored, but simply placed on an equal footing with other contracts." ( *Armendariz v. Foundation Health Psychcare Services, Inc. (2000) 24 Cal.4th 83, 126-127 [99 Cal. Rptr. 2d 745, 6 P.3d 669]* [***15] (*Armendariz*); see also *Buckeye Check Cashing, Inc. v. Cardegna (2006) 546 U.S. 440 [163 L. Ed. 2d 1038, 1042, 126 S. Ct. 1204, 1207]* (*Buckeye*) [section 2 of the FAA "embodies the national policy favoring arbitration and places arbitration agreements on equal footing with all other contracts"]; *Cronus Investments, supra, 35 Cal.4th at p. 384* ["the FAA's purpose is not to provide special status for arbitration agreements, but only 'to make arbitration agreements as enforceable as other contracts, but not more so' "].)

**(2)** Thus, under both the FAA and California law, "arbitration agreements are valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." ( *Armendariz, supra, 24 Cal.4th at p. 98*, fn. omitted.) [*1248]

**(3)** One ground is unconscionability, the basis asserted by petitioners below and in this writ proceeding. (See *Flores v. Transamerica HomeFirst, Inc. (2001) 93 Cal.App.4th 846, 856 [113 Cal. Rptr. 2d 376]*.) "The ' "strong public policy of this state in favor of resolving disputes by arbitration" ' does not extend to an arbitration [***16] agreement permeated by unconscionability." (*Ibid.*) As is frequently the case with inquiries into unconscionability, our analysis begins--although it does not end--with whether the Agreement and Release are contracts of adhesion. (See *Armendariz, supra, 24 Cal.4th at p. 113*.) Petitioners contend that they are and that the arbitration provisions are unconscionable. A contract of adhesion is a standardized contract that is imposed and drafted by the party of superior bargaining strength and relegates to the other party " 'only the opportunity to adhere to the contract or reject it.' " (*Ibid.*, quoting *Neal v. State Farm Ins. Cos. (1961) 188 Cal. App. 2d 690, 694 [10 Cal. Rptr. 781]*.) Adhesion contracts are routine in modern day commerce, and at least one commentator has suggested they are worthy of neither praise nor condemnation, only analysis. (1 Corbin on Contracts (1993) § 1.4, p. 14.) If a court finds a contract to be adhesive, it must then determine whether " 'other factors are present which, under established legal rules--legislative or judicial--operate to render it' " unenforceable. ( *Armendariz, at p. 113*, citing *Graham v. Scissor-Tail, Inc. (1981) 28 Cal.3d 807, 820 [171 Cal. Rptr. 604, 623 P.2d 165]* [***17] (*Graham*).)

**(4)** One "established rule" is that a court need not enforce an adhesion contract that is unconscionable. ( *Graham, supra, 28 Cal.3d at p. 820*.) As our Supreme Court explained in *Armendariz*, the Legislature has now codified the principle, historically developed in case law, that a court may refuse to enforce an unconscionable provision in a contract. (*Civ. Code, § 1670.5*.) [8] [**301] Because defenses to arbitration provisions under the FAA are on equal footing with defenses to any other contract, unconscionability is neither favored nor disfavored as a reason to refuse enforcement of an arbitration clause. (See *Doctor's Associates, Inc. v. Casarotto (1996) 517 U.S. 681, 686-687 [134 L. Ed. 2d 902, 116 S. Ct. 1652]*.)

> 8   *Civil Code section 1670.5, subdivision (a)*, provides: "If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result."

[***18] Recent appellate decisions have focused more on what is unconscionable and less on what is adhesive. (See *Trend Homes, Inc. v. Superior Court (2005) 131 Cal.App.4th 950, 958 [32 Cal. Rptr. 3d 411]*; *Morris v. Redwood Empire* [*1249] *Bancorp (2005) 128 Cal.App.4th 1305, 1318 [27 Cal. Rptr. 3d 797]*; *Harper v. Ultimo (2003) 113 Cal.App.4th 1402, 1409 [7 Cal. Rptr. 3d 418]* ["Adhesion is not a prerequisite for unconscionability"].)

**(5)** Unconscionability has both a procedural and a substantive element, the former focusing on "oppression" or "surprise" due to unequal bargaining power, the latter on "overly harsh" or "one-sided" results. ( *Armendariz, supra, 24 Cal.4th at p. 114*.) " 'The prevailing view is that [procedural and substantive unconscionability] must *both* be present in order for a court to exercise its discretion to refuse to enforce a contract or clause under the doctrine of unconscionability.' [Citation.] But they need not be present in the same degree. 'Essentially a sliding scale is invoked which disregards the regularity of the procedural process of the contract formation, that creates the terms, in proportion to the greater harshness or unreasonableness of the substantive [***19] terms themselves.' [Citations.] In other words, the more substan-

140 Cal. App. 4th 1238, *; 45 Cal. Rptr. 3d 293, **;
2006 Cal. App. LEXIS 972, ***; 2006 Cal. Daily Op. Service 6057

tively oppressive the contract term, the less evidence of
procedural unconscionability is required to come to the
conclusion that the term is unenforceable, and vice
versa.? (*Ibid.*)

Under the FAA, a court may not consider a claim
that an arbitration provision is unenforceable if it is a
subterfuge for a challenge that the entire agreement (in
which the arbitration clause is only a part) is unconscion-
able. That contention must be presented to the arbitrator.
( *Buckeye, supra,* 546 U.S. at pp. 446-449 [163 L. Ed. 2d
at pp. 1044-1046, 126 S. Ct. at pp. 1209-1210*] ["regard-
less of whether the challenge is brought in federal or
state court, a challenge to the validity of the contract as a
whole, and not specifically to the arbitration clause, must
go to the arbitrator"]; see *Rosenthal v. Great Western
Fin. Securities Corp.* (1996) 14 Cal.4th 394, 419 [58
Cal. Rptr. 2d 875, 926 P.2d 1061].) Our task, therefore,
is two-fold: (1) Does the petition here challenge the en-
forceability of the Agreement and the Release, in toto, or
does it contest only the arbitration provision? (2) If it is
the latter, is the arbitration [***20] provision uncon-
scionable?

### B. *The Standard of Review*

**(6)** The party petitioning to compel arbitration
"bears the burden of proving the existence of a valid ar-
bitration agreement by a preponderance of the evidence.
The party opposing the petition must meet the same evi-
dentiary burden to prove any facts necessary to its de-
fense." ( *Provencio v. WMA Securities, Inc.* (2005) 125
Cal.App.4th 1028, 1031 [23 Cal. Rptr. 3d 524].) "[T]he
party opposing arbitration ... has the burden of proving
the arbitration [**302] provision is unconscionable." (
*Szetela v. Discover Bank* (2002) 97 Cal.App.4th 1094,
1099 [118 Cal. Rptr. 2d 862].) [*1250]

Whether an arbitration provision is unconscionable
is ultimately a question of law. ( *Flores v. Transamerica
HomeFirst, Inc., supra,* 93 Cal.App.4th at p. 851; see
also *Civ. Code, § 1670.5.*) Where, as here, the trial court
rules on the question of unconscionability based on dec-
larations that contain no meaningful factual disputes, we
review the trial court's ruling de novo. ( *Flores v. Trans-
america HomeFirst, Inc., at p. 851; Brookwood v. Bank
of America* (1996) 45 Cal.App.4th 1667, 1670 [53 Cal.
Rptr. 2d 515]; *CPI Builders, Inc. v. Impco Technologies,
Inc.* (2001) 94 Cal.App.4th 1167, 1171-1172 [114 Cal.
Rptr. 2d 851].) [***21] [9]

9 Although the television defendants' brief sug-
gests there are disputed facts, we do not find any;
nor does the trial court's written ruling or state-
ments made at the hearing suggest that it was re-
solving a factual dispute.

### C. *The Trial Court Incorrectly Concluded Petitioners
Were Challenging the Enforceability of the Entire
Agreement and Release*

The trial court offered two reasons for its decision to
order arbitration. First, it concluded that petitioners' op-
position to arbitration was predicated on a challenge to
the Agreement as a whole, not to the arbitration provi-
sion in particular. From this premise, the trial court rea-
soned that, because the enforceability of the entire
agreement is to be considered by the arbitrator, not the
court ( *Buckeye, supra,* 546 U.S. at pp. 446-449 [163 L.
Ed. 2d at pp. 1044-1046, 126 S. Ct. at pp. 1209-1210]),
the petition should be granted. The trial court's framing
of the issue was seen in its written ruling, where it stated,
[***22] "Although plaintiffs argue that the 'arbitration
agreements' are enforceable, their argument is directed
not at the arbitration provisions but at the releases them-
selves." The court then provided a correct analysis of the
law on the subject, citing *Prima Paint v. Flood & Conk-
lin* (1967) 388 U.S. 395 [18 L. Ed. 2d 1270, 87 S. Ct.
1801] and *Rosenthal v. Grant Western Fin. Securities
Corp., supra,* 14 Cal.4th 394. The trial court concluded,
"Here, plaintiffs attack the validity of the releases, not
the arbitration provisions ... ."

Although we agree with the court's legal analysis, its
ultimate conclusion was flawed because petitioners' op-
position to the petition was that the arbitration clause in
particular, not the entire Agreement, was unconscion-
able. Petitioners devoted considerable attention to para-
graph 69 of the Agreement, emphasizing that it "is not
set out or made distinguishable in any manner. It is mis-
identified within the caption as 'miscellaneous.' It is not
distinguished in different type font size, bold letters,
capital letters, in red, and does not contain any separate
waiver notice." The caption of a four-page argument
made by petitioners [***23] reads: "The Arbitration
Agreements Are Procedurally and [*1251] Substan-
tively Unconscionable Thereby Barring Their Enforce-
ment." And in arguing that the arbitration provision was
substantively unconscionable, petitioners quoted from
paragraph 69 in an effort to demonstrate that the provi-
sion was one-sided, requiring only them, and not the
television defendants, to submit to arbitration. The prin-
cipal thrust of petitioners' oral argument to the trial court
was likewise that "the entire arbitration clause was itself
one-sided. So only the plaintiffs under that clause have a
duty to arbitrate." [**303]

We readily understand the potential for confusion in
this area. Uncertainty can become especially pronounced
when parties or courts use the term "arbitration agree-
ment," when "arbitration clause" might be more precise.
Petitioners have contributed to this confusion because in
the trial court they occasionally referred to the "contract"
as being unconscionable; a practice they continue in their

140 Cal. App. 4th 1238, *; 45 Cal. Rptr. 3d 293, **;
2006 Cal. App. LEXIS 972, ***; 2006 Cal. Daily Op. Service 6057

briefing in this court, when they ask us to declare the entire Agreement unenforceable. [10] Nevertheless, they argued separately that the arbitration clause itself is unconscionable, a point the trial court did [***24] not address.

   10   We decline petitioners' request.

The second justification offered by the trial court for granting the television defendants' petition to compel arbitration was that petitioners had an opportunity to read the Agreement and Release before signing them. While this is factually correct and legally bears on whether the Agreement is procedurally unconscionable, no authority is cited for a supposed rule that if a party reads an agreement he or she is barred from claiming it is unconscionable. Such a rule would seriously undermine the unconscionability defense.

Given the limited scope of the trial court's ruling, we could remand to permit it to decide whether the arbitration provision is unconscionable. Instead, because the case is before us on uncontested facts and our review is de novo, we decide the legal issues in the first instance. ( *Rayyis v. Superior Court (2005) 133 Cal.App.4th 138, 150 [35 Cal. Rptr. 3d 12].*)

### D. *The Arbitration Provision Is Unconscionable*

### 1. *The Adhesive Nature* [***25] *of the Parties' Agreement*

We begin with whether the parties' agreement was adhesive. (See *Armendariz, supra,* 24 Cal.4th at p. 113.) As discussed above, " '[t]he term [contract of adhesion] signifies a standardized contract, which, imposed and [*1252] drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it.' " (*Ibid.*)

In this case, it is undisputed that the lengthy Agreement was drafted by the television defendants. It is a standardized contract; none of the petitioners' names or other identifying information is included in the body of the document. There is no serious doubt that the television defendants had far more bargaining power than petitioners.

The remaining question is whether petitioners were relegated only to signing or rejecting the Agreement. The television defendants note that there is no evidence petitioners were told they could not negotiate any terms of the Agreement or that petitioners made any attempt to do so. Although literally correct, the uncontested evidence was that on the day petitioners signed the Agreement the television defendants initially [***26] met with the Leomitis alone. Inferentially, at the television defendants' urging, immediately after the meeting concluded, the

Leomitis gave the Agreement and exhibits to petitioners with directions to "flip through the pages and sign." The documents were returned in five to 10 minutes. One of the producers testified that he told the Leomitis "that these agreements must be executed as a condition to their further participation in the program."

From these facts, we conclude the Agreement was presented to petitioners on a take-it-or-leave-it basis by the party with [**304] the superior bargaining position who was not willing to engage in negotiations. Accordingly, we conclude the Agreement and exhibits constitute a contract of adhesion.

### 2. *Procedural Unconscionability*

"Procedural unconscionability focuses on the factors of surprise and oppression [citations], with surprise being a function of the disappointed reasonable expectations of the weaker party." ( *Harper v. Ultimo, supra,* 113 Cal.App.4th at p. 1406.)

In this case, the arbitration provision appears in one paragraph near the end of a lengthy, single-spaced document. The entire agreement was drafted by the [***27] television defendants, who transmitted copies of it to the petitioners. The television defendants knew petitioners were young and unsophisticated, and had recently lost both parents. Indeed, it was petitioners' vulnerability that made them so attractive to the television defendants. The latter made no effort to highlight the presence of the arbitration provision in the Agreement. It was one of 12 numbered paragraphs in a section entitled "MISCELLANEOUS." In contrast to several other paragraphs, no text in the arbitration provision is highlighted. No words are printed in bold letters or larger font; nor are they [*1253] capitalized. Although petitioners were required to place their initials in boxes adjacent to six other paragraphs, no box appeared next to the arbitration provision.

It is true that the top of the first page advises petitioners to read the entire agreement before signing it and the second-last paragraph states that the person signing acknowledges doing so. This language, although relevant to our inquiry, does not defeat the otherwise strong showing of procedural unconscionability.

We now turn to substantive unconscionability, utilizing our Supreme Court's sliding scale [***28] approach. (See *Armendariz, supra,* 24 Cal.4th at p. 114.) Procedural and substantive unconscionability "need not be present in the same degree. 'Essentially a sliding scale is invoked which disregards the regularity of the procedural process of the contract formation, that creates the terms, in proportion to the greater harshness or unreasonableness of the substantive terms themselves.' [Citations.]" (*Ibid.*)

140 Cal. App. 4th 1238, *; 45 Cal. Rptr. 3d 293, **;
2006 Cal. App. LEXIS 972, ***; 2006 Cal. Daily Op. Service 6057

3. *Substantive Unconscionability*

"Substantively unconscionable terms may 'generally be described as unfairly one-sided.' [Citation.] For example, an agreement may lack 'a modicum of bilaterality' and therefore be unconscionable if the agreement requires 'arbitration only for the claims of the weaker party but a choice of forums for the claims of the stronger party.' " ( *Fitz v. NCR Corp. (2004) 118 Cal.App.4th 702, 713 [13 Cal. Rptr. 3d 88]*, quoting *Armendariz, supra, 24 Cal.4th at p. 119*.)

In this case, the arbitration provision requires only petitioners to submit their claims to arbitration. The clause repeatedly includes "I agree" language, with the "I" being a reference to the "applicant" (i.e., each of the petitioners). The [***29] only time the phrase "the parties" is used is in the last sentence, where "the parties" agree that, notwithstanding the arbitration provision, the producer may have the right to seek injunctive or other equitable relief in a court of law as provided for in *Code of Civil Procedure section 1281.1* or other relevant laws.

