# Exhibit A

**APPENDIX OF NON-FEDERAL AND UNPUBLISHED FEDERAL AUTHORITIES
CITED IN VISA USA INC.'S MOTION TO STAY ACTION
AND TO COMPEL ARBITRATION**

Westlaw.

Not Reported in F.Supp.2d                                                                                          Page 1
Not Reported in F.Supp.2d, 2005 WL 1048700 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

▷Anderson v. Pitney Bowes, Inc.
N.D.Cal.,2005.
Only the Westlaw citation is currently available.
United States District Court,N.D. California.
Kendricks ANDERSON, Plaintiff,
v.
PITNEY BOWES, INC., Pitney Bowes Management
Services, Inc., and Does 1 through 10, inclusive,
Defendants.
No. C 04-4808 SBA.

May 4, 2005.

Richard E. Levine, San Francisco, CA, for Plaintiff.
Eric A. Grover, Paul R. Lynd, San Francisco, CA, for
Defendants.

ORDER
ARMSTRONG, J.
*1 This matter comes before the Court on Defendant
Pitney Bowes' ("PB") [FN1] motion to compel
arbitration and stay the action pending arbitration.
Having read and considered the arguments presented
by the parties in the papers submitted to the Court,
the Court finds this matter appropriate for resolution
without a hearing. The Court hereby GRANTS
Defendant's motion to compel binding arbitration and
stay the action pending arbitration.

> FN1. Defendants include Pitney Bowes,
> Inc., Pitney Bowes Management Services,
> Inc., and Does 1 through 10. For the
> purposes of this motion, the Court will refer
> to Defendants collectively as "PB" or
> "Defendant."

I. BACKGROUND

Plaintiff Kendricks Anderson ("Anderson") filed suit
in San Francisco Superior Court, alleging, *inter alia,*
that Defendant PB illegally terminated his
employment because of his race. PB removed the
case to federal court on diversity grounds.

On September 29, 2003, Plaintiff applied for
employment with PB. (Mot. to Compel at 1.) As part
of the application process, Plaintiff signed a
Statement of Terms and Conditions ("Statement"),[FN2]

which provides that:

> FN2. The Statement is dated September 29,
> 2003. (Pyle Decl., Ex. A at 1.) However,
> Plaintiff contends that he did not sign the
> Statement, or the PB Resolve Agreement
> (*see infra*, p. 2), until January 2004.
> (Anderson Decl. at ¶ 4.) Plaintiff alleges that
> he was instructed to back-date these
> documents by a human resources
> representative. (*Id.*) This factual dispute is
> irrelevant to the Court's decision, as
> Plaintiff's five causes of action all stem from
> wrongful termination, which allegedly
> occurred in June 2004, at least six months
> after Plaintiff alleges he signed the
> documents. (*See, e.g.,* Compl. at ¶¶ 20-40.)

As a condition of your employment, you will be
required to sign and comply with a PB Resolve
Agreement. The PB Resolve Agreement requires,
among other provisions, that all covered disputes you
may have with the Company and the Company may
have with you, be submitted to the Company's
alternate dispute resolution process ["PB Resolve"]
which includes full and final resolution of disputes
through a four-step process, ending with binding
arbitration.
(Pyle Decl., Ex. A at ¶ 1(c).) Plaintiff also signed the
PB Resolve Agreement ("Agreement"), which
requires the parties to submit any claims related to
termination, violation of public policy, and
discrimination to binding arbitration.[FN3] (*See id.,* Ex.
B at 1.) On the first page, in bold font, the Agreement
states that, "By signing the Agreement You are
specifically acknowledging that you have had an
opportunity to review the PB Resolve Program
Manual and agree to abide by its terms."(*Id.*
(capitalization and emphasis in original).) The
Agreement further provides that:

> FN3. For the purposes of this motion,
> Plaintiff does not dispute that the
> Agreement, if valid and binding, covers all
> claims raised in his complaint.

The Arbitrator shall have the exclusive authority to
resolve any dispute relating to the interpretation,
applicability, enforceability or formation of this

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 2
Not Reported in F.Supp.2d, 2005 WL 1048700 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

Agreement, including but not limited to any claim that all or any part of this Agreement is void or voidable.... The Arbitrator shall have jurisdiction to hear and rule on pre-hearing disputes....

(*Id.* at 2.) The last paragraph of the Agreement reads as follows:

*Voluntary Agreement*

I ACKNOWLEDGE THAT I HAVE CAREFULLY READ THIS AGREEMENT, THAT I UNDERSTAND ITS TERMS, THAT ALL UNDERSTANDINGS AND AGREEMENTS BETWEEN THE COMPANY AND ME RELATING TO THE SUBJECTS COVERED IN THE AGREEMENT ARE CONTAINED IN IT, AND THAT I HAVE ENTERED INTO THE AGREEMENT VOLUNTARILY AND NOT IN RELIANCE ON ANY PROMISES OR REPRESENTATIONS BY THE COMPANY OTHER THAN THOSE CONTAINED IN THIS AGREEMENT ITSELF. I UNDERSTAND THAT BY SIGNING THIS AGREEMENT I AM GIVING UP MY RIGHT TO A JURY TRIAL.

(*Id.* at 4 (capitalization and emphasis in original).) Directly underneath the "Voluntary Agreement" section is a separate line for an employee to initial acknowledgment of this paragraph. *Id.* Neither party disputes that Plaintiff did not place his initials on this separate line. The parties also do not dispute, however, that Plaintiff signed on the signature line at the end of the Agreement.

*2 Defendant now seeks to compel arbitration based on the executed Statement and Agreement. Defendant contends that the Court must order arbitration on all issues, including the gateway issues of arbitrability. In opposition, Plaintiff argues that the Court, as opposed to the arbitrator, must determine arbitrability. Plaintiff further alleges that his conscious refusal to initial the "Voluntary Agreement" paragraph shows that Plaintiff did not agree to arbitrate his claims against PB. Finally, Plaintiff argues that the Agreement is unenforceable because it is both substantively and procedurally unconscionable.[FN4] Because the Agreement clearly and unmistakably provides an arbitrator with exclusive jurisdiction to decide issues of arbitrability, the Court GRANTS Defendant's motion to compel and stay the action pending arbitration.

FN4. Plaintiff contends that the Agreement is unconscionable because it was (1) offered to him on a "sign-it-or-lose-your-job" basis;

(2) lacking in mutuality, and (3) unduly restrictive in its discovery limitations. (Opp. to Def's Mot. to Compel ("Opp.") at 13-17 (citing *Fitz v. NCR Corp.,* 118 Cal.App.4th 702, 13 Cal.Rptr.3d 88 (2004))). Plaintiff does not, however, contend that the paragraph arguably giving the arbitrator the power to decide arbitrability is unconscionable.

## II. DISCUSSION

### A. Legal Standard

The dispositive issue is who should decide arbitrability: the Court or an arbitrator. A dispute is arbitrable if: (1) there was an agreement to arbitrate between the parties; and (2) the agreement covers the dispute. *Howsam v. Dean Witter Reynolds, Inc.,* 537 U.S. 79, 83-4, 123 S.Ct. 588, 154 L.Ed.2d 491 (2002). "Arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Steelworkers v. Warrior & Gulf Nav. Co.,* 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). The question whether parties have submitted a particular dispute to arbitration, i.e., the "question of arbitrability," is generally an issue for judicial determination. *AT & T Technologies, Inc. v. Communications Workers,* 475 U.S. 643, 649, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986). Parties are free, however, to contract around this default rule by assigning the determination of arbitrability to an arbitrator. *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995).

The issue of who should decide arbitrability turns on what the parties agreed to in their contract. *Id.* at 943. "When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally ... should apply ordinary state law principles that govern the formation of contracts."[FN5] *Id.* at 944. There is a presumption that the parties did not agree to submit questions regarding the arbitrator's jurisdiction to that same arbitrator.[FN6] Consequently, if the contract is silent or ambiguous, the Court decides arbitrability. *Id.* at 944-45; *Dream Theater,* 124 Cal.App.4th at 553, 21 Cal.Rptr.3d 322. However, if the parties "clearly and unmistakably" empowered an arbitrator to determine arbitrability, the Court must compel arbitration of the gateway issues as well. *AT & T Technologies,* 475

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 3
Not Reported in F.Supp.2d, 2005 WL 1048700 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

U.S. at 649;*Dream Theater*, 124 Cal.App.4th at 553, 21 Cal.Rptr.3d 322;*Parker v. Twentieth Century-Fox Film Corp.*, 118 Cal.App.3d 895, 901-04, 173 Cal.Rptr. 639 (Ct.App.1981) (parties did not expressly provide arbitrator with authority to decide his or her own jurisdiction). Even then, the Court must examine the underlying contract to determine whether the parties have in fact agreed to commit the question of arbitrability to the arbitrator. *Freeman v. State Farm Mut. Auto. Ins. Co.*, 14 Cal.3d 473, 480, 121 Cal.Rptr. 477, 535 P.2d 341 (1975); *Dream Theater*, 124 Cal.App.4th at 553, 21 Cal.Rptr.3d 322;*Airline Pilots Ass'n, Int'l v. Midwest Airlines Express, Inc.*, 279 F.3d 553, 555 (7th Cir.2002) ("[T]he parties to a contract can if they wish assign the determination of arbitrability of a dispute to an arbitrator-but then the question whether they have done that is for the court.")."If the issues in a case are within the reach of the Agreement," the court must, upon request by either party, grant a stay of the action pending arbitration. *In re Complaint of Hornbeck Offshore Corp.*, 981 F.2d 752, 754 (5th Cir.1993) (internal quotations omitted).

> FN5. Both parties agree that California law governs this aspect of the dispute. In any event, California courts often look to federal law in deciding arbitration issues and "California law is consistent with federal law on the question of who decides disputes over arbitrability."*Dream Theater, Inc. v. Dream Theater*, 124 Cal.App.4th 547, 553, 21 Cal.Rptr.3d 322 (Ct.App.2004).

> FN6. The general presumption favoring arbitration is reversed when deciding *who* primarily should decide arbitrability, as opposed to *"whether* a particular merits related-dispute is arbitrable because it is within the scope of a valid arbitration agreement."*First Options*, 514 U.S. at 944;*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.* 473 U.S. 614, 626, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985) (general presumption concerning the scope of arbitrable issues in favor of arbitration). The presumption is reversed because the question of who decides whether a dispute is arbitrable is "rather arcane. A party often might not focus upon that question or upon the significance of having arbitrators decide the scope of their own powers."*First Options*, 514 U.S. at 945.

## B. Analysis

*3 Defendant contends that the parties' Agreement expressly and exclusively assigned questions of arbitrability to an arbitrator. In response, Plaintiff contends that the Court must decide: (1) whether the Agreement is unconscionable; and (2) the significance of Plaintiff's failure to initial the "Voluntary Agreement" paragraph. However, Plaintiff does not cite a single case in support of his proposition that the Court may determine arbitrability when the underlying contract unquestionably empowers an arbitrator with this authority. (*See, e.g.,* Opp. at 7-11.) Instead, Plaintiff attempts to distinguish the four cases upon which Defendant relies and makes a policy argument: if the Court compels arbitration, it will lose all authority to decide the enforceability of an unconscionable agreement simply because an employer has so provided in the text of a contract. (*Id.* at 8.)

The Agreement "clearly and unmistakably" provides an arbitrator with the exclusive authority to determine whether the Agreement is unenforceable. *AT & T Technologies*, 475 U.S. at 649;*First Options*, 514 U.S. at 944-45. The Agreement mandates that "the Arbitrator shall have *exclusive authority* to resolve any dispute relating to the *interpretation,applicability*, or *enforceability* or *formation* of this Agreement, including ... any claim that all or any part of this Agreement is *void or voidable.*"(Pyle Decl., Ex. B at 2 (emphasis added).) Neither a court nor an arbitrator is free to ignore this provision in the Agreement. The parties unambiguously expressed their intent to submit the question of unconscionability to an arbitrator by giving him or her the exclusive power to decide the Agreement's formation, enforceability, applicability and whether all or any part of it is void or voidable. *See, e.g., Armendariz v. Foundation Health Psychcare Servs.*, 24 Cal.4th 83, 113-14, 99 Cal.Rptr.2d 745, 6 P.3d 669 (2000) (unconscionability renders a contract unenforceable); *Three Valleys Municipal Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1141 (9th Cir.1991) ("If the dispute is within the scope of an arbitration agreement, an arbitrator may properly decide whether a contract is 'voidable' because the parties have agreed to arbitrate the dispute."). This language also evidences a clear intent that an arbitrator would decide the significance, if any, of Plaintiff's failure to initial one of the Agreement's paragraphs.[FN7]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-05585-JSW    Document 28-2    Filed 01/04/2008    Page 5 of 85
Not Reported in F.Supp.2d                                                                                                                    Page 4
Not Reported in F.Supp.2d, 2005 WL 1048700 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

FN7. Plaintiff contends that no agreement to arbitrate *exists* because of his failure to initial the "Voluntary Agreement" paragraph. However, Plaintiff fully admits that he signed two documents, the Statement and the Agreement, both of which unambiguously evidence the parties intent to submit certain disputes exclusively to arbitration. Further, the "Voluntary Agreement" paragraph states that: "I UNDERSTAND THAT BY SIGNING THIS AGREEMENT I AM GIVING UP MY RIGHT TO A JURY TRIAL."(Pyle Decl., Ex. B at 4 (emphasis in original).) Consequently, a PB employee forfeits his right to a jury trial *when he signs the Agreement*, not when he places his initials by the "Voluntary Agreement" paragraph. (*See id.*)Although Plaintiff states in his declaration that he did not initial this paragraph because he never intended to agree to arbitrate (Anderson Decl. at ¶ 8), a party's hidden intentions are immaterial to the determination of mutual assent. *See, e.g.*, *Horacek v. Smith*, 33 Cal.2d 186, 193, 199 P.2d 929 (1948) (undisclosed intentions irrelevant); 1 WITKIN SUM. CAL. LAW CONTRACTS S § 119 (9th ed.2004) (mutual assent is determined by the parties' overt acts, not their hidden intentions); *Zurich General Acc. & Liability Assur. Co. v. Industrial Acc. Com.*, 132 Cal.App. 101, 104, 22 P.2d 572 (1933) ("The apparent mutual assent of the parties, essential to the formation of a contract, must be gathered from the language employed by them ... It judges of his intention by his outward expressions and excludes all questions in regard to his unexpressed intention. If his words or acts, judged by a reasonable standard, manifest an intention to agree in regard to the matter in question, that agreement is established, and it is immaterial what may be the real but unexpressed state of his mind on the subject."). Plaintiff's execution of both the Statement and the Agreement objectively manifest his intent to agree to arbitrate certain disputes, including arbitrability. (*See* Pyle Decl., Ex. B at 2 ("The Arbitrator shall have the exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of this Agreement, including but not limited to any claim that all or any part of this Agreement is void or voidable.").) Whatever significance his failure to initial may have on the arbitrator's decision regarding the Agreement's enforceability, it does not impact the Court's determination that a contract to arbitrate between the parties exists.

Courts have found agreements to submit arbitrability to arbitrators with similar contractual language. *See, e.g.*, *Airline Pilots*, 279 F.3d at 556 ("[W]hen an arbitration clause is so broadly worded that it encompasses disputes over the scope or validity of the contract in which it is embedded, issues of the contract's scope or validity are for the arbitrators."). In fact, courts have found agreements to commit arbitrability to the arbitrator with contractual language that is much less "clear and unmistakable." In *Dream Theater*, for example, the sellers of a multimedia and entertainment business contended that the arbitration clause in their contract of sale did not apply to them because it was limited to third party indemnity claims. 124 Cal.App.4th at 550, 21 Cal.Rptr.3d 322. The arbitration clause only specified that arbitration would be "in accordance with the AAA Commercial Arbitration Rules."*Id.* The AAA Rules, in turn, provided "that the arbitrator 'shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement.'"*Id.* However, this language was not actually present in the agreement; a contracting party needed extrinsic materials to understand that they were forfeiting their right to have a court determine arbitrability.*Id.* Despite this, the *Dream Theater* court held that the contractual language was "clear and unmistakable" evidence that the parties intended an arbitrator, rather than the court, to decide whether their dispute was subject to arbitration. *Id.* at 549, 21 Cal.Rptr.3d 322. Here, the Agreement's arbitration clause facially gives an arbitrator the exclusive authority to determine his or her own jurisdiction; one need not reference extrinsic materials, such as the AAA Rules, to determine whether the parties intended an arbitrator to decide arbitrability. Because the parties clearly and unmistakably committed the issue of arbitrability to the arbitrator, the Court compels arbitration.

**\*4** Plaintiff argues that *Dream Theater* is inapplicable

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                    Page 5
Not Reported in F.Supp.2d, 2005 WL 1048700 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

because the court dealt with an indemnity issue, as opposed to an unconscionability argument. However, the *Dream Theater* court evaluated the same issue as this Court faces. The issue is not indemnity or unconscionability, but rather *who* decides whether an arbitration clause actually binds a party to arbitrate their claima court, or an arbitrator. 124 Cal.App.4th at 551-52, 21 Cal.Rptr.3d 322. Further, Plaintiff makes no effort to explain why this distinction, even if correct, would compel an opposite result.

Plaintiff also contends that the Court must decide the unconscionability and "failure to initial" arguments because the "*Dream Theater* court, while ultimately holding that the arbitrator did have the authority ... to arbitrate the claim in question, construed and interpreted the agreement, examined the evidence of the parties intentions, and made its decision."(Opp. at 11.) Plaintiff misunderstands the scope of a court's review under these circumstances. The Court, by conducting a *facial and limited review* of the contract, must only decide whether the parties have in fact clearly and unmistakably agreed to commit the question of arbitrability to the arbitrator. *See, e.g.,* United Steelworkers of America v. American Mfg. Co., 363 U.S. 564, 567-68 (1960); *Airline Pilots, 279 F.3d at 555;Dream Theater,* 124 Cal.App.4th at 553, 21 Cal.Rptr.3d 322 (determining who decides arbitrability "necessarily requires the courts to examine and, *to a limited extent,* construe the underlying agreement"); *Johnston Boiler Co. v. Local Lodge No. 893, 753 F.2d 40, 43 (6th Cir.1985).* The Supreme Court explained in *United Steelworkers* that:

The function of the court is very limited when the parties have agreed to submit all questions of contract interpretation to the arbitrator. It is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract. Whether the moving party is right or wrong is a question of contract interpretation for the arbitrator. In these circumstances the moving party should not be deprived of the arbitrator's judgment, when it was his judgment and all that it connotes that was bargained for.

*United Steelworkers of America, 363 U.S. at 567-68.* It would be error for the Court to determine the merits of Plaintiff's argument, i.e. whether the Agreement is unenforceable, when the parties clearly submitted that question to an arbitrator. *See id.*

Plaintiff conflates two separate issues: 1) *who* decides

arbitrability; and 2) *whether* a dispute is actually arbitrable. If there is a dispute over *who* decides, a court must determine if the parties unambiguously vested this authority with an arbitrator. When a court concludes that the parties clearly empowered an arbitrator with this decision, however, it would defy logic, tread on the prerogative of the arbitrator, and deprive the parties of their contract if a court were then to turn around and decide this very issue itself. *See, e.g., id.;AT & T Technologies, 475 U.S. at 649-50.* The *Dream Theater* court recognized this problem, and did not exceed the scope of its authority in conducting a limited review to determine solely whether the parties in fact agreed to submit arbitrability issues to an arbitrator. *Dream Theater,* 124 Cal.App.4th at 552-55, 21 Cal.Rptr.3d 322.

*\*5 Plaintiff erroneously contends that the Supreme Court's decisions in *AT & T* and *First Options*"absolutely reject[ ] the position argued for by Pitney Bowes here."(Opp. at 9 (emphasis in original).) In *AT & T Technologies v. Communications Workers,* the Court reaffirmed the basic principles of arbitration. As quoted above, the first principle is that " 'arbitration is a matter of contract.' "*AT & T Technologies, 475 U.S. at 648* (citing *Warrior & Gulf, 363 U.S. at 582 & United Steelworkers of America, 363 U.S. at 570-71 (1960)* (Brennan, J., concurring)). The second rule, which Plaintiff partially quotes, is that the question of arbitrability is generally for a court. Plaintiff's quotation, however, leaves out the very next sentence of the Court's decision: "Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator."*Id.* at 649 (emphasis added). Here, the parties did in fact "clearly and unmistakably" contract around the default rule established by the *AT & T* Court. *See supra* at 5-8.

Similarly, Plaintiff misconstrues the Supreme Court's analysis in *First Options.*As stated by the Court:
We believe the answer to the "who" question [ ] is fairly simple. Just as the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute [ ], so the question "who has the primary power to decide arbitrability" turns upon what the parties agreed about that matter. Did the parties agree to submit the arbitrability question itself to arbitration?

*First Options, 514 U.S. at 943.* The Supreme Court

Not Reported in F.Supp.2d                                                    Page 6
Not Reported in F.Supp.2d, 2005 WL 1048700 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.2d)**

then affirmed the Court of Appeals finding that the dispute was subject to independent review by the courts "because the Kaplans did not clearly agree to submit the question of arbitrability to arbitration."*Id. at 947.*Here, conversely, the Agreement unquestionably provides an arbitrator with exclusive jurisdiction over arbitrability issues.

Finally, Plaintiff argues that compelling arbitration in this case will divest a court of jurisdiction to decide an arbitration agreement's enforceability, including a clearly adhesive one. The Court is not free, however, to ignore the clear intent of the parties' contract. The basic objective is to ensure that arbitration agreements, just like all contracts, "are enforced according to their terms."*First Options,* 514 U.S. at 947 (internal quotations omitted). Further, arbitration, and other forms of alternate dispute resolution, frequently divest courts of cases and issues which they would normally adjudicate. Finally, Plaintiff's argument that the Court will retain no power after compelling arbitration is incorrect. If the arbitrator determines that the Agreement is unconscionable and consequently unenforceable, the Court will then decide Plaintiff's employment dispute. The parties can also return to the Court and request that it either vacate or confirm the arbitrator's final award. Plaintiff's policy argument, without any legal authority, simply does not compel a different result. Because arbitration is a matter of contract, and the Agreement is unmistakably clear, the Court GRANTS Defendant's motion to compel arbitration.

**\*6** Defendant also requests that this Court stay proceedings pending the arbitrator's determination. Plaintiff does not address this point in his opposition. The Federal Arbitration Act provides that:

If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3. The stay provision is mandatory: "If the issues in a case are within the reach of the Agreement, the district court has no discretion under section 3 to deny the stay."*Hornbeck Offshore Corp.,*

981 F.2d at 754 (5th Cir.1993) (internal quotations omitted). Because the parties agreed to arbitrate the issue of arbitrability, the Court GRANTS Defendant's motion for a stay as a matter of course.

### III. CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED THAT Defendant's Motion to compel arbitration and stay the action pending arbitration [Docket No. 8] is GRANTED.

IT IS SO ORDERED.

N.D.Cal.,2005.
Anderson v. Pitney Bowes, Inc.
Not Reported in F.Supp.2d, 2005 WL 1048700 (N.D.Cal.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit B

**APPENDIX OF NON-FEDERAL AND UNPUBLISHED FEDERAL AUTHORITIES
CITED IN VISA USA INC.'S MOTION TO STAY ACTION
AND TO COMPEL ARBITRATION**

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 1147662 (D.D.C.)
(Cite as: Not Reported in F.Supp.2d)

Page 1

**C**
Avue Technologies Corp. v. DCI Group, L.L.C.
D.D.C.,2006.
Only the Westlaw citation is currently available.
United States District Court,District of Columbia.
AVUE TECHNOLOGIES CORP., Movant,
v.
DCI GROUP, L.L.C., Respondent.
**Civil Action No. 06-327(JDB).**

April 28, 2006.

Andrew H. Marks, Peter Jacobs Eyre, Crowell &
Moring LLP, Washington, DC, for movant Avue
Technologies, Corp.
Robert Lee Gulley, Lathrop & Gage, Washington,
DC, Jill Holtzman Vogel, Holtzman Vogel PLLC,
Warrenton, VA, Richard Nelson Bien, Lathrop &
Gage L.C., Kansas City, MO, for respondent DCI
Group, L.L.C.

### MEMORANDUM OPINION
JOHN D. BATES, District Judge.
**\*1** Movant Avue Technologies Corporation ("Avue"
) brings this action seeking a stay of arbitration with
respect to certain claims submitted by respondent
DCI Group, LLC ("DCI"). The claims relate to
Avue's obligations pursuant to an agreement to
make certain payments for "journo-lobbying"
services provided by Tech Central Station ("TCS"),
a division of DCI. For the reasons that follow, the
Court will deny Avue's motion and dismiss this
action.

### BACKGROUND

Avue is a Delaware corporation with its principal
place of business in Tacoma, Washington. Avue's
Mot. Stay at 2 ¶ 3. Avue is engaged in the business
of providing employment-related "
technology-based solutions" for government
agencies. *Id.* DCI is a limited liability company with

its principal place of business in Arizona. Notice of
Removal at ¶ 2. DCI provides lobbying services,
using its many contacts in the legislative and
executive branches to further the agendas of its
various clients. Avue's Mot. Stay at 2 ¶ 4.

On March 9, 2004, Avue and DCI entered into a
consulting agreement ("Consulting Agrmt."),
pursuant to which DCI would "assist and advise
[Avue] with respect to agreed-upon legislative and
administrative initiatives," Consulting Agrmt. at 1 §
1, for the sum of $20,000 per month, *id.* at 2 § 4.
The Consulting Agreement was made retroactively
effective as of December 1, 2003.*Id.* at 2. By that
time, DCI had already been providing services to
Avue for many months. DCI's Opp'n at 7. The
Consulting Agreement "shall be deemed to have
been made in the State of Arizona, and shall be
construed and enforced in accordance with the law
of the State of Arizona, without reference to
principles of conflicts of laws thereof."Consulting
Agrmt. at 3 § 8(b). The document places strict
limits on modifications, providing that no
modification will be effective unless both in writing
and signed by the parties. *Id.* at 3 §§ 6, 7. There is
also an integration clause, which states that
[t]his Consulting Agreement constitutes the entire
Agreement between the parties with respect to the
subject matter hereof, and supercedes [sic] any and
all agreements, negotiations, communications,
writings, and understandings, either oral or written,
between the parties hereto with respect to the
rendering of Services by Consultant for Client and
contains all of the covenants and agreements
between the parties with respect to the rendering of
such services in any manner whatsoever. Each party
to this Agreement acknowledges that no
representations, inducements, promises, or
agreements, orally or otherwise, have been made by
any party, or anyone on behalf of any party, which
are not embodied herein, and that no other
agreement, statement, or promise not contained in
this Agreement shall be valid or binding.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 1147662 (D.D.C.)
**(Cite as: Not Reported in F.Supp.2d)**

*Id.* at 3 § 7. Finally, the Consulting Agreement includes a broad, but standard, arbitration clause, pursuant to which[a]ny claim, dispute, controversy or other matter in question with regard to this Agreement shall exclusively be subject to final binding arbitration in accordance with the Commercial Arbitration rules and regulations of the American Arbitration Association (AAA).... The parties or the arbitrators, as appropriate, shall undertake the duties of the AAA under the AAA rules. All arbitrations shall be conducted in the State of Arizona.

**\*2** *Id.* at 3 § 8(c).

Sometime "in or about December 2003," Avue and DCI reached an oral understanding ("TCS Agreement") that TCS (a division of DCI that is a daily online publication concerning science, technology, and politics) would generate favorable publicity about Avue's products through various journo-lobbying initiatives.[FN1]Avue's Mot. Stay at 3 ¶ 9. Pursuant to the TCS Agreement, Avue agreed to pay DCI an additional $20,000 per month. Neither party contests the existence of the Consulting Agreement or the existence of the TCS Agreement, and no dispute regarding the quality of services provided by DCI pursuant to either agreement is currently before the Court. DCI claims that it billed Avue for services performed under the Consulting and TCS Agreements from December 2003 through August 2004, during which time Avue remitted the agreed-upon payments-a total of $40,000 per month-without complaint. *See* DCI's Opp'n at 7. Thereafter, however, DCI alleges that Avue stopped making payments without cause.

> FN1. "Journo-lobbying" is the process through which communication channels are used to disseminate positive press pieces that masquerade as genuine news stories created by independent journalists. Pl's. Mot. Stay at 3 ¶ 9.

On November 28, 2005, DCI initiated an arbitration proceeding with the American Arbitration Association ("AAA"), based upon its interpretation of the arbitration clause contained in the Consulting Agreement, in an attempt to obtain the unremitted payments. Avue filed a document entitled "Answering Statement and Counterclaims" on December 19, 2005, in which it contended that the claims related to the TCS Agreement were improperly submitted for arbitration because the TCS Agreement is not part of the Consulting Agreement and, accordingly, is not subject to the arbitration clause contained in the Consulting Agreement.

On February 1, 2006, Avue filed in D.C. Superior Court a motion to stay arbitration under the D.C. Arbitration Act, D.C.CODE ANN. § 16-4302, seeking to sever the TCS-related claims from the arbitration proceedings. Avue's Mot. Stay at 1. DCI timely filed a notice of removal to this Court pursuant to 28 U.S.C. § 1441. In this action, Avue contends that the TCS Agreement is outside the scope of the services defined in § 1 of the Consulting Agreement and, furthermore, cannot be viewed as a modification of the Consulting Agreement because there is no written memorialization of the TCS initiative. Avue's Mot. Stay at 3-4 ¶ 10. Avue interprets the integration clause of the Consulting Agreement strictly, arguing that it flatly precludes any modification or supplementation that is not in written format. Avue also contends that the parties never agreed that disputes arising from the TCS Agreement would be submitted to arbitration. *Id.* at 4 ¶ 11.

DCI, on the other hand, claims that § 1 of the Consulting Agreement deliberately employs flexible language to describe the services that comprise the subject of the contract. The language was intended to be vague and amorphous, according to DCI, because the parties desired the flexibility of defining (and redefining) those services throughout the evolution of their professional relationship. *See* DCI's Opp'n at 7-8. Hence, DCI submits that the TCS Agreement is part of the Consulting Agreement-specifically, that "journo-lobbying" services fall within the ambit of "agreed upon legislative and administrative" initiatives. As a fallback argument, DCI submits that the TCS Agreement is a supplement to or modification of the Consulting Agreement, notwithstanding the integration clause. DCI's Stmt. Claims at 3 ¶ 9.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 3

Not Reported in F.Supp.2d, 2006 WL 1147662 (D.D.C.)
**(Cite as: Not Reported in F.Supp.2d)**

Specifically, the definition of services in § 1 is sufficiently ambiguous, according to DCI, that the Court should use the parole evidence rule to bring the TCS Agreement within the scope of the Consulting Agreement. Under this logic, the arbitration clause in the Consulting Agreement would also apply to the TCS Agreement. DCI asserts that it fully performed its duties and that Avue has committed a breach of contract by withholding payments in the principal amount of $565,501 .51 (as of October 1, 2005). DCI seeks to recover this amount through the arbitration proceeding, as well as interest and attorney's fees. DCI's Stmt. Claims at ¶¶ 14, 17.

**\*3** Before the Court may consider the core issue of whether the TCS Agreement is subject to arbitration, it must first decide two threshold issues: (1) who is the proper entity to decide whether the TCS Agreement is part of the Consulting Agreement and thus subject to arbitration-the Court or the arbitration panel? and (2) what law applies in determining that threshold issue-federal law, Arizona law, or the law of the District of Columbia? The Court will address these issues in turn.

