# Exhibit L

**APPENDIX OF NON-FEDERAL AND UNPUBLISHED FEDERAL AUTHORITIES
CITED IN VISA USA INC.'S MOTION TO STAY ACTION
AND TO COMPEL ARBITRATION**

1 of 1 DOCUMENT

**RICHARD SEGAL et al., Plaintiffs and Respondents, v. DAVID SILBERSTEIN et al., Defendants and Appellants.**

B191303

**COURT OF APPEAL OF CALIFORNIA, SECOND APPELLATE DISTRICT, DIVISION EIGHT**

*156 Cal. App. 4th 627; 2007 Cal. App. LEXIS 1786*

**October 29, 2007, Filed**

**PRIOR HISTORY: [**1]**
Los Angeles County Superior Court, No. BC345746, James Satt, Judge.

**DISPOSITION:**  Reversed and remanded.

**SUMMARY:**

CALIFORNIA OFFICIAL REPORTS SUMMARY

Plaintiff sued defendants, alleging that defendants breached their oral joint venture agreement to split the profits from their business entities. Pursuant to the joint venture agreement, the parties had formed several business entities to buy, develop, and manage real property. Pursuant to *Code Civ. Proc., § 1281.2*, defendants petitioned to compel arbitration of plaintiff's claims, but the trial court entered an order denying defendants' petition. (Superior Court of Los Angeles County, No. BC345746, James Satt, Judge.*)

* Retired judge of the former Municipal Court for the Los Angeles Judicial District, assigned by the Chief Justice pursuant to *article VI, section 6 of the California Constitution.*

The Court of Appeal reversed the order denying defendants' petition to compel arbitration and directed the trial court to enter a new and different order granting that petition. The court concluded that the trial court erred by denying defendants' petition to compel arbitration as to disputes over the operating agreements of two of the business entities. Arbitration was mandatory under these business entities' operating agreements. Any lawsuit that was brought to enforce or interpret the operating agreements or resolve disputes between members to those agreements had to be arbitrated. Although the trial court refused to compel arbitration on the ground one of the business entities was not a party to plaintiff's action and the complaint did not include allegations that raised any issues concerning the enforcement or interpretation of that agreement, or any disputes between the business entity's member-investors, it was not necessary that the business entity itself be named as a defendant to invoke the terms of the arbitration provision based on allegations that defendants violated the terms of the operating agreement. (Opinion by Rubin, J., with Cooper, P. J., and Flier, J. concurring.)

**HEADNOTES**

CALIFORNIA OFFICIAL REPORTS HEADNOTES

(1) **Arbitration and Award § 3--Agreements to Arbitrate--Petition to Compel--Burden of Proof.--**One party to an arbitration agreement [*628] may petition the court to compel other parties to arbitrate a dispute that is covered by their agreement (*Code Civ. Proc., § 1281.2*). Section 1281.2 creates a summary proceeding for determining whether the parties should be ordered to arbitrate. The petitioner bears the burden of proving the existence of a valid arbitration agreement by a preponderance of the evidence. The opposing party must meet the same evidentiary burden to prove facts necessary to its defense. The trial court acts as the trier of fact, weighing all the evidence.

(2) **Contracts § 23--Construction and Interpretation--Language.--**When interpreting contracts, the language used controls if it is clear and explicit. A court must view the language of a contract as a whole, avoiding a piecemeal, strict construction approach. If possible, the court should give effect to every provision and avoid rendering any part of an agreement surplusage. Where an agree-

156 Cal. App. 4th 627, *; 2007 Cal. App. LEXIS 1786, **

ment is capable of being interpreted in two ways, the court should construe it in order to make the agreement lawful, operative, definite, reasonable and capable of being carried into effect and avoid an interpretation which will make the instrument extraordinary, harsh, unjust, inequitable or which would result in absurdity.

**(3) Arbitration and Award § 3--Agreements to Arbitrate--Enforcement--Public Policy.--**Because of California's public policy that generally favors arbitration, a court will uphold arbitration unless it can say with assurance that an arbitration clause cannot reasonably be interpreted to cover a dispute or otherwise cannot be enforced.

**(4) Actions § 2--Definitions and Distinctions--Proceedings in Court of Law--Arbitration.--**The term "action" means a proceeding in a court of law and excludes arbitration, which is considered a substitute for proceedings in court (*Code Civ. Proc., § 22*).

**(5) Contracts § 33--Construction and Interpretation--Meaning of Words--"Shall."--**The term "shall" has long been considered mandatory under California's contract interpretation rules.

**(6) Arbitration and Award § 3--Agreements to Arbitrate--Petition to Compel--Business Entities--Operating Agreements--Arbitration Mandatory.--**In a case in which plaintiff alleged that defendants breached an oral joint venture agreement to split the profits from their [*629] business entities, the trial court's denial of defendants' petition under *Code Civ. Proc., § 1281.2,* to compel arbitration as to disputes over the operating agreements of two business entities formed pursuant to the joint venture agreement was subject to reversal because arbitration was mandatory under these business entities' operating agreements.

*[1 Crompton et al., Matthew Bender Practice Guide: Cal. Contract Litigation (2007) § 5.07.]*

**COUNSEL:** Rintala, Smoot, Jaenicke & Rees and Michael B. Garfinkel for Defendants and Appellants.

No appearance for Plaintiffs and Respondents.

**JUDGES:** Opinion by Rubin, J., with Cooper, P. J., and Flier, J. concurring.

**OPINION BY: RUBIN**

**OPINION**

    **RUBIN, J.--**Defendants David, Sandra, Michael, and Lisa Silberstein appeal from the trial court order

denying their petition to compel arbitration of claims raised in Richard Segal's complaint alleging breach of contract and breach of fiduciary duty in connection with the parties' real estate acquisition and development joint venture. Because the operating agreements of the parties' business entities require arbitration, we reverse.

**FACTS AND PROCEDURAL HISTORY**

    Richard Segal sued David Silberstein, alleging that Silberstein breached their oral joint venture agreement to split the profits from their business. The complaint alleged that pursuant to the joint venture agreement, Segal and Silberstein formed several business entities to buy, develop, and manage real property, including Chapman Summit (Chapman), Double S Development [**2] (Double S), BSG Financial (BSG), Sage Village, and Adventure Development. Segal alleged that Silberstein and several companies that were [*630] Silberstein's alter ego tried to hide, divert, fraudulently transfer, and otherwise take control of the assets and profits "of the aforementioned entities." [1]

    1   Other plaintiffs were: Texas partnership RJS Realty, Ltd., of which Segal was general partner; RPM Realty, a Nevada limited liability company that was a member and manager of Double S; and Seagrape, Inc., and Spectrum Real Estate Services, both Florida corporations that became member-investors of BSG.

    The defendant business entities alleged to have acted as Silberstein's alter ego are DSD Homes, a Texas limited liability company, Syndex, a California limited liability partnership, Syndicate Exchange, a Texas corporation, Adventure Partners, Ltd., a Texas limited partnership, Adventure General, a Texas corporation, and Garden Investments, a Nevada corporation. Other entities named as defendants were the just mentioned BSG and Double S, which are Texas limited liability companies. Also named as defendants were some of Silberstein's family members: Sandra, Michael, and Lisa Silberstein. We will [**3] sometimes refer to David Silberstein and his family member defendants as the Silbersteins.

    The complaint's first cause of action was by Segal against Silberstein for breach of their oral joint venture agreement by failing to account for, and by improperly diverting or assuming control over, the assets, income, and profits "of the aforementioned entities." The second cause of action, which incorporated all previous allegations, sought declaratory and injunctive relief as to all defendants. [2] It alleged that Silberstein took the following improper actions: refused to pay back loans made by

156 Cal. App. 4th 627, *; 2007 Cal. App. LEXIS 1786, **

plaintiffs "to the various entities"; wrongfully transferred assets of jointly owned entities to entities under his control; and wrongly disputed that David Silberstein owes capital contributions to the "jointly-formed entities." Based on those allegations, the complaint sought a judicial determination of the parties' rights "as to the management and operation of the entities, ... [including] the ownership percentage interest of Plaintiffs and Defendants, and each of them, in each entity listed hereinabove." Such a declaration was necessary, the complaint alleged, because plaintiffs were being denied [**4] their proper shares of, and interests in, "the various entities."

      2  Each succeeding cause of action incorporated all earlier allegations.

The third cause of action named all defendants and sought an accounting for the wrongfully diverted funds and assets previously described. The fourth cause of action was by Segal against Silberstein for constructive fraud and breach of fiduciary duty based on the previous allegations. The seventh cause of action was by Segal against all defendants for a constructive trust due to the allegedly wrongful acquisition by Silberstein's alter ego companies and family members of the assets of the business entities. The tenth cause of action was by Segal against all defendants and asked to set aside the transfers of various assets that Segal alleged were made in order to defraud him and [*631] other shareholders, investors, or creditors. The remaining eight causes of action are similar, but focus on wrongful conduct as to the assets and profits of defendants BSG, Double S, and Sage Village.

The Silbersteins brought a petition to compel arbitration of the claims raised in Segal's complaint. (*Code Civ. Proc., § 1281.2.*) [3] The motion was supported by the operating [**5] agreements of three of the business entities formed pursuant to the joint venture agreement--Chapman, BSG, and Double S. The three operating agreements were virtually identical. Each called for the formation of a real estate investment entity that required its members to make capital contributions in a designated amount. Profits would be split according to each member's percentage interest in the company, the companies' assets would be held in the name of each company, and accounts and records concerning company business would be maintained.

      3  All further undesignated section references are to the Code of Civil Procedure.

Each operating agreement contained an arbitration provision. The Chapman arbitration provision said: "Any action to enforce or interpret this Agreement or to resolve disputes between the Members or by or against any Member shall be settled by arbitration in accordance with the rules of the American Arbitration Association.

*Arbitration shall be the exclusive dispute resolution process in the State of California, but arbitration shall be a nonexclusive process elsewhere.* Any party may commence arbitration by sending a written demand for arbitration to the other parties. [**6] Such demand shall set forth the nature of the matter to be resolved by arbitration. Arbitration shall be conducted at Los Angeles, California. The substantive law of the State of California shall be applied by the arbitrator to the resolution of the dispute. The parties shall share equally all initial costs of arbitration. The prevailing party shall be entitled to reimbursement of attorney fees, costs, and expenses incurred in connection with the arbitration. All decisions of the arbitrator shall be final, binding, and conclusive on all parties. Judgment may be entered upon any such decision in accordance with applicable law in any court having jurisdiction thereof." (Italics added.)

The Double S and BSG arbitration provisions were identical except that they said arbitration was the exclusive dispute resolution process in Texas but not elsewhere, and that Texas law applied to resolving disputes. The Double S provision required a Texas arbitration to be held in San Antonio and the BSG provision required a Texas arbitration to be held in Houston. The Silbersteins argued to the trial court that arbitration was required by those three provisions. [*632]

Segal opposed the petition on the following [**7] grounds: (1) because the BSG and Double S agreements specified that arbitration was the exclusive process in Texas only, but was the nonexclusive process elsewhere, that meant arbitration was optional only and not required in California; (2) the Chapman agreement, which made arbitration the exclusive dispute resolution process in California, did not apply because Chapman was not a named party to the action and because the allegations of Segal's complaint did not raise any issues or disputes concerning Chapman; (3) an order compelling arbitration would be improper as to the Chapman agreement because Chapman and Silberstein were defendants in another pending action, raising the specter of conflicting rulings (*§ 1281.2, subd. (c)*); and (4) Silberstein waived his arbitration rights under the Chapman agreement by appearing in the other pending action instead of petitioning to compel arbitration. [4]

      4  Segal did not contend below that the arbitration provisions were not at issue because his suit alleged breach only of the oral joint venture agreement entities, an agreement presumably without an arbitration provision. Had he done so, we would most likely reject that contention. To do otherwise [**8] would strip the written operating agreements of legal effect merely because they were the product of an underlying oral

agreement. We also note that even though the complaint alleges the formation of several business entities pursuant to the joint venture agreement, the operating agreements of only three such entities are in the record. It is unclear whether operating agreements exist for the other entities.

The trial court agreed with Segal and denied the petition to compel arbitration. The Silbersteins have appealed. [5]

> 5  Despite receiving notice from this court, Segal did not file a respondent's brief. As a result, we will decide the appeal on the record, the opening brief, and appellants' oral argument. (*Cal. Rules of Court, rule 8.220(a)(2)*.)

## DISCUSSION

### 1. Applicable Law and Standard of Review

The BSG and Double S agreements require that those agreements be construed and enforced in accordance with Texas law. Neither party raised the choice of law issue below, however, relying instead on California law. On appeal, Silberstein continues to rely on California law and, as noted earlier, Segal has not filed a respondent's brief on appeal. We therefore deem the issue waived and will apply [**9] California law. (*Szetela v. Discover Bank (2002) 97 Cal.App.4th 1094, 1099, fn. 3 [118 Cal. Rptr. 2d 862]*; cf. *Liberty Mutual Ins. Co. v. Superior Court (1997) 58 Cal.App.4th 617, 624 [68 Cal. Rptr. 2d [*633] 219]* [choice of law issue not waived where party expressly stated he did not waive the issue and was reserving it].) [6]

> 6  Regardless, the applicable procedural and substantive law of Texas is nearly identical to California's. (See *Nabors Drilling USA, LP v. Carpenter (Tex.App.--San Antonio 2006) 198 S.W.3d 240, 246-247, 249*.)

(1) One party to an arbitration agreement may petition the court to compel other parties to arbitrate a dispute that is covered by their agreement. (*§ 1281.2*.) Section 1281.2 creates a summary proceeding for determining whether the parties should be ordered to arbitrate. The petitioner bears the burden of proving the existence of a valid arbitration agreement by a preponderance of the evidence. The opposing party must meet the same evidentiary burden to prove facts necessary to its defense. The trial court acts as the trier of fact, weighing all the evidence. Because there is no conflicting evidence regarding the interpretation of the arbitration agreements at issue here, we exercise our independent judgment to [**10] determine as a matter of law under the rules of contract interpretation whether those agreements apply. [7]

(*Provencio v. WMA Securities, Inc. (2005) 125 Cal.App.4th 1028, 1030-1031 [23 Cal. Rptr. 3d 524]*.)

> 7  The parties offered into evidence only the operating agreements, a promissory note, and the complaint in a pending action against Chapman. There was no evidence concerning the negotiations preceding the operating agreements or the parties' understandings or intentions in regard to the arbitration provisions. Accordingly, the only evidence relating to the interpretation of those provisions is the provisions themselves.

(2) When interpreting contracts, the language used controls if it is clear and explicit. We must view the language of a contract as a whole, avoiding a piecemeal, strict construction approach. If possible, we should give effect to every provision and avoid rendering any part of an agreement surplusage. Where an agreement is capable of being interpreted in two ways, we should construe it in order to make the agreement " 'lawful, operative, definite, reasonable and capable of being carried into effect and avoid an interpretation which will make the instrument extraordinary, harsh, unjust, inequitable [**11] or which would result in absurdity. [Citations.]' [Citation.]" (*City of El Cajon v. El Cajon Police Officers' Assn. (1996) 49 Cal.App.4th 64, 71 [56 Cal. Rptr. 2d 723]*.) (3) Because of California's public policy that generally favors arbitration, we will uphold arbitration unless we can say with assurance that an arbitration clause cannot reasonably be interpreted to cover a dispute or otherwise cannot be enforced. (*Coast Plaza Doctors Hospital v. Blue Cross of California (2000) 83 Cal.App.4th 677, 686 [99 Cal. Rptr. 2d 809]*.)

### 2. Arbitration Is Mandatory Under the BSG and Double S Agreements

Even though the BSG and Double S agreements state that "any action" to enforce or interpret those agreements "shall be settled by arbitration," the trial [*634] court ruled that arbitration was merely optional in California because the agreements also provided that arbitration "shall be the exclusive dispute resolution process in the State of Texas, but shall be a nonexclusive process elsewhere." We recognize the seeming ambiguity created by referring to arbitration as either an exclusive or nonexclusive dispute resolution process. For the following reasons, however, we do not construe that language to mean that a party to the BSG and Double S operating agreements [**12] may resort to civil litigation to enforce or interpret those agreements in states other than Texas.

(4) First, the term "action" means a proceeding in a court of law and excludes arbitration, which is considered a substitute for proceedings in court. (*§ 22; Brock v.*

*Kaiser Foundation Hospitals (1992) 10 Cal.App.4th 1790, 1795 [13 Cal. Rptr. 2d 678]; McRae v. Superior Court (1963) 221 Cal. App. 2d 166, 170 [34 Cal. Rptr. 346].)* [8]

 8  Once more, Texas law is similar, with the terms "suit," "action," and "cause of action" interchangeably defined as civil or criminal matters that are contested in a court of law. (*Hatten v. City of Houston (Tex.Civ.App. 1963) 373 S.W.2d 525, 533-534.*)

 **(5)** Second, the term "shall" has long been considered mandatory under California's contract interpretation rules. (*Blue Cross of Northern California v. Cory (1981) 120 Cal. App. 3d 723, 734 [174 Cal. Rptr. 901].*) Read with this in mind, the provision effectively states that any lawsuit brought to enforce or interpret the operating agreements or resolve disputes between members to those agreements must be arbitrated. Denying Silberstein's petition to compel arbitration, thereby permitting this civil action to proceed, would render this language meaningless.

 Third, apart from the nonexclusive [**13] process language, the entire provision is geared toward the arbitration process and does not appear to provide for civil litigation as a dispute resolution option. For instance, the clause designates the applicable arbitration rules, describes the process for commencing arbitration, states where a Texas arbitration will be held, requires "the arbitrator" to apply Texas law, provides that the parties shall equally share initial arbitration costs, awards the prevailing party its attorney's fees and costs "incurred in connection with the arbitration," states that the arbitrator's decision will be final and binding, and allows entry of judgment on that decision in any court with jurisdiction over the matter. By contrast, after stating that all actions (lawsuits) must be arbitrated, the provision never again mentions civil litigation and says nothing about costs and attorney's fees in the event a civil action were to be brought to enforce or interpret the operating agreements.

 Finally, adopting the trial court's interpretation leads to the following absurd results: an action to enforce the operating agreement must be arbitrated in the company's home state, with the prevailing party awarded [**14] its [*635] attorney's fees and costs, but the same dispute may be brought as a civil action in another state, with all the increased costs and delays attendant to litigation, but with no provision for fees and costs to the prevailing party. We can think of no good reason why a business entity or its investors would agree to being sued out of state perhaps thousands of miles away from where they do business, while requiring arbitration in their home state only. [9]

 9  If the parties truly intended to require arbitration only in Texas, they should have said so expressly, perhaps by having the provision read: "Any action to enforce or interpret this Agreement *in Texas* ... shall be settled by arbitration. In all other states, arbitration is not required and a civil action may be brought."

 **(6)** So what did the parties mean when they referred to arbitration as a nonexclusive dispute resolution process outside of Texas? We believe they were referring to even less costly and time-consuming alternative dispute resolution processes such as mediation and conciliation. Our Legislature has made a similar distinction in establishing a pilot mediation program for civil actions in certain counties. (*§§ 1775-1775.15.*) [**15] The Legislature contrasted "litigation culminating in a trial" with "less formal processes" (*§ 1775, subd. (b)*), such as "mediation" and similar alternative "dispute resolution" processes (*§ 1775, subds. (c), (d)*). The Texas courts have made a similar distinction. (See *State v. Fidelity and Deposit of Maryland (Tex.Ct. 2007) 223 S.W.3d 309, 312* [contrasting the "litigation process" with a state-mandated "dispute-resolution process" for state construction contracts].) At least this interpretation produces a result grounded in logic: instead of allowing full-blown civil litigation outside the company's home state, this interpretation mandates arbitration in all states, but allows the parties to consider even less formal and less costly alternative dispute resolution processes when dealing with a dispute outside the home state. Given our state's preference for arbitration, and the concomitant rule that arbitration should be upheld unless it can be said with assurance that an arbitration clause cannot reasonably be interpreted to cover a dispute (*Coast Plaza Doctors Hospital v. Blue Cross of California, supra, 83 Cal.App.4th at p. 686*), we adopt this interpretation and conclude that the [**16] trial court erred by denying the petition to compel arbitration as to disputes over the BSG and Double S operating agreements. [10]

 10  At bottom, this is a poorly worded arbitration provision and we suppose it is arguable that there are virtually unlimited devices to resolve disputes, including, theoretically, those founded on chance. We have given the contractual language the interpretation that seems most reasonable to us. This same arbitration provision has turned up in two unreported California appellate decisions (*Oviedo v. Grace* (Feb. 5, 2007, B188018) [nonpub.opn.]; *Bolton v. Heyermann* (Dec. 14, 2005, H027076) [nonpub. opn.]). Although the issue before us was not raised in those cases, it concerns us that such a troubling provision has found its way into use in California.

[*636]  3. *The Chapman Agreement Is At Issue and Requires Arbitration*

The trial court refused to compel arbitration under the Chapman agreement arbitration clause on the ground Chapman was not a party to Segal's action and the complaint did not include allegations that raised any issues concerning the enforcement or interpretation of that agreement, or any disputes between Chapman's member-investors. [11]

> 11   Although our [**17] interpretation of the exclusive versus nonexclusive process language applies with equal force to the Chapman agreement, that issue did not motivate the trial court's refusal to order arbitration under the Chapman provision. Instead, the trial court found that the Chapman agreement was not at issue in Segal's complaint.

The Chapman operating agreement required that profits be split according to each member's percentage interest in the Chapman company, that Chapman company assets would be held in the name of the company, and that accounts and records concerning company business would be maintained. The complaint named several entities formed pursuant to the Segal-Silberstein joint venture, including Chapman. It alleged that Silberstein, his family members, and his alter ego companies, were improperly taking profits and transferring and hiding assets of the "aforementioned entities." Based on those allegations, Segal sought damages for breach of contract and breach of fiduciary duty, as well as injunctive and declaratory relief as to the parties' rights to the management and operation of "the entities." These allegations clearly involve a dispute between Chapman's member-investors over [**18] the interpretation and enforcement of their operating agreement. It is unclear to us why Chapman itself must be named as a defendant to invoke the terms of the arbitration provision based on allegations that Silberstein, aided by others, violated the terms of the Chapman agreement. We therefore hold that the trial court erred.

Finally, Segal contended below that Silberstein waived his rights under the Chapman arbitration provision by appearing in another pending action against him (§ 1281.5, subd. (c)), and that arbitration had to be rejected because that other pending action posed a risk of conflicting rulings on common issues of law or fact. (§ 1281.2, subd. (c).) The complaint in that other action was included with Segal's opposition papers below. It involves an action for breach of a promissory note and other related claims by one of Chapman's creditors against Silberstein and Chapman. The plaintiffs in that other action do not allege that they are (and they do not appear to be) member-investors of Chapman, and that action therefore involves wholly separate issues that do not fall within the terms of the arbitration provision. The trial court also erred to the extent it denied Silberstein's [**19] petition to compel arbitration on that basis.

[*637]  **DISPOSITION**

For the reasons set forth above, the order denying Silberstein's petition to compel arbitration is reversed and the trial court is directed to enter a new and different order granting that petition. Appellants to recover their costs on appeal.

Cooper, P. J., and Flier, J., concurred.

# Exhibit M

**APPENDIX OF NON-FEDERAL AND UNPUBLISHED FEDERAL AUTHORITIES
CITED IN VISA USA INC.'S MOTION TO STAY ACTION
AND TO COMPEL ARBITRATION**

Westlaw.

107 Cal.App.4th 54                                                                                    Page 1

107 Cal.App.4th 54, 131 Cal.Rptr.2d 777, 03 Cal. Daily Op. Serv. 2402, 2003 Daily Journal D.A.R. 3059
**(Cite as: 107 Cal.App.4th 54)**

▷
JOHN NORMAN SHAFER et al., Plaintiffs and
Appellants, v. BERGER, KAHN, SHAFTON,
MOSS, FIGLER, SIMON & GLADSTONE et al.,
Defendants and Respondents.
Cal.App.2.Dist.
JOHN NORMAN SHAFER et al., Plaintiffs and
Appellants,
v.
BERGER, KAHN, SHAFTON, MOSS, FIGLER,
SIMON & GLADSTONE et al., Defendants and
Respondents.
**No. B151730.**

Court of Appeal, Second District, Division 1,
California.
Mar. 18, 2003.

SUMMARY

Homeowners who obtained an arbitration judgment
against an insured home remodeler for fraud filed
an action against the remodeler's insurer, and
against a law firm and an individual attorney
retained by the insurer to provide coverage advice
in the lawsuit against the insured. Plaintiffs'
complaint alleged that the individual attorney made
a fraudulent statement about coverage to plaintiffs
in letters to plaintiffs' attorney, pointing to the "
occurrence" provision in the policy and the
statutory exclusion for willful acts to justify the
insurer's payment of only $120,000 toward a
judgment totaling three times as much. Plaintiffs
alleged that the insurer had agreed with the insured
to cover willful acts so as to avoid providing the
insured with independent counsel. The trial court
sustained, without leave to amend, the demurrer of
the firm and the attorney, and dismissed the action
as to them. (Superior Court of Los Angeles County,
No. BC232231, Paul Gutman, Judge.)

The Court of Appeal reversed. The court held that
plaintiffs sufficiently alleged that the attorney made
a fraudulent statement about coverage to plaintiffs,
which they viewed as a statement of fact, along with
justifiable reliance, to withstand a demurrer. The
court also held that the litigation privilege did not
shield defendant from liability for fraud because his
alleged misrepresentations were made to a party
standing in the shoes of an insured, and the
application of the litigation privilege would be
inconsistent with the purpose of Ins. Code, § 11580,
a more specific statute, which makes the judgment
creditor of the insured a third party beneficiary of
the insurance contract between the insurer and the
insured. The court further held that the action was
not subject to the procedural requirements of Civ.
Code, § 1714.10, designed to eliminate frivolous
allegations that attorneys have conspired with their
clients. Section 1714.10, by its own terms, does not
apply to a cause of action against an attorney for a
civil conspiracy with his or her client, where, as
here, the attorney had an independent legal duty to
the plaintiff. (Opinion by Mallano, J., with Spencer,
P. J., and Vogel (Miriam A.), J., concurring.)

HEADNOTES

Classified to California Digest of Official Reports

**(1)** Appellate Review § 128--Scope of
Review--Rulings on Demurrers.
In reviewing the sufficiency of a complaint against a
general demurrer that has been sustained, the court
treats the demurrer as admitting all material facts
that are properly pleaded and determines whether
the complaint states facts sufficient to constitute a
cause of action. In the construction of a pleading,
for the purpose of determining its effect, its
allegations must be liberally construed with a view
to achieving substantial justice between the parties.

**(2)** Insurance Contracts and Coverage §
140--Actions--By Injured Person Against

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

107 Cal.App.4th 54, 131 Cal.Rptr.2d 777, 03 Cal. Daily Op. Serv. 2402, 2003 Daily Journal D.A.R. 3059
**(Cite as: 107 Cal.App.4th 54)**

Insurer--Enforcement of Insured's Right to Indemnity.
Upon obtaining a judgment against the insured, the judgment creditor has an independent cause of action against the insurer to enforce the insurer's obligation to indemnify the insured. The judgment creditor's right to sue is not derivative or dependent upon any assignment from the insured. Ins. Code, § 11580, makes the judgment creditor a third party beneficiary of the insurance contract between the insurer and the insured. Thus, a judgment creditor may proceed directly against any liability insurance covering the defendant, and obtain satisfaction of the judgment up to the amount of the policy limits. Such a claim is subject to the terms and limitations of the policy, including any reservation of rights.
[See Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2002) ¶ 15:1039 et seq.]

**(3)** Agency § 28--Duties and Liabilities of Agent--To Third Persons.
An agent is one who represents another, called the principal, in dealings with third persons. One who assumes to act as an agent is responsible to third persons as a principal for his or her acts in the course of the agency when those acts are wrongful in their nature. An agent or employee is always liable for his or her own torts, whether or not the employer is liable. If a tortious act has been committed by an agent acting under authority of his or her principal, the fact that the principal thus becomes liable does not exonerate the agent from liability. The fact that the tortious act arises during the performance of a duty created by contract does not negate the agent's liability.
[See 2 Witkin, Summary of Cal. Law (9th ed. 1987) Agency and Employment, § 149.]

**(4)** Attorneys at Law § 26--Liability to Third Persons--Misrepresentation.
The relationship of attorney and client is one of agent and principal. As with other types of agency relationships, the law of misrepresentation applies to lawyers. If activities of a nonlawyer in the same circumstances would render the nonlawyer civilly liable, the same activities by a lawyer in the same circumstances generally render the lawyer liable. A lawyer communicating on behalf of a client with a nonclient may not knowingly make a false statement of material fact to the nonclient. The law governing

misrepresentation by a lawyer includes the criminal law, the tort law of misrepresentation, the laws of mistake and fraud in contract law, and procedural law governing statements by an advocate. A misrepresentation can occur through direct statement or through affirmation of a misrepresentation of another, as when a lawyer knowingly affirms a client's false or misleading statement. In general, a lawyer who makes a fraudulent misrepresentation is subject to liability to the injured person when the other elements of the tort are established.

**(5)** Fraud and Deceit § 3--Elements.
Under California law, fraud is an intentional tort, the elements of which are (1) misrepresentation; (2) knowledge of falsity; (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage.
[See 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 676.]

**(6)** Attorneys at Law § 26--Liability to Third Persons--Misrepresentation by Insurer's Attorney to Injured Party.
In an action by homeowners, who obtained an arbitration judgment against an insured home remodeler for fraud, against a law firm and an individual attorney retained by the insurer to provide coverage advice in the lawsuit against the insured, plaintiffs' complaint sufficiently alleged that the attorney made a fraudulent statement about coverage to plaintiffs, which they viewed as a statement of fact, sufficient to withstand a demurrer. In letters to plaintiffs' attorney, defendant attorney pointed to the "occurrence" provision in the policy and the statutory exclusion for willful acts to justify the insurer's payment of only $120,000 toward a judgment totaling three times as much, when the insurer actually had agreed with the insured to cover willful acts so as to avoid providing the insured with independent counsel. An attorney may be liable to a nonclient, even an adversary in litigation, for fraud or deceit. Plaintiffs also justifiably relied on the statement to their detriment by failing to seek full payment and settling for the much lesser amount with the insurer.
[See 1 Witkin, Cal. Procedure (4th ed. 1996) Attorneys, § 327; West's Key Number Digest, Attorney and Client ☞ 26.]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

107 Cal.App.4th 54, 131 Cal.Rptr.2d 777, 03 Cal. Daily Op. Serv. 2402, 2003 Daily Journal D.A.R. 3059
**(Cite as: 107 Cal.App.4th 54)**

**(7a, 7b)** Libel and Slander § 18--Privileged Communications--Litigation Privilege--Misrepresentation by Insurer's Attorney to Injured Party.
An action by homeowners, who obtained an arbitration judgment against an insured home remodeler for fraud, against a law firm and an individual attorney retained by the insurer to provide coverage advice in the lawsuit against the insured, in which plaintiffs' complaint sufficiently alleged that the attorney made a fraudulent statement about coverage to plaintiffs, on which they relied to their detriment, was not barred by the litigation privilege (Civ. Code, § 47, subd. (b)). The litigation privilege did not shield defendants from liability for fraud because the alleged misrepresentations were made to a party standing in the shoes of an insured, and the application of the litigation privilege would be inconsistent with the purpose of Ins. Code, § 11580, a more specific statute, which makes the judgment creditor of the insured a third party beneficiary of the insurance contract between the insurer and the insured.

