# Exhibit A

**APPENDIX OF NON-FEDERAL AND UNPUBLISHED FEDERAL AUTHORITIES
CITED IN VISA USA INC.'S OPPOSITION TO MARITZ INC.'S
MOTION TO STAY ARBITRATION**

Westlaw.

Not Reported in F.Supp.2d                                                                                Page 1
Not Reported in F.Supp.2d, 2006 WL 1147662 (D.D.C.)
**(Cite as: Not Reported in F.Supp.2d)**

**C**Avue Technologies Corp. v. DCI Group, L.L.C.
D.D.C.,2006.
Only the Westlaw citation is currently available.
United States District Court,District of Columbia.
AVUE TECHNOLOGIES CORP., Movant,
v.
DCI GROUP, L.L.C., Respondent.
**Civil Action No. 06-327(JDB).**

April 28, 2006.

Andrew H. Marks, Peter Jacobs Eyre, Crowell &
Moring LLP, Washington, DC, for movant Avue
Technologies, Corp.
Robert Lee Gulley, Lathrop & Gage, Washington,
DC, Jill Holtzman Vogel, Holtzman Vogel PLLC,
Warrenton, VA, Richard Nelson Bien, Lathrop &
Gage L.C., Kansas City, MO, for respondent DCI
Group, L.L.C.

### MEMORANDUM OPINION

JOHN D. BATES, District Judge.
  *1 Movant Avue Technologies Corporation
("Avue") brings this action seeking a stay of
arbitration with respect to certain claims submitted by
respondent DCI Group, LLC ("DCI"). The claims
relate to Avue's obligations pursuant to an agreement
to make certain payments for "journo-lobbying"
services provided by Tech Central Station ("TCS"), a
division of DCI. For the reasons that follow, the
Court will deny Avue's motion and dismiss this
action.

### BACKGROUND

  Avue is a Delaware corporation with its principal
place of business in Tacoma, Washington. Avue's
Mot. Stay at 2 ¶ 3. Avue is engaged in the business of
providing employment-related "technology-based
solutions" for government agencies. Id. DCI is a
limited liability company with its principal place of
business in Arizona. Notice of Removal at ¶ 2. DCI
provides lobbying services, using its many contacts
in the legislative and executive branches to further
the agendas of its various clients. Avue's Mot. Stay at
2 ¶ 4.

  On March 9, 2004, Avue and DCI entered into a
consulting agreement ("Consulting Agrmt."),
pursuant to which DCI would "assist and advise
[Avue] with respect to agreed-upon legislative and
administrative initiatives," Consulting Agrmt. at 1 §
1, for the sum of $20,000 per month, id. at 2 § 4. The
Consulting Agreement was made retroactively
effective as of December 1, 2003.Id. at 2. By that
time, DCI had already been providing services to
Avue for many months. DCI's Opp'n at 7. The
Consulting Agreement "shall be deemed to have been
made in the State of Arizona, and shall be construed
and enforced in accordance with the law of the State
of Arizona, without reference to principles of
conflicts of laws thereof."Consulting Agrmt. at 3 §
8(b). The document places strict limits on
modifications, providing that no modification will be
effective unless both in writing and signed by the
parties. Id . at 3 §§ 6, 7. There is also an integration
clause, which states that

  [t]his Consulting Agreement constitutes the
  entire Agreement between the parties with respect to
  the subject matter hereof, and supercedes [sic] any
  and all agreements, negotiations, communications,
  writings, and understandings, either oral or written,
  between the parties hereto with respect to the
  rendering of Services by Consultant for Client and
  contains all of the covenants and agreements between
  the parties with respect to the rendering of such
  services in any manner whatsoever. Each party to this
  Agreement acknowledges that no representations,
  inducements, promises, or agreements, orally or
  otherwise, have been made by any party, or anyone
  on behalf of any party, which are not embodied
  herein, and that no other agreement, statement, or
  promise not contained in this Agreement shall be
  valid or binding.

  Id. at 3 § 7. Finally, the Consulting Agreement
includes a broad, but standard, arbitration clause,
pursuant to which[a]ny claim, dispute, controversy or
other matter in question with regard to this
Agreement shall exclusively be subject to final
binding arbitration in accordance with the
Commercial Arbitration rules and regulations of the
American Arbitration Association (AAA).... The
parties or the arbitrators, as appropriate, shall
undertake the duties of the AAA under the AAA
rules. All arbitrations shall be conducted in the State
of Arizona.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 2
Not Reported in F.Supp.2d, 2006 WL 1147662 (D.D.C.)
**(Cite as: Not Reported in F.Supp.2d)**

**\*2***Id.* at 3 § 8(c).

Sometime "in or about December 2003," Avue and DCI reached an oral understanding ("TCS Agreement") that TCS (a division of DCI that is a daily online publication concerning science, technology, and politics) would generate favorable publicity about Avue's products through various journo-lobbying initiatives.[FN1] Avue's Mot. Stay at 3 ¶ 9. Pursuant to the TCS Agreement, Avue agreed to pay DCI an additional $20,000 per month. Neither party contests the existence of the Consulting Agreement or the existence of the TCS Agreement, and no dispute regarding the quality of services provided by DCI pursuant to either agreement is currently before the Court. DCI claims that it billed Avue for services performed under the Consulting and TCS Agreements from December 2003 through August 2004, during which time Avue remitted the agreed-upon payments-a total of $40,000 per month-without complaint. *See* DCI's Opp'n at 7. Thereafter, however, DCI alleges that Avue stopped making payments without cause.

> FN1. "Journo-lobbying" is the process through which communication channels are used to disseminate positive press pieces that masquerade as genuine news stories created by independent journalists. Pl's. Mot. Stay at 3 ¶ 9.

On November 28, 2005, DCI initiated an arbitration proceeding with the American Arbitration Association ("AAA"), based upon its interpretation of the arbitration clause contained in the Consulting Agreement, in an attempt to obtain the unremitted payments. Avue filed a document entitled "Answering Statement and Counterclaims" on December 19, 2005, in which it contended that the claims related to the TCS Agreement were improperly submitted for arbitration because the TCS Agreement is not part of the Consulting Agreement and, accordingly, is not subject to the arbitration clause contained in the Consulting Agreement.

On February 1, 2006, Avue filed in D.C. Superior Court a motion to stay arbitration under the D.C. Arbitration Act, D.C.CODE ANN. § 16-4302, seeking to sever the TCS-related claims from the arbitration proceedings. Avue's Mot. Stay at 1. DCI timely filed a notice of removal to this Court pursuant

to 28 U.S.C. § 1441. In this action, Avue contends that the TCS Agreement is outside the scope of the services defined in § 1 of the Consulting Agreement and, furthermore, cannot be viewed as a modification of the Consulting Agreement because there is no written memorialization of the TCS initiative. Avue's Mot. Stay at 3-4 ¶ 10. Avue interprets the integration clause of the Consulting Agreement strictly, arguing that it flatly precludes any modification or supplementation that is not in written format. Avue also contends that the parties never agreed that disputes arising from the TCS Agreement would be submitted to arbitration. *Id.* at 4 ¶ 11.

DCI, on the other hand, claims that § 1 of the Consulting Agreement deliberately employs flexible language to describe the services that comprise the subject of the contract. The language was intended to be vague and amorphous, according to DCI, because the parties desired the flexibility of defining (and redefining) those services throughout the evolution of their professional relationship. *See* DCI's Opp'n at 7-8. Hence, DCI submits that the TCS Agreement is part of the Consulting Agreement-specifically, that "journo-lobbying" services fall within the ambit of "agreed upon legislative and administrative" initiatives. As a fallback argument, DCI submits that the TCS Agreement is a supplement to or modification of the Consulting Agreement, notwithstanding the integration clause. DCI's Stmt. Claims at 3 ¶ 9. Specifically, the definition of services in § 1 is sufficiently ambiguous, according to DCI, that the Court should use the parole evidence rule to bring the TCS Agreement within the scope of the Consulting Agreement. Under this logic, the arbitration clause in the Consulting Agreement would also apply to the TCS Agreement. DCI asserts that it fully performed its duties and that Avue has committed a breach of contract by withholding payments in the principal amount of $565,501 .51 (as of October 1, 2005). DCI seeks to recover this amount through the arbitration proceeding, as well as interest and attorney's fees. DCI's Stmt. Claims at ¶¶ 14, 17.

**\*3** Before the Court may consider the core issue of whether the TCS Agreement is subject to arbitration, it must first decide two threshold issues: (1) who is the proper entity to decide whether the TCS Agreement is part of the Consulting Agreement and thus subject to arbitration-the Court or the arbitration panel? and (2) what law applies in determining that threshold issue-federal law, Arizona

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                        Page 3
Not Reported in F.Supp.2d, 2006 WL 1147662 (D.D.C.)
**(Cite as: Not Reported in F.Supp.2d)**

law, or the law of the District of Columbia? The Court will address these issues in turn.

### *LEGAL STANDARDS*

The Federal Arbitration Act establishes a general policy in favor of arbitration, *see, e.g., Shearson/American Exp., Inc. v. McMahon,* 482 U.S. 220, 226, 227 (1987) (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24 (1983)); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 625-26 (1985); *Alliance Bernstein Inv. Res. & Mgmt., Inc. v. Schaffran,* 2006 WL 945341, at *3 (2d Cir. Apr. 12, 2006), as do the arbitration statutes of the District, *see Motor City Drive LLC v. Brennan Beer Gorman Monk Architects & Interiors, PLLC,* 890 A.2d 233, 236 (D.C.2006), and Arizona, *see Harrington v. Pulte Home Corp.,* 119 P.3d 1044, 1051 (Ariz.Ct.App.2005). However, this presumption may be reversed with respect to certain gateway issues of arbitrability, *see Howsam v. Dean Witter Reynolds, Inc.,* 537 U.S. 79, 84 (2002), because arbitration is purely a matter of contract, *see AT & T Technologies, Inc. v. Communications Workers of America,* 475 U.S. 643, 648 (1986), and, hence, "the question 'who has the primary power to decide arbitrability' turns upon what the parties agreed about that matter. Did the parties agree to submit the arbitrability question itself to arbitration?"*First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 943 (1995) (emphasis in original)."A party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."*AT & T Techs.,* 475 U.S. at 648. Therefore, if a court is called upon to decide the threshold issue of who decides arbitrability, it may not "assume that the parties agreed to arbitrate arbitrability unless there is 'clear and unmistakable' evidence" to that effect. *First Options,* 514 U.S. at 944. In determining whether "clear and unmistakable evidence" exists, courts should apply principles of ordinary state-law contract formation. *See id.* at 944.In the absence of sufficiently "clear and unmistakable evidence," the issue is most properly one for the court, rather than the arbitrator, to consider.*Id.; see also Howsam,* 537 U.S. at 83.

### *ANALYSIS*

#### I. What Law Applies?

DCI contends that, pursuant to the choice of law

provision in the Consulting Agreement, the Court must apply principles of Arizona contract law in determining whether the "clear and unmistakable evidence" standard of *First Options* is satisfied. In the alternative, DCI submits that the Court should apply federal law, because the Federal Arbitration Act "governs after removal." DCI's Opp'n at 3. Avue, on the other hand, claims that the Court should apply District of Columbia contract law because DCI maintains an office and conducts business in the District, the parties discussed the TCS Agreement in the District, and the location of performance under the contract is the District. Avue's Mot. Stay at 2 ¶ 2. To apply Arizona law, Avue continues, would assume the merits of the dispute because it would require an implicit finding that the TCS Agreement is part of the Consulting Agreement.

*4 To determine what law applies, the Court must necessarily construe the Consulting Agreement-specifically, the scope of the choice of law provision (§ 8(b)). The question is whether the choice of law provision is broad enough to encompass the TCS Agreement. Hence, the Court is "constru[ing] and enforc[ing]" the choice of law provision, which, by its terms, requires that the law of Arizona be used. Moreover, in order to determine whether the TCS Agreement is part of the Consulting Agreement, the parties are calling upon the Court to interpret several other provisions of the Consulting Agreement, including: (1) the breadth and potentially ambiguous nature of the definition of contractual services in § 1; (2) the validity and effectiveness of the integration provision in § 7; (3) the scope and applicability of the arbitration provision in § 8(c); and (4) the meaning of AAA Rule R-7(a), which the parties concede is a provision of the Consulting Agreement by virtue of the fact that the arbitration provision incorporates the AAA rules in their entirety by reference. Regardless of which way the Court decides to resolve this case, it is certainly called upon to construe or enforce at least one provision of the Consulting Agreement. Hence, the correct law to apply is the law of Arizona-even with respect to the threshold arbitrability issue-as the parties have provided in their contract.

Ultimately, however, this issue is immaterial. The D.C. Arbitration Act and the Federal Arbitration Act are "materially the same in all [relevant] respects."*See Masurovsky v. Green,* 687 A.2d 198, 204 n. 3 (D.C.1997). In addition, both Arizona and the District have enacted the Uniform Arbitration Act, and, accordingly, their relevant statutory

provisions are identical, *compare*D.C.CODE ANN. § 16-4302(b), *with*ARIZ. REV. STATS. ANN. § 12-1502(b). All three bodies of law also establish a general policy that strongly favors resolution of disputes through arbitration channels when a valid agreement to arbitrate exists. *See, e.g., Alliance Bernstein,* 2006 WL 945341, at *3 (noting the strong presumption in favor of arbitration under the Federal Arbitration Act and federal case law); *Harrington,* 119 P.3d at 1051 (same with respect to Arizona state law); *Motor City Drive,* 890 A.2d at 236 (same with respect to D.C. law). Whether the Court applies federal law, Arizona law, or the law of the District, the outcome of this case is the same.

### II. Who Decides Whether the TCS Agreement is Subject to Arbitration?

The parties agree that § 8(c) of the Consulting Agreement incorporates the AAA arbitration rules into their contract. AAA Rule R-7(a) provides that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement."Hence, the issue before the Court is whether the incorporation of the AAA rules, and specifically Rule R-7(a), by reference in the Consulting Agreement constitutes "clear and unmistakable evidence" that the parties intended to have an arbitration panel, rather than the Court, determine the gateway issue of whether the TCS Agreement is subject to arbitration. DCI contends that it does. Avue, on the other hand, asserts that "clear and unmistakable evidence" is a very demanding standard, as to which an incorporation of the AAA rules by reference comes up short. Avue's Reply at 3 & n. 2. Avue claims that it never intended, much less agreed, to relinquish its right to have a court decide such a jurisdictional issue.

*5 For support, Avue relies heavily on *Sapiro v. Verisign,* 310 F.Supp.2d 208 (D.D.C.2004), and *Booker v. Robert Half Int'l, Inc.,* 315 F.Supp.2d 94 (D.D.C.2004). But these cases are not directly on point. *Sapiro* did not even address an incorporation of the AAA rules, and it, like *Booker,* stands only for the proposition that a court is generally the proper entity to decide "whether [an] arbitration agreement establishes a valid contract between the parties."*See Sapiro,* 310 F.Supp.2d at 212;*Booker,* 315 F.Supp.2d at 98. Avue's reliance on these cases is misplaced because neither case discussed the "clear and unmistakable evidence" standard of *First Options,*

and neither case discussed the precise issue that is presented here-who decides arbitrability. Quite simply, there are two species of issues that courts appear to classify as "arbitrability" inquiries. The first type, presented by the factual scenarios in *Sapiro* and *Booker,* concerns whether there is an agreement to arbitrate at all. The second type focuses on whether a particular issue is within a valid agreement to arbitrate. Here, DCI submits that the arbitration clause in the Consulting Agreement extends to the TCS Agreement, a classic question of the scope, not the existence, of an arbitration agreement. Because the parties agree that there is a valid arbitration clause that binds them, but disagree regarding whether its *scope* encompasses the TCS Agreement, this case implicates the second type of arbitrability issue, not the first. And the initial question, of course, is who will decide that arbitrability issue.

The distinction may at first blush appear semantic in nature, but it is indeed a matter of substance. *See First Options,* 517 U.S. at 944-45 (clarifying that the question "who (primarily) should decide arbitrability" is different from the question whether a dispute is arbitrable because it is within the scope of a valid arbitration agreement). The decisionmaker's task is the same with respect to both issues: to ascertain the intent of the parties under applicable principles of contract law. But the "rather arcane" question of who decides arbitrability warrants a reversal of normal presumptions in favor of arbitration so that courts will not assume the parties agreed to arbitrate arbitrability absent "clear and unmistakable evidence." *Id.*

*First Options* involved "silence or ambiguity about the question 'who (primarily) should decide arbitrability,' " *id.,* and on the record there the Court concluded that there was no showing of a clear agreement "to have the arbitrators decide (i.e., to arbitrate) the question of arbitrability." *Id.* at 446.Here, there is no "silence or ambiguity" in the concededly-valid arbitration agreement at issue. The arbitration clause expressly incorporates the AAA rules, which designates (in Rule R-7(a)) the *arbitrator* as the "who" referred to in *First Options.*Hence, the "clear and unmistakable" intent of the parties, reflected in Rule R-7(a)-which is part of their contract-is to have the arbitrator decide arbitrability. Moreover, the issue ultimately presented is properly framed as "whether a particular merits-related dispute is arbitrable because it is within the scope of a valid arbitration agreement." *Id.* at 944-

Not Reported in F.Supp.2d                                                                      Page 5
Not Reported in F.Supp.2d, 2006 WL 1147662 (D.D.C.)
(Cite as: Not Reported in F.Supp.2d)

45.On that issue, the presumption against arbitration may not apply, and the general presumption in favor of arbitration would apply with full force. *Compare id., with Mitsubishi Motors Corp., 473 U.S. at 626,and Moses H. Cone Mem'l Hosp., 460 U.S. at 24-25.* The law of the District recognizes this distinction. *See Masurovsky, 687 A.2d at 204-05.*

**\*6** Arizona cases and federal law support this outcome. The Arizona Court of Appeals has squarely held that even under the "clear and unmistakable evidence" standard, the arbitration agreement need not "specifically state that the arbitrator has the primary authority to decide the arbitrability of the issues" if the AAA rules as a whole are incorporated by reference. *Brake Masters Sys., Inc. v. Gabbay,* 78 P.3d 1081, 1087-88 (Ct.App.Ariz.2003). This holding was based upon Rule R-8(a), which was later renumbered as Rule R-7(a).*Id.* at 1085 n. 2. Likewise, the weight of authority in the federal courts overwhelmingly supports the same conclusion. *See Terminix Int'l Co., LP v. Palmer Ranch Ltd. P'ship,* 432 F.3d 1327, 1332 (11th Cir.2005); *Contec Corp. v. Remote Solution Co.,* 398 F.3d 205, 208, 209 (2d Cir.2005); *see also P & P Indus., Inc. v. Sutter Corp.,* 179 F.3d 861, 867-68 (10th Cir.1999) (finding that when a party incorporates the AAA rules by reference, it is bound by all of the procedural rules of the AAA); *Rainwater v. Nat'l Home Ins. Co.,* 944 F.2d 190, 193-94 (4th Cir.1991) (finding, before *First Options,* that a reference to AAA rules in an arbitration agreement incorporates all of those rules by reference); *Commonwealth Edison Co. v. Gulf Oil Corp.,* 541 F.2d 1263, 1272-73 (7th Cir.1976) (same); *Bryson v. Gere,* 268 F.Supp.2d 46, 52-53 (D.D.C.2003) (finding, post-*First Options,* that a reference to AAA rules in an arbitration agreement incorporates all of those rules by reference, but without discussion of the "clear and unmistakable evidence" standard).*But see Diesselhorst v. Munsey Building, L.L.L.P,* 2005 WL 327532, at \* *3-4 (D.Md.2005)* (holding that incorporation of the AAA rules by reference does not rise to the level of "clear and unmistakable evidence" that the parties intended to have an arbitrator decide threshold issues of arbitrability). Both the Second Circuit in *Contec* and the Eleventh Circuit in *Terminix* have expressly concluded that the incorporation of the AAA rules, and specifically Rule R-7(a), empowering an arbitrator to decide issues of arbitrability serves as clear and unmistakable evidence of an agreement by the parties to have the arbitrator decide issues of the scope of an arbitration clause (*i.e.,* arbitrability).*See*

*Contec,* 398 F.3d at 208;*Terminix,* 432 F.3d at 1332. Accordingly, under these authorities, it is the arbitrator, not this Court, that should decide whether the scope of the Consulting Agreement encompasses the TCS Agreement.

Not to be deterred, Avue recognizes that the weight of authority is overwhelmingly positioned against it, but claims simply that these cases have been incorrectly decided. Avue acknowledges that Rule R-7(a) is part of the Consulting Agreement by virtue of the incorporation by reference of the AAA rules generally, and concedes that it is thus bound by the rule. Avue contends, however, that the language of Rule R-7(a) is permissive in nature, and therefore does not require an arbitrator to consider the scope of his own jurisdiction. Rather, Avue argues, the language simply means that *if* the parties submit a claim to arbitration, they cannot challenge the arbitrator's decision by arguing that he lacked jurisdiction to render it. Hence, according to Avue, the incorporation of Rule R-7(a) into the Consulting Agreement is not "clear and unmistakable evidence" of an intent to submit to the jurisdiction of an arbitrator with respect to the threshold issue of whether the TCS Agreement is within the Consulting Agreement. This precise question, focused on the allegedly permissive nature of Rule R-7(a), has not been addressed in other cases.

**\*7** The Court is not persuaded by Avue's arguments. To begin with, Rule R-7(a) was enacted in response to *First Options:* it was specifically meant to satisfy the clear and unmistakable evidence standard. *See Brake Masters,* 78 P.3d at 188 n. 4. Moreover, even assuming that the rule is, as Avue contends, permissive in nature, the arbitrator would still be the proper entity to decide whether the TCS Agreement is subject to arbitration. The language of R-7(a) is clear: "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the ... scope ... of the arbitration agreement."There is no language that limits the application of the rule to the time period after a decision is rendered, or to suggest that the power conferred upon the arbitrator is conditional upon yet another agreement by the parties to submit the claim to arbitration. If Avue desired such limitations, it could have contracted for them. Avue cannot rely on the plain language of the rule to argue that it is permissive, yet back away from or attempt to supplement the plain language in order to advance an interpretation inconsistent with the outcome in the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                              Page 6
Not Reported in F.Supp.2d, 2006 WL 1147662 (D.D.C.)
**(Cite as: Not Reported in F.Supp.2d)**

relevant case law.

