# Exhibit H

**APPENDIX OF NON-FEDERAL AND UNPUBLISHED FEDERAL AUTHORITIES
CITED IN VISA USA INC.'S OPPOSITION TO MARITZ INC.'S
MOTION TO STAY ARBITRATION**

Westlaw.

938 P.2d 903                                                                 Page 1
15 Cal.4th 951, 938 P.2d 903, 64 Cal.Rptr.2d 843, 21 Employee Benefits Cas. 1407, 97 Cal. Daily Op. Serv. 5206,
97 Daily Journal D.A.R. 8384
(Cite as: 15 Cal.4th 951, 938 P.2d 903)

Engalla v. Permanente Medical Group, Inc.
Cal. 1997.
NIDA ENGALLA et al., Plaintiffs and Respondents,
v.
PERMANENTE MEDICAL GROUP, INC. et al.,
Defendants and Appellants.
PERMANENTE MEDICAL GROUP, INC. et al.,
Petitioners,
v.
THE SUPERIOR COURT OF ALAMEDA
COUNTY, Respondent;
NIDA ENGALLA et al., Real Parties in Interest.
WILLIS F. McCOMAS et al., Petitioners,
. v.
THE SUPERIOR COURT OF ALAMEDA
COUNTY, Respondent; NIDA ENGALLA et al.,
Real Parties in Interest.

[Modification of opinion (15 Cal.4th 951; ___
Cal.Rptr.2d ___, ___ P.2d ___).]
No. S048811.

Supreme Court of California
July 30, 1997.

**THE COURT.**

The opinion herein, appearing at 15 Cal.4th 951,
is modified as follows:

On page 964, delete the first sentence of the
second full paragraph, beginning "Although
McComas was aware ...." and replace it with the
following: "Although McComas was aware from the
outset that Engalla was terminally ill and probably
had only a few months to live, and claimed that he
had 'cooperated in the appointment of the party
arbitrator very early in the case,' it was later revealed
that he had been advised by Ney in July that Ney was
unable to accept any further assignments to act as a
party arbitrator until late November, over four
months away."

On page 968, delete the second sentence of the
first full paragraph, beginning "On June 14 ...." and
replace it with the following: "On June 14, 1991, he
wrote to Kaiser stating his desire to complete
Engalla's deposition 'on the earliest date permitted by
law,' and his willingness to schedule it for a mutually
convenient time."

On page 968, delete the third sentence of the first
full paragraph, beginning "McComas promptly
responded ...." and replace it with the following:
"McComas promptly responded to that request by
noticing the depositions of all the Engallas for
November 18, 1991-a date more than five months
down the road-despite Rand's admonition that
Engalla 'had very little time left in his life.' "

These modifications do not affect the judgment.
NIDA ENGALLA et al., Plaintiffs and Respondents,
v.
PERMANENTE MEDICAL GROUP, INC., et al.,
Defendants and Appellants.
PERMANENTE MEDICAL GROUP, INC., et al.,
Petitioners,
v.
THE SUPERIOR COURT OF ALAMEDA
COUNTY, Respondent;
NIDA ENGALLA et al., Real Parties in Interest.
WILLIS F. McCOMAS et al., Petitioners,
v.
THE SUPERIOR COURT OF ALAMEDA
COUNTY, Respondent; NIDA ENGALLA et al.,
Real Parties in Interest.
No. S048811.

June 30, 1997.

SUMMARY

An employee brought a medical malpractice claim
against operators of the health services plan he had
selected through his employer, and the operators
petitioned to compel arbitration pursuant to the plan's
contractual arbitration provisions. After attempting
unsuccessfully to conclude the arbitration prior to the
employee's    death,    family    members    and
representatives of his estate filed a malpractice action
against the operators, and defendants filed a petition
to compel arbitration pursuant to Code Civ. Proc., §
1281.2. In opposing the petition, plaintiffs alleged
that defendants fraudulently misrepresented the
expedition of the arbitration system, and that
defendants engaged in a course of dilatory conduct in
order to postpone the employee's arbitration hearing
until after his death. The trial court found in
plaintiffs' favor and denied, on grounds of fraud,

938 P.2d 903                                                                                                    Page 2
15 Cal.4th 951, 938 P.2d 903, 64 Cal.Rptr.2d 843, 21 Employee Benefits Cas. 1407, 97 Cal. Daily Op. Serv. 5206,
97 Daily Journal D.A.R. 8384
**(Cite as: 15 Cal.4th 951, 938 P.2d 903)**

defendants' petition to compel arbitration. (Superior Court of Alameda County, No. H154976-4, Joanne C. Parrilli, Judge.) The Court of Appeal, First Dist., Div. Two, Nos. A062642, A063427 and A063547, reversed.

The Supreme Court reversed the judgment of the Court of Appeal with directions to remand the case for further proceedings. The court initially held that the trial court incorrectly treated the petition to compel arbitration as a type of summary judgment motion, in which it was obliged to determine only that there was a legitimate factual dispute among the parties and not to resolve that dispute. Thus, it was necessary to remand the case to that court to resolve any factually disputed issues. The court also held that plaintiffs, in seeking to have the arbitration agreement rescinded on the basis of fraud in the inducement (Code Civ. Proc., § 1281.2, subd. (b)), successfully established the element of misrepresentation. The arbitration agreement provided that party arbitrators "shall" be chosen within 30 days and neutral arbitrators within 60 days, and that the arbitration hearing "shall" be held "within a reasonable time thereafter." However, there was evidence that defendants established a self-administered arbitration system in which delay for their own benefit and convenience was an inherent part. The court further held that plaintiffs successfully established defendants' intent to induce reliance on the misrepresentations regarding the timely appointment of arbitrators, that the decedent's employer actually relied on defendants' misrepresentations in subscribing to the plan, and that plaintiffs presented sufficient evidence to establish actual injury. The court also held that plaintiffs were entitled to have the case remanded to the trial court to determine whether defendants had waived their right to compel arbitration, but that plaintiffs were unable to establish that the arbitration agreement was unconscionable on its face. (Opinion by Mosk, J., with George, C. J., Baxter, Werdegar, and Chin, JJ., concurring. Concurring opinion by Kennard, J. Dissenting opinion by Brown, J.)

### HEADNOTES

Classified to California Digest of Official Reports

**(1)** Arbitration and Award § 5--Arbitration Agreements--Construction-- Presumption in Favor of Arbitrability--Contract Law Standards.
California law incorporates many of the basic policy

objectives contained in the Federal Arbitration Act, including a presumption in favor of arbitrability and a requirement that an arbitration agreement must be enforced on the basis of state law standards that apply to contracts in general.

**(2)** Arbitration and Award § 13--Statutory Procedures for Compulsory Arbitration--Remedies for Refusal to Arbitrate--Petitions to Compel Arbitration--Summary Proceedings.
Code Civ. Proc., §§ 1281.2 and 1290.2, create a summary proceeding for resolving petitions to compel arbitration under California law. The petitioner bears the burden of proving the existence of a valid arbitration agreement by the preponderance of the evidence, and a party opposing the petition bears the burden of proving by a preponderance of the evidence any fact necessary to its defense. In these summary proceedings, the trial court sits as a trier of fact, weighing all the affidavits, declarations, and other documentary evidence, as well as oral testimony received at the court's discretion, to reach a final determination. No jury trial is available for a petition to compel arbitration.

**(3)** Arbitration and Award § 13--Statutory Procedures for Compulsory Arbitration--Remedies for Refusal to Arbitrate--Petitions to Compel Arbitration--Resolution of Factual Disputes by Trial Court.
In a medical malpractice action against the operators of a health services plan in which defendants petitioned to compel arbitration, the trial court incorrectly treated the petition to compel arbitration as a type of summary judgment motion, in which it was obliged to determine only that there was a legitimate factual dispute among the parties and not to resolve that dispute. The trial court was apparently of the view that it did not have to definitively decide the issue of fraud in the inducement of the arbitration agreement raised by plaintiffs in order to dispose of the petition, because that issue would be ultimately decided by a jury in the context of plaintiffs' damages action.

**(4a, 4b)** Arbitration and Award § 12--Statutory Procedures for Compulsory Arbitration--Defenses--Fraud--Misrepresentation--As to Timely Appointment of Arbitrators.
In a medical malpractice action against operators of a health services plan in which defendants petitioned to compel arbitration, plaintiffs, in seeking to have the arbitration agreement rescinded on the basis of fraud in the inducement (Code Civ. Proc., § 1281.2, subd.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

938 P.2d 903                                                              Page 3
15 Cal.4th 951, 938 P.2d 903, 64 Cal.Rptr.2d 843, 21 Employee Benefits Cas. 1407, 97 Cal. Daily Op. Serv. 5206,
97 Daily Journal D.A.R. 8384
**(Cite as: 15 Cal.4th 951, 938 P.2d 903)**

(b)), successfully established the element of misrepresentation. The arbitration agreement provided that party arbitrators "shall" be chosen within 30 days and neutral arbitrators within 60 days, and that the arbitration hearing "shall" be held "within a reasonable time thereafter." Defendants' representations were at the very least commitments to exercise good faith and reasonable diligence to have the arbitrators appointed within the specified time. However, facts supported plaintiffs' allegation that defendants entered into the agreement with knowledge that they would not comply with their own contractual timelines, or with at least a reckless indifference as to whether their agents would use reasonable diligence and good faith to comply with them. False representations made recklessly and without regard for their truth to induce action by another are the equivalent of misrepresentations knowingly and intentionally uttered. There was evidence that defendants established a self-administered arbitration system in which delay for their own benefit and convenience was an inherent part, despite representations to the contrary.

**(5)** Arbitration and Award § 13--Statutory Procedures for Compulsory Arbitration--Remedies for Refusal to Arbitrate--Petitions to Compel Arbitration--Revocation of Agreement.
The "revocation" of a contract, as referred to in Code Civ. Proc., § 1281.2, subd. (b) (upon filing a petition to compel arbitration, the court shall order arbitration upon determining that an agreement to arbitrate exists, unless grounds exist for "revocation of the agreement"), is something of a misnomer. Offers are "revoked," while contracts are extinguished by rescission. Thus, Civ. Proc., § 1281.2, subd. (b), is construed to mean that a petition to compel arbitration is not to be granted when there are grounds for rescinding the agreement.

**(6)** Arbitration and Award § 12--Statutory Procedures for Compulsory Arbitration--Defenses--Fraud--Fraud Directed to Making of Arbitration Agreement.
In order to defeat a petition to compel arbitration with a claim of fraud, the parties opposing the petition must show that the asserted fraud claim goes specifically to the making of the agreement to arbitrate, rather than to the making of the contract in general.

**(7)** Fraud and Deceit § 7--Actual Fraud--False Representations--Promissory Fraud.
Promissory fraud is a subspecies of fraud and deceit.

A promise to do something necessarily implies the intention to perform; hence, where a promise is made without such intention, there is an implied misrepresentation of fact that may be actionable fraud. An action for promissory fraud may lie where a defendant fraudulently induces the plaintiff to enter into a contract.

**(8)** Fraud and Deceit § 2--Actual Fraud--Elements.
The elements of fraud that will give rise to a tort action for deceit are: (a) misrepresentation (false representation, concealment, or nondisclosure), (b) knowledge of falsity (or "scienter"), (c) intent to defraud, i.e., to induce reliance, (d) justifiable reliance, and (e) resulting damage.

**(9)** Arbitration and Award § 12--Statutory Procedures for Compulsory Arbitration--Defenses--Fraud--Misrepresentation--As to Timely Appointment of Arbitrators--Intent to Induce Reliance.
In a medical malpractice action against operators of a health services plan in which defendants petitioned to compel arbitration, plaintiffs, in seeking to have the arbitration agreement rescinded on the basis of fraud in the inducement (Code Civ. Proc., § 1281.2, subd. (b)), successfully established defendants' intent to induce reliance on defendants' misrepresentations regarding the timely appointment of arbitrators. It could be reasonably inferred that defendants' misrepresentations of expedition, which were found not only in the contract but in newsletters periodically sent to subscribers touting the virtues of the plan's arbitration program, were made by defendants to encourage these subscribers to believe that its program would function efficiently. One such newsletter stated: "In the jury trial system, a malpractice complaint takes at least three years-and frequently longer-to reach court and a typical trial lasts ten to fourteen days. Arbitration proceedings don't involve a judge or jury; can be concluded in several months time, and a typical hearing lasts only two days." Such statements could plausibly be viewed as reflecting defendants' intent to induce subscription or renewal of subscription in the plan by misrepresenting the actual workings of its arbitration program.

**(10a, 10b)** Arbitration and Award § 12--Statutory Procedures for Compulsory Arbitration--Defenses--Fraud--Misrepresentation--As to Timely Appointment of Arbitrators--Actual Reliance--Materiality of Misrepresentation.
In a medical malpractice action against operators of a

938 P.2d 903                                                                          Page 4
15 Cal.4th 951, 938 P.2d 903, 64 Cal.Rptr.2d 843, 21 Employee Benefits Cas. 1407, 97 Cal. Daily Op. Serv. 5206,
97 Daily Journal D.A.R. 8384
(Cite as: 15 Cal.4th 951, 938 P.2d 903)

health services plan in which defendants petitioned to compel arbitration, plaintiffs, in seeking to have the arbitration agreement rescinded on the basis of fraud in the inducement (Code Civ. Proc., § 1281.2, subd. (b)), presented sufficient evidence to show that the deceased patient's employer actually relied on defendants' misrepresentations in subscribing to the plan. A presumption, or at least an inference, of reliance arises when a misrepresentation was material, and defendants' misrepresentations of expedition in the arbitration agreement were not so obviously unimportant as to render them immaterial as a matter of law. Expedition is commonly regarded as one of the primary advantages of arbitration. The representations served to confirm to the reasonable potential subscriber that defendants had an efficient system of arbitration. Moreover, the mere fact that there was a statutory remedy to expedite the arbitrator selection process (Code Civ. Proc., § 1281.6) did not render defendants' systematic delay irrelevant to the selection of a health plan. A party's success in having a Code Civ. Proc., § 1281.6, petition granted is neither assured, costless, nor in accord with normal expectations of arbitration participants, who view arbitration as an alternative to the courts. Nor was there evidence to conclusively rebut the inference of reliance on defendants' misrepresentations.

**(11)** Fraud and Deceit § 12--Actual Fraud--Reliance-- Presumption Based on Material Misrepresentation.
Actual reliance, as an element of fraud, occurs when a misrepresentation is an immediate cause of a plaintiff's conduct, which alters his or her legal relations, and when, absent such representation, the plaintiff would not, in all reasonable probability, have entered into the contract or other transaction. It is not necessary that the plaintiff's reliance upon the truth of the fraudulent misrepresentation be the sole or even the predominant or decisive factor in influencing the conduct. It is enough that the representation played a substantial part, and so has been a substantial factor, in influencing the plaintiff's decision. Moreover, a presumption, or at least an inference, of reliance arises wherever there is a showing that a misrepresentation was material. A misrepresentation is judged to be material if a reasonable person would attach importance to its existence or nonexistence in determining his or her choice of action in the transaction in question, and as such materiality is generally a question of fact unless the fact misrepresented is so obviously unimportant that the jury could not reasonably find that a reasonable

person would have been influenced by it.

**(12)** Arbitration and Award § 12--Statutory Procedures for Compulsory Arbitration--Defenses-- Fraud--Misrepresentation--As to Timely Appointment of Arbitrators--Actual Reliance-- Materiality of Misrepresentation--Employer as Employee's Agent.
In a medical malpractice action against operators of a health services plan in which defendants petitioned to compel arbitration, and in which plaintiffs sought to have the arbitration agreement rescinded on the basis of fraud in the inducement (Code Civ. Proc., § 1281.2, subd. (b)), the fact that the primary decisionmaker responsible for selecting the plan was not the deceased patient, but his employer, did not fundamentally alter the analysis pertaining to the materiality of the alleged misrepresentation. The evidence showed that the patient had little if any cognizance of the arbitration agreement. However, the patient's employer and its personnel employees were obviously aware of the arbitration provision and were responsible for scrutinizing the details of the health services plan before offering it to the company's employees. An employer that negotiates group medical benefits for its employees acts as an agent for those employees during the period of negotiation. An agency relationship is a fiduciary one, obliging the agent to act in the interest of the principal. Accordingly, a material representation for purposes of this case would have been one that would have substantially influenced the health plan selection process of the employer, acting as an agent of its employees as a class.

**(13a, 13b)** Arbitration and Award § 12--Statutory Procedures for Compulsory Arbitration--Defenses-- Fraud--Misrepresentation--As to Timely Appointment of Arbitrators--Injury.
In a medical malpractice action against operators of a health services plan in which defendants petitioned to compel arbitration, plaintiffs, in seeking to have the arbitration agreement rescinded on the basis of fraud in the inducement (Code Civ. Proc., § 1281.2, subd. (b)), presented sufficient evidence to establish actual injury. There was ample evidence that in plaintiffs' case, there was substantial delay in the selection of arbitrators contrary to their reasonable, fraudulently induced, contractual expectation. Although a malpractice claimant in arbitration bears the primary responsibility of exercising diligence to advance progress towards the resolutions of a claim, and the contract is not breached when delay in selecting

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

938 P.2d 903                                                                    Page 5
15 Cal.4th 951, 938 P.2d 903, 64 Cal.Rptr.2d 843, 21 Employee Benefits Cas. 1407, 97 Cal. Daily Op. Serv. 5206,
97 Daily Journal D.A.R. 8384
(Cite as: 15 Cal.4th 951, 938 P.2d 903)

arbitrators is from reasonable disagreement, defendants in this case engaged in a course of nonresponse, delay, and extracontractual conditions in the arbitrator selection process. Moreover, the availability of Code Civ. Proc., § 1281.6 (judicial remedy to expedite arbitrator selection process), did not absolve defendants of their contractual duties. A party that administers its own arbitration program, that fraudulently misrepresents the speed of the process, and that engages in conduct forcing substantial delay, may not then compel arbitration by contending that the other party failed to resort to the court by filing a Code Civ. Proc., § 1281.6, petition.

**(14)** Arbitration and Award § 12--Statutory Procedures for Compulsory Arbitration--Defenses--Fraud--Showing of Pecuniary Damages.
A defrauded party has the right to rescind a contract, even without a showing of pecuniary damages, on establishing that fraudulent contractual promises inducing reliance have been breached. The rule derives from the basic principle that a contracting party has a right to what it contracted for, and so has the right to rescind where he or she obtained something substantially different from that which is or she is led to expect. It follows that a defrauded party does not have to show pecuniary damages in order to defeat a petition to compel arbitration.

**(15a, 15b, 15c)** Arbitration and Award § 12--Statutory Procedures for Compulsory Arbitration--Defenses--Waiver--Based on Misrepresentation as to Timely Appointment of Arbitrators.
On appeal of a medical malpractice action against operators of a health services plan in which defendants petitioned to compel arbitration, plaintiffs were entitled to have the case remanded to the trial court to determine whether defendants waived their right to compel arbitration. The issue of whether defendants had waived the right to compel arbitration was a fundamental question that the trial court had jurisdiction to decide under Code Civ. Proc. § 1281.2, subd. (a). However, the trial court made no findings regarding the waiver claim, notwithstanding that evidence of defendants' course of delay, which was arguably unreasonable or in bad faith, could have provided sufficient grounds for a trier of fact to conclude that defendants had in fact waived their arbitration agreement. Such delay must be substantial, unreasonable, and in spite of the claimant's own reasonable diligence. The burden is on the one opposing the arbitration agreement to prove to the trial court that the other party's dilatory

conduct rises to such a level of misfeasance as to constitute a waiver, which is not to be lightly inferred. In this case, there was ample evidence that plaintiffs were diligent in seeking defendants' cooperation and instead suffered from defendants' delay.
[See 11 Witkin, Summary of Cal. Law (9th ed. 1990) Equity, § 44.]
**(16a, 16b)** Arbitration and Award § 12--Statutory Procedures for Compulsory Arbitration--Defenses--Waiver--Question of Fact--Standard of Review.
The term "waiver" generally denotes the voluntary relinquishment of a known right. But it can also mean the loss of an opportunity or a right as a result of a party's failure to perform an act it is required to perform, regardless of the party's intent to relinquish the right. A waiver of the right to demand arbitration has been found in a variety of contexts, ranging from situations in which the party seeking to compel arbitration has previously taken steps inconsistent with an intent to invoke arbitration to instances in which the petitioning party has unreasonably delayed in undertaking the procedure. Also, the bad faith or willful misconduct of a party may constitute a waiver and thus justify a refusal to compel arbitration. Although a waiver of arbitration is not to be lightly inferred, no single test delineates the nature of the conduct of a party that will constitute such a waiver. Whether there has been a waiver of a right to arbitrate is ordinarily a question of fact, and a finding of waiver, if supported by sufficient evidence, is binding on an appellate court. The appellate court's function is to review a trial court's findings regarding waiver to determine whether they are supported by substantial evidence.

**(17)** Arbitration and Award § 12--Statutory Procedures for Compulsory Arbitration--Defenses--Unconscionability--Selection of Arbitrators.
In a medical malpractice action against operators of a health services plan in which defendants petitioned to compel arbitration, plaintiffs were unable to establish that the arbitration agreement was unconscionable on its face. Contractual arrangements for nonjudicial resolution of disputes must possess minimum levels of integrity. In addition to the general doctrine of unconscionability derived from contract law, health maintenance organizations such as the one involved in this case are regulated by the Knox-Keene Health Care Plan Act, which provides that all contracts in connection with a health service plan be "fair, reasonable, and consistent with the objectives" of that statute (Health & Saf. Code, § 1367, subd.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

938 P.2d 903                                                                                    Page 6
15 Cal.4th 951, 938 P.2d 903, 64 Cal.Rptr.2d 843, 21 Employee Benefits Cas. 1407, 97 Cal. Daily Op. Serv. 5206,
97 Daily Journal D.A.R. 8384
(Cite as: 15 Cal.4th 951, 938 P.2d 903)

(h)). Although the contract in this case had some attributes of adhesion, it did not, on its face, lack minimum levels of integrity. Plaintiffs alleged that defendants' method of selecting neutral arbitrators was biased, that defendants had information on arbitrators that plaintiffs lacked, and that defendants sought to maximize this advantage by reserving an unlimited right to veto arbitrators proposed by the other party. However, none of these features rendered the agreement per se unconscionable. The alleged problem was not any defect or one-sidedness in its contractual provisions, but rather in the gap between its contractual representations and the actual workings of its arbitration program.
[See 11 Witkin, Summary of Cal. Law (9th ed. 1990) Equity, § 43.]

COUNSEL
Marion's Inn, Kennedy P. Richardson, Mark Palley, Archer, McComas & Lageson, Archer, McComas, Breslin, McMahon & Chritton and Willis F. McComas, in pro. per., and for Defendants and Appellants and for Petitioners.
Paul N. Halvonik, Fred J. Hiestand, Jackson, Tufts, Cole & Black, Gerald Z. Marer, Kenneth J. Philpot, Thelen, Marin, Johnson & Bridges, Curtis A. Cole, Michele Logan-Stern, Hammond, Zuetel & Cahill, Kenneth R. Zuetel, Jr., and Victoria K. Torigian as Amici Curiae on behalf of Defendants and Appellants and Petitioners.
No appearance for Respondent Superior Court.
David S. Rand, Carroll, Burdick & McDonough, Donald T. Ramsey and Rosemary Springer for Plaintiffs and Respondents and for Real Parties in Interest.
David E. Feller, Robert C. Post, Gail K. Hillebrand, Stefan M. Rosenzweig, David Link, Amy Bach, Anderson, Kill, Olick & Oshinsky, Eugene R. Anderson, Bennett Ellenbogen, Deborah M. Mongan, The Sturdevant Law Firm, James C. Sturdevant, Ann Saponara, McGuinn, Hillsman & Palefsky, Cliff Palefsky and Keith Ehrman as Amici Curiae on behalf of Plaintiffs and Respondents and Real Parties Interest. *960

**MOSK, J.**

In this case we consider the circumstances under which a court may deny a petition to compel arbitration because of the petitioner's fraud in inducing the arbitration agreement or waiver of the arbitration agreement. Plaintiffs are family members and representatives of the estate of Wilfredo Engalla (hereafter sometimes the Engallas). Engalla was enrolled, through his place of employment, in a health plan operated by the Permanente Medical Group, Inc., Kaiser Foundation Hospitals, and the Kaiser Foundation Health Plan (hereafter Kaiser).

Prior to his death, Engalla was engaged in a medical malpractice dispute with Kaiser, which, according to the terms of Kaiser's "Group Medical and Hospital Services Agreement" (Service Agreement), was submitted to arbitration. After attempting unsuccessfully to conclude the arbitration prior to Engalla's death, the Engallas filed a malpractice action against Kaiser in superior court, and Kaiser filed a petition to compel arbitration pursuant to Code of Civil Procedure section 1281.2. [FN1] In opposing the petition, plaintiffs claimed that Kaiser's self-administered arbitration system was corrupt or biased in a number of respects, that Kaiser fraudulently misrepresented the expeditiousness of its arbitration system, and that Kaiser engaged in a course of dilatory conduct in order to postpone Engalla's arbitration hearing until after his death, all of which should be grounds for refusing to enforce the arbitration agreement. The trial court found in the Engallas' favor, denying Kaiser's petition to compel arbitration on grounds of fraud, but the Court of Appeal reversed.

> FN1 All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

We conclude that there is indeed evidence to support the trial court's initial findings that Kaiser engaged in fraudulent conduct justifying a denial of its petition to compel arbitration, but we further conclude that questions of fact remain to be resolved by the trial court before it can be determined whether Kaiser's conduct was actually fraudulent. Similarly, there is a factual question as to whether Kaiser's actions constituted a waiver of its right to compel arbitration. We accordingly reverse the judgment of the Court of Appeal and direct it to remand the case to the trial court for such factual determinations. As will appear, although we affirm the basic policy in favor of enforcement of arbitration agreements, the governing statutes place limits on the extent to which a party that has committed misfeasance in the performance of such an agreement may compel its enforcement. *961

I. Factual and Procedural Background

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

938 P.2d 903                                                                                           Page 7
15 Cal.4th 951, 938 P.2d 903, 64 Cal.Rptr.2d 843, 21 Employee Benefits Cas. 1407, 97 Cal. Daily Op. Serv. 5206,
97 Daily Journal D.A.R. 8384
(Cite as: 15 Cal.4th 951, 938 P.2d 903)

Because the nature of this case cannot be appreciated without a detailed understanding of its factual context, these facts are set forth at length below. [FN2]

> FN2 Part I of this opinion has been adapted from the Court of Appeal opinion, with some modifications.

Engalla immigrated to the United States in 1980, where he commenced employment with Oliver Tire & Rubber Company (hereafter Oliver Tire) as a certified public accountant. At that time, Engalla was invited to enroll himself and his immediate family in a health plan offered by Kaiser. Oliver Tire had offered its employees health care through Kaiser since 1976, and its plan was renewed annually thereafter. Engalla enrolled with Kaiser by signing an application form which stated, in relevant part: "I apply for health plan membership for the persons listed and agree that we shall abide by the provisions of the Service Agreement and health plan regulations. If the agreement so provides, any monetary claim asserted by a Member or the Member's heirs or personnel [sic] representative on account of bodily injury, mental disturbance or death must be submitted to binding arbitration instead of a court trial."

### A. The Underlying Medical Malpractice Claim.

In March 1986, Engalla presented himself to Kaiser's Hayward facility complaining of a continuing cough and shortness of breath. Tests were administered, including radiologic examinations, and Kaiser's radiologist noted abnormalities of his right lung. Previous radiologic studies performed by Kaiser in 1982 at the same Hayward facility had been inadvertently destroyed, but would otherwise have confirmed that the abnormal condition had only recently developed. In his notes from the 1986 examination, the radiologist recommended follow-up if the films could not be located, but none was ever performed. For several years thereafter, Engalla repeatedly presented Kaiser with complaints symptomatic of respiratory disease. On some occasions he was given an appointment with a physician, but on other occasions he was only permitted to see nurse practitioners. For years, he was given inhalation medication, but Kaiser failed to perform diagnostic tests that might have revealed the developing cancer. Instead, he was repeatedly diagnosed with common colds and allergies. X-rays taken in 1991 finally revealed adenocarcinoma of the

lung, a type of lung cancer, but by then Engalla's condition was inoperable.

### B. The Arbitration Clause.

On or about May 31, 1991, Engalla and members of his immediate family served on Kaiser a written demand for arbitration of their claims that Kaiser *962 health care professionals had been negligent in failing to diagnose Engalla's lung cancer sooner. The Engallas' attorney, David Rand, correctly believed his clients were required to do so pursuant to the Service Agreement which was in effect at the time. The arbitration clause contained in the Service Agreement described the process for initiating a claim, the requirement that three arbitrators be used, and the time frame within which the arbitrators be selected. In this regard, section 8.B. of the Service Agreement provides that each side "shall" designate a party arbitrator within 30 days of service of the claim and that the 2 party arbitrators "shall" designate a third, neutral arbitrator within 30 days thereafter. [FN3] Section 8.C. sets forth general provisions concerning the arbitration of claims and incorporates applicable California law, including the California statute of limitations, the California Code of Civil Procedure provisions relating to arbitration, and the California Medical Injury Compensation Reform Act of 1975 (MICRA).

> FN3 The relevant portions of the Kaiser arbitration provision, found in section 8.B. of the Service Agreement, are as follows: "Within 30 days after initial service on a Respondent, Claimant and Respondent each shall designate an arbitrator and give written notice of such designation to the other, and Claimant shall forward $150, made payable to Kaiser Foundation Health Plan Arbitration Account, to Kaiser Foundation Health Plan.... This $150 will be deposited with Respondent's $150 in a special account maintained by Bank of America National Trust and Savings Association [and will] ... provide the initial funds to pay the fees of the neutral arbitrator and expenses of arbitration as approved by him or her .... Within 30 days after these notices have been given and payments made, the two arbitrators so selected shall select a neutral arbitrator and give notice of the selection to Claimant and all Respondents served, and the three arbitrators shall hold a hearing

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

938 P.2d 903                                                    Page 8
15 Cal.4th 951, 938 P.2d 903, 64 Cal.Rptr.2d 843, 21 Employee Benefits Cas. 1407, 97 Cal. Daily Op. Serv. 5206,
97 Daily Journal D.A.R. 8384
**(Cite as: 15 Cal.4th 951, 938 P.2d 903)**

within a reasonable time thereafter ...."

The Service Agreement further provides a broad statement governing its interpretation and, in that regard, states that Kaiser "is a named fiduciary to review claims under the Service Agreement." The nature of the claims for which Kaiser promises to act as a fiduciary is not specified, but a review of the Service Agreement reveals that the term "claims" appears in section 8, entitled "Arbitration of Claims."

The arbitration program is designed, written, mandated and administered by Kaiser. In regard to the latter, Kaiser collects funds from claimants and holds and disburses them as necessary to pay the neutral arbitrator and expenses approved by him or her. It monitors administrative matters pertinent to the progress of each case including, for example, the identity and dates of appointment of arbitrators. It does not, however, employ or contract with any independent person or entity to provide such administrative services, or any oversight or evaluation of the arbitration program or its performance. Rather, administrative functions are performed by outside counsel retained to defend Kaiser in an adversarial capacity.

The fact that Kaiser has designed and administers its arbitration program from an adversarial perspective is not disclosed to Kaiser members or **\*963** subscribers. It is not set forth in the arbitration provision itself, or in any of Kaiser's publications or disclosures about the arbitration program, and it was unknown to Engalla's employer, who signed the Service Agreement on his behalf. The employer's representative, Theodomeir Roy, read the provisions of the Service Agreement, and believed that the arbitration process would be equally fair to both the employee-subscriber and to Kaiser, and that it would allow employees to resolve disputes quickly and without undue expense. His expectation in that regard was consistent with the intent of Kaiser's general counsel, Scott Fleming, who originally drafted the arbitration provision, as well as various publications disseminated to Kaiser members. In those materials, Kaiser represented that an arbitration in its program would reach a hearing within several months' time, and that its members would find the arbitration process to be a fair approach to protecting their rights.

*C. Processing of the Engallas' Claim.*

Kaiser received the Engallas' May 31, 1991, demand for arbitration on June 5 or 6, approximately three business days after it was mailed by the Engallas' counsel. In that demand letter, Rand explained the nature of the claim, advised Kaiser of Engalla's terminal condition, and appealed to Kaiser to expedite the adjudication of the claim. Although he did not yet have a copy of the arbitration provision, Rand expressed an unqualified willingness to submit the matter to arbitration. At the same time, Rand indicated that he needed and was requesting a copy of the arbitration provision.

After hearing nothing for two weeks, Rand again wrote to Kaiser, repeated his agreement to arbitrate, and stressed the fact that "Mr. Engalla has very little time left in his life and I again urge you to assist me in expediting this matter for that reason." Several days later, Kaiser's in-house counsel, Cynthia Shiffrin, whose responsibility it was to monitor the Engallas' file, responded to the claim by acknowledging receipt and providing a copy of the arbitration provision per Rand's request. In turn, she requested $150, as required by the arbitration provision, as a deposit for half the expenses of the arbitration. Rand mailed the check the same day he received Shiffrin's letter. Shiffrin also expressed her willingness to comply with the request to avoid delay, noting that she had arranged for "expedited copies" of Engalla's medical records, and promising that outside counsel would contact Rand "in the near future with Kaiser's designation of an arbitrator."

*D. Appointment of the Party Arbitrators.*

In his May 31, 1991, demand letter, Rand requested that Kaiser's counsel contact him at the earliest convenience "so we may choose arbitrators." He **\*964** repeated that request on June 14, 1991. On June 21, Kaiser's outside counsel, Willis F. McComas, indicated that Kaiser would provide the identity of its arbitrator only after receiving the Engallas' designation. Rand objected to this staggered disclosure as not authorized by the arbitration agreement. Having heard nothing from McComas by July 8, Rand went ahead and designated Attorney Peter Molligan as the Engallas' arbitrator, again repeating his request that Kaiser do likewise "so that the two arbitrators can immediately commence efforts to identify and appoint the neutral arbitrator." It was not until July 17, 47 days after service of the claim, that McComas designated Kaiser's party

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

938 P.2d 903                                                                                                    Page 9
15 Cal.4th 951, 938 P.2d 903, 64 Cal.Rptr.2d 843, 21 Employee Benefits Cas. 1407, 97 Cal. Daily Op. Serv. 5206,
97 Daily Journal D.A.R. 8384
**(Cite as: 15 Cal.4th 951, 938 P.2d 903)**

arbitrator, Attorney Michael Ney. McComas admitted that he had not calendered any of the deadlines for designation of the arbitrators, claiming "[t]here is no rule that requires that."

Although he had designated Ney as his party arbitrator, McComas had not actually contacted Ney beforehand to see if he was available. Instead, on the day he designated him, McComas wrote to Ney asking if he was available. In that letter, McComas advised that the plaintiff was terminally ill, and that Rand had asked for an early arbitration date, but said that he had not responded to the request.

Although McComas was aware from the outset that Engalla was terminally ill and probably had only a few months to live, and claimed that he had "cooperated in the appointment of the party arbitrator very early in the case," it was later revealed that he had been advised by Ney in July that Ney was unable to accept any further assignments to act as a party arbitrator until late November, over four months away. When the fact of Ney's unavailability came to light on August 15, Rand made repeated requests that Kaiser appoint another arbitrator, but McComas refused. Rand also requested that Kaiser stipulate to a single neutral arbitrator, but that request was similarly refused. However, in late July, McComas did make arrangements for a backup arbitrator, Tom Watrous, who would step in if Ney was not available when the parties were ready to proceed with the arbitration hearing. [FN4]

> FN4 Watrous was, however, planning a three-week European vacation during October which would have made him unavailable for much of the time period in which the Engallas were seeking to complete the arbitration.

### E. Negotiations for Appointment of Neutral Arbitrator and Hearing Date.

According to the Service Agreement, a neutral arbitrator is to be chosen by the two party arbitrators within thirty days of their selection, and the hearing is to be held "within a reasonable time thereafter." Thus, pursuant to **\*965** the time frame mandated by Kaiser, the neutral arbitrator must be selected within 60 days after initial service of the claim. There is no dispute that timely appointment of a neutral arbitrator is critical to the progress of the case, inter alia,

because the Code of Civil Procedure provides a right to discovery only "[a]fter the appointment of the arbitrator or arbitrators." (§ 1283.05, subd. (a.).) In fact, in this case, McComas asserted that discovery could not commence until the neutral arbitrator was selected, because the neutral arbitrator would have to approve any discovery. Similarly, a hearing date cannot be set until the neutral arbitrator is appointed. (§ 1282.2, subd. (a.).) In this case, McComas refused to discuss disclosure of expert witnesses until the hearing date was set. In short, the timely appointment of a neutral arbitrator is the linchpin of all progress in a Kaiser arbitration. Without a neutral arbitrator in place, and absent a stipulation, nothing can be accomplished.

Although the arbitration provision specifies that the two party arbitrators "shall" select a neutral arbitrator, in reality the selection is made by defense counsel after consultation with the Kaiser medical-legal department. Kaiser has never relinquished control over this selection decision. Indeed, in this case, McComas instructed Ney on who should be proposed and who was unacceptable. Thus, the timeliness of appointment of a neutral arbitrator depends upon cooperation and agreement by Kaiser and its counsel, as well as that of the claimants and their attorneys.

In the initial claim of May 31, 1991, Rand requested the immediate commencement of the process for selection of arbitrators. During the next few months, Rand wrote more than a dozen letters to the arbitrators and McComas asking that the selections be made. Only two weeks after serving his demand letter, Rand stated that he intended "to encourage both designated arbitrators to identify the third arbitrator at the earliest possible date." On July 8, Rand suggested an agreement on the date for designation of experts, preferably in August, "and that we anticipate having the arbitration soon thereafter." On July 18, Rand again wrote to McComas on the subject of scheduling the arbitration hearing, noting that he would be prepared to proceed by early September. On July 23, Rand wrote to both party arbitrators and McComas, again stressing the terminal condition of the plaintiff, his desire to hold the arbitration hearing in early September, and the urgent need to select the third, neutral arbitrator. Rand again wrote to the two party arbitrators on August 9, and again urged them to "select the third arbitrator as soon as possible." The Engallas' designated arbitrator, Peter Molligan, also attempted

938 P.2d 903                                                                                                Page 10
15 Cal.4th 951, 938 P.2d 903, 64 Cal.Rptr.2d 843, 21 Employee Benefits Cas. 1407, 97 Cal. Daily Op. Serv. 5206,
97 Daily Journal D.A.R. 8384
**(Cite as: 15 Cal.4th 951, 938 P.2d 903)**

to push the defense into motion. On August 12, after trying at least three times to get Ney on the phone, Molligan finally wrote Ney about selecting the neutral arbitrator in order to "get this case moving." A few days *966 later, having still heard nothing, Rand tried again, saying: "Time is of the absolute essence and I again ask that you use all possible means to quickly select the third arbitrator. I am becoming increasingly concerned about the delays and am beginning to wonder whether the arbitration proceedings are suitable for this case."

During the week following August 15, 1991, the two party arbitrators exchanged six names. Rand also continued to press the issue of the unavailability of party arbitrator Ney, which he had just learned about, and repeated his request that the parties move toward a schedule that would allow the arbitration proceedings to begin in September. On August 30, having still heard nothing about the third arbitrator, Rand wrote to Judicial Arbitration and Mediation Services (JAMS) Judge Daniel Weinstein requesting proposals for judges who could be available for a hearing date "within the next several weeks."

On September 3, Ney wrote to Molligan, rejecting as unacceptable Judge Francis Mayer, one of the "neutrals" Molligan had suggested. Apparently, this veto was exercised pursuant to McComas's instructions. Ney expressed doubts about the availability of Molligan's other two choices-retired Judge Fannin or Weinstein, although he had not checked with either judge-and pressed instead for one of his own choices. On September 5, while Molligan was out of town, Rand agreed to one of the suggestions, Judge Robert Cooney, on the condition that "he can be available to commence this matter this month." If he was not available, Rand suggested two JAMS judges he knew to be available in September. Rand wrote to McComas again on September 18 and 25, literally begging for responses to his many suggestions for expediting the arbitration process.

Despite this additional prompting, McComas did not respond for almost three weeks and, when he finally wrote to Rand on September 24, he expressed uncertainty as to whether Judge Cooney had been agreed upon. Rand immediately responded on September 26 that Judge Cooney had been accepted and that he was only waiting for confirmation that the judge would be available "in the very near future." Apparently, because Kaiser holds itself out as the

program administrator, collects and disburses arbitrator fees and had, in fact, proposed Judge Cooney, Rand assumed Kaiser would handle the formal retention of Judge Cooney and pay a deposit on his fees. Kaiser takes the position that it is the claimant's burden to move the case along, including making arrangements with the neutral arbitrator.

After almost two more weeks, McComas wrote again on October 7, this time claiming that "[t]o this date, neither you nor your clients have agreed to *967 the appointment of a neutral arbitrator" because "[y]ou apparently agreed to Judge Cooney with an unrealistic condition." [FN5] Rand responded on October 16, stating, "I am incredulous that you are *still* asking that we agree to the appointment of the neutral arbitrator. We have repeatedly informed you that we will agree to your suggestion of Judge Cooney. Why do you continue to insist that we have not agreed? My only reservation was and still is a question concerning availability." On October 18, Rand again wrote that he was "still waiting to hear from you concerning the final retention of Judge Cooney. I had promised him that he would be hearing from you when I advised him that we had agreed to his appointment."

> FN5 The Engallas claim that McComas dissembled on September 24 and October 7 when he expressed uncertainty about Judge Cooney's availability and the plaintiffs' agreement to appointment of the retired judge. They argue that, by that time, McComas had not even contacted Judge Cooney to determine his availability, and that, in fact, Judge Cooney *was* available during September and October to preside over the hearing. They conclude that, by initially feigning uncertainty about whether Engalla had agreed to Judge Cooney's appointment, McComas managed to delay the appointment for over six weeks.

Finally, on October 22, McComas wrote to say that he understood the Engallas had agreed to retain Judge Cooney as the neutral arbitrator, conditioned upon his availability, and that he had, therefore, instructed Ney to complete the retainer. By this time, 144 days-almost 3 months more than the 60 days for the selection of the arbitrators represented in the Service Agreement-had elapsed since the initial service of the claim. Engalla died the next day.

938 P.2d 903                                                                                          Page 11
15 Cal.4th 951, 938 P.2d 903, 64 Cal.Rptr.2d 843, 21 Employee Benefits Cas. 1407, 97 Cal. Daily Op. Serv. 5206,
97 Daily Journal D.A.R. 8384
**(Cite as: 15 Cal.4th 951, 938 P.2d 903)**

*F. Historical Data re Speed of Kaiser Arbitrations.*

Statistically, delays occur in 99 percent of all Kaiser medical malpractice arbitrations. An independent statistical analysis of Kaiser-provided data of arbitration between 1984 and 1986 reveals that in only 1 percent of all Kaiser cases is a neutral arbitrator appointed within the 60-day period provided by the arbitration provision. Only 3 percent of cases see a neutral arbitrator appointed within 180 days. On average, it has taken 674 days for the appointment of a neutral arbitrator. For claimants whose cases were resolved by settlement or after a hearing, the time required to appoint a neutral arbitrator consumed more than half the total time for resolution. Furthermore, because the arbitration provision of the Service Agreement does not clearly establish a time frame for a hearing (it must be within a "reasonable time" after appointment of the neutral arbitrator), and because Kaiser claims it has no obligation to participate in a hearing until it deems itself ready, there tend to be significant additional delays after appointment of the neutral arbitrator. Thus, on average, it takes 863 days-almost 2 1/2 years-to reach a hearing in a Kaiser arbitration. The depositions of Scott **\*968** Fleming and Arthur Bernstein, both of whom formerly served as Kaiser's in-house counsel, revealed that Kaiser had long been aware that widespread delays were commonplace in Kaiser arbitrations.

*G. Deposition Scheduling During the Aborted Arbitration Proceedings.*

In proceedings parallel to his efforts to complete appointments of the arbitrators, Rand began attempts to conduct discovery immediately after filing his demand for arbitration. On June 14, he wrote to Kaiser stating his desire to complete Engalla's deposition "on the earliest date permitted by law," and his willingness to schedule it for a mutually convenient time. McComas proptly responded to that request by law," and his willingness to schedule it for a mutually convenient time. McComas promptly responded to that request by noticing the depositions of all the Engallas for November 18, 1991-a date more than five months down the read-despite Rand's admonition that Engalla "had very little time left in his life." On June 26, Rand notified McComas that his proposed dates were unacceptable, and suggested that Engalla's deposition be taken "much earlier than you have noticed [because his] developing condition may not permit a full deposition on November 18."

Rand again indicated his willingness to find mutually agreeable dates. He also requested the depositions of involved doctors "in the near future."

When McComas did not respond for almost two weeks, Rand noticed Engalla's deposition for August 9. In a letter accompanying that notice, Rand repeated his request for deposition of the doctors "this month" (July), proposed an agreement to designate experts in August, and offered to set dates for the other Engalla claimants at McComas's "earliest convenience." After the location was changed for medical reasons, Rand proceeded with Engalla's deposition on August 9, over Kaiser's objection that it had not been given any prior opportunity to conduct a discovery deposition. The August 9 deposition of Engalla, noticed and taken by Rand, was to be the only deposition that would be accomplished in the arbitration phase of this case.

Rand's efforts to schedule depositions of the involved doctors and nurses continued to founder. He initially requested dates for the depositions of the treating physicians on June 26, and did so again on July 8. In his June 26 request, and in each subsequent request, Rand offered to schedule the depositions at times-even after hours or on weekends-that would be convenient for Kaiser. He finally set them by notice of July 18. On July 24, McComas's secretary called Rand to request that they be taken off calendar. Rand responded that he would cooperate, but only if alternative dates could be established. No alternative dates were ever proposed by Kaiser, and the witnesses did not attend their scheduled depositions. McComas failed to **\*969** respond to three subsequent requests for depositions, which were made on September 5, 18, and 25. On September 24, McComas simply promised that his secretary would call to give dates for the health care providers. That did not occur until October 2, when McComas's secretary offered November 21 and 22 for the depositions of the doctors. This was the first time Kaiser had offered to produce the involved physicians, and the dates were still almost a month after Engalla's death. Although Rand ultimately convinced McComas to provide earlier dates for some (but not all) of the involved health care providers, the depositions were not taken because Engalla died before they could be completed.

As McComas subsequently admitted in a sworn declaration, the reason for the delays in scheduling depositions was that he "did not obtain all of the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

938 P.2d 903                                                        Page 12
15 Cal.4th 951, 938 P.2d 903, 64 Cal.Rptr.2d 843, 21 Employee Benefits Cas. 1407, 97 Cal. Daily Op. Serv. 5206,
97 Daily Journal D.A.R. 8384
(Cite as: 15 Cal.4th 951, 938 P.2d 903)

significant advice from [his] principal outside medical experts until early October, 1991 [and it] was for [that] reason that [he] never suggested deposition dates ... before the fourth week of October."

### H. *Termination of the Prior Arbitration.*

Immediately upon learning of Engalla's death on October 23, Rand notified McComas of that fact and asked him to stipulate that Kaiser would not capitalize on the delays that had plagued the arbitration. Specifically, Rand explained that under the case of *Atkins v. Strayhorn* (1990) 223 Cal.App.3d 1380 [273 Cal.Rptr. 231], the limitation of $250,000 on noneconomic damages under Civil Code section 3333.2 for a medical malpractice suit is applied separately to the claims of a patient and his spouse who simultaneously claims loss of consortium. Because Mrs. Engalla had made such a claim, *Atkins* authorized a total claim for noneconomic damages of $500,000. However, upon the passing of Engalla, the case of *Yates v. Pollock* (1987) 194 Cal.App.3d 195 [239 Cal.Rptr. 383], required merger of the widow's loss of consortium claim into an indivisible claim for wrongful death, which warrants only a single general damage claim limited to $250,000. Rand's request for a stipulation to override the effect of *Yates* was refused. At that point, Rand notified McComas that the Engallas refused to continue with the arbitration.

### I. *Commencement of Court Proceedings.*

On February 21, 1992, the Engallas filed their complaint in Alameda Superior Court. They alleged, in addition to the underlying malpractice claim, fraud as a defense to enforcement of the arbitration provision of the Service Agreement (hereafter arbitration agreement) and as the basis of an affirmative claim for damages, as well as various other claims related to the *970 breach of the arbitration agreement. On March 20, Kaiser removed the case to the United States District Court for the Northern District of California, claiming that the action and all issues presented were subject to the rule of federal preemption contained in the Employee Retirement Income Security Act of 1974 (29 U.S.C. §§ 1132, 1144). About the same time, Kaiser proposed to continue the arbitration process. The Engallas declined the offer and, instead, filed a motion to remand. On June 19, the federal court granted the Engallas' motion in its entirety and remanded the matter back to state court.

Upon remand, the Engallas immediately filed a motion to compel discovery they had served prior to Kaiser's removal effort. Kaiser responded with a petition to compel arbitration and stay the court action. The parties thereafter briefed both the discovery and arbitration motions, and the trial court heard lengthy argument and took the matters under submission. On September 29, 1992, the court issued an order continuing the matter for 90 days to permit the Engallas to make their "best showing with respect to the evidentiary grounds that exist to warrant removal of this case from the arbitration process." Discovery rulings were made only with respect to discovery that specifically pertained to the arbitration (as opposed to the medical malpractice) issues.

The parties embarked upon a course of discovery which was limited in light of the summary nature of the petition Kaiser had filed. The Engallas ultimately had five months to complete discovery, during which time thirteen motions were filed and more than a dozen depositions were taken.

The parties then submitted further briefs in connection with Kaiser's petition to compel arbitration. The Engallas also moved for summary adjudication of issues, asking for a judicial determination, pursuant to section 437c, subdivision (f), that Kaiser owed them certain duties. This motion was subsequently dismissed without prejudice based on certain technical defects. The Engallas also filed a discovery motion to obtain assertedly privileged documents.

After a hearing the trial court issued its order denying Kaiser's petition after making specific findings of fact on the issue of fraud both "in the inducement" and "in the application" of the arbitration agreement. The court further found that the arbitration agreement, as applied, was overbroad, unconscionable and a violation of public policy, inasmuch as Kaiser was arguing that the agreement could not be avoided on grounds of fraudulent inducement. The court further found that equitable considerations peculiar to this case required the invalidation of the arbitration provision. *971

On June 4, 1993, a hearing was held on the Engallas' discovery motion. At that hearing, Kaiser's counsel advised the court that Kaiser would not appeal the decision denying the petition, conceding

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

938 P.2d 903                                                                                                    Page 13
15 Cal.4th 951, 938 P.2d 903, 64 Cal.Rptr.2d 843, 21 Employee Benefits Cas. 1407, 97 Cal. Daily Op. Serv. 5206,
97 Daily Journal D.A.R. 8384
**(Cite as: 15 Cal.4th 951, 938 P.2d 903)**

that the court's ruling on the petition "was quite
correct." However, Kaiser later reconsidered and
appealed.

The Court of Appeal reversed. It rejected the
claim that Kaiser had defrauded the Engallas, finding
inter alia that Kaiser's contractual representation of a
60-day time limit for the selection of arbitrators was
not "a representation of fact or a promise by Kaiser
because appointment of the neutral arbitrator requires
the cooperation of and *mutual agreement* of the
parties." (Original italics.) The court further
concluded there was no evidence of actual reliance
on these representations nor evidence that the
Engallas would have been any better off had their
claims been submitted for judicial resolution rather
than arbitration. The court also found that the
availability of section 1281.6, which permits one of
the parties to petition the court to appoint an
arbitrator when the parties fail to agree on one,
undermined the Engallas' claim that Kaiser's alleged
deliberate delay in selecting arbitrators was a ground
for avoiding the arbitration agreement. The court
further rejected the claim that Kaiser's special
relationship as Engalla's insurer or as a fiduciary in
the administration of his health plan created any
special duty to disclose the workings of its arbitration
program. Finally, the court held the Engallas' waiver
and unconscionability claims to be without merit. We
granted review. FN6

> FN6 Kaiser and its counsel also filed in the
> Court of Appeal separate writ petitions
> requesting reversal of the trial court's
> discovery order discussed above. The Court
> of Appeal granted that relief, concluding
> that such discovery issues should be
> addressed to the arbitrator. The petition for
> review did not request review of the Court
> of Appeal's decision in the writ petition,
> which was premised on its grant of Kaiser's
> petition to compel arbitration. Accordingly,
> we do not address the issues raised by the
> writ petitions in this opinion. On remand,
> the parties are free to make or renew any
> discovery request relevant to the resolution
> of the petition to compel arbitration.

II. Procedural Issues

Before proceeding to the merits, we must address
certain procedural and threshold matters. As both
parties concede, California law is expressly

incorporated into the arbitration agreement in
question, and governs the adjudication of any
disputes arising from that agreement. (*Volt Info.
Sciences v. Leland Stanford Jr. U.* (1989) 489 U.S.
468, 476 [109 S.Ct. 1248, 1254, 103 L.Ed.2d 488].)
(1) California law incorporates many of the basic
policy objectives contained in the Federal Arbitration
Act, including a presumption in favor of arbitrability
(*Ericksen, Arbuthnot, McCarthy, Kearney & Walsh,
Inc. v. 100 Oak Street* (1983) 35 Cal.3d 312, 323
[*972197 Cal.Rptr. 581, 673 P.2d 251]) and a
requirement that an arbitration agreement must be
enforced on the basis of state law standards that apply
to contracts in general (*Madden v. Kaiser Foundation
Hospitals* (1976) 17 Cal.3d 699, 709, fn. 11 [131
Cal.Rptr. 882, 552 P.2d 1178] (*Madden*)). These
policies guide our determination of the present
matter.

The nature of the proceeding to resolve a petition
to compel arbitration under California law was
recently explained by this court in *Rosenthal v. Great
Western Fin. Securities Corp.* (1996) 14 Cal.4th 394
[58 Cal.Rptr.2d 875, 926 P.2d 1061] (*Rosenthal*). (2)
As we explain in that case, sections 1281.2 and
1290.2 create a summary proceeding for resolving
these petitions. (14 Cal.4th at p. 413.) The petitioner
bears the burden of proving the existence of a valid
arbitration agreement by the preponderance of the
evidence, and a party opposing the petition bears the
burden of proving by a preponderance of the
evidence any fact necessary to its defense. (*Ibid.*) In
these summary proceedings, the trial court sits as a
trier of fact, weighing all the affidavits, declarations,
and other documentary evidence, as well as oral
testimony received at the court's discretion, to reach a
final determination.(*Id.* at pp. 413-414.)No jury trial
is available for a petition to compel arbitration. (*Id.* at
p. 413.)

(3) Although the record is not entirely clear on
this point, it appears that the trial court in this case, as
in *Rosenthal* (see *Rosenthal, supra,* 14 Cal.4th at p.
414), incorrectly treated Kaiser's petition to compel
arbitration as a type of summary judgment motion, in
which it was obliged to determine only that there was
a legitimate factual dispute among the parties and not
to resolve that dispute. The court stated at the
conclusion of its ruling on the petition to compel: "In
summary, the Plaintiffs have made a substantive
challenge to the arbitration clause and have presented
facts tending to show that they were victims of fraud
in the inducement and application of the arbitration

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

938 P.2d 903                                                          Page 14
15 Cal.4th 951, 938 P.2d 903, 64 Cal.Rptr.2d 843, 21 Employee Benefits Cas. 1407, 97 Cal. Daily Op. Serv. 5206, 97 Daily Journal D.A.R. 8384
**(Cite as: 15 Cal.4th 951, 938 P.2d 903)**

clause. *How a trier of fact will ultimately decide the issues is not for this court to decide.* However, given the seriousness of the *allegations*, the showing of a factual basis for those claims, and the finality of arbitration even in the face of apparent legal error [citation], the strong policy favoring arbitration is outweighed by the law and facts in support of Plaintiffs' position." (Italics added.) To judge from remarks made by the trial court during the hearing on the petition to compel, the court appears to have followed the reasoning of *Rowland v. Paine Webber Inc.* (1992) 4 Cal.App.4th 279, 285-286 [6 Cal.Rptr.2d 20], that a court must only determine whether "there are any facts supporting the allegations of fraudulent inducement." Toward the end of the hearing on the petition to compel, the trial court again alluded to cases "that have ... talked in terms of the burden being akin to a burden on a summary judgment motion." Moreover, *973 both counsel for the Engallas and for Kaiser appear to have conceived their burden as one similar to summary judgment. The trial court was apparently of the view that it did not have to definitively decide the fraud issue in order to dispose of the petition, because that issue would be ultimately decided by a jury in the context of the Engallas' damages action. Because the trial court, understandably confused by case law (see *Rosenthal, supra,* 14 Cal.4th at p. 407 and cases cited therein), apparently abdicated its role as trier of fact in deciding the petition to compel arbitration, the case must be remanded to that court to resolve any factually disputed issues, unless there is no evidentiary support for the Engallas' claims. (See *id.* at p. 414.)We turn then to the question whether there was such support. [FN7]

———

FN7 In reviewing this quasi-summary-judgment motion we will "undertake [] an independent review of the evidence presented to the trial court to determine whether [any] triable issues of fact were presented." (*Schrader v. Scott* (1992) 8 Cal.App.4th 1679, 1683 [11 Cal.Rptr.2d 433].)

### III. Fraud in the Inducement of the Arbitration Agreement

(4a) The Engallas claim fraud in the inducement of the arbitration agreement and therefore that "[g]rounds exist for the revocation of the agreement" within the meaning of section 1281.2, subdivision (b). (5) As has been pointed out, the "revocation of a

contract" referred to in section 1281.2 is something of a misnomer. "Offers are 'revoked.' [Citation.] Contracts are extinguished by rescission." (Knight et al., Cal. Practice Guide: Alternative Dispute Resolution (The Rutter Group 1996) ¶ 5.111, p. 5-31, italics omitted.) We construe section 1281.2, subdivision (b), to mean that the petition to compel arbitration is not to be granted when there are grounds for rescinding the agreement. Fraud is one of the grounds on which a contract can be rescinded. (Civ. Code, § 1689, subd. (b)(1).) (6) In order to defeat a petition to compel arbitration, the parties opposing a petition to compel must show that the asserted fraud claim goes specifically " 'to the "making" of the agreement to arbitrate,' " rather than to the making of the contract in general. (*Rosenthal, supra,* 14 Cal.4th at p. 415.) In the present case, the Engallas do allege, and seek to show, fraud in the making of the arbitration agreement.

The Engallas claim [FN8] that Engalla was fraudulently induced to enter the arbitration agreement-in essence a claim of promissory fraud. (7) " 'Promissory fraud' is a subspecies of fraud and deceit. A promise to do something necessarily implies the intention to perform; hence, where a promise is made without such intention, there is an implied misrepresentation of fact that may be actionable fraud. [Citations.] [¶] An action for *974 promissory fraud may lie where a defendant fraudulently induces the plaintiff to enter into a contract." (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638 [49 Cal.Rptr.2d 377, 909 P.2d 981].) (8) The elements of fraud that will give rise to a tort action for deceit are: " '(a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or "scienter"); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage.' " (*Ibid.*) As explained below, there is no requirement to show pecuniary damages when fraud is the basis for a defense to a petition to compel arbitration, rather than a suit for damages.

FN8 For the sake of convenience, the arguments of the various amici curiae for the parties will be attributed to the parties.

(4b) Here the Engallas claim (1) that Kaiser misrepresented its arbitration agreement, in that it entered into the agreement knowing that, at the very least, there was a likelihood its agents would breach the part of the agreement providing for the timely

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

938 P.2d 903                                                                                              Page 15
15 Cal.4th 951, 938 P.2d 903, 64 Cal.Rptr.2d 843, 21 Employee Benefits Cas. 1407, 97 Cal. Daily Op. Serv. 5206,
97 Daily Journal D.A.R. 8384
(Cite as: 15 Cal.4th 951, 938 P.2d 903)

appointment of arbitrators and the expeditious progress towards an arbitration hearing; (2) that Kaiser employed the above misrepresentation in order to induce reliance on the part of Engalla and his employer; (3) that Engalla relied on these misrepresentations to his detriment. The trial court found evidence supporting those claims. We examine each of these claims in turn.

First, evidence of misrepresentation is plain. "[F]alse representations made recklessly and without regard for their truth in order to induce action by another are the equivalent of misrepresentations knowingly and intentionally uttered." (*Yellow Creek Logging Corp. v. Dare* (1963) 216 Cal.App.2d 50, 55 [30 Cal.Rptr. 629].) As recounted above, section 8.B. of the arbitration agreement provides that party arbitrators "shall" be chosen within 30 days and neutral arbitrators within 60 days, and that the arbitration hearing "shall" be held "within a reasonable time thereafter." Although Kaiser correctly argues that these contractual representations did not bind it to appoint a neutral arbitrator within 60 days, since the appointment of that arbitrator is a bilateral decision that depends on agreements of the parties, Kaiser's contractual representations were at the very least commitments to exercise good faith and reasonable diligence to have the arbitrators appointed within the specified time. This good faith duty is underscored by Kaiser's contractual assumption of the duty to administer the health service plan as a fiduciary.

Here there are facts to support the Engallas' allegation that Kaiser entered into the arbitration agreement with knowledge that it would not comply with its own contractual timelines, or with at least a reckless indifference as to whether its agents would use reasonable diligence and good faith to comply with them. As discussed, a survey of Kaiser arbitrations between 1984 and *975 1986 submitted into evidence showed that a neutral arbitrator was appointed within 60 days in only 1 percent of the cases, with only 3 percent appointed within 180 days, and that on average the neutral arbitrator was appointed 674 days-almost 2 years-after the demand for arbitration. Regardless of when Kaiser became aware of these precise statistics, which were part of a 1989 study, the depositions of two of Kaiser's in-house attorneys demonstrate that Kaiser was aware soon after it began its arbitration program that its contractual deadlines were not being met, and that severe delay was endemic to the program. Kaiser

nonetheless persisted in its contractual promises of expeditiousness.

Kaiser now argues that most of these delays were caused by the claimants themselves and their attorneys, who procrastinated in the selection of a neutral arbitrator. But Kaiser's counterexplanation is without any statistical support, and is based solely on anecdotal evidence related by Kaiser officials. Moreover, the explanation appears implausible in view of the sheer pervasiveness of the delays. While it is theoretically possible that 99 percent of plaintiffs' attorneys did not seek a rapid arbitration, a more reasonable inference, in light of common experience, is that in at least some cases Kaiser's defense attorneys were partly or wholly responsible for the delays, and Kaiser's former general counsel conceded as much in deposition testimony. It is, after all, the defense which often benefits from delay, thereby preserving the status quo to its advantage until the time when memories fade and claims are abandoned. Indeed, the present case illustrates why Kaiser's counsel may sometimes find it advantageous to delay the selection of a neutral arbitrator. There is also evidence that Kaiser kept extensive records on the arbitrators it had used, and may have delayed the selection process in order to ensure that it would obtain the arbitrators it thought would best serve its interests. Thus, it is a reasonable inference from the documentary record before us that Kaiser's contractual representations of expeditiousness were made with knowledge of their likely falsity, and in fact concealed an unofficial policy or practice of delay.

The systemwide nature of Kaiser's delay comes into clearer focus when it is contrasted with other arbitration systems. As the Engallas point out, many large institutional users of arbitration, including most health maintenance organizations (HMO's), avoid the potential problems of delay in the selection of arbitrators by contracting with neutral third party organizations, such as the American Arbitration Association (AAA). These organizations will then assume responsibility for administering the claim from the time the arbitration demand is filed, and will ensure the arbitrator or arbitrators are *976 chosen in a timely manner. [FN9] Though Kaiser is not obliged by law to adopt any particular form of arbitration, the record shows that it did not attempt to create within its own organization any office that would neutrally administer the arbitration program, but instead entrusted such administration to outside counsel

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

938 P.2d 903                                                                                          Page 16

15 Cal.4th 951, 938 P.2d 903, 64 Cal.Rptr.2d 843, 21 Employee Benefits Cas. 1407, 97 Cal. Daily Op. Serv. 5206, 97 Daily Journal D.A.R. 8384

**(Cite as: 15 Cal.4th 951, 938 P.2d 903)**

retained to act as advocates on its behalf. In other words, there is evidence that Kaiser established a self-administered arbitration system in which delay for its own benefit and convenience was an inherent part, despite express and implied contractual representations to the contrary. [FN10]

> FN9 Under the AAA proceeding, for example, that organization submits simultaneously to each of the parties, shortly after the arbitration demand is filed, a list of names of possible arbitrators and their biographical information. Each party is then given 10 days to cross-off the names to which it objects and to number the remaining names in order of preference. If a party does not respond within the 10-day period, all the arbitrators on the list are deemed to be acceptable to it. The AAA then selects the arbitrator or arbitrators from the list, who set a hearing date and supervise discovery. A similar procedure is employed for judicial arbitration. (See Cal. Rules of Court, rule 1605.)

> FN10 There is also evidence that Kaiser disseminated information through its newsletters which was seen by responsible officials in Oliver Tire, the company in which Engalla was employed, that represented Kaiser's arbitration system as fast and efficient. These misrepresentations further support the Engallas' fraud claim.

(9) A fraudulent state of mind includes not only knowledge of falsity of the misrepresentation but also an " 'intent to ... induce reliance' " on it. (*Lazar v. Superior Court, supra,* 12 Cal.4th at p. 638.) It can be reasonably inferred in the present case that these misrepresentations of expeditiousness, which are found not only in the contract but in newsletters periodically sent to subscribers touting the virtues of the Kaiser arbitration program, were made by Kaiser to encourage these subscribers to believe that its program would function efficiently. One such newsletter stated: "In the jury trial system, a malpractice complaint takes at least three years-and frequently longer-to reach court and a typical trial lasts ten to fourteen days. Arbitration proceedings don't involve a judge or jury; can be concluded *in several months time,* and a typical hearing lasts only two days." (Italics added.) Such statements can plausibly be viewed as reflecting Kaiser's intent to

induce subscription or renewal of subscription in Kaiser's health services plan by misrepresenting the actual workings of its arbitration program.

(10a) Kaiser also claims that the Engallas failed to demonstrate actual reliance on its misrepresentations. (11) Actual reliance occurs when a misrepresentation is " 'an immediate cause of [a plaintiff's] conduct, which alters his legal relations,' " and when, absent such representation, " 'he would not, in all reasonable probability, have entered into the contract or other transaction.' " (*Spinks v. Clark* (1905) 147 Cal. 439, 444 [82 P. 45]; see also 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 711 at p. 810.) "It is not ... necessary that [a plaintiff's] reliance upon the truth of the *977 fraudulent misrepresentation be the sole or even the predominant or decisive factor in influencing his conduct.... It is enough that the representation has played a substantial part, and so has been a substantial factor, in influencing his decision." (Rest.2d Torts, § 546, com. b, p. 103.)

Moreover, a presumption, or at least an inference, of reliance arises wherever there is a showing that a misrepresentation was material. (*Vasquez v. Superior Court* (1971) 4 Cal.3d 800, 814 [94 Cal.Rptr. 796, 484 P.2d 964, 53 A.L.R.3d 513]; see also 12 Williston on Contracts (3d ed. 1970) § 1515, p. 480; Rest.2d, Contracts, § 167.) A misrepresentation is judged to be " material" if " a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question " (Rest.2d Torts, § 538, subd. (2)(a); see also *Barnhouse v. City of Pinole* (1982) 133 Cal.App.3d 171, 188, fn. 5 [183 Cal.Rptr. 881]), and as such materiality is generally a question of fact unless the "fact misrepresented is so obviously unimportant that the jury could not reasonably find that a reasonable man would have been influenced by it." (Rest.2d Torts, § 538, com. e, p. 82.) Thus, the Engallas need only make a showing that the misrepresentations were material, and that therefore a reasonable trier of fact could infer reliance from such misrepresentations, in order to survive this summary-judgment-like proceeding, absent evidence conclusively rebutting reliance. (Cf. *Security Pac. Nat. Bank v. Associated Motor Sales* (1980) 106 Cal.App.3d 171, 179-180 [165 Cal.Rptr. 38] [presumption which shifts the burden of proving evidence entitles plaintiff to summary judgment if defendant fails to produce evidence to rebut the presumption].)

938 P.2d 903                                                                                                                Page 17
15 Cal.4th 951, 938 P.2d 903, 64 Cal.Rptr.2d 843, 21 Employee Benefits Cas. 1407, 97 Cal. Daily Op. Serv. 5206,
97 Daily Journal D.A.R. 8384
(Cite as: 15 Cal.4th 951, 938 P.2d 903)

(12) In the present case, our assessment of the materiality of representations is somewhat complicated by the fact that the primary decision maker responsible for selecting the Kaiser health plan was not Engalla himself but his employer, Oliver Tire. The evidence shows that Engalla had little if any cognizance of the arbitration agreement, and that the form he signed to enroll in Kaiser merely stated that members' claims must be submitted to arbitration "[i]f the [health services plan] agreement so provides." On the other hand, Oliver Tire and its personnel employees were obviously aware of the arbitration provision and were responsible for scrutinizing the details of the health services plan before offering it to the company's employees. But this complication does not alter fundamentally our analysis of materiality. As we have recognized, an employer that negotiates group medical benefits for its employees acts as an agent for those employees during the period of negotiation. (*Madden, supra,* 17 Cal.3d at pp. 705-706 & fn. 5.) An agency relationship is a fiduciary one, obliging the agent to act in the interest of the principal. (See *Fischer v. Machado* (1996) 50 Cal.App.4th 1069, 1072 [58 Cal.Rptr.2d 213].) Accordingly, a material representation in this case is one *978 that would have substantially influenced the health plan selection process of Oliver Tire, acting as an agent of its employees as a class.[FN11]

FN11 We recognize, of course, that this inverse agency relationship between the employer and its employees is a narrow one, and does not preclude an employer from acting in its own interests to obtain cost savings for the enterprise as a whole when choosing a group health plan. But, within these constraints, an employer negotiating or selecting a group health plan on behalf of its employees is presumed to be acting in their interest. If that proves not to be the case, then an employee bound by an arbitration agreement of which he was scarcely aware could well raise a claim that such agreement was unconscionable. (See *Madden, supra,* 17 Cal.3d at p. 711.) In the present case, the deposition testimony of Oliver Tire personnel confirms that the company acted with its employees' interests in mind in selecting a group health plan.

(10b) Applying these principles to the present case, we conclude that Kaiser's representations of expeditiousness in the arbitration agreement were not "so obviously unimportant" as to render them immaterial as a matter of law. We have recognized that expeditiousness is commonly regarded as one of the primary advantages of arbitration. " '[T]he parties to an arbitral agreement knowingly take the risks of error of fact or law committed by the arbitrators ... in order to obtain *speedy* decisions by experts in the field whose practical experience and worldly reasoning will be accepted as correct by other experts.' " (*Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 12 [10 Cal.Rptr.2d 183, 832 P.2d 899], italics added.) We have accordingly rejected, as a general proposition, the claim that arbitration agreements between an HMO and its participants are inherently one-sided in favor of the former. "The speed and economy of arbitration, in contrast to the expense and delay of a jury trial, could prove helpful to all parties ...." (*Madden, supra,* 17 Cal.3d at p. 711.) The explicit and implicit representations contained in Kaiser's arbitration agreement serve to confirm to the reasonable potential subscriber that Kaiser has an efficient system of arbitration, in which what is lost in terms of jury trial rights would be gained in part by a swifter resolution of the dispute. If it is indeed the case that these representations were false, and concealed an arbitration process in which substantial delay was the rule and timeliness the rare exception, then we cannot say these misrepresentations were so trivial that they would not have influenced a reasonable employer's decision as to which among the many competing employee health plans it would choose for its employees.

Kaiser argues to the contrary that the existence of section 1281.6 negates any possible materiality that its misrepresentation of expeditiousness may have had. That section states in pertinent part that in the absence of an agreed method of appointing an arbitrator, "or if the agreed method fails or for any reason cannot be followed ... the court, on petition of a party to the arbitration agreement, shall appoint the arbitrator." (*Ibid.*) But the mere fact *979 that there is a statutory remedy to expedite the arbitrator selection process does not necessarily render the reality of Kaiser's systematic delay irrelevant to the selection of a health plan. A party's success in having a section 1281.6 petition granted is not necessarily assured, nor is it costless, nor is it in accord with normal expectations of arbitration participants, who view arbitration as an alternative to the courts. " 'Typically, those who enter into arbitration agreements expect

938 P.2d 903                                                                 Page 18
15 Cal.4th 951, 938 P.2d 903, 64 Cal.Rptr.2d 843, 21 Employee Benefits Cas. 1407, 97 Cal. Daily Op. Serv. 5206,
97 Daily Journal D.A.R. 8384
**(Cite as: 15 Cal.4th 951, 938 P.2d 903)**

that their dispute will be resolved without necessity for any contact with the courts.' " (*Moncharsh v. Heily & Blase, supra,* 3 Cal.4th at p. 9.) Given the reality that there exists a considerable number of roughly comparable group health plans (see *How Good Is Your Health Plan?*(Aug. 1996) Consumer Reports, at pp. 28, 40-41), a reasonable employer choosing a health plan for its employees may very well decline to select a plan with a dysfunctional arbitration system requiring court supervision.

Nor is there any evidence to conclusively rebut the inference of Oliver Tire's reliance on Kaiser's representations of expedition. Kaiser claims to the contrary that the company paid scant attention to the arbitration clause, focusing in particular on the statement of Theodomeir Roy, a personnel officer with Oliver Tire who advised the company in its selection of employee health plans, that he "would not be concerned if [the plan] didn't [have an arbitration clause]. And in fact if it did, as it has here, [we] sort of look with favor on it, thinking that it was an expeditious way to resolve disputes. " Yet although Roy may have been indifferent to whether arbitration or some other effective dispute resolution mechanism was available, the evidence suggests he would have looked unfavorably on a system such as Kaiser is alleged to have actually had, which delayed the resolution of claims, required constant action by the claimant, and failed to adhere to its own contractual terms. There is therefore sufficient evidence to support the claim that Oliver Tire actually relied on Kaiser's misrepresentations.

(13a) We turn then to the question of injury. (14) A defrauded party has the right to rescind a contract, even without a showing of pecuniary damages, on establishing that fraudulent contractual promises inducing reliance have been breached. (See *Earl v. Saks & Co.* (1951) 36 Cal.2d 602, 611 [226 P.2d 340]; see also Calamari & Perillo, The Law of Contracts (3d ed. 1987) § 9.16, p. 360; Rest. 2d, Contracts, § 164, com. c, pp. 446-447.) The rule derives from the basic principle that a contracting party has a right to what it contracted for, and so has the right "to rescind where he obtain[ed] something substantially different from that which he [is] led to expect. " (*Earl v. Saks & Co., supra,* 36 Cal.2d at p. 612.) It follows that a defrauded party does not have to show pecuniary damages in order to defeat a petition to compel arbitration. (13b) Of course, the Engallas cannot defeat a *980 petition to compel arbitration on the mere showing that Kaiser has

engaged generally in fraudulent misrepresentation about the speed of the arbitration process. Rather, they must show that in their particular case, there was substantial delay in the selection of arbitrators contrary to their reasonable, fraudulently induced, contractual expectations. Here, there is ample evidence to support the Engallas' contention that Kaiser breached its arbitration agreement by repeatedly delaying the timely appointment of an available party arbitrator and a neutral arbitrator.

To be sure, the mere fact that the selection of arbitrators extended beyond their 30and 60-day deadlines does not by itself establish that Kaiser breached its arbitration agreement. It is, after all, the malpractice claimant in arbitration, like the plaintiff in litigation, who bears the primary responsibility of exercising diligence in order to advance progress towards the resolution of its claim (see *Burgess v. Kaiser Foundation Hospitals* (1993) 16 Cal.App.4th 1077, 1081-1082 [20 Cal.Rptr.2d 488]), and Kaiser is under no obligation to press for appointment of arbitrators when a claimant is himself dilatory. Nor is the contract breached when delay in the selection of arbitrators is the result of reasonable disagreements over arbitrator selection. Nonetheless, as explained above, Kaiser, by agreeing to 30and 60-day periods for the appointment of arbitrators, committed itself to cooperate with reasonable diligence and good faith in the process of appointing the arbitrators within the specified times. (See *Frey & Horgan Corp. v. Superior Court* (1936) 5 Cal.2d 401, 404 [55 P.2d 203].) Here, there is strong evidence that, despite a high degree of diligence on the part of Engalla's counsel in attempting to obtain the timely appointment of arbitrators, Kaiser lacked either reasonable diligence, good faith, or both, in cooperating on these timely appointments. Instead, the evidence shows that it engaged in a course of nonresponse and delay and added extracontractual conditions to the arbitration selection process, such as the requirement that the claimant name a party arbitrator first. Thus, strong evidence supports the conclusion that Kaiser did not fulfill its contractual obligations in this case to appoint arbitrators in a timely manner.

Nor does the presence of section 1281.6 excuse Kaiser's alleged misfeasance, as Kaiser contends. That section, as explained above, provides a statutory method for resolving breakdowns in the arbitrator selection process, and states in pertinent part that in the absence of an agreed method of appointing an

938 P.2d 903                                                                                                    Page 19
15 Cal.4th 951, 938 P.2d 903, 64 Cal.Rptr.2d 843, 21 Employee Benefits Cas. 1407, 97 Cal. Daily Op. Serv. 5206,
97 Daily Journal D.A.R. 8384
**(Cite as: 15 Cal.4th 951, 938 P.2d 903)**

arbitrator, "or if the agreed method fails or for any reason cannot be followed ... the court, on petition of a party to the arbitration agreement, shall appoint the arbitrator." Kaiser contends that section 1281.6 is implicitly incorporated into the contract, which specifies that California law be followed. Yet the availability of section 1281.6 does not absolve **\*981** Kaiser of its explicit and implicit contractual duties to timely select a neutral arbitrator and to not obstruct progress towards arbitration. All section 1281.6 provides is a *remedy* for the breach of those duties of which parties may avail themselves. As noted, this remedy compels claimants to go into superior court and seek specific performance of the arbitration agreement, forcing them to engage in at least some litigation in order to vindicate their rights and thereby violating the usual expectations of an arbitration agreement. (See *Moncharsh v. Heily & Blase, supra,* 3 Cal.4th at p. 9.) Nothing in the language of section 1281.6 compels a party to seek this remedy, nor does this language suggest that resort to section 1281.6 is a precondition to opposing successfully a petition to compel arbitration when the petitioning party has engaged in fraud. Rather, section 1281.6 appears to be simply a legislative means of implementing this state's policy in favor of arbitration by permitting parties to an arbitration contract to expedite the arbitrator selection process.

Of course, when a delay in the selection of arbitrators is the result of a reasonable and good faith disagreement between parties, or of some other reasonable cause, the remedy for such delay may indeed be a section 1281.6 petition rather than the abandonment of the arbitration agreement. But a party that imposes and administers its own arbitration program, that fraudulently misrepresents the speed of the arbitrator selection process so as to induce reliance, and that in fact engages in conduct forcing substantial delay, may not then compel arbitration by contending that the other party failed to resort to the court by filing a section 1281.6 petition.

In sum, we conclude there is evidence to support the Engallas' claims that Kaiser fraudulently induced Engalla to enter the arbitration agreement in that it misrepresented the speed of its arbitration program, a misrepresentation on which Engalla's employer relied by selecting Kaiser's health plan for its employees, and that the Engallas suffered delay in the resolution of its malpractice dispute as a result of that reliance, despite Engalla's own reasonable diligence. The trial court, on remand, must resolve conflicting factual

evidence [FN12] in order to properly adjudicate Kaiser's petition to compel arbitration. [FN13]**\*982**

> FN12 On remand the trial court may, at its discretion, rely on the documentary evidence already presented, may request further documentary submissions, or may request oral testimony. (See *Rosenthal, supra,* 14 Cal.4th at p. 414.)

> FN13 The Engallas also argue "constructive fraud" based on Kaiser's duty, as a fiduciary, to disclose the actual workings of its arbitration system, including systemwide delay. Constructive fraud consists of "any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault, or anyone claiming under him, by misleading another to his prejudice, or to the prejudice of anyone claiming under him." (Civ. Code, § 1573.)It is generally asserted against a fiduciary by one to whom a fiduciary duty is owed. (See, e.g., *Estate of Gump* (1991) 1 Cal.App.4th 582, 601 [2 Cal.Rptr.2d 269].) "Constructive fraud allows conduct insufficient to constitute actual fraud to be treated as such where the parties stand in a fiduciary relationship." (*Ibid.*) Because we conclude the Court of Appeal must be reversed on the Engallas' *actual* fraud theory, we need not and do not address the question of constructive fraud.

### IV. Waiver

(15a) The Engallas also claim the petition to compel arbitration should be denied on grounds of waiver. For reasons discussed below, we conclude that their waiver claims may have merit, but that the question of waiver must be determined by the trial court on remand.

Section 1281.2, subdivision (a), provides that a trial court shall refuse to compel arbitration if it determines that "[t]he right to compel arbitration has been waived by the petitioner." The Engallas argue that Kaiser's various dilatory actions constituted a waiver of its right to compel arbitration.

As a threshold matter, Kaiser argues that this waiver claim should be resolved by an arbitrator rather than by the court. Kaiser asserts that

938 P.2d 903                                                                    Page 20
15 Cal.4th 951, 938 P.2d 903, 64 Cal.Rptr.2d 843, 21 Employee Benefits Cas. 1407, 97 Cal. Daily Op. Serv. 5206,
97 Daily Journal D.A.R. 8384
(Cite as: 15 Cal.4th 951, 938 P.2d 903)

"arbitrators have exclusive jurisdiction to decide not only the substantive merits of a controversy but also any procedural disputes that precede the arbitration hearing," and that the Engallas' waiver claim is such a "procedural" dispute. In support of this assertion, it cites *John Wiley & Sons v. Livingston* (1964) 376 U.S. 543, 556-558 [84 S.Ct. 909, 917-919, 11 L.Ed.2d 898]. That case is inapposite. There the court considered an arbitration agreement that was part of the grievance machinery established by a labor management contract. There was no question that the parties had a valid and enforceable arbitration agreement, and no claim that the agreement had been waived. The court held rather that the question whether the parties had properly exhausted their remedies in the preliminary stages of the grievance process prior to invoking their right to arbitration-that is, whether a party's arbitration rights were invoked prematurely-was for the arbitrator to decide. (*Id.* at pp. 557-558 [84 S.Ct. at pp. 918-919].) "Once it is determined, ... that the parties are obligated to submit the subject matter of a dispute to arbitration, 'procedural' questions which grow out of the dispute and bear on its final disposition should be left to the arbitrator." (*Id.* at p. 557 [84 S.Ct. at p. 918].) Here, the question is different and more fundamental-whether Kaiser, by its delay or by other acts or omissions, has in fact waived its right to compel arbitration. Section 1281.2, subdivision (a), gives the trial court jurisdiction to decide this question when petitioned to compel arbitration.[FN14]

FN14 Kaiser also claims that support for its position that the waiver issue is for the arbitrator can be found in *Brock v. Kaiser Foundation Hospitals* (1992) 10 Cal.App.4th 1790 [13 Cal.Rptr.2d 678]. In that case, the plaintiff filed a medical malpractice claim against Kaiser, and the claim was stayed by the trial court pursuant to section 1281.4 after the parties stipulated to submit to contractual arbitration. After more than five years had elapsed, Kaiser filed a petition in the trial court for dismissal of the action on grounds of delay. The Court of Appeal held the trial court had no jurisdiction to dismiss the case, but that any such action must be taken by the arbitrator. (10 Cal.App.4th at p. 1808.) In the present case, unlike *Brock*, one of the parties to the arbitration claims the other party has waived its right to compel arbitration within the context of a petition to compel arbitration.

Section 1281.2, subdivision (a), gives the court jurisdiction to decide such a waiver claim.

(16a) Turning to the substance of the waiver claim, we have explained that the term "waiver" has a number of meanings in statute and case law.***983** (*Platt Pacific, Inc. v. Andelson* (1993) 6 Cal.4th 307, 315 [24 Cal.Rptr.2d 597, 862 P.2d 158].) "Generally, 'waiver' denotes the voluntary relinquishment of a known right. But it can also mean the loss of an opportunity or a right as a result of a party's failure to perform an act it is required to perform, regardless of the party's intent to ... relinquish the right." (*Ibid.*) The varied meanings of the term "waiver" are reflected in the case law on the enforcement of arbitration agreements. "In the past, California courts have found a waiver of the right to demand arbitration in a variety of contexts, ranging from situations in which the party seeking to compel arbitration has previously taken steps inconsistent with an intent to invoke arbitration [citations] to instances in which the petitioning party has unreasonably delayed in undertaking the procedure. [Citations.] The decisions likewise hold that the 'bad faith' or 'wilful misconduct' of a party may constitute a waiver and thus justify a refusal to compel arbitration. [Citation.] [¶] Although a number of authorities properly caution that a waiver of arbitration is not to be lightly inferred [citation], our cases establish that no single test delineates the nature of the conduct of a party that will constitute such a waiver. As our court stated in *Sawday v. Vista Irrigation Dist.*[(1966)] 64 Cal.2d 833, 836 [52 Cal.Rptr. 1, 415 P.2d 816]; 'Whether there has been a waiver of a right to arbitrate is ordinarily a question of fact, and a finding of waiver, if supported by sufficient evidence, is binding on an appellate court. [Citations.]' " (*Davis v. Blue Cross of Northern California* (1979) 25 Cal.3d 418, 425-426 [158 Cal.Rptr. 828, 600 P.2d 1060] (*Davis*); see also *Platt Pacific, Inc. v. Andelson, supra*, 6 Cal.4th at pp. 315-316.) (15b) The Engallas claim that unreasonable delay and bad faith found in Kaiser's dilatory conduct in choosing arbitrators constituted a form of waiver, and that Kaiser's petition to compel arbitration accordingly should be denied.

(16b) As we explained in *Davis*, the question of waiver is one of fact, and an appellate court's function is to review a trial court's findings regarding waiver to determine whether these are supported by substantial evidence. (15c) The trial court in this case

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

938 P.2d 903                                                                                    Page 21
15 Cal.4th 951, 938 P.2d 903, 64 Cal.Rptr.2d 843, 21 Employee Benefits Cas. 1407, 97 Cal. Daily Op. Serv. 5206,
97 Daily Journal D.A.R. 8384
(Cite as: 15 Cal.4th 951, 938 P.2d 903)

made no findings regarding the Engallas' waiver claim, focusing instead on their fraud claim, which has therefore been our primary focus as well. Given the summary-judgment-like *984 posture of the present case, our sole task is to review the record to determine whether there are facts to support the Engallas' waiver claim. We conclude that the evidence of Kaiser's course of delay, reviewed extensively above, which was arguably unreasonable or undertaken in bad faith, may provide sufficient grounds for a trier of fact to conclude that Kaiser has in fact waived its arbitration agreement.

We emphasize, as we explained in our discussion of fraud, that the delay must be substantial, unreasonable, and ·in spite of the claimant's own reasonable diligence. When delay in choosing arbitrators is the result of reasonable and good faith disagreements between the parties, the remedy for such delay is a petition to the court to choose arbitrators under section 1281.6, rather than evasion of the contractual agreement to arbitrate. The burden is on the one opposing the arbitration agreement to prove to the trial court that the other party's dilatory conduct rises to such a level of misfeasance as to constitute a waiver (see *Rosenthal, supra,* 14 Cal.4th at p. 413), and such waiver ” is not to be lightly inferred“ (*Davis, supra,* 25 Cal.3d at p. 426). In this case, there is ample evidence that the claimant was diligent in seeking Kaiser's cooperation, and instead suffered from Kaiser's delay, a delay which was unreasonable or in bad faith. We leave it to the trial court to determine on remand whether waiver of the right to compel arbitration has in fact occurred.

V. Unconscionability

(17) We turn then to the Engallas' unconscionability argument. We have required that ”contractual arrangement[s] for the nonjudicial resolution of disputes“ must possess ” 'minimum levels of integrity.' “ (*Graham v. Scissor-Tail, Inc.* (1981) 28 Cal.3d 807, 827 [171 Cal.Rptr. 604, 623 P.2d 165].) Thus, in *Graham v. Scissor-Tail, Inc.,* we held that an arbitration agreement that called for the selection of an arbitrator affiliated with one of the parties to the contract was unconscionable. (*Ibid.*) In addition to the general doctrine of unconscionability derived from contract law, HMO's such as Kaiser are regulated by the Knox-Keene Health Care Service Plan Act, which provides among other things that all contracts made in connection with a health service plan be ”fair, reasonable, and consistent with the

objectives“ of that statute. (Health & Saf. Code, § 1367, subd. (h).) HMO's are therefore especially obligated not to impose contracts on their subscribers that are one-sided and lacking in fundamental fairness.

In determining whether a contract term is unconscionable, we first consider whether the contract between Kaiser and Engalla was one of adhesion. (See *Graham v. Scissor-Tail, Inc., supra,* 28 Cal.3d at p. 817.) In *985Madden, supra,* 17 Cal.3d 699, we held that an agreement between Kaiser and a state employee was not a true contract of adhesion, although Kaiser's health plan was offered to state employees ”on a 'take it or leave it' basis without opportunity for individual bargaining.“ (*Id.* at p. 710.) We reasoned that the Kaiser contract was not adhesive because (1) it ”represents the product of negotiation between two parties, Kaiser and the [State Employees Retirement System], possessing parity of bargaining strength“ and (2) the state employee could choose from among a number of different health plans, and thus was not confronted with the choice typical of a contract of adhesion of ”either adher [ing] to the standardized agreement or forego[ing] the needed service.“ (*Id.* at p. 711.) We also found that the arbitration clause in question was not, unlike the ·unconscionable clauses in adhesion contracts, a term that limits the liability or obligations of a stronger party, but rather ”could prove helpful to all parties.“ (*Ibid.*)

The present agreement, which was also offered to Engalla on a ”take it or leave it“ basis, has more of the characteristics of an adhesion contract than the one considered in *Madden.* First, although Oliver Tire is a corporation of considerable size, it has had only a small number of employees enrolled in Kaiser, and did not have the strength to bargain with Kaiser to alter the terms of the contract. Second, Engalla did have one other health plan from which to choose, but not several plans as was the case in *Madden.* Finally, unlike in *Madden,* the Engallas do not claim that the arbitration clause itself is unconscionable, but that the arbitration program Kaiser established was biased against them.

Nonetheless, although the present contract has some of the attributes of adhesion, it did not, *on its face,* lack ” 'minimum levels of integrity.' “ (*Graham v. Scissor-Tail, Inc., supra,* 28 Cal.3d at p. 827.) The unfairness that is the substance of the Engallas' unconscionability argument comes essentially to this:

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

938 P.2d 903                                                                                                     Page 22
15 Cal.4th 951, 938 P.2d 903, 64 Cal.Rptr.2d 843, 21 Employee Benefits Cas. 1407, 97 Cal. Daily Op. Serv. 5206,
97 Daily Journal D.A.R. 8384
**(Cite as: 15 Cal.4th 951, 938 P.2d 903)**

The Engallas contend that Kaiser has established a system of arbitration inherently unfair to claimants, because the method of selecting neutral arbitrators is biased. They claim that Kaiser has an unfair advantage as a "repeat player" in arbitration, possessing information on arbitrators that the Engallas themselves lacked. They also argue that Kaiser, under its arbitration system, has sought to maximize this advantage by reserving for itself an unlimited right to veto arbitrators proposed by the other party. This method is in contrast to arbitration programs run by neutral, third party arbitration organizations such as the AAA, which give parties a very limited ability to veto arbitrators from its preselected panels.[FN15]

> FN15 See footnote 9, *ante, at page 976,* for an explanation of AAA's procedures.

Yet none of these features of Kaiser's arbitration program renders the arbitration agreement per se unconscionable. As noted above, section 1281.6*986 specifically contemplates a system whereby neutral arbitrators will be chosen directly by the parties. The alleged problem with Kaiser's arbitration in this case was not any defect or one-sidedness in its contractual provisions, but rather in the gap between its contractual representations and the actual workings of its arbitration program. It is the doctrines of fraud and waiver, rather than of unconscionability, that most appropriately address this discrepancy between the contractual representation and the reality. Thus, viewing the arbitration agreement on its face, we cannot say it is unconscionable.[FN16]

> FN16 We note that after review was granted in this case, the Legislature enacted Senate Bill No. 1660 (1995-1996 Reg. Sess.) amending Health and Safety Code section 1373.19 and adding Health and Safety section 1373.20. Health and Safety Code section 1373.20 specifically addresses a situation in which a health care service plan does not use "a professional dispute resolution organization independent of the plan" to settle arbitration disputes. For such organizations, Health and Safety Code section 1373.20 provides a means of expediting the procedures set forth in Code of Civil Procedure section 1281.6, mandating the trial court to " conclusively presume[]" that the agreed method of selecting arbitrators has failed 30 days after

one party has served a written demand to designate an arbitrator upon the other one. That section also provides for an award of the reasonable cost of a section 1281.6 petition when the court finds a party's conduct to be "dilatory." We express no opinion whether this new legislation would affect our analysis of cases such as the present.

### VI. Conclusion and Disposition

For the foregoing reasons, the judgment of the Court of Appeal is reversed with directions to remand the case for proceedings consistent with this opinion.

George, C. J., Baxter, J., Werdegar, J., and Chin, J., concurred.

**KENNARD, J.**

I concur in the majority opinion. I write separately to note that this case illustrates yet again the essential role of the courts in ensuring that the arbitration system delivers not only speed and economy but also fundamental fairness.

Unfairness in arbitration sufficiently extreme to justify court intervention can take many forms. As I have previously stated, in my view courts have the power to overturn an arbitrator's decision if it contains manifest error that causes substantial injustice. (*Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 36-40 [10 Cal.Rptr.2d 183, 832 P.2d 899] (dis. opn. of Kennard, J.).) It is also my view that arbitrators are limited to the same remedies that a court could award under the circumstances of the case, and that a court may overturn an arbitrator's award of relief that exceeds that limit. (*Advanced Micro Devices, Inc. v. Intel Corp.* (1994) 9 Cal.4th 362, 394-395, 400-401 [36 Cal.Rptr.2d 581, 885 P.2d 994] (dis. opn. of Kennard, J.).) *987

This case illustrates the role that courts play in maintaining the procedural fairness, as well as the substantive fairness, of arbitration proceedings. Procedural manipulations can be used by a party not only to delay and obstruct the proceedings, thereby denying the other party the speed and efficiency that are the arbitration system's primary justification, but also to affect the possible outcome of the arbitration. As to speed and efficiency, the Kaiser arbitration provision provides for appointment of a neutral arbitrator within a 60-day period. (See maj. opn.,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

938 P.2d 903                                                                    Page 23
15 Cal.4th 951, 938 P.2d 903, 64 Cal.Rptr.2d 843, 21 Employee Benefits Cas. 1407, 97 Cal. Daily Op. Serv. 5206,
97 Daily Journal D.A.R. 8384
(Cite as: 15 Cal.4th 951, 938 P.2d 903)

*ante,* at p. 962, fn. 3.) In reality, a neutral arbitrator was appointed within 60 days in less than 1 percent of Kaiser's arbitrations; the appointment occurred within 180 days (3 times the contractual time period) in less than 3 percent of Kaiser's arbitrations. Indeed, the *average* time for appointment of a neutral arbitrator was *674 days,* more than 11 times the contractual time period. The *average* time for a Kaiser-administered arbitration hearing to *begin* (not conclude) was *863 days* or almost 30 months. (*Id.* at p. 967.)Although the comparison is not exact, it is instructive to compare the "speed" of Kaiser's arbitration process to the speed of judicial proceedings in Alameda County Superior Court, where this action was filed. During the 1993-1994 fiscal year that court disposed of 96 percent of its civil cases in less than 24 months. (Judicial Council of Cal., Annual Data Reference, 1993-94 Caseload Data by Individual Courts, table No. 22, p. 52.)

By delaying arbitration in this case until after Wilfredo Engalla died, Kaiser also affected the potential outcome of his malpractice claims. Engalla's death reduced Kaiser's potential liability for noneconomic damages to $250,000 from the $500,000 potential liability it would have faced had the claims been arbitrated during Engalla's life. (See maj. opn., *ante,* at p. 969.)

As the majority opinion makes clear, courts must be alert to procedural manipulations of arbitration proceedings and should grant appropriate relief when such manipulations occur. As here, such conduct may give rise to claims of fraud in the inducement of the arbitration agreement or claims that the manipulating party has waived its right to enforce the arbitration agreement. Moreover, if such conduct affects the arbitration award, it may form the basis for vacating the award as one "procured by corruption, fraud or other undue means." (Code Civ. Proc., § 1286.2, subd. (a).)

Finally, it is worth noting that new possibilities for unfairness arise as arbitration ventures beyond the world of merchant-to-merchant disputes in which it was conceived into the world of consumer transactions (like the *988 health care agreement in this case) and nonunion employment relationships.[FN1] In such cases, the assumption that the parties have freely chosen arbitration as a dispute resolution mechanism in a process of arm's-length negotiation may be little more than an illusion. Unlike the traditional model of arbitration agreements negotiated between large commercial firms with equal bargaining power, consumer and employment arbitration agreements are typically "take it or leave it" propositions, contracts of adhesion in which the only choice for the consumer or the employee is to accept arbitration or forego the transaction. And the fact that the business organization imposing the arbitration clause is a repeat player in the arbitration system, while the consumer or employee is not, raises the potential that arbitrators will consciously or unconsciously bias their decisions in favor of an organization or industry that hires them regularly as an arbitrator.

> FN1 Legislation is pending on both the state and federal levels to address some of the unique problems of arbitration agreements governing consumer and nonunion employment disputes. At the state level, legislation is currently pending that would make arbitrations conducted under standardized employment, health care, and consumer contracts reviewable for legal error that causes a miscarriage of justice; in addition, a party could require the arbitrator in such a case to give a written explanation of the basis for the award. (Sen. Bill No. 19 (1997-1998 Reg. Sess.), approved by Sen., May 8, 1997.)
>
> Also at the state level, legislation has been introduced to prohibit enforcement of predispute arbitration agreements in the case of nonunion employment disputes. (Assem. Bill No. 574 (1997-1998 Reg. Sess.).) At the national level, legislation has been introduced to prohibit enforcement of predispute arbitration agreements in the case of employment discrimination claims arising under federal civil rights laws. (Sen. No. 63, H.R. No. 983, 105th Cong., 1st Sess. (1997).)
>
> I also note that a major provider of arbitration services, the American Arbitration Association, has recently promulgated special rules governing the arbitration of employment disputes. (American Arbitration Association, National Rules for the Resolution of Employment Disputes (eff. June 1, 1996).) The stated purpose of these rules is to "meet ... due process standards" and "administer cases in accordance with the law." (*Id.* at p. 3.) Among other features, the rules provide that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

938 P.2d 903                                                                    Page 24
15 Cal.4th 951, 938 P.2d 903, 64 Cal.Rptr.2d 843, 21 Employee Benefits Cas. 1407, 97 Cal. Daily Op. Serv. 5206,
97 Daily Journal D.A.R. 8384
**(Cite as: 15 Cal.4th 951, 938 P.2d 903)**

in employment disputes the award "shall provide the written reasons for the award unless the parties agree otherwise." (*Id.,* rule 32(b).) And the chairman of the National Labor Relations Board has recently called for reform of nonunion employment arbitration to ensure that it meets basic criteria of fairness. (Debare, *NLRB Chief Gould Backs Rules for Arbitration,* S. F. Chronicle (Apr. 10, 1997) p. C1.)

Here, neither plaintiffs' decedent nor his employer was afforded an opportunity to accept or reject arbitration as the means of resolving disputes. Rather, Kaiser's standard health care agreement, which included the arbitration requirement, was presented on a "take it or leave it" basis. (See maj. opn., *ante,* at p. 985.) There was no true bargaining involved here. Moreover, although Kaiser appears to have led its members to believe that Kaiser administered its arbitration system fairly and as a "fiduciary" (*id.* at p. 962), in reality the opposite may have been true. Kaiser "administered" its arbitration system through its defense attorneys who appear to have manipulated the process to Kaiser's advantage. (*Id.* at pp. 975-976.) *989

Private arbitration may resolve disputes faster and cheaper than judicial proceedings. Private arbitration, however, may also become an instrument of injustice imposed on a "take it or leave it" basis. The courts must distinguish the former from the latter, to ensure that private arbitration systems resolve disputes not only with speed and economy but also with fairness.

**BROWN, J.,**

Dissenting.-The intended target of the majority's wrath-the Permanente Medical Group, Inc., Kaiser Foundation Hospitals, and the Kaiser Foundation Health Plan (hereafter Kaiser)-could not be more deserving. I write separately to represent the interests of the unintended victim of the majority's holding-private arbitration in California.

Introduction

Pursuant to the terms of a prior written agreement, the parties in this case submitted a medical malpractice dispute to private, or nonjudicial, arbitration. California law, like corresponding federal law under the United States

Arbitration Act (9 U.S.C. §§ 1-16), has long reflected a strong policy in favor of such arbitration.

As this court recently explained, "Title 9 of the Code of Civil Procedure, [FN1] as enacted and periodically amended by the Legislature, represents a comprehensive statutory scheme regulating private arbitration in this state. (§ 1280 et seq.) Through this detailed statutory scheme, the Legislature has expressed a 'strong public policy in favor of arbitration as a speedy and relatively inexpensive means of dispute resolution.' [Citations.] Consequently, courts will ' "indulge every intendment to give effect to such proceedings." ' [Citations.] Indeed, more than 70 years ago this court explained: 'The policy of the law in recognizing arbitration agreements and in providing by statute for their enforcement is to encourage persons who wish to avoid delays incident to a civil action to obtain an adjustment of their differences by a tribunal of their own choosing.' [Citation.] 'Typically, those who enter into arbitration agreements expect that their dispute will be resolved without necessity for any contact with the courts.' " (*Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 9 [10 Cal.Rptr.2d 183, 832 P.2d 899].)

    FN1 Unless otherwise indicated, all further statutory references are to the Code of Civil Procedure.

Although the majority purports to "affirm the basic policy in favor of enforcement of arbitration agreements" (maj. opn., *ante,* at p. 960), it nonetheless concludes that "the governing statutes place limits on the extent to which a party that has committed *misfeasance in the performance* of such an agreement may compel its enforcement." (*Ibid.,* italics added.) I cannot *990 agree with the majority's interpretation of the governing statutory framework. In my view, except for seeking statutorily prescribed court assistance in the arbitrator selection process (see *post,* at pp. 992-994), once a private arbitration is pending, a party must seek relief for its adversary's "misfeasance in the performance" in the arbitral forum, not in the courts. Make no mistake about it. The majority's decision to validate a party's unilateral withdrawal from a pending arbitration based on the conduct of its arbitration adversary will wreak havoc on arbitrations throughout the state. Therefore, I respectfully dissent.

Factual and Procedural Background

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

938 P.2d 903                                                                                                      Page 25
15 Cal.4th 951, 938 P.2d 903, 64 Cal.Rptr.2d 843, 21 Employee Benefits Cas. 1407, 97 Cal. Daily Op. Serv. 5206,
97 Daily Journal D.A.R. 8384
(Cite as: 15 Cal.4th 951, 938 P.2d 903)

Almost lost in the majority's exhaustive procedural summary is one key fact-namely, the arbitration process was already underway by the time the plaintiffs unilaterally withdrew. A brief review of the history of the arbitration is in order.

On May 31, 1991, [FN2] pursuant to the terms of a "Group Medical and Hospital Services Agreement," Wilfredo Engalla, his wife, and their four children (hereafter the Engallas) demanded that Kaiser submit a medical malpractice dispute to binding private arbitration. On June 17, Kaiser submitted to the Engallas' arbitration demand. Two days later, the Engallas' counsel sent Kaiser the $150 check "required in order to initiate the arbitration proceeding."

> FN2 Unless otherwise indicated, all further references to dates are to the year 1991.

The Engallas designated their party arbitrator on July 8, Kaiser designated its party arbitrator on July 17, and the parties confirmed their agreement on a neutral arbitrator on October 22. While the parties were in the process of designating arbitrators, they exchanged a number of discovery requests.

Thereafter, on October 28, the Engallas refused to continue with the pending arbitration. [FN3] The reason the Engallas withdrew from the arbitration was that Kaiser declined to stipulate that Mrs. Engalla's separate loss of consortium claim survived her husband's death. It is this unilateral withdrawal from a pending arbitration that the majority's decision validates. *991

> FN3 In my view, the private arbitration commenced on June 17, the date Kaiser submitted to the Engallas' arbitration demand. Even if the arbitration could somehow be deemed to have commenced on a later date, it is beyond peradventure that the arbitration was pending as of October 28, the date of the Engallas' unilateral withdrawal. By this time, the parties had already designated both the party arbitrators and the neutral arbitrator. Thus, the majority properly characterizes the Engallas' actions on October 28 as the "[t]ermination of the [p]rior [a]rbitration." (Maj. opn., _ante_, at p. 969.) Similarly, in a declaration submitted to

the trial court, the Engallas' counsel correctly references "the termination of the arbitration proceedings."

## Discussion

In evaluating both the Engallas' fraudulent inducement claim and their waiver claim, the majority focuses on Kaiser's _performance_ during the course of the aborted private arbitration. According to the majority, the sine qua non of successful fraudulent inducement and waiver claims is unreasonable or bad faith delay by Kaiser. (Maj. opn., _ante_, at pp. 979-980, 984.) Thus, the majority permits the fraudulent inducement claim to proceed because "there is strong evidence that, despite a high degree of diligence on the part of [the Engallas'] counsel in attempting to obtain the timely appointment of arbitrators, Kaiser lacked either reasonable diligence, good faith, or both, in cooperating on these timely appointments." (_Id._ at p. 980.) Likewise, the majority permits the waiver claim to proceed because "there is ample evidence that the [Engallas were] diligent in seeking Kaiser's cooperation, and instead suffered from Kaiser's delay, a delay which was unreasonable or in bad faith. " (_Id._ at p. 984.)

Although the majority's desire to penalize Kaiser's obduracy is understandable, the consequences of validating a party's unilateral withdrawal from a pending arbitration based on the conduct of its arbitration adversary will reverberate far beyond the bad facts of the instant case. In stark contrast to the legislative response, which enhances the procedures for _keeping_ a case in private arbitration (see _post_, at pp. 993-994), the majority expands the procedures for _removing_ a case from arbitration. The majority maintains that section 1281.2 compels its decision. (See maj. opn., _ante_, at pp. 973, 982-983 & fn. 14.) I cannot agree. That statute delineates certain narrow circumstances in which a trial court may uphold a party's "refus[al] to arbitrate." (§ 1281.2.) Nothing in section 1281.2 permits a party that has previously _submitted_ a dispute to arbitration, and thereby _agreed to arbitrate_, to _withdraw_ from that arbitration at some later date based on the unreasonable or bad faith delay of its adversary.

To construe section 1281.2 in the sweeping fashion advanced by the majority will seriously compromise the integrity of the arbitral process and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

938 P.2d 903                                                                                Page 26

15 Cal.4th 951, 938 P.2d 903, 64 Cal.Rptr.2d 843, 21 Employee Benefits Cas. 1407, 97 Cal. Daily Op. Serv. 5206,
97 Daily Journal D.A.R. 8384

**(Cite as: 15 Cal.4th 951, 938 P.2d 903)**

will impose an unpredictable and unnecessary burden on our trial courts. It is well established that "contractual arbitration has a life of its own outside the judicial system." (*Brock v. Kaiser Foundation Hospitals* (1992) 10 Cal.App.4th 1790, 1805 [13 Cal.Rptr.2d 678]; see also *Nanfito v. Superior Court* (1991) 2 Cal.App.4th 315, 318 [2 Cal.Rptr.2d 876]; *Byerly v. Sale* (1988) 204 Cal.App.3d 1312, 1316 [251 Cal.Rptr. 749].) "It is the job of the arbitrator, not the court, to resolve all questions needed to determine the **\*992** controversy. [Citations.] The arbitrator, and not the court, decides questions of procedure and discovery. [Citations.] It is also up to the arbitrator, and not the court, to grant relief for delay in bringing an arbitration to a resolution." (*Titan/Value Equities Group, Inc. v. Superior Court* (1994) 29 Cal.App.4th 482, 487-488 [35 Cal.Rptr.2d 4], fns. omitted.)

"This does not mean that a party to an arbitration proceeding has no remedy against dilatory tactics." (*Brock v. Kaiser Foundation Hospitals, supra,* 10 Cal.App.4th at p. 1808.) Rather, a party who has suffered as a result of such tactics may seek appropriate relief in the arbitral forum. (*Ibid.*; see also *Titan/Value Equities Group, Inc. v. Superior Court, supra,* 29 Cal.App.4th at p. 488;*Nanfito v. Superior Court, supra,* 2 Cal.App.4th at pp. 318-319;*Byerly v. Sale, supra,* 204 Cal.App.3d at p. 1316;*Young v. Ross-Loos Medical Group, Inc.* (1982) 135 Cal.App.3d 669, 673 [185 Cal.Rptr. 536].)

Nor does the fact that the arbitrator selection process in a given private arbitration has not yet been completed preclude a party from obtaining appropriate relief. To the contrary, section 1281.6 provides a mechanism by which a party can seek limited assistance from the trial court in obtaining the appointment of an arbitrator or arbitrators. FN4 (*Burgess v. Kaiser Foundation Hospitals* (1993) 16 Cal.App.4th 1077, 1079, 1081-1082 [20 Cal.Rptr.2d 488]; *Brock v. Kaiser Foundation Hospitals, supra,* 10 Cal.App.4th at pp. 1803-1804;*American Home Assurance Co. v. Benowitz* (1991) 234 Cal.App.3d 192, 198-202 [285 Cal.Rptr. 626]; *Boutwell v. Kaiser Foundation Health Plan* (1988) 206 Cal.App.3d 1371, 1374 [254 Cal.Rptr. 173]; *Young v. Ross-Loos Medical Group, Inc., supra,* 135 Cal.App.3d at pp. 674-675;*Cook v. Superior Court* (1966) 240 Cal.App.2d 880, 887 [50 Cal.Rptr. 81].) "[O]nce there is an arbitrator appointed pursuant to section 1281.6, the party seeking to expedite the arbitration proceedings can apply to the arbitrator for

[appropriate relief]." (*Brock v. Kaiser Foundation Hospitals, supra,* 10 Cal.App.4th at p. 1804.) **\*993**

> FN4 Section 1281.6 provides that "if the agreed method [of appointing an arbitrator] fails or for any reason cannot be followed, ... the court, on petition of a party to the arbitration agreement, shall appoint the arbitrator." The United States Arbitration Act affords a nearly identical remedy. (See 9 U.S.C. § 5.)

As noted above, the parties in this case had already designated both the party arbitrators and the neutral arbitrator by the time the Engallas unilaterally withdrew from the pending arbitration. Therefore, the majority's discussion of whether the Engallas should have invoked section 1281.6 at some earlier point in the arbitration is largely beside the point. (See maj. opn., *ante,* at pp. 980-981, 983-984.) Rather, as discussed in the text, since the arbitration panel was already in place, the Engallas should have sought appropriate relief from the arbitrators. Nonetheless, since the majority deems it necessary to discuss section 1281.6, I address my differences with the majority's view of that statute.

I do not share the majority's view that requiring a party to a private arbitration to file a section 1281.6 petition would "violat[e] the usual expectations of an arbitration agreement." (Maj. opn., *ante,* at p. 981.) The majority's reliance on the statement in *Moncharsh v. Heily & Blase, supra,* 3 Cal.4th at page 9, that " '[t]ypically, those who enter into arbitration agreements expect that their dispute will be resolved without necessity for any contact with the courts' " (maj. opn., *ante,* at p. 979), is misplaced.*Moncharsh* did not hold that a party to a private arbitration would *never* have to have any contact with the courts but rather that "judicial intervention in the arbitration process [should] be *minimized.* [Citations.]" (*Moncharsh v. Heily & Blase, supra,* 3 Cal.4th at p. 10, italics added.) Indeed, the very paragraph of *Moncharsh* quoted by the majority emphasizes that title 9 of part 3 of the Code of Civil Procedure-which includes section 1281.6-"represents a comprehensive statutory scheme regulating private arbitration in this state. [Citation.]" (*Moncharsh v. Heily & Blase, supra,* 3 Cal.4th at p. 9.)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

938 P.2d 903                                                                                              Page 27
15 Cal.4th 951, 938 P.2d 903, 64 Cal.Rptr.2d 843, 21 Employee Benefits Cas. 1407, 97 Cal. Daily Op. Serv. 5206,
97 Daily Journal D.A.R. 8384
**(Cite as: 15 Cal.4th 951, 938 P.2d 903)**

Section 1281.6 is the statutory remedy that our Legislature has provided for *resolving* disputes in the arbitrator selection process, thereby preventing such disputes from becoming occasions for avoiding private arbitration agreements. The statute's evident purpose is to facilitate, not to hinder, private arbitration. Requiring a party to employ a legislatively prescribed remedy simply cannot be deemed contrary to the "normal expectations of arbitration participants." (Maj. opn., *ante*, at p. 979.) In fact, the arbitration provision at issue in the present case specifically alerts the signatories that "[w]ith respect to any matter not herein expressly provided for, the arbitration shall be governed by California Code of Civil Procedure provisions relating to arbitration."

The inclusiveness of the language of section 1281.6 belies the notion that it contains some sort of ill-defined exception for unreasonable or bad faith delay. (See maj. opn., *ante*, at pp. 980-981, 984.) By its own terms, the statute comes into play whenever "the agreed method [of appointing an arbitrator] fails or *for any reason* cannot be followed." (§ 1281.6, italics added.) If there were any doubt that the statutory remedy was intended to apply broadly, the Legislature has now put it to rest. Largely in response to this very case, the Legislature recently enacted Health and Safety Code section 1373.20, subdivision (a)(2), providing that for nonindependent arbitration systems such as Kaiser's "[i]n cases or disputes in which the parties have agreed to use a tripartite arbitration panel consisting of two party arbitrators and one neutral arbitrator, and the party arbitrators are unable to agree on the designation of a neutral arbitrator within 30 days after service of a written demand requesting the designation, it shall be conclusively presumed that the agreed method of selection has failed and the method **\*994** provided in Section 1281.6 of the Code of Civil Procedure may be utilized." The new legislation also provides for attorney fees and costs against a party that "has engaged in dilatory conduct intended to cause delay in proceeding under the arbitration agreement." (Health & Saf. Code, § 1373.20, subd. (b).)

In this case, having previously submitted their dispute to private arbitration and having already completed the arbitrator selection process, the Engallas should have sought relief for Kaiser's dilatory conduct in the pending arbitration. For example, the Engallas could have presented their fraud and waiver claims directly to the arbitrators and

requested that they not enforce the arbitration provision. (See *ATSA of California, Inc. v. Continental Ins. Co.* (9th Cir. 1983) 702 F.2d 172, 175 [waiver claim]; *Local 81, Am. Fed. of Tech. Eng. v. Western Elec. Co., Inc.* (7th Cir. 1974) 508 F.2d 106, 109 [same]; cf. *Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394, 431-433 [58 Cal.Rptr.2d 875, 926 P.2d 1061] (conc. opn. of Kennard, J.) [fraudulent inducement claim as to the contract as a whole].) Likewise, the Engallas could have requested that the arbitrators sanction Kaiser's dilatory conduct by deeming Mrs. Engalla's separate loss of consortium claim to have survived her husband's death. (See *Advanced Micro Devices, Inc. v. Intel Corp.* (1994) 9 Cal.4th 362 [36 Cal.Rptr.2d 581, 885 P.2d 994] [describing broad remedial powers of arbitrators].) In fact, at oral argument, the Engallas' counsel conceded that this case could likely have remained in private arbitration if Mrs. Engalla's economic loss had been ameliorated.

The one thing the Engallas should not be permitted to do, however, is to circumvent the arbitrators altogether. The consequences of validating a party's unilateral withdrawal from a pending arbitration will be dramatic. Jurisdictional disputes will inevitably arise. Suppose, for example, that following the Engallas' unilateral withdrawal, Kaiser had elected to continue to pursue the pending arbitration and that the arbitrators had ultimately entered a default judgment in favor of Kaiser. Would that default judgment have been valid? Would the same have been true if the trial court had simultaneously entered a default judgment in favor of the Engallas in the pending litigation?

In addition, as the Engallas' counsel acknowledged at oral argument, if this court validates the Engallas' unilateral withdrawal, other parties to pending arbitrations will doubtlessly engage in the same conduct. Counsel's answer to this dilemma was that this court should "trust the trial courts." The majority's answer is to "emphasize ... that the delay must be substantial, unreasonable, and in spite of the claimant's own reasonable diligence" and **\*995** not "the result of reasonable and good faith disagreements between the parties." (Maj. opn., *ante*, at p. 984; see also *id.* at pp. 979-980.)

Neither answer is satisfactory. Under the majority's holding, which has all the precision of a "SCUD" missile, the resolution of fraudulent inducement and waiver claims will necessarily entail

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

938 P.2d 903                                                    Page 28
15 Cal.4th 951, 938 P.2d 903, 64 Cal.Rptr.2d 843, 21 Employee Benefits Cas. 1407, 97 Cal. Daily Op. Serv. 5206,
97 Daily Journal D.A.R. 8384
**(Cite as: 15 Cal.4th 951, 938 P.2d 903)**

fact-intensive, case-by-case determinations. [FN5] (See maj. opn., *ante*, at pp. 979-981, 982-984.) The disruptive, time-consuming nature of these determinations is well illustrated by the facts of the present case, in which "[t]he Engallas ultimately had five months to complete discovery [on the petition to compel arbitration], during which time thirteen motions were filed and more than a dozen depositions were taken." (*Id.* at p. 970.) Even assuming that the trial courts ultimately resolve all future claims correctly, the interim disruption to pending arbitrations will be simply intolerable.

> FN5 The majority's decision to validate the Engallas' waiver claim promises to be particularly pernicious because the success of such a claim does not depend on any up-front, precontractual misrepresentations but solely on a party's performance during the course of a pending arbitration.

## Conclusion

"Great cases like hard cases make bad law. For great cases are called great, not by reason of their real importance in shaping the law of the future, but because of some accident of immediate overwhelming interest which appeals to the feelings and distorts the judgment. These immediate interests exercise a kind of hydraulic pressure which makes what previously was clear seem doubtful, and before which even well settled principles of law will bend." (*Northern Securities Co. v. United States* (1904) 193 U.S. 197, 400-401 [24 S.Ct. 436, 468, 48 L.Ed. 679] (dis. opn. of Holmes, J.).) Although legislators, practitioners, and courts have all expressed concern that disparities in bargaining power may affect the procedural fairness of consumer arbitration agreements, this case amply demonstrates why any solutions should come from the Legislature, whose ability to craft precise exceptions is far superior to that of this court.

However well-intentioned the majority and however deserving its intended target, today's holding pokes a hole in the barrier separating private arbitrations and the courts. Unfortunately, like any such breach, this hole will eventually cause the dam to burst. Ironically, the tool the majority uses to puncture its hole is the observation that " ' "those who enter into arbitration agreements expect that their dispute will be resolved without necessity for any contact with the courts." ' [Citation.]" (Maj. opn., *ante*, at p. 979; see **\*996** also *id.* at p. 981.)Because I suspect that parties to private arbitrations will be having quite a bit more contact with the courts than they ever bargained for, I dissent.

Cal. 1997.
Engalla v. Permanente Medical Group, Inc.
15 Cal.4th 951, 938 P.2d 903, 64 Cal.Rptr.2d 843, 21 Employee Benefits Cas. 1407, 97 Cal. Daily Op. Serv. 5206, 97 Daily Journal D.A.R. 8384

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit I

**APPENDIX OF NON-FEDERAL AND UNPUBLISHED FEDERAL AUTHORITIES
CITED IN VISA USA INC.'S OPPOSITION TO MARITZ INC.'S
MOTION TO STAY ARBITRATION**

Westlaw.

604 So.2d 332                                                              Page 1
604 So.2d 332
**(Cite as: 604 So.2d 332)**

▷Jones v. Merrill Lynch, Pierce, Fenner & Smith,
Inc.
Ala.,1991.

Supreme Court of Alabama.
Mary E. JONES
v.
MERRILL LYNCH, PIERCE, FENNER & SMITH,
INC., and J. Edward Porter.
**89-1574.**

April 19, 1991.
Rehearing Denied June 14, 1991.

Customer of investment firm brought action alleging
fraud and breach of fiduciary duty. The Circuit Court,
Jefferson County, No. CV-88-7022,Stuart Leach, J.,
entered judgment dismissing suit for customer's
failure to comply with order to arbitrate claims and
customer appealed. The Supreme Court, Adams, J.,
held that: (1) provision in customer account
agreement regarding revocation of contracts did not
preclude federally created right to specific
enforcement of arbitration clause where customer's
claim of fraud bore upon entire agreement and upon
activities of parties in general and not solely upon
arbitration clause itself, and (2) dismissal of action
with prejudice was not an abuse of discretion, but
affirmance would be conditioned upon willingness of
arbitration organization to take jurisdiction of
customer's claims and to reopen her case.

Affirmed conditionally.

West Headnotes

**[1]** T ⊜⇝414

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(I) Exchanges and Dealer Associations
            25Tk411 Relations Between Customer-
Investors and Broker-Dealers
                25Tk414 k. Performance, Breach,
Enforcement, and Contest of Agreement. Most Cited
Cases
        (Formerly 33k91 Arbitration, 160k11(11.1),
160k11(11))

Execution of form by representative of investment
firm agreeing to abide by Alabama law did not
constitute waiver of federally created rights arising
under Federal Arbitration Act with respect to
customer's fraud claim where the customer account
agreement contained no provision for application of
Alabama law. Code 1975, § 8-6-17; 9 U.S.C.A. §§ 1-
15.

**[2]** T ⊜⇝412

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(I) Exchanges and Dealer Associations
            25Tk411 Relations Between Customer-
Investors and Broker-Dealers
                25Tk412 k. In General. Most Cited
Cases
        (Formerly 33k91 Arbitration, 160k11(11.1),
160k11(11))
Federal Arbitration Act applies to customer
complaints of fraud against investment firms in
transactions in which securities are involved. 9
U.S.C.A. §§ 1-15.

**[3]** T ⊜⇝412

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(I) Exchanges and Dealer Associations
            25Tk411 Relations Between Customer-
Investors and Broker-Dealers
                25Tk412 k. In General. Most Cited
Cases
        (Formerly 33k91 Arbitration, 160k11(11.1),
160k11(11))
State court was constrained to apply federal law to
customer's fraud claims against investment company
insofar as Federal Arbitration Act has circumscribed
sphere of operation of state law. 9 U.S.C.A. §§ 1-15.

**[4]** Commerce 83 ⊜⇝80.5

83 Commerce
    83II Application to Particular Subjects and
Methods of Regulation
        83II(I) Civil Remedies
            83k80.5 k. Arbitration. Most Cited Cases
In cases involving arbitrability of claims of fraud in

604 So.2d 332
604 So.2d 332
**(Cite as: 604 So.2d 332)**

inducement of contract affecting interstate commerce, court must first determine whether fraud claim is directed solely at arbitration clause itself; if so, party opposing arbitration is entitled to trial involving state law issues relating to making of arbitration clause. 9 U.S.C.A. §§ 1-15.

**[5]** T ☜178

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(D) Performance, Breach, Enforcement, and Contest
            25Tk177 Right to Enforcement and Defenses in General
                25Tk178 k. In General. Most Cited Cases
    (Formerly 33k23 Arbitration)
Provision in Federal Arbitration Act regarding revocation of contracts does not preclude federally created right to specific enforcement of arbitration clause where claim of fraud bears upon entire agreement and upon activities of parties in general and is not directed solely at arbitration clause itself. 9 U.S.C.A. §§ 2, 4.

**[6]** T ☜413

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(I) Exchanges and Dealer Associations
            25Tk411 Relations Between Customer-Investors and Broker-Dealers
                25Tk413 k. Agreements to Arbitrate. Most Cited Cases
    (Formerly 33k91 Arbitration, 160k11(11.1), 160k11(11))
Arbitration clause in customer account agreement with investment firm was not unenforceable on theory that clause itself was procured by fraud where agreement was signed before firm's allegedly fraudulent activity with respect to customer's accounts and where customer's allegations of breach of fiduciary duty encompassed full scope of firm's activities and were not limited to making of agreement to arbitrate. 9 U.S.C.A. §§ 2, 4; Code 1975, § 6-5-104.

**[7]** T ☜413

25T Alternative Dispute Resolution
    25TII Arbitration

25TII(I) Exchanges and Dealer Associations
    25Tk411 Relations Between Customer-Investors and Broker-Dealers
        25Tk413 k. Agreements to Arbitrate. Most Cited Cases
    (Formerly 33k91 Arbitration, 160k11(11.1), 160k11(11))
Arbitration clause in customer account agreement with investment firm was not rendered unenforceable by absence of explanation as to consequences of clause. 9 U.S.C.A. §§ 2, 4; Code 1975, § 8-1-2.

**[8]** T ☜374(7)

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(H) Review, Conclusiveness, and Enforcement of Award
            25Tk366 Appeal or Other Proceedings for Review
                25Tk374 Scope and Standards of Review
                    25Tk374(7) k. Questions of Law or Fact. Most Cited Cases
    (Formerly 33k73.7(7) Arbitration)
Determination by trial judge regarding intent of parties to arbitrate involves question of fact and will not be disturbed unless clearly erroneous.

**[9]** T ☜413

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(I) Exchanges and Dealer Associations
            25Tk411 Relations Between Customer-Investors and Broker-Dealers
                25Tk413 k. Agreements to Arbitrate. Most Cited Cases
    (Formerly 33k91 Arbitration, 160k11(11.1), 160k11(11))
Trial judge's findings that arbitration clause in customer account agreement applied to second account opened by firm without customer signing separate authorization was not clearly erroneous. 9 U.S.C.A. §§ 2, 4.

**[10]** T ☜412

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(I) Exchanges and Dealer Associations
            25Tk411 Relations Between Customer-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

604 So.2d 332
604 So.2d 332
(Cite as: 604 So.2d 332)

Page 3

Investors and Broker-Dealers
        25Tk412 k. In General. Most Cited
Cases
    (Formerly 33k91 Arbitration, 160k11(11.1),
160k11(11))
In applying federal substantive law in determining
arbitrability of customer's fraud claims against
investment firm, trial court was constrained to
construe intent of parties generously in favor of
arbitrability. 9 U.S.C.A. §§ 2, 4.

**[11] T ☞134(1)**

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(B) Agreements to Arbitrate
            25Tk131 Requisites and Validity
                25Tk134 Validity
                    25Tk134(1) k. In General. Most
Cited Cases
    (Formerly 33k6.2, 33k6 Arbitration)
Arbitration clauses are not inherently unfair or
oppressive. 9 U.S.C.A. §§ 2, 4.

**[12] T ☞413**

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(I) Exchanges and Dealer Associations
            25Tk411 Relations Between Customer-
Investors and Broker-Dealers
                25Tk413 k. Agreements to Arbitrate.
Most Cited Cases
    (Formerly 33k91 Arbitration, 160k11(11.1),
160k11(11))
Where customer's claims of fraud and breach of
fiduciary duty were directed at entire customer
account agreement, issue of unconscionability of
arbitration clause in the agreement was also subject
to arbitration. 9 U.S.C.A. §§ 2, 4.

**[13] Jury 230 ☞28(7)**

230 Jury
    230II Right to Trial by Jury
        230k27 Waiver of Right
            230k28 In Civil Cases
                230k28(7) k. Submission to Arbitration.
Most Cited Cases
Arbitration clause in customer account agreement
with investment firm did not constitute unenforceable
waiver of right to trial by jury. Const. Art. 1, § 11; 9

U.S.C.A. §§ 2, 4.

**[14] T ☞412**

25T Alternative Dispute Resolution
    25TII Arbitration
        25TII(I) Exchanges and Dealer Associations
            25Tk411 Relations Between Customer-
Investors and Broker-Dealers
                25Tk412 k. In General. Most Cited
Cases
    (Formerly 33k91 Arbitration, 160k11(11.1),
160k11(11))
For purpose of arbitration clause in customer account
agreement with investment firm providing for
arbitration within six years from occurrence or event
giving rise to dispute, occurrence or event giving rise
to dispute was not execution of agreement containing
arbitration clause but rather the alleged instances of
churning, unauthorized trading and similar acts of
firm and its representative as set forth in complaint. 9
U.S.C.A. §§ 2, 4.

**[15] Pretrial Procedure 307A ☞563**

307A Pretrial Procedure
    307AIII Dismissal
        307AIII(B) Involuntary Dismissal
            307AIII(B)2 Grounds in General
                307Ak563 k. Disobedience to Order of
Court or Other Misconduct. Most Cited Cases
Dismissal for failure to comply with court order is
warranted where there is clear record of delay, willful
default or contumacious conduct by plaintiff. Rules
Civ.Proc., Rule 41(b).

**[16] Appeal and Error 30 ☞962**

30 Appeal and Error
    30XVI Review
        30XVI(H) Discretion of Lower Court
            30k962 k. Dismissal or Nonsuit Before
Trial. Most Cited Cases
Trial judge's decision to grant motion to dismiss for
failure to prosecute will be accorded considerable
weight by reviewing court and his decision will be
reversed only upon showing of abuse of discretion.
Rules Civ.Proc., Rule 41(b).

**[17] Appeal and Error 30 ☞1139**

30 Appeal and Error

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

604 So.2d 332
604 So.2d 332
(Cite as: 604 So.2d 332)

Page 4

30XVII Determination and Disposition of Cause
  30XVII(B) Affirmance
    30k1139 k. Conditions in General. Most Cited Cases

**Pretrial Procedure 307A ☞563**

307A Pretrial Procedure
  307AIII Dismissal
    307AIII(B) Involuntary Dismissal
      307AIII(B)2 Grounds in General
        307Ak563 k. Disobedience to Order of Court or Other Misconduct. Most Cited Cases
Dismissal of customer's action alleging fraud and breach of fiduciary duty by investment firm was not abuse of discretion where customer failed to comply with order granting defendants' motion to compel arbitration and for stay pending arbitration; however, affirmance of order would be conditioned upon willingness of arbitration organization to take jurisdiction of customer's claims and to reopen her case.

**[18] Mandamus 250 ☞60**

250 Mandamus
  250II Subjects and Purposes of Relief
    250II(A) Acts and Proceedings of Courts, Judges, and Judicial Officers
      250k60 k. Civil Proceedings Other Than Actions. Most Cited Cases
Petition for writ of mandamus is proper means to test trial court's granting of motion to arbitrate or granting of stay pending arbitration.

*333Alton B. Parker, Jr. and Maston E. Martin, Jr. of Spain, Gillon, Grooms, Blan & Nettles, Birmingham, for appellant.
A. Inge Selden III, Walker Percy Badham III and Mark Strength of Maynard, Cooper, Frierson & Gale, Birmingham, for appellees.
ADAMS, Justice.

Mary Jones appeals from a judgment dismissing her suit for failure to comply with an order to arbitrate her claims against Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch"), and J. Edward Porter. We affirm conditionally.

On August 12, 1982, Mrs. Jones opened account number 524-85812 with Merrill Lynch for the investment and management of proceeds from the settlement of a wrongful death action and an insurance policy on the life of her deceased husband. In doing so, she signed a "Customer Account Agreement" ("Agreement"), a copy *334 of which she received by mail with blank spaces for her signature, each of which was marked with an "X." The Agreement contained the following pertinent language:

"In consideration of your accepting and carrying *one or more accounts* for the undersigned [Mrs. Jones], the undersigned hereby agrees....

"....

"**11. Agreement to Arbitrate Controversies**

It is agreed that any controversy between us *arising out of your business or this agreement* shall be submitted to arbitration conducted under the provisions of the Constitution and Rules of the Board of Governors of the New York Stock Exchange, Inc. or pursuant to the Code of Arbitration Procedure of the National Association of Securities Dealers, Inc. as the undersigned may elect.

"**12. The Laws of the State of New York Govern**

This agreement and its enforcement shall be governed by the laws of the State of New York; shall cover *individually and collectively all accounts which the undersigned may open or reopen with you;* and shall enure to the benefit of your successors...."

(Emphasis added). By May 1983, the plaintiff had deposited with Merrill Lynch a total of $350,000. In March 1984, Merrill Lynch also opened in her name, allegedly without her consent, another account, account number 524-96284.

On November 4, 1988, she sued Merrill Lynch and Mr. Porter, its representative, alleging that improper activities of the defendants had resulted in a loss of over half of her $350,000 investment. More specifically, the plaintiff contended that "beginning on or about September 29, 1983, and continuing until on or about July 27, 1988, [the defendants] wrongfully, intentionally, fraudulently, maliciously, and deceptively manipulated ... and 'churned' " her accounts. Count one of her seven-count complaint alleged excessive trading of securities, which, she contended, amounted to a violation of Ala.Code 1975, § 8-6-17.[FN1] Count two alleged fraudulent conversion of securities from a cash account to a "margin" account, in violation of § 8-6-17. Count three alleged breach of fiduciary duty. Count four alleged conversion of the $350,000 investment to the use of the defendants. Counts five through seven alleged, respectively, knowing, reckless, and innocent

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

604 So.2d 332
604 So.2d 332
(Cite as: 604 So.2d 332)

misrepresentation of material facts regarding the $350,000 investment.

FN1.Section 8-6-17 provides:

"It is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly, to:

"(1) Employ any device, scheme or artifice to defraud;

"(2) Make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or

"(3) Engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person."

On December 6, 1988, the defendants filed a "Motion to Compel Arbitration and for Stay Pending Arbitration" of the dispute pursuant to Clause 11 of the Agreement. On March 3, 1989, the plaintiff filed an amended and restated complaint that contained the same counts as alleged in her original complaint. On April 10, 1989, the Honorable Stuart Leach, Jefferson County Circuit Court judge, conducted a pretrial hearing to consider various motions, including the defendants' motion to compel arbitration. After considering affidavits, briefs, and "heated argument from counsel for both parties," the trial judge, on June 16, 1989, granted the defendants' motion to compel arbitration.

On June 21, 1989, following the trial court's denial of a motion for "reconsideration," the plaintiff filed a motion requesting the trial court to provide a statement, pursuant to Rule 5, A.R.App.P., that would allow her to seek to appeal from the order compelling arbitration. The judge, on June 29, 1989, granted her motion, provided the statement required by Rule 5, and certified a number of questions to this Court for immediate appeal. On July 11, 1989, we denied the plaintiff's petition for permission*335 to appeal the interlocutory order compelling arbitration.

On August 28, 1989, the plaintiff filed a motion to set aside the order compelling arbitration. On September 22, 1989, the judge heard arguments on that motion; on September 28, 1989, the court denied the motion, but expressly retained jurisdiction of the case pending a decision by the arbitration board to take jurisdiction.

On November 3, 1989, the plaintiff submitted a statement of claims to the National Association of Securities Dealers, Inc. ("NASD"). However, she refused to sign the "NASD Uniform Submission Agreement," requisite to submitting her claims to arbitration, because, she argues, "by execution of the agreement she would consent to arbitrate her claims against Merrill Lynch and would thereby waive any objection [that] she might have to the validity, enforceability and revocability" of Clause 11 of the Agreement.[FN2] Consequently, on January 25, 1990, the NASD notified her that it was "closing the case."

FN2. Brief of appellant, p. 4.

On March 14, 1990, Merrill Lynch filed a "Motion to Dismiss for Failure to Comply with Court Orders and for Want of Prosecution." The plaintiff, on March 28, 1990, responded by filing a second amended complaint, containing an eighth count, in which she sought to reform the Agreement pursuant to Ala.Code 1975, § 8-1-2, by the deletion of Clause 11.[FN3]

FN3.Section 8-1-2 provides:

"When, through fraud, a mutual mistake of the parties or a mistake of one party which the other at the time knew or suspected, a written contract does not truly express the intention of the parties, it may be revised by a court on the application of the party aggrieved so as to express that intention...."

With her second amended complaint, the plaintiff also filed a motion to stay arbitration, supported by a supplemental brief and various affidavits. On April 5, 1990, the trial judge conducted a hearing on all motions, including the "Motion to Dismiss for Failure to Comply with Court Orders and for Want of Prosecution." On June 19, 1990, the judge entered the following order:

"This Court is of the opinion that it has no alternative but to grant Defendant's motion to dismiss this case, and accordingly, the case is hereby dismissed without prejudice to Plaintiff insofar as the initiating or maintaining [of] a claim relating to the issues in this case with the arbitration forum selected or to be selected by Plaintiff. In all other respects, this dismissal is with prejudice and costs are hereby taxed to Plaintiff."

On appeal, the plaintiff contends that the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

604 So.2d 332
604 So.2d 332
**(Cite as: 604 So.2d 332)**

Page 6

Agreement must be reformed to eliminate Clause 11 because (1) the agreement was procured by fraud; (2) there was no mutual assent to the agreement to arbitrate; (3) no agreement was made to arbitrate any disagreements involving account number 524-96284; (4) the agreement is unconscionable; and (5) the agreement constitutes an impermissible waiver of the right to a jury trial provided under Alabama law. In addition, she insists that the arbitration request is time-barred.

*I. Fraud*

[1] The plaintiff first insists that state law controls the disposition of this case. In particular, she contends that the defendants waived any federally created rights arising under the Federal Arbitration Act, 9 U.S.C. §§ 1-15 (1982) ("FAA"), as a result of Mr. Porter's execution of "Form U-4," the "Uniform Application for Securities Industry Registration or Transfer," in which he agreed to "abide by, comply with, and adhere to all the provisions, conditions and covenants of the statutes, constitutions, ... and rules and regulations" of Alabama in consideration for registration by this state as a representative of Merrill Lynch. Consequently, she insists, the defendants "agreed to be bound by the law of Alabama."

Her reliance on *Volt Information Sciences, Inc. v. Board of Trustees of Stanford Junior University,* 489 U.S. 468, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989), as support for this argument is misplaced. The contract involved in *Volt Information Sciences*336 contained a *choice of law clause* providing for the application of California law in the event of a dispute. That case merely held that where a contract contained a *choice of law clause,* specifically providing for the application of California law in the event of a dispute, California's statute providing for a stay of arbitration "pending resolution of related litigation" was not preempted by the FAA. *Id.* at 471, 477, 109 S.Ct. at 1251, 1255. The Court concluded that the parties had not waived their federally created rights because their "*agreement* did not require arbitration to proceed in [that] situation." *Id.* at 475, 109 S.Ct. at 1253 (emphasis added).

[2][3] Not only does the *Agreement* at issue in this case contain no clause providing for the application of Alabama law, but the practical and unacceptable result of the plaintiff's argument would be to render the FAA inoperative in all similar disputes within this state. Moreover, it is well settled

that the FAA applies to cases, such as this one, in which transactions in securities are involved. *Ex parte Merrill Lynch, Pierce, Fenner & Smith,* 494 So.2d 1, 2 n. 1 (Ala.1986). We are thus constrained to apply federal law insofar as the FAA has circumscribed the sphere of operation of state law. See *Southland Corp. v. Keating,* 465 U.S. 1, 16, 104 S.Ct. 852, 861, 79 L.Ed.2d 1 (1984); *Ex parte Alabama Oxygen Co.,* 433 So.2d 1158, 1168 (Ala.1983), (Maddox, J., dissenting), *vacated,*452 So.2d 860 (Ala.1984) (adopting dissenting opinion of Maddox, J., as opinion of the Court).

The FAA, in pertinent part, provides:
**"§ 2. Validity, irrevocability, and enforcement of agreements to arbitrate**
"A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, *save upon such grounds as exist at law or in equity for the revocation of any contract.*
"....
**"§ 4 Failure to arbitrate under agreement; petition to United States court having jurisdiction for order to compel arbitration; notice and service thereof; hearing and determination**
"A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under Title 28 [28 USC § 1 et seq.], in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement.... The court shall hear the parties, and upon being satisfied that the *making of the agreement for arbitration or the failure to comply therewith is not in issue,* the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement.... *If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof.*"

9 U.S.C. §§ 2, 4 (1982) (emphasis added). In the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

context of allegations of fraud in the inducement of a contract involving interstate commerce, these sections involve an interrelationship of federal and state law. See, generally, R. Connell, *The Federal Arbitration Act: The Expanding Impact of State Law Upon Rigorous Enforcement,*20 J.Mar.L. & Com. 327 (1989).

The polestar in our analysis of this interrelationship is *Prima Paint Corp. v. Flood & Conklin Manufacturing Co., 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967).* In that case, the parties entered into a "Consulting Agreement" containing a comprehensive arbitration clause. After a dispute arose, Flood & Conklin served notice of "intention to arbitrate." *Id.* at 398, 87 S.Ct. at 1803. Prima Paint responded**337 by filing suit in federal court, seeking rescission of the contract on the grounds that it had been procured by fraud. In particular, Prima Paint alleged that Flood & Conklin "had fraudulently represented that it was solvent and able to perform its contractual obligations, whereas it was in fact insolvent." *Id.* In holding that the dispute was subject to arbitration, the United States Supreme Court stated:

"Under § 4, with respect to a matter within the jurisdiction of an arbitration clause, the ... courts save for the existence of an arbitration clause, the ... court is instructed to order arbitration to proceed once it is satisfied that 'the making of the agreement for arbitration or the failure to comply [with the arbitration agreement] is not in issue.' Accordingly, if the claim is fraud in the *inducement of the arbitration clause itself*-an issue which goes to the 'making' of the agreement to *arbitrate*-the ... court may proceed to adjudicate it. But the statutory language does not permit the ... court to consider claims of fraud in the *inducement of the contract generally.* ... We hold, therefore, that in passing upon a § 3 application for a stay while the parties arbitrate, a ... court may consider only issues relating to the making and performance of the agreement to *arbitrate.*"

*Prima Paint, 388 U.S. at 403-04, 87 S.Ct. at 1806* (footnotes omitted; emphasis added). The Court reasoned that as long as the arbitration clause was broad enough to encompass claims of fraud in the inducement of the contract, such claims were, themselves, subject to arbitration. *Id. at 402, 406, 87 S.Ct. at 1805, 1807;* see also *Ex parte Costa & Head (Atrium), Ltd., 486 So.2d 1272, 1276 (Ala.1986).*

[4] Since *Prima Paint,* it has become clear that in

cases involving claims of fraud in the inducement of a contract affecting interstate commerce, the court must first determine whether the fraud claim is directed solely at the arbitration clause *itself. Coleman v. Prudential Bache Securities, Inc., 802 F.2d 1350, 1352 (11th Cir.1986)* (must be asserted that "arbitration clause itself, standing apart from the whole agreement, was induced by fraud"); *Bhatia v. Johnston, 818 F.2d 418, 422 (5th Cir.1987)* (must be asserted that "arbitration clause alone, as opposed to the Customer Agreement generally," had been induced by fraud); see also *Schact v. Beacon Ins. Co., 742 F.2d 386, 390 (7th Cir.1984).* If so, the party opposing arbitration is entitled to a trial involving state law issues relating to the making of the arbitration clause. See *Cohen v. Wedbush, Noble, Cooke, Inc., 841 F.2d 282, 286 (9th Cir.1988); Curtis v. Newhard, Cook & Co., 725 F.Supp. 1072, 1074 (E.D.Mo.1989).*

[5] If, however, looking beyond the *ad hoc* arguments of counsel, the court concludes that the claim of fraud actually bears upon the entire agreement and upon the activities of the parties in general, the provision in § 2 regarding the revocation of contracts does not preclude the federally created right to specific enforcement of the arbitration clause. See *Villa Garcia v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 833 F.2d 545, 548 (5th Cir.1987); Benoay v. Prudential-Bache Sec., Inc., 805 F.2d 1437, 1441 (11th Cir.1986); Coleman, 802 F.2d at 1352;Schact, 742 F.2d at 389.* Were it otherwise, a skillfully crafted complaint would, in every case, necessitate a trial thus effectively eviscerating the FAA and circumventing the strong policy favoring arbitration. See *Perry v. Thomas, 482 U.S. 483, 491, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987); Moses H. Cone Memorial Hosp. v. Mercury Const., 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983);* An examination of the case at hand demonstrates the reality of that prospect.

In her original 19-page complaint, Mrs. Jones devoted only three paragraphs in the statement-of-facts section to the arbitration clause, alleging merely that the arbitration clause constituted an unenforceable contractual waiver of the right to a jury trial. Her first "amended and restated complaint," filed four months later, alleged that the arbitration clause itself had been "procured by fraud and [was] unenforceable pursuant to Section 2 of the Federal Arbitration Act." Furthermore, her second complaint alleged that the arbitration clause served as

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

604 So.2d 332
604 So.2d 332
**(Cite as: 604 So.2d 332)**

the vehicle through which **\*338** the defendants sought to perpetrate their various fraudulent schemes by "browbeat[ing] Mary Jones into accepting much less than the value of her claim." Finally, with the filing of the second amended complaint on March 28, 1990, she added Count eight, which averred that the arbitration clause was due to be rescinded because of "fraud of the defendant, inequitable conduct of the defendant, or a mistake of the plaintiff which defendant at the time knew or suspected." The ability of competent counsel to sharpen the issue relating to the arbitration clause progressively over time is readily apparent.

However, even ignoring, momentarily, the evolution of the arbitration issue in this case, we are troubled by the theory urged by the plaintiff that the defendants used that clause as a shield behind which to carry out fraudulent schemes. A similar theory was expressly rejected in _Western Hospitals Federal Credit Union v. E.F. Hutton & Co._, 700 F.Supp. 1039 (N.D.Cal.1988). In that case, the credit union signed an agreement containing an arbitration clause with E.F. Hutton a year _after_ E.F. Hutton had allegedly churned and mismanaged the credit union's investments. When a dispute arose two years after the agreement was executed, the credit union filed suit in a federal district court, alleging that E.F. Hutton had "fraudulently induced plaintiffs to agree to arbitrate in an effort to minimize its liability for improper acts performed _before_ the agreement was signed." _Id._ at 1041-42. (Emphasis added.)

Finding no "independent challenge" to the arbitration clause itself, the district court rejected the credit union's contentions and enforced the arbitration clause. In so doing, the court succinctly remarked that if it "accepted [the credit union's] argument, almost all investors would be able to circumvent arbitration clauses by alleging that the broker's improper conduct not only gives rise to specific causes of action, but voids the arbitration agreement designed to process such disputes." _Id._ at 1043 n. 1.

[6] We believe that the logic of the district court is even more persuasive where, as here, the agreement was signed _before_ the allegedly fraudulent activity. To countenance the contention that Merrill Lynch induced Mrs. Jones to sign the agreement in anticipation of fraudulent activity would allow the plaintiff to "bootstrap" her various claims and theories "into a separate reason for voiding the arbitration clause." See _id._ at 1042.

The plaintiff contends that the "_central issue in this case is whether Merrill Lynch owed a duty to [her] to disclose the ... material facts regarding the arbitration agreement._" Reply brief of appellant, p. 6 (emphasis in original). The omission to do so, the argument goes, constituted fraud in the making of the arbitration clause itself. Cf. Ala.Code 1975, § 6-5-104. We also reject that argument because Mrs. Jones's claim of breach of a fiduciary duty to disclose material facts applies as cogently to _all_ of her claims as to the arbitration clause itself. For example, Count three, in all three of her complaints, alleges:

"Defendants Porter and Merrill Lynch owed a fiduciary duty and a duty of good faith and fair dealing, a duty to communicate full and proper information to Plaintiff and to keep Plaintiff fully and adequately informed, a duty to protect the interests of Plaintiff and not profit at the expense of Plaintiff, and a duty to manage her account in a manner that could reasonably be expected to accomplish her objectives of preservation of principal and generation of income. _All of these duties were breached by defendants Porter and Merrill Lynch, as such fiduciaries._"

(Emphasis added.) Thus, the allegations of breach of fiduciary duty clearly encompass the full scope of the defendants' activities in connection with the plaintiff's investments and are not limited to the making of the agreement to arbitrate.

The plaintiff also cites _Par-Knit Mills, Inc. v. Stockbridge Fabrics Co._, 636 F.2d 51 (3d Cir.1980), in support of her argument for a jury trial on the alleged arbitration\*339 clause issue. In that case, a dispute arose between Par-Knit Mills, a garment manufacturer, and Stockbridge Fabrics, its distributor, regarding the enforceability of an arbitration clause contained in a series of forms signed by Par-Knit's "production manager." The forms preceded delivery of textiles purchased on the basis of a series of oral contracts. Par-Knit contended that the production manager's signature on the forms in a space designated "Buyer's Acceptance," merely represented a confirmation of delivery dates. Because the court was thus confronted with a number of genuine issues of fact, including issues of agency and the actual or apparent authority of the production manager to bind the company to _any_ type of agreement, Par-Knit was entitled to a jury trial on those issues.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

604 So.2d 332
604 So.2d 332
**(Cite as: 604 So.2d 332)**

No such issues are here presented. Here, the plaintiff merely signed, in her own capacity, the Agreement she had received through the mail. Therefore, the trial judge, having correctly found no triable issues, properly concluded that the fraud claim was not directed solely at the arbitration clause. Therefore, because we have concluded that the plaintiff has failed to satisfy the threshold requirement articulated in the FAA, we need not and, therefore, do not, reach the issue of whether the defendants' failure to explain the consequences of the arbitration clause constituted fraud or breach of a fiduciary duty.

### II. Mutual Assent

[7] The plaintiff insists that Clause 11 is unenforceable because there was *no agreement to arbitrate*. However, she argues not that the defendants affirmatively misrepresented the existence or the effects of the arbitration clause, but merely that the defendants failed to provide any explanation at all regarding the consequences of Clause 11. The absence of an explanation, she insists, constituted a breach of fiduciary duty that would constitute grounds for rescission of the clause pursuant to Ala.Code 1975, § 8-1-2.

The plaintiff's contention is, therefore, merely a restatement of the fraud and breach-of-fiduciary-duty arguments previously discussed. To allow the disposition of this case to turn on a bare restatement of an allegation would clearly place form over substance. Because we have already determined that this case is not about fraud in the inducement as to the arbitration clause itself, we also reject the plaintiff's argument that the arbitration clause is unenforceable because of the absence of mutual assent.

### III. Arbitrability of the Second Account

It is undisputed that the plaintiff did not sign a separate agreement expressly authorizing the opening of the second account-account number 524-96284. She alleges that the defendants not only improperly opened that account, but transferred her securities and property from one account to the other without proper authorization. Consequently, she insists, transactions involving account number 524-96284, such as unauthorized purchases made in account number 524-85812 and transferred to and sold in

account number 524-96284, are not subject to arbitration under the terms of the Agreement that she signed upon the opening of account number 524-85812.

In support of her argument, the plaintiff refers to Clause 12 of the Agreement, which provides that the "agreement ... shall cover individually and collectively all accounts which the undersigned may *open or reopen* with [Merrill Lynch]." She insists that because the second account was not one that *she* opened or reopened, the second account is not subject to the arbitration provision. Merrill Lynch, however, contends that the phrase in Clause 11 providing for arbitration of "any controversy ... arising out of [its] *business*" is sufficiently broad to encompass the transactions connected with the disputed account.

[8] The question thus becomes a "matter of contractual interpretation to be determined by the intent of the parties." *Ex parte Warrior Basin Gas Co.,* 512 So.2d 1364, 1367-68 (Ala.1987). A determination by the trial judge regarding the intent of the parties to arbitrate is a question of fact and, as such, will not be disturbed unless *340 clearly erroneous. Id.* at 1368 (citing *Seaboard Coast Line R.R. v. Trailer Train Co.,* 690 F.2d 1343, 1348-49 (11th Cir.1982).

[9] We are unable to conclude that the trial judge's findings, based on the language of the Agreement itself, numerous affidavits, and the oral arguments of both parties, were clearly erroneous. For example, the language of the Agreement fairly supports a finding that the parties intended to arbitrate disputed claims. This is especially true with regard to the plaintiff's allegations that the defendants used the second account as a repository or transfer point for securities purchased through the first account. The transactions arising out of account number 524-96284 are thus so inextricably intertwined with those involving account number 524-85812 as to be inseparable absent resort to mere sophistry.

[10] In addition, we note that the trial judge, in properly applying "federal substantive law of arbitrability," was constrained to construe the intent of the parties generously in favor of arbitrability. *Ex parte Warrior Basin Gas Co.,* 512 So.2d at 1369; see also, *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985). Moreover, "federal policy

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

604 So.2d 332
604 So.2d 332
(Cite as: 604 So.2d 332)

Page 10

favoring arbitration and requiring courts to 'rigorously' enforce arbitration agreements," mandates the finding of intent to arbitrate absent "positive assurance" that the parties did not so intend. *Ex parte Warrior Basin Gas Co.,* 512 So.2d at 1370. We, therefore, conclude that the trial judge's findings were not clearly erroneous.

### IV. Unconscionability

[11][12] Likewise, we find no merit in the plaintiff's contention that the arbitration clause is due to be rescinded on the ground of unconscionability. Arbitration clauses are not "inherently unfair or oppressive." See *Coleman v. Prudential Bache Securities, Inc.,* 802 F.2d 1350, 1352 (11th Cir.1986); see also *Surman v. Merrill Lynch, Pierce, Fenner & Smith,* 733 F.2d 59, 61 n. 1 (8th Cir.1984). Furthermore, because the plaintiff's claims of fraud and breach of fiduciary duty are directed at the entire contract, the issue of unconscionability is also subject to arbitration. See *Coleman,* 802 F.2d at 1352.

[13] Neither does the clause constitute an unenforceable waiver of the right to trial by jury under Ala. Const. 1901, Art. I, § 11. As this Court has stated: "The Federal Arbitration Act ... creates a federal right to specific enforcement of arbitration agreements which are a part of contracts involving interstate commerce, notwithstanding any state substantive or procedural policies to the contrary." *Ex parte Alabama Oxygen Co.,* 433 So.2d at 1168. Moreover, the "public policy of this state is to encourage arbitration and amicable settlements of differences between parties." *Wells v. Mobile County Bd. of Realtors,* 387 So.2d 140, 144 (Ala.1980); see also *Ex parte Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 494 So.2d 1, 4 (Ala.1986). Arbitration clauses contained in contracts subject to §§ 2 and 4 of the FAA, which provide for judicial intervention and revocation "upon such grounds as exist at law or in equity," do not violate public policy or constitute an unenforceable waiver of the right to trial by jury. See *Wells,* 387 So.2d at 144.

### V. Timeliness of the Motion to Compel Arbitration

More problematic, however, is the plaintiff's contention that § 15 of the NASD Code of Arbitration Procedure bars submission to arbitration of the "dispute, claim or controversy regarding Paragraph 11 ... due to the fact that more than six

years have elapsed from the occurrence or event giving rise to the claim." [FN4] That section provides:

FN4. Brief of appellant, at 51.

"No dispute, claim, or controversy shall be eligible for submission to arbitration under this Code where six (6) years have elapsed from the occurrence or event giving rise to the act or dispute, claim, or controversy. This section shall *341 not extend applicable statutes of limitations, nor shall it apply to any case which is directed to arbitration by a court of competent jurisdiction."

*Id.* She insists that the "occurrence or event giving rise to the dispute" is the execution, on August 12, 1982, of the Agreement containing the arbitration clause. The defendants, however, contend that the events of which § 15 speaks are the alleged instances of churning, unauthorized trading, and similar acts of the defendants as set forth in the plaintiff's complaints.

[14] It cannot seriously be maintained that the plaintiff would have averred a cause of action for relief from the effects of the arbitration clause in the absence of the overriding substantive claims succinctly set forth in her complaints-claims that arose well within the period prescribed by § 15. For example, the plaintiff's complaints allege that "beginning on or about *September 29, 1983, and continuing until on or about July 27, 1988,* [the defendants] wrongfully, intentionally, fraudulently, maliciously, and deceptively manipulated Plaintiff's accounts, and 'churned' Plaintiff's accounts." (Emphasis added.) As we have already determined, based on our discussion of the issue of fraud, *supra,* this case is not about the arbitration clause. Therefore, on the strength of the plain language of § 15, the arbitration request does not appear to be time-barred.

This conclusion is buttressed by the fact that the NASD did not refuse to take jurisdiction of the dispute when, on November 3, 1989, Mrs. Jones submitted a statement of claims to the NASD. Instead, the NASD responded on January 3, 1990, with a memorandum requesting a properly executed copy of the Uniform Submission Agreement. Only when the plaintiff refused to submit the Uniform Submission Agreement did the NASD notify her that it was "closing the case."

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

604 So.2d 332
604 So.2d 332
**(Cite as: 604 So.2d 332)**

Page 11

[15][16] Finally, we consider whether the trial judge erred in granting the defendants' "Motion to Dismiss for Failure to Comply with Court Orders and for Want of Prosecution." Ala.R.Civ.P. 41(b) provides for the involuntary dismissal of an action upon "failure of the plaintiff to prosecute or to comply with [the Rules of Civil Procedure] or any order of [the] court." Although dismissal for failure to comply with a court order is a "harsh sanction," it is warranted where there is a "clear record of delay, willful default or contumacious conduct by the plaintiff." *Selby v. Money,* 403 So.2d 218, 220 (Ala.1981). Because the trial judge is in the best position to assess the conduct of the plaintiff and the degree of noncompliance, his decision to grant a motion to dismiss for failure to prosecute will be accorded considerable weight by a reviewing court. *Van Bronkhorst v. Safeco Corp.,* 529 F.2d 943, 947 (9th Cir.1976); *Von Poppenheim v. Portland Boxing & Wrestling Comm'n,* 442 F.2d 1047, 1051 (9th Cir.1971), *cert. denied,* 404 U.S. 1039, 92 S.Ct. 715, 30 L.Ed.2d 731 (1972). Therefore we will reverse that decision only upon a showing of abuse of discretion. *Selby,* at 220; *Smith v. Wilcox County Bd. of Educ.,* 365 So.2d 659 (Ala.1978).

[17][18] Under the facts of this case, we are unable to say that the trial judge abused his discretion in dismissing the plaintiff's case with prejudice. On June 16, 1989, the trial judge granted the defendants' "motion to compel arbitration and for stay pending arbitration." The plaintiff never properly sought a review of that decision,[FN5] nor did she take the necessary steps to comply with the order. Instead, five months later, after she had submitted a statement of claims to the NASD, she refused to sign the Uniform Submission Agreement, a prerequisite for compliance with the order to arbitrate.

> FN5. It is now well settled in this state that a "petition for a writ of mandamus is the proper means to test a trial court's *granting* of a motion to arbitrate or the granting of a stay pending arbitration." *Ex parte Alexander,* 558 So.2d 364, 365 (Ala.1990) (footnote omitted) (emphasis in original); see also *A.G. Edwards & Sons, Inc. v. Clark,* 558 So.2d 358, 360 (Ala.1990).

After another four months had elapsed, during which the NASD gave notice that it was closing the case for failure properly to begin the arbitration process, Merrill Lynch *342 filed its "motion to

dismiss for failure to comply with court orders and for want of prosecution." In response, the plaintiff began a new round of litigation in the trial court by filing another complaint, a motion to stay arbitration, a brief, and affidavits-all directed at an issue that had been adjudicated in the trial court nine months earlier. On June 19, 1990, a year after the original order to arbitrate, the judge dismissed the case with prejudice.

Considering the issues presented, the conduct of the plaintiff, the patience of the trial judge, the strain on the court docket, and the cost to the defendants of prolonging the litigation, we conclude that the judge did not abuse his discretion in granting the defendants' motion to dismiss. Our holding is specifically conditioned, however, upon the willingness of the NASD to take jurisdiction of the plaintiff's claims and to reopen her case. Otherwise, the judgment will be reversed and the cause remanded for trial on the plaintiff's claims.

AFFIRMED CONDITIONALLY.

HORNSBY, C.J., and ALMON, STEAGALL and INGRAM, JJ., concur.
Ala.,1991.
Jones v. Merrill Lynch, Pierce, Fenner & Smith, Inc.
604 So.2d 332

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit J

**APPENDIX OF NON-FEDERAL AND UNPUBLISHED FEDERAL AUTHORITIES
CITED IN VISA USA INC.'S OPPOSITION TO MARITZ INC.'S
MOTION TO STAY ARBITRATION**



14 Cal.App.4th 1692                                                          Page 1
14 Cal.App.4th 1692, 19 Cal.Rptr.2d 555
**(Cite as: 14 Cal.App.4th 1692)**

▷People ex rel. Sepulveda v. Highland Federal Sav. and Loan
Cal.App.2.Dist.

THE PEOPLE EX REL. JOSEFINA SEPULVEDA
et al., Plaintiffs and Appellants,
v.
HIGHLAND FEDERAL SAVINGS AND LOAN et
al., Defendants and Respondents.
**No. B058411.**

Court of Appeal, Second District, Division 3,
California.
Jan. 26, 1993.

## SUMMARY

The trial court sustained, without leave to amend, demurrers to a complaint asserting a federally chartered savings and loan institution's wrongful course of conduct enabling slum conditions in certain urban buildings to be perpetuated to the detriment of the health, safety, and welfare of the People of California and, in particular, a class of tenant plaintiffs. In addition to the savings and loan, defendants included the institution's president, its loan coordinator and vice-president, and a wholly owned subsidiary. Plaintiffs sought to hold defendants responsible for continuing slum conditions of certain buildings of which defendants allegedly were the beneficial (non-record) owners. In addition to monetary damages and penalties, plaintiffs sought injunctive relief. The court found the complaint failed to state a cause of action for violations of the Racketeer Influenced and Corrupt Organizations Act (RICO) (18 U.S.C. § 1961 et seq.) for fraud or for fraudulent concealment. The court further found the entire complaint, except the RICO cause, was barred by federal preemption. Based on the sustained demurrers, the court dismissed the action. (Superior Court of Los Angeles County, No. C718828, Barnet M. Cooperman, Judge.)

The Court of Appeal reversed with directions. The court held the various state causes of action were not explicitly or impliedly barred by federal preemption pursuant to the Home Owners' Loan Act (12 U.S.C. § 1461 et seq.) or its concomitant regulations, none of which purport to address the subject of minimum housing standards; allegations of usury and a prayer to enforce due-on-sale clauses, however, were expressly preempted and had to be struck. The court also held a cause based on RICO violations was stated: the requisite facts concerning the existence of an "enterprise" had been alleged, and, although allegations of wire fraud were deficient, the "racketeering activity" element was adequately pleaded by allegations of mail fraud. The court further held the complaint stated a cause of action for fraud, though not for fraudulent concealment. (Opinion by Croskey, J., with Klein, P. J., and Hinz, J., concurring.)

## HEADNOTES

Classified to California Digest of Official Reports

**(1)** Pleading § 23--Demurrer to Complaint--Demurrer as Admission-- Application of Rule on Appeal.
All well-pleaded allegations of a complaint are deemed to be true for the purpose of appellate review of a ruling on a demurrer.

**(2)** Appellate Review § 109--Briefs--Form and Requisites--Argument-- Omission.
An appellate court is not required to consider matters urged in the briefs where no pertinent argument is made in support thereof.

**(3a, 3b)** Constitutional Law § 34--Distribution of Governmental Powers-- Between Federal and State Governments--Conflicts Between Federal and State Powers and Their Resolution--Preemption-- Determining Intent of Congress.
In determining whether a state statute or cause of action is preempted by federal law and so invalid under U.S. Const., art. VI, cl. 2, the court's sole task is to ascertain the intent of Congress. First, within constitutional limits, Congress may preempt state law by so stating in express terms. Second, intent to preempt in a particular area may be inferred where a comprehensive scheme of federal regulation makes reasonable the inference that Congress left no room for supplementary state regulation. Third, where Congress has not completely displaced state regulation, federal law may yet preempt state law to the extent it actually conflicts with federal law, either because compliance with both federal and state regulations is a physical impossibility, or because

14 Cal.App.4th 1692                                                                Page 2
14 Cal.App.4th 1692, 19 Cal.Rptr.2d 555
**(Cite as: 14 Cal.App.4th 1692)**

state law obstructs accomplishment of the full purposes and objectives of Congress. However, no implied preemption is found where the impact on the subject is merely indirect.
[See 7 **Witkin**, Summary of Cal. Law (9th ed. 1988) Constitutional Law, § 8.]
**(4a, 4b)** Constitutional Law § 34--Distribution of Governmental Powers-- Between Federal and State Governments--Conflicts Between Federal and State Powers and Their Resolution--Preemption-- Disfavored.
Preemption of state law by federal regulation is not favored. The court will not find express preemption unless a regulation clearly so states. It is the burden of the party claiming preemption to prove it. Preemption is not to be lightly presumed.

**(5a, 5b, 5c)** Constitutional Law § 34--Distribution of Governmental Powers--Between Federal and State Governments--Conflicts Between Federal and State Powers and Their Resolution--Preemption--Agency Regulation.
Although federal regulations are not themselves controlling on the preemption issue, where Congress has entrusted an agency with the task of promulgating regulations to carry out the purposes of a statute, as part of the preemption analysis a court must consider whether the regulations evidence a desire to occupy a field completely. Preemption should not be inferred, however, simply because the agency regulations are comprehensive and sufficient to meet the need identified by Congress; the states and localities are not thereby barred from identifying additional needs or imposing further requirements in the field. No implied preemption is found where the impact on the subject is merely indirect. Also, where the subject matter is an area traditionally regulated by the states, no federal preemption is implied unless there is a clear and manifest intent shown.

**(6a, 6b, 6c, 6d)** Savings and Loan Associations § 10--Federal Associations--Regulation--Federal Preemption--Pleadings:Constitutional Law § 34--Distribution of Governmental Powers--Between Federal and State Governments--Conflicts Between Federal and State Powers and Their Resolution--Preemption--Federal Savings and Loan Association.
The paramount purpose of the Home Owners' Loan Act (12 U.S.C. § 1461 et seq.) is to ensure the solvency of federal savings associations. Hence, various state causes of action grounded in a federally chartered savings and loan institution's alleged wrongful course of conduct enabling slum conditions

in certain urban buildings to be perpetuated to the detriment of the health, safety, and welfare of the People of California and, in particular, a class of tenant plaintiffs, were not explicitly or impliedly barred by federal preemption pursuant to the act or its concomitant regulations, none of which purported to address the subject of minimum housing standards. The cause for unfair business practices did not directly affect the institution's operations under the regulations, and the regulations did not pertain to the racketeering charges; the remaining nuisance and other causes would at most only incidentally and remotely touch on the institution's operations. Allegations of usury and a prayer to enforce due-on-sale clauses, however, were expressly preempted and had to be struck.

**(7a, 7b)** Conspiracy § 19--Civil--Pleading--RICO-- Elements.
To state a cause of action under the Racketeer Influenced and Corrupt Organizations Act (RICO) (18 U.S.C. § 1961 et seq.), a plaintiff must plead facts to show (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. The enterprise is an entity, a group of persons associated for a common purpose of engaging in a course of conduct. It is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit.
[What is an enterprise, as defined at 18 USCS § 1961(4), for purposes of the Racketeer Influenced and Corrupt Organizations (RICO) statute (18 USCS §§ 1961 et seq.), note, 52 A.L.R. Fed. 818.]
**(8a, 8b, 8c)** Conspiracy § 19--Civil--Pleading-- RICO--Savings and Loan Association.
In an action asserting a savings and loan institution's wrongful course of conduct enabling slum conditions in certain urban buildings to be perpetuated to the detriment of the health, safety, and welfare of the People of California and, in particular, a class of tenant plaintiffs, the trial court erred in sustaining, without leave to amend, demurrers to a cause of action based on violations of the Racketeer Influenced and Corrupt Organizations Act (RICO) ( 18 U.S.C. § 1961 et seq.). The requisite "enterprise" facts consisted in allegations of a continuing scheme to defraud the tenant plaintiffs, that defendants were ongoing business entities with an ongoing relationship independent of that fraud scheme, and that an ongoing series of business transactions among defendants regarded each of the subject buildings. Although allegations of wire fraud were deficient, the "racketeering activity" element was adequately

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

14 Cal.App.4th 1692                                                    Page 3
14 Cal.App.4th 1692, 19 Cal.Rptr.2d 555
**(Cite as: 14 Cal.App.4th 1692)**

pleaded by allegations of mail fraud describing the intent to defraud and facts as to the time, place, and content of alleged mailings. Further, the directly resulting injuries to plaintiffs were pleaded.

**(9)** Conspiracy § 19--Civil--Pleading--RICO--Mail Fraud:Post Office § 3-- Improper Use of Mails--Mail Fraud--Actions--Pleading.

In pleading a violation of the mail fraud statute (18 U.S.C. § 1341) as a predicate act under a scheme in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO) (18 U.S.C. § 1961 et seq.), plaintiffs must allege that (1) the defendants devised a scheme or artifice to defraud, (2) the defendants used the mails in furtherance of the scheme, and (3) the defendants did so with the specific intent to deceive or defraud.

[Validity, construction, and application of federal mail fraud statute (18 USCS § 1341, and similar predecessor provisions)-Supreme Court cases, note, 97 L.Ed.2d 863.]

**(10)** Fraud and Deceit § 25--Actions--Pleading--RICO--Wire    Fraud:Conspiracy    §    19--Civil--Pleading--RICO--Wire    Fraud:Telegraphs    and Telephones § 2--Crimes-- Wire Fraud--Actions--Pleading.

In pleading a violation of the wire fraud statute (18 U.S.C. § 1342) as a predicate act under a scheme in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO) (18 U.S.C. § 1961 et seq.), plaintiffs must allege that (1) the defendants devised a scheme or artifice to defraud, (2) the defendants used the wires in furtherance of the scheme, and (3) the defendants did so with the specific intent to deceive or defraud.

**(11)** Fraud and Deceit § 25--Actions--Pleading--Savings and Loan Association.

A complaint asserting a savings and loan institution's wrongful course of conduct enabling slum conditions in certain urban buildings to be perpetuated to the detriment of the health, safety, and welfare of the People of California and, in particular, a class of tenant plaintiffs, stated a cause of action for fraud. It set forth with ample particularity the identities of the record holders of title to the subject properties, the identities and capacities of the many plaintiffs, and the time frame in which the alleged misrepresentations were made. Specific, detailed minutiae were properly the subject of discovery, not demurrer.

**(12)** Fraud and Deceit § 8--Fraudulent Concealment--

Beneficial Ownership of Leased Property--Pleading.

A complaint asserting a savings and loan institution's wrongful course of conduct enabling slum conditions in certain urban buildings to be perpetuated to the detriment of the health, safety, and welfare of the People of California and, in particular, a class of tenant plaintiffs, stated no cause of action for fraudulent concealment. Plaintiffs sought to compel the beneficial (nonrecord) owners of the subject properties to disclose their ownership to the tenant plaintiffs to enable them to seek civil relief or governmental enforcement of the habitability law, but the disclosure provisions of Civ. Code, § 1962 (information required in multiunit dwelling rental agreement), do not give rise to a duty to disclose the name and address of a beneficial owner. The reference in Civ. Code, § 1962, subd. (a), to an "owner of the premises" is to the record owner, not the beneficial owner.

COUNSEL
James K. Hahn, City Attorney, Stephanie Sautner and Ronald Low, Deputy City Attorneys, Litt, Marquez & Fajardo, Barrett S. Litt and Ben Margolis for Plaintiffs and Appellants.
McKenna & Fitting, Michael D. Berk, Aaron M. Peck, Theresa A. Kristovich and Carl W. Sonne for Defendants and Respondents.
**CROSKEY, J.**
    Plaintiffs appeal from the judgment of dismissal following the sustaining without leave to amend demurrers to the second amended complaint of defendants Highland Federal Bank (Highland), Ben Karmelich (Karmelich), Selina Elizabeth Pratt (Pratt), and H.F.S. Corporation (HFS; collectively, the Highland defendants). The court found the complaint failed to state a cause of action for Racketeer Influenced and Corrupt Organizations Act (RICO) (18 U.S.C. § 1961 et seq.) violations, fraud or fraudulent *1698 concealment. The court further found the entire complaint, except the RICO cause of action, was barred by federal preemption.

    Because the trial court erred in finding no cause of action was stated and the doctrine of federal preemption barred the state claims, we reverse the judgment.

Factual Statement

1. *The Parties*

14 Cal.App.4th 1692

Page 4

14 Cal.App.4th 1692, 19 Cal.Rptr.2d 555
**(Cite as: 14 Cal.App.4th 1692)**

Plaintiffs consist of the People of the State of California (People) and numerous individuals in their individual capacity and as guardians ad litem and on behalf of a class who resided in one or more of the subject slum Los Angeles City buildings (tenant plaintiffs). [FN1]

> FN1 The original individual plaintiffs are: Josefina Sepulveda; Margarita Espinoza; Margarita Bonilla; Raul Cruz Amaya; Jova Corea; Rosa Estela Nevares; Jose Santos Nevares; Rosa Cordova; Maria B. Mergar; Raudel Flores; Haydee Alcantara; Angel Edgardo Flores; Ana Arellano; Jose Roberto Reyes; Concepcion Reyes; Gloria Escobar; Silvia Escobar; Eddy Sanchez; Trinidad Garcia; Ramon Rojas; Josefina Rivera; Manuel Rivera; Salvador Rivera; Leticia Ruiz; Concepcion Garcia; Roman Campos; Ramon Campos; Daisy Villalobos; Maria Rojas; Gregorio Rojas; Amalia Mendoza; Manuel Gil; Maria De La Luz Almaraz; Guadalupe Barragan; Luz Ines Ruiz; Amalia Delgado; Jorge Florez; and Rafael Valtierra, individually, and on behalf of a class composed of all present tenants or residents of the following buildings, all located in the City of Los Angeles: 4020 South San Pedro Street; 5426 Virginia Avenue; 823 South Bonnie Brae Street; 807 South Fedora Avenue; 504 South Bonnie Brae Street; 533 Ceres Avenue; 1000 Echo Park Avenue; 1616 West 11th Street; 526 South Union Avenue; and 2616 Idell Street, and of all persons who were tenants and/or residents of said buildings at material times; Maria De Jesus Rodriguez, Betty Rodriguez, Guadalupe Ibarra, and Esiquio Rodriguez, minors, by their guardian ad litem Josefina Sepulveda; Javier Espinoza, George Michael Espinoza, Yesenia Raquel Espinoza, and Daniel Alejandro Bonilla, Tricia Bonilla, minors, by their guardian ad litem Margarita Espinoza; Alexander Corea Amaya, a minor, by his guardian ad litem Raul Cruz Amaya; Juan Jose Nevares and Carlos F. Nevares, Minors, by their guardian ad litem Rosa Estela Nevares; Yovani Velasquez, Jose Velasquez, Yessica Mergar, minors, by their guardian ad litem Maria B. Mergar; Indira Alcantara, a minor, by her guardian ad litem Haydee Alcantara; Mayra Arellano; Antonio Arellano; Steve Arellano; Eduardo Arellano

and Cindy Arellano, minors, by their guardian ad litem Ana Arellano; Patricia Reyes, minor, by her guardian ad litem Jose Roberto Reyes; Karen Rojas, Maria Garcia, Raul Garcia, minors, by their guardian ad litem.
> On February 6, 1991, the court dismissed plaintiffs Silvia Escobar, Eddie Sanchez, Ana Arellano, and Guadalupe Barragan in their individual capacity pay for failing to comply with a prior discovery order.

The defendants who are parties to this appeal are Highland, Karmelich (its president), Pratt (its loan coordinator and vice-president), and HFS (its wholly owned subsidiary).*1699

Highland, a federally chartered savings and loan institution, specializes in making loans to owners of residential properties, including slum buildings in the greater Los Angeles area. Eight of the eleven slum properties listed in this complaint were financed by defendant Highland. Karmelich is both its president and chief executive officer. Karmelich also served as secretary of the board of directors of defendant Northeast. Pratt is a vice-president and loan coordinator for defendant Highland. Pratt helped Highland facilitate the rapid transfer of record ownership of slum buildings. She was also actively engaged in soliciting and arranging for uncreditworthy borrowers to assume Highland loans on those slum buildings without regard to the borrowers' ability to maintain and repair the buildings. HFS is a California corporation and a wholly owned subsidiary of defendant Highland. (1)(See fn. 2.) Among its activities is the servicing of loans made by defendant Highland. [FN2]

> FN2 These facts are alleged in the second amended complaint. All well-pleaded allegations of the complaint are deemed to be true for the purpose of appellate review of a ruling on a demurrer. (*Shoemaker v. Meyers* (1990) 52 Cal.3d 1, 7 [276 Cal.Rptr. 303, 801 P.2d 1054, A.L.R.4th 1720].)
> These defendants are sometimes collectively referred to as the "Highland defendants." A number of other defendants were named in plaintiffs' second amended complaint. However, these remaining defendants are not parties to this appeal. They consist of other lenders, which are not savings associations, and individuals, including

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

14 Cal.App.4th 1692                                                                                                        Page 5
14 Cal.App.4th 1692, 19 Cal.Rptr.2d 555
(Cite as: 14 Cal.App.4th 1692)

some who at one time or another were owners of the subject 11 buildings. The action remains pending as to these defendants.

## 2. Nature of Charging Allegations

In this action plaintiffs seek to hold the Highland defendants responsible for the continuing slum conditions of certain buildings. In addition to monetary damages and penalties the complaint seeks injunctive relief. [FN3]*1700

FN3 Plaintiffs seek to enjoin the Highland defendants from, inter alia:

"(a) Soliciting, engaging or permitting individuals to act as straw buyers or record owners who, in fact, have no genuine ownership interest in the substandard property;

"(b) Recording or causing to be recorded any document containing the name of any record owner who is not the true owner of the substandard property, the legal obligor on the deed of trust, or the party whose assets were relied upon in creating the encumbrance;

"(c) Accepting, notarizing, causing to be notarized, or recording or causing to be recorded any documents that are a part of any financing arrangement concerning any substandard property, which document has been executed by a person other than the person whose name appears on the document;

"(d) Failing to send a copy of the notice set forth in sub-paragraph (g) below to each unit in the substandard property, in both English and Spanish, upon recordation of a trust deed to the potential borrower secured on the subject property;

"(e) Recording or causing to be recorded a trust deed secured by substandard property without first providing a copy of the trust deed, title report, and written proof of compliance with sub-paragraph (d) above to the following interested agencies: [¶] (i) Office of Thrift Supervision (OTS); [¶] (ii) The Housing Enforcement Division of the Los Angeles City Attorney's office; [¶] (iii) The Legal Aid Foundation of Los Angeles;

"(f) Selling or assigning Highland's beneficial interest in any note secured by substandard property without first providing to the purchaser or assignee a copy of the trust deed, the recorded substandard order, and the notice described in sub-paragraph (g) below; and without providing notice of such sale to the agencies listed in sub-paragraph (e) above.

"(g) Failing to give written notice to any potential borrower or anyone seeking to assume a note, previously issued by Highland, on substandard property of which the lender has notice by reason of recorded notice or otherwise concerning the potential legal consequences attached to ownership of said property. Said written notice shall include: [¶] (i) An advisement that the subject property or building has been declared substandard; [¶] (ii) That the borrower or person assuming the note and taking title to the property may be held criminally responsible if he or she fails to correct the substandard conditions; [¶] (iii) That the amount of rent a tenant owes may be subject to reduction by virtue of the uninhabitable conditions; [¶] (iv) That tenants may have a cause of action for damages with respect to the conditions in the building, and for injunctive relief requiring repair of said buildings forthwith; [¶] (v) That potential rent increases may be denied pursuant to the Los Angeles City Rent Stabilization Ordinance if the Substandard Notice is not lifted; [¶] (vi) That if borrower or person assuming the note fails to undertake the necessary repairs within a reasonable time (120 days), the lender will petition the court for the appointment of a receiver to collect the rents and make repairs, pursuant to waste provisions of its deed of trust; [¶] (vii) That under California law a borrower may not be able to claim state tax deductions for the interest payments and depreciation on said property until the Substandard Notice is removed.

"(h) Declining to initiate and complete foreclosure as speedily as the law permits on substandard property of which the lender has notice if the substandard conditions are not fully corrected within 120 days, provided that foreclosure proceedings may terminate if correction occurs before foreclosure is completed ...."

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

14 Cal.App.4th 1692                                                          Page 6
14 Cal.App.4th 1692, 19 Cal.Rptr.2d 555
**(Cite as: 14 Cal.App.4th 1692)**

The thrust of the complaint charges Highland with engaging in unfair business practices and fraud for the purpose of maximizing its profits. Such goal was achieved by creating a situation where rents, which were collectable only if the units complied with the habitability laws, were generated without the expenditure of sums necessary to ensure such compliance. Thus, the slum nature of the buildings was perpetuated and the tenant plaintiffs were defrauded of their right to a habitable dwelling.

Essentially, Highland allegedly committed such illegal activities through fraudulent loan transactions in order to avoid criminal and civil liability. Highland hid and exercised its control over the subject buildings by setting up record owners who had only token or no investment in the buildings, i.e., either such owners had insufficient asserts or lacked bona fide business qualifications to obtain the loans. In general, title to the buildings was worthless since the amount of the loans exceeded the fair market value of the security. The record owners therefore were "strawmen" who were basically managers of the buildings for Highland's benefit.

It is further alleged that Highland in effect was the true beneficial owner of the buildings because it determined who would be the record owner and when the owner failed to perform, Highland replaced him or her with another whom it could control. Such transfers of record ownership also *1701 served to complicate and frustrate civil and criminal prosecution for violation of the habitability law.

It was also alleged that Highland routinely facilitated the title transfer of the buildings without the exercise of the due-on-sale clauses of the loan agreements, without requiring loan assumption by creditworthy individuals, and without scrutiny to ensure necessary repairs were made. Highland charged loan points and interest at a rate higher than those for bona fide loan transactions and utilized the entire or almost entire loan amount from the new record owner to. pay off the principal, interest, penalties and arrearages owed by the former record holder. Such loans were often arranged by lender-related defendants controlled by and/or associated with Highland. Highland then allowed or caused the fraudulent documents to be recorded in order to hide their control.

Finally, it was alleged the above pattern of activity by Highland was outside of and inconsistent with the normal and standard practice of lenders.

Procedural Statement

This action was filed on March 28, 1989. On June 7, 1990, a second amended complaint asserting numerous causes of action was filed, including those for RICO violations, fraud and fraudulent concealment.[FN4]*1702

FN4 That complaint set forth, respectively, these causes of action:
(1) Unfair business practices (Bus. & Prof. Code, § 17200) (first cause of action by the People against all defendants);
(2) Violation of 18 United States Code sections 1961-1968 (RICO) (causes of action 81-161 by all plaintiffs against Highland, Karmelich, Pratt, inter alia, but not HFS). Former causes of action 2 through 80 and 81 in the first amended complaint were not realleged in the second amended complaint. There are no causes of action 2 through 80 in the second amended complaint;
(3) Injunctive relief (causes of action 162-242 by all plaintiffs against all defendants);
(4) Breach of warranty of habitability regarding written contract (causes of action 243-323 by all tenant plaintiffs against all defendants);
(5) Breach of warranty of habitability regarding oral contract (causes of action 324-404 by all tenant plaintiffs against all defendants);
(6) Nuisance (causes of action 405-485 by all tenant plaintiffs against all defendants);
(7) Negligence (causes of action 486-566 by all tenant plaintiffs against all defendants);
(8) Strict liability regarding maintenance of slum premises (causes of action 562-647 by all tenant plaintiffs against all defendants);
(9) Intentional infliction of emotional distress (causes of action 648- 728 by all tenant plaintiffs against all defendants);
(10) Violation of Civil Code section 1942.4 (causes of action 729-809 by all tenant plaintiffs against all defendants);
(11) Fraud (causes of action 810 through 890 by all tenant plaintiffs against all defendants);

14 Cal.App.4th 1692                                                   Page 7
14 Cal.App.4th 1692, 19 Cal.Rptr.2d 555
**(Cite as: 14 Cal.App.4th 1692)**

(12) Fraudulent concealment (Civ. Code, § 1710, subd. (3)) by all tenant plaintiffs against all defendants; and

(13) Violation of Civil Code section 789.3 (interruption of utility services) (causes of action 972-1,052 by all tenant plaintiffs against all defendants).

For the purpose of this appeal the enumerated groups of causes of actions in (2) through (13) above are referred to as causes of action 2 through 13, respectively.

On August 6, 1990, Highland defendants filed demurrers to that complaint. They also filed a companion motion to strike. On or about October 19, 1990, plaintiffs filed joint opposition. On or about November 13, 1990, Highland defendants filed their reply.

On January 25, 1991, the court sustained certain demurrers without leave to amend. The court sustained demurrers without leave to amend as to all causes of action, except the second for RICO violations, on the ground of failure to state a cause of action (Code Civ. Proc., § 430.10, subd. (e)) because of federal preemption. As authority it relied on section 545.2 of title 12 of the Code of Federal Regulations; *Fidelity Federal Savings and Loan v. De La Cuesta* (1982) 458 U.S. 141, 162 [73 L.Ed.2d 664, 680-681, 102 S.Ct. 3014]; and *Wisconsin League of Financial Institutions v. Galecki* (W.D.Wis. 1989) 707 F.Supp. 401, 405.

The court further sustained demurrers without leave to amend on the ground of failure to state a cause of action (Code Civ. Proc., § 430.10, subd. (e)) specifically as to the 2d cause of action (RICO), the 11th cause of action for fraud, and the 12th cause of action for fraudulent concealment. The court also sustained uncertainty demurrers to the entirety of the complaint with leave to amend. (Code Civ. Proc., § 430.10, subd. (f).) The motion to strike was placed off calendar.

On March 15, 1991, the court entered the order (judgment) of dismissal based on the sustaining of the demurrers of the Highland defendants, without leave to amend.

Issues Presented

This appeal presents three basic issues: (1) Are

the state claims against Highland, a federal savings and loan association, preempted by federal law? (2) If so, does federal preemption also bar the action against Karmelich, Highland's president, Pratt, its loan coordinator and a vice-president, and HFS, its wholly owned subsidiary? (3) Does the complaint state a cause of*1703 action against the Highland defendants for RICO violations, fraud, or fraudulent concealment?

Discussion

1. *Action Against Highland Not Barred by Federal Preemption Under HOLA*[FN5] (2)(See fn. 5)

a. *Principles Applicable to Determination of Preemption*

(3a) "Preemption issues are resolved through the process of statutory interpretation. [Citation.] We look to the language of the statute and to the intent of Congress." (*Siegel v. American Savings & Loan Assn.* (1989) 210 Cal.App.3d 953, 959 [258 Cal.Rptr. 746].)

> FN5 The Highland defendants concede the trial court's ruling based on federal preemption was grounded only on the Federal Home Owners' Loan Act of 1933 (HOLA) (12 U.S.C. § 1461 et seq.) and its concomitant regulations. Nonetheless, they urge us to uphold that ruling on the additional grounds of federal preemption based on the Federal Fair Housing Act of 1986 (12 U.S.C. § 3601 et seq.) and The Community Reinvestment Act (12 U.S.C. § 2903 et seq.). They assert: " 'If right upon any theory of the law applicable to the case, [a ruling] must be sustained regardless of the considerations which may have moved the trial court to its conclusion.' [Citation.]" (*D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 19 [112 Cal.Rptr. 786, 520 P.2d 10].)
>
> We have no quarrel with their recitation of law except to find it inapposite since defendants have failed to establish the applicability of those acts to the issues before this court. We observe the above two acts were briefly mentioned at footnote 30 of their demurrer memorandum, and thus, were technically before the trial court.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

14 Cal.App.4th 1692                                                     Page 8
14 Cal.App.4th 1692, 19 Cal.Rptr.2d 555
**(Cite as: 14 Cal.App.4th 1692)**

On appeal they devote several pages to quotations from the Fair Housing Act in their brief but fail to cogently connect the act's requirements with the matters at issue, which are mentioned in some detail in only footnote 19. Similarly, the Highland defendants quote at length from the Community Reinvestment Act but set forth no cognizable connection between its provisions and the subject issues.

Based on the above we reject their position as unsupported. It is well established that as an appellate court we are not required to consider matters urged in the briefs where no pertinent argument is made in support thereof. (See, e.g., _Strutt v. Ontario Sav. & Loan Assn._ (1972) 28 Cal.App.3d 866, 873 [105 Cal.Rptr. 395].)

" 'In determining whether a state statute [or a state cause of action] is pre-empted by federal law and therefore invalid under the Supremacy Clause of the Constitution, our sole task is to ascertain the intent of Congress. ... First, when acting within constitutional limits, Congress is empowered to pre-empt state law by so stating in express terms. Second, congressional intent to pre-empt state law in a particular area may be inferred where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress "left no room" for supplementary state regulation. ... [¶] As a third alternative, in those areas where Congress has **\*1704** not completely displaced state regulation, federal law may nonetheless preempt state law to the extent it actually conflicts with federal law. Such a conflict occurs either because "compliance with both federal and state regulations is a physical impossibility," or because the state law stands "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. " (4a) Nevertheless, pre-emption is not to be lightly presumed.' (_California Federal S. & L. Assn. v. Guerra_ (1987) 479 U.S. 272, 280-281 [93 L.Ed.2d 613, 623, 107 S.Ct. 683], citations omitted.) (5a) In _R. J. Reynolds Tobacco Co. v. Durham County_ (1986) 479 U.S. 130, 149 [93 L.Ed.2d 449, 467, 107 S.Ct. 499], the court stated: 'Although the regulations are not themselves controlling on the pre-emption issue, where, as in this case, Congress has entrusted an agency with the task of promulgating regulations to carry out the purposes of a statute, as part of the pre-emption analysis we must consider whether the regulations evidence a desire to occupy a field

completely. Pre-emption should not be inferred, however, simply because the agency's regulations are comprehensive.' (Citations omitted.)" (_Siegel v. American Savings & Loan Assn., supra,_ 210 Cal.App.3d at pp. 958-959.)

**b.** _No Express Preemption Under HOLA Except as to Two Items_

HOLA is the acronym of the federal Home Owners' Loan Act of 1933 (12 U.S.C. § 1461 et seq.). [FN6] " 'The language of HOLA, as well as the history that lies behind its enactment, demonstrate that there is a strong federal interest in the uniform treatment of the federally chartered savings and loans associations. Congress initially enacted HOLA and its regulatory structure in response to a crisis in the nation's private home financing system. [Citation.] This crisis had developed at least in part as a result of the inconsistent and ill-advised practices of the various states. As noted by the Ninth Circuit, " the states had developed a hodgepodge of savings and loan laws and regulations, and Congress hoped that [the Federal Home Loan Bank Board's] rules would set an example for uniform and sound savings and loan regulations." [FN7] (_Conference of Federal Savings & Loan Ass'ns v. Stein,_ 604 F.2d 1256, 1258, (9th Cir. 1979), _summarily affd.,_ 445 U.S. 921, 100 S.Ct. 1304, 63 L.Ed.2d 754 (1980), citing T. Marvell, _The Federal Home Loan Bank Board_ at 26 (1969).' (_Eureka Federal Sav. and Loan Ass'n v. Kidwell_ (N.D.Cal. 1987) 672 F.Supp. 436, 439.)" (_Siegel, supra,_ 210 Cal.App.3d at p. 959.)

> FN6 All statutory references are to title 12 of the United States Code unless otherwise specified.

> FN7 The board was replaced in 1989 with the Office of Thrift Supervision (OTS) and its director. (§§ 1462(1) & (3), 1462a(e).)

Part 545 of title 12 of the Code of Federal Regulations (12 C.F.R.) sets forth the regulations covering the operations of a federal association.**\*1705**Section 545.1 of 12 C.F.R., which specifies the general parameters of the association's authority, provides: "A Federal savings association may exercise all authority granted it by [HOLA] and its charter and bylaws, whether or not implemented specifically by Office regulations, subject to the limitations and interpretations contained in this part."

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

14 Cal.App.4th 1692                                                    Page 9
14 Cal.App.4th 1692, 19 Cal.Rptr.2d 555
**(Cite as: 14 Cal.App.4th 1692)**

Section 545.2 of 12 C.F.R. provides: " 'The regulations in this Part 545 are promulgated pursuant to the plenary and exclusive authority of the Board to regulate all aspects of the operations of Federal associations, as set forth in section 5(a) of the Home Owners' Loan Act of 1933, 12 U.S.C. 1464, as amended. This exercise of the Board's authority is preemptive of any state law purporting to address the subject of the operations of a Federal association.' " (*Ibid.*)

(6a) In their brief the Highland defendants urge the import of the above two regulations is preemption of any state law which would limit or penalize the conduct of a federal association where such conduct is authorized by HOLA and not proscribed by HOLA regulations since such law would thus be in direct conflict with HOLA. [FN8] *1706

> FN8 In a footnote of their brief the Highland defendants urge "[t]here is even a direct conflict between certain specific HOLA regulations and the state law upon which the subject state law claims are predicated." Specifically, they refer only to two regulations. The first, 12 C.F.R. section 545.32(d) authorizes an association to make a real estate loan up to 100 percent of the market value of the secured property. They claim a direct conflict exists because plaintiffs seek to proscribe loans where the borrower would have no equity in the property, thus, vesting "control" in Highland. We find no conflict. Defendants have mischaracterized certain language in the complaint. When viewed in context, it is clear plaintiffs were not alleging defendants should be prohibited from making loans up to 100 percent of the market value of the property.
> The complaint alleged, "The premises involved were security for indebtedness amounting to approximately 100% or more of their value, and additional loans on the property were not available in any bona fide business transaction." It was further alleged defendants "with full knowledge of the slum character of these buildings, has made or aided in the making of loans for amounts exceeding the value of the slum buildings at high interest rates and 'points', requiring payments to the lending defendant which

absorbed all or virtually all of the rental flow from the buildings. ... Each ... defendant reaped financial benefits from the slum buildings' continuing slum character." In context, the thrust of these allegations is merely to explain one reason why the slum condition of the property was perpetuated, namely, since no equity was left no additional loans were available to fix up the property.

The Highland defendants lastly claim a direct conflict exists between the state claims and 12 C.F.R. section 545.34, which permits an association to incorporate into a mortgage loan contract " 'a provision ... whereby the Federal association *may, at its option,* declare immediately due and payable' the secured indebtedness upon an unconsented to transfer of title to the real property." They argue plaintiffs seek to "deprive Highland of the *option* to exercise such provision and, instead, compel it to do so." (Italics in original.) In support, they point to the allegations in the complaint that defendants improperly made frequent transfers of the property "from one uncreditworthy and disreputable borrower to another without exercise of due-on-sale clauses of loan agreements, without requiring loan assumption by creditworthy individuals, and without scrutiny to determine or insure that payments would be made and that the slum buildings would be maintained in accordance with requirements of the law. By making frequent transfers of ownership of the slum buildings, each such defendant's conduct facilitated the ability of the involved record owner to avoid criminal liability for violations of the law ... [and] each such defendant further effectively avoided or delayed repair of the slum buildings."

We find no conflict in this regard. By such allegations plaintiffs do not seek to deprive defendants of their option to exercise the due-on-sale clauses. Instead, plaintiffs merely seek to preclude defendants from conducting sham transfers of the property. (But see discussion, *post,* regarding a direct conflict as to item (3)(h) of the prayer for injunctive relief.)

As authority for their claim of preemption the

14 Cal.App.4th 1692

Page 10

14 Cal.App.4th 1692, 19 Cal.Rptr.2d 555

**(Cite as: 14 Cal.App.4th 1692)**

Highland defendants argue "[t]he seminal case on the subject, and a case strikingly parallel in material respects to this case, is *People v. Coast Fed. Sav. & Loan Ass'n* (S.D.Cal. 1951) 98 F.Supp. 311." [FN9]They also rely heavily on *Fidelity Fed. Sav. & Loan Ass'n v. De La Cuesta* (1982) 458 U.S. 141 [73 L.Ed.2d 664, 680-681, 102 S.Ct. 3014] and *Wisconsin League of Financial Inst. v. Galecki* (W.D.Wis. 1989) 707 F.Supp. 401.[FN10]*1707

FN9 As further support, they cite: *Meyers v. Beverly Hills Fed. Sav. & Loan Ass'n* (9th Cir. 1974) 499 F.2d 1145 (prepayment penalties); *Greenwald v. First Fed. Sav. & Loan Ass'n of Boston* (D.C. Mass. 1978) 446 F.Supp. 620 (interest payments on escrow accounts); *First Fed. Sav. & Loan Ass'n of Boston v. Greenwald* (1st Cir. 1979) 591 F.2d 417 (interest payments on escrow accounts); *City Fed. Sav. & Loan Ass'n v. Crowley* (E.D.Wis. 1975) 393 F.Supp. 644 (self-dealing of association officers and directors in violation of board's regulations); *Lyons Sav. & Loan Ass'n v. Federal Home Loan Bank Board* (N.D.Ill. 1974) 377 F.Supp. 11 (branching of association); *Kaski v. First Fed. Sav. & Loan Ass'n of Madison* (1976) 72 Wis.2d 132 [240 N.W.2d 367] (interest rate escalation clauses in mortgage note); *Central Sav. & Loan Ass'n of Chariton v. Federal Home Loan Bank Bd.* (8th Cir. 1970) 422 F.2d 504 (mobile associations); *Murphy v. Colonial Fed. Sav. & Loan Ass'n* (2d Cir. 1967) 388 F.2d 609 (list of eligible voters re association director election); *North Arlington Nat'l Bank v. Kearny Fed. Sav. & Loan Ass'n* (3d Cir. 1951) 187 F.2d 564,cert. den., 342 U.S. 816 [96 L.Ed. 617, 72 S.Ct. 30] (branches); *Glendale Fed. Sav. & Loan Ass'n v. Fox* (C.D.Cal. 1978) 459 F.Supp. 903, 904-912 (due-on-sale clause); *Rettig v. Arlington Heights Fed. Sav. & Loan Ass'n* (N.D.Ill. 1975) 405 F.Supp. 819 (authority of association to sell insurance and internal obligations of directors); *Elwert v. Pacific First Fed. Sav. & Loan Ass'n* (D.Or. 1956) 138 F.Supp. 395 (branches); *Washington Fed. Sav. & Loan Ass'n v. Balaban* (Fla. 1973) 281 So.2d 15 (branches); *Springfield Inst. v. Worcester Fed. Sav. & Loan Ass'n* (1952) 329 Mass. 184 [107 N.E.2d 315],cert. den.344 U.S. 884 [97 L.Ed.684,73

S.Ct. 184] (branches).
Such reliance is patently misplaced. Those cases involved either a direct conflict between state law and specific regulations under HOLA or issues concerning the internal management and direct operation of the federal association itself, and thus, are factually inapposite.

FN10 The Highland defendants cite *Federal Sav. & Loan Ins. Corp. v. Kidwell* (N.D.Cal. 1989) 716 F.Supp. 1315, for the proposition that state law claims for negligence and waste against the federal association were preempted by federal law. Their reliance on that case is unfounded. In addition to the preemption issue the district court also ruled the claim for breach of fiduciary duty under federal common law was governed by a four-year state statute of limitations. In an unpublished decision the appellate court vacated the lower court decision in part without specifying which part was being vacated. (*Eureka Federal Sav. & Loan Ass'n v. Kidwell* (9th Cir. 1991) 937 F.2d 612.)Accordingly, the district court decision is without persuasive or precedential value.

Contrary to their assertion otherwise, *People v. Coast Fed. Sav. & Loan Ass'n* (S.D.Cal. 1951) 98 F.Supp. 311 is not "a case strikingly parallel in material respects to this case." In *Coast* "[t]he gravamen of the complaint is that through signs and other means of advertising, defendant [federal association] has transacted business in the manner of a bank and has held itself out as a bank or savings bank, and has led the public to believe that it was such a bank, without authority and in violation of state statutes." (*People v. Coast Fed. Sav. & Loan Ass'n, supra,* 98 F.Supp at p. 315.)Former section 161.7(e) of title 24 of the Code of Federal Regulations expressly governed the subject of advertising vis-a-vis federal associations. (98 F.Supp. at p. 315, fn. 5.) In view of such regulation the court held the board had primary jurisdiction over the subject matter. (*Id.* at p. 317.)

In contrast, this case does not involve a direct conflict between a specific regulation and state law. Reliance by the Highland defendants on *Fidelity Fed. Sav. & Loan Ass'n v. De La Cuesta* and *Wisconsin League of Financial Inst. v. Galecki* is misplaced for that same reason.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

14 Cal.App.4th 1692
14 Cal.App.4th 1692, 19 Cal.Rptr.2d 555
**(Cite as: 14 Cal.App.4th 1692)**

In *De La Cuesta* the United States Supreme Court held the board's regulation of due-on-sale clauses preempted state law as embodied in *Wellenkamp v. Bank of America* (1978) 21 Cal.3d 943 [582 P.2d 970]. (*Fidelity Fed. Sav. & Loan Ass'n v. De La Cuesta, supra,* 458 U.S. 141, 159 [73 L.Ed.2d 664, 678-679].) The *De La Cuesta* court reasoned:

"[T]he Board's intent to pre-empt the *Wellenkamp* doctrine is unambiguous. The due-on-sale regulation plainly provides that a federal savings and loan 'continues to have the power' to include a due-on- sale clause in a loan instrument and to enforce that clause 'at its option.' 12 CFR § 545.8-3(f) (1982). The California courts, in contrast, have limited a federal association's right to exercise a due-on-sale provision to those cases where the lender can demonstrate that the transfer has impaired its security. [¶] The conflict does not evaporate because the Board's regulation simply permits, but does not compel, federal savings and loans to include due-on-sale clauses in their contracts and to enforce those provisions when the security property is transferred. ... In addition, *Wellenkamp* explicitly bars a federal savings and loan from exercising a due-on-sale clause to adjust a long-term mortgage's interest rate toward current market rates-a due-on-sale practice the Board has approved ...." (458 U.S. at pp. 155-156 [73 L.Ed.2d 676-677], italics in original.)

In *Wisconsin League of Financial Inst. v. Galecki, supra,* the court held the "Board has expressly preempted state regulation in the area of mortgage escrow accounts and loan disclosures." (707 F.Supp. at p. 405.)The court **\*1708** expressly limited its holding the facts of that case by announcing: "The court need not determine the full breadth of the term 'operations of a federal Association' [as provided in section 545.2] because there can be no dispute that such phrase extends at least to the regulation of mortgage escrow accounts and mortgage loan disclosures. *Fidelity Federal,* 458 U.S. at 167 ...*Kaski v. First Federal Savings & Loan Association,* 72 Wis.2d 132, 240 N.W.2d 367 (1976)." [FN11] (707 F.Supp. at p. 405.)

FN11 In addition to direct preemption the *Galecki* court also found implicit preemption based on the finding state regulation of escrow accounts would be "a direct obstacle" to "the Board's express

purpose to permit the parties to negotiate terms of an escrow agreement between themselves without intervention by substantive law." (*Wisconsin League of Financial Institutions v. Galecki, supra,* 707 F.Supp. at p. 406.)In contrast, the state claims at issue here do not present "a direct obstacle" to any announced OTS policy.

It is undisputed that this case involves neither the regulation by state law of advertising, enforceability of due-on-sale clauses, or mortgage escrow accounts and mortgage loan disclosures. Accordingly, the *Coast, De La Cuesta,* and *Galecki* cases are of no moment with regard to whether the subject state causes of action are expressly preempted by HOLA and its concomitant regulations.

(4b) "Preemption of state law by federal regulation is not favored. We will not find express preemption unless a regulation clearly so states. (*Chicago & N. W. Tr. Co. v. Kalo Brick & Tile Co.* (1981) 450 U.S. 311, 317 [67 L.Ed.2d 258, 265, 101 S.Ct. 1124].) It is the burden of the party claiming preemption to prove it. (*Elsworth v. Beech Aircraft Corp.* (1984) 37 Cal.3d 540, 548 [208 Cal.Rptr. 874, 691 P.2d 630]; *Perdue v. Crocker National Bank* (1985) 38 Cal.3d 913, 937 [216 Cal.Rptr. 345, 702 P.2d 503].)" (*Siegel v. American Savings & Loan Assn., supra,* 210 Cal.App.3d at p. 960.)

(6b) As pointed out in *Siegel,* "[t]he Board is capable of saying it means to expressly preempt all state law in an area. ... Section 545.2 [of 12 C.F.R.] contains no such statement that federal law is preemptive of all state common law claims." (210 Cal.App.3d at pp. 960-961.)

Similarly, we have found no provision of HOLA nor any particular regulation, and none have been cited to us, which expressly preempt the statutory action by the People for unfair business practices and the causes of action by the tenant plaintiffs for fraud, RICO violations, etc. We therefore hold the subject action is not explicitly barred by federal preemption pursuant to HOLA. [FN12]

FN12 At oral argument the Highland defendants conceded no express statutory preemption exists here.

Nonetheless, we do find federal preemption with

14 Cal.App.4th 1692                                                          Page 12
14 Cal.App.4th 1692, 19 Cal.Rptr.2d 555
**(Cite as: 14 Cal.App.4th 1692)**

regard to two matters. First, the allegation that Highland charged loan "points and provided for *1709 interest, each of which was higher than the rates for bona fide loan [ ] transactions" impinges on the specific intent of Congress to preempt state usury laws, [FN13] and thus, improperly delves into an area expressly preempted by HOLA. (See, e.g., § 1463(g).)

> FN13 Section 1463(g) as to preemption of state usury laws, provides:
> "(1) Notwithstanding any State law, a savings association may charge interest on any extension of credit at a rate of not more than 1 percent in excess of the discount rate on 90-day commercial paper in effect at the Federal Reserve bank in the Federal Reserve district in which such savings association is located or at the rate allowed by the laws of the State in which such savings association is located, whichever is greater.
> "(2) If the rate prescribed in paragraph (1) exceeds the rate such savings association would be permitted to charge in the absence of this subsection, the receiving or charging a greater rate of interest than that prescribed by paragraph (1), when knowingly done, shall be deemed a forfeiture of the entire interest which the extension of credit carries with it, or which has been agreed to be paid thereon. If such greater rate of interest has been paid, the person who paid it may recover, in a civil action commenced in a court of appropriate jurisdiction not later than 2 years after the date of such payment, an amount equal to twice the amount of the interest paid from the savings association taking or receiving such interest."

The second matter concerns item (3)(h) of the complaint's prayer which seeks to enjoin the Highland defendants from "[d]eclining to initiate and complete foreclosure as speedily as the law permits on substandard property of which the lender has notice if the substandard conditions are not fully corrected within 120 days, provided that foreclosure proceedings may terminate if correction occurs before foreclosure is completed." This requested relief is in direct conflict with 12 C.F.R. section 545.34 which permits a federal association "at its option [to] declare immediately due and payable" the secured indebtedness upon an unconsented to transfer of title to the real property.

On remand, the court is therefore directed to strike such allegations and prayer requests. (Code Civ. Proc., § 436.)

### c. *No Implied Preemption Under HOLA*

Alternatively, the Highland defendants assert the subject action is barred by the doctrine of implied preemption. They urge federal law has impliedly "occupied the field" of federal savings and loan associations with regard to their operations and functions.

We acknowledge HOLA and the regulations promulgated thereunder have created both a comprehensive and uniform thrift system which is federally regulated and that in exercising its broad authority the former board has issued specific, detailed regulations governing those associations. Nonetheless, we observe the United States Supreme Court has declined to conclude *1710 the board has preempted all lending practices or that the Board's discretion is limitless.

In *De La Cuesta* the court construed the board's powers to be plenary over federal associations: "The broad language of § 5(a) [of HOLA] expresses no limits on the Board's authority to regulate the lending practices of federal savings and loans. ... [Thus,] '[i]t would have been difficult for Congress to give the Bank Board a broader mandate.' [Citation.]" (*Fidelity Federal Savings and Loan v. De La Cuesta, supra,* 458 U.S. at p. 161 [73 L.Ed.2d at p. 680].)

However, the court expressly declined to find the board had preempted state law as to all lending practices and cautioned: "Because we find an actual conflict between federal and state law, we need not decide whether the HOLA or the Board's regulations occupy the field of due-on-sale law or the entire field of federal savings and loan regulation." (*De La Cuesta, supra,* 458 U.S. at p. 159, fn. 14 [73 L.Ed.2d at p. 679].) The court went on to qualify its holding in that case as follows: "Although the Board's power to promulgate regulations exempting federal savings and loans from the requirements of state law may not be boundless, in this case we need not explore the outer limits of the Board's discretion." [FN14](*Id.* at p. 167 [73 L.Ed.2d at p. 684].)

FN14 Justice O'Connor wrote separately "to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

14 Cal.App.4th 1692                                                     Page 13
14 Cal.App.4th 1692, 19 Cal.Rptr.2d 555
**(Cite as: 14 Cal.App.4th 1692)**

emphasize that the authority of the ... Board to pre-empt state laws is not limitless. ... Nothing in the language of § 5(a) of HOLA, which empowers the Board to 'provide for the organization, incorporation, examination, operation, and regulation' of federally chartered savings and loans, remotely suggests that Congress intended to permit the Board to displace local laws, such as tax statutes and zoning ordinances, not directly related to savings and loan practices." (*Id.* at pp. 171-172 [73 L.Ed.2d at pp. 686-687].)

In his dissent, joined by Justice Stevens, Justice Rehnquist reasoned: "In § 545.8-3(f), the Board has gone beyond regulating how, when, and in what manner a federal savings and loan may lend mortgage money. ... In this case, the Board is not regulating the operation of federal savings and loan associations, but the operation of due-on-sale clauses. Without a congressional authorization more explicit than that relied upon by the Court, I conclude that the Board has entered a domain in which it is not authorized to override state laws. ... Discharge of its mission to ensure the soundness of federal savings and loans does not authorize the ... Board to intrude into the domain of state property and contract law that Congress has left to the States." (*Id.* at pp. 174-175 [73 L.Ed.2d at pp. 688-689].)

(5b) Moreover, "[c]omprehensiveness of federal regulation alone, is not sufficient to establish implied preemption. Again, the United States Supreme Court has said: 'We are even more reluctant to infer pre-emption from the comprehensiveness of regulations than from the comprehensiveness of statutes. As a result of their specialized functions, agencies normally deal with problems in far more detail than does Congress. To infer pre-emption whenever an agency deals with a problem comprehensively is virtually tantamount to saying that whenever a federal agency decides to step into a **\*1711** field, its regulations will be exclusive. Such a rule, of course, would be inconsistent with the federal-state balance embodied in our Supremacy Clause jurisprudence.' (*Hillsborough County v. Automated Medical Labs.*(1985) 471 U.S. 707, 717 [85 L.Ed.2d 714, 724, 105 S.Ct. 2371].) Our task is to determine whether the field which has been preempted by federal regulation is broad enough to cover plaintiffs' state

causes of action." (*Siegel, supra,* 210 Cal.App.3d 953, 961-962.)

(6c) We conclude it does not. The cause of action for unfair business practices as alleged by the People does not directly affect the operations of Highland, and therefore, is not covered by the subject regulations. Similarly, the regulations promulgated under HOLA do not pertain to racketeering charges under a RICO action. The remaining causes of action, e.g., nuisance, breach of warranty of habitability, intentional infliction of emotional distress, fraud, and interruptions of utilities would, at most, only incidentally and remotely touch upon the operations of Highland in its capacity as a federal savings association. Thus, those also do not impinge on the ambit of HOLA.

(3b) No implied preemption is found where the impact on the subject is merely indirect. (See, e.g., *English v. General Electric Co.* (1990) 496 U.S. 72 [110 L.Ed.2d 65, 110 S.Ct. 2270].) In *English,* the court held the emotional distress claims of a whistle blower were not preempted by the federal government's exclusive authority to regulate the safety of nuclear power because such claims only indirectly affected the issue of nuclear safety. "Instead, for a state law to fall within the pre-empted zone, it must have some direct and substantial effect on the decisions made by those who build or operate nuclear facilities concerning radiological safety levels." (*Id.* at p. 85 [110 L.Ed.2d at pp. 78-79].) The court reasoned: "For example, if an employer were to retaliate against a nuclear whistle-blower by hiring thugs to assault the employee on the job (conduct literally covered by § 2l̅0 [of the Energy Reorganization Act of 1972]), respondent's position would imply that the state criminal law prohibiting such conduct is within the pre-empted field. We simply cannot believe that Congress intended that result." (*Id.* at p. 83 [110 L.Ed.2d at p. 77]; see also, *id.* at pp. 75-76 [110 L.Ed.2d at pp. 71-72].)

(5c) Also, where the subject matter is an area traditionally regulated by the states, no federal preemption is implied unless there is a clear and manifest intent shown. Thus, there must be "a showing of implicit preemption of the whole field ... strong enough to overcome the presumption that state and local regulation of health and safety matters can constitutionally coexist with federal regulation." (*Hillsborough County v. Automated Medical Labs., supra,* 471 U.S. at p. 716 [85 L.Ed.2d at p. 723]; see

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

also, *1712*Merrill Lynch, Pierce, Fenner & Smith v. Ware* (1973) 414 U.S. 117, 139-140 [38 L.Ed.2d 348, 366-367, 94 S.Ct. 383] [no preemption by the Security Exchange Act of 1934 of action for profit sharing rights of terminated employee since California has strong policy of protecting wage earners].)

Moreover, "merely because the federal provisions were sufficiently comprehensive to meet the need identified by Congress [it does] not mean that States and localities [are] barred from identifying additional needs or imposing further requirements in the field." (*Hillsborough County v. Automated Medical Labs, Inc., supra*, 471 U.S. at p. 717 [85 L.Ed.2d at pp. 723-724].)

(6d) Accordingly, we determine whether the subject state causes of action are impliedly barred by federal preemption by scrutinizing them to see if they directly are "purporting to address the subject of the operations" of Highland, a federal savings association. (See 12 C.F.R. § 545.2.)

The state causes of action at issue are grounded in Highland's wrongful course of conduct which enables slum conditions in the subject buildings to be perpetuated to the detriment of the health, safety and welfare of the People of California and, in particular, the tenant plaintiffs. The essence of those causes of action concerns the right of the state to prohibit, and punish Highland for its part in, the conspiracy to maintain dwellings in an uninhabitable condition.

From our review of HOLA and its concomitant regulations we have found no statutory provision or regulation which even purports to address the subject of minimum housing standards. Also, any impact or intrusion on the "operations" of Highland is minimal and indirect.

Additionally, we conclude neither the intent of Congress in enacting HOLA nor the purpose of HOLA would be served by finding preemption under these circumstances. The paramount purpose of HOLA is to ensure the solvency of federal associations. (See, e.g., § 1463(a)(1)-(3), and § 1464(d)(2).) That purpose would not be hindered, directly or indirectly, by the prosecution of the subject state claims. This is not the situation where the state seeks to regulate the conduct of all federal associations in California. Rather, the state merely

seeks to protect its own interest in public safety and welfare against the wrongful conduct of an entity, inter alia, which just happens to be a federal association.

### d. *Action Against Karmelich, Pratt, and HFS Not Barred by Federal Preemption Under HOLA*

Since this action is not preempted under HOLA as to Highland, a fortiori no preemption bars the action against Karmelich, its president and chief *1713* executive officer, or Pratt, its loan coordinator and vice-president. Moreover, the action is also not preempted against HFS, which is Highland's wholly owned subsidiary but not a federal savings association.

### 2. *Causes of Action Stated Against Highland Defendants for RICO Violations, and Fraud, but Not Fraudulent Concealment*

#### a. *RICO Action Properly Pleaded as to Mail Fraud*

(7a) To state a cause of action under RICO (18 U.S.C. § 1961 et seq.) a plaintiff must plead facts to show: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." (*Sedima, S.P.R.L. v. Imrex Co.* (1985) 473 U.S. 479, 496 [87 L.Ed.2d 346, 358-359, 105 S.Ct. 3275], fn. omitted.) (8a) In their demurrer, the Highland defendants attack the above "enterprise" and "racketeering activity" components.

#### (1). *Existence of RICO Enterprise Pleaded*

The Highland defendants argue plaintiffs have failed to plead the existence and identity of an "enterprise," i.e., a group of defendants associated in fact for a common purpose although not a legal entity. We disagree.

An "enterprise" includes "any union or group of individuals associated in fact although not a legal entity." (18 U.S.C. § 1961(4).)

(7b) The existence of an enterprise is an essential element of a RICO claim. "The enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct. ... [It] is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates

14 Cal.App.4th 1692
14 Cal.App.4th 1692, 19 Cal.Rptr.2d 555
(Cite as: 14 Cal.App.4th 1692)

function as a continuing unit." (*United States v. Turkette* (1981) 452 U.S. 576, 583 [69 L.Ed.2d 246, 254-255, 101 S.Ct. 2524]; see also, *Shaffer v. Williams* (5th Cir. 1986) 794 F.2d 1030, 1032.)

(8b) The facts setting forth the existence and identity of the requisite enterprise are not alleged at a single location. Instead, such facts, because of the complexity of the scheme involved, are necessarily gleaned from various portions of the subject complaint.

At paragraph 150 of the complaint it was alleged: "The following associations constitute an enterprise within the meaning of RICO generally and 18 U.S.C. § 1961(4) specifically:

"a. The association in fact of defendants Highland, Northeast, and HFS (the Highland Enterprise).*1714

"

. . . . . . . . . .

"c. The association in fact of defendants Karmelich, Highland, Northeast, HFS, Leyton, Interreal, Interwest, PHC, and Fitzpatrick (the Highland- Leyton-Fitzpatrick Enterprise)."

Although subparagraph a of paragraph 150 refers to Highland, Northeast, and HFS, as "the Highland Enterprises" it is clear such enterprise is but a component of the "enterprise" which comprises this element of a RICO action. Similarly, the reference to "the Highland-Leyton-Fitzpatrick Enterprise" in subparagraph d of paragraph 150 is to the component of the "enterprise" consisting of the members of the Highland Enterprise, defendants Leyton, Interreal, Interwest, PHC and Fitzpatrick. From a review of the factual allegations concerning these components of such "enterprise" it is clear the requisite facts concerning the existence of an informal ongoing organization consisting of a group of entities associated together for a common purpose of engaging in a course of conduct and functioning as a continuing unit have been alleged.

The complaint essentially alleges the above defendants engaged in a continuing scheme to defraud the tenant plaintiffs by secretly manipulating the record owner defendants and by actively assisting

such owners to perpetuate the buildings in an uninhabitable condition in violation of the law. That the Highland, HFS and Northeast defendants were ongoing business entities which had an ongoing relationship with each other independent of that fraud scheme is shown by the following facts: It was alleged Highland was a federal savings and loan association specializing in loans on residential property; Northeast, an investment corporation located at Highland's offices, was engaged in the business of handling insurance; and HFS, a wholly owned subsidiary of Highland, serviced loans made by Highland. The complaint further alleged that the association of defendant Highland, Northeast and HFS constituted an association in fact within the meaning of RICO. The above factual allegations thus evidence an interlocking independent business relationship among those three entities.

Moreover, it was also alleged that defendants Interreal, Interwest and PHC, all of which were entities in which defendant Leyton had an interest, along with the above Highland entities and the individual defendants, Karmelich, as the secretary of Northeast's board of directors, Leyton and Fitzpatrick constituted an association of fact, and thus, an enterprise. The specifics of such association are set forth in the complaint and demonstrate an ongoing series of business transactions among these various defendants with regard to each of the subject buildings. (See, e.g., *Temple University v. *1715 Salla Bros., Inc.* (E.D.Pa 1986) 656 F.Supp. 97, 102 [sufficient ongoing organization shown]; cf. *Calcasieu Marine Nat. Bank v. Grant* (5th Cir. 1991) 943 F.2d 1453, 1461-1463 [no ongoing association shown]; *Martin v. Brown* (W.D.Pa. 1990) 758 F.Supp. 313, 322 [insufficient ongoing unit shown]; *Uniroyal Goodrich Tire Co. v. Mutual Trading Corp.* (N.D.Ill. 1990) 749 F.Supp. 869, 876-877 [insufficient "association-in-fact" shown].)

(2) *"Racketeering Activity" Based on Mail Fraud Properly Pleaded*

"Racketeering activity" under RICO consists of certain specific acts which are expressly enumerated in title 18 United States Code, section 1961. The activity underlying the subject RICO claim is mail fraud and wire fraud. (9), (10) "In pleading a violation of the mail fraud statute (18 U.S.C. § 1341) [or the wire fraud statute (18 U.S.C. § 1342) as a predicate act under a RICO scheme, plaintiffs must allege that (1) defendants devised a scheme or artifice

14 Cal.App.4th 1692                                                                                          Page 16
14 Cal.App.4th 1692, 19 Cal.Rptr.2d 555
**(Cite as: 14 Cal.App.4th 1692)**

to defraud, (2) defendants used the mails [or wires] in furtherance of the scheme, and (3) defendants did so with the specific intent to deceive or defraud. [Citation.]" (*McMartin v. Children's Institute International* (1989) 212 Cal.App.3d 1393, 1407 [261 Cal.Rptr. 437]; accord, *Schreiber Distributing v. Serv- Well Furniture Co.* (9th Cir. 1986) 806 F.2d 1393, 1399-1400 [mail and wire fraud]; see also, *United States v. Gordon* (5th Cir. 1986) 780 F.2d 1165, 1171 [wire fraud].)

(8c) The Highland defendants also challenge the allegations of mailing and wire fraud as inadequate. They argue plaintiffs are required to but have failed to "specifically plead the time, place or nature of the alleged communications constituting racketeering activity. [Citation.]" (*McMartin v. Children's Institute Int'l, supra,* 212 Cal.App.3d at p. 1407; see also, *Alan Neuman Productions, Inc. v. Albright* (9th Cir. 1988) 862 F.2d 1388, 1392; *Rosenthal v. Vogt* (1991) 229 Cal.App.3d 69, 77 [280 Cal.Rptr. 11].)

We agree the allegation of "wire fraud" is totally deficient in the above regard. Subparagraph e of paragraph 151 merely alleges: "Interstate telephone conversations relating to the slum buildings with lenders, persons attempting to locate various of the defendants, the Federal Home Loan Bank Board, and others." No facts are alleged to show the nature of such conversations or the place and time thereof. Accordingly, since plaintiffs have failed to show how such defects would be remedied if leave to amend were granted, we conclude the trial court was correct in impliedly finding the predicate act of "wire fraud" was inadequate to support a RICO action. (See, e.g., *Goodman v. Kennedy* (1976) 18 Cal.3d 335, 349 [134 Cal.Rptr. 375, 556 P.2d 737].) The court is thus directed to strike subparagraph e of paragraph 151. (Code Civ. Proc., § 436.)*1716

We further conclude, however, the court erred in sustaining the demurrer to that cause of action since the plaintiffs have adequately pleaded facts to support the predicate act of "mail fraud." The specific factual allegations of the mailings in the subject complaint are both qualitatively and quantitatively superior to the bare conclusionary allegation found to be inadequate in *Schreiber Distributing Co. v. Serv-Well Furniture Co., supra,* 806 F.2d 1393. In *Schreiber,* the sole allegation was "on two or more occasions [defendants used] the United States mail ... for the purpose of executing or attempting to execute the aforesaid fraudulent scheme ...." (*Id.* at p. 1401; cf.

also, *Alan Neuman Productions, Inc. v. Albright, supra,* 862 F.2d 1388, 1393, "The allegation of [the] complaint concerning predicate acts of fraud are similarly general referring to 'many acts of mail fraud,' 'many acts of wire fraud,' and 'many victims.' ")

In contrast, the complaint here described the nature of the mailings as consisting "of [the] documents, deeds, deeds of trust and similar matters relating to the slum buildings." They were further delineated as the mailings were described as "[m]ailing of rent checks, mortgage and loan payments, payment for services rendered, and similar commercial transactions relating to slum buildings." The mailings of various materials were also described as relating to code violations regarding slum buildings. Moreover, the place of mailing was reflected in the allegation of "[m]ailing of materials to various governmental entities, and recordation of real estate documents requested by mail and directed to the Los Angeles County Recorder. Every recorded document pertaining to the real estate transactions described in this complaint was sent through the mails to the County Recorder in furtherance of their conspiracy."

The intent to defraud element was supplied through the allegations concerning their effort to achieve the fraudulent objectives. Additional facts as to the time, place, and content of the fraud are set forth with particularity at paragraphs 87 through 98 of the complaint.

The allegations of the subject complaint as to time, place, etc., sufficiently comport with the requirement of pleading fraud with particularity. As one court explained: "Plaintiffs cannot be expected to specify the exact time and particular place of each factual omission and misrepresentation. The complaint adequately specifies the transactions and the approximate time frame, the contents of the alleged misrepresentations and the essence of omitted information, and the identities of those involved." (*Onesti v. Thomson McKinnon Securities, Inc.* (D.C.Ill. 1985) 619 F.Supp. 1262, 1265.)

As to other specific dates and details, we point out such matters are properly addressed during discovery, not on demurrer. Also, when a particular document or matter was mailed is within the peculiar knowledge of the *1717 defendants. (See, e.g., *Committee on Children's Television, Inc. v. General*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

_Foods Corp._ (1983) 35 Cal.3d 197, 214, 217 [197 Cal.Rptr. 783, 673 P.2d 660].)

### (3) _Nexus Between Racketeering Activity and Injury Pleaded_

The Highland defendants next attack plaintiffs' RICO claim on the ground no facts are alleged to show any direct injury to the tenant plaintiffs as the proximate result of the racketeering activity. (_Sedima, S.P.R.L. v. Imrex Co., supra,_ 473 U.S. at p. 496 [87 L.Ed.2d at pp. 358-359]; _McMartin v. Children's Institute, supra,_ 212 Cal.App.3d at p. 1407.)

We reject their contention as meritless. The injury suffered by each tenant plaintiff was the deprivation of a habitable dwelling and the loss of the money he or she had paid in rent, which was excessive because the dwellings were uninhabitable. Such injury flowed directly from the racketeering activity committed by defendants.

### (4) _Violation of 18 United States Code Section 1962(d) Pleaded_

In a related argument defendants assert the lack of a legally cognizable injury flowing from the racketeering activity also demonstrates the failure of plaintiffs to allege a violation of _title 18 of the United States Code, section 1962(d)._ [FN15] (See _Medallion TV Enterprise v. SelecTV of California_ (C.D.Cal. 1986) 627 F.Supp. 1290, 1297-1301.)

FN15 Subdivision (d) of _section 1962_ provides: "It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section."
The relevant subdivision is (c), which provides in pertinent part: "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."

We disagree. As discussed, above, the requisite injury was properly alleged, and thus, defendants' assertion is untenable.

### b. _Cause of Action Stated for Fraud_

(11) The Highland defendants contend no cause of action for fraud is stated because there are insufficient facts alleged to " 'show how, when, where, to whom, and by what means the [mis]representations were tendered.' _Stansfield v. Starkey_ (1990) 220 Cal.App.3d 59, 73, ... quoting _Hills Transp. Co. v. Southwest Forest Indus., Inc._ (1968) 266 Cal.App.2d 702, 707 ...." They complain "the People and the tenants [plaintiffs] allege ... 'each record owner', without any further identification or limitation, made the allegedly fraudulent representations; that they were made to *1718 'plaintiffs', without any further identification; and that they were made 'at the time of each respective record owner's ownership', without any further limitation as to time. The complaint is silent as to how the alleged representations were communicated." They contend the "above allegations are, of course, calculated to avoid communicating meaningful information about the alleged fraud either to the Highland defendants or to the Court. ..." (_Ibid._)

Defendant's contentions are meritless. The complaint sets forth with ample particularity the identities of the record holders, the identities and capacities of the many plaintiffs, and the time frame in which the representations were made. We acknowledge the allegations of fraud lack the specific detailed minutiae desired by the Highland defendants. Those details, however, are properly the subject of discovery, not demurrer. The magnitude of the fraudulent scheme alleged and the number of plaintiffs involved invoke the analogy to the fact situation in _Committee on Children's Television, Inc. v. General Foods Corp., supra,_ 35 Cal.3d 197, 214.)

In that case, the court rejected a lack of specificity argument based on the following reasoning, which we find instructive here: "Plaintiffs allege that defendants carried out a large scale program of deceptive advertising in which the specific advertisements change constantly, but all follow a pattern of making, in one form or another, certain misleading and deceptive representations. If such is the case, to require plaintiffs to plead the specifics of each advertisement would render a suit challenging the overall program impractical. The complaint would have to include thousands of pages setting out specifics which are largely within defendants' knowledge. The cost and difficulty of compiling, organizing, and setting down the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

14 Cal.App.4th 1692                                           Page 18
14 Cal.App.4th 1692, 19 Cal.Rptr.2d 555
**(Cite as: 14 Cal.App.4th 1692)**

information would seriously deter the filing of such complaint. The effect of such a pleading requirement, moreover, would not be limited to discouraging private suits; it would also seriously hamper suits by public officials seeking to enjoin schemes of unfair competition and deceptive advertising." (*Committee on Children's Television, Inc. v. General Foods Corp., supra,* 35 Cal.3d 197, 214.)

### c. *No Fraudulent Concealment Cause of Action Stated*

(12) Defendants claim no cause of action is stated for fraudulent concealment for two reasons: (1) the Highland defendants were under no legal duty to disclose the concealed facts at issue; and (2) in any event, the cause of action erroneously assumes someone who lends money on the security of real property may, by virtue of that activity, assume the obligations of ownership. They point out unless the defendant is under a duty to disclose, concealment of a fact is not actionable. (Civ. Code, § 1710, subd. (3).) Defendants argue there is no duty to disclose here because section 1962 of the Civil Code does not require the disclosure of the name and address of the *1719 owner of certain real property. Such a requirement, according to defendants, is based on the assumption "that Section 1962 imposes on an owner of real property a duty to disclose his or her name and address *even when the name and address of an agent for the owner, such as a property manager, is disclosed.* That assumption is fallacious."

They further argue "someone that lends money on the security of, but does not have possession and control of, real property may [not], by virtue of that activity, become the 'beneficial' or 'responsible' owner of such property and thereby assume the obligations of ownership [and thus, the duty to disclose under Civil Code section 1962] to [the] tenants."

We agree no cause of action for fraudulent concealment is stated but not for the reasons given by defendants. The thrust of this cause of action is to compel the beneficial owners to disclose such beneficial ownership to the tenant plaintiffs to enable the latter to seek "civil relief or governmental enforcement of the law from the responsible non-record owner defendants." Plaintiffs concede as much in their reply brief: "If the tenants had known that the one in control of the property was a bank, they would be far more likely to bring an action to have the

property repaired than they would were the owner a person having substantially no assets."

A plain reading of section 1962 of the Civil Code[FN16] reveals its disclosure provisions do not give rise to a duty to disclose the name and address of a beneficial owner. All that is required under section 1962 is the disclosure of "the name and usual street address at which personal service may be effected *1720 of each person who is: (1) Authorized to manage the premises[; and] (2) An owner of the premises or who is authorized to act for and on behalf of the owner for the purpose of service of process and for the purpose of receiving and receipting for all notices and demands." (Civ. Code, § 1962.)The reference to "[a]n owner of the premises" is to the record owner, not the beneficial owner. This is clear from the language of subdivision (e) of Civil Code section 1962, which provides: "Nothing in this section limits or excludes the liability of any undisclosed owner."

> FN16 Civil Code section 1962 provides:
> "(a) Any owner of a dwelling structure specified in Section 1961 or a party signing a rental agreement or lease on behalf of the owner shall disclose therein the name and usual street address at which personal service may be effected of each person who is:
> "(1) Authorized to manage the premises.
> "(2) An owner of the premises or who is authorized to act for and on behalf of the owner for the purpose of service of process and for the purpose of receiving and receipting for all notices and demands.
> "(b) In the case of an oral rental agreement the owner or a person acting on behalf of the owner for the receipt of rent or otherwise, on written demand, shall furnish the tenant with a written statement containing the information required by subdivision (a).
> "(c) The information required by this section shall be kept current and this section shall extend to and be enforceable against any successor owner or manager, who shall comply with this section within 15 days of succeeding the previous owner or manager.
> "(d) A party who enters into a rental agreement on behalf of the owner who fails to comply with this section is deemed an agent of each person who is an owner:
> "(1) For the purpose of service of process

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

14 Cal.App.4th 1692
14 Cal.App.4th 1692, 19 Cal.Rptr.2d 555
**(Cite as: 14 Cal.App.4th 1692)**

Page 19

and receiving and receipting for notices and demands.

"(2) For the purpose of performing the obligations of the owner under law and under the rental agreement.

"(e) Nothing in this section limits or excludes the liability of any undisclosed owner."

### Disposition

The judgment is reversed with directions to the court: (1) to strike the allegation that Highland charged "points and provided for interest, each of which was higher than the rates for bona fide loans transactions"; (2) to strike prayer item (3)(h); (3) to strike subparagraph (e) of paragraph 151 of the second amended complaint; and (4) to conduct further proceedings consistent with the views expressed herein. The plaintiffs shall recover their costs on appeal.

Klein, P. J., and Hinz, J., concurred.

A petition for a rehearing was denied February 25, 1993, and respondents' petition for review by the Supreme Court was denied April 22, 1993.

Cal.App.2.Dist.
People ex rel. Sepulveda v. Highland Fed. Savings & Loan
14 Cal.App.4th 1692, 19 Cal.Rptr.2d 555

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit K

**APPENDIX OF NON-FEDERAL AND UNPUBLISHED FEDERAL AUTHORITIES
CITED IN VISA USA INC.'S OPPOSITION TO MARITZ INC.'S
MOTION TO STAY ARBITRATION**

**Westlaw.**

25 Cal.App.3d 750                                                                                        Page 1

25 Cal.App.3d 750, 102 Cal.Rptr. 286

**(Cite as: 25 Cal.App.3d 750)**

**C** South Tahoe Gas Co. v. Hofmann Land Imp. Co.

Cal.App.1.Dist.

SOUTH TAHOE GAS CO., Plaintiff and
Respondent,

v.

HOFMANN LAND IMPROVEMENT CO., INC., et
al., Defendants and Appellants

**Civ. No. 27743.**

Court of Appeal, First District, Division 1, California.

May 19, 1972.

SUMMARY

The trial court entered judgment in favor of a utility
company and against a real estate developer and its
guarantor for a sum representing the charge for
extension of a gas main at the rate per foot filed in a
tariff rule by the utility and approved by the Public
Utilities Commission. The contract between the
parties had provided for a much higher rate per foot
for the extension. The trial court found the higher rate
illegal, but interpreted the contract as excluding the
improper charge and including the proper charge per
foot. (Superior Court of Contra Costa County, No.
106798, Joseph Genser, Judge.)

The Court of Appeal affirmed the judgment of the
trial court, rejecting defendants' contention that they
were relieved of any liability for the extension
because of the utility's fraud. Among the reasons
given in support of affirmance, the court noted that,
even assuming fraud on the part of the utility, there
was no showing that the developer was damaged by
being charged the proper rate. In that connection, the
court cited the principle that fraud without damage
furnishes no ground for action, nor is fraud without
damage a defense. (Opinion by Sims, J., with
Molinari, P. J., and Elkington, J., concurring.)

HEADNOTES

Classified to California Digest of Official Reports

**(1a, 1b, 1c)** Contracts § 76(10)--Effect of Illegality--
Exceptions to Rule Against Enforceability--
Enforcement as Though Contract Contained Proper
Terms.

In an action by a utility corporation against a real
estate developer seeking payment for a gas main
extension, the trial court properly concluded that the
utility was entitled to recover at the rate fixed in a
tariff rule it had filed with the Public Utilities
Commission, even though the contract between the
parties called for an illegal and unenforceable rate in
excess of that provided by the rule. Not only is there
no express provision in the Public Utilities Code
prohibiting the recovery of compensation under such
circumstances, but Pub. Util. Code, §§ 494, 532,
require that the prescribed compensation be collected,
and the contract expressly as well as impliedly
referred to the tariff rule. Moreover, the developer
acknowledged that it would have signed a contract
for the rate actually set by the rule, and it made no
showing of damages resulting from the alleged fraud
of the utility in attempting to charge the higher rate.
[See **Cal.Jur.2d,** Contracts, § 98 et seq.; **Am.Jur.2d,**
Contracts, § 216 et seq.]

**(2)** Contracts § 76(10)--Effect of Illegality--
Exceptions to Rule Against Enforceability--Contracts
Malum Prohibitum.

All the consequences attending a contract contrary to
public morals do not extend to one which is purely
*malum prohibitum*; in the latter case courts will take
notice of the circumstances and will give relief if
justice and equity require a restoration of money
received by either party.

**(3)** Contracts § 76(10)--Effect of Illegality--
Exceptions to Rule Against Enforceability.

The rule denying recovery to a party to an illegal
contract is subject to a wide range of exceptions. In
each case, the extent of enforceability and the kind of
remedy granted depend upon a variety of factors,
including the policy of the transgressed law, the kind
of illegality, and the particular facts.

**(4)** Fraud and Deceit § 5(4)(a)--Elements of
Actionable Fraud.

The elements of actual fraud, whether as the basis of
the remedy in contract or tort, are a false
representation or concealment of a material fact (or,
in some cases, an opinion) susceptible of knowledge,
made with knowledge of its falsity or without
sufficient knowledge on the subject to warrant a
representation, with the intent to induce the person to
whom it is made to act upon it; and such person must
act in reliance on the representation to his damage.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

25 Cal.App.3d 750                                                              Page 2
25 Cal.App.3d 750, 102 Cal.Rptr. 286
**(Cite as: 25 Cal.App.3d 750)**

(5) Fraud and Deceit § 29--Actual Fraud--Damage.
Fraud without damage furnishes no ground for
action, nor is fraud without damage a defense.

COUNSEL
James R. Madison and Orrick, Herrington, Rowley &
Sutcliffe, for Plaintiff and Respondent.
Fred F. Cooper for Defendants and Respondents.
SIMS, J.
   Defendants, a corporation which contracted with
plaintiff utility for a gas main extension into a tract it
was developing, and a second corporation which
guaranteed the former's liability under that contract,
have appealed from a judgment which awarded the
utility $8,562 plus interest, representing the charges
for the extension at the effective approved rates for
such an extension adjusted for allowable refunds.
They contend that the contract for the extension was
illegal and unenforceable because the utility
contracted to charge for the extension at $3.35 per
foot when its allowable rate for such extensions as
filed with the State Public Utilities Commission was
$2 per foot, and that they were relieved of any
liability for the extension because of the utility's
fraud.

   A review of the record and the applicable law
reflects that although the purported charge of $3.35
per foot was acknowledged to be illegal, the trial
court properly concluded that the utility was entitled
to recover at the $2 rate fixed in the filed and
approved rules, and that there is no merit in
defendants' contention that the fraud, if any, of the
utility precluded it from recovering these charges.
The foregoing conclusions make it unnecessary to
consider the utility's contention that it was entitled to
recover on an account stated. [FN1] The judgment must
be affirmed.

> FN1 The complaint contained four causes of
> action, first, to recover on the contract at the
> rate of $2 per foot less allowable credits;
> second, to recover in accordance with its
> tariff schedule at the rate of $2 per foot;
> third, on an account stated; and fourth, on an
> open book account. The court found that the
> correspondence between the parties did not
> constitute an account stated.

   The trial court found that on September 26, 1966
the utility and *753 the developer entered into a

contract under which the utility undertook to install a
gas main extension to supply dwelling units to be
located in the developer's tract. The contract states in
pertinent part:

   "The gas main extension applied for will be
installed by the Company in accordance with the
provisions of its filed Rule No. 15, relating to
extension of main for subdivisions, tracts, housing
projects, and multifamily dwellings.

   "The estimated cost of said gas main extension is
$30,000.00, consisting of approximately 9,000 feet of
main at a unit cost of $3.35 per foot."

   The contract refers to, and has annexed to it a
copy of, section C-1 a of rule No. 15 which provides
for payment of the entire estimated cost of the
extension, provided that payment of such sums as it
appears would be refunded within six months may be
postponed if the utility is given evidence that the
development will proceed promptly, and if the
developer agrees to pay, at the end of the period, any
balance of the amount which otherwise would have
been advanced that is not refundable. The contract
provides for payment in the latter manner, and for a
guaranty to be approved by the utility. This guaranty,
as found by the court, was furnished by the
developer's codefendant.

   The contract concludes: "This agreement is
subject to the Company's tariff schedules and the
refund provisions thereof on file with the Public
Utilities Commission of the State of California and
particularly to the Company's rule 15. The Applicant
acknowledges that it has made itself familiar with the
provisions of rule 15 and that it is aware that a copy
thereof is available for inspection at the offices of the
Company in Tahoe Valley, California. Determination
of the amount which would have been refunded by
the Company under rule No. 15 during the above
mentioned 6 months period shall be made by the
Company in accordance with the provisions of said
rule 15 and the Company's standard form of contract
for gas main extension pursuant thereto, a copy of
which is attached hereto as Exhibit B and the terms
and conditions of which form a part of this
agreement."

   The contract form attached to the principal
document has inserted the figure of $3.35 per foot. It
again refers to Rule 15 and states: "A copy of Rule

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

25 Cal.App.3d 750                                                                                                    Page 3
25 Cal.App.3d 750, 102 Cal.Rptr. 286
(Cite as: 25 Cal.App.3d 750)

15 will be provided on request." The reverse of the form sets forth the terms upon which refunds against the cost of the extension will be granted when service connections are made with the extended gas main.

At the time the contract was entered into, rule No. 15, entitled "Gas *754 Main Extensions," which had been filed with the Public Utilities Commission on May 24, 1960, pursuant to the provisions of section 489 of the Public Utilities Code, [FN2] provided in pertinent part: "... [¶] B. Free Extensions to Individual Applicants for Service. [¶] 1. Free Footage Allowances. ... [¶] 2. Conditions. ... [¶] 3. Main Extensions Beyond The Free Length. [¶] a. Advances. [¶] (1) Extensions of mains beyond the free length will be made by the utility provided applicants for such extensions advance to the utility $2.00 for each foot of main in excess of the free length. Such extensions will be owned, operated and maintained by the utility. ..."

> FN2 Public Utilities Code section 489 provides: "Under such rules as the commission prescribes, every public utility other than a common carrier may file with the commission within such time and in such form as the commission designates, and shall print and keep open to public inspection, schedules showing all rates, tolls, rentals, charges, and classifications collected or enforced, or to be collected or enforced, together with all rules, contracts, privileges, and facilities which in any manner affect or relate to rates, tolls, rentals, classifications, or service. Nothing in this section shall prevent the commission from approving or fixing rates, tolls, rentals, or charges, from time to time, in excess of or less than those shown by such schedules."

The foregoing rule, effective May 29, 1960 was not revised (see Pub. Util. Code, §§ 454, 455 and 491) until May 20, 1968 (except for a special condition in effect from May 17, 1965 for one year which is not pertinent here) when the rate for extensions covered by the above paragraph was increased from $2 to $3.05 per foot.

The court found: "The estimated cost was misstated by South Tahoe in [the contract] in that the rate of charge for gas main extensions provided in South Tahoe's Tariff Rule 15 as of the time of said agreement was $2.00 per foot." [FN3]

> FN3 It appears to be assumed that the applicable rate per foot for an extension is to be found in part B of rule No. 15 which deals with "Free Extensions to *Individual Applicants* for Service." (Italics added.) It is arguable that part C, which is entitled "Main Extensions to Serve *Subdivisions, Tracts, Housing Projects and Multi-Family Dwellings*," (italics added) is *sui generis* and means what it says in referring to the "cost of such extensions." No opinion is expressed on this point because in this case the utility at all times has conceded that he rate set forth in part B is applicable.

The court further found: "The charge of $3.35 per foot for extensions set forth in [the contract] is illegal as contrary to South Tahoe's Rule 15. The court determines that [the contract] should be interpreted as excluding the improper charge and including the proper charge of $2.00 per foot."

The utility extended its gas mains as required by the contract and brought this action to recover at the rate of $2 per foot less allowable *755 refunds. Other facts concerning the negotiations between the parties are set forth below.

I

In their answer the defendants alleged "that the agreement sued upon by plaintiff herein was illegal and violative of the laws of the State of California and the regulations of the Public Utilities Commission of the State of California." They attack the finding that the contract "should be interpreted as excluding the improper charge and including the proper charge of $2.00 per foot."

Civil Code section 1668 states in pertinent part, "All contracts which have for their object, directly or indirectly, ... violation of law, whether wilful or negligent, are against the policy of the law."

Section 1667 reads, "That is not lawful which is: 1. Contrary to an express provision of law; 2. Contrary to the policy of express law, though not expressly prohibited; or, 3. Otherwise contrary to good morals."

Section 1607 provides, "The consideration of a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

contract must be lawful within the meaning of section 1667."

Section 1608 states, "If any part of a single consideration for one or more objects, or of several considerations for a single object, is unlawful, the entire contract is void."

The court properly found that a charge in excess of the prescribed rates was illegal. (Cf., however, fn. 3 above.) Public Utilities Code section 532 provides in pertinent part, "... no public utility shall charge, or receive a different compensation for any product or commodity furnished or to be furnished, or for any service rendered or to be rendered, than the rates, tolls, rentals, and charges applicable thereto as specified in its schedules on file and in effect at the time, ..." That code further provides that the Public Utilities Commission may order that the public utility make reparation if it has charged an unreasonable, excessive, or discriminatory amount for any product or commodity furnished or service performed (§ 734); that a court action may be brought for the payment of such reparation (§ 735); that a court action may be brought for damages resulting from a violation of the provisions of section 532 (§ 736); that exemplary damages may be awarded for a wilful violation of the provisions of the state Constitution, any state law, or any order or decision of the commission (§ 2106); that the utility may be liable for penalties for such a violation (§ 2107); and that an officer, agent or employee who *756 is responsible for such a violation may be subject to criminal prosecution (§ 2110).

(1a) In support of their contention that the entire contract is void and that the utility, therefore, cannot recover any compensation for the extension of the gas main which it has constructed, defendants rely on the following principle: "The general rule is that a void contract, a contract against public policy or against the mandate of a statute, may not be made the foundation of any action, either in law or in equity. [Citations.]" (Hooper v. Barranti (1947) 81 Cal.App.2d 570, 574 [184 P.2d 688]. See also Smith v. Bach (1920) 183 Cal. 259, 262-263 [191 P. 14]; Berka v. Woodward (1899) 125 Cal. 119, 126-127 [57 P. 777]; Stockton Morris etc. Co. v. Calif. etc. Corp. (1952) 112 Cal.App.2d 684, 689 [247 P.2d 90]; and Del Rey Realty Co. v. Fourl (1941) 44 Cal.App.2d 399, 402-403 [112 P.2d 649].) In the case last cited the court quoted with approval from 6 California Jurisprudence, page 153, as follows: "The

rule as to the nonenforceability of illegal contracts is not based upon any consideration for the party against whom the relief is sought, and who may be benefited by the refusal of the court to grant the same, but upon consideration of sound public policy. It is not for the sake of a party, but for the sake of the law itself, that a court refuses to be made use of for the enforcement of illegal contracts and leaves the parties where it finds them.'" (44 Cal.App.2d at p. 403; and see 12 Cal.Jur.2d, Contracts, § 98, pp. 297-298.)

The foregoing cases do not cover the situation presented by the contract in this case. Berka v. Woodward and the Stockton Morris Plan Company case involve contracts by public bodies. In the former case a city council member was denied compensation for lumber and materials furnished to the city. Not only did the city charter and state law prohibit such a contract, but also state law expressly provided that the contract could be avoided at the instance of any party except the interested official (see 125 Cal. at pp. 121-122). In the latter case the contract was invalid because it was not executed by the requisite number of members of the governing body of the public entity and because it violated a constitutional proscription against the incurring of a future indebtedness (112 Cal.App.2d at p. 687). In Hooper the contract contemplated that a partnership would conduct an on-sale liquor business under an individual's license in violation of the Alcoholic Beverage Control Act (81 Cal.App.2d at p. 575). In the Realty Company case the agreement provided for rendering compensation to an unlicensed person in violation of the California Real Estate Act (44 Cal.App.2d at p. 403). In Smith v. Bach there was a violation of a subdivision map act. *757

In the instant case there is no law against contracting for the extension of a gas main. It is only the amount that can be charged which is regulated. There is no express provision in the Public Utilities Code prohibiting recovery of compensation as is the case under the state contractor's licensing act (see Bus. & Prof. Code, § 7031; and Lewis & Queen v. N. M. Ball Sons (1957) 48 Cal.2d 141, 150-151 [308 P.2d 713]), and the real estate act (see Bus. & Prof. Code, § 10136; and Del Rey Realty Co. v. Fourl, supra, 44 Cal.App.2d 399, 402). In fact, as reviewed below, the Public Utilities Code, expressly requires that the prescribed compensation be collected.

Civil Code section 1598 provides: "Where a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

contract has but a single object, and such object is unlawful, whether in whole or in part, or wholly impossible of performance, or so vaguely expressed as to be wholly unascertainable, the entire contract is void."

Section 1599 reads, "Where a contract has several distinct objects, of which one at least is lawful, and one at least is unlawful, in whole or in part, the contract is void as to the latter and valid as to the rest."

In *Pitts v. Highland Construction Co.* (1953) 115 Cal.App.2d 206 [252 P.2d 14], a contractor sought to recover compensation due under a secret agreement which violated the provisions of law under which a "G.I." loan, guaranteed by the Veterans Administration, had been obtained to pay for the ostensible costs of construction. The court reversed a judgment for the owner-borrower because the lower court had refused to permit the contractor to recover for extra work which was contemplated under the original disclosed and legal agreement. The court quoted from 2 Kent's Commentaries, 467, as approved in an early usury case (*Jackson v. Shawl* (1865) 29 Cal. 267, 272) as follows: "'... The general and more liberal principle now is, that when any matter, void even by statute, be mixed up with good matter, which is entirely independent of it, the good part shall stand and the rest be held void.'" (115 Cal.App.2d at p. 212.)

Here the contract is, at worst, ambiguous. Throughout it refers to rule 15. "Pertinent rules and regulations which the Public Utilities Commission requires a public utility to adopt and file with the commission automatically become an implied term of any contract made between that public utility and its customer. (*Hischemoeller v. National Ice etc. Storage Co.,* 46 Cal.2d 318, 325 ...; *Gardner v. Basich Constr. Co.,* 44 Cal.2d 191, 193-194 ...; *Cole v. Pacific Tel. & Tel. Co.,* 112 Cal.App.2d 416, 418 ....)" (*758Sherwood v. County of Los Angeles* (1962) 203 Cal.App.2d 354, 359 [21 Cal.Rptr. 810].) In *Sherwood* the court upheld a judgment which denied the trustee successor to a public utility, which had extended its water mains to a "Civic Center" area after negotiations with the defendant county, any recovery for the costs of the extension because the mains had been installed and used without any contract for repayment. The court stated, "Any claim of liability asserted against the customer must find support in the terms, express or implied, of that

contract. Thus, with respect to certain rates fixed by law, it was said in *Church v. Public Utilities Com.,* 51 Cal.2d 399 ... at page 401: 'The law, however, does not create the liability. It only determines the amount of the liability created by the agreement of the parties.' (See also *Gardner v. Basich Bros. Constr. Co., supra,* 44 Cal.2d 191, 194.) " (*Id.*) Defendants argue that the contract was void because it provided for an illegal rate, and that therefore there is no liability upon which to predicate a recovery at the rate fixed in rule 15. This overlooks the fact that the contract expressly, as well as impliedly, refers to the rule, and therefore to the rates set forth therein.

The applicable principle is expressed in Civil Code section 1643 as follows: "A contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties." (See *Barham v. Barham* (1949) 33 Cal.2d 416, 429 [202 P.2d 289]; and *Fadel v. Slayman* (1948) 84 Cal.App.2d 6, 9 [189 P.2d 771].)

(2) The construction adopted by the court is also supported by the principle "... that all the consequences which attend a contract contrary to public morals do not attend one which is purely *malum prohibitum,* and that in the latter case courts will take notice of the circumstances and will give relief if justice and equity require a restoration of money received by either party thereunder. [Citations.]" (*Smith v. Bach, supra,* 183 Cal. 259, 263. See also *Berka v. Woodward, supra,* 125 Cal. 119, 122-124; and *Trumbo v. Bank of Berkeley* (1947) 77 Cal.App.2d 704, 710-711 [176 P.2d 376].) This principle is usually applied "to aid one not in *pari delicto,* though to some extent involved in the illegality, but who ... is comparatively the more innocent, and to permit him to recover back money paid on a contract as the circumstances of the case may require. [Citations.]" (*Smith v. Bach, supra,* 183 Cal. at pp. 263-264.) Nevertheless, in *Berka v. Woodward, supra,* it was noted that when a contract is illegal because of a breach of a fiduciary duty the following rule applies: "If he [the party to be protected] shall elect to rescind, he does so upon the equitable condition of restoring what he has received. If, however, he chooses to retain the consideration, he is not bound by *759 the terms and conditions of the contract, but the courts permit an action to establish and to recover the reasonable value of the thing sold or the service rendered. Such, it may be said, is the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

25 Cal.App.3d 750
25 Cal.App.3d 750, 102 Cal.Rptr. 286
(Cite as: 25 Cal.App.3d 750)

Page 6

general rule, but in this state the line has been more closely drawn. Such contracts are against public policy. Being against public policy, the making of them is not to be encouraged. But to permit a profit is thus to encourage them. Therefore, in this state, when a recovery is permitted, it is not for the reasonable or market value, which naturally includes within it the contemplation of a profit, but, when possible, the recovery is limited to the actual cost. [Citation.]" (125 Cal. at pp. 123-124.) In *Trumbo* v. *Bank of Berkeley, supra,* the principle was applied to permit recovery for services rendered in pre-incorporation activities pursuant to a contract which was illegal because in violation of the duties of the directors of the proposed corporation. The court noted, "... it would be most unjust and inequitable to allow the promoters to take the benefits of respondent's efforts, all of which were legal, and then to be allowed to escape all liability on the ground that the consideration they agreed to furnish was illegal." (77 Cal.App.2d at p. 710.) So here the defendants should not be permitted to obtain the advantages of the gas main extension and yet disclaim any responsibility to reimburse the utility for the lawful costs incurred.

(3) "The rule denying recovery to a party to an illegal contract is subject to a wide range of exceptions. ... In each case, the extent of enforceability and the kind of remedy granted depend upon a variety of factors, including the policy of the transgressed law, the kind of illegality and the particular facts. [Citations.]" (*Emmons, Williams, Mires & Leech v. State Bar* (1970) 6 Cal.App.3d 565, 569 [86 Cal.Rptr. 367].) Among the factors noted in that case were the fact that the party claiming illegality would be unjustly enriched if the other party were denied recovery, and that the forfeiture from refusal to permit recovery would be harsh in proportion to the character and extent of illegality. (*Id.,* at p. 570.) Similar results would obtain here if defendants' contentions were sustained.

(1b) Defendants insist that a forfeiture should be enforced in this case because it is the policy of the law to discourage illegal conduct. (See *Lewis & Queen v. N. M. Ball Sons, supra,* 48 Cal.2d 141, 147-148; and *Berka v. Woodward, supra,* 125 Cal. 119, 124.) The provisions of the Public Utilities Code, which were referred to in the opening paragraphs of this part of the opinion, should sufficiently discourage attempts to overcharge. A utility, which is subject to civil and penal penalties for such conduct and whose officers and employees are subject to

criminal prosecution, is not apt to wilfully or intentionally engage in such practices. In the absence of any provision expressly excluding any recovery under such *760 a contract, the trial court properly permitted the utility to recover for the extension at the filed and approved rate.

II

In this case the question of illegality must also be viewed in the light of plaintiff's status as a public utility. It has been stated, with respect to a common carrier, "The carrier cannot by contract, conduct, estoppel, waiver, directly or indirectly increase or decrease the rate as published in the tariff of the carrier until the published tariff itself is changed." (*Transmix Corp. v. Southern Pac. Co.* (1960) 187 Cal.App.2d 257, 264 [9 Cal.Rptr. 714].) It is established that a shipper may recover in court charges he has paid in excess of the legally established rates. (See *California Adj. Co. v. Atchison etc. Ry. Co.* (1918) 179 Cal. 140, 146-148 [175 P. 682, 13 A.L.R. 274]; *Transmix Corp. v. Southern Pac. Co., supra; Southern Pacific Co. v. Superior Court* (1915) 27 Cal.App. 240, 251-255 [150 P. 397, 404]; and *Sunset Pac. Oil Co. v. Railroad Co.* (1930) 110 Cal.App.Supp. 773, 782 [290 P. 434].) In *Southern Pacific Co. v. Superior Court* it was noted that the shipper was not claiming that he was entitled to recover all that he had paid because it was an unlawful charge, but only that sum which was in excess of the lawful rate (27 Cal.App. at p. 245). In the *Sunset Pacific Oil Co.* case the court stated, "Under the provisions of section 17 of the Public Utilities Act [cf. Pub. Util. Code, § 494; and note § 532 as set forth above] the measure of damages for the collection of a rate in excess of that provided in the tariff is necessarily the difference between the rate assessed and that which was applicable." (110 Cal.App.Supp. at p. 782.)

The principle that the whole overcharge does not cause a forfeiture of the legal charge is necessitated by the strong policy against permitting discounts or rebates. (See *Keller v. Thornton Canning Co.* (1967) 66 Cal.2d 963, 967-968 [59 Cal.Rptr. 836, 429 P.2d 156]; *West v. Holstrom* (1968) 261 Cal.App.2d 89, 92, 93 [67 Cal.Rptr. 831]; *People ex rel. Public Util. Com. v. Ryerson* (1966) 241 Cal.App.2d 115, 120 [50 Cal.Rptr. 246]; *Southern Pacific Co. v. Fish* (1958) 166 Cal.App.2d 353, 364 [333 P.2d 133]; *Gardner v. Rich Mfg. Co.* (1945) 68 Cal.App.2d 725, 729-730 [158 P.2d 23]; and *Butler v. Bell Oil & Refining Co.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(1945) 70 Cal.App.2d 728, 730 [161 P.2d 559].) "The collection of undercharges ... has been held to be one of the most effective means of preserving the minimum rate structure and of eliminating collusion between carriers and shippers. [Citations.]" (*People ex rel. Public Util. Com. v. Ryerson, supra*, 241 Cal.App.2d at p. 120.) It is also necessary "to maintain the integrity of the orders of the Public Utilities Commission. [Citation.]" *761 (*West v. Holstrom, supra*, 261 Cal.App.2d at p. 92.) In such an action the customer cannot defeat the recovery of the undercharge, discount or rebate by claiming the contract was illegal. (See *Southern Pacific Co. v. Fish, supra*, 166 Cal.App.2d at p. 364.)

It is true that in cases involving the regulation of highway carriers there is an element of ruinous competition (see *Keller v. Thornton Canning Co., supra*, 66 Cal.2d at p. 967) which does not mark the business of a monopolistic utility. Nevertheless the same principles have been applied to prevent discrimination between customers of a railroad. In *Transmix Corp. v. Southern Pac. Co., supra*, the court quoted with approval and added emphasis from *New York, N.H. & H.R. Co. v. York & Whitney Co.* (1913) 215 Mass. 36, 40 [102 N.E. 366, 368] (writ of error dismissed (1915) 239 U.S. 631 [60 L.Ed. 477, 36 S.Ct. 166]) as follows: "'... the reason why there must be *inflexibility* in the enforcement of the published rate *against all and every suggestion for relaxation* rests upon the practical impossibility otherwise of maintaining equality between all shippers without preferential privileges of any sort. The rate when published becomes established by law. It can be varied only by law, and not by act of the parties.'" (187 Cal.App.2d at p. 265, italics the court's; and see *West v. Holstrum, supra*, 261 Cal.App.2d at p. 93.)

In this case if the utility is prohibited from collecting the legally approved charge, the defendant developer will be receiving a rebate of the approved cost of the services rendered by extending the mains. Moreover if the outlay reduces the capital of the utility it may either impair its ability to serve its other customers, or produce a dispute as to whether the rates in effect and collected furnish its stockholders a fair return. It is established that a public utility furnishing water must furnish the services set forth in its schedule of rates, rules and regulations. (See *Vila v. Tahoe Southside Water Utility* (1965) 233 Cal.App.2d 469, 474-475 and 479 [43 Cal.Rptr. 654].) By the same token the court did not err in

requiring the defendants to pay for the services received at the approved rate.

## III

As a third affirmative defense defendants alleged, "... that their consent to the agreement and guaranty referred to in the Complaint were obtained by fraud by the misrepresentation of plaintiff that the agreements plaintiff requested defendants to sign complied with the laws of the State of California and the regulations of the Public Utilities Commission of the State of California. That plaintiff represented that said agreements and *762 guaranty did so comply when in fact, plaintiff well knew that they did not, and said representations were made falsely and knowingly by plaintiff with the intent to have defendants rely on said representations, and defendants did so rely."

As a fourth separate defense they alleged. "That plaintiff had a duty to inform defendants that the agreements and guaranty did not comply with the laws of the State of California or the regulations of the Public Utilities Commission of the State of California and that plaintiff failed to carry out said duty and its failure to so inform defendants in accordance with its duty was fraudulent."

The court found, "Plaintiff was guilty of fraud, but [the developer] did not rely upon any false statement in executing [the contract] in that it would have executed an agreement providing for payment at a rate of $2.00 per foot as stated in [the utility's] Tariff Rule 15."

The finding of fraud was predicated upon the negotiations between the parties before and after the execution of the contract. On March 25, 1966, apparently in response to an inquiry from the developer's engineers, the utility wrote them concerning the costs of natural gas and of propane service. The letter included the following: "Based on construction costs experienced during the 1965 season, the developers would, under our Rule 15, be required to make an advance payment of some $29,800 calculating the distance from Hiway 50 to and within the Unit 1 area at $3.35 per foot." The vice-president of the developer testified that the developer relied upon the information furnished to its engineers, and that the developer would not have signed the contract calling for a unit cost of $3.35 per

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

foot if he had known that rule 15 provided for a unit cost of $2 per foot; that the developer did not ascertain that rule 15 contained a provision for a unit price of $2 per foot (cf. fn. 3 above), until it finally received a copy of the rule after a dispute developed concerning the charges billed by the utility. It was acknowledged, however, that the developer would have signed a contract that contained a unit price, $2 per foot or any other, which was actually contained in rule 15.

The utility manager testified that he did not intent to charge the developer in excess of the tariff filed in 1960; that by virtue of construction work performed in the summer of 1965 it had been ascertained that the 1960 rate for gas main extensions was unrealistic; that he did not appreciate that the tariff rate would have to be changed; that he quoted a figure which realistically reflected the utility's cost; and that he did not learn that the utility could only charge $2 per foot until the dispute arose in ***763** 1967. He acknowledged that he had a copy of rule 15 in his office when the contract was entered into in September 1966; that in 1965 proceedings had been taken to amend the rule in other particulars; and that proceedings were ultimately taken to increase the rate from $2 to $3.05 per foot.

When the work was completed the utility on April 4, 1967 demanded the sum of $27,189.96 from the developer and its guarantor. This sum represented charges of $35,390.76 less credits for service connections made to that date of $8,200.80. The charges included 9,721 feet of pipe at a rate of $3.35 per foot and indicated that the total cost was "to be amortized as provided under P.U.C. Rule 15 and our agreement." On April 10, 1967 the developer wrote that it wanted clarification of certain discrepancies, which were not related to the price, and requested a copy of "P.U.C. Rule 15." In the utility's reply dated April 14, 1967, after addressing itself to the developer's complaints and giving it credit for one small item, it stated, "Your request for a copy of our Rule 15 indicates the possibility of further discussion between us over its provisions and application, and while you would be welcome at any time to examine it in our office, we feel going in that direction completely missed the point and would be fruitless." On April 21, 1967 the developer repeated its request for a copy of rule 15 and rule 16 relating to service connections. On April 28, 1967 the utility sent copies of the requested rules, explained its interpretation of the provisions of the contract, and demanded payment.

On May 5, 1967 the developer directed the utility's attention to the provisions of the rule specifying a$2 per foot rate. On May 9, 1967 the utility explained that costs had gone up since the rate was specified in 1960 and it insisted on payment according to the rate set forth in the contract. The developer replied, "... we agree that we signed a separate agreement wherein the price per foot was stipulated. However, we have been informed by our attorney that this contract or agreement is not valid if the terms specified therein are not in accordance with Rule 15. Therefore, although we recognize that we have an obligation, we do not feel we can pay the amount requested, until the above noted discrepancy is cleared up." On June 28, 1967 the utility acquiesced in the $2 rate and rebilled the developer for a net figure of $15,986. When the developer refused to pay this action was commenced. At the hearing it was stipulated that further credits had reduced the principal sum to the amount awarded in the judgment.

Civil Code section 1572 provides: "Actual fraud, within the meaning of this chapter, consists in any of the following acts, committed by a party to the contract, or with his connivance, with intent to deceive another ***764** party thereto, or to induce him to enter into the contract; [¶] 1. The suggestion, as a fact, of that which is not true, by one who does not believe it to be true; [¶] 2. The positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true; [¶] 3. The suppression of that which is true, by one having knowledge or belief of the fact; [¶] 4. A promise made without any intention of performing it; or, [¶] 5. Any other act fitted to deceive."

If the premise, adopted by the parties and the court, that the legal rate for gas main extensions to a subdivision or a tract was $2 a foot is followed (cf. fn. 3 above), it is apparent that the finding of fraud may be predicated on the assertion through the original estimate and in the contract that the rate provided in rule 15 was $3.35 per foot, when that assertion was not warranted by the information of the person making it, who should have known that the filed and approved rate was $2 per foot. Moreover, the failure to forthrightly furnish a copy of the rule when it was requested and the attempt to collect the full contract price would sustain an inference that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

there was a violation of subdivisions 1, 2, 3 or 5 of section 1572 at that time. (See *Curran v. Helsop* (1953) 115 Cal.App.2d 476, 480-481 [252 P.2d 378].) Even though the utility did not intend to deceive the developer in the precontract negotiations and in the form of the contract itself, the representation that the $3.35 per foot charge was authorized by its lawful tariffs was in fact made to induce the developer to enter into the contract.

Defendants assert that the fraud of the utility is a complete defense to an action on the contract. (See *Friedberg v. Weissbuch* (1955) 135 Cal.App.2d 750 756 [287 P.2d 785]; and 23 Cal.Jur.2d, Fraud and Deceit, § 54, pp. 134-135.) In the case cited the contract was executory on both sides, the defendant had abandoned the premises upon discovery of the fraud, and the court properly held that the plaintiff could not enforce the unexecuted portions of the agreement. Here the defendants received all of the benefits - the extension of the gas mains - for which they contracted and they have not attempted to and cannot physically rescind. The text cited by defendants concludes, "Fraud, when so pleaded [as a defense], may constitute a complete defense to the action; or it may be set up as a partial defense or counterclaim and entitle the defendant to recoupment for the damages sustained. Of course, in order so to recoup, the amount must be definite and ascertainable by calculation, and the defendant must show affirmatively a right of action in his favor arising out of the fraud." (23 Cal.Jur.2d at pp. 134-135, fns. omitted.) *765

(4) "The elements of actual fraud, whether as the basis of the remedy on contract or tort, may be stated as follows: There must be (1) a *false representation* or concealment of a material fact (or, in some cases, an opinion) susceptible of knowledge, (2) made with *knowledge* of its falsity or without sufficient knowledge on the subject to warrant a representation, (3) with the *intent* to induce the person to whom it is made to act upon it; and such person must (4) act in *reliance* upon the representation (5) to his *damage*. [Citations.]" (See 1 Witkin, Summary of Cal. Law (1960) Contracts, § 137, p. 147; and 23 Cal.Jur.2d *op.cit.*, § 66, pp. 164-165.)

(1c) The court concluded that the developer did not rely upon the utility's representation that $3.35 per foot was a legal rate because it would have signed a contract at the legal rate of $2 per foot. The fact that the developer might have executed a different

contract if it had known the true facts, does not affect its reliance on the misrepresentation in executing a contract for a greater rate. If the question were not whether the rate represented were the legal rate, but whether the sum represented the actual cost and the parties were bargaining, free of regulation, for reimbursement to the utility of its actual costs, it is clear that the fact the developer would be willing to contract for the actual cost would not prevent him from showing that he relied on the accuracy of the representation in agreeing to a larger figure. The fact that the developer was willing to pay the legal rate really goes to the matter of damages.

The court in summing up properly noted that there were no damages resulting from the alleged fraud because the utility was not receiving more than the legal rate. (5) "Fraud without damage furnishes no ground for action, nor is fraud without damage a defense." (*Holton v. Noble* (1890) 83 Cal. 7, 9 [23 P. 581]. See also *Bernson v. Bowman* (1960) 182 Cal.App.2d 697, 704 [6 Cal.Rptr. 455]; and *Molfino v. Levinson Produce Co.* (1947) 79 Cal.App.2d 587, 589 [180 P.2d 365]. Defendants plea that they should be relieved of payment in order to discourage similar attempts to secure overpayment in the manner unsuccessfully attempted by plaintiff, does not give rise to a cause of action in the absence of a showing of actual damage.

The judgment is affirmed.

Molinari, P. J., and Elkington, J., concurred. *766
Cal.App.1.Dist.
South Tahoe Gas Co. v. Hofmann Land Improvement Co.
25 Cal.App.3d 750, 102 Cal.Rptr. 286

END OF DOCUMENT

# Exhibit L

**APPENDIX OF NON-FEDERAL AND UNPUBLISHED FEDERAL AUTHORITIES
CITED IN VISA USA INC.'S OPPOSITION TO MARITZ INC.'S
MOTION TO STAY ARBITRATION**

Westlaw.

466 P.2d 996                                                                                            Page 1
2 Cal.3d 285, 466 P.2d 996, 85 Cal.Rptr. 444
**(Cite as: 2 Cal.3d 285, 466 P.2d 996)**

▷Warner Const. Corp. v. City of Los Angeles,
Cal. 1970.

Supreme Court of California,In Bank.
WARNER CONSTRUCTION CORPORATION,
Plaintiff and Respondent,
v.
CITY OF LOS ANGELES, Defendant and
Appellant.
L.A. 29653.

March 31, 1970.

Action by contractor against city for breach of
warranty and fraudulent concealment in connection
with a contract for construction of a retaining wall to
retard erosion of hill supporting street. The Superior
Court, Los Angeles County, Frank J. Mackin, J.,
entered judgment for contractor and city appealed.
The Supreme Court, Tobriner, Acting C.J., held that
city officials' letters, which authorized use of rotary
mud and stated that city would assume additional
cost and which were sent to contractor after parties
had reached stage of clear disagreement on issue
whether contractor was entitled to a change order,
were not admissible to show contemporaneous and
practical construction of contract, in view of statute
excluding offers of compromise, but, under
circumstances, error did not cause prejudice to city.

Affirmed in part, reversed in part, and remanded with
directions.

Opinion, Cal.App., 76 Cal.Rptr. 60., vacated.

West Headnotes

**[1] Municipal Corporations 268 ⬡374(6)**

268 Municipal Corporations
    268IX Public Improvements
        268IX(C) Contracts
            268k374 Rights and Remedies of
Contractors and Sureties Against Municipality
            268k374(6) k. Trial, Judgment, and
Review. Most Cited Cases
Where interpretation of contract for construction of
retaining wall to retard erosion of hill supporting

street depended on credibility of testimony of a soil
mechanics engineer, there was no error in submitting
construction of contract to jury.

**[2] Municipal Corporations 268 ⬡332**

268 Municipal Corporations
    268IX Public Improvements
        268IX(C) Contracts
            268k332 k. Form and Requisites of
Proposals or Bids. Most Cited Cases
Where plans and specifications for construction of
retaining wall to retard erosion of hill supporting
street included logs of two test holes, and attached to
the test-hole logs was a caveat to effect that test-hole
information showed conditions only at date and
location indicated and that bidders were cautioned
that it was not being warranted that such information
was representative of conditions at other locations,
bidder took risk in making deductions from accurate
test data, but city retained responsibility for any
inaccuracy in the data.

**[3] Fraud 184 ⬡64(4)**

184 Fraud
    184II Actions
        184II(F) Trial
            184k64 Questions for Jury
                184k64(4) k. Materiality of Matter
Represented or Concealed. Most Cited Cases

**Fraud 184 ⬡64(5)**

184 Fraud
    184II Actions
        184II(F) Trial
            184k64 Questions for Jury
                184k64(5) k. Reliance on
Representations and Inducement to Act. Most Cited
Cases
In action by contractor against city for breach of
warranty and fraudulent concealment in connection
with a contract for construction of a retaining wall to
retard erosion of hill supporting street, evidence was
for jury on issues as to whether misrepresentation of
"clay binder" for "minute binder" was a material
misrepresentation, whether contractor relied on it,
and whether that reliance was reasonable.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

466 P.2d 996                                                                                    Page 2
2 Cal.3d 285, 466 P.2d 996, 85 Cal.Rptr. 444
**(Cite as: 2 Cal.3d 285, 466 P.2d 996)**

**[4] Municipal Corporations 268 ☞374(4)**

268 Municipal Corporations
   268IX Public Improvements
     268IX(C) Contracts
       268k374 Rights and Remedies of
Contractors and Sureties Against Municipality
         268k374(4) k. Evidence. Most Cited
Cases

**Municipal Corporations 268 ☞374(6)**

268 Municipal Corporations
   268IX Public Improvements
     268IX(C) Contracts
       268k374 Rights and Remedies of
Contractors and Sureties Against Municipality
         268k374(6) k. Trial, Judgment, and
Review. Most Cited Cases
In action by contractor against city for breach of
warranty and fraudulent concealment in connection
with a contract for construction of a retaining wall to
retard erosion of hill supporting street, contractor's
evidence that general notes contained in plans and
specifications excluded use of rotary mud was
properly admitted, and interpretation of the general
notes in light of that evidence posed a question for
jury.

**[5] Fraud 184 ☞17**

184 Fraud
   184I Deception Constituting Fraud, and Liability
Therefor
     184k15 Fraudulent Concealment
       184k17 k. Duty to Disclose Facts. Most
Cited Cases
By failing to impart its knowledge of difficulties to
be encountered in a project, the owner, as a general
rule, will be liable for misrepresentation if the
contractor is unable to perform according to the
contract provisions; fact that a breach is fraudulent
does not make the rule inapplicable.

**[6] Fraud 184 ☞58(1)**

184 Fraud
   184II Actions
     184II(D) Evidence
      184k58 Weight and Sufficiency
       184k58(1) k. In General. Most Cited
Cases
In action by contractor against city for fraudulent
concealment in connection with a contract for
construction of a retaining wall to retard erosion of
hill supporting street, evidence supported finding of
liability.

**[7] Fraud 184 ☞31**

184 Fraud
   184II Actions
     184II(A) Rights of Action and Defenses
      184k31 k. Nature and Form of Remedy.
Most Cited Cases
A party induced by a false representation to enter into
a contract may proceed to perform it and sue for
damages for the misrepresentation.

**[8] Fraud 184 ☞38**

184 Fraud
   184II Actions
     184II(A) Rights of Action and Defenses
      184k38 k. Time to Sue and Limitations.
Most Cited Cases

**Municipal Corporations 268 ☞374(2)**

268 Municipal Corporations
   268IX Public Improvements
     268IX(C) Contracts
       268k374 Rights and Remedies of
Contractors and Sureties Against Municipality
         268k374(2) k. Conditions Precedent
and Limitations. Most Cited Cases
Where a halt in construction of retaining wall
pending a suit for rescission or damages, or pending
further competitive bids, would have risked collapse
of road and sliding of structure onto the street below,
contractor justifiably completed construction prior to
commencing suit against city for breach of warranty
and fraudulent concealment.

**[9] Fraud 184 ☞64(1)**

184 Fraud
   184II Actions
     184II(F) Trial
      184k64 Questions for Jury
       184k64(1) k. In General. Most Cited
Cases
     (Formerly 184k4(1), 184k44(1))

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

466 P.2d 996                                                    Page 3
2 Cal.3d 285, 466 P.2d 996, 85 Cal.Rptr. 444
**(Cite as: 2 Cal.3d 285, 466 P.2d 996)**

**Municipal Corporations 268 ☜⟶374(6)**

268 Municipal Corporations
    268IX Public Improvements
        268IX(C) Contracts
            268k374 Rights and Remedies of
Contractors and Sureties Against Municipality
            268k374(6) k. Trial, Judgment, and
Review. Most Cited Cases
In action by contractor against city for breach of
warranty and fraudulent concealment in connection
with a contract for construction of a retaining wall to
retard erosion of hill supporting street,
reasonableness of contractor's delay and its resulting
claim for damages raised questions for jury.

**[10] Appeal and Error 30 ☜⟶1050.1(11)**

30 Appeal and Error
    30XVI Review
        30XVI(J) Harmless Error
        30XVI(J)10 Admission of Evidence
            30k1050 Prejudicial Effect in General
            30k1050.1 Evidence in General
                30k1050.1(8) Particular Types of
Evidence
                30k1050.1(11) k.
Documentary Evidence; Photographs. Most Cited
Cases
    (Formerly 30k1050(1))

**Evidence 157 ☜⟶213(2)**

157 Evidence
    157VII Admissions
        157VII(A) Nature, Form, and Incidents in
General
        157k212 Offers of Compromise or
Settlement
        157k213 In General
            157k213(2) k. What Constitutes
Offer. Most Cited Cases
In action by contractor against city for breach of
warranty and fraudulent concealment in connection
with contract for construction of retaining wall to
retard erosion of hill supporting street, city officials'
letters, which authorized use of rotary mud and stated
that city would assume additional cost and which
were sent to contractor after parties had reached stage
of clear disagreement on issue whether contractor
was entitled to a change order, were not admissible to
show contemporaneous and practical construction of
contract, in view of statute excluding offers of
compromise, but, under circumstances, error did not
prejudice city. West's Ann.Evid.Code, § 1152.

**[11] Contracts 95 ☜⟶170(1)**

95 Contracts
    95II Construction and Operation
        95II(A) General Rules of Construction
        95k170 Construction by Parties
            95k170(1) k. In General. Most Cited
Cases
Principle of "practical construction" applies only to
acts performed under contract before any dispute has
arisen.

**[12] Trial 388 ☜⟶255(4)**

388 Trial
    388VII Instructions to Jury
        388VII(E) Requests or Prayers
        388k255 Necessity in General
            388k255(4) k. Purpose and Effect of
Evidence. Most Cited Cases
Where exhibits objected to by defendant were
admitted without any hint of limited purpose, and to
all appearances trial judge had rejected defendant's
contentions as to why exhibits should not be
admitted, and, by time of submission of jury
instructions, a significant part of trial testimony had
been devoted to discussion of meaning and import of
the exhibits, defendant's opportunity to seek a
limiting instruction did not constitute a sufficient
remedy and defendant did not waive any error by
failing to request such instruction.

**[13] Fraud 184 ☜⟶59(1)**

184 Fraud
    184II Actions
        184II(E) Damages
        184k59 Measure in General
            184k59(1) k. In General. Most Cited
Cases

**Municipal Corporations 268 ☜⟶374(5)**

268 Municipal Corporations
    268IX Public Improvements
        268IX(C) Contracts
            268k374 Rights and Remedies of

466 P.2d 996
2 Cal.3d 285, 466 P.2d 996, 85 Cal.Rptr. 444
**(Cite as: 2 Cal.3d 285, 466 P.2d 996)**

Page 4

Contractors and Sureties Against Municipality
          268k374(5) k. Damages. Most Cited
Cases
Award for lost profits resulting from additional
construction cost which contractor was allegedly
compelled to bear out of its own resources was
speculative and could not be sustained, in action by
contractor against city for breach of warranty and
fraudulent concealment in connection with a contract
for construction of a retaining wall, where contractor
did not present evidence of its profits for following
and preceding years and also presented no expert
analysis or breakdown of damages.

[14] Appeal and Error 30 ☞882(19)

30 Appeal and Error
    30XVI Review
        30XVI(C) Parties Entitled to Allege Error
            30k881 Estoppel to Allege Error
                30k882 Error Committed or Invited by
Party Complaining
                    30k882(19) k. Amount of Recovery
or Extent of Relief. Most Cited Cases
Defendant's tactical decision to emphasize liability
issue and minimize discussion of damages did not
amount to a waiver of defendant's right to object on
appeal to speculative damages.

[15] Appeal and Error 30 ☞230

30 Appeal and Error
    30V Presentation and Reservation in Lower Court
of Grounds of Review
        30V(B) Objections and Motions, and Rulings
Thereon
            30k230 k. Necessity of Timely Objection.
Most Cited Cases
Where, during plaintiff's argument to jury, defense
counsel did not object or request that jury be
admonished and instead waited until conclusion of
argument and then moved for mistrial, claim as to
misconduct of plaintiff's counsel would not be
sustained on appeal.

***445**997*289 Roger Arnebergh, City Atty.,
Bourke Jones and Charles W. Sullivan, Asst. City
Attys., and Robert A. Clinco, Deputy City Atty., for
defendant and appellant.
Caryl Warner, Los Angeles, for plaintiff and
respondent.
***446 TOBRINER, Acting Chief Justice.

Plaintiff Warner Construction Corporation brings
suit against the City of Los Angeles for breach of
warranty and fraudulent concealment in connection
with a contract for construction of a retaining wall on
Vista Del Mar, a street in the City of Los Angeles. A
jury returned a verdict for plaintiff for $150,000. We
hold that, since the interpretation of the crucial
provisions turned on the credibility of expert
testimony, the court did not err in submitting the
construction of the contract to the jury. We have also
concluded that the evidence supports the jury's
finding of liability. Although certain letters of the
city's Board of Public Works, which contained
statements tendered in negotiations for a
compromise, should not have been admitted, their
introduction did not cause prejudicial error. Plaintiff's
proven damages, however, reach at most $81,743.55;
its failure to present evidence of lost profits renders
damages over that sum speculative. The cause,
therefore, must be reversed for a new trial on the
issue of damages.

Vista Del Mar, a street in the City of Los
Angeles, runs parallel to the waterfront along the
crest of a hill. The hill is composed of sand and
sandstone of varying but low cohesiveness. In 1964
the city requested bids for construction of a retaining
wall, referred to as a sidehill bridge, to retard erosion
which was undermining Vista Del Mar. In support of
the retaining wall, there would be 29 soldier beams,
reinforced concrete pillars of 24 to 30 inches in
diameter and 18 to 34 feet in length. Twenty-nine
anchor caissons (reinforced concrete pilings) were to
be sunk on the other side of Vista Del Mar, and
joined to the soldier beams by 2-inch steel rods
running under the roadway.

*290 As the low bidder at $81,000, plaintiff
obtained the award of the contract. The contract
provided for amendment by 'change orders' issued by
the city at the contractor's request. Five change orders
were issued, increasing the contract price to
$83,416.53.

During construction, caving occurred in
unsupported holes. Plaintiff attempted to drive steel
casings into the sand to support the walls of the holes,
but due to the instability of the sand the jarring
threatened the collapse of the entire work area.
Plaintiff then requested a change order to permit
drilling with rotary mud,[FN1] and a concomitant
increase in price. The city refused, maintaining that
the plans required only that holes be drilled, leaving

466 P.2d 996                                                                    Page 5
2 Cal.3d 285, 466 P.2d 996, 85 Cal.Rptr. 444
**(Cite as: 2 Cal.3d 285, 466 P.2d 996)**

the drilling method to the contractor's discretion, and thus that no change order was needed. After extended but unsuccessful negotiations, plaintiff resumed construction using rotary mud without a change order, and completed the project.

> FN1. Rotary mud is a drilling fluid. Added to the hole during drilling, it coats the sides of the hole and through hydraulic pressure aids in supporting the walls and preventing cave-ins. A steel casing can then be added for further support; after the use of rotary mud the casing need not be driven into the sand, but drops of its own weight.

Plaintiff's suit asserts four causes of action. The first is for the balance of $4,725 plus interest due on the contract; defendant admits this debt. The second cause of action claims damages of $2,716.39 for a five-day delay in construction pending a change order increasing the depth of the wall by four feet. This cause of action does not relate in any way to the issues of warranty and concealment, and defendant's briefs on appeal do not discuss it.

This appeal deals solely with plaintiff's third and fourth causes of action, which allege respectively breach of contract and fraudulent concealment of material facts; plaintiff claims damages for the increased cost of construction resulting from the use of rotary mud, for loss of profits, for loss of business, and for loss of an advantageous competitive position in the industry.

Plaintiff bases its third cause of action on Standard Specification No. 158, paragraph 2-8, which proves that if the contractor***447**999 encounters subsurface conditions materially different from those shown on the plans, which it could not reasonably be expected to ascertain in advance, a change order will issue to provide for any increase in cost resulting from the unexpected conditions. Plaintiff contends that the plans impliedly excluded use of rotary mud, leading it to believe soil conditions permitted casting without rotary mud; it claims a contractual right to a change order compensating for the increased cost of using rotary mud.

Plaintiff's fourth cause of action, for fraudulent concealment, asserts *291 that the city did not disclose that cave-ins occurred in both test holes drilled by the city, forcing the city to change its

drilling methods and to abandon the holes before reaching the planned depth of 50 feet. Plaintiff also claims that the city concealed information that two ancient landslides occurred at the construction site.

1. The issue of liability

We consider the issue of liability in three parts: (a) the logs of the test holes; (b) General Notes 7 and 8; and (c) the nondisclosures.

*(a) The logs of the test holes*

The plans and specifications included the logs of two test holes. The logs show that the city drilled two test holes on the site, which passed through various layers of sand. Undisputed evidence, however, demonstrated that the log of test hole No. 1 erroneously reported the soil to a depth of 14 feet as 'coarse sand with clay binder' although the material actually discovered was 'coarse sand with minute binder.' Likewise, the log of test hole No. 2 listed 26 to 35 feet as 'sand with clay binder' although the material actually encountered at that depth was 'sand with minute binder.' Mr. Maurseth, a soil mechanics engineer, testified that 'clay binder' meant, in the trade, a sufficient amount of clay to cause the sand particles to adhere cohesively; 'minute binder' meant the binding material is present in such minute quantities that it is inadequate to stabilize the sand. Being less cohesive, 'sand with minute binder' is much more likely to cave in.

[1] We do not accept defendant's contention that the trial court erred in submitting the interpretation of the logs to the jury. Although defendant urges that under Parsons v. Bristol Development Co. (1965) 62 Cal.2d 861, 865, 44 Cal.Rptr. 767, 770, 402 P.2d 839, 842, 'it is * * * a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence,' the interpretation of the contract here depends on the credibility of Mr. Maurseth's testimony that 'sand with clay binder' implies not a 'minute' amount of clay, but an amount sufficient to give significant stability to the formation. The trial court properly relegated that question of credibility for decision by the jury. (See Pierpont Inn, Inc. v. State of California (1969) 70 Cal.2d 282, 294, 74 Cal.Rptr. 521, 449 P.2d 737.)

Attached to the test-hole logs was a caveat: 'The

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

466 P.2d 996
2 Cal.3d 285, 466 P.2d 996, 85 Cal.Rptr. 444
(Cite as: 2 Cal.3d 285, 466 P.2d 996)

Page 6

test-hole information on these plans shows conditions found only at the date and location indicated. Bidders are cautioned that the city in no way warrants that such information is representative of conditions at any other location, *292 or at any other time. Groundwater levels, particularly, are subject to change.'

[2] Although defendant contends that this note effectively disclaims any warranty, we find, on closer examination, that the warranty and the disclaimer pass each other without collision. The warranty describes the subsurface conditions at the test holes, but says nothing about conditions elsewhere on the site. The disclaimer states that 'the test-hole information * * * shows conditions found only at the date and location indicated,' and cautions bidders that the city does not warrant that the data is representative***448**1000 of other locations, but it in no way disclaims the accuracy of the test-hole logs.FN2 Reading the two together, we conclude that the bidder takes the risk in making deductions from accurate test data, but the city retains responsibility for any inaccuracy in the data. (See Wunderlich v. State of California (1967) 65 Cal.2d 777, 784-785, 56 Cal.Rptr. 473;Chris Nelsen & Son, Inc. v. City of Monroe (1953) 337 Mich. 438, 446, 60 N.W.2d 182,423 P.2d 545.)

FN2. Standard Specification No. 158, section 2-1, contains another disclaimer, which is not discussed by the parties on appeal. This disclaimer reads: 'While it is believed that information obtained by the Engineer will be reasonably correct, the City does not warrant either the completeness or the accuracy of such information. It is the responsibility of the Contractor to ascertain the existence of such additional conditions affecting his cost of doing the work as may be disclosed by a reasonable examination of the site.'
In E. H. Morrill Co. v. State of California (1967) 65 Cal.2d 787, 56 Cal.Rptr. 479, 423 P.2d 551, we held that the trial court erred in construing a very similar provision to be an effective disclaimer of specific representations of site conditions. We there noted the specific character of the representations of site conditions and of geological conditions; we emphasized the absence of any cross-reference from the representations to the general language of

the disclaimer. We then quoted from Hollerbach v. United States (1914) 233 U.S. 165, 172, 34 S.Ct. 553, 58 L.Ed. 898;'It 'would be going quite too far to interpret the general language of the other (sections of the contract) as requiring independent investigation of facts which the specifications furnished by the government as a basis of the contract left in no doubt. * * * In its positive assertion of the nature of this much of the work (the government) made a representation upon which the claimants had a right to rely without an investigation to prove its falsity.'' (P. 792, 56 Cal.Rptr. p. 482, 423 P.2d p. 554.)
The trial court in the instant case read the section 158 disclaimer to the jury, but instructed them that 'if a public agency makes a positive and material representation as to a condition presumably within the knowledge of the agency and upon which the plaintiff had a right to rely, the agency is deemed to have warranted such facts despite a general provision requiring an on-site inspection by the contractor.'In submitting the issue of the effect of the section 158 disclaimer to the jury, and its instructions to the jury, the trial court complied with our decision in Morrill, and the verdict must be taken as resolving that issue against defendant.

[3] Whether the misrepresentation of 'clay binder' for 'minute binder' was a material misrepresentation, whether plaintiff relief on it, and whether that reliance was reasonable, all present disputed questions *293 of fact properly submitted to the jury. The jury's verdict impliedly resolved these issues in plaintiff's favor.

### (b) General Notes 7 and 8

The plans and specifications contained 16 'General Notes.' Note 7 provides that 'holes for the soldier beams and anchor caissons shall be made by boring and/or drilling.'Note 8 states: 'soldier beams and anchor caissons shall be cast in place within unsupported holes, except that where, in the opinion of the engineer, the holes are subject to caving or sloughing, or are in any way unstable, the walls shall be temporarily supported by steel casings or shells. Before placing the steel casing or shells as much of the loose soil as is practical shall be removed from

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

466 P.2d 996
2 Cal.3d 285, 466 P.2d 996, 85 Cal.Rptr. 444
(Cite as: 2 Cal.3d 285, 466 P.2d 996)

the holes.'

Defendant contends that the language of Notes 7 and 8 does not prohibit the use of rotary mud, but leaves the drilling technique entirely to the contractor's discretion. The rotary mud technique, however, is an unusual and expensive method of drilling, and results in castings of less strength than casting against virgin soil.[FN3] Plaintiff adduced***449**1001 substantial expert testimony, including not only plaintiff's experts but also Mr. Reader, the city's engineer in charge of designing the sidehill bridge, to the effect that the specifications of General Note 8 impliedly excluded the use of rotary mud and that a change order would be required to permit rotary mud drilling.

> FN3. General Note 8 contemplated casting the concrete against virgin soil; steel casings, if utilized, were only to furnish 'temporary' support and to be withdrawn before casting. If rotary mud were used, it would coat the sides of the hole and the concrete would be cast against a thin layer of rotary mud. The resulting structure has somewhat less strength since slight lateral movement is possible before the concrete meets the resistance of the soil.

[4] In Pacific Gas & Elec. Co. v. G. W. Thomas Drayage etc. Co. (1968) 69 Cal.2d 33, 37, 69 Cal.Rptr. 561, 564, 442 P.2d 641, 644, we held that 'the test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible.'Under that test plaintiff's evidence that General Notes 7 and 8 excluded use of rotary mud was properly admitted, and the interpretation of the General Notes in the light of that evidence posed a question for the jury.

*(c) The non-disclosure: the alleged fraudulent concealment*

[5] A fraudulent concealment often composes the basis for an action in tort, but tort actions for misrepresentation against public agencies are barred *294 by Government Code section 818.8.[FN4] Plaintiff retains, however, a cause of action in contract.'It is

the general rule that by failing to impart its knowledge of difficulties to be encountered in a project, the owner will be liable for misrepresentation if the contractor is unable to perform according to the contract provisions.'(City of Salinas v. Souza & McCue Construction Co. (1967) 66 Cal.2d 217, 222, 57 Cal.Rptr. 337-339, 424 P.2d 921, 923 (disapproved on other grounds in Helfend v. Southern Cal.Rapid Transit Dist. (1970) 2 Cal.3d 1, 14, 84 Cal.Rptr. 173, 465 P.2d 61).) As explained in Souza & McCue Constr. Co. v. Superior Court (1962) 57 Cal.2d 508, 510-511, 20 Cal.Rptr. 634, 636, 370 P.2d 338, 340:'This rule is mainly based on the theory that the furnishing of misleading plans and specifications by the public body constitutes a breach of an implied warranty of their correctness. The fact that a breach is fraudulent does not make the rule inapplicable.'(See also E. H. Morrill Co. v. State of California, supra, 65 Cal.2d 787, 793-794, 56 Cal.Rptr. 479, 423 P.2d 551;John McShain, Inc. v. United States (1969) 412 F.2d 1281, Ct.Cl.)

> FN4.Section 818.8 states that '(a) public entity is not liable for an injury caused by misrepresentation by an employee of the public entity, whether or not such misrepresentation be negligent or intentional.'Section 814 provides that nothing in the Tort Claims Act 'affects liability based on contract.' Interpreting these provisions, we held in E. H. Morrill Co. v. State of California, supra, 65 Cal.2d 787, 793-794, 56 Cal.Rptr. 479, 423 P.2d 551, that section 818.8 barred a tort action for deceit against a public entity, but did not affect an action in contract for breach of warranty.

In transactions which do not involve fiduciary or confidential relations, a cause of action for non-disclosure of material facts may arise in at least three instances: (1) the defendant makes representations but does not disclose facts which materially qualify the facts disclosed, or which render his disclosure likely to mislead;[FN5] (2) the facts are known or accessible only to defendant, and defendant knows they are not known to or reasonably discoverable by the plaintiff;[FN6] (3) the defendant actively conceals discovery from the plaintiff.[FN7]

> FN5.Civil Code section 1710, subd. (3); Rogers v. Warden (1942) 20 Cal.2d 286, 289, 125 P.2d 7;McCue v. Bruce

466 P.2d 996
2 Cal.3d 285, 466 P.2d 996, 85 Cal.Rptr. 444
(Cite as: 2 Cal.3d 285, 466 P.2d 996)

Page 8

Enterprises, Inc. (1964) 228 Cal.App.2d 21, 27, 39 Cal.Rptr. 125;Gillespie v. Ormsby (1959) 126 Cal.App.2d 513, 527, 272 P.2d 949.

FN6.Lingsch v. Savage (1963) 213 Cal.App.2d 729, 735, 29 Cal.Rptr. 201;Sime v. Malouf (1949) 95 Cal.App.2d 82, 100, 212 P.2d 946,213 P.2d 788;Barder v. McClung (1949) 93 Cal.App.2d 692, 697, 209 P.2d 808.

FN7.Herzog v. Capital Co. (1945) 27 Cal.2d 349, 353, 164 P.2d 8;Sime v. Malouf, supra, 95 Cal.App.2d 82, 99, 212 P.2d 946,213 P.2d 788;Williams v. Graham (1948) 83 Cal.App.2d 649, 652, 189 P.2d 324.

***450**1002[6] All these instances are present in this case, or so the jury could find. The nondisclosure of the cave-ins and special drilling techniques used in drilling the test holes transformed the logs into misleading half-truths.*295 The facts concealed were exclusively available to defendant. Finally, plaintiff presented evidence of intentional concealment by the city.[FN8]

FN8. The general disclaimer in Standard Specification No. 158 does not affect plaintiff's action for fraudulent concealment. (City of Salinas v. Souza & McCue Constr. Co., supra, 66 Cal.2d 217, 224, 57 Cal.Rptr. 337, 424 P.2d 921;A. Teichert & Son, Inc. v. State of California (1965) 238 Cal.App.2d 736, 755, 48 Cal.Rptr. 225. The latter case was disapproved on other grounds in E. H. Morrill Co. v. State of California, supra, 65 Cal.2d at p. 792, 56 Cal.Rptr. 479, 423 P.2d 551, but remains viable authority on the point in question.)

2. Completion of Performance

The city argues that, since the contract did not expressly authorize use of rotary mud, plaintiff, in performing in that manner, attempted to force the city to reform the contract and to subvert the policy requirement of competitive bidding. It contends that modifications of a contract can only be awarded through competitive bidding (Paterson v. Board of Trustees (1958) 157 Cal.App.2d 811, 321 P.2d 825), and that, absent modification, plaintiff's only

remedies lie in either prompt rescission of the contract or discontinuance of performance and suit for damages (see Kenworthy v. State of California (1965) 236 Cal.App.2d 378, 46 Cal.Rptr. 396).

[7][8] As the court in Gogo v. Los Angeles etc. Flood Control Dist. (1941) 45 Cal.App.2d 334, 338, 114 P.2d 65, 67, stated, however, 'a party induced by a false representation to enter into a contract may proceed to perform it and sue for damages for the misrepresentation.'Evidence in the instant case showed that plaintiff's abandonment of the project would have created a serious public hazard. The bank on the downhill side of the roadway had been cut sheer and solidified by a chemical process. The chemical solidification, however, effected only a temporary control; a halt in construction pending a suit for rescission or damages, or pending further competitive bids, would have risked the collapse of the road and the sliding of the structure onto the street below. Under the circumstances, plaintiff justifiably completed construction; defendant has not questioned the reasonableness of the methods used, nor the cost incurred, in the completion.

[9] Defendant stands on somewhat stronger ground when it alleges that, in view of the situation, plaintiff delayed too long before resuming work. Section 2-8 of the Standard Specifications, however, contemplates that the contractor will halt performance pending issuance of a change order, and the reasonableness of plaintiff's delay and its resulting claim for damages raised questions for the jury.

*296 3. Admission of Evidence

On February 23 and 24, 1965, plaintiff notified defendant of its unwillingness to continue work without a change order. On March 8 defendant sent plaintiff a report of the Board of Public Works stating that 'consideration of alternate methods of constructing the project is not thought to be necessary,' and directing plaintiff to resume work.

On March 19 plaintiff sent another request, which suggested that rotary mud be used at an additional cost to the city of $12,000. The president of the Board of Public Works, Mr. Gill, sent plaintiff a letter on March 25 authorizing use of rotary mud and stating that the city would assume the additional cost. On March 29 the secretary to the board

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

466 P.2d 996
2 Cal.3d 285, 466 P.2d 996, 85 Cal.Rptr. 444
(Cite as: 2 Cal.3d 285, 466 P.2d 996)

Page 9

confirmed this communication, stating that the city engineer would issue an appropriate change order. In the meantime, however, plaintiff discovered that the additional work would cost not $12,000 as previously estimated, but $34,400, and it so notified the city. As a result of this communication the defendant***451**1003 did not issue the change order at $12,000; it rejected plaintiff's $34,400 offer.

The trial court, over defendant's objection, admitted into evidence the letter from Mr. Gill authorizing use of rotary mud and stating that the city would assume the additional cost, and the letter from the secretary of the board confirming the president's letter. Plaintiff offered these exhibits generally, without specifying any basis for their admission. Defendant objected on several grounds, including Evidence Code section 1152, which provides in part: 'Evidence that a person has, in compromise * * *, furnished or offered or promised to furnish money or any other thing, act, or service to another who has sustained or will sustain or claims that he has sustained or will sustain loss or damage, as well as any conduct or statements made in negotiation thereof, is inadmissible to prove his liability for the loss or damage or any part of it.'

[10] We cannot accept plaintiff's contention that the correspondence could properly have been admitted to show the contemporaneous and practical construction of the contract. We recognize, however, that the court could properly have admitted the evidence for the limited purpose of proving plaintiff's bona fide and good faith efforts to reach an agreement so that work could be resumed. But the court imposed no such limitation, and we find no basis to hold that defendant waived the point. We finally conclude, however, that, despite the error in admission of the evidence, no prejudice to defendant resulted.

[11] The principle of 'practical construction' applies only to acts performed under the contract before any dispute has arisen. The 'construction *297 given the contract by the acts and conduct of the parties with knowledge of its terms, Before any controversy has arisen as to its meaning, is entitled to great weight and will, when reasonable, be adopted and enforced by the court.'(Italics added.) (Woodbine v. Van Horn (1946) 29 Cal.2d 95, 104, 173 P.2d 17, 22)FN9 By March 8, 1965, the parties had reached a stage of clear disagreement on the crucial question whether plaintiff was entitled to a change order.

Anything said in negotiations after that date could not be admitted under the rule of practical construction; it remained subject to exclusion under Evidence Code section 1152.FN10

> FN9. Accord: Whalen v. Ruiz (1953) 40 Cal.2d 294, 301, 253 P.2d 457;Gillespie v. City of Los Angeles (1950) 36 Cal.2d 553, 561, 225 P.2d 522.

> FN10. Plaintiff cites California Home Extension Ass'n v. Hilborn (1951) 37 Cal.2d 459, 465, 235 P.2d 369, 372, which stated: '(A)lthough the statements were allegedly made during a conference at which the parties were attempting to compromise their difficulties, that fact does not justify exclusion of the evidence if it was otherwise admissible.'Evidence Code section 1152, however, expressly excludes not only offers of compromise but also 'any conduct or statements made in negotiation thereof.'

Plaintiff argues that since the contract provides for its own modification by change orders, a dispute should not be said to arise until the parties have abandoned efforts to resolve the controversy within this contractual framework. Although the instant agreement does include an amendatory procedure, all contracts can be amended by consent of the parties; a compromise in a contract dispute, even if reached at the courthouse steps, will often take the form of a modification of the contract. We see no valid grounds for distinction between contracts which contemplate amendment and those which do not.FN11 The purpose of section 1152, to promote candor in settlement negotiation (see Evid.Code, s 1152, Law Revision Com. com.), applies equally in both instances.

> FN11. The only authority we have found which bears even remotely on the point, Jones, Evidentiary Concepts in Labor Arbitration: Some Modern Variations on Ancient Legal Themes (1966) 13 U.C.L.A.L.Rev. 1241, 1278-1279, discusses the exclusion in labor arbitrations of evidence of offers of compromise arising during the contractual grievance procedure.

***452**1004[12] We have stated that we believe that the correspondence between the parties could have been admitted to show that during the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

delay of March 1965 plaintiff, in good faith and pursuant to the contractual procedure, had engaged in negotiations in the reasonable hope that an agreement could be reached and the work resumed.[FN12] Admission of proof of negotiations for this narrow purpose would not be likely to discourage negotiations; on the other hand, the exclusion of such evidence, after defendant has put in issue the reasonableness of plaintiff's delay of performance, *298 would arbitrarily limit its rebuttal. Plaintiff then argues that 'if evidence is admissible for any purpose, it must be received, even though it may be highly improper for another purpose' (Inyo Chemical Co. v. City of Los Angeles (1939) 5 Cal.2d 525, 544, 55 P.2d 850, 859) and that defendant's sole remedy is to seek a limiting instruction (see Evid.Code, s 355).[FN13] Since defendant requested no such instruction, plaintiff contends that it waived any error.

> FN12. Evidence of the negotiations might also be admissible to rebut defendant's claim that plaintiff failed to mitigate damages (see supra, at pp. 15-16); if defendant had raised any issue respecting plaintiff's exhaustion of contractual remedies the evidence of negotiations would clearly be admissible to prove exhaustion.

> FN13. See Daggett v. Atchison, T. & S.F. Ry. Co. (1957) 48 Cal.2d 655, 313 P.2d 557 (purpose of evidence not specified; objection, for lack of materiality, may have been based on wrong grounds); Hatfield v. Levy Brothers (1941) 18 Cal.2d 798, 809-810, 117 P.2d 841 (evidence offered generally; motion to strike based on incorrect grounds); Brown v. Affonso (1959) 185 Cal.App.2d 235, 239, 8 Cal.Rptr. 156 (evidence offered for proper purpose).

In the instant situation, however, defendant's opportunity to seek a limiting instruction did not constitute a sufficient remedy. (See Adkins v. Brett (1920) 184 Cal. 252, 258-259, 193 P. 251;Brown v. Affonso (1959) 185 Cal.App.2d 235, 239, 8 Cal.Rptr. 156.)The evidence was offered generally; when defendant objected, plaintiff's counsel defended the offer primarily on the ground that the correspondence showed the actions of the parties under the contract.[FN14] The trial court admitted the evidence without any hint of limited purpose, and to all appearances the trial judge had rejected defendant's contention that the correspondence constituted

negotiations of compromise under section 1152. Under these circumstances defense counsel cannot be expected to speculate upon the possibility that the court received the evidence for some undisclosed and limited purpose other than that suggested by its proponent, or to prepare instructions based on any such speculation.[FN15] A trial becomes***453**1005 unfair if *299 testimony thus accepted may be used in an appellate court as though admitted for a different purpose, unavowed and unsuspected. * * * Such at all events is the result when the purpose in reserve is so obscure and artificial that it would be unlikely to occur to the minds of uninstructed jurors, and even if it did, would be swallowed up and lost in the one that was disclosed.'(Shepard v. United States (1933) 290 U.S. 96, 103, 54 S.Ct. 22, 25.)[FN16]

> FN14.Evidence Code section 354 states in part that 'a verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous exclusion of evidence unless * * * it appears of record that: (a) the substance, purpose, and relevance of the excluded evidence was made known to the court * * *.' Thus when evidence is offered on an inadmissible basis, its exclusion is not reversible error. (Witkin, Cal. Evidence (2d ed. 1966) p. 280.) The court may, of course, admit the evidence despite the mistaken theory of its proponent, but in such event fairness may require that the court disclose the limited purpose for which it is admitting the evidence. (Shepard v. United States (1933) 290 U.S. 96, 102-103, 54 S.Ct. 22, 78 L.Ed. 196.)

> FN15.Martinez v. Nichols Conveyor etc. Co. (1966) 243 Cal.App.2d 795, 802, 52 Cal.Rptr. 842, 847, and Southers v. Savage (1961) 191 Cal.App.2d 100, 105, 12 Cal.Rptr. 470, both stated that 'if evidence is admissible on any ground, even though such ground is not specified, either intentionally or unintentionally, by the trial court, this court * * * will not find error in its admission.'This doctrine traces to Wilcox v. Berry (1948) 32 Cal.2d 189, 192, 195 P.2d 414, 416. In that case the trial court admitted Mr. Berry's statement that his car's brakes did not work properly as a spontaneous declaration; we held that it was admissible as an admission against interest, so that 'the

466 P.2d 996
2 Cal.3d 285, 466 P.2d 996, 85 Cal.Rptr. 444
(Cite as: 2 Cal.3d 285, 466 P.2d 996)

ground of the court's ruling is immaterial.'
When evidence is admissible generally, as in Wilcox and Southers, the theory under which it was admitted is immaterial; the evidence comes before the court properly and without restriction on its use. The situation is quite different when, as in the present case, evidence is admitted generally which should have been admitted only for a very limited purpose; in such instances the theory of admission is crucial. Martinez v. Nichols Conveyor etc. Co., supra, 243 Cal.App.2d 795, 52 Cal.Rptr. 842, failed to recognize this distinction. Its application of the Wilcox rationale to evidence admissible only for a limited purpose appears erroneous.

FN16. In Shepard v. United States, supra, 290 U.S. 96, 54 S.Ct. 22, the evidence was offered expressly on an improper ground, and the court commented that 'a different situation would be here if we could fairly say in the light of the whole record that the purpose had been left at large, without identifying token. There would then be room for argument that demand should have been made for an explanatory ruling.'(P. 103, 54 S.Ct. p. 25.)Although in the present case plaintiff's counsel offered the evidence without specifying the ground for admission, he provided an 'identifying token'; plaintiff's counsel defended the offer on the ground that it was admissible to show the practical construction of the contract, and used the evidence for that purpose during the trial.

Furthermore, by the time of the submission of the jury instructions, a significant part of the trial testimony had been devoted to a discussion of the meaning and import of these exhibits. At this point a request for a limiting instruction would have been doubly futile; not only had the court apparently rejected the contention of the defense that the letters were offers of compromise under section 1152, but so much testimony had pertained to the letters that the jury could not reasonably be expected to follow any such instruction.

We have concluded, however, that the error did not cause prejudice to defendant. Plaintiff's third cause of action alleged that plaintiff was entitled to a change order to permit use of rotary mud; the exhibits in question are the most convincing evidence presented on this question and their admission was plainly prejudicial so far as this cause of action is concerned.[FN17] Plaintiff's fourth cause of action, however, was *300 for fraudulent concealment, and the correspondence is immaterial to this cause of action.[FN18]

FN17. After the court had admitted the exhibits into evidence, defendant called Mr. Gill to explain his action and the action of the Board of Public Works respecting the proposed change order. At various times during trial, other witnesses referred to the exhibits without objection. Plaintiff contends that this testimony constitutes a waiver by defendant of its objection to admission of the exhibits, or, alternatively, that it makes any error in their admission non-prejudicial since the content of the documents was substantially repeated before the jury in the oral testimony.
The principle stated in Fernandez v. Western etc. Fuse Co. (1917) 34 Cal.App. 420, 424, 167 P. 900, 902, answers this argument: 'The error was committed at the instance of the opposite party, and appellant did all it could * * * to prevent the error. After the court had held, over the appellant's objection, that the evidence was competent, * * * appellant, in seeking to overcome the case made by the appellee, could follow the theory laid down by the court without impliedly admitting court's action.'(See also De Roulet v. the court's theory to be right, and without waiving his right to question the Mitchel (1945) 70 Cal.App.2d 120, 125, 160 P.2d 574.)

FN18. The jury rendered a general verdict against defendant, and some cases hold that 'even though the evidence may not be sufficient to sustain a cause of action * * * a reversal may not be had upon that ground if the evidence as to other causes of action * * * is sufficient to sustain the verdict.'(Caccamo v. Swanston (1949) 94 Cal.App.2d 957, 971-972, 212 P.2d 246, 255; see e.g., Philpott v. Mitchell (1963) 219 Cal.App.2d 244, 255-256, 32 Cal.Rptr. 911;Guerra v. Balestrieri (1954) 127 Cal.App.2d 511, 517, 274 P.2d 443;Martin

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

466 P.2d 996
2 Cal.3d 285, 466 P.2d 996, 85 Cal.Rptr. 444
(Cite as: 2 Cal.3d 285, 466 P.2d 996)

v. Vierra (1939) 34 Cal.App.2d 86, 94, 93 P.2d 261,94 P.2d 567.)Other cases, however, warn that 'where it seems probable that the jury's verdict may have been based (on error) prejudice appears and this court 'should not speculate upon the basis of the verdict. " (Robinson v. Cable (1961) 55 Cal.2d 425, 428, 11 Cal.Rptr. 377, 378, 359 P.2d 929, 930;Oettinger v. Stewart (1944) 24 Cal.2d 133, 140, 148 P.2d 19.)Neither formula permits us to shortcut our constitutional duty to examine the entire record to determine whether the error has resulted in a miscarriage of justice. (Cal.Const., art. VI, s 13.)

***454**1006 Plaintiff's evidence of error in the test-hole logs and of concealment of material data was largely undisputed and, as pointed out supra at pages 447-448, defendant's disclaimers under such circumstances cannot stand. The only major issue of fact that remains is whether plaintiff relied on the city's data. Plaintiff's president testified that he did so; expert testimony showed that such reliance was reasonable. Defendant points out that plaintiff dug its own test holes, but such holes were intended only to confirm surface conditions and did not go to a depth sufficient to disclose the subsurface conditions misrepresented or concealed by defendant.[FN19]

FN19. Defendant also notes that Mr. Warner testified that 'my procedure would have been about the same' if the plans had contained no test-hole information. Subsequent testimony by Warner indicated that 'procedure' referred to the construction method, and that Warner relied on the data both in computing its bid and in not undertaking further independent investigation of subsoil conditions.

We conclude that it is not reasonably probable that, absent the erroneous admission of the exhibits, defendant would have attained a more favorable result (see People v. Watson (1956) 46 Cal.2d 818, 836, 299 P.2d 243). To the contrary, even if the jury had found for defendant on the third cause of action the probability is that the jury would have returned a verdict for plaintiff based upon proof of fraudulent concealment under plaintiff's fourth cause of action.

4. Damages

Defendant asserts that the $150,000 damages awarded plaintiff includes compensation for speculative and unproven items of damages.*301 Although plaintiff undoubtedly should recover the additional cost of construction attributable to the city's misrepresentations, plus a reasonable profit on the additional work (see City of Salinas v. Souza & McCue Construction Co., supra, 66 Cal.2d 217, 225, 57 Cal.Rptr. 337, 424 P.2d 921), its verified claim specified an itemized additional cost of $70,672.16.[FN20] This figure included $200 a day for personal supervision by James Warner, plaintiff's president. Since Warner is virtually sole owner of plaintiff, and since Gerald Stephenson, plaintiff's certified public accountant, referred to the $200 per day as profit and supervision, plaintiff's claim of $73,672.16 must include a reasonable profit. Defendant concedes that a balance of $4,725 is owing on the original contract; as this balance is a sum certain we add interest in the amount of $630, making a total of $5,355. Defendant also does ot challenge on appeal plaintiff's claim for $2,716.39 on its second cause of action.

FN20. Plaintiff asserts that Warner estimated the original cost of the job at $72,000, and that the final cost was $156,349.53, making an additional cost due to the city's misrepresentations of $84,349.53. This computation is erroneous. The $72,000 does not include the additions resulting from the five change orders, and includes no sum for lost profits; the $156,349.53 figure takes account of the change orders and includes the estimated profit on the contract, but no claim for a reasonable profit on the additional work necessitated by use of rotary mud.

The above items of damage total $81,743.55, which, deducted from the verdict of $150,000, leaves a balance of $68,256.45. According to plaintiff, this sum would do no more than compensate it for further losses. Warner testified that plaintiff was compelled to bear the additional cost of ***455**1007 construction out of its own resources. This loss of capital, according to Warner, forced a curtailment in construction operations and in research; the loss likewise led to a reduction of bonding capacity as well as the destruction of plaintiff's former advantageous competitive position in the industry.

466 P.2d 996
2 Cal.3d 285, 466 P.2d 996, 85 Cal.Rptr. 444
**(Cite as: 2 Cal.3d 285, 466 P.2d 996)**

Page 13

[13] For an established firm such as Warner Construction Corporation, an award for lost profits could not be criticized as speculative. (See Lucky Auto Supply v. Turner (1966) 244 Cal.App.2d 872, 882, 53 Cal.Rptr. 628.)Plaintiff, however, presented no evidence to show the loss of profits resulting from this alleged impairment of capital. Loss of business, restriction of research, reduction of bonding capacity, and destruction of a former advantageous competitive position comprise imponderable factors which may affect different companies to differing extents and amounts. Measurement of the damages requires proof of the effect of these factors upon the profits of plaintiff. (Dallman Co. v. Southern Heater Co. (1968) 262 Cal.App.2d 582, 591-592, 68 Cal.Rptr. 873.)In the absence of such proof, the damages in excess of $81,743.55 are speculative and cannot be sustained.

*302 In Stott v. Johnston (1951) 36 Cal.2d 864, 876, 229 P.2d 348, 355, we upheld an award of $10,000 for damages to good will, stating that 'under all the circumstances here, it is difficult to see what additional evidence plaintiff could have introduced on the damage issue. The law only requires that the best evidence be adduced of which the nature of the case is capable.'FN21Plaintiff has not presented the 'best evidence' available. It did not present evidence of its profits for the years preceding or following 1965; it presented no expert analysis or breakdown of the damages. The damages attributed by plaintiff to loss of capital amount to an annual return of over 30 percent on the capital; plaintiff presented no evidence that its business achieved such a rate of return on invested capital. In sum, although plaintiff undoubtedly sustained damage from the loss of capital, the amount of damage is entirely uncertain, and we cannot believe that plaintiff has brought forth the best evidence of which the case is capable.

FN21. See Steelduct Co. v. Henger-Seltzer Co. (1945) 26 Cal.2d 634, 651, 160 P.2d 804;Dallman v. Southern Heater Co., supra, 262 Cal.App.2d 582, 594, 68 Cal.Rptr. 873;Allen v. Gardner (1954) 126 Cal.App.2d 335, 340, 272 P.2d 19; Rilovich v. Raymond (1937) 20 Cal.App.2d 630, 644, 67 P.2d 1062;Hacker etc. Co. v. Chapman Valve Mfg. Co. (1936) 17 Cal.App.2d 265, 267, 61 P.2d 944. McCormick, Damages (1935), states that: 'In deciding questions of certainty of proof, there seems to be a clearly discernible tendency to treat the problems more and more individually and pragmatically, and not only to insist that The claimant furnish the best available proof of the amount of loss, but also to hold that, if he has furnished the most satisfactory data that the particular situation admits of, this suffices.'(Italics added.) (P. 110.)

[14] Plaintiff contends that defendant waived its right to object to the award. Plaintiff stresses the following points: defendant's failure to demur to the allegations of damages in the complaint, defendant's emphasis in its argument to the jury upon the issue of liability, its omission of any discussion of the amount of damages, and the absence of any objection to the instructions on damages. Defendant, however, has never conceded that plaintiff was entitled to damages in excess of the $4,725 owing on the contract; nor did the instructions compel or permit the jury to award speculative damages. Defendant's tactical decision to emphasize the liability issue and minimize discussion of damages does not, in our opinion, amount to a waiver of defendant's right to object on appeal to speculative damages.

5. Misconduct by Plaintiff's Counsel

In arguing to the jury plaintiff's counsel repeatedly referred to the city's public ***456**1008 works budget of $60,000,000 a year.FN22 Defendant asserts that *303 these references constitute an impermissible appeal to base damages on the wealth of defendant and to take into account the relative poverty of plaintiff. (See Love v. Wolf (1964) 226 Cal.App.2d 378, 388-389, 38 Cal.Rptr. 183.)

FN22. Examples of such references are:
'$184,000 isn't very much as against $60,000,000. On the other hand, it's a tidy sum of money * * *. It's what the damages are fairly shown by the evidence * * * you will find it's the cost of doing business.'
'Who should stand the loss between the contractor with that character and that determination and that purpose in life and that belief in the truth or should a great wealthy municipal corporation spending $60,000,000 a year for such things who have conducted themselves as you have seen in this case?'
'Of course, $100,000 is only peanuts on this operation. You heard Mr. Gill testify that he is spending some $60,000,000 a year. Another witness said they had some

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

466 P.2d 996
2 Cal.3d 285, 466 P.2d 996, 85 Cal.Rptr. 444
**(Cite as: 2 Cal.3d 285, 466 P.2d 996)**

$3,000,000 in the capital improvement fund. That isn't the test how much a person has. The test is what was the damage.'

'Are we going to say the king can do no wrong and Mr. Warner stands the $184,000, his family, his corporation-can it stand that loss or does it come out of the $60,000,000 a year that Mr. Gill is spending. I think there's a strong moral here. I think that a government has to be honest with its subjects. There must be a truthfulness, a certain faith, a certain integrity btween the city and the individual because if the city is dishonest then what can we tell our children?'

[15] During plaintiff's argument to the jury defense counsel did not object or request that the jury be admonished; instead, he waited until the conclusion of the arguments and then moved for a mistrial. In Horn v. Atchison T. & S.F. Ry. Co. (1961) 61 Cal.2d 602, 610, 39 Cal.Rptr. 721, 725-726, 394 P.2d 561, 565-566, we stated: 'Generally a claim of misconduct is entitled to no consideration on appeal unless the record shows a timely and proper objection and a request that the jury be admonished. * * * In the absence of a timely objection the offended party is deemed to have waived the claim of error through his participation in the atmosphere which produced the claim of prejudice. The motion for a mistrial in the instant case can hardly be deemed a timely objection as the claimed damage could not then be forestalled.'[FN23]

> FN23. Unlike Horn, counsel did request that the jury be admonished to disregard the alleged improper statements. Defendant submitted an instruction, stating as it did so its belief that the instruction would not cure the prejudicial effect of the misconduct. The court refused the instruction on the ground that instructions against verdicts based on passion or prejudice, and prohibiting punitive damages, were sufficient.

To the extent that it awards damages in excess of $81,743.55, the judgment is reversed and the cause remanded for further proceedings in accord with the views herein expressed; in all other respects the judgment is affirmed. The parties shall bear their own costs on appeal.

McCOMB, PETERS, MOSK and SULLIVAN, JJ.,

and COUGHLIN,[FN*] J. pro tem., concur.

> FN* Assigned by the Chairman of the Judicial Council.

Cal. 1970.
Warner Constr. Corp. v. City of Los Angeles
2 Cal.3d 285, 466 P.2d 996, 85 Cal.Rptr. 444

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.