MANATT, PHELPS & PHILLIPS, LLP
RONALD S. KATZ (California Bar No. 085713)
E-mail: rkatz@manatt.com
RYAN S. HILBERT (California Bar No. 210549)
E-mail: rhilbert@manatt.com
1001 Page Mill Road, Building 2
Palo Alto, CA 94304-1006
Telephone: (650) 812-1300
Facsimile: (650) 213-0260

Attorneys for Defendant/Counterclaim and
Third-Party Plaintiff Maritz Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT

SAN FRANCISCO DIVISION

| | |
|---|---|
| VISA U.S.A. INC.,<br><br>　　　　Plaintiff/Counterclaim<br>　　　　Defendant,<br><br>　　v.<br><br>MARITZ INC., d/b/a MARITZ<br>LOYALTY MARKETING,<br><br>　　　　Defendant/Counterclaim<br>　　　　and Third-Party Plaintiff,<br><br>　　v.<br><br>CARLSON MARKETING GROUP, INC.<br><br>　　　　Third-Party Defendant. | CIVIL ACTION NO. C 07-5585 JSW<br><br>DECLARATION OF STEVE GALLANT |

MANATT, PHELPS &
PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

2778303

DECLARATION OF STEVE GALLANT
CASE NO. C07-5585 JSW

I, Steve Gallant, do hereby declare under penalty of perjury as follows:

1. I am Associate General Counsel at Maritz Inc. ("Maritz"). I live in St. Louis County, Missouri, and work at Maritz's headquarters in Fenton, Missouri.

2. On or about April 23, 2007, I reviewed a letter dated April 20, 2007, from Elizabeth L. Buse of Visa U.S.A. Inc. ("Visa") to Kelvin Taylor of Maritz (the "April 20 letter"). Ms. Buse advised Maritz in the April 20 letter that Visa was terminating the Master Services Agreement dated April 17, 2006 (the "Agreement") effective May 20, 2007. A copy of the April 20 letter is attached hereto as Exhibit 1.

3. I specifically recall noting as I reviewed the April 20 letter that Visa was not terminating the Agreement based upon any claim that Maritz was in material breach or in default under Section XII.A.1 or Section XII.A.2(a) of the Agreement. Had Visa attempted to terminate for material breach, Maritz would have been entitled to notice and opportunity to cure under Section XII.A.1 of the Agreement. (A copy of the pertinent provisions of the Agreement is attached hereto as Exhibit 2.) Instead, according to the April 20 letter, Visa was terminating the Agreement pursuant to Section XII.A.2(b) of the Agreement because Visa had decided to implement the Visa Extras Rewards Program through a different vendor.

4. Since Visa was not terminating the Agreement based upon any alleged default or material breach but instead under Section XII.A.2(b), I considered Visa's termination to be a termination for convenience.

5. Since Visa was terminating the Agreement for convenience, I reviewed the portion of the Agreement pertaining to Maritz's right to be compensated following termination. The Agreement provided for Visa to pay Maritz for, among other things, completed Milestones and also for partially completed Milestones on a pro-rata basis based on percentage of completion.

6. I considered Ms. Buse's "reservation of rights" language in her April 20 letter to be simply standard language to preserve Visa's ability to object to the amount that Visa would have to pay to Maritz in light of Visa's "for convenience" termination.

7. In response to the April 20 letter, Maritz's Kelvin Taylor sent a letter to Visa dated May 7, 2007 (the "May 7 letter") in which Maritz advised Visa that, in accordance with

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

2778303

2

DECLARATION OF STEVE GALLANT
CASE NO. C07-5585 JSW

1  Section XII.A.2(b) of the Agreement, the amount due and owing to Maritz from Visa was
2  approximately $5.2 million. A copy of the May 7 letter is attached hereto as Exhibit 3.

3      8.    Maritz's May 7 letter contains a very brief reservation of rights sentence. Maritz
4  anticipated, quite simply, that Visa might attempt to pare down the $5.2 million that Visa owed,
5  and Maritz therefore was simply reciprocally reserving its rights to the extent it might be relevant
6  to do so. I thought that Visa might disagree, for example, with Maritz's percentage completion
7  estimates for partially completed Milestones and thus attempt to reduce the amount that Visa
8  would have to pay Maritz.

9      9.    Ms. Buse subsequently sent letters to Mr. Taylor dated June 5 and July 2, 2007 in
10  which Ms. Buse again mentioned Visa's reservation of rights. As of those dates, I had no reason
11  to believe that Visa was claiming that Maritz should pay it any money, much less the tens of
12  millions of dollars that Mr. Thompson subsequently revealed on July 23, 2007. To my
13  knowledge, no one from Visa had made any such claims to Maritz, and I am confident I would
14  have been told had such claims been made. Such claims would also have been completely
15  inconsistent with Visa's termination of the Agreement which was based on convenience rather
16  than default and as such I considered the "reservation of rights" language to be redundant to that
17  of the April 20 letter.

