**Exhibit 2
to the
Declaration of Steve Gallant**

[EXECUTION COPY]

MASTER SERVICES AGREEMENT

between

VISA U.S.A. INC.,
a Delaware corporation

and

MARITZ INC.
d/b/a Maritz Loyalty Marketing,
a Missouri corporation

Dated April 17, 2006

17529\895193.18

Exhibit 2

(iii)  Activation and Enrollment: managing Member and Cardholder participation status;

(iv)  Account Maintenance: maintaining participant files and information;

(v)  Transaction Processing: receiving and dispersing transaction information;

(vi)  Point Issuance/Earnings: tabulating and assigning points balances;

(vii)  Redemption and Fulfillment: inventory and mailing of catalog items, corresponding account procedures;

(viii)  Customer Service: user interface/touch-points through web, VRU, phone;

(ix)  Reporting and Billing: Visa and Member management information and operational reports, and accounting/billing procedures;

(x)  Reward Administration: securing and updating the rewards catalog offerings; and

(xi)  Program Management: ensuring all aspects of the Rewards Program operate as agreed, including implementation of Member options.

**IV.    TERM.** The initial term of this Agreement will commence upon the Effective Date and continue until the end of the third year following the Phase I-A Launch Date, unless earlier terminated under Section XII below. Thereafter, this Agreement will automatically be renewed for succeeding terms of two years, subject to Section XII. As used herein, "Term" means the time period between the Effective Date and the date of termination including renewal terms (if any).

**V.    SCOPE OF SERVICES.** During the Term, Maritz will provide the following services under this Agreement and the Related Agreements:

**A.    Platform Development Services.** Maritz will perform Development Services according to the provisions of the Development Agreement, and its attached schedules and/or exhibits.

**B.    Hosting and Maintenance Services.** Maritz will perform the hosting and maintenance services according to the provisions of the Hosting and Maintenance Agreement, and its attached schedules and/or exhibits.

**C.    Rewards Program Administration Services.** Maritz will develop, manage, and implement the Rewards Program and provide the Program Services to Visa and/or participating Members and their Visa Cardholders in the United States as set forth in the Business Requirements and the Service Level Agreement.

**VI.    RESPONSIBILITIES RELATING TO PROGRAM SERVICES.** During the Term, and in some cases beyond, the Parties agree to perform as follows:

17529\895193.18

**A.    Procedures and Performance Standards.** Maritz will comply with the Service Levels set forth in the Service Level Agreement. In the event that Maritz fails to meet any of the Service Levels with respect to its performance for Visa or Members, the Service Quality Adjustment as set forth in the Service Level Agreement, will apply, except as otherwise set forth herein. The Parties agree that such Service Quality Adjustments will not be the exclusive remedy of Visa with respect to Maritz's failure to meet Service Levels, but will be in addition to any other remedy available under this Agreement, at law or in equity: however, any monetary remedy will take into account any amounts issued as a Service Quality Adjustment.

**B.    Reports and Call Logs.** Maritz will provide Visa with a monthly written report (the "Report") by the 10th business day of each month as set forth in the Service Level Agreement. Additionally, Maritz will retain logs of all Cardholder and Member contacts through the Rewards Program contact center and any pertinent documentation relating thereto for seven (7) years after the close of any such contact. Maritz will make such logs and documentation available to Visa (and/or Visa's designated agent) upon Visa's written request, or to the pertinent Member for that Member's Cardholders, upon Member's written request. In the event of inadvertent human error with respect to the retention of call log information for any identified individual transaction, Maritz will review and make recommendations in accordance with the Change Control Process.

**C.    Security Procedures.** In order to secure the operations and confidentiality of data with respect to the Program Services to be provided hereunder, Maritz will take the appropriate action steps to comply with the Payment Card Industry Data Security Standard ("PCI") and the Visa Cardholder Information Security Program ("CISP", and together with PCI, the "Security Procedures") at all times during the term of this Agreement. For the Visa Extras Program, Maritz will complete the initial CISP and PCI audit and submit the results to Visa by a date to be agreed upon by the Parties not later than the Phase I-A Launch Date that will provide adequate time to create the action plans set forth below prior to the Phase I-A Launch Date. Subsequent to the initial audit, action plans to address any areas of noncompliance will be developed by Maritz and Visa and Maritz shall use commercially reasonable efforts to complete such action plan and validate its compliance by no later than the Phase I-A Launch Date. Maritz agrees that after initial compliance its obligation to comply with CISP is ongoing, and further agrees to comply with CISP's requirement of annual recertification. The CISP and the PCI, as in effect on the date hereof, have previously been supplied to Maritz. Maritz acknowledges that the CISP and the PCI may change from time to time. After the Phase I-A Launch Date, Maritz will implement any new Security Procedures requested by Visa in writing, within 10 business days after receipt of such request unless, however, such changes constitute a material change to the Rewards Platform or Program Services, in which case the Parties will agree on the schedule for implementation of such changes through the Change Control Process. Failure to comply with Security Procedures within the agreed upon time period which is not remedied within ten (10) business days after receipt of written notice to Maritz will constitute a material breach of this Agreement, provided, however, in the event that a breach cannot through reasonable diligence be remedied within such ten (10) day period, then the time for effecting a cure may be extended by mutual agreement of the Parties so long as Maritz is diligently pursuing a remedy. In addition to the CISP validation and annual recertification referenced above,

7

Maritz consents to additional testing and audits by Visa, at Visa's discretion and at Visa's expense (for outside third party expenses only), to confirm Maritz's compliance with such Security Procedures. Maritz agrees that it shall not store (in electronic form or otherwise) any magnetic stripe data from any payment cards.

