1  Roderick M. Thompson (State Bar No. 96192)
   rthompson@fbm.com
2  Robert C. Holtzapple (State Bar No. 145954)
   bholtzapple@fbm.com
3  Helen Dutton (State Bar No. 235558)
   hdutton@fbm.com
4  Diego F. Acevedo (State Bar No. 244693)
   dacevedo@fbm.com
5  Farella Braun & Martel LLP
   235 Montgomery Street, 17th Floor
6  San Francisco, CA  94104
   Telephone:  (415) 954-4400
7  Facsimile:  (415) 954-4480

8  Attorneys for Plaintiff
   VISA U.S.A. INC.

9

10            UNITED STATES DISTRICT COURT FOR THE

11              NORTHERN DISTRICT OF CALIFORNIA

12

13
   VISA U.S.A. INC.,                    Case No. CV-07-5585 JSW
14
                    Plaintiff,          **APPENDIX OF NON-FEDERAL AND**
15                                       **UNPUBLISHED AUTHORITIES CITED IN**
                                         **VISA USA INC.'S REPLY IN SUPPORT**
        vs.                              **OF MOTION TO STAY ACTION AND TO**
16                                       **COMPEL ARBITRATION**
   MARITZ INC., d/b/a MARITZ
17 LOYALTY MARKETING,                   Date:          February 8, 2008
                                        Time:          9:00 a.m.
18                  Defendant.          Courtroom 2 (17th Floor)
                                        Hon. Jeffrey S. White
19

20

21

22

23

24

25

26

27

28

APPENDIX OF AUTHORITIES CITED IN VISA'S REPLY
ISO MOTION TO STAY ACTION AND TO COMPEL
ARBITRATION/CV-07-5585 JSW

21823\1433369.1

## TABLE OF UNPUBLISHED FEDERAL CASES

**TAB**

*Bayer CropScience, Inc. v. Limagrain Genetics Corp. Inc.,*
    2004 WL 2931284 (N.D. Ill. Dec. 9, 2004) ....................................................................... A

## TABLE OF STATE CASES

**TAB**

*Brownlee v. Vang,*
235 Cal. App. 2d 465 (1965) ............................................................................................... B

*Cicone v. URS Corp.,*
    183 Cal.App.3d 194 (1986) ............................................................................................. C

*Goodman v. Kennedy*
    18 Cal. 3d 335 (1976) ..................................................................................................... D

*People v. Highland Federal Sav. & Loan,*
    14 Cal. App. 4th 1692 (1993) .......................................................................................... E

*Vega v. Jones, Day, Reavis, & Pogue,*
    121 Cal. App. 4th 282 (2004) .......................................................................................... F

## OTHER AUTHORITIES

**TAB**

Martin Domke, DOMKE ON COMMERCIAL ARBITRATION § 22.6 (3 ed. 2007) ................ G

Restatement (Second) of Torts § 551 (1977) ........................................................................ H

DATED: January 25, 2007

Respectfully submitted,

FARELLA BRAUN & MARTEL LLP

By: /s/ Roderick M. Thompson
      Roderick M. Thompson

Attorneys for Plaintiff VISA U.S.A. INC.

Farella Braun & Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
(415) 954-4400

APPENDIX OF AUTHORITIES CITED IN VISA'S REPLY
ISO MOTION TO STAY ACTION AND TO COMPEL
ARBITRATION/ CV-07-5585 JSW

1

21823\1433369.1

# Exhibit A

**APPENDIX OF NON-FEDERAL AND UNPUBLISHED FEDERAL AUTHORITIES CITED IN VISA USA INC.'S REPLY IN SUPPORT OF MOTION TO STAY ACTION AND TO COMPEL ARBITRATION**

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 1
Not Reported in F.Supp.2d, 2004 WL 2931284 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

Bayer CropScience, Inc. v. Limagrain Genetics
Corp., Inc.
N.D.Ill.,2004.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
BAYER CROPSCIENCE, INC. Plaintiff,
v.
LIMAGRAIN GENETICS CORPORATION, INC.,
Defendant.
No. 04 C 5829.

Dec. 9, 2004.

James A. White, Gregory Steven Otsuka, Carrie
Elizabeth Bassi, Jones Day, Chicago, IL, for Plaintiff.
Timothy John Miller, Novack & Macey, Chicago, IL,
Jay L. Alexander, Ryan E. Bull, Baker Botts LLP,
Washington, DC, for Defendant.

*MEMORANDUM OPINION AND ORDER*
DARRAH, J.
*1 Bayer CropScience, Inc. filed a complaint against
Limagrain Genetics Corporation, Inc., seeking
declaratory (count I) and injunctive (count II) relief
with respect to Limagrain's demand for arbitration.
Presently before the Court is Limagrain's Motion to
Dismiss and/or Compel Arbitration, and Bayer's
Cross-Motion to Enjoin Arbitration.

BACKGROUND

A reading of Bayer's Complaint supports the
following summary of the alleged operative conduct
of the parties.

In 1988, Rhone-Poulenc, Inc. acquired Callahan
Enterprises, Inc. ("CEI"). Bayer is the successor-in-
interest to Rhone-Poulenc. On June 30, 1994,
Limagrain and Rhone-Poulenc executed an Asset
Purchase Agreement, in which Limagrain assumed
all CEI rights and obligations, including those under
a 1986 contract that CEI had with Midwest Oilseeds,
Inc. ("MOI"). The Agreement also contained
provisions regarding indemnification (Section 11)
and arbitration (Section 9.1).

MOI sued Limigrain, in its capacity as successor in

interest to CEI, and at the conclusion of the trial,
Limigrain was found liable to MOI for damages over
$40 million resulting from Limiagrain's breach of the
1986 contract. On or about June 28, 2004, after the
judgment against Limagrain, Limagrain filed its
Notice of Arbitration ("Notice") with the American
Arbitration Association ("AAA") and served Bayer
with the Notice.

In the Notice, Limagrain makes three claims against
Bayer. First, Limigrain claims Bayer must indemnify
Limagrain for some or all of Limagrain's liability in
the lawsuit brought by MOI against Limagrain,
pursuant to indemnification provision (Section 11.2)
of the Agreement. Secondly, Limagrain claims that
Bayer is liable for its predecessor's (Rhone-Poulenc)
intentional or negligent failure to disclose certain
information related to the 1986 contract between CEI
and MOI to Limagrain prior to entering the
Agreement ("wrongful inducement claim"). Lastly,
Limagrain claims that Bayer is liable for damages to
Limagrain's "reputation in the industry as a result of
its dispute with MOI," and damages for the costs
Limagrain will incur "in reconstituting its stock of
unencumbered      genetic      material,"      because
Limagrain's " 'ownership' rights in germplasm and
genetic material derived from MOI germplasm are, in
effect, worthless."

Bayer claims that the arbitration provision of the
Agreement does not cover Limagrain's wrongful
inducement claim, nor does it cover the remaining
claims for damages. Specifically, Bayer claims that
Section 9.1 of the Agreement requiring arbitration,
only applies to "any controversy or dispute under this
Agreement."Accordingly,      Bayer      argues      that
Limagrain does not allege that its wrongful
inducement and damages claims arise "under th[e]
Agreement." FN1

> FN1. Bayer alleges that Limagrain lays out
> four claims for indemnification in the
> Notice, although the Notice only lists three:
> 1. Indemnification; 2. Failure to Disclose
> ("wrongful inducment"); 3. Other Damages.
> Contrarily, Limagrain claims to only have
> alleged the first two claims. The Court will
> address the damages claims as a part of the
> wrongful inducement claims since the 'other

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2931284 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

Page 2

damages' claim is merely the manifestation of the harm caused by the wrongful inducement.

## LEGAL STANDARD

In reviewing a motion to dismiss, the court considers all facts alleged in the complaint and any reasonable inferences drawn therefrom in the light most favorable to the plaintiff. *See Marshall-Mosby v. Corporate Receivables, Inc.,* 205 F.3d 323, 326 (7th Cir.2000). Dismissal is warranted if "it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The "suit should not be dismissed if it is possible to hypothesize facts, consistent with the complaint, that would make out a claim." *Graehling v. Vill. Of Lombard, Ill.,* 58 F.3d 295, 297 (7th Cir.1995).

**\*2** Federal law favors arbitration as a means of resolving disputes. The Federal Arbitration Act ("FAA") provides that a "written provision in ... a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The Supreme Court has recognized that the FAA embodies a broad federal policy favoring arbitration. *Shearson/American Express, Inc. v. McMahon,* 482 U.S. 220, 225-226, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987). Section 4 of the FAA directs the court to issue an order compelling arbitration if either party fails, neglects, or refuses to comply with the arbitration agreement. 9 U.S.C. § 4. The FAA further "establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract itself or an allegation of waiver, delay or a like defense to arbitrability."

## ANALYSIS

Bayer first argues that Limagrain's claims for wrongful inducement and for the other damages are outside of the scope of the arbitration provision of the Agreement. Limagrain contends that they are within the scope of the Agreement because the claims arise

"under the Agreement."

"In deciding whether a particular claim comes within the scope of an arbitration agreement, the focus is on the factual allegations of the complaint."*Goldberg v. Focus Affiliates, Inc.,* 152 F.Supp.2d 978, 980 (N.D.Ill.2001) (quoting *Schacht v. Hartford Fire Insurance Co.,* 1991 WL 171377 (N.D.Ill.1991.). Generally speaking, "[a]n order to arbitrate [a] particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."*Welborn Clinic v. Medquist Incorporated,* 301 F.3d 634, 639 (7th Cir.2002)(quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582-583, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)). Indeed, "once it is clear the parties have a contract that provides for arbitration of some issue between them, any doubts concerning the scope of the arbitration clause are resolved in favor of arbitration."*Miller v. Flume,* 139 F.3d 1130, 1135 (7th Cir.1998).

Claims of fraudulent or false inducement can be subject to arbitration under mandatory arbitration provisions. *See Melborn Clinic,* 301 F.3d at 641;*Goldberg,* 152 F.Supp.2d at 981. A court must look to the wording of the arbitration provision and determine if it is broad enough to include the particular claim. *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 403-404, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967). For example, in *Goldberg,* the Court held that because the arbitration provision contained the phrase "under the terms of this Agreement," the provision was broad enough to include claims of fraudulent inducement.

**\*3** Limagrain's wrongful inducement claim is within the scope of the arbitration clause. This issue was addressed in *Goldberg.*Limagrain is alleging a fraudulent or negligent failure to disclose information, causing inducement into a contract with Bayer. Furthermore, Limagrain's damages claims in the Notice of Arbitration are results of the alleged wrongful inducement, and therefore also fall within the scope of the arbitration clause. In short, all of Limagrain's claims are within the scope of the arbitration agreement.

Next, Bayer claims that even if the wrongful inducement and damages claims are within the scope of the arbitration provision, the parties intended to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2931284 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

Page 3

exclude the issue of arbitrability from being submitted to arbitration, thus requiring the Court to decide the issue. Specifically, Bayer contends that the Agreement contained an integration provision at Section 12.10 that preempts the arbitration provision regarding any understanding or representation made prior to the Agreement. Accordingly, Bayer claims that this is sufficient evidence to indicate an intent of the parties to not arbitrate the wrongful inducement claims, and accordingly, the issue of its arbitrability is a question for the Court to answer. Contrarily, Limagrain argues that the issue of arbitrability of an issue is for the arbitrator to decide, pursuant to the rules of the AAA, which include Rule 7(a) of the Commercial Arbitration Rules and Mediation Procedures of the AAA. Rule 7(a) states that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement."

