# Exhibit D

**APPENDIX OF NON-FEDERAL AND UNPUBLISHED FEDERAL AUTHORITIES
CITED IN VISA USA INC.'S REPLY IN SUPPORT OF MOTION TO STAY
ACTION AND TO COMPEL ARBITRATION**

Westlaw.

556 P.2d 737                                                                                     Page 1
18 Cal.3d 335, 556 P.2d 737, 134 Cal.Rptr. 375, Fed. Sec. L. Rep. P 95,829
**(Cite as: 18 Cal.3d 335, 556 P.2d 737)**

▷Goodman v. Kennedy
Cal.

MELVILLE GOODMAN et al., Plaintiffs and
Appellants,
v.
J. JOSEPH KENNEDY et al., Defendants and
Respondents.
L.A. No. 30465.

Supreme Court of California
November 29, 1976.

SUMMARY

Plaintiffs brought an action for damages against an
attorney for losses they incurred on certain shares of
stock purchased from the attorney's clients, who were
principal officers of the corporation issuing the stock.
Plaintiffs alleged that defendant negligently advised
his clients that the shares in question could be issued
to them as stock dividends and sold to third persons
without jeopardizing the previously granted
exemption from the requirement of registering the
corporation's stock. Plaintiffs also alleged that
defendant had a telephone conversation concerning
the proposed stock purchase with an attorney
representing two of the three plaintiffs, in which
defendant failed to advise that attorney of certain
facts allegedly material to the necessity for the
exemption and the effect that the proposed purchase
might have on its continued existence. It was alleged
defendant withheld the information for the purpose of
deceiving plaintiffs and that plaintiffs relied on the
nondisclosure in purchasing the stock. The alleged
result of the purchase was an order by the Securities
and Exchange Commission suspending the
exemption with consequent loss in the stock's value.
The trial court sustained a general demurrer to
plaintiffs' complaint without leave to amend and
entered a judgment of dismissal. (Superior Court of
Los Angeles County, No. C997337, Rodney K.
Potter, Judge.)

The Supreme Court affirmed. The court held
defendant's duty of care in giving legal advice to his
client did not extend to plaintiffs with whom the
clients, in acting upon the advice, dealt at arm's
length, in the absence of any showing that the legal
advice was foreseeably transmitted to or relied on by
plaintiffs, or that plaintiffs were intended
beneficiaries of a transaction to which the advice
pertained. The court further held that under the
circumstances defendant had no duty toward
plaintiffs during his alleged conversation with their
attorney to bring up the subject matter of his prior
advice to his clients, and that no facts were alleged
that would give rise to any such duty. The court also
held that plaintiffs' cause of action for fraud and for
violation of provisions of the Corporate Securities
Law of 1968, based on the same alleged
nondisclosures, failed to state a cause of action for
lack of any factual allegations giving rise to a duty to
disclose. (Opinion by Wright, C. J., with McComb,
Sullivan, Clark and Richardson, JJ., concurring.
Separate dissenting opinion by Mosk, J., with
Tobriner, J., concurring.)

HEADNOTES

Classified to California Digest of Official Reports

**(1a, 1b, 1c)** Attorneys at Law § 22--Acts Constituting
Malpractice-- Negligence--Liability to Third Person.
In an action by purchasers of stock against the
attorney who represented the sellers, who were
principal officers of the corporation issuing the stock,
for damages allegedly resulting from an order
suspending the exemption from the requirement of
registering the stock, allegations that defendant's
negligent advice to his own clients that the stock in
question could be issued to them as stock dividends
and sold to third persons without jeopardizing the
exemption from registration, and allegations of
conscious nondisclosure of such matters to an
attorney representing plaintiffs, did not state a cause
of action for negligence, where defendant had no
relationship to plaintiffs that would give rise to his
owing plaintiffs any duty of care in advising his
clients that they could sell the stock without adverse
consequences either when the advice was initially
given, or when he learned of plaintiffs' identity
through the inquiry of their attorney.
[See **Cal.Jur.3d, Attorneys at Law, § 287**;
**Am.Jur.2d, Attorneys at Law, § 196**.]
**(2)** Negligence § 92--Actions--Questions of Law and
Fact--Duty and Care.
Whether an attorney owed a duty to avoid harm to
third persons from negligent advice given to his

556 P.2d 737
18 Cal.3d 335, 556 P.2d 737, 134 Cal.Rptr. 375, Fed. Sec. L. Rep. P 95,829
**(Cite as: 18 Cal.3d 335, 556 P.2d 737)**

Page 2

clients is a question of law, and depends on a judicial weighing of the policy consideration for and against the imposition of liability under the circumstances.

**(3)** Attorneys at Law § 22--Acts Constituting Malpractice--Negligence--Duty to Third Persons.
To make an attorney liable for negligent confidential advice not only to the client who enters into a transaction in reliance on that advice, but also to the other parties to the transaction with whom the client deals at arm's length, would inject undesirable self-protective reservations into the attorney's counseling role, and would result both in an undue burden upon the profession and a diminution in the quality of the legal services received by the client.

**(4)** Investment Securities § 6--Actions--Corporate Securities Law.
No cause of action was stated in a complaint for violation of Corp. Code, § 25400, making it unlawful to make false or misleading statements or to omit material facts for the purpose of inducing the purchase of stock, or of Corp. Code, § 25401, making it unlawful to sell a security by means of a communication that includes such a statement, where there was no allegation that defendant made any statement to plaintiffs with respect to the stock after the date the statute became effective, and where there was no allegation that defendant made either any untrue statement of a material fact or any statement that was rendered misleading by the omission of a material fact.

**(5)** Attorneys at Law § 21--Nature and Basis of Malpractice Actions--Fraud.
The limitations upon liability to third persons for negligence based upon the scope of an attorney's duty of care do not apply to his liability for fraud.

**(6a, 6b)** Attorneys at Law § 22--Acts Constituting Malpractice--Fraud--Third Persons.
In an action against an attorney for losses incurred on certain shares of stock purchased from the attorney's clients, who were principal officers of the corporation issuing the stock, as a result of a suspension of the exemption from registration of the stock, no cause of action for fraud was stated by allegations that the attorney failed to advise plaintiffs' attorney of certain facts allegedly material to the necessity for the exemption and the effect the proposed purchase by plaintiffs might have on it, that such omission was for the purpose of deceiving plaintiffs, that plaintiffs relied on the nondisclosure in purchasing the stock,

where there were no allegations that would establish any duty of disclosure on the part of the attorney, and where insufficient facts were alleged to establish that the attorney knew the materiality of the omitted matters, or that plaintiffs were reasonably induced to purchase the stock by the omission.

**(7)** Fraud and Deceit § 8--Actual Fraud--False Representations-- Concealment--Duty of Disclosure.
A duty of disclosure may exist when one party to a transaction has sole knowledge or access to material facts and knows that such facts are not known to or reasonably discoverable by the other party.

**(8a, 8b)** Pleading § 32--Demurrer to Complaint--Judgment on Demurrer.
In an action by the purchasers of stock against the attorney for the sellers, in which the complaint for damages for fraud alleged that the attorney fraudulently concealed material information concerning the stock's exemption from registration requirements, the trial court did not abuse its discretion in sustaining a demurrer to the complaint without leave to amend, where the demurrer asserted that the fraud counts were deficient in that they showed no duty on the part of the attorney to disclose the allegedly omitted matters and no justifiable reliance by plaintiff on the alleged nondisclosures, and where plaintiffs failed to show any ability to plead and prove facts which would establish the elements requisite to fraud.

**(9)** Pleading § 32--Demurrer to Complaint--Judgment on Demurrer.
While generally it is an abuse of discretion to sustain a demurrer without leave to amend if there is any reasonable possibility that the defect can be cured by amendment, the burden is on the plaintiff to demonstrate that the trial court abused its discretion, and plaintiff must show in what manner he can amend his complaint and show that amendment will change the legal effect of his pleading.

COUNSEL
Hecht & Diamond and Roger Jon Diamond for Plaintiffs and Appellants.
Cary A. Rosen and Rosen, Ross, Fields & Zax for Defendants and Respondents. *339
WRIGHT, C. J.
     Plaintiffs seek damages from defendant Kennedy, an attorney, for losses they incurred on certain shares of stock purchased from Kennedy's clients, who were principal officers of the corporation

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

556 P.2d 737
18 Cal.3d 335, 556 P.2d 737, 134 Cal.Rptr. 375, Fed. Sec. L. Rep. P 95,829
**(Cite as: 18 Cal.3d 335, 556 P.2d 737)**

Page 3

issuing the stock. Plaintiffs allege that defendant [FN1] negligently advised his clients that the shares in question could be issued to them as stock dividends and sold to third persons without jeopardizing the exemption from the requirement of registering the corporation's stock under the Securities Act of 1933 (the Act) theretofore granted under Regulation A of the Securities and Exchange Commission (SEC). (See 15 U.S.C. § 77c(b); 17 C.F.R. §§ 230.251-230.263.) Plaintiffs also allege that defendant had a telephone conversation concerning the proposed stock purchase with an attorney representing two of the three plaintiffs in which defendant failed to advise that attorney of certain facts allegedly material to the necessity for the SEC exemption and the effect the proposed purchase might have on its continued existence. Defendant allegedly withheld this information for the purpose of deceiving plaintiffs and plaintiffs allegedly relied on the nondisclosure in purchasing the stock. The alleged result of the purchase was an order by the SEC suspending the exemption with consequent loss in the stock's value, to plaintiffs' damage.

> FN1 "Defendant" hereinafter refers to defendant Kennedy. The law firm of which Kennedy was a partner was also joined as a defendant solely on the theory that he was acting as the firm's agent.

A general demurrer to plaintiffs' third amended complaint alleging these facts was sustained without leave to amend and plaintiffs appeal from the ensuing dismissal. Their appeal presents the legal question of whether or under what circumstances an attorney's duty of care in giving legal advice to a client extends to persons with whom the client in acting upon the advice deals wholly at arm's length. Applying criteria announced in our prior decisions, we conclude for reasons to be explained that the present defendant had no such duty in the absence of any showing that the legal advice was foreseeably transmitted to or relied upon by plaintiffs or that plaintiffs were intended beneficiaries of a transaction to which the advice pertained. Nor under the alleged circumstances did defendant have any duty toward plaintiffs during his alleged conversation with their attorney to bring up the subject matter of his prior advice to his clients. No facts are alleged that would give rise to any such duty such as defendant's making any statement that would be misleading without the disclosure. *340

Plaintiffs also assert causes of action for fraud and for violation of provisions of the Corporate Securities Law of 1968 (Corp. Code, § 25400, subd. (d), § 25401) based on the same alleged nondisclosures. These causes of action likewise fail for lack of any factual allegations giving rise to a duty to disclose.

### Negligence

The negligence claims of plaintiffs Stanley D. Davidson, Marvyn Davidson and Melville Goodman are separately stated in the first, fourth and seventh causes of action respectively of the third amended complaint. They allege: Defendant was a director and officer of Motel Managers Training School, Inc. (the corporation). At all relevant times the exemption from registration provided by the SEC's Regulation A was limited to stock issues having an aggregate offering price of not more than $300,000. (See 15 U.S.C. § 77c(b) (prior to 1970 amendments); 17 C.F.R. § 230.254 (prior to 1972 amendment).) During the fall of 1968 defendant negligently advised Soma and Spencer, the corporation's principal officers, that they "could cause the [corporation] to issue to each of them additional shares in the form of stock dividends, and that they could sell those additional shares to third persons with the result that the proceeds received from the sale of those shares would not be computed in the aggregate offering price under Regulation A."

The actual issuance of shares pursuant to this advice is not directly alleged but can be inferred from other allegations. It is alleged that "with respect to the additional shares issued to ... Soma and ... Spencer, no escrow arrangement was made as required by Rule 253(c)," which provides that securities issued to the corporation's officers and not placed under such escrow arrangement must be included in the computation of the amount of the Regulation A offering. (See 17 C.F.R. § 230.253, subd. (c)(2).) Also alleged only by implication are the facts that the shares were issued to Soma and Spencer as stock dividends and that there had in fact been a Regulation A offering. These facts are inferable from the pleading of the previously mentioned telephone conversation as follows: "One Sunday morning in December 1968, defendant Kennedy was contacted by Attorney Thomas Pitcher of the law firm of Gibson, Dunn & Crutcher, acting on behalf of plaintiffs Marvyn Davidson and Stanley D. Davidson, to discuss the proposed sale of [the] stock

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

556 P.2d 737
18 Cal.3d 335, 556 P.2d 737, 134 Cal.Rptr. 375, Fed. Sec. L. Rep. P 95,829
(Cite as: 18 Cal.3d 335, 556 P.2d 737)

Page 4

from Soma and Spencer to Marvyn Davidson and Stanley D. Davidson." There is no further allegation of what *was* said during this conversation but it is **\*341** alleged that defendant did *not* state to Pitcher (1) "that the [corporation] had begun a Regulation A offering on September 30, 1968, and completed that offering on October 25, 1968," (2) "that the stock being sold to [the Davidsons] was received from the [corporation] as stock dividends," (3) "reasons why the securities would be exempt from registration as exempt securities or on a transaction exemption," (4) "the possibility that the [SEC] could integrate the new stock with shares previously sold by the [corporation] under Regulation A, with the result that the entire Regulation A exemption might be lost," and (5) "that Soma and Spencer were underwriters under Section 2(11) of the Act." [FN2] These *omissions* in defendant's statements to Pitcher were allegedly made "for the purpose of deceiving him and his clients and obtaining the result of [each] plaintiff's purchase of stock from Soma and Spencer."

> FN2 It is made clear by another paragraph of the complaint that the sellers' status as underwriters was material not to the Regulation A exemption but to the elimination of any possibility of a different exemption provided by section 4, subdivision (1) of the Act (15 U.S.C. § 77d(1)).

It is alleged that in January 1969, plaintiffs Stanley D. Davidson and Marvyn Davidson each purchased 3,000 shares of the stock for $40,500 and plaintiff Melville Goodman purchased 3,000 shares for $54,000. Plaintiffs allegedly made these purchases and thereafter retained the shares "relying upon representations made by [defendant] to Pitcher, and thereafter conveyed by Pitcher to [each plaintiff] that the transaction was not in violation of the [Act]." However, no express representation of such nonviolation is alleged to have been made by defendant during the telephone conversation and plaintiffs acknowledged in a memorandum to the trial court in opposition to the demurrer that the misrepresentation on which they assertedly relied consisted only of defendant's silence in the face of what they claim was a duty to disclose. Indeed the previously mentioned allegation that defendant omitted any statement to Pitcher of "reasons why the securities would be exempt from registration" further negates any claim that defendant affirmatively represented the legality of the transaction.