The television defendants claim that the arbitration provision is bilateral, because "all disputes or controversies arising under this Agreement or any of its terms, any [**305] effort by any party to enforce ... this Agreement ... and any and all disputes or controversies relating to my appearance or participation in the Program, shall be resolved by binding arbitration." (¶ 69.) Thus, "all [*1254] disputes" are subject to arbitration, and either side may move to compel. But they miss the point: only one side (petitioners) agreed to that clause. [11]

> [11] Interestingly, petitioners claim the television defendants did not even sign the Agreement until after the motion to compel arbitration was filed, a point not disputed by the television defendants.

[***30] The television defendants also assert that their contractual right to seek injunctive relief shows that they are required to arbitrate since, ordinarily, a party may seek injunctive relief as a matter of civil law. The provision would be meaningless, they argue, if the television defendants were not required to submit their claims to arbitration. We disagree. Under the arbitration provision, the television defendants (though not petitioners) can *compel* arbitration. The injunction clause is significant because the television defendants can compel arbitration without fearing that doing so would preclude them from seeking injunctive or other equitable relief in a court of record. [12]

> [12] The fact that the injunction provision is one-sided does not necessarily mean that the clause is substantively unconscionable. A "contracting party with superior bargaining strength may pro-

vide 'extra protection' for itself within the terms of the arbitration agreement if 'business realities' create a special need for the advantage. [Citation.] The 'business realities,' creating the special need, must be explained in the terms of the contract or factually established." ( *Fitz v. NCR Corp., supra, 118 Cal.App.4th at p. 723*.) We observe that although the television defendants explained why it was important to deny petitioners injunctive relief, they did not attempt to explain why they needed such remedy.

[***31] (7) Additional elements of substantive unconscionability are found in the provision barring only petitioners from seeking appellate review of the arbitrator's decision and, at least insofar as it could impact petitioners' statutory claims, the provision requiring arbitration in accordance with the rules of the American Arbitration Association, which provide that arbitration costs are to be borne equally by the parties. (See *Boghos v. Certain Underwriters at Lloyd's of London (2005) 36 Cal.4th 495, 505-508 [30 Cal. Rptr. 3d 787, 115 P.3d 68]*; *Independent Assn. of Mailbox Center Owners, Inc. v. Superior Court (2005) 133 Cal.App.4th 396, 414-417 [34 Cal. Rptr. 3d 659]*.) [13] The harsh, one-sided nature of the arbitration provision, combined with the elements of procedural unconscionability earlier discussed, leads us to conclude that the arbitration provision is unconscionable and, therefore, unenforceable. [14] Accordingly, it was error for the trial court to have granted the petition to compel arbitration.

> [13] As noted above, the trial court shifted all arbitration costs to the television defendants. (See *Gutierrez v. Autowest, Inc. (2003) 114 Cal.App.4th 77, 92-93 [7 Cal. Rptr. 3d 267]* [unconscionable requirement for payment of arbitration costs may be severed].)

[***32]
> [14] We disagree with petitioners' argument that the producer's right to change program rules unilaterally means the arbitration agreement is not bilateral. There is nothing to suggest a change in how the program is structured materially affects the parties' arbitration rights and duties.

[*1255]

**DISPOSITION**

The petition for writ of mandate is granted. The respondent court is directed to vacate that part of its December 1, 2005 order granting the petition of the television defendants to compel arbitration and staying certain claims, and to thereafter [**306] enter a new and different order denying the petition to compel arbitration.

140 Cal. App. 4th 1238, *; 45 Cal. Rptr. 3d 293, **;
2006 Cal. App. LEXIS 972, ***; 2006 Cal. Daily Op. Service 6057

Petitioners are entitled to recover their costs in this writ proceeding. (Cal. Rules of Court, rule 56(*l*)(1).)

Cooper, P. J., and Boland, J., concurred.

On July 10, 2006, the opinion was modified to read as printed above.

# Exhibit F

**APPENDIX OF NON-FEDERAL AND UNPUBLISHED FEDERAL AUTHORITIES
CITED IN VISA USA INC.'S PETITION TO COMPEL ARBITRATION**

LEXSEE



Warning
As of: Nov 28, 2007

**DONALD LAGATREE, Plaintiff and Appellant, v. LUCE, FORWARD, HAMILTON & SCRIPPS LLP, Defendant and Respondent. DONALD LAGATREE, Plaintiff and Appellant, v. KEESAL, YOUNG & LOGAN, Defendant and Respondent.**

**No. B124263, No. B125272.**

**COURT OF APPEAL OF CALIFORNIA, SECOND APPELLATE DISTRICT, DIVISION ONE**

**74 Cal. App. 4th 1105; 88 Cal. Rptr. 2d 664; 1999 Cal. App. LEXIS 829; 15 I.E.R. Cas. (BNA) 865; 99 Cal. Daily Op. Service 7593; 99 Daily Journal DAR 9559**

**September 13, 1999, Decided**

**SUBSEQUENT HISTORY:**     [***1]  Review Denied January 19, 2000, Reported at: 2000 Cal. LEXIS 262.

**PRIOR HISTORY:**   APPEALS from judgments of the Superior Court of Los Angeles County. Super. Ct. No. BC185963. Super. Ct. No. BC185962. Wendell Mortimer, Jr., and Alexander H. Williams III, Judges.

**DISPOSITION:**   The judgments are affirmed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appeal by plaintiff of judgments of the Los Angeles County Superior Court (California) sustaining defendants' demurrers in action for wrongful termination of employment.

**OVERVIEW:** Plaintiff filed separate actions against defendant law firms, alleging that plaintiff had been terminated in violation of public policy for refusing to sign predispute arbitration agreements requiring that work-related disputes be resolved through binding arbitration. Defendants' demurrers to the complaints were sustained without leave to amend. The court affirmed, concluding that the terminations did not violate public policy. The rights at issue were subject to waiver by agreement, and additional factors weighed against recognition of a public policy claim. General social policies would not have been advanced by not allowing a wrongful termination claim in this case, as public policy favors the resolution

of disputes through arbitration, and to impose liability on defendants would have thwarted that policy.

**OUTCOME:** Judgments affirmed; plaintiff could not state a cause of action for wrongful termination in violation of public policy, where he was discharged for refusing to sign arbitration agreement requiring that work-related disputes be resolved through binding arbitration.

**CORE TERMS:** arbitration, arbitration agreement, arbitrator, public policy, public policy, wrongful termination, discharged, state law, judicial forum, arbitration clause, predispute, condition of employment, compulsory, waived, commerce, agreements to arbitrate, enforceable, arbitrate, italics, termination, unconscionability, unconscionable, terminated, arbitration provision, revocation, demurrer, adhesion, jury trial, citations omitted, claimant

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Demurrers*
[HN1]The Court of Appeal treats a demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. The court also considers matters which may be judicially noticed. Further, the court gives the complaint a reasonable interpretation, reading it as a whole and its parts in their context. When a demurrer is sustained, the court determines

74 Cal. App. 4th 1105, *; 88 Cal. Rptr. 2d 664, **;
1999 Cal. App. LEXIS 829, ***; 15 I.E.R. Cas. (BNA) 865

whether the complaint states facts sufficient to constitute a cause of action.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > General Overview*
*Civil Procedure > Appeals > Standards of Review > Abuse of Discretion*
[HN2]When a demurrer is sustained without leave to amend, the Court of Appeal decides whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and the court reverses; if not, there has been no abuse of discretion and the court affirms. The burden of proving such reasonable possibility is squarely on the plaintiff.

*Labor & Employment Law > Employment Relationships > At-Will Employment > Duration of Employment*
[HN3]See Cal. Lab. Code §2922.

*Labor & Employment Law > Employment Relationships > At-Will Employment > Duration of Employment*
*Labor & Employment Law > Wrongful Termination > Breach of Contract > Express Contracts*
*Labor & Employment Law > Wrongful Termination > Breach of Contract > For Cause Standard*
[HN4]Presumption that an employment, having no specified term, may be terminated at the will of either party on notice to the other, may be superseded by a contract, express or implied, limiting the employer's right to discharge the employee. Absent any contract, however, the employment is "at will," and the employee can be fired with or without good cause. But the employer's right to discharge an "at will" employee is still subject to limits imposed by public policy, since otherwise the threat of discharge could be used to coerce employees into committing crimes, concealing wrongdoing, or taking other action harmful to the public weal.

*Labor & Employment Law > Employment Relationships > At-Will Employment > Exceptions > Public Policy*
*Labor & Employment Law > Wrongful Termination > Public Policy*
[HN5]While an at-will employee may be terminated for no reason, or for an arbitrary or irrational reason, there can be no right to terminate for an unlawful reason or a purpose that contravenes fundamental public policy.

*Labor & Employment Law > Wrongful Termination*
[HN6]The California Supreme Court has established a set of requirements that a policy must satisfy to support a tortious discharge claim. First, the policy must be supported by either constitutional or statutory provisions or regulations enacted under statutory authority. Second, the policy must be "public" in the sense that it inures to the benefit of the public rather than serving merely the interests of the individual. Third, the policy must have been articulated at the time of the discharge. Fourth, the policy must be "fundamental" and "substantial."

*Labor & Employment Law > Wrongful Termination > Public Policy*
[HN7]The cases in which California courts have recognized a separate tort cause of action for wrongful termination in violation of public policy generally fall into four categories, where the employee is discharged for: (1) refusal to violate a statute; (2) performing a statutory obligation; (3) exercising or refusing to waive a statutory or constitutional right or privilege; or (4) reporting an alleged violation of a statute of public importance.

*Labor & Employment Law > Wrongful Termination*
[HN8]The term "public policy" is inherently not subject to precise definition. Thus, it is generally agreed that courts should venture into this area, if at all, with great care and due deference to the judgment of the legislative branch, lest they mistake their own predilections for public policy. Courts should proceed cautiously if called upon to declare public policy absent some prior legislative expression on the subject.

*Contracts Law > Defenses > Public Policy Violations*
*Labor & Employment Law > Wrongful Termination > Breach of Contract > Employer Handbooks*
*Labor & Employment Law > Wrongful Termination > Public Policy*
[HN9]A claim of wrongful termination in violation of public policy must be based on a "substantial public" policy. In determining whether such a policy has been violated, the courts consider whether an employer and employee could circumvent the policy by way of agreement. Plainly, not all of an employer's duties nor all of an employee's rights inure to the benefit of the public at large rather than to a particular employer or employee. The fact that a duty or right can be modified or waived by agreement suggests that it does not confer a substantial benefit on the public.

74 Cal. App. 4th 1105, *; 88 Cal. Rptr. 2d 664, **;
1999 Cal. App. LEXIS 829, ***; 15 I.E.R. Cas. (BNA) 865

*Labor & Employment Law > Wrongful Termination*
[HN10]The obligation to refrain from conduct that violates public policy is a duty imposed by law upon all employers to implement the fundamental public policies of the state; it cannot be bargained away.

*Civil Procedure > Counsel > General Overview*
*Civil Procedure > Trials > Jury Trials > Right to Jury Trial*
[HN11]See Cal. Const. art. I, § 16.

*Civil Procedure > Trials > Jury Trials > Right to Jury Trial*
[HN12]Under the Code of Civil Procedure, trial by jury may be waived by the parties to an issue of fact in any of several ways. Cal. Civ. Proc. Code §631(a).

*Civil Procedure > Alternative Dispute Resolution > General Overview*
*Contracts Law > Contract Conditions & Provisions > Arbitration Clauses*
*Labor & Employment Law > Collective Bargaining & Labor Relations > Arbitration > Enforcement*
[HN13]The California Constitution cannot be read to prohibit individuals from waiving, in advance of any pending action, the right to trial by jury in a civil case. This conclusion is supported by those cases upholding the validity of arbitration agreements.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Affirmative Defenses*
[HN14]The right to a judicial forum can generally be waived by contract.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Affirmative Defenses*
*Civil Procedure > Alternative Dispute Resolution > General Overview*
[HN15]When parties agree to submit their disputes to arbitration, they select a forum that is alternative to, and independent of, the judicial.

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > Federal Arbitration Act > Arbitration Agreements*
*Civil Procedure > Alternative Dispute Resolution > Judicial Review*
*International Trade Law > Dispute Resolution > Arbitration*
[HN16]The Federal Arbitration Act, 9 U.S.C.S. §§ 1-16, establishes a federal policy favoring arbitration, requiring that courts rigorously enforce agreements to arbitrate.

*Admiralty Law > Maritime Contracts > General Overview*
*Civil Procedure > Alternative Dispute Resolution > Arbitrations > General Overview*
*Transportation Law > Interstate Commerce > Definition of Commerce*
[HN17]§ 2 of the Federal Arbitration Act (FAA), 9 U.S.C.S § 2, provides that a written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract. The words "involving commerce" are to be interpreted broadly, since the FAA embodies Congress' intent to provide for the enforcement of arbitration agreements within the full reach of the Commerce Clause. The phrase "evidencing a transaction" simply means that the transaction in fact involves interstate commerce, even if the parties did not contemplate an interstate commerce connection.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Affirmative Defenses*
*Civil Procedure > Alternative Dispute Resolution > General Overview*
[HN18]When deciding whether the parties agreed to arbitrate a certain matter, courts generally should apply ordinary state-law principles that govern the formation of contracts. But the applicability of state law is not without limits.

*Civil Procedure > Federal & State Interrelationships > Federal Common Law > General Overview*
*Civil Procedure > Alternative Dispute Resolution > Validity of ADR Methods*
*Labor & Employment Law > Collective Bargaining & Labor Relations > Arbitration > Enforcement*
[HN19]An agreement to arbitrate is valid, irrevocable, and enforceable, as a matter of federal law save upon such grounds as exist at law or in equity for the revocation of any contract. Thus state law, whether of legislative or judicial origin, is applicable if that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally.

74 Cal. App. 4th 1105, *; 88 Cal. Rptr. 2d 664, **;
1999 Cal. App. LEXIS 829, ***; 15 I.E.R. Cas. (BNA) 865

*Civil Procedure > Alternative Dispute Resolution > General Overview*
*Contracts Law > Contract Interpretation > General Overview*
*Labor & Employment Law > Collective Bargaining & Labor Relations > Arbitration > Enforcement*
[HN20]A court may not, in assessing the rights of litigants to enforce an arbitration agreement, construe that agreement in a manner different from that in which it otherwise construes nonarbitration agreements under state law. Nor may a court rely on the uniqueness of an agreement to arbitrate as a basis for a state-law holding that enforcement would be unconscionable.

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > General Overview*
*Contracts Law > Defenses > Ambiguity & Mistake > General Overview*
*Contracts Law > Formation > Ambiguity & Mistake > General Overview*
[HN21]In applying general state-law principles of contract interpretation to the interpretation of an arbitration agreement within the scope of the Federal Arbitration Act, 9 U.S.C.S. §§ 1-16, due regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself resolved in favor of arbitration.

*Civil Procedure > Alternative Dispute Resolution > General Overview*
*Contracts Law > Defenses > Duress & Undue Influence > General Overview*
*Contracts Law > Defenses > Fraud & Misrepresentation > General Overview*
[HN22]Generally, applicable state law contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening § 2 of the Federal Arbitration Act (FAA), 9 U.S.C.S. § 2. However, the FAA pre-empts state laws which require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration.

*Admiralty Law > Maritime Contracts > Coverage*
*Civil Procedure > Alternative Dispute Resolution > Arbitrations > General Overview*
*Contracts Law > Contract Conditions & Provisions > Arbitration Clauses*
[HN23]There are only two limitations on the enforceability of arbitration clauses governed by the Federal Arbitration Act, 9 U.S.C.S. §§ 1-16: (1) they must be part of a written maritime contract or a contract evidencing a

transaction involving commerce and (2) such clauses may be revoked upon grounds as exist at law or in equity for the revocation of any contract.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Affirmative Defenses*
*Civil Procedure > Alternative Dispute Resolution > Arbitrations > Federal Arbitration Act > General Overview*
*International Trade Law > Dispute Resolution > Arbitration*
[HN24]Typically, courts look to the parties' contract and business operations in determining whether the contract falls within the scope of the Federal Arbitration Act, 9 U.S.C.S. §§ 1-16.