### LEGAL STANDARDS

The Federal Arbitration Act establishes a general policy in favor of arbitration, *see, e.g., Shearson/American Exp., Inc. v. McMahon,* 482 U.S. 220, 226, 227 (1987) (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24 (1983)); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 625-26 (1985); *Alliance Bernstein Inv. Res. & Mgmt., Inc. v. Schaffran,* 2006 WL 945341, at \*3 (2d Cir. Apr. 12, 2006), as do the arbitration statutes of the District, *see Motor City Drive LLC v. Brennan Beer Gorman Monk Architects & Interiors, PLLC,* 890 A.2d 233, 236 (D.C.2006), and Arizona, *see Harrington v. Pulte Home Corp.,* 119 P.3d 1044, 1051 (Ariz.Ct.App.2005). However, this presumption may be reversed with respect to certain gateway issues of arbitrability, *see Howsam v. Dean Witter Reynolds, Inc.,* 537 U.S. 79, 84 (2002), because arbitration is purely a matter of contract, *see AT & T Technologies, Inc. v. Communications*

*Workers of America,* 475 U.S. 643, 648 (1986), and, hence, "the question 'who has the primary power to decide arbitrability' turns upon what the parties agreed about that matter. Did the parties agree to submit the arbitrability question itself to arbitration?"*First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 943 (1995) (emphasis in original)."A party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."*AT & T Techs.,* 475 U.S. at 648. Therefore, if a court is called upon to decide the threshold issue of who decides arbitrability, it may not "assume that the parties agreed to arbitrate arbitrability unless there is 'clear and unmistakable' evidence" to that effect. *First Options,* 514 U.S. at 944. In determining whether "clear and unmistakable evidence" exists, courts should apply principles of ordinary state-law contract formation. *See id.* at 944.In the absence of sufficiently "clear and unmistakable evidence," the issue is most properly one for the court, rather than the arbitrator, to consider.*Id.; see also Howsam,* 537 U.S. at 83.

### ANALYSIS

#### I. What Law Applies?

DCI contends that, pursuant to the choice of law provision in the Consulting Agreement, the Court must apply principles of Arizona contract law in determining whether the "clear and unmistakable evidence" standard of *First Options* is satisfied. In the alternative, DCI submits that the Court should apply federal law, because the Federal Arbitration Act "governs after removal." DCI's Opp'n at 3. Avue, on the other hand, claims that the Court should apply District of Columbia contract law because DCI maintains an office and conducts business in the District, the parties discussed the TCS Agreement in the District, and the location of performance under the contract is the District. Avue's Mot. Stay at 2 ¶ 2. To apply Arizona law, Avue continues, would assume the merits of the dispute because it would require an implicit finding that the TCS Agreement is part of the Consulting Agreement.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 4

Not Reported in F.Supp.2d, 2006 WL 1147662 (D.D.C.)
**(Cite as: Not Reported in F.Supp.2d)**

**\*4** To determine what law applies, the Court must necessarily construe the Consulting Agreement-specifically, the scope of the choice of law provision (§ 8(b)). The question is whether the choice of law provision is broad enough to encompass the TCS Agreement. Hence, the Court is "constru[ing] and enforc[ing]" the choice of law provision, which, by its terms, requires that the law of Arizona be used. Moreover, in order to determine whether the TCS Agreement is part of the Consulting Agreement, the parties are calling upon the Court to interpret several other provisions of the Consulting Agreement, including: (1) the breadth and potentially ambiguous nature of the definition of contractual services in § 1; (2) the validity and effectiveness of the integration provision in § 7; (3) the scope and applicability of the arbitration provision in § 8(c); and (4) the meaning of AAA Rule R-7(a), which the parties concede is a provision of the Consulting Agreement by virtue of the fact that the arbitration provision incorporates the AAA rules in their entirety by reference. Regardless of which way the Court decides to resolve this case, it is certainly called upon to construe or enforce at least one provision of the Consulting Agreement. Hence, the correct law to apply is the law of Arizona-even with respect to the threshold arbitrability issue-as the parties have provided in their contract.

Ultimately, however, this issue is immaterial. The D.C. Arbitration Act and the Federal Arbitration Act are "materially the same in all [relevant] respects."*See Masurovsky v. Green,* 687 A.2d 198, 204 n. 3 (D.C.1997). In addition, both Arizona and the District have enacted the Uniform Arbitration Act, and, accordingly, their relevant statutory provisions are identical, *compare*D.C.CODE ANN. § 16-4302(b), *with*ARIZ. REV. STATS. ANN. § 12-1502(b). All three bodies of law also establish a general policy that strongly favors resolution of disputes through arbitration channels when a valid agreement to arbitrate exists. *See, e.g., Alliance Bernstein,* 2006 WL 945341, at \*3 (noting the strong presumption in favor of arbitration under the Federal Arbitration Act and federal case law); *Harrington,* 119 P.3d at 1051 (same with respect to Arizona state law); *Motor City Drive,* 890 A.2d at 236 (same with respect to D.C. law). Whether the Court applies federal law, Arizona law, or the law of the District, the outcome of this case is the same.

### *II. Who Decides Whether the TCS Agreement is Subject to Arbitration?*

The parties agree that § 8(c) of the Consulting Agreement incorporates the AAA arbitration rules into their contract. AAA Rule R-7(a) provides that " [t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement."Hence, the issue before the Court is whether the incorporation of the AAA rules, and specifically Rule R-7(a), by reference in the Consulting Agreement constitutes "clear and unmistakable evidence" that the parties intended to have an arbitration panel, rather than the Court, determine the gateway issue of whether the TCS Agreement is subject to arbitration. DCI contends that it does. Avue, on the other hand, asserts that " clear and unmistakable evidence" is a very demanding standard, as to which an incorporation of the AAA rules by reference comes up short. Avue's Reply at 3 & n. 2. Avue claims that it never intended, much less agreed, to relinquish its right to have a court decide such a jurisdictional issue.

**\*5** For support, Avue relies heavily on *Sapiro v. Verisign,* 310 F.Supp.2d 208 (D.D.C.2004), and *Booker v. Robert Half Int'l, Inc.,* 315 F.Supp.2d 94 (D.D.C.2004). But these cases are not directly on point. *Sapiro* did not even address an incorporation of the AAA rules, and it, like *Booker,* stands only for the proposition that a court is generally the proper entity to decide "whether [an] arbitration agreement establishes a valid contract between the parties."*See Sapiro,* 310 F.Supp.2d at 212;*Booker,* 315 F.Supp.2d at 98. Avue's reliance on these cases is misplaced because neither case discussed the " clear and unmistakable evidence" standard of *First Options,* and neither case discussed the precise issue that is presented here-who decides arbitrability. Quite simply, there are two species of issues that courts appear to classify as "arbitrability" inquiries. The first type, presented by the factual scenarios in *Sapiro* and *Booker,* concerns whether there is an agreement to arbitrate at all. The second

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 1147662 (D.D.C.)
**(Cite as: Not Reported in F.Supp.2d)**

type focuses on whether a particular issue is within a valid agreement to arbitrate. Here, DCI submits that the arbitration clause in the Consulting Agreement extends to the TCS Agreement, a classic question of the scope, not the existence, of an arbitration agreement. Because the parties agree that there is a valid arbitration clause that binds them, but disagree regarding whether its *scope* encompasses the TCS Agreement, this case implicates the second type of arbitrability issue, not the first. And the initial question, of course, is who will decide that arbitrability issue.

The distinction may at first blush appear semantic in nature, but it is indeed a matter of substance. *See First Options,* 517 U.S. at 944-45 (clarifying that the question "who (primarily) should decide arbitrability" is different from the question whether a dispute is arbitrable because it is within the scope of a valid arbitration agreement). The decisionmaker's task is the same with respect to both issues: to ascertain the intent of the parties under applicable principles of contract law. But the "rather arcane" question of who decides arbitrability warrants a reversal of normal presumptions in favor of arbitration so that courts will not assume the parties agreed to arbitrate arbitrability absent "clear and unmistakable evidence." *Id.*

*First Options* involved "silence or ambiguity about the question 'who (primarily) should decide arbitrability,' " *id.,* and on the record there the Court concluded that there was no showing of a clear agreement "to have the arbitrators decide (i.e., to arbitrate) the question of arbitrability." *Id.* at 446.Here, there is no "silence or ambiguity" in the concededly-valid arbitration agreement at issue. The arbitration clause expressly incorporates the AAA rules, which designates (in Rule R-7(a)) the *arbitrator* as the "who" referred to in *First Options.* Hence, the "clear and unmistakable" intent of the parties, reflected in Rule R-7(a)-which is part of their contract-is to have the arbitrator decide arbitrability. Moreover, the issue ultimately presented is properly framed as "whether a particular merits-related dispute is arbitrable because it is within the scope of a valid arbitration agreement." *Id.* at 944-45.On that issue, the

presumption against arbitration may not apply, and the general presumption in favor of arbitration would apply with full force. *Compare id.,* with *Mitsubishi Motors Corp.,* 473 U.S. at 626,and *Moses H. Cone Mem'l Hosp.,* 460 U.S. at 24-25. The law of the District recognizes this distinction. *See Masurovsky,* 687 A.2d at 204-05.

**\*6** Arizona cases and federal law support this outcome. The Arizona Court of Appeals has squarely held that even under the "clear and unmistakable evidence" standard, the arbitration agreement need not "specifically state that the arbitrator has the primary authority to decide the arbitrability of the issues" if the AAA rules as a whole are incorporated by reference. *Brake Masters Sys., Inc. v. Gabbay,* 78 P.3d 1081, 1087-88 (Ct.App.Ariz.2003). This holding was based upon Rule R-8(a), which was later renumbered as Rule R-7(a).*Id.* at 1085 n. 2. Likewise, the weight of authority in the federal courts overwhelmingly supports the same conclusion. *See Terminix Int'l Co., LP v. Palmer Ranch Ltd. P'ship,* 432 F.3d 1327, 1332 (11th Cir.2005); *Contec Corp. v. Remote Solution Co.,* 398 F.3d 205, 208, 209 (2d Cir.2005); *see also P & P Indus., Inc. v. Sutter Corp.,* 179 F.3d 861, 867-68 (10th Cir.1999) (finding that when a party incorporates the AAA rules by reference, it is bound by all of the procedural rules of the AAA); *Rainwater v. Nat'l Home Ins. Co.,* 944 F.2d 190, 193-94 (4th Cir.1991) (finding, before *First Options,* that a reference to AAA rules in an arbitration agreement incorporates all of those rules by reference); *Commonwealth Edison Co. v. Gulf Oil Corp.,* 541 F.2d 1263, 1272-73 (7th Cir.1976) (same); *Bryson v. Gere,* 268 F.Supp.2d 46, 52-53 (D.D.C.2003) (finding, post-*First Options,* that a reference to AAA rules in an arbitration agreement incorporates all of those rules by reference, but without discussion of the "clear and unmistakable evidence" standard).*But see Diesselhorst v. Munsey Building, L.L.L.P,* 2005 WL 327532, at \* \*3-4 (D.Md.2005) (holding that incorporation of the AAA rules by reference does not rise to the level of "clear and unmistakable evidence" that the parties intended to have an arbitrator decide threshold issues of arbitrability). Both the Second Circuit in *Contec* and the Eleventh Circuit in *Terminix* have expressly concluded that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 1147662 (D.D.C.)
**(Cite as: Not Reported in F.Supp.2d)**

the incorporation of the AAA rules, and specifically Rule R-7(a), empowering an arbitrator to decide issues of arbitrability serves as clear and unmistakable evidence of an agreement by the parties to have the arbitrator decide issues of the scope of an arbitration clause (*i.e.*, arbitrability).*See Contec,* 398 F.3d at 208;*Terminix,* 432 F.3d at 1332 . Accordingly, under these authorities, it is the arbitrator, not this Court, that should decide whether the scope of the Consulting Agreement encompasses the TCS Agreement.

Not to be deterred, Avue recognizes that the weight of authority is overwhelmingly positioned against it, but claims simply that these cases have been incorrectly decided. Avue acknowledges that Rule R-7(a) is part of the Consulting Agreement by virtue of the incorporation by reference of the AAA rules generally, and concedes that it is thus bound by the rule. Avue contends, however, that the language of Rule R-7(a) is permissive in nature, and therefore does not require an arbitrator to consider the scope of his own jurisdiction. Rather, Avue argues, the language simply means that *if* the parties submit a claim to arbitration, they cannot challenge the arbitrator's decision by arguing that he lacked jurisdiction to render it. Hence, according to Avue, the incorporation of Rule R-7(a) into the Consulting Agreement is not "clear and unmistakable evidence" of an intent to submit to the jurisdiction of an arbitrator with respect to the threshold issue of whether the TCS Agreement is within the Consulting Agreement. This precise question, focused on the allegedly permissive nature of Rule R-7(a), has not been addressed in other cases.

**\*7** The Court is not persuaded by Avue's arguments. To begin with, Rule R-7(a) was enacted in response to *First Options:* it was specifically meant to satisfy the clear and unmistakable evidence standard. *See Brake Masters,* 78 P.3d at 188 n. 4. Moreover, even assuming that the rule is, as Avue contends, permissive in nature, the arbitrator would still be the proper entity to decide whether the TCS Agreement is subject to arbitration. The language of R-7(a) is clear: "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the ... scope ... of the arbitration agreement."There is no language that

limits the application of the rule to the time period after a decision is rendered, or to suggest that the power conferred upon the arbitrator is conditional upon yet another agreement by the parties to submit the claim to arbitration. If Avue desired such limitations, it could have contracted for them. Avue cannot rely on the plain language of the rule to argue that it is permissive, yet back away from or attempt to supplement the plain language in order to advance an interpretation inconsistent with the outcome in the relevant case law.

In this Court's view, Rule R-7(a) means that unless the arbitrator elects not to exercise the power to decide arbitrability that the parties have given him, a court may not jump in to decide the scope of the arbitration agreement at issue. Put another way, when Avue signed a contract that incorporated the AAA rules by reference, it agreed, pursuant to the language of Rule R-7(a), to let the arbitrator decide the issue of which claims submitted by DCI fall within the ambit of the arbitration clause. To the best of this Court's knowledge, the arbitrator has not relinquished that authority. "[W]hen, as here, parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator."' *Book Depot P'ship v. Am. Book Co.,* 2005 U.S. Dist. LEXIS 33782 at \*8-9 & n. 3 (E.D.Tenn.2005) (quoting *Contec Corp.,* 398 F.3d at 208)."[Avue] cannot now disown its agreed-to obligation to arbitrate *all* disputes, including the question of arbitrability."*Contec Corp.,* 398 F.3d at 211 (emphasis in original). Hence, the question "who (primarily) should decide arbitrability," in the construct of *First Options,* 514 U.S. at 944, is answered here by "clear and unmistakable evidence" of the parties' intent found in the provisions of their agreement (the incorporated AAA Rule R-7(a)). That answer is the arbitrator, not this Court.

### CONCLUSION

For the foregoing reasons, the Court concludes that the arbitrator is the proper entity to decide the issue of whether the scope of the arbitration clause of the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                              Page 7

Not Reported in F.Supp.2d, 2006 WL 1147662 (D.D.C.)
**(Cite as: Not Reported in F.Supp.2d)**


Consulting    Agreement    includes    the    TCS
Agreement. Accordingly, Avue's motion to stay
arbitration proceedings will be denied and, since
that is the entirety of the relief sought in this action,
the case will be dismissed. A separate order has
been issued on this date.

D.D.C.,2006.
Avue Technologies Corp. v. DCI Group, L.L.C.
Not Reported in F.Supp.2d, 2006 WL 1147662
(D.D.C.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit C

**APPENDIX OF NON-FEDERAL AND UNPUBLISHED FEDERAL AUTHORITIES
CITED IN VISA USA INC.'S MOTION TO STAY ACTION
AND TO COMPEL ARBITRATION**

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2931284 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

Page 1

**C**Bayer CropScience, Inc. v. Limagrain Genetics
Corp., Inc.
N.D.Ill.,2004.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
BAYER CROPSCIENCE, INC. Plaintiff,
v.
LIMAGRAIN GENETICS CORPORATION, INC.,
Defendant.
No. 04 C 5829.

Dec. 9, 2004.

James A. White, Gregory Steven Otsuka, Carrie
Elizabeth Bassi, Jones Day, Chicago, IL, for Plaintiff.
Timothy John Miller, Novack & Macey, Chicago, IL,
Jay L. Alexander, Ryan E. Bull, Baker Botts LLP,
Washington, DC, for Defendant.

*MEMORANDUM OPINION AND ORDER*
DARRAH, J.
*1 Bayer CropScience, Inc. filed a complaint against
Limagrain Genetics Corporation, Inc., seeking
declaratory (count I) and injunctive (count II) relief
with respect to Limagrain's demand for arbitration.
Presently before the Court is Limagrain's Motion to
Dismiss and/or Compel Arbitration, and Bayer's
Cross-Motion to Enjoin Arbitration.

BACKGROUND

A reading of Bayer's Complaint supports the
following summary of the alleged operative conduct
of the parties.

In 1988, Rhone-Poulenc, Inc. acquired Callahan
Enterprises, Inc. ("CEI"). Bayer is the successor-in-
interest to Rhone-Poulenc. On June 30, 1994,
Limagrain and Rhone-Poulenc executed an Asset
Purchase Agreement, in which Limagrain assumed
all CEI rights and obligations, including those under
a 1986 contract that CEI had with Midwest Oilseeds,
Inc. ("MOT"). The Agreement also contained
provisions regarding indemnification (Section 11)
and arbitration (Section 9.1).

MOI sued Limigrain, in its capacity as successor in

interest to CEI, and at the conclusion of the trial,
Limigrain was found liable to MOI for damages over
$40 million resulting from Limiagrain's breach of the
1986 contract. On or about June 28, 2004, after the
judgment against Limagrain, Limagrain filed its
Notice of Arbitration ("Notice") with the American
Arbitration Association ("AAA") and served Bayer
with the Notice.

In the Notice, Limagrain makes three claims against
Bayer. First, Limagrain claims Bayer must indemnify
Limagrain for some or all of Limagrain's liability in
the lawsuit brought by MOI against Limagrain,
pursuant to indemnification provision (Section 11.2)
of the Agreement. Secondly, Limagrain claims that
Bayer is liable for its predecessor's (Rhone-Poulenc)
intentional or negligent failure to disclose certain
information related to the 1986 contract between CEI
and MOI to Limagrain prior to entering the
Agreement ("wrongful inducement claim"). Lastly,
Limagrain claims that Bayer is liable for damages to
Limagrain's "reputation in the industry as a result of
its dispute with MOI," and damages for the costs
Limagrain will incur "in reconstituting its stock of
unencumbered genetic material," because
Limagrain's " 'ownership' rights in germplasm and
genetic material derived from MOI germplasm are, in
effect, worthless."

Bayer claims that the arbitration provision of the
Agreement does not cover Limagrain's wrongful
inducement claim, nor does it cover the remaining
claims for damages. Specifically, Bayer claims that
Section 9.1 of the Agreement requiring arbitration,
only applies to "any controversy or dispute under this
Agreement."Accordingly, Bayer argues that
Limagrain does not allege that its wrongful
inducement and damages claims arise "under th[e]
Agreement." FN1

> FN1. Bayer alleges that Limagrain lays out
> four claims for indemnification in the
> Notice, although the Notice only lists three:
> 1. Indemnification; 2. Failure to Disclose
> ("wrongful inducment"); 3. Other Damages.
> Contrarily, Limagrain claims to only have
> alleged the first two claims. The Court will
> address the damages claims as a part of the
> wrongful inducement claims since the 'other

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2931284 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

Page 2

damages' claim is merely the manifestation of the harm caused by the wrongful inducement.

### LEGAL STANDARD

In reviewing a motion to dismiss, the court considers all facts alleged in the complaint and any reasonable inferences drawn therefrom in the light most favorable to the plaintiff. *See Marshall-Mosby v. Corporate Receivables, Inc.*, 205 F.3d 323, 326 (7th Cir.2000). Dismissal is warranted if "it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The "suit should not be dismissed if it is possible to hypothesize facts, consistent with the complaint, that would make out a claim." *Graehling v. Vill. Of Lombard, Ill.*, 58 F.3d 295, 297 (7th Cir.1995).

*2 Federal law favors arbitration as a means of resolving disputes. The Federal Arbitration Act ("FAA") provides that a "written provision in ... a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The Supreme Court has recognized that the FAA embodies a broad federal policy favoring arbitration. *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 225-226, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987). Section 4 of the FAA directs the court to issue an order compelling arbitration if either party fails, neglects, or refuses to comply with the arbitration agreement. 9 U.S.C. § 4. The FAA further "establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract itself or an allegation of waiver, delay or a like defense to arbitrability."

### ANALYSIS

Bayer first argues that Limagrain's claims for wrongful inducement and for the other damages are outside of the scope of the arbitration provision of the Agreement. Limagrain contends that they are within the scope of the Agreement because the claims arise "under the Agreement."

"In deciding whether a particular claim comes within the scope of an arbitration agreement, the focus is on the factual allegations of the complaint." *Goldberg v. Focus Affiliates, Inc.*, 152 F.Supp.2d 978, 980 (N.D.Ill.2001) (quoting *Schacht v. Hartford Fire Insurance Co.*, 1991 WL 171377 (N.D.Ill.1991).). Generally speaking, "[a]n order to arbitrate [a] particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Welborn Clinic v. Medquist Incorporated*, 301 F.3d 634, 639 (7th Cir.2002)(quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582-583, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)). Indeed, "once it is clear the parties have a contract that provides for arbitration of some issue between them, any doubts concerning the scope of the arbitration clause are resolved in favor of arbitration." *Miller v. Flume*, 139 F.3d 1130, 1135 (7th Cir.1998).

Claims of fraudulent or false inducement can be subject to arbitration under mandatory arbitration provisions. *See Melborn Clinic*, 301 F.3d at 641; *Goldberg*, 152 F.Supp.2d at 981. A court must look to the wording of the arbitration provision and determine if it is broad enough to include the particular claim. *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403-404, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967). For example, in *Goldberg*, the Court held that because the arbitration provision contained the phrase "under the terms of this Agreement," the provision was broad enough to include claims of fraudulent inducement.

*3 Limagrain's wrongful inducement claim is within the scope of the arbitration clause. This issue was addressed in *Goldberg*.Limagrain is alleging a fraudulent or negligent failure to disclose information, causing inducement into a contract with Bayer. Furthermore, Limagrain's damages claims in the Notice of Arbitration are results of the alleged wrongful inducement, and therefore also fall within the scope of the arbitration clause. In short, all of Limagrain's claims are within the scope of the arbitration agreement.

Next, Bayer claims that even if the wrongful inducement and damages claims are within the scope of the arbitration provision, the parties intended to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                Page 3
Not Reported in F.Supp.2d, 2004 WL 2931284 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

exclude the issue of arbitrability from being submitted to arbitration, thus requiring the Court to decide the issue. Specifically, Bayer contends that the Agreement contained an integration provision at Section 12.10 that preempts the arbitration provision regarding any understanding or representation made prior to the Agreement. Accordingly, Bayer claims that this is sufficient evidence to indicate an intent of the parties to not arbitrate the wrongful inducement claims, and accordingly, the issue of its arbitrability is a question for the Court to answer. Contrarily, Limagrain argues that the issue of arbitrability of an issue is for the arbitrator to decide, pursuant to the rules of the AAA, which include Rule 7(a) of the Commercial Arbitration Rules and Mediation Procedures of the AAA. Rule 7(a) states that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement."

Whether an issue is subject to arbitration is a matter of contract interpretation under state law. *Welborn Clinic,* 301 F.3d at 639. In Illinois, state law requires the court to determine whether the parties objectively revealed an intent to submit the arbitrability issue to arbitration. *See Estate of Jesmer v. Rohley,* 241 Ill.App.3d 798, 803, 182 Ill.Dec. 282, 609 N.E.2d 816 (1993). Despite a strong por-arbitration tilt, agreements must not be construed so broadly as to force arbitration of claims that the parties never agreed to submit to arbitration. *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 943, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). Accordingly, courts should not assume that the parties agreed to arbitrate arbitrability unless there is "clear and unmistakable" evidence that they did so. *First Options,* 514 U.S. at 944. Evidence of the parties intent to arbitrate the issue of arbitrability can be found in the terms of the contract, such as in an integration clause. *See Bidlack v. Wheelabrator Corporation,* 993 F.2d 603, 608 (7th Cir.1993) ("[T]he presence of such a clause is some indication of the parties' desire to limit a free-ranging judicial discretion to interpolate terms.")."It is a rule universally recognized that a written contract is the highest evidence of the terms of an agreement between the parties to it, and it is the duty of every contracting party to learn and know its contents before he signs it."*Bunge Corporation v. Williams,* 45 Ill.App.3d 359, 364, 4 Ill.Dec. 11, 359 N.E.2d 844 (Ill.App. 5th Dist.1977). Finally, if evidence of intent does not exist, it is the Court's job to address arbitrability issues. *Howsam v. Dean Witter*

*Reynolds, Inc.,* 537 U.S. 79, 83, 123 S.Ct. 588, 154 L.Ed.2d 491 (2002); *Reliance Insurance Co. v. Raybestos Products Co.,* 382 F.3d 676, 678-679 (7th Cir.2004).

**\*4** The inclusion of the phrase "[t]he arbitration shall be conducted ... in accordance with the prevailing commercial arbitration rules of the American Arbitration Association" in the arbitration provision of the Agreement is clear and unmistakable evidence that the issue of arbitrability is to be submitted to the arbitrator. To explain, Rule 7(a) of the Rules of the AAA state that the arbitrator shall determine his or her own jurisdiction over an issue. Furthermore, the parties are responsible for and bound by all terms they put into a contract. *Bunge Corporation,* 45 Ill.App.3d at 364, 4 Ill.Dec. 11, 359 N.E.2d 844. Accordingly, if Bayer did not intend to be bound by Rule 7(a) of the AAA, it should have stated such an exception in the Agreement.

Alternatively, even if the evidence was not clear and unmistakable in favor of an arbitrator determining issues of arbitrability, the Court cannot say with positive assurance that the provision is not susceptible to an interpretation that a wrongful inducement claim is subject to mandatory arbitration. Accordingly, the broad scope of the arbitration provision of the Agreement embodies the issue of arbitrability for the same reasons as stated above. Therefore, the issue of arbitrability is to be determined by the arbitrator.

## CONCLUSION

For the reasons stated above, the Defendant's Motions to Dismiss and Compel Arbitration is granted, and the Plaintiff's Cross-Motion to Enjoin Arbitration is denied.

N.D.Ill.,2004.
Bayer CropScience, Inc. v. Limagrain Genetics Corp., Inc.
Not Reported in F.Supp.2d, 2004 WL 2931284 (N.D.Ill.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit D

**APPENDIX OF NON-FEDERAL AND UNPUBLISHED FEDERAL AUTHORITIES
CITED IN VISA USA INC.'S MOTION TO STAY ACTION
AND TO COMPEL ARBITRATION**

21823\1392810.1

Westlaw.

Slip Copy

Slip Copy, 2007 WL 707501 (N.D.Cal.), 82 U.S.P.Q.2d 1216
(Cite as: Slip Copy)

C
Packeteer, Inc. v. Valencia Systems, Inc.
N.D.Cal.,2007.

United States District Court, N.D. California,
San Jose Division.
PACKETEER, INC., Plaintiff,
v.
VALENCIA SYSTEMS, INC., Defendant.
No. C-06-07342 RMW.

March 6, 2007.

Margaret Anne Crawford, William J. Frimel, J.
Blakely D. Kiefer, for Plaintiff.
Elizabeth H. Rader, for Defendants.

ORDER GRANTING MOTION TO DISMISS
RONALD M. WHYTE, United States District
Judge.
*1 Defendant Valencia Systems, Inc. ("Valencia")
moves to dismiss the complaint for declaratory
relief filed by Packeteer, Inc. ("Packeteer"), or to
stay the case pending arbitration. Packeteer asserts
that the arbitrator does not have jurisdiction to
arbitrate the claims that are the subject of its plea
for declaratory relief, specifically claims under the
Copyright Act, 17 U.S.C. § 101, et seq., and the
Digital Millennium Copyright Act ("DMCA"), 17
U.S.C. § 512, et seq. For the reasons set forth
below, the court grant Valencia's motion to dismiss.

I. BACKGROUND

Valencia and Packeteer entered into a Software
License and Development Agreement dated
February 22, 2002 ("SLADA") under which
Valencia agreed to develop certain customized
software which it licenses to Packeteer. Compl. at ¶
7; see also Decl. Elizabeth Rader Supp Mot. Dism (
"Rader Decl."), Ex. A. This agreement was renewed
on February 21, 2004 and was extended until

February 21, 2008. Id. The customized software,
ReportCenter, is based upon Valencia's preexisting
software called "Aruba." Compl. at ¶ 8. The
SLADA includes an arbitration clause which reads
in relevant part:
The Parties agree to attempt in good faith to resolve
any dispute concerning this Agreement or the
Parties' respective obligations hereunder on an
amicable basis. In the event the Parties are unable to
resolve any such dispute on an amicable basis, the
Parties agree that any dispute remaining unresolved
shall be resolved by binding arbitration before one
single arbitrator in the Greater San Francisco area,
under the rules of the American Arbitration
Association. Judgment on any arbitration award
rendered in accordance with this Paragraph shall be
final and binding on all parties.

SLADA ¶ 15.4.

Under the SLADA, Valencia allegedly agrees to
provide ongoing services to Packeteer, including
modification, maintenance, support services and
certain ongoing development. Compl. at ¶ 9. The
parties also agree that additional services may be
ordered by Packeteer in writing under the
agreement and that the services shall not be
unreasonably withheld. Compl. at ¶ 10. The parties
entered into numerous amendments to the SLADA
to memorialize such additional services. Compl. at
¶ 11. The SLADA also sets forth terms under
which Valencia agrees to provide certain ongoing
support and maintenance services, which according
to Packeteer "involves the implementation of
software and security patches for Packeteer's
hardware products."Compl. ¶ 13.

In September 2005, a dispute arose between the
parties. Packeteer asked Valencia to perform
services under the SLADA, but the parties
apparently disagreed as to whether this request
sought maintenance, support, or additional
development services requiring payment of
additional fees. The parties also disagreed over the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 707501 (N.D.Cal.), 82 U.S.P.Q.2d 1216
**(Cite as: Slip Copy)**

cost for any additional development services. Since then, Valencia has allegedly refused to provide additional services under the SLADA requested by Packeteer and threatened to terminate maintenance and support services. Compl. ¶¶ 12, 14. On June 13, 2006, Valencia filed a demand for arbitration setting forth three issues for arbitration. Compl. ¶ 23. On June 19, 2006, the parties sent notices of termination to one another. Compl. ¶¶ 24-25. On June 21, 2006 Packeteer filed suit in Santa Clara County Superior court and on June 26, 2006, obtained an order from that court enjoining Valencia from terminating, ending, delaying or limiting its maintenance and support services for the next three years unless otherwise ordered by a court or arbitrator. Compl. ¶ 14.

**\*2** Meanwhile, on June 22, 2006, Packeteer asked Valencia to provide a patch to ReportCenter to allow the software to work with one of Packeteer's products, PacketShaper 1400; Valencia provided the patch on July 3, 2006. Compl. ¶¶ 27-28. According to Valencia, on September 18, 2006, Packeteer issued a press released stating that the PacketShaper 1400 now worked with ReportCenter, from which Valencia inferred that Packeteer had created a derivative work based on Valencia's proprietary source code. Mot. Summ. J. at 5; Rader Decl., Ex. E. [FN1] After the parties were ordered to arbitrate Valencia's original claims, Valencia filed an amended demand for arbitration, which included claims for copyright infringement and violations of the DMCA. Compl. ¶ 31.

> FN1. Valencia provides a declaration, previously submitted in the arbitration proceedings, by one of Packeteer's engineers stating that he had reverse-engineered a patch provided by Valencia in March 2006 to produce the PacketShaper 1400 patch. Rader Decl., Ex. H, Decl. Robert Moss Supp. Packeteer's Opp'n to Valencia's Mot. for Interim Measures.

## II. ANALYSIS

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1

-16 manifests a strong and liberal policy in favor of arbitration of disputes. *See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 625 (1985). The Supreme Court has long recognized that "where the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that '[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of in interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.' " *AT & T Techs., Inc. v. Communications Workers of America,* 475 U.S. 643, 650 (1986) (quoting *Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582-83 (1960)). Any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration. *See Moses H. Cone Hosp. v. Mercury Construction Corp.,* 460 U.S. 1, 24-25 (1983).