**(8)** Libel and Slander § 18--Privileged Communications--Litigation Privilege.
In general, the litigation privilege precludes liability for communications made in any proceeding of a legislative, judicial, or official nature, and in proceedings where a writ of mandate is sought. The usual formulation is that the privilege applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action. Because the privilege applies without regard to malice or evil motives, it has been characterized as absolute. The principal purpose of the litigation privilege is to afford litigants and witnesses the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions.

**(9)** Insurance Contracts and Coverage § 140--Actions--By Injured Person Against Insurer--Enforcement of Insured's Right to Indemnity.
Ins. Code, § 11580, makes the judgment creditor of the insured a third party beneficiary of the insurance contract between the insurer and the insured. A third party beneficiary may enforce a contract expressly made for his or her benefit. Although the contract may not have been made to benefit the third party beneficiary alone, he or she may enforce those promises directly made for him or her. The injured claimant's rights under the statute may extend beyond third party beneficiary principles.

**(10a, 10b)** Attorneys at Law § 26--Liability to Third Persons-- Conspiracy--Procedural Requirements--Misrepresentation by Insurer's Attorney to Injured Party.
An action by homeowners, who obtained an arbitration judgment against an insured home remodeler for fraud, against a law firm and an individual attorney retained by the insurer to provide coverage advice in the lawsuit against the insured, in which plaintiffs' complaint sufficiently alleged that the attorney made a fraudulent statement about coverage to plaintiffs, on which they relied to their detriment, was not subject to the procedural requirements of Civ. Code, § 1714.10, designed to eliminate frivolous allegations that attorneys have conspired with their clients. Section 1714.10, by its own terms, does not apply to a cause of action against an attorney for a civil conspiracy with his or her client, where, as here, the attorney had an independent legal duty to the plaintiff. The attorney in this case had a duty to provide truthful information to plaintiffs about the insurance coverage by virtue of his status as coverage counsel, independent of any duties that the insurer may have had. Thus, plaintiffs could sue defendants for allegedly conspiring with the insurer to commit actual fraud.
[See 1 Witkin, Cal. Procedure (4th ed. 1996) Attorneys, § 313.]

**(11)** Attorneys at Law § 26--Liability to Third Persons--Conspiracy-- Procedural Requirements.
The legislative purpose of Civ. Code, § 1714.10, is to eliminate frivolous allegations that attorneys have conspired with their clients. This statutory purpose is served by a prefiling procedure to determine whether the proposed conspiracy pleading is legally sufficient, and whether it is supported by a sufficient prima facie showing of facts to sustain a favorable decision if the evidence submitted by the petitioner is credited. If either of these requirements

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

107 Cal.App.4th 54, 131 Cal.Rptr.2d 777, 03 Cal. Daily Op. Serv. 2402, 2003 Daily Journal D.A.R. 3059
**(Cite as: 107 Cal.App.4th 54)**

is not met, the petition must be denied; if both are satisfied, it must be granted.

**(12)    Conspiracy    §    5--Criminal--Liability    of Conspirators--Agents and Employees.**
In general, a cause of action for civil conspiracy may not arise if the alleged conspirator, though a participant in the agreement underlying the injury, was not personally bound by the duty violated by the wrongdoing and was acting only as the agent or employee of the party who did have that duty. Agents and employees of a corporation cannot conspire with their corporate principal or employer where they act in their official capacities on behalf of the corporation and not as individuals for their individual advantage. There is an exception to the general rule for claims against an attorney who conspires with his or her client to cause injury by violating the attorney's own duty to the plaintiff.

COUNSEL
Hunt Ortmann Blasco Palffy & Rossell, Craig N. Rossell and Regan A. Molatore for Plaintiffs and Appellants.

Ropers, Majeski, Kohn & Bentley, Susan H. Handelman and Gregory K. Storey for Defendants and Respondents.
**MALLANO, J.**
This appeal presents the question of whether an attorney, who is retained by an insurance company to provide coverage advice in a lawsuit against its insured, may be held liable to the plaintiff in that lawsuit for making a fraudulent statement about coverage. We answer that question in the affirmative because deceit undermines the administration of justice.

I. Background

For purposes of our review, we must accept as true the following allegations of the complaint. (See *Blank v. Kirwan* (1985) 39 Cal.3d 311, 318[216 Cal.Rptr. 718, 703 P.2d 58].) With that in mind, we rarely use "alleged" in discussing the factual assertions in the complaint.

John and June Shafer are homeowners in Los

Angeles County. In the early 1990's, they contracted with Tri-County Builders, a general contractor, to **\*60** remodel their home and build an addition to it. Tri-County Builders, a partnership, was run by Jay DeMay and Perry Hanstad. The construction contract apparently required that any disputes between the parties be resolved by binding arbitration before the American Arbitration Association (AAA).

As a result of numerous problems with the construction, in December 1991, the Shafers filed a demand for arbitration against Tri-County Builders, DeMay, and Hanstad. The demand set forth claims for breach of contract, negligence, fraud, and intentional infliction of emotional distress, among others, and sought an award of damages, including punitive damages. DeMay tendered the defense of the action to Truck Insurance Exchange, which had issued a comprehensive general liability policy to him doing business as Tri-County Builders. [FN1]

> FN1 The record includes references to both Truck Insurance Exchange and Farmers Insurance Group. The relationship between the two is not clear. For consistency, we refer to the insurance company as Truck.

By letter dated May 18, 1992, Truck agreed to defend Tri-County Builders, DeMay, and Hanstad, subject to a reservation of rights. The letter consisted of four single-spaced pages that quoted and discussed several provisions in the insurance policy. It pointed out that coverage was dependent upon an "occurrence," which, according to the letter, was defined in the policy as "an event, or a series of events ... which results during the policy period, in bodily injury or property damage, neither expected nor intended from the standpoint of the insured."

The letter continued: "[Y]our policy does not afford coverage for exemplary or punitive damages .... Additionally, intentional acts are not covered under any policy of insurance as provided under Insurance Code Section 533, as this is against public policy for insurers to provide coverage for such causes of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

107 Cal.App.4th 54                                                                                                Page 5

107 Cal.App.4th 54, 131 Cal.Rptr.2d 777, 03 Cal. Daily Op. Serv. 2402, 2003 Daily Journal D.A.R. 3059
**(Cite as: 107 Cal.App.4th 54)**

action. [FN2] A definition of 'occurrence,' as well as Section 533 of the California Insurance Code and *61Section 1668 of the California Civil Code, may exclude coverage for damages resulting from such intentional and/or willful acts." [FN3]

> FN2 Section 533 of the Insurance Code states: "An insurer is not liable for a loss caused by the wilful act of the insured; but he is not exonerated by the negligence of the insured, or of the insured's agents or others." "A 'wilful act' under section 533 will include either 'an act deliberately done for the express purpose of causing damage or [an act] intentionally performed with knowledge that damage is highly probable or substantially certain to result.' " (*Mez Industries, Inc. v. Pacific Nat. Ins. Co.* (1999) 76 Cal.App.4th 856, 875-876[90 Cal.Rptr.2d 721], italics omitted.)

> FN3 Civil Codesection 1668 provides: " All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law." Our Supreme Court has noted that "[s]ection 1668 applies to contractual exemptions from liability, not to indemnity contracts.... An insurance policy is an indemnity contract." (*Safeco Ins. Co. v. Robert S.* (2001) 26 Cal.4th 758, 767[110 Cal.Rptr.2d 844, 28 P.3d 889], citations omitted.)

In response to Truck's letter, DeMay requested that Truck pay for counsel of his own choosing. Because the Shafers' arbitration demand asserted claims of negligent and willful wrongdoing, DeMay was concerned that an attorney selected by Truck would have a conflict of interest given that a finding of liability based on *willful* acts would negate Truck's obligation to pay indemnity while a finding of *negligence* would entitle DeMay to indemnification. (See Civ. Code, § 2860; *San Diego Federal Credit Union v. Cumis Ins. Society, Inc.* (1984) 162

Cal.App.3d 358[208 Cal.Rptr. 494, 50 A.L.R.4th 913](*Cumis*).)

For advice on coverage issues, Truck retained Lance LaBelle, Esq., of Berger, Kahn, Shafton, Moss, Figler, Simon & Gladstone. On June 9, 1992, LaBelle discussed coverage with Chris Lundblad, an employee of Truck. On June 11, 1992, LaBelle sent Lundblad a confirming letter, stating:

"This will confirm our telephone conference of June 9, 1992, wherein authority was extended for our office to modify Truck's May 18, 1992 reservation of rights [letter] with respect to the plaintiffs' claim as it relates to 'bodily injury' under the policy. Specifically, we discussed affording coverage for 'bodily injury,' i.e., physical manifestation of injury alleged in the complaint, which claim relates to both the intentional and negligence based causes of action in the complaint.

"[W]hile the vast majority of damages would not constitute 'property damage' under your policy ..., we discussed the potential that resulting property damage to the flooring might constitute covered 'property damage' .... In an effort to modify the reservation of rights so as to not trigger the <u>Cumis</u> obligation ..., we have enclosed the modified reservation of rights [letter] which we furnished to your insured pursuant to your authority. Please note that the definition of 'occurrence' has been deleted from the reservation of rights [letter] along with any reference to Insurance Code Section 533 and Civil Code Section 1668."

LaBelle sent the superseding reservation of rights letter to DeMay's attorney on June 10, 1992. It consisted of 10 single-spaced pages that quoted *62 and discussed the policy provisions as to which Truck reserved its rights. The letter did not define " occurrence" nor did it refer to Insurance Code section 533 or Civil Code section 1668. There was no reservation of rights as to willful or intentional acts, though coverage for punitive damages was expressly excluded. The letter stated in part: "Our firm has been retained by Truck Insurance Exchange (Truck) with respect to the coverage aspects of the [Shafer/Tri-County Builders] matter.. Please be advised that Truck has elected to replace

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

107 Cal.App.4th 54                                                                Page 6

107 Cal.App.4th 54, 131 Cal.Rptr.2d 777, 03 Cal. Daily Op. Serv. 2402, 2003 Daily Journal D.A.R. 3059
(Cite as: 107 Cal.App.4th 54)

and supersede its previously communicated May 18, 1992 reservation of rights with [this] reservation of rights." The letter to DeMay's attorney concluded: "Truck has made arrangements for your clients' defense to be handled by the law firm of Bodkin, McCarthy, Sargent & Smith. You will soon be contacted by [a Bodkin attorney] to make arrangements for transfer of the file.... Obviously, to the extent that Mr. DeMay also wishes to retain ... your professional services, he is free to do so at his own expense."

The superseding reservation of rights letter, when read in context with the first reservation of rights letter and LaBelle's June 11, 1992 letter to Lundblad, implicitly acknowledged that, while an insurance policy cannot provide indemnity for willful acts (see Ins. Code, § 533), an insurer may agree to pay indemnity *after* an insured has committed a willful act. If the insurer so agrees, the insured (DeMay) is entitled to indemnification if he relies on that agreement to his detriment, for example, by discharging his own counsel in order to be represented by counsel chosen by the insurer. (See *Tomerlin v. Canadian Indemnity Co.* (1964) 61 Cal.2d 638, 643-649[39 Cal.Rptr. 394 P.2d 571]; *Downey Venture v. LMI Ins. Co.* (1998) 66 Cal.App.4th 478, 511[78 Cal.Rptr.2d 142] [discussing *Tomerlin*]; Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2002) ¶¶ 7:327, 7:745 to 7:751, pp. 7A-86.2, 7B-64.1 to 7B-64.3 (rev. #1 2001) [same].)

The arbitration commenced on March 1, 1993, before a three-member panel. There were 20 days of evidentiary hearings, one day of site inspection, and one day of closing arguments. The parties produced 20 witnesses and numerous exhibits.

On July 26, 1993, the panel unanimously found in favor of the Shafers, awarding them $153,732 in general damages, $85,166 in attorneys' fees and costs, $40,513 in pre-award interest, $31,891.31 to cover AAA administrative fees and the arbitrators' compensation, and $25,000 in punitive damages against DeMay, totaling $336,302.31.

In the arbitration award, which referred to Tri-County Builders, DeMay, and Hanstad

collectively as "respondents," the arbitrators found that "respondents failed to accurately cost the project from the outset, and never *63 adequately scheduled the job. Respondents failed to properly supervise, and failed to properly man the job. Respondents failed to complete the job as scheduled after repeated assurances and revisions of completion dates. Respondents provided poor workmanship."

The arbitrators also found that "[r]espondent DeMay committed a fraudulent act at the time he entered into the [Construction] Agreement, that he never intended to complete the project within the times repeatedly promised, and ignored the ... Agreement with absolute impunity. Respondent DeMay repeatedly extracted payment of additional monies in advance of work performed while promising to complete the project with new extended completion dates. The Panel further finds that Respondent DeMay committed other acts of fraud ....

"The Panel finds that there was a scheme and design by Respondent DeMay commencing at a time before signing the original contract with [the Shafers], designed to extract profits from items through change orders which should have been included within the scope of the original contract....

"Moreover, Respondents' estimated cost had gross deficiencies which were part of the misrepresentation and fraud.... [¶] ... [¶]

"The failure to properly price the electrical service was a sham....

"Respondent DeMay failed to thoroughly inspect the existing house before he authorized signing the initial construction contract, notwithstanding the fact this was the largest project DeMay had entered into to date.

"The Panel finds that these events collectively are more than breach of contract and negligence. They evidence a scheme and design that Respondent DeMay never intended to build the project for the price and within the time originally contracted for."

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

107 Cal.App.4th 54, 131 Cal.Rptr.2d 777, 03 Cal. Daily Op. Serv. 2402, 2003 Daily Journal D.A.R. 3059
**(Cite as: 107 Cal.App.4th 54)**

Based on these findings, the arbitrators awarded $25,000 in punitive damages against DeMay. The arbitrators found that the fraudulent nature of DeMay's conduct had been established by clear and convincing evidence, the standard used in civil actions (see Civ. Code, § 3294, subd. (c)(3)).

On October 20, 1993, the Superior Court for the County of Los Angeles confirmed the arbitration award, entering judgment in the Shafers' favor and against Tri-County Builders, DeMay, and Hanstad in the amount of $311,302.31, plus $25,000 in punitive damages against DeMay *(Shafer v. Tri-County Builders* (Super. Ct. L.A. County, 1993, No. BS025082)).*64

By letter dated December 8, 1993, counsel for the Shafers wrote to LaBelle, saying: "Now that the arbitrator's Award in this matter has been rendered into an enforceable Judgment, the Shafers ask that Truck Insurance Exchange ('Truck') satisfy that Judgment against its insureds. [¶] We remind Truck that the Shafers now have the right to sue Truck directly if Truck will not voluntarily satisfy the Judgment." The Shafers expected Truck to pay the entire judgment.

On March 16, 1994, LaBelle sent a letter to the Shafers' attorney, enclosing a check for $120,000. The letter indicated that the check was for $85,166 in attorneys' fees, $31,891.31 to reimburse the Shafers for AAA fees and the arbitrators' compensation, and $2,942.69 for "miscellaneous property damage."

In the letter, LaBelle stated: "Truck is making a good faith payment of these items at this time, but is reserving its right to reimbursement of these amounts from the Shafers should a determination be made in a court of law that these items, in fact, are not covered under Truck's policy. Truck incorporates herein by reference the June 10, 1992 reservation of rights [letter] previously issued to its insured. Truck also reserves its rights under California case and statutory law, and in accordance with California public policy which precludes indemnity for damages based upon a finding of fraud. [¶] The Shafers are free to negotiate this check without waiving their rights to claim that an

additional portion of the award is covered under the Truck policy." FN4

> FN4 Although LaBelle's letter to the Shafers' attorney, Craig Rossell, referred to the June 10, 1992, reservation of rights letter, there is nothing in the record to establish that LaBelle provided Rossell with a copy of it. LaBelle's letter to Rossell stated that the check for $120,000 was enclosed, and the pertinent exhibit in the record consists solely of that letter and the check. Further, the first amended complaint alleges that the Shafers did not learn about the existence or contents of the two reservation of rights letters until at least four years and nine months after LaBelle sent the letter to Rossell.

Truck's payment of $120,000 left an unpaid sum of $150,789.31 in general damages, $40,513 in pre-award interest, and $25,000 in punitive damages, totaling $216,302.31. From March to July 1994, LaBelle and the Shafers' attorney exchanged a series of letters, with the Shafers seeking additional payment on the judgment and LaBelle refusing on behalf of Truck.

In a letter dated May 6, 1994, LaBelle commented: " On page 3 of the arbitration award, the arbitrators state that the insured 'never intended to complete the project within the times repeatedly promised ....' Page 6 of *65 the arbitration award states that the insured 'never intended to build the project for the price and within the time originally contracted for.'

"The intent of the insured is a critical issue in the analysis of ... coverage. Section B1 of the policy states that the Company will pay for 'damage to property ... caused by an occurrence to which this insurance applies.' Occurrence is defined in paragraph 40(m) as 'an event ... proximately caused by an act or omission of the insured ... which results ... in bodily injury or property damage, neither expected nor intended from the standpoint of the insured.' This policy language is consistent with section 533 of the Insurance Code, which states '[a]n insurer is not liable for loss caused by the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

107 Cal.App.4th 54, 131 Cal.Rptr.2d 777, 03 Cal. Daily Op. Serv. 2402, 2003 Daily Journal D.A.R. 3059
**(Cite as: 107 Cal.App.4th 54)**

willful act of the insured ....'

"Therefore, while the arbitration award is vague as to the division of the $153,232 awarded in damages, it is very clear on its finding that the insured never expected or intended to complete the project on time." (Underscoring in original.)

Meanwhile, Truck and DeMay entered into a settlement agreement under which Truck paid DeMay $35,000 as part of a mutual release of all claims. DeMay agreed to assist Truck in any proceedings arising out of the arbitration award and to keep the existence and terms of the settlement confidential. Shortly after signing the settlement agreement, DeMay moved to the Canadian-Wisconsin border to avoid enforcement of the Shafers' judgment.

Hanstad, too, sought to avoid the judgment. He filed for bankruptcy. The Shafers filed a petition in the bankruptcy proceeding, alleging that the debt was not dischargeable because it was based on fraudulent conduct. (See 11 U.S.C. § 523(a)(2).) Because Truck was not paying the entire amount owed on the judgment, the Shafers needed to preserve their claim against Hanstad. Ultimately, the entire amount of the judgment was declared nondischargeable.

Truck monitored developments in the bankruptcy proceeding. In an internal memo dated November 30, 1994, one Truck employee wrote to another: " The issue [in the bankruptcy proceeding] is that the Shafers are claiming that the judgment they have obtained against [Hanstad] is related to fraud and intentional acts and that this is a non-dischargeable judgment ....

"Accordingly, that plays right into our hands in that they cannot argue to a court of law both that the remaining claims against Tri-County Builders are intentional and fraudulent claims which cannot be discharged through bankruptcy and that they are unrelated to any fraud and intentional acts by the insured and should be compensated by Truck .... *66

"We believe that all monies owed on this matter

have been paid. This matter is basically closed except for [the Shafers' direct action against Truck] which may follow. However, we do not expect the ... Shafers to actually follow through with their threats of filing suit. This matter is being handled primarily by Lance LaBelle of the Law Offices of Berger, Kahn."

In 1996, Hanstad sued Truck for bad faith. He was represented by counsel for the Shafers. In December 1998, during the discovery phase of the case, the Shafers' attorney learned for the first time that Truck had agreed to indemnify Tri-County Builders, DeMay, and Hanstad for willful acts. That knowledge was confirmed in early 1999, when LaBelle's deposition was taken. Ultimately, Hanstad prevailed against Truck for bad faith.

On June 22, 2000, the Shafers filed this action against Truck, LaBelle, and LaBelle's firm, alleging causes of action for breach of contract, bad faith, and fraud. LaBelle and his firm (collectively LaBelle) were named on the fraud claim only. LaBelle filed a demurrer, arguing that he did not owe the Shafers a duty of truthful disclosure about the coverage afforded by Truck and that the Shafers had not justifiably relied on any statements he had made. The trial court sustained the demurrer with leave to amend.

The Shafers filed a first amended complaint. It retained the cause of action against LaBelle for fraud and added a cause of action against LaBelle and Truck for conspiracy. The amended complaint read as follows: After the Shafers obtained a judgment against Truck's insureds, LaBelle represented to the Shafers that Truck had not agreed to provide indemnity for willful acts. In fact, Truck had agreed to indemnification. While LaBelle and Truck knew that the statement about indemnity was false, the Shafers did not know of its falsity. LaBelle made the false statement with the intention of inducing the Shafers to forgo full payment on the judgment. The Shafers relied on LaBelle's false statement, resulting in economic and noneconomic damages.

LaBelle filed a demurrer to the amended complaint, making the same arguments as before. LaBelle also

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

107 Cal.App.4th 54, 131 Cal.Rptr.2d 777, 03 Cal. Daily Op. Serv. 2402, 2003 Daily Journal D.A.R. 3059
**(Cite as: 107 Cal.App.4th 54)**

asserted that the Shafers' conspiracy claim was barred by section 1714.10 of the Civil Code, which prohibits a conspiracy claim against an attorney unless the trial court first determines that the plaintiff has a reasonable probability of prevailing on the merits. [FN5]

> FN5 Civil Codesection 1714.10, subdivision (a), states in part: "No cause of action against an attorney for a civil conspiracy with his or her client ... shall be included in a complaint or other pleading unless the court enters an order allowing the pleading that includes the claim for civil conspiracy to be filed after the court determines that the party seeking to file the pleading has established that there is a reasonable probability that the party will prevail in the action...."

By order filed December 26, 2000, the trial court sustained the demurrer without leave to amend, agreeing with the arguments made in LaBelle's *67 papers. An order of dismissal and judgment were duly entered. The Shafers filed a timely appeal.


## II. Discussion

The Shafers argue on appeal that the trial court erred in dismissing the causes of action for fraud and conspiracy. We agree. LaBelle owed the Shafers a duty not to make fraudulent statements about the insurance coverage provided by Truck. And, contrary to LaBelle's contention, the Shafers' reliance on his statements was justifiable. For his part, LaBelle contends that this action is barred because the litigation privilege (Civ. Code, § 47, subd. (b)) protected his statements about insurance coverage. With that we disagree. As for the conspiracy claim, Civil Code section 1714.10 does not preclude liability because LaBelle had an independent duty not to injure the Shafers through fraudulent statements.


### A. *Misrepresentation of Coverage*

(1) In reviewing the sufficiency of a complaint against a general demurrer that was sustained, we treat the demurrer as admitting all material facts that are properly pleaded and determine whether the complaint states facts sufficient to constitute a cause of action. (*Blank v. Kirwan, supra,* 39 Cal.3d at p. 318; accord, *Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1126[119 Cal.Rptr.2d 709, 45 P.3d 1171].) "In the construction of a pleading, for the purpose of determining its effect, its allegations must be liberally construed, with a view to substantial justice between the parties." (Code Civ. Proc., § 452.)

Section 11580 of the Insurance Code requires that liability insurance policies, with exceptions not relevant here, contain a provision stating that " whenever judgment is secured against the insured ... in an action based upon bodily injury, death, or property damage, then an action may be brought against the insurer on the policy and subject to its terms and limitations, by such judgment creditor to recover on the judgment." (Ins. Code, § 11580, subd. (b)(2).) If that provision does not appear in a policy, it is implied by law.(*Id.,*§ 11580; all further references to § 11580 are to the Insurance Code.) The Shafers filed the present action, in part, pursuant to section 11580. *68

(2) Upon obtaining a judgment against the insured, the judgment creditor has an independent cause of action against the insurer to enforce the insurer's obligation to indemnify the insured. (*Gonzalez v. St. Paul Mercury Ins. Co.* (1976) 60 Cal.App.3d 675, 680-681[131 Cal.Rptr. 626].) "The judgment creditor's right to sue is not derivative or dependent upon any assignment from the insured." (Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra,* ¶ 15:1039, p. 15-187.)Section 11580 "makes the judgment creditor a third party beneficiary of the insurance contract between the insurer and the insured." (*Murphy v. Allstate Ins. Co.* (1976) 17 Cal.3d 937, 943[132 Cal.Rptr. 424, 553 P.2d 584]( *Murphy*).)

Under section 11580, "a judgment creditor may proceed directly against any liability insurance covering the defendant, and obtain satisfaction of the judgment up to the amount of the policy limits."

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

107 Cal.App.4th 54, 131 Cal.Rptr.2d 777, 03 Cal. Daily Op. Serv. 2402, 2003 Daily Journal D.A.R. 3059
**(Cite as: 107 Cal.App.4th 54)**

(*Reliance Ins. Co. v. Superior Court* (2000) 84 Cal.App.4th 383, 386[100 Cal.Rptr.2d 807].) Such a claim is subject to the terms and limitations of the policy, including any reservation of rights. (See Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra*, ¶¶ 15:1123 to 15:1136, pp. 15-200.1 to 15-200.2 (rev. #1 2001).)

In applying section 11580, we rely on principles of agency law dating back more than a century, as codified in the Civil Code. (3) "An agent is one who represents another, called the principal, in dealings with third persons. Such representation is called agency." (Civ. Code, § 2295.)"One who assumes to act as an agent is responsible to third persons as a principal for his acts in the course of his agency ... [¶] ... [¶] ... [w]hen his acts are wrongful in their nature." (*Id.*, § 2343.)

" 'An agent or employee is always liable for his own torts, whether his employer is liable or not.' " (*Holt v. Booth* (1991) 1 Cal.App.4th 1074, 1080, fn. 5[2 Cal.Rptr.2d 727]; accord, *Michaelis v. Benavides* (1998) 61 Cal.App.4th 681, 686[71 Cal.Rptr.2d 776].) "In other words, when the agent commits a tort, such as ... fraud ..., then ... the agent [is] subject to liability in a civil suit for such wrongful conduct." (*Mottola v. R.L. Kautz & Co.* (1988) 199 Cal.App.3d 98, 108[244 Cal.Rptr. 737]; accord, *Crawford v. Nastos* (1960) 182 Cal.App.2d 659, 664-665[6 Cal.Rptr. 425, 97 A.L.R.2d 840]; see generally 2 Witkin, Summary of Cal. Law (9th ed. 1987) Agency and Employment, § 149, p. 144.)

" '[I]f a tortious act has been committed by an agent acting under authority of his principal, the fact that the principal thus becomes liable does not, of course, exonerate the agent from liability.' ... The fact that the tortious act *69 arises during the performance of a duty created by contract does not negate the agent's liability." (*Bayuk v. Edson* (1965) 236 Cal.App.2d 309, 320[46 Cal.Rptr. 49].)

(4) The relationship of attorney and client is one of agent and principal. (See *CPI Builders, Inc. v. Impco Technologies, Inc.* (2001) 94 Cal.App.4th 1167, 1174[114 Cal.Rptr.2d 851]; *Caro v. Smith* (1997) 59 Cal.App.4th 725, 731[69 Cal.Rptr.2d 306]; see also *Levy v. Superior Court* (1995) 10

Cal.4th 578, 583-584[41 Cal.Rptr.2d 878, 896 P.2d 171].) As with other types of agency relationships, " [t]he law of misrepresentation applies to lawyers." ( Rest.3d, Law Governing Lawyers (2000) § 98, com. c, p. 59.) "Lawyers are subject to the general law. If activities of a nonlawyer in the same circumstances would render the nonlawyer civilly liable ..., the same activities by a lawyer in the same circumstances generally render the lawyer liable ...." (*Id.*, § 56, com. b, p. 416.)

"A lawyer communicating on behalf of a client with a nonclient may not ... [¶] ... knowingly make a false statement of material fact ... to the nonclient ...." (Rest.3d, Law Governing Lawyers, § 98, p. 58.)" The law governing misrepresentation by a lawyer includes the criminal law (theft by deception), *the law of misrepresentation in tort law* and of mistake and fraud in contract law, and procedural law governing statements by an advocate .... Compliance with those obligations meets social expectations of honesty and fair dealing and facilitates negotiation and adjudication, which are important professional functions of lawyers." (*Id.*, com. b, pp. 58-59, citation omitted, italics added.) " A misrepresentation can occur through direct statement or through affirmation of a misrepresentation of another, as when a lawyer knowingly affirms a client's false or misleading statement." (*Id.*,com. c, p. 59.)

As one of our courts has stated: "In the context of fraudulent conduct by an attorney toward persons not his own clients, no preference is accorded to the attorney's professional status in the disposition of claims alleging fraud. If an attorney commits actual fraud in his dealings with a third party, the fact he did so in the capacity of attorney for a client does not relieve him of liability. [Citation.] While in general an attorney's professional duty of care extends only to dealings with his own client and to intended beneficiaries of the legal work performed, these limitations upon liability for negligence ... do not apply to liability for fraud. [Citation.]" (*Jackson v. Rogers & Wells* (1989) 210 Cal.App.3d 336, 345 [258 Cal.Rptr. 454], citing *Goodman v. Kennedy* (1976) 18 Cal.3d 335, 346[134 Cal.Rptr. 375, 556 P.2d 737].)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

107 Cal.App.4th 54, 131 Cal.Rptr.2d 777, 03 Cal. Daily Op. Serv. 2402, 2003 Daily Journal D.A.R. 3059
**(Cite as: 107 Cal.App.4th 54)**

"In general, a lawyer who makes a fraudulent misrepresentation is subject to liability to the injured person when the other elements of the tort are *70 established ...." (Rest.3d, Law Governing Lawyers, § 98, com. g, p. 61.) This rule "applies equally to statements made to a sophisticated person, such as to a lawyer representing another client, as well as to an unsophisticated person." (Id., com. b, p. 59.) "Misrepresentation is not part of proper legal assistance; vigorous argument often is. Thus, lawyers are civilly liable to clients and nonclients for fraudulent misrepresentation, but are not liable for such conduct as using legally innocuous hyperbole or proper argument in negotiations ... or presenting an argument to a tribunal in litigation." (Id., § 56, com. f, p. 418.)

In *Cicone v. URS Corp.* (1986) 183 Cal.App.3d 194 [227 Cal.Rptr. 887](*Cicone*), the court held that an attorney may be liable to a nonclient for fraudulent statements made during business negotiations. There, the sellers and the buyer in a business acquisition were represented by their respective counsel, who conducted the transaction. The buyer drafted a proposed written agreement containing a provision obligating the sellers to warrant the accuracy of the company's balance sheet. The sellers objected to that provision and refused to guarantee the accuracy of the company's financial information. In response, the buyer stated that he understood and would deem the sellers to be guaranteeing the balance sheet to the best of their knowledge. The sellers signed the agreement without modification.

At the time the buyer agreed to accept the sellers' best knowledge, he had no intention of honoring it but intended to rely on the strict warranty in the written agreement. The sellers relied on the buyer's oral statement in signing the agreement. The balance sheet was, in fact, correct to the best of the sellers' knowledge. But, after the transaction was completed, the buyer claimed that the sellers had understated tax liabilities in the amount of $200,000. The sellers settled the claim without litigation and filed suit against their attorney for malpractice. He cross-complained against the buyer's attorney, alleging causes of action for negligence, equitable indemnity, fraud, and deceit.

The buyer's attorney filed a demurrer, arguing that he owed no duty to the sellers or their attorney. The trial court agreed, sustained the demurrer without leave to amend, and dismissed the cross-complaint.