In this Court's view, Rule R-7(a) means that unless the arbitrator elects not to exercise the power to decide arbitrability that the parties have given him, a court may not jump in to decide the scope of the arbitration agreement at issue. Put another way, when Avue signed a contract that incorporated the AAA rules by reference, it agreed, pursuant to the language of Rule R-7(a), to let the arbitrator decide the issue of which claims submitted by DCI fall within the ambit of the arbitration clause. To the best of this Court's knowledge, the arbitrator has not relinquished that authority. "[W]hen, as here, parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator." *Book Depot P'ship v. Am. Book Co.,* 2005 U.S. Dist. LEXIS 33782 at *8-9 & n. 3 (E.D.Tenn.2005) (quoting *Contec Corp.,* 398 F.3d at 208)."[Avue] cannot now disown its agreed-to obligation to arbitrate *all* disputes, including the question of arbitrability."*Contec Corp.,* 398 F.3d at 211 (emphasis in original). Hence, the question "who (primarily) should decide arbitrability," in the construct of *First Options,* 514 U.S. at 944, is answered here by "clear and unmistakable evidence" of the parties' intent found in the provisions of their agreement (the incorporated AAA Rule R-7(a)). That answer is the arbitrator, not this Court.

### CONCLUSION

For the foregoing reasons, the Court concludes that the arbitrator is the proper entity to decide the issue of whether the scope of the arbitration clause of the Consulting Agreement includes the TCS Agreement. Accordingly, Avue's motion to stay arbitration proceedings will be denied and, since that is the entirety of the relief sought in this action, the case will be dismissed. A separate order has been issued on this date.

D.D.C.,2006.
Avue Technologies Corp. v. DCI Group, L.L.C.
Not Reported in F.Supp.2d, 2006 WL 1147662 (D.D.C.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit B

**APPENDIX OF NON-FEDERAL AND UNPUBLISHED FEDERAL AUTHORITIES
CITED IN VISA USA INC.'S OPPOSITION TO MARITZ INC.'S
MOTION TO STAY ARBITRATION**

1 of 1 DOCUMENT



Cited
As of: Jan 10, 2008

**VLADIMIR POPONIN, Ph.D. Plaintiff, v. VIRTUAL PRO, INC., Defendant.**

**No. C 06-4019 PJH**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

*2006 U.S. Dist. LEXIS 71125*

**September 20, 2006, Decided
September 20, 2006, Filed**

**COUNSEL:** [*1] For Ph.D. Vladimir Poponin, Plaintiff: Ilana S. Rubel, Michael J. Sacksteder, Fenwick & West LLP, San Francisco, CA.; Ryan Jared Marton, Fenwick & West LLP, Mountain View, CA.

For Virtual Pro Inc., Defendant: Richard C. Darwin, Buchalter Nemer, Attorneys at Law, San Francisco, CA.

**JUDGES:** PHYLLIS J. HAMILTON, United States District Judge.

**OPINION BY:** PHYLLIS J. HAMILTON

**OPINION**

**ORDER GRANTING MOTION TO DISMISS AND DENYING MOTION FOR PRELIMINARY INJUNCTION**

Plaintiff's motion for a preliminary injunction, and defendant's motion to dismiss the action, or in the alternative, to stay arbitration, and motion for a protective order, came on for hearing before this court on August 30, 2006. Plaintiff appeared by his counsel Michael J. Sacksteder, and defendant appeared by its counsel Richard C. Darwin. Having read the parties papers and carefully considered their arguments and the relevant legal authority, and good cause appearing, the court hereby DENIES the motion for preliminary injunction, GRANTS the motion to dismiss, and DENIES the motion for a protective order.

**BACKGROUND**

This is an action seeking declaratory and injunctive relief, and vacatur of an interim arbitration award, and [*2] also alleging breach of contract.

Plaintiff Vladimir Poponin, Ph.D., is a Russian-born theoretical physicist. He originally came to the United States at the invitation of Stanford University's Chemistry Department, to do research into the spectroscopy of DNA. He became a permanent resident of the United States in 1995, and subsequently left Stanford to pursue private ventures.

In 1998, Dr. Poponin filed a provisional application in the United States Patent and Trademark Office for a patent on one of his inventions. As the deadline approached for filing a utility patent application to claim priority to the provisional application, he met Martti Vallila ("Vallila"), the President of defendant Virtual Pro, Inc. (Virtual Pro"). Dr. Poponin alleges that Vallila told him that Virtual Pro was in the business of commercializing intellectual property owned by Russian citizens, and that Vallila suggested that Virtual Pro help Dr. Poponin with the funding and development of his first patent.

On September 20, 1999, Dr. Poponin entered into an agreement with Virtual Pro. He signed two documents an "Agreement" and an "Assignment." In the Agreement, Dr. Poponin agreed to assign all rights in one [*3] of his inventions (specified in the "Assignment") to Virtual Pro, and Virtual Pro agreed to complete the process of obtaining a patent on the invention, to commercialize it, and to pay Dr. Poponin 50% of the revenues. The Agreement provided for the submission of any disputes "arising in

Case 3:07-cv-05585-JSW    Document 36-2    Filed 01/11/2008    Page 10 of 54

Page 2
2006 U.S. Dist. LEXIS 71125, *

connection with the present Agreement" to binding arbitration under the Rules of Arbitration of the International Chamber of Commerce ("ICC") Court of Arbitration.

In the Assignment, Dr. Poponin assigned all ownership and rights in an invention described as "A New Method for the Analysis of Nuclic Acids Hybridization on High Density NA Chips." Dr. Poponin made the Assignment "consistent with my Agreement with Virtual Pro." The Assignment also provided that "[a]ny claims or legal actions relating to this assignment and the transactions to which it relates shall be commenced and maintained in a state or federal court located in the State of California."

Virtual Pro subsequently financed and otherwise supported the issuance of *U.S Patent No. 6,376,177* ("the *'177 patent*"), based on the technology described in the provisional application filed by Dr. Poponin. Virtual Pro retained an attorney to prosecute [*4] the patent application, which was filed on October 6, 1999. The patent issued on April 23, 2002.

At some point after he entered into the Agreement with Virtual Pro, Dr. Poponin began to develop additional inventions ("the unrelated inventions") that he claims were not described in the provisional application and were not covered by the terms of the Agreement or the Assignment. Dr. Poponin subsequently filed a number of U.S. and foreign patent applications covering those new inventions.

On June 14, 2005, Virtual Pro filed a claim with the ICC Court of Arbitration, asserting that Dr. Poponin had breached the Agreement by, *e.g.,* failing to copy Vallila with e-mail correspondence and refusing to answer Vallila's questions; excluding Virtual Pro's representative from negotiations or meetings with potential commercial and/or scientific partners; failing to assign to Virtual Pro patent applications containing inventions deriving from the subject matter of the invention referenced in the Agreement/Assignment; and secretly initiating negotiations relating to the possibility of assigning the *'177 patent* to some Japanese company.

Among other things, Virtual Pro demanded an accounting of [*5] all contracts signed by Dr. Poponin relating to the subject matter of the Agreement, and payment of 50% of all sums received by Dr. Poponin in connection with any such contracts. According to Dr. Poponin, Virtual Pro is attempting to assert rights over the unrelated inventions.

Dr. Poponin submitted a response to the ICC on August 24, 2005. Dr. Poponin and Virtual Pro each nominated a co-arbitrator, and the ICC nominated a third member of the panel. On October 7, 2005, the ICC confirmed the nomination of the arbitrators proposed by Dr.

Poponin and Virtual Pro, and formally determined to allow the matter to proceed in accordance with the ICC Rules.

On January 20, 2006, Dr. Poponin (through his then-attorney Frank Sommers) filed a brief in support of his request to dismiss the arbitration for lack of jurisdiction, arguing that the arbitrators did not have jurisdiction over the dispute because he had never agreed to the arbitration. He asserted that the Agreement and the Assignment were part of an integrated whole, and that the Assignment expressed the parties' primary intent that disputes be settled by a court, not by arbitration. He also asserted that the consent to arbitration was [*6] part of a contradictory section of an integrated document. Virtual Pro filed a response on January 25, 2006.

On January 30, 2006, Mr. Sommers sent the tribunal an e-mail stating that he had been removed as counsel because Dr. Poponin was unable to pay his fees, and that Dr. Poponin would be representing himself in the arbitration. On February 3, 2006, Dr. Poponin filed a reply brief on the jurisdictional issue.

On March 13, 2006, the ICC arbitral tribunal issued an interim award determining that it had jurisdiction, and reserving all other decisions to a future award. The tribunal found that the Agreement and Assignment were separate documents?and that while the Agreement made reference to the Assignment, it did not incorporate the Assignment by reference, and that the Agreement stated that its provisions "constitute[] the sum total of the [A]greement." The tribunal also noted that the Assignment was executed only by Dr. Poponin, not by Virtual Pro, and contained a submission to jurisdiction provision as to "[a]ny claims or legal actions relating to this [A]ssignment and the transactions to which [the Assignment] relates."

The tribunal found that the claims asserted by [*7] Virtual Pro and the general relief requested fell within the scope of the Agreement, which contained a broad arbitration clause submitting such disputes to arbitration under the ICC Rules of Arbitration. The tribunal concluded that it had jurisdiction to hear the disputes submitted in the matter before it.

Dr. Poponin also filed counterclaims against Virtual Pro in the arbitration. However, the counterclaims were dismissed by the ICC because Dr. Poponin failed to pay the required $ 106,000 filing fee by the deadline imposed by the ICC. In addition, during the time that Dr. Poponin was not represented by counsel (from January 30 to May 24, 2006), the discovery deadline passed and the tribunal subsequently found that Dr. Poponin was precluded from seeking any discovery in the arbitration.

Dr. Poponin filed the complaint in the present action on June 28, 2006. Dr. Poponin alleges that the attorney hired by Virtual Pro to prosecute the *'177 patent* failed to claim priority to the provisional application, and unnecessarily narrowed the scope of the claims of the patent during prosecution. Dr. Poponin asserts that he made numerous requests to Virtual Pro to remedy the errors of its patent [*8] prosecution attorney, to no avail. Dr. Poponin also claims that Virtual Pro refused to pursue an international filing of the *'177 patent*, further diminishing its value. When Dr. Poponin tried to remedy the alleged errors himself, by filing amended claims, he claims that Virtual Pro?which was required to sign off on the filing because it was the assignee?refused to do so. Dr. Poponin claims that Virtual Pro has failed to take any steps to commercialize the patent, and that he has received no revenue from his invention.

Dr. Poponin asserts seven causes of action:

(1) a claim seeking a declaratory judgment that the ICC lacks jurisdiction because there is no valid agreement requiring arbitration of Virtual Pro's pending claims;

(2) a claim seeking a declaratory judgment that Virtual Pro has no rights in any invention referenced in the Agreement and Assignment;

(3) a claim seeking a declaratory judgment that Virtual Pro has no rights in the inventions and patents created subsequent to the execution of the Agreement and Assignment, or to monies from Dr. Poponin's contracts and agreements relating to the unrelated inventions;

(4) a claim seeking a declaratory judgment [*9] that the Agreement and Assignment as construed by defendant are null and void as contrary to public policy;

(5) a claim seeking a declaratory judgment that any obligations Dr. Poponin might owe pursuant to the Agreement or Assignment are excused by Virtual Pro's material breach;

(6) a claim alleging breach of contract by Virtual Pro; and

(7) a claim seeking vacatur of the Interim Arbitration award, with regard to the issue of arbitrability.

He also seeks a stay of the arbitration or an order preliminarily enjoining any further proceedings in the ICC pending resolution of whether arbitrability was properly determined by the arbitrator.

On July 5, 2006, Dr. Poponin notified the ICC tribunal that he had filed the present action, and requested a stay of the arbitration proceedings pending resolution by this court of his claim that the dispute is not arbitrable. The tribunal denied the request. Dr. Poponin also asked Virtual Pro to agree to a stay, but Virtual Pro declined.

On July 17, 2006, the tribunal held a telephonic conference to discuss discovery rulings and to set the date for the final hearing. The same day, the tribunal issued a prehearing procedural order, [*10] ordering Dr. Poponin to produce to Virtual Pro all agreements with third parties having to do with the *'177 patent* and also with the subsequent unrelated inventions. The tribunal denied Dr. Poponin's application to submit a request for production of documents and to take Virtual Pro's deposition; and ordered the parties to exchange witness statements, witness lists, and exhibits. The tribunal set a date of September 20-22, and 25-26, 2006, for the final arbitration hearing.

On July 25, 2006, Dr. Poponin filed an application for a temporary restraining order in the present action. Following briefing by the parties and a hearing, the court denied the application in an order issued August 3, 2006.

Dr. Poponin now seeks a preliminary injunction, enjoining Virtual Pro from proceeding against him in the ICC arbitration. Virtual Pro seeks an order dismissing the complaint either for lack of subject matter jurisdiction or for failure to state a claim. In the alternative, Virtual Pro seeks an order staying this case pending the completion of the arbitration. Virtual Pro also seeks a protective order prohibiting Dr. Poponin from proceeding with discovery in this action while the arbitration [*11] is proceeding.

## DISCUSSION

### A. Motion for Preliminary Injunction

#### 1. Legal Standard

To prevail on a motion for preliminary injunction, plaintiff must show (1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest (in certain cases). *See Rodde v. Bonta, 357 F.3d 988, 994 (9th Cir. 2004).* Alternatively, injunctive relief can be granted if the plaintiff merely "demonstrate[s]... a combination of probable success on the merits and the possibility of irreparable injury." *Id.*

2006 U.S. Dist. LEXIS 71125, *

### 2. Plaintiff's Motion

Dr. Poponin argues that he is likely to succeed on the merits, asserting that it is the court, not the arbitrators that must decide the question of arbitrability; that the parties did not agree to arbitrate this dispute (based on lack of agreement in the Assignment); that the contract is procedurally unconscionable because his English skills are limited and he was at a disadvantage when presented with an agreement written in English, which he was pressured to sign by Vallila; and that [*12] the contract is substantively unconscionable and therefore unenforceable, because it seeks to "enslave" Dr. Poponin for life with regard to all contracts and inventions developed from the '177 patent, even if not directly related to the patented invention.

Dr. Poponin contends that absent injunctive relief, he will suffer irreparable harm, as he will be deprived of his right to trial by jury. He also asserts that his business will be damaged because the ICC tribunal has ordered him to turn over documents of a highly confidential nature to Virtual Pro. He claims that the information in those documents relates to his current business endeavors, which involve inventions that are not covered by the terms of the Agreement or the Assignment. [1] Dr. Poponin asserts that he should not be compelled to provide Vallila with information that Vallila can use to interfere with his (Dr. Poponin's) current business.

> 1  In his declaration, Dr. Poponin describes his recent work as "research into the cost-effective, rapid, and individualized mapping of the human genome." He asserts that this research has nothing to do with the technology represented in the '177 patent.

[*13] In a supplemental declaration, Dr. Poponin states that he was informed by one of his principal investors that the investor is withholding financing because of the pending arbitration, because the investor is concerned that Dr. Poponin will be compelled to disclose a confidential agreement that he has with "third parties" relating to the funding of his current research. Dr. Poponin contends that without the expected financing, his business will fold.

Dr. Poponin asserts that it is unlikely that he could recover damages from Virtual Pro, as Virtual Pro appears to be without domestic assets, and appears to be operated solely through the person of Martti Valilla in Paris.

Dr. Poponin also contends that he cannot fully present his case to the ICC tribunal, because his request to serve document requests on Virtual Pro was denied.

Finally, Dr. Poponin contends that the balance of hardships favors him, because the hardship of having to continue with the arbitration pending a final determination by this court as to the arbitrability question would be enormous.

In opposition, Virtual Pro makes four arguments. First, Virtual Pro asserts that this court has no subject matter jurisdiction [*14] to determine arbitrability, because the parties agreed that all disputes arising in connection with the Agreement would be decided in accordance with the ICC rules, which provide that arbitrability (or the "existence, validity or scope" of the agreement to arbitrate) is to be decided by the arbitrators. [2]

> 2  Rule 6(2) of the ICC Rules provides, in part,
>
> > If the Respondent does not file an answer,... or if any party raises one or more pleas concerning the existence, validity or scope of the arbitration agreement, the Court may decide, without prejudice to the admissibility or merits of the plea or pleas, that the arbitration shall proceed if it is prima facie satisfied that an arbitration agreement under the Rules may exist. In such a case, any decision as to the jurisdiction of the Arbitral Tribunal shall be taken by the Arbitral Tribunal itself. If the Court is not so satisfied, the parties shall be notified that the arbitration cannot proceed.
>
> ICC Rule 6(2).

Second, Virtual Pro argues that [*15] if this court *does* decide to address the question of arbitrability, it should find that the dispute is arbitrable and deny the request for preliminary injunction. Virtual Pro contends that the Agreement and Assignment are separate documents and should be interpreted differently, and that the forum selection clause in the Assignment relates only to claims and legal actions relating to the Assignment itself. Virtual Pro asserts that the present dispute—whether either party has breached its obligations under the Agreement—is governed by the Agreement, not the Assignment.

Third, Virtual Pro contends that the arbitration provision is neither procedurally nor substantively unconscionable. Virtual Pro asserts that the Agreement does not bear any of the characteristics of an adhesive or unenforceable contract, and that Dr. Poponin had the draft Agreement in his possession for at least a day because he was encouraged by Vallila to take it home and think about it before he signed it. Virtual Pro also notes that it

2006 U.S. Dist. LEXIS 71125, *

was Dr. Poponin who held the rights to the intellectual property, not Virtual Pro, and that Dr. Poponin cannot now argue that the parties' bargaining strength was unequal. Virtual [*16] Pro asserts that the arbitration provision is mutual, requiring each side to submit any disputes under the Agreement to the ICC.

Finally, Virtual Pro argues that Dr. Poponin has not met his burden of demonstrating a need for a preliminary injunction. Virtual Pro contends that Dr. Poponin cannot establish likelihood of success, because the court does not have jurisdiction over the claims alleged in the complaint. Virtual Pro also asserts that Dr. Poponin has not established a possibility of irreparable harm. Virtual Pro contends that the argument that the anonymous investors will withdraw their financial support if the case proceeds to arbitration could apply equally to the case if it proceeds to litigation. Similarly, if the case proceeds to litigation, Virtual Pro will request the same documents it has requested in the arbitration, so any temporary relief that Dr. Poponin receives from that obligation to produce documents will be short-lived.

With regard to the claim that Dr. Poponin will be irreparably harmed by the loss of his right to a jury trial, Virtual Pro argues that Dr. Poponin agreed to the jurisdiction of the ICC, rather than the courts, when he signed the Agreement with [*17] its broad arbitration provision, and confirmed that decision when he participated in the ICC arbitration, filed counterclaims, and affirmatively submitted the jurisdictional questions to the arbitrators.

In reply, Dr. Poponin argues that this court has exclusive jurisdiction to determine whether the dispute is arbitrable. Dr. Poponin contends that he has raised serious questions of validity that require a judicial inquiry into the substance and circumstances of the Agreement, and whether there was any agreement to arbitrate whatsoever.

Dr. Poponin argues that Virtual Pro has failed to rebut his showing that the parties never clearly and unmistakably agreed to arbitrate this matter. He argues that because the Assignment states that any claims or legal actions relating to the Assignment "and the transactions to which it relates" shall be commenced in a state or federal court in the State of California, the arbitration provision in the Agreement is ineffective. He asserts that the disputes that are presently before the arbitrators are clearly claims relating to the Assignment "and the transactions to which it relates," because the Agreement was executed at the same time as the Assignment [*18] and is "defined in scope" by the Assignment.

He argues that under *California Civil Code § 1642*, the Agreement and the Assignment are legally part of the same contract because they relate to the same matters, were made between the same parties, and were made as substantially part of the same transaction. He also argues that the terms of one agreement are incorporated into another whenever the reference to the second agreement is clear and unequivocal, and that the words "incorporated by reference" are not necessary. He claims that the presence of two different dispute resolution provisions in this "unitary contract" creates an inherent conflict giving rise to an irreconcilable ambiguity as to whether the parties agreed to arbitrate. He contends that this ambiguity should be construed against Virtual Pro, the drafter of the contract documents, and that the court should find that the parties did not agree to arbitrate.

Second, Dr. Poponin asserts that his actions in connection with the arbitration do not constitute a waiver of his right to challenge the ICC's jurisdiction in this court. He contends that in addition to filing a motion to dismiss, he informed the [*19] tribunal shortly after he had been "forced" to act as his own counsel (January 30, 2006) that he did not accept the ICC's jurisdiction. He claims that he further expressed his unwillingness to be bound by arbitration by refusing to sign the Terms of Reference provided by the ICC tribunal. He asserts that in the light of such clear statements and actions, he cannot be seen as having waived his right to object in this court to the tribunal's jurisdiction simply because he took the same action?moving to dismiss the arbitration for lack of jurisdiction?that the courts have held do not result in a waiver of the right to litigate.

He contends that the ICC tribunal's ruling should be discounted because the tribunal did not have the benefit of Dr. Poponin's current attorney's arguments in connection with these motions. At the time the issue of jurisdiction was presented to the tribunal, Dr. Poponin had dismissed his attorney because he could not afford to pay him, and he asserts that his brief filed with the tribunal did not mention the cases cited by his attorney in this motion; did not mention Civil Code § 1642 or the body of California case law relating to the reading together of related [*20] documents executed together; did not mention the California rule regarding the construing of ambiguities against the drafter; and did not mention any of the arguments relating to procedural or substantive unconscionability. He also asserts that it is clear from the brief he did file that he had little familiarity with English or with legal concepts or language.

Third, Dr. Poponin argues that the arbitration provision is both procedurally and substantively unconscionable. He claims that the circumstances under which the Agreement was executed caused it to be similar to a contract of adhesion, and demonstrate procedural unconscionability. He asserts that the "language imbalance" created a "differential in the parties' respective bargaining strength," because Dr. Poponin, with his limited English skills, was forced to rely on Vallila's description of

the Agreement's terms. He also contends that the parties were unequal financially, because Dr. Poponin was on the verge of losing his patent rights for lack of funding, and Virtual Pro had the money he needed to save his application. He asserts in addition that, contrary to Virtual Pro's assertion, there was no period of negotiation. He [*21] claims that Vallila did not give him a day to review the agreement, but rather pressured him to sign it immediately?to "take it or leave it."

Dr. Poponin also argues that the arbitration provision is substantively unconscionable, because there was "unfair surprise" inherent in Virtual Pro's assertion of an entitlement to all his subsequent work. He asserts that Virtual Pro's reading of the Agreement is also substantively unconscionable, as Virtual Pro is essentially asserting ownership of 50% of his labors indefinitely for a $ 4,000 patent prosecution payment (referring to the $ 4,000 that Virtual Pro allegedly paid the patent attorney to obtain the '177 patent on Dr. Poponin's invention).