18      10.    On Monday, June 18, 2007, Mark Peterman of Maritz told me that he had spoken
19  with David Shepard of Visa on Friday, June 15, 2007. According to Mr. Peterman, Mr. Shepard,
20  Tad Fordyce and Tim Attinger of Visa were available to meet with Maritz in mid-July 2007 to
21  discuss Maritz's invoices, which was consistent with what I believed we were going to discuss
22  with Visa. (I understood that Mssrs. Fordyce, Attinger and Shepard all had leading roles for Visa
23  in connection with the Rewards Program project, as did Mr. Peterman for Maritz.) To my
24  knowledge no one from Visa told Mr. Peterman that Visa considered Maritz to be in default, or
25  that Visa was looking for any payment from Maritz, much less that Visa believed that Maritz
26  owed Visa tens of millions of dollars. If Visa had so informed Mr. Peterman, I would have been
27  informed.

11. A copy of Mr. Peterman's June 18, 2007 email reflecting his June 15, 2007 discussion with Mr. Shepard of Visa is attached hereto as Exhibit 4.

12. On July 2, 2007, Ms. Buse of Visa sent a letter to Mr. Taylor of Maritz (the "July 2 letter") in which she proposed a three stage process to negotiate a resolution. Ms. Buse suggested that the parties first engage in direct negotiations; then a non-binding mediation if the negotiations were unsuccessful; and an arbitration if the mediation was not successful. She suggested in her July 2 letter that Maritz's legal counsel contact Visa's counsel to establish a mutually acceptable procedure.

13. As of July 2, 2007, my belief and understanding was that we were going to negotiate how much of the $5.2 million referenced in Mr. Taylor's May 7 letter Maritz was entitled to receive from Visa pursuant to the termination for convenience portion of the Agreement. To my knowledge, as of July 2, 2007, Visa had not told Maritz that Visa considered Maritz to be in default, or that Visa expected Maritz to pay anything, much less that Visa would claim that Maritz owed tens of millions of dollars.

14. Based upon Ms. Buse's July 2 letter, I contacted Visa's counsel, Rod Thompson.

15. I had several conversations or communications with Mr. Thompson between Maritz's receipt of the July 2 letter and July 9, 2007. At no time during any of these discussions or communications did Mr. Thompson say or indicate that Visa was claiming that Maritz was in default, or that Visa would claim that Maritz should pay Visa anything, much less that Visa was owed tens of millions of dollars. Nothing that Mr. Thompson said to me suggested that Visa had or was making any claim for money from Maritz. Based on our conversations, I was led to believe that we were trying to devise a process for determining the amount of compensation that Maritz was owed by Visa under the Agreement in light of Visa's termination for convenience.

16. I believe it was reasonable for me to expect that, if Visa intended to make a default claim exceeding the amount of Maritz's invoices by ten times or more and to resolve that claim in binding arbitration, Mr. Thompson would tell me. He did not, nor to my knowledge did Visa convey any such information to anyone else at Maritz.

17.   I also knew that under Section XXII.A. of the Agreement, the parties were obligated to act in good faith and reasonably in resolving any disputes that arose under the Agreement (See Exhibit 2). More specifically, Section XXII.A. of the Agreement provides:

> "**DISPUTE RESOLUTION.**
>
> A.   **Good Faith.**  The Parties shall act in good faith and reasonably in interpreting this Agreement and the Related Agreements and resolving any disputes that arise thereunder."

If Visa was claiming that Maritz owed it tens of millions of dollars, then Visa/Mr. Thompson should have disclosed this information before inducing me to agree to an arbitration.

18.   On July 9, 2007, Mr. Thompson sent me a letter (the "July 9 letter") which contained, among other things, an agreement to arbitrate. I signed and returned the July 9 letter the next day. At no time before I signed the July 9 letter did Mr. Thompson ever say or indicate to me that Visa considered Maritz to be in default, or that Visa expected Maritz to pay Visa anything, much less that Visa was or would be seeking tens of millions of dollars from Maritz.

19.   Under these circumstances, I was willing to agree to a three-step approach to try to resolve things, i.e., a business negotiation, followed by a mediation if the meeting were unsuccessful, followed by an arbitration if the mediation were unsuccessful. I never would have agreed to arbitrate in the July 9 letter had I known that Visa was claiming that Maritz had defaulted and that Visa was owed tens of millions of dollars in alleged damages.