**D.    Corrective Action Requirement and Notice.**

    **1.**    Any time either Party has any reason to believe: (i) a failure to comply with either VI. A., B, or C above (including, without limitation, any printing, systems or other error); or (ii) any fraudulent activity, has or might occur, that Party will immediately inform the other, using the fastest form of communication available. Any such notification will be recapped in a follow up written communication. Immediately thereafter, Maritz will provide Visa with a written plan outlining the prompt corrective action required, and, if the Parties agree the action is correct, Maritz will diligently pursue the implementation of such at Maritz's sole expense. Maritz will provide promptly, and in any event not later than three days after the occurrence thereof, a written report setting forth the details of such failure to comply or fraudulent activity and the actions taken to remedy the same.

    **2.**    The Parties agree that, in the event of an over-issuance of points to Cardholder(s) accounts or erroneous printed or oral communication of excessive points to Cardholder(s), resolution may include recapturing such over-issuance through debiting the Cardholder(s) points account or not allowing the redemption of the over-issued points ("Points Adjustment"). Any such resolution will have as a priority the goal of minimizing the impact on the Cardholder(s) and in all events will be subject to prior written approval by Visa. Maritz acknowledges that Visa may be required to seek and secure approval by the particular Member or Members for any such Points Adjustment depending upon the circumstances, in Visa's sole discretion. Maritz shall indemnify Visa and each Member for any losses, costs, expenses or other damages resulting from any actual misallocation of points, any erroneous communication of excessive points or any Points Adjustment to the extent such misallocation, erroneous communication or need for such Points Adjustment was the result of Maritz's error, negligence or willful misconduct.

**E.    Dedicated Telephone Numbers.** Maritz agrees that all telephone numbers published for Cardholders and Members in relation to the Rewards Program will be exclusively dedicated thereto. Any changes to the telephone numbers used for the Rewards Program will require the mutual agreement of the Parties. In the event of any termination of the Agreement, Maritz will expedite the transfer of such numbers in accordance with Section XII.B.2 below. Visa will own all phone numbers used for the Rewards Program.

**F.    Overseas Work.** Maritz shall not conduct any Program Services outside of the United States, whether directly through its own employees or through subcontractors, consultants or other third parties, unless it has provided not less than thirty (30) days prior written notice to Visa of its intent to conduct such work outside of the United States

and Visa has consented to the same in writing. Maritz shall ensure that adequate security measures are put in place to ensure that all work done outside of the United States shall comply with the terms and conditions of this Agreement, including without limitation the provisions of Article XIV (Confidentiality) hereof, and the guidelines of the Federal Financial Institutions Examination Council ("FFIEC") on off-shore activities, including the Bank Secrecy Act Anti-Money Laundering Examination Manual, the IT Examination Handbook on Outsourcing Technology Services and such other relevant guidelines as the FFIEC may publish from time to time.

**G.    Disaster Recovery Plan.** Not less than thirty (30) days after the Phase I-A Launch Date, Maritz will provide Visa with a written disaster recovery plan ("Disaster Recovery Plan") based upon requirements provided by Visa, detailing Maritz's capabilities and procedures which will meet minimum requirements deemed adequate by Visa and will include contingencies for data, telecommunications, information systems and operations. The Disaster Recover Plan shall comply in all respects with all applicable laws and regulations, including banking regulator supervisory requirements. If Visa determines such safeguards to be inadequate, Maritz will, at its own cost, implement any requested changes within thirty (30) days of notification from Visa or, if Maritz can demonstrate to Visa's satisfaction that such schedule is not commercially reasonable, then upon a reasonable schedule set by mutual agreement. Promptly after such changes are implemented, Maritz will provide an update to its Disaster Recovery Plan. Such procedures and disaster recovery capabilities primarily apply to the operations of Maritz, but will also apply to any other facilities utilized by Maritz to perform the Program Services including any facilities of Maritz or its subcontractors necessary for compliance with the Service Level Agreement, the Security Procedures referred to in Section VI.C above, and the procedures for protecting Confidential Information and Cardholder information referred to in Section XIV below. When completed and approved by Visa, the Disaster Recovery Plan will be attached to this Agreement as Exhibit D and made part of this Agreement. Not less than thirty (30) days after the Phase I-A Launch Date, and thereafter during the Term of this Agreement on or before November 1 of each year, Maritz will conduct an off-line "cold recovery" of its information infrastructure, including a non-production link to the call center to validate its recovery procedures. Within five (5) days of each such test, Maritz will submit a written report to Visa detailing the results of the latest test.