Whether an issue is subject to arbitration is a matter of contract interpretation under state law. *Welborn Clinic,* 301 F.3d at 639. In Illinois, state law requires the court to determine whether the parties objectively revealed an intent to submit the arbitrability issue to arbitration. *See Estate of Jesmer v. Rohlev,* 241 Ill.App.3d 798, 803, 182 Ill.Dec. 282, 609 N.E.2d 816 (1993). Despite a strong por-arbitration tilt, agreements must not be construed so broadly as to force arbitration of claims that the parties never agreed to submit to arbitration. *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 943, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). Accordingly, courts should not assume that the parties agreed to arbitrate arbitrability unless there is "clear and unmistakable" evidence that they did so. *First Options,* 514 U.S. at 944. Evidence of the parties intent to arbitrate the issue of arbitrability can be found in the terms of the contract, such as in an integration clause. *See Bidlack v. Wheelabrator Corporation,* 993 F.2d 603, 608 (7th Cir.1993) ("[T]he presence of such a clause is some indication of the parties' desire to limit a free-ranging judicial discretion to interpolate terms.")."It is a rule universally recognized that a written contract is the highest evidence of the terms of an agreement between the parties to it, and it is the duty of every contracting party to learn and know its contents before he signs it."*Bunge Corporation v. Williams,* 45 Ill.App.3d 359, 364, 4 Ill.Dec. 11, 359 N.E.2d 844 (Ill.App. 5th Dist.1977). Finally, if evidence of intent does not exist, it is the Court's job to address arbitrability issues. *Howsam v. Dean Witter*

*Reynolds, Inc.,* 537 U.S. 79, 83, 123 S.Ct. 588, 154 L.Ed.2d 491 (2002); *Reliance Insurance Co. v. Raybestos Products Co.,* 382 F.3d 676, 678-679 (7th Cir.2004).

**\*4** The inclusion of the phrase "[t]he arbitration shall be conducted ... in accordance with the prevailing commercial arbitration rules of the American Arbitration Association" in the arbitration provision of the Agreement is clear and unmistakable evidence that the issue of arbitrability is to be submitted to the arbitrator. To explain, Rule 7(a) of the Rules of the AAA state that the arbitrator shall determine his or her own jurisdiction over an issue. Furthermore, the parties are responsible for and bound by all terms they put into a contract. *Bunge Corporation,* 45 Ill.App.3d at 364, 4 Ill.Dec. 11, 359 N.E.2d 844. Accordingly, if Bayer did not intend to be bound by Rule 7(a) of the AAA, it should have stated such an exception in the Agreement.

Alternatively, even if the evidence was not clear and unmistakable in favor of an arbitrator determining issues of arbitrability, the Court cannot say with positive assurance that the provision is not susceptible to an interpretation that a wrongful inducement claim is subject to mandatory arbitration. Accordingly, the broad scope of the arbitration provision of the Agreement embodies the issue of arbitrability for the same reasons as stated above. Therefore, the issue of arbitrability is to be determined by the arbitrator.

CONCLUSION

For the reasons stated above, the Defendant's Motions to Dismiss and Compel Arbitration is granted, and the Plaintiff's Cross-Motion to Enjoin Arbitration is denied.

N.D.Ill.,2004.
Bayer CropScience, Inc. v. Limagrain Genetics Corp., Inc.
Not Reported in F.Supp.2d, 2004 WL 2931284 (N.D.Ill.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit B

**APPENDIX OF NON-FEDERAL AND UNPUBLISHED FEDERAL AUTHORITIES CITED IN VISA USA INC.'S REPLY IN SUPPORT OF MOTION TO STAY ACTION AND TO COMPEL ARBITRATION**

LEXSEE 235 CAL. APP. 2D 465

**ROBERT G. BROWNLEE, Plaintiff and Respondent, v. ALFRED VANG et al., Defendants and Appellants**

Civ. No. 519

**Court of Appeal of California, Fifth Appellate District**

*235 Cal. App. 2d 465; 45 Cal. Rptr. 458; 1965 Cal. App. LEXIS 946*

**June 28, 1965**

**PRIOR HISTORY:** [***1] APPEAL from a judgment of the Superior Court of San Diego County. Byron F. Lindsley, Judge.

Action for fraud.

**DISPOSITION:** Affirmed. Judgment for plaintiff affirmed.

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**

(1a) (1b) (1c) Fraud--Actions--Evidence. --The evidence sufficiently supported the finding that plaintiff relied on defendant's false representations and that the reliance was justified where it was shown that defendant falsely represented himself as an electronics expert, that plaintiff was ignorant concerning such matters, that through friendship a relation of trust and confidence existed between them, and that in securing a loan from plaintiff and later securing cancellation of the debt in return for worthless stock, defendant falsely represented the potential production of and income from his claimed inventions to allay plaintiff's suspicions.

(2) Id.--Reliance--Necessity. --To make out a case of misrepresentation, plaintiff must show not only the representation of a material fact on which he was entitled to rely, but that he did in fact rely to his damage.

(3) Id.--Questions of Fact--Reliance. --Whether fraud, including the element of reliance, exists is ordinarily a question for the fact-finding entity.

(4) Id.--Actions--Evidence. --The judicial officer who sees and hears the witnesses in a fraud case has the duty to determine the weight and effect of their evidence; the trial court's decision as to whether any substantial showing of fraud outweighs opposing testimony is ordinarily final, and appellate courts will not disturb a finding of fraud supported by any substantial evidence.

(5) Id.--Actions--Defenses. --That plaintiff in a fraud case is too credulous is not generally a defense; the test of defendant's representation is its actual effect on the particular mind, whether it is strong and circumspect, or weak and too relying.

(6) Id.--Actions--Defenses. --It could not be said that plaintiff was more credulous than the average person in relying on defendant's misrepresentations concerning projects to develop inventions and various corporations formed by defendant where the record showed that others invested in the projects and corporations and lost.

**COUNSEL:** William F. Reed and Carl Hoppe for Defendants and Appellants.

James W. Funsten for Plaintiff and Respondent.

**JUDGES:** Brown (R. M.), J. Conley, P. J., and Stone, J., concurred.

**OPINION BY:** BROWN

**OPINION**

[*466] [**459] This is an appeal by the defendant-appellant from an adverse judgment rendered by the court in an action based upon the theory of fraud. By the judgment the plaintiff was awarded $ 4,500 as compensatory damages, $ 3,000 as exemplary damages, and his costs of suit. The action was brought against Alfred Vang, Ann Vang and Magnatron Corporation of America, Inc. The court found that no liability attached to Ann Vang. It was stipulated that, for the purpose of this lawsuit, the defendant Alfred Vang and the defendant

235 Cal. App. 2d 465, *; 45 Cal. Rptr. 458, **;
1965 Cal. App. LEXIS 946, ***

Magnatron Corporation of America, Inc. are one. For convenience, the word "defendant" as herein used will be a reference to Alfred Vang.

The sole question presented by the appeal is whether the evidence supports the trial court's finding that the plaintiff relied upon the false representations [***2] made by the defendant and that such reliance was justified.

*The Facts*

(1a) The plaintiff met the defendant, Alfred Vang, and the latter's wife, Ann Vang, in the latter part of 1947 or the early part of 1948 in Carmel, California. They became friends. At that time the plaintiff was a merchant seaman. He had recently married and was desirous of obtaining a shore job. Although he had attended the Colorado Junior College for three years and Hastings College of the Law for one year, he had neither training nor experience in engineering, science, or business. He had never made investments in stocks or bonds. His savings amounted to $ 4,000. The defendant told the plaintiff that he was an engineer and had studied at the University of Copenhagen; that he was an associate of Neils Bohr, a famous scientist, and had worked with Bohr on the Manhattan Project; that he had worked for the Federal Defense Department over a period of years and was called to Washington for [*467] consultation from time to time; that he had designed and developed numerous electronic processes and items including the first automobile valve of the type still in use today; that he was a partner in the firm [***3] of Stevenson, Jordan and Harrison, one of the biggest of the research and development companies in the United States; that he owned and operated a factory in the east which was producing welding machines; that he had invented an electronic tube which General Electric and other leading manufacturers were very much interested in; that he had invented a panel which he used with the electronic tube the use of which was practically unlimited; that he had a contract with Electrical Products Company of Los Angeles to produce the panels; that he was developing a fog dispersion machine at the Monterey airport; and that he had developed a welding machine which was in production and was [**460] being sold in the east. In October 1948, the defendant told the plaintiff that he was negotiating for a plant on the Monterey peninsula for the purpose of putting his electronic tube into production and asked to borrow $ 6,000. He promised the plaintiff a position with him in his project. On October 23, 1948, the plaintiff loaned the defendant his savings of $ 4,000 and received a promissory note executed by the defendant promising to repay the sum with interest 60 days thereafter. He relied in [***4] part upon the representations of the defendant made directly to him, and in part

upon an article which appeared in the October 13, 1947, issue of the Monterey Peninsula Herald, and information therein which originated with the defendant, which spoke in glowing terms of the defendant, his reputed background as an electronic inventor, and of a revolutionary invention which would disperse fog which the defendant was reportedly building and should have ready for testing about two weeks after the article appeared. The plaintiff also testified that he had seen the electronic tube and relied upon its functioning properly before he loaned the defendant the money. Shortly after the loan was made the defendant left the community and went to Berkeley. He failed to repay the loan. When the loan became due the plaintiff telephoned the defendant; the defendant reassured the plaintiff that everything was working out; that he had started a company with one George Hart. The plaintiff testified, "I felt he was a pretty important man and I didn't feel as though I wanted to badger him about the thing, and I felt that it was all right, that I would just -- I would go along with [*468] it more [***5] or less at his convenience, but I would like to have it back." The defendant also told the plaintiff that the panel was being used to drive a vibrator and that people from the University of California were very interested in the invention. About the middle of 1949, the plaintiff was told by George Hart that the defendant had left Berkeley and had removed to Vancouver, Canada. The plaintiff had several conversations with the defendant, who continually assured the plaintiff that his various enterprises were going well. He explained that George Hart had "locked him out" of the Berkeley plant and he had moved to Canada. He invited the plaintiff to come up to Canada and he would show the plaintiff what he was doing. On October 13, 1949, the plaintiff filed an action in the Superior Court of Monterey County in an attempt to collect on the note. Vang was never served. Subsequently the plaintiff asked Dun & Bradstreet to investigate what the defendant was doing in Canada. Dun & Bradstreet collected $ 500 on the note. The defendant asked the plaintiff to call off Dun & Bradstreet. In June of 1950 the plaintiff went to Canada and spent a "couple" of days with the defendant. The defendant [***6] showed him what they were doing, showed him drawings and parts of an electronic hammer, told him that he had a number of contracts for the equipment, told him that the defendant and one Eggleton had formed one company and were forming a second, gave a demonstration with the panel device, and suggested that he take stock in the companies in lieu of the amount of the debt. The plaintiff testified: "I went up there pretty mad at Fred and I went away pretty happy with him. This appeared to me, from what he told me -- the thing looked practical and looked as though his panels were a complete success." On some unspecified date between July 28, 1950, and March 5, 1951, the plaintiff cancelled the