As to damages, it is alleged: The SEC temporarily suspended the Regulation A exemption on September 29, 1969, and permanently suspended it on April 17, 1970, "for exceeding the ceiling allowed under the terms and conditions of Regulation A." "[T]he sale to plaintiff[s] ... violated the Regulation A exemption for which an injunction [suspension] issued." The suspension caused the value of the stock to depreciate to plaintiffs' damage. The stock has become valueless and the sellers are insolvent and cannot respond to a judgment for damages or restitution. **\*342**

(1a) Plaintiffs' causes of action for negligence thus rest on defendant's asserted liability for his (1) negligent advice to his own clients that the stock could be sold without vitiating the exemption from registration under Regulation A and (2) conscious nondisclosure of matters which would have indicated the possibility of such adverse consequence to the attorney for two of the plaintiffs in a conversation initiated by that attorney to discuss the proposed sale of some of the stock to those plaintiffs. [FN3] Plaintiffs assert that if defendant should have reasonably foreseen that this negligent advice or conscious nondisclosure would economically damage plaintiffs he should be liable for such damage. However, there can be no such liability unless defendant owed a *duty* to plaintiffs to avoid the asserted wrongdoings. (2) Whether such a duty existed is a question of law and depends on a judicial weighing of the policy considerations for and against the imposition of liability under the circumstances. (*Weirum v. RKO General, Inc.* (1975) 15 Cal.3d 40, 46 [123 Cal.Rptr. 468, 539 P.2d 36]; *Amaya v. Home Ice, Fuel & Supply Co.* (1963) 59 Cal.2d 295, 307 [29 Cal.Rptr. 33, 379 P.2d 513]; see *Dillon v. Legg* (1968) 68 Cal.2d 728, 734-735 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316].)

> FN3 The nondisclosure was conscious in that disclosure was allegedly omitted for the purpose of deceiving the attorney and plaintiffs, but there are no allegations in the negligence causes of action purporting to set forth the other elements of a cause of action for fraud.

(1b) We consider first whether defendant owed any duty of care to plaintiffs in advising his own clients concerning the legal consequences of a possible sale of the stock. Plaintiffs rely for the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

556 P.2d 737                                                                                                          Page 5
18 Cal.3d 335, 556 P.2d 737, 134 Cal.Rptr. 375, Fed. Sec. L. Rep. P 95,829
(Cite as: 18 Cal.3d 335, 556 P.2d 737)

existence of such a duty upon our decisions holding that an attorney may be liable to the intended beneficiaries of a deceased testator for the amount the intended beneficiary would have received from the testator's estate if the attorney had exercised due care in drafting the will in accordance with the testator's expressed wishes. (*Heyer v. Flaig* (1969) 70 Cal.2d 223 [74 Cal.Rptr. 225, 449 P.2d 161]; *Lucas v. Hamm* (1961) 56 Cal.2d 583 [15 Cal.Rptr. 821, 364 P.2d 685].) The forerunner of these decisions was *Biakanja v. Irving* (1958) 49 Cal.2d 647 [320 P.2d 16, 65 A.L.R.2d 1358], in which we held a notary public liable to the beneficiary of a will which was ineffective because of the notary's negligent supervision of its attestation. *Biakanja* overruled *Buckley v. Gray* (1895) 110 Cal. 339 [42 P. 900], which had held that lack of privity of contract precluded an attorney's liability to an intended beneficiary for negligence in drafting a will and directing its execution. Rejecting the requirement of privity, we said in *Biakanja*: "The determination whether in a specific case the *343 defendant will be held liable to a third person not in privity is a matter of policy and involves the balancing of various factors, among which are the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, and the policy of preventing future harm." (49 Cal.2d at p. 650.)

In *Lucas v. Hamm, supra*, 56 Cal.2d 583, we applied these factors in holding that the defendant attorney's duty of care in drafting a will extended to the intended beneficiary. We said: "As in *Biakanja*, one of the main purposes which the transaction between defendant and the testator intended to accomplish was to provide for the transfer of property to plaintiffs; the damage to plaintiffs in the event of invalidity of the bequest was clearly foreseeable; it became certain, upon the death of the testator without change of the will, that plaintiffs would have received the intended benefits but for the asserted negligence of defendant; and if persons such as plaintiffs are not permitted to recover for the loss resulting from negligence of the draftsman, no one would be able to do so and the policy of preventing future harm would be impaired." (56 Cal.2d at p. 589.) We subsequently pointed out in *Heyer v. Flaig, supra*, 70 Cal.2d 223, that "[w]hen an attorney undertakes to fulfill the testamentary instructions of his client, he realistically and in fact assumes a relationship not only with the client but also with the client's intended beneficiaries" (70 Cal.2d at p. 228) and that it is this relationship which gives rise to a duty of care owed by the attorney to such beneficiary (70 Cal.2d at p. 229).

The present defendant had no relationship to plaintiffs that would give rise to his owing plaintiffs any duty of care in advising his clients that they could sell the stock without adverse consequences. There is no allegation that the advice was ever communicated to plaintiffs and hence no basis for any claim that they relied upon it in purchasing or retaining the stock. [FN4] Nor was the advice given for the purpose of enabling defendant's clients to discharge any obligation to plaintiffs. Thus, there is *344 no allegation that plaintiffs had any relationship to defendant's clients or to the corporation as stockholders or otherwise when the advice was given.

> FN4 We are therefore not concerned with such cases as *Roberts v. Ball, Hunt, Hart, Brown & Baerwitz* (1976) 57 Cal.App.3d 104, 110-111 [128 Cal.Rptr. 901], in which an attorney gives his client a written opinion with the intention that it be transmitted to and relied upon by the plaintiff in dealing with the client. In that situation the attorney owes the plaintiff a duty of care in providing the advice because the plaintiff's anticipated reliance upon it is "the end and aim of the transaction" (*Glanzer v. Shepard* (1922) 233 N.Y. 236, 238-239 [135 N.E. 275, 23 A.L.R. 1425]).

Plaintiffs contend, however, that because the advice related to a possible sale of stock by defendant's clients, defendant's duty of care in giving the advice extended to anyone to whom the sale might be made. Invoking the policy considerations upon which liability to putative will beneficiaries was recognized in *Biakanja, Lucas* and *Heyer, supra*, plaintiffs argue that defendant's advice was "intended to affect" them as purchasers and that harm to them was foreseeable from the adverse effect of the sale upon the value of the stock contrary to the erroneous assurances embodied in the negligent advice. However, plaintiffs were not persons upon whom defendant's clients had any wish or obligation to confer a benefit in the transaction. Plaintiffs' only relationship to the proposed transaction was that of parties with whom defendant's clients might negotiate

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

556 P.2d 737                                                                                            Page 6
18 Cal.3d 335, 556 P.2d 737, 134 Cal.Rptr. 375, Fed. Sec. L. Rep. P 95,829
(Cite as: 18 Cal.3d 335, 556 P.2d 737)

a bargain at arm's length. Any buyers' "potential advantage" from the possible purchase of the stock "was only a collateral consideration of the transaction" ( *Biakanja v. Irving, supra,* 49 Cal.2d at p. 650) and did not put such potential buyers into any relationship with defendant as "intended beneficiaries" of his clients' anticipated sales ( *Heyer v. Flaig, supra,* 70 Cal.2d at p. 228).

(3) To make an attorney liable for negligent confidential advice not only to the client who enters into a transaction in reliance upon the advice but also to the other parties to the transaction with whom the client deals at arm's length would inject undesirable self-protective reservations into the attorney's counselling role. The attorney's preoccupation or concern with the possibility of claims based on mere negligence (as distinct from fraud or malice) by any with whom his client might deal "would prevent him from devoting his entire energies to his client's interests" (*Anderson v. Eaton* (1930) 211 Cal. 113, 116 [293 P. 788]). The result would be both "an undue burden on the profession" ( *Lucas v. Hamm, supra,* 56 Cal.2d 583, 589) and a diminution in the quality of the legal services received by the client.[FN5] (See *Daly v. Smith* (1963) 220 Cal.App.2d 592, 604 [33 Cal.Rptr. 920].)*345

> FN5 In *Norton v. Hines* (1975) 49 Cal.App.3d 917 [123 Cal.Rptr. 237], a party who had successfully defended a civil suit filed a complaint against his opponent's attorney claiming damages for the attorney's negligence in advising prosecution of the suit but failing to allege the elements of an action for malicious prosecution. In holding that no cause of action was stated the court properly expressed concern that if an attorney is made liable to his client's adversary for mere negligence in advising commencement of a suit, "lawsuits now justifiably commenced will be refused by attorneys, and the client, in most cases, will be denied his day in court." (49 Cal.App.3d at p. 923.) (See also *DeLuca v. Whatley* (1974) 42 Cal.App.3d 574 [117 Cal.Rptr. 63].)

(1c) Plaintiffs contend that even if defendant had no duty of care toward them when he initially advised his clients, Soma and Spencer, concerning the propriety of a sale of the stock, such a duty on his part toward plaintiffs Stanley D. Davidson and Marvyn Davidson arose when he learned through the inquiry of their attorney, Pitcher, that they were prospective purchasers from Soma and Spencer. Knowledge of the Davidsons' identity, however, had no bearing on the propriety of the confidential advice which defendant originally imparted to his clients and therefore did not affect the scope of defendant's duty of care with respect to that advice. Nor did the alleged circumstances of the telephone call from Pitcher give rise to any duty of care that would require defendant to disclose the matters he allegedly omitted to state. There is no allegation that defendant made any affirmative misrepresentation to Pitcher or made any statements that were misleading because of alleged nondisclosures or that defendant was dealing with Pitcher other than at arm's length. In the absence of any claim of fraud, the allegation that the purpose of defendant's nondisclosure was to deceive Pitcher and to induce the sale establishes no more than that defendant determined to leave to his clients the decision of what information to volunteer in the course of the sale negotiations.

*Claimed Violations of Corporate Securities Law*

(4) Separate causes of action are alleged for each plaintiff based on sections 25400 and 25401 of the Corporate Securities Law of 1968 (Corp. Code, §§ 25400, 25401). Insofar as material here these provisions have the following effect: Section 25400, subdivision (d), makes it unlawful for the purpose of inducing the purchase of stock to make any statement which (1) is false or misleading with respect to any material fact or (2) omits material facts necessary to make the statement not misleading. Section 25401 makes it unlawful to sell a security by means of a communication that includes such a statement. A party injured by violations of the provisions may recover damages. (Corp. Code, §§ 25500, 25501.)

These provisions became effective on January 2, 1969, and do not apply to legal proceedings "on the basis of facts or circumstances occurring before [this] effective date." (Corp. Code, § 25704, subd. (a).) Accordingly, section 25400, subdivision (d), is inapplicable to the present case as there is no allegation that defendant made any statement with *346 respect to the stock subsequent to his alleged telephone conversation with Pitcher in December 1968.

It is arguable that section 25401 applies to a sale made after its effective date even though the false or

misleading communication instrumental to the sale was made earlier. The alleged time of sale is "January 1969." We need not decide whether section 25401 could apply to sales made by means of a misleading communication transmitted prior to the section's effective date as no such communication is alleged. There is no allegation of any statement by defendant to plaintiffs or their representative other than that defendant engaged in a telephone conversation with Pitcher "to discuss the proposed sale of [the] stock." Thus, defendant is not alleged to have made either any untrue statement of a material fact or any statement that was rendered misleading by the omission of a material fact.[FN6]

        FN6 The full text of section 25401 of the Corporations Code is as follows: "It is unlawful for any person to offer or sell a security in this state or buy or offer to buy a security in this state by means of any written or oral communication which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."

*Fraud*

    The third amended complaint's purported causes of action for fraud, separately alleged for each plaintiff, simply incorporate all of the allegations of the negligence counts, add that the omissions in defendant's statements during his conversation with plaintiffs' attorney, Pitcher, "were done intentionally and for the purpose of defrauding plaintiff[s]," and claim punitive damages. If defendant committed actual fraud in his dealings with Pitcher, the fact that he did so in the capacity of attorney does not relieve him of liability. (*Greenwood v. Mooradian* (1955) 137 Cal.App.2d 532, 539 [290 P.2d 955]; see *Warner v. Roadshow Attractions Co.* (1942) 56 Cal.App.2d 1, 7 [132 P.2d 35].) (5) The limitations upon liability for negligence based upon the scope of an attorney's duty of care do not apply to liability for fraud. (*Buckley v. Gray, supra*, 110 Cal. 339, 342; cf. *Ultramares Corp. v. Touche* (1931) 255 N.Y. 170, 189 [174 N.E. 441, 74 A.L.R. 1139].)

    (6a) Being grounded solely on omissions, the validity of the present fraud counts depends on allegations that would establish some duty of disclosure on the part of defendant. No such duty is shown. There is no allegation of a confidential relationship (see *347Hobart v. Hobart Estate Co.* (1945) 26 Cal.2d 412, 433 [159 P.2d 958]; *Black v. Shearson, Hammill & Co.* (1968) 266 Cal.App.2d 362, 367 [72 Cal.Rptr. 157]) or of any representation by defendant that was likely to mislead for want of the disclosures (see Civ. Code, § 1710, subd. 3; *Rogers v. Warden* (1942) 20 Cal.2d 286, 289 [125 P.2d 7]) or of any active concealment of the undisclosed matters (see *Herzog v. Capital Co.* (1945) 27 Cal.2d 349, 353 [164 P.2d 8]; *Williams v. Graham* (1948) 83 Cal.App.2d 649, 652 [189 P.2d 324]).

    (7) The only other basis for a duty of disclosure is one which may exist when one party to a transaction has sole knowledge or access to material facts and knows that such facts are not known to or reasonably discoverable by the other party. (See *Warner Constr. Corp. v. City of Los Angeles* (1970) 2 Cal.3d 285, 294 [85 Cal.Rptr. 444, 466 P.2d 996]; *Lingsch v. Savage* (1963) 213 Cal.App.2d 729, 735 [29 Cal.Rptr. 201, 8 A.L.R.3d 537].) (6b) The complaint fails to state any claim for fraud on this theory. Insufficient facts are alleged to establish that defendant knew the materiality of the omitted matters or that they were inaccessible to plaintiffs. Nor are there any factual allegations showing that plaintiffs were reasonably induced to purchase the stock by defendant's omission of these matters from his statements in the conversation with Pitcher. The mere conclusionary allegations that the omissions were intentional and for the purpose of defrauding and deceiving plaintiffs and bringing about the purchase of the stock and that plaintiffs relied on the omissions in making such purchase are insufficient for the foregoing purposes. (*Cooper v. Leslie Salt Co.* (1969) 70 Cal.2d 627, 636 [75 Cal.Rptr. 766, 451 P.2d 406]; *La Vista Cemetery Assn. v. American Sav. & Loan Assn.* (1970) 12 Cal.App.3d 365, 369 [90 Cal.Rptr. 722]; *Norkin v. United States Fire Ins. Co.* (1965) 237 Cal.App.2d 435, 437 [47 Cal.Rptr. 15]; *Lesperance v. North American Aviation, Inc.* (1963) 217 Cal.App.2d 336, 344 [31 Cal.Rptr. 873].)