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > General Overview*
*Civil Procedure > Alternative Dispute Resolution > Validity of ADR Methods*
*Contracts Law > Contract Conditions & Provisions > Arbitration Clauses*
[HN25]See Cal. Civ. Proc. Code §1281.

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > Federal Arbitration Act > Arbitration Agreements*
*Contracts Law > Contract Conditions & Provisions > Arbitration Clauses*
*International Trade Law > Dispute Resolution > Arbitration*
[HN26]California law incorporates many of the basic policy objectives contained in the Federal Arbitration Act, 9 U.S.C.S. §§ 1-16, including a presumption in favor of arbitrability and a requirement that an arbitration agreement must be enforced on the basis of state law standards that apply to contracts in general.

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > Federal Arbitration Act > Arbitration Agreements*
*Contracts Law > Contract Conditions & Provisions > Arbitration Clauses*
*International Trade Law > Dispute Resolution > Arbitration*
[HN27] Cal. Civ. Proc. Code §1281, like § 2 of the Federal Arbitration Act, 9 U.S.C.S. § 2, provides that predispute arbitration agreements are valid, enforceable, and irrevocable, save upon such grounds as exist for the revocation of any contract.

74 Cal. App. 4th 1105, *; 88 Cal. Rptr. 2d 664, **;
1999 Cal. App. LEXIS 829, ***; 15 I.E.R. Cas. (BNA) 865

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > General Overview*
*Contracts Law > Contract Conditions & Provisions > Arbitration Clauses*
*Labor & Employment Law > Collective Bargaining & Labor Relations > Arbitration > General Overview*
[HN28]Mere inequality in bargaining power is not a sufficient reason to hold that arbitration agreements are never enforceable in the employment context.

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > General Overview*
*Civil Procedure > Alternative Dispute Resolution > Validity of ADR Methods*
*Labor & Employment Law > Collective Bargaining & Labor Relations > Arbitration > Enforcement*
[HN29]A predispute arbitration agreement is not invalid merely because it is imposed as a condition of employment.

*Civil Procedure > Alternative Dispute Resolution > Mandatory ADR*
*Contracts Law > Contract Conditions & Provisions > Arbitration Clauses*
*Labor & Employment Law > Collective Bargaining & Labor Relations > Arbitration > Enforcement*
[HN30]The mandatory nature of an arbitration agreement does not, by itself, render the agreement unenforceable.

*Contracts Law > Contract Conditions & Provisions > General Overview*
*Contracts Law > Defenses > Unconscionability > Adhesion Contracts*
*Contracts Law > Types of Contracts > Adhesion Contracts*
[HN31]In order for a contract to be invalidated as a contract of adhesion, the plaintiff must allege both a lack of meaningful choice about whether to accept the provision in question, and that the disputed provisions were so onesided as to be oppressive.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Affirmative Defenses*
*Civil Procedure > Alternative Dispute Resolution > Arbitrations > General Overview*
*Contracts Law > Contract Conditions & Provisions > Arbitration Clauses*
[HN32]There is nothing inherently unfair or oppressive about arbitration clauses.

*Contracts Law > Defenses > Public Policy Violations*
*Contracts Law > Defenses > Unconscionability > Adhesion Contracts*
*Contracts Law > Types of Contracts > Adhesion Contracts*
[HN33]Unconscionability has both a procedural and a substantive element. The procedural element focuses on the unequal bargaining positions and hidden terms common in the context of adhesion contracts. While courts have defined the substantive element in various ways, it traditionally involves contract terms that are so one-sided as to shock the conscience, or that impose harsh or oppressive terms.

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > General Overview*
*Civil Procedure > Alternative Dispute Resolution > Mandatory ADR*
*Contracts Law > Types of Contracts > Adhesion Contracts*
[HN34]In the context of adhesion contracts, courts have held that the inclusion of an arbitration provision is not per se unconscionable, particularly in a commercial transaction.

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > General Overview*
*Contracts Law > Contract Conditions & Provisions > Arbitration Clauses*
*Labor & Employment Law > Collective Bargaining & Labor Relations > Arbitration > Enforcement*
[HN35]Where an agreement to arbitrate exists, the parties' mutual promises to forego a judicial determination and to arbitrate their disputes provide consideration for each other. Both parties give up the same rights and thus neither gains an advantage over the other. There may be arbitration provisions which do give an advantage to one party. In those cases, however, it is not the requirement of arbitration alone which makes the provision unfair but rather the place or manner in which the arbitration is to occur. Consequently, the fact that one party later seeks to avoid his agreement to arbitrate cannot alone preclude enforcement of the agreement.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Affirmative Defenses*
*Civil Procedure > Alternative Dispute Resolution > General Overview*
[HN36]Arbitration is viewed as a common, expeditious, and judicially favored method of resolving disputes.

74 Cal. App. 4th 1105, *; 88 Cal. Rptr. 2d 664, **;
1999 Cal. App. LEXIS 829, ***; 15 I.E.R. Cas. (BNA) 865

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Affirmative Defenses*
*Civil Procedure > Alternative Dispute Resolution > Arbitrations > General Overview*
*Labor & Employment Law > Collective Bargaining & Labor Relations > Arbitration > Enforcement*
[HN37]The policy favoring arbitration cannot displace the necessity for a voluntary agreement to arbitrate. Arbitration is a matter of consent, not coercion.

*Labor & Employment Law > Wrongful Termination*
[HN38]The public policy at issue must be tethered to specific constitutional or statutory provisions to ensure that employers have adequate notice of the conduct that will subject them to tort liability to the employees they discharge. The determination of whether an employer has violated public policy depends in large part on whether the public policy alleged is sufficiently clear to provide the basis for such a potent remedy.

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > General Overview*
*Civil Procedure > Remedies > Costs & Attorney Fees > Costs*
*Contracts Law > Contract Conditions & Provisions > Arbitration Clauses*
[HN39]See Cal. Civ. Proc. Code §1284.2.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Affirmative Defenses*
*Civil Procedure > Alternative Dispute Resolution > Arbitrations > General Overview*
*Civil Procedure > Remedies > Costs & Attorney Fees > Costs*
[HN40]By enacting Cal. Civ. Proc. Code §1284.2, the Legislature has established a policy that arbitration costs are to be paid by the party incurring them unless the parties agree otherwise. Under this statutory scheme, a party is not entitled to the costs he or she incurred in arbitration absent an agreement to the contrary.

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > General Overview*
*Civil Procedure > Alternative Dispute Resolution > Mandatory ADR*
*Contracts Law > Contract Conditions & Provisions > Arbitration Clauses*
[HN41]By agreeing to arbitrate a claim, a party does not forgo the substantive rights afforded by the cause of ac-

tion; it only submits to their resolution in an arbitral, rather than a judicial, forum. It follows that a compulsory arbitration provision does not affect an employer's liability for future wrongdoing. Potential liability remains the same; only the forum is changed.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

A legal secretary brought an action against his two former employers for wrongful termination in violation of public policy, alleging that he was discharged for refusing to sign a predispute arbitration agreement requiring that work-related disputes be resolved through binding arbitration. The trial court sustained employers' demurrers without leave to amend. (Superior Court of Los Angeles County, Nos. BC185963 and BC185962, Wendell Mortimer, Jr., and Alexander H. Williams III, Judges.)

The Court of Appeal affirmed. The court held that under both federal and state law, an employee's rights to a jury trial and a judicial forum can be validly waived by agreement, even where the waiver is required as a condition of employment. As a result, those rights do not implicate a substantial public policy that would prohibit the employee's termination, absent other factors to the contrary, and no such factors were present in this case. General social policies would be advanced by not allowing the wrongful termination claim, since public policy favors the resolution of disputes through arbitration. (Opinion by Masterson, J., with Spencer, P. J., and Ortega, J., concurring.)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEAD-NOTES**
Classified to California Digest of Official Reports

**(1) Appellate Review § 128--Scope of Review--Rulings on Demurrers.** --In reviewing a ruling on a demurrer, courts treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions, or conclusions of fact or law, and also consider matters that may be judicially noticed. Further, courts give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. When a demurrer is sustained, courts determine whether the complaint states facts sufficient to constitute a cause of action. When it is sustained without leave to amend, courts decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and appellate courts reverse; if not, there has been no abuse of discretion and appellate courts

74 Cal. App. 4th 1105, *; 88 Cal. Rptr. 2d 664, **;
1999 Cal. App. LEXIS 829, ***; 15 I.E.R. Cas. (BNA) 865

affirm. The burden of proving such reasonable possibility is on the plaintiff.

**(2) Employer and Employee § 8--Employment Relationship--Duration and Termination.** --The presumption of Lab. Code, § 2922, that an employment, having no specified term, may be terminated at the will of either party on notice to the other, may be superseded by a contract, express or implied, limiting the employer's right to discharge the employee. Absent any contract, however, the employment is at will, and the employee can be fired with or without good cause. But the employer's right to discharge an at will employee is still subject to limits imposed by public policy, since otherwise the threat of discharge could be used to coerce employees into committing crimes, concealing wrongdoing, or taking other action harmful to the public weal. Accordingly, while an at-will employee may be terminated for no reason, or for an arbitrary or irrational reason, there can be no right to terminate for an unlawful reason or a purpose that contravenes fundamental public policy.

**(3) Employer and Employee § 9--Employment Relationship--Actions for Wrongful Discharge--Tortious Discharge.** --In order for an employee to state a claim for termination for an unlawful reason or a purpose that contravenes fundamental public policy, that policy must be supported by either constitutional or statutory provisions or regulations enacted under statutory authority. The policy must be public in the sense that it inures to the benefit of the public rather than serving merely the interests of the individual. The policy must have been articulated at the time of the discharge, and the policy must be fundamental and substantial. The cases in which California courts have recognized a separate tort cause of action for wrongful termination in violation of public policy generally fall into four categories, where the employee is discharged for: (1) refusal to violate a statute, (2) performing a statutory obligation, (3) exercising (or refusing to waive) a statutory or constitutional right or privilege, or (4) reporting an alleged violation of a statute of public importance. The fact that a duty or right can be modified or waived by agreement suggests that it does not confer a substantial benefit on the public.

**(4) Arbitration and Award § 5--Arbitration Agreements--Waiver of Jury and Judicial Forum.** --The rights to a jury trial and a judicial forum may be waived in an arbitration agreement. In a civil case a jury may be waived by the consent of the parties expressed as prescribed by statute (Cal. Const., art. I, § 16). Similarly, the right to a judicial forum can generally be waived by contract, e.g., by agreeing to a method of resolving a controversy, such as arbitration, that does not invoke a judicial forum. When parties agree to submit their disputes to

arbitration they select a forum that is alternative to, and independent of, the judicial.

**(5) Arbitration and Award § 5--Arbitration Agreements--Construction and Effect--Governing Law.** --In applying general state law principles of contract interpretation to the interpretation of an arbitration agreement within the scope of the Federal Arbitration Act (FAA) (9 U.S.C. §§ 1-16), due regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself resolved in favor of arbitration. Generally applicable state law contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening the FAA. However, the FAA preempts state laws which require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration. There are only two limitations on the enforceability of arbitration clauses governed by the FAA: they must be part of a written maritime contract or a contract evidencing a transaction involving commerce, and such clauses may be revoked upon grounds as exist at law or in equity for the revocation of any contract. There is nothing in the FAA indicating that the broad principle of enforceability is subject to any additional limitations under state law. In most important respects, the California statutory scheme on enforcement of private arbitration agreements (Code Civ. Proc., § 1281) is similar to the FAA.

**(6) Arbitration and Award § 5.5--Arbitration Agreements--Construction and Effect--Employment--Compulsory Arbitration.** --A compulsory predispute arbitration agreement is not rendered unenforceable just because it is required as a condition of employment or offered on a "take it or leave it" basis. An employee who signs such an agreement is obligated to submit employment-related disputes to arbitration; if he or she refuses to do so, the courts stand ready to compel arbitration.

**(7a) (7b) Employer and Employee § 9--Employment Relationship--Actions for Wrongful Discharge--Employee's Refusal to Sign Compulsory Arbitration Agreement--Public Policy.** --An employee did not state a cause of action for wrongful termination in violation of public policy by alleging that he was discharged for refusing to sign a predispute arbitration agreement requiring that work-related disputes be resolved through binding arbitration. Under both federal and state law, an employee's rights to a jury trial and a judicial forum can be validly waived by agreement, even where the waiver is required as a condition of employment. As a result, those rights do not implicate a substantial public policy that would prohibit the employee's termination, absent other factors to the contrary, and no such factors were present

Page 7

74 Cal. App. 4th 1105, *; 88 Cal. Rptr. 2d 664, **;
1999 Cal. App. LEXIS 829, ***; 15 I.E.R. Cas. (BNA) 865

in this case. General social policies would be advanced by not allowing the wrongful termination claim, since public policy favors the resolution of disputes through arbitration. The compulsory nature of the predispute arbitration agreement did not render it unenforceable on grounds of coercion or for lack of voluntariness. Neither did the agreement make the arbitration so costly an employee could not afford it; the rules provided for a hardship waiver. A federal circuit court ruling that an employee could not be forced to pay fees was not binding and was not a well-established policy in California at the time plaintiff was terminated, and would not support a violation of public policy claim against the employer.

[See 2 Witkin, Summary of Cal. Law (9th ed. 1987) Agency and Employment, § 167.]

**(8) Courts § 40--Decisions--Stare Decisis--United States Supreme Court.** --Although decisions of the United States Supreme Court are not binding with respect to state law, they are entitled to respectful consideration.

**COUNSEL:** ACLU Foundation of Southern California, David S. Schwartz and Mark D. Rosenbaum for Plaintiff and Appellant.

Luce, Forward, Hamilton & Scripps, Charles A. Bird and Kelly Capen Douglas for Defendant and Respondent Luce, Forward, Hamilton & Scripps.

Keesal, Young & Logan, Ben R. Suter, Dawn M. Schock and Lisa M. Bertain for Defendant and Respondent Keesal, Young & Logan.

Sidley & Austin, Jeffrey A. Berman and Octavio A. Pedroza for Employers Group as Amicus Curiae on behalf of Defendants and Respondents.

**JUDGES:** Opinion by Masterson, J., with Spencer, P. J., and Ortega, J., concurring.

**OPINION BY:** MASTERSON

**OPINION**

[*1109] [**667] **MASTERSON J.**

This appeal presents the question of whether an employee can state a cause of action for wrongful termination in violation of public policy where he was discharged in 1997 for refusing to sign a predispute arbitration agreement [***2] requiring that work-related disputes be resolved through binding arbitration. We conclude that the termination did not violate public policy.

BACKGROUND

In September 1993, plaintiff Donald Lagatree, a legal secretary, commenced temporary employment with the law firm of Keesal, Young & Logan (Keesal Young) in Long Beach. On March 14, 1994, Lagatree became a full-time employee of the firm. Throughout his employment with Keesal Young, Lagatree's job performance was rated satisfactory or better. He received pay raises and bonuses.

In early June 1997, Keesal Young asked Lagatree to sign an arbitration agreement, which stated: "I agree that any claims arising out of or relating to my employment or the termination of my employment with Keesal, Young & Logan ('KY&L') that KY&L may have against me or that I may have against KY&L or its present or former employees or agents shall be resolved by final and binding arbitration . . . . Notwithstanding the above, I understand that I am not required to arbitrate the following claims: discrimination claims, wage and hour claims, and other related statutory claims." The agreement provided that disputes would be heard by a panel of three retired [***3] superior court judges and that the arbitration would be conducted pursuant to the commercial arbitration rules of the American Arbitration Association. The agreement also provided that "the entire cost of the arbitration, including legal fees, shall be borne by the losing party."

Lagatree informed Keesal Young's managing partner that he did not want to submit disputes to arbitration. On or about June 30, 1997, Lagatree was discharged for refusing to sign the agreement.