Under the FAA, the court is limited to (1) determining whether a valid agreement to arbitrate exists and, if so, (2) deciding whether the scope of the agreement to arbitrate encompasses the dispute at issue. 9 U.S.C. § 4; *Simula, Inc. v. Autoliv, Inc.,* 175 F.3d 716, 719-20 (9th Cir.1999). It is undisputed that there is a valid agreement to arbitrate between Packeteer and Valencia-in fact, the parties are presently involved in arbitration over other issues. The issue before the court is whether the copyright and DMCA claims are properly subject to arbitration.

Valencia argues that because it incorporates the rules of the American Arbitration Association, the agreement to arbitrate is sufficiently broad as to give the arbitrator the authority to determine arbitrability of issues. *See, e.g., Terminix Int'l Co. v. Palmer Ranch Ltd. P'ship,* 432 F.3d 1327, 1332 (11th Cir.2005). Based upon the language of the arbitration provision, this court agrees. *See* SLADA ¶ 15.4 ("[A]ny dispute concerning this Agreement . . . shall be resolved by binding arbitration before one single arbitrator ... under the rules of the American Arbitration Association."). And the arbitrator has, indeed, determined that the issues are arbitrable. *See* Decl. of Amit Kurlekar Supp. Reply, Ex. A, Procedural Order # 2 issued in *Valencia Systems, Inc. v. Packeteer, Inc.,* No. 74 117 Y

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                      Page 3

Slip Copy, 2007 WL 707501 (N.D.Cal.), 82 U.S.P.Q.2d 1216
(Cite as: Slip Copy)

00661 06 DEAR (AAA Jan. 17, 2007). As set forth in further detail below, the court also independently determines that the issues are arbitrable.

*3 Valencia contends that the issue is simply whether the agreement to arbitrate encompasses the copyright and DMCA claims in dispute. Valencia, naturally, asserts that the arbitration clause requires these claims to be arbitrated. Packeteer, on the other hand, argues that the arbitration clause only requires arbitration of breach of contract and other claims related directly to the SLADA.

The relevant language in the arbitration clause, "any dispute concerning this Agreement or the Parties' respective obligations hereunder," creates a broad scope of arbitration and encompasses all claims which arise from the parties' obligations under the SLADA. The copyright and DMCA claims at issue are based upon Packeteer's alleged creation and distribution to its customers of a patch based on having reverse-engineered a portion of Valencia's object-code, which was distributed to Packeteer under the terms of the SLADA. Furthermore, Packeteer has asserted in the arbitration that it engaged in this activity on the basis of its understanding of its rights under paragraph 11.3(c) of the SLADA, which provides, in relevant part,

[I]n the event that this Agreement is terminated by Packeteer for cause ... Valencia shall immediately deliver to Packeteer a copy of the Source Code version of the Licensed Software together with all information necessary for Packeteer to perform the maintenance and support services, preparing Maintenance Modifications and continue licensing the Licensed Software as contemplated herein ... In the event Valencia fails to proivde such source code promptly ... Packeteer shall have the right to reverse engineer the Licensed Software code ....

Whether based purely upon the language of the arbitration clause in addition on Packeteer's contention in arbitration that it was permitted to act as it did because of rights granted under the SLADA, it is clear that the dispute in this case concerns the parties' obligations under the Agreement, no matter whether the issue is characterized as a question regarding whether Packeteer's conduct constituted a breach of license agreement, a violation of the Copyright Act or a violation of the DMCA. Thus, the court concludes that the agreement to arbitrate encompasses the claims set forth in Packeteer's complaint for declaratory relief.

Packeteer further contends that the copyright and DMCA claims are not subject to arbitration regardless of the scope of the agreement to arbitrate. It argues that because Congress conferred exclusive jurisdiction over copyright and DMCA claims on the federal courts, an arbitration agreement cannot subject such claims to arbitration. Courts, however, have held that copyright issues are subject to arbitration. The Ninth Circuit has assumed that copyright validity is arbitrable. *Lorber Industries of California v. Los Angeles Printworkers, Corp.,* 803 F.2d 523, 525 (9th Cir.1986). The Second Circuit more recently rejected an argument that copyright disputes are "unsuitable" for arbitration.*McMahan Securities Co. v. Forum Capital Markets,* 35 F.3d 82, 89 (2d Cir.1994). And even in *Saturday Evening Post Company v. Rumbleseat Press, Inc.,* 816 F.2d 1191, (7th Cir.1987), which Packeteer seeks to distinguish in support of its opposition to Valencia's motion based on the nature of the copyright claims at issue in the present case, the Seventh Circuit rejected an argument by Rumbleseat Press that Congress's decision to give federal courts exclusive jurisdiction over copyright disputes implicitly precludes arbitrating disputes as to the validity of a copyright. *Id.* at 1198-99.At base, the Seventh Circuit's ruling permitted someone other than a federal court to determine a copyright claim.

*4 Because the parties agreed to arbitrate any dispute regarding the parties's obligations under the SLADA under the rules of the AAA Rules of Arbitration, the court grants defendant's motion to dismiss. As a further basis for this court's decision, the arbitrator, acting under those Rules of Arbitration, has now determined that she has jurisdiction to arbitrate the declaratory relief claims under Copyright Act and the DMCA.

### III. ORDER

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2007 WL 707501 (N.D.Cal.), 82 U.S.P.Q.2d 1216
**(Cite as: Slip Copy)**

For the foregoing reasons, the court grants defendant's motion to dismiss.

N.D.Cal.,2007.
Packeteer, Inc. v. Valencia Systems, Inc.
Slip Copy, 2007 WL 707501 (N.D.Cal.), 82 U.S.P.Q.2d 1216

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit E

**APPENDIX OF NON-FEDERAL AND UNPUBLISHED FEDERAL AUTHORITIES
CITED IN VISA USA INC.'S MOTION TO STAY ACTION
AND TO COMPEL ARBITRATION**

Westlaw.

Slip Copy
Slip Copy, 2006 WL 2691418 (N.D.Cal.)
(Cite as: Slip Copy)

Page 1

C Poponin v. Virtual Pro, Inc.
N.D.Cal.,2006.
Only the Westlaw citation is currently available.
United States District Court,N.D. California.
Vladimir POPONIN, Ph.D., Plaintiff,
v.
VIRTUAL PRO, INC., Defendant.
No. C 06-4019 PJH.

Sept. 20, 2006.

Ilana S. Rubel, Michael J. Sacksteder, Fenwick & West LLP, San Francisco, CA, for Plaintiff.
Richard C. Darwin, Buchalter Nemer, Attorneys at Law, San Francisco, CA, for Defendant.

## ORDER GRANTING MOTION TO DISMISS AND DENYING MOTION FOR PRELIMINARY INJUNCTION

PHYLLIS J. HAMILTON, District Judge.

*1 Plaintiff's motion for a preliminary injunction, and defendant's motion to dismiss the action, or in the alternative, to stay arbitration, and motion for a protective order, came on for hearing before this court on August 30, 2006. Plaintiff appeared by his counsel Michael J. Sacksteder, and defendant appeared by its counsel Richard C. Darwin. Having read the parties papers and carefully considered their arguments and the relevant legal authority, and good cause appearing, the court hereby DENIES the motion for preliminary injunction, GRANTS the motion to dismiss, and DENIES the motion for a protective order.

### BACKGROUND

This is an action seeking declaratory and injunctive relief, and vacatur of an interim arbitration award, and also alleging breach of contract.

Plaintiff Vladimir Poponin, Ph.D., is a Russian-born theoretical physicist. He originally came to the United States at the invitation of Stanford University's Chemistry Department, to do research into the spectroscopy of DNA. He became a permanent resident of the United States in 1995, and subsequently left Stanford to pursue private ventures.

In 1998, Dr. Poponin filed a provisional application in the United States Patent and Trademark Office for a patent on one of his inventions. As the deadline approached for filing a utility patent application to claim priority to the provisional application, he met Martti Vallila ("Vallila"), the President of defendant Virtual Pro, Inc. (Virtual Pro"). Dr. Poponin alleges that Vallila told him that Virtual Pro was in the business of commercializing intellectual property owned by Russian citizens, and that Vallila suggested that Virtual Pro help Dr. Poponin with the funding and development of his first patent.

On September 20, 1999, Dr. Poponin entered into an agreement with Virtual Pro. He signed two documents-an "Agreement" and an "Assignment." In the Agreement, Dr. Poponin agreed to assign all rights in one of his inventions (specified in the "Assignment") to Virtual Pro, and Virtual Pro agreed to complete the process of obtaining a patent on the invention, to commercialize it, and to pay Dr. Poponin 50% of the revenues. The Agreement provided for the submission of any disputes "arising in connection with the present Agreement" to binding arbitration under the Rules of Arbitration of the International Chamber of Commerce ("ICC") Court of Arbitration.

In the Assignment, Dr. Poponin assigned all ownership and rights in an invention described as "A New Method for the Analysis of Nuclic Acids Hybridization on High Density NA Chips."Dr. Poponin made the Assignment "consistent with my Agreement with Virtual Pro."The Assignment also provided that "[a]ny claims or legal actions relating to this assignment and the transactions to which it relates shall be commenced and maintained in a state or federal court located in the State of California."

Virtual Pro subsequently financed and otherwise supported the issuance of U.S. Patent No. 6,376,177 ("the 177 patent"), based on the technology described in the provisional application filed by Dr. Poponin. Virtual Pro retained an attorney to prosecute the patent application, which was filed on October 6, 1999. The patent issued on April 23, 2002.

*2 At some point after he entered into the Agreement with Virtual Pro, Dr. Poponin began to develop

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2691418 (N.D.Cal.)
(Cite as: Slip Copy)

additional inventions ("the unrelated inventions") that he claims were not described in the provisional application and were not covered by the terms of the Agreement or the Assignment. Dr. Poponin subsequently filed a number of U.S. and foreign patent applications covering those new inventions.

On June 14, 2005, Virtual Pro filed a claim with the ICC Court of Arbitration, asserting that Dr. Poponin had breached the Agreement by, e.g., failing to copy Vallila with e-mail correspondence and refusing to answer Vallila's questions; excluding Virtual Pro's representative from negotiations or meetings with potential commercial and/or scientific partners; failing to assign to Virtual Pro patent applications containing inventions deriving from the subject matter of the invention referenced in the Agreement/Assignment; and secretly initiating negotiations relating to the possibility of assigning the 177 patent to some Japanese company.

Among other things, Virtual Pro demanded an accounting of all contracts signed by Dr. Poponin relating to the subject matter of the Agreement, and payment of 50% of all sums received by Dr. Poponin in connection with any such contracts. According to Dr. Poponin, Virtual Pro is attempting to assert rights over the unrelated inventions.

Dr. Poponin submitted a response to the ICC on August 24, 2005. Dr. Poponin and Virtual Pro each nominated a co-arbitrator, and the ICC nominated a third member of the panel. On October 7, 2005, the ICC confirmed the nomination of the arbitrators proposed by Dr. Poponin and Virtual Pro, and formally determined to allow the matter to proceed in accordance with the ICC Rules.

On January 20, 2006, Dr. Poponin (through his then-attorney Frank Sommers) filed a brief in support of his request to dismiss the arbitration for lack of jurisdiction, arguing that the arbitrators did not have jurisdiction over the dispute because he had never agreed to the arbitration. He asserted that the Agreement and the Assignment were part of an integrated whole, and that the Assignment expressed the parties' primary intent that disputes be settled by a court, not by arbitration. He also asserted that the consent to arbitration was part of a contradictory section of an integrated document. Virtual Pro filed a response on January 25, 2006.

On January 30, 2006, Mr. Sommers sent the tribunal an e-mail stating that he had been removed as counsel because Dr. Poponin was unable to pay his fees, and that Dr. Poponin would be representing himself in the arbitration. On February 3, 2006, Dr. Poponin filed a reply brief on the jurisdictional issue.

On March 13, 2006, the ICC arbitral tribunal issued an interim award determining that it had jurisdiction, and reserving all other decisions to a future award. The tribunal found that the Agreement and Assignment were separate documents and that while the Agreement made reference to the Assignment, it did not incorporate the Assignment by reference, and that the Agreement stated that its provisions "constitute[ ] the sum total of the [A]greement." The tribunal also noted that the Assignment was executed only by Dr. Poponin, not by Virtual Pro, and contained a submission to jurisdiction provision as to "[a]ny claims or legal actions relating to this [A]ssignment and the transactions to which [the Assignment] relates."

*3 The tribunal found that the claims asserted by Virtual Pro and the general relief requested fell within the scope of the Agreement, which contained a broad arbitration clause submitting such disputes to arbitration under the ICC Rules of Arbitration. The tribunal concluded that it had jurisdiction to hear the disputes submitted in the matter before it.

Dr. Poponin also filed counterclaims against Virtual Pro in the arbitration. However, the counterclaims were dismissed by the ICC because Dr. Poponin failed to pay the required $106,000 filing fee by the deadline imposed by the ICC. In addition, during the time that Dr. Poponin was not represented by counsel (from January 30 to May 24, 2006), the discovery deadline passed and the tribunal subsequently found that Dr. Poponin was precluded from seeking any discovery in the arbitration.

Dr. Poponin filed the complaint in the present action on June 28, 2006. Dr. Poponin alleges that the attorney hired by Virtual Pro to prosecute the 177 patent failed to claim priority to the provisional application, and unnecessarily narrowed the scope of the claims of the patent during prosecution. Dr. Poponin asserts that he made numerous requests to Virtual Pro to remedy the errors of its patent prosecution attorney, to no avail. Dr. Poponin also claims that Virtual Pro refused to pursue an international filing of the 177 patent, further

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                Page 3
Slip Copy, 2006 WL 2691418 (N.D.Cal.)
(Cite as: Slip Copy)

diminishing its value. When Dr. Poponin tried to remedy the alleged errors himself, by filing amended claims, he claims that Virtual Pro-which was required to sign off on the filing because it was the assignee-refused to do so. Dr. Poponin claims that Virtual Pro has failed to take any steps to commercialize the patent, and that he has received no revenue from his invention.

Dr. Poponin asserts seven causes of action:
(1) a claim seeking a declaratory judgment that the ICC lacks jurisdiction because there is no valid agreement requiring arbitration of Virtual Pro's pending claims;
(2) a claim seeking a declaratory judgment that Virtual Pro has no rights in any invention referenced in the Agreement and Assignment;
(3) a claim seeking a declaratory judgment that Virtual Pro has no rights in the inventions and patents created subsequent to the execution of the Agreement and Assignment, or to monies from Dr. Poponin's contracts and agreements relating to the unrelated inventions;
(4) a claim seeking a declaratory judgment that the Agreement and Assignment as construed by defendant are null and void as contrary to public policy;
(5) a claim seeking a declaratory judgment that any obligations Dr. Poponin might owe pursuant to the Agreement or Assignment are excused by Virtual Pro's material breach;
(6) a claim alleging breach of contract by Virtual Pro; and
(7) a claim seeking vacatur of the Interim Arbitration award, with regard to the issue of arbitrability.

He also seeks a stay of the arbitration or an order preliminarily enjoining any further proceedings in the ICC pending resolution of whether arbitrability was properly determined by the arbitrator.

*4 On July 5, 2006, Dr. Poponin notified the ICC tribunal that he had filed the present action, and requested a stay of the arbitration proceedings pending resolution by this court of his claim that the dispute is not arbitrable. The tribunal denied the request. Dr. Poponin also asked Virtual Pro to agree to a stay, but Virtual Pro declined.

On July 17, 2006, the tribunal held a telephonic conference to discuss discovery rulings and to set the date for the final hearing. The same day, the tribunal issued a prehearing procedural order, ordering Dr.

Poponin to produce to Virtual Pro all agreements with third parties having to do with the 177 patent and also with the subsequent unrelated inventions. The tribunal denied Dr. Poponin's application to submit a request for production of documents and to take Virtual Pro's deposition; and ordered the parties to exchange witness statements, witness lists, and exhibits. The tribunal set a date of September 20-22, and 25-26, 2006, for the final arbitration hearing.

On July 25, 2006, Dr. Poponin filed an application for a temporary restraining order in the present action. Following briefing by the parties and a hearing, the court denied the application in an order issued August 3, 2006.

Dr. Poponin now seeks a preliminary injunction, enjoining Virtual Pro from proceeding against him in the ICC arbitration. Virtual Pro seeks an order dismissing the complaint either for lack of subject matter jurisdiction or for failure to state a claim. In the alternative, Virtual Pro seeks an order staying this case pending the completion of the arbitration. Virtual Pro also seeks a protective order prohibiting Dr. Poponin from proceeding with discovery in this action while the arbitration is proceeding.

## DISCUSSION

### A. Motion for Preliminary Injunction

#### 1. Legal Standard

To prevail on a motion for preliminary injunction, plaintiff must show (1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest (in certain cases).See Rodde v. Bonta, 357 F.3d 988, 994 (9th Cir.2004). Alternatively, injunctive relief can be granted if the plaintiff merely "demonstrate[s] ... a combination of probable success on the merits and the possibility of irreparable injury."Id.

#### 2. Plaintiff's Motion

Dr. Poponin argues that he is likely to succeed on the merits, asserting that it is the court, not the arbitrators that must decide the question of arbitrability; that the parties did not agree to arbitrate this dispute (based on lack of agreement in the Assignment); that the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2691418 (N.D.Cal.)
(Cite as: Slip Copy)

Page 4

contract is procedurally unconscionable because his English skills are limited and he was at a disadvantage when presented with an agreement written in English, which he was pressured to sign by Vallila; and that the contract is substantively unconscionable and therefore unenforceable, because it seeks to "enslave" Dr. Poponin for life with regard to all contracts and inventions developed from the 177 patent, even if not directly related to the patented invention.

**\*5** Dr. Poponin contends that absent injunctive relief, he will suffer irreparable harm, as he will be deprived of his right to trial by jury. He also asserts that his business will be damaged because the ICC tribunal has ordered him to turn over documents of a highly confidential nature to Virtual Pro. He claims that the information in those documents relates to his current business endeavors, which involve inventions that are not covered by the terms of the Agreement or the Assignment.[FN1] Dr. Poponin asserts that he should not be compelled to provide Vallila with information that Vallila can use to interfere with his (Dr. Poponin's) current business.

> FN1. In his declaration, Dr. Poponin describes his recent work as "research into the cost-effective, rapid, and individualized mapping of the human genome." He asserts that this research has nothing to do with the technology represented in the 177 patent.

In a supplemental declaration, Dr. Poponin states that he was informed by one of his principal investors that the investor is withholding financing because of the pending arbitration, because the investor is concerned that Dr. Poponin will be compelled to disclose a confidential agreement that he has with "third parties" relating to the funding of his current research. Dr. Poponin contends that without the expected financing, his business will fold.

Dr. Poponin asserts that it is unlikely that he could recover damages from Virtual Pro, as Virtual Pro appears to be without domestic assets, and appears to be operated solely through the person of Martti Valila in Paris.

Dr. Poponin also contends that he cannot fully present his case to the ICC tribunal, because his request to serve document requests on Virtual Pro was denied.

Finally, Dr. Poponin contends that the balance of hardships favors him, because the hardship of having to continue with the arbitration pending a final determination by this court as to the arbitrability question would be enormous.

In opposition, Virtual Pro makes four arguments. First, Virtual Pro asserts that this court has no subject matter jurisdiction to determine arbitrability, because the parties agreed that all disputes arising in connection with the Agreement would be decided in accordance with the ICC rules, which provide that arbitrability (or the "existence, validity or scope" of the agreement to arbitrate) is to be decided by the arbitrators.[FN2]

> FN2. Rule 6(2) of the ICC Rules provides, in part,
> If the Respondent does not file an answer, ... or if any party raises one or more pleas concerning the existence, validity or scope of the arbitration agreement, the Court may decide, without prejudice to the admissibility or merits of the plea or pleas, that the arbitration shall proceed if it is prima facie satisfied that an arbitration agreement under the Rules may exist. In such a case, any decision as to the jurisdiction of the Arbitral Tribunal shall be taken by the Arbitral Tribunal itself. If the Court is not so satisfied, the parties shall be notified that the arbitration cannot proceed. ICC Rule 6(2).

Second, Virtual Pro argues that if this court *does* decide to address the question of arbitrability, it should find that the dispute is arbitrable and deny the request for preliminary injunction. Virtual Pro contends that the Agreement and Assignment are separate documents and should be interpreted differently, and that the forum selection clause in the Assignment relates only to claims and legal actions relating to the Assignment itself. Virtual Pro asserts that the present dispute-whether either party has breached its obligations under the Agreement-is governed by the Agreement, not the Assignment.

Third, Virtual Pro contends that the arbitration provision is neither procedurally nor substantively unconscionable. Virtual Pro asserts that the Agreement does not bear any of the characteristics of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

an adhesive or unenforceable contract, and that Dr. Poponin had the draft Agreement in his possession for at least a day because he was encouraged by Vallila to take it home and think about it before he signed it. Virtual Pro also notes that it was Dr. Poponin who held the rights to the intellectual property, not Virtual Pro, and that Dr. Poponin cannot now argue that the parties' bargaining strength was unequal. Virtual Pro asserts that the arbitration provision is mutual, requiring each side to submit any disputes under the Agreement to the ICC.

**\*6** Finally, Virtual Pro argues that Dr. Poponin has not met his burden of demonstrating a need for a preliminary injunction. Virtual Pro contends that Dr. Poponin cannot establish likelihood of success, because the court does not have jurisdiction over the claims alleged in the complaint. Virtual Pro also asserts that Dr. Poponin has not established a possibility of irreparable harm. Virtual Pro contends that the argument that the anonymous investors will withdraw their financial support if the case proceeds to arbitration could apply equally to the case if it proceeds to litigation. Similarly, if the case proceeds to litigation, Virtual Pro will request the same documents it has requested in the arbitration, so any temporary relief that Dr. Poponin receives from that obligation to produce documents will be short-lived.

With regard to the claim that Dr. Poponin will be irreparably harmed by the loss of his right to a jury trial, Virtual Pro argues that Dr. Poponin agreed to the jurisdiction of the ICC, rather than the courts, when he signed the Agreement with its broad arbitration provision, and confirmed that decision when he participated in the ICC arbitration, filed counterclaims, and affirmatively submitted the jurisdictional questions to the arbitrators.

In reply, Dr. Poponin argues that this court has exclusive jurisdiction to determine whether the dispute is arbitrable. Dr. Poponin contends that he has raised serious questions of validity that require a judicial inquiry into the substance and circumstances of the Agreement, and whether there was any agreement to arbitrate whatsoever.

Dr. Poponin argues that Virtual Pro has failed to rebut his showing that the parties never clearly and unmistakably agreed to arbitrate this matter. He argues that because the Assignment states that any claims or legal actions relating to the Assignment "and the transactions to which it relates" shall be

commenced in a state or federal court in the State of California, the arbitration provision in the Agreement is ineffective. He asserts that the disputes that are presently before the arbitrators are clearly claims relating to the Assignment "and the transactions to which it relates," because the Agreement was executed at the same time as the Assignment and is "defined in scope" by the Assignment.

He argues that under <u>California Civil Code § 1642</u>, the Agreement and the Assignment are legally part of the same contract because they relate to the same matters, were made between the same parties, and were made as substantially part of the same transaction. He also argues that the terms of one agreement are incorporated into another whenever the reference to the second agreement is clear and unequivocal, and that the words "incorporated by reference" are not necessary. He claims that the presence of two different dispute resolution provisions in this "unitary contract" creates an inherent conflict giving rise to an irreconcilable ambiguity as to whether the parties agreed to arbitrate. He contends that this ambiguity should be construed against Virtual Pro, the drafter of the contract documents, and that the court should find that the parties did not agree to arbitrate.

**\*7** Second, Dr. Poponin asserts that his actions in connection with the arbitration do not constitute a waiver of his right to challenge the ICC's jurisdiction in this court. He contends that in addition to filing a motion to dismiss, he informed the tribunal shortly after he had been "forced" to act as his own counsel (January 30, 2006) that he did not accept the ICC's jurisdiction. He claims that he further expressed his unwillingness to be bound by arbitration by refusing to sign the Terms of Reference provided by the ICC tribunal He asserts that in the light of such clear statements and actions, he cannot be seen as having waived his right to object in this court to the tribunal's jurisdiction simply because he took the same action-moving to dismiss the arbitration for lack of jurisdiction-that the courts have held do not result in a waiver of the right to litigate.

He contends that the ICC tribunal's ruling should be discounted because the tribunal did not have the benefit of Dr. Poponin's current attorney's arguments in connection with these motions. At the time the issue of jurisdiction was presented to the tribunal, Dr. Poponin had dismissed his attorney because he could not afford to pay him, and he asserts that his brief

Slip Copy                                                                    Page 6
Slip Copy, 2006 WL 2691418 (N.D.Cal.)
(Cite as: Slip Copy)

filed with the tribunal did not mention the cases cited by his attorney in this motion; did not mention Civil Code § 1642 or the body of California case law relating to the reading together of related documents executed together; did not mention the California rule regarding the construing of ambiguities against the drafter; and did not mention any of the arguments relating to procedural or substantive unconscionability. He also asserts that it is clear from the brief he did file that he had little familiarity with English or with legal concepts or language.

Third, Dr. Poponin argues that the arbitration provision is both procedurally and substantively unconscionable. He claims that the circumstances under which the Agreement was executed caused it to be similar to a contract of adhesion, and demonstrate procedural unconscionability. He asserts that the "language imbalance" created a "differential in the parties' respective bargaining strength," because Dr. Poponin, with his limited English skills, was forced to rely on Vallila's description of the Agreement's terms. He also contends that the parties were unequal financially, because Dr. Poponin was on the verge of losing his patent rights for lack of funding, and Virtual Pro had the money he needed to save his application. He asserts in addition that, contrary to Virtual Pro's assertion, there was no period of negotiation. He claims that Vallila did not give him a day to review the agreement, but rather pressured him to sign it immediately-to "take it or leave it."

Dr. Poponin also argues that the arbitration provision is substantively unconscionable, because there was "unfair surprise" inherent in Virtual Pro's assertion of an entitlement to all his subsequent work. He asserts that Virtual Pro's reading of the Agreement is also substantively unconscionable, as Virtual Pro is essentially asserting ownership of 50% of his labors indefinitely for a $4,000 patent prosecution payment (referring to the $4,000 that Virtual Pro allegedly paid the patent attorney to obtain the 177 patent on Dr. Poponin's invention).

*8 Finally, Dr. Poponin asserts that he has satisfied the requirements for issuance of a preliminary injunction. He claims that continued, unwarranted participation in the arbitration is "per se irreparable harm." He also claims that he will suffer irreparable financial harm, as his reasearch, and the company he founded in anticipation of receiving funding, cannot continue if he is unable to meet his payroll obligations and pay the rent on the building housing his laboratories.

He disputes Virtual Pro's assertion that it does not matter whether the action proceeds in litigation in this court or in arbitration-insofar as the disclosure of documents in discovery is concerned-because, he argues, he can get a protective order in a court case that will protect his intellectual property in all circumstances, while the arbitrators have no jurisdiction to enforce a protective order on non-parties to this action. He also argues that this court is the only forum in which he can pursue his counterclaims, as the ICC tribunal dismissed the counterclaims after he failed to pay the required $106,000 advance in costs.

The court finds that the motion for a preliminary injunction must be DENIED. Dr. Poponin has not met his burden of showing either a likelihood of success or irreparable harm, or that the balance of hardships tips in his favor.

The threshold question is whether there is a valid agreement to arbitrate. Arbitration is fundamentally a creature of contract. United Steelworkers v. Warrior and Gulf Navigation Co., 363 U.S. 574, 582 (1960). "[A]rbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration." AT & T Techs., Inc. v. Communication Workers, 475 U.S. 643, 648-49 (1986) (citation omitted). The Federal Arbitration Act makes written agreements to arbitrate "valid, irrevocable, and enforceable" on the same terms as other contracts. 9 U.S.C. § 2.

Courts generally apply ordinary state-law principles governing contract formation in deciding whether an agreement to arbitrate exists. First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995). Here, Dr. Poponin does not argue that there is no objective intent (expressed in the Agreement) that all disputes will be arbitrated. Rather, he argues that under California law the Agreement and the Assignment must be considered one contract, and that because there are two conflicting dispute resolution provisions in that "single contract," the agreement to arbitrate is not effective.

The court finds, however, that the two agreements are separate. Both parties signed the Agreement, which provides for arbitration of "all disputes arising in connection with the present Agreement." In addition,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                 Page 7
Slip Copy, 2006 WL 2691418 (N.D.Cal.)
**(Cite as: Slip Copy)**

the Agreement states that it "constitutes the sum total of the [A]greement."Dr. Poponin's assignment of his rights in the invention was a separate contract, which was not signed by Virtual Pro, and which was not incorporated by reference into the Agreement. However, even if Dr. Poponin is correct that under California law, the Agreement and the Assignment must be considered together as one "unitary contract," that single contract clearly provides that any disputes relating to the Agreement are to be arbitrated, while any disputes relating to the actual Assignment itself are to be brought in a state or federal court in California.

**\*9** While the Federal Arbitration Act contains a general presumption that arbitrability should be decided by the court, both state and federal cases hold that the issue may be referred to the arbitrator if there is clear and unmistakable evidence from the arbitration agreement that the parties intended that the question of arbitrability should be decided by the arbitrator. *See Id.* at 944-45;*see also Contec Corp. v. Remote Solution Co., Ltd., 398 F.3d 205, 208 (2nd Cir.2005); Dream Theater, Inc. v. Dream Theater, 124 Cal.App. 4th 547, 550-57 (2004)).*

Moreover, the cases hold that where the parties' agreement to arbitrate includes an agreement to follow a particular set of arbitration rules-such as the ICC Rules-that provide for the arbitrator to decide arbitrability, the presumption that courts decide arbitrability falls away, and the issue is decided by the arbitrator. *See The Shaw Group, Inc. v. Triplefine Int'l Corp. 322 F.3d 115, 121-22 (2nd Cir.2003); Apollo Computer, Inc. v. Berg, 886 F.2d 469, 473 (1st Cir.1989); The Daiei, Inc. v. United States Shoe Corp., 755 F.Supp. 299, 303 (D.Haw.1991)); Dream Theater, 124 Cal.App. 4th at 557.*

Because Dr. Poponin cannot show that there is no agreement to arbitrate, he cannot establish a likelihood of success on the merits. In short, Dr. Poponin cannot prevail because this court has no subject matter jurisdiction to determine arbitrability. By agreeing to arbitration under the ICC Rules, Dr. Poponin and Virtual Pro clearly and unmistakably agreed that questions of arbitrability would be submitted to arbitration. Moreover, Dr. Poponin affirmatively submitted the issue of jurisdiction to the tribunal, by filing a request to dismiss the claims on January 20, 2006. This confirmed his intent to arbitrate the question of arbitrability. The fact that he stated in his reply brief that he did not accept the

ICC's jurisdiction does not negate that fact that he submitted the question to the arbitral panel for decision. Moreover, he was represented by counsel when he did so.

Dr. Poponin argues that under *Kaplan,*"merely arguing the arbitrability issue to an arbitrator does not indicate a clear willingness to arbitrate that issue, i.e., a willingness to be effectively bound by the arbitrator's decision on that point."*Kaplan,* 514 U.S. at 946. While true, this proposition is irrelevant in the context of the present case. In *Kaplan,* there was no clear and unmistakable evidence that the parties intended to submit the question of arbitrability to the arbitrators. Dr. Poponin's attempt to apply the *Kaplan* result-the Kaplans did not clearly agree to submit question of arbitrability to arbitration, and thus question of arbitrability was subject to independent review by the courts-in the present case is therefore unavailing.

Dr. Poponin's argument that the Agreement is both procedurally and substantively unconscionable is also without merit. Under California law, unconscionability has both a procedural and a substantive component. The former focuses on "oppression" or "surprise" resulting from unequal bargaining power, while the latter focuses on " overly harsh" or "one-sided" results. *Discover Bank v. Superior Court,* 36 Cal.4th 148, 160 (2005).

**\*10** Generally, a contract that is procedurally unconscionable is one that is a contract of adhesion, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to accept the contract or reject it. *Id.* Here, however, the parties were of equal bargaining strength. Dr. Poponin's limited facility with English did not make him a "weaker party" for purposes of this analysis. He could have asked a third party to assist him with his English. Moreover, while Virtual Pro had access to potential funding sources, Dr. Poponin was the owner of the invention. Thus, each side had something the other side wanted.