The Court of Appeal reversed, explaining: "[The buyer's attorney] argue[s] a lack of duty owed to [the sellers' attorney]. However, this argument appears in relation to the causes of action for negligence and indemnity. More properly it could be stated, inferentially everyone has a duty to refrain from committing intentionally tortious conduct against another. Thus, a promise material to the contract which is made without any intention of performing it is deemed a misrepresentation of fact.... *71

"[The sellers' attorney] alleges [that the buyer and his attorney] made a promise without disclosing they entertained no intention to perform said promise to deem the warranty of the financial statement as only to sellers' best knowledge and belief.

"Although a duty to disclose a material fact normally arises only where there exists a confidential relation between the parties or other special circumstances require disclosure, where one does speak he must speak the whole truth to the end that he does not conceal any facts which materially qualify those stated....

" 'The extent of liability an attorney may incur toward third persons, while the attorney is acting on behalf of a client, has been the subject of divergent opinion in various American jurisdictions, the traditional view being that an attorney may not generally be held liable to third persons because he is not in privity with them, and owes them no duty to act with care.... A typical statement of this approach is that "an attorney is not liable to third persons for acts committed in good faith in performance of professional activities as an attorney for his client. If, however, an attorney is actuated by malicious motives, or shares the illegal motives of his client, he may be personally liable with the client for damage suffered by a third person as the result of the attorney's actions." ...' ...

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

107 Cal.App.4th 54, 131 Cal.Rptr.2d 777, 03 Cal. Daily Op. Serv. 2402, 2003 Daily Journal D.A.R. 3059
**(Cite as: 107 Cal.App.4th 54)**

"In California it is well established that an attorney may not, with impunity, either conspire with a client to defraud or injure a third person or engage in intentional tortious conduct toward a third person....

"Thus, the case law is clear that a duty is owed by an attorney not to defraud another, even if that other is an attorney negotiating at arm's length.

"Thus, while duty is not an element of fraud in the traditional sense, a duty is owed to others to refrain from intentionally tortious conduct. Therefore, any inference arising from the lower court's decision that the element of duty bars [the sellers' attorney's] causes of action for fraud and deceit [against the buyer's attorney] is not supported by law." (*Cicone, supra,* 183 Cal.App.3d at pp. 201-202, citations omitted.)

As early as 1895, when strict notions of privity ruled the day, our Supreme Court recognized that an attorney could be held liable for defrauding a third party, even without privity, stating: "It is a general doctrine ... that an attorney is liable for negligence in the conduct of his professional duties ... to his client alone ... and not to third parties. The *exceptions* to this general rule ... are where *the attorney has been guilty of fraud* or collusion, or of a *72 malicious or tortious act. Responsibility for a fraudulent act is independent of any contractual relation between the guilty party and the one injured; and one committing a malicious or tortious act, to the injury of another, is liable therefor, without reference to any question of privity between himself and the wronged one." (*Buckley v. Gray* (1895) 110 Cal. 339, 342[42 P. 900], italics added, disapproved on another point in *Biakanja v. Irving* (1958) 49 Cal.2d 647, 648-651[320 P.2d 16, 65 A.L.R.2d 1358].)

More recently, in a case brought by a nonclient against an attorney for fraud, the Court of Appeal concluded that an attorney "had a duty to abstain from injuring [a third party] through express misrepresentation.... [¶] ... [¶] ... '[W]here one does speak he must speak the whole truth to the end that he does not conceal any facts which materially qualify those stated.... One who is asked for or volunteers information must be truthful, and the

telling of a half-truth calculated to deceive is fraud.' " (*Pavicich v. Santucci* (2000) 85 Cal.App.4th 382, 397-398[102 Cal.Rptr.2d 125].)

In a similar case, the Iowa Supreme Court quoted extensively from the Restatement Third of the Law Governing Lawyers and discussed *Cicone, supra,* 183 Cal.App.3d 194, in holding that "once a lawyer responds to a request for information in an arm's-length transaction and undertakes to give that information, the lawyer has a duty to the lawyer requesting the information to give it truthfully. Such a duty is an independent one imposed for the benefit of a particular person or class of persons.... [¶] Public policy favors a duty, running from an attorney representing a party to a commercial transaction, not to make fraudulent misrepresentations to an attorney representing the adverse party in the transaction." (*Hansen v. Anderson, Wilmarth* (Iowa 2001) 630 N.W.2d 818, 825-826(*Hansen*).)

The principles set forth in the Restatement are not limited to business transactions. They "may apply in representing a client in litigation, such as when negotiating a settlement." (Rest.3d, Law Governing Lawyers, § 98, com. a, p. 58.) In *Fire Ins. Exchange v. Bell by Bell* (Ind. 1994) 643 N.E.2d 310, the principal question was "whether, and to what extent, a party who is represented by counsel has the right to rely on a representation by opposing counsel during settlement negotiations." (*Id.* at p. 311.)In that case, an infant was severely burned at his grandfather's home when a water heater ignited a fire. The infant's mother retained counsel, Robert Collins, who contacted Farmers Group, Inc., which had issued the grandfather's homeowners policy.

In negotiating a settlement, the attorney for Farmers stated that the policy limits were $100,000 when they were actually $300,000, as he knew. Based *73 on that false information, Collins advised the infant's mother to settle for $100,000 and she did so. In subsequent litigation against the manufacturer of the water heater, Collins learned that the Farmers policy had limits of $300,000.

Collins filed an action on behalf of the infant against Farmers and its attorney, alleging a cause of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

107 Cal.App.4th 54, 131 Cal.Rptr.2d 777, 03 Cal. Daily Op. Serv. 2402, 2003 Daily Journal D.A.R. 3059
**(Cite as: 107 Cal.App.4th 54)**

action based on the misrepresentation of the policy limits. The defendants moved for summary judgment, contending that Collins "had, as a matter of law, no right to rely on the alleged misrepresentations because he was a trained professional involved in adversarial settlement negotiation and had access to the relevant facts." ( *Fire Ins. Exchange v. Bell by Bell, supra*, 643 N.E.2d at p. 312(*Fire Ins. Exchange*).) The trial court denied summary judgment. The Indiana Supreme Court affirmed, stating:

"The reliability and trustworthiness of attorney representations constitute an important component of the efficient administration of justice. A lawyer's representations have long been accorded a particular expectation of honesty and trustworthiness. [¶] ... [¶]

"... The reliability of lawyers' representations is an integral component of the fair and efficient administration of justice. The law should promote lawyers' care in making statements that are accurate and trustworthy and should foster the reliance upon such statements by others." (*Fire Ins. Exchange, supra*, 643 N.E.2d at pp. 312-313.)The court concluded that, as a matter of law, Collins had the right to rely on opposing counsel's representation of the policy limits. (*Id.* at p. 313.)

The United States Court of Appeals for the Second Circuit reached the same conclusion in *Slotkin v. Citizens Cas. Co. of New York* (2d Cir. 1979) 614 F.2d 301(*Slotkin*). There, the attorneys for an insurer in a medical malpractice case stated that the policy limits were $200,000, failing to mention that there was an additional $1 million in excess coverage. The plaintiffs settled for $185,000.

Upon learning of the misrepresentation, the plaintiffs brought a diversity action against the insurer's attorneys, alleging fraud. The plaintiffs prevailed. In upholding the verdict as to one of the attorneys, the Second Circuit, applying New York law, stated: "[The insurer's attorney] stipulated that 'to the best of his knowledge' there was only $200,000 worth of coverage .... [His] insistence that the policy limit was $200,000 ... renders him liable under the New York definition of scienter as 'a

reckless indifference to error,' 'a pretense of exact knowledge,' or '[an] assertion of *74 a false material fact "susceptible of accurate knowledge" but stated to be true on the personal knowledge of the representer.' " (*Slotkin, supra*, 614 F.2d at p. 314.)

(5) Turning to the present case, under California law, "[f]raud is an intentional tort, the elements of which are (1) misrepresentation; (2) knowledge of falsity; (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage." ( *Cicone, supra*, 183 Cal.App.3d at p. 200; accord, 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 676, p. 778.) LaBelle argues that his statement about insurance coverage was not a representation of fact but a nonactionable legal opinion. He also contends that he did not owe the Shafers a duty to make truthful statements about coverage and that they did not justifiably rely on any statements he made. Based on the allegations of the first amended complaint, we disagree.

### 1. *Misrepresentation of Fact*

(6) In the arbitration, the Shafers prevailed against the insureds (Tri-County Builders, DeMay, and Hanstad). After judgment was entered on the arbitration award, the Shafers looked to Truck for payment, as was their statutory right. In a series of letters, the Shafers' attorney and LaBelle discussed the coverage afforded by Truck and whether the Shafers were entitled to more than $120,000.

LaBelle's June 11, 1992, letter to Lundblad at Truck-when read together with the first and the superseding reservation of rights letters-confirmed that Truck had agreed to cover willful acts under the policy. In the June 11 letter, LaBelle referred to his prior discussion with Lundblad about affording coverage for "both the intentional and negligence based causes of action in the complaint" and explained that the June 10, 1992, superseding reservation of rights letter did not refer to the policy's definition of "occurrence" or the statutory exclusion for willful acts. LaBelle also confirmed that the superseding reservation of rights letter was " an effort to modify the [first] reservation of rights [letter] so as to not trigger the *Cumis* obligation [(

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

107 Cal.App.4th 54, 131 Cal.Rptr.2d 777, 03 Cal. Daily Op. Serv. 2402, 2003 Daily Journal D.A.R. 3059
**(Cite as: 107 Cal.App.4th 54)**

*Cumis, supra,* 162 Cal.App.3d 358)]." In that way, Truck extended coverage to willful acts and avoided having to pay for *Cumis* counsel. (See Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra,* ¶¶ 7:769 to 7:790.5, pp. 7B-64.10 to 7B-65 [discussing insured's right to *Cumis* counsel].)

Yet, in letters to the Shafers' attorney dated March 16 and May 6, 1994, LaBelle pointed to the " occurrence" provision in the policy and the statutory exclusion for willful acts to justify Truck's payment of only $120,000 *75 toward a judgment totaling $336,302.31. Thus, LaBelle allegedly misrepresented the scope of insurance coverage. He had a duty not to make fraudulent statements. (See *Goodman v. Kennedy, supra,* 18 Cal.3d at p. 346; *Buckley v. Gray, supra,* 110 Cal. at p. 342; *Pavicich v. Santucci, supra,* 85 Cal.App.4th at pp. 392, 397-398; *Jackson v. Rogers & Wells, supra,* 210 Cal.App.3d at p. 345; *Cicone, supra,* 183 Cal.App.3d at pp. 201-202; *Fire Ins. Exchange, supra,* 643 N.E.2d at pp. 312-313; *Hansen, supra,* 630 N.W.2d at pp. 825-826; *Slotkin, supra,* 614 F.2d 301; Rest.3d, Law Governing Lawyers, § 98, coms. a-c, pp. 58-59.)

Indeed, "cases from twenty-eight states hold[] that '[a]n attorney can be liable to a nonclient, even an adversary in litigation, for fraud or deceit.' " ( *Hansen, supra,* 630 N.W.2d at p. 825, citing 1 Mallen & Smith, Legal Malpractice (5th ed. 2000) § 6.7 fn. 1, p. 564.)

"A knowing misrepresentation may relate to a proposition of fact .... Certain statements, such as some statements relating to price or value, are considered nonactionable hyperbole or a reflection of the state of mind of the speaker and not misstatements of fact .... Whether a misstatement should be so characterized depends on *whether it is reasonably apparent that the person to whom the statement is addressed would regard the statement as one of fact* or based on the speaker's knowledge of facts reasonably implied by the statement or as merely an expression of the speaker's state of mind. Assessment depends on the circumstances in which the statement is made, including the past relationship of the negotiating persons, their apparent sophistication, the plausibility of the statement on its face, the phrasing of the statement, related communication between the persons involved, the known negotiating practices of the community in which both are negotiating, and similar circumstances. In general, a lawyer who is known to represent a person in a negotiation will be understood by nonclients to be making *nonimpartial* statements, in the same manner as would the lawyer's client." (Rest.3d, Law Governing Lawyers, § 98, com. c, pp. 59-60, italics added.)

In light of the foregoing factors, the first amended complaint adequately pleads that LaBelle made a fraudulent statement about the insurance coverage provided by Truck, and the Shafers reasonably viewed his statement as one of fact.

### 2. *Justifiable Reliance*

The Shafers justifiably relied on LaBelle's alleged false statements. They had no reason to doubt him. They did not know that LaBelle had sent DeMay's attorney two reservation of rights letters, nor did they know the contents of either one. Like the plaintiffs in *76Fire Ins. Exchange, supra,* 643 N.E.2d 310, *Hansen, supra,* 630 N.W.2d 818, and *Slotkin, supra,* 614 F.2d 301, the Shafers reasonably relied on the coverage representations made by counsel for an insurance company.

In a March 16, 1994, letter to the Shafers' attorney, LaBelle stated that "[Truck] reserves its rights under California case and statutory law, and in accordance with California public policy which precludes indemnity for damages based upon a finding of fraud." As alleged in the operative complaint, "[the Shafers'] reliance on [LaBelle's] fraudulent concealment was well justified.... [W]ithout the reservation of rights letters, [the Shafers] had no real choice but to rely on [LaBelle's] pronouncements about lack of coverage for intentional acts. [The Shafers'] attorneys understood that intentional misconduct by an insured precludes coverage under any policy of insurance. What they did not know, and what [LaBelle] failed to reveal ..., was that the manner in which [Truck] had reserved its rights under the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

107 Cal.App.4th 54, 131 Cal.Rptr.2d 777, 03 Cal. Daily Op. Serv. 2402, 2003 Daily Journal D.A.R. 3059
**(Cite as: 107 Cal.App.4th 54)**

policy tacitly expanded coverage to include intentional misconduct by the insured ...." Elsewhere in the amended complaint, the Shafers alleged that they did not obtain evidence about the fraudulent nature of LaBelle's statements until late 1998 and early 1999, during discovery in related litigation.

If the Shafers had known or suspected the truth-that Truck had agreed to provide coverage for willful acts-they would have aggressively sought full payment of the judgment at the outset instead of accepting a payment of $120,000 in March 1994. But the Shafers believed LaBelle. They did not file suit until June 2000-six years and eight months after the entry of judgment-when they learned about the alleged fraud. In the meantime, the Shafers allegedly incurred economic and noneconomic damages.

Further, LaBelle's relationship vis-a-vis the Shafers was not that of an *opposing* participant or party. Under section 11580, Truck had to pay the Shafers the amount of the judgment, subject to the terms and limitations of the insurance policy, including any reservation of rights. (See Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra*, ¶¶ 15:1123 to 15:1136, pp. 15-200.1 to 15-200.2.) In that sense, the Shafers were to be treated as the insureds. Section 11580 "inure[s] to the benefit of any and every person who might be negligently injured by the assured as completely as if *such injured person had been specifically named in the policy*." (*Malmgren v. Southwestern A. Ins. Co.* (1927) 201 Cal. 29, 33[255 P. 512], italics added; construing Stats. 1919, ch. 367, § 1, p. 776, now § 11580; see Historical Note, 43 West's Ann. Ins. Code (1988 ed.) foll. § 11580, p. 242.) And, as stated, the Shafers were third party beneficiaries of the insurance policy. (See, e.g., *Murphy, supra*, 17 Cal.3d at pp. 942-943.)*77

We also observe that LaBelle is trying to have his cake and eat it too. He advised Truck to provide coverage for willful acts so that Truck would not have to pay for *Cumis* counsel. Yet, LaBelle represented to the Shafers that willful acts were not covered so that Truck would not have to pay the total amount due on the judgment.

LaBelle's case authority does not support his position that the Shafers could not justifiably rely on his word. In *Goodman v. Kennedy, supra*, 18 Cal.3d 335, the plaintiffs (nonclients) sued an attorney for erroneous advice about purchasing stock from his clients. But "[t]here [was] no allegation that the advice was ever communicated to plaintiffs and hence no basis for any claim that they relied upon it in purchasing or retaining the stock." (*Id.* at p. 343; see *Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370, 411[11 Cal.Rptr.2d 51, 834 P.2d 745, 48 A.L.R.5th 835] [discussing *Goodman*].) Here, LaBelle made the misrepresentations directly to the Shafers, and they relied on his statements in failing to seek full payment on the judgment.

In *Parnell v. Smart* (1977) 66 Cal.App.3d 833[136 Cal.Rptr. 246], the plaintiff was not allowed to bring a legal malpractice action against the attorneys who had represented the opposing side in prior proceedings. In particular, the plaintiff argued that "an insurance carrier's retained counsel owes a duty to a third party ... to disclose to the carrier all settlement offers made in the course of that claim." (*Id.* at p. 837.)The Shafers do not make any such argument.

In *B.L.M. v. Sabo & Deitsch* (1997) 55 Cal.App.4th 823[64 Cal.Rptr.2d 335], the court held that a law firm was not liable to a nonclient for negligent misrepresentation where the complaint did not allege either an intent to induce the nonclient to rely on the attorneys' advice or the nonclient's justifiable reliance on that advice. (*Id.* at pp. 834-841.)In the instant case, those elements of fraud are alleged, and LaBelle does not contend otherwise.

Thus, LaBelle had a duty not to make fraudulent statements to the Shafers about the insurance coverage provided by Truck. The first amended complaint alleges that the Shafers justifiably relied on a misrepresentation of that sort. It follows that the trial court erred in sustaining the demurrer.

### B. *Litigation Privilege*

LaBelle contends that the "litigation privilege" ( Civ. Code, § 47, subd. (b)) applied to his statements

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

107 Cal.App.4th 54, 131 Cal.Rptr.2d 777, 03 Cal. Daily Op. Serv. 2402, 2003 Daily Journal D.A.R. 3059
**(Cite as: 107 Cal.App.4th 54)**

about insurance coverage, rendering them nonactionable. LaBelle did not raise this issue below, but "it is well settled that when the issue raises a pure question of law ..., we may consider the *78 issue for the first time on appeal." ( *Gilliland v. Medical Board* (2001) 89 Cal.App.4th 208, 219[106 Cal.Rptr.2d 863].)

(7a) We conclude that the litigation privilege does not shield LaBelle from liability for fraud because his alleged misrepresentations were made to a party standing in the shoes of an insured, and the application of the litigation privilege in this case would be inconsistent with the purpose of section 11580.

(8) In general, the litigation privilege precludes liability for communications made in any proceeding of a legislative, judicial, or official nature, and in proceedings where a writ of mandate is sought. (Civ. Code, § 47, subd. (b).) "The usual formulation is that the privilege applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action." ( *Silberg v. Anderson* (1990) 50 Cal.3d 205, 212[266 Cal.Rptr. 638, 786 P.2d 365].) "Because the privilege applies without regard to malice or evil motives, it has been characterized as 'absolute.' " ( *Brown v. Kennard* (2001) 94 Cal.App.4th 40, 45 [113 Cal.Rptr.2d 891]; accord, *Aronson v. Kinsella* (1997) 58 Cal.App.4th 254, 261-266[68 Cal.Rptr.2d 305].) [FN6]

> FN6 The litigation privilege, as codified, " does not make privileged any communication made in a judicial proceeding knowingly concealing the existence of an insurance policy or policies. " (Civ. Code, § 47, subd. (b)(3).) The parties do not contend that this exception applies here.

"The principal purpose of [the litigation privilege] is to afford litigants and witnesses ... the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions.... [¶] ... [¶]

"[I]n immunizing participants from liability for torts arising from communications made during judicial proceedings, the law places upon litigants the burden of exposing during trial the bias of witnesses and the falsity of evidence, thereby enhancing the finality of judgments and avoiding an unending roundelay of litigation, an evil far worse than an occasional unfair result." ( *Silberg v. Anderson, supra,* 50 Cal.3d at pp. 213-214, citations omitted.) " 'In other words, the litigation privilege is intended to encourage parties to feel free to exercise their fundamental right of resort to the courts for assistance in the resolution of their disputes, without being chilled from exercising this right by the fear that they may subsequently be sued in a derivative tort action arising out of something said or done in the context of the litigation....' " ( *Aronson v. Kinsella, supra,* 58 Cal.App.4th at p. 262.)

(9) Turning to section 11580, our Supreme Court explained in *Murphy, supra,* 17 Cal.3d 937: " [Section 11580] makes *the judgment creditor a third *79 party beneficiary* of the insurance contract between the insurer and the insured.... [¶] A third party beneficiary *may enforce a contract expressly made for his benefit....* And although the contract may not have been made to benefit him alone, he may enforce those promises directly made for him.... [¶] The injured claimant's rights under the statute may extend beyond third party beneficiary principles. In *Barrera v. State Farm Mut. Automobile Ins. Co.* [(1969)] 71 Cal.2d 659, 670 [79 Cal.Rptr. 106, 456 P.2d 674] ... this court held that Insurance Code section 11580 must be read in light of the Financial Responsibility Law and that its underlying policy providing benefits to injured parties may not be limited by third party beneficiary law. On the basis of that policy, it was held that in an action by the injured claimant, misrepresentations by the insured do not constitute a defense for an insurer who failed to promptly investigate insurability." ( *Murphy, supra,* 17 Cal.3d at p. 943, citations omitted, italics added.)

In *Johnson v. Holmes Tuttle Lincoln-Merc.*(1958) 160 Cal.App.2d 290[325 P.2d 193]-one of the cases

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

107 Cal.App.4th 54, 131 Cal.Rptr.2d 777, 03 Cal. Daily Op. Serv. 2402, 2003 Daily Journal D.A.R. 3059
**(Cite as: 107 Cal.App.4th 54)**

cited with approval in *Murphy, supra,* 17 Cal.3d at page 943-the Court of Appeal discussed section 11580, stating:

" 'A contract, made expressly for the benefit of a third person, may be enforced by him at any time before the parties thereto rescind it.' ... Where one person for a valuable consideration engages with another to do some act for the benefit of a third person, and the agreement thus made has not been rescinded, the party for whose benefit the contract or promise was made, or who would enjoy the benefit of the act, *may maintain an action against the promisor for the breach of his engagement.* While the contract remains unrescinded, the relations of the parties are the same as though the promise had been made directly to the third party. Although the party for whose benefit the promise was made was not cognizant of it when made, it is, if adopted by him, deemed to have been made to him. *He may sue on the promise.* Where a promise is made to benefit a third party on the happening of a certain contingency, the third party may enforce the contract on the occurrence of that contingency.... The action by a third party beneficiary for the breach of the promisor's engagement does not rest on the ground of any actual or supposed relationship between the parties but on the broad and more satisfactory basis that the law, operating on the acts of the parties, creates the duty, establishes a privity, and implies the promise and obligation on which the action is founded.... [¶] ] ... [¶] [Section 11580] is a part of every policy and creates a contractual relation which ... benefit[s] ... every person who might be negligently injured by the insured ...." (*Johnson v. Holmes Tuttle Lincoln-Merc., supra,* 160 Cal.App.2d at pp. 296-298, citations omitted, italics added.) *80

"It is fundamental that generally speaking the injured party may not directly sue an insurer of the alleged tortfeasor.... The statutory cause of action created by Insurance Code section 11580 ... is based on the unsatisfied judgment.... Hence the contingency giving rise to an injured party's right as a third party beneficiary to enforce the contract is the legally established liability of the insured." ( *Zahn v. Canadian Indem. Co.* (1976) 57 Cal.App.3d 509, 513[129 Cal.Rptr. 286].)

(7b) As LaBelle would have it, the litigation privilege precludes liability for any fraudulent statements he made to the Shafers about the coverage afforded to Truck's insureds. We reject that contention. The litigation privilege does not protect fraudulent statements intended to prevent an injured party from exercising his or her rights under section 11580.

Simply put, the injured party, as "[a] third party beneficiary[,] may enforce a contract expressly made for his benefit." (*Murphy, supra,* 17 Cal.3d at p. 943.)That includes an insurance policy in cases where the injured party files suit against an insured. (*Ibid.*) The insurer has a duty to act "as if such injured person had been specifically named in the policy." (*Malmgren v. Southwestern A. Ins. Co., supra,* 201 Cal. at p. 33.)Section 11580 recognizes that "the insurer's ... duty to pay adjudicated liabilities is in place as much *to protect ... injured parties from uncompensated loss* as to protect the insured from personal financial disaster." (*Hand v. Farmers Ins. Exchange* (1994) 23 Cal.App.4th 1847, 1858[29 Cal.Rptr.2d 258], italics added.)

Just as an insurer may be held liable for defrauding its insured (see *Notrica v. State Comp. Ins. Fund* (1999) 70 Cal.App.4th 911, 945-947, 951[83 Cal.Rptr.2d 89]; *Chodos v. Insurance Co. of North America* (1981) 126 Cal.App.3d 86, 98-103[178 Cal.Rptr. 831]), so an insurer should not be allowed to deceive a third party beneficiary of the insurance policy (see *Murphy, supra,* 17 Cal.3d at pp. 942-943;*County of Mariposa v. Yosemite West Associates* (1988) 202 Cal.App.3d 791, 803, 812-813[248 Cal.Rptr. 778]; *Shell v. Schmidt* (1954) 126 Cal.App.2d 279[272 P.2d 82]). And if an insurer may be found liable to a third party beneficiary for fraud, so may its coverage counsel. (See *Goodman v. Kennedy, supra,* 18 Cal.3d at p. 346;*Buckley v. Gray, supra,* 110 Cal. at p. 342; *Pavicich v. Santucci, supra,* 85 Cal.App.4th at pp. 392, 397-398;*Jackson v. Rogers & Wells, supra,* 210 Cal.App.3d at p. 345;*Cicone, supra,* 183 Cal.App.3d at pp. 201-202;*Fire Ins. Exchange, supra,* 643 N.E.2d at pp. 312-313;*Hansen, supra,* 630 N.W.2d at pp. 825-826;*Slotkin, supra,* 614 F.2d 301;Rest.3d, Law Governing Lawyers, § 98, coms. a-c, pp. 58-59.) *81

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

107 Cal.App.4th 54, 131 Cal.Rptr.2d 777, 03 Cal. Daily Op. Serv. 2402, 2003 Daily Journal D.A.R. 3059
**(Cite as: 107 Cal.App.4th 54)**

Counsel retained by an insurer has an obligation to be truthful in describing insurance coverage to a third party beneficiary. The litigation privilege is not a license to deceive an injured party who steps into the shoes of the insured. (See pt. II.A.2., *ante*.) Section 11580 grants an injured party the right to file suit in order to recover under the insurance policy. Coverage counsel may not commit fraud in an attempt to defeat that right. And to the extent there is a conflict between an injured party's rights under section 11580 and coverage counsel's reliance on the litigation privilege (Civ. Code, § 47, subd. (b)), the rights of the injured party prevail as they arise under the more specific of the two statutes. (See *Schoendorf v. U.D. Registry, Inc.* (2002) 97 Cal.App.4th 227, 243[118 Cal.Rptr.2d 313].)

Finally, we note that a primary purpose of the litigation privilege is to safeguard litigants and witnesses from subsequent tort suits. The privilege also encourages open channels of communication, promotes the zealous protection of clients' interests, and obligates litigants to expose the bias of witnesses and the falsity of evidence during trial. ( *Silberg v. Anderson, supra,* 50 Cal.3d at pp. 213-214;*Home Ins. Co. v. Zurich Ins. Co.* (2002) 96 Cal.App.4th 17, 23, 26[116 Cal.Rptr.2d 583](*Home Ins. Co.*).) Those purposes are not frustrated where, consistent with section 11580, an injured party pursues a fraud claim against an insurer's coverage counsel. "We need not [condone] fraud in an effort to secure free access to the courts." (*Edwards v. Centex Real Estate Corp.* (1997) 53 Cal.App.4th 15, 37[61 Cal.Rptr.2d 518].)

The litigation privilege also serves to "enhanc[e] the finality of judgments and avoid[] an unending roundelay of litigation ...." (*Silberg v. Anderson, supra,* 50 Cal.3d at p. 214.)"For our justice system to function, it is necessary that litigants assume responsibility for the complete litigation of their cause during the proceedings. To allow a litigant to attack the integrity of evidence after the proceedings have concluded, except in the most narrowly circumscribed situations, such as extrinsic fraud, would impermissibly burden, if not inundate, our justice system." (*Ibid.*) But an action under section 11580 is not a second bite at the apple. The

statute does not offer an opportunity to retry issues, reweigh evidence, or make a collateral attack.

As the Restatement indicates, "[a] lawyer communicating with a nonclient on behalf of a client *is not privileged* to make a material misrepresentation of fact ... to the nonclient." ( Rest.3d, Law Governing Lawyers, § 98, p. 58, italics added.) Similarly, "a lawyer who is known to represent a person in a negotiation will be understood by nonclients to be making nonimpartial statements, in the same manner as would the lawyer's client. Subject to such *\*82* an understanding, the lawyer *is not privileged* to make [knowing] misrepresentations ...." (*Id.* at p. 60, italics added.)

LaBelle has the burden of establishing that the privilege applies (see *Edwards v. Centex Real Estate Corp., supra,* 53 Cal.App.4th at p. 37), and he has failed to do so, at least at the pleading stage of the case.

Nothing in *Home Ins. Co., supra,* 96 Cal.App.4th 17, is to the contrary. There, the defendant in a personal injury action was provided a defense by Zurich Insurance Company. During the litigation, defense counsel allegedly made a fraudulent statement about policy limits, saying they were $15,000 when they were really $500,000. Based on that statement, the plaintiffs settled for $15,000. Upon learning of the misrepresentation, the plaintiffs' *insurer* sued Zurich for fraud. The trial court dismissed the case on demurrer. The Court of Appeal affirmed, holding that the action was barred by the litigation privilege.

The court in *Home Ins. Co., supra,* 96 Cal.App.4th 17, did not consider the applicability or effect of section 11580, under which an injured party becomes a third party beneficiary of the insurance policy and may bring a direct action against the insurer. (See *Murphy, supra,* 17 Cal.3d at pp. 940, 942-943.)And the injured party's rights are to be protected "as if [he or she] had been specifically named in the policy." (*Malmgren v. Southwestern A. Ins. Co., supra,* 201 Cal. at p. 33; accord, *Johnson v. Holmes Tuttle Lincoln-Merc., supra,* 160 Cal.App.2d at p. 298.)These considerations

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

107 Cal.App.4th 54, 131 Cal.Rptr.2d 777, 03 Cal. Daily Op. Serv. 2402, 2003 Daily Journal D.A.R. 3059
**(Cite as: 107 Cal.App.4th 54)**

were not present in *Home Ins. Co.*, which involved an action brought by an *insurer*. "A case is not authority for points not decided." (*Paterno v. State of California* (1999) 74 Cal.App.4th 68, 88[87 Cal.Rptr.2d 754].)

In sum, the litigation privilege does not protect LaBelle's alleged fraudulent statements about insurance coverage. The Shafers have a right to pursue a fraud claim against him. The trial court erred in sustaining the demurrer without leave to amend.[FN7]

> FN7 Our analysis of the litigation privilege is based on the principles furthered by section 11580 and the case law recognizing that an attorney may be held liable for making fraudulent statements to a nonclient. We do not mean to suggest that coverage counsel may be held liable for "bad faith" conduct in violation of the covenant of good faith and fair dealing. That type of liability may be imposed only on the insurer. (See, e.g., *Gruenberg v. Aetna Ins. Co.* (1973) 9 Cal.3d 566, 576 [108 Cal.Rptr. 480, 510 P.2d 1032]; *Younan v. Equifax Inc.* (1980) 111 Cal.App.3d 498, 508-511 & fn. 10[169 Cal.Rptr. 478].)