Finally, Dr. Poponin asserts that he has satisfied the requirements for issuance of a preliminary injunction. He claims that continued, unwarranted participation in the arbitration is "per se irreparable harm." He also claims that he will suffer irreparable financial harm, as his reasearch, and the company he founded in anticipation of receiving funding, cannot continue if he is unable to meet his payroll obligations and pay the rent on the building housing his laboratories.

He disputes Virtual [*22] Pro's assertion that it does not matter whether the action proceeds in litigation in this court or in arbitration?insofar as the disclosure of documents in discovery is concerned?because, he argues, he can get a protective order in a court case that will protect his intellectual property in all circumstances, while the arbitrators have no jurisdiction to enforce a protective order on non-parties to this action. He also argues that this court is the only forum in which he can pursue his counterclaims, as the ICC tribunal dismissed the counterclaims after he failed to pay the required $ 106,000 advance in costs.

The court finds that the motion for a preliminary injunction must be DENIED. Dr. Poponin has not met his burden of showing either a likelihood of success or irreparable harm, or that the balance of hardships tips in his favor.

The threshold question is whether there is a valid agreement to arbitrate. Arbitration is fundamentally a creature of contract. *United Steelworkers v. Warrior and Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S. Ct. 1347, 4 L. Ed. 2d 1409 (1960). "[A]rbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances [*23] to arbitration." *AT&T Techs., Inc. v. Communication Work-*

*ers, 475 U.S. 643, 648-49, 106 S. Ct. 1415, 89 L. Ed. 2d 648 (1986)* (citation omitted). The Federal Arbitration Act makes written agreements to arbitrate "valid, irrevocable, and enforceable" on the same terms as other contracts. *9 U.S.C. § 2*.

Courts generally apply ordinary state-law principles governing contract formation in deciding whether an agreement to arbitrate exists. *First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944, 115 S. Ct. 1920, 131 L. Ed. 2d 985 (1995)*. Here, Dr. Poponin does not argue that there is no objective intent (expressed in the Agreement) that all disputes will be arbitrated. Rather, he argues that under California law the Agreement and the Assignment must be considered one contract, and that because there are two conflicting dispute resolution provisions in that "single contract," the agreement to arbitrate is not effective.

The court finds, however, that the two agreements are separate. Both parties signed the Agreement, which provides for arbitration of "all disputes arising in connection with the present Agreement." In addition, the Agreement states that it "constitutes the sum total of the [A]greement. [*24] " Dr. Poponin's assignment of his rights in the invention was a separate contract, which was not signed by Virtual Pro, and which was not incorporated by reference into the Agreement. However, even if Dr. Poponin is correct that under California law, the Agreement and the Assignment must be considered together as one "unitary contract," that single contract clearly provides that any disputes relating to the Agreement are to be arbitrated, while any disputes relating to the actual Assignment itself are to be brought in a state or federal court in California.

While the Federal Arbitration Act contains a general presumption that arbitrability should be decided by the court, both state and federal cases hold that the issue may be referred to the arbitrator if there is clear and unmistakable evidence from the arbitration agreement that the parties intended that the question of arbitrability should be decided by the arbitrator. *See Id. at 944-45; see also Contec Coro. v. Remote Solution Co., Ltd., 398 F.3d 205, 208 (2nd Cir. 2005); Dream Theater, Inc. v. Dream Theater, 124 Cal. App. 4th 547, 550-57, 21 Cal. Rptr. 3d 322 (2004))*.

Moreover, the cases hold that [*25] where the parties' agreement to arbitrate includes an agreement to follow a particular set of arbitration rules?such as the ICC Rules?that provide for the arbitrator to decide arbitrability, the presumption that courts decide arbitrability falls away, and the issue is decided by the arbitrator. *See The Shaw Group, Inc. v. Triplefine Intl Corp. 322 F.3d 115, 121-22 (2nd Cir. 2003); Apollo Computer, Inc. v. Berg, 886 F.2d 469, 473 (1st Cir. 1989); The Daiei, Inc. v.*

*United States Shoe Corp.*, 755 F.Supp. 299, 303 (D. Haw. 1991)); *Dream Theater*, 124 Cal. App. 4th at 557.

Because Dr. Poponin cannot show that there is no agreement to arbitrate, he cannot establish a likelihood of success on the merits. In short, Dr. Poponin cannot prevail because this court has no subject matter jurisdiction to determine arbitrability. By agreeing to arbitration under the ICC Rules, Dr. Poponin and Virtual Pro clearly and unmistakably agreed that questions of arbitrability would be submitted to arbitration. Moreover, Dr. Poponin affirmatively submitted the issue of jurisdiction to the tribunal, by filing a request to dismiss the claims [*26] on January 20, 2006. This confirmed his intent to arbitrate the question of arbitrability. The fact that he stated in his reply brief that he did not accept the ICC's jurisdiction does not negate that fact that he submitted the question to the arbitral panel for decision. Moreover, he was represented by counsel when he did so.

Dr. Poponin argues that under *Kaplan*, "merely arguing the arbitrability issue to an arbitrator does not indicate a clear willingness to arbitrate that issue, i.e., a willingness to be effectively bound by the arbitrator's decision on that point." *Kaplan*, 514 U.S. at 946. While true, this proposition is irrelevant in the context of the present case. In *Kaplan*, there was no clear and unmistakable evidence that the parties intended to submit the question of arbitrability to the arbitrators. Dr. Poponin's attempt to apply the *Kaplan* result?the Kaplans did not clearly agree to submit question of arbitrability to arbitration, and thus question of arbitrability was subject to independent review by the courts?in the present case is therefore unavailing.

Dr. Poponin's argument that the Agreement is both procedurally and substantively unconscionable [*27] is also without merit. Under California law, unconscionability has both a procedural and a substantive component. The former focuses on "oppression" or "surprise" resulting from unequal bargaining power, while the latter focuses on "overly harsh" or "one-sided" results. *Discover Bank v. Superior Court*, 36 Cal. 4th 148, 160, 30 Cal. Rptr. 3d 76, 113 P.3d 1100 (2005).

Generally, a contract that is procedurally unconscionable is one that is a contract of adhesion, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to accept the contract or reject it. *Id.* Here, however, the parties were of equal bargaining strength. Dr. Poponin's limited facility with English did not make him a "weaker party" for purposes of this analysis. He could have asked a third party to assist him with his English. Moreover, while Virtual Pro had access to potential funding sources, Dr. Poponin was the owner of the invention. Thus, each side had something the other side wanted.

Dr. Poponin characterizes the Agreement as having been presented to him on a "take-it-or-leave-it-basis," but this is not entirely accurate. Even if Dr. Poponin's version of [*28] events is true, and Vallila urged him to sign the contracts immediately, the complaint reflects that Vallila presented the contracts to him following some period of negotiation and discussion. If Dr. Poponin was uncomfortable about signing the Agreement, he could have asked for more time to review it. There is no evidence that the arbitration provision was included in the Agreement on a true "take-it-or-leave-it" basis (as in bank account or credit card agreements, or cellular phone service Contracts).

Substantive unconscionability takes many forms, but may generally be described as "unfairly one-sided." *Id.* One such form is an arbitration agreement's lack of a "modicum of bilaterality" wherein the employee's claims against the employer, but not the employer's claims against the employee, are subject to arbitration. *Little v. Auto Stiegler, Inc.*, 29 Cal. 4th 1064, 1071-72, 130 Cal. Rptr. 2d 892, 63 P.3d 979 (2003). The paramount consideration in assessing substantive unconscionability is mutuality.*Abramson v. Jupiter Networks, Inc.*, 115 Cal. App. 4th 638, 664, 9 Cal. Rptr. 3d 422 (2004); *see also Armendariz v. Foundation Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 120, 99 Cal. Rptr. 2d 745, 6 P.3d 669 (2000) (arbitration [*29] agreement imposed in adhesive context lacks basic fairness and mutuality if it requires one contracting party, but not the other, to arbitrate all claims arising out of the same transaction or occurrence cir series of transactions or occurrences).

Here, the arbitration provision governs "[a]ll disputes arising in connection with" the Agreement. It does not distinguish among types of claims, or suggest that claims likely to be brought by one party in connection with the Agreement will be arbitrated, while claims likely to be brought by the other will not. Because of the nature of the Assignment, it is likely that only Virtual Pro would potentially have been situated to bring a claim under the Assignment?e.g., to compel Dr. Poponin to execute the necessary documents to effectuate the assignment. Nevertheless, the fact that the Assignment provides that "any claims or legal actions relating to" the Assignment will be brought in a state or federal court in California does not create a lack of mutuality in the arbitration provision found in the Agreement, because the arbitration provision applies to the entire Agreement (though not to the Assignment, which, in any event, was a fait [*30] accompli well before the *'177 patent* issued). There is no suggestion in the Agreement that only one party will be compelled to arbitrate.

Dr. Poponin's claim that Virtual Pro's alleged interpretation of the Agreement is unconscionable because Virtual Pro is asserting ownership of 50% of Dr. Poponin's intellectual property is without merit. The scope of the Agreement is what is to be decided by the arbitrators. The fact that Virtual Pro is arguing for a particular interpretation of the Agreement does not make the agreement unconscionable.

Nor has Dr. Poponin established that he will be irreparably harmed if the injunction does not issue. He argues, essentially, that his business will fail if he is compelled to proceed with arbitration, but not if he can proceed with litigation in the court. However, the opinions of his investors with regard to the relative merits of a court action as opposed to arbitration are irrelevant. In addition, he will have to cooperate with discovery in any court action, and the parties will be bound by protective orders whether they proceed in arbitration or a court action.

His claims that he will be harmed because he will be denied the opportunity to argue [*31] his counterclaims and because he was not permitted to take discovery are without merit. He was not precluded from filing counterclaims in the arbitration. Rather, his counterclaims were dismissed by the arbitrators because he failed to pay the required costs. Similarly, he was not prevented from taking discovery, but simply chose not to before the deadline had expired. These are not valid grounds for enjoining Virtual Pro from proceeding with the arbitration.

B. Motion to Dismiss

1. Legal Standard

Federal courts are courts of limited jurisdiction, and can adjudicate only those cases which the Constitution and Congress authorize them to adjudicate--those involving diversity of citizenship or a federal question, or those to which the United States is a party. *See Kokkonen v. Guardian Life Ins. Co. of America, 511 U.S. 375, 377, 114 S. Ct. 1673, 128 L. Ed. 2d 391 (1994)*. Federal courts are presumptively without jurisdiction over civil actions, and the burden of establishing that a cause lies within this limited jurisdiction rests upon the party asserting jurisdiction. *Id.*

Subject matter jurisdiction cannot be waived, and the court is under a continuing duty to dismiss an action whenever it appears [*32] that the court lacks jurisdiction. *Billingsley v. Commissioner, 868 F.2d 1081, 1085 (9th Cir. 1989)*. The plaintiff bears the burden of demonstrating that subject matter jurisdiction exists over this complaint when challenged under *Fed. R. Civ. P. 12(b)(1)*. *See, e.g., Tosco Corp. v. Communities for a Better Env't, 236 F.3d 495, 499 (9th Cir. 2001)*.

2. Defendant's Motion to Dismiss

For the reasons stated in its opposition to the motion for preliminary injunction, Virtual Pro argues that the court should dismiss this action for lack of subject matter jurisdiction. In the event the court determines that some claims are not arbitrable, Virtual Pro seeks an order staying the action pending the completion of the arbitration.

Dr. Poponin opposes the motion, making the same arguments as in his motion for preliminary injunction.

The court finds that the motion must be GRANTED. The court has no jurisdiction to decide the question of arbitrability, because the parties agreed to arbitrate any disputes arising under the Agreement pursuant to the ICC Rules of Arbitration, which provide that arbitrability is for the arbitrators [*33] to decide. The ICC tribunal having determined that it has jurisdiction to decide all disputes arising from the Agreement, the claims asserted by Dr. Poponin herein are subject to arbitration.

C. Defendant's Motion for Protective Order

Virtual Pro seeks a protective order precluding plaintiff from conducting discovery in this action while the arbitration is on-going. This motion is DENIED, as moot.

CONCLUSION

In accordance with the foregoing, plaintiff's motion for a preliminary injunction is DENIED, and defendant's motion to dismiss is GRANTED.

IT IS SO ORDERED.

Dated: September 20, 2006

/s/

PHYLLYS J. HAMILTON

United States District Judge

JUDGMENT

This matter having come on for hearing, and the court having dismissed the action for lack of subject matter jurisdiction,

It is Ordered and Adjudged

that plaintiff Vladimir Poponin take nothing, and that the action be dismissed.

Dated: September 20, 2006

/s/

PHYLLYS J. HAMILTON

# Exhibit C

**APPENDIX OF NON-FEDERAL AND UNPUBLISHED FEDERAL AUTHORITIES
CITED IN VISA USA INC.'S OPPOSITION TO MARITZ INC.'S
MOTION TO STAY ARBITRATION**



Slip Copy
Slip Copy, 2007 WL 914464 (N.D.Cal.)
**(Cite as: Slip Copy)**

**H**Santana Row Hotel Partners, LP v. Zurich America
Ins. Co.
N.D.Cal.,2007.
Only the Westlaw citation is currently available.
United States District Court, N.D. California,
San Jose Division.
SANTANA ROW HOTEL PARTNERS, LP,
Plaintiff,
v.
ZURICH AMERICA INSURANCE COMPANY, et
al., Defendants.
No. C 05-00198 JW.

March 20, 2007.

Allen Ruby, Glen W. Schofield, Steven A. Ellenberg,
Ruby & Schofield, San Jose, CA, for Plaintiff.
Gary R. Selvin, Selvin, Wraith, Halman, LLP,
Oakland, CA, Alan Michael Jones, Ron Howard
Burnovski, Steven Donald Turner, Jones Turner,
LLP, Irvine, CA, for Defendants.

**ORDER DENYING MOTION TO COMPEL
ARBITRATION**

JAMES WARE, United States District Judge.

### I. INTRODUCTION

*1 Santana Row Hotel Partners, L.P.
("Plaintiff") brings this suit against Defendants
Zurich American Insurance Company ("Zurich"),
Gallagher-Pipino, Inc. and Arthur J. Gallagher & Co.
(collectively "Gallagher"), alleging breach of
contract, fraud, and related claims. Plaintiff alleges
that Zurich failed to pay losses resulting from a fire
which were covered by an insurance policy. Before
the Court is Gallagher's Motion to Compel
Arbitration, which relates to certain cross-claims
brought by Zurich against Gallagher. The Court
conducted a hearing on March 5, 2007. Based on the
papers submitted to date, and the arguments of
counsel at the hearing, the Court DENIES Gallagher's
Motion to Compel Arbitration.

### II. BACKGROUND

Defendant Zurich alleges as follows:

In May 2000, Zurich issued a builders risk
insurance policy ("Policy") to Federal Realty
Investment Trust ("FRIT"), covering certain losses
associated with FRIT's construction and development
of a retail and residential community in San Jose
known as Santana Row. (Defendant Zurich's
Amended Cross-Claim ¶¶ 15, 17, hereafter, "Cross-
Claim," Docket Item No. 107.) At the time Zurich
issued the Policy, Plaintiff was leasing from FRIT the
upper floors of a Santana Row building to build and
operate a hotel. (Cross-Claim ¶ 15.)

On August 19, 2002 there was a fire at the
Santana Row development which caused massive
damage and significant delays in the hotel's
scheduled opening.(*Id.* ¶ 20.)On August 29, 2002, ten
days after the fire, and January 8, 2003, Gallagher
issued two Certificates of Insurance which Plaintiff
alleges are evidence that it was insured at the time of
the fire. (*Id.* ¶¶ 28-33.)In the fall of 2003, an officer
of Arthur J. Gallagher & Co., represented to Zurich
that Gallagher had communicated to FRIT that they
had bound coverage for SRHP's interest in the hotel
building. (*Id.* ¶ 34.)Through these and other
communications, Gallagher represented that Plaintiff
was covered under the Policy for its fire-related
losses. (*Id.* ¶ 48.)On the basis of these
representations, Zurich measured SHRP's losses,
made payments to SHRP that were not owed, and
was exposed to potential liability for SHRP's fire-
related losses. (*Id.* ¶ 54.)

Zurich filed its Amended Cross-Claim on August
11, 2006, alleging five causes of action: 1) breach of
contract, 2) contractual indemnity, 3) equitable
contribution, 4) negligent misrepresentation, and 5)
fraud. Before the Court is Gallagher's Motion to
Compel Arbitration. (hereafter, "Motion," Docket
Item No. 167.) Gallagher asks the Court to compel
arbitration of Zurich's Cross-Claims and stay their
litigation pending the outcome of arbitration.

### III. STANDARDS

"A party to a valid arbitration agreement may
'petition any United States district court for an order
directing that such arbitration proceed in the manner
provided for in such agreement.' " *Lifescan, Inc. v.
Premier Diabetic Servs., Inc.,* 363 F.3d 1010, 1012
(9th Cir.2004) (quoting 9 U.S.C. § 4). The district

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 914464 (N.D.Cal.)
**(Cite as: Slip Copy)**

Page 2

court must only determine whether an arbitration agreement exists and whether it encompasses the dispute at issue. *See id.* at 1012;*see also Chiron Corp. v. Ortho Diagnostic Sys., Inc.,* 207 F.3d 1126, 1130 (9th Cir.2000). "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.,* 460 U.S. 1, 24-25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). Thus, arbitration should only be denied where "it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT & T Technologies, Inc. v. Communication Workers,* 475 U.S. 643, 650, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) (quoting *United Steelworkers v. Warrior Gulf Navigation Corp.,* 363 U.S. 574, 582-83, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)).

## *IV. DISCUSSION*

**\*2** The parties do not dispute that they have an Arbitration Agreement [FN1] that encompasses Zurich's cross-claim. Instead, Zurich contends that the Arbitration Agreement was the product of fraudulent inducement on the part of Gallagher, and is therefore unenforceable. There are two issues for consideration: (1) the threshold issue of whether the fraudulent inducement claim should be decided by the arbitrator or the Court, and (2) Gallagher's contention that Zurich has not properly alleged fraudulent inducement in its cross-claim. (Motion at 4-5.) The Court considers these issues in turn.

> FN1. (Declaration of Curtis R. Ogilvie in Support of Petition to Compel Arbitration, Ex. A, hereafter, "Arbitration Agreement," Docket Item No. 168.)

### A. *The Claim of Fraudulent Inducement is Properly Before the Court*

The parties dispute whether the fraudulent inducement claim is properly before the Court.

The Supreme Court has distinguished claims that an entire contract was fraudulently induced from claims that the arbitration provision in an otherwise valid contract was fraudulently induced. *Buckeye Check Cashing, Inc. v. Cardegna,* 546 U.S. 440, 126 S.Ct. 1204, 1209, 163 L.Ed.2d 1038 (2006); *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S.

395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967). The district court faced with a fraudulent inducement claim that runs to the entire contract must refer that claim to the arbitrator. *Buckeye Check Cashing,* 126 S.Ct. at 1209. On the other hand, a district court faced with a claim that only the arbitration provision was fraudulently induced must consider such a claim before compelling arbitration.*Id.;Nagrampa v. MailCoups, Inc.,* 469 F.3d 1257, 1268-69 (9th Cir.2006).

Both *Buckeye Check Cashing* and *Prima Paint* involved an arbitration clause in a broader contract. By contrast, the Arbitration Agreement between Zurich and Gallagher is precisely what its title indicates: an agreement to arbitrate. It contains no broader contractual duties other than to arbitrate covered disputes in the agreed-upon manner.[FN2]Therefore, it does not present the severability issue confronted in the cases. The fraud claim runs solely to an agreement to arbitrate. Accordingly, the claim must be considered by the Court as a prerequisite to its enforcement. 9 U.S.C. § 2.

> FN2. The Arbitration Agreement provides:
> The purpose of this Agreement is to (1) establish a binding agreement to arbitrate certain disputes between Gallagher and Zurich; (2) outline the scope and procedures of such arbitration; and (3) set forth the duties and obligations of each party with respect to such arbitration.
> (Arbitration Agreement at 1.) Gallagher itself agrees that the Arbitration Agreement is "an entirely separate and distinct contract" from any other agreements between the parties. (Motion at 5.)

### B. *Sufficiency of Cross-Claim Allegations*

Gallagher contends that the fraudulent inducement claim may not be considered because Zurich has not properly alleged it in its cross-claim. (Motion at 4-5.)

The Federal Rules provide, "In all averments of fraud or mistake, the circumstance constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other conditions of mind of a person may be averred generally."Fed.R.Civ.P. 9(b). The heightened pleading requirement applies to claims for which fraud is an essential element and to claims in which the plaintiff relies on the fraudulent

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 914464 (N.D.Cal.)
**(Cite as: Slip Copy)**

conduct as the basis for the claim. *Vess v. Ciba-Geigy Corp. USA,* 317 F.3d 1097, 1103 (9th Cir.2003).

Zurich points to five paragraphs in its Cross-Claim which purportedly allege fraudulent inducement of the Arbitration Agreement. (Opposition to Motion to Compel Arbitration at 5, Docket Item No. 194.) The substance of these allegations is that Thomas Gallagher made false representations to Zurich which caused it to measure SRHP's losses from the fire, make a non-policy payment to SRHP, and to "otherwise act to its detriment." (Cross-Claim ¶¶ 34, 46-49.)[FN3] The Court finds these allegations, which do not even mention the Arbitration Agreement, wholly deficient to state a claim that Zurich was fraudulently induced into entering it.[FN4]

> FN3. The cited allegations in their entirety are as follows:
> 34. In or about the fall of 2003, AJG's officer, Thomas Gallagher, orally represented to Zurich that Gallagher-Pipino and/or AJG had communicated to FRIT that they had bound coverage for SRHP's interest in Building 5 of the Santana Row project prior to the
> August 19, 2002 fire.
> ...
> 46. Zurich realleges and incorporates by reference each and every allegation of paragraphs 1 through 34 above as though fully stated herein. Zurich pleads this cause of action as an alternative pleading under Rule 8(e)(2) of the Federal Rules of Civil Procedure.
> 47. On March 18, 2003, Gallagher-Pipino's Sam Pipino wrote and delivered a letter to Zurich's Daniel Sock claiming that Gallagher-Pipino had bound coverage for SRHP under the Policy on July 15, 2001.
> 48. Through various communications, including, but not limited to, the "Evidence of Property Insurance" forms dated August 29, 2002 and January 8, 2003 and Sam Pipino's March 18, 2003 letter, Gallagher-Pipino and AJG represented to Zurich that SRHP was an insured under the Policy at the time of the August 19, 2002 fire 'and entitled to benefits under the Policy for its fire-related losses. Said representations were not true and Gallagher-Pipino and AJG had no reasonable grounds for believing said representations were true at the time they were made.
> 49. In reasonable reliance upon Gallagher-Pipino and AJG's misrepresentations regarding SRHP's

status as an insured under the Policy, Zurich was induced to measure SRHP's alleged losses, to make payments to SRHP that were not owed under the Policy and to otherwise act to its detriment. Had Gallagher-Pipino and AJG not made these representations, Zurich would not have taken such actions.