20.   The agreement to arbitrate in the July 9 letter provides that the arbitration "will allow for only limited discovery" and that the hearing must be commenced within 90 days after the mediation process ends. I would never have agreed to such an expedited schedule or to limited discovery had Visa revealed that it would be seeking tens of millions of dollars from Maritz. I would not have been willing to arbitrate under these conditions a default claim against Maritz for tens of millions of dollars (which is a vastly different claim than one in which Maritz was seeking to recover $5 million in termination for convenience compensation).

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

2778303

5

DECLARATION OF STEVE GALLANT
CASE NO. C07-5585 JSW

21. My objection all along has been only with the agreement to arbitrate. Although Visa and Mr. Thompson had misled Maritz and me, and their conduct raised serious questions in my mind as to whether either negotiations or mediation would be successful, Maritz and I nonetheless were still willing to meet with Visa and also to attempt to mediate our differences, and Maritz in fact did meet with Visa and did participate in the mediation. However, we were not and are not willing to give up (among other things) Maritz's right to a jury trial, Maritz's right to conduct discovery that is critical to getting to the bottom of Visa's belatedly-revealed claims for tens of millions of dollars, or to limit Maritz's possible rights on appeal.

22. Mr. Thompson did not reveal Visa's claims to me until approximately two weeks after he sent his July 9 letter containing the agreement to arbitrate.

23. More specifically, on Monday, July 23, 2007, I returned to the office after having been on vacation. That morning, I read the proposed "Alternative Dispute Resolution Protocol" that Mr. Thompson had sent me by letter dated July 19, 2007. The proposed Protocol stated that "Each Party claims the other should make a payment to resolve the dispute." My immediate reaction was that the sentence was probably a mistake that resulted from a carry-over from a "form" protocol that Mr. Thompson or Visa had used in the past. Shortly thereafter, I met with Mark Peterman and Stu Vincent of Maritz, both of whom had been intimately involved in the Visa project. The purpose of the meeting with Mr. Peterman and Mr. Vincent (which had been previously scheduled) was to prepare for a meeting that had been scheduled in St. Louis with Visa for the next day, July 24, 2007, at which we were going to discuss the $5.2 million that Visa owed as referenced in the May 7 letter. I showed Mssrs. Peterman and Vincent the sentence in the proposed Protocol and asked them if they knew of any claim by Visa that Maritz should pay Visa money to resolve the dispute. They told me that they did not. In fact, they told me that Mr. Peterman had spoken with Mr. Fordyce the previous Friday, July 20, 2007, and had discussed with him how the negotiations on July 24 would proceed, and that Fordyce had confirmed Peterman's understanding and expectation that the purpose of the July 24 meeting was to cover Maritz's invoices. Mr. Fordyce had said nothing, according to Mr. Peterman, about Visa having any claim that Maritz should pay money.

MANATT, PHELPS & PHILLIPS, LLP
ATTORNEYS AT LAW
PALO ALTO

2778303

6

DECLARATION OF STEVE GALLANT
CASE NO. C07-5585 JSW

24.     I quickly followed up and called Mr. Thompson. I told him that I had noticed the "Each party claims the other should make a payment" language in the proposed Protocol and told him that I assumed it was a mistake or a carry-over from another form. He told me it was not a mistake and then revealed, for the first time, that Visa was claiming that Maritz owed Visa tens of millions of dollars.

25.     I essentially told him that this was news to me and that I was very surprised. Mr. Thompson then claimed that our business people had known about this for many months. I knew his statement was untrue, since Mr. Peterman and Mr. Vincent of Maritz had told me less than two hours earlier that they did not know that Visa was claiming that Maritz should pay Visa anything, much less that Maritz supposedly owed Visa tens of millions of dollars.

26.     When Mr. Thompson revealed that Visa was claiming that Maritz owed Visa tens of millions of dollars, I was incensed and immediately felt as if we (i.e., Maritz and I) had been duped, deceived and lied to. Although I may have indicated at the time that I was not "accusing" Mr. Thompson of certain things, that was largely because accusing him at that point of fraud and improper conduct would not have accomplished anything and probably would have led to some very harsh and uncomplimentary things being said. Moreover, I wanted to try to keep the discussion on a professional level and did not want my emotions to get the better of me. He had clearly deceived me, but I did not want his deceitful conduct to result in my stooping to a similar level.

27.     Pursuant to my initial reaction, I told him that I saw no reason for Visa to come to St. Louis on July 24 for the meeting because we (Maritz) did not have any information about Visa's claim and the trip therefore would be a waste of time. Upon further reflection, I called Mr. Thompson back and told him that they could come on out. He told me that they had decided not to come.

28.     Mr. Thompson clearly knew we were surprised by Visa's claim. He sent me an email on July 23 stating that "in light of Maritz [sic] surprise about Visa's claim for damages, it makes sense not to rush into a meeting without an agreement on the details of the process." A copy of this email is attached hereto as Exhibit 5.