**H.    Operational Inspections/Monitoring.** Maritz will secure for Visa or its designated representatives the right to perform from time to time inspections during normal business hours of Maritz facilities, operations and records pertinent to the provision of Program Services hereunder upon reasonable prior written notice from Visa, and will ensure for Visa and/or its designees cooperation in connection with such inspections. Visa will have the right to place random and unannounced test calls to service numbers used by Maritz for the Program Services to validate service quality and to conduct silent monitoring sessions. Visa and Maritz will agree on a mutually acceptable procedure for both Maritz and Visa to monitor Member and Cardholder calls to Maritz and other interactions, including Web site, e-mail and IVR. Such procedures shall include on-site and remote monitoring of such calls, audio recording of calls and periodic review of recorded calls. Maritz will be responsible for complying with all laws applicable to remote telephone monitoring. Maritz will arrange for performance tests to

be conducted not less than once every six months to demonstrate compliance with service levels set forth in the Service Level Agreement, which tests shall be conducted in coordination with Visa. Visa may request additional performance tests in addition to the tests set forth in the preceding sentence, with the costs for Visa's employees in connection with such additional performance tests to be at Visa's expense.

**I.      Records; Audit Rights; Financial Statements.**

**1.**      Records. During the term of this Agreement and for a period of not less than three (3) years after the termination or expiration of this Agreement, Maritz shall maintain complete and accurate records concerning its performance under this Agreement and all amounts charged by Maritz hereunder.

**2.**      Audit Rights. Maritz shall allow Visa or its designated agent access during normal business hours during the term of this Agreement and for six (6) months thereafter to perform audits of Maritz's facilities, operations, staffing and records relating to Program Services to determine whether Maritz is in compliance with this Agreement, including without limitation CISP and PCI compliance. Maritz shall also provide Visa or its designated agent during normal business hours with books, records and supporting documentation adequate to evaluate Maritz's performance. Any determination made by Visa or its agent regarding Maritz's compliance with its obligations under this Agreement shall not relieve Maritz of any liability for breach of this Agreement. In the event that any audit by Visa or its designee reveals an overcharge by Maritz of five percent (5%) or more in the aggregate for the period being audited, Maritz shall reimburse Visa for the costs of such audit or, at Visa's option, credit such amounts against future payments due from Visa. Maritz shall, in any event, promptly refund to Visa any amounts that any audit reveals as having been overpaid to Maritz.

**3.**      Financial Statements. Upon Visa's request, Maritz shall provide Visa with a copy of Maritz's most recent audited financial statements, a letter from Maritz's certified public accountant, and/or other documentation acceptable to Visa, setting forth Maritz's then-current financial status. Maritz represents, warrants and agrees that all such documentation will be complete and accurate. Visa acknowledges and agrees that such documentation is confidential to Maritz and shall restrict access to those employees and advisors who have a need for such access in order to monitor and evaluate Maritz's continued performance under this Agreement.

**J.      Liaison Between the Parties.** Except as otherwise expressly provided in this Agreement, Visa and Maritz will communicate directly with one another in the administration of the Program Services. For this purpose, each Party will designate in writing at least one management level person, reasonably acceptable to both Parties, to administrate each Party's performance under this Agreement (each, a "Program Manager"). Maritz shall cause the person assigned by it as Program Manager to devote substantial time and effort to the Rewards Program. The Maritz Program Manager is prohibited from working for Visa Competitors. Informal and multiple lines of communication between the Parties are encouraged, provided that, in circumstances in

17529\895193.18

which one Party seeks to rely on instructions or advice of the other, until given further written notice, Visa may rely on communications on behalf of Maritz from the Maritz Program Manager or his or her superior officers and Maritz may rely on communications from the Visa Program Manager or his or her superior officers. The Parties will designate replacements of their representatives for purposes of this Section VI.J by giving the other Party written notice of the replacements in accordance with Section XXIII.G below.

**K.     Handling of Member or Cardholder Complaints.** In the event a Member, merchant or Cardholder communicates to Maritz any dissatisfaction with any action or advice given by Maritz or if Maritz receives notice of a threat of legal or regulatory action or inquiry with respect to the Rewards Program, Maritz will promptly notify the Visa Program Manager of the complaint and the identity of the Party complaining, along with the action taken or proposed to be taken. In the event a Member, merchant or Cardholder communicates to Visa any dissatisfaction with an action or advice given by Maritz or if Visa receives notice of a threat of legal or regulatory action or inquiry with respect to the Rewards Program, Visa will promptly notify the Maritz Program Manager of the complaint and the identity of the party complaining, and Maritz will promptly notify the Visa Program Manager of the action taken or proposed to be taken by Maritz. Maritz will not take any legal action with respect to any complaint by a Member (except to exercise Maritz's rights as described in a separate agreement between Maritz and the Member, and only to the extent such exercise of rights does not impact Visa's rights hereunder), merchant or Cardholder until after consultation with and approval of the action by the Visa Program Manager or his or her superior officer, as well as an officer of the Visa legal department, which approvals will not be unreasonably withheld.

**L.     Quarterly Meetings.** The Parties will be represented by management-level personnel directly responsible for performance hereunder at a service update and/or planning meeting to be held, at Visa's option, at least quarterly, at a time and place to be agreed upon by the Parties. At such meetings, Maritz will present a review of the actual Program Services used by Cardholders during the previous quarter and year. At each such meeting, Maritz will: (i) identify and suggest solutions to customer service issues; (ii) describe any fraud control activities; (iii) identify any additional joint marketing opportunities; (iv) provide Program Services review, updates and recommendations; and (v) review performance expectations. Additionally, the Parties may discuss any adjustments to the Program Services at such meetings. The Parties will bear their own expenses with respect to such meetings.

**M.     Transfers of Personnel.** In the event any Maritz personnel providing Program Services transfer out of such position, Maritz will provide adequate training to the replacement personnel prior to the departing employee's transfer or departure date, if at all possible.