235 Cal. App. 2d 465, *; 45 Cal. Rptr. 458, **;
1965 Cal. App. LEXIS 946, ***

note in exchange for shares of stock in Magnatron Hammer Company, Ltd. and Magnatron Panel Company, Ltd., the two Canadian companies. The plaintiff returned for trips to Canada in 1951 and again in 1953, and attended shareholders' meetings. Although no dividends were paid on the stock, he received corporate financial statements showing that the companies were solvent. On some date between April 28, 1953, and January 13, 1954, the plaintiff purchased from one Joe Jordan further shares of stock [***7] in the two companies for $ 400. During the period from 1950 to 1955, the plaintiff also expended time and moneys in attending meetings in [*469] Canada [**461] and preparing himself for the purpose of participating in projects of the defendant. At intervals during this period of time the defendant gave glowing progress accounts to the plaintiff and assured him that he would have a good position with the projects as soon as they got into production. The plaintiff testified: "Well, we were friendly, and then I felt unfriendly toward Fred; then we would get together, and it would be friendly again, and then it would continue to be that way." As late as 1960, just before this suit was filed, the defendant continued to reassure the plaintiff. In 1955 the plaintiff engaged the law firm of Lawrence, Shaw, McFarlane and Stewart to attend a shareholder's annual meeting and send him a report. The attorneys' report was unfavorable and suggested that stock in the defendant's companies was watered. The trial court found:

"I. Commencing in the year 1947 and continuing through the year 1955 defendant Alfred Vang represented to plaintiff that said defendant was a university educated [***8] electronics scientist with experience in electronics research and development and with professional associations with leading scientists. Continuously during said period, Alfred Vang represented to plaintiff that he, Alfred Vang, had perfected several different devices employing a unique electronics tube and circuit system developed by said Alfred Vang which devices were of great commercial value for immediate use in electroplating hard rock drill bits, aluminum smelting, industrial hammers, welding and other uses. Continuously during said period said Alfred Vang represented that he was able to, and intended to, make immediate commercial application of said devices and provide plaintiff employment in connection with said project.

"II. Continuously during said period of time there was a relation of personal trust and confidence between the plaintiff and the defendant Alfred Vang.

"III. Said representations were false. Said Alfred Vang did not have any university or college education. Said Alfred Vang did not have certain electronics research and development experience that he claimed to have. Said Alfred Vang did not have professional associations with leading scientists. Said [***9] Alfred Vang

knew he was unable to, or had intention [sic] to, make commercial application of his devices and he never had any intention to provide employment for plaintiff. Said Alfred Vang made said representations [*470] regarding said projects for the purpose of raising money for his use and to promote his own interests and without any intention to carry out the projects.

"IV. Said representations were made by said Alfred Vang with the intent to deceive plaintiff Robert G. Brownlee. Said plaintiff reasonably relied upon the said representations above set forth, and each of them, and in reliance thereon, gave Alfred Vang $ 4,000 of which $ 3,500 remains unreimbursed, and thereafter purchased worthless stock in reliance thereon at a cost of $ 400, and expended additional time and money for attendance at the corporation meetings of the projects of Alfred Vang and for preparation of himself to participate in the projects of said Alfred Vang, all to the damage of Robert G. Brownlee in the total sum of $ 4,500.

"V. Before June 27, 1955, said Robert G. Brownlee had neither discovered the fraud nor failed to exercise due diligence to discover the fraud. Before June 27, 1955, [***10] Robert G. Brownlee did not have the means of discovering the fraud and could not have discovered it in the exercise of due diligence. On said June 27, 1955, said Robert G. Brownlee must be deemed to have notice of said fraud on account of the continued failure of Alfred Vang to do what he said he intended to do and [**462] also on account of the letter received said day from Canadian attorneys stating suspicions of watered stock.

"VI. . . . .

"VII. The representations of said Alfred Vang were made as part of a continuous fraudulent and malicious course of conduct whereby he obtained money from numerous people as investments in projects which he never had any intention of carrying out."

*Argument and the Law*

The defendant does not challenge the trial court's findings relating to the misrepresentations or damages. The only charge of error is that the trial court erred in finding that the plaintiff reasonably relied upon the representations of the defendant. It is claimed that the evidence is to the contrary. The plaintiff testified at length; the defendant did not testify and apparently was not present at the trial, but portions of a prior deposition which he had given [***11] were read into the record. That record is voluminous. The reporter's transcript embraces 813 pages; the clerk's, 254 [*471] pages; there are 179 interrogatories with answers; and more than 150 exhibits were received in evidence. From this vast record, the defendant has selected isolated items of evidence with

235 Cal. App. 2d 465, *; 45 Cal. Rptr. 458, **;
1965 Cal. App. LEXIS 946, ***

which to persuade this court that the plaintiff, rather than relying upon representations of the defendant, took a calculated risk in the projects of the defendant in the hope of ultimate financial gain.

The defendant argues that, at the outset, the defendant promised to repay to the plaintiff the sum of $ 4,000 within 60 days; that he defaulted and left the community. The plaintiff testified that the first statement made by the defendant that he thought was false was the promise to pay the money, which promise was not kept; that the next statement was when the defendant told the plaintiff that the defendant was going to remain in the Monterey area, but did not do so and left the community; that he discovered the falsity of that statement in the fall of 1949. The plaintiff also testified that the defendant represented he was going to build a fog dispersal machine in [***12] Monterey, which he did not do. This the plaintiff learned in 1949. The plaintiff testified that he relied in part on the newspaper article that the fog dispersing machine would be ready for testing in late October 1949; but made no investigation to determine whether or not the machine had been completed. The plaintiff further testified that prior to the exchange of the note for the stock, he had a conversation with George Hart in San Francisco and Hart told the plaintiff that the defendant never finished any of his work. On July 4, 1949, the plaintiff wrote to the defendant and stated, in part, ". . . On October 23 of this year your 60 day note for the $ 4,000 loan I made you will be 10 months overdue." The defendant also points to the lawsuit which the plaintiff filed in Monterey County in an attempt to collect on the note, and the fact that he had Dun & Bradstreet investigate the defendant's activities in Canada and attempt collection. On March 31, 1950, the plaintiff wrote to the defendant stating in part: "Got your latest promise the other day through Dun and Bradstreet. If you have plans for skipping out of Canada without notice with the idea of raising a little money and [***13] losing me at the same time -- don't do it."

When questioned concerning this letter, the plaintiff testified: "As far as keeping his promise to pay the money to me my confidence had dropped to a rather low ebb . . ." The defendant contends that the plaintiff's testimony summarized [*472] above shows that he did not rely upon representations made by the defendant. Nevertheless, with knowledge of the many promises which had been unfulfilled, the plaintiff negotiated his first five shares of stock in Magnatron Hammer, Ltd. on July 25, 1950. About six months later, on January 5, 1951, the plaintiff complained by letter to the defendant, ". . . as you will recall, in 1948 when I made you the loan it was made [**463] with the understanding that I was to be given a chance to work for you." In a subsequent letter of February 8, 1951, the plaintiff admitted: ". . . When I

suggested in my last letter that I was willing to take a final chance by accepting a transfer of stock I meant just that. I had no idea at that time, nor do I have any idea now, when you will get into production, or if you ever will."

Shortly after writing that letter and on March 5, 1951, the plaintiff obtained [***14] 15 shares in Magnatron Panel Company, Ltd., and 24 shares in Magnatron Hammer Company, Ltd., and cancelled the note.

In April 1953, the plaintiff purchased stock from Joe Jordan; at that time he knew that he had not received any dividends on the stock which he had acquired in 1950 and 1951. Also at this time he knew that there had been no commercial production in any of the defendant's ventures up to that date.

If the testimony on which the defendant relies was the sole evidence on the subject, it would be difficult to say that the plaintiff placed any reliance on the representations made by the defendant after the note was in default and the defendant had moved from the Monterey area. But it is not. The record is replete with testimony concerning telephone calls over the interval from 1949 through 1954 in which the defendant constantly explained difficulties he was encountering, soothed away the plaintiff's fears, gave glowing accounts of his various inventions, their marketability, desirability to manufacturers, and their potential worth. The defendant's wife, Ann Vang, wrote several letters to the plaintiff. One such letter, written on December 2, 1949, and authorized by [***15] the defendant, thanks the plaintiff for his patience; states that certain panels and electric hammers were being built to be shipped to California and would be in San Francisco no later than January 15th; that an attorney had been appointed to form a company for the immediate production of hammers; and that as soon as the hammers arrived in San Francisco the plaintiff could be paid in money or stock. The letter extolled the efficiency and low cost of [*473] the hammers and their usefulness and salability. Mr. George Hart, who had been associated with the defendant in Berkeley, told the plaintiff that the equipment was good and that it would do the things the defendant claimed it would do. It was not until August 24, 1957, that the plaintiff learned for the first time that the electronic tube, which was claimed by the defendant to be a basis of his various inventions, did not work. It was not until after this suit was filed that plaintiff learned the hammer and panel were not inventions of the defendant. After 1957, plaintiff reached the conclusion that Vang's promises were made without the intention to perform, and this was after he had the opportunity of discovering that [***16] the defendant had a long history of promotional companies. Even as late as 1960, about a month before this suit was filed, the defendant again stated to the plaintiff that the projects in Can-

235 Cal. App. 2d 465, *; 45 Cal. Rptr. 458, **;
1965 Cal. App. LEXIS 946, ***

ada were being successfully completed, and he furnished the plaintiff with what purported to be a financial statement and again attempted to allay the plaintiff's suspicions of fraud and assure him that defendant would protect his interests.

(2) It is elementary that to make out a case of misrepresentation, the plaintiff must show not only a representation of a material fact upon which he was entitled to rely, but that he did in fact rely to his damage. ( *Edwards v. Lang, 198 Cal.App.2d 5 [18 Cal.Rptr. 60]; Eck v. McMichael, 176 Cal.App.2d 368 [1 Cal.Rptr. 369].*)
(3) Whether or not fraud exists, including the element of reliance, is ordinarily a question of fact for the fact-finding entity.

(4) As this court said in *Vogelsang v. Wolpert, 227 Cal.App.2d 102, 110-111 [38 Cal.Rptr. 440]*:

"Because of the diversity of factors and the differing intelligence of those guilty of fraud and their victims the function of the trial judge in fraud [**464] cases is particularly significant. [***17] It is the duty of the judicial officer who sees and hears the witnesses to determine the weight and effect of their evidence; if there is any substantial showing of fraud the trial court must determine whether it outweighs the testimony presented by the opposing side; and his decision is ordinarily final in matters of this kind; appellate courts will not disturb a finding of fraud if there is any substantial evidence to support the lower court's decision. [Citations.]

"As a determination of the existence of fraud is particularly within the decisional field of the trial judge, the [*474] appellants are attempting to swim upstream against a strong current of authority when they maintain that there was no such showing in the long record, and in effect that this court should pass again upon the factors which the trial court found to be indicative of fraud."

(5) And at pages 111-112: "As is observed in *Feckenscher* v. *Gamble, supra,* 12 Cal.2d 482, 496-497 [85 P.2d 885]: "'That plaintiff is too credulous is not generally a defense. The test of the representation is its actual effect on the particular mind, whether it is a strong and circumspect mind, or one weak and too [***18] relying.'" ( *Neff v. Engler, 205 Cal. 484, 489 [271 P. 744].*)'"

Plaintiff points to the case of *Blackman v. Howes, 82 Cal.App.2d 275*, where the court, in considering the issue of justifiable reliance, said at pages 278-279 [*185 P.2d 1019, 174 A.L.R. 1004]*: "When the facts are susceptible to opposing inferences, whether a party relied upon a false representation, notwithstanding prior information which, if investigated, might have led to discovery of the falsity of the representation, is itself a question of fact to be determined by the trier of fact. [Citation.] Where one is justified in relying, and in fact does rely, upon false

representations, his right of action is not destroyed because means of knowledge were open to him. In such a case, no duty in law is devolved upon him to employ such means of knowledge. [Citation.]