    The five matters which defendant allegedly failed to disclose to Pitcher were (1) the existence of a prior Regulation A offering, (2) the fact that Soma and Spencer had received the stock to be sold as stock dividends, (3) reasons for exemption of the stock from registration, (4) the possibility that the SEC would treat the stock being sold as included in the Regulation A offering and therefore withdraw the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

556 P.2d 737
18 Cal.3d 335, 556 P.2d 737, 134 Cal.Rptr. 375, Fed. Sec. L. Rep. P 95,829
(Cite as: 18 Cal.3d 335, 556 P.2d 737)

Page 8

Regulation A exemption, and (5) that Soma and Spencer were "underwriters." Significant to defendant's state of mind on these matters is the allegation retained in the fraud counts that prior to the conversation with Pitcher defendant *negligently* advised Soma and Spencer they could receive the **\*348** stock as stock dividends and sell it without jeopardizing the Regulation A exemption. That defendant gave this advice, albeit negligently, implies that he did not know it was false or erroneous, there being no factual allegations to the contrary. His implied belief that the advice was correct in turn indicates a lack of knowledge of the materiality to the transaction being discussed with Pitcher of the first and second omitted matters (existence of the Regulation A offering and issuance of stock dividends) and of the existence of the fourth omitted matter (possibility of losing the Regulation A exemption). The third omission (reasons for exemption from registration) and fifth omission (that Soma and Spencer were underwriters) would also have been immaterial if defendant's negligent advice had been correct. [FN7]

> FN7 The complaint alleges that the private offering exemption under section 4, subdivision (2), of the Act (15 U.S.C. § 77d(2)) was not available "[b]ecause the shares of stock sold to plaintiffs were not separate and distinct from the public offering under Regulation A, in that those shares were part of a single plan of financing." This implies that the private offering exemption *would* have been available if defendant had been correct in advising that Soma's and Spencer's stock dividends would be treated as separate from the Regulation A offering. Under such circumstances neither the third omission (reasons for exemption from registration) nor the fifth omission (Soma's and Spencer's status as underwriters for purposes of a still different exemption (see fn. 2, *ante*)) would be material.

Not only do the fraud counts fail to allege defendant's knowledge of the existence and materiality of the omitted matters, they also fail to allege facts establishing defendant's knowledge that the omitted matters were not known to or reasonably discoverable by plaintiffs. There are no facts pleaded indicating that defendant had any part in negotiating the sales of the stock other than to answer a Sunday

morning telephone inquiry from plaintiffs' attorney concerning one or more unstated phases of the matter. No alleged circumstances negate a reasonable assumption on the part of defendant that plaintiffs had readily apparent and available sources of information about the corporation and its securities including information from direct dealings between plaintiffs and defendant's clients.

There is also an utter failure to allege any facts indicating that plaintiffs' claimed reliance upon the omissions inducing their purchase of the stock was justifiable or reasonable. (See *Lingsch v. Savage, supra,* 213 Cal.App.2d 729, 739.) The mere circumstance of Pitcher's telephonic inquiry did not necessarily place defendant in a position of negotiator for Soma and Spencer as sellers such as would make it reasonable for Pitcher or plaintiffs to expect full disclosure by defendant of all material facts. **\*349**

(8a) Finally we consider whether plaintiffs should be given an opportunity to amend their pleadings to allege, if they can, facts sufficient to cure the defects in their attempts to state causes of action for fraud. (See Code Civ. Proc., § 472c.) We conclude that the trial court did not abuse its discretion in sustaining the demurrer to the third amended complaint without leave to amend. (9) "Generally it is an abuse of discretion to sustain a demurrer without leave to amend if there is any reasonable possibility that the defect can be cured by amendment. (*Temescal Water Co. v. Department of Public Works* (1955) 44 Cal.2d 90, 107 [280 P.2d 1].) ... However, the burden is on the plaintiff to demonstrate that the trial court abused its discretion. (*Filice v. Boccardo* (1962) 210 Cal.App.2d 843, 847 [26 Cal.Rptr. 789]; *Starbird v. Lane* (1962) 203 Cal.App.2d 247, 262 [21 Cal.Rptr. 280]; *Schultz v. Steinberg* (1960) 182 Cal.App.2d 134, 140 [5 Cal.Rptr. 890].) Plaintiff must show in what manner he can amend his complaint and how that amendment will change the legal effect of his pleading. (*Saint v. Saint* (1932) 120 Cal.App. 15, 23-24 [7 P.2d 374].)" ( *Cooper v. Leslie Salt Co., supra,* 70 Cal.2d 627, 636.)

(8b) After plaintiffs voluntarily amended their original complaint, demurrers were sustained to the first and second amended complaints as well as to the third amended complaint. All three demurrers asserted that the fraud counts of the respective complaints were deficient in that they showed no duty on the part of defendant to disclose the allegedly omitted matters and no justifiable reliance by

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

556 P.2d 737
18 Cal.3d 335, 556 P.2d 737, 134 Cal.Rptr. 375, Fed. Sec. L. Rep. P 95,829
(Cite as: 18 Cal.3d 335, 556 P.2d 737)

Page 9

plaintiffs on the alleged nondisclosures. Plaintiffs' only response to these grounds of demurrer in the trial court insofar as shown by the record was to argue that a duty of disclosure existed under the case law dealing with an attorney's duty of care toward nonclients (e.g., *Lucas v. Hamm, supra,* 56 Cal.2d 583, 588-589). As already stated in connection with the negligence counts, plaintiffs were outside the scope of any such duty shown by the pleadings.

On appeal the only suggestion by plaintiffs of a possible relevant amendment to their complaint appears in their final brief where they state: "If this Court will give [plaintiffs] the opportunity to do so and if it believes it to be necessary, [plaintiffs] will allege that which they believe is implicit in their complaint, that they did not know the facts which were not told to them nor were such facts readily accessible." However, they make no offer to allege facts establishing any of the other elements already pointed out as missing from their purported causes of action for fraud. Neither the record nor the tenor of their briefs or oral argument *350 indicates any ability upon their part to plead and prove facts which would establish the elements we have herein stated to be requisite to establish fraud.

The judgment is affirmed.

McComb, J., Sullivan, J., Clark, J., and Richardson, J., concurred.
**MOSK, J.**
I dissent.

This case comes to us after resolution at the pleading stage. We must, therefore, assume all the allegations of the complaint can be established if plaintiffs are given their day in court. The majority erroneously deny them that opportunity.

Our problem is to decide whether negligent advice by an attorney to his client regarding the effect of a transaction contemplated by the client can be the basis for a cause of action by a third person who, foreseeably, has been damaged in the transaction.

Until relatively recent times, the absence of privity of contract precluded a person other than a client from recovering for the professional negligence of an attorney or an accountant. (See, e.g., *Nat. Savings Bank v. Ward* (1880) 100 U.S. 195 [25 L.Ed. 621].) The rationale underlying this rule can be traced

to an opinion by Judge Cardozo in *Ultramares Corporation v. Touche* (1931) 255 N.Y. 170 [174 N.E. 441, 74 A.L.R. 1139] which involved the liability of a firm of accountants to a creditor who had extended credit to a corporation in reliance on a balance sheet of the corporation prepared by the defendant indicating that the corporation had substantial assets. The defendant knew that the document would be exhibited to potential creditors to establish the financial status of the corporation. Nevertheless, the court refused to hold the defendant liable on a negligence theory to a creditor who had relied upon the audit to his damage. Judge Cardozo, observing that the "assault upon the citadel of privity is proceeding these days apace" reasoned that if liability for negligence to one not in privity exists under these circumstances "a thoughtless slip or blunder ... may expose accountants to a liability in an indeterminate amount for an indeterminate time to an indeterminate class. The hazards of a business conducted on these terms are so extreme as to enkindle doubt whether a flaw may not exist in the implication of a duty that exposes to these consequences." (174 N.E. at pp. 444-445.)*351

Since *Ultramares* there has been a steady erosion of the privity requirement in malpractice actions, and California has been in the forefront of jurisdictions extending the scope of professional liability to third persons. In a series of decisions this court has established that, despite the absence of privity, negligence in drafting or attestation of a will may render a defendant liable to the intended beneficiary who failed to receive a share of the estate in accordance with the testator's wishes. In *Biakanja v. Irving* (1958) 49 Cal.2d 647 [320 P.2d 16, 65 A.L.R.2d 1358], the intended beneficiary of a will which was denied probate because it was not properly attested was allowed to recover damages from a notary public whose negligence caused the will to fail. Likewise, in *Lucas v. Hamm* (1961) 56 Cal.2d 583 [15 Cal.Rptr. 821, 364 P.2d 685], and *Heyer v. Flaig* (1969) 70 Cal.2d 223 [74 Cal.Rptr. 225, 449 P.2d 161], it was held that an attorney who negligently drafted a will may be liable to a person who had not received the share of the estate to which he would have been entitled if the will had been drafted in accordance with the testator's intention. In *Heyer* the concept of privity as a bar to the maintenance of an action in these circumstances was abandoned altogether, and it was held that the defendant was liable not because he had breached a contract with the testator but because he breached a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

556 P.2d 737
Page 10
18 Cal.3d 335, 556 P.2d 737, 134 Cal.Rptr. 375, Fed. Sec. L. Rep. P 95,829
(Cite as: 18 Cal.3d 335, 556 P.2d 737)

duty owed directly to the injured party, i.e., that liability was based on tort rather than on a contractual theory.

These decisions establish that the determination whether a duty was owed to a third party is a question of policy involving the balancing of various factors, including the extent to which the transaction was intended to affect the plaintiff, the degree of certainty that he suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, and the policy of preventing future harm. An additional element to be considered if the defendant is an attorney is whether the recognition of liability would impose an undue burden on the essential functions of the legal profession. [FN1]

> FN1 On that subject the pithy comment in _Coberly v. Superior Court_ (1965) 231 Cal.App.2d 685, 689 [42 Cal.Rptr. 64], is relevant: "a lawyer may not gain business as a specialist and defend mistakes as a layman."

Defendant contends that _Biakanja_ and its progeny are distinguishable because in those cases the purpose of the attorney's employment by the testator was to benefit the heirs, whereas here plaintiffs were not the intended beneficiaries of defendant's advice, which was given solely for the benefit of his clients. (See *352_National Auto. Cas. Ins. Co. v. Atkins_ (1975) 45 Cal.App.3d 562, 565 [119 Cal.Rptr. 618].) Manifestly a duty to a third party can be more readily found in a situation in which the object of the attorney's employment is the benefit of the third party; there the connection between the attorney's negligence and the injury is evident. But it does not necessarily follow that the absence of direct service or to an intent to benefit the third party precludes liability. Rather, whether a duty is to be implied turns upon a balancing of the factors described in the _Biakanja_ line of cases.

I turn, then, to the _Biakanja_ factors. Defendant contends that his advice to his client was not intended to affect plaintiffs because at the time the advice was rendered plaintiffs had no connection with the corporation. While it is true that when defendant rendered his advice he was not certain the corporation would issue the additional shares and, of course, could not know the identity of prospective

purchasers, there can be no doubt he knew that if his advice was followed those who purchased the stock would be affected thereby. The mere fact that he did not know their identity cannot be decisive. Nor is there any question that it was reasonably foreseeable if the advice was incorrect the purchasers of the stock would be injured.

The complaint leaves something to be desired in specifying the relationship between defendant's negligence and the injury suffered by plaintiffs, but liberally construed, it can be read to allege that the corporation issued the additional shares as the result of defendant's advice, [FN2] which in turn caused the commission to suspend the Regulation A exemption, resulting in impairment of the value of the stock and the inability of plaintiffs to sell their shares. If we accept the allegations of the complaint as true, as we must, it is clear that plaintiffs suffered injury, for it is alleged that as a result of the actions of the commission they were unable to sell their shares and the value of the stock declined.

> FN2 The complaint does not expressly allege that the corporation issued the additional shares as the result of Kennedy's advice, but such an averment may be implied from the facts alleged. (Code Civ. Proc., § 452.)

Finally, the policy of preventing future harm and making injured parties whole weighs in plaintiffs' favor. In the _Biakanja_ line of cases, imposing liability on the defendant was justified because the intended beneficiary had no right of action against the estate, and his sole recourse was against the person who had drafted the will. Here, plaintiffs cannot *353 recover against the corporation or Soma and Spencer [FN3] the amount they paid for the securities, and their only recourse is against defendant. Even if the corporation and its officers could recoup through a cause of action for malpractice against defendant, it is doubtful that their damages would include the amount plaintiffs paid for the stock, for the corporation received and used those funds.

> FN3 It is alleged that Soma and Spencer are insolvent. Although the insolvency of the corporation is not directly alleged, a corporation whose stock is without any value is obviously not in a position to respond in damages.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

556 P.2d 737                                                    Page 11
18 Cal.3d 335, 556 P.2d 737, 134 Cal.Rptr. 375, Fed. Sec. L. Rep. P 95,829
**(Cite as: 18 Cal.3d 335, 556 P.2d 737)**

In the light of the factors discussed above, I conclude that defendant should be held to owe a duty to plaintiffs. I disagree with the majority's conclusion that the imposition of liability in this case will result in an undue burden upon the legal profession. The contention is not persuasive that the right to recover for malpractice must be limited to the client on a theory that "if we go one step beyond that, there is no reason why we should not go fifty." (*Nat. Savings Bank v. Ward, supra,* 100 U.S. at p. 203 [25 L.Ed. at p. 624].) Attorneys are not provided the insulation of mere agents. As the Supreme Court has said many times, they "are officers of the law, as well as the agents by whom they are employed." (*Baker v. Humphrey* (1880) 101 U.S. 494, 502 [25 L.Ed. 1065, 1068].)

In this case the class of persons certain to be damaged by the attorney's negligent advice to his client was reasonably foreseeable and the damage was an inexorably direct consequence of the negligent act. Thus, the imposition of a duty toward the third party will not have the result that "assumption of one relation will mean the involuntary assumption of a series of new relations, inescapably hooked together." (*H. R. Moch Co. v. Rensselaer Water Co.* (1928) 247 N.Y. 160 [159 N.E. 896, 899].)

No doubt gross extensions of liability, although involving similar conduct and results, can be conjured up: e.g., liability to the creditors of the insolvent corporation or to the children of stockholders deprived of their college tuition by the impoverishment of their parents. However recovery under such fanciful circumstances could be denied for remoteness. Furthermore, the liability of the attorney to third parties should be limited to cases in which, like the matter before us and the *Biakanja* circumstances, the only recourse of the injured party is to pursue the negligent attorney. *354

The refusal to impose a duty on the attorney in these circumstances unfairly penalizes innocent persons whose injury was the foreseeable result of the attorney's negligence. In this state we have laid to rest the strictures of the compulsory privity doctrine in malpractice actions by holding that the defendant's liability is based upon tort rather than contract. It would appear to be a rational corollary and a logical consequence of that determination to hold that an attorney who negligently advises his client to enter into a transaction which will inevitably harm another may be liable to the person injured.

The majority is correct as to the causes of action for fraud and violation of the California Corporations Code. However I would reverse the judgment as to the causes of action for negligence.