Lagatree searched for another secretarial job. On September 12, 1997, he was offered a full-time position at the law firm of Luce, Forward, Hamilton & Scripps LLP (Luce Forward). He accepted the offer. On September 16, 1997, Lagatree reported to Luce Forward's Los Angeles office for his first day of work. Later that day, Lagatree was given a "Letter of Employment," which purported to "confirm[] our offer of employment to you in the position as a non-exempt legal secretary . . ., should you accept." The [*1110] letter further stated: "In the event of any dispute or claim between you and the firm (including employees, partners, agents, successors and assigns), including, but not limited to claims arising from [***4] or related to your employment or the termination of your employment, we jointly [**668] agree to submit all such disputes or claims to confidential binding arbitration, under the Federal Arbitration Act."

On September 18, 1997, his third day at Luce Forward, Lagatree told his superiors that he would not agree to arbitrate disputes. Lagatree was advised that the arbitration provision was "not negotiable" and that his continued employment was contingent upon signing the

agreement. Lagatree declined to sign the agreement and was discharged.

On February 13, 1998, Lagatree filed separate actions against Keesal Young and Luce Forward. Both complaints alleged that Lagatree had been terminated in violation of public policy for refusing to waive his constitutional rights to a jury trial and a judicial forum (U.S. Const., 1st & 7th Amends.; Cal. Const., art. I, § 3, 16). Lagatree also alleged that his discharge violated the California Unfair Competition Law ( Bus. & Prof. Code, § 17200- 17209) [1] and Civil Code section 1668. [2] The law firms demurred to the complaints, arguing that an employer does not [***5] violate public policy by discharging employees who refuse to sign a predispute arbitration agreement as a condition of employment. The demurrers were sustained without leave to amend. Lagatree filed timely appeals from the dismissals. We ordered the cases consolidated for purposes of appeal. [3]

> 1    " Section 17200 of the Business and Professions Code broadly defines 'unfair competition' as, inter alia, any 'unlawful, unfair or fraudulent business [act or] practice . . . .' 'Unlawful business activity' proscribed under section 17200 includes ' "anything that can properly be called a business practice and that at the same time is forbidden by law." ' . . . '[I]n essence, an action based on Business and Professions Code section 17200 to redress an unlawful business practice "borrows" violations of other laws and treats these violations, when committed pursuant to business activity, as unlawful practices independently actionable under section 17200 et seq. and subject to the distinct remedies provided thereunder.' " ( Farmers Ins. Exchange v. Superior Court (1992) 2 Cal. 4th 377, 383 [6 Cal. Rptr. 2d 487, 826 P.2d 730].)

[***6]
> 2    Civil Code section 1668 provides: "All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law."

> 3    Lagatree is represented by the same counsel in both cases. Because of differences in their procedural history, the cases were separately briefed on appeal.

## DISCUSSION

(1) In reviewing the ruling on a demurrer, "we are guided by long-settled rules. [HN1]'We treat the demurrer as admitting all material facts properly pleaded, but

not contentions, deductions or conclusions of fact or law. . . . [*1111] We also consider matters which may be judicially noticed.' . . . Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. . . . When a demurrer is sustained, we determine whether the complaint states facts sufficient [***7] to constitute a cause of action. . . . And [HN2]when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. . . . The burden of proving such reasonable possibility is squarely on the plaintiff." ( Blank v. Kirwan (1985) 39 Cal. 3d 311, 318 [216 Cal. Rptr. 718, 703 P.2d 58], citations omitted.)

### A. Overview of Wrongful Termination Law

(2) " Labor Code section 2922 provides in relevant part, [HN3]'An employment, having no specified term, may be terminated at the will of either party on notice to the other. . . .' [HN4]This presumption may be superseded by a contract, express or implied, limiting the employer's right to discharge the employee. . . . Absent any contract, however, [***8] the employment is 'at will,' and the employee can be fired with or [**669] without good cause. But the employer's right to discharge an 'at will' employee is still subject to limits imposed by public policy, since otherwise the threat of discharge could be used to coerce employees into committing crimes, concealing wrongdoing, or taking other action harmful to the public weal." ( Foley v. Interactive Data Corp. (1988) 47 Cal. 3d 654, 665 [254 Cal. Rptr. 211, 765 P.2d 373], citations and fn. omitted ( Foley).) "Accordingly, [HN5]while an at-will employee may be terminated for no reason, or for an arbitrary or irrational reason, there can be no right to terminate for an unlawful reason or a purpose that contravenes fundamental public policy." ( Gantt v. Sentry Insurance (1992) 1 Cal. 4th 1083, 1094 [4 Cal. Rptr. 2d 874, 824 P.2d 680], overruled on other grounds in Green v. Ralee Engineering Co. (1998) 19 Cal. 4th 66, 80, fn. 6 [78 Cal. Rptr. 2d 16, 960 P.2d 1046].) [4]

> 4    Lagatree does not dispute that he was an at-will employee.

[***9]    (3) [HN6]Our Supreme Court "[has] established a set of requirements that a policy must satisfy to support a tortious discharge claim. First, the policy must be supported by either constitutional or statutory provisions [or regulations enacted under statutory authority]. Second, the policy must be 'public' in the sense that it 'inures to the benefit of the public' rather than serving merely the interests of the individual. Third, the policy must have been articulated at the time of the discharge.

Fourth, the policy must be 'fundamental' and 'substantial.' " ( *Stevenson v. Superior Court* (1997) 16 Cal. 4th 880, 889-890 [66 Cal. Rptr. 2d 888, 941 P.2d 1157]; see *Green v. Ralee Engineering Co., supra,* 19 Cal. 4th at pp. 75-76, 79-80, 89-90.) [*1112]

"The [HN7]cases in which California courts have recognized a separate tort cause of action for wrongful termination in violation of public policy generally fall into four categories, where the employee is discharged for: [***10] (1) refusal to violate a statute . . .; (2) performing a statutory obligation . . .; (3) exercising (or refusing to waive) a statutory or constitutional right or privilege . . . ; or (4) reporting an alleged violation of a statute of public importance . . . ." ( *Pettus v. Cole* (1996) 49 Cal. App. 4th 402, 454 [57 Cal. Rptr. 2d 46], citations and fn. omitted; accord, *Green v. Ralee Engineering Co., supra,* 19 Cal. 4th at p. 76.)

" 'Yet despite its broad acceptance, the principle underlying the public policy exception is more easily stated than applied. The difficulty, of course, lies in determining where and how to draw the line between claims that genuinely involve matters of public policy, and those that concern merely ordinary disputes between employer and employee.' " ( *Stevenson v. Superior Court, supra,* 16 Cal. 4th at p. 889.) Unfortunately, " '[t]he [HN8]term "public policy" is inherently not subject to precise definition. . . .' " ( *Gantt v. Sentry Insurance, supra,* 1 Cal. 4th at p. 1094.) Thus, ". . . it is [***11] generally agreed that . . . courts should venture into this area, if at all, with great care and due deference to the judgment of the legislative branch, 'lest they mistake their own predilections for public policy . . . .' . . . [C]ourts 'should proceed cautiously' if called upon to declare public policy absent some prior legislative expression on the subject." ( *Id.* at p. 1095.)

[HN9]A claim of wrongful termination in violation of public policy must be based on a "substantial public" policy. (See *Green v. Ralee Engineering Co., supra,* 19 Cal. 4th at pp. 75-76, 89-90.) In determining whether such a policy has been violated, the courts consider whether an employer and employee could circumvent the policy by way of agreement. Plainly, not all of an employer's duties nor all of an employee's rights "inure to the benefit of the public at large rather than to a particular employer [**670] or employee." (*Foley, supra,* 47 Cal. 3d at p. 669.) The fact that a duty or right can be modified or waived by agreement suggests that it does not confer a substantial [***12] benefit on the public.

In *Foley, supra,* 47 Cal. 3d 654, the plaintiff learned that his immediate supervisor was being investigated by the Federal Bureau of Investigation for embezzlement in connection with his prior employment. The plaintiff told a company officer about the investigation. Shortly there-

after, the plaintiff was terminated. In his wrongful termination action, the plaintiff asserted that his discharge violated the "public policy that imposes a legal duty on employees to report relevant business information to management." ( *Id.* at p. 669.) The Supreme Court disagreed, finding that the plaintiff's termination did not [*1113] violate a substantial public policy. ( *Id.* at p. 670.) As the court explained in footnote 12 of its opinion: "The absence of a distinctly 'public' interest in this case is apparent when we consider that if an employer and employee were *expressly* to agree that the employer has no obligation to, and should not, inform the employer of any adverse information the employee learns about a fellow employee's background, nothing in the state's public policy would render such an agreement void. By [***13] contrast, in the previous cases asserting a discharge in violation of public policy, the public interest at stake was invariably one which could not properly be circumvented by agreement of the parties. For example, in *Tameny* [v. *Atlantic Richfield Co.* (1980)] 27 Cal. 3d 167 [164 Cal. Rptr. 839, 610 P.2d 1330, 9 A.L.R.4th 314], a contract provision purporting to obligate the employee to comply with an order of the employer directing the employee to violate the antitrust laws would clearly have been void as against public policy, and in *Petermann* [v. *International Brotherhood of Teamsters* (1959)] 174 Cal. App. 2d 184 [344 P.2d 25], a contract provision which purported to obligate the employee to commit perjury at the employer's behest would just as obviously have been invalid. Because here the employer and employee could have agreed that the employee had no duty to disclose such information, it cannot be said that an employer, in discharging an employee on this basis, violates a fundamental duty imposed on all employers for the protection of the public interest." (*Foley, supra,* 47 Cal. 3d at p. 670, fn. 12, italics in original. [***14] )

Similarly, in *Gantt v. Sentry Insurance, supra,* 1 Cal. 4th 1083, the court noted that "[t]he [HN10]obligation to refrain from . . . conduct [that violates public policy] is a 'duty imposed by law upon all employers to implement the fundamental public policies' of the state . . .; *it cannot be bargained away* . . . ." ( *Id.* at p. 1100, citing *Foley, supra,* 47 Cal. 3d at p. 670, fn. 12, italics added.)

More recently, in *Green v. Ralee Engineering Co., supra,* 19 Cal. 4th 66, the plaintiff, a quality control inspector for a manufacturer of aircraft parts, alleged that he had been discharged for complaining internally that his employer was shipping defective parts to aircraft assembly companies. Relying on footnote 12 in *Foley,* the employer argued that the employee's claim did not concern a public benefit or interest. (19 Cal. 4th at p. 84.) The Supreme Court rejected that argument, stating: "The critical distinction between the facts here and those at

74 Cal. App. 4th 1105, *; 88 Cal. Rptr. 2d 664, **;
1999 Cal. App. LEXIS 829, ***; 15 I.E.R. Cas. (BNA) 865

issue in *Foley, supra,* 47 Cal. 3d at pages 670-671, footnote [***15] 12, is that the violations of internal practices affected only the employer's interest, while here defendant's alleged misconduct potentially jeopardized airline passenger safety. Protecting airline passengers, therefore, is the relevant fundamental public [**671] policy at issue. Promoting airline safety--the subject of the federal regulations--constitutes [*1114] a policy of sufficient public importance. As plaintiff points out, travel by any common carrier inevitably concerns the public, because a common carrier's mistake or a manufacturer's defective part can cause multiple casualties." (19 Cal. 4th at p. 85.)

Post-*Foley* decisions of the Courts of Appeal have been faithful to the analysis in *Foley's* footnote 12. In *Collier v. Superior Court* (1991) 228 Cal. App. 3d 1117 [279 Cal. Rptr. 453], the plaintiff alleged that he had been discharged for notifying upper management that other employees were possibly engaged in illegal conduct on the job, including bribery, embezzlement, tax evasion, drug trafficking, and violations of federal antitrust laws. In holding that the employee had adequately pleaded a public policy claim, the [***16] court stated:

"The public nature of the interest at stake in this case becomes apparent under the hypothetical test suggested in the margin of the *Foley* decision. (47 Cal. 3d at p. 670, fn. 12.) In explaining why there was no public interest in the case before it, the court [in *Foley*] noted that if an employer and employee expressly agreed that the employee had no obligation to, and should not, inform the employer of any adverse information the employee learned about a fellow employee's background, nothing in the state's public policy would render such an agreement void. . . . This is because the adverse information in *Foley* served only the employer's interest, not the public's interest, and thus there was no public interest at stake in preventing such report.

"That is a critical distinction between the facts alleged in *Foley* and those in this case. . . . [T]he burden of suspected misconduct in this case was not confined to the interests of the employer alone. An agreement prohibiting an employee from informing anyone in the employer's organization about reasonably based suspicions of ongoing criminal conduct by coworkers would be a disservice not [***17] only to the employer's interests, but also to the interests of the public and would therefore present serious public policy concerns not present in *Foley.*" ( *Collier v. Superior Court, supra,* 228 Cal. App. 3d at pp. 1124-1125, followed in *Gould v. Maryland Sound Industries, Inc.* (1995) 31 Cal. App. 4th 1137, 1149-1150 [37 Cal. Rptr. 2d 718] [employer violates public policy by terminating employee for reporting to management that company was violating wage and hour laws].)

In *Holmes v. General Dynamics Corp.* (1993) 17 Cal. App. 4th 1418 [22 Cal. Rptr. 2d 172], the plaintiff, who worked for a defense contractor, informed his superiors that the company was overbilling the government. Despite a commendable work record, the plaintiff was discharged. He sued [*1115] for wrongful termination, alleging that he had been discharged for reporting violations of the federal False Statements Act (18 U.S.C. § 1001), which prohibits the making of knowingly false statements to any federal department or agency.

In affirming a jury verdict in the plaintiff's favor, the Court of Appeal acknowledged that, in [***18] *Foley,* ". . . the court explained [that] the absence of a substantial public interest was 'apparent' because the employer and employee could have properly agreed the employee should not inform the employer of any such adverse information about a co-employee's background. . . . Here, by contrast, it would be clearly improper for [the employer] to prohibit employees, particularly employees such as [the plaintiff,] whose job was to monitor contract performance, from reporting or disclosing suspected violations of governmental contracts." (17 Cal. App. 4th at p. 1433.)

Finally, in a pair of cases addressing whether workplace drug-testing programs violate an employee's right of privacy under the state Constitution (Cal. Const., art. I, § 1), two Courts of Appeal, although [**672] reaching opposite conclusions, are noteworthy because they both applied the analysis set forth in *Foley's* footnote 12.

In *Semore v. Pool* (1990) 217 Cal. App. 3d 1087 [266 Cal. Rptr. 280], the plaintiff was discharged for refusing to take a random drug test (a pupillary reaction eye test). He filed suit for wrongful termination, alleging a violation of his right [***19] of privacy. The trial court sustained the employer's demurrer without leave to amend, finding that the employer had a compelling interest in a drug-free workplace, that the drug test at issue was nonintrusive, and that employees should expect to be tested in such a manner to determine their fitness for work. ( *Id.* at p. 1093.)

The Fourth District Court of Appeal reversed. In doing so, the court found that the employer and employee could not have entered into a valid contract obligating the employee to take a drug test. The court stated: "While plaintiff could contractually agree not to assert his right to privacy, we think it clear that the employer could not use such an agreement to circumvent the public policy favoring privacy, and the employer could not successfully enforce such a contractual agreement if it intruded on plaintiff's right to privacy. . . . If the intrusion violates the right to privacy, it is illegal whether or not it is pursuant to an agreement. If pursuant to such an agreement, the agreement would be unenforceable because it would

be against public policy." (217 Cal. App. 3d at p. 1097, citation and fn. omitted.)