Dr. Poponin characterizes the Agreement as having been presented to him on a "take-it-or-leave-it-basis," but this is not entirely accurate. Even if Dr. Poponin's version of events is true, and Vallila urged him to sign the contracts immediately, the complaint reflects that Vallila presented the contracts to him following some period of negotiation and discussion. If Dr. Poponin was uncomfortable about signing the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                    Page 8
Slip Copy, 2006 WL 2691418 (N.D.Cal.)
(Cite as: Slip Copy)

Agreement, he could have asked for more time to review it. There is no evidence that the arbitration provision was included in the Agreement on a true "take-it-or-leave-it" basis (as in bank account or credit card agreements, or cellular phone service contracts).

Substantive unconscionability takes many forms, but may generally be described as "unfairly one-sided." *Id.* One such form is an arbitration agreement's lack of a "modicum of bilaterality" wherein the employee's claims against the employer, but not the employer's claims against the employee, are subject to arbitration. *Little v. Auto Stiegler, Inc.,* 29 Cal.4th 1064, 1071-72 (2003). The paramount consideration in assessing substantive unconscionability is mutuality. *Abramson v. Jupiter Networks, Inc.,* 115 Cal.App. 4th 638, 664 (2004); *see also Armendariz v. Foundation Health Psychcare Servs., Inc.,* 24 Cal.4th 83, 120 (2000)* (arbitration agreement imposed in adhesive context lacks basic fairness and mutuality if it requires one contracting party, but not the other, to arbitrate all claims arising out of the same transaction or occurrence or series of transactions or occurrences).

Here, the arbitration provision governs "[a]ll disputes arising in connection with" the Agreement. It does not distinguish among types of claims, or suggest that claims likely to be brought by one party in connection with the Agreement will be arbitrated, while claims likely to be brought by the other will not. Because of the nature of the Assignment, it is likely that only Virtual Pro would potentially have been situated to bring a claim under the Assignment- *e.g.,* to compel Dr. Poponin to execute the necessary documents to effectuate the assignment. Nevertheless, the fact that the Assignment provides that "any claims or legal actions relating to" the Assignment will be brought in a state or federal court in California does not create a lack of mutuality in the arbitration provision found in the Agreement, because the arbitration provision applies to the entire Agreement (though not to the Assignment, which, in any event, was a fait accompli well before the 177 patent issued). There is no suggestion in the Agreement that only one party will be compelled to arbitrate.

*11 Dr. Poponin's claim that Virtual Pro's alleged interpretation of the Agreement is unconscionable because Virtual Pro is asserting ownership of 50% of Dr. Poponin's intellectual property is without merit.

The scope of the Agreement is what is to be decided by the arbitrators. The fact that Virtual Pro is arguing for a particular interpretation of the Agreement does not make the agreement unconscionable.

Nor has Dr. Poponin established that he will be irreparably harmed if the injunction does not issue. He argues, essentially, that his business will fail if he is compelled to proceed with arbitration, but not if he can proceed with litigation in the court. However, the opinions of his investors with regard to the relative merits of a court action as opposed to arbitration are irrelevant. In addition, he will have to cooperate with discovery in any court action, and the parties will be bound by protective orders whether they proceed in arbitration or a court action.

His claims that he will be harmed because he will be denied the opportunity to argue his counterclaims and because he was not permitted to take discovery are without merit. He was not precluded from filing counterclaims in the arbitration. Rather, his counterclaims were dismissed by the arbitrators because he failed to pay the required costs. Similarly, he was not prevented from taking discovery, but simply chose not to before the deadline had expired. These are not valid grounds for enjoining Virtual Pro from proceeding with the arbitration.

B. Motion to Dismiss

1. Legal Standard

Federal courts are courts of limited jurisdiction, and can adjudicate only those cases which the Constitution and Congress authorize them to adjudicate-those involving diversity of citizenship or a federal question, or those to which the United States is a party. *See Kokkonen v. Guardian Life Ins. Co. of America,* 511 U.S. 375, 377 (1994). Federal courts are presumptively without jurisdiction over civil actions, and the burden of establishing that a cause lies within this limited jurisdiction rests upon the party asserting jurisdiction. *Id.*

Subject matter jurisdiction cannot be waived, and the court is under a continuing duty to dismiss an action whenever it appears that the court lacks jurisdiction. *Billingsly v. C.I.R.,* 868 F.2d 1081, 1085 (9th Cir.1989). The plaintiff bears the burden of demonstrating that subject matter jurisdiction exists over this complaint when challenged under

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 2691418 (N.D.Cal.)
(Cite as: Slip Copy)

Fed.R.Civ.P. 12(b)(1).*See, e.g., Tosco Corp. v. Communities for a Better Env't, 236 F.3d 495, 499 (9th Cir.2001).*

2. Defendant's Motion to Dismiss

For the reasons stated in its opposition to the motion for preliminary injunction, Virtual Pro argues that the court should dismiss this action for lack of subject matter jurisdiction. In the event that the court determines that some claims are not arbitrable, Virtual Pro seeks an order staying the action pending the completion of the arbitration.

*12 Dr. Poponin opposes the motion, making the same arguments as in his motion for preliminary injunction.

The court finds that the motion must be GRANTED. The court has no jurisdiction to decide the question of arbitrability, because the parties agreed to arbitrate any disputes arising under the Agreement pursuant to the ICC Rules of Arbitration, which provide that arbitrability is for the arbitrators to decide. The ICC tribunal having determined that it has jurisdiction to decide all disputes arising from the Agreement, the claims asserted by Dr. Poponin herein are subject to arbitration.

C. Defendant's Motion for Protective Order

Virtual Pro seeks a protective order precluding plaintiff from conducting discovery in this action while the arbitration is on-going. This motion is DENIED, as moot.

CONCLUSION

In accordance with the foregoing, plaintiff's motion for a preliminary injunction is DENIED, and defendant's motion to dismiss is GRANTED.

IT IS SO ORDERED.

N.D.Cal.,2006.
Poponin v. Virtual Pro, Inc.
Slip Copy, 2006 WL 2691418 (N.D.Cal.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit F

**APPENDIX OF NON-FEDERAL AND UNPUBLISHED FEDERAL AUTHORITIES.
CITED IN VISA USA INC.'S MOTION TO STAY ACTION
AND TO COMPEL ARBITRATION**

Westlaw.

Not Reported in F.Supp.2d                                                                              Page 1
Not Reported in F.Supp.2d, 2007 WL 914464 (N.D.Cal.)
**(Cite as: 2007 WL 914464 (N.D.Cal.))**

**H**Only the Westlaw citation is currently available.

United States District Court, N.D. California,
San Jose Division.
SANTANA ROW HOTEL PARTNERS, LP,
Plaintiff,
v.
ZURICH AMERICA INSURANCE COMPANY, et
al., Defendants.
No. C 05-00198 JW.

March 20, 2007.

Allen Ruby, Glen W. Schofield, Steven A. Ellenberg,
Ruby & Schofield, San Jose, CA, for Plaintiff.

Gary R. Selvin, Selvin, Wraith, Halman, LLP,
Oakland, CA, Alan Michael Jones, Ron Howard
Burnovski, Steven Donald Turner, Jones Turner,
LLP, Irvine, CA, for Defendants.

**ORDER DENYING MOTION TO COMPEL
ARBITRATION**

JAMES WARE, United States District Judge.

**I. INTRODUCTION**
*1 Santana Row Hotel Partners, L.P. ("Plaintiff")
brings this suit against Defendants Zurich American
Insurance Company ("Zurich"), Gallagher-Pipino,
Inc. and Arthur J. Gallagher & Co. (collectively
"Gallagher"), alleging breach of contract, fraud, and
related claims. Plaintiff alleges that Zurich failed to
pay losses resulting from a fire which were covered
by an insurance policy. Before the Court is
Gallagher's Motion to Compel Arbitration, which
relates to certain cross-claims brought by Zurich
against Gallagher. The Court conducted a hearing on
March 5, 2007. Based on the papers submitted to
date, and the arguments of counsel at the hearing, the
Court DENIES Gallagher's Motion to Compel
Arbitration.

**II. BACKGROUND**
Defendant Zurich alleges as follows:
  In May 2000, Zurich issued a builders risk
insurance policy ("Policy") to Federal Realty
Investment Trust ("FRIT"), covering certain losses
associated with FRIT's construction and
development of a retail and residential community
in San Jose known as Santana Row. (Defendant
Zurich's Amended Cross-Claim ¶¶ 15, 17,
hereafter, "Cross-Claim," Docket Item No. 107.) At
the time Zurich issued the Policy, Plaintiff was
leasing from FRIT the upper floors of a Santana
Row building to build and operate a hotel. (Cross-
Claim ¶ 15.)
On August 19, 2002 there was a fire at the Santana
Row development which caused massive damage
and significant delays in the hotel's scheduled
opening. (Id. ¶ 20.) On August 29, 2002, ten days
after the fire, and January 8, 2003, Gallagher issued
two Certificates of Insurance which Plaintiff
alleges are evidence that it was insured at the time
of the fire. (Id. ¶¶ 28-33.) In the fall of 2003, an
officer of Arthur J. Gallagher & Co., represented to
Zurich that Gallagher had communicated to FRIT
that they had bound coverage for SRHP's interest
in the hotel building. (Id. ¶ 34.) Through these and
other communications, Gallagher represented that
Plaintiff was covered under the Policy for its fire-
related losses. (Id. ¶ 48.) On the basis of these
representations, Zurich measured SRHP's losses,
made payments to SRHP that were not owed, and
was exposed to potential liability for SHRP's fire-
related losses. (Id. ¶ 54.)

  Zurich filed its Amended Cross-Claim on August 11,
2006, alleging five causes of action: 1) breach of
contract, 2) contractual indemnity, 3) equitable
contribution, 4) negligent misrepresentation, and 5)
fraud. Before the Court is Gallagher's Motion to
Compel Arbitration. (hereafter, "Motion," Docket
Item No. 167.) Gallagher asks the Court to compel
arbitration of Zurich's Cross-Claims and stay their
litigation pending the outcome of arbitration.

**III. STANDARDS**
  "A party to a valid arbitration agreement may
'petition any United States district court for an order
directing that such arbitration proceed in the manner
provided for in such agreement.' " Lifescan, Inc. v.
Premier DiabeticServs., Inc., 363 F.3d 1010, 1012
(9th Cir.2004) (quoting 9 U.S.C. § 4). The district
court must only determine whether an arbitration
agreement exists and whether it encompasses the
dispute at issue. See id. at 1012;see also Chiron
Corp. v. Ortho Diagnostic Sys., Inc., 207 F.3d 1126,
1130 (9th Cir.2000). "[A]ny doubts concerning the

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 914464 (N.D.Cal.)
(Cite as: 2007 WL 914464 (N.D.Cal.))

scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24-25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). Thus, arbitration should only be denied where "it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT & T Technologies, Inc. v. Communication Workers*, 475 U.S. 643, 650, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) (quoting *United Steelworkers v. Warrior Gulf Navigation Corp.*, 363 U.S. 574, 582-83, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)).

## IV. DISCUSSION

*2 The parties do not dispute that they have an Arbitration Agreement [FN1] that encompasses Zurich's cross-claim. Instead, Zurich contends that the Arbitration Agreement was the product of fraudulent inducement on the part of Gallagher, and is therefore unenforceable. There are two issues for consideration: (1) the threshold issue of whether the fraudulent inducement claim should be decided by the arbitrator or the Court, and (2) Gallagher's contention that Zurich has not properly alleged fraudulent inducement in its cross-claim. (Motion at 4-5.) The Court considers these issues in turn.

> FN1. (Declaration of Curtis R. Ogilvie in Support of Petition to Compel Arbitration, Ex. A, hereafter, "Arbitration Agreement," Docket Item No. 168.)

### A. The Claim of Fraudulent Inducement is Properly Before the Court

The parties dispute whether the fraudulent inducement claim is properly before the Court.

The Supreme Court has distinguished claims that an entire contract was fraudulently induced from claims that the arbitration provision in an otherwise valid contract was fraudulently induced. *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 126 S.Ct. 1204, 1209, 163 L.Ed.2d 1038 (2006); *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967). The district court faced with a fraudulent inducement claim that runs to the entire contract must refer that claim to the arbitrator. *Buckeye Check Cashing*, 126 S.Ct. at 1209. On the other hand, a district court faced with a claim that only the arbitration provision was

fraudulently induced must consider such a claim before compelling arbitration. *Id.; Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1268-69 (9th Cir.2006).

Both *Buckeye Check Cashing* and *Prima Paint* involved an arbitration clause in a broader contract. By contrast, the Arbitration Agreement between Zurich and Gallagher is precisely what its title indicates: an agreement to arbitrate. It contains no broader contractual duties other than to arbitrate covered disputes in the agreed-upon manner. [FN2] Therefore, it does not present the severability issue confronted in the cases. The fraud claim runs solely to an agreement to arbitrate. Accordingly, the claim must be considered by the Court as a prerequisite to its enforcement. 9 U.S .C. § 2.

> FN2. The Arbitration Agreement provides: The purpose of this Agreement is to (1) establish a binding agreement to arbitrate certain disputes between Gallagher and Zurich; (2) outline the scope and procedures of such arbitration; and (3) set forth the duties and obligations of each party with respect to such arbitration.
> (Arbitration Agreement at 1.) Gallagher itself agrees that the Arbitration Agreement is "an entirely separate and distinct contract" from any other agreements between the parties. (Motion at 5.)

### B. Sufficiency of Cross-Claim Allegations

Gallagher contends that the fraudulent inducement claim may not be considered because Zurich has not properly alleged it in its cross-claim. (Motion at 4-5.)

The Federal Rules provide, "In all averments of fraud or mistake, the circumstance constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other conditions of mind of a person may be averred generally." Fed.R.Civ.P. 9(b). The heightened pleading requirement applies to claims for which fraud is an essential element and to claims in which the plaintiff relies on the fraudulent conduct as the basis for the claim. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103 (9th Cir.2003).

Zurich points to five paragraphs in its Cross-Claim which purportedly allege fraudulent inducement of the Arbitration Agreement. (Opposition to Motion to

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2007 WL 914464 (N.D.Cal.)
(Cite as: 2007 WL 914464 (N.D.Cal.))

Compel Arbitration at 5, Docket Item No. 194.) The substance of these allegations is that Thomas Gallagher made false representations to Zurich which caused it to measure SRHP's losses from the fire, make a non-policy payment to SRHP, and to "otherwise act to its detriment." (Cross-Claim ¶¶ 34, 46-49.)  [FN3] The Court finds these allegations, which do not even mention the Arbitration Agreement, wholly deficient to state a claim that Zurich was fraudulently induced into entering it. [FN4]

FN3. The cited allegations in their entirety are as follows:

34. In or about the fall of 2003, AJG's officer, Thomas Gallagher, orally represented to Zurich that Gallagher-Pipino and/or AJG had communicated to FRIT that they had bound coverage for SRHP's interest in Building 5 of the Santana Row project prior to the August 19, 2002 fire.
...

46. Zurich realleges and incorporates by reference each and every allegation of paragraphs 1 through 34 above as though fully stated herein. Zurich pleads this cause of action as an alternative pleading under Rule 8(e)(2) of the Federal Rules of Civil Procedure.

47. On March 18, 2003, Gallagher-Pipino's Sam Pipino wrote and delivered a letter to Zurich's Daniel Sock claiming that Gallagher-Pipino had bound coverage for SRHP under the Policy on July 15, 2001.

48. Through various communications, including, but not limited to, the "Evidence of Property Insurance" forms dated August 29, 2002 and January 8, 2003 and Sam Pipino's March 18, 2003 letter, Gallagher-Pipino and AJG represented to Zurich that SRHP was an insured under the Policy at the time of the August 19, 2002 fire and entitled to benefits under the Policy for its fire-related losses. Said representations were not true and Gallagher-Pipino and AJG had no reasonable grounds for believing said representations were true at the time they were made.

49. In reasonable reliance upon Gallagher-Pipino and AJG's misrepresentations regarding SRHP's status as an insured under the Policy, Zurich was induced to measure SRHP's alleged losses, to make payments to SRHP that were not owed under the Policy and to otherwise act to its detriment. Had Gallagher-Pipino and AJG not made these representations, Zurich would not have taken such actions.

FN4. Zurich also points to a paragraph in its Answer to Second Amended Complaint. While this paragraph does mention the Arbitration Agreement, it does not directly allege that it was fraudulently induced. (See Answer to Second Amended Complaint ¶ 36, Docket Item No. 107.)

*3 Zurich's representations to the Court, however, indicate that it could plead facts which would support its claim that it was fraudulently induced into entering the Arbitration Agreement. (Opposition at 5.) Accordingly, the Court grants Zurich leave to amend its Cross-Claim.

### V. CONCLUSION

The Court DENIES Gallagher's Motion to Compel Arbitration without prejudice to being renewed upon the filing Zurich's amended cross-claim. Zurich shall file an Amended Cross-Claim to cure the deficiencies with respect to its fraud claim within thirty (30) days of this Order.

Not Reported in F.Supp.2d, 2007 WL 914464 (N.D.Cal.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

# Exhibit G

**APPENDIX OF NON-FEDERAL AND UNPUBLISHED FEDERAL AUTHORITIES
CITED IN VISA USA INC.'S MOTION TO STAY ACTION
AND TO COMPEL ARBITRATION**

Westlaw.

Slip Copy

Slip Copy, 2007 WL 1742870 (N.D.Cal.)
**(Cite as: Slip Copy)**

C
Susai v. Jagadeesh
N.D.Cal.,2007.
Only the Westlaw citation is currently available.
United States District Court,N.D. California.
Michael K. SUSAI, Plaintiff,
v.
B.V. JAGADEESH, et al., Defendants.
**No. C 07-00001 SBA.**

June 14, 2007.

Barry D. Brown, Jr., James Mason Smith, Squire, Sanders & Dempsey L.L.P., Palo Alto, CA, Rodney Richard Patula, Squire Sanders & Dempsey, San Francisco, CA, for Plaintiff.
Mona M. Patel, Geoffrey E. Hobart, Covington & Burling LLP, Washington, DC, Richard Allen Jones , Simon J. Frankel, Covington & Burling, San Francisco, CA, Lee Howard Rubin, Mayer Brown Rowe & Maw LLP, Palo Alto, CA, for Defendants.

**ORDER**
SAUNDRA BROWN ARMSTRONG, United States District Judge.
*1 This matter comes before the Court on defendants' Joint Petition to Compel Arbitration [Docket No. 24], Joint Motion to Dismiss the First Amended Complaint [Docket No. 22], and plaintiff's Request for Judicial Notice [Docket No. 30]. Having read and considered the arguments presented by the parties in the papers submitted to the Court, the Court finds this matter appropriate for resolution without a hearing. The Court hereby GRANTS defendants' Joint Petition to Compel Arbitration.

**_BACKGROUND_**

**I. Background Facts**

Plaintiff Michel K. Susai founded defendant NetScaler, Inc. ("NetScaler") in 1997 to develop and sell products for delivery of information over the internet using so-called "content switching" technology. FAC ¶¶ 14, 15. During the first five years of the company's existence, it went through several rounds of financing and consequent changes in its board of directors and management.*Id.* at ¶¶ 17-28.By 2000, defendant Gabriel Venture Partners, L.L.P. ('Gabriel') had become a major investor in NetScaler, and its nominee to the company's board was defendant Bolander. *Id* . at ¶ 24.By this time, Gabriel and the investors it led and the board members who represented them had effective control of NetScaler and forced Susai, who then controlled approximately 20% of the company's stock, to step down as CEO, although he remained the Chairman of the Board and an employee of the company. *Id.* at ¶¶ 25, 26.Defendant Jagadeesh was thereafter appointed CEO and President. *Id.* at ¶ 27.

By 2002, NetScaler was in need of a significant infusion of capital. *Id.* at ¶ 29.In October of that year, Sequoia Capital opened negotiations for what is now known as the "Series 1 Financing," by which Sequoia eventually secured 60% ownership of NetScaler by the end of 2002. As a condition to the Series 1 Financing, the existing shareholders of the company were to be diluted. *Id.* at ¶ 36.The financing was accomplished through a series of transactions including a stock conversion, a reverse stock split, amendments to a stock option plan, and the Severance Agreement with Susai ("Agreement," (FAC, Ex. B)), which reduced Susai's stock holdings and voided a voting agreement between Susai and other shareholders. The Agreement was executed on December 17, 2002. Thereafter, the Series 1 Financing was consummated and new equity positions were established. *Id.* at ¶¶ 36-43.In the end, Susai terminated all connection with NetScaler and his equity in the company was reduced to 3% of the post-Series 1 stock in the company. *Id.* at ¶ 42.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                        Page 2

**Slip Copy, 2007 WL 1742870 (N.D.Cal.)**
**(Cite as: Slip Copy)**

The terms and agreements regarding Susai's stock ownership were memorialized in the Agreement. The Agreement also included a release clause and an expansive arbitration provision. FAC, Ex. B at ¶ 9 (emphasis added). The release clause, entitled " Release of Claims" states that Susai and Netscalar, including its employees, officers, investors, and shareholders, mutually release each other from
\*2 any claim, duty, obligation, or cause of action relating to any matters of any kind, whether presently known or unknown, suspected or unsuspected, that [they] may possess arising from any omissions, acts or facts that have occurred ... [including] any and all claims relating to, or arising from, Mr. Susai's ownership ... of shares of stock in the Company, including without limitation, any claims for fraud, misrepresentation, breach of fiduciary duty, breach of duty under applicable state corporate law, and securities fraud under any state or federal law.

*Id.* ¶ 3(b). The parties further agreed to the release of "any and all claims for ... fraud; fraudulent inducement; negligent or intentional misrepresentation; unfair business practices ... [and] any and all claims for violation of any federal, state, or municipal statute."*Id.*

The arbitration provision states:
The Parties agree that any and all disputes arising out of the terms of this Agreement, their interpretation, or any of the matters herein released, shall be subject to binding arbitration ...**The Parties hereby agree to waive their right to have any dispute between resolved in a court of law by a judge or jury.**

*Id.* ¶ 9 (emphasis in original). Additionally, the parties waived their rights to the protections afforded by California Civil Code section 1542, which provides that a general release does not extend to claims of which the parties are not aware of at the time of the execution of the release.[FN1]

> FN1.Section 1542 states: "A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing

the release, which if known by him or her must have materially affected his or her settlement with the debtor."Cal. Civ.Code § 1542.

## II. The Present Lawsuit

In 2005, NetScaler was acquired for $325 million by Citrix. *Id .* at ¶ 53.As the FAC relates:
Shortly after the acquisition, Susai learned that either the day after or very shortly after he had entered into the December 2002 agreements, disposing of his pre-Series 1 stock in NetScaler, the option holders [who] remained with the Company after the Sequoia round and had been employed for four years were immediately vested in 70% of their options. Under all the circumstances, the intention to grant such options to those persons existed before and as of the time Susai was induced to approve the transactions and agreements alleged herein above.

*Id.* at ¶ 54.Susai states that he was "shocked" by this information. Opp. at 3. Susai states, in relaying the gravamen of his complaint, thatIn 2002, he had been unaware of defendants' pre-Series 1 intention to grant themselves such post-financing accelerated options. The intention was concealed from Susai, even though defendants did confirm that options would of course be granted to continuing employees. But defendants concealed the most material of all information about the options, under the circumstances that existed in late 2002.

*Id.*The FAC further states:Had Susai known of the feature, he would have, *inter alia,* used his then-existing holdings and position in NetScaler to insist that he receive options with the vesting feature ... and/or otherwise receive fair value for his pre-Series 1 stock in NetScaler-proportionate in value to what Jagadeesh, Bolander and others received for their pre-Series 1 stock.

\*3 FAC at ¶ 46.

Susai filed this lawsuit on January 3, 2007, over four years after the December 2002 Agreement was consummated. Susai alleges claims for violation of Rule 10b-5, fraud, deceit, negligent misrepresentation, breach of fiduciary duties, unjust

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                  Page 3

Slip Copy, 2007 WL 1742870 (N.D.Cal.)
(Cite as: Slip Copy)

enrichment, and violation of the California unfair business practices law, all based on defendants' alleged concealments, as well as their "oppression and coercion of Susai as a minority shareholder."*See* FAC at ¶¶ 84-98.

The original complaint filed by Susai made no reference to the Agreement. However, after defendants informed Susai of their intention to enforce the arbitration provision of the Agreement during a meet-and-confer discussion on March 5, 2007, Susai amended his pleadings to assert a cause of action alleging the invalidity of the arbitration and release provisions in the Agreement. Pet. to Compel. at ¶ 9. Susai alleges in his Seventh Claim that in 2002, defendants not only knew that their actions would "lead to Susai's loss of his rightful interests in NetScaler," but also "knew that, upon discovery by Susai [of defendants' scheme], he would assert claims for relief against them for the loss of such interests."*Id.* at ¶ 103."With the specific intent of avoiding such claims and while concealing from Susai that the claims were about to arise, defendants procured from him the release and arbitration provisions that are the cornerstones of the defense motions now before the Court."Opp. at 4; *see* FAC at ¶¶ 104-108.

### LEGAL STANDARD

A party to a valid arbitration agreement may " petition any United States district court for an order . .. directing that such arbitration proceed in the manner provided for in such agreement."9 U.S.C. § 4. The district court must only determine whether an arbitration agreement exists and whether it encompasses the dispute at issue. *See Lifescan, Inc. v. Premier Diabetic Servs., Inc.,* 363 F.3d 1010, 1012 (9th Cir.2004); *see also Chiron Corp. v. Ortho Diagnostic Sys., Inc.,* 207 F.3d 1126, 1130 (9th Cir.2000). Any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration. *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,* 460 U.S. 1, 24-25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). Thus, arbitration should only be denied where "it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that

covers the asserted dispute."*AT & T Technologies, Inc. v. Communication Workers,* 475 U.S. 643, 650, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) (quoting *United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582-83, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)).

Arbitration provides a forum for resolving disputes more expeditiously and with greater flexibility than litigation. *Lifescan,* 363 F.3d at 1011. The Federal Arbitration Act provides that arbitration agreements governed by the Act "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The Act was created to "reverse the longstanding judicial hostility to arbitration agreements" and "to place arbitration agreements on the same footing as other contracts."*Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 24, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991).Section 2 of the Act evinces "a liberal federal policy favoring arbitration agreements, not withstanding any state substantive or procedural policies to the contrary." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983).

### ANALYSIS

*4 Defendants raise two primary arguments in their petition: 1) since the arbitration clause states that disputes relating to the "interpretation" of, or matters "released" under, the Agreement are to be submitted to the arbitrator, the questions of the validity and scope of the arbitration clause are to be decided by the arbitrator and not this Court, and 2) assuming the Court reaches the issue of the scope of the arbitration clause, plaintiff's claims are clearly within the scope of the expansive clause. In response, Susai argues that 1) in the absence of a " clear and unmistakable" intention to submit the specific issue of the scope of an arbitration clause to the arbiter, this Court must decide that issue, and 2) since the FAC does not allege that the Agreement as a whole is invalid but only specifically challenges the arbitration provision, this Court must decide the issue of the validity of the arbitration clause.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 4

Slip Copy, 2007 WL 1742870 (N.D.Cal.)
**(Cite as: Slip Copy)**

### I. Arbitrability

This Court has already considered-and rejected-Susai's first argument. In *Anderson v. Pitney Bowes, Inc.,* 2005 WL 1048700 (N.D.Cal. May 4, 2005) (Armstrong, J.), this Court held that where the parties " 'clearly and unmistakably' empowered an arbitrator to determine arbitrability, the Court must compel arbitration."*Id.* at *2 (citing *AT & T Technologies,* 475 U.S. at 649). This Court found a "clear and unmistakable" intention to submit the question of arbitrability to an arbitrator when the agreement provided that "the Arbitrator shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, or enforceability or formation of this Agreement, including ... any claim that all or any part of this Agreement is void or voidable ."*Id.* at *3. Susai asserts that, in contrast, "[n]o such language exists in the Arbitration Provision here."

This Court disagrees. The arbitration clause in this case states that "any and all disputes arising out of the terms of this Agreement, their *interpretation,* or *any of the matters herein released"* shall be subject to binding arbitration. FAC, Ex. B at ¶ 9 (emphasis added). While the arbitration clause in *Anderson* specifically submitted to the arbitrator "any claim that all or any part of this Agreement is void or voidable," the arbitration clause here broadly states that "any of the matters *herein released"* shall be subject to arbitration. By incorporating the matters described in the release clause, the parties effectively submitted *any* dispute between them to the arbitrator, including allegations of fraud in the inducement of agreement to the arbitration provisions. The release clause states that "any claim, duty, obligation, or cause of action relating to any matters of any kind ... including without limitation, any claims for fraud [or] misrepresentation" are thereby released. Susai absurdly argues that since the arbitration clause literally covers "matters herein released," in order to determine the scope of the arbitration clause, the Court must first determine which matters are in fact "released" by the release provision, which in turn requires the Court to determine whether the release and arbitration clauses are themselves valid, which would require an inquiry into precise the matters at

issue, i.e., whether Susai was fraudulently induced into entering into those provisions. However, Susai's tortured interpretation would render the " matters herein released" language in the arbitration provision nonsensical, as it would mean that " released" matters-matters that by definition could not be submitted to the Court or the arbitrator-would be submitted to the arbitrator.

**\*5** When the language of a contractual provision is unintelligible if read literally, a court may give the language a practical interpretation which makes it intelligible. *U.S. v. Data Translation, Inc.,* 984 F.2d 1256, 1260 (1st Cir.1992) (citing Restatement (Second) of Contracts §§ 200, 203 (1981)). While perhaps not a paragon of clarity, the intended meaning of the arbitration clause is clear enough: all of the claims described in the release clause are to be submitted to the arbitrator, and it is for the arbitrator, and not this Court, to determine the scope and validity of the release clause, and by incorporation, the scope and validity of the arbitration provision.

Finally, the arbitration provision provides that any dispute related to the "interpretation" of the "terms" of the Agreement shall be submitted to the arbitrator. The question of the scope of the arbitration clause is precisely a question of the interpretation of the terms of the Agreement. Parties to an arbitration agreement are free to submit questions related to the scope of the agreement to the arbitrator. *AT & T Technologies,* 475 U.S. at 649 . The exceedingly broad arbitration provision in this case covers disputes related to the scope of the arbitration provision itself, and therefore this issue must be submitted to the arbitrator.

### II. Validity of the Arbitration Clause

Susai also argues that because he specifically challenges the validity of arbitration and release provisions but does not seek to invalidate the Agreement as a whole, this Court must pass on the issue of the validity of the provisions, which inquiry would require the Court to determine whether Susai was in fact defrauded-the very claim that forms the basis of his lawsuit. In *Buckeye Check Cashing, Inc.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 1742870 (N.D.Cal.)
**(Cite as: Slip Copy)**

*v. Cardegna*, 546 U.S. 440, 126 S.Ct. 1204, 163 L.Ed.2d 1038 (2006), the Supreme Court recognized that challenges to arbitration agreements fall into two categories: (1) those "challeng[ing] specifically the validity of the agreement to arbitrate; " and (2) those "challeng[ing] the contract as a whole, either on a ground that directly affects the entire agreement (e.g., the agreement was fraudulently induced), or on the ground that the illegality of one of the contract's provisions renders the whole contract invalid."126 S.Ct. at 1208.

In clarifying its interpretation of *Buckeye*, the Ninth Circuit in *Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1268-69 (9th Cir.2006), sitting en banc, held that "when the crux of the complaint challenges the validity or enforceability of the agreement containing the arbitration provision, then the question of whether the agreement, as a whole, is unconscionable must be referred to the arbitrator." *Id.* at 1263-1264 (citing *Buckeye, supra*, 546 U.S. 440, 126 S.Ct. 1204, 163 L.Ed.2d 1038). However, the court continued, "[w]hen the crux of the complaint is not the invalidity of the contract as a whole, but rather the arbitration provision itself, then the federal courts must decide whether the arbitration provision is invalid and unenforceable." *Id.* at 1264.