### C. *Conspiracy Claim*

(10a) Civil Code section 1714.10, subdivision (a) provides: "No cause of action against an attorney for a civil conspiracy with his or her client *\*83 arising from any attempt to contest or compromise a claim or dispute, and which is based upon the attorney's representation of the client, shall be included in a complaint or other pleading unless the court enters an order allowing the pleading that includes the claim for civil conspiracy to be filed after the court determines that the party seeking to file the pleading has established that there is a reasonable probability that the party will prevail in the action...." (Hereafter section 1714.10.)

(11) "[T]he legislative purpose of section 1714.10 [is] to eliminate frivolous allegations that attorneys

have conspired with their clients. This statutory purpose is served by ... a prefiling procedure to determine whether the proposed conspiracy pleading is legally sufficient, and whether it is supported by a sufficient prima facie showing of facts to sustain a favorable decision *if the evidence submitted by the petitioner is credited.* If either of these requirements is not met, the petition must be denied; if both are satisfied, it must be granted." ( *Hung v. Wang* (1992) 8 Cal.App.4th 908, 931[11 Cal.Rptr.2d 113], italics added.)

"[T]he motion required by such statutes [as section 1714.10] operates like a demurrer or motion for summary judgment in 'reverse.' Rather than requiring the defendant to defeat the plaintiff's pleading by showing it is legally or factually meritless, the motion requires the plaintiff to demonstrate that he possesses a legally sufficient claim which is 'substantiated,' that is, supported by competent, admissible evidence." (*College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 719[34 Cal.Rptr.2d 898, 882 P.2d 894], italics omitted.)

"The procedure under section 1714.10 is similar to the procedure employed in the determination of a motion for summary judgment, with a single material difference: under section 1714.10, the burden of proof is shifted to the plaintiff. In this way, the statutory requirement is similar to the showing required of [a] plaintiff who responds to a motion for summary judgment under the Federal Rules of Civil Procedure....

"Under federal law, 'summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' ... '... [A]t the summary judgment stage the judge's function is *not ... to weigh the evidence* and determine the truth of the matter but to determine whether there is a genuine issue for trial....' " (*Hung v. Wang, supra,* 8 Cal.App.4th at pp. 931-933, italics added.) Thus, to the extent the parties' evidence is in conflict, the facts and inferences supported by the plaintiff's evidence must be accepted as true. (See *Ortiz v. Los Angeles Police Relief Assn.* (2002) 98 Cal.App.4th 1288, 1298-1299[120 Cal.Rptr.2d 670].)*\*84

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

107 Cal.App.4th 54, 131 Cal.Rptr.2d 777, 03 Cal. Daily Op. Serv. 2402, 2003 Daily Journal D.A.R. 3059
(Cite as: 107 Cal.App.4th 54)

(12) In general, "[a] cause of action for civil conspiracy may not arise ... if the alleged conspirator, though a participant in the agreement underlying the injury, was not personally bound by the duty violated by the wrongdoing and was acting only as the agent or employee of the party who did have that duty." (*Doctors' Co. v. Superior Court* (1989) 49 Cal.3d 39, 44[260 Cal.Rptr. 183, 775 P.2d 508].) " 'Agents and employees of a corporation cannot conspire with their corporate principal or employer where they act in their official capacities on behalf of the corporation and not as individuals for their individual advantage....' " ( *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 512, fn. 4[28 Cal.Rptr.2d 475, 869 P.2d 454].) But there is an exception to the general rule for "claims against an attorney [who] conspir[es] with his or her client to cause injury by violating the attorney's own duty to the plaintiff." (*Doctors' Co. v. Superior Court, supra,* 49 Cal.3d at p. 47.)

(10b) Consistent with that exception, section 1714.10, by its own terms, "shall not apply to a cause of action against an attorney for a civil conspiracy with his or her client, where ... the attorney has an independent legal duty to the plaintiff ...." (§ 1714.10, subd. (c)(1).)

As already discussed (see pt. II.A.1., *ante*), LaBelle had a duty to provide truthful information to the Shafers in describing the insurance coverage afforded by Truck. That duty existed by virtue of LaBelle's status as coverage counsel, independent of any duties that Truck may have had as an insurer. " '[A]gents [may be] held subject to liability for conspiracy to commit actual fraud since they ha[ve] a duty to abstain from injuring the plaintiff through express misrepresentation, independent of the insurer's implied covenant of good faith and fair dealing.' " (*Pavicich v. Santucci, supra,* 85 Cal.App.4th at p. 392, italics omitted, quoting *Doctors' Co. v. Superior Court, supra,* 49 Cal.3d at p. 48.)Because LaBelle had a duty to refrain from injuring the Shafers through express misrepresentation, section 1714.10 does not apply. (See *Pavicich v. Santucci, supra,* 85 Cal.App.4th at pp. 397-398.)

We reject LaBelle's contention that the Shafers " merely alleged" fraud. The two reservation of rights letters and LaBelle's letters to the Shafers' attorney were attached to the complaint, as was LaBelle's letter to Lundblad at Truck stating that the first reservation of rights letter was being modified "so as to not trigger the Cumis obligation." And in accordance with special pleading requirements that apply to fraud claims (see *Wilson v. Houston Funeral Home* (1996) 42 Cal.App.4th 1124, 1139 [50 Cal.Rptr.2d 169]), the Shafers alleged each element of fraud with specificity.

Nor is LaBelle correct in arguing that the Shafers had to seek leave of court, supported by affidavits, to bring the conspiracy claim. In certain *85 circumstances section 1714.10 requires a plaintiff to obtain a "court ... order allowing the pleading that includes the claim for civil conspiracy to be filed" (§ 1714.10, subd. (a)), but "[n]o such order is required for claims against an attorney for conspiring with his or her client where: [¶] ... the attorney had an independent legal duty to the party who is now the plaintiff in the instant case." (Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2002) ¶ 6:357, p. 6-70.6, italics omitted; accord, § 1714.10, subd. (c).)

"A cause of action for conspiracy will lie against agents and employees of insurers even though the former are not parties to the agreement of insurance when they join the insurer in a conspiracy to defraud the insured. As such, they are jointly liable with those with whom they conspire to commit the tort." (*Younan v. Equifax Inc., supra,* 111 Cal.App.3d at p. 511, cited with approval in *Everest Investors 8 v. Whitehall Real Estate Limited Partnership XI* (2002) 100 Cal.App.4th 1102, 1108 [123 Cal.Rptr.2d 297], and *Applied Equipment Corp. v. Litton Saudi Arabia Ltd., supra,* 7 Cal.4th at pp. 512-513.)

That principle of liability is not limited to fraud perpetrated upon an *insured*. (*Pavicich v. Santucci, supra,* 85 Cal.App.4th at pp. 397-398.)"[A]n attorney [may be liable if he or she] commits actual fraud in his dealings with *third parties*." (*Id.* at p. 395, italics added; accord, *Goodman v. Kennedy, supra,* 18 Cal.3d at p. 346;*Buckley v. Gray, supra,*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

107 Cal.App.4th 54                                                          Page 21

107 Cal.App.4th 54, 131 Cal.Rptr.2d 777, 03 Cal. Daily Op. Serv. 2402, 2003 Daily Journal D.A.R. 3059
**(Cite as: 107 Cal.App.4th 54)**

110 Cal. at p. 342;*Jackson v. Rogers & Wells, supra*, 210 Cal.App.3d at p. 345;*Cicone, supra,* 183 Cal.App.3d at pp. 201-202;*Fire Ins. Exchange, supra,* 643 N.E.2d at pp. 312-313;*Hansen, supra,* 630 N.W.2d at pp. 825-826;*Slotkin, supra,* 614 F.2d 301;Rest.3d, Law Governing Lawyers, § 98, coms. a-c, pp. 58-59.)

Thus, the Shafers may sue LaBelle for allegedly conspiring with Truck to commit actual fraud.

### III. Disposition

The judgment is reversed. Appellants are entitled to costs on appeal.

Spencer, P. J., and Vogel (Miriam A.), J., concurred.
A petition for a rehearing was denied April 8, 2003, and the opinion was modified to read as printed above. Respondents' petition for review by the Supreme Court was denied July 16, 2003. Brown, J., did not participate therein. Kennard, J., and Chin, J., were of the opinion that the petition should be granted. *86

Cal.App.2.Dist.
Shafer v. Berger, Kahn, Shafton, Moss, Figler, Simon & Gladstone
107 Cal.App.4th 54, 131 Cal.Rptr.2d 777, 03 Cal. Daily Op. Serv. 2402, 2003 Daily Journal D.A.R. 3059

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit N

**APPENDIX OF NON-FEDERAL AND UNPUBLISHED FEDERAL AUTHORITIES
CITED IN VISA USA INC.'S MOTION TO STAY ACTION
AND TO COMPEL ARBITRATION**

 **American Arbitration Association**
*Dispute Resolution Services Worldwide*

Commercial Arbitration Rules and Mediation PROCEDURES
(Including Procedures for Large, Complex Commercial Disputes)
Amended and Effective September 1, 2007

Summary of Changes

TABLE OF CONTENTS

IMPORTANT NOTICE
INTRODUCTION
STANDARD ARBITRATION CLAUSE
ADMINISTRATIVE FEES
MEDIATION
LARGE, COMPLEX CASES

COMMERCIAL MEDIATION PROCEDURES
M-1. Agreement of Parties

M-2. Initiation of Mediation
M-3. Representation
M-4. Appointment of the Mediator
M-5. Mediator's Impartiality and Duty to Disclose
M-6. Vacancies
M-7. Date and Responsiblities of the Mediator
M-8. Responsibilities of the Parties
M-9. Privacy
M-10. Confidentiality
M-11. No Stenographic Record
M-12. Termination of Mediation
M-13. Exclusion of Liability
M-14. Interpretation and Application of Procedures
M-15. Deposits
M-16. Expenses

M-17. Cost of Mediation

COMMERCIAL ARBITRATION RULES
R-1. Agreement of Parties
R-2. AAA and Delegation of Duties
R-3. National Roster of Arbitrators
R-4. Initiation under an Arbitration Provision in a Contract
R-5. Initiation under a Submission
R-6. Changes of Claim
R-7. Jurisdiction
R-8. Mediation
R-9. Administrative Conference
R-10. Fixing of Locale

R-11. Appointment from National Roster
R-12. Direct Appointment by a Party
R-13. Appointment of Chairperson by Party-Appointed Arbitrators or Parties
R-14. Nationality of Arbitrator
R-15. Number of Arbitrators
R-16. Disclosure
R-17. Disqualification of Arbitrator
R-18. Communication with Arbitrator
R-19. Vacancies
R-20. Preliminary Hearing
R-21. Exchange of Information
R-22. Date, Time, and Place of Hearing
R-23. Attendance at Hearings
R-24. Representation
R-25. Oaths
R-26. Stenographic Record
R-27. Interpreters
R-28. Postponements
R-29. Arbitration in the Absence of a Party or Representative
R-30. Conduct of Proceedings
R-31. Evidence
R-32. Evidence by Affidavit and Post-hearing Filing of Documents or Other Evidence
R-33. Inspection or Investigation
R-34. Interim Measures
R-35. Closing of Hearing
R-36. Reopening of Hearing
R-37. Waiver of Rules
R-38. Extensions of Time
R-39. Serving of Notice
R-40. Majority Decision
R-41. Time of Award
R-42. Form of Award
R-43. Scope of Award
R-44. Award upon Settlement
R-45. Delivery of Award to Parties
R-46. Modification of Award
R-47. Release of Documents for Judicial Proceedings
R-48. Applications to Court and Exclusion of Liability
R-49. Administrative Fees
R-50. Expenses
R-51. Neutral Arbitrator's Compensation
R-52. Deposits
R-53. Interpretation and Application of Rules
R-54. Suspension for Nonpayment

EXPEDITED PROCEDURES
E-1. Limitation on Extensions
E-2. Changes of Claim or Counterclaim
E-3. Serving of Notices
E-4. Appointment and Qualifications of Arbitrator
E-5. Exchange of Exhibits
E-6. Proceedings on Documents
E-7. Date, Time, and Place of Hearing

E-8. The Hearing
E-9. Time of Award
E-10. Arbitrator's Compensation

PROCEDURES FOR LARGE, COMPLEX COMMERCIAL DISPUTES
L-1. Administrative Conference

L-2. Arbitrators

L-3. Preliminary Hearing

L-4. Management of Proceedings

OPTIONAL RULES FOR EMERGENCY MEASURES OF PROTECTION
O-1. Applicability
O-2. Appointment of Emergency Arbitrator
O-3. Schedule
O-4. Interim Award
O-5. Constitution of the Panel
O-6. Security
O-7. Special Master
O-8. Costs

ADMINISTRATIVE FEES
Fees
Refund Schedule
Hearing Room Rental

IMPORTANT NOTICE

These rules and any amendment of them shall apply in the form in effect at the time the administrative filing requirements are met for a demand for arbitration or submission agreement received by the AAA. To ensure that you have the most current information, see our Web Site at www.adr.org.

INTRODUCTION

Each year, many millions of business transactions take place. Occasionally, disagreements develop over these business transactions. Many of these disputes are resolved by arbitration, the voluntary submission of a dispute to an impartial person or persons for final and binding determination. Arbitration has proven to be an effective way to resolve these disputes privately, promptly, and economically.

The American Arbitration Association (AAA), a not-for-profit, public service organization, offers a broad range of dispute resolution services to business executives, attorneys, individuals, trade associations, unions, management, consumers, families, communities, and all levels of government. Services are available through AAA headquarters in New York and through offices located in major cities throughout the United States. Hearings may be held at locations convenient for the parties and are not limited to cities with AAA offices. In addition, the AAA serves as a center for education and training, issues specialized publications, and conducts research on all forms of out-of-court dispute settlement.

Standard Arbitration Clause

The parties can provide for arbitration of future disputes by inserting the following clause into their

contracts:

*Any controversy or claim arising out of or relating to this contract, or the breach thereof, shall be settled by arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.*

Arbitration of existing disputes may be accomplished by use of the following:

*We, the undersigned parties, hereby agree to submit to arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules the following controversy: (describe briefly) We further agree that the above controversy be submitted to (one) (three) arbitrator(s). We further agree that we will faithfully observe this agreement and the rules, that we will abide by and perform any award rendered by the arbitrator(s), and that a judgment of any court having jurisdiction may be entered on the award.*

In transactions likely to require emergency interim relief, the parties may wish to add to their clause the following language:

*The parties also agree that the AAA Optional Rules for Emergency Measures of Protection shall apply to the proceedings.*

These Optional Rules may be found below.

The services of the AAA are generally concluded with the transmittal of the award. Although there is voluntary compliance with the majority of awards, judgment on the award can be entered in a court having appropriate jurisdiction if necessary.

Administrative Fees

The AAA charges a filing fee based on the amount of the claim or counterclaim. This fee information, which is included with these rules, allows the parties to exercise control over their administrative fees.

The fees cover AAA administrative services; they do not cover arbitrator compensation or expenses, if any, reporting services, or any post-award charges incurred by the parties in enforcing the award.

Mediation

The parties might wish to submit their dispute to mediation prior to arbitration. In mediation, the neutral mediator assists the parties in reaching a settlement but does not have the authority to make a binding decision or award. Mediation is administered by the AAA in accordance with its Commercial Mediation Procedures. There is no additional administrative fee where parties to a pending arbitration attempt to mediate their dispute under the AAA's auspices.

If the parties want to adopt mediation as a part of their contractual dispute settlement procedure, they can insert the following mediation clause into their contract in conjunction with a standard arbitration provision:

*If a dispute arises out of or relates to this contract, or the breach thereof, and if the dispute cannot be settled through negotiation, the parties agree first to try in good faith to settle the dispute by mediation administered by the American Arbitration Association under its Commercial Mediation Procedures before resorting to arbitration, litigation, or some other dispute resolution procedure.*

If the parties want to use a mediator to resolve an existing dispute, they can enter into the following submission:

*The parties hereby submit the following dispute to mediation administered by the American Arbitration Association under its Commercial Mediation Procedures. (The clause may also provide for the qualifications of the mediator(s), method of payment, locale of meetings, and any other item of concern to the parties.)*

Large, Complex Cases

Unless the parties agree otherwise, the procedures for Large, Complex Commercial Disputes, which appear in this pamphlet, will be applied to all cases administered by the AAA under the Commercial Arbitration Rules in which the disclosed claim or counterclaim of any party is at least $500,000 exclusive of claimed interest, arbitration fees and costs.

The key features of these procedures include:

§ a highly qualified, trained Roster of Neutrals;

§ a mandatory preliminary hearing with the arbitrators, which may be conducted by teleconference;

§ broad arbitrator authority to order and control discovery, including depositions;

§ presumption that hearings will proceed on a consecutive or block basis.

COMMERCIAL MEDIATION PROCEDURES

M-1. Agreement of Parties

Whenever, by stipulation or in their contract, the parties have provided for mediation or conciliation of existing or future disputes under the auspices of the American Arbitration Association (AAA) or under these procedures, the parties and their representatives, unless agreed otherwise in writing, shall be deemed to have made these procedural guidelines, as amended and in effect as of the date of filing of a request for mediation, a part of their agreement and designate the AAA as the administrator of their mediation.

The parties by mutual agreement may vary any part of these procedures including, but not limited to, agreeing to conduct the mediation via telephone or other electronic or technical means.

M-2. Initiation of Mediation

Any party or parties to a dispute may initiate mediation under the AAA's auspices by making a request for mediation to any of the AAA's regional offices or case management centers via telephone, email, regular mail or fax. Requests for mediation may also be filed online via WebFile at www.adr.org.

The party initiating the mediation shall simultaneously notify the other party or parties of the request. The initiating party shall provide the following information to the AAA and the other party or parties as applicable:

    i.  A copy of the mediation provision of the parties' contract or the parties' stipulation to mediate.
    ii.  The names, regular mail addresses, email addresses, and telephone numbers of all parties to the dispute and representatives, if any, in the mediation.
    iii.  A brief statement of the nature of the dispute and the relief requested.
    iv.  Any specific qualifications the mediator should possess.

Where there is no preexisting stipulation or contract by which the parties have provided for mediation of existing or future disputes under the auspices of the AAA, a party may request the AAA to invite another party to participate in "mediation by voluntary submission". Upon receipt of such a request, the AAA will contact the other party or parties involved in the dispute and attempt to obtain a submission to mediation.

## M-3. Representation

Subject to any applicable law, any party may be represented by persons of the party's choice. The names and addresses of such persons shall be communicated in writing to all parties and to the AAA.

## M-4. Appointment of the Mediator

Parties may search the online profiles of the AAA's Panel of Mediators at www.aaamediation.com in an effort to agree on a mediator. If the parties have not agreed to the appointment of a mediator and have not provided any other method of appointment, the mediator shall be appointed in the following manner:

i.   Upon receipt of a request for mediation, the AAA will send to each party a list of mediators from the AAA's Panel of Mediators. The parties are encouraged to agree to a mediator from the submitted list and to advise the AAA of their agreement.

ii.  If the parties are unable to agree upon a mediator, each party shall strike unacceptable names from the list, number the remaining names in order of preference, and return the list to the AAA. If a party does not return the list within the time specified, all mediators on the list shall be deemed acceptable. From among the mediators who have been mutually approved by the parties, and in accordance with the designated order of mutual preference, the AAA shall invite a mediator to serve.

iii. If the parties fail to agree on any of the mediators listed, or if acceptable mediators are unable to serve, or if for any other reason the appointment cannot be made from the submitted list, the AAA shall have the authority to make the appointment from among other members of the Panel of Mediators without the submission of additional lists.

## M-5. Mediator's Impartiality and Duty to Disclose

AAA mediators are required to abide by the Model Standards of Conduct for Mediators in effect at the time a mediator is appointed to a case. Where there is a conflict between the Model Standards and any provision of these Mediation Procedures, these Mediation Procedures shall govern. The Standards require mediators to (i) decline a mediation if the mediator cannot conduct it in an impartial manner, and (ii) disclose, as soon as practicable, all actual and potential conflicts of interest that are reasonably known to the mediator and could reasonably be seen as raising a question about the mediator's impartiality.

Prior to accepting an appointment, AAA mediators are required to make a reasonable inquiry to determine whether there are any facts that a reasonable individual would consider likely to create a potential or actual conflict of interest for the mediator. AAA mediators are required to disclose any circumstance likely to create a presumption of bias or prevent a resolution of the parties' dispute within the time-frame desired by the parties. Upon receipt of such disclosures, the AAA shall immediately communicate the disclosures to the parties for their comments.

The parties may, upon receiving disclosure of actual or potential conflicts of interest of the mediator, waive such conflicts and proceed with the mediation. In the event that a party disagrees as to whether the mediator shall serve, or in the event that the mediator's conflict of interest might reasonably be viewed as undermining the integrity of the mediation, the mediator shall be replaced.

## M-6. Vacancies

If any mediator shall become unwilling or unable to serve, the AAA will appoint another mediator, unless the parties agree otherwise, in accordance with section M-4.

## M-7. Duties and Responsibilities of the Mediator

    i.   The mediator shall conduct the mediation based on the principle of party self-determination. Self-determination is the act of coming to a voluntary, uncoerced decision in which each party makes free and informed choices as to process and outcome.

    ii.   The mediator is authorized to conduct separate or ex parte meetings and other communications with the parties and/or their representatives, before, during, and after any scheduled mediation conference. Such communications may be conducted via telephone, in writing, via email, online, in person or otherwise.

    iii.   The parties are encouraged to exchange all documents pertinent to the relief requested. The mediator may request the exchange of memoranda on issues, including the underlying interests and the history of the parties' negotiations. Information that a party wishes to keep confidential may be sent to the mediator, as necessary, in a separate communication with the mediator.

    iv.   The mediator does not have the authority to impose a settlement on the parties but will attempt to help them reach a satisfactory resolution of their dispute. Subject to the discretion of the mediator, the mediator may make oral or written recommendations for settlement to a party privately or, if the parties agree, to all parties jointly.

    v.   In the event a complete settlement of all or some issues in dispute is not achieved within the scheduled mediation session(s), the mediator may continue to communicate with the parties, for a period of time, in an ongoing effort to facilitate a complete settlement.

    vi.   The mediator is not a legal representative of any party and has no fiduciary duty to any party.

## M-8. Responsibilities of the Parties

The parties shall ensure that appropriate representatives of each party, having authority to consummate a settlement, attend the mediation conference.

Prior to and during the scheduled mediation conference session(s) the parties and their representatives shall, as appropriate to each party's circumstances, exercise their best efforts to prepare for and engage in a meaningful and productive mediation.

## M-9. Privacy

Mediation sessions and related mediation communications are private proceedings. The parties and their representatives may attend mediation sessions. Other persons may attend only with the permission of the parties and with the consent of the mediator.

## M-10. Confidentiality

Subject to applicable law or the parties' agreement, confidential information disclosed to a mediator by the parties or by other participants (witnesses) in the course of the mediation shall not be divulged by the mediator. The mediator shall maintain the confidentiality of all information obtained in the mediation, and all records, reports, or other documents received by a mediator while serving in that capacity shall be confidential.

The mediator shall not be compelled to divulge such records or to testify in regard to the mediation in any adversary proceeding or judicial forum.

The parties shall maintain the confidentiality of the mediation and shall not rely on, or introduce as evidence in any arbitral, judicial, or other proceeding the following, unless agreed to by the parties or required by applicable law:

    i.   Views expressed or suggestions made by a party or other participant with respect to a possible settlement of the dispute;

    ii.   Admissions made by a party or other participant in the course of the mediation proceedings;

    iii.   Proposals made or views expressed by the mediator; or

    iv.   The fact that a party had or had not indicated willingness to accept a proposal for settlement made by the mediator.

## M-11. No Stenographic Record

There shall be no stenographic record of the mediation process.

## M-12. Termination of Mediation

The mediation shall be terminated:

    i.   By the execution of a settlement agreement by the parties; or

    ii.   By a written or verbal declaration of the mediator to the effect that further efforts at mediation would not contribute to a resolution of the parties' dispute; or
    iii.  By a written or verbal declaration of all parties to the effect that the mediation proceedings are terminated; or
    iv.  When there has been no communication between the mediator and any party or party's representative for 21 days following the conclusion of the mediation conference.

## M-13. Exclusion of Liability

Neither the AAA nor any mediator is a necessary party in judicial proceedings relating to the mediation. Neither the AAA nor any mediator shall be liable to any party for any error, act or omission in connection with any mediation conducted under these procedures.

## M-14. Interpretation and Application of Procedures

The mediator shall interpret and apply these procedures insofar as they relate to the mediator's duties and responsibilities. All other procedures shall be interpreted and applied by the AAA.

## M-15. Deposits

Unless otherwise directed by the mediator, the AAA will require the parties to deposit in advance of the mediation conference such sums of money as it, in consultation with the mediator, deems necessary to cover the costs and expenses of the mediation and shall render an accounting to the parties and return any unexpended balance at the conclusion of the mediation.

## M-16. Expenses

All expenses of the mediation, including required traveling and other expenses or charges of the mediator, shall be borne equally by the parties unless they agree otherwise. The expenses of participants for either side shall be paid by the party requesting the attendance of such participants.

## M-17. Cost of the Mediation

There is no filing fee to initiate a mediation or a fee to request the AAA to invite parties to mediate.

The cost of mediation is based on the hourly mediation rate published on the mediator's AAA profile. This rate covers both mediator compensation and an allocated portion for the AAA's services. There is a four-hour minimum charge for a mediation conference. Expenses referenced in Section M-16 may also apply.

If a matter submitted for mediation is withdrawn or cancelled or results in a settlement after the agreement to mediate is filed but prior to the mediation conference the cost is $250 plus any mediator time and charges incurred.

The parties will be billed equally for all costs unless they agree otherwise.

If you have questions about mediation costs or services visit our website at www.adr.org or contact your local AAA office.

#### Conference Room Rental

The costs described above do not include the use of AAA conference rooms. Conference rooms are available on a rental basis. Please contact your local AAA office for availability and rates.

## COMMERCIAL ARBITRATION RULES

R-1. Agreement of Parties*+

(a) The parties shall be deemed to have made these rules a part of their arbitration agreement whenever they have provided for arbitration by the American Arbitration Association (hereinafter AAA) under its Commercial Arbitration Rules or for arbitration by the AAA of a domestic commercial dispute without specifying particular rules. These rules and any amendment of them shall apply in the form in effect at the time the administrative requirements are met for a demand for arbitration or submission agreement received by the AAA. The parties, by written agreement, may vary the procedures set forth in these rules. After appointment of the arbitrator, such modifications may be made only with the consent of the arbitrator.

(b) Unless the parties or the AAA determines otherwise, the Expedited Procedures shall apply in any case in which no disclosed claim or counterclaim exceeds $75,000, exclusive of interest and arbitration fees and costs. Parties may also agree to use these procedures in larger cases. Unless the parties agree otherwise, these procedures will not apply in cases involving more than two parties. The Expedited Procedures shall be applied as described in Sections E-1 through E-10 of these rules, in addition to any other portion of these rules that is not in conflict with the Expedited Procedures.

(c) Unless the parties agree otherwise, the Procedures for Large, Complex Commercial Disputes shall apply to all cases in which the disclosed claim or counterclaim of any party is at least $500,000, exclusive of claimed interest, arbitration fees and costs. Parties may also agree to use the Procedures in cases involving claims or counterclaims under $500,000, or in nonmonetary cases. The Procedures for Large, Complex Commercial Disputes shall be applied as described in Sections L-1 through L-4 of these rules, in addition to any other portion of these rules that is not in conflict with the Procedures for Large, Complex Commercial Disputes.

(d) All other cases shall be administered in accordance with Sections R-1 through R-54 of these rules.

* The AAA applies the *Supplementary Procedures for Consumer-Related Disputes* to arbitration clauses in agreements between individual consumers and businesses where the business has a standardized, systematic application of arbitration clauses with customers and where the terms and conditions of the purchase of standardized, consumable goods or services are nonnegotiable or primarily non-negotiable in most or all of its terms, conditions, features, or choices. The product or service must be for personal or household use. The AAA will have the discretion to apply or not to apply the Supplementary Procedures and the parties will be able to bring any disputes concerning the application or non-application to the attention of the arbitrator. Consumers are not prohibited from seeking relief in a small claims court for disputes or claims within the scope of its jurisdiction, even in consumer arbitration cases filed by the business.

+ A dispute arising out of an employer promulgated plan will be administered under the AAA's National Rules for the Resolution of Employment Disputes.

R-2. AAA and Delegation of Duties

When parties agree to arbitrate under these rules, or when they provide for arbitration by the AAA and an arbitration is initiated under these rules, they thereby authorize the AAA to administer the arbitration. The authority and duties of the AAA are prescribed in the agreement of the parties and in these rules, and may be carried out through such of the AAA's representatives as it may direct. The AAA may, in its discretion, assign the administration of an arbitration to any of its offices.

R-3. National Roster of Arbitrators

The AAA shall establish and maintain a National Roster of Commercial Arbitrators ("National Roster")

and shall appoint arbitrators as provided in these rules. The term "arbitrator" in these rules refers to the arbitration panel, constituted for a particular case, whether composed of one or more arbitrators, or to an individual arbitrator, as the context requires.

R-4. Initiation under an Arbitration Provision in a Contract

(a) Arbitration under an arbitration provision in a contract shall be initiated in the following manner:

(i) The initiating party (the "claimant") shall, within the time period, if any, specified in the contract(s), give to the other party (the "respondent") written notice of its intention to arbitrate (the "demand"), which demand shall contain a statement setting forth the nature of the dispute, the names and addresses of all other parties, the amount involved, if any, the remedy sought, and the hearing locale requested.

(ii) The claimant shall file at any office of the AAA two copies of the demand and two copies of the arbitration provisions of the contract, together with the appropriate filing fee as provided in the schedule included with these rules.

(iii) The AAA shall confirm notice of such filing to the parties.

(b) A respondent may file an answering statement in duplicate with the AAA within 15 days after confirmation of notice of filing of the demand is sent by the AAA. The respondent shall, at the time of any such filing, send a copy of the answering statement to the claimant. If a counterclaim is asserted, it shall contain a statement setting forth the nature of the counterclaim, the amount involved, if any, and the remedy sought. If a counterclaim is made, the party making the counterclaim shall forward to the AAA with the answering statement the appropriate fee provided in the schedule included with these rules.

(c) If no answering statement is filed within the stated time, respondent will be deemed to deny the claim. Failure to file an answering statement shall not operate to delay the arbitration.

(d) When filing any statement pursuant to this section, the parties are encouraged to provide descriptions of their claims in sufficient detail to make the circumstances of the dispute clear to the arbitrator.

R-5. Initiation under a Submission

Parties to any existing dispute may commence an arbitration under these rules by filing at any office of the AAA two copies of a written submission to arbitrate under these rules, signed by the parties. It shall contain a statement of the nature of the dispute, the names and addresses of all parties, any claims and counterclaims, the amount involved, if any, the remedy sought, and the hearing locale requested, together with the appropriate filing fee as provided in the schedule included with these rules. Unless the parties state otherwise in the submission, all claims and counterclaims will be deemed to be denied by the other party.

R-6. Changes of Claim

After filing of a claim, if either party desires to make any new or different claim or counterclaim, it shall be made in writing and filed with the AAA. The party asserting such a claim or counterclaim shall provide a copy to the other party, who shall have 15 days from the date of such transmission within which to file an answering statement with the AAA. After the arbitrator is appointed, however, no new or different claim may be submitted except with the arbitrator's consent.

R-7. Jurisdiction

(a) The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement.

(b) The arbitrator shall have the power to determine the existence or validity of a contract of which an arbitration clause forms a part. Such an arbitration clause shall be treated as an agreement independent of the other terms of the contract. A decision by the arbitrator that the contract is null and void shall not for that reason alone render invalid the arbitration clause.