> FN4. Zurich also points to a paragraph in its Answer to Second Amended Complaint. While this paragraph does mention the Arbitration Agreement, it does not directly allege that it was fraudulently induced. (*See* Answer to Second Amended Complaint ¶ 36, Docket Item No. 107.)

*3 Zurich's representations to the Court, however, indicate that it could plead facts which would support its claim that it was fraudulently induced into entering the Arbitration Agreement. (Opposition at 5.) Accordingly, the Court grants Zurich leave to amend its Cross-Claim.

*V. CONCLUSION*

The Court DENIES Gallagher's Motion to Compel Arbitration without prejudice to being renewed upon the filing Zurich's amended cross-claim. Zurich shall file an Amended Cross-Claim to cure the deficiencies with respect to its fraud claim within thirty (30) days of this Order.

N.D.Cal.,2007.
Santana Row Hotel Partners, LP v. Zurich America Ins. Co.
Slip Copy, 2007 WL 914464 (N.D.Cal.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit D

**APPENDIX OF NON-FEDERAL AND UNPUBLISHED FEDERAL AUTHORITIES
CITED IN VISA USA INC.'S OPPOSITION TO MARITZ INC.'S
MOTION TO STAY ARBITRATION**

LEXSEE 2007 U.S. DIST. LEXIS 53680

**VINCENT CONSOLIDATED COMMODITIES, INC., Plaintiff, v. AMERICAN TRADING AND TRANSFER, LLC, et al., Defendants.**

Case No. 07-CV-20 W (LSP)

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

*2007 U.S. Dist. LEXIS 53680*

**July 24, 2007, Decided
July 24, 2007, Filed**

**COUNSEL:** [*1] For Vincent Consolidated Commodities, Inc., a Wisconsin Corporation, Plaintiff: William T Yoon, LEAD ATTORNEY, Foley and Lardner, San Diego, CA.

For Relaser, Inc., a California corporation, Defendant: Thomas T Lord, LEAD ATTORNEY, Law Offices of Thomas T Lord, San Diego, CA.

**JUDGES:** Hon. Thomas J. Whelan, United States District Judge.

**OPINION BY:** Thomas J. Whelan

**OPINION**

**ORDER DENYING MOTION TO DISMISS**

On January 3, 2007, Plaintiff Vincent Consolidated Commodities, Inc. ("Vincent") commenced this action for breach of contract, unjust enrichment, and fraud against Relaser, Inc. ("Relaser"), among others. On March 28, 2007, Relaser filed a motion to dismiss for failure to state a claim upon which relief can be granted or for a more definite statement under *Federal Rule of Civil Procedure 12 (b) (6) and 12(e)*.

The Court decides the matter on the papers submitted without oral argument. See Civil Local Rule 7.1 (d.1). For the reasons outlined below, the Court **DENIES** the motion to dismiss with respect to the breach of contract and fraud claims, **GRANTS** the motion to dismiss with respect to the claim of unjust enrichment, and **DENIES** the motion for a more definite statement.

**I. Background**

The facts as Vincent alleges them are [*2] as follows. Vincent is a Wisconsin corporation in the business of buying and reselling commodities in bulk. (Compl. at P 2.) Saint Simons Trading Co. ("St. Simons"), a Michigan corporation, American Trading and Transfer, LLC, a California limited liability company, and Relaser, a California corporation, also all buy and trade commodities, including non-fat dry milk. (Id. at PP 3-5.)

In the dairy industry, a chain of intermediaries effectuates milk sales and purchases through a series of oral and written agreements. (Compl. P 9.) On or about March 2006, the four parties entered into a series of agreements (collectively, the "Agreement"). Vincent and St. Simons agreed to purchase from Relaser, through American Trading, 10 loads of food-grade non-fat dry milk (the "Milk"). (Id. P 10.) Relaser agreed to provide the Milk to St. Simons and Vincent through American Trading, evidenced by a purchase order placed with St. Simons. (Id. P 12.) Vincent claims as assignee of St. Simons' rights under the Agreement. (Id. PP 13.)

Relaser required pre-payment of the Milk price. (Compl. P 16.) Relying on the purchase order, Vincent wire-transferred $ 201,041.20 (the "Payment") to American Trading on or [*3] about March 16, 2006. (Id.) American Trading promptly forwarded the Payment to Relaser. (Id.) But Relaser never had a contract to obtain the Milk, and Gary Wetter, on behalf of Relaser, failed to inform Vincent or St. Simons that Relaser had no intention of obtaining a contract, allegedly aware that the information was material to Vincent. (Id. PP 13-15, 17.)

The Milk has yet to be delivered despite repeated demands for it. (Compl. P 18.) Vincent has only received $ 12,579.80 from American Trading, and the Payment transferred to Relaser through American Trading has not been returned to Vincent, despite repeated demands for it. (Id. P 19.) Vincent has been unable to meet its obligations to its customers, forced to refund the commissions

they would have otherwise earned on the sale (about $ 35,000), and lost goodwill and profits. (Id. P 20.)

On January 3, 2007, Vincent filed this action against American Trading, Gary Wetter, and Relaser, Inc. for breach of contract, unjust enrichment, and fraud. On March 28, 2007, Relaser filed a motion to dismiss for failure to state a claim upon which relief can be granted or for a more definite statement under *Federal Rule of Civil Procedure 12(b)(6)* [*4] *and (e).*

## II. Legal Standards

Under *Rule 12(b)(6)*, the court may dismiss a cause of action for failure to state a claim upon which relief can be granted. *Fed. R. Civ. P. 12(b)(6)*. A motion to dismiss under *Rule 12 (b) (6)* tests the complaint's sufficiency. See *N. Star Int'l v. Ariz. Corp. Comm'n, 720 F.2d 578, 581 (9th Cir. 1983)*. Dismissal of a claim according to this rule is proper only in "extraordinary" cases. *United States v. Redwood City, 640 F.2d 963, 966 (9th Cir. 1981)*. A complaint should be dismissed as a matter of law for two reasons: (1) lack of a cognizable legal theory, or (2) insufficient facts under a cognizable theory. *Robertson v. Dean Witter Reynolds, Inc., 749 F.2d 530, 534 (9th Cir. 1984)*.

As the Supreme Court recently explained, "[w]hile a complaint attacked by a *Rule 12 (b) (6)* motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,, 550 U.S. , , 127 S. Ct. 1955, 1964, 167 L. Ed. 2d 929 (2007)*. Rather, the allegations in the complaint "must be enough [*5] to raise a right to relief above the speculative level." *Id. at 1964-65*. Additionally, all material allegations in the complaint, "even if doubtful in fact," are assumed to be true. Id. The court must construe all factual allegations in the complaint and all reasonable inferences therefrom in the plaintiff's favor. *Gompper v. VISX, Inc., 298 F.3d 893, 895 (9th Cir. 2002); Walleri v. Fed. Home Loan Bank of Seattle, 83 F.3d 1575, 1580 (9th Cir. 1996)*.

A complaint alleging fraud must meet the particularity requirements of *Federal Rule of Civil Procedure 9 (b)* as well. A plaintiff must specifically identify the allegedly fraudulent statements or acts of fraud. *Kaplan v. Rose, 49 F.3d 1363, 1370 (9th Cir. 1994)*. The plaintiff must plead facts such as the dates, times, places, and persons associated with each misrepresentation or act of fraud. *In re GlenFed, Inc. Sec. Litig., 42 F.3d 1541, 1548-49 n.7 (9th Cir. 1994) (en banc)* (superseded by statute on other grounds); *Neubronner v. Milken, 6 F.3d 666, 672 (9th Cir. 1993)*.

## III. Discussion

### A. Vincent pleaded sufficient facts to support the breach of contract claim.

Relaser contends that Vincent did not plead sufficient facts for a breach-of-contract [*6] claim. (Def's Mem. of P. & A. at 6.) Relaser argues that Vincent's complaint fails to plead whom it contracted with and the terms of the contract. (Id.) Furthermore, Relaser argues that Vincent failed to quote the terms of the purchase order or attach the order to the complaint to show that a contract existed. (Id. at 3.)

The elements for a breach of contract claim are (1) the existence and terms of the contract, (2) plaintiff's performance, (3) defendant's breach, and (4) damages. *Sallie Mae v. Hanes, 181 F.R.D. 629, 633 (S.D. Cal. 1998); First Commercial Mortgage Co. v. Reece, 89 Cal. App. 4th 731, 745, 108 Cal. Rptr. 2d 23 (2001)*. Vincent responds that its complaint states all four elements: (1) Relaser entered a contract to provide the Milk when they signed the purchase order, (2) Vincent paid over $ 200,000 for the Milk, (3) Relaser never sent the Milk, and (4) Vincent has suffered damages as a result of this breach. (Pl.'s Mem. in Opp'n at 5.)

Assuming the truth of all factual allegations, Vincent adequately pleads a case for breach of contract. Vincent's failure to attach the contract or purchasing order to the complaint does not render the claim invalid because *Rule 8* requires [*7] merely "a short and plain statement of the claim showing that the pleader is entitled to relief." See *Fannuchi & Limi Farms v. United Agri Prods., 414 F.3d 1075, 1082 (9th Cir. 2005)*. Notice pleading means Vincent need not have attached a contract. See id. Therefore, the court will **DENY** the motion to dismiss the breach-of-contract claim.

### B. Unjust enrichment is not an independent cause of action.

Vincent also asserts an independent cause of action for unjust enrichment. (Compl. PP 30-31.) But, as numerous courts have held, "[t]here is no cause of action in California for unjust enrichment." *Melchior v. New Line Prod., Inc., 106 Cal. App. 4th 779, 131 Cal. Rptr. 2d 347 (Cal. Ct. App. 2003)*. "Unjust enrichment . . . is synonymous with restitution." *Dinosaur Dev., Inc. v. White, 216 Cal. App. 3d 1310, 265 Cal. Rptr. 525, 527 (Cal. Ct. App. 1989)*. Unjust enrichment is another word for the remedy of restitution, not a cause of action. *Walker v. USAA Cas. Ins. Co., 474 F. Supp. 2d 1168, 1174 (E.D. Cal. 2003); Lauriedale Assocs., Ltd. v. Wilson, 9 Cal. Rptr. 2d 774, 780, 7 Cal. App. 4th 1439 (Cal. Ct. App. 1992)* ("[A]ppellants have mischaracterized the legal theory underlying their cause of action. The phrase 'Un-

just Enrichment' does not describe a theory [*8] of recovery, but an effect: the result of a failure to make restitution . . . .").

Although at least one California appellate court has held that unjust enrichment is a cause of action, see *Lectrodryer v. SeoulBank, 77 Cal. App. 4th 723, 91 Cal. Rptr. 2d 881, 884 (Cal. Ct. App. 2000)*, the California Supreme Court has merely mentioned a "cause of action for unjust enrichment" in passing while discussing the remedy of restitution, see *Ghirardo v. Antonioli, 14 Cal. 4th 39, 51-52, 57 Cal. Rptr. 2d 687, 924 P.2d 996 (1996)*. Ghirardo, however, cites the Restatement of Restitution to develop its holding. Id. ("Under the law of restitution, an individual may be required to make restitution if he is unjustly enriched at the expense of another."). According to the Restatement, one may recover restitution damages in a contract action. *Restatement (First) of Restitution § 5 (1937)*. Thus, if Vincent seeks recovery for unjust enrichment, it need only include the request in its prayer for relief.

Because California does not recognize a separate claim for unjust enrichment, the court will **GRANT** Relaser's motion to dismiss without leave to amend.

## C. Vincent met the heightened pleading standard for the fraud claim.

Relaser also argues that the complaint fails [*9] to allege specific facts showing that Relaser fraudulently induced Vincent to pay for the Milk. (Def's Mem. of P. & A. at 3-4.) Specifically, Relaser contends that Vincent's allegations are "conclusory and inadequate legal characterizations amounting to unsupportable conclusions." (Id.) Relaser also argues that Vincent has failed to meet the heightened pleading requirements for fraud under *Rule 9(b)*. (Id.)

The elements of a fraud claim are (1) concealment or misrepresentation of material fact; (2) knowledge of falsity when made; (3) intent to defraud the plaintiff; (4) plaintiff's justifiable reliance; and (5) resultant damage to the plaintiff. *S. Tahoe Gas Co. v. Hoffman Land Improvement Co., 25 Cal. App. 3d 750, 102 Cal. Rptr. 286, 296 (Cal. Ct. App. 1972)*. In the complaint, Vincent alleges all five elements: (1) Relaser, through its agent Wetter, misrepresented the existence of an enforceable contract to obtain Milk, (2) knowing that no contract existed, (3) without an intent to enter into a contract, (4) Vincent relied on the misrepresentation and sent the Payment, and as a result, (5) suffered monetary and reputation damages. (Compl. PP 34-39.)

Complaints alleging fraud must also meet the pleading requirements [*10] of *Rule 9(b)*, which provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." *Rule 9(b)* thus imposes two separate requirements on complaints alleging fraud. First, a plaintiff must specifically identify the allegedly fraudulent statements or acts of fraud. *Kaplan, 49 F.3d at 1370*. This requires the plaintiff to plead evidentiary facts such as the dates, times, places and person associated with each misrepresentation or act of fraud. *GlenFed, 42 F.3d at 1548 n.7*. Here, Vincent alleges that in March 2006, Relaser, through its agent Wetter, entered into an agreement with Vincent and St. Simons to provide Milk, evidenced by a purchase order, and intentionally misrepresented the existence of an enforceable contract to acquire the Milk. (Compl. PP 10-18.)

Second, where the act of fraud is based on a misrepresentation, the plaintiff must demonstrate that the statement was false or misleading *at the time it was made*. *GlenFed, 42 F.3d at 1549*. For this reason, "a plaintiff must set forth, as part of the circumstances constituting fraud, an explanation as to why the disputed statement was untrue or misleading *when* [*11] *made* [which] can be done most directly by pointing to inconsistent contemporaneous statements or information . . . which were made by or available to the defendants." Id. Here, Vincent alleges that "at the time the Agreement was entered, Relaser did not have possession of an enforceable contract to purchase the Milk and had no intention of obtaining the Milk to fill the order when it accepted the Purchase Order." (Compl. P 14.) Assuming the truth of these allegations, this paragraph establishes contemporaneous falsehood on its face.

*Rule 9(b)* also prohibits fraud allegations directed at groups of people and requires the plaintiff to specify the role of each defendant involved in the fraudulent activity. *Bruns v. Ledbetter, 583 F. Supp. 1050, 1052 (S.D. Cal. 1984)*; see also *In re Worlds of Wonder Sec. Litig., 694 F. Supp. 1427, 1433 (N.D. Cal. 1988)* ("Each defendant is entitled to know what misrepresentations are attributable to them and what fraudulent conduct they are charged with."). Here, Vincent has specified the role of Relaser in the fraudulent activity. As stated above, Vincent alleges that Relaser did not have possession of a contract to purchase the Milk, and that Relaser had [*12] no intention of obtaining the Milk to fill the order, despite its agreement to provide Milk to Vincent. (Compl. PP 10-12, 14.)

Because Vincent has stated facts upon which relief can be granted and met the heightened pleading standard for fraud, the court will **DENY** Relaser's motion to dismiss the fraud claim.

## D. Relaser has a sufficient basis to form a responsive pleading.

Relaser argues that Vincent's complaint is vague, ambiguous, and should be pled with more specificity under *Rule 12(e)*. (Def 's Mem. of P. & A. at 6.) *Rule 12(e)* provides that "if a pleading . . . is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading, the party may move for a more definite statement before interposing a responsive pleading." Motions for a more definite statement are generally viewed with disfavor and are rarely granted. *Cellars v. Pac. Coast Packaging, Inc., 189 F.R.D. 575, 578 (N.D. Cal. 1999)*. The test in evaluating a 12 (e) motion is whether the complaint provides the defendant with a sufficient basis to frame a responsive pleading. *Fed. Sav. & Loan Ins. Corp. v. Musacchio, 695 F. Supp. 1053, 1060 (N.D. Cal. 1988)*. The court will require a more definite [*13] statement only when the pleading is "so vague or ambiguous that the opposing party cannot respond, even with a simple denial, in good faith or without prejudice to himself." *Delta Educ., Inc. v. Langlois, 719 F. Supp. 42, 50 (D.N.H. 1989)*; *Bureerong v. Uvawas, 922 F. Supp. 1450, 1461 (C.D. Cal. 1996)* ("[A] motion for a more definite statement should not be granted unless the defendant literally cannot frame a responsive pleading."); *Sagan v. Apple Computer, Inc., 874 F. Supp. 1072, 1077 (C.D. Cal. 1994)* ("[B]ecause of minimal pleading requirements of the Federal Rules . . . [p]arties are expected to use discovery, not pleadings, to learn specifics of the claims being asserted.").

Here, it cannot be said that Vincent's complaint is so "vague and ambiguous" that Relaser cannot reasonably frame a responsive pleading. Relaser has demonstrated the sufficiency of the complaint by disputing several factual assertions in its motion to dismiss. See Def.'s Mem. of P. & A. ("Relaser did not contract at all with Plaintiff or St. Simons.") ("Plaintiff did not pay $ 210,041.20 for the Milk.") (Relaser made no representation to and/or contracts with Plaintiff or St. Simons whatsoever."). Together, [*14] these assertions could easily form a responsive pleading. Relaser can use discovery to learn the specifics missing from the "short and plain" complaint, after filing a responsive pleading. Because Relaser can frame a responsive pleading without causing undue prejudice to itself, the court will **DENY** its motion for a more definite statement.

### III. Conclusion

In light of the foregoing, the court **DENIES** Relaser's motion to dismiss with respect to the breach of contract and fraud claims, **GRANTS** the motion to dismiss with respect to the claim of unjust enrichment, and **DENIES** the motion for a more definite statement.

**IT IS SO ORDERED.**

DATED: July 24, 2007

Hon. Thomas J. Whelan

United States District Judge

10037F

********* Print Completed *********

Time of Request: Friday, January 11, 2008  21:26:51 EST

Print Number:    2842:69017639
Number of Lines: 195
Number of Pages:

Send To:  RICHARDS, MICHELLE
          FARELLA BRAUN & MARTEL
          235 MONTGOMERY ST
          SAN FRANCISCO, CA 94104-2902

# Exhibit E

**APPENDIX OF NON-FEDERAL AND UNPUBLISHED FEDERAL AUTHORITIES
CITED IN VISA USA INC.'S OPPOSITION TO MARITZ INC.'S
MOTION TO STAY ARBITRATION**



Slip Copy
Slip Copy, 2007 WL 1775393 (E.D.Pa.)
**(Cite as: Slip Copy)**

**C**Way Services, Inc. v. Adecco North America, LLC
E.D.Pa.,2007.
Only the Westlaw citation is currently available.
United States District Court,E.D. Pennsylvania.
WAY SERVICES, INC., Plaintiff,
v.
ADECCO NORTH AMERICA, LLC, et al.,
Defendants.
Civil No. 06-CV-2109.

June 18, 2007.

Eric L. Winkle, W. Bryan Byler, Byler, Goldman,
Winkle & Hetrick, PC, Lancaster, PA, for Plaintiff.
David I. Ackerman, David J. Butler, Bingham
McCutchen LLP, Washington, DC, Mark D.
Bradshaw, Stevens & Lee, Harrisburg, PA, for
Defendants.

### MEMORANDUM OPINION & ORDER

RUFE, J.
   *1 This case involves a dispute between a
franchisor and franchisee, both of whom claim that
the other has breached their franchise agreement.
Previously, the Court granted Plaintiff's Motion to
Compel Arbitration, and arbitration before the
American Arbitration Association ("AAA") has
commenced. Presently before the Court is Plaintiff's
Motion to Stay Arbitration, in which it argues that
only Count II of its Complaint should be arbitrated by
the AAA. Because Plaintiff entered an arbitration
agreement granting the arbitration panel the power to
decide the scope of its own jurisdiction, the Court
will deny the Motion, and the arbitration before the
AAA may proceed in accordance with the panel's
ruling.

### I. BRIEF FACTUAL BACKGROUND

   The instant dispute arises out of a relationship
between Plaintiff Way Services, Inc. ("Way
Services") and Defendants Adecco USA, Inc. and
Adecco North America, LLC (collectively
"Adecco"), that ostensibly commenced in August
1993. At that time, Way Services and Adia Services,
Inc. ("Adia Services") entered a franchise agreement
under which Plaintiff was to operate a temporary-
staffing business in Pennsylvania.[FN1]Adecco is the

successor-in-interest to Adia Services, and the
franchise agreement remained in place after Adecco
replaced Adia Services as the franchisor.

   > FN1. The Court notes that Way Services
   > previously had a relationship with Adia
   > Services' predecessors-in-interest. The
   > modern relationship, however, which is
   > based on the franchise agreement currently
   > in force, began in 1993.

   In addition to outlining the parties' relationship,
the franchise agreement included an arbitration
clause requiring that "any dispute or disagreement
between the parties arising out of or in relation to this
Agreement ... be settled by arbitration under the rules
then obtaining of the American Arbitration
Association in San Francisco, California."[FN2]The
agreement included a choice-of-law provision
requiring that it be governed by and interpreted under
California law.[FN3]

   > FN2. Franchise Agreement [Doc. # 47-2,
   > Ex. A], at 43, ¶ 22.1.

   > FN3.Id. at 41, ¶ 21.1.

   Apparently, the franchise relationship was an
amicable one for over a decade. Sometime in early
2006, however, Adecco demanded that Way Services
discharge its President and General Manager,
Michael Doner, based on allegations of misconduct.
In April 2006, Way Services complied with Adecco's
demand, and Mr. Doner was terminated. On May 12,
2006, Adecco notified Way Services that it was
terminating their franchise relationship as of May 21,
2006. In this lettered notice of termination, Adecco
identified numerous provisions of the franchise
agreement that Way Services was allegedly
breaching by continuing to associate with and support
Traffic Control Services, Inc. ("TCS"), a business
owned by Mr. Doner, his wife, and his mother.