**N.     Transaction Information.** Visa shall provide to Maritz, to the extent permitted by law and existing contractual obligations, information relating to the existing Visa Extras rewards program (the "Existing Program") to the extent reasonably necessary for Maritz to carry out the Development Services and to ensure the migration of the Existing Program to the Rewards Platform. From and after the Phase I-A Launch Date and prior

11

Visa Competitor or have responsibility for the overall development of such a program.

**B.    Permitted Activities for Visa Competitors.**

In the event Maritz provides any services of any kind to any Visa Competitors, it will provide Visa with not less than thirty (30) days prior written notice of its intention to do so and will:

1.    Separate the management of such services so that individuals with overall account management and strategy roles, currently the rank or equivalent of Account General Manager, Director, Account Solutions and/or Account Manager do not work on both the Program Services and the Visa Competitor's services, and, in addition to complying with its confidentiality obligations described in Section XIV hereof, Maritz will permit no access to Program Services-related data to any Visa Competitor or internal staff members who provide overall account management and strategy services for the Visa Competitor. As used in this Section, "Account General Manager" means the person directly superior to the supervisor having direct supervisory responsibility for the personnel communicating with Visa, Cardholders, and Members in the performance of the Program Services.

2.    To the extent possible within Maritz's existing physical plant, physically separate facilities occupied by Maritz Customer Service and Account Services representatives supporting the Visa Competitor from those used to provide Program Services to Visa, including using separate workstations. Such facilities will be deemed separate if those used to provide Program Services to Visa are located in a separate work area, not immediately adjacent to the work area used to support the Visa Competitor, and Maritz will implement controls and procedures to prevent Maritz representatives supporting the Visa Competitor from accessing or being informed of any Confidential Information relating to the Rewards Program. The Rewards Platform shall be hosted on dedicated Infrastructure that is not used for services to any third party, including Visa Competitors.

3.    Use separate telephone numbers and P.O. Boxes for the Program Services and the services provided to the Visa Competitor.

4.    Make no use of Visa marks or name including but not limited to the branding of the Rewards Program in any communication with customers, merchants or members of the Visa Competitor unless otherwise approved by Visa in writing.

## XII.    TERMINATION.

**A.    Early Termination.**  Any termination of this Agreement will also constitute the termination of each of the Related Agreements, unless the Parties otherwise agree in writing. Each Party's termination rights are set forth below:

17

1.    This Agreement can be terminated by either Party upon a material breach by the other Party of any provision of this Agreement, the Development Agreement or any other Related Agreement, effective thirty (30) days after delivery of written notice to such other Party of its intention to terminate and the nature of such breach, except that if the breach is remedied within that thirty (30) day period, this Agreement will continue as though such notice had not been sent. Without limitation on any other right or remedy available to Visa and/or its Members under this Agreement, Maritz will be in material breach if it fails to meet the identified service and performance levels defined in the Service Level Agreement for four consecutive 30-day periods or eight out of twelve 30-day periods. Notwithstanding the foregoing, in the event that Maritz alleges a breach of Visa's performance or payment obligations under this Agreement, Maritz shall not be entitled to terminate this Agreement provided that Visa has paid all undisputed amounts and performed all undisputed obligations.

2.    During the Development Phase, Visa may terminate this Agreement (a) immediately by written notice if Maritz's delivery of any critical Milestone (as identified in the Milestone Schedule) is more than two (2) weeks overdue, except to the extent such delay was caused by Visa, a third party with respect to which Visa exercises control, Visa's existing service provider or by material changes in the scope of the development project beyond that set forth in the Specifications, subject to Section XXIII.I herein; or (b) upon thirty (30) days written notice if Visa determines in its sole discretion not to develop or Launch the Rewards Program, or to develop or implement all or part of the Rewards Program internally or through other outside vendors. In the event of termination pursuant to clause (b) above, Visa will pay Maritz any amounts due for completed Milestones and, on a pro-rata basis based on percentage of completion for in-progress Milestones, for work commenced prior to the receipt of such notice and which cannot through Maritz's commercially reasonable efforts be reduced or cancelled, but not exceeding the amounts that would have been due and owing had all such Milestones been completed, together with any amounts retained by Visa from payments for Milestones completed prior to such termination, which payments will be subject to any fee adjustments based on Maritz's failure to deliver any Milestone as required under the Milestones Schedule (as defined in the Development Agreement) in addition to other rights and remedies available to Visa and/or its Members. In the event that this Agreement is terminated pursuant to this Section XII.A.2 and any payments made by Visa for completed Milestones or in-progress Milestones have been used to purchase Infrastructure in the form of equipment, such equipment shall be the property of Visa, and Maritz shall comply with Visa's reasonable instructions concerning delivery or disposition of such equipment.

3.    A Member may terminate the participation of any or all of its Cardholders in the Rewards Program hereunder at any time upon written notice to Maritz. Maritz may cancel Program Services to any Member and such Member's Cardholders if the Member fails to remit the necessary payment for any undisputed charges owed to Maritz under a separate Agreement between Maritz and Member for customization services, provided however, that such action is

18

17529\895193.18

consistent with Maritz's separate agreement with the Member, Maritz serves prior written notice to Visa and such Member not less than ninety (90) days in advance of such cancellation, and the failure to remit the necessary payment is not cured within such ninety (90) day period.