"'The mere circumstance that one makes an independent investigation or consults with others does not necessarily show that he relied upon his own judgment rather than upon the representations of the other party, nor does it give rise to a presumption of law to that effect.' [Citation.] A buyer is not chargeable with knowledge [***19] of conditions which he fails to discover because of some deception of the seller. [Citations.] When, as here, the buyer has only a suspicion of fraud and the seller lulls the buyer into inaction by a false representation, the seller will not be permitted to assert that the buyer lost his rights by accepting the assurance of the seller that there was no fraud. [Citation.]"

In *Bank of America v. Greenbach, 98 Cal.App.2d 220, at page 233 [219 P.2d 814]*, the court said: "It is, of course, the law that a party has a duty to investigate where he has notice of facts which indicate fraud. [Citations.] But this duty to investigate is a relative matter. The creditor has a legal right to rely upon the statements made by the debtor. If the debtor is guilty of deliberate fraud, it is not [*475] good morals, nor does it make good sense or good law, to say that the creditor was too credulous because he placed too much reliance on the statements made by the fraudulent debtor, and is therefore barred."

At page 234, the court said: "It is also well settled that when a fact is peculiarly within the knowledge of the person making the representation and not within the knowledge of the person [***20] to whom it is made, the latter [**465] has the right to rely upon the representations of the former respecting such fact."

The trial court found that during the period here involved there was a relation of personal trust and confidence between the plaintiff and the defendant, and that finding stands unquestioned.

In volume 23, California Jurisprudence, Second Edition, Fraud and Deceit, section 31, pages 75-76, it is said: "A person has a right to rely on statements of material facts essentially connected with the substance of the transaction where there is a confidential relation existing between the parties, and such reliance cannot be charged as negligence. . . . A similar situation exists where one of the parties is ignorant and inexperienced in regard to the matters concerning which the material representations are made, and such ignorance is known to the other party, who is also aware that reliance is being placed on his representations and that the facts are not, and cannot be expected to be, within the first party's knowledge."

The court, in *Bank of America v. Greenbach, supra, 98 Cal.App.2d 220*, said at page 235: "[The] question as to whether the known facts [***21] were sufficient to put the defrauded person on inquiry is one of fact for the trial court. . . . '. . . Whether or not the plaintiff was negligent in relying upon the truth of the defendant's representations seems to be immaterial. If under the facts, because of the relation of the parties, involving trust and confidence, or because the representor was in a position to know the facts which was definitely superior to that of the representee, or where an investigation by the representee could not be easily made, the courts hold that he was justified in relying on the truth of the false statements.'"

In *Garrett v. Perry, 53 Cal.2d 178 [346 P.2d 758]*, the issue of justifiable reliance on the part of the person defrauded was raised. Mr. Chief Justice Gibson, speaking for the Supreme Court, made brief disposition of the contention. [*476] At pages 181-182, he stated: "The fact that a buyer makes an independent investigation does not preclude him from relying on representations made by the seller where, as here, the seller has a superior knowledge. [Citation.] Nor did the receipt of some unfavorable information preclude plaintiff from such reliance as a matter of [***22] law. [Citation.] The trial court could properly conclude that any suspicions of plaintiff arising from the information he had obtained upon his investigations were allayed by defendant's subsequent reassurances and that under the circumstances of this case plaintiff was not precluded from relying upon what defendant told him."

In volume 23 of California Jurisprudence, Second Edition, Fraud and Deceit, section 39, at page 97, it is said: ". . ., a party's suspicions may have been reasonably allayed by the other party's positive reassurances or representations."

In *Kalkruth v. Resort Properties, Ltd., 57 Cal.App.2d 146, at page 150 [134 P.2d 513]*, the court said: "We believe that when, as here, the buyer has only a suspicion of the fraud, and the seller who has defrauded the buyer, lulls the buyer into a sense of security by both words and conduct, the seller should not be permitted to assert that the buyer had lost his rights by waiving the suspicion and accepting the reassurance of the seller that no fraud had been perpetrated."

**(1b)** In this case the defendant purported to be an expert in the field of electronics; the plaintiff was ignorant concerning such matters. Through [***23] friendship a relation of trust [**466] and confidence existed between them. The misrepresentations made relative to a subject matter of which the plaintiff had no knowledge were not such that their falsity must have been so obvious to the plaintiff as to preclude any justifiable reliance

thereon by him. Further representations, made as statements of fact and not of opinion, dealing with contracts which the defendant had entered into with other firms, the potential production of and income from his claimed inventions, designed to allay the suspicions of the plaintiff, were themselves misrepresentations calculated to deceive. That they accomplished their purpose should not now redound to the benefit of the defendant. **(6)** It cannot be said that the plaintiff was more credulous than the average person would have been. The record shows that others invested in the projects and various corporations formed by the defendant and lost. It was said in the case of *Sanfran Co. v. Rees Blow Pipe Mfg. Co., 168 Cal.App.2d 191, at pages 202-203 [335 P.2d 995]*:

[*477] "In *De Spirito v. Andrews, 151 Cal.App.2d 126*, the court said at page 130 [311 P.2d 173]:

"'It is a general [***24] rule that a vendor not in a confidential relation to the buyer is not under a duty to make full disclosure concerning the object which he would sell. However, it is a universally recognized exception that if he undertakes to do so he is bound not only to tell the truth but he is equally obligated not to suppress or conceal facts within his knowledge which materially qualify those stated. If he speaks at all, he must make a complete and fair disclosure. [Citations.]'

"As pointed out in *Kuhn v. Gottfried, 103 Cal.App.2d 80, 81 [229 P.2d 137]*, any facts which affect the desirability of the property to be sold, are facts 'which materially qualify these stated.' Defendant admitted that the double lines on the plot plan could be interpreted to mean walls.

". . . 'Where material facts are accessible to the vendor only and he knows them not to be within the reach of the diligent attention and observation of the vendee, the vendor is bound to disclose such facts to the vendee.' ( *Rothstein v. Janss Investment Corp., 45 Cal.App.2d 64 [113 P.2d 465]; Dyke v. Zaiser, 80 Cal.App.2d 639 [182 P.2d 344].*) . . .

". . . Whether the investigation made by the plaintiff [***25] was a properly full one after his discovery that the building was not Class 'C,' was an issue of fact for the trial court."

The cases upon which the defendant relies are not in point. In the case of *Ruhl v. Mott, 120 Cal. 668 [53 P. 304]*, the plaintiff entered upon the land, discovered the fraud, expressed dissatisfaction, and notwithstanding this knowledge, thereafter affirmed the contract by including the unpaid interest in a new note and giving the defendant a new mortgage upon the land. It was held that the second transaction was free from fraud and the plaintiff's conduct constituted a waiver of all rights of rescission. In *Gratz v. Schuler, 25 Cal.App. 117 [142 P.899]*, the

235 Cal. App. 2d 465, *; 45 Cal. Rptr. 458, **;
1965 Cal. App. LEXIS 946, ***

plaintiff purchased a panorama on defendant's representations that he could earn so much a day, and notwithstanding that after the plaintiff had operated the panorama for a few days to see what it was earning and thus knew the real earning capacity of the panorama, he completed the payment of the balance of the purchase price, and he could not be heard to say that he was deceived by the representations. In *Carpenter v. Hamilton, 18 Cal.App.2d 69 [62 P.2d 1397]*, the plaintiffs, [***26] before parting with value, inspected a portion of the premises where there were patent defects contrary to representations which had been made by the [*478] defendant. The reviewing court held that knowledge of the plaintiffs of the defendant's misrepresentations relating to the portion inspected, precluded reliance by them upon misrepresentations as to the condition of the premises which they did not visit. [**467] This case has never been overruled, but its broad language has been undercut by subsequent cases, such as *Sanfran Co. v.*

*Rees Blow Pipe Mfg. Co., supra, 168 Cal.App.2d 191, 203*, and *Hefferan v. Freebairn, 34 Cal.2d 715, 720 [214 P.2d 386]*, where its holding has been held applicable only to visible defects.

(1c) In the case before us the plaintiff was constantly reassured by the defendant, and under the circumstances he was not precluded from relying on what the defendant told him or showed him.

The defendant questions the sufficiency of the evidence to support the finding, but we think that the evidence is ample to support such, and will not belabor the well-settled law that this court is bound thereby. (*Overton v. Vita-Food Corp., 94* [***27] *Cal.App.2d 367 [210 P.2d 757]; Berniker v. Berniker, 30 Cal.2d 439 [182 P.2d 557]*.)

The judgment is affirmed.

# Exhibit C

**APPENDIX OF NON-FEDERAL AND UNPUBLISHED FEDERAL AUTHORITIES
CITED IN VISA USA INC.'S REPLY IN SUPPORT OF MOTION TO STAY
ACTION AND TO COMPEL ARBITRATION**

21823\1392810.1

LEXSEE 183 CAL.APP.3D 194

**FRANK J. CICONE, Cross-complainant and Appellant, v. URS CORPORATION et al., Cross-defendants and Respondents**

No. F004334

Court of Appeal of California, Fifth Appellate District

*183 Cal. App. 3d 194; 227 Cal. Rptr. 887; 1986 Cal. App. LEXIS 1804*

July 10, 1986

**SUBSEQUENT HISTORY:**    [***1] A petition for a rehearing was denied August 8, 1986, and the opinion was modified to read as printed above.

**PRIOR HISTORY:**    Superior Court of Kern County, No. 184091, Clarence Westra, Jr., Judge.

**DISPOSITION:**    The judgment of dismissal is reversed as to all causes of action alleged in Cicone's cross-complaint and the matter is remanded to the trial court for further proceedings in accordance with the views expressed herein.

Cross-complainant, Cicone, to recover his costs on appeal.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

In a malpractice action against an attorney seeking damages for alleged negligence in handling the sale of plaintiffs' business, the attorney interposed a cross-complaint for damages for fraud, negligent misrepresentation, breach of good faith and fair dealing and equitable indemnity against the corporate buyer, its president, and the attorney for the buyer, alleging breach of an oral promise that certain statements in the written sale contract would be deemed by the buyer to have been made on the sellers' best knowledge only. The trial court dismissed the cross-complaint on demurrer without leave to amend. (Superior Court of Kern County, No. 184091, Clarence Westra, Jr., Judge.)

The Court of Appeal reversed. The court held that dismissal was erroneous and an abuse of discretion. The promise by the buyer and its attorney, as alleged in the pleadings, constituted a misrepresentation of fact, was material to the contract between the parties, and was made without any intention that it would be performed.

As to the issue of whether the sellers' attorney was justified in relying on the buyer's misrepresentation, the court held that this constituted a question of fact under the circumstances, precluding dismissal of the action. It further held that, inasmuch as the pleadings indicated that the parties were cotortfeasors, to one degree or another, principles of either partial or full equitable indemnity were applicable, depending on subsequent proof. (Opinion by Martin, J., with Franson, Acting P. J., and Hoover, J., * concurring.)

    *    Assigned by the Chairperson of the Judicial Council.