Tobriner, J., concurred. *355

Cal.
Goodman v. Kennedy
18 Cal.3d 335, 556 P.2d 737, 134 Cal.Rptr. 375, Fed. Sec. L. Rep. P 95,829

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Exhibit E

**APPENDIX OF NON-FEDERAL AND UNPUBLISHED FEDERAL AUTHORITIES CITED IN VISA USA INC.'S REPLY IN SUPPORT OF MOTION TO STAY ACTION AND TO COMPEL ARBITRATION**

LEXSEE 14 CAL. APP. 4TH 1692

**THE PEOPLE EX REL. JOSEFINA SEPULVEDA et al., Plaintiffs and Appellants, v. HIGHLAND FEDERAL SAVINGS AND LOAN et al., Defendants and Respondents.**

**No. B058411**

**COURT OF APPEAL OF CALIFORNIA, SECOND APPELLATE DISTRICT, DIVISION THREE.**

*14 Cal. App. 4th 1692; 19 Cal. Rptr. 2d 555; 1993 Cal. App. LEXIS 435; 93 Cal. Daily Op. Service 2989; 93 Daily Journal DAR 5206*

**January 26, 1993, Decided**

**SUBSEQUENT HISTORY:**  [***1]  Review Denied April 22, 1993, Reported at *1993 Cal. LEXIS 2258*.

**PRIOR HISTORY:**  Superior Court of Los Angeles County, No. C718828, Barnet M. Cooperman, Judge.

**DISPOSITION:**  The judgment is reversed with directions to the court: (1) to strike the allegation that Highland charged "points and provided for interest, each of which was higher than the rates for bona fide loans transactions"; (2) to strike prayer item (3)(h); (3) to strike subparagraph (e) of paragraph 151 of the second amended complaint; and (4) to conduct further proceedings consistent with the views expressed herein. The plaintiffs shall recover their costs on appeal.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

The trial court sustained, without leave to amend, demurrers to a complaint asserting a federally chartered savings and loan institution's wrongful course of conduct enabling slum conditions in certain urban buildings to be perpetuated to the detriment of the health, safety, and welfare of the People of California and, in particular, a class of tenant plaintiffs. In addition to the savings and loan, defendants included the institution's president, its loan coordinator and vice-president, and a wholly owned subsidiary. Plaintiffs sought to hold defendants responsible for continuing slum conditions of certain buildings of which defendants allegedly were the beneficial (non-record) owners. In addition to monetary damages and penalties, plaintiffs sought injunctive relief. The court found the complaint failed to state a cause of action for violations of the Racketeer Influenced and Corrupt Or-

ganizations Act (RICO) (*18 U.S.C. § 1961 et seq.*) for fraud or for fraudulent concealment. The court further found the entire complaint, except the RICO cause, was barred by federal preemption. Based on the sustained demurrers, the court dismissed the action. (Superior Court of Los Angeles County, No. C718828, Barnet M. Cooperman, Judge.)

The Court of Appeal reversed with directions. The court held the various state causes of action were not explicitly or impliedly barred by federal preemption pursuant to the Home Owners' Loan Act (*12 U.S.C. § 1461 et seq.*) or its concomitant regulations, none of which purport to address the subject of minimum housing standards; allegations of usury and a prayer to enforce due-on-sale clauses, however, were expressly preempted and had to be struck. The court also held a cause based on RICO violations was stated: the requisite facts concerning the existence of an "enterprise" had been alleged, and, although allegations of wire fraud were deficient, the "racketeering activity" element was adequately pleaded by allegations of mail fraud. The court further held the complaint stated a cause of action for fraud, though not for fraudulent concealment. (Opinion by Croskey, J., with Klein, P. J., and Hinz, J., concurring.)

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**
Classified to California Digest of Official Reports

**(1) Pleading § 23--Demurrer to Complaint--Demurrer as Admission--Application of Rule on Appeal.**  --All well-pleaded allegations of a complaint are deemed to be true for the purpose of appellate review of a ruling on a demurrer.

14 Cal. App. 4th 1692, *; 19 Cal. Rptr. 2d 555, **;
1993 Cal. App. LEXIS 435, ***; 93 Cal. Daily Op. Service 2989

**(2) Appellate Review § 109--Briefs--Form and Requisites--Argument--Omission.** --An appellate court is not required to consider matters urged in the briefs where no pertinent argument is made in support thereof.

**(3a) (3b) Constitutional Law § 34--Distribution of Governmental Powers--Between Federal and State Governments--Conflicts Between Federal and State Powers and Their Resolution--Preemption--Determining Intent of Congress.** --In determining whether a state statute or cause of action is preempted by federal law and so invalid under U.S. Const., art. VI, cl. 2, the court's sole task is to ascertain the intent of Congress. First, within constitutional limits, Congress may preempt state law by so stating in express terms. Second, intent to preempt in a particular area may be inferred where a comprehensive scheme of federal regulation makes reasonable the inference that Congress left no room for supplementary state regulation. Third, where Congress has not completely displaced state regulation, federal law may yet preempt state law to the extent it actually conflicts with federal law, either because compliance with both federal and state regulations is a physical impossibility, or because state law obstructs accomplishment of the full purposes and objectives of Congress. However, no implied preemption is found where the impact on the subject is merely indirect.

[See 7 Witkin, Summary of Cal. Law (9th ed. 1988) Constitutional Law, § 8.]

**(4a) (4b) Constitutional Law § 34--Distribution of Governmental Powers--Between Federal and State Governments--Conflicts Between Federal and State Powers and Their Resolution--Preemption--Disfavored.** --Preemption of state law by federal regulation is not favored. The court will not find express preemption unless a regulation clearly so states. It is the burden of the party claiming preemption to prove it. Preemption is not to be lightly presumed.

**(5a) (5b) (5c) Constitutional Law § 34--Distribution of Governmental Powers--Between Federal and State Governments--Conflicts Between Federal and State Powers and Their Resolution--Preemption--Agency Regulation.** --Although federal regulations are not themselves controlling on the preemption issue, where Congress has entrusted an agency with the task of promulgating regulations to carry out the purposes of a statute, as part of the preemption analysis a court must consider whether the regulations evidence a desire to occupy a field completely. Preemption should not be inferred, however, simply because the agency regulations are comprehensive and sufficient to meet the need identified by Congress; the states and localities are not thereby

barred from identifying additional needs or imposing further requirements in the field. No implied preemption is found where the impact on the subject is merely indirect. Also, where the subject matter is an area traditionally regulated by the states, no federal preemption is implied unless there is a clear and manifest intent shown.

**(6a) (6b) (6c) (6d) Savings and Loan Associations § 10--Federal Associations--Regulation--Federal Preemption--Pleadings: Constitutional Law § 34--Distribution of Governmental Powers--Between Federal and State Governments--Conflicts Between Federal and State Powers and Their Resolution--Preemption--Federal Savings and Loan Association.** --The paramount purpose of the Home Owners' Loan Act (12 U.S.C. § 1461 et seq.) is to ensure the solvency of federal savings associations. Hence, various state causes of action grounded in a federally chartered savings and loan institution's alleged wrongful course of conduct enabling slum conditions in certain urban buildings to be perpetuated to the detriment of the health, safety, and welfare of the People of California and, in particular, a class of tenant plaintiffs, were not explicitly or impliedly barred by federal preemption pursuant to the act or its concomitant regulations, none of which purported to address the subject of minimum housing standards. The cause for unfair business practices did not directly affect the institution's operations under the regulations, and the regulations did not pertain to the racketeering charges; the remaining nuisance and other causes would at most only incidentally and remotely touch on the institution's operations. Allegations of usury and a prayer to enforce due-on-sale clauses, however, were expressly preempted and had to be struck.

**(7a) (7b) Conspiracy § 19--Civil--Pleading--RICO--Elements.** --To state a cause of action under the Racketeer Influenced and Corrupt Organizations Act (RICO) (18 U.S.C. § 1961 et seq.), a plaintiff must plead facts to show (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. The enterprise is an entity, a group of persons associated for a common purpose of engaging in a course of conduct. It is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit.

**(8a) (8b) (8c) Conspiracy § 19--Civil--Pleading--RICO--Savings and Loan Association.** --In an action asserting a savings and loan institution's wrongful course of conduct enabling slum conditions in certain urban buildings to be perpetuated to the detriment of the health, safety, and welfare of the People of California and, in particular, a class of tenant plaintiffs, the trial court erred in sustaining, without leave to amend, demurrers to a

14 Cal. App. 4th 1692, *; 19 Cal. Rptr. 2d 555, **;
1993 Cal. App. LEXIS 435, ***; 93 Cal. Daily Op. Service 2989

cause of action based on violations of the Racketeer Influenced and Corrupt Organizations Act (RICO) (*18 U.S.C. § 1961 et seq.*). The requisite "enterprise" facts consisted in allegations of a continuing scheme to defraud the tenant plaintiffs, that defendants were ongoing business entities with an ongoing relationship independent of that fraud scheme, and that an ongoing series of business transactions among defendants regarded each of the subject buildings. Although allegations of wire fraud were deficient, the "racketeering activity" element was adequately pleaded by allegations of mail fraud describing the intent to defraud and facts as to the time, place, and content of alleged mailings. Further, the directly resulting injuries to plaintiffs were pleaded.

**(9) Conspiracy § 19--Civil--Pleading--RICO--Mail Fraud: Post Office § 3--Improper Use of Mails--Mail Fraud--Actions--Pleading.** --In pleading a violation of the mail fraud statute (*18 U.S.C. § 1341*) as a predicate act under a scheme in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO) (*18 U.S.C. § 1961 et seq.*), plaintiffs must allege that (1) the defendants devised a scheme or artifice to defraud, (2) the defendants used the mails in furtherance of the scheme, and (3) the defendants did so with the specific intent to deceive or defraud.

**(10) Fraud and Deceit § 25--Actions--Pleading--RICO--Wire Fraud: Conspiracy § 19--Civil--Pleading--RICO--Wire Fraud: Telegraphs and Telephones § 2--Crimes--Wire Fraud--Actions--Pleading.** --In pleading a violation of the wire fraud statute (*18 U.S.C. § 1342*) as a predicate act under a scheme in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO) (*18 U.S.C. § 1961 et seq.*), plaintiffs must allege that (1) the defendants devised a scheme or artifice to defraud, (2) the defendants used the wires in furtherance of the scheme, and (3) the defendants did so with the specific intent to deceive or defraud.

**(11) Fraud and Deceit § 25--Actions--Pleading--Savings and Loan Association.** --A complaint asserting a savings and loan institution's wrongful course of conduct enabling slum conditions in certain urban buildings to be perpetuated to the detriment of the health, safety, and welfare of the People of California and, in particular, a class of tenant plaintiffs, stated a cause of action for fraud. It set forth with ample particularity the identities of the record holders of title to the subject properties, the identities and capacities of the many plaintiffs, and the time frame in which the alleged misrepresentations were made. Specific, detailed minutiae were properly the subject of discovery, not demurrer.

**(12) Fraud and Deceit § 8--Fraudulent Concealment--Beneficial Ownership of Leased Property--Pleading.** --A complaint asserting a savings and loan institution's wrongful course of conduct enabling slum conditions in certain urban buildings to be perpetuated to the detriment of the health, safety, and welfare of the People of California and, in particular, a class of tenant plaintiffs, stated no cause of action for fraudulent concealment. Plaintiffs sought to compel the beneficial (nonrecord) owners of the subject properties to disclose their ownership to the tenant plaintiffs to enable them to seek civil relief or governmental enforcement of the habitability law, but the disclosure provisions of *Civ. Code, § 1962* (information required in multiunit dwelling rental agreement), do not give rise to a duty to disclose the name and address of a beneficial owner. The reference in *Civ. Code, § 1962, subd. (a)*, to an "owner of the premises" is to the record owner, not the beneficial owner.

**COUNSEL:** James K. Hahn, City Attorney, Stephanie Sautner and Ronald Low, Deputy City Attorneys, Litt, Marquez & Fajardo, Barrett S. Litt and Ben Margolis for Plaintiffs and Appellants.

McKenna & Fitting, Michael D. Berk, Aaron M. Peck, Theresa A. Kristovich and Carl W. Sonne for Defendants and Respondents.

**JUDGES:** Opinion by Croskey, J., with Klein, P. J., and Hinz, J., concurring.

**OPINION BY:** CROSKEY, J.

**OPINION**

[*1697] [**556] Plaintiffs appeal from the judgment of dismissal following the sustaining without leave to amend demurrers to the second amended complaint of defendants Highland Federal [***2] Bank (Highland), Ben Karmelich (Karmelich), Selina Elizabeth Pratt (Pratt), and H.F.S. Corporation (HFS; collectively, the Highland defendants). The court found the complaint failed to state a cause of action for Racketeer Influenced and Corrupt Organizations Act (RICO) (*18 U.S.C. § 1961 et seq.*) violations, fraud or fraudulent [*1698] concealment. The court further found the entire complaint, except the RICO cause of action, was barred by federal preemption.

Because the trial court erred in finding no cause of action was stated and the doctrine of federal preemption barred the state claims, we reverse the judgment.

[**557] FACTUAL STATEMENT

1. *THE PARTIES*

14 Cal. App. 4th 1692, *; 19 Cal. Rptr. 2d 555, **;
1993 Cal. App. LEXIS 435, ***; 93 Cal. Daily Op. Service 2989

Plaintiffs consist of the People of the State of California (People) and numerous individuals in their individual capacity and as guardians ad litem and on behalf of a class who resided in one or more of the subject slum Los Angeles City buildings (tenant plaintiffs). [1]

1  The original individual plaintiffs are: Josefina Sepulveda; Margarita Espinoza; Margarita Bonilla; Raul Cruz Amaya; Jova Corea; Rosa Estela Nevares; Jose Santos Nevares; Rosa Cordova; Maria B. Mergar; Raudel Flores; Haydee Alcantara; Angel Edgardo Flores; Ana Arellano; Jose Roberto Reyes; Concepcion Reyes; Gloria Escobar; Silvia Escobar; Eddy Sanchez; Trinidad Garcia; Ramon Rojas; Josefina Rivera; Manuel Rivera; Salvador Rivera; Leticia Ruiz; Concepcion Garcia; Roman Campos; Ramon Campos; Daisy Villalobos; Maria Rojas; Gregorio Rojas; Amalia Mendoza; Manuel Gil; Maria De La Luz Almaraz; Guadalupe Barragan; Luz Ines Ruiz; Amalia Delgado; Jorge Florez; and Rafael Valtierra, individually, and on behalf of a class composed of all present tenants or residents of the following buildings, all located in the City of Los Angeles: 4020 South San Pedro Street; 5426 Virginia Avenue; 823 South Bonnie Brae Street; 807 South Fedora Avenue; 504 South Bonnie Brae Street; 533 Ceres Avenue; 1000 Echo Park Avenue; 1616 West 11th Street; 526 South Union Avenue; and 2616 Idell Street, and of all persons who were tenants and/or residents of said buildings at material times; Maria De Jesus Rodriguez, Betty Rodriguez, Guadalupe Ibarra, and Esiquio Rodriguez, minors, by their guardian ad litem Josefina Sepulveda; Javier Espinoza, George Michael Espinoza, Yesenia Raquel Espinoza, and Daniel Alejandro Bonilla, Tricia Bonilla, minors, by their guardian ad litem Margarita Espinoza; Alexander Corea Amaya, a minor, by his guardian ad litem Raul Cruz Amaya; Juan Jose Nevares and Carlos F. Nevares, Minors, by their guardian ad litem Rosa Estela Nevares; Yovani Velasquez, Jose Velasquez, Yessica Mergar, minors, by their guardian ad litem Maria B. Mergar; Indira Alcantara, a minor, by her guardian ad litem Haydee Alcantara; Mayra Arellano; Antonio Arellano; Steve Arellano; Eduardo Arellano and Cindy Arellano, minors, by their guardian ad litem Ana Arellano; Patricia Reyes, minor, by her guardian ad litem Jose Roberto Reyes; Karen Rojas, Maria Garcia, Raul Garcia, minors, by their guardian ad litem.