In *Luck v. Southern Pacific Transportation Co. (1990) 218 Cal. App. 3d 1 [267 Cal. Rptr. 618],* [***20] the plaintiff was terminated for refusing to submit a [*1116] urine sample as part of an unannounced drug test. She, too, based her public policy claim on the state constitutional right of privacy. A jury returned a verdict in her favor, and the employer appealed. The First District Court of Appeal held that the public policy claim was without merit. The court relied in part on *Foley's* footnote 12, as follows: "Measured against the *Foley* standard, [the plaintiff] did not state a cause of action for wrongful termination in violation of public policy. The right to privacy is, by its very name, a private right, not a public one. The parties could have lawfully agreed that [the plaintiff] would submit to urinalysis without violating any public interest. Such an agreement between [the plaintiff] and [the employer] would not have been against public policy. . . . Therefore, under *Foley,* there was no violation of *public* policy." (218 Cal. App. 3d at p. 28, italics in original.) [5]

> 5  In *Luck,* the plaintiff sued not only for wrongful termination but also for breach of the covenant of good faith and fair dealing. In reviewing the covenant claim, the court held that a private employer must have a "compelling interest" to justify an invasion of its employees' privacy. (218 Cal. App. 3d at pp. 17-24 & fn. 13.) The California Supreme Court subsequently disapproved *Luck* on that point. (See *Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal. 4th 1, 56-57 [26 Cal. Rptr. 2d 834, 865 P.2d 633].)

[***21] In accordance with the foregoing authorities, we first identify the alleged rights underlying Lagatree's wrongful termination claim. We then determine whether those rights can be "bargained away" (*Gantt v. Sentry Insurance, supra,* 1 Cal. 4th at p. 1100) or "circumvented by agreement of the parties" (*Foley, supra,* 47 Cal. 3d at p. 670, fn. 12). If so, we consider other factors, if any, bearing on whether Lagatree's claim is supported by a substantial public policy. Applying that analysis here, we ultimately conclude that the rights at issue are subject to waiver by agreement and that additional factors weigh against the recognition of a public policy claim. As a result, the demurrers were properly sustained without leave to amend. (See *Foley, supra,* 47 Cal. 3d at p. 670 & fn. 12, 254 Cal. Rptr. [**673] 211, 765 P.2d 373; *Green v. Ralee Engineering Co., supra,* 19 Cal. 4th at pp. 75-76, 89-90, 78 Cal. Rptr. 2d 16, 960 P.2d 1046.)

**(4)** The rights underlying Lagatree's claim are easily identified: an individual's constitutional rights to a jury

trial and a judicial forum for the resolution of disputes. The question thus becomes whether those rights can be waived by agreement. As a general [***22] rule, they are subject to waiver.

With respect to the right to trial by jury, our Constitution provides: "A [HN11]jury may be waived in a criminal cause by the consent of both parties expressed in open court by the defendant and the defendant's counsel. In a civil cause a jury may be waived by the consent of the parties expressed as prescribed by statute." (Cal. Const., art. I, § 16.) [HN12]Under the Code of Civil [*1117] Procedure, "[t]rial by jury may be waived . . . by the . . . parties to an issue of fact in any of [several] ways." ( Code Civ. Proc., § 631, subd. (a).) [6]

> 6  Section 631, subdivision (a), of the Code of Civil Procedure lists the ways in which a jury trial can be waived, including the filing of a written consent with the court, the making of an oral statement in open court which is entered in the minutes or docket, the failure to appear at trial, the failure to announce in a timely manner that a jury is required, and the failure to make a timely deposit of jury fees.

[***23] Indeed, in criminal cases, even where the defendant's life is at stake, a jury can be waived. (See, e.g., *People v. Scott* (1997) 15 Cal. 4th 1188, 1207-1210 [65 Cal. Rptr. 2d 240, 939 P.2d 354].) As for waiver in civil actions, one court has noted: "[T]he [HN13]California Constitution cannot be read to prohibit individuals from waiving, in advance of any pending action, the right to trial by jury in a civil case. [P] Our conclusion is supported by those cases upholding the validity of arbitration agreements." ( *Trizec Properties, Inc. v. Superior Court* (1991) 229 Cal. App. 3d 1616, 1618 [280 Cal. Rptr. 885].) It therefore appears that, as a general matter, the right to a jury trial can be bargained away. [7]

> 7  Inherent in an arbitration agreement is a waiver of trial by jury--a waiver that is not precluded by the Constitution or the Code of Civil Procedure. (See *Madden v. Kaiser Foundation Hospitals* (1976) 17 Cal. 3d 699, 712-714 [131 Cal. Rptr. 882, 552 P.2d 1178], construing Cal. Const., art. I, § 16, and Code Civ. Proc., § 631, subd. (a).)

[***24] Similarly, [HN14]the right to a judicial forum can generally be waived by contract: "[I]t has always been understood without question that parties could eschew [a] jury trial . . . by agreeing to a method of resolving [a] controversy, such as arbitration, which does not invoke a judicial forum. . . . [P] . . . [P] [HN15]When parties agree to submit their disputes to arbitration they

select a forum that is alternative to, and independent of, the judicial . . . ." ( *Madden v. Kaiser Foundation Hospitals, supra,* 17 Cal. 3d at pp. 713-714.)

While helpful, these general observations do not end our analysis. More specifically, we examine whether a predispute arbitration agreement is valid where (1) an employer insists on such an agreement as a condition of employment, and (2) an employee signs the agreement to avoid being discharged. That question, in turn, requires an understanding of the Federal Arbitration Act (FAA) (9 U.S.C. § 1-16) and its California counterpart.

[***25] B. *Enforcement of Arbitration Agreements*

"The FAA was designed 'to overrule the judiciary's long-standing refusal to enforce agreements to arbitrate,' . . . and to place such agreements ' 'upon the same footing as other contracts[.]' ' . . . While Congress was no [*1118] doubt aware that the Act would encourage the expeditious resolution of disputes, its passage 'was motivated, first and foremost, by a congressional desire to enforce agreements into which parties had entered.' " ( *Volt Info. Sciences v. Leland Stanford Jr. U.* (1989) 489 U.S. 468, 478 [109 S. Ct. 1248, 1255, 103 L. Ed. 2d 488], citations omitted.) "The [HN16]Arbitration [**674] Act thus establishes a 'federal policy favoring arbitration,' . . . requiring that 'we rigorously enforce agreements to arbitrate.' " (*Shearson/American Express, Inc.* v. *McMahon* (1987) 482 U.S. 220, 226 [107 S. Ct. 2332, 2337, 96 L. Ed. 2d 185].) [8]

8    State courts have concurrent jurisdiction to enforce the FAA. ( *Moses H. Cone Hospital v. Mercury Constr. Corp.* (1983) 460 U.S. 1, 25 [103 S. Ct. 927, 941-942, 74 L. Ed. 2d 765].)

[***26] [HN17]

Section 2 of the FAA provides that "[a] written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." (9 U.S.C. § 2.) The words "involving commerce" are to be interpreted broadly since the FAA "embodies Congress' intent to provide for the enforcement of arbitration agreements within the full reach of the Commerce Clause." ( *Perry v. Thomas* (1987) 482 U.S. 483, 490 [107 S. Ct. 2520, 2526, 96 L. Ed. 2d 426]; accord, *Allied-Bruce Terminix Cos. v. Dobson* (1995) 513 U.S. 265, 273-275 [115 S. Ct. 834, 839-840, 130 L. Ed. 2d 753].) The phrase "evidencing a transaction" simply means that "the 'transaction' in fact 'involv[es]' interstate commerce, even if the parties did not contemplate an interstate commerce [***27]

connection." ( *Allied-Bruce Terminix Cos. v. Dobson, supra,* 513 U.S. at p. 281 [115 S. Ct. at p. 843].)

In determining whether a predispute arbitration agreement is enforceable under the FAA, the Supreme Court has, on occasion, indicated that substantive federal law--a federal common law of contracts--should apply. (See, e.g., *Mitsubishi Motors v. Soler Chrysler-Plymouth* (1985) 473 U.S. 614, 625-626 [105 S. Ct. 3346, 3353-3354, 87 L. Ed. 2d 444]; *Southland Corp.* v. *Keating* (1984) 465 U.S. 1, 10-16 & fn. 9 [104 S. Ct. 852, 855-861, 862-864, 79 L. Ed. 2d 1]; *id.* at pp. 19-21 (conc. and dis. opn. of Stevens, J.); *Moses H. Cone Hospital v. Mercury Constr. Corp., supra,* 460 U.S. at pp. 24-25 [103 S. Ct. at pp. 941-942].) More recently, however, the court has stated that "[w]hen [HN18]deciding whether the parties agreed to arbitrate a certain matter . . ., courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." ( *First Options of Chicago, Inc. v. Kaplan* (1995) 514 U.S. 938, 944 [115 S. Ct. 1920, 1924, 131 L. Ed. 2d 985].) [***28] But the applicability of state law is not without limits: "We note . . . the choice-of-law issue that arises when defenses such as . . . unconscionability . . . are [*1119] asserted. In instances such as these, the text of § 2 [of the FAA] provides the touchstone for choosing between state-law principles and the principles of federal common law envisioned by the passage of that statute: [HN19]An agreement to arbitrate is valid, irrevocable, and enforceable, as a matter of federal law . . ., 'save upon such grounds as exist at law or in equity for the revocation of any contract.' . . . Thus state law, whether of legislative or judicial origin, is applicable if that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally. A state-law principle that takes its meaning precisely from the fact that a contract to arbitrate is at issue does not comport with this requirement of § 2. . . . [HN20]A court may not, then, in assessing the rights of litigants to [***29] enforce an arbitration agreement, construe that agreement in a manner different from that in which it otherwise construes nonarbitration agreements under state law. Nor may a court rely on the uniqueness of an agreement to arbitrate as a basis for a state-law holding that enforcement would be unconscionable . . . ." ( *Perry v. Thomas, supra,* 482 U.S. at p. 492, fn. 9 [107 S. Ct. at p. 2527], citations and italics omitted.)

(5) "[I]n [HN21]applying general state-law principles of contract interpretation to the interpretation of an arbitration agreement within the scope of the Act . . ., due [**675] regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself resolved in favor of arbitration." ( *Volt Info. Sciences v. Leland Stanford Jr. U., supra,* 489 U.S. at pp. 475-476 [109 S. Ct. at p. 1254], cita-

74 Cal. App. 4th 1105, *; 88 Cal. Rptr. 2d 664, **;
1999 Cal. App. LEXIS 829, ***; 15 I.E.R. Cas. (BNA) 865

tion omitted.) "[G]enerally [HN22]applicable [state law] contract defenses, such as fraud, [***30] duress or unconscionability, may be applied to invalidate arbitration agreements without contravening § 2." ( *Doctor's Associates, Inc. v. Casarotto* (1996) 517 U.S. 681, 687 [116 S. Ct. 1652, 1656, 134 L. Ed. 2d 902].) However, ". . . the FAA pre-empts state laws which 'require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration.' " ( *Volt Info. Sciences v. Leland Stanford Jr. U., supra,* 489 U.S. at p. 478 [109 S. Ct. at p. 1255].)

"We [HN23]discern only two limitations on the enforceability of arbitration [clauses] governed by the Federal Arbitration Act: [(1)] they must be part of a written maritime contract or a contract 'evidencing a transaction involving commerce' and [(2)] such clauses may be revoked upon 'grounds as exist at law or in equity for the revocation of any contract.' We see nothing in the Act indicating that the broad principle of enforceability is subject to any [*1120] additional limitations under State law." (*Southland Corp.* v. *Keating, supra,* 465 U.S. [***31] at pp. 10-11 [104 S. Ct. at p. 858].) [9]

> 9  Thus, the FAA preempts a state statute that permits wage claims to be brought in court even though the claimant agreed to arbitrate them. ( *Perry v. Thomas, supra,* 482 U.S., at pp. 489-491 [107 S. Ct. at pp. 2525-2526] [California Labor Code section 229 is preempted].) Further, state laws cannot mandate that arbitration agreements bear special notice provisions. ( *Doctor's Associates, Inc. v. Casarotto, supra,* 517 U.S. at pp. 684, 686-688 [116 S. Ct. at pp. 1654-1655, 1655-1657] [FAA preempts Montana statute requiring that notice of arbitration clause be typed in underlined capital letters on first page of contract].)

As stated, the FAA applies to "a contract evidencing a transaction involving commerce." [HN24] (9 U.S.C. § 2.) Typically, courts look to the parties' contract [***32] and business operations in determining whether the contract falls within the scope of the FAA. ( *Ideal Unlimited Services v. Swift-Eckrich, Inc.* (D.P.R. 1989) 727 F. Supp. 75, 76.) Here, "[t]here is no showing that [Lagatree,] while performing his duties under the employment contract[,], was working 'in' commerce, was producing goods for commerce, or was engaging in activity that affected commerce, within the meaning of [the FAA]." ( *Bernhardt v. Polygraphic Co.* (1956) 350 U.S. 198, 200-201 [76 S. Ct. 273, 275, 100 L. Ed. 199].) [10] Nevertheless, the parties in this case have relied on decisions construing the FAA and so shall we. (See *Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal. 4th 951, 971-972 [64 Cal. Rptr. 2d 843, 938 P.2d 903].) [11]

> 10  The Luce Forward agreement explicitly provides that it is to be governed by the FAA, while the Keesal Young agreement is silent on the matter. We express no opinion on the effect, if any, of the provision in the Luce Forward agreement.

> 11  Section 1 of the FAA provides that the act does not apply to "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." (9 U.S.C. § 1.) Lagatree argues that this exemption covers *all* types of employment, such that the FAA does not apply to *any* employment contracts. That position is not without support. The Ninth Circuit recently adopted it. ( *Craft v. Campbell Soup Co.* (9th Cir. 1998) 161 F.3d 1199.) However, nine other circuits have construed the exemption narrowly, finding that it applies only to employees actually engaged in the transportation of goods in commerce. (See *id.* at p. 1202, fn. 5 [listing circuits]; *Koveleskie v. SBC Capital Markets, Inc.* (7th Cir. 1999) 167 F.3d 361, 363-364 [same].) Under the majority view, Lagatree would not be exempt from the FAA (assuming he satisfies the commerce requirement). In any event, given the basis for our decision, we need not construe or apply the section 1 exemption.

[***33]  Moreover, the question of the FAA's applicability appears to be academic. As one court has recognized: "[I]t is unclear what difference it would make if this case were deemed to be outside the scope of the [**676] FAA. The parties' agreement would still be a contract that waives [the employee's] right to a judicial forum for employment-related claims and agrees to submit those claims to arbitration. [The employer] would still have the right to seek enforcement of that contract. Although the applicability of the FAA may be significant in the sense that the statute prescribes certain procedural rules that might not otherwise obtain, we have little doubt that, even if an [*1121] arbitration agreement is outside the FAA, the agreement still may be enforced . . . ." ( *Cole v. Burns Intern. Security Services* (D.C.Cir. 1997) 105 F.3d 1465, 1472 [323 App.D.C. 133].)

Assuming arguendo that the FAA does not apply, we would assess the validity of the parties' arbitration agreements under the California Arbitration Act (CAA) ( Code Civ. Proc., § 1280- 1294.2). Like the FAA, the CAA provides: [HN25]"A [***34] written agreement to submit to arbitration an existing controversy or a controversy thereafter arising is valid, enforceable and irrevocable, save upon such grounds as exist for the revocation of any contract." ( Code Civ. Proc., § 1281.) [12] "California [HN26]law incorporates many of the basic policy

objectives contained in the Federal Arbitration Act, including a presumption in favor of arbitrability . . . and a requirement that an arbitration agreement must be enforced on the basis of state law standards that apply to contracts in general . . . ." ( _Engalla v. Permanente Medical Group, Inc., supra,_ 15 Cal. 4th at pp. 971-972, citations omitted.)

12 As our Supreme Court has commented, the phrase "revocation of any contract" is "something of a misnomer. 'Offers are "revoked." ' . . . Contracts are extinguished by rescission.' " ( _Engalla v. Permanente Medical Group, Inc., supra,_ 15 Cal. 4th at p. 973.)