**\*6** As an initial matter, it appears that Susai's seventh claim alleging the invalidity of the arbitration provision was added only once Susai became aware that defendants intended to compel arbitration. As noted above, the original complaint filed by Susai made no reference to the Agreement. However, after defendants informed Susai of their intention to enforce the arbitration provision of the Agreement during a meet-and-confer discussion on March 5, 2007, Susai amended his pleadings to assert a cause of action alleging the invalidity of the arbitration and release provisions in the Agreement. Pet. to Compel at ¶ 9. Specifically, Susai alleges that defendants knew that their actions would "lead to Susai's loss of his rightful interests in NetScaler," and that, "[w]ith the specific intent of avoiding such claims and while concealing from Susai that the claims were about to arise, defendants procured from him the release and arbitration provisions that are the cornerstones of the defense motions now

before the Court."Opp. at 4; *see* FAC at ¶¶ 104-108.

However, there is no question that the "crux" of Susai's complaint is that he was fraudulently induced into entering into the Agreement as a whole. Susai does not allege facts relating to the supposedly fraudulently induced arbitration provision that are independent of defendant's alleged scheme to defraud Susai of his rights by enticing him to entering into the Agreement as a whole under false pretenses. *Cf. Nagrampa*, 469 F.3d at 1271 (examining the "crux of the complaint" in that case made it "abundantly clear" that plaintiff's challenge went specifically, and only, to the arbitration clause, where plaintiff alleged contract was one of adhesion, and only filed suit only after defendant successfully moved the arbitral venue for the contract claims at issue to the other side of the country and the AAA rejected her petition to waive the arbitral fees). While he does not specifically allege the invalidity of the Agreement (which he apparently avoided doing to avoid triggering the arbitration provision, as described above), all of the damages he describes flow from the his claim that, had he known all of the purported facts at the time he entered into the Agreement, he would not have done so. There is no factual basis which distinguishes Susai's other claims from his challenge to the arbitration provision. Accordingly, under the rule articulated in *Buckeye* and *Nagrampa*, the question of the validity of the arbitration clause must be referred to the arbitrator. Where, as here, there is no independent challenge to the arbitration clause in that the plaintiff alleges the same facts as alleged in the underlying dispute to void the arbitration clause, the court must honor the arbitration clause. *Western Hospitals Federal Credit Union v. E.F. Hutton & Co., Inc.*, 700 F.Supp. 1039, 1043 (N.D.Cal.1988) (Henderson, J.). Susai may not "bootstra[p] the conduct for which [he] is suing [defendants] into a separate reason for voiding the arbitration clause." *Id.* at 1042.Susai's cynical attempt to avoid this sound rule by simply adding a cause of action challenging the validity of the arbitration clause therefore fails.

**\*7** Because the Court does not reach the merits of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                              Page 6

Slip Copy, 2007 WL 1742870 (N.D.Cal.)
**(Cite as: Slip Copy)**

the case, the motion to dismiss is denied as moot.

### *CONCLUSION*

For the foregoing reasons, the defendants' Petition to Compel Arbitration [Docket No. 24] is GRANTED, and this case is STAYED pending arbitration. The Motion to Dismiss [Docket No. 22] is DENIED AS MOOT. Plaintiff's Request for Judicial Notice [Docket No. 30] is GRANTED.

IT IS SO ORDERED.

N.D.Cal.,2007.
Susai v. Jagadeesh
Slip Copy, 2007 WL 1742870 (N.D.Cal.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit H

**APPENDIX OF NON-FEDERAL AND UNPUBLISHED FEDERAL AUTHORITIES
CITED IN VISA USA INC.'S MOTION TO STAY ACTION
AND TO COMPEL ARBITRATION**

Westlaw.

Slip Copy    Page 1

Slip Copy, 2007 WL 1775393 (E.D.Pa.)
**(Cite as: Slip Copy)**

**C**
Way Services, Inc. v. Adecco North America, LLC
E.D.Pa.,2007.
Only the Westlaw citation is currently available.
United States District Court,E.D. Pennsylvania.
WAY SERVICES, INC., Plaintiff,
v.
ADECCO NORTH AMERICA, LLC, et al.,
Defendants.
**Civil No. 06-CV-2109.**

June 18, 2007.

Eric L. Winkle, W. Bryan Byler, Byler, Goldman, Winkle & Hetrick, PC, Lancaster, PA, for Plaintiff.
David I. Ackerman, David J. Butler, Bingham McCutchen LLP, Washington, DC, Mark D. Bradshaw, Stevens & Lee, Harrisburg, PA, for Defendants.

### MEMORANDUM OPINION & ORDER
RUFE, J.
**\*1** This case involves a dispute between a franchisor and franchisee, both of whom claim that the other has breached their franchise agreement. Previously, the Court granted Plaintiff's Motion to Compel Arbitration, and arbitration before the American Arbitration Association ("AAA") has commenced. Presently before the Court is Plaintiff's Motion to Stay Arbitration, in which it argues that only Count II of its Complaint should be arbitrated by the AAA. Because Plaintiff entered an arbitration agreement granting the arbitration panel the power to decide the scope of its own jurisdiction, the Court will deny the Motion, and the arbitration before the AAA may proceed in accordance with the panel's ruling.

### I. BRIEF FACTUAL BACKGROUND

The instant dispute arises out of a relationship between Plaintiff Way Services, Inc. ("Way Services

") and Defendants Adecco USA, Inc. and Adecco North America, LLC (collectively "Adecco"), that ostensibly commenced in August 1993. At that time, Way Services and Adia Services, Inc. ("Adia Services") entered a franchise agreement under which Plaintiff was to operate a temporary-staffing business in Pennsylvania.[FN1] Adecco is the successor-in-interest to Adia Services, and the franchise agreement remained in place after Adecco replaced Adia Services as the franchisor.

> FN1. The Court notes that Way Services previously had a relationship with Adia Services' predecessors-in-interest. The modern relationship, however, which is based on the franchise agreement currently in force, began in 1993.

In addition to outlining the parties' relationship, the franchise agreement included an arbitration clause requiring that "any dispute or disagreement between the parties arising out of or in relation to this Agreement ... be settled by arbitration under the rules then obtaining of the American Arbitration Association in San Francisco, California."[FN2] The agreement included a choice-of-law provision requiring that it be governed by and interpreted under California law.[FN3]

> FN2. Franchise Agreement [Doc. # 47-2, Ex. A], at 43, ¶ 22.1.

> FN3. Id. at 41, ¶ 21.1.

Apparently, the franchise relationship was an amicable one for over a decade. Sometime in early 2006, however, Adecco demanded that Way Services discharge its President and General Manager, Michael Doner, based on allegations of misconduct. In April 2006, Way Services complied with Adecco's demand, and Mr. Doner was terminated. On May 12, 2006, Adecco notified Way

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 1775393 (E.D.Pa.)
**(Cite as: Slip Copy)**

Services that it was terminating their franchise relationship as of May 21, 2006. In this lettered notice of termination, Adecco identified numerous provisions of the franchise agreement that Way Services was allegedly breaching by continuing to associate with and support Traffic Control Services, Inc. ("TCS"), a business owned by Mr. Doner, his wife, and his mother.

In response, Way Services filed a Complaint in this Court, alleging three causes of action against Adecco and seeking an injunction prohibiting Adecco from terminating the franchise agreement. In Count I, Way Services alleges that Adecco committed fraud by instructing it not to remedy its breaches of the franchise agreement, and then attempting to terminate the agreement. In Count II, Way Services alleges that Adecco's attempt to terminate the franchise agreement constitutes a breach of that agreement. In Count III, Way Services alleges that Adecco's attempt to terminate the franchise agreement constitutes tortious interference with a contract that it had made with TCS. The Court immediately entered a temporary restraining order precluding Adecco from terminating the franchise agreement, pending consideration of the request for a preliminary injunction.

**\*2** Before a hearing was held on Way Services' Application for a Preliminary Injunction,[FN4] Way Services filed a Motion to Compel Arbitration. Adecco responded to this flurry of litigation by filing an Answer and several counterclaims against Way Services, including claims for breach of contract, trademark infringement, and conspiracy to defraud. Adecco also filed a response to the Motion to Compel Arbitration, in which it agreed that arbitration was appropriate, but argued that it should be able to terminate the franchise agreement before arbitrating the dispute.

> FN4. Pl.'s Application for Prelim. Inj. [Doc. # 9]. After briefing and a hearing, this application was subsequently granted, and a preliminary injunction was entered on September 6, 2006. *See* Mem. Op. & Order [Doc. # 43], Sept. 6, 2006.

On June 23, 2006, the Court granted Way Services' Motion to Compel Arbitration, requiring Way Services to file for arbitration within seven days. On June 27, 2006, Way Services filed a Demand for Arbitration with the AAA, attaching a copy of its federal-court Complaint and informing the AAA that its other causes of action should be arbitrated " to the extent the Federal District Court does not exercise jurisdiction over [them]." Adecco filed an Answering Statement asserting breach-of-contract counterclaims against Way Services only.

Thereafter, the AAA ordered the parties to brief the issue of the arbitration's scope, and the parties did so through lettered briefs. After considering the briefing, the AAA panel determined that the franchise agreement granted it the power to determine its own jurisdiction, and ruled that all three of Way Services' claims and Adecco's breach-of-contract claim were subject to the pending arbitration.[FN5]

> FN5.*See* Order of Arbitrator [Doc. # 47-7, Ex. F], Jan. 25, 2007.

In response, Way Services has filed the instant Motion to Stay Arbitration. Adecco has filed its Response, and the Motion is now ready for this Court's review.

## II. DISCUSSION

Way Services, obviously dissatisfied with the AAA panel's determination of arbitrability, now moves this Court to stay the arbitration and assert jurisdiction over Counts I and II of Way Services' Complaint, as well as all of Adecco's counterclaims. Way Services first argues that the Court's Orders granting the Motion to Compel Arbitration and placing the matter in civil suspense compelled arbitration of Count II of the Complaint only and reserved exclusive jurisdiction over all other matters. More importantly, Way Services argues that questions of arbitrability, such as the appropriate scope of an arbitration, are to be decided by the Court rather than the arbitration panel. Accordingly, Way Services asks this Court to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 1775393 (E.D.Pa.)
**(Cite as: Slip Copy)**

reject the AAA panel's determination of scope and, instead, perform its own inquiry into which claims are to be arbitrated.

Generally, the question of arbitrability is a gateway issue to be decided by a court rather than an arbitrator.[FN6] The parties to an arbitration agreement can, however, contract around this presumption by agreeing to submit the arbitrability question itself to arbitration.[FN7] But, "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clear and unmistakable' evidence that they did so."[FN8] Silence or ambiguity about who should decide the arbitrability issue should not lead a court to presume that the parties intended for the issue to be decided by the arbitrator.[FN9] Rather, a court must examine the arbitration agreement to decide if, when construed under the relevant state law, the agreement evidences a clear intention that the arbitrators will have the authority to determine the scope of arbitration.[FN10]

FN6. *AT & T Techs., Inc. v. Commc'ns Workers of Am.,* 475 U.S. 643, 649, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986).

FN7. *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 943, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995); *see also Apollo Computer, Inc. v. Berg,* 886 F.2d 469, 473 (1st Cir.1989).

FN8. *First Options,* 514 U.S. at 944 (citing *AT & T,* 475 U.S. at 649).

FN9. *Id.* at 944-45.

FN10. *See Contec Corp. v. Remote Solution Co.,* 398 F.3d 205, 208 (2d Cir.2005).

**\*3** Under this framework, numerous courts have found that when an arbitration agreement incorporates by reference rules giving the arbitrator the power to rule on his or her own jurisdiction, " the parties' incorporation of those rules evidences a clear and unmistakable intent to delegate the determination of arbitrability to [the] arbitrator." [FN11] Specifically, several courts-including California courts applying California law-presented with arbitration clauses nearly identical to the one in this case have found that reference to the AAA rules, or similar rules granting the arbitrator the authority to determine his or her own jurisdiction, establishes a clear and unmistakable intent to permit the arbitrators to decide the arbitrability question. [FN12]

FN11. *Qualcomm Inc. v. Nokia Corp.,* 466 F.3d 1366, 1373 (Fed.Cir.2006)

FN12. *See, e.g., Terminix Int'l Co., LP v. Palmer Ranch Ltd. P'ship,* 432 F.3d 1327, 1332 (11th Cir.2005); *Contec,* 398 F.3d at 208;*Apollo Computer,* 886 F.2d at 473; *Rodriguez v. Am. Techs., Inc.,* 136 Cal.App.4th 1110, 39 Cal.Rptr.3d 437, 446 (Ct.App.2006); *Dream Theater, Inc. v. Dream Theater,* 124 Cal.App.4th 547, 21 Cal.Rptr.3d 322, 329 (Ct.App.2004).

Significantly, California law embraces the conclusion that incorporation of the AAA rules evidences a clear and unmistakable intent to have the arbitrator determine any arbitrability questions. For example, in *Dream Theater, Inc. v. Dream Theater,*[FN13] the California Court of Appeal considered an arbitration clause providing that contested claims would be submitted to " mandatory, final and binding arbitration in the County of Los Angeles, California, in accordance with the Commercial Arbitration Rules of the American Arbitration Association then in effect." [FN14] After examining the Supreme Court's decision in *First Options,*[FN15] and after noting that " California law is consistent with federal law on the question of who decides disputes over arbitrability," [FN16] the court concluded that reference to the AAA rules-which "specify that the arbitrator will decide disputes over the scope of the arbitration agreement"[FN17]-is sufficiently clear and unmistakable evidence that the arbitrator should decide whether a claim is arbitrable.[FN18]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 4

Slip Copy, 2007 WL 1775393 (E.D.Pa.)
**(Cite as: Slip Copy)**

FN13.124 Cal.App.4th 547, 21 Cal.Rptr.3d 322 (Ct.App.2004).

FN14.*Id.* at 327.

FN15.*Id.* at 326.

FN16.*Id.*

FN17.*Id.* at 329.

FN18.*Id.; see also Rodriguez,* 39 Cal.Rptr.3d at 446 (holding the same when considering an arbitration clause that incorporated the AAA's Construction Industry Rules, which also designate the arbitrability question for arbitration).

Various federal courts have arrived at the same conclusion when considering similar arbitration clauses. For example, in *Contec Corp. v. Remote Solution Co.,*[FN19] the Second Circuit Court of Appeals was faced with an arbitration clause that read, in pertinent part:

FN19.398 F.3d 205 (2d Cir.2005).

In the event of any controversy arising with respect to this Agreement, both parties shall use its [sic] best efforts to resolve the controversy. In the event the parties are unable to arrive at a resolution, such controversy shall be determined by arbitration held in the City of Albany, New York in accordance with the Commercial Arbitration Rules of the American Arbitration Association (the "AAA") or any organization that is the successor thereto.[FN20]

FN20.*Id.* at 208.

Acknowledging that Rule 7(a) of the AAA Commercial Arbitration Rules grants the arbitrator " the power to rule on his or her own jurisdiction, including any objection with respect to the existence, scope or validity of the arbitration agreement," the court held that "the incorporation serve[d] as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator.

"[FN21] Accordingly, the court held that arbitration of the arbitrability issue itself was appropriate.

FN21.*Id.*

*4 Likewise, in *Qualcomm Inc. v. Nokia Corp.,* [FN22] the Federal Circuit concluded that the parties had clearly and unmistakably evidenced their intent to arbitrate the arbitrability issue by incorporating the AAA rules into their arbitration agreement. In that case, the court considered an arbitration clause dictating that "any dispute, claim or controversy arising out of or relating to th[e] Agreement, or the breach or validity [t]hereof ... be settled by arbitration in accordance with the arbitration rules of the American Arbitration Association."[FN23] Approving of and adopting the Second Circuit's analysis in *Contec,* the court held that incorporation of the AAA rules "clearly and unmistakably shows the parties' intent to delegate the issue of determining arbitrability to an arbitrator."[FN24]

FN22.466 F.3d 1366 (Fed.Cir.2006).

FN23.*Id.* at 1368.

FN24.*Id.* at 1373.

The Eleventh Circuit Court of Appeals reached this same result when presented with a similar arbitration clause. In *Terminix International Co., LP v. Palmer Ranch Limited Partnership,*[FN25] the parties had entered arbitration agreements providing that "arbitration shall be conducted in accordance with the Commercial Arbitration Rules then in force of the American Arbitration Association."[FN26]The court, noting the AAA rule granting an arbitrator the authority to rule on his or her own jurisdiction as well as the Federal Circuit's decision in *Contec,* held that, by incorporating the AAA rules into their agreements, the parties had clearly and unmistakably agreed that the arbitrator should decide the question of arbitrability.[FN27]

FN25.432 F.3d 1327 (11th Cir.2005).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 5

**Slip Copy, 2007 WL 1775393 (E.D.Pa.)**
**(Cite as: Slip Copy)**

FN26.*Id.* at 1332.

FN27.*Id.*

The First Circuit arrived at a similar conclusion when dealing with an arbitration agreement that incorporated the rules of arbitration of the International Chamber of Commerce ("ICC"), as opposed to the AAA. In *Apollo Computer, Inc. v. Berg,*[FN28] the court considered an arbitration clause stating that "all disputes arising out of or in connection with their contract would be settled by binding arbitration in accordance with the rules of arbitration of the [ICC]."[FN29] Articles 8.3 and 8.4 of the ICC rules granted the arbitrator the power to decide the arbitrability question if such question was raised by either party.[FN30]Consequently, the court held that the parties had contracted around the presumption that a court would decide the arbitrability issue by agreeing to be bound by the ICC rules. Their agreement, therefore, "clearly and unmistakably allow[ed] the arbitrator to determine her own jurisdiction."[FN31]

FN28.886 F.2d 469 (1st Cir.1989).

FN29.*Id.* at 473.

FN30.*Id.*

FN31.*Id.*

Considering this relevant case law, the Court is persuaded that the prevailing rule across jurisdictions is that incorporation by reference of rules granting the arbitrator the authority to decide questions of arbitrability-especially the AAA rules-is clear and unmistakable evidence that the parties agreed to submit arbitrability questions to the arbitrators. More importantly, the Court is convinced that California law has adopted this rule.

If, after applying this rule, a court ultimately determines that the parties clearly and unmistakably intended to submit the arbitrability question to the arbitrator, then it must defer to the arbitrator's decision about arbitrability of the claims.[FN32]The arbitrator's decision is to be reconsidered and

vacated only in limited and rare circumstances, such as those outlined in 9 U.S.C. § 10.[FN33]

FN32.*First Options,* 514 U.S. at 943.

FN33.*See id.;*9 U.S.C. § 10 (2006) (outlining the bases for vacating an arbitrator's award, such as corruption or fraud in the process, or misconduct by the arbitrator).

*5 In the matter currently before the Court, Way Services' assertion that the Court must decide the scope of arbitration itself rather than deferring to the arbitrators' determination, is unfounded. The instant case presents an issue virtually identical to that presented in cases like *Qualcomm, Contec, Terminix,* and *Dream Theater,* and the Court sees no reason to reach a different conclusion in this case. When Way Services entered the franchise agreement, it agreed to an arbitration clause that required arbitration of disputes in accordance with the AAA's arbitration rules. Those rules-specifically Rule 7(a)-grant the arbitrator "the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement."[FN34]Accordingly, the incorporation of the AAA rules clearly and unmistakably evidences Way Services' agreement to arbitrate all disputes as to arbitrability, including the proper scope of the arbitration. In light of the significant authority supporting this conclusion, Way Services' arguments to the contrary are unconvincing.

FN34. AAA Commercial Arbitration Rules [Doc. # 47-8, Ex. G], Rule 7(a), at 11 of 28.

Since the AAA arbitration panel had the authority to determine its own jurisdiction in this case, the Court must defer to its ruling on the scope of the pending arbitration. This is clearly not a case where vacatur of the panel's ruling would be appropriate. There are no allegations of bias, impropriety, corruption, or misconduct, and the arbitrators have not exceeded their power. Therefore, this Court will not

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2007 WL 1775393 (E.D.Pa.)
**(Cite as: Slip Copy)**

disrupt the arbitrators' ruling that Counts I, II, and III of Way Services' Complaint, as well as Adecco's counterclaim for breach of contract, will be arbitrated before them pursuant to the franchise agreement.

END OF DOCUMENT

### III. CONCLUSION

Because Way Services agreed to resolve any disputes arising from or related to the franchise agreement through arbitration governed by the AAA rules, it cannot now successfully attempt to disavow that commitment. The AAA rules clearly state that the arbitrators have the authority to determine their own jurisdiction, and, therefore, this Court cannot remove the question of arbitrability from the arbitration panel's purview. To do so would be to act in direct contravention of the parties' arbitration agreement. Accordingly, the Court will deny Way Services' Motion to Stay Arbitration, and the ongoing arbitration may proceed as currently defined by the AAA panel.

An appropriate Order follows.

### ORDER

**AND NOW,** this 18th day of June 2007, upon consideration of Plaintiff's Motion to Stay Arbitration [Doc. # 45], Plaintiff's Memorandum in Support thereof [Doc. # 46], and Defendants' Opposition thereto [Doc. # 47], and after careful review of the relevant legal authorities, it is hereby **ORDERED** that the Motion is **DENIED** and the arbitration may proceed.

It is **FURTHER ORDERED** that the Court retains jurisdiction over this matter, but the case shall remain in the Civil Suspense File until it is in a status such that it may proceed to final disposition.

*6 It is so **ORDERED.**

E.D.Pa.,2007.
Way Services, Inc. v. Adecco North America, LLC
Slip Copy, 2007 WL 1775393 (E.D.Pa.)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit I

**APPENDIX OF NON-FEDERAL AND UNPUBLISHED FEDERAL AUTHORITIES
CITED IN VISA USA INC.'S MOTION TO STAY ACTION
AND TO COMPEL ARBITRATION**

Westlaw.

159 Cal.App.3d 229

Page 1

159 Cal.App.3d 229, 205 Cal.Rptr. 469
**(Cite as: 159 Cal.App.3d 229)**

**C**

Chase Chemical Co., Inc. v. Hartford Acc. and
Indem. Co.
Cal.App.2.Dist.

CHASE CHEMICAL COMPANY, INC.,
Cross-complainant and Appellant,
v.
HARTFORD ACCIDENT AND INDEMNITY
COMPANY, Cross-defendant and Respondent.
**No. B001430.**

Court of Appeal, Second District, Division 4,
California.
Aug 17, 1984.

SUMMARY

Two employees brought an action against a third
party for injuries sustained in the course of their
employment. The third party filed a cross-complaint
against the employer's workers' compensation
insurer for comparative contribution or indemnity
stemming from the insurer's alleged aggravation of
the employees' initial work-related injuries, and for
an offset of the workers' compensation benefits paid
to the employees. No written indemnity agreement
between the employer and the third party ever
existed, and Lab. Code, § 3864, provides that an
employer is not liable to a third party for indemnity
in the absence of a written agreement executed prior
to the injury. The insurer demurred to the third
party's cross-complaint. The trial court sustained the
demurrer without leave to amend on the grounds the
pleading did not state a cause of action and
dismissed the cross-complaint as to the insurer.
(Superior Court of Los Angeles County, No.
345249, John L. Cole, Judge.)

The Court of Appeal reversed. The court held that
an insurer who, with a duty to disclose, fraudulently
conceals from an employee the existence of an
injury and its cause forfeits its "alter ego" status and
could be sued at law by that employee or by a third
party defendant because such conduct goes beyond
the normal role of an insurer in a compensation
scheme intended to protect the worker. The court
further held that a third party could bring an action
for comparative indemnity against such insurer in
the absence of a written indemnity agreement, since
Lab. Code, § 3864, would not shield that insurer
who steps outside its statutorily protected employer
status by such conduct. However, it held that the
third party's cross-complaint did not state a cause of
action for comparative indemnity against the insurer
as an independent tortfeasor, since the
cross-complaint failed to allege facts upon which a
duty on the part of the insurer to disclose the
existence, if any, of injury aggravating conditions
could be based. Nonetheless, it held that the trial
court abused its discretion in sustaining the
demurrer without leave to amend, since the
cross-complaint stated a valid cause of action for
offset of compensation benefits against the insurer,
and whether it could also state sufficient facts to
constitute a cause of action for comparative
indemnity was a question which could only be
decided after the filing of an amended
cross-complaint. (Opinion by McClosky, Acting P.
J., with Arguelles, J., and Title, J., [FN*] concurring.)

FN* Assigned by the Chairperson of the
Judicial Council.

HEADNOTES

Classified to California Digest of Official Reports

(1) Workers' Compensation § 1--Employee Injured
in Course of Employment-- Resolution of Claims
Against Employer.
When an employee is injured in the course of
employment, the resolution of any claims that he
has against his employer who is acting as such is
governed by the Workers' Compensation Act. (Lab.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

159 Cal.App.3d 229                                           Page 2

159 Cal.App.3d 229, 205 Cal.Rptr. 469
**(Cite as: 159 Cal.App.3d 229)**

Code, § 3200 et seq.) Thereunder, an employer's liability for compensation benefits exists without regard to fault (Lab. Code, § 3600), and, with certain limited exceptions, the right to recover workers' compensation benefits under § 3600 is the employee's exclusive remedy against his employer. ( Lab. Code, §§ 3601, 3602.)

**(2)** Workers' Compensation § 11--Actions Against Third Party Tortfeasors.
By virtue of Lab. Code, § 3852, an industrially injured employee retains his right to sue "any person other than the employer" for damages proximately resulting from the injury sustained in the course of employment.

**(3)** Workers' Compensation § 13--Actions Against Third Party Tortfeasors-- Rights of Employer or Carrier.
The term "employer" as used in Lab. Code, div. 4, pt. 1, ch. 5 (Lab. Code, § 3850 et seq.), which chapter is entitled "Subrogation of Employer" and includes Lab. Code, §§ 3852 (action against third persons; recovery by employer) and 3864 (absence of employer's liability to third person in case of judgment against or settlement by latter), includes the employer's workers' compensation carrier. (Lab. Code, §§ 3850, subd. (b), & 3211.)

**(4a, 4b)** Workers' Compensation § 24--Actions Against Third Party Tortfeasors--Right of Third Party to Indemnity--Against Employer's Insurer-- Absence of Written Indemnity Agreement.
In an action by two employees against a third party for injuries sustained in the course of their employment, Lab. Code, § 3864, which eliminates an employer's liability to a third party for implied indemnity absent an express agreement, did not bar the third party's cross-complaint against the employer's workers' compensation insurer for comparative contribution or indemnity stemming from the insurer's alleged aggravation of the employees' initial work-related injuries, though no written indemnity agreement between the employer and the third party ever existed. An insurer who, with a duty to disclose, fraudulently conceals from an employee the existence of an injury and its cause forfeits its "alter ego" status and may be sued at law by that employee or by a third party defendant

because such conduct goes beyond the normal role of an insurer in a compensation scheme intended to protect the worker. Section 3864 would not shield that insurer who steps outside its statutorily protected employer status by such conduct.

**(5)** Workers' Compensation § 24--Actions Against Third Party Tortfeasors-- Right of Third Party to Indemnity--Requirement of Written Agreement--Purpose.
The purpose of Lab. Code, § 3864, enacted in 1959, was to eliminate the employer's liability for implied indemnity in the absence of a written agreement, because implied indemnity imposed a greater burden on the employer than was contemplated under the workers' compensation system.

**(6)** Workers' Compensation § 24--Actions Against Third Party Tortfeasors-- Right of Third Party to Indemnity--Necessity for Written Agreement.
Although Lab. Code, § 3864, eliminates an employer's liability under the Workers' Compensation Law for implied indemnity in the absence of a written agreement, it is a well-established principle of jurisprudence that when the reason for a rule does not apply, the rule itself should not apply. To the extent that an employer's (including insurer's) liability is not limited by the workers' compensation scheme, this principle is applicable.

**(7)** Workers' Compensation § 7.4--Exclusivity of Remedy--Scope and Extent of Exclusivity; Dual Capacity Doctrine--Tort Action Against Employer Not Barred-- Aggravation of Injury Due to Fraudulent Concealment.
While the worker's compensation law bars an employee's action at law for his initial injury, a cause of action may exist for aggravation of the disease because of the employer's fraudulent concealment of the condition and its cause. That is so because in so doing the employer has stepped outside its Workers' Compensation Act protected role as an employer.

**(8)** Workers' Compensation § 24--Actions Against Third Party Tortfeasors-- Right of Third Party to Indemnity--Aggravation of Injury due to Employer's Fraudulent Concealment.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

159 Cal.App.3d 229, 205 Cal.Rptr. 469
**(Cite as: 159 Cal.App.3d 229)**

If an employee can sue his employer at law for aggravation of his initial injuries because of his employer's fraudulent concealment of the existence of the condition and its cause and connection with employment, then, since the employer has stepped outside of that protective role as employer, a third party is entitled to indemnity from the employer for such aggravation without regard to the lack of existence of a written indemnity agreement for those damages proximately caused by the aggravation. With regard to the initial injury which remains governed by the workers' compensation system, Lab. Code, § 3864, still applies. Therefore, in the absence of a written indemnity agreement executed between the employer and the third party prior to the injury, that third party may not successfully seek indemnity from the employer or its compensation carrier for the employee's initial injury.

[Modern status of effect of state workmen's compensation act on right of third-person tortfeasor to contribution or indemnity from employer of injured or killed workman, note, 100 A.L.R.3d 350. See also **Cal.Jur.3d,** Contribution and Indemnification, § 89; **Am.Jur.2d,** Workmen's Compensation, § 426.]

**(9)** Workers' Compensation § 7.4--Exclusivity of Remedy--Scope and Extent of Exclusivity; Dual Capacity Doctrine--Tort Action Against Employer Not Barred-- Aggravation of Injury Due to Fraudulent Concealment.

An employee can bring a common law action for damages against the employer's workers' compensation insurer for aggravation of industrial injuries due to that insurer's fraudulent concealment of the injury and its cause, where the insurer's fraudulent concealment constitutes a breach of its duty to disclose. In so fraudulently concealing, the insurer steps outside of its protected role as an employer and subjects itself to an action at law. It therefore necessarily follows that any such tort liability on the part of the workers' compensation insurer cannot be established by derivative or vicarious liability principles, but must be alleged and proven to be the act of an insurer apart from any tortious conduct on the part of the actual employer.

**(10)** Workers' Compensation § 7--Exclusivity of

Remedy--Scope and Extent of Exclusivity; Dual Capacity Doctrine--Liability of Insurance Carriers as "Third Parties."

Lab. Code, § 3850, protects insurance carriers from liability as "third parties" by defining "employer" to include the employer's workers' compensation insurer. Carriers thus retain immunity in most instances from civil liability under Lab. Code, § 3852 (actions against third persons), as the "alter ego" of the employer.

**(11a, 11b, 11c)** Workers' Compensation § 24--Actions Against Third Party Tortfeasors--Right of Third Party to Indemnity--Against Employer's Insurer--Aggravation of Injuries Due to Fraudulent Concealment.

In an action by two employees against a third party for injuries sustained in the course of their employment, the facts alleged by the third party in its cross-complaint were not sufficient to state a cause of action against the employer's workers' compensation insurer for comparative indemnity with regard to the aggravation of the employees' injuries based on fraudulent concealment of the injuries and their cause, even if the facts alleged were sufficient to state a cause of action for fraudulent concealment against the employer. The third party's cross-complaint failed to allege facts upon which a duty on the part of the insurer to disclose the existence, if any, of injury aggravating conditions could be based. Hence, an action for comparative indemnity against the insurer as an independent tortfeasor did not lie.

**(12)** Workers' Compensation § 7.2--Exclusivity of Remedy--Scope and Extent of Exclusivity; Dual Capacity Doctrine--Tort Action Against Employer Barred.

An employer's workers' compensation carrier may not be sued at law for negligently inspecting the insured employer's premises. Part of its normal role as an insurer is to conduct such inspections. As long as a compensation carrier is acting in that role, it does not become "any person other than the employer" within the meaning of Lab. Code, § 3852 (actions against third persons).