(c) A party must object to the jurisdiction of the arbitrator or to the arbitrability of a claim or counterclaim no later than the filing of the answering statement to the claim or counterclaim that gives rise to the objection. The arbitrator may rule on such objections as a preliminary matter or as part of the final award.

R-8. Mediation

At any stage of the proceedings, the parties may agree to conduct a mediation conference under the Commercial Mediation Procedures in order to facilitate settlement. The mediator shall not be an arbitrator appointed to the case. Where the parties to a pending arbitration agree to mediate under the AAA's rules, no additional administrative fee is required to initiate the mediation.

R-9. Administrative Conference

At the request of any party or upon the AAA's own initiative, the AAA may conduct an administrative conference, in person or by telephone, with the parties and/or their representatives. The conference may address such issues as arbitrator selection, potential mediation of the dispute, potential exchange of information, a timetable for hearings and any other administrative matters.

R-10. Fixing of Locale

The parties may mutually agree on the locale where the arbitration is to be held. If any party requests that the hearing be held in a specific locale and the other party files no objection thereto within 15 days after notice of the request has been sent to it by the AAA, the locale shall be the one requested. If a party objects to the locale requested by the other party, the AAA shall have the power to determine the locale, and its decision shall be final and binding.

R-11. Appointment from National Roster

If the parties have not appointed an arbitrator and have not provided any other method of appointment, the arbitrator shall be appointed in the following manner:

(a) Immediately after the filing of the submission or the answering statement or the expiration of the time within which the answering statement is to be filed, the AAA shall send simultaneously to each party to the dispute an identical list of 10 (unless the AAA decides that a different number is appropriate) names of persons chosen from the National Roster. The parties are encouraged to agree to an arbitrator from the submitted list and to advise the AAA of their agreement.

(b) If the parties are unable to agree upon an arbitrator, each party to the dispute shall have 15 days from the transmittal date in which to strike names objected to, number the remaining names in order of preference, and return the list to the AAA. If a party does not return the list within the time specified, all persons named therein shall be deemed acceptable. From among the persons who have been approved on both lists, and in accordance with the designated order of mutual preference, the AAA shall invite the acceptance of an arbitrator to serve. If the parties fail to agree on any of the persons named, or if acceptable arbitrators are unable to act, or if for any other reason the appointment cannot be made from

the submitted lists, the AAA shall have the power to make the appointment from among other members of the National Roster without the submission of additional lists.

(c) Unless the parties agree otherwise when there are two or more claimants or two or more respondents, the AAA may appoint all the arbitrators.

R-12. Direct Appointment by a Party

(a) If the agreement of the parties names an arbitrator or specifies a method of appointing an arbitrator, that designation or method shall be followed. The notice of appointment, with the name and address of the arbitrator, shall be filed with the AAA by the appointing party. Upon the request of any appointing party, the AAA shall submit a list of members of the National Roster from which the party may, if it so desires, make the appointment.

(b) Where the parties have agreed that each party is to name one arbitrator, the arbitrators so named must meet the standards of Section R-17 with respect to impartiality and independence unless the parties have specifically agreed pursuant to Section R-17(a) that the party-appointed arbitrators are to be non-neutral and need not meet those standards.

(c) If the agreement specifies a period of time within which an arbitrator shall be appointed and any party fails to make the appointment within that period, the AAA shall make the appointment.

(d) If no period of time is specified in the agreement, the AAA shall notify the party to make the appointment. If within 15 days after such notice has been sent, an arbitrator has not been appointed by a party, the AAA shall make the appointment.

R-13. Appointment of Chairperson by Party-Appointed Arbitrators or Parties

(a) If, pursuant to Section R-12, either the parties have directly appointed arbitrators, or the arbitrators have been appointed by the AAA, and the parties have authorized them to appoint a chairperson within a specified time and no appointment is made within that time or any agreed extension, the AAA may appoint the chairperson.

(b) If no period of time is specified for appointment of the chairperson and the party-appointed arbitrators or the parties do not make the appointment within 15 days from the date of the appointment of the last party-appointed arbitrator, the AAA may appoint the chairperson.

(c) If the parties have agreed that their party-appointed arbitrators shall appoint the chairperson from the National Roster, the AAA shall furnish to the party-appointed arbitrators, in the manner provided in Section R-11, a list selected from the National Roster, and the appointment of the chairperson shall be made as provided in that Section.

R-14. Nationality of Arbitrator

Where the parties are nationals of different countries, the AAA, at the request of any party or on its own initiative, may appoint as arbitrator a national of a country other than that of any of the parties. The request must be made before the time set for the appointment of the arbitrator as agreed by the parties or set by these rules.

R-15. Number of Arbitrators

If the arbitration agreement does not specify the number of arbitrators, the dispute shall be heard and determined by one arbitrator, unless the AAA, in its discretion, directs that three arbitrators be

appointed. A party may request three arbitrators in the demand or answer, which request the AAA will consider in exercising its discretion regarding the number of arbitrators appointed to the dispute.

R-16. Disclosure

(a) Any person appointed or to be appointed as an arbitrator shall disclose to the AAA any circumstance likely to give rise to justifiable doubt as to the arbitrator's impartiality or independence, including any bias or any financial or personal interest in the result of the arbitration or any past or present relationship with the parties or their representatives. Such obligation shall remain in effect throughout the arbitration.

(b) Upon receipt of such information from the arbitrator or another source, the AAA shall communicate the information to the parties and, if it deems it appropriate to do so, to the arbitrator and others.

(c) In order to encourage disclosure by arbitrators, disclosure of information pursuant to this Section R-16 is not to be construed as an indication that the arbitrator considers that the disclosed circumstance is likely to affect impartiality or independence.

R-17. Disqualification of Arbitrator

(a) Any arbitrator shall be impartial and independent and shall perform his or her duties with diligence and in good faith, and shall be subject to disqualification for

(i) partiality or lack of independence,

(ii) inability or refusal to perform his or her duties with diligence and in good faith, and

(iii) any grounds for disqualification provided by applicable law. The parties may agree in writing, however, that arbitrators directly appointed by a party pursuant to Section R-12 shall be nonneutral, in which case such arbitrators need not be impartial or independent and shall not be subject to disqualification for partiality or lack of independence.

(b) Upon objection of a party to the continued service of an arbitrator, or on its own initiative, the AAA shall determine whether the arbitrator should be disqualified under the grounds set out above, and shall inform the parties of its decision, which decision shall be conclusive.

R-18. Communication with Arbitrator

(a) No party and no one acting on behalf of any party shall communicate ex parte with an arbitrator or a candidate for arbitrator concerning the arbitration, except that a party, or someone acting on behalf of a party, may communicate ex parte with a candidate for direct appointment pursuant to Section R-12 in order to advise the candidate of the general nature of the controversy and of the anticipated proceedings and to discuss the candidate's qualifications, availability, or independence in relation to the parties or to discuss the suitability of candidates for selection as a third arbitrator where the parties or party-designated arbitrators are to participate in that selection.

(b) Section R-18(a) does not apply to arbitrators directly appointed by the parties who, pursuant to Section R-17(a), the parties have agreed in writing are non-neutral. Where the parties have so agreed under Section R-17(a), the AAA shall as an administrative practice suggest to the parties that they agree further that Section R-18(a) should nonetheless apply prospectively.

R-19. Vacancies

(a) If for any reason an arbitrator is unable to perform the duties of the office, the AAA may, on proof satisfactory to it, declare the office vacant. Vacancies shall be filled in accordance with the applicable provisions of these rules.

(b) In the event of a vacancy in a panel of neutral arbitrators after the hearings have commenced, the remaining arbitrator or arbitrators may continue with the hearing and determination of the controversy, unless the parties agree otherwise.

(c) In the event of the appointment of a substitute arbitrator, the panel of arbitrators shall determine in its sole discretion whether it is necessary to repeat all or part of any prior hearings.

R-20. Preliminary Hearing

(a) At the request of any party or at the discretion of the arbitrator or the AAA, the arbitrator may schedule as soon as practicable a preliminary hearing with the parties and/or their representatives. The preliminary hearing may be conducted by telephone at the arbitrator's discretion.

(b) During the preliminary hearing, the parties and the arbitrator should discuss the future conduct of the case, including clarification of the issues and claims, a schedule for the hearings and any other preliminary matters.

R-21. Exchange of Information

(a) At the request of any party or at the discretion of the arbitrator, consistent with the expedited nature of arbitration, the arbitrator may direct

i) the production of documents and other information, and

ii) the identification of any witnesses to be called.

(b) At least five business days prior to the hearing, the parties shall exchange copies of all exhibits they intend to submit at the hearing.

(c) The arbitrator is authorized to resolve any disputes concerning the exchange of information.

R-22. Date, Time, and Place of Hearing

The arbitrator shall set the date, time, and place for each hearing. The parties shall respond to requests for hearing dates in a timely manner, be cooperative in scheduling the earliest practicable date, and adhere to the established hearing schedule. The AAA shall send a notice of hearing to the parties at least 10 days in advance of the hearing date, unless otherwise agreed by the parties.

R-23. Attendance at Hearings

The arbitrator and the AAA shall maintain the privacy of the hearings unless the law provides to the contrary. Any person having a direct interest in the arbitration is entitled to attend hearings. The arbitrator shall otherwise have the power to require the exclusion of any witness, other than a party or other essential person, during the testimony of any other witness. It shall be discretionary with the arbitrator to determine the propriety of the attendance of any other person other than a party and its representatives.

R-24. Representation

Any party may be represented by counsel or other authorized representative. A party intending to be so represented shall notify the other party and the AAA of the name and address of the representative at least three days prior to the date set for the hearing at which that person is first to appear. When such a representative initiates an arbitration or responds for a party, notice is deemed to have been given.

### R-25. Oaths

Before proceeding with the first hearing, each arbitrator may take an oath of office and, if required by law, shall do so. The arbitrator may require witnesses to testify under oath administered by any duly qualified person and, if it is required by law or requested by any party, shall do so.

### R-26. Stenographic Record

Any party desiring a stenographic record shall make arrangements directly with a stenographer and shall notify the other parties of these arrangements at least three days in advance of the hearing. The requesting party or parties shall pay the cost of the record. If the transcript is agreed by the parties, or determined by the arbitrator to be the official record of the proceeding, it must be provided to the arbitrator and made available to the other parties for inspection, at a date, time, and place determined by the arbitrator.

### R-27. Interpreters

Any party wishing an interpreter shall make all arrangements directly with the interpreter and shall assume the costs of the service.

### R-28. Postponements

The arbitrator may postpone any hearing upon agreement of the parties, upon request of a party for good cause shown, or upon the arbitrator's own initiative.

### R-29. Arbitration in the Absence of a Party or Representative

Unless the law provides to the contrary, the arbitration may proceed in the absence of any party or representative who, after due notice, fails to be present or fails to obtain a postponement. An award shall not be made solely on the default of a party. The arbitrator shall require the party who is present to submit such evidence as the arbitrator may require for the making of an award.

### R-30. Conduct of Proceedings

(a) The claimant shall present evidence to support its claim. The respondent shall then present evidence to support its defense. Witnesses for each party shall also submit to questions from the arbitrator and the adverse party. The arbitrator has the discretion to vary this procedure, provided that the parties are treated with equality and that each party has the right to be heard and is given a fair opportunity to present its case.

(b) The arbitrator, exercising his or her discretion, shall conduct the proceedings with a view to expediting the resolution of the dispute and may direct the order of proof, bifurcate proceedings and direct the parties to focus their presentations on issues the decision of which could dispose of all or part of the case.

(c) The parties may agree to waive oral hearings in any case.

R-31. Evidence

(a) The parties may offer such evidence as is relevant and material to the dispute and shall produce such evidence as the arbitrator may deem necessary to an understanding and determination of the dispute. Conformity to legal rules of evidence shall not be necessary. All evidence shall be taken in the presence of all of the arbitrators and all of the parties, except where any of the parties is absent, in default or has waived the right to be present.

(b) The arbitrator shall determine the admissibility, relevance, and materiality of the evidence offered and may exclude evidence deemed by the arbitrator to be cumulative or irrelevant.

(c) The arbitrator shall take into account applicable principles of legal privilege, such as those involving the confidentiality of communications between a lawyer and client.

(d) An arbitrator or other person authorized by law to subpoena witnesses or documents may do so upon the request of any party or independently.

R-32. Evidence by Affidavit and Post-hearing Filing of Documents or Other Evidence

(a) The arbitrator may receive and consider the evidence of witnesses by declaration or affidavit, but shall give it only such weight as the arbitrator deems it entitled to after consideration of any objection made to its admission.

(b) If the parties agree or the arbitrator directs that documents or other evidence be submitted to the arbitrator after the hearing, the documents or other evidence shall be filed with the AAA for transmission to the arbitrator. All parties shall be afforded an opportunity to examine and respond to such documents or other evidence.

R-33. Inspection or Investigation

An arbitrator finding it necessary to make an inspection or investigation in connection with the arbitration shall direct the AAA to so advise the parties. The arbitrator shall set the date and time and the AAA shall notify the parties. Any party who so desires may be present at such an inspection or investigation. In the event that one or all parties are not present at the inspection or investigation, the arbitrator shall make an oral or written report to the parties and afford them an opportunity to comment.

R-34. Interim Measures**

(a) The arbitrator may take whatever interim measures he or she deems necessary, including injunctive relief and measures for the protection or conservation of property and disposition of perishable goods.

(b) Such interim measures may take the form of an interim award, and the arbitrator may require security for the costs of such measures.

(c) A request for interim measures addressed by a party to a judicial authority shall not be deemed incompatible with the agreement to arbitrate or a waiver of the right to arbitrate.

** The Optional Rules may be found below.

R-35. Closing of Hearing

The arbitrator shall specifically inquire of all parties whether they have any further proofs to offer or

witnesses to be heard. Upon receiving negative replies or if satisfied that the record is complete, the arbitrator shall declare the hearing closed. If briefs are to be filed, the hearing shall be declared closed as of the final date set by the arbitrator for the receipt of briefs. If documents are to be filed as provided in Section R-32 and the date set for their receipt is later than that set for the receipt of briefs, the later date shall be the closing date of the hearing. The time limit within which the arbitrator is required to make the award shall commence, in the absence of other agreements by the parties, upon the closing of the hearing.

R-36. Reopening of Hearing

The hearing may be reopened on the arbitrator's initiative, or upon application of a party, at any time before the award is made. If reopening the hearing would prevent the making of the award within the specific time agreed on by the parties in the contract(s) out of which the controversy has arisen, the matter may not be reopened unless the parties agree on an extension of time. When no specific date is fixed in the contract, the arbitrator may reopen the hearing and shall have 30 days from the closing of the reopened hearing within which to make an award.

R-37. Waiver of Rules

Any party who proceeds with the arbitration after knowledge that any provision or requirement of these rules has not been complied with and who fails to state an objection in writing shall be deemed to have waived the right to object.

R-38. Extensions of Time

The parties may modify any period of time by mutual agreement. The AAA or the arbitrator may for good cause extend any period of time established by these rules, except the time for making the award. The AAA shall notify the parties of any extension.

R-39. Serving of Notice

(a) Any papers, notices, or process necessary or proper for the initiation or continuation of an arbitration under these rules, for any court action in connection therewith, or for the entry of judgment on any award made under these rules may be served on a party by mail addressed to the party, or its representative at the last known address or by personal service, in or outside the state where the arbitration is to be held, provided that reasonable opportunity to be heard with regard to the dispute is or has been granted to the party.

(b) The AAA, the arbitrator and the parties may also use overnight delivery or electronic facsimile transmission (fax), to give the notices required by these rules. Where all parties and the arbitrator agree, notices may be transmitted by electronic mail (E-mail), or other methods of communication.

(c) Unless otherwise instructed by the AAA or by the arbitrator, any documents submitted by any party to the AAA or to the arbitrator shall simultaneously be provided to the other party or parties to the arbitration.

R-40. Majority Decision

When the panel consists of more than one arbitrator, unless required by law or by the arbitration agreement, a majority of the arbitrators must make all decisions.

R-41. Time of Award

The award shall be made promptly by the arbitrator and, unless otherwise agreed by the parties or specified by law, no later than 30 days from the date of closing the hearing, or, if oral hearings have been waived, from the date of the AAA's transmittal of the final statements and proofs to the arbitrator.

R-42. Form of Award

(a) Any award shall be in writing and signed by a majority of the arbitrators. It shall be executed in the manner required by law.

(b) The arbitrator need not render a reasoned award unless the parties request such an award in writing prior to appointment of the arbitrator or unless the arbitrator determines that a reasoned award is appropriate.

R-43. Scope of Award

(a) The arbitrator may grant any remedy or relief that the arbitrator deems just and equitable and within the scope of the agreement of the parties, including, but not limited to, specific performance of a contract.

(b) In addition to a final award, the arbitrator may make other decisions, including interim, interlocutory, or partial rulings, orders, and awards. In any interim, interlocutory, or partial award, the arbitrator may assess and apportion the fees, expenses, and compensation related to such award as the arbitrator determines is appropriate.

(c) In the final award, the arbitrator shall assess the fees, expenses, and compensation provided in Sections R-49, R-50, and R-51. The arbitrator may apportion such fees, expenses, and compensation among the parties in such amounts as the arbitrator determines is appropriate.

(d) The award of the arbitrator(s) may include:

(i) interest at such rate and from such date as the arbitrator(s) may deem appropriate; and

(ii) an award of attorneys' fees if all parties have requested such an award or it is authorized by law or their arbitration agreement.

R-44. Award upon Settlement

If the parties settle their dispute during the course of the arbitration and if the parties so request, the arbitrator may set forth the terms of the settlement in a "consent award." A consent award must include an allocation of arbitration costs, including administrative fees and expenses as well as arbitrator fees and expenses.

R-45. Delivery of Award to Parties

Parties shall accept as notice and delivery of the award the placing of the award or a true copy thereof in the mail addressed to the parties or their representatives at the last known addresses, personal or electronic service of the award, or the filing of the award in any other manner that is permitted by law.

R-46. Modification of Award

Within 20 days after the transmittal of an award, any party, upon notice to the other parties, may request the arbitrator, through the AAA, to correct any clerical, typographical, or computational errors in the

award. The arbitrator is not empowered to redetermine the merits of any claim already decided. The other parties shall be given 10 days to respond to the request. The arbitrator shall dispose of the request within 20 days after transmittal by the AAA to the arbitrator of the request and any response thereto.

### R-47. Release of Documents for Judicial Proceedings

The AAA shall, upon the written request of a party, furnish to the party, at the party's expense, certified copies of any papers in the AAA's possession that may be required in judicial proceedings relating to the arbitration.

### R-48. Applications to Court and Exclusion of Liability

(a) No judicial proceeding by a party relating to the subject matter of the arbitration shall be deemed a waiver of the party's right to arbitrate.

(b) Neither the AAA nor any arbitrator in a proceeding under these rules is a necessary or proper party in judicial proceedings relating to the arbitration.

(c) Parties to an arbitration under these rules shall be deemed to have consented that judgment upon the arbitration award may be entered in any federal or state court having jurisdiction thereof.

(d) Parties to an arbitration under these rules shall be deemed to have consented that neither the AAA nor any arbitrator shall be liable to any party in any action for damages or injunctive relief for any act or omission in connection with any arbitration under these rules.

### R-49. Administrative Fees

As a not-for-profit organization, the AAA shall prescribe an initial filing fee and a case service fee to compensate it for the cost of providing administrative services. The fees in effect when the fee or charge is incurred shall be applicable. The filing fee shall be advanced by the party or parties making a claim or counterclaim, subject to final apportionment by the arbitrator in the award. The AAA may, in the event of extreme hardship on the part of any party, defer or reduce the administrative fees.

### R-50. Expenses

The expenses of witnesses for either side shall be paid by the party producing such witnesses. All other expenses of the arbitration, including required travel and other expenses of the arbitrator, AAA representatives, and any witness and the cost of any proof produced at the direct request of the arbitrator, shall be borne equally by the parties, unless they agree otherwise or unless the arbitrator in the award assesses such expenses or any part thereof against any specified party or parties.

### R-51. Neutral Arbitrator's Compensation

(a) Arbitrators shall be compensated at a rate consistent with the arbitrator's stated rate of compensation.

(b) If there is disagreement concerning the terms of compensation, an appropriate rate shall be established with the arbitrator by the AAA and confirmed to the parties.

(c) Any arrangement for the compensation of a neutral arbitrator shall be made through the AAA and not directly between the parties and the arbitrator.

### R-52. Deposits

The AAA may require the parties to deposit in advance of any hearings such sums of money as it deems necessary to cover the expense of the arbitration, including the arbitrator's fee, if any, and shall render an accounting to the parties and return any unexpended balance at the conclusion of the case.

R-53. Interpretation and Application of Rules

The arbitrator shall interpret and apply these rules insofar as they relate to the arbitrator's powers and duties. When there is more than one arbitrator and a difference arises among them concerning the meaning or application of these rules, it shall be decided by a majority vote. If that is not possible, either an arbitrator or a party may refer the question to the AAA for final decision. All other rules shall be interpreted and applied by the AAA.

R-54. Suspension for Nonpayment

If arbitrator compensation or administrative charges have not been paid in full, the AAA may so inform the parties in order that one of them may advance the required payment. If such payments are not made, the arbitrator may order the suspension or termination of the proceedings. If no arbitrator has yet been appointed, the AAA may suspend the proceedings.

EXPEDITED PROCEDURES

E-1. Limitation on Extensions

Except in extraordinary circumstances, the AAA or the arbitrator may grant a party no more than one seven-day extension of time to respond to the demand for arbitration or counterclaim as provided in Section R-4.

E-2. Changes of Claim or Counterclaim

A claim or counterclaim may be increased in amount, or a new or different claim or counterclaim added, upon the agreement of the other party, or the consent of the arbitrator. After the arbitrator is appointed, however, no new or different claim or counterclaim may be submitted except with the arbitrator's consent. If an increased claim or counterclaim exceeds $75,000, the case will be administered under the regular procedures unless all parties and the arbitrator agree that the case may continue to be processed under the Expedited Procedures.

E-3. Serving of Notices

In addition to notice provided by Section R-39(b), the parties shall also accept notice by telephone. Telephonic notices by the AAA shall subsequently be confirmed in writing to the parties. Should there be a failure to confirm in writing any such oral notice, the proceeding shall nevertheless be valid if notice has, in fact, been given by telephone.

E-4. Appointment and Qualifications of Arbitrator

(a) The AAA shall simultaneously submit to each party an identical list of five proposed arbitrators drawn from its National Roster from which one arbitrator shall be appointed.

(b) The parties are encouraged to agree to an arbitrator from this list and to advise the AAA of their agreement. If the parties are unable to agree upon an arbitrator, each party may strike two names from the list and return it to the AAA within seven days from the date of the AAA's mailing to the parties. If for any reason the appointment of an arbitrator cannot be made from the list, the AAA may make the appointment from other members of the panel without the submission of additional lists.

(c) The parties will be given notice by the AAA of the appointment of the arbitrator, who shall be subject to disqualification for the reasons specified in Section R-17. The parties shall notify the AAA within seven days of any objection to the arbitrator appointed. Any such objection shall be for cause and shall be confirmed in writing to the AAA with a copy to the other party or parties.

E-5. Exchange of Exhibits

At least two business days prior to the hearing, the parties shall exchange copies of all exhibits they intend to submit at the hearing. The arbitrator shall resolve disputes concerning the exchange of exhibits.

E-6. Proceedings on Documents

Where no party's claim exceeds $10,000, exclusive of interest and arbitration costs, and other cases in which the parties agree, the dispute shall be resolved by submission of documents, unless any party requests an oral hearing, or the arbitrator determines that an oral hearing is necessary. The arbitrator shall establish a fair and equitable procedure for the submission of documents.

E-7. Date, Time, and Place of Hearing

In cases in which a hearing is to be held, the arbitrator shall set the date, time, and place of the hearing, to be scheduled to take place within 30 days of confirmation of the arbitrator's appointment. The AAA will notify the parties in advance of the hearing date.

E-8. The Hearing

(a) Generally, the hearing shall not exceed one day. Each party shall have equal opportunity to submit its proofs and complete its case. The arbitrator shall determine the order of the hearing, and may require further submission of documents within two days after the hearing. For good cause shown, the arbitrator may schedule additional hearings within seven business days after the initial day of hearings.

(b) Generally, there will be no stenographic record. Any party desiring a stenographic record may arrange for one pursuant to the provisions of Section R-26.

E-9. Time of Award

Unless otherwise agreed by the parties, the award shall be rendered not later than 14 days from the date of the closing of the hearing or, if oral hearings have been waived, from the date of the AAA's transmittal of the final statements and proofs to the arbitrator.

E-10. Arbitrator's Compensation

Arbitrators will receive compensation at a rate to be suggested by the AAA regional office.

PROCEDURES FOR LARGE, COMPLEX COMMERCIAL DISPUTES

L-1. Administrative Conference

Prior to the dissemination of a list of potential arbitrators, the AAA shall, unless the parties agree otherwise, conduct an administrative conference with the parties and/or their attorneys or other representatives by conference call. The conference will take place within 14 days after the commencement of the arbitration. In the event the parties are unable to agree on a mutually acceptable time for the conference, the AAA may contact the parties individually to discuss the issues contemplated

herein. Such administrative conference shall be conducted for the following purposes and for such additional purposes as the parties or the AAA may deem appropriate:

(a) to obtain additional information about the nature and magnitude of the dispute and the anticipated length of hearing and scheduling;

(b) to discuss the views of the parties about the technical and other qualifications of the arbitrators;

(c) to obtain conflicts statements from the parties; and

(d) to consider, with the parties, whether mediation or other non-adjudicative methods of dispute resolution might be appropriate.

L-2. Arbitrators

(a) Large, Complex Commercial Cases shall be heard and determined by either one or three arbitrators, as may be agreed upon by the parties. If the parties are unable to agree upon the number of arbitrators and a claim or counterclaim involves at least $1,000,000, then three arbitrator(s) shall hear and determine the case. If the parties are unable to agree on the number of arbitrators and each claim and counterclaim is less than $1,000,000, then one arbitrator shall hear and determine the case.

(b) The AAA shall appoint arbitrator(s) as agreed by the parties. If they are unable to agree on a method of appointment, the AAA shall appoint arbitrators from the Large, Complex Commercial Case Panel, in the manner provided in the Regular Commercial Arbitration Rules. Absent agreement of the parties, the arbitrator(s) shall not have served as the mediator in the mediation phase of the instant proceeding.

L-3. Preliminary Hearing

As promptly as practicable after the selection of the arbitrator(s), a preliminary hearing shall be held among the parties and/or their attorneys or other representatives and the arbitrator(s). Unless the parties agree otherwise, the preliminary hearing will be conducted by telephone conference call rather than in person. At the preliminary hearing the matters to be considered shall include, without limitation:

(a) service of a detailed statement of claims, damages and defenses, a statement of the issues asserted by each party and positions with respect thereto, and any legal authorities the parties may wish to bring to the attention of the arbitrator(s);

(b) stipulations to uncontested facts;

(c) the extent to which discovery shall be conducted;

(d) exchange and premarking of those documents which each party believes may be offered at the hearing;

(e) the identification and availability of witnesses, including experts, and such matters with respect to witnesses including their biographies and expected testimony as may be appropriate;

(f) whether, and the extent to which, any sworn statements and/or depositions may be introduced;

(g) the extent to which hearings will proceed on consecutive days;

(h) whether a stenographic or other official record of the proceedings shall be maintained;

(i) the possibility of utilizing mediation or other non-adjudicative methods of dispute resolution; and

(j) the procedure for the issuance of subpoenas.

By agreement of the parties and/or order of the arbitrator(s), the pre-hearing activities and the hearing procedures that will govern the arbitration will be memorialized in a Scheduling and Procedure Order.

L-4. Management of Proceedings

(a) Arbitrator(s) shall take such steps as they may deem necessary or desirable to avoid delay and to achieve a just, speedy and cost-effective resolution of Large, Complex Commercial Cases.

(b) Parties shall cooperate in the exchange of documents, exhibits and information within such party's control if the arbitrator(s) consider such production to be consistent with the goal of achieving a just, speedy and cost-effective resolution of a Large, Complex Commercial Case.

(c) The parties may conduct such discovery as may be agreed to by all the parties provided, however, that the arbitrator(s) may place such limitations on the conduct of such discovery as the arbitrator(s) shall deem appropriate. If the parties cannot agree on production of documents and other information, the arbitrator(s), consistent with the expedited nature of arbitration, may establish the extent of the discovery.

(d) At the discretion of the arbitrator(s), upon good cause shown and consistent with the expedited nature of arbitration, the arbitrator(s) may order depositions of, or the propounding of interrogatories to, such persons who may possess information determined by the arbitrator(s) to be necessary to determination of the matter.

(e) The parties shall exchange copies of all exhibits they intend to submit at the hearing 10 business days prior to the hearing unless the arbitrator(s) determine otherwise.

(f) The exchange of information pursuant to this rule, as agreed by the parties and/or directed by the arbitrator(s), shall be included within the Scheduling and Procedure Order.

(g) The arbitrator is authorized to resolve any disputes concerning the exchange of information.

(h) Generally hearings will be scheduled on consecutive days or in blocks of consecutive days in order to maximize efficiency and minimize costs.

OPTIONAL RULES FOR EMERGENCY MEASURES OF PROTECTION

O-1. Applicability

Where parties by special agreement or in their arbitration clause have adopted these rules for emergency measures of protection, a party in need of emergency relief prior to the constitution of the panel shall notify the AAA and all other parties in writing of the nature of the relief sought and the reasons why such relief is required on an emergency basis. The application shall also set forth the reasons why the party is entitled to such relief. Such notice may be given by facsimile transmission, or other reliable means, but must include a statement certifying that all other parties have been notified or an explanation of the steps taken in good faith to notify other parties.

O-2. Appointment of Emergency Arbitrator

Within one business day of receipt of notice as provided in Section O-1, the AAA shall appoint a single emergency arbitrator from a special AAA panel of emergency arbitrators designated to rule on emergency applications. The emergency arbitrator shall immediately disclose any circumstance likely, on the basis of the facts disclosed in the application, to affect such arbitrator's impartiality or independence. Any challenge to the appointment of the emergency arbitrator must be made within one business day of the communication by the AAA to the parties of the appointment of the emergency arbitrator and the circumstances disclosed.

O-3. Schedule

The emergency arbitrator shall as soon as possible, but in any event within two business days of appointment, establish a schedule for consideration of the application for emergency relief. Such schedule shall provide a reasonable opportunity to all parties to be heard, but may provide for proceeding by telephone conference or on written submissions as alternatives to a formal hearing.

O-4. Interim Award

If after consideration the emergency arbitrator is satisfied that the party seeking the emergency relief has shown that immediate and irreparable loss or damage will result in the absence of emergency relief, and that such party is entitled to such relief, the emergency arbitrator may enter an interim award granting the relief and stating the reasons therefore.

O-5. Constitution of the Panel

Any application to modify an interim award of emergency relief must be based on changed circumstances and may be made to the emergency arbitrator until the panel is constituted; thereafter such a request shall be addressed to the panel. The emergency arbitrator shall have no further power to act after the panel is constituted unless the parties agree that the emergency arbitrator is named as a member of the panel.

O-6. Security

Any interim award of emergency relief may be conditioned on provision by the party seeking such relief of appropriate security.