   In response, Way Services filed a Complaint in
this Court, alleging three causes of action against
Adecco and seeking an injunction prohibiting Adecco
from terminating the franchise agreement. In Count I,
Way Services alleges that Adecco committed fraud
by instructing it not to remedy its breaches of the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 1775393 (E.D.Pa.)
**(Cite as: Slip Copy)**

franchise agreement, and then attempting to terminate the agreement. In Count II, Way Services alleges that Adecco's attempt to terminate the franchise agreement constitutes a breach of that agreement. In Count III, Way Services alleges that Adecco's attempt to terminate the franchise agreement constitutes tortious interference with a contract that it had made with TCS. The Court immediately entered a temporary restraining order precluding Adecco from terminating the franchise agreement, pending consideration of the request for a preliminary injunction.

**\*2** Before a hearing was held on Way Services' Application for a Preliminary Injunction,[FN4] Way Services filed a Motion to Compel Arbitration. Adecco responded to this flurry of litigation by filing an Answer and several counterclaims against Way Services, including claims for breach of contract, trademark infringement, and conspiracy to defraud. Adecco also filed a response to the Motion to Compel Arbitration, in which it agreed that arbitration was appropriate, but argued that it should be able to terminate the franchise agreement before arbitrating the dispute.

> FN4. Pl.'s Application for Prelim. Inj. [Doc. # 9]. After briefing and a hearing, this application was subsequently granted, and a preliminary injunction was entered on September 6, 2006. *See* Mem. Op. & Order [Doc. # 43], Sept. 6, 2006.

On June 23, 2006, the Court granted Way Services' Motion to Compel Arbitration, requiring Way Services to file for arbitration within seven days. On June 27, 2006, Way Services filed a Demand for Arbitration with the AAA, attaching a copy of its federal-court Complaint and informing the AAA that its other causes of action should be arbitrated "to the extent the Federal District Court does not exercise jurisdiction over [them]." Adecco filed an Answering Statement asserting breach-of-contract counterclaims against Way Services only.

Thereafter, the AAA ordered the parties to brief the issue of the arbitration's scope, and the parties did so through lettered briefs. After considering the briefing, the AAA panel determined that the franchise agreement granted it the power to determine its own jurisdiction, and ruled that all three of Way Services' claims and Adecco's breach-of-contract claim were subject to the pending arbitration.[FN5]

> FN5. *See* Order of Arbitrator [Doc. # 47-7, Ex. F], Jan. 25, 2007.

In response, Way Services has filed the instant Motion to Stay Arbitration. Adecco has filed its Response, and the Motion is now ready for this Court's review.

## II. DISCUSSION

Way Services, obviously dissatisfied with the AAA panel's determination of arbitrability, now moves this Court to stay the arbitration and assert jurisdiction over Counts I and II of Way Services' Complaint, as well as all of Adecco's counterclaims. Way Services first argues that the Court's Orders granting the Motion to Compel Arbitration and placing the matter in civil suspense compelled arbitration of Count II of the Complaint only and reserved exclusive jurisdiction over all other matters. More importantly, Way Services argues that questions of arbitrability, such as the appropriate scope of an arbitration, are to be decided by the Court rather than the arbitration panel. Accordingly, Way Services asks this Court to reject the AAA panel's determination of scope and, instead, perform its own inquiry into which claims are to be arbitrated.

Generally, the question of arbitrability is a gateway issue to be decided by a court rather than an arbitrator.[FN6] The parties to an arbitration agreement can, however, contract around this presumption by agreeing to submit the arbitrability question itself to arbitration.[FN7] But, "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clear and unmistakable' evidence that they did so."[FN8] Silence or ambiguity about who should decide the arbitrability issue should not lead a court to presume that the parties intended for the issue to be decided by the arbitrator.[FN9] Rather, a court must examine the arbitration agreement to decide if, when construed under the relevant state law, the agreement evidences a clear intention that the arbitrators will have the authority to determine the scope of arbitration.[FN10]

> FN6. *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 1775393 (E.D.Pa.)
(Cite as: Slip Copy)

Page 3

FN7.*First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 943, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995); *see also Apollo Computer, Inc. v. Berg,* 886 F.2d 469, 473 (1st Cir.1989).

FN8.*First Options,* 514 U.S. at 944 (citing *AT & T,* 475 U.S. at 649).

FN9.*Id.* at 944-45.

FN10.*See Contec Corp. v. Remote Solution Co.,* 398 F.3d 205, 208 (2d Cir.2005).

*3 Under this framework, numerous courts have found that when an arbitration agreement incorporates by reference rules giving the arbitrator the power to rule on his or her own jurisdiction, "the parties' incorporation of those rules evidences a clear and unmistakable intent to delegate the determination of arbitrability to [the] arbitrator."[FN11]Specifically, several courts-including California courts applying California law-presented with arbitration clauses nearly identical to the one in this case have found that reference to the AAA rules, or similar rules granting the arbitrator the authority to determine his or her own jurisdiction, establishes a clear and unmistakable intent to permit the arbitrators to decide the arbitrability question.[FN12]

FN11.*Qualcomm Inc. v. Nokia Corp.,* 466 F.3d 1366, 1373 (Fed.Cir.2006)

FN12.*See, e.g., Terminix Int'l Co., LP v. Palmer Ranch Ltd. P'ship,* 432 F.3d 1327, 1332 (11th Cir.2005); *Contec,* 398 F.3d at 208;*Apollo Computer,* 886 F.2d at 473;*Rodriguez v. Am. Techs., Inc.,* 136 Cal.App.4th 1110, 39 Cal.Rptr.3d 437, 446 (Ct.App.2006); *Dream Theater, Inc. v. Dream Theater,* 124 Cal.App.4th 547, 21 Cal.Rptr.3d 322, 329 (Ct.App.2004).

Significantly, California law embraces the conclusion that incorporation of the AAA rules evidences a clear and unmistakable intent to have the arbitrator determine any arbitrability questions. For example, in *Dream Theater, Inc. v. Dream Theater,*[FN13] the California Court of Appeal considered an arbitration clause providing that contested claims would be submitted to "mandatory, final and binding arbitration in the County of Los Angeles, California, in accordance with the Commercial Arbitration Rules of the American Arbitration Association then in effect."[FN14]After examining the Supreme Court's decision in *First Options,*[FN15] and after noting that "California law is consistent with federal law on the question of who decides disputes over arbitrability,"[FN16] the court concluded that reference to the AAA rules-which "specify that the arbitrator will decide disputes over the scope of the arbitration agreement"[FN17]-is sufficiently clear and unmistakable evidence that the arbitrator should decide whether a claim is arbitrable.[FN18]

FN13.124 Cal.App.4th 547, 21 Cal.Rptr.3d 322 (Ct.App.2004).

FN14.*Id.* at 327.

FN15.*Id.* at 326.

FN16.*Id.*

FN17.*Id.* at 329.

FN18.*Id.; see also Rodriguez,* 39 Cal.Rptr.3d at 446 (holding the same when considering an arbitration clause that incorporated the AAA's Construction Industry Rules, which also designate the arbitrability question for arbitration).

Various federal courts have arrived at the same conclusion when considering similar arbitration clauses. For example, in *Contec Corp. v. Remote Solution Co.,*[FN19] the Second Circuit Court of Appeals was faced with an arbitration clause that read, in pertinent part:

FN19.398 F.3d 205 (2d Cir.2005).

In the event of any controversy arising with respect to this Agreement, both parties shall use its [sic] best efforts to resolve the controversy. In the event the parties are unable to arrive at a resolution, such controversy shall be determined by arbitration held in the City of Albany, New York in accordance with the Commercial Arbitration Rules of the American Arbitration Association (the "AAA") or any organization that is the successor thereto.[FN20]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN20.*Id.* at 208.

Acknowledging that Rule 7(a) of the AAA Commercial Arbitration Rules grants the arbitrator "the power to rule on his or her own jurisdiction, including any objection with respect to the existence, scope or validity of the arbitration agreement," the court held that "the incorporation serve[d] as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator."[FN21]Accordingly, the court held that arbitration of the arbitrability issue itself was appropriate.

FN21.*Id.*

*4 Likewise, in *Qualcomm Inc. v. Nokia Corp.,*[FN22] the Federal Circuit concluded that the parties had clearly and unmistakably evidenced their intent to arbitrate the arbitrability issue by incorporating the AAA rules into their arbitration agreement. In that case, the court considered an arbitration clause dictating that "any dispute, claim or controversy arising out of or relating to th[e] Agreement, or the breach or validity [t]hereof ... be settled by arbitration in accordance with the arbitration rules of the American Arbitration Association."[FN23]Approving of and adopting the Second Circuit's analysis in *Contec,* the court held that incorporation of the AAA rules "clearly and unmistakably shows the parties' intent to delegate the issue of determining arbitrability to an arbitrator."[FN24]

FN22.466 F.3d 1366 (Fed.Cir.2006).

FN23.*Id.* at 1368.

FN24.*Id.* at 1373.

The Eleventh Circuit Court of Appeals reached this same result when presented with a similar arbitration clause. In *Terminix International Co., LP v. Palmer Ranch Limited Partnership,*[FN25] the parties had entered arbitration agreements providing that "arbitration shall be conducted in accordance with the Commercial Arbitration Rules then in force of the American Arbitration Association."[FN26]The court, noting the AAA rule granting an arbitrator the authority to rule on his or her own jurisdiction as well as the Federal Circuit's decision in *Contec,* held that, by incorporating the AAA rules into their agreements, the parties had clearly and unmistakably

agreed that the arbitrator should decide the question of arbitrability.[FN27]

FN25.432 F.3d 1327 (11th Cir.2005).

FN26.*Id.* at 1332.

FN27.*Id.*

The First Circuit arrived at a similar conclusion when dealing with an arbitration agreement that incorporated the rules of arbitration of the International Chamber of Commerce ("ICC"), as opposed to the AAA. In *Apollo Computer, Inc. v. Berg,*[FN28] the court considered an arbitration clause stating that "all disputes arising out of or in connection with their contract would be settled by binding arbitration in accordance with the rules of arbitration of the [ICC]."[FN29] Articles 8.3 and 8.4 of the ICC rules granted the arbitrator the power to decide the arbitrability question if such question was raised by either party.[FN30]Consequently, the court held that the parties had contracted around the presumption that a court would decide the arbitrability issue by agreeing to be bound by the ICC rules. Their agreement, therefore, "clearly and unmistakably allow[ed] the arbitrator to determine her own jurisdiction."[FN31]

FN28.886 F.2d 469 (1st Cir.1989).

FN29.*Id.* at 473.

FN30.*Id.*

FN31.*Id.*

Considering this relevant case law, the Court is persuaded that the prevailing rule across jurisdictions is that incorporation by reference of rules granting the arbitrator the authority to decide questions of arbitrability-especially the AAA rules-is clear and unmistakable evidence that the parties agreed to submit arbitrability questions to the arbitrators. More importantly, the Court is convinced that California law has adopted this rule.

If, after applying this rule, a court ultimately determines that the parties clearly and unmistakably intended to submit the arbitrability question to the arbitrator, then it must defer to the arbitrator's

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                      Page 5
Slip Copy, 2007 WL 1775393 (E.D.Pa.)
(Cite as: Slip Copy)

decision about arbitrability of the claims.[FN32]The arbitrator's decision is to be reconsidered and vacated only in limited and rare circumstances, such as those outlined in 9 U.S.C. § 10.[FN33]

FN32.*First Options,* 514 U.S. at 943.

FN33.*See id.;*9 U.S.C. § 10 (2006) (outlining the bases for vacating an arbitrator's award, such as corruption or fraud in the process, or misconduct by the arbitrator).

*5 In the matter currently before the Court, Way Services' assertion that the Court must decide the scope of arbitration itself rather than deferring to the arbitrators' determination, is unfounded. The instant case presents an issue virtually identical to that presented in cases like *Qualcomm, Contec, Terminix,* and *Dream Theater,* and the Court sees no reason to reach a different conclusion in this case. When Way Services entered the franchise agreement, it agreed to an arbitration clause that required arbitration of disputes in accordance with the AAA's arbitration rules. Those rules-specifically Rule 7(a)-grant the arbitrator "the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement."[FN34]Accordingly, the incorporation of the AAA rules clearly and unmistakably evidences Way Services' agreement to arbitrate all disputes as to arbitrability, including the proper scope of the arbitration. In light of the significant authority supporting this conclusion, Way Services' arguments to the contrary are unconvincing.

FN34. AAA Commercial Arbitration Rules [Doc. # 47-8, Ex. G], Rule 7(a), at 11 of 28.

Since the AAA arbitration panel had the authority to determine its own jurisdiction in this case, the Court must defer to its ruling on the scope of the pending arbitration. This is clearly not a case where vacatur of the panel's ruling would be appropriate. There are no allegations of bias, impropriety, corruption, or misconduct, and the arbitrators have not exceeded their power. Therefore, this Court will not disrupt the arbitrators' ruling that Counts I, II, and III of Way Services' Complaint, as well as Adecco's counterclaim for breach of contract, will be arbitrated before them pursuant to the franchise agreement.

## III. CONCLUSION

Because Way Services agreed to resolve any disputes arising from or related to the franchise agreement through arbitration governed by the AAA rules, it cannot now successfully attempt to disavow that commitment. The AAA rules clearly state that the arbitrators have the authority to determine their own jurisdiction, and, therefore, this Court cannot remove the question of arbitrability from the arbitration panel's purview. To do so would be to act in direct contravention of the parties' arbitration agreement. Accordingly, the Court will deny Way Services' Motion to Stay Arbitration, and the ongoing arbitration may proceed as currently defined by the AAA panel.

An appropriate Order follows.

### *ORDER*

**AND NOW,** this 18th day of June 2007, upon consideration of Plaintiff's Motion to Stay Arbitration [Doc. # 45], Plaintiff's Memorandum in Support thereof [Doc. # 46], and Defendants' Opposition thereto [Doc. # 47], and after careful review of the relevant legal authorities, it is hereby **ORDERED** that the Motion is **DENIED** and the arbitration may proceed.

It is **FURTHER ORDERED** that the Court retains jurisdiction over this matter, but the case shall remain in the Civil Suspense File until it is in a status such that it may proceed to final disposition.

*6 It is so **ORDERED.**

E.D.Pa.,2007.
Way Services, Inc. v. Adecco North America, LLC
Slip Copy, 2007 WL 1775393 (E.D.Pa.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit F

**APPENDIX OF NON-FEDERAL AND UNPUBLISHED FEDERAL AUTHORITIES CITED IN VISA USA INC.'S OPPOSITION TO MARITZ INC.'S MOTION TO STAY ARBITRATION**



235 Cal.App.2d 465
235 Cal.App.2d 465, 45 Cal.Rptr. 458
**(Cite as: 235 Cal.App.2d 465)**

Page 1

**C**Brownlee v. Vang
Cal.App.5.Dist.
ROBERT G. BROWNLEE, Plaintiff and
Respondent,
v.
ALFRED VANG et al., Defendants and Appellants.
**Civ. No. 519.**

District Court of Appeal, Fifth District, California.
June 28, 1965.

HEADNOTES

**(1a, 1b, 1c)** Fraud § 77(1)(b)--Actions--Evidence.
The evidence sufficiently supported the finding that plaintiff relied on defendant's false representations and that the reliance was justified where it was shown that defendant falsely represented himself as an electronics expert, that plaintiff was ignorant concerning such matters, that through friendship a relation of trust and confidence existed between them, and that in securing a loan from plaintiff and later securing cancellation of the debt in return for worthless stock, defendant falsely represented the potential production of and income from his claimed inventions to allay plaintiff's suspicions.

**(2)** Fraud § 22(1)--Reliance--Necessity.
To make out a case of misrepresentation, plaintiff must show not only the representation of a material fact on which he was entitled to rely, but that he did in fact rely to his damage.
See **Cal.Jur.2d,** Fraud and Deceit, § 29; **Am.Jur.,** Fraud and Deceit (1st ed § 141).

**(3)** Fraud § 91(8)--Questions of Fact--Reliance.
Whether fraud, including the element of reliance, exists is ordinarily a question for the fact-finding entity.

**(4)** Fraud § 77(1)(a)--Actions--Evidence.
The judicial officer who sees and hears the witnesses in a fraud case has the duty to determine the weight and effect of their evidence; the trial court's decision as to whether any substantial showing of fraud outweighs opposing testimony is ordinarily final, and appellate courts will not disturb a finding of fraud supported by any substantial evidence.

**(5)** Fraud § 49(1)--Actions--Defenses.

That plaintiff in a fraud case is too credulous is not generally a defense; the test of defendant's representation is its actual effect on the particular mind, whether it is strong and circumspect, or weak and too relying.

**(6)** Fraud § 49(1)--Actions--Defenses.
It could not be said that plaintiff was more credulous than the average person in relying on defendant's misrepresentations concerning projects to develop inventions and various corporations formed by defendant where the record showed that others invested in the projects and corporations and lost.

SUMMARY

APPEAL from a judgment of the Superior Court of San Diego County. Byron F. Lindsley, Judge. Affirmed.

Action for fraud. Judgment for plaintiff affirmed.

COUNSEL
William F. Reed and Carl Hoppe for Defendants and Appellants.
James W. Funsten for Plaintiff and Respondent.
BROWN (R. M.), J.
This is an appeal by the defendant-appellant from an adverse judgment rendered by the court in an action based upon the theory of fraud. By the judgment the plaintiff was awarded $4,500 as compensatory damages, $3,000 as exemplary damages, and his costs of suit. The action was brought against Alfred Vang, Ann Vang and Magnatron Corporation of America, Inc. The court found that no liability attached to Ann Vang. It was stipulated that, for the purpose of this lawsuit, the defendant Alfred Vang and the defendant Magnatron Corporation of America, Inc. are one. For convenience, the word "defendant" as herein used will be a reference to Alfred Vang.

The sole question presented by the appeal is whether the evidence supports the trial court's finding that the plaintiff relied upon the false representations made by the defendant and that such reliance was justified.

*The Facts*

235 Cal.App.2d 465                                                                                                    Page 2
235 Cal.App.2d 465, 45 Cal.Rptr. 458
(Cite as: 235 Cal.App.2d 465)

(1a) The plaintiff met the defendant, Alfred Vang, and the latter's wife, Ann Vang, in the latter part of 1947 or the early part of 1948 in Carmel, California. They became friends. At that time the plaintiff was a merchant seaman. He had recently married and was desirous of obtaining a shore job. Although he had attended the Colorado Junior College for three years and Hastings College of the Law for one year, he had neither training nor experience in engineering, science, or business. He had never made investments in stocks or bonds. His savings amounted to $4,000. The defendant told the plaintiff that he was an engineer and had studied at the University of Copenhagen; that he was an associate of Neils Bohr, a famous scientist, and had worked with Bohr on the Manhattan Project; that he had worked for the Federal Defense Department over a period of years and was called to Washington for **467** consultation from time to time; that he had designed and developed numerous electronic processes and items including the first automobile valve of the type still in use today; that he was a partner in the firm of Stevenson, Jordan and Harrison, one of the biggest of the research and development companies in the United States; that he owned and operated a factory in the east which was producing welding machines; that he had invented an electronic tube which General Electric and other leading manufacturers were very much interested in; that he had invented a panel which he used with the electronic tube the use of which was practically unlimited; that he had a contract with Electrical Products Company of Los Angeles to produce the panels; that he was developing a fog dispersion machine at the Monterey airport; and that he had developed a welding machine which was in production and was being sold in the east. In October 1948, the defendant told the plaintiff that he was negotiating for a plant on the Monterey peninsula for the purpose of putting his electronic tube into production and asked to borrow $6,000. He promised the plaintiff a position with him in his project. On October 23, 1948, the plaintiff loaned the defendant his savings of $4,000 and received a promissory note executed by the defendant promising to repay the sum with interest 60 days thereafter. He relied in part upon the representations of the defendant made directly to him, and in part upon an article which appeared in the October 13, 1947, issue of the Monterey Peninsula Herald, and information therein which originated with the defendant, which spoke in glowing terms of the defendant, his reputed background as an electronic inventor, and of a revolutionary invention which would disperse fog which the defendant was reportedly building and should have ready for testing about two weeks after the article appeared. The plaintiff also testified that he had seen the electronic tube and relied upon its functioning properly before he loaned the defendant the money. Shortly after the loan was made the defendant left the community and went to Berkeley. He failed to repay the loan. When the loan became due the plaintiff telephoned the defendant; the defendant reassured the plaintiff that everything was working out; that he had started a company with one George Hart. The plaintiff testified, "I felt he was a pretty important man and I didn't feel as though I wanted to badger him about the thing, and I felt that it was all right, that I would just-I would go along with **468** it more or less at his convenience, but I would like to have it back." The defendant also told the plaintiff that the panel was being used to drive a vibrator and that people from the University of California were very interested in the invention. About the middle of 1949, the plaintiff was told by George Hart that the defendant had left Berkeley and had removed to Vancouver, Canada. The plaintiff had several conversations with the defendant, who continually assured the plaintiff that his various enterprises were going well. He explained that George Hart had "locked him out" of the Berkeley plant and he had moved to Canada. He invited the plaintiff to come up to Canada and he would show the plaintiff what he was doing. On October 13, 1949, the plaintiff filed an action in the Superior Court of Monterey County in an attempt to collect on the note. Vang was never served. Subsequently the plaintiff asked Dun & Bradstreet to investigate what the defendant was doing in Canada. Dun & Bradstreet collected $500 on the note. The defendant asked the plaintiff to call off Dun & Bradstreet. In June of 1950 the plaintiff went to Canada and spent a "couple" of days with the defendant. The defendant showed him what they were doing, showed him drawings and parts of an electronic hammer, told him that he had a number of contracts for the equipment, told him that the defendant and one Eggleton had formed one company and were forming a second, gave a demonstration with the panel device, and suggested that he take stock in the companies in lieu of the amount of the debt. The plaintiff testified: "I went up there pretty mad at Fred and I went away pretty happy with him. This appeared to me, from what he told me-the thing looked practical and looked as though his panels were a complete

235 Cal.App.2d 465                                                      Page 3
235 Cal.App.2d 465, 45 Cal.Rptr. 458
**(Cite as: 235 Cal.App.2d 465)**

success." On some unspecified date between July 28, 1950, and March 5, 1951, the plaintiff cancelled the note in exchange for shares of stock in Magnatron Hammer Company, Ltd. and Magnatron Panel Company, Ltd., the two Canadian companies. The plaintiff returned for trips to Canada in 1951 and again in 1953, and attended shareholders' meetings. Although no dividends were paid on the stock, he received corporate financial statements showing that the companies were solvent. On some date between April 28, 1953, and January 13, 1954, the plaintiff purchased from one Joe Jordan further shares of stock in the two companies for $400. During the period from 1950 to 1955, the plaintiff also expended time and moneys in attending meetings in *469 Canada and preparing himself for the purpose of participating in projects of the defendant. At intervals during this period of time the defendant gave glowing progress accounts to the plaintiff and assured him that he would have a good position with the projects as soon as they got into production. The plaintiff testified: "Well, we were friendly, and then I felt unfriendly toward Fred; then we would get together, and it would be friendly again, and then it would continue to be that way." As late as 1960, just before this suit was filed, the defendant continued to reassure the plaintiff. In 1955 the plaintiff engaged the law firm of Lawrence, Shaw, McFarlane and Stewart to attend a shareholder's annual meeting and send him a report. The attorneys' report was unfavorable and suggested that stock in the defendant's companies was watered. The trial court found:

"I. Commencing in the year 1947 and continuing through the year 1955 defendant Alfred Vang represented to plaintiff that said defendant was a university educated electronics scientist with experience in electronics research and development and with professional associations with leading scientists. Continuously during said period, Alfred Vang represented to plaintiff that he, Alfred Vang, had perfected several different devices employing a unique electronics tube and circuit system developed by said Alfred Vang which devices were of great commercial value for immediate use in electroplating hard rock drill bits, aluminum smelting, industrial hammers, welding and other uses. Continuously during said period said Alfred Vang represented that he was able to, and intended to, make immediate commercial application of said devices and provide plaintiff employment in connection with said project.