4.    Visa may terminate this Agreement immediately in the event that Maritz declares bankruptcy or is unable or fails to pay its obligations as they come due, its assets are assigned for the benefit of creditors, bankruptcy or receivership proceedings are instituted against it and not dismissed or discharged within sixty (60) days, or if a trustee, conservator or receiver or other liquidating officer is appointed for it or its assets, effective thirty (30) days after delivery of a written notice of intent to so terminate.

5.    Visa may terminate this Agreement, or any services being provided hereunder, at any time if Visa determines, in its sole discretion, to cancel or substantially modify the Rewards Program, effective ninety (90) days after delivery to Maritz of written notice of such cancellation or modification. In the event Visa terminates a portion of the services hereunder, the Parties will review the pricing and program costs in good faith to determine whether pricing adjustments may be appropriate as a result of cost savings or additional costs resulting from such termination. All pricing adjustments shall be subject to the agreement of both parties, which shall not be unreasonably withheld.

6.    Visa may terminate this Agreement at any time in the event that 50% or more of the voting stock of Maritz is acquired, beneficially or of record, by a Visa Competitor, or Maritz assigns, sub-licenses, transfers, encumbers or sells all or substantially all of its assets to, or does anything that results in transfer of control of Maritz or the Program Services to any Visa Competitor or affiliate of a Visa Competitor.

7.    Maritz acknowledges the differences in termination rights in this Agreement are equitable in recognition of the time, development efforts, and uncertainties required for Visa and/or its Members to replace the services provided for hereunder and the hardship and injury to goodwill caused by any lapse in the Program Services.

8.    Either Party may terminate this Agreement by notifying the other Party in writing of its intention not to allow the Agreement to automatically renew for a successive two-year term at least one hundred and eighty (180) days in advance of the expiration of the then-current Term. In such case, the Agreement will terminate at midnight on the last day of the then-current Term.

9.    Either Party may terminate this Agreement in the event that the other Party (the "non-performing Party") is delayed in performing any material obligation hereunder, which delay in performance is excused under Section XXIII.I, for a period longer than sixty (60) days upon ten days written notice to the non-performing Party, unless the non-performing Party resumes performance of the obligation that has been delayed during said ten day notice period.

19

**B.      Requirements Upon Termination.**  In recognition of the commitment by Maritz to provide Program Services hereunder and the reliance by Visa on that commitment, the following is agreed:

    **1.      Continued Provision of Program Services, and Allocation of Transition Expenses.**  In the event of any termination or expiration of this Agreement and upon the request of Visa, Maritz will comply with the Transition Services Agreement.

    **2.      Telephone Numbers.**  Maritz agrees that the telephone number(s) to be published by Maritz, Visa, or its Members for use by Cardholders, and/or Members in relationship to the Rewards Program will be used exclusively for Visa program purposes.  Furthermore, the parties will agree in advance to additions or deletions to such telephone numbers.  Upon expiration or termination of this Agreement for any reason, and, upon Visa's request, Maritz will execute such documentation and take such other action as necessary to transfer or route telephone numbers described in Section VI.E hereof used by Maritz for the Rewards Program to Visa or a successor services provider designated by Visa, provided that upon expiration or termination, the reasonable expenses thereof will be allocated between the parties in accordance with the Transition Services Agreement.  To the extent such telephone numbers cannot be transferred, Maritz will work with Visa, at Visa's sole cost and expense, to forward telephone calls to Visa and/or the new service provider for a period of one (1) year from the date all Visa program records are transferred to the new service provider.  Maritz agrees to provide all reasonably necessary assistance including necessary documentation, to effect such transfers, and will cease all use of such numbers after termination of this Agreement, except pursuant to a transition plan agreed upon in writing by Visa.

    **3.      Internet/Web Addresses.**  Maritz agrees that the Internet/Web address(es) specifically registered and published for the purposes of accessing the Rewards Program Web site for use by Cardholders, and/or Members is (are) owned by Visa and will be used exclusively for Visa program purposes.  Upon expiration or termination of this Agreement for any reason, and, upon Visa's request, Maritz will execute such documentation and take such other action as necessary to transfer such Internet/Web address(es) to Visa or a successor services provider designated by Visa.  Maritz agrees to provide all reasonably necessary assistance including necessary documentation, to effect such transfers, and will cease all use of such Internet/Web address(es) after termination of this Agreement, except pursuant to a transition plan agreed upon in writing by Visa.

    **4.      Provision of Data and Transition to Alternate Distributor.**  Except as prohibited by law or regulation, upon termination of this Agreement by either Party, Maritz will provide to Visa all data in its possession or under its control pertinent to the Rewards Program, including but not limited to redemption requests and fulfillment of such requests, disputes, Member, merchant and Cardholder contacts, complaints, points earned, etc.

**5.    Discontinuance of Rewards Program.** Neither Visa nor its Members will have any liability whatsoever to Maritz, or its affiliated companies, in the event Visa or a Member reduces or cancels the Rewards Program pursuant to Sections XII.A.3 or XII.A.5 above, except for fees due for Program Services provided prior to the effective date of such cancellation or reduction, including any amounts related to outstanding unredeemed pay-on-redemption certificates, or as otherwise set forth herein.

**6.    Survival of Terms.** In addition to the specific obligations indicated herein, the terms of Sections XII.B., XIV, XV, XVI, XVII, XVIII, XIX, XX, XXII, and XXIII shall indefinitely survive the termination of this Agreement.