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**
Classified to California Digest of Official Reports

**(1) Pleading § 29--Demurrer to Complaint--Hearing and Determination.** --Sustaining a general demurrer without leave to amend is not an abuse of discretion if it appears from the pleading that there is no reasonable probability the defect can be cured by amendment. The burden is on the pleading party to demonstrate that the trial court abused its discretion and he must also show in what manner he can amend the pleading and how the amendment will change the legal effect of the pleading.

**(2) Fraud and Deceit § 25--Actions--Pleading--Specificity.** --Fraud is an intentional tort, the elements of which are misrepresentation, knowledge of falsity, intent to defraud, justifiable reliance, and resulting damage. Each element must be alleged in the proper manner, and the facts constituting the fraud must be alleged with sufficient specificity to allow the other party to understand fully the nature of the charge made.

183 Cal. App. 3d 194, *; 227 Cal. Rptr. 887, **;
1986 Cal. App. LEXIS 1804, ***

**(3) Torts § 1--Intentionally Tortious Conduct.** -- Inferentially, everyone has a duty to refrain from committing intentionally tortious conduct against another.

**(4) Fraud and Deceit § 5--Actual Fraud--False Representations--Statements of Fact.** --A promise material to a contract that is made without any intention of performing it is deemed a misrepresentation of fact.

**(5) Fraud and Deceit § 8--Actual Fraud-- Concealment.** --Although a duty to disclose a material fact normally arises only where there exists a confidential relation between the parties or where other special circumstances require disclosure, if a person does speak he must speak the whole truth to the end that he does not conceal any facts that materially qualify those that have been stated.

**(6) Attorneys at Law § 20--Attorney-client Relationship--Liability of Attorneys.** --An attorney may not, with impunity, either conspire with a client to defraud or injure a third person, or engage in intentional tortious conduct toward a third person, even if the third person is an attorney negotiating at arm's length.

**(7) Fraud and Deceit § 7--Actual Fraud--False Representations--Promises--Oral Agreement to Limit Applicability of Contractual Provision.** --In a malpractice action against an attorney seeking damages for alleged negligence in handling the sale of plaintiffs' business, in which the attorney interposed a cross-complaint for damages against the corporate buyer, its president, and its attorney, alleging breach of an oral promise that certain statements in the written sale contract would be deemed by the buyer to have been made on the sellers' best knowledge only, dismissal of the cross-complaint on demurrer without leave to amend constituted an abuse of discretion, where the alleged promise by the buyer and its attorney constituted a misrepresentation of fact, was material to the contract between the parties, and was made without any intention that it would be performed.

**(8) Pleading § 74--Amendment and Withdrawal-- Subject Matter--Conflict With Responses in Interrogatory.** --Proposed amendments to a party's cross-complaint were not barred as being directly contradicted by the party's response to an interrogatory, where the interrogatory did not request the party to divulge every fact on which the original allegation was based, and the party's response was made on his best recollection and was not so inconsistent with the proposed allegations as to make the party's pleading demurrable.

**(9) Fraud and Deceit § 13--Actual Fraud--Reliance-- Right to Rely.** --Whether a person is justified in relying on another individual's representation constitutes a question of fact for determination of the trier of fact, and the issue is whether the person who claims reliance was justified in relying upon the representation in the light of his own knowledge and experience.

**(10) Negligence § 17--Elements of Actionable Negligence--Proximate Cause--Intervening Causes-- Foresight.** --Foreseeability of harm is generally a question of fact for the jury and it may be decided as a question of law only if under the undisputed facts there is no room for a reasonable difference of opinion. Thus the trial court erred in determining, as a matter of law, that a party's misrepresentation, made to an attorney and his clients, as to matters involved in a business sale transaction was not a proximate cause of harm to the attorney. Accepting the attorney's proposed amended allegations as true, a trier of fact could conclude it was reasonably foreseeable that the attorney's clients, faced with a large monetary demand and the prospect of an expensive defense, as a result of the attorney's reliance on the misrepresentation, would settle the case, rather than litigate the issues. If so found, this would be, not a superseding cause, but a foreseeable intervening cause, which would not relieve the party from potential liability to the attorney who was sued by his clients for malpractice.

**(11) Fraud and Deceit § 16--Actual Fraud--Damage-- Exposure of Attorney to Liability for Malpractice.** -- Exposure of an attorney to legal malpractice liability by the actions of a third party constitutes a proper basis for an inference of detriment sufficient to sustain a damage award in favor of the attorney in an action against the third party.

**(12) Fraud and Deceit § 10--Actual Fraud-- Knowledge.** --If a party makes false statements, honestly believing them to be true, but without reasonable grounds for such belief, he or she may be held liable for negligent misrepresentation, which is a form of deceit. Thus it was an abuse of discretion for the trial court to sustain a demurrer to a cross-complaint by an attorney, in a malpractice action against him, alleging negligent misrepresentation on the part of the adverse party's attorney in connection with negotiations involving a business sale transaction, since the adverse party's attorney owed a duty of care to cross-complainant, in view of the fact that the statement or promise was intended to be relied on by the attorney and to induce him to advise his clients to close the transaction.

**(13) Contribution and Indemnification § 9-- Indemnity--Operation and Interpretation.** --In a malpractice action against an attorney seeking damages for alleged negligence in handling the sale of plaintiffs'

183 Cal. App. 3d 194, *; 227 Cal. Rptr. 887, **;
1986 Cal. App. LEXIS 1804, ***

business, in which the attorney interposed a cross-complaint for damages and full equitable indemnity against the buyer and its attorney, alleging breach of an oral promise that certain statements in the written sale contract would be deemed by the buyer to have been made on the sellers' best knowledge only, dismissal of the cross-complaint on demurrer without leave to amend, on the issue of equitable indemnity, constituted an abuse of discretion, where, according to the pleadings, the parties were cotortfeasors, which brought into play principles of either partial or full equitable indemnity, depending on the proof to be adduced at trial.

**COUNSEL:** Robert E. King, John D. Gibson and Arthur E. Schwimmer for Cross-complainant and Appellant.

Howard, Rice, Nemerovski, Canady, Robertson & Falk, Robert E. Gooding, Jr., Ann Brick, Steven L. Mayer, David B. Goodwin, Borton, Petrini & Conron and Bob H. Joyce for Cross-defendants and Respondents.

**JUDGES:** Opinion by Martin, J., with Franson, Acting P. J., and Hoover, J., * concurring.

\* Assigned by the Chairperson of the Judicial Council.

**OPINION BY:** MARTIN

**OPINION**

[*197] [**888] This an appeal from a judgment of dismissal following the sustaining of a general demurrer to an original cross-complaint without leave to amend.

[*198] On June 10, 1983, plaintiffs Gerald D. Lucas, Janice H. Lucas, and [***2] Lucas Family Trust filed a complaint alleging legal malpractice against defendants Frank J. Cicone and Frank J. Cicone Law Corporation et al. On October 25, 1983, defendants answered the complaint and filed a cross-complaint for comparative equitable indemnity, damages and punitive damages against URS Corporation, Arthur H. Stromberg and Richard W. Canady.

Cross-defendants filed general and special demurrers to the cross-complaint and a motion to strike the punitive damage allegations of the cross-complaint on December 23, 1983.

The demurrer and motion to strike were argued by counsel and submitted on January 26, 1984. On April 27, 1984, the lower court granted the general demurrer as to [**889] all causes of action without leave to amend. On June 26, 1984, the cross-complaint was dismissed with prejudice and judgment was entered in favor of the

cross-defendants on June 27, 1984. This appeal followed.

Facts

Cicone primarily challenges the trial court's decision to sustain the demurrers without leave to amend.

This case involves a legal malpractice suit brought against Cicone an attorney, by plaintiffs, his former clients. Plaintiffs alleged Cicone was guilty of malpractice [***3] in conducting negotiations for the sale of plaintiffs' business, Advanced Production Service, Inc. (Advanced), to cross-defendant URS Corporation (URS). Cicone cross-complained against URS, its president and their attorney, Canady, for fraud, negligent misrepresentation, breach of good faith and fair dealing and equitable indemnity.

Cicone represents the factual allegations upon which the claims of fraud and deceit are based would be amended beyond those currently contained in the present cross-complaint to allege as follows:

In early September 1981, URS, through its president, Stromberg, reached a preliminary agreement with Gerald Lucas, President of Advanced, for URS to purchase from Lucas and his family the stock and assets of Advanced for $ 3.5 million cash. The final agreement was to be prepared by counsel for URS, and, at Stromberg's request, it was to be executed by the parties in as short a period of time as was reasonable. Lucas then engaged Cicone to represent him and his family in consummating the transaction.

Shortly after entering into the preliminary agreement, Advanced gave the accountants and other personnel of URS full access to the books and records [*199] [***4] of Advanced, and the respective corporations' accountants and personnel were in frequent communication about Advanced's financial data.

Prior to October 13, 1981, URS presented Advanced with a proposed final agreement. The agreement provided in part that the sellers warranted the accuracy of an unaudited balance sheet of Advanced as of September 30, 1981, and included a warranty that Advanced had no liabilities other than those shown on the balance sheet. A number of other warranties in the agreement were stated to be made only to the best knowledge of sellers.

At a meeting on October 13, 1981, attended by Gerald Lucas, Cicone, Lucas' personal accountant R. Randall Richardson, Stromberg, and URS' attorney, Canady, Cicone advised Stromberg and Canady the sellers could not and would not guarantee the accuracy of the balance sheet. Canady, with Stromberg's tacit approval, replied the buyer understood and URS would deem the sellers to

183 Cal. App. 3d 194, *; 227 Cal. Rptr. 887, **;
1986 Cal. App. LEXIS 1804, ***

be guaranteeing the information in the balance sheet only to sellers' best knowledge.

Cicone would further allege that Canady's statement, made on behalf of Stromberg and URS, constituted a promise that URS would accept the balance sheet as correct only [***5] to the best of the sellers' knowledge. As Canady knew, that promise was false and was made without any intention of performing it, for cross-defendants intended to rely on the strict warranty contained in the written agreement. The promise was made for the purpose of inducing Cicone to rely on it and thereby to advise the sellers to follow through with the sale and to sign the final agreement. Cicone did rely on the promise and did advise the sellers to sign the agreement, and as a result the sellers did sign the agreement. Cicone's reliance on the promise was justifiable because the circumstances under which it was made gave him reason to believe it would be carried out and Cicone had no reason to disbelieve Canady.

The balance sheet was correct to the best of the sellers' knowledge. However, shortly after the transaction had been consummated, URS, through Stromberg, made a claim against the sellers based on a $ 200,000 under statement in the balance sheet of deferred tax liabilities, of which the sellers had been unaware. The sellers, through [**890] counsel other than Cicone, settled the claim without litigation for $ 125,000 and filed a legal malpractice action against [***6] Cicone. As a result, Cicone may incur liability to the sellers, and is required to defend a malpractice action, thereby incurring expense, losing time from his practice, and facing impairment of his professional reputation.

Discussion

I. Fraud and Deceit

Cicone contends on appeal the lower court abused its discretion in sustaining the demurrer to the original cross-complaint without leave to amend.