On February 6, 1991, the court dismissed plaintiffs Silvia Escobar, Eddie Sanchez, Ana Arellano, and Guadalupe Barragan in their individual capacity pay for failing to comply with a prior discovery order.

[***3]  The defendants who are parties to this appeal are Highland, Karmelich (its president), Pratt (its loan coordinator and vice-president), and HFS (its wholly owned subsidiary).

[*1699]  Highland, a federally chartered savings and loan institution, specializes in making loans to owners of residential properties, including slum buildings in the greater Los Angeles area. Eight of the eleven slum properties listed in this complaint were financed by defendant Highland. Karmelich is both its president and chief executive officer. Karmelich also served as secretary of the board of directors of defendant Northeast. Pratt is a vice-president and loan coordinator for defendant Highland. Pratt helped Highland facilitate the rapid transfer of record ownership of slum buildings. She was also actively engaged in soliciting and arranging for uncreditworthy borrowers to assume Highland loans on those slum buildings without regard to the borrowers' ability to maintain and repair the buildings. HFS is a California corporation and a wholly owned subsidiary of defendant Highland. (1) (See fn. 2.) Among its activities is the servicing of loans made by defendant Highland. [2]

2  These facts are alleged in the second amended complaint. All well-pleaded allegations of the complaint are deemed to be true for the purpose of appellate review of a ruling on a demurrer. (*Shoemaker v. Meyers (1990) 52 Cal.3d 1, 7 [276 Cal.Rptr. 303, 801 P.2d 1054, A.L.R.4th 1720].*)

These defendants are sometimes collectively referred to as the "Highland defendants." A number of other defendants were named in plaintiffs' second amended complaint. However, these remaining defendants are not parties to this appeal. They consist of other lenders, which are not savings associations, and individuals, including some who at one time or another were owners of the subject 11 buildings. The action remains pending as to these defendants.

[***4]  2. *NATURE OF CHARGING ALLEGATIONS*

In this action plaintiffs seek to hold the Highland defendants responsible for the continuing slum conditions of certain buildings. In addition to monetary damages and penalties the complaint seeks injunctive relief. [3]

3  Plaintiffs seek to enjoin the Highland defendants from, inter alia:

"(a) Soliciting, engaging or permitting individuals to act as straw buyers or record owners

14 Cal. App. 4th 1692, *; 19 Cal. Rptr. 2d 555, **;
1993 Cal. App. LEXIS 435, ***; 93 Cal. Daily Op. Service 2989

who, in fact, have no genuine ownership interest in the substandard property;

"(b) Recording or causing to be recorded any document containing the name of any record owner who is not the true owner of the substandard property, the legal obligor on the deed of trust, or the party whose assets were relied upon in creating the encumbrance;

"(c) Accepting, notarizing, causing to be notarized, or recording or causing to be recorded any documents that are a part of any financing arrangement concerning any substandard property, which document has been executed by a person other than the person whose name appears on the document;

"(d) Failing to send a copy of the notice set forth in sub-paragraph (g) below to each unit in the substandard property, in both English and Spanish, upon recordation of a trust deed to the potential borrower secured on the subject property;

"(e) Recording or causing to be recorded a trust deed secured by substandard property without first providing a copy of the trust deed, title report, and written proof of compliance with sub-paragraph (d) above to the following interested agencies: [P] (i) Office of Thrift Supervision (OTS); [P] (ii) The Housing Enforcement Division of the Los Angeles City Attorney's office; [P] (iii) The Legal Aid Foundation of Los Angeles;

"(f) Selling or assigning Highland's beneficial interest in any note secured by substandard property without first providing to the purchaser or assignee a copy of the trust deed, the recorded substandard order, and the notice described in sub-paragraph (g) below; and without providing notice of such sale to the agencies listed in sub-paragraph (e) above.

"(g) Failing to give written notice to any potential borrower or anyone seeking to assume a note, previously issued by Highland, on substandard property of which the lender has notice by reason of recorded notice or otherwise concerning the potential legal consequences attached to ownership of said property. Said written notice shall include: [P] (i) An advisement that the subject property or building has been declared substandard; [P] (ii) That the borrower or person assuming the note and taking title to the property may be held criminally responsible if he or she fails to correct the substandard conditions; [P]

(iii) That the amount of rent a tenant owes may be subject to reduction by virtue of the uninhabitable conditions; [P] (iv) That tenants may have a cause of action for damages with respect to the conditions in the building, and for injunctive relief requiring repair of said buildings forthwith; [P] (v) That potential rent increases may be denied pursuant to the Los Angeles City Rent Stabilization Ordinance if the Substandard Notice is not lifted; [P] (vi) That if borrower or person assuming the note fails to undertake the necessary repairs within a reasonable time (120 days), the lender will petition the court for the appointment of a receiver to collect the rents and make repairs, pursuant to waste provisions of its deed of trust; [P] (vii) That under California law a borrower may not be able to claim state tax deductions for the interest payments and depreciation on said property until the Substandard Notice is removed.

"(h) Declining to initiate and complete foreclosure as speedily as the law permits on substandard property of which the lender has notice if the substandard conditions are not fully corrected within 120 days, provided that foreclosure proceedings may terminate if correction occurs before foreclosure is completed . . . ."

[***5] [*1700] [**558] The thrust of the complaint charges Highland with engaging in unfair business practices and fraud for the purpose of maximizing its profits. Such goal was achieved by creating a situation where rents, which were collectable only if the units complied with the habitability laws, were generated without the expenditure of sums necessary to ensure such compliance. Thus, the slum nature of the buildings was perpetuated and the tenant plaintiffs were defrauded of their right to a habitable dwelling.

Essentially, Highland allegedly committed such illegal activities through fraudulent loan transactions in order to avoid criminal and civil liability. Highland hid and exercised its control over the subject buildings by setting up record owners who had only token or no investment in the buildings, i.e., either such owners had insufficient asserts or lacked bona fide business qualifications to obtain the loans. In general, title to the buildings was worthless since the amount of the loans exceeded the fair market value of the security. The record owners therefore were "strawmen" who were basically managers of the buildings for Highland's benefit.

It is further alleged that Highland [***6] in effect was the true beneficial owner of the buildings because it determined who would be the record owner and when the owner failed to perform, Highland replaced him or her with another whom it could control. Such transfers of

14 Cal. App. 4th 1692, *; 19 Cal. Rptr. 2d 555, **;
1993 Cal. App. LEXIS 435, ***; 93 Cal. Daily Op. Service 2989

record ownership also [*1701] served to complicate and frustrate civil and criminal prosecution for violation of the habitability law.

It was also alleged that Highland routinely facilitated the title transfer of the [**559] buildings without the exercise of the due-on-sale clauses of the loan agreements, without requiring loan assumption by creditworthy individuals, and without scrutiny to ensure necessary repairs were made. Highland charged loan points and interest at a rate higher than those for bona fide loan transactions and utilized the entire or almost entire loan amount from the new record owner to pay off the principal, interest, penalties and arrearages owed by the former record holder. Such loans were often arranged by lender- related defendants controlled by and/or associated with Highland. Highland then allowed or caused the fraudulent documents to be recorded in order to hide their control.

Finally, it was alleged the above pattern of activity [***7] by Highland was outside of and inconsistent with the normal and standard practice of lenders.

PROCEDURAL STATEMENT

This action was filed on March 28, 1989. On June 7, 1990, a second amended complaint asserting numerous causes of action was filed, including those for RICO violations, fraud and fraudulent concealment. [4]

4    That complaint set forth, respectively, these causes of action:

(1) Unfair business practices ( *Bus. & Prof. Code, § 17200*) (first cause of action by the People against all defendants);

(2) Violation of *18 United States Code sections 1961-1968* (RICO) (causes of action 81-161 by all plaintiffs against Highland, Karmelich, Pratt, inter alia, but not HFS). Former causes of action 2 through 80 and 81 in the first amended complaint were not realleged in the second amended complaint. There are no causes of action 2 through 80 in the second amended complaint;

(3) Injunctive relief (causes of action 162-242 by all plaintiffs against all defendants);

(4) Breach of warranty of habitability regarding written contract (causes of action 243-323 by all tenant plaintiffs against all defendants);

(5) Breach of warranty of habitability regarding oral contract (causes of action 324-404 by all tenant plaintiffs against all defendants);

(6) Nuisance (causes of action 405-485 by all tenant plaintiffs against all defendants);

(7) Negligence (causes of action 486-566 by all tenant plaintiffs against all defendants);

(8) Strict liability regarding maintenance of slum premises (causes of action 562-647 by all tenant plaintiffs against all defendants);

(9) Intentional infliction of emotional distress (causes of action 648- 728 by all tenant plaintiffs against all defendants);

(10) Violation of *Civil Code section 1942.4* (causes of action 729-809 by all tenant plaintiffs against all defendants);

(11) Fraud (causes of action 810 through 890 by all tenant plaintiffs against all defendants);

(12) Fraudulent concealment ( *Civ. Code, § 1710, subd. (3)*) by all tenant plaintiffs against all defendants; and

(13) Violation of *Civil Code section 789.3* (interruption of utility services) (causes of action 972-1,052 by all tenant plaintiffs against all defendants).

For the purpose of this appeal the enumerated groups of causes of actions in (2) through (13) above are referred to as causes of action 2 through 13, respectively.

[***8] [*1702] On August 6, 1990, Highland defendants filed demurrers to that complaint. They also filed a companion motion to strike. On or about October 19, 1990, plaintiffs filed joint opposition. On or about November 13, 1990, Highland defendants filed their reply.

On January 25, 1991, the court sustained certain demurrers without leave to amend. The court sustained demurrers without leave to amend as to all causes of action, except the second for RICO violations, on the ground of failure to state a cause of action ( *Code Civ. Proc., § 430.10, subd. (e)*) because of federal preemption. As authority it relied on *section 545.2 of title 12 of the Code of Federal Regulations; Fidelity Federal Savings and Loan v. De La Cuesta (1982) 458 U.S. 141, 162 [73 L.Ed.2d 664, 680-681, 102 S.Ct. 3014]*; and *Wisconsin League of Financial Institutions v. Galecki (W.D.Wis. 1989) 707 F.Supp. 401, 405.*

The court further sustained demurrers without leave to amend on the ground of failure to state a cause of action ( *Code Civ. Proc., § 430.10, subd. (e)*) specifically as to the 2d cause of action (RICO), the 11th [***9] cause of action for fraud, and the 12th cause of action for

14 Cal. App. 4th 1692, *; 19 Cal. Rptr. 2d 555, **;
1993 Cal. App. LEXIS 435, ***; 93 Cal. Daily Op. Service 2989

fraudulent concealment. The court also sustained uncertainty demurrers to the entirety of the complaint with leave to amend. ( *Code Civ. Proc., § 430.10, subd. (f).*) The motion to strike was placed off calendar.

On March 15, 1991, the court entered the order (judgment) of dismissal based on the [**560] sustaining of the demurrers of the Highland defendants, without leave to amend.

### ISSUES PRESENTED

This appeal presents three basic issues: (1) Are the state claims against Highland, a federal savings and loan association, preempted by federal law? (2) If so, does federal preemption also bar the action against Karmelich, Highland's president, Pratt, its loan coordinator and a vice-president, and HFS, its wholly owned subsidiary? (3) Does the complaint state a cause of [*1703] action against the Highland defendants for RICO violations, fraud, or fraudulent concealment?

### DISCUSSION

1. *ACTION AGAINST HIGHLAND NOT BARRED BY FEDERAL PREEMPTION UNDER HOLA[5]*

(2) (See fn. 5)

5    The Highland defendants concede the trial court's ruling based on federal preemption was grounded only on the Federal Home Owners' Loan Act of 1933 (HOLA) (*12 U.S.C. § 1461 et seq.*) and its concomitant regulations. Nonetheless, they urge us to uphold that ruling on the additional grounds of federal preemption based on the Federal Fair Housing Act of 1986 (*12 U.S.C. § 3601 et seq.*) and The Community Reinvestment Act (*12 U.S.C. § 2903 et seq.*). They assert: " 'If right upon any theory of the law applicable to the case, [a ruling] must be sustained regardless of the considerations which may have moved the trial court to its conclusion.' [Citation.]" ( *D'Amico v. Board of Medical Examiners (1974) 11 Cal.3d 1, 19 [112 Cal.Rptr. 786, 520 P.2d 10].*)

We have no quarrel with their recitation of law except to find it inapposite since defendants have failed to establish the applicability of those acts to the issues before this court. We observe the above two acts were briefly mentioned at footnote 30 of their demurrer memorandum, and thus, were technically before the trial court.

On appeal they devote several pages to quotations from the Fair Housing Act in their brief but fail to cogently connect the act's requirements with the matters at issue, which are mentioned in

some detail in only footnote 19. Similarly, the Highland defendants quote at length from the Community Reinvestment Act but set forth no cognizable connection between its provisions and the subject issues.