[***35] Consequently, we need not decide whether the FAA applies. Even if it does not, we would reach the same result under the virtually identical provision of the CAA. "In most important respects, the California statutory scheme on enforcement of private arbitration agreements is similar to the [FAA]; the similarity is not surprising, as the two share origins in the earlier statutes of New York and New Jersey. . . . [HN27] Code of Civil Procedure section 1281, like section 2 of the [FAA], provides that predispute arbitration agreements are 'valid, enforceable and irrevocable, save upon such grounds as exist for the revocation of any contract.' " ( _Rosenthal v. Great Western Fin. Securities Corp._ (1996) 14 Cal. 4th 394, 406 [58 Cal. Rptr. 2d 875, 926 P.2d 1061], citations omitted.) [13]

13 As originally drafted, Assembly Bill No. 858 (1999-2000 Reg. Sess.) would have prohibited employers from requesting or requiring employees to enter into a predispute arbitration agreement. The Assembly passed the bill on June 4, 1999. In the Senate, the bill was amended several times before it was passed and returned to the Assembly on September 10, 1999. The Assembly did not concur in the Senate amendments and sent the bill to a conference committee on the last day of the 1999 legislative calendar. The bill, or a similar one, may be considered next year. However, even if the bill becomes law, it would not have any bearing on this appeal: "[T]o support a tort action for wrongful discharge, 'the policy in question . . .' . . . must be . . . 'well established' _at the time of the discharge._" ( _Stevenson v. Superior Court, supra,_ 16 Cal. 4th at p. 889, italics added; accord, _Foley, supra,_ 47 Cal. 3d at p. 668.)

[***36] C. _Compulsory Arbitration Agreements_

We now turn to the question of the enforceability of predispute arbitration agreements imposed as a condition of employment. As noted, if they are [*1122] enforce-able, then an employee's rights to a jury trial and a judicial forum can be bargained away. And if a right or duty can be waived by agreement, it is not rooted in a substantial public policy, absent other factors to the contrary.

In _Gilmer v. Interstate/Johnson Lane Corp._ (1991) 500 U.S. 20 [111 S. Ct. 1647, 114 L. Ed. 2d 26] ( _Gilmer_), the plaintiff [**677] was required by his employer to register as a securities representative with the New York Stock Exchange (NYSE). His registration application, entitled "Uniform Application for Securities Industry Registration or Transfer," commonly known as a "Form U-4," provided for the arbitration of disputes in accordance with the rules of the NYSE. Those rules mandated the arbitration of " '[a]ny controversy between a registered representative and any member or member organization arising out of the employment or termination of employment of such registered representative.' " ( _Id._ at p. 23 [111 S. Ct. at pp. 1650-1651].) [***37] A Form U-4 is a standardized form, and its execution is a condition of employment for securities broker-dealers. ( _Ibid.; Halligan v. Piper Jaffray, Inc._ (2d Cir. 1998) 148 F.3d 197, 198 & fn. 1; _Seus v. John Nuveen & Co., Inc._ (3d Cir. 1998) 146 F.3d 175, 177-178.)

The plaintiff in _Gilmer_ was discharged at age 62. He filed an action in United States District Court, alleging a violation of the Age Discrimination in Employment Act of 1967 (ADEA) (29 U.S.C. § 621 et seq.). The Supreme Court held that, despite the compulsory nature of the Form U-4, the plaintiff could not pursue a civil action and was required to arbitrate his ADEA claim. As the court stated: [HN28]"Mere inequality in bargaining power . . . is not a sufficient reason to hold that arbitration agreements are never enforceable in the employment context. . . . [T]he FAA's purpose was to place arbitration agreements on the same footing as other contracts. Thus, arbitration agreements are enforceable 'save upon such grounds as exist at law or in equity for the revocation [***38] of any contract.' 9 U.S.C. § 2. 'Of course, courts should remain attuned to well-supported claims that the agreement to arbitrate resulted from the sort of fraud or overwhelming economic power that would provide grounds "for the revocation of any contract." ' . . . There is no indication in this case, however, that [the plaintiff,] an experienced businessman, was coerced or defrauded into agreeing to the arbitration clause in his registration application. . . . [T]his claim of unequal bargaining power is best left for resolution in specific cases." (500 U.S. at p. 33 [11 S. Ct. at pp. 1655-1656], citation omitted.)

As we read _Gilmer,_ [HN29]a predispute arbitration agreement is not invalid merely because it is imposed as a condition of employment. By directing that claims of economic coercion be decided on a case-by-case basis, the court in _Gilmer_ necessarily concluded that compul-

74 Cal. App. 4th 1105, *; 88 Cal. Rptr. 2d 664, **;
1999 Cal. App. LEXIS 829, ***; 15 I.E.R. Cas. (BNA) 865

sory arbitration agreements are not [*1123] invalid per se. Put another way, under *Gilmer*, [HN30] [***39] the mandatory nature of an arbitration agreement does not, by itself, render the agreement unenforceable. This conclusion finds support in post-*Gilmer* cases.

In *Seus v. John Nuveen & Co., Inc., supra,* 146 F.3d 175, the court rejected the plaintiff's assertion that a Form U-4 is an invalid contract of adhesion. As the court put it, "This very argument was rejected in *Gilmer* . . . ." ( *Id.* at p. 184.) The court continued: "In [HN31]order for a contract to be invalidated as a contract of adhesion, the plaintiff 'must allege both a lack of meaningful choice about whether to accept the provision in question, and that the disputed provisions were so onesided as to be oppressive.' . . . The district court found . . . that the terms of [the] Form U-4 were neither oppressive nor unconscionable. . . . We agree." (*Ibid.*; accord, *Koveleskie v. SBC Capital Markets, Inc., supra,* 167 F.3d at pp. 366-367 [Form U-4 not an unconscionable contract of adhesion where it was offered on "take it or leave it" basis]; *Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith* (1st Cir. 1999) 170 F.3d 1, 17 [***40] [Form U-4 not invalid even though arbitration provision was nonnegotiable, and employer would not hire person who refused to sign form].) [14]

14 In *Duffield v. Robertson Stephens & Co.* (9th Cir. 1998) 144 F.3d 1182, the Ninth Circuit held that the Civil Rights Act of 1991 (Pub.L. No. 102-166, 105 Stat. 1071) invalidates compulsory arbitration agreements with respect to statutory discrimination claims. Because the Civil Rights Act of 1991 does not apply to common law actions for wrongful termination, *Duffield* is not applicable here.

[**678] Similarly, in *Beauchamp v. Great West Life Assur. Co.* (E.D.Mich. 1996) 918 F. Supp. 1091, the court held that a Form U-4 was not an invalid contract of adhesion. Citing *Gilmer*, the court concluded that the form was not unconscionable. ( *Id.* at pp. 1098-1099.) The court also commented that "[u]nder plaintiff's theory, practically every condition of employment would be an 'adhesion contract' which could not [***41] be enforced because it would have been presented to the employee by the employer in a situation of unequal bargaining power on a 'take it or leave it' basis." ( *Id.* at p. 1098.)

Nor is *Gilmer* limited to employment in the securities industry. In *Kelly v. UHC Management Co., Inc.* (N.D.Ala. 1997) 967 F. Supp. 1240, the plaintiff employees, who worked for United HealthCare Corporation, signed an acknowledgment form and received an employee handbook mandating the arbitration of employment-related disputes. When the employees filed an action alleging race discrimination, the employer moved

to stay the proceedings so that the parties could proceed with arbitration. In attempting to avoid arbitration, the employees asserted that the arbitration provisions had been offered on a "take it or leave it" basis. ( *Id.* at p. 1257.) They also claimed [*1124] that "the arbitration policy was a mandatory condition of employment [since] an employee's choice was to accept the agreement to arbitrate employment disputes or discontinue his or her employment . . . ." ( *Id.* at p. 1257, fn. 17.) The court enforced the arbitration clause, [***42] stating: "[A]ssuming *arguendo* that the arbitration agreements are adhesive--i.e., that they were offered on a take it or leave it basis with no opportunity for bargaining on the part of the plaintiffs--the agreements to arbitrate are nonetheless valid and enforceable. . . . '[HN32][T]here is nothing inherently unfair or oppressive about arbitration clauses.' . . . In fact, . . . the FAA shows a strong federal policy in favor of arbitration. . . . Second, nothing about the present agreement is unconscionable or overbearing. It simply requires the plaintiffs to submit their employment claims to arbitration rather than sue in court. In light of the strong federal policy in favor of arbitration, this agreement is not unconscionable." (967 F. Supp. at p. 1257, citations and fn. omitted; see *id.* at pp. 1250-1251 [discussing *Gilmer*]; accord, *Lang v. Burlington Northern R. Co.* (D.Minn. 1993) 835 F. Supp. 1104.)

And in *Rhode v. E & T Investments, Inc.* (M.D.Ala. 1998) 6 F. Supp.2d 1322, the court applied *Gilmer* to a dispute [***43] involving the purchase of a mobilehome. There, the purchase agreement contained an arbitration clause, and the parties also executed a separate arbitration agreement. The buyer filed a civil action against the seller and the manufacturer of the home, alleging breach of contract, among other things. The defendants moved to compel arbitration. In response, the buyer argued that the arbitration provisions were unconscionable. He predicted that " 'if all manufacturers and dealers [of mobilehomes] require the execution [of an arbitration agreement] as a condition precedent to closing the sale, the consumer is put into the unenviable position of either having to acquiesce to the seller's will or live in a tent.' " ( *Id.* at p. 1328.) The court rejected the unconscionability argument, concluding that the buyer "fail[ed] to allege any facts to support the finding that arbitration would preclude [him] from bringing his claims against Defendants or that an arbitrator could not award [the] full panoply of relief available [under the] law." (*Ibid.*)

Turning our attention to California case law, we find the same trend. In *24 Hour Fitness, Inc. v. Superior Court* (1998) 66 Cal. App. 4th 1199 [78 Cal. Rptr. 2d 533], [***44] the plaintiff employee signed an arbitration [**679] agreement and certified that she had read the employer's personnel handbook, which described the arbitration process in detail. The employee later filed

Page 16

74 Cal. App. 4th 1105, *; 88 Cal. Rptr. 2d 664, **;
1999 Cal. App. LEXIS 829, ***; 15 I.E.R. Cas. (BNA) 865

suit, alleging that she had been constructively discharged as a result of sexual harassment. In an effort to avoid arbitration, she relied on the CAA, arguing [*1125] that the arbitration agreement was unconscionable. [15] The court found the agreement to be valid, explaining:

15 To be specific, the employee invoked section 1281 of the Code of Civil Procedure, which, like section 2 of the FAA, provides that arbitration agreements are valid, enforceable, and irrevocable, save upon such grounds as exist for the revocation of any contract.

"[U]nconscionability [HN33]has both a procedural and a substantive element . . . . The procedural element focuses on the unequal bargaining [***45] positions and hidden terms common in the context of adhesion contracts. . . . While courts have defined the substantive element in various ways, it traditionally involves contract terms that are so one-sided as to 'shock the conscience,' or that impose harsh or oppressive terms. . . . [16]

16 "[T]here is a 'sliding scale relationship between the two concepts [of procedural and substantive unconscionability]: the greater the degree of substantive unconscionability, the less the degree of procedural unconscionability that is required to annul the contract or clause. . . .' " ( Ilkhchooyi v. Best (1995) 37 Cal. App. 4th 395, 410 [45 Cal. Rptr. 2d 766], citations omitted.)

"[The plaintiff's] attempt to invalidate the arbitration clause for unconscionability rests primarily on the undisputed fact that it was presented to her as part of an adhesion contract, i.e., " ' 'a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing [***46] party only the opportunity to adhere to the contract or reject it.' " . . .' . . . Even assuming the circumstances here amount to procedural unconscionability, [the plaintiff] must still show the existence of a factual issue as to substantive unconscionability to defeat summary judgment . . . She has not done so. . . . [P] Nor does she suggest any concrete reason why the terms of the agreement are unduly harsh, oppressive or one-sided." (24 Hour Fitness, Inc. v. Superior Court, supra, 66 Cal. App. 4th at pp. 1212-1213, citations omitted; see Perdue v. Crocker National Bank (1985) 38 Cal. 3d 913, 925, fn. 9 [216 Cal. Rptr. 345, 702 P.2d 503] [discussing analytical framework of unconscionability doctrine].) [17]

17 In 24 Hour Fitness, the court distinguished Stirlen v. Supercuts, Inc. (1997) 51 Cal. App. 4th 1519 [60 Cal. Rptr. 2d 138], stating: "In Stirlen, the unconscionable arbitration clause relegated all employee claims to arbitration while allowing the

employer to enforce its rights in court . . .; restricted the discovery available to employees, but not [the] employer . . .; and unilaterally deprived employees, but not [the] employer, of significant statutory and common law remedies . . . . Here, in contrast, the arbitration clause applies equally to employer and employee; allows both parties substantially the same array of discovery procedures available in civil actions; and does not create an imbalance in remedies potentially available to either side." (66 Cal. App. 4th at p. 1213, citations omitted.)

[***47] In the same vein, the plaintiff employees in Brookwood v. Bank of America (1996) 45 Cal. App. 4th 1667 [53 Cal. Rptr. 2d 515] and Spellman v. Securities, Annuities & Ins. Services, Inc. (1992) 8 Cal. App. 4th 452 [10 Cal. Rptr. 2d 427], executed a Form U-4 as a condition of employment. After they were [*1126] discharged, they each filed a civil action alleging wrongful termination under state law. The courts held that the FAA required the claims to be arbitrated.

California courts have also addressed the enforceability of arbitration agreements between securities brokers and their clients. ( Macaulay v. Norlander (1992) 12 Cal. App. 4th 1 [15 Cal. Rptr. 2d 204]; Strotz v. Dean Witter Reynolds, Inc. (1990) 223 Cal. App. 3d 208 [272 Cal. Rptr. 680], overruled on other grounds in Rosenthal v. Great Western Fin. Securities [**680] Corp., supra, 14 Cal. 4th at p. 423, 58 Cal. Rptr. 2d 875, 926 P.2d 1061.) In Macaulay, a brokerage firm required all of its clients to sign an agreement containing an arbitration clause. Two clients, who had signed the agreement, filed civil actions alleging that they had been defrauded. [***48] The firm petitioned the superior court to compel arbitration of the disputes. The superior court denied the petition. The Court of Appeal reversed, noting that " '[i]n [HN34]the context of adhesion contracts, the courts have held that the inclusion of an arbitration provision is not per se unconscionable, particularly in a commercial transaction. . . .' " (12 Cal. App. 4th at p. 6, citation omitted.)

In Strotz, another broker/client case, the court stated: "Where [HN35]an agreement to arbitrate exists, the parties' mutual promises to forego a judicial determination and to arbitrate their disputes provide consideration for each other. Both parties give up the same rights and thus neither gains an advantage over the other." (223 Cal. App. 3d at p. 216.) The Strotz court acknowledged that ". . . there may be arbitration provisions which do give an advantage to one party. . . . In those cases, however, it is not the requirement of arbitration alone which makes the provision [***49] unfair but rather the place or manner in which the arbitration is to occur." ( Id. at p. 216, fn. 7.) Consequently, ". . . the fact that one party later seeks to

74 Cal. App. 4th 1105, *; 88 Cal. Rptr. 2d 664, **;
1999 Cal. App. LEXIS 829, ***; 15 I.E.R. Cas. (BNA) 865

avoid his agreement to arbitrate cannot alone preclude enforcement of the agreement." ( *Id.* at p. 216.)