**(13)** Fraud and Deceit § 1--Actual Fraud--Elements.

The elements of fraud, which give rise to the tort

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

159 Cal.App.3d 229, 205 Cal.Rptr. 469
**(Cite as: 159 Cal.App.3d 229)**

action for deceit, are misrepresentation (false representation, concealment, or nondisclosure); knowledge of falsity (or "scienter"); intent to defraud, i.e., to induce reliance; justifiable reliance; and resulting damage.

**(14)** Fraud and Deceit § 8--Actual Fraud--False Representations-- Concealment.
Fraud based on concealment or nondisclosure is not actionable unless there is a duty to disclose.

**(15)** Pleading § 26--Demurrer to Complaint--Grounds--General Demurrer; Failure to State Cause of Action.
In determining whether or not a complaint is sufficient as against a demurrer, upon the ground that it does not state facts sufficient to constitute a cause of action, if upon a consideration of all the facts stated it appears that the plaintiff is entitled to any relief at the hands of the court against the defendant, the complaint will be held good, although the facts may not be clearly stated, or may be intermingled with a statement of other facts irrelevant to the cause of action shown, or although the plaintiff may demand relief to which he is not entitled under the facts alleged.

**(16)** Pleading § 22--Demurrer to Complaint--Demurrer as Admission.
While the material facts stated in a complaint are taken as true for the purpose of ruling on a demurrer, that is not true as to legal conclusions stated therein such as the existence of a duty.

**(17)** Workers' Compensation § 22--Actions Against Third Party Tortfeasors-- Damages--Credit for Compensation Paid by Employer.
When an employee secures a judgment against a third party tortfeasor, that third party is entitled to have the damages assessed against him reduced by the amount of the workers' compensation benefits received by the employee. The reduction will vary depending upon the degree of negligence by the employer and the relationship between the compensation paid by the employer and the judgment entered against the third party.

**(18)** Workers' Compensation § 22--Actions Against Third Party Tortfeasors-- Damages--Credit for

Compensation Paid by Employer.
In an action by two employees against a third party for injuries sustained in the course of their employment, in which the third party filed an amended cross-complaint against the employer's workers' compensation insurer for comparative contribution stemming from the insurer's alleged aggravation of the employees' initial work-related injuries, and seeking an offset for workers' compensation benefits paid to the employees, the trial court abused its discretion in sustaining a demurrer to the amended cross-complaint without leave to amend. The fact that the third party requested relief to which it was not entitled--damages for the original injury and for negligence--did not negate the fact that the third party had stated a valid cause of action for offset of compensation benefits against the insurer. Whether it could also state sufficient facts to constitute a cause of action for comparative indemnity with regard to the aggravation of the employees' injuries because of fraudulent concealment of the injury and its cause was a question which could only be decided after the filing of the next amended cross-complaint.

COUNSEL
McCashin & Portugal, James P. McCashin II and Jon N. Manzanares for Cross-complainant and Appellant.
Schell & Delamer, Fred B. Belanger, Kenneth B. Prindle and Michael L. Amaro for Cross-defendant and Respondent.
McClosky, Acting P. J.
Chase Chemical Company, Inc. (Chase) appeals from the February 24, 1983, order of dismissal as to Hartford Insurance Group dba Hartford Accident and Indemnity Company (Hartford) after Hartford's demurrer to Chase's second amended cross-complaint was sustained without leave to amend.

The following issues are presented for resolution:

1. Does Labor Code section 3864 [FN1] bar Chase's second amended cross-complaint for "comparative contribution" against Hartford?

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

159 Cal.App.3d 229

159 Cal.App.3d 229, 205 Cal.Rptr. 469
**(Cite as: 159 Cal.App.3d 229)**

FN1 All statutory references herein are to the Labor Code unless otherwise stated.

2. Did Chase state a valid cause of action against Hartford for comparative indemnity stemming from Hartford's aggravation of plaintiffs' initial work-related injuries?

3. Did Chase in its second amended cross-complaint state any cause of action against Hartford?

## Facts

Maureen Baile and Susan Jensen (plaintiffs) brought an action for personal injuries, negligence and products liability against third parties Unique Industries, Inc. and Chase for injuries that they had sustained while using a certain degreasing machine. *236

Chase filed its answer to plaintiffs' complaint and filed a cross-complaint for indemnity, comparative contribution and offset of workers' compensation benefits against, among others, Data Con, Inc. (Data Con), plaintiffs' employer, and Hartford, Data Con's workers' compensation insurance carrier.

On April 6, 1982, Hartford demurred to Chase's cross-complaint on the grounds that Chase's causes of action for indemnity and contribution were barred by section 3864 and that Hartford owed no duty of care to plaintiffs.

On April 19, 1982, the trial court sustained Hartford's demurrer on the ground that the pleading did not state facts sufficient to constitute a cause of action. (Code Civ. Proc., § 430.10, subd. (e).) Leave to amend was granted.

After two more unsuccessful attempts by Chase to state causes of action for comparative indemnity or offset of workers' compensation benefits against Data Con and Hartford, the trial court sustained Hartford's demurrer to Chase's second amended cross-complaint without leave to amend. In its second amended cross-complaint, Chase had attempted to set forth a cause of action for what it calls "comparative contribution" FN2 or

proportional offset of workers' compensation benefits.

FN2 Chase states that the terms "comparative contribution" and "comparative indemnity" are used interchangeably to denote the "allocation of damages among concurrent tortfeasors on a comparative fault basis as mandated by the California Supreme Court in *American Motorcycle*." We use the term comparative "indemnity" as that term is used by the Supreme Court in *American Motorcycle Assn. v. Superior Court* (1978) 20 Cal.3d 578 [146 Cal.Rptr. 182, 578 P.2d 899] and in its progeny.

In sustaining Hartford's demurrer without leave to amend, the trial court found that Chase "could not sue plaintiffs' [sic] employer directly, in the absence of an allegation of a written agreement to indemnify (Lab. Code, § 3864). Clearly, then, it cannot sue the employer's insurance carrier for the same conduct." The trial court further declared that, assuming the second amended cross-complaint stated a cause of action for fraud by Data Con against plaintiffs, no "case called to the Court's attention goes so far as to allow someone in the shoes of cross-complainant, a materialman, to assert any rights relating from that fraud which manifestly was not directed against it."

On February 24, 1983, an order dismissing Chase's second amended cross-complaint as to Hartford was entered. This appeal followed. Chase and Hartford are the only parties to this appeal. *237

## Discussion

(1)When an employee is injured in the course of employment, the resolution of any claims that he has against his employer who is acting as such is governed by the Workers' Compensation Act. (§ 3200 et seq.) Thereunder, an employer's liability for compensation benefits exists without regard to fault (§ 3600), and, with certain limited exceptions, the right to recover workers' compensation benefits under section 3600 is the employee's exclusive

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

159 Cal.App.3d 229

159 Cal.App.3d 229, 205 Cal.Rptr. 469
**(Cite as: 159 Cal.App.3d 229)**

remedy against his employer. (§§ 3601, 3602.)

(2)By virtue of section 3852, an industrially injured employee retains his right to sue "any person other than the employer" for damages proximately resulting from the injury sustained in the course of employment.

With regard to indemnity, section 3864 provides: "If an action as provided in this chapter prosecuted by the employee, the employer, or both jointly against the third person results in judgment against such third person, or settlement by such third person, the employer shall have no liability to reimburse or hold such third person harmless on such judgment or settlement in absence of a written agreement so to do executed prior to the injury."

(3)The term "employer" as used in division 4, part 1, chapter 5 of the Labor Code which chapter is entitled "Subrogation of Employer" and includes sections 3852 and 3864 includes the employer's workers' compensation carrier. (§ 3850, subd. (b) and 3211.)

(4a)As the "alter ego" of Data Con, Hartford contends that Chase could not seek indemnity from it because no written indemnity agreement between Data Con and Chase ever existed. Chase, on the other hand, argues that section 3864 does not apply when an employer's liability is not limited by the Workers' Compensation Act.

(5)"The purpose of Labor Code section 3864, enacted in 1959, was to eliminate the employer's liability for implied indemnity in the absence of a written agreement, because implied indemnity imposed a greater burden on the employer than was contemplated under the workers' compensation system." ( *Val's Painting & Drywall, Inc. v. Allstate Ins. Co.* (1975) 53 Cal.App.3d 576, 584 [126 Cal.Rptr. 267].)

(6)It is a well established principle of jurisprudence, that when the reason for a rule does not apply, the rule itself should not apply. To the *238 extent that an employer's (including insurer's) liability is not limited by the workers' compensation scheme, this principle is applicable.

(7)In *Johns-Manville Products Corp. v. Superior Court* (1980) 27 Cal.3d 465 [165 Cal.Rptr. 858, 612 P.2d 948, 9 A.L.R.4th 758], our state Supreme Court recognized an exception to the general rule that an employee's sole recourse against his employer is to be found in the workers' compensation scheme. The court held "that while the workers' compensation law bars the employee's action at law for his initial injury, a cause of action may exist for aggravation of the disease because of the employer's fraudulent concealment of the condition and its cause." ( *Id.*, at p. 469.)That is so because in so doing, the employer has stepped outside its Workers' Compensation Act protected role as an employer. FN3

> FN3 In 1982, the Legislature amended section 3602 by adding, among other things, subdivision (b)(2) which provides: "(b) An employee, or his or her dependents in the event of his or her death, may bring an action at law for damages against the employer, as if this division did not apply, in the following instances: [¶] .... [¶] (2) Where the employee's injury is aggravated by the employer's fraudulent concealment of the existence of the injury and its connection with the employment, in which case the employer's liability shall be limited to those damages proximately caused by the aggravation ...."

(8)Hence, if an employee sues his employer at law for aggravation of his initial injuries because of his employer's fraudulent concealment of the existence of the condition and its cause and connection with employment, then, since the employer has stepped outside of that protected role as an employer, a third party is entitled to such indemnity from the employer for such aggravation without regard to the lack of existence of a written indemnity agreement for those damages proximately caused by the aggravation.

With regard to the initial injury which remains governed by the workers' compensation system, section 3864 still applies. Therefore, in the absence of a written indemnity agreement executed between

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

159 Cal.App.3d 229, 205 Cal.Rptr. 469
**(Cite as: 159 Cal.App.3d 229)**

the employer and the third party prior to the injury, that third party may not successfully seek indemnity from the employer or its compensation carrier for the employee's initial injury. (See *Johns-Manville Products Corp. v. Superior Court, supra.,* 27 Cal.3d 465;*Unruh v. Truck Insurance Exchange* (1972) 7 Cal.3d 616 [102 Cal.Rptr. 815, 498 P.2d 1063] and *Alameda Tank Co. v. Starkist Foods, Inc.* (1980) 103 Cal.App.3d 428 [162 Cal.Rptr. 924].)

(9)The next question to be decided is whether an employee can bring a common law action for damages against the employer's workers' compensation insurer for aggravation of industrial injuries due to that insurer's fraudulent concealment of the injury and its cause. **\*239**

We hold that the rule of *Johns-Manville* should be applied to recognize a cause of action at law against an employer's workers' compensation insurer for aggravation of the employee's injuries where the insurer's fraudulent concealment constitutes a breach of its duty to disclose. In so fraudulently concealing, the insurer steps outside of its protected role as an employer and subjects itself to an action at law. It, therefore, necessarily follows that any such tort liability on the part of the workers' compensation insurer cannot be established by derivative or vicarious liability principles but must be alleged and proven to be the act of that insurer apart from any tortious conduct on the part of the actual employer.

(10)"Labor Code section 3850 protects insurance carriers from liability as 'third parties' by defining 'employer' to include the employer's workers' compensation insurer. Carriers thus retain immunity in most instances from civil liability under section 3852 as the 'alter ego' of the employer." ( *Droz v. Pacific National Insurance Co.* (1982) 138 Cal.App.3d 181, 183 [188 Cal.Rptr. 10].)

(4b)Under the authority of *Unruh v. Truck Insurance Exchange, supra.,* 7 Cal.3d 616, we conclude that an insurer who, with a duty to disclose, fraudulently conceals from an employee the existence of an injury and its cause forfeits its " alter ego" status and may be sued at law by that employee or by a third party defendant because "

such conduct goes beyond the normal role of an insurer in a compensation scheme intended to protect the worker." ( *Id.,* at p. 630.)

Consequently, we further hold that a third party may bring an action for comparative indemnity against such insurer in the absence of a written indemnity agreement since section 3864 would not shield that insurer who steps outside its statutorily protected employer status by such conduct.

(11a)We now proceed to decide whether the facts alleged by Chase in its second amended cross-complaint are sufficient to state a cause of action for comparative indemnity with regard to the aggravation of plaintiffs' injuries because of fraudulent concealment of the injury and its cause.

In pertinent part, Chase in its second amended cross-complaint alleged as follows:

"9. Cross-defendant Data Con, Inc., with the knowledge and approval of Cross-Defendant The Hartford, researched, evaluated, tested, purchased, leased, rented or otherwise provided for use by its employees, including the Plaintiffs, the degreasing machine which is the subject of Plaintiffs' **\*240** Complaint machine [*sic*] and each of its components and supplies used in the machine, including the chemical trichlorcethane. On or about August, 1977, and thereafter Cross-Defendants continued to require its employees, including Plaintiffs to regularly use that degreasing machine and chemicals in an unventilated area and to use and be exposed to the vapors and chemicals used therein continuously in a manner contrary to the instructions of the suppliers, up to and including the date of each Plaintiffs' termination of employment in approximately May, 1980. During that period Cross-Defendants knew of the dangers to Plaintiffs from continued improper use of the degreasing equipment but nonetheless fraudulently concealed from Plaintiffs, their physicians and investigators and from governmental agencies and others who might have prevented exacerbation of Plaintiffs' damages, if any, the true facts of Plaintiffs' work conditions and their risk of injury to Plaintiffs and each of them, thereby preventing Plaintiffs from receiving treatment for the conditions, illnesses and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

159 Cal.App.3d 229                                                    Page 8

159 Cal.App.3d 229, 205 Cal.Rptr. 469
(Cite as: 159 Cal.App.3d 229)

injuries suffered by Plaintiffs as a result thereby and further inducing Plaintiffs to continue to work at Cross-Defendant's place of employment under hazardous and continually unhealthful conditions which would not have existed had the equipment or supplies been properly maintained and utilized and had the employees, including Plaintiffs, been properly trained and protected in the use thereof.

"

. . . . . . . . . .

"11. At all times herein mentioned, Cross-Defendant The Hartford had obligations and duties to perform for the benefit of Plaintiffs and Cross-Defendant Data Con, Inc., as Workers' Compensation insurers for Data Con, Inc., including but not limited to periodic inspection of the premises, equipment, training and employee warnings of Cross-Defendant Data Con, Inc. for safety defects, health hazards and any potential risk of injury to or exacerbation of injuries of its employees, including Plaintiffs and were under a concomitant duty to warn Data Con, Inc. and its employees of any safety defects, health hazards or potential risk of injury or exacerbation of injury and to provide advice and suggestions on how to repair, remove or minimize such defects, hazards or risks. In addition, Cross-Defendant The Hartford was consulted by Cross-Defendant Data Con, Inc. regarding the need to provide its employees, including Plaintiffs, with safety equipment; Cross-Defendant The Hartford refused to authorize or recommend even the minimum safety items, even though it knew that such items were necessary to prevent further injury to those employees, including Plaintiffs.

"12. Cross-defendants and each of them were negligent in the performance of their duty or intentionally ignored their duty to inspect those premises *241 for safety defects, health hazards or risks of injury to or exacerbation of injuries of Plaintiffs and negligently discharged or intentionally failed to discharge their accompanying duty to advise and suggest adequate repairs or protective measures for removing said defects,

hazards or risks.

"13. The accident and injuries alleged in Plaintiffs' Complaint were caused by the negligent or intentional failure of Cross-Defendants Data Con, Inc. and The Hartford, to properly inspect, maintain, service, and test the subject premises, equipment and products used thereon, to properly supervise and instruct Plaintiffs in the use of said premises, equipment and products and to provide a safe place to work for Plaintiffs.

"14. Any injury or damage suffered by Plaintiffs were both initially suffered and subsequently aggravated while acting in the course and scope of their employment for Data Con, Inc., which employer provided certain benefits in compliance with the terms and provisions of the Workers' Compensation laws of the State of California. Cross-complainant does not know the nature and extent of the Workers' Compensation benefits that may have been provided and will seek leave to amend its Cross-Complaint when they have been ascertained. Cross-Complainant requests that the court apply the principles of *Witt v. Jackson* and the subsequent cases modifying that decision as well as the case of *Johns-Manville Products v. Contra Costa etc.*, 27 Cal.3d 465,612 P.2d 948 and analagous authorities so as to permit the trier of fact to provide for an offset of Cross-Complainant's liability, if any, to Plaintiff in an amount proportionate with that degree of fault which Cross-Defendants are found to bear in the causing of Plaintiffs' injuries. In the alternative, Cross-Complainant seeks comparative contribution from Cross-Defendants proportionate with their fault in causing or aggravating Plaintiffs' injuries or offset in an amount equal to the Workers' Compensation benefits paid to or on behalf of Plaintiffs."

It is clear from a reading of these allegations that Chase was seeking "comparative contribution" or indemnity based alternatively on negligence or intentional tort theories and that it was also seeking comparative indemnity for plaintiffs' initial injuries. (12)With regard to the duty of Hartford to inspect, a compensation carrier may not be sued at law for negligently inspecting the insured employer's

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

159 Cal.App.3d 229, 205 Cal.Rptr. 469
**(Cite as: 159 Cal.App.3d 229)**

premises. Part of its normal role as an insurer is to conduct such inspections. As long as a compensation carrier is acting in that role, it does not become "any person other than the employer" within the meaning of section 3852. ( *Unruh v. Truck Insurance Exchange, supra.*, 7 Cal.3d 616, 626-627; *Williams v. State Compensation Ins. Fund* (1975) 50 Cal.App.3d 116, 120 [123 Cal.Rptr. 812] ; *State Comp. Ins. Fund v. Superior Court* (1965) 237 Cal.App.2d 416, 424-425 [*24246 Cal.Rptr. 891].) (11b)In its reply brief, Chase unequivocally states that its cause of action for comparative indemnity is not based on a negligence theory and that it is not seeking comparative indemnity for plaintiffs' initial injuries. It further states, without equivocation, that it "is seeking comparative contribution for the aggravation of Plaintiffs' injury on a fraud theory, pursuant to the California Supreme Court's decision in *Johns-Manville* ...." That is all it is allowed to do under *Johns-Manville*.

Assuming, without deciding, that the facts alleged in Chase Chemical's second amended cross-complaint are sufficient to state a cause of action for fraudulent concealment against Data Con, we must hold that these same facts are insufficient to state a cause of action for fraudulent concealment against Hartford.

(13)"The elements of fraud, which give rise to the tort action for deceit, are (1) misrepresentation (false representation, concealment or nondisclosure); (2) knowledge of falsity (or 'scienter'); (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage." (4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 446, p. 2711.)

(14)Fraud based on concealment or nondisclosure, however, is not actionable unless there is a duty to disclose. (4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 459, p. 2724.) (11c)Chase's second amended complaint fails to allege *facts* upon which a duty on the part of Hartford to disclose the existence, if any, of injury aggravating conditions may be predicated. Hence, an action for comparative indemnity against Hartford as an independent tortfeasor does not lie. In the absence of facts establishing a duty, we find it unnecessary

to decide whether the remaining elements of fraudulent concealment have been sufficiently pleaded.

(15)"In determining whether or not the complaint is sufficient as against the demurrer, upon the ground that it does not state facts sufficient to constitute a cause of action, the rule is, that if upon a consideration of all the facts stated it appears that the plaintiff is entitled to any relief at the hands of the court against the defendants, the complaint will be held good, although the facts may not be clearly stated, or may be intermingled with a statement of other facts irrelevant to the cause of action shown, or although the plaintiff may demand relief to which he is not entitled under the facts alleged." ( *Matteson v. Wagoner* (1905) 147 Cal. 739, 742 [82 P. 436].) (16)While the material facts stated in a complaint are taken as true for the purpose of ruling on a demurrer, that is not true as to legal conclusions stated therein such as the existence of a duty. *243

(17)When an employee secures a judgment against a third party tortfeasor, that third party is entitled to have the damages assessed against him reduced by the amount of workers' compensation benefits received by the employee. "[T]he reduction would vary depending upon the degree of negligence by the employer and the relationship between the compensation paid by the employer and the judgment entered against the third party." ( *Del Monte Corp. v. Superior Court* (1982) 127 Cal.App.3d 1049, 1053 [179 Cal.Rptr. 855]; see also *Aceves v. Regal Pale Brewing Co.* (1979) 24 Cal.3d 502, 512 [156 Cal.Rptr. 41]; *Associated Construction & Engineering Co. v. Workers' Comp. Appeals Bd.* (1978) 22 Cal.3d 829 [150 Cal.Rptr. 888, 587 P.2d 684].)

In its second amended cross-complaint Chase alleged: "Any injury or damage suffered by Plaintiffs were both initially suffered and subsequently aggravated while acting in the course and scope of their employment for Data Con, Inc., which employer provided certain benefits in compliance with the terms and provisions of the Workers' Compensation laws of the State of California. Cross-Complainant does not know the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

159 Cal.App.3d 229

159 Cal.App.3d 229, 205 Cal.Rptr. 469
**(Cite as: 159 Cal.App.3d 229)**

nature and extent of the Workers' Compensation benefits that may have been provided and will seek leave to amend its Cross-Complaint when they have been ascertained." Having so alleged, Chase Chemical requested disjunctively, among other things, an "offset in an amount equal to the Workers' Compensation benefits paid to or on behalf of Plaintiffs."

(18)Hartford concedes that Chase "may still be entitled to an 'offset' for any workers' compensation benefits paid," but argues that because Chase did not limit its cause of action to an offset of workers' compensation benefits, Chase in its second amended cross-complaint fails to state facts sufficient to constitute a cause of action against Hartford. We disagree.

The fact that Chase has requested relief to which it is not entitled to, i.e., for damages for the original injury and for negligence, does not negate the fact that Chase has stated a valid cause of action for offset of compensation benefits against Hartford. Whether it can also state sufficient facts to constitute a cause of action for comparative indemnity under the rule of *Johns-Manville* is a question which can only be decided after the filing of the next amended cross-complaint.

It follows, therefore, that the trial court abused its discretion in sustaining Hartford's demurrer to Chase Chemical's second amended cross-complaint without leave to amend.

The order of dismissal is reversed. The matter is remanded to the Superior Court with directions to allow the filing of a third amended cross-complaint, *244 within such time as the court shall determine to be reasonable, alleging *facts* sufficient to state causes of action in accordance with the views expressed herein.

Arguelles, J., and Title, J., [FN*] concurred. *245

    FN* Assigned by the Chairperson of the Judicial Council.
Cal.App.2.Dist.
Chase Chemical Co. v. Hartford Accident & Indemnity Co.

159 Cal.App.3d 229, 205 Cal.Rptr. 469

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit J

**APPENDIX OF NON-FEDERAL AND UNPUBLISHED FEDERAL AUTHORITIES
CITED IN VISA USA INC.'S MOTION TO STAY ACTION
AND TO COMPEL ARBITRATION**

LEXSEE


Caution
As of: Nov 28, 2007

**DREAM THEATER, INC., et al., Plaintiffs and Respondents, v. DREAM THEA-
TER et al., Defendants and Appellants.**

B174152

**COURT OF APPEAL OF CALIFORNIA, SECOND APPELLATE DISTRICT, DI-
VISION FOUR**

**124 Cal. App. 4th 547; 21 Cal. Rptr. 3d 322; 2004 Cal. App. LEXIS 2010; 2004 Cal.
Daily Op. Service 10522; 2004 Daily Journal DAR 14254**

**November 30, 2004, Filed**

**NOTICE:**

As modified Dec. 28, 2004.

**SUBSEQUENT HISTORY:** Modified and rehearing
denied by  Dream Theater, Inc. v. Dream Theater, 2004
Cal. App. LEXIS 2232 (Cal. App. 2d Dist., Dec. 28,
2004)

**PRIOR HISTORY:**    [***1]  Superior Court of Los
Angeles County, No. LC067280, Ruth Essegian, Judge.

**DISPOSITION:**    Order reversed; remanded with in-
structions. Costs awarded..

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellant buyers sought
review of an order from the Superior Court of Los Ange-
les County (California), which, in response to respondent
sellers' motion for an order determining the arbitrability
of a contractual dispute, stayed arbitration proceedings
on the basis of a finding that the parties' dispute was not
arbitrable.

**OVERVIEW:** The dispute arose from an alleged failure
of disclosure by the sellers. The arbitration clause was
located in a portion of the contract regarding indemnity.
The sellers contended that the arbitration clause was lim-
ited to third party indemnity claims. The court observed,
however, that the contract did not contain any provision

that specifically limited the arbitration clause to third
party claims. Cal. Civ. Code § 2772, which stated that
indemnity could apply to either direct or third party
claims, did not support the sellers' argument. The con-
tract provided for arbitration of all contested claims of
loss, and nothing in the indemnity provisions or the arbi-
tration clause was expressly limited to third party law-
suits. The arbitration provision referred to commercial
arbitration rules specifying that the arbitrator would de-
cide disputes over the scope of the arbitration agreement.
Hence, the court concluded that the parties' agreement to
arbitrate according to these rules provided clear and un-
mistakable evidence of the parties' intent that the arbitra-
tor would decide whether a contested claim was arbitra-
ble.

**OUTCOME:** The court reversed and remanded with
instructions to vacate the order and to enter a new order
staying the action pending the arbitrator's determination
of the scope of his or her jurisdiction.

**CORE TERMS:** arbitration, seller's, buyer's, arbitra-
tor's, arbitrability, arbitration clause, indemnity, arbitra-
tion agreement, party claims, indemnification, indem-
nify, notice, arbitrable, indemnitor, contested, arbitrate,
collective bargaining agreement, specify, unmistakably,
disclose, parties agreed, dispute resolution, own jurisdic-
tion, unmistakable, venue, consulting agreement, settle-
ment, commercial contract, subject to arbitration, credit
line

**LexisNexis(R) Headnotes**

124 Cal. App. 4th 547, *; 21 Cal. Rptr. 3d 322, **;
2004 Cal. App. LEXIS 2010, ***; 2004 Cal. Daily Op. Service 10522

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > Arbitrability*
*Civil Procedure > Alternative Dispute Resolution > Validity of ADR Methods*
*Contracts Law > Contract Conditions & Provisions > Arbitration Clauses*
[HN1]The issue of who should decide arbitrability turns on what the parties agreed in their contract.

*Civil Procedure > Alternative Dispute Resolution > Validity of ADR Methods*
*Contracts Law > Contract Conditions & Provisions > Arbitration Clauses*
*Contracts Law > Contract Interpretation > General Overview*
[HN2]Where the parties have introduced no extrinsic evidence, a trial court's ruling regarding arbitrability is a conclusion of law, and an appellate court independently interprets the contract.

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > General Overview*
*Civil Procedure > Alternative Dispute Resolution > Validity of ADR Methods*
*Contracts Law > Contract Conditions & Provisions > Arbitration Clauses*
[HN3]Arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > Arbitrability*
*Civil Procedure > Alternative Dispute Resolution > Validity of ADR Methods*
*Contracts Law > Contract Conditions & Provisions > Arbitration Clauses*
[HN4]The question of arbitrability is for judicial determination unless the parties clearly and unmistakably provide otherwise.

*Civil Procedure > Alternative Dispute Resolution > Validity of ADR Methods*
*Contracts Law > Contract Conditions & Provisions > Arbitration Clauses*
*Labor & Employment Law > Collective Bargaining & Labor Relations > Arbitration > Authority*
[HN5]Regardless of policy considerations, the parties' agreement determines what disputes will be arbitrated.

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > Arbitrability*
*Contracts Law > Defenses > Ambiguity & Mistake > General Overview*
*Contracts Law > Formation > Ambiguity & Mistake > General Overview*
[HN6]Arbitration is simply a matter of contract between the parties. When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally should apply ordinary state-law principles that govern the formation of contracts. It should not be assumed the parties intended the arbitrator to decide whether their dispute was arbitrable unless there is clear and unmistakable evidence that they did so. The question of who decides whether a dispute is subject to arbitration is rather arcane and may not have been considered and agreed upon by the parties. Where the agreement is silent or ambiguous on that question, the court and not the arbitrator should decide arbitrability so as not to force unwilling parties to arbitrate a matter they reasonably thought a judge, not an arbitrator, would decide.

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > Arbitrability*
*Contracts Law > Contract Interpretation > General Overview*
*Labor & Employment Law > Collective Bargaining & Labor Relations > Arbitration > General Overview*
[HN7]California courts often look to federal law when deciding arbitration issues under state law. California law is consistent with federal law on the question of who decides disputes over arbitrability. California courts use the same principles of contract interpretation whether the arbitration clause is in a collective bargaining agreement or a commercial contract.

*Contracts Law > Contract Conditions & Provisions > Arbitration Clauses*
*Contracts Law > Contract Interpretation > General Overview*
*Labor & Employment Law > Collective Bargaining & Labor Relations > Arbitration > Authority*
[HN8]Unless a claim of arbitrability is wholly groundless, a court should stay proceedings pending the arbitrator's determination of his or her own jurisdiction. This necessarily requires the courts to examine and, to a limited extent, construe the underlying agreement.

*Contracts Law > Contract Conditions & Provisions > Indemnity*

Page 2

124 Cal. App. 4th 547, *; 21 Cal. Rptr. 3d 322, **;
2004 Cal. App. LEXIS 2010, ***; 2004 Cal. Daily Op. Service 10522

*Contracts Law > Third Parties > General Overview*
[HN9]Indemnification agreements ordinarily relate to third party claims. But this general rule does not apply if the parties to a contract use the term "indemnity" to include direct liability as well as third party liability. An indemnity agreement is to be interpreted according to the language and contents of the contract as well as the intention of the parties as indicated by the contract.

*Contracts Law > Contract Conditions & Provisions > Indemnity*
[HN10]See Cal. Civ. Code § 2772.

**SUMMARY:**

CALIFORNIA OFFICIAL REPORTS SUMMARY

In a contractual dispute arising from an alleged failure of disclosure by the sellers of a business, the trial court stayed arbitration proceedings on the basis of a finding that the parties' dispute was not arbitrable. The arbitration clause was located in a portion of the contract regarding indemnity. (Superior Court of Los Angeles County, No. LC067280, Ruth Essegian, Judge.)

The Court of Appeal reversed and remanded for stay of the action pending an arbitrator's ruling on arbitrability. The arbitration clause was not limited to third party indemnity claims, because the contract did not contain any provision that specifically limited the arbitration clause to third party claims. Civ. Code, § 2772, which states that indemnity can apply to either direct or third party claims, did not support such a limitation. The contract provided for arbitration of all contested claims of loss, and nothing in the indemnity provisions or the arbitration clause was expressly limited to third party lawsuits. The arbitration provision referred to commercial arbitration rules specifying that the arbitrator would decide disputes over the scope of the arbitration agreement. Hence, the court concluded that the parties' agreement to arbitrate according to these rules provided clear and unmistakable evidence of the parties' intent that the arbitrator would decide whether a contested claim was arbitrable. (Opinion by Grimes, J.,* with Epstein, P. J., and Curry, J., concurring.)

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**HEADNOTES**

CALIFORNIA OFFICIAL REPORTS HEADNOTES
Classified to California Digest of Official Reports

**(1) Arbitration and Award § 5--Arbitration Agreements--Construction and Effect--Arbitrability.**--The issue of who should decide arbitrability turns on what the parties agreed in their contract; hence, an arbitration provision referring to commercial arbitration rules specifying that [*548] the arbitrator would decide disputes over the scope of the arbitration agreement established, in accordance with the parties' intent, that the arbitrator would decide whether a contested claim was arbitrable.

[6 Witkin, Cal. Procedure (4th ed. 1997) Proceedings Without Trial, § 510.]

**(2) Arbitration and Award § 5--Arbitration Agreements--Construction and Effect--Arbitrability--Standard of Review.**--Where the parties have introduced no extrinsic evidence, a trial court's ruling regarding arbitrability is a conclusion of law, and the appellate court independently interprets the contract.