O-7. Special Master

A request for interim measures addressed by a party to a judicial authority shall not be deemed incompatible with the agreement to arbitrate or a waiver of the right to arbitrate. If the AAA is directed by a judicial authority to nominate a special master to consider and report on an application for emergency relief, the AAA shall proceed as provided in Section O-1 of this article and the references to the emergency arbitrator shall be read to mean the special master, except that the special master shall issue a report rather than an interim award.

O-8. Costs

The costs associated with applications for emergency relief shall initially be apportioned by the emergency arbitrator or special master, subject to the power of the panel to determine finally the apportionment of such costs.

ADMINISTRATIVE FEES

The administrative fees of the AAA are based on the amount of the claim or counterclaim. Arbitrator

compensation is not included in this schedule. Unless the parties agree otherwise, arbitrator compensation and administrative fees are subject to allocation by the arbitrator in the award.

In an effort to make arbitration costs reasonable for consumers, the AAA has a separate fee schedule for consumer-related disputes. Please refer to Section C-8 of the *Supplementary Procedures for Consumer-Related Disputes* when filing a consumer-related claim.

The AAA applies the *Supplementary Procedures for Consumer-Related Disputes* to arbitration clauses in agreements between individual consumers and businesses where the business has a standardized, systematic application of arbitration clauses with customers and where the terms and conditions of the purchase of standardized, consumable goods or services are non-negotiable or primarily non-negotiable in most or all of its terms, conditions, features, or choices. The product or service must be for personal or household use. The AAA will have the discretion to apply or not to apply the Supplementary Procedures and the parties will be able to bring any disputes concerning the application or non-application to the attention of the arbitrator. Consumers are not prohibited from seeking relief in a small claims court for disputes or claims within the scope of its jurisdiction, even in consumer arbitration cases filed by the business.

Fees

An initial filing fee is payable in full by a filing party when a claim, counterclaim or additional claim is filed. A case service fee will be incurred for all cases that proceed to their first hearing. This fee will be payable in advance at the time that the first hearing is scheduled. This fee will be refunded at the conclusion of the case if no hearings have occurred. However, if the Association is not notified at least 24 hours before the time of the scheduled hearing, the case service fee will remain due and will not be refunded.

These fees will be billed in accordance with the following schedule:

| Amount of Claim | Initial Filing Fee | Case Service Fee |
|---|---|---|
| Above $0 to $10,000 | $750 | $200 |
| Above $10,000 to $75,000 | $950 | $300 |
| Above $75,000 to $150,000 | $1,800 | $750 |
| Above $150,000 to $300,000 | $2,750 | $1,250 |
| Above $300,000 to $500,000 | $4,250 | $1,750 |
| Above $500,000 to $1,000,000 | $6,000 | $2,500 |
| Above $1,000,000 to $5,000,000 | $8,000 | $3,250 |
| Above $5,000,000 to $10,000,000 | $10,000 | $4,000 |
| Above $10,000,000 | * | * |
| Nonmonetary Claims** | $3,250 | $1,250 |

Fee Schedule for Claims in Excess of $10 Million .

The following is the fee schedule for use in disputes involving claims in excess of $10 million. If you have any questions, please consult your local AAA office or case management center.

| Claim Size | Fee | Case Service Fee |
|---|---|---|
| $10 million and above | Base fee of $ 12,500 plus .01% of the amount of | $6,000 |



| | claim above $ 10 million. | |
|---|---|---|
| | Filing fees capped at $65,000 | |

** This fee is applicable only when a claim or counterclaim is not for a monetary amount. Where a monetary claim amount is not known, parties will be required to state a range of claims or be subject to the highest possible filing fee.

Fees are subject to increase if the amount of a claim or counterclaim is modified after the initial filing date. Fees are subject to decrease if the amount of a claim or counterclaim is modified before the first hearing.

The minimum fees for any case having three or more arbitrators are $2,750 for the filing fee, plus a $1,250 case service fee. Expedited Procedures are applied in any case where no disclosed claim or counterclaim exceeds $75,000, exclusive of interest and arbitration costs.

Parties on cases held in abeyance for one year by agreement, will be assessed an annual abeyance fee of $300. If a party refuses to pay the assessed fee, the other party or parties may pay the entire fee on behalf of all parties, otherwise the matter will be closed.

Refund Schedule

The AAA offers a refund schedule on filing fees. For cases with claims up to $75,000, a minimum filing fee of $300 will not be refunded. For all other cases, a minimum fee of $500 will not be refunded. Subject to the minimum fee requirements, refunds will be calculated as follows:

- 100% of the filing fee, above the minimum fee, will be refunded if the case is settled or withdrawn within five calendar days of filing.
- 50% of the filing fee will be refunded if the case is settled or withdrawn between six and 30 calendar days of filing.
- 25% of the filing fee will be refunded if the case is settled or withdrawn between 31 and 60 calendar days of filing.

No refund will be made once an arbitrator has been appointed (this includes one arbitrator on a three-arbitrator panel). No refunds will be granted on awarded cases.

Note: the date of receipt of the demand for arbitration with the AAA will be used to calculate refunds of filing fees for both claims and counterclaims.

Hearing Room Rental

The fees described above do not cover the rental of hearing rooms, which are available on a rental basis. Check with the AAA for availability and rates.

© 2007 American Arbitration Association, Inc. All rights reserved. These Rules are the copyrighted property of the American Arbitration Association (AAA) and are intended to be used in conjunction with the AAA's administrative services. Any unauthorized use or modification of these Rules may violate copyright laws and other applicable laws. Please contact 800.778.7879 or websitemail@adr.org for additional information.

AAA235

- AAA MISSION & PRINCIPLES
- PRIVACY POLICY
- TERMS OF USE

- <u>TECHNICAL RECOMMENDATIONS</u>
- ©2007 AMERICAN ARBITRATION ASSOCIATION. ALL RIGHTS RESERVED

# Exhibit O

**APPENDIX OF NON-FEDERAL AND UNPUBLISHED FEDERAL AUTHORITIES
CITED IN VISA USA INC.'S MOTION TO STAY ACTION
AND TO COMPEL ARBITRATION**

Westlaw.

Williston on Contracts
Database updated November 2007

Richard A. Lord

Chapter 69. Fraud and Misrepresentation
III. Silence or Concealment As Fraud

References

§ 69:16.In general

**West's Key Number Digest**

West's Key Number Digest, Fraud⚷15 to 17

**Legal Encyclopedias**

Am. Jur. 2d, Fraud and Deceit §§ 203, 204

Am. Jur. 2d, Products Liability § 892

C.J.S., Fraud §§ 18 to 21

**Treatises and Practice Aids**

Williston on Contracts 4th—Forms § 69F:5

It was long ago said, "there is no legal obligation on the vendor to inform the purchaser that he is under a mistake, not induced by the act of the vendor."[FN37] This hoary statement of the law is still the general rule. It is settled that there is no general requirement of full disclosure of all relevant facts in every business relationship,[FN38] and consequently agreed by the majority of jurisdictions that, at least in courts of law, it is not necessarily fraudulent for one party to a bargain consciously to take advantage of the ignorance or mistake of the other party by failing to disclose material facts,[FN39] provided no words or acts of the party who failed to disclose the fact in question contribute to the mistake, and there is no duty existing between the parties that compels disclosure of the facts,[FN40] although it would seem that a gesture or even an expression of the face might be enough in such a case to constitute actionable deceit.[FN41]

It is necessary, especially where a written contract is in question of which equity might take jurisdiction, to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-05585-JSW    Document 28-3    Filed 01/04/2008    Page 60 of 85

WILLSTN-CN § 69:16                                                    Page 2
26 Williston on Contracts § 69:16 (4th ed.)

consider in connection with such cases not only whether the party who keeps silent has in effect made a fraudulent representation that will afford ground for an action of deceit as well as a right of rescission, but whether even if this is not true there is such a mistake as to justify rescission. Unilateral mistake, even apart from knowledge of the other party to the transaction of the mistake, has been held in some cases to justify relief;[FN42] and it has been held with undeniable justice that mistake by one party and knowledge of the mistake by the other will justify relief as fully as mutual mistake.[FN43]

The importance of distinguishing whether the transaction can be called fraudulent as distinguished from one based on mistake without fraud, even where no other remedy than rescission is sought, lies in the fact that fraud as to any circumstances actually inducing a bargain may justify relief,[FN44] although mistake must be as to a matter that formed a fundamental basis of the bargain.[FN45]


[FN37]

**UK:**

Smith v. Hughes, (1871) LR 6 QB 597 (an action for the price of oats; the defendant (the buyer) refused to accept the oats or pay the price because he had been under the impression when he agreed to buy the oats that they were old oats, whereas, in fact, they were new oats; the jury found that the seller believed the defendant to be under this impression; the judge at the trial directed the jury on this finding to return a verdict for the defendant; it was held by the Court of Appeals that there must be a new trial; the self-deception of the buyer did not enable him to avoid the contract even though known to the seller).


[FN38]

**Wash:**

Puget Sound Service Corp. v. Dalarna Management Corp., 51 Wash. App. 209, 752 P.2d 1353 (Div. 1 1988).


[FN39]

**Federal:**

Laidlaw v. Organ, 15 U.S. 178, 4 L. Ed. 214 (1817) (an action by the buyer of tobacco against the sellers to gain possession of it; there was evidence that before the sale that the buyer, upon being asked by one of the sellers whether there was any news calculated to enhance its value, was silent although he had received news that the seller had not of the treaty of Ghent that terminated the War of 1812).


**Cal:**

Herzog v. Capital Co., 27 Cal. 2d 349, 164 P.2d 8 (1945) (citing Restatement of Contracts § 472 (b).
Jordan v. Guerra, 23 Cal. 2d 469, 144 P.2d 349 (1943) (citing Restatement of Restitution § 8).
Heydenfeldt v. Osmont, 178 Cal. 768, 175 P. 1 (1918).
Clauser v. Taylor, 44 Cal. App. 2d 453, 112 P.2d 661 (2d Dist. 1941) (citing Restatement of Contracts § 472, Comment b).


**Conn:**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-05585-JSW    Document 28-3    Filed 01/04/2008    Page 61 of 85

WILLSTN-CN § 69:16                                                    Page 3
26 Williston on Contracts § 69:16 (4th ed.)

Haddad v. Clark, 132 Conn. 229, 43 A.2d 221 (1945) (quoting Restatement of Restitution § 8).
Gayne v. Smith, 104 Conn. 650, 134 A. 62 (1926).

**DC:**

Borzillo v. Thompson, 57 A.2d 195 (Mun. Ct. App. D.C. 1948) (citing Restatement of Contracts §§ 471(c), 472(1)(b), (2)).

**Florida:**

Columbus Hotel Corp. v. Hotel Management Co., 116 Fla. 464, 156 So. 893 (1934).

**Ill:**

Dayton v. Kidder, 105 Ill. App. 107, 1902 WL 2291 (3d Dist. 1902).

**Md:**

Fegeas v. Sherrill, 218 Md. 472, 147 A.2d 223 (1958) (failure of vendors to inform purchasers of past trouble with termites did not constitute fraudulent concealment).

**Mass:**

Lang v. Giraudo, 311 Mass. 132, 40 N.E.2d 707 (1942) (citing Restatement of Contracts § 471, Illus 1; Restatement of Restitution § 8).

**NY:**

South Shore Skate Club, Inc. v. Fatscher, 17 A.D.2d 840, 233 N.Y.S.2d 372 (2d Dep't 1962).

**Okla:**

Gutelius v. Sisemore, 1961 OK 243, 365 P.2d 732 (Okla. 1961) (the doctrine of caveat emptor applies to the sale of realty where the purchaser inspects it, and purchaser of a house who observed the location of air vents, the slope of the land, and the quality of soil that resulted in flooding the basement, could not sue the seller for fraud for his silence on the subject).

**Pa:**

William Goldstein Co. v. Joseph J. & Reynold H. Greenberg, Inc., 352 Pa. 259, 42 A.2d 551 (1945) (quoting Restatement of Contracts § 472).

**Tenn:**

Georgia Marble Co. v. Standard Tile Co., 19 Tenn. App. 258, 86 S.W.2d 429 (1935).

**Wash:**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-05585-JSW    Document 28-3    Filed 01/04/2008    Page 62 of 85

WILLSTN-CN § 69:16                                                      Page 4
26 Williston on Contracts § 69:16 (4th ed.)

Brinkerhoff v. Campbell, 99 Wash. App. 692, 994 P.2d 911 (Div. 1 2000) (a person's silence does not amount to a failure to act in good faith, as will allow silence to constitute a misrepresentation of material fact that will render contract voidable, absent an affirmative duty to disclose material facts).

[FN40]

**Federal:**

Ahern v. Scholz, 85 F.3d 774, 44 Fed. R. Evid. Serv. 687 (1st Cir. 1996).
In re Sallee, 286 F.3d 878, 2002 FED App. 0128P (6th Cir. 2002), cert. denied, 123 S. Ct. 415, 154 L. Ed. 2d 294 (U.S. 2002).
GE Life and Annuity Assur. Co. v. Barbour, 191 F. Supp. 2d 1375 (M.D. Ga. 2002) (applying Georgia law).
Lewin v. Long, 70 F. Supp. 2d 534 (D.N.J. 1999).

**La:**

Luquette v. Floyd, 147 So. 2d 894 (La. Ct. App. 3d Cir. 1962), writ refused, 244 La. 119, 150 So. 2d 585 (1963).

**Tex:**

Boyd v. Boyd, 67 S.W.3d 398 (Tex. App. Fort Worth 2002) (where a person is under a duty to disclose material information, refrains from doing so, and thereby leads another to contract in reliance on a mistaken understanding of the facts, the resulting contract is subject to rescission due to the intentional nondisclosure).
World Help v. Leisure Lifestyles, Inc., 977 S.W.2d 662 (Tex. App. Fort Worth 1998), reh'g overruled, (Sept. 24, 1998).

**Wash:**

Brinkerhoff v. Campbell, 99 Wash. App. 692, 994 P.2d 911 (Div. 1 2000).

[FN41]

**NC:**

Smith v. Beatty, 37 N.C. 456, 2 Ired. Eq. 456, 1843 WL 979 (1843) (a false denial of knowledge is unquestionably fraudulent).

**Pa:**

Sansom v. Provident Trust Co., 103 Pa. Super. 447, 157 A. 34 (1931).

[FN42] See § 70:121.

**Federal:**

Martin v. Campanaro, 156 F.2d 127 (C.C.A. 2d Cir. 1946) (citing Restatement of Contracts § 503).
Ricketts v. Pennsylvania R. Co., 153 F.2d 757, 164 A.L.R. 387 (C.C.A. 2d Cir. 1946) (citing text, and

Case 3:07-cv-05585-JSW     Document 28-3     Filed 01/04/2008     Page 63 of 85

WILLSTN-CN § 69:16                                                     Page 5
26 Williston on Contracts § 69:16 (4th ed.)

Restatement of Contracts § 503, Comment a).
U.S. v. Jones, 176 F.2d 278 (9th Cir. 1949) (citing text and Restatement of Contracts § 503.
Hume v. American-West African Line, 36 F. Supp. 880 (S.D. N.Y. 1941), judgment rev'd on other grounds, 121 F.2d 336 (C.C.A. 2d Cir. 1941) (citing Restatement of Contracts § 503).
Royal Ins. Co. v. City of Morgantown, W.Va., 98 F. Supp. 609 (N.D. W. Va. 1951) (citing Restatement of Contracts § 503; insurance contract).

**Cal:**

M. F. Kemper Const. Co. v. City of Los Angeles, 37 Cal. 2d 696, 235 P.2d 7 (1951) (citing Restatement of Contracts § 503).
Cf.: Harkins v. Fielder, 150 Cal. App. 2d 528, 310 P.2d 423 (2d Dist. 1957) (citing Palmquist v. Mercer, 43 Cal. 2d 92, 272 P.2d 26 (1954)).

**DC:**

Stern v. Ace Wrecking Co., Inc., 38 A.2d 626 (Mun. Ct. App. D.C. 1944) (citing Restatement of Contracts § 504).

**Neb:**

In re Davenport's Estate, 140 Neb. 769, 2 N.W.2d 17 (1942) (quoting Restatement of Contracts § 503).

[FN43]

**Mich:**

Barr v. Payne, 298 Mich. 85, 298 N.W. 460 (1941) (quoting text).

**Minn:**

Norris v. Cohen, 223 Minn. 471, 27 N.W.2d 277, 171 A.L.R. 178 (1947) (relying on Nadeau case, below).
Nadeau v. Maryland Cas. Co., 170 Minn. 326, 212 N.W. 595 (1927) (quoting and applying text).
cf Miller v. Pelzer, 159 Minn. 375, 199 N.W. 97, 33 A.L.R. 678 (1924).

**Tex:**

Coker v. Hughes, 307 S.W.2d 354 (Tex. Civ. App. Amarillo 1957).

[FN44]

**Cal:**

Jordan v. Guerra, 23 Cal. 2d 469, 144 P.2d 349 (1943) (citing Restatement of Restitution § 8).
Costello v. Roer, 77 Cal. App. 2d 174, 175 P.2d 65 (2d Dist. 1946) (quoting Restatement of Restitution § 8(2)).

**Fla:**

Billian v. Mobil Corp., 710 So. 2d 984 (Fla. Dist. Ct. App. 4th Dist. 1998), reh'g and reh'g en banc denied,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-05585-JSW    Document 28-3    Filed 01/04/2008    Page 64 of 85

WILLSTN-CN § 69:16                                                          Page 6
26 Williston on Contracts § 69:16 (4th ed.)

(Apr. 24, 1998).

**Iowa:**

Bales v. Massey, 241 Iowa 1084, 43 N.W.2d 671 (1950) (quoting Restatement of Restitution § 8).

**Kan:**

Rosenberger v. Livingston, 166 Kan. 259, 200 P.2d 329 (1948) (citing Restatement of Contracts § 470).
Scott v. National Reserve Life Ins. Co., 144 Kan. 224, 58 P.2d 1131 (1936) (as to material misstatement in application for insurance).

**Ky:**

Faulkner Drilling Co., Inc. v. Gross, 943 S.W.2d 634 (Ky. Ct. App. 1997) (concealment of a material fact justifies rescission; a material fact is one likely to affect the conduct of a reasonable person and be an inducement to the contract).

**La:**

Carruth v. State Farm Mut. Auto. Ins. Co., 113 So. 2d 56 (La. Ct. App. 2d Cir. 1959) (as to material misstatement of occupation in application for automobile liability insurance).

**Md:**

Clark v. Kirsner, 196 Md. 52, 74 A.2d 830 (1950) (citing text and Restatement of Contracts § 476, Comment b; in rescission, materiality of innocent misrepresentation is more essential than in instances of fraudulent misrepresentations).

**Miss:**

Penn Mut. Life Ins. Co. v. Nunnery, 176 Miss. 197, 167 So. 416 (1936).

**Neb:**

Trebelhorn v. Bartlett, 154 Neb. 113, 47 N.W.2d 374 (1951) (citing Restatement of Contracts § 470).
Pasko v. Trela, 153 Neb. 759, 46 N.W.2d 139 (1951) (quoting Restatement of Contracts § 470).

**NY:**

Ettman v. Equitable Life Assur. Soc. of U.S., 6 A.D.2d 697, 174 N.Y.S.2d 553 (2d Dep't 1958), appeal granted, 6 A.D.2d 802, 175 N.Y.S.2d 582 (2d Dep't 1958) and order aff'd, 5 N.Y.2d 1005, 185 N.Y.S.2d 262, 158 N.E.2d 124 (1959) (misrepresentation as to treatment for heart disease, held material as a matter of law).
Greenbaum v. Baywood Homes, 62 N.Y.S.2d 545 (Sup 1946), judgment aff'd, 272 A.D. 826, 72 N.Y.S.2d 267 (2d Dep't 1947), judgment aff'd, 299 N.Y. 692, 87 N.E.2d 72 (1949) (citing text and Restatement of Contracts § 476).

**Or:**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:07-cv-05585-JSW     Document 28-3     Filed 01/04/2008     Page 65 of 85

WILLSTN-CN § 69:16                                                    Page 7
26 Williston on Contracts § 69:16 (4th ed.)

Newton v. Peay, 196 Or. 76, 245 P.2d 870 (1952) (citing Restatement of Contracts § 476).
Whitehead v. Montgomery Ward & Co., 194 Or. 106, 239 P.2d 226 (1951) (citing Restatement of Contracts § 476).

**Pa:**

Lake v. Thompson, 366 Pa. 352, 77 A.2d 364 (1951) (citing Restatement of Contracts § 470).

[FN45]

**NY:**

Chinnery v. Kennosset Realty Co., 286 N.Y. 167, 36 N.E.2d 97 (1941).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

WILLSTN-CN § 69:16

END OF DOCUMENT

# Exhibit P

**APPENDIX OF NON-FEDERAL AND UNPUBLISHED FEDERAL AUTHORITIES
CITED IN VISA USA INC.'S MOTION TO STAY ACTION
AND TO COMPEL ARBITRATION**

Westlaw.

REST 2d CONTR § 161                                                        Page 1
  Restatement (Second) of Contracts § 161 (1981)

**C Restatement of the Law -- Contracts**
**Restatement (Second) of Contracts**
**Current through August 2007**

Copyright © 1981-2007 by the American Law Institut

**Chapter 7. Misrepresentation, Duress And Undue Influence**
**Topic 1. Misrepresentation**
§ 161. When Non-Disclosure Is Equivalent To An Assertion

Link to Case Citations

A person's non-disclosure of a fact known to him is equivalent to an assertion that the fact does not exist in the following cases only:
  (a) where he knows that disclosure of the fact is necessary to prevent some previous assertion from being a misrepresentation or from being fraudulent or material.

  (b) where he knows that disclosure of the fact would correct a mistake of the other party as to a basic assumption on which that party is making the contract and if non-disclosure of the fact amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing.
  (c) where he knows that disclosure of the fact would correct a mistake of the other party as to the contents or effect of a writing, evidencing or embodying an agreement in whole or in part.
  (d) where the other person is entitled to know the fact because of a relation of trust and confidence between them.

**Comment:**

  *a. Concealment distinguished.* Like concealment, non-disclosure of a fact may be equivalent to a misrepresentation. Concealment necessarily involves an element of non-disclosure, but it is the act of preventing another from learning of a fact that is significant and this act is always equivalent to a misrepresentation (§ 160). Non-disclosure without concealment is equivalent to a misrepresentation only in special situations. A party making a contract is not expected to tell all that he knows to the other party, even if he knows that the other party lacks knowledge on some aspects of the transaction. His nondisclosure, as such, has no legal effect except in the situations enumerated in this Section. He may not, of course, tell half-truths and his assertion of only some of the facts without the inclusion of such additional matters as he knows or believes to be necessary to prevent it from being misleading is itself a misrepresentation. See Comment *a* to § 159. In contrast to the rule applicable to liability in tort for misrepresentation, it is not enough, where disclosure is expected, merely to make reasonable efforts to disclose the relevant facts. Actual disclosure is required. Compare Restatement, Second, Torts § 551, Comment *d*.

  *b. Fraudulent or material.* In order to make the contract voidable under the rule stated in § 164(1), the non-disclosure must be either fraudulent or material. The notion of disclosure necessarily implies that the fact in question is known to the person expected to disclose it. But the failure to disclose the fact may be unintentional, as when one forgets to disclose a known fact, and it is then equivalent to an innocent misrepresentation. Furthermore, one is expected to disclose only such facts as he knows or has reason to know will influence the other in determining his course of action. See § 162(2). Therefore, he need not disclose facts that the ordinary person would regard as unimportant unless he knows of some peculiarity of the other person that is likely to lead him to attach importance to them. There is, however, no such requirement of materiality if it can be shown that the non-disclosure was

actually fraudulent. If a fact is intentionally withheld for the purpose of inducing action, this is equivalent to a fraudulent misrepresentation.

   *c. Failure to correct.* One who has made an assertion that is neither a fraudulent nor a material misrepresentation may subsequently acquire knowledge that bears significantly on his earlier assertion. He is expected to speak up and correct the earlier assertion in three cases. First, if his assertion was not a misrepresentation because it was true, he may later learn that it is no longer true. See Illustration 1. Second, his assertion may have been a misrepresentation but may not have been fraudulent. If this was because he believed that it was true, he may later learn that it was not true. See Illustration 2. If this was because he did not intend that it be relied upon, he may later learn that the other is about to rely on it. See Illustration 3. Third, if his assertion was a misrepresentation but was not material because he had no reason to know of the other's special characteristics that made reliance likely, he may later learn of such characteristics. If a person fails to correct his earlier assertion in these situations, the result is the same as it would have been had he had his newly acquired knowledge at the time he made the assertion. The rule stated in Clause (a), like that stated in Clause (d), extends to non-disclosure by persons who are not parties to the transaction.

**Illustrations:**

   1. A makes to B, a credit rating company, a true statement of his financial condition, intending that its substance be published to B's subscribers. B summarizes the information and transmits the summary to C, a subscriber. Shortly thereafter, A's financial condition becomes seriously impaired, but he does not disclose this to B. C makes a contract to lend money to A. A's non-disclosure is equivalent to an assertion that his financial condition is not seriously impaired, and this assertion is a misrepresentation. Whether the contract is voidable by B is determined by the rule stated in § 164.
   2. A, seeking to induce B to make a contract to buy a thoroughbred mare, tells B that the mare is in foal to a well-known stallion. Unknown to A, the mare has miscarried. A learns of the miscarriage but does not disclose it to B. B makes the contract. A's non-disclosure is equivalent to an assertion that the mare has not miscarried, and this assertion is a misrepresentation. Whether the contract is voidable by B is determined by the rule stated in § 164.
   3. A, in casual conversation with B, tells B that a tract of land owned by A contains thirty acres. A knows that it contains only twenty-nine acres but misstates its area because he does not regard the figure as important. A's statement is not fraudulent because it is not made with the intention of inducing B to buy the land (§ 162(1)). B later offers to buy the tract from A. A does not disclose its true area to B, for fear that B will not buy it, and accepts B's offer. A's non-disclosure is equivalent to a new assertion that the tract contains thirty acres, and this assertion is a fraudulent misrepresentation (§ 162(1)). Whether the contract is voidable by B is determined by the rule stated in § 164.

   *d. Known mistake as to a basic assumption.* In many situations, if one party knows that the other is mistaken as to a basic assumption, he is expected to disclose the fact that would correct the mistake. A seller of real or personal property is, for example, ordinarily expected to disclose a known latent defect of quality or title that is of such a character as would probably prevent the buyer from buying at the contract price. An owner is ordinarily expected to disclose a known error in a bid that he has received from a contractor. See Comment *e* to § 153. The mistake must be as to a basic assumption, as is also required by the rules on mistake stated in § 152 (see Illustrations 4, 5 and 6) and § 153 (see Illustrations 8 and 9). The rule stated in Clause (b), is, however, broader than these rules for mistake because it does not require a showing of a material effect on the agreed exchange and is not affected by the fact that the party seeking relief bears the risk of the mistake (§ 154). Nevertheless, a party need not correct all mistakes of the other and is expected only to act in good faith and in accordance with reasonable standards of fair dealing, as reflected in prevailing business ethics. A party may, therefore, reasonably expect the other to take normal steps to inform himself and to draw his own conclusions. If the other is indolent, inexperienced or ignorant, or if his judgment is bad or he lacks access to adequate information, his adversary is not generally expected to compensate for these deficiencies. A buyer of property, for example, is not ordinarily expected to disclose circumstances that make the property more valuable than the seller supposes. Compare Illustrations 10 and 11. In contrast to the rules stated in Clauses (a) and (d), that stated in Clause (b) is limited to non-disclosure by a party to the transaction.

Copr. © 2007 The American Law Institute.

Actual knowledge is required for the application of the rule stated in Clause (b). The case of a party who does not know but has reason to know of a mistake is governed by the rule stated in § 153(b). As to knowledge in the case of an organization, see the analogous rule in Uniform Commercial Code § 1-201(27).

**Illustrations:**

4. A, seeking to induce B to make a contract to buy land, knows that B does not know that the land has been filled with debris and covered but does not disclose this to B. B makes the contract. A's non-disclosure is equivalent to an assertion that the land has not been filled with debris and covered, and this assertion is a misrepresentation. Whether the contract is voidable by B is determined by the rule stated in § 164.

5. A, seeking to induce B to make a contract to buy A's house, knows that B does not know that the house is riddled with termites but does not disclose this to B. B makes the contract. A's non-disclosure is equivalent to an assertion that the house is not riddled with termites, and this assertion is a misrepresentation. Whether the contract is voidable by B is determined by the rule stated in § 164.

6. A, seeking to induce B to make a contract to buy a food-processing business, knows that B does not know that the health department has given repeated warnings that a necessary license will not be renewed unless expensive improvements are made but does not disclose this to B. B makes the contract. A's non-disclosure is equivalent to an assertion that no warnings have been given by the health department, and this assertion is a misrepresentation. Whether the contract is voidable by B is determined by the rule stated in § 164.

7. A, seeking to induce B to make a contract to sell land, knows that B does not know that the land has appreciably increased in value because of a proposed shopping center but does not disclose this to B. B makes the contract. Since B's mistake is not one as to a basic assumption (see Comment b to § 152 and Comment b to § 261), A's non-disclosure is not equivalent to an assertion that the value of the land has not appreciably increased, and this assertion is not a misrepresentation. The contract is not voidable by B. See Illustration 13.

8. In response to B's invitation for bids on the construction of a building according to stated specifications, A submits an offer to do the work for $150,000. A believes that this is the total of a column of figures, but he has made an error by inadvertently omitting a $5,000 item, and in fact the total is $155,000. B knows this but accepts A's bid without disclosing it. B's non-disclosure is equivalent to an assertion that no error has been made in the total, and this assertion is a misrepresentation. Whether the contract is voidable by A is determined by the rule stated in § 164. See Illustrations 1 and 2 to § 153. See also Comment a to § 167.

9. In answer to an inquiry from "J.B. Smith Company," A offers to sell goods for cash on delivery. A mistakenly believes that the offeree is John B. Smith, who has an established business of good repute, but in fact it is a business run by his son, with whom A has refused to deal because of previous disputes. The son learns of A's mistake but accepts A's offer without disclosing his identity. The son's non-disclosure is equivalent to an assertion that the business is run by the father, and this assertion is a misrepresentation. Whether the contract is voidable by A is determined by the rule stated in § 164. See Illustration 11 to § 153. See also Comment a to § 167.

10. A, seeking to induce B to make a contract to sell A land, learns from government surveys that the land contains valuable mineral deposits and knows that B does not know this, but does not disclose this to B. B makes the contract. A's non-disclosure does not amount to a failure to act in good faith and in accordance with reasonable standards of fair dealing and is therefore not equivalent to an assertion that the land does not contain valuable mineral deposits. The contract is not voidable by B.

11. The facts being otherwise as stated in Illustration 10, A learns of the valuable mineral deposits from trespassing on B's land and not from government surveys. A's non-disclosure is equivalent to an assertion that the land does not contain valuable mineral deposits, and this assertion is a misrepresentation. Whether the contract is voidable by B is determined by the rule stated in § 164.

*e. Known mistake as to a writing.* One party cannot hold the other to a writing if he knew that the other was mistaken as to its contents or as to its legal effect. He is expected to correct such mistakes of the other party and his failure to do so is equivalent to a misrepresentation, which may be grounds either for avoidance under § 164 or for reformation under § 166. (Compare the rule on reformation for mistake of both parties as to their written expression stated in § 155. See Comment a to § 155.) The failure of a party to use care in reading the writing so as to discover the mistake may not preclude such relief (§ 172). In the case of standardized agreements, these rules supplement that

Copr. © 2007 The American Law Institute.

of § 211(3), which applies, regardless of actual knowledge, if there is reason to believe that the other party would not manifest assent if he knew that the writing contained a particular term. Like the rule stated in Clause (b), that stated in Clause (c) requires actual knowledge and is limited to non-disclosure by a party to the transaction. See Comment *d*.