"II. Continuously during said period of time there was a relation of personal trust and confidence between the plaintiff and the defendant Alfred Vang.

"III. Said representations were false. Said Alfred Vang did not have any university or college education. Said Alfred Vang did not have certain electronics research and development experience that he claimed to have. Said Alfred Vang did not have professional associations with leading scientists. Said Alfred Vang knew he was unable to, or had intention [sic] to, make commercial application of his devices and he never had any intention to provide employment for plaintiff. Said Alfred Vang made said representations *470 regarding said projects for the purpose of raising money for his use and to promote his own interests and without any intention to carry out the projects.

"IV. Said representations were made by said Alfred Vang with the intent to deceive plaintiff Robert G. Brownlee. Said plaintiff reasonably relied upon the said representations above set forth, and each of them, and in reliance thereon, gave Alfred Vang $4,000 of which $3,500 remains unreimbursed, and thereafter purchased worthless stock in reliance thereon at a cost of $400, and expended additional time and money for attendance at the corporation meetings of the projects of Alfred Vang and for preparation of himself to participate in the projects of said Alfred Vang, all to the damage of Robert G. Brownlee in the total sum of $4,500.

"V. Before June 27, 1955, said Robert G. Brownlee had neither discovered the fraud nor failed to exercise due diligence to discover the fraud. Before June 27, 1955, Robert G. Brownlee did not have the means of discovering the fraud and could not have discovered it in the exercise of due diligence. On said June 27, 1955, said Robert G. Brownlee must be deemed to have notice of said fraud on account of the continued failure of Alfred Vang to do what he said he intended to do and also on account of the letter received said day from Canadian attorneys stating suspicions of watered stock.

"VI.

. . . . . . . . . .

"VII. The representations of said Alfred Vang

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

235 Cal.App.2d 465
235 Cal.App.2d 465, 45 Cal.Rptr. 458
**(Cite as: 235 Cal.App.2d 465)**

Page 4

were made as part of a continuous fraudulent and
malicious course of conduct whereby he obtained
money from numerous people as investments in
projects which he never had any intention of carrying
out."

*Argument and the Law*

The defendant does not challenge the trial court's
findings relating to the misrepresentations or
damages. The only charge of error is that the trial
court erred in finding that the plaintiff reasonably
relied upon the representations of the defendant. It is
claimed that the evidence is to the contrary. The
plaintiff testified at length; the defendant did not
testify and apparently was not present at the trial, but
portions of a prior deposition which he had given
were read into the record. That record is voluminous.
The reporter's transcript embraces 813 pages; the
clerk's, 254 *471 pages; there are 179 interrogatories
with answers; and more than 150 exhibits were
received in evidence. From this vast record, the
defendant has selected isolated items of evidence
with which to persuade this court that the plaintiff,
rather than relying upon representations of the
defendant, took a calculated risk in the projects of
the defendant in the hope of ultimate financial gain.

The defendant argues that, at the outset, the
defendant promised to repay to the plaintiff the sum
of $4,000 within 60 days; that he defaulted and left
the community. The plaintiff testified that the first
statement made by the defendant that he thought was
false was the promise to pay the money, which
promise was not kept; that the next statement was
when the defendant told the plaintiff that the
defendant was going to remain in the Monterey area,
but did not do so and left the community; that he
discovered the falsity of that statement in the fall of
1949. The plaintiff also testified that the defendant
represented he was going to build a fog dispersal
machine in Monterey, which he did not do. This the
plaintiff learned in 1949. The plaintiff testified that
he relied in part on the newspaper article that the fog
dispersing machine would be ready for testing in late
October 1949; but made no investigation to
determine whether or not the machine had been
completed. The plaintiff further testified that prior to
the exchange of the note for the stock, he had a
conversation with George Hart in San Francisco and
Hart told the plaintiff that the defendant never
finished any of his work. On July 4, 1949, the
plaintiff wrote to the defendant and stated, in part, "...

On October 23 of this year your 60 day note for the
$4,000 loan I made you will be 10 months overdue."
The defendant also points to the lawsuit which the
plaintiff filed in Monterey County in an attempt to
collect on the note, and the fact that he had Dun &
Bradstreet investigate the defendant's activities in
Canada and attempt collection. On March 31, 1950,
the plaintiff wrote to the defendant stating in part:
"Got your latest promise the other day through Dun
and Bradstreet. If you have plans for skipping out of
Canada without notice with the idea of raising a little
money and losing me at the same time-don't do it."

When questioned concerning this letter, the
plaintiff testified: "As far as keeping his promise to
pay the money to me my confidence had dropped to a
rather low ebb ..." The defendant contends that the
plaintiff's testimony summarized *472 above shows
that he did not rely upon representations made by the
defendant. Nevertheless, with knowledge of the many
promises which had been unfulfilled, the plaintiff
negotiated his first five shares of stock in Magnatron
Hammer, Ltd. on July 25, 1950. About six months
later, on January 5, 1951, the plaintiff complained by
letter to the defendant, "... as you will recall, in 1948
when I made you the loan it was made with the
understanding that I was to be given a chance to work
for you." In a subsequent letter of February 8, 1951,
the plaintiff admitted: "... When I suggested in my
last letter that I was willing to take a final chance by
accepting a transfer of stock I meant just that. I had
no idea at that time, nor do I have any idea now,
when you will get into production, or if you ever
will."

Shortly after writing that letter and on March 5,
1951, the plaintiff obtained 15 shares in Magnatron
Panel Company, Ltd., and 24 shares in Magnatron
Hammer Company, Ltd., and cancelled the note.

In April 1953, the plaintiff purchased stock from
Joe Jordan; at that time he knew that he had not
received any dividends on the stock which he had
acquired in 1950 and 1951. Also at this time he knew
that there had been no commercial production in any
of the defendant's ventures up to that date.

If the testimony on which the defendant relies
was the sole evidence on the subject, it would be
difficult to say that the plaintiff placed any reliance
on the representations made by the defendant after
the note was in default and the defendant had moved
from the Monterey area. But it is not. The record is

235 Cal.App.2d 465                                                    Page 5
235 Cal.App.2d 465, 45 Cal.Rptr. 458
**(Cite as: 235 Cal.App.2d 465)**

replete with testimony concerning telephone calls over the interval from 1949 through 1954 in which the defendant constantly explained difficulties he was encountering, soothed away the plaintiff's fears, gave glowing accounts of his various inventions, their marketability, desirability to manufacturers, and their potential worth. The defendant's wife, Ann Vang, wrote several letters to the plaintiff. One such letter, written on December 2, 1949, and authorized by the defendant, thanks the plaintiff for his patience; states that certain panels and electric hammers were being built to be shipped to California and would be in San Francisco no later than January 15th; that an attorney had been appointed to form a company for the immediate production of hammers; and that as soon as the hammers arrived in San Francisco the plaintiff could be paid in money or stock. The letter extolled the efficiency and low cost of *473 the hammers and their usefulness and salability. Mr. George Hart, who had been associated with the defendant in Berkeley, told the plaintiff that the equipment was good and that it would do the things the defendant claimed it would do. It was not until August 24, 1957, that the plaintiff learned for the first time that the electronic tube, which was claimed by the defendant to be a basis of his various inventions, did not work. It was not until after this suit was filed that plaintiff learned the hammer and panel were not inventions of the defendant. After 1957, plaintiff reached the conclusion that Vang's promises were made without the intention to perform, and this was after he had the opportunity of discovering that the defendant had a long history of promotional companies. Even as late as 1960, about a month before this suit was filed, the defendant again stated to the plaintiff that the projects in Canada were being successfully completed, and he furnished the plaintiff with what purported to be a financial statement and again attempted to allay the plaintiff's suspicions of fraud and assure him that defendant would protect his interests.

(2) It is elementary that to make out a case of misrepresentation, the plaintiff must show not only a representation of a material fact upon which he was entitled to rely, but that he did in fact rely to his damage. (_Edwards v. Lang_, 198 Cal.App.2d 5 [18 Cal.Rptr. 60]; _Eck v. McMichael_, 176 Cal.App.2d 368 [1 Cal.Rptr. 369].) (3) Whether or not fraud exists, including the element of reliance, is ordinarily a question of fact for the fact-finding entity. (4) As this court said in _Vogelsang v. Wolpert_, 227 Cal.App.2d 102, 110-111 [38 Cal.Rptr. 440]:

"Because of the diversity of factors and the differing intelligence of those guilty of fraud and their victims, the function of the trial judge in fraud cases is particularly significant. It is the duty of the judicial officer who sees and hears the witnesses to determine the weight and effect of their evidence; if there is any substantial showing of fraud the trial court must determine whether it outweighs the testimony presented by the opposing side; and his decision is ordinarily final in matters of this kind; appellate courts will not disturb a finding of fraud if there is any substantial evidence to support the lower court's decision. [Citations.]

"As a determination of the existence of fraud is particularly within the decisional field of the trial judge, the *474 appellants are attempting to swim upstream against a strong current of authority when they maintain that there was no such showing in the long record, and in effect that this court should pass again upon the factors which the trial court found to be indicative of fraud."

(5) And at pages 111-112: "As is observed in _Feckenscher v. Gamble, supra_, 12 Cal.2d 482, 496-497 [85 P.2d 885]: ' "That plaintiff is too credulous is not generally a defense. The test of the representation is its actual effect on the particular mind, whether it is a strong and circumspect mind, or one weak and too relying." ' (_Neff v. Engler_, 205 Cal. 484, 489 [271 P. 744].)' "

Plaintiff points to the case of _Blackman v. Howes_, 82 Cal.App.2d 275, where the court, in considering the issue of justifiable reliance, said at pages 278-279 [185 P.2d 1019, 174 A.L.R. 1004]: "When the facts are susceptible to opposing inferences, whether a party relied upon a false representation, notwithstanding prior information which, if investigated, might have led to discovery of the falsity of the representation, is itself a question of fact to be determined by the trier of fact. [Citation.] Where one is justified in relying, and in fact does rely, upon false representations, his right of action is not destroyed because means of knowledge were open to him. In such a case, no duty in law is devolved upon him to employ such means of knowledge. [Citation.]

" 'The mere circumstance that one makes an independent investigation or consults with others does not necessarily show that he relied upon his own judgment rather than upon the representations of the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

235 Cal.App.2d 465                                                                Page 6
235 Cal.App.2d 465, 45 Cal.Rptr. 458
**(Cite as: 235 Cal.App.2d 465)**

other party, nor does it give rise to a presumption of law to that effect.' [Citation.] A buyer is not chargeable with knowledge of conditions which he fails to discover because of some deception of the seller. [Citations.] When, as here, the buyer has only a suspicion of fraud and the seller lulls the buyer into inaction by a false representation, the seller will not be permitted to assert that the buyer lost his rights by accepting the assurance of the seller that there was no fraud. [Citation.]"

In *Bank of America v. Greenbach*, 98 Cal.App.2d 220, at page 233 [219 P.2d 814], the court said: "It is, of course, the law that a party has a duty to investigate where he has notice of facts which indicate fraud. [Citations.] But this duty to investigate is a relative matter. The creditor has a legal right to rely upon the statements made by the debtor. If the debtor is guilty of deliberate fraud, it is not *475 good morals, nor does it make good sense or good law, to say that the creditor was too credulous because he placed too much reliance on the statements made by the fraudulent debtor, and is therefore barred."

At page 234, the court said: "It is also well settled that when a fact is peculiarly within the knowledge of the person making the representation and not within the knowledge of the person to whom it is made, the latter has the right to rely upon the representations of the former respecting such fact."

The trial court found that during the period here involved there was a relation of personal trust and confidence between the plaintiff and the defendant, and that finding stands unquestioned.

In volume 23, California Jurisprudence, Second Edition, Fraud and Deceit, section 31, pages 75-76, it is said: "A person has a right to rely on statements of material facts essentially connected with the substance of the transaction where there is a confidential relation existing between the parties, and such reliance cannot be charged as negligence. ... A similar situation exists where one of the parties is ignorant and inexperienced in regard to the matters concerning which the material representations are made, and such ignorance is known to the other party, who is also aware that reliance is being placed on his representations and that the facts are not, and cannot be expected to be, within the first party's knowledge."

The court, in *Bank of America v. Greenbach, supra*, 98 Cal.App.2d 220, said at page 235: "[T]he question as to whether the known facts were sufficient to put the defrauded person on inquiry is one of fact for the trial court. ... '... Whether or not the plaintiff was negligent in relying upon the truth of the defendant's representations seems to be immaterial. If under the facts, because of the relation of the parties, involving trust and confidence, or because the representor was in a position to know the facts which was definitely superior to that of the representee, or where an investigation by the representee could not be easily made, the courts hold that he was justified in relying on the truth of the false statements.' "

In *Garrett v. Perry*, 53 Cal.2d 178 [346 P.2d 758], the issue of justifiable reliance on the part of the person defrauded was raised. Mr. Chief Justice Gibson, speaking for the Supreme Court, made brief disposition of the contention. *476 At pages 181-182, he stated: "The fact that a buyer makes an independent investigation does not preclude him from relying on representations made by the seller where, as here, the seller has a superior knowledge. [Citation.] Nor did the receipt of some unfavorable information preclude plaintiff from such reliance as a matter of law. [Citation.] The trial court could properly conclude that any suspicions of plaintiff arising from the information he had obtained upon his investigations were allayed by defendant's subsequent reassurances and that under the circumstances of this case plaintiff was not precluded from relying upon what defendant told him."

In volume 23 of California Jurisprudence, Second Edition, Fraud and Deceit, section 39, at page 97, it is said: "..., a party's suspicions may have been reasonably allayed by the other party's positive reassurances or representations."

In *Kalkruth v. Resort Properties, Ltd.*, 57 Cal.App.2d 146, at page 150 [134 P.2d 513], the court said: "We believe that when, as here, the buyer has only a suspicion of the fraud, and the seller who has defrauded the buyer, lulls the buyer into a sense of security by both words and conduct, the seller should not be permitted to assert that the buyer had lost his rights by waiving the suspicion and accepting the reassurance of the seller that no fraud had been perpetrated."

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(1b) In this case the defendant purported to be an expert in the field of electronics; the plaintiff was ignorant concerning such matters. Through friendship a relation of trust and confidence existed between them. The misrepresentations made relative to a subject matter of which the plaintiff had no knowledge were not such that their falsity must have been so obvious to the plaintiff as to preclude any justifiable reliance thereon by him. Further representations, made as statements of fact and not of opinion, dealing with contracts which the defendant had entered into with other firms, the potential production of and income from his claimed inventions, designed to allay the suspicions of the plaintiff, were themselves misrepresentations calculated to deceive. That they accomplished their purpose should not now redound to the benefit of the defendant. (6) It cannot be said that the plaintiff was more credulous than the average person would have been. The record shows that others invested in the projects and various corporations formed by the defendant and lost. It was said in the case of *Sanfran Co. v. Rees Blow Pipe Mfg. Co.,* 168 Cal.App.2d 191, at pages 202-203 [335 P.2d 995]:*477

"In *De Spirito v. Andrews,* 151 Cal.App.2d 126, the court said at page 130 [311 P.2d 173]:

" 'It is a general rule that a vendor not in a confidential relation to the buyer is not under a duty to make full disclosure concerning the object which he would sell. However, it is a universally recognized exception that if he undertakes to do so he is bound not only to tell the truth but he is equally obligated not to suppress or conceal facts within his knowledge which materially qualify those stated. If he speaks at all, he must make a complete and fair disclosure. [Citations.]'

"As pointed out in *Kuhn v. Gottfried,* 103 Cal.App.2d 80, 81 [229 P.2d 137], any facts which affect the desirability of the property to be sold, are facts 'which materially qualify these stated.' Defendant admitted that the double lines on the plot plan could be interpreted to mean walls.

"... 'Where material facts are accessible to the vendor only and he knows them not to be within the reach of the diligent attention and observation of the vendee, the vendor is bound to disclose such facts to the vendee.' (*Rothstein v. Janss Investment Corp.,* 45 Cal.App.2d 64 [113 P.2d 465]; *Dyke v. Zaiser,* 80 Cal.App.2d 639 [182 P.2d 344].) ...

"... Whether the investigation made by the plaintiff was a properly full one after his discovery that the building was not Class 'C,' was an issue of fact for the trial court."

The cases upon which the defendant relies are not in point. In the case of *Ruhl v. Mott,* 120 Cal. 668 [53 P. 304], the plaintiff entered upon the land, discovered the fraud, expressed dissatisfaction, and notwithstanding this knowledge, thereafter affirmed the contract by including the unpaid interest in a new note and giving the defendant a new mortgage upon the land. It was held that the second transaction was free from fraud and the plaintiff's conduct constituted a waiver of all rights of rescission. In *Gratz v. Schuler,* 25 Cal.App. 117 [142 P. 899], the plaintiff purchased a panorama on defendant's representations that he could earn so much a day, and notwithstanding that after the plaintiff had operated the panorama for a few days to see what it was earning and thus knew the real earning capacity of the panorama, he completed the payment of the balance of the purchase price, and he could not be heard to say that he was deceived by the representations. In *Carpenter v. Hamilton,* 18 Cal.App.2d 69 [62 P.2d 1397], the plaintiffs, before parting with value, inspected a portion of the premises where there were patent defects contrary to representations which had been made by the *478 defendant. The reviewing court held that knowledge of the plaintiffs of the defendant's misrepresentations relating to the portion inspected, precluded reliance by them upon misrepresentations as to the condition of the premises which they did not visit. This case has never been overruled, but its broad language has been undercut by subsequent cases, such as *Sanfran Co. v. Rees Blow Pipe Mfg. Co., supra,* 168 Cal.App.2d 191, 203, and *Hefferan v. Freebairn,* 34 Cal.2d 715, 720 [214 P.2d 386], where its holding has been held applicable only to visible defects.

(1c) In the case before us the plaintiff was constantly reassured by the defendant, and under the circumstances he was not precluded from relying on what the defendant told him or showed him.

The defendant questions the sufficiency of the evidence to support the finding, but we think that the evidence is ample to support such, and will not belabor the well-settled law that this court is bound thereby. (*Overton v. Vita-Food Corp.,* 94 Cal.App.2d 367 [210 P.2d 757]; *Berniker v. Berniker,* 30 Cal.2d

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

235 Cal.App.2d 465
235 Cal.App.2d 465, 45 Cal.Rptr. 458
**(Cite as: 235 Cal.App.2d 465)**

439 [182 P.2d 557].)

The judgment is affirmed.

Conley, P. J., and Stone, J., concurred. *479
Cal.App.5.Dist.
Brownlee v. Vang
235 Cal.App.2d 465, 45 Cal.Rptr. 458

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit G

**APPENDIX OF NON-FEDERAL AND UNPUBLISHED FEDERAL AUTHORITIES
CITED IN VISA USA INC.'S OPPOSITION TO MARITZ INC.'S
MOTION TO STAY ARBITRATION**

**Westlaw.**

183 Cal.App.3d 194                                                                                  Page 1
183 Cal.App.3d 194, 227 Cal.Rptr. 887
**(Cite as: 183 Cal.App.3d 194)**

▷Cicone v. URS Corp.
Cal.App.5.Dist.
    FRANK J. CICONE, Cross-complainant and
                Appellant,
                   v.
    URS CORPORATION et al., Cross-defendants and
                Respondents.
              **No. F004334.**

      Court of Appeal, Fifth District, California.
                 Jul 10, 1986.

                  SUMMARY

In a malpractice action against an attorney seeking
damages for alleged negligence in handling the sale
of plaintiffs' business, the attorney interposed a cross-
complaint for damages for fraud, negligent
misrepresentation, breach of good faith and fair
dealing and equitable indemnity against the corporate
buyer, its president, and the attorney for the buyer,
alleging breach of an oral promise that certain
statements in the written sale contract would be
deemed by the buyer to have been made on the
sellers' best knowledge only. The trial court
dismissed the cross-complaint on demurrer without
leave to amend. (Superior Court of Kern County, No.
184091, Clarence Westra, Jr., Judge.)

The Court of Appeal reversed. The court held that
dismissal was erroneous and an abuse of discretion.
The promise by the buyer and its attorney, as alleged
in the pleadings, constituted a misrepresentation of
fact, was material to the contract between the parties,
and was made without any intention that it would be
performed. As to the issue of whether the sellers'
attorney was justified in relying on the buyer's
misrepresentation, the court held that this constituted
a question of fact under the circumstances,
precluding dismissal of the action. It further held that,
inasmuch as the pleadings indicated that the parties
were cotortfeasors, to one degree or another,
principles of either partial or full equitable indemnity
were applicable, depending on subsequent proof.
(Opinion by Martin, J., with Franson, Acting P. J.,
and Hoover, J.,[FN*] concurring.)

          FN* Assigned by the Chairperson of the
          Judicial Council.

                  HEADNOTES

      Classified to California Digest of Official Reports

**(1)** Pleading § 29--Demurrer to Complaint--Hearing
and Determination.
Sustaining a general demurrer without leave to
amend is not an abuse of discretion if it appears from
the pleading that there is no reasonable probability
the defect can be cured by amendment. The burden is
on the pleading party to demonstrate that the trial
court abused its discretion and he must also show in
what manner he can amend the pleading and how the
amendment will change the legal effect of the
pleading.