**XIII.  FURTHER RESPONSIBILITIES AND STANDARDS OF CARE.** Maritz understands that its performance under this Agreement will reflect heavily on the goodwill of Visa and its Members with their Cardholders and merchants. Therefore, Maritz will perform its obligations hereunder in a professional manner with courtesy to Visa, Members and Cardholders and merchants. Maritz will take adequate measures to instruct all Maritz personnel, including personnel of Maritz subcontractors providing Program Services hereunder, and will make all reasonable efforts to accommodate Visa Cardholders' and Members' requests within the Rewards Program parameters agreed upon by the Parties in writing.

**XIV.  CONFIDENTIALITY.**

**A.    Business Information of the Parties.** In performing their obligations pursuant to this Agreement, the Parties acknowledge that each may have access to and receive disclosure of Confidential Information relating to the other, and in the case of Maritz, from Visa's Members, including, but not limited to, marketing philosophy and objectives, competitive advantages and disadvantages, the types of services provided, financial results, the names, addresses and account numbers of customers, agents, service providers, and a variety of other information and material. The Parties agree that all such information and materials which are disclosed in writing or other tangible form, or orally, obtained by each Party, its affiliates, directors, officers and other employees, and any third parties with which it contracts, is and will be considered confidential and proprietary to the Party from which it is obtained. The Parties further agree that each will:

**1.**    strictly protect and preserve the confidential and proprietary nature of all Confidential Information of the other;

**2.**    not disclose, give, sell or otherwise transfer or make available, directly or indirectly, any Confidential Information of the other to any third party except as needed in the performance of duties hereunder or as required by law provided that the Parties will give each other prompt notice of any request or order seeking the disclosure of Confidential Information in judicial or governmental proceedings, and adequate opportunity to assert a claim of privilege, seek a protective order, or make other objection to such disclosure;

21

Date for each subsequent Release of the Software, and on no less than a semi-annual basis, Maritz will place into such escrow additional Source Materials representing new releases, modifications and enhancements to the Source Materials. Visa's and Maritz's respective ownership and licensing rights with respect to the Source Materials are governed by Article II of the Development Agreement In the event of a Source Materials Release Event, in addition to Visa's rights to obtain Source Materials under the Escrow Agreement, Maritz agrees to immediately provide Visa with annotated source code for the Rewards Platform and a complete set of Source Materials. The cost of establishing and maintaining the Source Materials escrow will be borne by Visa. The Parties agree that this Agreement is a license of "intellectual property" as defined in the United States Bankruptcy Code Section, 11 U.S.C Section 101(35A), that the Escrow Agreement is supplementary to this Agreement pursuant to the United States Bankruptcy Code, Section 365(n) , and that Visa is entitled to the protection of those provisions in any Maritz Bankruptcy.

**B.    Source Materials Release Event.** The Source Materials will be released to Visa upon the occurrence of any of the following "Source Materials Release Events" which will be set forth in the Escrow Agreement: (i) if Maritz files a petition for protection under the Bankruptcy Code of the United States; (ii) upon the occurrence of any of the events set forth in Section XII.A.6 or (iii) as mutually agreed upon by the Parties prior to the end of the Term.

**C.    Further Actions Upon Source Code Release Event.** In addition to the release of the Source Materials pursuant to the Escrow Agreement, upon a Source Code Release Event Maritz will (i) provide Visa with access to Maritz's Project Manager and other personnel knowledgeable about the Software and the Rewards Platform at such time and places as Visa may reasonably request; and (ii) immediately deliver to Visa the then-current version of the Source Materials, regardless of whether such version was previously deposited into escrow pursuant to the Escrow Agreement. Notwithstanding any agreement to the contrary, upon a Source Code Release Event Visa shall be free to hire the Maritz Project Manager, programmers that provided Development Services or otherwise worked on the Rewards Program, and other key Maritz personnel necessary or desirable for maintaining the Software and the Program Services. In addition, Maritz shall, if requested by Visa, provide Transition Services pursuant to the Transition Services Agreement.

**D.    Maritz's Representations and Warranties.** Maritz represents and warrants that (i) the Source Materials are not the subject of a lien or encumbrance; (ii) the materials deposited consist of the complete Source Materials, excluding the intellectual property of any third party; and (iii) the Source Materials are readable and useable in the form delivered or, if any portion of the Source Materials is encrypted, the decryption tools and decryption keys have also been deposited or identified.

## XXII. DISPUTE RESOLUTION.

**A.    Good Faith.** The Parties shall act in good faith and reasonably in interpreting this Agreement and the Related Agreements and resolving any disputes that arise thereunder.

30

**B.    Injunctive Relief.**  Notwithstanding the foregoing, either Party may seek prejudgment remedies or injunctive relief, including a preliminary injunction or temporary restraining order, where there is otherwise a risk of irreparable harm, by filing an action in the courts of the state of California in the City and County of San Francisco or the federal District Court for the Northern District of California, which shall have exclusive jurisdiction over any action for such injunctive relief.