[*200] Preliminarily, the general principles governing demurrers should be noted: The party against whom a complaint or cross-complaint has been filed may object by demurrer to the pleading where it does not state facts sufficient to constitute a cause of action. ( *Code Civ. Proc., § 430.10, subd. (e)*.) (1) Sustaining a general demurrer without leave to amend is not an abuse of discretion if it appears from the pleading there is no reasonable probability the defect can be cured by amendment under applicable substantive law. ( *Vater v. County of Glenn (1958) 49 Cal.2d 815, 821 [323 P.2d 85]; Sackett v. Wyatt (1973) 32 Cal.App.3d 592, 603 [108 Cal.Rptr. 219]*.) The burden is on the cross-complainant [***7] to demonstrate the lower court abused its discretion. The cross-complainant must show in what manner he can

amend his cross-complaint and how that amendment will change the legal effect of his pleading. ( *Goodman v. Kennedy (1976) 18 Cal.3d 335, 349 [134 Cal.Rptr. 375, 556 P.2d 737]*.) If the demurrer was properly sustained on any ground, then the lower court will be affirmed. ( *Munoz v. Davis (1983) 141 Cal.App.3d 420, 422 [190 Cal.Rptr. 400]*.)

In the third, fourth, fifth and sixth causes of action of the cross-complaint, Cicone attempts to allege causes of action for fraud and deceit.

*Fraud*

(2) Fraud is an intentional tort, the elements of which are (1) misrepresentation; (2) knowledge of falsity; (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage. ( *Seeger v. Odell (1941) 18 Cal.2d 409, 414 [115 P.2d 977, 136 A.L.R. 1291]; Nelson v. Gaunt (1981) 125 Cal.App.3d 623, 635 [178 Cal.Rptr. 167]*.) [1]

> 1 *Section 1709 of the Civil Code* provides: "One who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers."
>
> *Section 1710 of the Civil Code* provides: "A deceit, within the meaning of the last section, is either:
>
> "1. The suggestion, as a fact, of that which is not true, by one who does not believe it to be true;
>
> "2. The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true;
>
> "3. The suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or,
>
> "4. A promise, made without any intention of performing it."

[***8]

Every element of the cause of action for fraud must be alleged in the proper manner and the facts constituting the fraud must be alleged with sufficient specificity to allow defendant to understand fully the nature of the charge made. ( *Roberts v. Ball, Hunt, Hart, Brown & Baerwitz (1976) 57 Cal.App.3d 104, 109 [128 Cal.Rptr. 901]*.)

[*201] The lower court determined, inter alia, cross-defendants owed no duty to Cicone and therefore

183 Cal. App. 3d 194, *; 227 Cal. Rptr. 887, **;
1986 Cal. App. LEXIS 1804, ***

Cicone failed to state a cause of action, citing for this proposition, among others, *Groswird v. Hayne Investments, Inc.* (Cal.App.) However, a rehearing was granted in *Groswird* and the subsequent opinion was not certified for publication.

*Duty*

Cross-defendants argue a lack of duty owed to Cicone. However, this argument appears in relation to the causes of action for negligence and indemnity. (3) More properly it could be stated, inferentially everyone [**891] has a duty to refrain from committing intentionally tortious conduct against another. (4) Thus, a promise material to the contract which is made without any intention of performing it is deemed a misrepresentation of fact. ( [***9] *Civ. Code, §§ 1572, subd. 4, 1710, subd. 4; Jacobs v. Freeman (1980) 104 Cal.App.3d 177, 192 [163 Cal.Rptr. 680].)*

Cicone alleges cross-defendants made a promise without disclosing they entertained no intention to perform said promise to deem the warranty of the financial statement as only to sellers' best knowledge and belief.

(5) Although a duty to disclose a material fact normally arises only where there exists a confidential relation between the parties or other special circumstances require disclosure, where one does speak he must speak the whole truth to the end that he does not conceal any facts which materially qualify those stated. *(Ibid.)* One who is asked for or volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud. ( *Goodman v. Kennedy, supra, 18 Cal.3d 335, 346-347; Rogers v. Warden (1942) 20 Cal.2d 286, 289 [125 P.2d 7].)*

"The extent of liability an attorney may incur toward third persons, while the attorney is acting on behalf of a client, has been the subject of divergent opinion in various American jurisdictions, [***10] the traditional view being that an attorney may not generally be held liable to third persons because he is not in privity with them, and owes them no duty to act with care. (See Attorneys -- Liability to Third Parties, 45 A.L.R.3d 1177, 1181.) A typical statement of this approach is that 'an attorney is not liable to third persons for acts committed in good faith in performance of professional activities as an attorney for his client. If, however, an attorney is actuated by malicious motives, or shares the illegal motives of his client, he may be personally liable with the client for damage suffered by a third person as the result of the attorney's actions.' (Fns. omitted.) (7 *Am.Jur.2d, Attorneys, § 196, p. 161 (1963).)" ( *Roberts v. Ball, Hunt, Hart, Brown & Baerwitz, supra, 57 Cal.App.3d 104, 109.)*

[*202] (6) In California it is well established that an attorney may not, with impunity, either conspire with a client to defraud or injure a third person or engage in intentional tortious conduct toward a third person. *(Ibid.)*

Thus, the case law is clear that a duty is owed by an attorney not to defraud another, even if that other [***11] is an attorney negotiating at arm's length.

Thus, while duty is not an element of fraud in the traditional sense, a duty is owed to others to refrain from intentionally tortious conduct. Therefore, any inference arising from the lower court's decision that the element of duty bars Cicone's causes of action for fraud and deceit is not supported by law.

*Misrepresentation*

(7) Cross-defendants assert the alleged misrepresentation is one of law and therefore not actionable. According to this theory, the allegations that Canady made "certain assurances and promises that the correct interpretation of the guarantee clause (or clauses in [the] agreement was that it would be based upon sellers' best information and belief," amounts to nothing more than an allegation that Canady stated a legal opinion of how the terms of the contract would be interpreted in the future.

Cicone offers a proposed amendment to the pleading to the effect that Canady, with Stromberg's tacit approval, stated URS would deem the sellers to be guaranteeing the information in the balance sheet only to the sellers' best knowledge.

It is true the representation must ordinarily be an affirmation of fact. [***12] ( *Civ. Code, § 1710, subd. 1.*) A misrepresentation of law is ordinarily not actionable in the absence of a confidential relationship or other special circumstance. (4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, §§ 447, [**892] 451, pp. 2712, 2715.) The theory is either that everyone is bound to know the law, or that a statement regarding the law is a mere opinion on which one may not rely. *(Ibid.)* "'Wherever a party states a matter which might otherwise be only an opinion, and does not state it as the mere expression of his own opinion, but affirms it as an existing fact material to the transaction, so that the other party may reasonably treat it as a fact and rely and act upon it as such, then the statement clearly becomes an affirmation of fact within the meaning of the general rule, and may be a fraudulent misrepresentation.' (2 Pomeroy's Equity Jurisprudence, sec. 878.)" ( *Crandall v. Parks (1908) 152 Cal. 772, 776 [93 P. 1018].*) Predictions or representations as to what will happen in the future are normally treated as opinion; but often they may be interpreted as implying knowledge of facts which [*203] makes [***13] the predictions probable. If the defendant does not know of such facts,

183 Cal. App. 3d 194, *; 227 Cal. Rptr. 887, **;
1986 Cal. App. LEXIS 1804, ***

the statement is an actionable misrepresentation. (See *Rest.2d, Torts, § 539*.) Thus, a statement by an architect that a building will not cost more than a certain amount may be regarded as an affirmation of fact. ( *Barron Estate Co. v. Woodruff Co. (1912) 163 Cal. 561, 574 [126 P. 351].*) The same is true where an agent states his principal will advance money to harvest a crop, or where a corporation agent represents the corporation will lease certain property or locate a plant in a certain city. ( *California C. & C. Corp. v. Carpenter (1926) 77 Cal.App. 18, 27 [246 P. 126]*; see also *Eade v. Reich (1932) 120 Cal.App. 32, 35 [7 P.2d 1043].*)

A statement of what the defendant or some third person intends to do relates to an existing state of mind, and is a representation of fact. (4 Witkin, Summary of Cal. Law, *op. cit. supra*, § 453, p. 2717.) Thus, a promise made without any intention to perform it may constitute fraud. In other words, a promise to do something necessarily implies the intention to perform, [***14] and where such intention is absent, there is a misrepresentation of fact, which is actionable fraud. ( *Civ. Code, § 1710, subd. 4.*) A trier of fact may be justified in inferring from the circumstances surrounding the subsequent repudiation that defendant never intended to carry out the agreement when it was made. The subsequent repudiation relates back to the original promise. ( *Tenzer v. Superscope, Inc. (1985) 39 Cal.3d 18, 30 [216 Cal.Rptr. 130, 702 P.2d 212].*)

The proposed allegations of Cicone allege a promise without any intention to perform: "Canady's statement, made on behalf of Stromberg and URS, constituted a promise that URS would accept the balance sheet as correct only to the best of the sellers' knowledge. As Canady knew, that promise was false and was made without any intention of performing it, for cross-defendants intended to rely on the strict warranty contained in the written agreement. The promise was made for the purpose of inducing Cicone to rely on it and thereby to advise the sellers to follow through with the sale and to sign the final agreement."

(8) Cross-defendants further contend Cicone's proposed [***15] amendments to the cross-complaint are barred by his sworn interrogatory answers directly contradicting the proposed allegations. According to cross-defendants, if Cicone's proposed amended pleadings allege "a promise made without the intention to perform it," that allegation is inconsistent with Cicone's answers to interrogatories and is, therefore, impermissible. [2]

2  Cross-defendants' motion to augment the record filed on April 22, 1985, to include interrogatories propounded by cross-defendants to Cicone and Cicone's responses to said interrogatories was granted on July 2, 1985.

[*204] Interrogatory No. 12 propounded to Cicone states: "If you contend that Richard W. Canady stated that any unaudited accounting in the sales agreement would be based on [**893] the seller's best information and belief, please describe the exact statements of Mr. Canady, the date or dates, times, and circumstances under which they were uttered, and your replies to such statements (to the best of your knowledge)."

Cicone's [***16] full response to the interrogatory was as follows: "Please see response to Interrogatory No. 9. Further, the specific topic of the unaudited accounting was brought to the attention of Mr. Canady during a meeting on October 13, 1981. Plaintiffs and cross-complainant herein indicated that the unaudited accounting could not be guaranteed, in response to which *Mr. Canady represented that this was the exact meaning of the paragraph guaranteeing the accounting*, in that *any representations as to financial matters would be on the best knowledge of Lucas and that as such, Lucas did not guarantee any such financial information*. This response is to the best recollection of cross-complainant herein, particularly in light of the passage of time since said meeting." (Italics added.)

Cross-defendants contend the foregoing answer limits the scope of Cicone's allegations to categorizing Canady's statement as an interpretation of the sales agreement, i.e., an unactionable opinion of law.