Based on the above we reject their position as unsupported. It is well established that as an appellate court we are not required to consider matters urged in the briefs where no pertinent argument is made in support thereof. (See, e.g., *Strutt v. Ontario Sav. & Loan Assn. (1972) 28 Cal.App.3d 866, 873 [105 Cal.Rptr. 395].*)

[***10] A. *PRINCIPLES APPLICABLE TO DETERMINATION OF PREEMPTION*

(3a) "Preemption issues are resolved through the process of statutory interpretation. [Citation.] We look to the language of the statute and to the intent of Congress." ( *Siegel v. American Savings & Loan Assn. (1989) 210 Cal.App.3d 953, 959 [258 Cal.Rptr. 746].*)

" 'In determining whether a state statute [or a state cause of action] is pre-empted by federal law and therefore invalid under the Supremacy Clause of the Constitution, our sole task is to ascertain the intent of Congress. . . . First, when acting within constitutional limits, Congress is empowered to pre-empt state law by so stating in express terms. Second, congressional intent to pre-empt state law in a particular area may be inferred where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress "left no room" for supplementary state regulation. [P] As a third alternative, in those areas where Congress has [*1704] not completely displaced state regulation, federal law may nonetheless preempt state law to the extent it actually conflicts with federal [***11] law. Such a conflict occurs either because "compliance with both federal and state regulations is a physical impossibility," or because the state law stands "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." (4a) Nevertheless, pre-emption is not to be lightly, presumed.' ( *California Federal S. & L. Assn. v. Guerra (1987) 479 U.S. 272, 280-281 [93 L.Ed.2d 613, 623, 107 S.Ct. 683]*, citations omitted.) (5a) In *R. J. Reynolds Tobacco Co. v. Durham County (1986) 479 U.S. 130, 149 [93 L.Ed.2d 449, 467, 107 S.Ct. 499]*, the court stated: 'Although the regulations are not themselves controlling on the pre-emption issue, where, as in this case, Congress has entrusted an agency with the task of promulgating regulations to carry out the purposes of a statute, as part of the pre-emption analysis we must [**561] consider whether the regulations evidence a desire to occupy a field completely. Pre-emption should not be inferred, however, simply because the agency's regulations are comprehensive.' (Citations omitted.)" (

14 Cal. App. 4th 1692, *; 19 Cal. Rptr. 2d 555, **;
1993 Cal. App. LEXIS 435, ***; 93 Cal. Daily Op. Service 2989

*Siegel v. American Savings & Loan Assn., supra, 210 Cal.App.3d at pp. 958-959.*) [***12]

**B.  NO EXPRESS PREEMPTION UNDER HOLA EXCEPT AS TO TWO ITEMS**

HOLA is the acronym of the federal Home Owners' Loan Act of 1933 (*12 U.S.C. § 1461 et seq.*). [6] " 'The language of HOLA, as well as the history that lies behind its enactment, demonstrate that there is a strong federal interest in the uniform treatment of the federally chartered savings and loans associations. Congress initially enacted HOLA and its regulatory structure in response to a crisis in the nation's private home financing system. [Citation.] This crisis had developed at least in part as a result of the inconsistent and ill- advised practices of the various states.  As noted by the Ninth Circuit, "the states had developed a hodgepodge of savings and loan laws and regulations, and Congress hoped that [the Federal Home Loan Bank Board's] rules would set an example for uniform and sound savings and loan regulations." [7] ( *Conference of Federal Savings & Loan Ass'ns v. Stein, 604 F.2d 1256, 1258,* (9th Cir. 1979), *summarily affd., 445 U.S. 921, 100 S.Ct. 1304, 63 L.Ed.2d 754 (1980),* [***13] *citing* T. Marvell, *The Federal Home Loan Bank Board* at 26 (1969).' ( *Eureka Federal Sav. and Loan Ass'n v. Kidwell (N.D.Cal. 1987) 672 F.Supp. 436, 439.)"* ( *Siegel, supra, 210 Cal.App.3d at p. 959.*)

6    All statutory references are to title 12 of the United States Code unless otherwise specified.

7    The board was replaced in 1989 with the Office of Thrift Supervision (OTS) and its director. (§ 1462(1) & (3), 1462a(e).)

Part 545 of title 12 of the Code of Federal Regulations (12 C.F.R.) sets forth the regulations covering the operations of a federal association. *Section* [*1705] *545.1 of 12 C.F.R.,* which specifies the general parameters of the association's authority, provides: "A Federal savings association may exercise all authority granted it by [HOLA] and its charter and bylaws, whether or not implemented specifically by Office regulations, subject to the limitations and interpretations contained in this part."

*Section* [***14] *545.2 of 12 C.F.R.* provides: " 'The regulations in this Part 545 are promulgated pursuant to the plenary and exclusive authority of the Board to regulate all aspects of the operations of Federal associations, as set forth in section 5(a) of the Home Owners' Loan Act of 1933, *12 U.S.C. 1464,* as amended. This exercise of the Board's authority is preemptive of any state law purporting to address the subject of the operations of a Federal association.' " (*Ibid.*).

**(6a)** In their brief the Highland defendants urge the import of the above two regulations is preemption of any state law which would limit or penalize the conduct of a federal association where such conduct is authorized by HOLA and not proscribed by HOLA regulations since such law would thus be in direct conflict with HOLA. [8]

8    In a footnote of their brief the Highland defendants urge "there is even a direct conflict between certain specific HOLA regulations and the state law upon which the subject state law claims are predicated."

Specifically, they refer only to two regulations. The first, 12 C.F.R. section 545.32(d) authorizes an association to make a real estate loan up to 100 percent of the market value of the secured property. They claim a direct conflict exists because plaintiffs seek to proscribe loans where the borrower would have no equity in the property, thus, vesting "control" in Highland. We find no conflict. Defendants have mischaracterized certain language in the complaint.  When viewed in context, it is clear plaintiffs were not alleging defendants should be prohibited from making loans up to 100 percent of the market value of the property.

The complaint alleged, "The premises involved were security for indebtedness amounting to approximately 100%% or more of their value, and additional loans on the property were not available in any bona fide business transaction." It was further alleged defendants "with full knowledge of the slum character of these buildings, has made or aided in the making of loans for amounts exceeding the value of the slum buildings at high interest rates and 'points', requiring payments to the lending defendant which absorbed all or virtually all of the rental flow from the buildings. . . . Each . . . defendant reaped financial benefits from the slum buildings' continuing slum character." In context, the thrust of these allegations is merely to explain one reason why the slum condition of the property was perpetuated, namely, since no equity was left no additional loans were available to fix up the property.

The Highland defendants lastly claim a direct conflict exists between the state claims and 12 C.F.R. section 545.34, which permits an association to incorporate into a mortgage loan contract " 'a provision . . . whereby the Federal association *may, at its option,* declare immediately due and payable' the secured indebtedness upon an unconsented to transfer of title to the real property." They argue plaintiffs seek to "deprive Highland

14 Cal. App. 4th 1692, *; 19 Cal. Rptr. 2d 555, **;
1993 Cal. App. LEXIS 435, ***; 93 Cal. Daily Op. Service 2989

of the *option* to exercise such provision and, instead, compel it to do so." (Italics in original.) In support, they point to the allegations in the complaint that defendants improperly made frequent transfers of the property "from one uncreditworthy and disreputable borrower to another without exercise of due-on-sale clauses of loan agreements, without requiring loan assumption by creditworthy individuals, and without scrutiny to determine or insure that payments would be made and that the slum buildings would be maintained in accordance with requirements of the law.  By making frequent transfers of ownership of the slum buildings, each such defendant's conduct facilitated the ability of the involved record owner to avoid criminal liability for violations of the law . . . [and] each such defendant further effectively avoided or delayed repair of the slum buildings."

We find no conflict in this regard.  By such allegations plaintiffs do not seek to deprive defendants of their option to exercise the due-on-sale clauses.  Instead, plaintiffs merely seek to preclude defendants from conducting sham transfers of the property. (But see discussion, *post*, regarding a direct conflict as to item (3)(h) of the prayer for injunctive relief.)

[***15]    [*1706]    [**562]  As authority for their claim of preemption the Highland defendants argue "the seminal case on the subject, and a case strikingly parallel in material respects to this case, is *People v. Coast Fed. Sav. & Loan Ass'n (S.D.Cal. 1951) 98 F.Supp. 311*." [9] They also rely heavily on *Fidelity Fed. Sav. & Loan Ass'n v. De la Cuesta (1982) 458 U.S. 141 [73 L.Ed.2d 664, 680-681, 102 S.Ct. 3014]* and *Wisconsin League of Financial Inst. v. Galecki (W.D.Wis. 1989) 707 F.Supp. 401*. [10]

9   As further support, they cite: *Meyers v. Beverly Hills Fed. Sav. & Loan Ass'n (9th Cir. 1974) 499 F.2d 1145* (prepayment penalties); *Greenwald v. First Fed. Sav. & Loan Ass'n of Boston (D.C. Mass. 1978) 446 F.Supp. 620* (interest payments on escrow accounts); *First Fed. Sav. & Loan Ass'n of Boston v. Greenwald (1st Cir. 1979) 591 F.2d 417* (interest payments on escrow accounts); *City Fed. Sav. & Loan Ass'n v. Crowley (E.D.Wis. 1975) 393 F.Supp. 644* (self-dealing of association officers and directors in violation of board's regulations); *Lyons Sav. & Loan Ass'n v. Federal Home Loan Bank Board (N.D.Ill. 1974) 377 F.Supp. 11* (branching of association); *Kaski v. First Fed. Sav. & Loan Ass'n of Madison (1976) 72 Wis.2d 132 [240 N.W.2d*

*367]* (interest rate escalation clauses in mortgage note); *Central Sav. & Loan Ass'n of Chariton v. Federal Home Loan Bank Bd. (8th Cir. 1970) 422 F.2d 504* (mobile associations); *Murphy v. Colonial Fed. Sav. & Loan Ass'n (2d Cir. 1967) 388 F.2d 609* (list of eligible voters re association director election); *North Arlington Nat'l Bank v. Kearny Fed. Sav. & Loan Ass'n (3d Cir. 1951) 187 F.2d 564*, cert. den., *342 U.S. 816 [96 L.Ed. 617, 72 S.Ct. 30]* (branches); *Glendale Fed. Sav. & Loan Ass'n v. Fox (C.D.Cal. 1978) 459 F.Supp. 903, 904-912* (due-on-sale clause); *Rettig v. Arlington Heights Fed. Sav. & Loan Ass'n (N.D.Ill. 1975) 405 F.Supp. 819* (authority of association to sell insurance and internal obligations of directors); *Elwert v. Pacific First Fed. Sav. & Loan Ass'n (D.Or. 1956) 138 F.Supp. 395* (branches); *Washington Fed. Sav. & Loan Ass'n v. Balaban (Fla. 1973) 281 So.2d 15* (branches); *Springfield Inst. v. Worcester Fed. Sav. & Loan Ass'n (1952) 329 Mass. 184 [107 N.E.2d 315]*, cert. den. *344 U.S. 884 [97 L.Ed.684, 73 S.Ct. 184]* (branches).

Such reliance is patently misplaced.  Those cases involved either a direct conflict between state law and specific regulations under HOLA or issues concerning the internal management and direct operation of the federal association itself, and thus, are factually inapposite.

[***16]
10   The Highland defendants cite *Federal Sav. & Loan Ins. Corp. v. Kidwell (N.D.Cal. 1989) 716 F.Supp. 1315*, for the proposition that state law claims for negligence and waste against the federal association were preempted by federal law.  Their reliance on that case is unfounded.  In addition to the preemption issue the district court also ruled the claim for breach of fiduciary duty under federal common law was governed by a four-year state statute of limitations.  In an unpublished decision the appellate court vacated the lower court decision in part without specifying which part was being vacated.  ( *Eureka Federal Sav. & Loan Ass'n v. Kidwell (9th Cir. 1991) 937 F.2d 612*.)  Accordingly, the district court decision is without persuasive or precedential value.

[*1707]  Contrary to their assertion otherwise, *People v. Coast Fed. Sav. & Loan Ass'n (S.D.Cal. 1951) 98 F.Supp. 311* is not "a case strikingly parallel in material respects to this case." In *Coast* "the gravamen of the complaint is that through [***17] signs and other means of advertising, defendant [federal association] has transacted business in the manner of a [**563] bank and has held itself out as a bank or savings bank, and has led the

14 Cal. App. 4th 1692, *; 19 Cal. Rptr. 2d 555, **;
1993 Cal. App. LEXIS 435, ***; 93 Cal. Daily Op. Service 2989

public to believe that it was such a bank, without authority and in violation of state statutes." ( *People v. Coast Fed. Sav. & Loan Ass'n, supra,* 98 F.Supp at p. 315.) Former section 161.7(e) of title 24 of the Code of Federal Regulations expressly governed the subject of advertising vis-a-vis federal associations. ( *98 F.Supp. at p. 315, fn. 5.*) In view of such regulation the court held the board had primary jurisdiction over the subject matter. ( at p. 317.)

In contrast, this case does not involve a direct conflict between a specific regulation and state law. Reliance by the Highland defendants on *Fidelity Fed. Sav. & Loan Ass'n v. De La Cuesta* and *Wisconsin League of Financial Inst. v. Galecki* is misplaced for that same reason.

In *De La Cuesta* the United States Supreme Court held the board's regulation of due-on-sale clauses preempted state law as embodied in *Wellenkamp v. Bank of America* (1978) 21 Cal.3d 943 [582 P.2d 970]. [***18] ( *Fidelity Fed. Sav. & Loan Ass'n v. De La Cuesta, supra,* 458 U.S. 141, 159 [73 L.Ed.2d 664, 678-679].) The *De La Cuesta* court reasoned:

"The Board's intent to pre-empt the *Wellenkamp* doctrine is unambiguous. The due-on-sale regulation plainly provides that a federal savings and loan 'continues to have the power' to include a due-on- sale clause in a loan instrument and to enforce that clause 'at its option.' 12 CFR § 545.8-3(f) (1982). The California courts, in contrast, have limited a federal association's right to exercise a due-on-sale provision to those cases where the lender can demonstrate that the transfer has impaired its security. [P] The conflict does not evaporate because the Board's regulation simply permits, but does not compel, federal savings and loans to include due-on-sale clauses in their contracts and to enforce those provisions when the security property is transferred. . . . In addition, *Wellenkamp* explicitly bars a federal savings and loan from exercising a due-on-sale clause to adjust a long-term mortgage's interest rate toward current market rates--a due-on-sale practice the Board [***19] has approved . . . ." (458 U.S. at pp. 155-156 [73 L.Ed.2d 676-677], italics in original.)

In *Wisconsin League of Financial Inst. v. Galecki, supra,* the court held the "Board has expressly preempted state regulation in the area of mortgage escrow accounts and loan disclosures." ( *707 F.Supp. at p. 405.*) The court [*1708] expressly limited its holding to the facts of that case by announcing: "The court need not determine the full breadth of the term 'operations of a federal Association' [as provided in *section 545.2*] because there can be no dispute that such phrase extends at least to the regulation of mortgage escrow accounts and mortgage loan disclosures. *Fidelity Federal, 458 U.S. at 167* . . . *Kaski*

*v. First Federal Savings & Loan Association,* 72 Wis.2d 132, 240 N.W.2d 367 (1976)." [11] (707 F.Supp. at p. 405.)

11  In addition to direct preemption the *Galecki* court also found implicit preemption based on the finding state regulation of escrow accounts would be "a direct obstacle" to "the Board's express purpose to permit the parties to negotiate terms of an escrow agreement between themselves without intervention by substantive law." ( *Wisconsin League of Financial Institutions v. Galecki, supra,* 707 F.Supp. at p. 406.) In contrast, the state claims at issue here do not present "a direct obstacle" to any announced OTS policy.

[***20]  It is undisputed that this case involves neither the regulation by state law of advertising, enforceability of due-on-sale clauses, or mortgage escrow accounts and mortgage loan disclosures. Accordingly, the *Coast, De La Cuesta,* and *Galecki* cases are of no moment with regard to whether the subject state causes of action are expressly preempted by HOLA and its concomitant regulations.

(4b)  "Preemption of state law by federal regulation is not favored. We will not find express preemption unless a regulation clearly so states. ( *Chicago & N. W. Tr. Co. v. Kalo Brick & Tile Co.* (1981) 450 U.S. 311, 317 [67 L.Ed.2d 258, 265, 101 S.Ct. 1124].) It is the burden of the party claiming preemption to prove it. ( *Elsworth v. Beech Aircraft Corp.* (1984) 37 Cal.3d 540, 548 [208 Cal.Rptr. 874, 691 P.2d 630]; *Perdue v. Crocker National Bank* (1985) [**564] 38 Cal.3d 913, 937 [216 Cal.Rptr. 345, 702 P.2d 503].)" ( *Siegel v. American Savings & Loan Assn., supra,* 210 Cal.App.3d at p. 960.) [***21]

(6b)  As pointed out in *Siegel,* "the Board is capable of saying it means to expressly preempt all state law in an area. . . . *Section 545.2* [of 12 C.F.R.] contains no such statement that federal law is preemptive of all state common law claims." (210 Cal.App.3d at pp. 960-961.)