Finally, in *Izzi v. Mesquite Country Club* (1986) 186 Cal. App. 3d 1309 [231 Cal. Rptr. 315], the court enforced an arbitration clause contained in a purchase agreement for a condominium, stating: "Even assuming arguendo the purchase agreement was adhesive in nature, we would still view it as enforceable. There is nothing in the circumstances of this case from which it appears the arbitration provision conflicts with the reasonable expectations of an ordinary person or is unduly oppressive or unconscionable. . . . The rules of the American Arbitration Association specified by the clause as [*1127] governing the resolution of disputes are generally regarded to be neutral and fair. [18] In other words, even if defendants did have bargaining power superior to that of plaintiffs, the application of the arbitration clause to this dispute does not engender any unjust advantage [***50] to defendants. The invocation of the adhesion doctrine is unwarranted on these facts." ( *Id.* at p. 1318, citation and fn. omitted.) [19]

18  In the present case, the Keesal Young arbitration agreement called for the application of the "commercial rules" of the American Arbitration Association (AAA). However, effective June 1, 1996, approximately one year before Lagatree was terminated, the AAA adopted special rules to govern the arbitration of employment disputes (National Arbitration Rules for the Resolution of Employment Disputes (AAA 1996)). As stated therein, "[t]he parties shall be deemed to have made *these* rules a part of their arbitration agreement whenever they have provided for arbitration by the American Arbitration Association . . . [and if] an adverse material inconsistency exists between the arbitration agreement and these rules, the arbitrator shall apply these rules." (*Id.*, rule 1, at p. 8, italics added.) The new rules were adopted to "ensure[] fairness and equity for the resolution of workplace disputes" and to "administer cases in accordance with . . . due process standards . . . ." (*Id.*, Introduction, at p. 3.) [***51]

19  Because Lagatree knew what he was being asked to sign, there is no contention that the arbitration agreements "[did] not fall within the reasonable expectations of the weaker or 'adhering' party . . . ." ( *Graham v. Scissor-Tail, Inc.* (1981) 28 Cal. 3d 807, 820 [171 Cal. Rptr. 604, 623 P.2d 165].)

D.  *Validity of the Arbitration Agreements*

**(6)**  As we have seen, the cases uniformly agree that a compulsory predispute arbitration agreement is not

rendered unenforceable just because it is required as a condition of employment or offered on a "take it or leave it" basis. An employee [**681] who signs such an agreement is obligated to submit employment-related disputes to arbitration; if he refuses to do so, the courts stand ready to compel arbitration.

**(7a)**  Yet, as Lagatree would have it, he can refuse to sign an arbitration agreement, be discharged, and strike gold with a wrongful termination suit. The law does not permit such an absurd result.

As stated, if a claim of wrongful termination in violation of public policy is based on a right or duty that can be bargained [***52] away, the claim is not rooted in a substantial public policy, absent other factors to the contrary. As one commentator has noted: "The pertinent question is whether, in the overall mix, the nature of the forum for future disputes is a subject that may be determined by contract or whether this term belongs to the nonwaivable, nonmodifiable category and, hence, is outside of the realm of contract." (Estreicher, *Predispute Agreements to Arbitrate Statutory Employment Claims* (1997) 72 N.Y.U. L.Rev. 1344, 1354.) We think it plain that, under both federal and state law, an employee's rights to a jury trial and a judicial forum can be validly waived by agreement, even where the waiver is required as a [*1128] condition of employment. As a result, those rights do not implicate a substantial public policy, absent other factors to the contrary. Here, we find that other factors reinforce the conclusion that a public policy claim should not be allowed.

To date, wrongful termination cases involving public policy violations have typically concerned employer conduct that burdened the public good with an actual detriment and conferred absolutely no benefit on the public. By [***53] way of example, in *Tameny v. Atlantic Richfield Co.* (1980) 27 Cal. 3d 167 [164 Cal. Rptr. 839, 610 P.2d 1330, 9 A.L.R.4th 314], the employer insisted that an employee participate in an illegal price-fixing scheme; in *Green v. Ralee Engineering Co.*, *supra*, 19 Cal. 4th 66, the employer retaliated against an employee for complaining to management that the company was making defective aircraft parts; in *Rojo v. Kliger* (1990) 52 Cal. 3d 65 [276 Cal. Rptr. 130, 801 P.2d 373], the employer was accused of sex discrimination; in *Petermann v. International Brotherhood of Teamsters* (1959) 174 Cal. App. 2d 184 [344 P.2d 25], the employer instructed an employee to perjure himself before a state legislative committee; and in *Hentzel v. Singer Co.* (1982) 138 Cal. App. 3d 290 [188 Cal. Rptr. 159, 35 A.L.R.4th 1015], the employer discharged an employee for protesting unsafe working conditions. In all of these cases, "general social policies [were] advanced" by permitting a wrongful termination claim in violation

of public policy. ( *Green v. Ralee Engineering Co.*, *supra*, 19 Cal. 4th at p. 75.) [***54]

Here, general social policies will be advanced by *not* allowing a wrongful termination claim. This is so because public policy favors the resolution of disputes through arbitration. To impose liability in a case such as this would thwart that policy.

By enacting the CAA, "the Legislature has expressed a 'strong public policy in favor of arbitration as a speedy and relatively inexpensive means of dispute resolution.' " ( *Moncharsh v. Heily & Blase* (1992) 3 Cal. 4th 1, 9 [10 Cal. Rptr. 2d 183, 832 P.2d 899].) "Because of the relatively low cost and efficiency of the arbitration process, an individual [employee] involved in a typical [employment] dispute frequently will find an arbitral forum more accessible than the more expensive and cumbersome court system." ( *Moore v. Conliffe* (1994) 7 Cal. 4th 634, 657 [29 Cal. Rptr. 2d 152, 871 P.2d 204].) "[A]rbitration has become an accepted and favored method of resolving disputes . . ., praised by the courts as an expeditious and economical method of relieving overburdened civil calendars . . . ." ( *Madden v. Kaiser Foundation Hospitals*, *supra*, 17 Cal. 3d at pp. 706-707.) In [***55] short, [HN36]arbitration is viewed as a "common, expeditious, and judicially favored method [of resolving disputes]." ( *Id.* at p. 707, 131 Cal. Rptr. 882, 552 P.2d 11787; accord, *Mitsubishi Motors v. Soler Chrysler-Plymouth*, *supra*, 473 U.S. at p. 633 [105 S. Ct. at p. 3357].)

[*1129] Lagatree points out that, although courts often laud the benefits of arbitration, " 'the [HN37]policy favoring arbitration cannot displace the necessity for a *voluntary* agreement to arbitrate.' " ( *Victoria v. Superior Court* (1985) 40 Cal. 3d 734, 739 [222 Cal. Rptr. 1, 710 P.2d 833], italics added and omitted; accord, *Lawrence v. Walzer & Gabrielson* (1989) 207 Cal. App. 3d 1501, 1505 [256 Cal. Rptr. 6].) "Arbitration . . . is a matter of consent, not coercion . . . ." ( *Volt Info. Sciences v. Leland Stanford Jr. U.*, *supra*, 489 U.S. at p. 479 [109 S. Ct. at p. 1256].) But, as *Gilmer* and its progeny make clear, the compulsory nature of a [***56] predispute arbitration agreement does not render the agreement unenforceable on grounds of coercion or for lack of voluntariness.

In *Seus v. John Nuveen & Co., Inc.*, *supra*, 146 F.3d 175, the court addressed the question of whether the plaintiff had knowingly and voluntarily agreed to arbitrate her statutory discrimination claims arising under federal law. The court said: "By 'knowing' and 'voluntary,' [the plaintiff] means more than with an understanding that a binding agreement is being entered and without fraud or duress. Determining whether an agreement to arbitrate is 'knowing' and 'voluntary,' in her view, requires an inquiry into such matters as the specificity of the language of the agreement, the plaintiff's education and experience, the plaintiff's opportunity for deliberation and negotiation, and whether plaintiff was encouraged to consult counsel. She does not contend that this heightened 'knowing and voluntary' standard is a *generally applicable principle of contract law*. . . . Applying that standard here would be inconsistent with the FAA and *Gilmer*. Nothing short of a showing of fraud, duress, mistake or some other ground recognized by the [***57] law *applicable to contracts generally* would have excused the district court from enforcing [the plaintiff's] agreement." ( *Id.* at pp. 183-184, italics added.)

As one federal court has accurately noted: "Arbitration clauses such as the one in *Gilmer* are, for the average employee, not the product of bargaining but a nonnegotiable adhesion contract. Consent to the arbitration clause is the price for obtaining or retaining employment." ( *Krahel v. Owens-Brockway Glass Container, Inc.* (D.Or. 1997) 971 F. Supp. 440, 448.) Even so, the courts have characterized the arbitration agreement in *Gilmer*--despite its compulsory nature--as consensual and voluntary. (See, e.g., *Penny v. United Parcel Service* (6th Cir. 1997) 128 F.3d 408, 412; *Nichols v. General Motors Co.* (S.D.Ohio 1997) 978 F. Supp. 743, 748; *Gray v. Toshiba America Consumer Products, Inc.* (M.D.Tenn. 1997) 959 F. Supp. 805, 809; see also *Securities Industry Ass'n v. Connolly* (D.Mass. 1988) 703 F. Supp. 146, 152-153 [holding, pre-*Gilmer*, that state law requirement of voluntariness cannot interfere with validity [***58] of mandatory arbitration agreement] affd. (1st Cir. 1989) 883 F.2d 1114.)

[*1130] Of significance, our own Supreme Court has observed: "In *Gilmer*, a securities representative had been *required* by his employer to register with the New York Stock Exchange. The registration application included an agreement to arbitrate any dispute arising out of the employment or termination of the employment . . . [P] The court reasoned that the plaintiff had agreed *voluntarily* to arbitrate his statutory claim . . . . [P] . . . [P] . . . In *Gilmer*, the court emphasized that *by agreeing* to arbitrate[,] the plaintiff had traded the more extensive procedures available in the federal court for the simplicity, informality, and expedition of arbitration." ( *Brosterhous v. State Bar* (1995) 12 Cal. 4th 315, 331-332 [48 Cal. Rptr. 2d 87, 906 P.2d 1242], italics added.) Accordingly, we reject Lagatree's assertion that a compulsory arbitration agreement is invalid for lack of consent or voluntariness.

[**683] Finally, Lagatree argues that an employee cannot be terminated for refusing to sign an unenforceable agreement. Specifically, he argues [***59] that the Keesal Young arbitration agreement was unenforceable because it made arbitration so costly that employees

74 Cal. App. 4th 1105, *; 88 Cal. Rptr. 2d 664, **;
1999 Cal. App. LEXIS 829, ***; 15 I.E.R. Cas. (BNA) 865

could not afford to pursue a claim. [20] His argument focuses on two provisions in the Keesal Young agreement. We address them in turn.

> 20    Lagatree does not challenge the Luce Forward agreement on this ground. (See fn. 30, *post.*)

First, the agreement stated that arbitration would be conducted in accordance with the rules of the AAA. (See fn. 18, *ante.*) Lagatree argues that the administrative fees imposed by the AAA are so high that they effectively preclude an employee from initiating arbitration. We disagree. Although the AAA rules do establish administrative fees (which include filing fees, hearing fees, and hearing room rental fees), rule 35 provides that "[t]he AAA may, in the event of extreme hardship on any party, defer or reduce the administrative fees." (National Arbitration Rules for the Resolution of Employment Disputes, *supra,* rule 35, at p. 27.) Consequently, we perceive [***60] no unfairness with regard to the AAA administrative fees. [21]

> 21    We also find that the AAA rules governing discovery and remedies are fair to claimants. "The arbitrator shall have the authority to order such discovery, by way of deposition, interrogatory, document production, or otherwise, as the arbitrator considers necessary to a full and fair exploration of the issues in dispute." (National Arbitration Rules for the Resolution of Employment Disputes, *supra,* rule 7, at pp. 12-13.) And "[t]he arbitrator may grant any remedy or relief that the arbitrator deems just and equitable, including, but not limited to, any remedy or relief that would have been available to the parties had the matter been heard in court." (*Id.,* rule 32, at pp. 25-26.)

Second, Lagatree takes issue with the provision in the Keesal Young agreement that "the entire cost of the arbitration . . . shall be borne by the losing party." Because the agreement called for a panel of three retired [*1131] superior court judges, [***61] so the argument goes, a claimant had to be prepared to pay $ 1,500 an hour in arbitrator fees if he ultimately lost the arbitration. As Lagatree sees it, Keesal Young required its employees to agree to arbitration, but failed to provide an affordable forum in which they could seek relief.

In support of that contention, Lagatree relies on *Cole v. Burns Intern. Security Services, supra,* 105 F.3d 1465. There, the District of Columbia Circuit held that, in an employment-related arbitration, an employer cannot require an employee to pay any portion of the arbitrator fees. (*Id.* at pp. 1483-1486.) The court stated: "These fees would be prohibitively expensive for an employee . .

., especially after being fired from his job, and it is unacceptable to require [him] to pay arbitrators' fees, because such fees are unlike anything that he would have to pay to pursue his statutory claims in court. . . . [P] Arbitration will occur in this case only because it has been mandated by the employer as a condition of employment. Absent this requirement, the employee would be free to pursue his claims in court without having to pay for the services of a judge. [***62] In such a circumstance--where arbitration has been imposed by the employer and occurs only at the option of the employer--arbitrators' fees should be borne solely by the employer." (105 F.3d at p. 1484.) [22]

> 22    The arbitration agreement in *Cole,* unlike the one here, gave only the employer the right to seek arbitration. (105 F.3d at p. 1469.) If an employee filed a civil action, the employer had 60 days within which to move for arbitration. (*Ibid.*) If the employer filed a civil action, the employee had no authority to compel arbitration. (*Ibid.*) We also note that *Cole* addressed the imposition of arbitrator fees in a dispute involving *statutory* claims. For purposes of this appeal, we assume that *Cole's* analysis applies to common law claims for wrongful termination in violation of public policy.

[**684] Of course, the question before us is not whether a particular provision in the Keesal Young arbitration agreement would be enforceable today. Rather, the [***63] question is whether Keesal Young violated a public policy that was "not only 'fundamental' and 'substantial,' but also '*well established*' at the time of [*Lagatree's*] discharge." ( *Stevenson v. Superior Court, supra,* 16 Cal. 4th at p. 889, italics added; accord, *Foley, supra,* 47 Cal. 3d at p. 668.) [HN38]The public policy at issue must be " '. . . tether[ed] . . . to specific constitutional or statutory provisions . . . to ensure that employers have *adequate notice* of the conduct that will subject them to tort liability to the employees they discharge . . . .' " ( *Stevenson v. Superior Court, supra,* 16 Cal. 4th at p. 889, italics added.) " '. . . Th[e] determination [of whether an employer has violated public policy] depends in large part on whether the public policy alleged is *sufficiently clear* to provide the basis for such a potent remedy.' " (*Ibid.,* italics added.) Here, in order to make that determination, we look to the state of the law as it existed in June 1997, when Keesal Young discharged Lagatree. (See [***64] *Luck v. Southern Pacific Transportation Co., supra,* 218 Cal. App. 3d at p. 29.)

[*1132] Our survey of arbitration cases convinces us that, as of June 1997, there was not a well-established policy in California against imposing arbitrator fees on the losing party in an employment-related arbitration. On

the contrary, the law authorized the use of such cost-shifting measures. Since 1961, with the enactment of the CAA (see Stats. 1961, ch. 461, § 2, pp. 1540-1552), the payment of arbitrator fees has been governed by section 1284.2 of the Code of Civil Procedure (see *Austin v. Allstate Ins. Co.* (1993) 16 Cal. App. 4th 1812, 1815 [21 Cal. Rptr. 2d 56]). That statute states: "[HN39]Unless the arbitration agreement otherwise provides or the parties to the arbitration otherwise agree, each party to the arbitration shall pay his pro rata share of the expenses and fees of the neutral arbitrator, together with other expenses of the arbitration incurred or approved by the neutral arbitrator, not including counsel fees or witness [***65] fees or other expenses incurred by a party for his own benefit." ( Code Civ. Proc., § 1284.2 (section 1284.2), added by Stats. 1961, ch. 461, § 2, p. 1545.) [23]

[23]    The CAA provides that an arbitration shall be conducted by a single neutral arbitrator unless the parties' agreement states otherwise. ( Code Civ. Proc., § 1282, subd. (a).)