**(3) Arbitration and Award § 5--Arbitration Agreements--Construction and Effect--Necessity of Agreement to Arbitrate.**--Arbitration is a matter of contract, and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.

**(4) Arbitration and Award § 5--Arbitration Agreements--Construction and Effect--Arbitrability.**--The question of arbitrability is for judicial determination unless the parties clearly and unmistakably provide otherwise.

**(5) Arbitration and Award § 5--Arbitration Agreements--Construction and Effect--Arbitrability.**--Regardless of policy considerations, the parties' agreement determines what disputes will be arbitrated.

**(6) Arbitration and Award § 5--Arbitration Agreements--Construction and Effect--Arbitrability.**--Arbitration is simply a matter of contract between the parties. When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally should apply ordinary state law principles that govern the formation of contracts. It should not be assumed the parties intended the arbitrator to decide whether their dispute was arbitrable unless there is clear and unmistakable evidence that they did so. The question of who decides whether a dispute is subject to arbitration is rather arcane and might not have been considered and agreed upon by the parties. Where the agreement is silent or ambiguous on that question, the court and not the arbitrator should decide arbitrability so as not to force unwilling parties to arbitrate a matter they reasonably thought a judge, not an arbitrator, would decide.

124 Cal. App. 4th 547, *; 21 Cal. Rptr. 3d 322, **;
2004 Cal. App. LEXIS 2010, ***; 2004 Cal. Daily Op. Service 10522

**(7) Arbitration and Award § 5--Arbitration Agreements--Construction and Effect--Federal Precedents.-** --California courts often look to federal law when deciding arbitration issues under state law. California law [*549] is consistent with federal law on the question of who decides disputes over arbitrability. California courts use the same principles of contract interpretation whether the arbitration clause is in a collective bargaining agreement or a commercial contract.

**(8) Arbitration and Award § 5--Arbitration Agreements--Construction and Effect--Arbitrability.--** Unless a claim of arbitrability is wholly groundless, a court should stay proceedings pending the arbitrator's determination of his or her own jurisdiction. This necessarily requires the court to examine and, to a limited extent, construe the underlying agreement.

**(9) Contracts § 28--Construction and Interpretation-- Intention of Parties--Indemnity.--**Indemnification agreements ordinarily relate to third party claims. But this general rule does not apply if the parties to a contract use the term "indemnity" to include direct liability as well as third party liability. An indemnity agreement is to be interpreted according to the language and contents of the contract as well as the intention of the parties as indicated by the contract.

**COUNSEL:** Latham & Watkins, Kristine L. Wilkes, Russell F. Sauer, Jr., and Lauren S. Kim for Defendants and Appellants.

Castle & Associates, Nomi L. Castle, Farzad Tabatabai and Robert S. Blonstein for Plaintiffs and Respondents.

**JUDGES:** Grimes, J., with Epstein, P. J., and Curry, J., concurring. (article VI, section 6 of the California Constitution.)

**OPINION BY:** GRIMES

**OPINION**

[**323]  **GRIMES, J.**--This is an appeal from an order staying proceedings before the American Arbitration Association (AAA) based on the finding that the parties' commercial dispute is not arbitrable and jurisdiction lies with the court. We hold that (1) the parties' agreement determines whether the court or the arbitrator decides if the dispute is subject to arbitration; (2) where the parties do not offer evidence extrinsic to the contract, on appeal we review the contract independently; and (3) the parties state a clear and unmistakable agreement that the arbitrator will decide whether the dispute is subject to arbitration when they incorporate [***2] into their agreement the AAA Commercial Arbitration Rules

which specify the arbitrator will decide arbitrability, and [**324] nothing in the parties' agreement excludes from the jurisdiction of the arbitrator the decision whether the dispute must be submitted to arbitration.

[*550] **FACTUAL BACKGROUND**

*The Contract and the Arbitration Clause*

Appellants are the buyer of an Internet-based multimedia and entertainment business and its managing agents. The buyer is Dream Theater, LLC. Its managing agents are The Dupuis Group, LLC, Donald J. Esters, and Steven Dupuis (Buyers). Respondents are the seller Dream Theater, Inc. and its shareholders Ali Davoudian, Mohammed Davoudian, and Darren Chuckry (Sellers). On October 17, 2001, Buyers executed an asset purchase agreement (the Contract) pursuant to which buyer Dream Theater, LLC acquired assets and liabilities of the Dream Theater business from Sellers. The parties executed various schedules and exhibits to the Contract, including a consulting agreement between buyer Dream Theater, LLC and Ali Davoudian, a former shareholder of seller Dream Theater, Inc. Among the liabilities that Buyers assumed was a credit line of $ 100,000 from Bank [***3] of America to Dream Theater, Inc., guaranteed by its shareholders.

The Contract has comprehensive dispute resolution provisions contained in nine separately numbered paragraphs spanning four pages of single-spaced text. The parties used broad language to express their agreement to avoid litigation as a means of dispute resolution. The Contract identifies the parties' respective obligations to indemnify one another from any and all losses, including losses arising from either party's breach of the Contract as well as those arising from third party claims. It sets forth the means to assert a claim of loss by giving an indemnification notice, provides for the enforcement of an uncontested claim by way of stipulated judgment, establishes a period of time to pursue settlement, and establishes procedures for "mandatory, final and binding arbitration" after the settlement period elapses. The Contract specifies that arbitration will be in accordance with the AAA Commercial Arbitration Rules. These rules provide that the arbitrator "shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement."

[***4] *The Nature and Procedural History of the Parties' Disputes*

Buyers hired Mr. Chuckry, a former officer of seller Dream Theater, Inc. to run the business. Some months after the purchase, Buyers learned that Mr. Chuckry had multiple sclerosis, which they believed to have nega-

tively affected his ability to run the business. Buyers claimed that Sellers knew about Mr. Chuckry's illness and had a duty to disclose it to Buyers before the purchase was consummated, and that Sellers' failure to disclose his disability caused Buyers to suffer losses "approaching $ 500,000."

[*551] Buyers served Sellers with an indemnification notice on February 11, 2003, stating their intent to offset their claimed losses by withholding any further payments on the Bank of America credit line, which had an outstanding balance due of $ 88,855.16. Buyers made no more payments on the credit line. In due course, Bank of America recovered the balance owing on the credit line from Sellers. On December 16, 2003, Sellers filed this lawsuit in superior court seeking recovery from Buyers of the [***5] $ 88,855.16 and other damages, including [**325] payments allegedly due under the consulting agreement.

After Sellers filed this lawsuit, Buyers allegedly discovered another breach of the Contract by Sellers. Buyers claimed to have learned in February 2004 that Sellers' largest customer, FX Networks, had given notice of termination of its contract with Sellers some days before the sale to Buyers, and that Sellers failed to disclose the loss of this customer. Sellers had represented in the Contract with Buyers that FX Networks generated revenues of over $ 1 million in 2001 (the year the Contract was executed), which was more than five times what Sellers' next largest customers generated that year. On about February 11, 2004, Buyers served Sellers with a second indemnification notice asserting losses of about $ 1 million as a result of Sellers' failure to disclose the loss of the FX Networks business. Sellers contested this second indemnification notice on February 13, 2004. Buyers demanded arbitration of this dispute on February 23, 2004.

On March 9, 2004, Sellers obtained an ex parte order shortening time for the hearing of Sellers' motion for an order determining the arbitrability of Buyers' [***6] claim of damages arising from the alleged failure to disclose the loss of the FX Networks contract. On March 18, 2004, the trial court ordered that the claim was not arbitrable and stayed the arbitration. This timely appeal followed.

## DISCUSSION

### A. Standard of Review

(1) [HN1]The issue of who should decide arbitrability turns on what the parties agreed in their contract. ( *First Options of Chicago, Inc. v. Kaplan* (1995) 514 U.S. 938, 943 [131 L. Ed. 2d 985, 115 S. Ct. 1920]; *Freeman v. State Farm Mut. Auto. Ins. Co.* (1975) 14 Cal.3d 473,

480 [121 Cal. Rptr. 477, 535 P.2d 341].) [HN2](2) Since the parties here introduced no extrinsic evidence, the trial court's ruling regarding arbitrability is a conclusion of law, and we independently interpret the Contract. ( *Merrick v. Writers Guild of America, West, Inc.* [*552] (1982) 130 Cal. App. 3d 212, 217 [181 Cal. Rptr. 530]; *Coast Plaza Doctors Hospital v. Blue Cross of California* (2000) 83 Cal.App.4th 677, 684 [99 Cal. Rptr. 2d 809].)

### B. The Arbitrator and Not the court Will Decide What Disputes Are Arbitrable if the Parties Clearly and Unmistakably State That is Their Intent

(3) In *AT&T Technologies v. Communications Workers* (1986) 475 U.S. 643 [89 L. Ed. 2d 648, 106 S. Ct. 1415], [***7] the court reaffirmed the basic principles of arbitration. The first two principles guide our conclusion in this case. The first principle is that "[HN3] 'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.' [Citation.]" ( *Id.* at p. 648.) (4) The second principle is that [HN4]the question of arbitrability is for judicial determination "[u]nless the parties clearly and unmistakably provide otherwise." ( *Id.* at p. 649.)

(5) The arbitration clause at issue in *AT&T Technologies v. Communications Workers, supra,* 475 U.S. 643 was part of a collective bargaining agreement. The court reasoned that the presumption of arbitrability furthers the national policy of peaceful resolution of labor disputes and achieves the parties' presumed objectives in collective bargaining. ( *Id.* at p. 650.) The court recognized, however, that parties would be less inclined to enter collective bargaining agreements if arbitrators were empowered to decide disputes the [**326] parties never agreed to submit to arbitration. ( *Id.* at p. 651.) Accordingly, [HN5]regardless of policy considerations [***8] such as those at stake in collective bargaining agreements, the parties' agreement determines what disputes will be arbitrated.

(6) In *First Options of Chicago, Inc. v. Kaplan, supra,* 514 U.S. 938, the court applied the same basic principles of arbitration in a case involving a commercial contract. The court found that "[HN6]arbitration is simply a matter of contract between the parties." ( *Id.* at p. 943.) "When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally ... should apply ordinary state-law principles that govern the formation of contracts." ( *Id.* at p. 944.) The court qualified this principle by finding it should not be assumed the parties intended the arbitrator to decide whether their dispute was arbitrable unless there is clear and unmistakable evidence that they did so. ( *Ibid.*) The *First Options* court recognized that the question of who

124 Cal. App. 4th 547, *; 21 Cal. Rptr. 3d 322, **;
2004 Cal. App. LEXIS 2010, ***; 2004 Cal. Daily Op. Service 10522

decides whether a dispute is subject to arbitration is "rather arcane," and may not have been considered and agreed upon by the parties. (*Id.* at p. 945.) The court held that, where the agreement is silent or ambiguous [***9] on that question, the court and not the arbitrator should decide arbitrability so as not to force unwilling parties to arbitrate a matter they reasonably thought a judge, not an arbitrator, would decide. (*Ibid.*)

[*553] (7) [HN7]California courts often look to federal law when deciding arbitration issues under state law. (See, e.g., *Pour Le Bebe, Inc. v. Guess? Inc.* (2003) 112 Cal.App.4th 810, 829-835 [5 Cal. Rptr. 3d 442].) California law is consistent with federal law on the question of who decides disputes over arbitrability. California courts use the same principles of contract interpretation whether the arbitration clause is in a collective bargaining agreement or a commercial contract. "Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." ( *United Public Employees v. City & County of San Francisco* (1997) 53 Cal.App.4th 1021, 1026 [62 Cal. Rptr. 2d 440] [construing a collective bargaining agreement]; accord, *Parker v. Twentieth Century-Fox Film Corp.* (1981) 118 Cal. App. 3d 895, 901-904 [173 Cal. Rptr. 639] [parties to a commercial contract did not expressly provide [***10] that arbitrator would decide the scope of his authority].) (8) [HN8]Unless a claim of arbitrability is wholly groundless, the court should stay proceedings pending the arbitrator's determination of his or her own jurisdiction. ( *McCarroll v. L. A. County etc. Carpenters* (1957) 49 Cal.2d 45, 65 [315 P.2d 322].) This necessarily requires the courts to examine and, to a limited extent, construe the underlying agreement. ( *Freeman v. State Farm Mut. Auto. Ins. Co., supra,* 14 Cal.3d 473.)

*C. The Parties Here Clearly and Unmistakably Agreed That the Arbitrator Will Decide the Scope of the Arbitration Agreement*

The Contract in issue here does not have a "common broad form" of arbitration agreement. [1] The parties used the term [**327] "indemnification" in section 7 of the Contract to define their respective obligations to pay for "any and all claims, losses, damages of any kind, liabilities, obligations, Actions, [2] deficiencies, demands, costs, and expenses (whether or not arising out of third [*554] party Claims), including, without limitation, all interest, fines, penalties, amounts paid in settlement, costs of mitigation, reasonable attorneys' fees, court costs and all amounts paid [***11] in investigation, defense or settlement of any of the foregoing (collectively, 'Losses') ... ."

[1] The authors of California Practice Guide: Alternative Dispute Resolution (The Rutter Group 2003) paragraphs 5:215.3-5:215.10, at pages 5-121 to 5-123, cite examples of common "broad" versus "narrow" arbitration clauses. An arbitration clause that covers *any claim arising out of or relating to* the contract or the breach thereof "is very broad." ( *Larkin v. Williams, Woolley, Cogswell, Nakazawa & Russell* (1999) 76 Cal.App.4th 227, 230 [90 Cal. Rptr. 2d 195].) But omission of the phrase *or relating to* has been found to exclude arbitration of some claims. (See *Tracer Research v. Nat. Environ. Services Co.* (9th Cir. 1994) 42 F.3d 1292, 1295.) An arbitration clause that covers *all disputes arising in connection with the agreement* was interpreted broadly in *Simula, Inc. v. Autoliv, Inc.* (9th Cir. 1999) 175 F.3d 716, 720-725. These cases demonstrate how similar language used to describe the scope of an arbitration clause has been interpreted quite differently by the courts.

[***12]
[2] "Action" is defined elsewhere in the Contract to mean "any action, arbitration, audit, demand, claim, complaint, dispute, hearing, inquiry, investigation, litigation, prosecution or suit (whether civil, criminal, administrative, judicial or investigative, whether formal or informal, whether public or private)."

The parties' obligations to indemnify complement one another. Sellers agreed to indemnify buyer Dream Theater, LLC against (a) any breach by Sellers of any representations or warranties made in the Contract; (b) any breach of any covenant in the Contract or ancillary documents; and (c) all liabilities except those buyer assumed. Buyer Dream Theater, LLC agreed to indemnify seller Dream Theater, Inc. against (a) any breach by buyer of any representations or warranties made in the Contract; (b) any breach of any covenant in the Contract or ancillary documents; and (c) all liabilities buyer assumed.

The Contract defines the party seeking recovery of losses as the "Indemnified Party" and defines the party against whom losses are sought as the "Indemnitor." The Contract specifies procedures [***13] by which an Indemnified Party may obtain a stipulated judgment to enforce an "Uncontested Claim." [3] The Contract also specifies procedures by which an indemnitor may contest a claim, including a period for settlement discussions and, as the last resort, arbitration.

[3] The Contract provides that "[i]n the event that, within thirty (30) calendar days after an Indemnification Notice is received by the Indemni-

124 Cal. App. 4th 547, *; 21 Cal. Rptr. 3d 322, **;
2004 Cal. App. LEXIS 2010, ***; 2004 Cal. Daily Op. Service 10522

tor, the Indemnitor does not contest such indemnification in writing to the Indemnified Party as provided in Section 7.7(b) (an 'Uncontested Claim'), the Indemnitor will be conclusively deemed to have consented, to the recovery by the Indemnified Party the full amount of Losses specified in the Indemnification Notice in accordance with this Section 7, and, without further notice, to have stipulated to the entry of a final judgment for damages against the Indemnitor for such amount in any court having jurisdiction over the matter where venue is proper."

The indemnity provisions are in section 7 of the [***14] Contract, and the arbitration clause is also in section 7. It provides initially that, "Each Party agrees that any Contested Claim [*] will be submitted to mandatory, final and binding arbitration in the County of Los Angeles, California, in accordance with the Commercial Arbitration Rules of the American Arbitration Association then in effect." The arbitration clause addresses various topics, including payment of costs, burden of proof and other matters, and it concludes that [**328] "except as specifically otherwise provided in this Agreement, arbitration conducted in accordance with this Agreement will be the sole and exclusive means of resolution of any Contested Claim made pursuant to Section 7."

> 4    The Contract provides that a "Contested Claim" arises "[i]n the event that the Indemnitor gives the Indemnified Party written notice contesting all or any portion of an Indemnification Notice."

[*555] Sellers contend that the arbitration clause is limited to third party indemnity claims. Sellers' position is plausible, since [***15] the term "indemnify" ordinarily relates to third party claims. In support of their argument, however, Sellers rely on cases that construe contracts that are dissimilar to the Contract in issue here. _Varco-Pruden, Inc. v. Hampshire Constr. Co._ (1975) 50 Cal. App. 3d 654 [123 Cal. Rptr. 606] (_Varco-Pruden_), involved construction contracts that provided for indemnity of tort claims arising from the contractor's and subcontractor's performance of the work. _Myers Building Industries, Ltd. v. Interface Technology, Inc._ (1993) 13 Cal.App.4th 949 [17 Cal. Rptr. 2d 242] (_Myers Building_), also involved construction, architectural, and related contracts entirely unlike the Contract here, with provisions that the court found to be standard third party indemnification clauses.

(9) Both _Varco-Pruden_ and _Myers Building_ recognized that "[HN9][i]ndemnification agreements ordinarily relate to third party claims." (_Myers Building, supra,_ 13 Cal.App.4th at p. 949; _Varco-Pruden, supra,_ 50 Cal. App. 3d at p. 660.) But this general rule does not apply if the parties to a contract use the term "indemnity" to include direct liability as well as third party liability. "An indemnity agreement is to [***16] be interpreted according to the language and contents of the contract as well as the intention of the parties as indicated by the contract." (_Myers Building,_ at p. 968.) Here, buyer Dream Theater, LLC agreed to indemnify seller Dream Theater, Inc. against not only third party claims but also any breach of buyer's obligations to seller: for example, buyer must indemnify seller against any breach of the covenant to pay off the Bank of America credit line. To interpret seller's rights under the indemnity agreement to include direct claims against buyer as well as third party claims, but to limit buyer's rights to third party claims, makes no sense in light of the complementary structure of the indemnity clauses. Yet, to accept seller's contention that it is only obligated to indemnify against third party claims would require that the Contract be interpreted to extinguish the parties' reciprocal obligations to indemnify one another against their own wrongdoing.

Sellers do not point to any language of the Contract which specifically limits the arbitration clause to third party claims or otherwise excludes from arbitration the parties' dispute over Sellers' alleged breach of the representations [***17] and warranties concerning the FX Networks business. Sellers rely on the venue provisions in both the Contract and in the consulting agreement that was executed at the same time as the Contract as indicating an intent to limit the arbitration clause. The Contract and the concurrently executed [*556] consulting agreement both specify that any action arising out of the agreements may be brought in any state or federal court in Los Angeles having jurisdiction over the dispute, and the parties waive any objection to venue in a Los Angeles court.

These venue provisions do not expressly limit the scope of the arbitration clause, and enforcement of the arbitration clause does not, as Sellers contend, nullify the venue provisions. No matter how broad the arbitration clause, it may be necessary to file an action in court to enforce an arbitration agreement, or to obtain a judgment enforcing an arbitration award, and the parties may need to invoke the jurisdiction of a court to obtain other remedies, [**329] such as a preliminary injunction, appointment of a receiver, or a writ of attachment or of possession. (See, e.g., Code Civ. Proc., §§ 1281.2 & 1281.8 [***18] , subd. (b).)

Sellers also rely on the last of three definitions of "indemnity" in Black's Law Dictionary which on its face is limited to tort liability. Black's Law Dictionary defines "indemnity" as follows: "1. A duty to make good any loss, damage, or liability incurred by another. 2. The right of an injured party to claim reimbursement for its

loss, damage, or liability from a person who has such a duty. 3. Reimbursement or compensation for loss, damage, or liability in tort; esp., the right of a party who is secondarily liable to recover form the party who is primarily liable for reimbursement of expenditures paid to a third party for injuries resulting from a violation of a common-law duty." (Blacks Law Dict. (7th ed. 1999) p. 772, col. 2.) Thus, the term "indemnity" encompasses any duty to pay for another's loss or damage and is not limited to reimbursement of third party claims. [5]

> 5   Sellers cite Civil Code section 2772, which provides that indemnity "[HN10]is a contract by which one engages to save another from a legal consequence of the conduct of one of the parties, or of some other person." Section 2772 plainly states that indemnity may apply to either direct or third party claims and does not support Sellers' argument.

[***19] The terms "Indemnification," "Indemnified Party," and "Indemnitor" in the Contract, in and of themselves, do not limit the scope of the arbitration clause to third party claims. To the contrary, section 7.1 of the Contract states that Sellers are obligated to indemnify against all losses "whether or not arising out of third party Claims." The Contract here provides for arbitration of all contested claims of loss, and nothing in the indemnity provisions or the arbitration clause is expressly limited to third party lawsuits. Thus, Sellers have not shown that only third party claims of loss are arbitrable. (See [*557] _Wilshire-Doheny Associates, Ltd. v. Shapiro (2000) 83 Cal.App.4th 1380, 1396 [100 Cal. Rptr. 2d 478]._)

It is difficult to imagine how parties could state any more comprehensively than they did in the Contract the intent to avoid litigation at every step of the dispute resolution process. The Contract provides that if a contested claim is not settled within the contractual deadline, then it must be submitted to binding arbitration in accordance with the AAA Commercial Arbitration Rules. These rules specify that the arbitrator will decide disputes over the scope of the arbitration agreement. [***20] We conclude that the parties' agreement to arbitrate according to this rule is clear and unmistakable evidence of the intent that the arbitrator will decide whether a Contested Claim is arbitrable.

In _Shaw Group Inc. v. Triplefine Intern. Corp. (2d Cir. 2003) 322 F.3d 115,_ the court vacated an injunction prohibiting an arbitration of certain claims. The court found the parties' contract clearly and unmistakably evidenced an intent to arbitrate questions of arbitrability. "Because the arbitration agreement at issue in this case provides for all disputes between the parties to be referred to the International Chamber of Commerce (ICC), and because the rules of that organization expressly provide for the International Court of Arbitration (ICA) to resolve in the first instance any disputes about its own jurisdiction, we conclude that the arbitrability of [the claim] was a question for the arbitrator rather than the court." ( _Id._ at p. 118.) We conclude, as the _Shaw_ court did, that where the Contract provides for arbitration in conformance with rules that specify the arbitrator will decide the scope of his or her own jurisdiction, the parties' [***21] [**330] intent is clear and unmistakable, even without a recital in the contract that the arbitrator will decide any dispute over arbitrability.

The parties here dispute what claims are arbitrable and what claims no longer present live controversies. Sellers' complaint concerns Buyers' offset of claimed damages arising from Mr. Chuckry's disability, a claim which Buyers contend Sellers waived by not contesting it pursuant to the dispute resolution provisions of section 7.7 of the Contract. The complaint also asserts claims under the consulting agreement, which does not have an arbitration clause. Buyers' arbitration demand concerns Sellers' alleged failure to disclose the loss of the FX Networks business. On remand, the trial court shall stay this entire action pending the arbitrator's determination of the scope of his or her jurisdiction to decide the various disputes among the parties.

[*558] **DISPOSITION**

The order staying arbitration is reversed and remanded with instructions to vacate the order finding that AAA has no jurisdiction over the arbitration demand and to enter a new order staying this action pending the arbitrator's determination of the scope of his or her jurisdiction. [***22] Buyers are awarded costs on appeal.

Epstein, P. J., and Curry, J., concurred.

A petition for a rehearing was denied December 28, 2004, and the opinion was modified to read as printed above.

# Exhibit K

**APPENDIX OF NON-FEDERAL AND UNPUBLISHED FEDERAL AUTHORITIES
CITED IN VISA USA INC.'S MOTION TO STAY ACTION
AND TO COMPEL ARBITRATION**

Westlaw.

604 So.2d 332                                                                    Page 1

604 So.2d 332
**(Cite as: 604 So.2d 332)**

▷
Jones v. Merrill Lynch, Pierce, Fenner & Smith, Inc.
Ala.,1991.

Supreme Court of Alabama.
Mary E. JONES
v.
MERRILL LYNCH, PIERCE, FENNER &
SMITH, INC., and J. Edward Porter.
**89-1574.**

April 19, 1991.
Rehearing Denied June 14, 1991.

Customer of investment firm brought action
alleging fraud and breach of fiduciary duty. The
Circuit Court, Jefferson County, No.
CV-88-7022,Stuart Leach, J., entered judgment
dismissing suit for customer's failure to comply with
order to arbitrate claims and customer appealed.
The Supreme Court, Adams, J., held that: (1)
provision in customer account agreement regarding
revocation of contracts did not preclude federally
created right to specific enforcement of arbitration
clause where customer's claim of fraud bore upon
entire agreement and upon activities of parties in
general and not solely upon arbitration clause itself,
and (2) dismissal of action with prejudice was not
an abuse of discretion, but affirmance would be
conditioned upon willingness of arbitration
organization to take jurisdiction of customer's
claims and to reopen her case.

Affirmed conditionally.
West Headnotes
**[1] T ☞414**

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(I) Exchanges and Dealer Associations
            25Tk411    Relations    Between
Customer-Investors and Broker-Dealers
            25Tk414 k. Performance, Breach,
Enforcement, and Contest of Agreement. Most

Cited Cases
    (Formerly    33k91    Arbitration,    160k11(11.1),
160k11(11))
Execution of form by representative of investment
firm agreeing to abide by Alabama law did not
constitute waiver of federally created rights arising
under Federal Arbitration Act with respect to
customer's fraud claim where the customer account
agreement contained no provision for application of
Alabama law. Code 1975, § 8-6-17; 9 U.S.C.A. §§
1-15.

**[2] T ☞412**

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(I) Exchanges and Dealer Associations
            25Tk411    Relations    Between
Customer-Investors and Broker-Dealers
            25Tk412 k. In General. Most Cited
Cases
    (Formerly    33k91    Arbitration,    160k11(11.1),
160k11(11))
Federal Arbitration Act applies to customer
complaints of fraud against investment firms in
transactions in which securities are involved. 9
U.S.C.A. §§ 1-15.

**[3] T ☞412**

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(I) Exchanges and Dealer Associations
            25Tk411    Relations    Between
Customer-Investors and Broker-Dealers
            25Tk412 k. In General. Most Cited
Cases
    (Formerly    33k91    Arbitration,    160k11(11.1),
160k11(11))
State court was constrained to apply federal law to
customer's fraud claims against investment company
insofar    as    Federal    Arbitration    Act    has
circumscribed sphere of operation of state law. 9
U.S.C.A. §§ 1-15.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

604 So.2d 332
**(Cite as: 604 So.2d 332)**

**[4] Commerce 83 ☞80.5**

83 Commerce
    83II Application to Particular Subjects and Methods of Regulation
        83II(I) Civil Remedies
            83k80.5 k. Arbitration. Most Cited Cases
In cases involving arbitrability of claims of fraud in inducement of contract affecting interstate commerce, court must first determine whether fraud claim is directed solely at arbitration clause itself; if so, party opposing arbitration is entitled to trial involving state law issues relating to making of arbitration clause. 9 U.S.C.A. §§ 1-15.

**[5] T ☞178**

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(D) Performance, Breach, Enforcement, and Contest
            25Tk177 Right to Enforcement and Defenses in General
                25Tk178 k. In General. Most Cited Cases
    (Formerly 33k23 Arbitration)
Provision in Federal Arbitration Act regarding revocation of contracts does not preclude federally created right to specific enforcement of arbitration clause where claim of fraud bears upon entire agreement and upon activities of parties in general and is not directed solely at arbitration clause itself. 9 U.S.C.A. §§ 2, 4.

**[6] T ☞413**

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(I) Exchanges and Dealer Associations
            25Tk411 Relations Between Customer-Investors and Broker-Dealers
                25Tk413 k. Agreements to Arbitrate. Most Cited Cases
    (Formerly 33k91 Arbitration, 160k11(11.1), 160k11(11))
Arbitration clause in customer account agreement with investment firm was not unenforceable on theory that clause itself was procured by fraud where agreement was signed before firm's allegedly fraudulent activity with respect to customer's accounts and where customer's allegations of breach of fiduciary duty encompassed full scope of firm's activities and were not limited to making of agreement to arbitrate. 9 U.S.C.A. §§ 2, 4; Code 1975, § 6-5-104.

**[7] T ☞413**

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(I) Exchanges and Dealer Associations
            25Tk411 Relations Between Customer-Investors and Broker-Dealers
                25Tk413 k. Agreements to Arbitrate. Most Cited Cases
    (Formerly 33k91 Arbitration, 160k11(11.1), 160k11(11))
Arbitration clause in customer account agreement with investment firm was not rendered unenforceable by absence of explanation as to consequences of clause. 9 U.S.C.A. §§ 2, 4; Code 1975, § 8-1-2.

**[8] T ☞374(7)**

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(H) Review, Conclusiveness, and Enforcement of Award
            25Tk366 Appeal or Other Proceedings for Review
                25Tk374 Scope and Standards of Review
                    25Tk374(7) k. Questions of Law or Fact. Most Cited Cases
    (Formerly 33k73.7(7) Arbitration)
Determination by trial judge regarding intent of parties to arbitrate involves question of fact and will not be disturbed unless clearly erroneous.

**[9] T ☞413**

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(I) Exchanges and Dealer Associations
            25Tk411 Relations Between Customer-Investors and Broker-Dealers
                25Tk413 k. Agreements to Arbitrate.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

604 So.2d 332                                          Page 3

604 So.2d 332
**(Cite as: 604 So.2d 332)**

Most Cited Cases
    (Formerly 33k91 Arbitration, 160k11(11.1), 160k11(11))
Trial judge's findings that arbitration clause in customer account agreement applied to second account opened by firm without customer signing separate authorization was not clearly erroneous. 9 U.S.C.A. §§ 2, 4.

**[10] T ⬅412**

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(I) Exchanges and Dealer Associations
            25Tk411    Relations    Between Customer-Investors and Broker-Dealers
                25Tk412 k. In General. Most Cited Cases
    (Formerly 33k91 Arbitration, 160k11(11.1), 160k11(11))
In applying federal substantive law in determining arbitrability of customer's fraud claims against investment firm, trial court was constrained to construe intent of parties generously in favor of arbitrability. 9 U.S.C.A. §§ 2, 4.

**[11] T ⬅134(1)**

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(B) Agreements to Arbitrate
            25Tk131 Requisites and Validity
                25Tk134 Validity
                    25Tk134(1) k. In General. Most Cited Cases
    (Formerly 33k6.2, 33k6 Arbitration)
Arbitration clauses are not inherently unfair or oppressive. 9 U.S.C.A. §§ 2, 4.

**[12] T ⬅413**

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(I) Exchanges and Dealer Associations
            25Tk411    Relations    Between Customer-Investors and Broker-Dealers
                25Tk413 k. Agreements to Arbitrate. Most Cited Cases
    (Formerly 33k91 Arbitration, 160k11(11.1),

160k11(11))
Where customer's claims of fraud and breach of fiduciary duty were directed at entire customer account agreement, issue of unconscionability of arbitration clause in the agreement was also subject to arbitration. 9 U.S.C.A. §§ 2, 4.

**[13] Jury 230 ⬅28(7)**

230 Jury
    230II Right to Trial by Jury
        230k27 Waiver of Right
            230k28 In Civil Cases
                230k28(7) k. Submission to Arbitration. Most Cited Cases
Arbitration clause in customer account agreement with investment firm did not constitute unenforceable waiver of right to trial by jury. Const. Art. 1, § 11; 9 U.S.C.A. §§ 2, 4.