**Illustration:**

> 12. A, seeking to induce B to make a contract to sell a tract of land to A for $100,000, makes a written offer to B. A knows that B mistakenly thinks that the offer contains a provision under which A assumes an existing mortgage, and he knows that it does not contain such a provision but does not disclose this to B. B signs the writing, which is an integrated agreement. A's non-disclosure is equivalent to an assertion that the writing contains such a provision, and this assertion is a misrepresentation. Whether the contract is voidable by B is determined by the rule stated in § 164. Whether, at the request of B, the court will decree that the writing be reformed to add the provision for assumption is determined by the rule stated in § 166. See Illustration 4 to § 166.

> *f. Relation of trust and confidence.* The rule stated in Clause (d) supplements that stated in § 173 with respect to contracts between parties in a fiduciary relation. Where the latter rule applies, as in the case of a trustee, an agent, a guardian, or an executor or administrator, its more stringent requirements govern. Even where a party is not, strictly speaking, a fiduciary, he may stand in such a relation of trust and confidence to the other as to give the other the right to expect disclosure. Such a relationship normally exists between members of the same family and may arise, in other situations as, for example, between physician and patient. In addition, some types of contracts, such as those of suretyship or guaranty, marine insurance and joint adventure, are recognized as creating in themselves confidential relations and hence as requiring the utmost good faith and full and fair disclosure. As to contracts of suretyship, see Restatement of Security § 124.

The rule stated in Clause (d) is not limited to cases in which the non-disclosure is by a party to the transaction. In contrast, the rule stated in § 173 applies only to non-disclosure by a fiduciary who is a party. Therefore the rule stated in Clause (d) covers the residual case of a fiduciary who is not a party. As to the duty of a trustee to disclose to his beneficiary matters important for him to know in dealing with others, see Restatement, Second, Trusts § 173, Comment *d*. As to the duty of an agent to disclose to his principal matters important for him to know in dealing with others, see Restatement, Second, Agency § 381.

**Illustration:**

> 13. A, who is experienced in business, has raised B, a young man, in his household, and B has habitually followed his advice, although A is neither his parent nor his guardian. A, seeking to induce B to make a contract to sell land to A, knows that the land has appreciably increased in value because of a planned shopping center but does not disclose this to B. B makes the contract. A's non-disclosure is equivalent to an assertion that the value of the land has not appreciably increased, and this assertion is a misrepresentation. Whether the contract is voidable by B is determined by the rule stated in § 164. See Illustration 7.

### REPORTER'S NOTE

This Section is based on former §§ 471(c) and 472; cf. Restatement, Second, Torts § 551. See 12 Williston, Contracts §§ 1497-99 (3d ed.1970); Keeton, Fraud--Concealment and Non-Disclosure, 15 Tex.L.Rev. 1 (1936).

*Comment c.* See James & Gray, Misrepresentation--Part II, 37 Md.L.Rev. 488, 525-26 n. 13 (1978). Illustration 1 is based on Illustration 2 to Restatement, Second, Torts § 551. In Bursey v. Clement, 118 N.H. 412, 387 A.2d 346 (1978), a real estate contract and conveyance were held subject to rescission when, after a change in a building permit policy, a defendant failed to correct his previously accurate statement that no "no growth" legislation was planned. Illustration 2 is supported by Illustration 1 to Restatement, Second, Torts § 551. Illustration 3 is based on

Copr. © 2007 The American Law Institute.

Illustrations 1 and 3 to former § 472.

Comment d. See James & Gray, Misrepresentation--Part II, 37 Md.L.Rev. 488, 526-27 (1978); Kronman, Mistake, Disclosure, Information, and the Law of Contracts, 7 J.Leg. Studies 1 (1978). Kronman's thesis is that the right not to disclose socially useful information is a property right and that "the law tends to recognize a right of this sort where the information is the result of a deliberate and costly search and not to recognize it where the information has been casually acquired." Id. at 33. Kronman, however, does not consider whether it is relevant that the other party may lack the resources for such a "deliberate and costly search." Illustration 4 is based on Clauser v. Taylor, 44 Cal.App.2d 453, 112 P.2d 661 (1941); cf. Lawson v. Citizens & Southern Nat'l Bank, 255 S.C. 517, 180 S.E.2d 206 (1971), appeal after remand, 259 S.C. 477, 193 S.E.2d 124 (1972); Loghry v. Capel, 257 Iowa 285, 132 N.W.2d 417 (1965). Illustration 5 is based on Illustration 3 to Restatement, Second, Torts § 551; Obde v. Schlemeyer, 56 Wash.2d 449, 353 P.2d 672 (1960); cf. Weikel v. Sterns, 142 Ky. 513, 134 S.W. 908 (1911); Perkins v. Marsh, 179 Wash. 362, 37 P.2d 689 (1934). Contra: Hendrick v. Lynn, 37 Del. Ch. 402, 144 A.2d 147 (1958); Swinton v. Whitinsville Sav. Bank, 311 Mass. 677, 42 N.E.2d 808 (1942). See Annot., 22 A.L.R.3d 972 (1968). Illustration 6 is based on Peterson v. Arellono, 289 Minn. 541, 185 N.W.2d 282 (1971); cf. Musgrave v. Lucas, 193 Or. 401, 238 P.2d 780 (1951); Nader v. Allegheny Airlines, 445 F.Supp. 168, 173-76 (D.D.C.1978). Illustration 7 is based on Illustration 4 to former § 472. Illustration 8 is based on Conlan v. Sullivan, 110 Cal. 624, 42 P. 1081 (1895); Tyra v. Cheney, 129 Minn. 428, 152 N.W. 835 (1915); cf. Illustration 2 to former §472; United States v. Jones, 176 F.2d 278 (9th Cir.1949); Kemp v. United States, 38 F.Supp. 568 (D.Md.1968). Compare Illustrations 8 and 9 to Restatement of Restitution § 11. Illustration 9 is based on Boston Ice Co. v. Potter, 123 Mass. 28 (1877); Klein v. Tabatchnick, 418 F.Supp. 1368, 1375-76 (S.D.N.Y.1976); cf. Illustration 4 to former § 471. Illustration 10 is based on Caples v. Steel, 7 Or. 491 (1879); Harris v. Tyson, 24 Pa. 347 (1855); Neill v. Shamburg, 158 Pa. 263, 27 A. 992 (1893). Cf. Leitch Gold Mines v. Texas Gulf Sulphur, 1 Ont. 469 (1969); Kronman, supra at 19- 22. Illustration 11 is supported by Phillips v. Homfray, L.R. 6 Ch. Rep. 770 (1871); Keeton, Fraud-- Concealment and Non-Disclosure, 15 Tex.L.Rev. 1, 25- 26 (1936); 12 Williston, Contracts § 1498 (3d ed.1970).

Comment e. With respect to avoidance, Illustration 12 is supported by Hollywood Credit Clothing Co. v. Gibson, 188 A.2d 348 (D.C.App.1963); Bixler v. Wright, 116 Me. 133, 100 A. 467 (1917); see also Illustration 5 to former § 471. With respect to reformation, Illustration 12 is supported by Illustration 1 to former § 505; Hugo v. Erickson, 110 Neb. 602, 194 N.W. 723 (1923); Webb v. Culver, 265 Or. 467, 509 P.2d 1173 (1973); cf. Bleyer v. Veeder, 119 N.J.Eq. 398, 183 A.2d 203 (1936). On the "duty" to read, see Reporter's Note to Comment e to § 23.

Comment f. See James & Gray, Misrepresentation--Part II, 37 Md.L.Rev. 488, 524-25 (1978). Illustration 13 is based on Illustration 5 to former § 472; cf. Sellers v. Sellers, 428 P.2d 230 (Okl.1967). Compare Eaton v. Sontag, 387 A.2d 33 (Me.1978) (fifteen years' social friendship alone does not create "confidential relationship").

Case Citations

Case Citations Through December 1977, Including Cross References

Case Citations January 1978 -- June 1984

Case Citations July 1984 -- June 1989

Case Citations July 1989 -- June 1991

Case Citations July 1991 -- June 1996

Case Citations July 1996 -- June 2001

Case Citations July 2001 -- June 2006

Copr. © 2007 The American Law Institute.

Case Citations July 2006 -- April 2007

### Case Citations Through December 1977, Including Cross References:
### Cross References to

1. Digest System Key Numbers

   Contracts ☞ 94(8)

2. A.L.R. Annotation

   Fraud predicated on vendor's misrepresentation or concealment of danger or possibility of flooding or other unfavorable water conditions. 90 A.L.R.3d 568.

   Duty of vendor of real estate to give purchaser information as to termite infestation. 22 A.L.R.3d 972.

### Case Citations January 1978 -- June 1984:

No earlier citations

   **C.A.D.C.**1983. Cit. in ftn. in disc. The government brought a criminal action for wire fraud against the defendants. The defendants appealed from district court convictions. This court affirmed. In discussing the scope of wire fraud, this court stated that an employee's intentional nondisclosure of a conflict of interest did not constitute sufficient evidence of intent to defraud an employer under the wire fraud statute. There must also be a reasonably foreseeable, identifiable risk of harm to the employer caused by the nondisclosure. The court noted that civil law treatment of nondisclosure was similar in the nondisclosure was material only if it was reasonably likely to affect a party's judgment in a particular transaction. United States v. Lemire, 720 F.2d 1327, 1336, certiorari denied --- U.S. ----, 104 S.Ct. 2678, 81 L.Ed.2d 874 (1984).

   **S.D.Tex.**1983. Com. (a) cit. in ftn. in disc. A defendant moved to dismiss her indictment on the grounds that it violated the federal government's agreement with a codefendant not to prosecute her. The government argued, inter alia, that it was induced to enter the agreement by fraud and duress. The court recognized that fraud, which it defined as false assertions made explicitly or implicitly, was grounds for avoiding a contract if it induced a party to enter the agreement. However, the court found no untruthfulness in the codefendant's preagreement statements to the government. Nor could the government avoid performance on the grounds of unintentional concealment of a material fact absent proof that the codefendant knew of the allegedly withheld fact. A contract was voidable if the parties made a mutual mistake about a material fact, but the government by its actions bore the risk of the mistake. Since the agreement was found voidable for duress, however, the motion was denied. United States v. McBride, 571 F.Supp. 596, 609.

   **Cal.App.**1983. Cit. in disc., subsec. (b) cit. in disc. A purchaser of a house sued a vendor and his real estate agents, seeking rescission of the contract of sale and damages. The lower court granted the vendor's and the real estate agents' demurrer to the purchaser's first amended complaint for failure to state a cause of action, and the purchaser appealed. This court held that the purchaser stated a cause of action where the vendor and real estate agents failed to disclose the fact that the house was the site of a decade-old multiple murder, a material fact which, it was alleged, decreased the value of the house at the time of sale. Accordingly, the judgment granting the demurrer was reversed. Reed v. King, 145 Cal.App.3d 261, 193 Cal.Rptr. 130, 131, 132.

   **Conn.**1983. Cit. in disc. The plaintiffs brought an action for damages resulting from fraudulent misrepresentations claimed to have been made when they purchased the defendant's interests in certain corporations. The defendant filed a counterclaim based on the plaintiffs' refusal to pay the balance due on a promissory note given to him at the time of the purchase and also his share as a beneficiary in a profit sharing plan of one of the

Copr. © 2007 The American Law Institute.

REST 2d CONTR § 161                                                                  Page 7
  Restatement (Second) of Contracts § 161 (1981)

corporations. The trial court rendered judgment for the defendant on the complaint as well as on the counterclaim. The state found no error in the appeal, but found error in the cross appeal in the trial court's refusal to award the defendant attorney's fees on his counterclaim. The defendant breached his fiduciary duty to the plaintiffs by failing to disclose the existence of a bank account into which he diverted corporate funds while entering a settlement agreement with the plaintiffs under which the defendant sold his interest in the corporations. The plaintiffs did not assume the risk of mistake, as they had no idea that the defendant had diverted corporate money to his own use in an entirely separate and concealed account. The plaintiffs' misjudgment in relying upon the defendant's fulfillment of his legal duty as fiduciary and an the financial books of the corporation was not so extreme as to amount to a failure to act in good faith and in accordance with reasonable standards of fair dealing. A settlement agreement and general release could not shield the defendant from liability for failing to disclose information regarding to the concealed bank account. However, the plaintiffs were precluded from relief for the defendant's misrepresentation because they chose to seek damages under the agreement for the nondisclosure rather than rescission of the agreement, and they could not prove that the terms of the settlement would have been different had they known of the nondisclosure. Pacelli Bros. Transp., Inc. v. Pacelli, 189 Conn. 401, 456 A.2d 325, 328.

   **Mass.App.**1982. Com. (b) cit. in disc. The plaintiff buyer brought an action against the defendant seller and the defendant broker, alleging that they had induced him to buy the seller's property by representing that there were no existing state building code violations affecting the building when, in fact, there were. The plaintiff sought damages as well as rescission of the sale. The seller counterclaimed for monies owed by the plaintiff on his second mortgage promissory note. The trial judge found that neither defendant had deceived the plaintiff, and entered a judgment in their favor. In affirming, this court noted that there was authority for the proposition that a material misrepresentation made by one who was not a party to the transaction to one who was a party could render the contract voidable. However, such relief was unavailable where the other party to the contract, the seller here, in good faith and without reason to know of the misrepresentation either gave value or relied materially on the transaction. Further, the purchase and sale agreement between the parties was silent on the topic of building code violations and thus made no mention of who would bear the risk of any mistake concerning them. It could not be said that the building code violations had a material effect on the agreed exchange between the parties. The court saw no justification for allocating the risk of the sale to the defendants by allowing the plaintiff to rescind. Lawton v. Dracousis, 14 Mass.App.Ct. 164, 437 N.E.2d 543, 547, review denied 387 Mass. 1103, 440 N.E.2d 1177 (1982).

   **Mo.App.**1983. Subsec. (d) and com. (f) cit. in ftn. in sup. An attorney and a banker who had served as consultants for a closely held corporation brought an action for declaratory judgment to determine whether the corporation had the right to purchase their shares in the corporation under the terms of a shareholder's agreement. The trial court entered judgment for the plaintiffs, concluding that neither had been an employee of the corporation within the meaning of the shareholder's agreement, which allowed the corporation to purchase the shares of the terminated employees. After the banker died, the corporation appealed the judgment for the attorney, and this court reversed. The court noted that the prior decision amounted to an adjudication that the meaning of the term employment was manifest from the term itself, and held that the lower court's decision on that issue was against the weight of the evidence and based on erroneous conclusions of law. Finding that the shareholder's agreement contained no definition of the term, the court indicated that the trial court erred in interpreting it as a word of art, instead of one of common usage with a meaning variable according to the purpose of the document. Interpreting the word itself, the court found that the term "under employment" referred to a shareholder actively engaged in the affairs of the corporation, described all minority shareholders, and was therefore applicable to the attorney appellee. Shaffer v. Terrydale Management Corp., 648 S.W.2d 595, 607.

   **N.Y.Sup.Ct.App.Div.**1982. Com. (f) quot. in part in disc. The plaintiff and her husband agreed to lend the defendant $20,000, payable within six months at a rate of 12 percent interest per annum. After three years, the defendant had repaid $2,500. The plaintiff, now divorced and holding the promissory note as part of her divorce settlement, demanded payment from the defendant. Instead of paying, the defendant drew a new promissory note providing for payment of $17,500 at 12 percent interest per year. The plaintiff took the note without looking at it. No payments were made on the indebtedness. When the plaintiff brought suit, the defendant raised the defense of usury. The lower court granted judgment for the plaintiff, finding that the defense had not been established. This court affirmed, stating that the peculiar facts of the required that the defendant be estopped from asserting the defense.

Copr. © 2007 The American Law Institute.

The defendant was active in borrowing and lending money had was familiar with the usury laws. He was a close friend of the plaintiff and her husband. The defendant drew the note and fixed the rate of interest. Although the defendant was aware of the legal rate of interest, he did not tell the plaintiff that the note was usurious. Due to the close personal relationship between the parties, and the defendant's superior knowledge, he had a duty to disclose that fact. Hammond v. Marrano, 88 A.D.2d 758, 451 N.Y.S.2d 484, 486, appeal granted 57 N.Y.2d 608, 455 N.Y.S.2d 1027, 442 N.E.2d 70 (1982).

     The following cases have cited or referred to § 303 of the Tentative Drafts. This is now s 161 of the Official Draft.

    **D.D.C.**1980. Cit. in disc. The action was commenced by a home owner challenging the validity of a promissory note and deed of trust on her home. The court voided the promissory note and deed of trust and permanently enjoined the defendants from exercising their power to foreclose. The court concluded that the defendant's actions in the negotiation and execution of the loan documents contained all of the elements necessary to render a contract void for fraud or misrepresentation. The defendants, through affirmative statements and material omissions, had made statements not in accord with the facts regarding essential terms of the proposed contract (failure to disclose brokerage fees and failure to disclose the significance of designating the loan as one for business purposes), reasonably inducing apparent assent (her signature) by one who neither knew nor had reasonable opportunity to know what these essential terms were (plaintiff was faced with the option of immediately signing the documents or losing her home in foreclosure). Greene v. Gibraltar Mortgage Inv. Corp., 488 F.Supp. 177, 180.

    **Alaska,** 1981. Quot. in part in ftn. and com. (e) quot. in part in ftn. After a nightclub owner fired a performing band, the plaintiff band brought an action against the defendant nightclub owner for the payment due under the parties' written contract. On motion for partial summary judgment, the trial court entered judgment in favor of the band on the basis of the written contract. The appellate court affirmed, and the defendant again appealed. On appeal, the defendant argued, inter alia, that the doctrine of promissory estoppel applied to the instant case. The court noted that the doctrine of promissory estoppel is a principle applicable to situations where a promise unsupported by consideration is sought to be enforced; thus, the principle had no relevance to the case at bar. The defendant also argued that the lower court should have admitted his proffered parol evidence regarding an antecedent oral agreement that the contract engaging the band to perform at the nightclub could be terminated on two weeks' notice if the band didn't draw well as the addition of a consistent term to the contract. On this issue, the court noted that a binding agreement supersedes inconsistent terms of prior agreements. The court held that the oral agreement proffered by the defendant was inconsistent with the unambiguous terms of the written contract and was therefore inadmissible. Finally, the defendant argued that the parol evidence was admissible to show the band's fraud in inducing the defendant to enter the written contract. The court noted that the parol evidence was admissible on this ground even if the contract were to be viewed as fully integrated. However, the court noted that a party seeking to avoid enforcement of a contract on the ground of fraud must show, inter alia, that the fraud induced the recipient to make the contract. The court found that in the instant case, there was no evidence from which it could be inferred that the parol statements induced the defendant to enter into the contract. Accordingly, the judgment below was affirmed. Johnson v. Curran, 633 P.2d 994, 998.

    **Wis.**1980. Cit. in sup. A bank brought an action against a surety to recover the balance due on a debtor's promissory note. When the surety had initially contacted the bank to inquire about the debtor's credit record he was told that her credit was good and that a third mortgage on the debtor's property would accompany the loan. The surety was also told that the proceeds from this loan would be used to improve the debtor's property when in fact the proceeds would be used to pay a prior loan. In addition, the debtor's credit history was actually cloudy and the bank later withdrew the mortgage requirement without notifying the surety. The trial court submitted the case to the jury on a tort theory of misrepresentation and instructed the jury on comparative negligence. The surety was found to be 67% negligent. The intermediate court reversed the trial court and held that the bank was strictly liable for its misrepresentations. On appeal, this court stated that the case was submitted to the jury on an improper theory of law. The court discussed the relationship between contract and tort actions for misrepresentation. The court found that this was a suit to recover on a contract and the surety's defense was based upon an attempt to avoid the contract rather than an assertion of damages. Therefore, this court held that the principles of contract and suretyship law

Copr. © 2007 The American Law Institute.

REST 2d CONTR § 161                                                    Page 9
  Restatement (Second) of Contracts § 161 (1981)

would apply rather than tort law. The court stated that the issue was under what circumstances would a contractual surety obligation be rendered voidable based upon the material misrepresentation or nondisclosure of a creditor. The court stated that two types of misrepresentations were alleged in this case. The first involved whether the nondisclosure of material facts, known to the creditor, would be sufficient to avoid the surety's contract. The court stated that a surety has a valid defense if the creditor knows facts that materially increase the risk beyond that which the creditor has reason to believe the surety intends to assume, and the creditor knows that the surety does not know these facts and has an opportunity to inform the surety. The court held that the degree of knowledge possessed by the surety and the materiality of the undisclosed facts are questions for the jury. The court stated that the bank could not use the privacy interests of its customers as a shield to protect itself from the legal duty of disclosing material facts to the surety. The court held that the bank's nondisclosure in this case could form the basis of a misrepresentation sufficient to avoid the surety's contract. The court then discussed the situation where a creditor makes a false, affirmative statement to the surety regarding the risk of entering into the contract. The court stated that the general rule for rescission in this situation was that if a party to a contract is induced, by means of a fraudulent or material misrepresentation made by another party to the contract, the contract is voidable if the recipient justifiably relied upon that misrepresentation. The court noted that if there was an actual fraud in this case then there would not be a requirement that the misrepresentation be material. The court held that there are two separate standards for determining the materiality of a misrepresentation: whether the reasonable man would be induced to enter into the contract on the basis of the misrepresentation and whether the maker of the false statement knew of special circumstances which would induce the recipient to enter into the contract. The court held that the surety's failure to discover the facts behind the misrepresentation would not make his reliance unjustified unless he acted in bad faith or his conduct did not conform to the reasonable standards of fair dealing. The court found that the issue, whether the bank's nondisclosure of the debtor's credit history was significant enough to avoid the contract, was a question for the jury. The court also found that whether the bank's misrepresentation as to the existence of the third mortgage was material, was also a question for the jury. One factor which would affect this determination of materiality would be the misrepresentation as to the purpose and use of the loan proceeds. The court found that the status quo could not be restored by granting rescission in this case. The court held that because the trial had proceeded on an improper theory, the issues were not fully tried. The intermediate court's decision was reversed and the cause was remanded for a new trial. First Nat. Bank & Trust Co. v. Notte, 97 Wis.2d 207, 293 N.W.2d 530, 537.

### Case Citations July 1984 -- June 1989:

**C.A.5,** 1985. Cit. in disc. §§ 159-164. The owner of a damaged vessel, who claimed that he had been fraudulently induced to sign a contract with a salvage company, sued to have the contract declared invalid. This court affirmed the district court's judgment for the owner. It held that the owner did not ratify the contract, since he did not delay in seeking to rescind the contract and did not demonstrate any intent to ratify the salvage contract. Black Gold Marine, Inc. v. Jackson Marine Co., 759 F.2d 466, 470, rehearing denied 765 F.2d 1120 (5th Cir.1985).

**C.A.D.C.**1985. Cit. in disc., cit. in ftn., com. (a) cit. in ftn. A borrower sued a bank for damages after the bank rescinded a loan agreement at the last moment. The loan was to have been used for the redemption of the borrower's home, which had been sold at a tax sale. The bank defended and moved for summary judgment on the ground that the borrower had made innocent material representations in his loan application that justified the bank's avoidance of the contract. The trial court granted the bank's motion for summary judgment, and the borrower appealed. Reversing and remanding, this court held that the trial court had failed to apply the correct legal test for determining when an innocent material misrepresentation permitted the rescission of a contract. According to the court, the trial court had not considered the legal distinctions between assertions of fact and nondisclosure and between assertions of fact and statements of opinion and had neglected to investigate whether the bank had actually relied on the representations in deciding to make the loan; whether that reliance, if it existed, was justifiable; and whether the bank had relied to its detriment. Barrer v. Women's Nat. Bank, 761 F.2d 752, 758.

**U.S.Cl.Ct.**1988. Cit. in sup. §§ 160-164. A not-for-profit cooperative association of rural electric systems made an $8 million debt service payment to a government lending agency on behalf of one of its member cooperatives in reliance on an agreement with the Rural Electrification Administration (REA) that it would provide a lien accommodation in favor of the association to secure a $53 million loan to the member. The REA refused to secure the smaller loan, asserting that the lien accommodation was predicated on the member's obtaining approval for a

Copr. © 2007 The American Law Institute.

loan from the association in the full amount, and that this condition had not been met because the necessary state regulatory agency's borrowing approval had not been obtained. The association sued the government for restitution of the $8 million, alleging breach of contract by the REA and, alternatively, seeking rescission and restitution. This court granted the defendant's motion for summary judgment, holding that the failure of conditions precedent released the REA from any contractual obligations, and that there was no evidence to support the plaintiff's claim of fraudulent inducement where the record revealed no misrepresentations by the REA regarding the terms and conditions for a lien accommodation. National Rural Util. Co-op. Finance Corp. v. U.S., 14 Cl.Ct. 130, 142.

**D.Del.**1985. Cit. in sup., cit. in disc. §§ 159-164. The purchasers of a residential development sued the sellers for rescission or reformation of a contract on grounds of misrepresentation and mutual mistake after the sellers sold the property without a required governmental approval, causing the purchasers to lose 38 of the purchased lots. Both parties moved for summary judgment. The court denied both motions, holding that issues of material fact precluded summary judgment. The court stated that a material representation, innocently made, but nevertheless false, renders a contract voidable when one of the parties justifiably relies on the misstatement in making the contract. The court also reasoned that seeking rescission based on misrepresentation through nondisclosure is inconsistent with seeking rescission on the basis of mutual mistake. Shore Builders, Inc. v. Dogwood, Inc., 616 F.Supp. 1004, 1012, 1014.

**D.N.M.**1988. Cit. in disc. §§ 159-161 and §§ 159-164. Past and present telephone company customers who had contracted for inside wire maintenance service (IWMS) sued the company, alleging that the company monopolized the IWMS and that the contracts were void or voidable under state contract law. The court granted the plaintiffs' motion for certification as a plaintiff class, and denied the defendant's motion for dismissal of the plaintiffs' pendent state law claim. Regarding the contracts claim, the court found that there was no clearly established or plainly contradictory law in the other states in the proposed class that conflicted with the relevant law of the forum state of New Mexico; therefore application of the contract law from the Restatement, relied on by the parties, would not violate the due process clause or the full faith and credit clause of the Constitution. Sollenbarger v. Mountain States Tel. and Tel. Co., 121 F.R.D. 417, 421, 428, 434.

**S.D.N.Y.**1987. Subsec. (b) quot. in sup. A foreign country borrowed money to finance the construction of an electric power plant. After it defaulted on a loan payment, guarantor banks that paid the full amount of the loan sued the country for repayment. The court denied the plaintiffs' motion for summary judgment, holding that the defendant had raised a triable issue by asserting that the plaintiffs fraudulently omitted to advise the defendant that the project could never be self-financing. The court said that a person's nondisclosure of a fact known to him was equivalent to an assertion that the fact did not exist; a half-truth could actually be regarded as crossing the line from nondisclosure to an active false assertion of fact. Morgan Guar. Trust Co. of N.Y. v. Republic of Palau, 657 F.Supp. 1475, 1483.

**S.D.N.Y.**1988. Subsec. (b) quot. in disc. Several banking institutions sought to recover from a foreign state over $40 million they paid out as guarantors after the foreign state defaulted on its repayment of loans for the construction of a power plant. This court entered judgment for the plaintiffs, holding that the defendant had contractually waived its right of sovereign immunity; that British law, as specified in the choice-of-laws clause in the parties' recourse agreement, was applicable where there was no evidence that the clause was consented to as a result of fraud or misrepresentation; that under British law the plaintiffs were entitled to recover because defendant failed to prove any mistake or reliance on an alleged misrepresentation that would invalidate the recourse agreement; and that, since there was no evidence of an agency relationship between the plaintiffs and the project's contractor, any misrepresentation made by the contractor was not attributable to the plaintiffs. Morgan Guar. Trust Co. of N.Y. v. Rep. of Palau, 693 F.Supp. 1479, 1496.

**S.D.N.Y.**1988. Cit. in ftn. An investor sued a stock brokerage firm and a stock broker, alleging that he was fraudulently induced to agree to arbitrate all claims arising out of his account with the stock broker when the broker told him to sign a document without reading a margin agreement that contained an arbitration clause. Although a jury found for the plaintiff, this court granted the broker's motion for judgment n.o.v., holding that there was no evidence to support the jury's verdict on the issues of falsity, materiality, and justifiable reliance, and that the plaintiff failed to establish a prima facie case of fraudulent inducement with respect to the arbitration agreement.

Copr. © 2007 The American Law Institute.

The court said that, for the plaintiff to establish that the broker had made fraudulent misstatements about the margin agreement, the plaintiff must show that the broker did not have the confidence that he stated or implied in the truth of his statements or that the broker knew that he did not have the basis that he stated or implied for the assertion. Rush v. Oppenheimer & Co., Inc., 681 F.Supp. 1045, 1048.

**Ariz.App.1986.** Cit. in sup., com. (d) quot. in disc. Buyers sued to rescind an agreement to purchase a residence, alleging that the sellers had made misrepresentations by failing to disclose the existence of termite infestation and damage in the residence. The trial court dismissed the misrepresentation claim and granted summary judgment for the defendants on the concealment claim. Reversing, this court held that the sellers had a duty to disclose to the buyer the existence of termite damage in a residential dwelling which was known to the sellers, but not to the buyer, and which materially affected the value of the property. The court reasoned that disclosure of the termite damage was necessary because it was a material fact that could influence a buyer's decision to purchase, and because nondisclosure was equivalent to the assertion that damage which affected the value of the property did not exist. Hill v. Jones, 151 Ariz. 81, 725 P.2d 1115, 1118, 1120.

**Ariz.App.1988.** Com. (d) cit. in disc. A cattle ranch operator leased grazing land from a land company; the lease reserved to the lessor the right to sell the land and to cancel the lease on 30 days' notice. After an adjoining rancher purchased the leased property, the vendor gave notice of the lease cancellation to the lessee. The lessee sued the purchaser and the vendor, alleging that the purchaser had fraudulently induced the sale and that the vendor breached the lease because the lessee had an implied right of first refusal. The trial court granted the defendants' motions for summary judgment. Affirming, this court held that there was no evidence that the purchaser had acted improperly or with an improper motive to cause a breach of the lease, or that he wrongfully interfered with the plaintiff's business relationships or contractual rights. The court examined the purchaser's conduct and motive and found no evidence that he acted illegally or inequitably; therefore summary judgment was properly granted. Bar J Bar Cattle Co., Inc. v. Pace, 158 Ariz. 481, 763 P.2d 545, 548.

**Iowa, 1985.** Subsec. (b) quot. in sup. A bank refused to honor a cashier's check that it had made out to the plaintiff. The plaintiff had obtained the cashier's check by cashing a personal check from a third party whom the plaintiff had known lacked sufficient funds to cover the personal check. The plaintiff brought this action for the amount of the check and for compensatory and punitive damages. The jury found for the plaintiff against the bank, and this appeal followed. Affirming, this court noted the bank's contention that it could defend against its own cashier's check on the ground of fraud by the check's holder. The court noted that, although nondisclosure of a fact known to a person normally is not equivalent to an assertion that the fact does not exist, nondisclosure does constitute such an assertion by the person when he knows that disclosure of the fact would correct a mistake of the other party as to a basic assumption on which the party is making the contract and if nondisclosure amounts to a failure to act in good faith. Bossuyt v. Osage Farmers Nat. Bank, 360 N.W.2d 769, 774.