**(2)** Fraud and Deceit § 25--Actions--Pleading--
Specificity.
Fraud is an intentional tort, the elements of which are
misrepresentation, knowledge of falsity, intent to
defraud, justifiable reliance, and resulting damage.
Each element must be alleged in the proper manner,
and the facts constituting the fraud must be alleged
with sufficient specificity to allow the other party to
understand fully the nature of the charge made.

**(3)** Torts § 1--Intentionally Tortious Conduct.
Inferentially, everyone has a duty to refrain from
committing intentionally tortious conduct against
another.

**(4)** Fraud and Deceit § 5--Actual Fraud--False
Representations--Statements of Fact.
A promise material to a contract that is made without
any intention of performing it is deemed a
misrepresentation of fact.
[See **Cal.Jur.3d, Fraud and Deceit, § 21;
Am.Jur.2d,** § 64.]
**(5)** Fraud and Deceit § 8--Actual Fraud--
Concealment.
Although a duty to disclose a material fact normally
arises only where there exists a confidential relation
between the parties or where other special
circumstances require disclosure, if a person does
speak he must speak the whole truth to the end that
he does not conceal any facts that materially qualify
those that have been stated.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(**6**)  Attorneys at Law  §  20--Attorney-client Relationship--Liability of Attorneys.
An attorney may not, with impunity, either conspire with a client to defraud or injure a third person, or engage in intentional tortious conduct toward a third person, even if the third person is an attorney negotiating at arm's length.

(**7**)  Fraud and Deceit § 7--Actual Fraud--False Representations--Promise-- Oral Agreement to Limit Applicability of Contractual Provision.
In a malpractice action against an attorney seeking damages for alleged negligence in handling the sale of plaintiffs' business, in which the attorney interposed a cross-complaint for damages against the corporate buyer, its president, and its attorney, alleging breach of an oral promise that certain statements in the written sale contract would be deemed by the buyer to have been made on the sellers' best knowledge only, dismissal of the cross-complaint on demurrer without leave to amend constituted an abuse of discretion, where the alleged promise by the buyer and its attorney constituted a misrepresentation of fact, was material to the contract between the parties, and was made without any intention that it would be performed.

(**8**)  Pleading § 74--Amendment and Withdrawal-- Subject Matter--Conflict With Responses in Interrogatory.
Proposed amendments to a party's cross-complaint were not barred as being directly contradicted by the party's response to an interrogatory, where the interrogatory did not request the party to divulge every fact on which the original allegation was based, and the party's response was made on his best recollection and was not so inconsistent with the proposed allegations as to make the party's pleading dumurrable.

(**9**)  Fraud and Deceit § 13--Actual Fraud--Reliance-- Right to Rely.
Whether a person is justified in relying on another individual's representation constitutes a question of fact for determination of the trier of fact, and the issue is whether the person who claims reliance was justified in relying upon the representation in the light of his own knowledge and experience.

(**10**)  Negligence § 17--Elements of Actionable Negligence--Proximate Cause-- Intervening Causes-- Foresight.
Foreseeability of harm is generally a question of fact

for the jury and it may be decided as a question of law only if under the undisputed facts there is no room for a reasonable difference of opinion. Thus the trial court erred in determining, as a matter of law, that a party's misrepresentation, made to an attorney and his clients, as to matters involved in a business sale transaction was not a proximate cause of harm to the attorney. Accepting the attorney's proposed amended allegations as true, a trier of fact could conclude it was reasonably foreseeable that the attorney's clients, faced with a large monetary demand and the prospect of an expensive defense, as a result of the attorney's reliance on the misrepresentation, would settle the case, rather than litigate the issues. If so found, this would be, not a superseding cause, but a foreseeable intervening cause, which would not relieve the party from potential liability to the attorney who was sued by his clients for malpractice.
[See **Cal.Jur.3d, Negligence, § 62; Am.Jur.2d, Negligence, § 199.**]
(**11**)  Fraud and Deceit § 16--Actual Fraud--Damage-- Exposure of Attorney to Liability for Malpractice.
Exposure of an attorney to legal malpractice liability by the actions of a third party constitutes a proper basis for an inference of detriment sufficient to sustain a damage award in favor of the attorney in an action against the third party.

(**12**)  Fraud and Deceit § 10--Actual Fraud-- Knowledge.
If a party makes false statements, honestly believing them to be true, but without reasonable grounds for such belief, he or she may be held liable for negligent misrepresentation, which is a form of deceit. Thus it was an abuse of discretion for the trial court to sustain a demurrer to a cross-complaint by an attorney, in a malpractice action against him, alleging negligent misrepresentation on the part of the adverse party's attorney in connection with negotiations involving a business sale transaction, since the adverse party's attorney owed a duty of care to cross-complainant, in view of the fact that the statement or promise was intended to be relied on by the attorney and to induce him to advise his clients to close the transaction.
[See **Cal.Jur.3d, Fraud and Deceit, § 35; Am.Jur.2d, Fraud and Deceit, § 197.**]
(**13**)  Contribution and Indemnification § 9-- Indemnity--Operation and Interpretation.
In a malpractice action against an attorney seeking damages for alleged negligence in handling the sale of plaintiffs' business, in which the attorney

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

183 Cal.App.3d 194
183 Cal.App.3d 194, 227 Cal.Rptr. 887
**(Cite as: 183 Cal.App.3d 194)**

interposed a cross-complaint for damages and full equitable indemnity against the buyer and its attorney, alleging breach of an oral promise that certain statements in the written sale contract would be deemed by the buyer to have been made on the sellers' best knowledge only, dismissal of the cross-complaint on demurrer without leave to amend, on the issue of equitable indemnity, constituted an abuse of discretion, where, according to the pleadings, the parties were cotortfeasors, which brought into play principles of either partial or full equitable indemnity, depending on the proof to be adduced at trial.

COUNSEL
Robert E. King, John D. Gibson and Arthur E. Schwimmer for Cross-complainant and Appellant.
Howard, Rice, Nemerovski, Canady, Robertson & Falk, Robert E. Gooding, Jr., Ann Brick, Steven L. Mayer, David B. Goodwin, Borton, Petrini & Conron and Bob H. Joyce for Cross-defendants and Respondents.
MARTIN, J.
This an appeal from a judgment of dismissal following the sustaining of a general demurrer to an original cross-complaint without leave to amend. ***198**

On June 10, 1983, plaintiffs Gerald D. Lucas, Janice H. Lucas, and Lucas Family Trust filed a complaint alleging legal malpractice against defendants Frank J. Cicone and Frank J. Cicone Law Corporation et al. On October 25, 1983, defendants answered the complaint and filed a cross-complaint for comparative equitable indemnity, damages and punitive damages against URS Corporation, Arthur H. Stromberg and Richard W. Canady.

Cross-defendants filed general and special demurrers to the cross-complaint and a motion to strike the punitive damage allegations of the cross-complaint on December 23, 1983.

The demurrer and motion to strike were argued by counsel and submitted on January 26, 1984. On April 27, 1984, the lower court granted the general demurrer as to all causes of action without leave to amend. On June 26, 1984, the cross-complaint was dismissed with prejudice and judgment was entered in favor of the cross-defendants on June 27, 1984. This appeal followed.

Facts

Cicone primarily challenges the trial court's decision to sustain the demurrers without leave to amend.

This case involves a legal malpractice suit brought against Cicone an attorney, by plaintiffs, his former clients. Plaintiffs alleged Cicone was guilty of malpractice in conducting negotiations for the sale of plaintiffs' business, Advanced Production Service, Inc. (Advanced), to cross-defendant URS Corporation (URS). Cicone cross-complained against URS, its president and their attorney, Canady, for fraud, negligent misrepresentation, breach of good faith and fair dealing and equitable indemnity.

Cicone represents the factual allegations upon which the claims of fraud and deceit are based would be amended beyond those currently contained in the present cross-complaint to allege as follows:

In early September 1981, URS, through its president, Stromberg, reached a preliminary agreement with Gerald Lucas, President of Advanced, for URS to purchase from Lucas and his family the stock and assets of Advanced for $3.5 million cash. The final agreement was to be prepared by counsel for URS, and, at Stromberg's request, it was to be executed by the parties in as short a period of time as was reasonable. Lucas then engaged Cicone to represent him and his family in consummating the transaction.

Shortly after entering into the preliminary agreement, Advanced gave the accountants and other personnel of URS full access to the books and records ***199** of Advanced, and the respective corporations' accountants and personnel were in frequent communication about Advanced's financial data.

Prior to October 13, 1981, URS presented Advanced with a proposed final agreement. The agreement provided in part that the sellers warranted the accuracy of an unaudited balance sheet of Advanced as of September 30, 1981, and included a warranty that Advanced had no liabilities other than those shown on the balance sheet. A number of other warranties in the agreement were stated to be made only to the best knowledge of sellers.

At a meeting on October 13, 1981, attended by

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

183 Cal.App.3d 194                                    Page 4
183 Cal.App.3d 194, 227 Cal.Rptr. 887
**(Cite as: 183 Cal.App.3d 194)**

Gerald Lucas, Cicone, Lucas' personal accountant R. Randall Richardson, Stromberg, and URS' attorney, Canady, Cicone advised Stromberg and Canady the sellers could not and would not guarantee the accuracy of the balance sheet. Canady, with Stromberg's tacit approval, replied the buyer understood and URS would deem the sellers to be guaranteeing the information in the balance sheet only to sellers' best knowledge.

Cicone would further allege that Canady's statement, made on behalf of Stromberg and URS, constituted a promise that URS would accept the balance sheet as correct only to the best of the sellers' knowledge. As Canady knew, that promise was false and was made without any intention of performing it, for cross-defendants intended to rely on the strict warranty contained in the written agreement. The promise was made for the purpose of inducing Cicone to rely on it and thereby to advise the sellers to follow through with the sale and to sign the final agreement. Cicone did rely on the promise and did advise the sellers to sign the agreement, and as a result the sellers did sign the agreement. Cicone's reliance on the promise was justifiable because the circumstances under which it was made gave him reason to believe it would be carried out and Cicone had no reason to disbelieve Canady.

The balance sheet was correct to the best of the sellers' knowledge. However, shortly after the transaction had been consummated, URS, through Stromberg, made a claim against the sellers based on a $200,000 under statement in the balance sheet of deferred tax liabilities, of which the sellers had been unaware. The sellers, through counsel other than Cicone, settled the claim without litigation for $125,000 and filed a legal malpractice action against Cicone. As a result, Cicone may incur liability to the sellers, and is required to defend a malpractice action, thereby incurring expense, losing time from his practice, and facing impairment of his professional reputation.

Discussion

I. Fraud and Deceit

Cicone contends on appeal the lower court abused its discretion in sustaining the demurrer to the original cross-complaint without leave to amend. *200

Preliminarily, the general principles governing demurrers should be noted: The party against whom a complaint or cross-complaint has been filed may object by demurrer to the pleading where it does not state facts sufficient to constitute a cause of action. (Code Civ. Proc., § 430.10, subd. (e).) (1)Sustaining a general demurrer without leave to amend is not an abuse of discretion if it appears from the pleading there is no reasonable probability the defect can be cured by amendment under applicable substantive law. ( _Vater v. County of Glenn_ (1958) 49 Cal.2d 815, 821 [323 P.2d 85]; _Sackett v. Wyatt_ (1973) 32 Cal.App.3d 592, 603 [108 Cal.Rptr. 219].) The burden is on the cross-complainant to demonstrate the lower court abused its discretion. The cross-complainant must show in what manner he can amend his cross-complaint and how that amendment will change the legal effect of his pleading. ( _Goodman v. Kennedy_ (1976) 18 Cal.3d 335, 349 [134 Cal.Rptr. 375, 556 P.2d 737].) If the demurrer was properly sustained on any ground, then the lower court will be affirmed. ( _Munoz v. Davis_ (1983) 141 Cal.App.3d 420, 422 [190 Cal.Rptr. 400].)

In the third, fourth, fifth and sixth causes of action of the cross-complaint, Cicone attempts to allege causes of action for fraud and deceit.

_Fraud_

(2)Fraud is an intentional tort, the elements of which are (1) misrepresentation; (2) knowledge of falsity; (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage. ( _Seeger v. Odell_ (1941) 18 Cal.2d 409, 414 [115 P.2d 977, 136 A.L.R. 1291]; _Nelson v. Gaunt_ (1981) 125 Cal.App.3d 623, 635 [178 Cal.Rptr. 167].)[FN1]

> FN1 Section 1709 of the Civil Code provides: "One who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers."
> Section 1710 of the Civil Code provides: "A deceit, within the meaning of the last section, is either:
> "1. The suggestion, as a fact, of that which is not true, by one who does not believe it to be true;
> "2. The assertion, as a fact, of that which is not true, by one who has no reasonable

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

183 Cal.App.3d 194                                                    Page 5
183 Cal.App.3d 194, 227 Cal.Rptr. 887
(Cite as: 183 Cal.App.3d 194)

ground for believing it to be true;

"3. The suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or,

"4. A promise, made without any intention of performing it."

Every element of the cause of action for fraud must be alleged in the proper manner and the facts constituting the fraud must be alleged with sufficient specificity to allow defendant to understand fully the nature of the charge made. ( *Roberts v. Ball, Hunt, Hart, Brown & Baerwitz (1976) 57 Cal.App.3d 104, 109 [128 Cal.Rptr. 901].)\*201*

The lower court determined, inter alia, cross-defendants owed no duty to Cicone and therefore Cicone failed to state a cause of action, citing for this proposition, among others, *Groswird v. Hayne Investments, Inc.* (Cal.App.) However, a rehearing was granted in *Groswird* and the subsequent opinion was not certified for publication.

*Duty*

Cross-defendants argue a lack of duty owed to Cicone. However, this argument appears in relation to the causes of action for negligence and indemnity. (3)More properly it could be stated, inferentially everyone has a duty to refrain from committing intentionally tortious conduct against another. (4) Thus, a promise material to the contract which is made without any intention of performing it is deemed a misrepresentation of fact. (Civ. Code, §§ 1572, subd. 4, 1710, subd. 4; *Jacobs v. Freeman (1980) 104 Cal.App.3d 177, 192 [163 Cal.Rptr. 680].)*

Cicone alleges cross-defendants made a promise without disclosing they entertained no intention to perform said promise to deem the warranty of the financial statement as only to sellers' best knowledge and belief.

(5)Although a duty to disclose a material fact normally arises only where there exists a confidential relation between the parties or other special circumstances require disclosure, where one does speak he must speak the whole truth to the end that he does not conceal any facts which materially

qualify those stated. (*Ibid.*) One who is asked for or volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud. ( *Goodman v. Kennedy, supra., 18 Cal.3d 335, 346-347;Rogers v. Warden (1942) 20 Cal.2d 286, 289 [125 P.2d 7].)*

"The extent of liability an attorney may incur toward third persons, while the attorney is acting on behalf of a client, has been the subject of divergent opinion in various American jurisdictions, the traditional view being that an attorney may not generally be held liable to third persons because he is not in privity with them, and owes them no duty to act with care. (See Attorneys-Liability to Third Parties, 45 A.L.R.3d 1177, 1181.)A typical statement of this approach is that 'an attorney is not liable to third persons for acts committed in good faith in performance of professional activities as an attorney for his client. If, however, an attorney is actuated by malicious motives, or shares the illegal motives of his client, he may be personally liable with the client for damage suffered by a third person as the result of the attorney's actions.' (Fns. omitted.)" ( *Roberts v. Ball, Hunt, Hart, Brown & Baerwitz, supra., 57 Cal.App.3d 104, 109.) \*202*

(6)In California it is well established that an attorney may not, with impunity, either conspire with a client to defraud or injure a third person or engage in intentional tortious conduct toward a third person. (*Ibid.*)

Thus, the case law is clear that a duty is owed by an attorney not to defraud another, even if that other is an attorney negotiating at arm's length.

Thus, while duty is not an element of fraud in the traditional sense, a duty is owed to others to refrain from intentionally tortious conduct. Therefore, any inference arising from the lower court's decision that the element of duty bars Cicone's causes of action for fraud and deceit is not supported by law.

*Misrepresentation*

(7)Cross-defendants assert the alleged misrepresentation is one of law and therefore not actionable. According to this theory, the allegations that Canady made "certain assurances and promises that the correct interpretation of the guarantee clause

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

183 Cal.App.3d 194                      Page 6
183 Cal.App.3d 194, 227 Cal.Rptr. 887
**(Cite as: 183 Cal.App.3d 194)**

(or clauses in [the] agreement was that it would be based upon sellers' best information and belief," amounts to nothing more than an allegation that Canady stated a legal opinion of how the terms of the contract would be interpreted in the future.

Cicone offers a proposed amendment to the pleading to the effect that Canady, with Stromberg's tacit approval, stated URS would deem the sellers to be guaranteeing the information in the balance sheet only to the sellers' best knowledge.

It is true the representation must ordinarily be an affirmation of fact. (Civ. Code, § 1710, subd. 1.) A misrepresentation of law is ordinarily not actionable in the absence of a confidential relationship or other special circumstance. (4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 447, 451, pp. 2712, 2715.) The theory is either that everyone is bound to know the law, or that a statement regarding the law is a mere opinion on which one may not rely. (*Ibid.*) "'Wherever a party states a matter which might otherwise be only an opinion, and does not state it as the mere expression of his own opinion, but affirms it as an existing fact material to the transaction, so that the other party may reasonably treat it as a fact and rely and act upon it as such, then the statement clearly becomes an affirmation of fact within the meaning of the general rule, and may be a fraudulent misrepresentation.' (2 Pomeroy's Equity Jurisprudence, sec. 878.)" ( *Crandall v. Parks* (1908) 152 Cal. 772, 776 [93 P. 1018].) Predictions or representations as to what will happen in the future are normally treated as opinion; but often they may be interpreted as implying knowledge of facts which *203 makes the predictions probable. If the defendant does not know of such facts, the statement is an actionable misrepresentation. (See Rest.2d, Torts, § 539.) Thus, a statement by an architect that a building will not cost more than a certain amount may be regarded as an affirmation of fact. ( *Barron Estate Co. v. Woodruff Co.* (1912) 163 Cal. 561, 574 [126 P. 351].) The same is true where an agent states his principal will advance money to harvest a crop, or where a corporation agent represents the corporation will lease certain property or locate a plant in a certain city. ( *California C. & C. Corp. v. Carpenter* (1926) 77 Cal.App. 18, 27 [246 P. 126]; see also *Eade v. Reich* (1932) 120 Cal.App. 32, 35 [7 P.2d 1043].)

A statement of what the defendant or some third person intends to do relates to an existing state of mind, and is a representation of fact. (4 Witkin, Summary of Cal. Law, *op. cit. supra.*, § 453, p. 2717.) Thus, a promise made without any intention to perform it may constitute fraud. In other words, a promise to do something necessarily implies the intention to perform, and where such intention is absent, there is a misrepresentation of fact, which is actionable fraud. (Civ. Code, § 1710, subd. 4.) A trier of fact may be justified in inferring from the circumstances surrounding the subsequent repudiation that defendant never intended to carry out the agreement when it was made. The subsequent repudiation relates back to the original promise. ( *Tenzer v. Superscope, Inc.* (1985) 39 Cal.3d 18, 30 [216 Cal.Rptr. 130, 702 P.2d 212].)

The proposed allegations of Cicone allege a promise without any intention to perform: "Canady's statement, made on behalf of Stromberg and URS, constituted a promise that URS would accept the balance sheet as correct only to the best of the sellers' knowledge. As Canady knew, that promise was false and was made without any intention of performing it, for cross-defendants intended to rely on the strict warranty contained in the written agreement. The promise was made for the purpose of inducing Cicone to rely on it and thereby to advise the sellers to follow through with the sale and to sign the final agreement."

(8)Cross-defendants further contend Cicone's proposed amendments to the cross-complaint are barred by his sworn interrogatory answers directly contradicting the proposed allegations. According to cross-defendants, if Cicone's proposed amended pleadings allege "a promise made without the intention to perform it," that allegation is inconsistent with Cicone's answers to interrogatories and is, therefore, impermissible. [FN2]*204

> FN2 Cross-defendants' motion to augment the record filed on April 22, 1985, to include interrogatories propounded by cross-defendants to Cicone and Cicone's responses to said interrogatories was granted on July 2, 1985.

Interrogatory No. 12 propounded to Cicone states: "If you contend that Richard W. Canady stated that any unaudited accounting in the sales agreement would be based on the seller's best information and belief, please describe the exact statements of Mr. Canady, the date or dates, times, and circumstances

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

183 Cal.App.3d 194
183 Cal.App.3d 194, 227 Cal.Rptr. 887
**(Cite as: 183 Cal.App.3d 194)**

under which they were uttered, and your replies to such statements (to the best of your knowledge)."

Cicone's full response to the interrogatory was as follows: "Please see response to Interrogatory No. 9. Further, the specific topic of the unaudited accounting was brought to the attention of Mr. Canady during a meeting on October 13, 1981. Plaintiffs and cross-complainant herein indicated that the unaudited accounting could not be guaranteed, in response to which *Mr. Canady represented that this was the exact meaning of the paragraph guaranteeing the accounting*, in that *any representations as to financial matters would be on the best knowledge of Lucas and that as such, Lucas did not guarantee any such financial information*. This response is to the best recollection of cross-complainant herein, particularly in light of the passage of time since said meeting." (Italics added.)

Cross-defendants contend the foregoing answer limits the scope of Cicone's allegations to categorizing Canady's statement as an interpretation of the sales agreement, i.e., an unactionable opinion of law.

"As a general rule in testing a pleading against a demurrer the facts alleged in the pleading are deemed to be true, however improbable they may be. [Citation.] The courts, however, will not close their eyes to situations where a complaint contains allegations of fact inconsistent with attached documents, or allegations contrary to facts which are judicially noticed. [Citations.] Thus, a pleading valid on its face may nevertheless be subject to demurrer when matters judicially noticed by the court render the complaint meritless. In this regard the court passing upon the question of the demurrer may look to affidavits filed on behalf of plaintiff, and the plaintiff's answers to interrogatories [citation], as well as to the plaintiff's response to request for admissions. [Citations.]" ( *Del E. Webb Corp. v. Structural Materials Co.* (1981) 123 Cal.App.3d 593, 604 [176 Cal.Rptr. 824].)