## XXIII. MISCELLANEOUS.

**A.    Joint Preparation.**  The language of this Agreement including all schedules and exhibits shall be construed simply, as a whole and in accordance with its fair meaning and not strictly for or against any Party.  The Parties agree that this Agreement has been prepared jointly and has been the subject of arm's length and careful negotiation.  Each Party has been given the opportunity to independently review this Agreement with legal counsel and other consultants, and each Party has the requisite experience and sophistication to understand, interpret, and agree to the particular language of the provisions.  Accordingly, in the event of an ambiguity in or dispute regarding the interpretation of this Agreement, the drafting of the language of this Agreement shall not be attributed to either Party.  The use of the word "include" shall mean "includes, but is not limited to."  The singular use of words includes the plural use and vice versa.

**B.    Assignment and Transfer.**  Except as expressly stated herein, no Party will assign or otherwise transfer this Agreement or any of its rights hereunder, without the prior written consent of the other Party.  No Party will unreasonably withhold consent to assignment or subcontracting hereof by the other, but may require reasonable terms and conditions for such consent.  Notwithstanding the foregoing, either Party may assign this Agreement to parent, subsidiary or affiliate companies without the express consent of the other Party, provided that no such assignment will relieve assigning Party from any duty of performance hereunder.  Without limiting the foregoing, Maritz and its affiliates shall continue to be bound by the provisions of Section XI notwithstanding any such assignment.

**C.    Relationship Of The Parties.**  The Parties to this Agreement intend that each will act as independent contractor of the other in the performance hereof.  Unless otherwise indicated, each Party will bear its own costs, expenses and liability arising under this Agreement.  The employees, agents and servants of one Party are not to be considered employees of the other for any purpose whatsoever.  No agency or joint venture relationship is created hereby, except that Maritz may act as an agent of Visa in arranging and negotiating partnership marketing agreements, including agreements for items to include in the Rewards catalog defined in the Business Requirements.  All such agreements are subject to final review, approval and signature by Visa.

**D.    Interest In Property.**  Unless set forth herein or in any Related Agreement, no Party will acquire by virtue of this Agreement any property or other right, claim or interest, including any patent right or copyright interest in any of the information, systems, processes, equipment, computer programs or data of the other.

31

17529\895193.18

**E.    No Publicity/Trademarks.** Nothing in this Agreement grants either Party any
rights in the trademarks, trade names or service marks of the other party. Neither Party
shall make any use of the trademarks, trade names or service marks of the other Party
without such other party's prior express written consent. Maritz shall not issue any press
release or make any other public disclosure relating to this Agreement or the performance
of any Program Services for Visa or any Member without Visa's prior express written
consent in each instance.

**F.    Maritz Licenses.** At all times during the Term, Maritz will be duly licensed in
all jurisdictions, and will maintain in good standing all such licenses, as are required for
its performance under this Agreement and will at all times conduct its business in
compliance with the requirements thereof.

**G.    Notices.** Any notice, request, consent, waiver or other communication required or
permitted to be given hereunder, except as expressly stated herein, will be effective only
if in writing and will be deemed sufficiently given only if delivered in person or sent by
facsimile or by certified or registered mail, postage prepaid, return receipt requested,
addressed as follows:

**If to Visa:**

Visa U.S.A. Inc.
900 Metro Center
Foster City, CA 94404
Attention: Diane Dick
Mail Stop M3-6G
Facsimile: (650) 554-3609

**With a copy to:**

Visa U.S.A. Inc.
123 Mission Street
San Francisco, CA 94105
Attention: General Counsel
Facsimile: (415) 932-2531

**If to Maritz:**
Maritz Inc.
1375 N. Highway Dr.
Fenton, MO 63099
Attention: President, Maritz Loyalty Marketing
Facsimile (636) 827-5485

**With a copy to:**
Maritz Inc.
1375 N. Highway Dr.
Fenton, MO 63099
Attention: Law Department
Facsimile: (636) 827-3708

or to such other person or address as a Party may designate by notice given to the other
Party as provided herein. Such notice or communication will be deemed to have been
given as of the date so received by facsimile or, if mailed, on the fifth (5th) day after
mailing in the United States of America.

**H.    Applicable Law.** This Agreement will be governed by and construed in
accordance with the internal laws and not the laws of conflicts of the State of California.

**I.    Excuse For Non-Performance.** No Party will be responsible, or be in breach of
this Agreement, if its performance is delayed, or it otherwise fails in its performance of
its obligations hereunder, as a result of any act of God, war, fire, earthquake, sickness,
accident, civil commotion, act of government, or any other cause wholly beyond its
control, and not due to its own negligence or that of its contractors or representatives, and

32

17529\895193.18

which cannot be overcome by the exercise of due diligence.  Without limitation of the foregoing, a subcontractor's failure to perform any obligation for any reason whatsoever will not be deemed to excuse performance of this Agreement by the Party responsible for such subcontractor's performance.

**J.     Severability.**  If any term or provision of this Agreement will be found by a court of competent jurisdiction to be illegal or otherwise unenforceable, the same will not invalidate the whole of the Agreement, but such term or provision will be deemed modified to the extent necessary in the court's opinion to render such term or provision enforceable, and rights and obligations of the Party will be construed and enforced accordingly, preserving to the fullest permissible extent the intent and agreements of the Parties herein set forth.

**K.     Non-Waiver.**  No delay or failure by either Party to exercise any right under this Agreement and no partial exercise of any right under the Agreement will constitute a waiver of that right or any other right.

**L.     Headings.**  Headings in this Agreement are for convenience only and will not be used to interpret or construe its provisions.