"As a general rule in testing a pleading against a demurrer the facts alleged in the pleading are deemed to be true, however improbable they may be. [Citation.] The courts, however, will not close their [***17] eyes to situations where a complaint contains allegations of fact inconsistent with attached documents, or allegations contrary to facts which are judicially noticed. [Citations.] Thus, a pleading valid on its face may nevertheless be subject to demurrer when matters judicially noticed by the court render the complaint meritless. In this regard the court passing upon the question of the demurrer may look to affidavits filed on behalf of plaintiff, and the plaintiff's answers to interrogatories [citation], as well as to the plaintiff's response to request for admissions. [Citations.]" ( *Del E. Webb Corp. v. Structural Materials Co. (1981) 123 Cal.App.3d 593, 604 [**894] [176 Cal.Rptr. 824].*)

Cross-defendants rely primarily on *Dwan v. Dixon (1963) 216 Cal.App.2d 260 [30 Cal.Rptr. 749]* in which plaintiffs alleged in their original complaint that two of the defendants therein served intoxicating beverages to one Froberg, a third defendant, and then permitted him to drive, knowing he was intoxicated. Because California law at that time did not provide a cause of action based on facts such as those alleged above ( *id., at p. 264*), [***18] plaintiffs attempted to amend their complaint by

183 Cal. App. 3d 194, *; 227 Cal. Rptr. 887, **;
1986 Cal. App. LEXIS 1804, ***

alleging a more active course of [*205] conduct by defendants, alleging defendants took an active part in "putting" Froberg in his car, "heading him for the highway," and "aiding" and "assisting" him in driving. (*Ibid.*) Defendants demurred, contending the amendment was improper since it was inconsistent with statements in the sworn affidavit of plaintiffs' attorney and with plaintiffs' interrogatory answers. They argued that "to permit appellants to make allegations which are directly contradictory to the facts within their own knowledge is to defeat the rule of truthful pleading." (*Ibid.*) The Court of Appeal agreed, affirming the lower court's sustaining of defendants' demurrer without leave to amend.

However, in *Dwan v. Dixon*, the written interrogatories requested plaintiffs divulge "each and every fact upon which the allegations" of the complaint were based. The facts provided by plaintiffs failed to support the allegations of the amended pleading. (*Id., at p.* 262.)

In the instant case, the interrogatory in question fails to make such a comprehensive request. Furthermore, Cicone's response [***19] is made based upon his "best recollection." Finally, in our view, Cicone's answer to the interrogatory is not so inconsistent with the facts appearing in Cicone's proposed allegations as to render the cross-complaint demurrable. (See *Del E. Webb. Corp. v. Structural Materials Co., supra,* 123 Cal.App.3d 593, 605-606.)

*Justifiable Reliance*

Cross-defendants contend the allegation of the word "reasonable" is insufficient to allege justifiable reliance in this case. Cross-defendants declare: "[An] attorney is not justified in relying on statements of law made by an adverse party or attorney in the course of arm's length negotiations." Cross-defendants urge us to hold any reliance by Cicone on the alleged misrepresentation was unjustifiable as a matter of law.

(9) Whether reliance is justified is a question of fact for the determination of the trier of fact. The issue is whether the person who claims reliance was justified in relying on the representation in light of his own knowledge and experience. ( *Gray v. Don Miller & Associates, Inc.* (1984) 35 Cal.3d 498, 503 [198 Cal.Rptr. 551, 674 P.2d 253].) As Cicone points out: "Negligence [***20] in reliance upon a misrepresentation is not a defense where the misrepresentation was *intentionally* made to induce reliance upon it. ( *Hefferan v. Freebairn* (1950) 34 Cal.2d 715, 719 . . .; *Smith v. Williams* (1961) 55 Cal.2d 617, 620 . . . .) Only '[if] the conduct of the plaintiff [in relying upon a misrepresentation] in the light of his own intelligence and information was manifestly unreasonable' will he be denied recovery. ( *Hefferan v. Freebairn*, [*206] *supra,* 34 Cal.2d at p. 719.)" ( *Winn*

*v. McCulloch Corp.* (1976) 60 Cal.App.3d 663, 671 [131 Cal.Rptr. 597], italics added.)

While the complaint has not been carefully drawn in this regard, it appears there is a reasonable possibility the paucity of facts regarding a justifiable reliance can be cured by amendment and the demurrer should be not sustained without leave to amend on this ground. ( *Lingsch v. Savage* (1963) 213 Cal.App.2d 729, 739-740 [29 Cal.Rptr. 201, 8 A.L.R.3d 537].) [3]

3  Cross-defendants strongly assert that even taking Cicone's allegation of a "promise to perform" as true, any reliance by Cicone was unreasonable as a matter of law. To support this argument, cross-defendants rely on their assertion that the "terms of the sales agreement were directly at variance with Canady's alleged representation *and* the fact that it contained an integration clause expressly providing that the written document 'supersedes all prior and contemporaneous agreements. . . .'" However, the sales agreement was not attached and incorporated into the complaint or the cross-complaint by reference. Cross-defendants attempt to make it a part of the record as an exhibit to cross-defendants' demurrer.

"It is an elementary rule that the sole function of a demurrer is to test the sufficiency of the challenged pleading. It cannot, properly, be addressed to or based upon evidence or other extrinsic matters." ( *Cravens v. Coghlan* (1957) 154 Cal.App.2d 215, 217 [315 P.2d 910].) Although the court may take judicial notice of judicial records and decisions in the same case, this does not mean it may take judicial notice of the truth of factual matters asserted therein. ( *Garcia v. Sterling* (1985) 176 Cal.App.3d 17, 22 [221 Cal.Rptr. 349].) The document attached to the demurrer was not properly before the lower court, nor is it properly before this court. We and the trial court are not permitted to consider it for any purpose in ruling upon the demurrer.

[***21] *Proximate Causation*

(10) The lower court determined "Defendant's statements are not a proximate cause of harm to cross-complainant (assuming damage) as a matter of law. (See *Groswird v. Hayne Investments 133 CA3d. 624*) . . ." [4] Cross-defendants assert the settlement of the controversy between Advanced and URS was an intervening cause which removed the possibility of a meritorious defense. Accordingly, cross-defendants argue the alleged damage was not caused by the alleged misrepresentation but by

183 Cal. App. 3d 194, *; 227 Cal. Rptr. 887, **;
1986 Cal. App. LEXIS 1804, ***

an independent intervening force and claims the fraud causes of action must be dismissed.

    4    As stated, a rehearing was granted in *Groswird.*

Ordinarily, forseeability is a question of fact for the jury. "It may be decided as a question of law only if, 'under the undisputed facts there is no room for a reasonable difference of opinion.'" ( *Bigbee v. Pacific Tel. & Tel. Co. (1983) 34 Cal.3d 49, 56 [192 Cal.Rptr. 857, 665 P.2d 947]*, quoting from *Schrimscher v. Bryson (1976) 58 Cal.App.3d 660, 664 [130 Cal.Rptr. 125].*) [***22] [**895] "'[Foreseeability] is not to be measured by what is more probable than not, but includes whatever is likely enough in the setting of modern life that a reasonably thoughtful [person] would take account of it [*207] in guiding practical conduct.' (2 Harper & James, Law of Torts [1956] § 18.2, at p. 1020.)" ( *Bigbee v. Pacific Tel. & Tel. Co., supra, 34 Cal.3d at p. 57.*) An actor may be liable if his negligence is a substantial factor in causing an injury, and he is not relieved of liability because of the intervening act of a third person if such act was reasonably foreseeable at the time of his negligent conduct. ( *Vesely v. Sager (1971) 5 Cal.3d 153, 163 [95 Cal.Rptr. 623, 486 P.2d 151].*) If the act of the third party is not reasonably foreseeable, not a normal consequence in the situation, it is a superseding cause. ( *Commercial Standard Title Co. v. Superior Court (1979) 92 Cal.App.3d 934, 944 [155 Cal.Rptr. 393].*)

Accepting the proposed amended allegations as true, a trier of fact could conclude it is reasonably foreseeable that Advanced, faced with a large monetary demand and a prospect [***23] of an expensive defense, would settle the case rather than litigate the issues. If so found, this would be a foreseeable intervening cause, not a superseding cause, and would not relieve cross-defendants of potential liability.

*Damages*

    (11) Cicone challenges the lower court's finding Cicone "has suffered no damage . . . ."

The case of *Pollack v. Lytle (1981) 120 Cal.App.3d 931 [175 Cal.Rptr. 81]* recognizes detriment to a claimant is inferable from exposure to legal malpractice liability. In that case, the plaintiff was obliged to defend a malpractice action whereby he would incur expenses, lose time from his practice, suffer inconvenience, face professional embarrassment and the impairment of his professional reputation. ( *Id., at p. 944.*) Reaching a similar conclusion upon different facts, the court held in *Roberts v. Ball, Hunt, Hart, Brown & Baerwitz, supra, 57 Cal.App.3d 104, 111-112:* "Such legal expense is neither remote nor speculative, but must of necessity be

incurred by plaintiff to make him whole." ( *Id., at p. 112.*)

We conclude the lower court abused its discretion in sustaining [***24] the demurrer without leave to amend as to the causes of action for fraud and deceit.

II. Negligent Misrepresentation

The seventh, eighth and ninth causes of action of the cross-complaint, incorporating various other allegations of the cross-complaint, are based on negligence. Cicone asserts those causes of action state, or can be amended to state, a cause of action for negligent misrepresentation. He relies on the proposed factual allegations as set forth in the summary of facts with respect [*208] to the fraud and deceit causes of action modified to allege a negligent representation by Canady rather than an intentional misrepresentation.

    (12) "Where a defendant makes false statements, honestly believing them to be true, but without reasonable grounds for such belief, he may be held liable for negligent misrepresentation, a form of deceit." ( *Roberts v. Ball, Hunt, Hart, Brown & Baerwitz, supra, 57 Cal.App.3d 104, 111; Muraoka v. Budget Rent-A-Car, Inc. (1984) 160 Cal.App.3d 107, 119 [206 Cal.Rptr. 476].*)

However, we must reexamine the question of duty owed by cross-defendants to Cicone as it relates to a cause of action [***25] for negligent misrepresentation. Cicone concedes, in his negligence argument, an attorney *advising his own client* has no duty of care to third persons in the absence of an allegation that his advice was foreseeably transmitted to or relied upon by third persons or that he made some affirmative misrepresentation to the third person's attorney. ( *Goodman v. Kennedy, supra, 18 Cal.3d 335, 343-345.*)

Cicone contends, however, *Goodman* recognizes that where, as in *Roberts, supra, 57 Cal.App.3d 104*, the attorney intends his statement to be relied upon by third persons dealing with his client, the attorney owes the third person a [**896] duty of care, and argues "certainly, where an affirmative negligent misrepresentation is made directly to the third persons and their attorney, there is no sound reason to shield the attorney, or his equally negligent client, from liability for their conduct."

A "deceit" is defined in California law as "[the] assertion, as a fact, of that which is not true, *by one who has no reasonable ground for believing it to be true;* . . ." ( *Civ. Code, § 1710, subd. 2*, italics added.) [***26] Thus, where a defendant makes false statements honestly believing them to be true, but without reasonable grounds for such belief, he may be held liable for negligent misrepresentation, a form of deceit. ( *Muraoka v.*

183 Cal. App. 3d 194, *; 227 Cal. Rptr. 887, **;
1986 Cal. App. LEXIS 1804, ***

*Budget Rent-A-Car, Inc., supra, 160 Cal.App.3d 107, 119,* citing *Roberts v. Ball, Hart, Hart, Brown & Baerwitz, supra, 57 Cal.App.3d at p. 111.*)

Here, Cicone alleges cross-defendant Canady, an attorney, in his client's presence (the buyer) and in the presence of cross-complainant Cicone, an attorney, and his client (the seller) represented to Cicone and his client that the buyer would deem the seller to be guaranteeing the information in the unaudited balance sheet only to the seller's best knowledge and belief. This representation was made to induce Cicone to advise his client to close the sales transaction immediately, which was done. In an amended cross-complaint, Cicone would further allege that this representation was not true, that Canady had no reasonable basis for believing it to be true, that Cicone [*209] and his client were intended to and did, in fact, rely upon Canady's negligent representation with resulting [***27] damages.