Similarly, we have found no provision of HOLA nor any particular regulation, and none have been cited to us, which expressly preempt the statutory action by the People for unfair business practices and the causes of action by the tenant plaintiffs for fraud, RICO violations, etc. We therefore hold the subject action is not explicitly barred by federal preemption pursuant to HOLA. [12]

12  At oral argument the Highland defendants conceded no express statutory preemption exists here.

Nonetheless, we do find federal preemption with regard to two matters. First, the allegation that Highland charged loan "points and provided for [*1709] interest,

14 Cal. App. 4th 1692, *; 19 Cal. Rptr. 2d 555, **;
1993 Cal. App. LEXIS 435, ***; 93 Cal. Daily Op. Service 2989

each of which was higher than the rates for bona [***22] fide loan[] transactions" impinges on the specific intent of Congress to preempt state usury laws, [13] and thus, improperly delves into an area expressly preempted by HOLA. (See, e.g., § 1463(g).)

13    Section 1463(g) as to preemption of state usury laws, provides:

"(1) Notwithstanding any State law, a savings association may charge interest on any extension of credit at a rate of not more than 1 percent in excess of the discount rate on 90-day commercial paper in effect at the Federal Reserve bank in the Federal Reserve district in which such savings association is located or at the rate allowed by the laws of the State in which such savings association is located, whichever is greater.

"(2) If the rate prescribed in paragraph (1) exceeds the rate such savings association would be permitted to charge in the absence of this subsection, the receiving or charging a greater rate of interest than that prescribed by paragraph (1), when knowingly done, shall be deemed a forfeiture of the entire interest which the extension of credit carries with it, or which has been agreed to be paid thereon. If such greater rate of interest has been paid, the person who paid it may recover, in a civil action commenced in a court of appropriate jurisdiction not later than 2 years after the date of such payment, an amount equal to twice the amount of the interest paid from the savings association taking or receiving such interest."

[***23] The second matter concerns item (3)(h) of the complaint's prayer which seeks to enjoin the Highland defendants from "declining to initiate and complete foreclosure as speedily as the law permits on substandard property of which the lender has notice if the substandard conditions are not fully corrected within 120 days, provided that foreclosure proceedings may terminate if correction occurs before foreclosure is completed." This requested relief is in direct conflict with 12 C.F.R. section 545.34 which permits a federal association "at its option [to] declare immediately due and payable" the secured indebtedness upon an unconsented to transfer of title to the real property.

On remand, the court is therefore directed to strike such allegations and prayer requests. ( *Code Civ. Proc., § 436*.)

C. *NO IMPLIED PREEMPTION UNDER HOLA*

Alternatively, the Highland defendants assert the subject action is barred by the doctrine of implied preemption. They urge federal law has impliedly "occupied the field" of federal savings and loan associations with regard to their operations and functions.

We acknowledge HOLA and the regulations promulgated thereunder have created both a comprehensive [***24] and uniform thrift system which is federally regulated and that in exercising its broad authority the former board has issued specific, detailed regulations governing those associations. Nonetheless, we observe the United States Supreme Court has declined to conclude [*1710] the board has preempted all lending practices or that the Board's discretion is limitless.

In *De La Cuesta* the court construed the board's powers to be plenary over federal associations: "The broad language of § 5(a) [of HOLA] expresses no limits on [**565] the Board's authority to regulate the lending practices of federal savings and loans. . . . [Thus,] 'it would have been difficult for Congress to give the Bank Board a broader mandate.' [Citation.]" ( *Fidelity Federal Savings and Loan v. De La Cuesta, supra, 458 U.S. at p. 161 [73 L.Ed.2d at p. 680]*.)

However, the court expressly declined to find the board had preempted state law as to all lending practices and cautioned: "Because we find an actual conflict between federal and state law, we need not decide whether the HOLA or the Board's regulations occupy the field of due-on-sale law or the [***25] entire field of federal savings and loan regulation." ( *De La Cuesta, supra, 458 U.S. at p. 159, fn. 14 [73 L.Ed.2d at p. 679]*.) The court went on to qualify its holding in that case as follows: "Although the Board's power to promulgate regulations exempting federal savings and loans from the requirements of state law may not be boundless, in this case we need not explore the outer limits of the Board's discretion." [14] ( at p. 167 [73 L.Ed.2d at p. 684].)

14    Justice O'Connor wrote separately "to emphasize that the authority of the . . . Board to preempt state laws is not limitless. . . . Nothing in the language of § 5(a) of HOLA, which empowers the Board to 'provide for the organization, incorporation, examination, operation, and regulation' of federally chartered savings and loans, remotely suggests that Congress intended to permit the Board to displace local laws, such as tax statutes and zoning ordinances, not directly related to savings and loan practices." ( at pp. 171-172 [73 L.Ed.2d at pp. 686-687].)

In his dissent, joined by Justice Stevens, Justice Rehnquist reasoned: "In § 545.8-3(f), the Board has gone beyond regulating how, when, and in what manner a federal savings and loan may lend mortgage money. . . . In this case, the

14 Cal. App. 4th 1692, *; 19 Cal. Rptr. 2d 555, **;
1993 Cal. App. LEXIS 435, ***; 93 Cal. Daily Op. Service 2989

Board is not regulating the operation of federal savings and loan associations, but the operation of due-on-sale clauses. Without a congressional authorization more explicit than that relied upon by the Court, I conclude that the Board has entered a domain in which it is not authorized to override state laws. . . . Discharge of its mission to ensure the soundness of federal savings and loans does not authorize the . . . Board to intrude into the domain of state property and contract law that Congress has left to the States." ( at pp. 174-175 [73 L.Ed.2d at pp. 688- 689].)

[***26]

(5b) Moreover, "comprehensiveness of federal regulation alone, is not sufficient to establish implied preemption. Again, the United States Supreme Court has said: 'We are even more reluctant to infer pre-emption from the comprehensiveness of regulations than from the comprehensiveness of statutes. As a result of their specialized functions, agencies normally deal with problems in far more detail than does Congress. To infer preemption whenever an agency deals with a problem comprehensively is virtually tantamount to saying that whenever a federal agency decides to step into a [*1711] field, its regulations will be exclusive. Such a rule, of course, would be inconsistent with the federal-state balance embodied in our Supremacy Clause jurisprudence.' ( Hillsborough County v. Automated Medical Labs. (1985) 471 U.S. 707, 717 [85 L.Ed.2d 714, 724, 105 S.Ct. 2371].) Our task is to determine whether the field which has been preempted by federal regulation is broad enough to cover plaintiffs' state causes of action." ( Siegel, supra, 210 Cal.App.3d 953, 961-962.)

(6c) We conclude it [***27] does not. The cause of action for unfair business practices as alleged by the People does not directly affect the operations of Highland, and therefore, is not covered by the subject regulations. Similarly, the regulations promulgated under HOLA do not pertain to racketeering charges under a RICO action. The remaining causes of action, e.g., nuisance, breach of warranty of habitability, intentional infliction of emotional distress, fraud, and interruptions of utilities would, at most, only incidentally and remotely touch upon the operations of Highland in its capacity as a federal savings association. Thus, those also do not impinge on the ambit of HOLA.

(3b) No implied preemption is found where the impact on the subject is merely indirect. (See, e.g., English v. General Electric Co. (1990) 496 U.S. 72 [110 L.Ed.2d 65, 110 S.Ct. 2270].) In English, the court held the emotional distress claims of a whistle blower were not preempted by the federal government's exclusive authority to regulate the safety of nuclear power because such

[**566] claims only indirectly affected the issue of nuclear safety. "Instead, for a state law [***28] to fall within the pre-empted zone, it must have some direct and substantial effect on the decisions made by those who build or operate nuclear facilities concerning radiological safety levels." ( at p. 85 [110 L.Ed.2d at pp. 78-79].) The court reasoned: "For example, if an employer were to retaliate against a nuclear whistle-blower by hiring thugs to assault the employee on the job (conduct literally covered by § 210 [of the Energy Reorganization Act of 1972]), respondent's position would imply that the state criminal law prohibiting such conduct is within the pre-empted field. We simply cannot believe that Congress intended that result." ( at p. 83 [110 L.Ed.2d at p. 77]; see also, at pp. 75-76 [110 L.Ed.2d at pp. 71-72].)

(5c) Also, where the subject matter is an area traditionally regulated by the states, no federal preemption is implied unless there is a clear and manifest intent shown. Thus, there must be "a showing of implicit preemption of the whole field . . . strong enough to overcome the presumption that [***29] state and local regulation of health and safety matters can constitutionally coexist with federal regulation." ( Hillsborough County v. Automated Medical Labs., supra, 471 U.S. at p. 716 [85 L.Ed.2d at p. 723]; see also, [*1712] Merrill Lynch, Pierce, Fenner & Smith v. Ware (1973) 414 U.S. 117, 139-140 [38 L.Ed.2d 348, 366-367, 94 S.Ct. 383] [no preemption by the Security Exchange Act of 1934 of action for profit sharing rights of terminated employee since California has strong policy of protecting wage earners].)

Moreover, "merely because the federal provisions were sufficiently comprehensive to meet the need identified by Congress [it does] not mean that States and localities [are] barred from identifying additional needs or imposing further requirements in the field." ( Hillsborough County v. Automated Medical Labs., Inc., supra, 471 U.S. at p. 717 [85 L.Ed.2d at pp. 723-724].)

(6d) Accordingly, we determine whether the subject state causes of action are impliedly barred by federal preemption by scrutinizing [***30] them to see if they directly are "purporting to address the subject of the operations" of Highland, a federal savings association. (See 12 C.F.R. § 545.2.)

The state causes of action at issue are grounded in Highland's wrongful course of conduct which enables slum conditions in the subject buildings to be perpetuated to the detriment of the health, safety and welfare of the People of California and, in particular, the tenant plaintiffs. The essence of those causes of action concerns the right of the state to prohibit, and punish Highland for its part in, the conspiracy to maintain dwellings in an uninhabitable condition.

14 Cal. App. 4th 1692, *; 19 Cal. Rptr. 2d 555, **;
1993 Cal. App. LEXIS 435, ***; 93 Cal. Daily Op. Service 2989

From our review of HOLA and its concomitant regulations we have found no statutory provision or regulation which even purports to address the subject of minimum housing standards. Also, any impact or intrusion on the "operations" of Highland is minimal and indirect.

Additionally, we conclude neither the intent of Congress in enacting HOLA nor the purpose of HOLA would be served by finding preemption under these circumstances. The paramount purpose of HOLA is to ensure the solvency of federal associations. (See, e.g., § 1463(a)(1)-(3), and § 1464(d)(2).) That [***31] purpose would not be hindered, directly or indirectly, by the prosecution of the subject state claims. This is not the situation where the state seeks to regulate the conduct of all federal associations in California. Rather, the state merely seeks to protect its own interest in public safety and welfare against the wrongful conduct of an entity, inter alia, which just happens to be a federal association.

D. *ACTION AGAINST KARMELICH, PRATT, AND HFS NOT BARRED BY FEDERAL PREEMPTION UNDER HOLA*

Since this action is not preempted under HOLA as to Highland, a fortiori no preemption bars the action against Karmelich, its president and chief [*1713] executive officer, or Pratt, its loan coordinator and vice- president. Moreover, the action is also not preempted against HFS, which is Highland's wholly owned subsidiary but not a federal savings association.

[**567]    2. *CAUSES OF ACTION STATED AGAINST HIGHLAND DEFENDANTS FOR RICO VIOLATIONS, AND FRAUD, BUT NOT FRAUDULENT CONCEALMENT*

A. *RICO ACTION PROPERLY PLEADED AS TO MAIL FRAUD*

**(7a)** To state a cause of action under RICO (*18 U.S.C. § 1961 et seq.*) a plaintiff must plead facts to show: "(1) conduct [***32] (2) of an enterprise (3) through a pattern (4) of racketeering activity." ( *Sedima, S.P.R.L. v. Imrex Co.* (1985) 473 U.S. 479, 496 [87 L.Ed.2d 346, 358-359, 105 S.Ct. 3275]*, fn. omitted.) **(8a)** In their demurrer, the Highland defendants attack the above "enterprise" and "racketeering activity" components.

(1)    *EXISTENCE    OF    RICO    ENTERPRISE PLEADED*

The Highland defendants argue plaintiffs have failed to plead the existence and identity of an "enterprise," i.e., a group of defendants associated in fact for a common purpose although not a legal entity. We disagree.

An "enterprise" includes "any union or group of individuals associated in fact although not a legal entity." (*18 U.S.C. § 1961(4).*)

**(7b)** The existence of an enterprise is an essential element of a RICO claim. "The enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct. . . . [It] is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." ( *United States v. Turkette* (1981) 452 U.S. 576, 583 [69 L.Ed.2d 246, 254-255, 101 S.Ct. 2524]*; [***33] see also, *Shaffer v. Williams* (5th Cir. 1986) 794 F.2d 1030, 1032*.)

**(8b)** The facts setting forth the existence and identity of the requisite enterprise are not alleged at a single location. Instead, such facts, because of the complexity of the scheme involved, are necessarily gleaned from various portions of the subject complaint.

At paragraph 150 of the complaint it was alleged: "The following associations constitute an enterprise within the meaning of RICO generally and *18 U.S.C. § 1961(4)* specifically:

"a. The association in fact of defendants Highland, Northeast, and HFS (the Highland Enterprise).

[*1714] "

"c. The association in fact of defendants Karmelich, Highland, Northeast, HFS, Leyton, Interreal, Interwest, PHC, and Fitzpatrick (the Highland- Leyton-Fitzpatrick Enterprise)."

Although subparagraph a of paragraph 150 refers to Highland, Northeast, and HFS, as "the Highland Enterprises" it is clear such enterprise is but a component of the "enterprise" which comprises this element of a RICO action. Similarly, the reference to "the Highland-Leyton-Fitzpatrick Enterprise" in subparagraph d of paragraph [***34] 150 is to the component of the "enterprise" consisting of the members of the Highland Enterprise, defendants Leyton, Interreal, Interwest, PHC and Fitzpatrick. From a review of the factual allegations concerning these components of such "enterprise" it is clear the requisite facts concerning the existence of an informal ongoing organization consisting of a group of entities associated together for a common purpose of engaging in a course of conduct and functioning as a continuing unit have been alleged.

The complaint essentially alleges the above defendants engaged in a continuing scheme to defraud the tenant plaintiffs by secretly manipulating the record owner defendants and by actively assisting such owners to perpetuate the buildings in an uninhabitable condition

14 Cal. App. 4th 1692, *; 19 Cal. Rptr. 2d 555, **;
1993 Cal. App. LEXIS 435, ***; 93 Cal. Daily Op. Service 2989

in violation of the law. That the Highland, HFS and Northeast defendants were ongoing business entities which had an ongoing relationship with each other independent of that fraud scheme is shown by the following facts: It was alleged Highland was a federal savings and loan association specializing in loans on residential property; Northeast, an investment corporation located at Highland's offices, was engaged in the [***35] business of handling insurance; and HFS, a wholly owned subsidiary of Highland, serviced [**568] loans made by Highland. The complaint further alleged that the association of defendant Highland, Northeast and HFS constituted an association in fact within the meaning of RICO. The above factual allegations thus evidence an interlocking independent business relationship among those three entities.