In *Tipton v. Systron Donner Corp.* (1979) 99 Cal. App. 3d 501 [160 Cal. Rptr. 303], the court applied section 1284.2 in the context of an employment dispute. There, an employee had been discharged, and he challenged his termination through arbitration. The dispute was heard by a panel of three arbitrators. [24] The parties' agreement stated that "all costs, including those incurred in the court proceedings, shall be assessed against and borne by the disaffirming party." (99 Cal. App. 3d at p. 507.) In a two-to-one decision, the arbitrators found that there was good cause for the termination. [***66] In confirming the arbitration award, the trial court awarded costs to the employer for both the arbitration and the court proceedings. The trial court also ruled that the employee was liable for all of the neutral arbitrator's fees. On appeal, the employee challenged the award of costs, arguing that the fees of the neutral arbitrator-- approximately $ 10,000--should have been split between the parties. The Court of Appeal rejected that argument, finding that, under section 1284.2 and the parties' agreement, the trial court had properly imposed the entire cost of the neutral arbitrator on the [**685] employee. (99 Cal. App. 3d at pp. 507-508, 160 Cal. Rptr 303.) [25]

[24]    In accordance with the arbitration agreement, each side chose one arbitrator. Because the two arbitrators could not agree on an outcome, they selected a third, neutral arbitrator.

[25]    The employee paid his half of the fees directly to the arbitrator and, as ordered by the trial court, reimbursed the employer for the other half. (99 Cal. App. 3d at pp. 507-508.)

[***67] In *Dickinson v. Kaiser Foundation Hospitals* (1980) 112 Cal. App. 3d 952 [169 Cal. Rptr. 493], the claimant brought a medical malpractice claim against a hospital. Pursuant to the parties' agreement, the dispute was submitted to arbitration. The arbitration panel, consisting of three arbitrators, [*1133] awarded the claimant $ 655,200 in damages but directed that the parties bear their own costs. In confirmation proceedings before the trial court, the claimant requested that the award be "corrected" to reflect that he was entitled to costs of approximately $ 9,000. The trial court rejected the request and entered judgment on the award. The Court of Appeal affirmed, stating that, under the CAA (§ 1284.2), the parties were to bear their own costs unless they had agreed otherwise. Because there was no such agreement, the claimant was not entitled to costs. (112 Cal. App. 3d at p. 954; see also *Kauffman v. Shearson Hayden Stone, Inc.* (1982) 128 Cal. App. 3d 809 [180 Cal. Rptr. 566] [affirming order awarding half of arbitrator fees to prevailing party].)

Thus, [HN40] [***68] by enacting section 1284.2, "[t]he Legislature has . . . established a policy that arbitration costs are to be paid by the party incurring them [unless the parties agree otherwise]. Under this statutory scheme, [a party] is not entitled to the costs [he or] she incurred in arbitration [absent an agreement to the contrary]. We recognize that there will be instances of unavoidably high arbitration expenses disproportionate to the amount recoverable . . ., resulting in inadequate compensation to the claimants, and are sympathetic to those finding themselves in that position. We believe however, that any relief in this regard must be provided by the Legislature." ( *Austin v. Allstate Ins. Co., supra*, 16 Cal. App. 4th at p. 1817.) [26]

[26]    By its own terms, section 1284.2 governs the fees of "neutral" arbitrators, which the CAA defines as arbitrators who are "selected jointly by the parties or by the arbitrators selected by the parties . . . ." ( Code Civ. Proc., § 1280, subd. (d).) In his suit against Keesal Young, Lagatree alleged that disputes were to be resolved by a panel of three arbitrators, but he did not allege how the arbitrators were to be chosen or whether any of them would be selected jointly by the parties. Lagatree has not asserted that nonneutral arbitrators would be used, nor has he challenged the arbitration agreement on that basis. (See *Graham v. Scissor-Tail, Inc., supra*, 28 Cal. 3d at pp. 821-828.) As a result, we do not address any issues concerning the use of nonneutral arbitrators. (See *Graham v. Lenzi* (1995) 37 Cal. App. 4th 248, 259, fn. 10 [43 Cal. Rptr. 2d 407]; *MST Farms v. C. G. 1464* (1988) 204 Cal. App. 3d 304, 306 [251 Cal. Rptr. 72].)

74 Cal. App. 4th 1105, *; 88 Cal. Rptr. 2d 664, **;
1999 Cal. App. LEXIS 829, ***; 15 I.E.R. Cas. (BNA) 865

[***69]  Against this backdrop of state law, we have the February 1997 decision of the District of Columbia Circuit in *Cole v. Burns Intern. Security Services, supra,* 105 F.3d 1465, which was handed down approximately five months before Lagatree was terminated at Keesal Young. As far as we can tell, *Cole* was the first decision to hold that arbitrator fees in an employment-related arbitration cannot be imposed on an employee.

Assuming that *Cole* made its way to California in five months, we doubt that employers here would have viewed it as a source of well-established public policy. For one thing, the language in *Cole* did not readily lend itself to common law claims for wrongful termination. By way of example, the [*1134] *Cole* court stated: "[I]n *Gilmer*[, *supra,* 500 U.S. 20,] the Supreme Court endorsed a system of arbitration in which employees are not required to pay for the arbitrator assigned to hear their statutory claims. . . . Under *Gilmer,* arbitration is supposed to be a reasonable substitute for a judicial forum. Therefore, it would undermine Congress's intent to prevent employees who are seeking to vindicate [**686] statutory [***70] rights from gaining access to a judicial forum and then require them to pay for the services of an arbitrator when they would never be required to pay for a judge in court." ( *Cole v. Burns Intern. Security Services, supra,* 105 F.3d at p. 1484.)

**(8)** (see fn. 27.) Further, we question whether *Cole*--a nonbinding decision from another jurisdiction--could support a well-established public policy under California law. [27] The subsequent judicial treatment of *Cole* illustrates the pitfalls of relying on a single non-California case in attempting to determine state public policy.

27  Although decisions of the United States Supreme Court are not binding with respect to state law (see *Kelly v. Vons Companies, Inc.* (1998) 67 Cal. App. 4th 1329, 1337 [79 Cal. Rptr. 2d 763]), they are entitled to "respectful consideration" ( *People v. Guiton* (1993) 4 Cal. 4th 1116, 1126 [17 Cal. Rptr. 2d 365, 847 P.2d 45]). We express no view as to whether such a decision could support a public policy claim under California law. (Cf. *Silberg v. Anderson* (1990) 50 Cal. 3d 205, 213-214 [266 Cal. Rptr. 638, 786 P.2d 365]; *Rifkind & Sterling, Inc.* v. *Rifkind* (1994) 28 Cal. App. 4th 1282, 1289-1293 [33 Cal. Rptr. 2d 828]; *Meanley v. McColgan* (1942) 49 Cal. App. 2d 203, 209 [121 P.2d 45].)

[***71]  At least two federal circuits, the Tenth and Eleventh, have followed *Cole*. ( *Shankle v. B-G Maintenance Management of Colorado* (10th Cir. 1999) 163 F.3d 1230, 1234-1235; *Paladino v. Avnet Computer Technologies, Inc.* (11th Cir. 1998) 134 F.3d 1054, 1062). However, in a more recent decision, the Eleventh Circuit strongly suggested that *Cole* might not apply where, as here, the arbitration agreement requires that all fees and costs be paid by the losing party (as opposed to imposing all or a portion of them on the employee even if he prevails). ( *Randolph v. Green Tree Financial Corp.--Alabama* (11th Cir. 1999) 178 F.3d 1149, 1158; see also *Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, supra,* 170 F.3d at pp. 15-16 [arbitration agreement may be valid if it mandates award of fees and costs to prevailing party].)

The First and Seventh Circuits have also discussed *Cole,* but have concluded that a challenge to arbitrator fees should not be made unless and until such expenses have actually been imposed on a claimant. ( *Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, supra,* 170 F.3d at pp. 15-16; [***72] *Koveleskie v. SBC Capital Markets, Inc., supra,* 167 F.3d at p. 366.) In those circuits, ". . . the *possibility* that a plaintiff may be required to pay arbitration fees is not, by itself, a sufficient reason to invalidate an agreement to [*1135] arbitrate . . . because the arbitral panel may not in fact require the plaintiff to pay fees and, if a plaintiff believes that excessive fees have been levied against him or her, judicial review of the imposition of the fees is available after arbitration." ( *Arakawa v. Japan Network Group* (S.D.N.Y. 1999) 56 F. Supp.2d 349, 354, italics added; see *Howard v. Anderson* (S.D.N.Y. 1999) 36 F. Supp.2d 183, 186-187.) [28]

28  Plainly, under the Keesal Young agreement, if an employee were to prevail at the arbitration, he would not have to pay any portion of the arbitrator fees.

**(7b)** So, we state the obvious. As the post-*Cole* decisions indicate, a rule of law announced in one case may be modified, limited, or distinguished [***73] in later cases. For our purposes, it is sufficient to point out that the holding in *Cole,* as subsequently applied by the First and Seventh Circuits and as suggested by the Eleventh Circuit, would not support a public policy claim against Keesal Young. [29]

29  Interestingly, in *Cole* itself, the court held that the arbitration agreement was valid. There, the agreement was silent as to the allocation of arbitrator fees. (105 F.3d at pp. 1468, 1480-1481, 1485-1486.) The court stated: "[W]e hold that [the employee] could not be required to agree to arbitrate his public law claims as a condition of employment if the arbitration agreement required him to pay all or part of the arbitrator's fees and expenses. In light of this holding, we find that the arbitration agreement in this case is valid and en-

forceable. We do so because we interpret the agreement as requiring [the employer] to pay all of the arbitrator's fees . . . ." (105 F.3d at p. 1485.)

[**687] Moreover, in [***74] light of California law on the subject of arbitrator fees (i.e., section 1284.2 and the cases construing it), employers did not have "adequate notice" in June 1997 that a cost-shifting provision would violate a "clear" public policy. ( *Stevenson v. Superior Court, supra*, 16 Cal. 4th at p. 889.) Indeed, in *Tipton v. Systron Donner Corp., supra*, 99 Cal. App. 3d 501, the court enforced just such a provision. In addition, the provision in the Keesal Young agreement was mutual: It imposed arbitrator fees on the "losing party," be it the employer or the employee. In that sense, the provision was indistinguishable from a clause requiring the losing party to pay the prevailing party's attorneys' fees and costs--a clause that was undeniably valid. (See *DiMarco v. Chaney* (1995) 31 Cal. App. 4th 1809 [37 Cal. Rptr. 2d 558]; Knight et al., Cal. Practice Guide: Alternative Dispute Resolution (The Rutter Group 1999) PP 5:430-5:431, 5:434-5:434.1, rev. # 1, 1999, pp. 5-167, 5-170.)

In any event, we need not take a poll among employers or stretch the bounds of judicial notice to conclude that, in June 1997, California did not have a well-established [***75] policy against imposing arbitrator fees on the losing party in an employment-related arbitration.

Nothing in *California Teachers Assn. v. State of California* (1999) 20 Cal. 4th 327 [84 Cal. Rptr. 2d 425, 975 P.2d 622], handed down by the [*1136] Supreme Court four months ago, compels a different conclusion. There, the court held that, under the due process clause, a public school teacher threatened with suspension or dismissal cannot be required to pay half the cost of the administrative law judge (ALJ) who hears the teacher's challenge to the proposed action. The court found unconstitutional section 44944, subdivision (e), of the Education Code, which imposed half the cost of the ALJ on a teacher who did not prevail in the administrative proceeding or who prevailed at the administrative level but lost in a subsequent judicial challenge to the ALJ's decision. In reaching that conclusion, the four-member majority relied in part on *Cole v. Burns Intern. Security Services, supra*, 105 F.3d 1465. (See *California Teachers Assn. v. State of California, supra*, 20 Cal. 4th at pp. 333, 355-356.) Assuming arguendo that the high [***76] court now views *Cole* as the law in California, we note that the issue of liability here is governed by public policy as it existed two years ago. [30]

30   After the reply briefs were filed in this case, the parties submitted supplemental letter briefs

discussing the effect on this appeal, if any, of the Supreme Court's decision in *California Teachers Assn. v. State of California, supra*, 20 Cal. 4th 327. Relying on *Cole*, Lagatree argued for the first time that the Luce Forward arbitration agreement was invalid because it was silent as to (1) the allocation of arbitrator fees and (2) the availability of prehearing discovery. However, Lagatree cannot raise those issues for the first time in a letter brief. (See *Herman v. Los Angeles County Metropolitan Transportation Authority* (1999) 71 Cal. App. 4th 819, 822, fn. 3 [84 Cal. Rptr. 2d 144]; *Trustees of Capital Wholesale Electric etc. Fund v. Shearson Lehman Brothers, Inc.* (1990) 221 Cal. App. 3d 617, 626-627 [270 Cal. Rptr. 566].) This is especially so, given that Lagatree relied on *Cole* extensively in his briefs on the Keesal Young appeal but cited *Cole* only once in his briefs on the Luce Forward appeal--to explain why *Cole*, as interpreted by Luce Forward, was not applicable. In any event, as *Cole* demonstrates, an arbitration agreement that is silent on an issue is still valid because it can be interpreted in favor of the employee. (See fn. 29, ante.)

[***77] E. *Remaining Theories of Liability*

Lagatree argues that predispute arbitration provisions imposed as a condition of employment have the purpose and effect of lessening an employer's liability for its future wrongful conduct, thereby violating Civil Code section 1668's prohibition on exculpatory clauses. (See fn. 2, ante.)

As one court has commented: " 'Traditionally, the law has looked carefully and [**688] with some skepticism at those who attempt to contract away their legal liability for the commission of torts. This general policy of the common law found legislative expression early in California history with the enactment of Civil Code section 1668. This section made it clear a party could not contract away liability for his fraudulent or intentional acts or for his negligent violations of statutory law. . . .' " (*Baker Pacific Corp.* v. *Suttles* (1990) 220 Cal. App. 3d 1148, 1153 [269 Cal. Rptr. 709].)

Lagatree's contention that a compulsory arbitration provision ipso facto constitutes an invalid exculpatory clause is foreclosed as a matter of law. [*1137] "Such generalized attacks on arbitration [***78] 'res[t] on suspicion of arbitration as a method of weakening the protections afforded in the substantive law to would-be complainants,' and as such, they are 'far out of step with our current strong endorsement of . . . this method of resolving disputes.' " (*Gilmer, supra*, 500 U.S. at p. 30 [111 S. Ct. at p. 1654].) " '[B]y [HN41]agreeing to arbi-

74 Cal. App. 4th 1105, *; 88 Cal. Rptr. 2d 664, **;
1999 Cal. App. LEXIS 829, ***; 15 I.E.R. Cas. (BNA) 865

trate a . . . claim, a party does not forgo the substantive rights afforded by the [cause of action]; it only submits to their resolution in an arbitral, rather than a judicial, forum.' " ( *Id.* at p. 26 [111 S. Ct. at p. 1652].) It follows that a compulsory arbitration provision does not affect an employer's liability for future wrongdoing. Potential liability remains the same; only the forum is changed. [31]

31   Lagatree asserts that disputed issues of fact precluded the resolution of his claim under Civil Code section 1668. Not so. In both complaints, Lagatree merely alleged in conclusory fashion that compulsory predispute arbitration agreements lessen an employer's liability for future misconduct. However, the language of the arbitration agreements proves otherwise. Nothing in *Farnham v. Superior Court (1997) 60 Cal. App.* 4th 69 [70 Cal. Rptr. 2d 85], upon which Lagatree relies, is to the contrary.

[***79]   Lastly, Lagatree acknowledges that his claim under the Unfair Competition Law ( Bus. & Prof. Code, § 17200- 17209) rests on the same alleged violation of public policy that supports the wrongful termination claim. Because we have concluded that there was no violation of public policy, the unfair competition claim fails as well.

DISPOSITION

The judgments are affirmed.

Spencer, P. J., and, Ortega, J., concurred.

Appellant's petition for review by the Supreme Court was denied January 19, 2000. Mosk, J., was of the opinion that the petition should be granted.