**[14] T ⬅412**

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(I) Exchanges and Dealer Associations
            25Tk411    Relations    Between Customer-Investors and Broker-Dealers
                25Tk412 k. In General. Most Cited Cases
    (Formerly 33k91 Arbitration, 160k11(11.1), 160k11(11))
For purpose of arbitration clause in customer account agreement with investment firm providing for arbitration within six years from occurrence or event giving rise to dispute, occurrence or event giving rise to dispute was not execution of agreement containing arbitration clause but rather the alleged instances of churning, unauthorized trading and similar acts of firm and its representative as set forth in complaint. 9 U.S.C.A. §§ 2, 4.

**[15] Pretrial Procedure 307A ⬅563**

307A Pretrial Procedure
    307AIII Dismissal
        307AIII(B) Involuntary Dismissal
            307AIII(B)2 Grounds in General
                307Ak563 k. Disobedience to Order of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

604 So.2d 332                                                                                    Page 4

604 So.2d 332
**(Cite as: 604 So.2d 332)**

Court or Other Misconduct. Most Cited Cases
Dismissal for failure to comply with court order is warranted where there is clear record of delay, willful default or contumacious conduct by plaintiff. Rules Civ.Proc., Rule 41(b).

**[16] Appeal and Error 30 ☜962**

30 Appeal and Error
    30XVI Review
        30XVI(H) Discretion of Lower Court
            30k962 k. Dismissal or Nonsuit Before Trial. Most Cited Cases
Trial judge's decision to grant motion to dismiss for failure to prosecute will be accorded considerable weight by reviewing court and his decision will be reversed only upon showing of abuse of discretion. Rules Civ.Proc., Rule 41(b).

**[17] Appeal and Error 30 ☜1139**

30 Appeal and Error
    30XVII Determination and Disposition of Cause
        30XVII(B) Affirmance
            30k1139 k. Conditions in General. Most Cited Cases

**Pretrial Procedure 307A ☜563**

307A Pretrial Procedure
    307AIII Dismissal
        307AIII(B) Involuntary Dismissal
            307AIII(B)2 Grounds in General
                307Ak563 k. Disobedience to Order of Court or Other Misconduct. Most Cited Cases
Dismissal of customer's action alleging fraud and breach of fiduciary duty by investment firm was not abuse of discretion where customer failed to comply with order granting defendants' motion to compel arbitration and for stay pending arbitration; however, affirmance of order would be conditioned upon willingness of arbitration organization to take jurisdiction of customer's claims and to reopen her case.

**[18] Mandamus 250 ☜60**

250 Mandamus
    250II Subjects and Purposes of Relief

        250II(A) Acts and Proceedings of Courts, Judges, and Judicial Officers
            250k60 k. Civil Proceedings Other Than Actions. Most Cited Cases
Petition for writ of mandamus is proper means to test trial court's granting of motion to arbitrate or granting of stay pending arbitration.

**\*333** Alton B. Parker, Jr. and Maston E. Martin, Jr. of Spain, Gillon, Grooms, Blan & Nettles, Birmingham, for appellant.
A. Inge Selden III, Walker Percy Badham III and Mark Strength of Maynard, Cooper, Frierson & Gale, Birmingham, for appellees.
ADAMS, Justice.
Mary Jones appeals from a judgment dismissing her suit for failure to comply with an order to arbitrate her claims against Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch"), and J. Edward Porter. We affirm conditionally.

On August 12, 1982, Mrs. Jones opened account number 524-85812 with Merrill Lynch for the investment and management of proceeds from the settlement of a wrongful death action and an insurance policy on the life of her deceased husband. In doing so, she signed a "Customer Account Agreement" ("Agreement"), a copy **\*334** of which she received by mail with blank spaces for her signature, each of which was marked with an "X. " The Agreement contained the following pertinent language:
"In consideration of your accepting and carrying *one or more accounts* for the undersigned [Mrs. Jones], the undersigned hereby agrees....
"....
**"11. Agreement to Arbitrate Controversies**
It is agreed that any controversy between us *arising out of your business or this agreement* shall be submitted to arbitration conducted under the provisions of the Constitution and Rules of the Board of Governors of the New York Stock Exchange, Inc. or pursuant to the Code of Arbitration Procedure of the National Association of Securities Dealers, Inc. as the undersigned may elect.
**"12. The Laws of the State of New York Govern**
This agreement and its enforcement shall be

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

604 So.2d 332

604 So.2d 332
(Cite as: 604 So.2d 332)

governed by the laws of the State of New York; shall cover *individually and collectively all accounts which the undersigned may open or reopen with you;* and shall enure to the benefit of your successors...."

(Emphasis added). By May 1983, the plaintiff had deposited with Merrill Lynch a total of $350,000. In March 1984, Merrill Lynch also opened in her name, allegedly without her consent, another account, account number 524-96284.

On November 4, 1988, she sued Merrill Lynch and Mr. Porter, its representative, alleging that improper activities of the defendants had resulted in a loss of over half of her $350,000 investment. More specifically, the plaintiff contended that "beginning on or about September 29, 1983, and continuing until on or about July 27, 1988, [the defendants] wrongfully, intentionally, fraudulently, maliciously, and deceptively manipulated ... and 'churned' " her accounts. Count one of her seven-count complaint alleged excessive trading of securities, which, she contended, amounted to a violation of Ala.Code 1975, § 8-6-17.[FN1] Count two alleged fraudulent conversion of securities from a cash account to a " margin" account, in violation of § 8-6-17. Count three alleged breach of fiduciary duty. Count four alleged conversion of the $350,000 investment to the use of the defendants. Counts five through seven alleged, respectively, knowing, reckless, and innocent misrepresentation of material facts regarding the $350,000 investment.

FN1. Section 8-6-17 provides:
"It is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly, to:
"(1) Employ any device, scheme or artifice to defraud;
"(2) Make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or
"(3) Engage in any act, practice or course of business which operates or would

operate as a fraud or deceit upon any person."

On December 6, 1988, the defendants filed a " Motion to Compel Arbitration and for Stay Pending Arbitration" of the dispute pursuant to Clause 11 of the Agreement. On March 3, 1989, the plaintiff filed an amended and restated complaint that contained the same counts as alleged in her original complaint. On April 10, 1989, the Honorable Stuart Leach, Jefferson County Circuit Court judge, conducted a pretrial hearing to consider various motions, including the defendants' motion to compel arbitration. After considering affidavits, briefs, and "heated argument from counsel for both parties," the trial judge, on June 16, 1989, granted the defendants' motion to compel arbitration.

On June 21, 1989, following the trial court's denial of a motion for "reconsideration," the plaintiff filed a motion requesting the trial court to provide a statement, pursuant to Rule 5, A.R.App.P., that would allow her to seek to appeal from the order compelling arbitration. The judge, on June 29, 1989, granted her motion, provided the statement required by Rule 5, and certified a number of questions to this Court for immediate appeal. On July 11, 1989, we denied the plaintiff's petition for permission*335 to appeal the interlocutory order compelling arbitration.

On August 28, 1989, the plaintiff filed a motion to set aside the order compelling arbitration. On September 22, 1989, the judge heard arguments on that motion; on September 28, 1989, the court denied the motion, but expressly retained jurisdiction of the case pending a decision by the arbitration board to take jurisdiction.

On November 3, 1989, the plaintiff submitted a statement of claims to the National Association of Securities Dealers, Inc. ("NASD"). However, she refused to sign the "NASD Uniform Submission Agreement," requisite to submitting her claims to arbitration, because, she argues, "by execution of the agreement she would consent to arbitrate her claims against Merrill Lynch and would thereby waive any objection [that] she might have to the validity, enforceability and revocability" of Clause

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

11 of the Agreement.[FN2] Consequently, on January 25, 1990, the NASD notified her that it was "closing the case."

FN2. Brief of appellant, p. 4.

On March 14, 1990, Merrill Lynch filed a "Motion to Dismiss for Failure to Comply with Court Orders and for Want of Prosecution." The plaintiff, on March 28, 1990, responded by filing a second amended complaint, containing an eighth count, in which she sought to reform the Agreement pursuant to Ala.Code 1975, § 8-1-2, by the deletion of Clause 11.[FN3]

FN3. Section 8-1-2 provides:
"When, through fraud, a mutual mistake of the parties or a mistake of one party which the other at the time knew or suspected, a written contract does not truly express the intention of the parties, it may be revised by a court on the application of the party aggrieved so as to express that intention...."

With her second amended complaint, the plaintiff also filed a motion to stay arbitration, supported by a supplemental brief and various affidavits. On April 5, 1990, the trial judge conducted a hearing on all motions, including the "Motion to Dismiss for Failure to Comply with Court Orders and for Want of Prosecution." On June 19, 1990, the judge entered the following order:
"This Court is of the opinion that it has no alternative but to grant Defendant's motion to dismiss this case, and accordingly, the case is hereby dismissed without prejudice to Plaintiff insofar as the initiating or maintaining [of] a claim relating to the issues in this case with the arbitration forum selected or to be selected by Plaintiff. In all other respects, this dismissal is with prejudice and costs are hereby taxed to Plaintiff."

On appeal, the plaintiff contends that the Agreement must be reformed to eliminate Clause 11 because (1) the agreement was procured by fraud; (2) there was no mutual assent to the agreement to arbitrate;

(3) no agreement was made to arbitrate any disagreements involving account number 524-96284; (4) the agreement is unconscionable; and (5) the agreement constitutes an impermissible waiver of the right to a jury trial provided under Alabama law. In addition, she insists that the arbitration request is time-barred.

*I. Fraud*

[1] The plaintiff first insists that state law controls the disposition of this case. In particular, she contends that the defendants waived any federally created rights arising under the Federal Arbitration Act, 9 U.S.C. §§ 1-15 (1982) ("FAA"), as a result of Mr. Porter's execution of "Form U-4," the "Uniform Application for Securities Industry Registration or Transfer," in which he agreed to "abide by, comply with, and adhere to all the provisions, conditions and covenants of the statutes, constitutions, ... and rules and regulations" of Alabama in consideration for registration by this state as a representative of Merrill Lynch. Consequently, she insists, the defendants "agreed to be bound by the law of Alabama."

Her reliance on *Volt Information Sciences, Inc. v. Board of Trustees of Stanford Junior University,* 489 U.S. 468, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989), as support for this argument is misplaced. The contract involved in *Volt Information Sciences *336 contained a *choice of law clause* providing for the application of California law in the event of a dispute. That case merely held that where a contract contained a *choice of law clause,* specifically providing for the application of California law in the event of a dispute, California's statute providing for a stay of arbitration "pending resolution of related litigation" was not preempted by the FAA. *Id.* at 471, 477, 109 S.Ct. at 1251, 1255. The Court concluded that the parties had not waived their federally created rights because their "*agreement* did not require arbitration to proceed in [that] situation." *Id.* at 475, 109 S.Ct. at 1253 (emphasis added).

[2][3] Not only does the *Agreement* at issue in this case contain no clause providing for the application

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

604 So.2d 332
**(Cite as: 604 So.2d 332)**

of Alabama law, but the practical and unacceptable result of the plaintiff's argument would be to render the FAA inoperative in all similar disputes within this state. Moreover, it is well settled that the FAA applies to cases, such as this one, in which transactions in securities are involved. *Ex parte Merrill Lynch, Pierce, Fenner & Smith*, 494 So.2d 1, 2 n. 1 (Ala.1986). We are thus constrained to apply federal law insofar as the FAA has circumscribed the sphere of operation of state law. See *Southland Corp. v. Keating*, 465 U.S. 1, 16, 104 S.Ct. 852, 861, 79 L.Ed.2d 1 (1984); *Ex parte Alabama Oxygen Co.*, 433 So.2d 1158, 1168 (Ala.1983), (Maddox, J., dissenting), *vacated*,452 So.2d 860 (Ala.1984) (adopting dissenting opinion of Maddox, J., as opinion of the Court).

The FAA, in pertinent part, provides:
"**§ 2. Validity, irrevocability, and enforcement of agreements to arbitrate**
"A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, *save upon such grounds as exist at law or in equity for the revocation of any contract.*
"....
"**§ 4 Failure to arbitrate under agreement; petition to United States court having jurisdiction for order to compel arbitration; notice and service thereof; hearing and determination**
"A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under Title 28 [28 USC § 1 et seq.], in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement.... The court shall hear the parties, and upon being satisfied that the *making of the agreement for arbitration or the*

*failure to comply therewith is not in issue,* the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement.... *If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof.*"

9 U.S.C. §§ 2, 4 (1982) (emphasis added). In the context of allegations of fraud in the inducement of a contract involving interstate commerce, these sections involve an interrelationship of federal and state law. See, generally, R. Connell, *The Federal Arbitration Act: The Expanding Impact of State Law Upon Rigorous Enforcement,*20 J.Mar.L. & Com. 327 (1989).

The polestar in our analysis of this interrelationship is *Prima Paint Corp. v. Flood & Conklin Manufacturing Co.*, 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967). In that case, the parties entered into a "Consulting Agreement" containing a comprehensive arbitration clause. After a dispute arose, Flood & Conklin served notice of "intention to arbitrate." *Id.* at 398, 87 S.Ct. at 1803. Prima Paint responded*337 by filing suit in federal court, seeking rescission of the contract on the grounds that it had been procured by fraud. In particular, Prima Paint alleged that Flood & Conklin "had fraudulently represented that it was solvent and able to perform its contractual obligations, whereas it was in fact insolvent." *Id.* In holding that the dispute was subject to arbitration, the United States Supreme Court stated:
"Under § 4, with respect to a matter within the jurisdiction of the ... courts save for the existence of an arbitration clause, the ... court is instructed to order arbitration to proceed once it is satisfied that ' the making of the agreement for arbitration or the failure to comply [with the arbitration agreement] is not in issue.' Accordingly, if the claim is fraud in the *inducement of the arbitration clause itself*-an issue which goes to the 'making' of the agreement to *arbitrate*-the ... court may proceed to adjudicate it. But the statutory language does not permit the ... court to consider claims of fraud in the *inducement of the contract generally.* ... We hold, therefore, that in passing upon a § 3 application for a stay while the parties arbitrate, a ... court may consider

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

604 So.2d 332
**(Cite as: 604 So.2d 332)**

only issues relating to the making and performance of the agreement to *arbitrate.*"

*Prima Paint,* 388 U.S. at 403-04, 87 S.Ct. at 1806 (footnotes omitted; emphasis added). The Court reasoned that as long as the arbitration clause was broad enough to encompass claims of fraud in the inducement of the contract, such claims were, themselves, subject to arbitration. *Id.* at 402, 406, 87 S.Ct. at 1805, 1807; see also *Ex parte Costa & Head (Atrium), Ltd.,* 486 So.2d 1272, 1276 (Ala.1986).

[4] Since *Prima Paint,* it has become clear that in cases involving claims of fraud in the inducement of a contract affecting interstate commerce, the court must first determine whether the fraud claim is directed solely at the arbitration clause *itself. Coleman v. Prudential Bache Securities, Inc.,* 802 F.2d 1350, 1352 (11th Cir.1986) (must be asserted that "arbitration clause itself, standing apart from the whole agreement, was induced by fraud"); *Bhatia v. Johnston,* 818 F.2d 418, 422 (5th Cir.1987) (must be asserted that "arbitration clause alone, as opposed to the Customer Agreement generally," had been induced by fraud); see also *Schact v. Beacon Ins. Co.,* 742 F.2d 386, 390 (7th Cir.1984). If so, the party opposing arbitration is entitled to a trial involving state law issues relating to the making of the arbitration clause. See *Cohen v. Wedbush, Noble, Cooke, Inc.,* 841 F.2d 282, 286 (9th Cir.1988); *Curtis v. Newhard, Cook & Co.,* 725 F.Supp. 1072, 1074 (E.D.Mo.1989).

[5] If, however, looking beyond the *ad hoc* arguments of counsel, the court concludes that the claim of fraud actually bears upon the entire agreement and upon the activities of the parties in general, the provision in § 2 regarding the revocation of contracts does not preclude the federally created right to specific enforcement of the arbitration clause. See *Villa Garcia v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 833 F.2d 545, 548 (5th Cir.1987); *Benoay v. Prudential-Bache Sec., Inc.,* 805 F.2d 1437, 1441 (11th Cir.1986); *Coleman,* 802 F.2d at 1352; *Schact,* 742 F.2d at 389. Were it otherwise, a skillfully crafted complaint would, in every case, necessitate a trial thus effectively eviscerating the FAA and

circumventing the strong policy favoring arbitration. See *Perry v. Thomas,* 482 U.S. 483, 491, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987); *Moses H. Cone Memorial Hosp. v. Mercury Const.,* 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983); An examination of the case at hand demonstrates the reality of that prospect.

In her original 19-page complaint, Mrs. Jones devoted only three paragraphs in the statement-of-facts section to the arbitration clause, alleging merely that the arbitration clause constituted an unenforceable contractual waiver of the right to a jury trial. Her first "amended and restated complaint," filed four months later, alleged that the arbitration clause itself had been "procured by fraud and [was] unenforceable pursuant to Section 2 of the Federal Arbitration Act." Furthermore, her second complaint alleged that the arbitration clause served as the vehicle through which *338 the defendants sought to perpetrate their various fraudulent schemes by "browbeat[ing] Mary Jones into accepting much less than the value of her claim." Finally, with the filing of the second amended complaint on March 28, 1990, she added Count eight, which averred that the arbitration clause was due to be rescinded because of "fraud of the defendant, inequitable conduct of the defendant, or a mistake of the plaintiff which defendant at the time knew or suspected." The ability of competent counsel to sharpen the issue relating to the arbitration clause progressively over time is readily apparent.

However, even ignoring, momentarily, the evolution of the arbitration issue in this case, we are troubled by the theory urged by the plaintiff that the defendants used that clause as a shield behind which to carry out fraudulent schemes. A similar theory was expressly rejected in *Western Hospitals Federal Credit Union v. E.F. Hutton & Co.,* 700 F.Supp. 1039 (N.D.Cal.1988). In that case, the credit union signed an agreement containing an arbitration clause with E.F. Hutton a year *after* E.F. Hutton had allegedly churned and mismanaged the credit union's investments. When a dispute arose two years after the agreement was executed, the credit union filed suit in a federal district court, alleging that E.F. Hutton had "fraudulently induced

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

604 So.2d 332                                                    Page 9

604 So.2d 332
**(Cite as: 604 So.2d 332)**

plaintiffs to agree to arbitrate in an effort to minimize its liability for improper acts performed *before* the agreement was signed." *Id.* at 1041-42. (Emphasis added.)

Finding no "independent challenge" to the arbitration clause itself, the district court rejected the credit union's contentions and enforced the arbitration clause. In so doing, the court succinctly remarked that if it "accepted [the credit union's] argument, almost all investors would be able to circumvent arbitration clauses by alleging that the broker's improper conduct not only gives rise to specific causes of action, but voids the arbitration agreement designed to process such disputes." *Id.* at 1043 n. 1.

[6] We believe that the logic of the district court is even more persuasive where, as here, the agreement was signed *before* the allegedly fraudulent activity. To countenance the contention that Merrill Lynch induced Mrs. Jones to sign the agreement in *anticipation* of fraudulent activity would allow the plaintiff to "bootstrap" her various claims and theories "into a separate reason for voiding the arbitration clause." See *id.* at 1042.

The plaintiff contends that the "*central issue in this case is whether Merrill Lynch owed a duty to [her] to disclose the ... material facts regarding the arbitration agreement.*" Reply brief of appellant, p. 6 (emphasis in original). The omission to do so, the argument goes, constituted fraud in the making of the arbitration clause itself. Cf. Ala.Code 1975, § 6-5-104. We also reject that argument because Mrs. Jones's claim of breach of a fiduciary duty to disclose material facts applies as cogently to *all* of her claims as to the arbitration clause itself. For example, Count three, in all three of her complaints, alleges:
"Defendants Porter and Merrill Lynch owed a fiduciary duty and a duty of good faith and fair dealing, a duty to communicate full and proper information to Plaintiff and to keep Plaintiff fully and adequately informed, a duty to protect the interests of Plaintiff and not profit at the expense of Plaintiff, and a duty to manage her account in a manner that could reasonably be expected to accomplish her objectives of preservation of

principal and generation of income. *All of these duties were breached by defendants Porter and Merrill Lynch, as such fiduciaries.*"

(Emphasis added.) Thus, the allegations of breach of fiduciary duty clearly encompass the full scope of the defendants' activities in connection with the plaintiff's investments and are not limited to the making of the agreement to arbitrate.

The plaintiff also cites *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co.,* 636 F.2d 51 (3d Cir.1980) , in support of her argument for a jury trial on the alleged arbitration*339 clause issue. In that case, a dispute arose between Par-Knit Mills, a garment manufacturer, and Stockbridge Fabrics, its distributor, regarding the enforceability of an arbitration clause contained in a series of forms signed by Par-Knit's "production manager." The forms preceded delivery of textiles purchased on the basis of a series of oral contracts. Par-Knit contended that the production manager's signature on the forms in a space designated "Buyer's Acceptance," merely represented a confirmation of delivery dates. Because the court was thus confronted with a number of genuine issues of fact, including issues of agency and the actual or apparent authority of the production manager to bind the company to *any* type of agreement, Par-Knit was entitled to a jury trial on those issues.

No such issues are here presented. Here, the plaintiff merely signed, in her own capacity, the Agreement she had received through the mail. Therefore, the trial judge, having correctly found no triable issues, properly concluded that the fraud claim was not directed solely at the arbitration clause. Therefore, because we have concluded that the plaintiff has failed to satisfy the threshold requirement articulated in the FAA, we need not and, therefore, do not, reach the issue of whether the defendants' failure to explain the consequences of the arbitration clause constituted fraud or breach of a fiduciary duty.

*II. Mutual Assent*

[7] The plaintiff insists that Clause 11 is

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

unenforceable because there was *no agreement to arbitrate*. However, she argues not that the defendants affirmatively misrepresented the existence or the effects of the arbitration clause, but merely that the defendants failed to provide any explanation at all regarding the consequences of Clause 11. The absence of an explanation, she insists, constituted a breach of fiduciary duty that would constitute grounds for rescission of the clause pursuant to Ala.Code 1975, § 8-1-2.

The plaintiff's contention is, therefore, merely a restatement of the fraud and breach-of-fiduciary-duty arguments previously discussed. To allow the disposition of this case to turn on a bare restatement of an allegation would clearly place form over substance. Because we have already determined that this case is not about fraud in the inducement as to the arbitration clause itself, we also reject the plaintiff's argument that the arbitration clause is unenforceable because of the absence of mutual assent.

*III. Arbitrability of the Second Account*

It is undisputed that the plaintiff did not sign a separate agreement expressly authorizing the opening of the second account-account number 524-96284. She alleges that the defendants not only improperly opened that account, but transferred her securities and property from one account to the other without proper authorization. Consequently, she insists, transactions involving account number 524-96284, such as unauthorized purchases made in account number 524-85812 and transferred to and sold in account number 524-96284, are not subject to arbitration under the terms of the Agreement that she signed upon the opening of account number 524-85812.

In support of her argument, the plaintiff refers to Clause 12 of the Agreement, which provides that the "agreement ... shall cover individually and collectively all accounts which the undersigned may *open or reopen* with [Merrill Lynch]." She insists that because the second account was not one that *she* opened or reopened, the second account is not subject to the arbitration provision. Merrill Lynch,

however, contends that the phrase in Clause 11 providing for arbitration of "any controversy ... arising out of [its] *business*" is sufficiently broad to encompass the transactions connected with the disputed account.

[8] The question thus becomes a "matter of contractual interpretation to be determined by the intent of the parties." *Ex parte Warrior Basin Gas Co.,* 512 So.2d 1364, 1367-68 (Ala.1987). A determination by the trial judge regarding the intent of the parties to arbitrate is a question of fact and, as such, will not be disturbed unless *340 clearly erroneous. *Id.* at 1368 (citing *Seaboard Coast Line R.R. v. Trailer Train Co.,* 690 F.2d 1343, 1348-49 (11th Cir.1982).

[9] We are unable to conclude that the trial judge's findings, based on the language of the Agreement itself, numerous affidavits, and the oral arguments of both parties, were clearly erroneous. For example, the language of the Agreement fairly supports a finding that the parties intended to arbitrate disputed claims. This is especially true with regard to the plaintiff's allegations that the defendants used the second account as a repository or transfer point for securities purchased through the first account. The transactions arising out of account number 524-96284 are thus so inextricably intertwined with those involving account number 524-85812 as to be inseparable absent resort to mere sophistry.

[10] In addition, we note that the trial judge, in properly applying "federal substantive law of arbitrability," was constrained to construe the intent of the parties generously in favor of arbitrability. *Ex parte Warrior Basin Gas Co.,* 512 So.2d at 1369; see also, *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985). Moreover, "federal policy favoring arbitration and requiring courts to ' rigorously' enforce arbitration agreements," mandates the finding of intent to arbitrate absent " positive assurance" that the parties did not so intend. *Ex parte Warrior Basin Gas Co.,* 512 So.2d at 1370. We, therefore, conclude that the trial judge's findings were not clearly erroneous.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

604 So.2d 332
**(Cite as: 604 So.2d 332)**

*IV. Unconscionability*

[11][12] Likewise, we find no merit in the plaintiff's contention that the arbitration clause is due to be rescinded on the ground of unconscionability. Arbitration clauses are not "inherently unfair or oppressive." See *Coleman v. Prudential Bache Securities, Inc.,* 802 F.2d 1350, 1352 (11th Cir.1986); see also *Surman v. Merrill Lynch, Pierce, Fenner & Smith,* 733 F.2d 59, 61 n. 1 (8th Cir.1984). Furthermore, because the plaintiff's claims of fraud and breach of fiduciary duty are directed at the entire contract, the issue of unconscionability is also subject to arbitration. See *Coleman,* 802 F.2d at 1352.

[13] Neither does the clause constitute an unenforceable waiver of the right to trial by jury under Ala. Const. 1901, Art. I, § 11. As this Court has stated: "The Federal Arbitration Act ... creates a federal right to specific enforcement of arbitration agreements which are a part of contracts involving interstate commerce, notwithstanding any state substantive or procedural policies to the contrary." *Ex parte Alabama Oxygen Co.,* 433 So.2d at 1168. Moreover, the "public policy of this state is to encourage arbitration and amicable settlements of differences between parties." *Wells v. Mobile County Bd. of Realtors,* 387 So.2d 140, 144 (Ala.1980); see also *Ex parte Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 494 So.2d 1, 4 (Ala.1986). Arbitration clauses contained in contracts subject to §§ 2 and 4 of the FAA, which provide for judicial intervention and revocation " upon such grounds as exist at law or in equity," do not violate public policy or constitute an unenforceable waiver of the right to trial by jury. See *Wells,* 387 So.2d at 144.

*V. Timeliness of the Motion to Compel Arbitration*

More problematic, however, is the plaintiff's contention that § 15 of the NASD Code of Arbitration Procedure bars submission to arbitration of the "dispute, claim or controversy regarding Paragraph 11 ... due to the fact that more than six years have elapsed from the occurrence or event giving rise to the claim." [FN4] That section

provides:

FN4. Brief of appellant, at 51.

"No dispute, claim, or controversy shall be eligible for submission to arbitration under this Code where six (6) years have elapsed from the occurrence or event giving rise to the act or dispute, claim, or controversy. This section shall *341 not extend applicable statutes of limitations, nor shall it apply to any case which is directed to arbitration by a court of competent jurisdiction."
*Id.* She insists that the "occurrence or event giving rise to the dispute" is the execution, on August 12, 1982, of the Agreement containing the arbitration clause. The defendants, however, contend that the events of which § 15 speaks are the alleged instances of churning, unauthorized trading, and similar acts of the defendants as set forth in the plaintiff's complaints.

[14] It cannot seriously be maintained that the plaintiff would have averred a cause of action for relief from the effects of the arbitration clause in the absence of the overriding substantive claims succinctly set forth in her complaints-claims that arose well within the period prescribed by § 15. For example, the plaintiff's complaints allege that " beginning on or about *September 29, 1983, and continuing until on or about July 27, 1988,* [the defendants] wrongfully, intentionally, fraudulently, maliciously, and deceptively manipulated Plaintiff's accounts, and 'churned' Plaintiff's accounts." (Emphasis added.) As we have already determined, based on our discussion of the issue of fraud, *supra,* this case is not about the arbitration clause. Therefore, on the strength of the plain language of § 15, the arbitration request does not appear to be time-barred.

This conclusion is buttressed by the fact that the NASD did not refuse to take jurisdiction of the dispute when, on November 3, 1989, Mrs. Jones submitted a statement of claims to the NASD. Instead, the NASD responded on January 3, 1990, with a memorandum requesting a properly executed copy of the Uniform Submission Agreement. Only when the plaintiff refused to submit the Uniform

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

604 So.2d 332

604 So.2d 332
**(Cite as: 604 So.2d 332)**

Submission Agreement did the NASD notify her that it was "closing the case."

[15][16] Finally, we consider whether the trial judge erred in granting the defendants' "Motion to Dismiss for Failure to Comply with Court Orders and for Want of Prosecution." Ala.R.Civ.P. 41(b) provides for the involuntary dismissal of an action upon "failure of the plaintiff to prosecute or to comply with [the Rules of Civil Procedure] or any order of [the] court." Although dismissal for failure to comply with a court order is a "harsh sanction," it is warranted where there is a "clear record of delay, willful default or contumacious conduct by the plaintiff." *Selby v. Money,* 403 So.2d 218, 220 (Ala.1981). Because the trial judge is in the best position to assess the conduct of the plaintiff and the degree of noncompliance, his decision to grant a motion to dismiss for failure to prosecute will be accorded considerable weight by a reviewing court. *Van Bronkhorst v. Safeco Corp.,* 529 F.2d 943, 947 (9th Cir.1976); *Von Poppenheim v. Portland Boxing & Wrestling Comm'n,* 442 F.2d 1047, 1051 (9th Cir.1971), *cert. denied,* 404 U.S. 1039, 92 S.Ct. 715, 30 L.Ed.2d 731 (1972). Therefore we will reverse that decision only upon a showing of abuse of discretion. *Selby,* at 220; *Smith v. Wilcox County Bd. of Educ.,* 365 So.2d 659 (Ala.1978).

[17][18] Under the facts of this case, we are unable to say that the trial judge abused his discretion in dismissing the plaintiff's case with prejudice. On June 16, 1989, the trial judge granted the defendants' "motion to compel arbitration and for stay pending arbitration." The plaintiff never properly sought a review of that decision,[FN5] nor did she take the necessary steps to comply with the order. Instead, five months later, after she had submitted a statement of claims to the NASD, she refused to sign the Uniform Submission Agreement, a prerequisite for compliance with the order to arbitrate.

FN5. It is now well settled in this state that a "petition for a writ of mandamus is the proper means to test a trial court's *granting* of a motion to arbitrate or the granting of a

stay pending arbitration." *Ex parte Alexander,* 558 So.2d 364, 365 (Ala.1990) (footnote omitted) (emphasis in original); see also *A.G. Edwards & Sons, Inc. v. Clark,* 558 So.2d 358, 360 (Ala.1990).

After another four months had elapsed, during which the NASD gave notice that it was closing the case for failure properly to begin the arbitration process, Merrill Lynch ***342** filed its "motion to dismiss for failure to comply with court orders and for want of prosecution." In response, the plaintiff began a new round of litigation in the trial court by filing another complaint, a motion to stay arbitration, a brief, and affidavits-all directed at an issue that had been adjudicated in the trial court nine months earlier. On June 19, 1990, a year after the original order to arbitrate, the judge dismissed the case with prejudice.

Considering the issues presented, the conduct of the plaintiff, the patience of the trial judge, the strain on the court docket, and the cost to the defendants of prolonging the litigation, we conclude that the judge did not abuse his discretion in granting the defendants' motion to dismiss. Our holding is specifically conditioned, however, upon the willingness of the NASD to take jurisdiction of the plaintiff's claims and to reopen her case. Otherwise, the judgment will be reversed and the cause remanded for trial on the plaintiff's claims.

AFFIRMED CONDITIONALLY.

HORNSBY, C.J., and ALMON, STEAGALL and INGRAM, JJ., concur.
Ala.,1991.
Jones v. Merrill Lynch, Pierce, Fenner & Smith, Inc.
604 So.2d 332

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.