**Mass.App.1988.** Subsec. (c) cit. but dist. A deed conveyed more of the seller's land than the parties had previously agreed to convey. The buyer noted the discrepancy at the closing, and since the seller himself was not present, the seller's attorney agreed to the modification of the original agreement. The seller sued to reform the deed. The trial court denied relief. Reversing, this court held that the seller was entitled to reformation of the deed. The court stated that when one party to a contract was mistaken about a basic assumption that had a substantial adverse effect on that party's duties in the contract, while the other party had reason to know of the mistake, equitable relief was available. The court also stated that the attorney was not authorized to act as the agent of the seller at the closing, and therefore his assent to the modification of the agreement was not binding on the seller. Torrao v. Cox, 26 Mass.App.Ct. 247, 525 N.E.2d 1349, 1352.

**N.J.Super.1985.** Cit. in disc. A lessee sued the lessor for breach of contract, and the lessor counterclaimed for breach of the lease. At issue was the nonperformance by the lessee of a condition precedent in a commercial lease agreement, allegedly caused by the lessor's bad faith failure to disclose a material fact. The trial court granted summary judgment for the lessor, holding that the lessee had failed to sufficiently raise the issue of the lessor's bad faith. Reversing and remanding, this court held that, although the lessee had not fulfilled the condition precedent,

Copr. © 2007 The American Law Institute.

there was evidence that the lessor had failed to disclose a material fact; thus, summary judgment was improper because the condition could have been excused. The court stated that to establish bad faith, an express misrepresentation did not have to be shown; the requirement could be met by evidence of nondisclosure of a material fact. Allstate Redevelopment v. Summit Assoc., 206 N.J.Super. 318, 502 A.2d 1137, 1141.

**Va.**1988. Cit. in disc. A grantor conveyed property to the grantees, reserving a parking easement. The grantees filed a bill praying that the easement be removed due to mistake and fraud, and the grantor filed a cross-bill, alleging fraud and undue influence, and demanded rescission of the deed. The trial court ordered rescission of the deed, and this court affirmed, holding that the grantees had a duty to disclose the true contents and effect of the deed before the grantor signed it, and that the nondisclosure was the equivalent of a fraudulent assertion of a material fact, knowingly made with intent to mislead. The court stated that a contracting party's willful nondisclosure of a material fact that he knows is unknown to the other party may evince an intent to practice actual fraud. Spence v. Griffin, 236 Va.21, 372 S.E.2d 595, 599.

**Wash.App.**1985. Subsec. (b) quot. in disc. Purchasers of residential property sued the sellers for fraud, misrepresentation, and breach of an express warranty in connection with the sellers' failure to disclose a defect in the water system. The trial court dismissed the complaint, awarding attorney's fees to the sellers, and the purchasers appealed, contending that the sellers had a duty to disclose the unusual water piping arrangements and that failure to do so amounted to a material misrepresentation rendering the sellers liable for damages. This court affirmed, holding that the defect complained of was not a material defect substantially and adversely affecting the value and usefulness of the property. The court reasoned that the duty to disclose arises in such cases only when the undisclosed fact substantially and adversely affects the value of the property or operates to materially impair or defeat the purpose of the transaction. The court remanded as to the issue of attorney's fees. Mitchell v. Straith, 40 Wash.App. 405, 698 P.2d 609, 613.

**Wash.App.**1985. Coms. (a) and (b) cit. in disc. Franchisees sued the franchisor for negligent misrepresentation. The franchisees, who had purchased and then sold at a loss a yogurt franchise, charged that the franchisors had misrepresented the yogurt mix as a unique formula. Although the franchisor and the company that had developed the mix had treated the formula as a trade secret, they also had sold the mix to other customers. The trial court held that there was no misrepresentation and awarded the franchisor court costs and attorney's fees. Affirming, this court disagreed with the franchisee's contention that the franchisor should have disclosed the fact that the mix had been sold to other customers. The court concluded that a vendor was required to disclose only facts that it could reasonably assume were material to the transaction and held that the evidence supported the representation that the yogurt was unique. Morris v. International Yogurt Co., 41 Wash.App. 226, 703 P.2d 318, 320.

### Case Citations July 1989 -- June 1991:

**S.D.N.Y.**1990. Cit. in disc. Several banks that held the promissory notes of investors in a company sued the surety for payment of the defaulted notes, while the surety moved for an enforcement of its rights to recover from the defaulting investors. The court granted the banks' motions for partial summary judgment and denied the surety's motion for quia timet or exoneration relief, holding, inter alia, that under the terms of the bonds the surety had waived defenses to the payment of the notes, and that even if the waiver-of-defenses provisions in the surety bonds were void, the investors did not have valid defenses to payment of their notes; therefore, the surety was obligated on their behalf to make payment to the banks. The court specifically rejected the investors' defense of fraudulent inducement by the banks, stating that the banks did not have a duty to disclose information regarding "pooling" of funds and that no fiduciary duty existed between the banks and the investors. In re Gas Reclamation, Inc. Securities Litigation, 741 F.Supp. 1094, 1104, dismissed 924 F.2d 448 (2d Cir.1991).

**S.D.N.Y.**1990. Quot. in disc, subsec. (d) cit. in disc. The petitioner entered into a contract with the respondent whereby the petitioner was to manage offshore supply vessels purchased by the respondent. The respondent rescinded the contract upon learning that one of the petitioner's officers, who was supervising the refurbishing of the vessels, had previously been convicted of bank fraud. Upon the petitioner's demand for arbitration, a majority of an arbitration panel found for the petitioner, concluding that the nondisclosure of the criminal record did not justify

rescission. The petitioner moved to confirm the award, and the respondent filed a cross-motion to stay or vacate the award. This court granted the petition to confirm the award, holding that the nondisclosure was made without the kind of knowledge necessary to render it the equivalent of a misrepresentation. The court said that the respondent was not entitled to relief because it failed to show harm from reliance given the officer's offer to resign his position with the petitioner. U.S. Offshore, Inc. v. Seabulk Offshore, Ltd., 753 F.Supp. 86, 90.

    **Colo.App.**1990. Subsec. (d), com. (f) cit. in disc. In a suit by a bank for foreclosure under a deed of trust, the borrower counterclaimed, inter alia, for breach of fiduciary duty. The borrower was allowed to add as a counterclaim defendant an adviser to a real estate sale, alleging that because of his special trust in the advisor's opinions and business acumen developed over 20 years of business dealings and social friendship, he had relied on the advisor's assessment of the real estate deal and had been induced to pursue a less attractive offer. The jury was instructed that a fiduciary duty may arise from a business or confidential relationship in which one party is induced to relax the care and vigilance it would have ordinarily exercised. This court reversed and vacated the trial court's judgment on the jury verdict against the advisor for breach of fiduciary duty, holding that judgment was precluded by the jury's inconsistent findings on other related claims. The court concluded that the instructions had equated fiduciary duty with a confidential relationship, and had erroneously advised the jury that, if the borrower trusted the advisor, it could find a breach of duty without considering how and if a confidential relationship had indeed arisen and determining the scope of any duty created. First Nat. Bank of Meeker v. Theos, 794 P.2d 1055, 1061.

    **Tex.App.**1989. Subsec. (c) cit. in disc. A couple purchased several tracts of land from a bank. The buyers were familiar with the land and, at closing, became aware that the deed contained additional tracts of land not bargained for. The buyers did not bring the mistake to the attention of bank officials. Subsequently, the bank discovered its mistake and sued the buyers, seeking to reform the deed. The trial court ruled for the bank. Affirming, this court held that the bank's mistake, combined with the buyers' concealment of their awareness of the mistake, amounted to a mutual mistake--a valid ground for reformation. The court noted that, while the buyers' conduct did not rise to the level of fraud, their unjust enrichment coupled with concealment was inequitable enough to justify reformation. Hamberlin v. Longview Bank & Trust Co., 770 S.W.2d 12, 14.

    **Wis.**1980. Cit. in disc. (citing § 303, T.D. No. 11, 1976, which is now s 161 of the Official Draft). A bank sued a surety to recover the balance owing on a consumer installment note and chattel security agreement, plus interest and costs. The defendant was a gratuitous cosigner for the principal debtor, who defaulted on the obligation and later filed for bankruptcy. After instructing the jury on theories of negligent and intentional misrepresentation and comparative negligence, the trial court entered judgment on a verdict for the bank. The intermediate appellate court reversed and granted the surety rescission. This court reversed and remanded for a new trial, noting that contract rather than tort law was appropriate. The court held the bank had a duty to make disclosure to the surety if the bank knew of facts that materially increased the risk beyond that which the bank had reason to believe the surety intended to assume, and the bank had a reasonable opportunity to communicate them to the surety; failure to disclose under these circumstances would be a defense to the surety obligation. Moreover, the contract would be voidable if the surety justifiably relied on any fraudulent or material misrepresentations made by the bank to obtain the surety's assent. First Nat. Bank & Trust Co., etc. v. Notte, 97 Wis.2d 207, 293 N.W.2d 530, 537.

### Case Citations July 1991 -- June 1996:

    **C.A.1**, 1993. Quot. in disc. Borrowers sued the Federal Deposit Insurance Corporation, as receiver of a failed bank, to recover damages and to enjoin it from collecting on promissory notes issued to them by the bank, alleging that the bank failed to disclose that the project for which the loans were made was subject to a notice of responsibility requiring the removal of hazardous waste from the property. Affirming the district court's dismissal of the case, this court held that since plaintiffs' misrepresentation claim based on nondisclosure, as much as one based on an affirmative assertion, was tantamount to a challenge to the truthfulness of the bank's warranty that the project was free of any notices of responsibility and thus was analogous to a breach of warranty claim, it was barred by a federal statute making invalid all agreements, including warranties, that tended to diminish the interest of defendant in any asset it acquired unless certain requirements were met. McCullough v. F.D.I.C., 987 F.2d 870, 873.

Copr. © 2007 The American Law Institute.

**C.A.3**, 1992. Cit. in sup., quot. in ftn. An employee who was promoted for performing well in his former position and then discharged from the job to which he was promoted sued his Chapter 11 debtor employer for compensation in accordance with his new employment contract. The bankruptcy court ruled for the defendant, finding that the plaintiff breached the new contract by performing negligently under the earlier employment agreement, and the district court affirmed. Vacating and remanding, this court held that more findings were necessary to determine whether the new contract was entered into by fraud or mistake. The court said that if the plaintiff concealed from the defendant his poor performance in his former position and the defendant promoted him on the basis of his reputation as a good performer, then the contract was induced by fraud or misrepresentation and was voidable. The court also said that the contract might be voidable under a theory of unilateral mistake if the defendant promoted the plaintiff in ignorance of the plaintiff's failure to perform well in his former position. In re Allegheny Intern., Inc., 954 F.2d 167, 178.

**C.A.7**, 1991. Com. (d) cit. in disc. A lessee sued a lessor for breach of lease after the lessor refused to finance improvements. The district court granted summary judgment to the lessor, on the ground that the failure of the lessee to mention its entitlement under the lease to purchase the property if financing negotiations broke down prevented proper negotiations and violated a duty of good faith. Reversing and remanding, this court held that genuine issues of material fact existed as to whether the lessee acted in bad faith in dealing with the lessor. The court said that, although Wisconsin law read into every contract a duty of good faith, it noted that there were situations in which a party might take advantage of another's ignorance without incurring liability. Market Street Associates Ltd. Partnership v. Frey, 941 F.2d 588, 594, on remand 817 F.Supp. 784 (E.D.Wis.1993), affirmed 21 F.3d 782 (7th Cir.1994).

**D.Hawaii**, 1993. Cit. in sup. Owner of building under construction sued surety for contractor principal, alleging, inter alia, fraudulent and negligent misrepresentation, fraudulent withholding of material information, and breach of contract arising from surety's refusal to cover allowance items in the construction contract. Denying surety's motion for summary judgment, the court held that surety could be found liable for fraudulent and negligent misrepresentation regardless of whether its alleged representation that the bond would cover allowance items was characterized as a factual or legal misrepresentation, and that owner stated a valid claim for nondisclosure because surety's alleged failure to inform owner of its policy regarding allowance items was a factual misrepresentation basic to the bond transaction. The court held, moreover, that surety's alleged fraud could also warrant reformation of the contract to make surety liable for allowance items, regardless of the principal's liability. Elliot Megdal & Assoc. v. Hawaii Planing Mill, 814 F.Supp. 898, 906.

**Ariz.App.**1994. Quot. in case cit. in sup. Purchasers of residential lot sued seller for, inter alia, negligent misrepresentation by omission. Plaintiffs, who required water service in order to construct a home on the lot, alleged that they were damaged by defendant's failure to inform them that the water company was overextended and unable to provide service. Reversing the trial court insofar as it entered summary judgment for defendant on this issue and remanding, this court held that because defendant was aware of plaintiffs' utility needs and had included in other purchasers' agreements a disclaimer regarding the availability of water, it owed plaintiffs a duty to disclose potential water service problems. Alaface v. National Inv. Co., 181 Ariz. 586, 892 P.2d 1375, 1385.

**Mass.**1993. Com. (b) quot. in case quot. in disc. Husband and wife rented an apartment from landlord who later sold apartment to another landlord. After wife became pregnant, an inspection of the apartment revealed high levels of lead-based paint. The apartment was deleaded over a period of four months, during which time the couple's newborn baby required medical intervention because of lead in his bloodstream. The couple sued, among others, the first landlord for violating the Massachusetts unfair trade practices statute by failing to disclose the presence of lead-based paint. Trial court entered judgment for the couple, holding that landlord's nondisclosure of presence of lead-based paint violated the statute. Reversing, this court held that the statute imposed no liability for nondisclosure in this case, since the nondisclosure was not material, knowing, and willful. There was no evidence that landlord knew of presence of lead-based paint, or that any complaints regarding lead-based paint were directed to the landlord while he owned the apartment. Underwood v. Risman, 414 Mass. 96, 605 N.E.2d 832, 835.

Copr. © 2007 The American Law Institute.

**Mo.1995.** Cit. in headnotes and sup. Investor sued securities broker and its employee for breach of fiduciary duty in her securities transactions, alleging that she was misled about the arbitration and loan provision forms. Trial court overruled defendants' motion to stay litigation and compel arbitration and appellate court affirmed. This court affirmed, holding, inter alia, that employee's silence was not a misrepresentation, and thus not fraud in the procurement. While stockbrokers owe customers a fiduciary duty, a broker's duty to disclose material facts does not include an obligation to discuss orally with a competent party conspicuous written provisions like the arbitration and loan clauses here. State ex rel. PaineWebber v. Voorhees, 891 S.W.2d 126, 127, 129, 130.

**N.Y.Sup.Ct.1995.** Illus. 4 cit. in disc. After home buyers discovered the presence of a chemical on the property, resulting from treatment for termites 19 years previously, they sued the sellers seeking rescission based on mutual mistake, rescission and damages for fraud or constructive fraud, and alleging breach of contract for the sale of an uninhabitable residence. This court dismissed plaintiff's claims, holding, inter alia, that plaintiff failed to state a cause of action for constructive fraud, because there was no misrepresentation of fact regarding termites or chlordane in that plaintiffs had access to the pertinent information and defendants informed plaintiffs of all they knew on the subject prior to the closing. Plaintiffs chose to go forward with the deal knowing that a termite condition once existed, not knowing the present state of the termite problem, and without attempting to protect themselves by adding a rider regarding the termite condition. Copland v. Nathaniel, 164 Misc.2d 507, 624 N.Y.S.2d 514, 522.

**Va.App.1994.** Subsec. (d) and com. (f) quot. in sup. A couple entered into a prenuptial agreement providing that the wife forfeited all marital rights she might otherwise have acquired in the husband's property. After being married four years, the wife filed for divorce and challenged the validity of the prenuptial agreement. The trial court nullified the prenuptial agreement. Affirming, this court held that the agreement was unenforceable because it was entered into by the wife without full and frank disclosure of the extent of husband's financial holdings and without the benefit of independent legal representation. The court noted that parties engaged to be married are not dealing at arm's length, as they have a special relationship of trust and confidence. Carpenter v. Carpenter, 19 Va.App. 147, 449 S.E.2d 502, 504.

## Case Citations July 1996 -- June 2001:

**Ct.Fed.Cl.**1997. Subsec. (b) cit. in disc. and headnote. A custodial services company that had been awarded a competitively bid contract with the Army abandoned the work when the Army required the company to adhere to wage rates set forth in a collective-bargaining agreement that were higher than those upon which the company had based its bid. As a result, the government terminated the contract for default. The company submitted a claim for relief, which was rejected by the contracting officer. This court granted the government's motion to dismiss, holding, inter alia, that the company was not free to recognize the contract's mistake and, at the same time, supply its own correction. Thus, if plaintiff knew at the time it acknowledged receipt of the contractual amendment that the collective-bargaining agreement was no longer in force, then it had an obligation to bring that fact to the government's attention. Ashford v. United States, 43 Fed.Cl. 1, 4, affirmed 178 F.3d 1311 (Fed.Cir.1998).

**D.Ariz.**1998. Cit. in case quot. in disc. Property buyers sued sellers and real estate brokers, alleging, in part, that defendants committed fraud and intentional misrepresentation during the listing of the property, during the advertisement of the property, and during the execution of the real property disclosure statement. This court granted in part and denied in part defendants' motion for partial summary judgment, holding, inter alia, that a jury could find that sellers were negligent in not informing plaintiffs that the main residence was a blocked-in mobile home and that some of the wells were inoperable and contained contaminated water. Coleman v. Watts, 87 F.Supp.2d 944, 953.

**D.Kan.**2001. Cit. in sup., subsec. (b) quot. in sup. An end-lender in the mortgage business sued an originator of mortgage loans for breach of contract, alleging that plaintiff accepted defendant's written offer to refinance or repurchase four loans from plaintiff if plaintiff first purchased two of those loans from defendant. Entering judgment for defendant, this court held that the alleged contract was unenforceable. Plaintiff's material misrepresentations regarding serious problems with the loans rendered the contract voidable by defendant; moreover, there was no consideration for the contract. Saxon Mortg., Inc. v. Mortgage Plus, Inc., 130 F.Supp.2d 1236, 1245, 1246.

Copr. © 2007 The American Law Institute.

**S.D.N.Y.**1998. Cit. in headnote, subsec. (a) cit. in disc. Criminal defendant moved for dismissal of a superseding indictment or for an order directing the government to grant him a cooperation agreement, which he argued prosecutors promised him in exchange for his participation in five proffer sessions. Denying the motion, the court held, in part, that government did not renege on assurances it made to defendant with respect to a cooperation agreement; that defendant could not rescind his proffers based on mutual mistake, since only he misunderstood the meaning of the promises allegedly made; and that defendant was not fraudulently induced into the proffer sessions by misrepresentations or nondisclosures on the part of government. U.S. v. Heatley, 39 F.Supp.2d 287, 311.

**N.D.Ohio,** 1996. Subsec. (d) cit. in headnotes and sup. Employer's president and an employee brought an ERISA action against a group health insurer, alleging that the insurer breached its obligation to inform them that, although insureds were required to pay 20% of the amounts billed by the hospitals, the insurer had discount agreements with the hospitals under which it was required to pay less than 80% of the amounts billed. Following entry of summary judgment for plaintiffs, the insurer moved for reconsideration. This court denied the insurer's motion, holding, inter alia, that insurer operated a discount scheme that was, with regard to its obligations under ERISA, undisclosed to the beneficiaries of its hospitalization policies. The court stated that none of the methods by which the discount scheme may have become known to members of the public, including some of insurer's beneficiaries, constituted in form or substance the notice that should and could have been given directly, and from the outset, in the pertinent plan documents. McConocha v. Blue Cross and Blue Shield Mut. of Ohio, 930 F.Supp. 1182, 1183, 1185.

**Alaska,** 1997. Cit. in disc., subsec. (a) cit. in disc., com. (b) quot. in disc. Campaign worker sued state political party and party chairman for, inter alia, breach of contract and misrepresentation after chairman reneged on an alleged oral promise to hire worker as party's executive director. The trial court entered judgment on a jury verdict awarding worker approximately $30,000 in damages. Affirming, this court held that, notwithstanding the Statute of Frauds, chairman's promise of employment was enforceable under the doctrine of promissory estoppel where worker forwent a similar position in reliance on chairman's offer; that the lower court did not err by failing to instruct the jury that worker was required to take definite and substantial action in reliance on chairman's promise; that chairman's status as a volunteer was not fatal to worker's misrepresentation claim; and that the damages awarded were not excessive in light of the evidence. Alaska Democratic Party v. Rice, 934 P.2d 1313, 1320.

**Ariz.**2000. Cit. in disc. Sellers of real property sued buyer's real estate agent for negligent misrepresentation, alleging that defendant failed to inform them that the buyer was or might have been unable to perform because of financial difficulties. Trial court granted defendant summary judgment, and the intermediate appellate court affirmed. This court reversed and remanded, holding, inter alia, that since the buyer had a duty to disclose her financial condition to the sellers, her agent had a duty to disclose. The court stated generally that a buyer could not present himself as a ready, willing, and able buyer if he knew that there was a significant risk that the deal would never close because of his inability to perform. Lombardo v. Albu, 199 Ariz. 97, 14 P.3d 288, 290.

**Colo.**1998. Illus. 11 cit. in disc. Oil company that had an exclusive right to explore for oil on Indian tribe property sued a competitor and its geologist, alleging trespass for conducting tests on the property and fraudulent concealment. Plaintiff alleged that defendants had a duty to disclose their knowledge regarding the tests before buying plaintiff's rights to the land. Trial court entered judgment for defendants, and the appellate court affirmed. This court affirmed, holding, inter alia, that defendants were not liable for fraudulent concealment, because they did not have a duty to disclose their knowledge of potential gas reserves to plaintiff prior to the sale. Mallon Oil v. Bowen/Edwards Associates, 965 P.2d 105, 112.

**Colo.App.**1996. Cit. in headnotes, illus. 10 and 11 cit. in disc. An oil and gas company that had a mineral development agreement with an Indian tribe sued a company that purchased interests in those oil and gas rights and the purchaser's employee, asserting claims for fraudulent concealment of the results of the purchaser's employee's desorption tests, misappropriation of geological data, and civil conspiracy. Trial court granted defendants summary judgment. This court vacated and remanded, holding, inter alia, that defendants did not have a duty to disclose their

Copr. © 2007 The American Law Institute.

findings of gas in the subject land from their geophysical tests. There was no relationship of trust and confidence between the two oil and gas exploration companies, as competitors, that would give rise to a duty to disclose. The information defendants acquired would not make untrue a previous representation, since there were no previous representations between the two regarding the amount of gas in the subject land. Furthermore, because the employee was rightfully on the land looking for coal, he was not a geophysical trespasser, and consequently, defendants had no duty to disclose their discovery of gas. Mallon Oil Co. v. Bowen/Edwards Assoc., 940 P.2d 1055, 1056, 1060, affirmed 965 P.2d 105 (Colo.1998). See above case.

**Iowa,** 1996. Cit. in disc., subsec. (b) cit. in case cit. in disc. Purchasers of a motor home sued dealer to rescind the purchase agreement based on misrepresentation, alleging, in part, that defendant failed to disclose to them the motor home manufacturer's troubled financial condition and its bankruptcy. The trial court granted the requested relief. Affirming and remanding, this court held, inter alia, that the trial court did not err in finding that defendant knew of the manufacturer's serious financial troubles prior to the sale of the motor home to plaintiffs. Hyler v. Garner, 548 N.W.2d 864, 872, 873.

**Wash.App.**2000. Quot. in case quot. in disc. After defendant in a case arising from a two-car accident moved to enforce a settlement agreement, plaintiff moved to declare the agreement void and unenforceable due to misrepresentation of a material fact. Reversing the trial court's order enforcing the settlement, this court held, inter alia, that a factual dispute existed as to whether defendant's attorney made an affirmative misrepresentation about the limits of defendant's automobile insurance policy; the court remanded for an evidentiary hearing. Brinkerhoff v. Campbell, 99 Wash.App. 692, 994 P.2d 911, 915.

### Case Citations July 2001 -- June 2006:

**C.A.7,** 2003. Quot. in sup. Motorcycle manufacturer sought rescission of its approval of transfer of dealership. District court granted summary judgment for transferee. Reversing and remanding, this court held, inter alia, that issues of fact precluded summary judgment as to whether transferee induced manufacturer to approve transfer of dealership by material or fraudulent misrepresentations. Harley-Davidson Motor Co., Inc. v. Powersports, Inc., 319 F.3d 973, 991.

**D.D.C.**2005. Cit. in disc. Serviceman sued various armed-services representatives, alleging, in part, that the Army's failure to disclose the possibility of an involuntary extension of his term of service constituted a misrepresentation that invalidated his enlistment contract. Denying serviceman's motion for a preliminary injunction ordering his immediate release from active military service, this court held, inter alia, that serviceman offered no evidence that he was induced to enter the enlistment contract by fraud or false representations; therefore, serviceman failed to make a clear showing that he was likely to succeed on his fraud claim. Qualls v. Rumsfeld, 357 F.Supp.2d 274, 284.

**S.D.Iowa,** 2005. Cit. in disc., subsec. (b) cit. and quot. in sup. Real-estate company sued competitor for, in part, breach of the implied covenant of good faith and fair dealing after defendant's proposed launch of a new office-exclusive marketing program allegedly threatened to breach a sublicense between the parties. This court granted plaintiff's motion to enforce settlement agreement, holding, inter alia, that defendant failed to show any basis in equity to rescind the agreement. Because plaintiff did not know, and had no reason to know, that its failure to disclose to defendant the fact that its president had made statements to an Internet news service about this litigation added to defendant's mistaken assumption that plaintiff had made no further public statements, there could be no finding that plaintiff failed to act in good faith through nondisclosure. Mid-America Real Estate Co. v. Iowa Realty, Inc., 385 F.Supp.2d 828, 835.

**D.Minn.Bkrtcy.Ct.**2005. Cit. in disc. Chapter 7 trustee brought adversary proceeding against lender, alleging breach of contract. Granting judgment for lender, this court held, inter alia, that, although the contract between lender and debtor was valid, it was procured by debtor's material and fraudulent misrepresentations, and, therefore, lender was entitled to rescission. In re Health Risk Management, Inc., 319 B.R. 181, 188.

Copr. © 2007 The American Law Institute.

**Conn.App.**2003. Cit. in case quot. in sup. Uncle brought action for strict foreclosure of a purchase-money mortgage on one of three properties he conveyed to his niece. Niece counterclaimed, alleging that uncle was guilty of fraud and misrepresentation regarding sale of property. Trial court entered judgment of strict foreclosure, and denied niece's counterclaim. This court reversed, holding, inter alia, that a reasonable factfinder would conclude that uncle's representation to niece that all the properties were legal and good was material to her ultimate decision to buy, and that uncle knew otherwise as to the two other properties when he pressured her to buy the three properties. There was a reasonable nexus between counterclaim and uncle's conduct in inducing niece's making of note and mortgage. Morgera v. Chiappardi, 74 Conn.App. 442, 451, 813 A.2d 89, 95, on remand 2003 WL 22705753 (Conn.Super.2003).

**Del.Ch.**2000. Cit. in ftn., subsec. (d) cit. in ftn. After member of limited-liability company was removed from the company and his interest declared forfeited, he sued the remaining members for breach of the parties' operating agreement. Entering judgment for plaintiff, the court held, inter alia, that, even if plaintiff fraudulently induced defendants to enter into the operating agreement by failing to disclose his improper fee arrangement with a potential lender, the alleged fraud did not justify plaintiff's removal or bar recovery because defendants clearly did not rely on it when they signed the operating agreement. Walker v. Resource Development Co. Ltd., L.L.C., 791 A.2d 799, 816.

**Iowa,**2004. Quot. in sup., subsec. (d) cit. in sup., com. (f) quot. in sup. City and its claim administrator sued for specific performance of settlement agreement with city transit driver who sought workers' compensation benefits. Driver counterclaimed for rescission. Trial court ordered rescission due to misrepresentation and failure to disclose material facts. Court of appeals reversed, holding that claims representative made no material misrepresentations. This court affirmed, holding that driver did not establish rescission of settlement based on false representations or failure to make required disclosures. Claims representative's role did not involve relation of trust sufficient to invoke enhanced duty of disclosure, and parties' discussion of future medical benefits was with regard to settlement offer's terms and did not pertain to driver's potential entitlement in litigation. City of Ottumwa v. Poole, 687 N.W.2d 266, 269-270.

**Nev.**2004. Cit. in sup. and in ftn., subsecs. (b) and (c) quot. in sup. Buyer of two incorrectly described parcels of city property at a public auction sued county for trespass, inverse condemnation, and nuisance after taxes were assessed on parcels. County counterclaimed, seeking reformation of deed or rescission of contract. Trial court ordered buyer to reform contract to reflect property that county had intended to sell. This court affirmed reformation order, but remanded for partial refund to buyer. Given Nevada case law, the Restatement Second of Contracts, and the trend among western states to allow reformation, the court held that trial court did not err in reforming contract between buyer and county to describe remnant parcels based on county's unilateral mistake. Buyer knew about mistake but failed to disclose it to county. NOLM, LLC v. County of Clark, 100 P.3d 658, 661, 663.

**N.M.App.**2003. Com. (b) quot. in sup. Buyers of home that lacked permits required by state law sued sellers, electrical and mechanical subcontractor, and public utility, asserting claims for, among other things, rescission and negligent misrepresentation. Trial court granted defendants summary judgment. Reversing in part and remanding, this court held, inter alia, that contractual disclaimer that buyers were purchasing home on their own examination did not prevent rescission based on sellers' fraud. McElhannon v. Ford, 134 N.M. 124, 73 P.3d 827, 832.

**Or.App.**2003. Com. (e) cit. and quot. in sup. Seller of timberland sued to compel buyer to reconvey land and timber, alleging that conveyance resulted either from mutual mistake by seller and buyer or from seller's unilateral mistake coupled with buyer's inequitable conduct. Trial court entered judgment for seller, reforming contract, ordering buyer to reconvey property, and awarding seller $2 million. This court affirmed, holding that buyer engaged in inequitable conduct that perpetuated, and sought to take advantage of, seller's unilateral mistake. Buyer, which knew that property description of parties' agreement was broad enough to encompass land and timber not within parties' original and continuing contemplation, made no effort to correct either its previous misrepresentation or seller's continuing misapprehension. Pioneer Resources, LLC v. D.R. Johnson Lumber Co., 187 Or.App. 341, 376, 378, 68 P.3d 233, 253, 254.

Copr. © 2007 The American Law Institute.

**Case Citations July 2006 -- April 2007:**

    **N.M.App.**2006. Com. (e) cit. in sup. As part of his wrongful-termination suit, terminated employee alleged that his former employer misrepresented that an arbitration requirement had been removed from the employment agreement, thereby inducing him to sign it. The trial court granted defendant's motion to compel arbitration. This court reversed and remanded, holding, inter alia, that plaintiff produced evidence to support the determination that his failure to read the contract was justified by defendant's conduct. The court pointed to plaintiff's allegations that, after he objected during negotiations to language referring to compulsory arbitration, defendant represented that such language had been fully removed from a revised version of the agreement forwarded to plaintiff. Sisneros v. Citadel Broadcasting Co., 140 N.M. 266, 142 P.3d 34, 40.

(1981)

REST 2d CONTR § 161
END OF DOCUMENT

Copr. © 2007 The American Law Institute.