Cross-defendants rely primarily on *Dwan v. Dixon* (1963) 216 Cal.App.2d 260 [30 Cal.Rptr. 749] in which plaintiffs alleged in their original complaint that two of the defendants therein served intoxicating beverages to one Froberg, a third defendant, and then permitted him to drive, knowing he was intoxicated. Because California law at that time did not provide a cause of action based on facts such as those alleged

above ( *id.*, at p. 264), plaintiffs attempted to amend their complaint by alleging a more active course of *205 conduct by defendants, alleging defendants took an active part in "putting" Froberg in his car, "heading him for the highway," and "aiding" and "assisting" him in driving. (*Ibid.*) Defendants demurred, contending the amendment was improper since it was inconsistent with statements in the sworn affidavit of plaintiffs' attorney and with plaintiffs' interrogatory answers. They argued that "to permit appellants to make allegations which are directly contradictory to the facts within their own knowledge is to defeat the rule of truthful pleading." (*Ibid.*) The Court of Appeal agreed, affirming the lower court's sustaining of defendants' demurrer without leave to amend.

However, in *Dwan v. Dixon*, the written interrogatories requested plaintiffs divulge "each and every fact upon which the allegations" of the complaint were based. The facts provided by plaintiffs failed to support the allegations of the amended pleading. ( *Id.*, at p. 262.)

In the instant case, the interrogatory in question fails to make such a comprehensive request. Furthermore, Cicone's response is made based upon his "best recollection." Finally, in our view, Cicone's answer to the interrogatory is not so inconsistent with the facts appearing in Cicone's proposed allegations as to render the cross-complaint demurrable. (See *Del E. Webb. Corp. v. Structural Materials Co., supra.,* 123 Cal.App.3d 593, 605-606.)

*Justifiable Reliance*

Cross-defendants contend the allegation of the word "reasonable" is insufficient to allege justifiable reliance in this case. Cross-defendants declare: "[A]n attorney is not justified in relying on statements of law made by an adverse party or attorney in the course of arm's length negotiations." Cross-defendants urge us to hold any reliance by Cicone on the alleged misrepresentation was unjustifiable as a matter of law.

(9)Whether reliance is justified is a question of fact for the determination of the trier of fact. The issue is whether the person who claims reliance was justified in relying on the representation in light of his own knowledge and experience. ( *Gray v. Don Miller & Associates, Inc.* (1984) 35 Cal.3d 498, 503

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

183 Cal.App.3d 194
183 Cal.App.3d 194, 227 Cal.Rptr. 887
**(Cite as: 183 Cal.App.3d 194)**

[198 Cal.Rptr. 551, 674 P.2d 253].) As Cicone points out: "Negligence in reliance upon a misrepresentation is not a defense where the misrepresentation was *intentionally* made to induce reliance upon it. ( *Hefferan v. Freebairn* (1950) 34 Cal.2d 715, 719...; *Smith v. Williams* (1961) 55 Cal.2d 617, 620....) Only '[i]f the conduct of the plaintiff [in relying upon a misrepresentation] in the light of his own intelligence and information was manifestly unreasonable' will he be denied recovery. ( ***206***Hefferan v. Freebairn, supra, 34 Cal.2d at p. 719.)" ( *Winn v. McCulloch Corp.* (1976) 60 Cal.App.3d 663, 671 [131 Cal.Rptr. 597], italics added.)

While the complaint has not been carefully drawn in this regard, it appears there is a reasonable possibility the paucity of facts regarding a justifiable reliance can be cured by amendment and the demurrer should not be sustained without leave to amend on this ground. ( *Lingsch v. Savage* (1963) 213 Cal.App.2d 729, 739-740 [29 Cal.Rptr. 201, 8 A.L.R.3d 537].)[FN3]

FN3 Cross-defendants strongly assert that even taking Cicone's allegation of a "promise to perform" as true, any reliance by Cicone was unreasonable as a matter of law. To support this argument, cross-defendants rely on their assertion that the "terms of the sales agreement were directly at variance with Canady's alleged representation *and* the fact that it contained an integration clause expressly providing that the written document 'supersedes all prior and contemporaneous agreements. ...'" However, the sales agreement was not attached and incorporated into the complaint or the cross-complaint by reference. Cross-defendants attempt to make it a part of the record as an exhibit to cross-defendants' demurrer.

"It is an elementary rule that the sole function of a demurrer is to test the sufficiency of the challenged pleading. It cannot, properly, be addressed to or based upon evidence or other extrinsic matters." ( *Cravens v. Coghlan* (1957) 154 Cal.App.2d 215, 217 [315 P.2d 910].) Although the court may take judicial notice of judicial records and decisions in the same case, this does not mean it may take judicial notice of the truth of factual matters asserted therein. ( *Garcia v. Sterling* (1985) 176 Cal.App.3d

17, 22 [221 Cal.Rptr. 349].) The document attached to the demurrer was not properly before the lower court, nor is it properly before this court. We and the trial court are not permitted to consider it for any purpose in ruling upon the demurrer.

*Proximate Causation*

(10)The lower court determined "Defendant's statements are not a proximate cause of harm to cross-complainant (assuming damage) as a matter of law. (See *Groswird v. Hayne Investments* 133 CA3d. 624)..."[FN4] Cross-defendants assert the settlement of the controversy between Advanced and URS was an intervening cause which removed the possibility of a meritorious defense. Accordingly, cross-defendants argue the alleged damage was not caused by the alleged misrepresentation but by an independent intervening force and claims the fraud causes of action must be dismissed.

FN4 As stated, a rehearing was granted in *Groswird*

Ordinarily, forseeability is a question of fact for the jury. "It may be decided as a question of law only if, 'under the undisputed facts there is no room for a reasonable difference of opinion.'" *Bigbee v. Pacific Tel. & Tel. Co.* (1983) 34 Cal.3d 49, 56 [192 Cal.Rptr. 857, 665 P.2d 947], quoting from *Schrimscher v. Bryson* (1976) 58 Cal.App.3d 660, 664 [130 Cal.Rptr. 125].) "'[Foreseeability] is not to be measured by what is more probable than not, but includes whatever is likely enough in the setting of modern life that a reasonably thoughtful [person] would take account of it *207 in guiding practical conduct.' (2 Harper & James, Law of Torts [1956] § 18.2, at p. 1020.)" ( *Bigbee v. Pacific Tel. & Tel. Co., supra, 34 Cal.3d at p. 57.) An actor may be liable if his negligence is a substantial factor in causing an injury, and he is not relieved of liability because of the intervening act of a third person if such act was reasonably foreseeable at the time of his negligent conduct. ( *Vesely v. Sager* (1971) 5 Cal.3d 153, 163 [95 Cal.Rptr. 623, 486 P.2d 151].) If the act of the third party is not reasonably foreseeable, not a normal consequence in the situation, it is a superseding cause. ( *Commercial Standard Title Co. v. Superior Court* (1979) 92 Cal.App.3d 934, 944 [155 Cal.Rptr. 393].)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

183 Cal.App.3d 194                                                                 Page 9
183 Cal.App.3d 194, 227 Cal.Rptr. 887
(Cite as: 183 Cal.App.3d 194)

Accepting the proposed amended allegations as true, a trier of fact could conclude it is reasonably foreseeable that Advanced, faced with a large monetary demand and a prospect of an expensive defense, would settle the case rather than litigate the issues. If so found, this would be a foreseeable intervening cause, not a superseding cause, and would not relieve cross-defendants of potential liability.

*Damages*

(11) Cicone challenges the lower court's finding Cicone "has suffered no damage ..."

The case of *Pollack v. Lytle* (1981) 120 Cal.App.3d 931 [175 Cal.Rptr. 81] recognizes detriment to a claimant is inferable from exposure to legal malpractice liability. In that case, the plaintiff was obliged to defend a malpractice action whereby he would incur expenses, lose time from his practice, suffer inconvenience, face professional embarrassment and the impairment of his professional reputation. ( *Id.,* at p. 944.) Reaching a similar conclusion upon different facts, the court held in *Roberts v. Ball, Hunt, Hart, Brown & Baerwitz, supra, 57 Cal.App.3d 104, 111-112*: "Such legal expense is neither remote nor speculative, but must of necessity be incurred by plaintiff to make him whole." ( *Id.,* at p. 112.)

We conclude the lower court abused its discretion in sustaining the demurrer without leave to amend as to the causes of action for fraud and deceit.

II. Negligent Misrepresentation

The seventh, eighth and ninth causes of action of the cross-complaint, incorporating various other allegations of the cross-complaint, are based on negligence. Cicone asserts those causes of action state, or can be amended to state, a cause of action for negligent misrepresentation. He relies on the proposed factual allegations as set forth in the summary of facts with respect *208 to the fraud and deceit causes of action modified to allege a negligent representation by Canady rather than an intentional misrepresentation.

(12) "Where a defendant makes false statements, honestly believing them to be true, but without reasonable grounds for such belief, he may be held liable for negligent misrepresentation, a form of deceit." ( *Roberts v. Ball, Hunt, Hart, Brown & Baerwitz, supra, 57 Cal.App.3d 104, 111; Muraoka v. Budget Rent-A-Car, Inc.* (1984) 160 Cal.App.3d 107, 119 [206 Cal.Rptr. 476].)

However, we must reexamine the question of duty owed by cross-defendants to Cicone as it relates to a cause of action for negligent misrepresentation. Cicone concedes, in his negligence argument, an attorney *advising his own client* has no duty of care to third persons in the absence of an allegation that his advice was foreseeably transmitted to or relied upon by third persons or that he made some affirmative misrepresentation to the third person's attorney. ( *Goodman v. Kennedy, supra, 18 Cal.3d 335, 343-345*.)

Cicone contends, however, *Goodman* recognizes that where, as in *Roberts, supra, 57 Cal.App.3d 104,* the attorney intends his statement to be relied upon by third persons dealing with his client, the attorney owes the third person a duty of care, and argues "certainly, where an affirmative negligent misrepresentation is made directly to the third persons and their attorney, there is no sound reason to shield the attorney, or his equally negligent client, from liability for their conduct."

A "deceit" is defined in California law as "[t]he assertion, as a fact, of that which is not true, *by one who has no reasonable ground for believing it to be true*; ..." (Civ. Code, § 1710, subd. 2, italics added.) Thus, where a defendant makes false statements honestly believing them to be true, but without reasonable grounds for such belief, he may be held liable for negligent misrepresentation, a form of deceit. ( *Muraoka v. Budget Rent-A-Car, Inc., supra, 160 Cal.App.3d 107, 119, citing Roberts v. Ball, Hunt, Hart, Brown & Baerwitz, supra, 57 Cal.App.3d at p. 111*.)

Here, Cicone alleges cross-defendant Canady, an attorney, in his client's presence (the buyer) and in the presence of cross-complainant Cicone, an attorney, and his client (the seller) represented to Cicone and his client that the buyer would deem the seller to be guaranteeing the information in the unaudited balance sheet only to the seller's best knowledge and belief. This representation was made to induce Cicone to advise his client to close the sales transaction immediately, which was done. In an amended cross-complaint, Cicone would further

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

allege that this representation was not true, that Canady had no reasonable basis for believing it to be true, that Cicone \*209 and his client were intended to and did, in fact, rely upon Canady's negligent representation with resulting damages.

In *Goodman v. Kennedy, supra,* 18 Cal.3d 335, plaintiffs, nonlawyers, sought damages from defendant, an attorney, for losses they incurred on stock purchased from defendant's clients. Plaintiffs alleged defendant negligently advised his clients the stock could be sold by them to third persons without jeopardizing the exempt status of the stock under the Securities Act of 1933. The alleged result of the purchase was an order by the Securities Exchange Commission suspending exemption of the stock with consequent loss in the stock's value, to plaintiffs' damage. The trial court sustained a general demurrer to plaintiffs' complaint without leave to amend and entered judgment of dismissal. The Supreme Court affirmed, holding defendant's duty of care in giving legal advice to his client did not extend to plaintiffs with whom defendant's clients, in acting upon the advice, dealt at arm's length, in the absence of any showing that the legal advice was foreseeably transmitted to or relied on by plaintiffs, or that plaintiffs were intended beneficiaries of a transaction to which the advice pertained. The court stated: "The present defendant had no relationship to plaintiffs that would give rise to his owing plaintiffs any duty of care in advising his clients that they could sell the stock without adverse consequences. There is no allegation that the advice was ever communicated to plaintiffs and hence no basis for any claim that they relied upon it in purchasing or retaining the stock. Nor was the advice given for the purpose of enabling defendant's clients to discharge any obligation to plaintiffs. Thus, there is no allegation that plaintiffs had any relationship to defendant's clients or to the corporation as stockholders or otherwise when the advice was given." ( *Id.,* at pp. 343-344, fn. omitted.) Thus, *Goodman* is clearly distinguishable on its facts from the instant case. However, the Supreme Court in *Goodman* explicitly recognizes that where an attorney *intends* his advise or statement to his client to be relied upon by third persons dealing with his client, the attorney owes the third person a duty of care. As stated in *Goodman:* "We are therefore not concerned with such cases as *Roberts v. Ball, Hunt, Hart, Brown & Baerwitz* (1976) 57 Cal.App.3d 104, 110-111, ... in which an attorney gives his client a written opinion with the intention that it be transmitted to and relied upon by the plaintiff in

dealing with the client. *In that situation the attorney owes the plaintiff a duty of care in providing the advice because the plaintiff's anticipated reliance upon it is 'the end and aim of the transaction'* ( *Glanzer v. Shepard* (1922) 233 N.Y. 236, 238-239 [135 N.E. 275, 23 ALR 1425])" (18 Cal.3d at p. 343, fn. 4). In the present case, Cicone's reliance on Canady's alleged misrepresentation was the very purpose of the representation. Canady expected Cicone to advise his client to close the transaction; Cicone did so and the transaction was closed. \*210

A duty of care under these facts logically follows from the holding in *Roberts.* In that case, plaintiff alleged he was the prospective lender of substantial moneys to BBC, a partnership; that defendant attorneys gave a member of the partnership a letter stating that in their professional opinion BBC was a general partnership of 14 general partners; that they knew this letter was to be used to induce plaintiff to make loans to BBC; that they failed to disclose the belief on the part of many of the partners that BBC was a limited partnership and that the limited partners had no personal liability for its obligations; and that, in reliance on the letter, plaintiff made loans and thereafter incurred litigation costs in a still pending attempt to establish liability of the partners as general partners. The Court of Appeal held that a cause of action for negligent misrepresentation was stated under the principles laid down in *Lucas v. Hamm* (1961) 56 Cal.2d 583 [15 Cal.Rptr. 821, 364 P.2d 685]; *Donald v. Garry* (1971) 19 Cal.App.3d 769 [97 Cal.Rptr. 191, 45 A.L.R.3d 1177] and *Restatement Second of Torts* section 324A. "The defendants' [attorney'] opinion concerning the status of the partners was rendered for the purpose of influencing plaintiff's conduct, and harm to him was clearly foreseeable. We have no difficulty, therefore, in determining that the issuance of a legal opinion intended to secure benefit for the client, either monetary or otherwise, must be issued with due care, or the attorneys who do not act carefully will have breached a duty *owed to those they attempted or expected to influence on behalf of their clients.*" (57 Cal.App.3d at p. 111, italics added.)

If the issuance of a legal opinion intended to secure a benefit for a client must be issued with due care towards third persons whom the attorneys attempt or expect to influence on behalf of their clients, then a fortiori why should such a duty of care not exist toward the third party's attorney where an affirmative misrepresentation of fact is made directly

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

to the attorney for the purpose of influencing his client?

Public policy does not foreclose the imposition of a duty of care by Canady to Cicone under these facts. To the contrary, a majority of the policy factors considered by the courts in determining the question of a duty of care support such a duty. "The determination whether in a specific case the defendant will be held liable to a third person not in privity ... involves the balancing of various factors, among which are the extent to which the transaction was intended to affect the plaintiff [clearly present], the foreseeability of harm to him [clearly present in the instant case], the degree of certainty that the plaintiff suffered injury [clearly present], the closeness of the connection between the defendant's conduct and the injury suffered [clearly present], the moral blame attached to the defendant's conduct [arguable in view of the fact defendant's client was also present], and the policy of preventing future harm [clearly present]." ( *211 *Goodman v. Kennedy, supra.* 18 Cal.3d at pp. 342-343, quoting from *Biakanja v. Irving* (1958) 49 Cal.2d 647, 650 [320 P.2d 16, 65 A.L.R.2d 1358]; see also Note, *Attorneys' Liability to Third Parties for Professional Negligence* (1978) 66 Cal.L.Rev. 393.)Finally, persons such as Canady have, or can readily obtain, insurance for these risks.

Nor do we visualize any legitimate threat to the professional relationship between Canady and his client, the buyer, by imposing on Canady a duty of care toward Cicone under our facts. An attorney must take pains to avoid negligent mispresention of material facts in negotiating business transactions with third parties and their attorneys. All that is required to avoid negligent misrepresentation is that the attorney have some reasonable basis for believing the truthfulness of his or her representations. Imposing possible liability where such a basis is lacking will not prevent an attorney from devoting his entire energies to his client's interest. Neither will it require the attorney to assist opposing counsel in the performance of the latter's duties to his client.

Finally, it takes more than a negligent misrepresentation to impose liability. The misrepresentation must be of a material fact, it must be made with the intent to induce reliance by the opposing party, it must actually be relied upon reasonably by the opposing party and proof must be made of damages proximately caused by the

misrepresentation. All of these elements are present under the allegations here reviewed. We therefore conclude the trial court abused its discretion in sustaining cross-defendants' demurrer to the seventh, eighth and ninth causes of action without leave to amend.

### III. Full Equitable Indemnity

(13)The trial court additionally sustained cross-defendants' demurrer to cross-complainant's first cause of action seeking full equitable indemnity without leave to amend. Cicone contends this was error as the "cross-complaint states or can be amended to state a cause of action for full equitable indemnity" as an alternative to the direct cause of action for fraud and deceit. In sum, Cicone contends the concept of full equitable indemnity survived *American Motorcycle Assn. v. Superior Court* (1978) 20 Cal.3d 578 [146 Cal.Rptr. 182, 578 P.2d 899], citing *E. L. White, Inc. v. City of Huntington Beach* (1982) 138 Cal.App.3d 366, 375-376 [187 Cal.Rptr. 879]. In *American Motorcycle* our Supreme Court held that a concurrent tortfeasor may obtain partial indemnity from other concurrent tortfeasors on a comparative fault basis.

In *E. L. White, Inc. v. City of Huntington Beach, supra.* the Fourth District Court of Appeal found substantial evidence had been presented to *212 support the trial court's decision to require Huntington Beach to fully indemnify E. L. White, Inc., and its insurer, Royal Globe, in light of evidence presented which established E. L. White, Inc., was liable only vicariously and Huntington Beach was actually negligent for a wrongful death and personal injury which arose from the same accident at a construction site. The Court of Appeal concluded a vicariously liable tortfeasor may still obtain full indemnity even though *American Motorcycle* now allows partial indemnity to be obtained on a comparative fault basis in appropriate cases. "To conclude otherwise would counter basic 'principles of common-law indemnification between vicariously liable tortfeasors and tortfeasors guilty of the acts and omissions causing the harm. In short, the apportionment rule applies to those who in fact share responsibility for causing the accident or harm, and does not extend further to those who are only vicariously liable ....' [Citation.]" ( *Id.,* at p. 376, fn. omitted.)

Restatement Second of Torts section 886B

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

183 Cal.App.3d 194
183 Cal.App.3d 194, 227 Cal.Rptr. 887
**(Cite as: 183 Cal.App.3d 194)**

entitled "Indemnity Between Tortfeasors" provides in pertinent part: "(1) If two persons are liable in tort to a third person for the same harm and one of them discharges the liability of both, he is entitled to indemnity from the other if the other would be unjustly enriched at his expense by the discharge of the liability.

"(2) Instances in which indemnity is granted under this principle include the following:

. . . . . . . . . . .

"(c) The indemnitee was induced to act by a misrepresentation on the part of the indemnitor, upon which he justifiably relied; ..."

The concept of joint tortfeasors for the purpose of indemnity is explained in the restatement as "... two or more persons who are liable to the same person for the same harm. *It is not necessary that they act in concert or in pursuance of a common design, nor is it necessary that they be joined as defendants.* The rules stated applies to all torts, including not only negligence but also misrepresentation, defamation, injurious falsehood, nuisance or any other basis of tort liability." (Rest.2d Torts, § 886A, com. b, italics added.)

Although there can be no indemnity without joint and several liability by the prospective indemnitor and indemnitee ( *Munoz v. Davis* (1983) 141 Cal.App.3d 420, 425 [190 Cal.Rptr. 400]), indemnity does not require a "special" relationship between the cotortfeasors. (*People ex. rel. Dept. of Transportation v. Superior Court* (1980) 26 Cal.3d 744, 757, fn. 4 [163 Cal.Rptr. 585, 608 P.2d 673]. It only requires a significant difference in the kind or quality of the conduct of each tortfeasor. ( *213American Motorcycle*http://www.westlaw.com/Find/Default.wl?rs=dfa1.0&vr=2.0&DB=233&DocName=20CALIF3D578&FindType=Y&ReferencePositionType=S&ReferencePosition=594*Assn. v. Superior Court, supra.* 20 Cal.3d 578, 594-595, fn. 4.) Here, Cicone is alleged only to have been negligent while the cross-defendants Canady and his client are alleged to have intentionally deceived Cicone and his client. Should this be proved at trial, then the entire liability may be shifted to Canady and his client. On the other hand, if cross-defendants are only found to have been negligent in their representations to cross-complainant, then partial (comparative) indemnity under the *American Motorcycle* principles will come into play.

Thus, we conclude the trial court abused its discretion in sustaining cross-defendants' demurrer to cross-complainant's first cause of action without leave to amend.

IV.

Cicone also contends the trial court erred in sustaining cross-defendants' demurrer to cross-complainant's second cause of action for partial equitable indemnity without leave to amend. In light of our previous discussion in parts II and III of this opinion, no further analysis need be made as the same rationale would apply to a cause of action for partial equitable indemnity. If Cicone may properly allege a cause of action for negligent misrepresentation, he may also allege a cause of action for partial equitable indemnity. The trial court abused its discretion in sustaining cross-defendants' demurrer to this cause of action without leave to amend.

The judgment of dismissal is reversed as to all causes of action alleged in Cicone's cross-complaint and the matter is remanded to the trial court for further proceedings in accordance with the views expressed herein.

Cross-complainant, Cicone, to recover his costs on appeal.

Franson, Acting P.J., and Hoover, J.,[FN*] concurred.

FN* Assigned by the Chairperson of the Judicial Council.

A petition for a rehearing was denied August 8, 1986, and the petition was modified to read as printed above. *214

Cal.App.5.Dist.
Cicone v. URS Corp.
183 Cal.App.3d 194, 227 Cal.Rptr. 887

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.