**M.     Counterparts.**  This Agreement may be executed in two or more counterparts, each of which will be deemed an original but all of which together will constitute one and the same instrument.

**N.     Recitals.**  The Parties intend that the recitals set forth above are part of this Agreement and are hereby incorporated by reference.

**O.     Entire Agreement.**  This Agreement, the Related Agreements, and any other documents expressly incorporated herein by reference, contain the entire agreement between the Parties, and except where otherwise expressly stated, supersede all prior agreements, negotiations, representations and proposals written or oral, related to its subject matter, including but not limited to the Request for Proposals dated October 19, 2005 issued by Visa in respect of the Visa Extras Rewards Program and the Interim Letter of Engagement dated February 13, 2006 (the "Interim Letter of Engagement") between Maritz and Visa, and all work undertaken pursuant to the Interim Letter of Engagement shall be deemed to have been work undertaken pursuant to this Agreement. This Agreement may only be changed or altered by a written instrument signed by the Party or Parties against which enforcement of any waiver, change, modification, extension or discharge is sought, and such written instrument must expressly reference this Agreement and state that it is a waiver, change, modification, extension or discharge of rights or obligations under this Agreement.  In the case of any conflict between the terms of this Agreement and any duly incorporated Exhibit, the terms of the Agreement will prevail.

**P.     Further Assurances.**  The Parties agree that each will, from time to time, execute, acknowledge, and deliver, or cause to be executed, acknowledged, and delivered, such amendments and supplements hereto and such further instruments as the

33

17529\895193.18

Parties mutually agree are reasonably required or appropriate to further express the intention of the Parties or to facilitate the performance of this Agreement.

**Q.      Binding Effect; Members as Beneficiaries.**  This Agreement shall be binding upon and inure to the benefit of Visa and Maritz and their respective successors and permitted assigns and, to the extent set forth in Section XVII, to Members participating in the Rewards Program.

**R.      Time of the Essence; Liquidated Damages.**  Time is of the essence of this Agreement.  The Parties agree that failure by Maritz to release the Phase I-A Software, to migrate existing Cardholder accounts from the existing Visa rewards program to the Rewards Platform and to commence commercial operations of the Rewards Program on or before the Phase I-A Launch Date will result in damages to Visa and/or Visa Members participating in the Rewards Program or the existing rewards program, which damages are difficult to quantify.  The Parties agree that $70,000 is a good faith estimate of the damages likely to be suffered by Visa in the event of a delay in commencement of commercial operations.  However, as an accommodation to Maritz, the Parties agree that Maritz shall pay liquidated damages in the amount of $10,000 per day for each day that the Launch is delayed beyond the Phase I-A Launch Date up to a maximum of fourteen (14) days after the Phase I-A Launch Date, in the amount of $35,000 per day for each day that the Launch is delayed beyond the end of such fourteen day period up to a maximum of seven (7) days after the end of such fourteen day period,and thereafter in the amount of $70,000 per day until the Launch takes place.  Such amounts may be deducted from and set off against any amounts retained by Visa from payments for Deliverables pursuant to the Pricing Schedule for payment after the Phase I-A Launch Date, the Phase I-B Launch Date or the Phase I-C Launch Date, as the case may be.  Notwithstanding anything to the contrary, no liquidated damages payments shall be owed by Maritz in the event the Launch is delayed beyond the Phase I-A Launch Date solely as a result of non-compliance with the Security Procedures; provided, however, that Maritz is not in material breach of Section VI.C above.  In addition, the dates for calculating liquidated damages hereunder shall be suspended on a day for day basis (i) to the extent that Maritz's performance is delayed for reasons described in Section XXIII.I, or (ii) to the extent agreed upon by the Parties through the Change Control Process.  With respect to any day from and after the Phase I-A Launch Date for which a delay in the Phase I-A Launch Date is caused in whole or in part by a failure by Visa, a third party with respect to which Visa exercises control, or Visa's existing service provider (collectively, the "Visa Related Parties") to perform its obligations under this Agreement or the Related Agreements, the amount of liquidated damages payable for such date shall be apportioned between Visa and Maritz in accordance with their respective fault with respect to such delay, provided that such apportionment shall only be made in the event that the Visa Related Parties are more than 50% at fault for such delay.  Maritz shall have the burden of proving that any delay has been caused in whole or in part by the Visa Related Parties and the degree of fault of such parties for such delay.  The Parties agree that the amounts set forth in this Section XXIII.R are good faith estimates of the damages likely to be suffered by Visa in the event of such delays (subject to the accommodation set forth above) and not a penalty.  Visa shall be available during each day subsequent to the Phase I-A Launch Date until Launch of the Phase I-A Software has occurred to assist Maritz in reducing any delay.  Visa shall also use reasonable commercial efforts to cause

34

any third party over whom it exercises control as well as its current service provider to also be available during each day subsequent to the Phase I-A Launch Date until Launch of the Phase I-A Software has occurred in order to assist Maritz in reducing any delay. If further delays are caused solely by the failure of Visa, such third parties or Visa's current service provider to be available on any particular day, liquidated damages shall not accrue for such day.

## ACCEPTED AND AGREED:

**MARITZ INC., d/b/a Maritz**
**Loyalty Marketing** ("Maritz")

**VISA U.S.A. INC.**
("Visa")

By _____

By _____

Name _____

Name _____

Title _____

Title _____

Date _____

Date _____

35