In *Goodman v. Kennedy, supra,* 18 Cal.3d 335, plaintiffs, nonlawyers, sought damages from defendant, an attorney, for losses they incurred on stock purchased from defendant's clients. Plaintiffs alleged defendant negligently advised his clients the stock could be sold by them to third persons without jeopardizing the exempt status of the stock under the Securities Act of 1933. The alleged result of the purchase was an order by the Securities Exchange Commission suspending exemption of the stock with consequent loss in the stock's value, to plaintiffs' damage. The trial court sustained a general demurrer to plaintiffs' complaint without leave to amend and entered judgment of dismissal. The Supreme Court affirmed, holding defendant's duty of care in giving legal advice to his client did not extend to plaintiffs with whom defendant's clients, in acting upon the advice, dealt at arm's length, in the absence of any showing that the legal advice was foreseeably transmitted to or relied on by plaintiffs, or that plaintiffs were intended beneficiaries of a transaction to which the advice pertained. The court stated: "The present defendant had no relationship [***28] to plaintiffs that would give rise to his owing plaintiffs any duty of care in advising his clients that they could sell the stock without adverse consequences. There is no allegation that the advice was ever communicated to plaintiffs and hence no basis for any claim that they relied upon it in purchasing or retaining the stock. Nor was the advice given for the purpose of enabling defendant's clients to discharge any obligation to plaintiffs. Thus, there is no allegation that plaintiffs had any relationship to defendant's clients or to the corporation as stockholders or otherwise when the advice was given." ( *Id., at pp.* 343-344, fn. omitted.) Thus, *Goodman* is clearly distinguishable on its facts from the instant case. However, the Supreme Court in *Goodman* explicitly recognizes that where an attorney *intends* his advise or

statement to his client to be relied upon by third persons dealing with his client, the attorney owes the third person a duty of care. As stated in *Goodman:* "We are therefore not concerned with such cases as *Roberts v. Ball, Hunt, Hart, Brown & Baerwitz* (1976) 57 Cal.App.3d 104, 110-111, . . . in which an [***29] attorney gives his client a written opinion with the intention that it be transmitted to and relied upon by the plaintiff in dealing with the client. *In that situation the attorney owes the* [**897] *plaintiff a duty of care in providing the advice because the plaintiff's anticipated reliance upon it is 'the end and aim of the transaction,'* ( *Glanzer v. Shepard* (1922) 233 N.Y. 236, 238-239 [135 N.E. 275, 23 ALR 1425])" (18 Cal.3d at p. 343, fn. 4). In the present case, Cicone's reliance on Canady's alleged misrepresentation was the very purpose of the representation. Canady expected Cicone to advise his client to close the transaction; Cicone did so and the transaction was closed.

[*210] A duty of care under these facts logically follows from the holding in *Roberts.* In that case, plaintiff alleged he was the prospective lender of substantial moneys to BBC, a partnership; that defendant attorneys gave a member of the partnership a letter stating that in their professional opinion BBC was a general partnership of 14 general partners; that they knew this letter was to be used to induce plaintiff to make loans to BBC; that they [***30] failed to disclose the belief on the part of many of the partners that BBC was a limited partnership and that the limited partners had no personal liability for its obligations; and that, in reliance on the letter, plaintiff made loans and thereafter incurred litigation costs in a still pending attempt to establish liability of the partners as general partners. The Court of Appeal held that a cause of action for negligent misrepresentation was stated under the principles laid down in *Lucas v. Hamm* (1961) 56 Cal.2d 583 [15 Cal.Rptr. 821, 364 P.2d 685]; *Donald v. Garry* (1971) 19 Cal.App.3d 769 [97 Cal.Rptr. 191, 45 A.L.R.3d 1177] and *Restatement Second of Torts section 324A.* "The defendants' [attorney'] opinion concerning the status of the partners was rendered for the purpose of influencing plaintiff's conduct, and harm to him was clearly foreseeable. We have no difficulty, therefore, in determining that the issuance of a legal opinion intended to secure benefit for the client, either monetary or otherwise, must be issued with due care, or the attorneys who do not act carefully will have breached [***31] *a duty owed to those they attempted or expected to influence on behalf of their clients."* (57 Cal.App.3d at p. 111, italics added.)

If the issuance of a legal opinion intended to secure a benefit for a client must be issued with due care towards third persons whom the attorneys attempt or expect to influence on behalf of their clients, then a fortiori why should such a duty of care not exist toward the third

183 Cal. App. 3d 194, *; 227 Cal. Rptr. 887, **;
1986 Cal. App. LEXIS 1804, ***

party's attorney where an affirmative misrepresentation of fact is made directly to the attorney for the purpose of influencing his client?

Public policy does not foreclose the imposition of a duty of care by Canady to Cicone under these facts. To the contrary, a majority of the policy factors considered by the courts in determining the question of a duty of care support such a duty. "'The determination whether in a specific case the defendant will be held liable to a third person not in privity . . . involves the balancing of various factors, among which are the extent to which the transaction was intended to affect the plaintiff [clearly present], the foreseeability of harm to him [clearly present in the instant case], the degree of certainty that the [***32] plaintiff suffered injury [clearly present], the closeness of the connection between the defendant's conduct and the injury suffered [clearly present], the moral blame attached to the defendant's conduct [arguable in view of the fact defendant's client was also present], and the policy of preventing future harm [clearly present].'" ( *Goodman v. Kennedy,* [*211] *supra,* 18 Cal.3d at pp. 342-343, quoting from *Biakanja v. Irving (1958) 49 Cal.2d 647, 650 [320 P.2d 16, 65 A.L.R.2d 1358];* see also Note, *Attorneys' Liability to Third Parties for Professional Negligence* (1978) 66 Cal.L.Rev. 393.) Finally, persons such as Canady have, or can readily obtain, insurance for these risks.

Nor do we visualize any legitimate threat to the professional relationship between Canady and his client, the buyer, by imposing on Canady a duty of care toward Cicone under our facts. An attorney must [**898] take pains to avoid negligent misrepsentation of material facts in negotiating business transactions with third parties and their attorneys. All that is required to avoid negligent misrepresentation is that the attorney have some [***33] reasonable basis for believing the truthfulness of his or her representations. Imposing possible liability where such a basis is lacking will not prevent an attorney from devoting his entire energies to his client's interest. Neither will it require the attorney to assist opposing counsel in the performance of the latter's duties to his client.

Finally, it takes more than a negligent misrepresentation to impose liability. The misrepresentation must be of a material fact, it must be made with the intent to induce reliance by the opposing party, it must actually be relied upon reasonably by the opposing party and proof must be made of damages proximately caused by the misrepresentation. All of these elements are present under the allegations here reviewed. We therefore conclude the trial court abused its discretion in sustaining cross-defendants' demurrer to the seventh, eighth and ninth causes of action without leave to amend.

III. Full Equitable Indemnity

(13) The trial court additionally sustained cross-defendants' demurrer to cross-complainant's first cause of action seeking full equitable indemnity without leave to amend. Cicone contends this was error as the "cross-complaint [***34] states or can be amended to state a cause of action for full equitable indemnity" as an alternative to the direct cause of action for fraud and deceit. In sum, Cicone contends the concept of full equitable indemnity survived *American Motorcycle Assn. v. Superior Court (1978) 20 Cal.3d 578 [146 Cal.Rptr. 182, 578 P.2d 899],* citing *E. L. White, Inc. v. City of Huntington Beach (1982) 138 Cal.App.3d 366, 375-376 [187 Cal.Rptr. 879].* In *American Motorcycle,* our Supreme Court held that a concurrent tortfeasor may obtain partial indemnity from other concurrent tortfeasors on a comparative fault basis.

In *E. L. White, Inc. v. City of Huntington Beach, supra,* the Fourth District Court of Appeal found substantial evidence had been presented to [*212] support the trial court's decision to require Huntington Beach to fully indemnify E. L. White, Inc., and its insurer, Royal Globe, in light of evidence presented which established E. L. White, Inc., was liable only vicariously and Huntington Beach was actually negligent for a wrongful death and personal injury which arose from the same accident at a construction site. [***35] The Court of Appeal concluded a vicariously liable tortfeasor may still obtain full indemnity even though *American Motorcycle* now allows partial indemnity to be obtained on a comparative fault basis in appropriate cases. "To conclude otherwise would counter basic 'principles of common-law indemnification between vicariously liable tortfeasors and tortfeasors guilty of the acts and omissions causing the harm. In short, the apportionment rule applies to those who in fact share responsibility for causing the accident or harm, and does not extend further to those who are only vicariously liable . . . .' [Citation.]" ( *Id., at p. 376,* fn. omitted.)

*Restatement Second of Torts section 886B* entitled "Indemnity Between Tortfeasors" provides in pertinent part: "(1) If two persons are liable in tort to a third person for the same harm and one of them discharges the liability of both, he is entitled to indemnity from the other if the other would be unjustly enriched at his expense by the discharge of the liability.

"(2) Instances in which indemnity is granted under this principle include the following:

". . . .

"(c) The indemnitee [***36] was induced to act by a misrepresentation on the part of the indemnitor, upon which he justifiably relied; . . ."

183 Cal. App. 3d 194, *; 227 Cal. Rptr. 887, **;
1986 Cal. App. LEXIS 1804, ***

The concept of joint tortfeasors for the purpose of indemnity is explained in the restatement as ". . . two or more persons who are liable to the same person for the same harm. [**899] *It is not necessary that they act in concert or in pursuance of a common design, nor is it necessary that they be joined as defendants.* The rules stated applies to all torts, including not only negligence but also misrepresentation, defamation, injurious falsehood, nuisance or any other basis of tort liability." ( *Rest.2d Torts, § 886A, com. b,* italics added.)

Although there can be no indemnity without joint and several liability by the prospective indemnitor and indemnitee ( *Munoz v. Davis (1983) 141 Cal.App.3d 420, 425 [190 Cal.Rptr. 400]*), indemnity does not require a "special" relationship between the cotortfeasors. (*People ex. rel. Dept. of Transportation v. Superior Court (1980) 26 Cal.3d 744, 757, fn. 4 [163 Cal.Rptr. 585, 608 P.2d 673]*. It only requires a significant difference in [***37] the kind or quality of the conduct of each tortfeasor. ( *American Motorcycle* [*213] *Assn. v. Superior Court, supra, 20 Cal.3d 578, 594-595, fn. 4.*) Here, Cicone is alleged only to have been negligent while the cross-defendants Canady and his client are alleged to have intentionally deceived Cicone and his client. Should this be proved at trial, then the entire liability may be shifted to Canady and his client. On the other hand, if cross-defendants are only found to have been negligent in their representations to cross-complainant, then partial (com-parative) indemnity under the *American Motorcycle* principles will come into play.

Thus, we conclude the trial court abused its discretion in sustaining cross-defendants' demurrer to cross-complainant's first cause of action without leave to amend.

IV.

Cicone also contends the trial court erred in sustaining cross-defendants' demurrer to cross-complainant's second cause of action for partial equitable indemnity without leave to amend. In light of our previous discussion in parts II and III of this opinion, no further analysis need be made as the same rationale would apply to a cause of action for partial [***38] equitable indemnity. If Cicone may properly allege a cause of action for negligent misrepresentation, he may also allege a cause of action for partial equitable indemnity. The trial court abused its discretion in sustaining cross-defendants' demurrer to this cause of action without leave to amend.

The judgment of dismissal is reversed as to all causes of action alleged in Cicone's cross-complaint and the matter is remanded to the trial court for further proceedings in accordance with the views expressed herein.

Cross-complainant, Cicone, to recover his costs on appeal.