Moreover, it was also alleged that defendants Interreal, Interwest and PHC, all of which were entities in which defendant Leyton had an interest, along with the above Highland entities and the individual defendants, Karmelich, as the secretary of Northeast's board of directors, Leyton and Fitzpatrick constituted an association of fact, and thus, an enterprise. The specifics of such association are set forth in the complaint and demonstrate an ongoing series of business transactions among these various defendants with regard to each of the subject buildings. (See, e.g., *Temple University v.* [*1715] *Salla Bros., Inc.* (E.D.Pa 1986) 656 F.Supp. 97, 102 [sufficient ongoing organization shown]; cf. *Calcasieu Marine Nat. Bank v. Grant* (5th Cir. 1991) 943 F.2d 1453, 1461-1463 [***36] [no ongoing association shown]; *Martin v. Brown* (W.D.Pa. 1990) 758 F.Supp. 313, 322 [insufficient ongoing unit shown]; *Uniroyal Goodrich Tire Co. v. Mutual Trading Corp.* (N.D.Ill. 1990) 749 F.Supp. 869, 876-877 [insufficient "association-in-fact" shown].)

## (2) "RACKETEERING ACTIVITY" BASED ON MAIL FRAUD PROPERLY PLEADED

"Racketeering activity" under RICO consists of certain specific acts which are expressly enumerated in title *18 United States Code, section 1961.* The activity underlying the subject RICO claim is mail fraud and wire fraud.(9) (10) "In pleading a violation of the mail fraud statute (*18 U.S.C. § 1341*) [or the wire fraud statute (*18 U.S.C. § 1342*)] as a predicate act under a RICO scheme, plaintiffs must allege that (1) defendants devised a scheme or artifice to defraud, (2) defendants used the mails [or wires] in furtherance of the scheme, and (3) defendants did so with the specific intent to deceive or defraud. [Citation.]" ( *McMartin v. Children's Institute International* (1989) 212 Cal.App.3d 1393, 1407 [261 Cal.Rptr. 437]; [***37] accord, *Schreiber Distributing v. Serv- Well Furniture Co.* (9th Cir. 1986) 806 F.2d 1393, 1399-1400 [mail and wire fraud]; see also, *United*

*States v. Gordon (5th Cir. 1986) 780 F.2d 1165, 1171* [wire fraud].)

(8c) The Highland defendants also challenge the allegations of mailing and wire fraud as inadequate. They argue plaintiffs are required to but have failed to "specifically plead the time, place or nature of the alleged communications constituting racketeering activity. [Citation.]" ( *McMartin v. Children's Institute Int'l, supra,* 212 Cal.App.3d at p. 1407; see also, *Alan Neuman Productions, Inc. v. Albright* (9th Cir. 1988) 862 F.2d 1388, 1392; *Rosenthal v. Vogt* (1991) 229 Cal.App.3d 69, 77 [280 Cal.Rptr. 1].)

We agree the allegation of "wire fraud" is totally deficient in the above regard. Subparagraph e of paragraph 151 merely alleges: "Interstate telephone conversations relating to the slum buildings with lenders, persons attempting to locate various of the defendants, the Federal Home Loan Bank [***38] Board, and others." No facts are alleged to show the nature of such conversations or the place and time thereof. Accordingly, since plaintiffs have failed to show how such defects would be remedied if leave to amend were granted, we conclude the trial court was correct in impliedly finding the predicate act of "wire fraud" was inadequate to support a RICO action. (See, e.g., *Goodman v. Kennedy* (1976) 18 Cal.3d 335, 349 [134 Cal.Rptr. 375, 556 P.2d 737].) The court is thus directed to strike subparagraph e of paragraph 151. ( *Code Civ. Proc., § 436.*)

[*1716] We further conclude, however, that the court erred in sustaining the demurrer to that cause of action since the plaintiffs have adequately pleaded facts to support the predicate act of "mail fraud." The specific factual allegations of the mailings in the subject complaint are both qualitatively and quantitatively superior to the bare conclusionary allegation found to be inadequate in *Schreiber Distributing Co. v. Serv-Well Furniture Co., supra,* 806 F.2d 1393. [**569] In *Schreiber,* the sole allegation was "on two or more occasions [defendants [***39] used] the United States mail . . . for the purpose of executing or attempting to execute the aforesaid fraudulent scheme . . . ." ( at p. 1401; cf. also, *Alan Neuman Productions, Inc. v. Albright, supra,* 862 F.2d 1388, 1393, "The allegation of [the] complaint concerning predicate acts of fraud are similarly general referring to 'many acts of mail fraud,' 'many acts of wire fraud,' and 'many victims.' ")

In contrast, the complaint here described the nature of the mailings as consisting "of [the] documents, deeds, deeds of trust and similar matters relating to the slum buildings." They were further delineated as the mailings were described as "mailing of rent checks, mortgage and loan payments, payment for services rendered, and similar commercial transactions relating to slum buildings."

14 Cal. App. 4th 1692, *; 19 Cal. Rptr. 2d 555, **;
1993 Cal. App. LEXIS 435, ***; 93 Cal. Daily Op. Service 2989

The mailings of various materials were also described as relating to code violations regarding slum buildings. Moreover, the place of mailing was reflected in the allegation of "mailing of materials to various governmental entities, and recordation of real estate documents requested by mail and directed to the Los Angeles County Recorder. Every recorded document [***40] pertaining to the real estate transactions described in this complaint was sent through the mails to the County Recorder in furtherance of their conspiracy."

The intent to defraud element was supplied through the allegations concerning their effort to achieve the fraudulent objectives. Additional facts as to the time, place, and content of the fraud are set forth with particularity at paragraphs 87 through 98 of the complaint.

The allegations of the subject complaint as to time, place, etc., sufficiently comport with the requirement of pleading fraud with particularity. As one court explained: "Plaintiffs cannot be expected to specify the exact time and particular place of each factual omission and misrepresentation. The complaint adequately specifies the transactions and the approximate time frame, the contents of the alleged misrepresentations and the essence of omitted information, and the identities of those involved." ( *Onesti v. Thomson McKinnon Securities, Inc. (D.C.Ill. 1985) 619 F.Supp. 1262, 1265*.)

As to other specific dates and details, we point out such matters are properly addressed during discovery, not on demurrer. Also, when a particular [***41] document or matter was mailed is within the peculiar knowledge of the [*1717] defendants. (See, e.g., *Committee on Children's Television, Inc. v. General Foods Corp. (1983) 35 Cal.3d 197, 214, 217 [197 Cal.Rptr. 783, 673 P.2d 660].*)

(3) *NEXUS BETWEEN RACKETEERING ACTIVITY AND INJURY PLEADED*

The Highland defendants next attack plaintiffs' RICO claim on the ground no facts are alleged to show any direct injury to the tenant plaintiffs as the proximate result of the racketeering activity. ( *Sedima, S.P.R.L. v. Imrex Co., supra, 473 U.S. at p. 496 [87 L.Ed.2d at pp. 358-359]; McMartin v. Children's Institute, supra, 212 Cal.App.3d at p. 1407.*)

We reject their contention as meritless. The injury suffered by each tenant plaintiff was the deprivation of a habitable dwelling and the loss of the money he or she had paid in rent, which was excessive because the dwellings were uninhabitable. Such injury flowed directly from the racketeering activity committed by defendants.

(4) *VIOLATION OF 18 UNITED STATES CODE* [***42] *SECTION 1962(D) PLEADED*

In a related argument defendants assert the lack of a legally cognizable injury flowing from the racketeering activity also demonstrates the failure of plaintiffs to allege a violation of title *18 of the United States Code, section 1962(d)*. [15] (See [**570] *Medallion TV Enterprise v. SelecTV of California (C.D.Cal. 1986) 627 F.Supp. 1290, 1297-1301*.)

15 *Subdivision (d) of section 1962* provides: "It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section."

The relevant subdivision is (c), which provides in pertinent part: "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."

We disagree. As discussed, above, the requisite injury was properly alleged, [***43] and thus, defendants' assertion is untenable.

B. *CAUSE OF ACTION STATED FOR FRAUD*

(11) The Highland defendants contend no cause of action for fraud is stated because there are insufficient facts alleged to " 'show how, when, where, to whom, and by what means the misrepresentations were tendered.' *Stansfiel v. Starkey (1990) 220 Cal.App.3d 59, 73, . . . quoting Hills Transp. Co. v. Southwest Forest Indus., Inc. (1968) 266 Cal.App.2d 702, 707 . . ..*" They complain "the People and the tenants [plaintiffs] allege . . . 'each record owner', without any further identification or limitation, made the allegedly fraudulent representations; that they were made to [*1718] 'plaintiffs', without any further identification; and that they were made 'at the time of each respective record owner's ownership', without any further limitation as to time. The complaint is silent as to how the alleged representations were communicated." They contend the "above allegations are, of course, calculated to avoid communicating meaningful information about the alleged fraud either to the Highland defendants or to the Court. . . ." (*Ibid.* [***44] )

Defendant's contentions are meritless. The complaint sets forth with ample particularity the identities of the record holders, the identities and capacities of the many plaintiffs, and the time frame in which the representations were made. We acknowledge the allegations of fraud lack the specific detailed minutiae desired by the Highland defendants. Those details, however, are properly the subject of discovery, not demurrer. The magnitude of the fraudulent scheme alleged and the number of plaintiffs involved invoke the analogy to the fact situa-

14 Cal. App. 4th 1692, *; 19 Cal. Rptr. 2d 555, **;
1993 Cal. App. LEXIS 435, ***; 93 Cal. Daily Op. Service 2989

tion in *Committee on Children's Television, Inc. v. General Foods Corp., supra, 35 Cal.3d 197, 214.*)

In that case, the court rejected a lack of specificity argument based on the following reasoning, which we find instructive here: "Plaintiffs allege that defendants carried out a large scale program of deceptive advertising in which the specific advertisements change constantly, but all follow a pattern of making, in one form or another, certain misleading and deceptive representations. If such is the case, to require plaintiffs to plead the specifics of each advertisement would [***45] render a suit challenging the overall program impractical. The complaint would have to include thousands of pages setting out specifics which are largely within defendants' knowledge. The cost and difficulty of compiling, organizing, and setting down the information would seriously deter the filing of such complaint. The effect of such a pleading requirement, moreover, would not be limited to discouraging private suits; it would also seriously hamper suits by public officials seeking to enjoin schemes of unfair competition and deceptive advertising." (*Committee on Children's Television, Inc. v. General Foods Corp., supra, 35 Cal.3d 197, 214.*)

### C. *NO FRAUDULENT CONCEALMENT CAUSE OF ACTION STATED*

**(12)** Defendants claim no cause of action is stated for fraudulent concealment for two reasons: (1) the Highland defendants were under no legal duty to disclose the concealed facts at issue; and (2) in any event, the cause of action erroneously assumes someone who lends money on the security of real property may, by virtue of that activity, assume the obligations of ownership. They point out unless the defendant is under a duty [***46] to disclose, concealment of a fact is not actionable. ( *Civ. Code, § 1710, subd. (3)*.) Defendants argue there is no duty to disclose here because *section 1962 of the Civil Code* does not require the disclosure of the name and address of the [*1719] owner of certain real property. Such a requirement, according to defendants, is based on the assumption "that Section 1962 [**571] imposes an owner of real property a duty to disclose his or her name and address *even when the name and address of an agent for the owner, such as a property manager, is disclosed*. That assumption is fallacious."

They further argue "someone that lends money on the security of, but does not have possession and control of, real property may [not], by virtue of that activity, become the 'beneficial' or 'responsible' owner of such property and thereby assume the obligations of ownership [and thus, the duty to disclose under *Civil Code section 1962*] to [the] tenants."

We agree no cause of action for fraudulent concealment is stated but not for the reasons given by defen-

dants. The thrust of this cause of action is to compel the beneficial owners to disclose such beneficial ownership to the tenant plaintiffs to [***47] enable the latter to seek "civil relief or governmental enforcement of the law from the responsible non-record owner defendants." Plaintiffs concede as much in their reply brief: "If the tenants had known that the one in control of the property was a bank, they would be far more likely to bring an action to have the property repaired than they would were the owner a person having substantially no assets."

A plain reading of *section 1962 of the Civil Code* [16] reveals its disclosure provisions do not give rise to a duty to disclose the name and address of a beneficial owner. All that is required under section 1962 is the disclosure of "the name and usual street address at which personal service may be effected [*1720] of each person who is: (1) Authorized to manage the premises[; and] (2) An owner of the premises or who is authorized to act for and on behalf of the owner for the purpose of service of process and for the purpose of receiving and receipting for all notices and demands." ( *Civ. Code, § 1962*.) The reference to "an owner of the premises" is to the record owner, not the beneficial owner. This is clear from the language of subdivision (e) of *Civil Code section 1962*, [***48] which provides: "Nothing in this section limits or excludes the liability of any undisclosed owner."

16    *Civil Code section 1962* provides:

"(a) Any owner of a dwelling structure specified in *Section 1961* or a party signing a rental agreement or lease on behalf of the owner shall disclose therein the name and usual street address at which personal service may be effected of each person who is:

"(1) Authorized to manage the premises.

"(2) An owner of the premises or who is authorized to act for and on behalf of the owner for the purpose of service of process and for the purpose of receiving and receipting for all notices and demands.

"(b) In the case of an oral rental agreement the owner or a person acting on behalf of the owner for the receipt of rent or otherwise, on written demand, shall furnish the tenant with a written statement containing the information required by subdivision (a).

"(c) The information required by this section shall be kept current and this section shall extend to and be enforceable against any successor owner or manager, who shall comply with this section within 15 days of succeeding the previous owner or manager.

14 Cal. App. 4th 1692, *; 19 Cal. Rptr. 2d 555, **;
1993 Cal. App. LEXIS 435, ***; 93 Cal. Daily Op. Service 2989

"(d) A party who enters into a rental agreement on behalf of the owner who fails to comply with this section is deemed an agent of each person who is an owner:

"(1) For the purpose of service of process and receiving and receipting for notices and demands.

"(2) For the purpose of performing the obligations of the owner under law and under the rental agreement.

"(e) Nothing in this section limits or excludes the liability of any undisclosed owner."

[***49] DISPOSITION

The judgment is reversed with directions to the court: (1) to strike the allegation that Highland charged "points and provided for interest, each of which was higher than the rates for bona fide loans transactions"; (2) to strike prayer item (3)(h); (3) to strike subparagraph (e) of paragraph 151 of the second amended complaint; and (4) to conduct further proceedings consistent with the views expressed herein. The plaintiffs shall recover their costs on appeal.

Klein, P. J., and Hinz, J., concurred.

A petition for a rehearing was denied February 25, 1993, and respondents' petition for review by the Supreme Court was denied April 22, 1993.

10037F

********** Print Completed **********

Time of Request: Friday, January 25, 2008  23:09:23 EST

Print Number:    1821:71633197
Number of Lines: 948
Number of Pages:

Send To:  RICHARDS, MICHELLE
          FARELLA BRAUN & MARTEL
          235 MONTGOMERY ST
          SAN FRANCISCO, CA 94104-2902