# Exhibit F

**APPENDIX OF NON-FEDERAL AND UNPUBLISHED FEDERAL AUTHORITIES
CITED IN VISA USA INC.'S REPLY IN SUPPORT OF MOTION TO STAY
ACTION AND TO COMPEL ARBITRATION**

21823\1392810.1

LEXSEE 121 CAL. APP. 4TH 282

**FRANK T. VEGA, Plaintiff and Appellant, v. JONES, DAY, REAVIS & POGUE, Defendant and Respondent.**

**B170659**

**COURT OF APPEAL OF CALIFORNIA, SECOND APPELLATE DISTRICT, DIVISION EIGHT**

*121 Cal. App. 4th 282; 17 Cal. Rptr. 3d 26; 2004 Cal. App. LEXIS 1263; 2004 Cal. Daily Op. Service 7000; 2004 Daily Journal DAR 9475*

**August 2, 2004, Filed**

**SUBSEQUENT HISTORY:** Rehearing denied by *Vega v. Jones, Day, Reavis & Pogue, 2004 Cal. App. LEXIS 1497 (Cal. App. 2d Dist., Aug. 30, 2004)*
Review denied by *Vega v. Jones, 2004 Cal. LEXIS 10281 (Cal., Oct. 27, 2004)*

**PRIOR HISTORY:**    [***1]  Superior Court for the County of Los Angeles, No. BC295541, Judith C. Chirlin, Judge.

**DISPOSITION:** Reversed.

**SUMMARY:**

CALIFORNIA OFFICIAL REPORTS SUMMARY

A shareholder in the acquired company of a merger transaction sued the acquiring company's law firm for fraud and negligent misrepresentation, alleging the firm concealed the "toxic" terms of a third party financing transaction to deceive him into exchanging his valuable stock in the acquired company for worthless toxic stock in the acquiring company. The financing transaction between the acquiring company and a third party included toxic stock provisions, under which the investors received convertible preferred stock that seriously diluted the shares of all other stockholders. The law firm allegedly knew that full disclosure of the toxic stock terms would prevent the merger and without the merger the financing would not be possible and the acquiring corporation would go out of business. The firm offered shareholders a sanitized version of the disclosure schedule in the consent form that excluded the toxic stock provisions. Two weeks before the merger took place the firm filed a certificate with the Delaware Secretary of State that included the toxic provisions. The law firm filed a demurrer, which the trial court sustained and ordered the

complaint dismissed without leave to amend. (Superior Court of the County of Los Angeles, No. BC295541, Judith C. Chirlin, Judge.)

The Court of Appeal reversed. The court held that the complaint alleged the law firm, while expressly undertaking to disclose the financing transaction, provided disclosure schedules that did not include material terms of the transaction; thus the complaint properly stated a fraud claim based on nondisclosure. The mere statement that the financing being negotiated was standard and nothing unusual was not actionable misrepresentation. When the firm expressly undertook to disclose the terms of the financing transaction, it was not at liberty to conceal a material term, and the disclosure of a half-truth calculated to deceive was fraud. The mere fact information exists somewhere in the public domain is not conclusive evidence that no concealment occurred. The question of whether the firm intentionally concealed the information in order to induce the shareholders and whether the certificate containing the correct information filed with the Delaware Secretary of State made the information reasonably accessible were questions of fact to be resolved on the [*283]  evidence, not as a matter of law on a demurrer. The alleged concealment of the toxic terms to induce the exchange of stock set forth in the complaint sufficiently apprised the firm of the facts to allow it to prepare its defense. The issue of when the period of limitations began to run was a question that could not be resolved on demurrer. The earlier lawsuits filed by shareholders of the same acquired company did not require application of the doctrine of res judicata where the shareholder was not a party to those suits, had no proprietary or financial interest in them and had no control over them. (Opinion by Boland, J., with Cooper, P. J., and Rubin, J., concurring.)

**HEADNOTES**

121 Cal. App. 4th 282, *; 17 Cal. Rptr. 3d 26, **;
2004 Cal. App. LEXIS 1263, ***; 2004 Cal. Daily Op. Service 7000

CALIFORNIA OFFICIAL REPORTS HEADNOTES
Classified to California Digest of Official Reports

**(1) Attorneys at Law § 26--Attorney-client Relationship--Liability of Attorneys--Fraud: Fraud and Deceit § 5--Attorneys--False Representations--Statements of Material Fact.--**A fraud claim against a lawyer is no different from a fraud claim against anyone else. While an attorney's professional duty of care extends only to his own client and intended beneficiaries of his legal event, the limitations on liability for negligence do not apply to liability for fraud. Accordingly, a lawyer communicating on behalf of a client with a nonclient may not knowingly make a false statement of material fact to the nonclient and may be liable to a nonclient for fraudulent statements made during business negotiations.

**(2) Fraud and Deceit § 6--False Representations--Statements of Opinion or Belief--Casual Expression of Belief.--**A mere statement that a $ 10 million financing arrangement being negotiated with a third party was "standard" and "nothing unusual" was not itself an actionable misrepresentation during a merger between two corporations. While expressions of professional opinion are sometimes treated as representations of fact, a casual expression of belief is not similarly treated. No party to a major transaction could reasonably rely on a casual statement by counsel for another party to the transaction.

**(3) Fraud and Deceit § 8--False Representations--Active Concealment--"Toxic" Stock Provisions in Financing Agreement.--**When a stockholder of an acquired corporation who exchanged his valuable stock for stock in the acquiring corporation alleged that the acquiring corporation counsel deliberately or with a reckless disregard of the truth concealed "toxic" stock provisions in a financing agreement from the [*284] stockholder, those allegations stated an active concealment or suppression of facts. So long as the remaining elements of a fraud claim were met the allegations were not deficient and a demurrer should not have been sustained.

[5 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 678.]

**(4) Fraud and Deceit § 8--False Representations--Concealment of a Material Term--Half-truth Voluntarily Offered.--**Counsel representing the acquiring corporation in a merger, who had specifically undertaken responsibility to disclose a financing transaction that involved "toxic" stock provisions, was not at liberty to then conceal a material term, such as the existence of the toxic stock provisions. Even where no duty to disclose would otherwise exist, where one does speak he must speak the whole truth to the end that he does not conceal

any facts which materially qualify those stated. One who is asked for or volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud. Counsel representing the acquiring corporation in a merger that provides a disclosure schedule which deliberately omits material facts that would stop the merger clearly fits this category of fraud.

**(5) Fraud and Deceit § 8--False Representations--Concealment of a Material Term--Questions of Fact.--**The mere fact that information exists somewhere in the public domain is by no means a conclusive bar to a concealment claim. The question in a nondisclosure case is whether the defendant knew of material facts, and also knew that those facts were neither known nor readily accessible to the plaintiff. Thus, the question of intentional concealment was not one to be resolved as a matter of law on a demurrer where counsel representing an acquiring corporation in a merger allegedly knew about "toxic" provisions in the financing agreement and expressed a desire to disclose the information but actually disclosed a sanitized version without the toxic stock terms. Counsel knew the facts were unknown to stockholders of the acquired corporation, unless, and only to the extent that, counsel or the acquiring corporation disclosed those terms. The point of disclosing material information in a transaction is that it was not otherwise available to the other side. Questions as to whether counsel intentionally concealed that information in order to induce the shareholder to believe the transaction was standard, and whether the consent form indicating that a certificate regarding the investment and its terms would be filed in Delaware in the [*285] future made the toxic terms reasonably accessible to the shareholder, were questions of fact to be resolved on the evidence.

[3 Witkin, Cal. Procedure (4th ed. 1996) Actions, § 602 et seq.; 5 Witkin, Cal. Procedure (4th ed. 1997) Pleading, §§ 668, 678; 7 Witkin, Cal. Procedure (4th ed. 1997) Judgment, § 393; 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, §§ 506, 677; 9 Witkin, Summary of Cal. Law (9th ed. 1989) Corporations, § 179 et seq.]

**(6) Fraud and Deceit § 32--Actions--Damages--Concealment of a Material Term.--**When a stockholder of an acquired corporation in a concealment claim alleged that, had full disclosure been made concerning "toxic" provisions in the acquiring corporation's financing agreement with a third party, he would not have exchanged his valuable stock for the acquiring corporation's "toxic" stock, those allegations, if true, would show the nondisclosure resulted in damage.

**(7) Fraud and Deceit § 8--False Representations--Concealment of a Material Term--Pleading.--**In a concealment case, the pertinent question was not who said

121 Cal. App. 4th 282, *; 17 Cal. Rptr. 3d 26, **;
2004 Cal. App. LEXIS 1263, ***; 2004 Cal. Daily Op. Service 7000

what to whom but rather, the question was whether the attorney for an acquiring corporation in a merger, in undertaking to disclose a $ 10 million financing agreement, intentionally concealed the agreement's "toxic" terms from shareholders of the acquired corporation so that they would proceed with the transaction. The complaint setting forth these allegations sufficiently apprised the attorneys of the facts of shareholder's fraud claim to allow them to prepare their defense.

**(8) Corporations § 28--Stockholders--Derivative Actions: Fraud and Deceit § 8--False Representations--Concealment of a Material Term.**--A derivative suit is a suit brought on behalf of a corporation; the action is derivative if the gravamen of the complaint is injury to the corporation or the whole body of its stock, or it seeks to recover assets for the corporation. Thus, when a stockholder sought to recover for an injury to himself when he was deceived into exchanging his valuable stock in an acquired corporation for worthless "toxic" stock in the acquiring corporation, the action was not derivative.

**(9) Limitation of Actions § 73--Pleading--Demurrer--Commencement of Limitation Period--Question of Fact.**--The statute of limitations commences to run only after one has knowledge of facts sufficient to make a reasonably prudent person suspicious of fraud, thus putting him on inquiry. The means of knowledge are equivalent to knowledge only where there is a duty to inquire, as where plaintiff is [*286] aware of facts which would make a reasonably prudent person suspicious. Whether a shareholder's knowledge that a $ 10 million financing transaction would occur, standing alone, should have made him suspicious of fraud, or suspicious that the transaction might contain "toxic" terms that would affect the value of his stock in a pending corporate merger was a question of fact. Whether other circumstances existed which, in conjunction with knowledge of the existence of the financing transaction, would have made a prudent person suspicious was a question that could not be resolved on demurrer.

**(10) Judgments § 68--Res Judicata--Identity of Parties--Sufficiently Close Relationship Between the Parties--Reasonable Expectation.**--The doctrine of res judicata precludes parties or their privies from relitigating issues decided in a prior action in which a final judgment on the merits was entered. The concept of privity includes a relationship between the party to be estopped and the unsuccessful party in the prior litigation which is sufficiently close so as to justify application of the doctrine of collateral estoppel. Notwithstanding expanded notions of privity, due process requirements must be satisfied. In addition to an identity or community of interest between the party to be estopped and the losing party in the first action, and adequate representation by the latter, the circumstances must have been such that the party to be estopped should reasonably have expected to be bound by the prior adjudication.

**(11) Judgments § 68--Res Judicata--Identity of Parties--Lack of Sufficiently Close Relationship Between the Parties.**--A shareholder should not reasonably have expected to be bound by the adjudication of lawsuits in which he did not participate in any way, in which he had no proprietary or financial interest, and over which he had no control of any sort. The only relationship between the shareholder and the prior lawsuit was that he and the plaintiffs in those suits were shareholders in the same company. This was not a sufficiently close relationship to justify application of the principle of preclusion.

COUNSEL: Manuel R. Ramos for Plaintiff and Appellant.

Gibson, Dunn & Crutcher, James P. Fogelman, Joel M. Tantalo and Sarah R. Long for Defendant and Respondent.

JUDGES: Boland, J., with Cooper, P. J., and Rubin, J., concurring.

OPINION BY: BOLAND [*287]

OPINION

[**28] BOLAND, J.--

**SUMMARY**

A shareholder in a company acquired in a merger transaction sued the law firm which represented the acquiring company for fraud. He alleged the law firm concealed the so-called toxic terms of a third party financing transaction, and thus defrauded him into exchanging his valuable stock in the acquired company for "toxic" stock in the acquiring company. The law firm demurred. It contended it [**29] made no affirmative misstatements and had no duty to disclose the terms of the third party investment to an adverse party in the merger transaction. We conclude the complaint stated a fraud claim based on nondisclosure. The complaint alleged the law firm, while expressly undertaking to disclose the financing transaction, provided disclosure schedules that did not include material terms of the transaction.

**[***2] FACTUAL AND PROCEDURAL BACKGROUND**

Frank T. Vega (Vega), a 23 percent shareholder in a company known as Monsterbook.com, sued Jones, Day,

121 Cal. App. 4th 282, *; 17 Cal. Rptr. 3d 26, **;
2004 Cal. App. LEXIS 1263, ***; 2004 Cal. Daily Op. Service 7000

Reavis & Pogue (Jones Day), a law partnership, for fraud and negligent misrepresentation in connection with a merger transaction. In the merger transaction, Jones Day represented Transmedia Asia Pacific, Inc., which acquired Monsterbook. Monsterbook and Vega were represented by the law firm of Heller, Ehrman, White & McAuliffe (Heller Ehrman).

The terms of the acquisition included Vega's receipt of restricted stock in Transmedia in exchange for his interest in Monsterbook. Monsterbook and Vega accepted the merger offer on March 8, 2000. Closing occurred on April 13, 2000, when the two companies exchanged stock based on a $ 15 million valuation of Monsterbook. Vega thus exchanged stock valued at $ 3.45 million for the restricted Transmedia stock.

During the weeks between Vega's acceptance of the merger offer on March 8 and the closing on April 13, Transmedia, which "[e]verybody knew ... was an iffy company," sought and secured $ 10 million in investment financing from a third party. [1] The terms of Transmedia's $ 10 million third party [*288] financing transaction included so-called toxic [***3] stock provisions, under which the investors received convertible preferred stock that seriously diluted the shares of all other Transmedia stockholders. Both Transmedia and Jones Day knew that "toxic" stock financing is a "desperate and last resort of financing for a struggling company" and that 95 percent of companies who engage in such financing end up in bankruptcy.

1    Transmedia's Form 10-K annual report for fiscal year 1998, filed with the Securities and Exchange Commission, indicated Transmedia's working capital deficit raised "substantial doubt about its ability to continue as a going concern," and that its ability to do so was dependent on its ability to continue to effect sales of equity securities and issue of debt. Its annual report for fiscal year 1999, filed January 13, 2000, showed a slightly larger working capital deficit, decreased revenues and an increased net loss.

Jones Day prepared a two-page disclosure schedule that clearly described and properly disclosed the "toxic" provisions of the [***4] $ 10 million investment, but did not send the disclosure to Vega, Monsterbook or Heller Ehrman. Jones Day knew that a full disclosure of the "toxic" terms of the financing would have "killed the acquisition," without which Transmedia would not have obtained the financing and would have gone out of business. Instead, Vega, Monsterbook and Heller Ehrman were told, on about March 16, 2000, that the $ 10 million financing then being negotiated was "standard" and "nothing unusual" and that Jones Day and Transmedia would supply additional documents to support these

characterizations of the financing. [2] [**30] No documents showing the "toxic" nature of the investment were provided; instead, Jones Day supplied Heller Ehrman with "a different sanitized version" of the disclosure schedule which did not include the "toxic" stock provisions.

2    On March 16, 2000, Heller Ehrman sent an e-mail informing Monsterbook and Vega as follows: "On another note, I received a call from the lawyers for Transmedia. ... There are a couple of disclosure issues relating to Transmedia that came up. Specifically, they are revising their most recent 10K (annual report) and are also about to close a private stock financing. Neither of these were included in the disclosure schedules that they sent to us, and they want them included--which means that they have to wait until they sort out their books. I have not spoken directly with their attorneys, we've just traded phone messages. Tom Stromberg who has been working on this deal also gave them a call. Neither we nor Transmedia's attorneys think that this is a big deal as it relates to the MonsterBook acquisition, but it will delay closing."

[***5] Jones Day also prepared, and Transmedia sent to Monsterbook and Vega, a consent form concerning the $ 10 million investment, which Vega signed. The consent form stated that the $ 10 million investment would be convertible into an aggregate maximum of 6,815,000 shares of common stock, "thus misrepresenting that it fell within the 20% dilution 'toxic' cap mandated by NASD Rule 4350(i)(1)(D)." On March 28, 2000, two weeks before the closing of Transmedia's acquisition of Monsterbook, Jones Day filed a "Certificate of Designation" with the Delaware Secretary of State, certifying the creation of the convertible preferred stock. This document, available to the public, contained all the terms of the financing, including the "toxic" provisions.

The closing of the Monsterbook acquisition occurred on April 13, 2000. Eight months later, on December 14, 2000, Vega learned for the first time, [*289] through a press release issued by Transmedia, about the "toxic" stock provision of the $ 10 million financing. Several legal actions ensued.

First, on October 2, 2001, Monsterbook's former majority shareholder, William H. McKee, who had owned 70.125 percent of Monsterbook's stock, sued Heller Ehrman for [***6] legal malpractice. In a first amended complaint on November 21, 2001, McKee and a second shareholder, Paul R. Estrada, who had held a 1.486 percent interest in Monsterbook, also named Transmedia and Jones Day as defendants, alleging causes of action for fraud and negligent misrepresentation.

121 Cal. App. 4th 282, *; 17 Cal. Rptr. 3d 26, **;
2004 Cal. App. LEXIS 1263, ***; 2004 Cal. Daily Op. Service 7000

Second, on December 14, 2001, another shareholder, John Cuero, who had held a 2 percent interest in Monsterbook, sued Heller Ehrman, Jones Day, and Transmedia. This suit was consolidated with McKee's lawsuit. In the consolidated actions, Jones Day sought and obtained summary judgment, and judgment was entered in its favor on August 23, 2002. [3] Estrada waived his right to appeal; McKee abandoned his appeal; and Cuero's appeal was dismissed at his request.

3    The complaint in McKee's lawsuit, unlike Vega's complaint, did not allege that Jones Day prepared a complete disclosure of the $ 10 million financing, but provided Heller Ehrman with a sanitized version of the disclosure schedule without the toxic stock provisions. The trial court in the McKee case (Judge James C. Chalfant) concluded that: (1) Jones Day's statements that the preferred stock offering was "no big deal" and "standard" were nonactionable expressions of opinion. Because Jones Day's loyalty was owed only to Transmedia, not to Monsterbook's shareholders, Jones Day had no duty to disclose the details of the transaction. The statement was also nonactionable because of its casual nature, so that it could not be relied on by anyone. (2) The consent form prepared by Jones Day and signed by Transmedia and McKee was not a representation by Jones Day; and there was no evidence that the consent form--concerning the aggregate maximum of 6,815,000 shares--was a misrepresentation or a misleading half-truth. Therefore, Jones Day had no duty to disclose other terms of the preferred stock transaction. (3) McKee and the other shareholders could not have justifiably relied on Jones Day's opinions; any reliance on Jones Day's opinion that the transaction was "standard" or "no big deal" would have been unreasonable as a matter of law.

[***7] [**31] Third, on May 12, 2003, Vega filed this lawsuit against Jones Day and Transmedia, and Jones Day demurred. [4] The demurrer to the fraud claim was sustained, without leave to amend, on multiple grounds, as follows:

- The claim did not allege an actionable, affirmative misstatement by Jones Day;

- Vega could not justifiably have relied on the statements allegedly made by Jones Day;

- Because Jones Day owed Vega no duty to disclose, Vega could not state a claim based on omission or nondisclosure;

[*290] - Vega did not allege damages proximately caused by Jones Day;

- Vega had no standing to bring the claim because it was derivative in nature;

- The claim was barred by the statute of limitations; and

- The claim was barred by res judicata.

Jones Day's demurrer to the negligent misrepresentation claim was sustained on the same grounds and, in addition, because a negligent misrepresentation claim cannot be based on an omission or nondisclosure. The court also concluded Vega failed to plead both causes of action with the requisite specificity.

4    Transmedia's default was entered on October 2, 2003.

[***8] The trial court's order sustaining the demurrers and dismissing Vega's complaint with prejudice was filed August 5, 2003, and this appeal followed. [5]

5    The trial court's order dismissed Vega's complaint with prejudice, but no judgment was entered for Jones Day in accordance with the order. Since the case is fully briefed, in the interests of judicial economy we will construe the order as a judgment of dismissal. (See *Smith v. Hopland Band of Pomo Indians (2002) 95 Cal.App.4th 1, 3, fn. 1 [115 Cal. Rptr. 2d 455]* [premature appeal from order sustaining demurrer and granting motion to dismiss; "[a]lthough we fail to understand why the clearly established law on this point continues to be disregarded, in the interest of judicial economy, we shall deem the order to incorporate a judgment of dismissal"].)

## DISCUSSION

Vega's allegations may be summarized as follows. Jones Day hid the existence of the "toxic" stock provisions with the intent to induce Vega to give up his valuable stock in Monsterbook in exchange [***9] for Transmedia's "toxic" and worthless stock. Jones Day knew about the "toxic" stock provisions, and knew the acquisition would not occur if Monsterbook, Vega and their lawyers discovered them. Jones Day deliberately concealed the "toxic" stock provisions by telling Heller Ehrman the transaction was "standard" and "nothing unusual," by failing to provide the proper written disclosure it prepared, and by instead providing a different, sanitized version of the disclosure. Vega did not know, and had no reason to suspect, that the financing contained "toxic" provisions, and would not have given up his valuable stock in Monsterbook had he known. As a result of Jones Day's concealment of the "toxic" terms of the financing, Vega lost his $ 3.45 million interest in Monsterbook.

[*291]  We agree with Vega that the complaint properly states a fraud claim.

(1)  Before we analyze the elements of the claim, we note the governing legal principles. A fraud claim against a lawyer is no different from a fraud claim against anyone else. " 'If an attorney commits actual fraud in his dealings with a third party, the fact he did so in the capacity of attorney for a client does not relieve him [**32] of liability.' " [***10] ( *Shafer v. Berger, Kahn, Shafton, Moss, Figler, Simon & Gladstone (2003) 107 Cal.App.4th 54, 69 [131 Cal. Rptr. 2d 777]* (*Shafer*), quoting *Jackson v. Rogers & Wells (1989) 210 Cal. App. 3d 336, 345 [258 Cal. Rptr. 454].*) While an attorney's professional duty of care extends only to his own client and intended beneficiaries of his legal work, the limitations on liability for negligence do not apply to liability for fraud. (*Ibid.*) Accordingly, a lawyer communicating on behalf of a client with a nonclient may not knowingly make a false statement of material fact to the nonclient ( *Shafer, supra, 107 Cal.App.4th at p. 69*), and may be liable to a nonclient for fraudulent statements made during business negotiations. ( *Cicone v. URS Corp. (1986) 183 Cal. App. 3d 194, 202 [227 Cal. Rptr. 887]* ["the case law is clear that a duty is owed by an attorney not to defraud another, even if that other is an attorney negotiating at arm's length"].)

With these principles in mind, we turn to the elements of fraud, which are: "(1) representation; (2) falsity; (3) knowledge of falsity; (4) intent to deceive; and (5) reliance and resulting damage (causation)." [***11] (5 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 668, p. 123.) Active concealment or suppression of facts by a nonfiduciary "is the equivalent of a false representation, i.e., actual fraud." (*Id.,* § 678, p. 136, italics omitted.) We treat the various elements, and the bases for the trial court's decision, in turn.

1. *False representation.*

(2)  We agree with Jones Day that a mere statement that the $ 10 million financing then being negotiated was "standard" and "nothing unusual" is not itself an actionable misrepresentation. While expressions of professional opinion are sometimes treated as representations of fact, a "casual expression of belief" is not similarly treated. ( *Bily v. Arthur Young & Co. (1992) 3 Cal.4th 370, 408 [11 Cal. Rptr. 2d 51, 834 P.2d 745],* quoting *Gagne v. Bertran (1954) 43 Cal.2d 481, 489 [275 P.2d 15].*) Moreover, no party to a major transaction could reasonably rely on a casual statement by counsel for another party to the transaction. [6]

6    The demurrer to Vega's cause of action for negligent misrepresentation was properly sustained by the trial court, since such a claim re-

quires a positive assertion. ( *Wilson v. Century 21 Great Western Realty (1993) 15 Cal.App.4th 298, 306 [18 Cal. Rptr. 2d 779]* [negligent misrepresentation is a species of fraud requiring a positive assertion; an implied assertion or representation is not enough].) Since no positive assertions are alleged, other than the comments that the financing was "standard" and "nothing unusual," no claim for negligent misrepresentation is stated.

[***12]  [*292]  (3)  More problematic, however, is the question of active concealment or suppression of facts, which is the equivalent of a false representation. Vega alleges that Jones Day, after telling Heller Ehrman that Transmedia was about to close a $ 10 million private stock transaction which it wanted to include in its disclosure schedules, prepared a proper disclosure schedule containing the pertinent terms, but provided a "different sanitized version" of the schedule, without the "toxic" stock provisions. Thus, Vega alleges that Jones Day "deliberately or with a reckless disregard of the truth concealed the 'toxic' stock provisions" from Vega, Monsterbook and Heller Ehrman. These allegations state an "active concealment or suppression of facts." [7] (5 Witkin, Cal. Procedure, [**33] *supra,* § 678, p. 136, italics omitted.) So long as the remaining elements of a fraud claim are met (see discussion *post*), we are unable to conclude these allegations are deficient.

7    See *Civil Code sections 1710, subdivision 3* (defining deceit as including "[t]he suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact"), and *1572, subdivision 3* (defining actual fraud in a contract setting to include the "suppression of that which is true, by one having knowledge or belief of the fact").

[***13]  (4)  Jones Day contends that fraud based on concealment requires that the defendant have a duty to disclose the suppressed fact, and that as counsel for the adverse party in a merger, Jones Day owed no duty to disclose to Vega or Monsterbook the terms of the third party $ 10 million investment. Thus, the disclosure schedule, they contend, "is entirely irrelevant" because Jones Day had no duty to provide it to Monsterbook or Vega or Heller Ehrman. We disagree. Jones Day specifically undertook to disclose the transaction and, having done so, is not at liberty to conceal a material term. Even where no duty to disclose would otherwise exist, "where one does speak he must speak the whole truth to the end that he does not conceal any facts which materially qualify those stated. [Citation.] One who is asked for or volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud." ( *Cicone v. URS*

121 Cal. App. 4th 282, *; 17 Cal. Rptr. 3d 26, **;
2004 Cal. App. LEXIS 1263, ***; 2004 Cal. Daily Op. Service 7000

*Corp., supra, 183 Cal. App. 3d at p. 201; Shafer, supra, 107 Cal.App.4th at p. 72.)*

Jones Day insists this case is controlled by *B.L.M. v. Sabo & Deitsch* (1997) 55 *Cal.App.4th 823 [64 Cal. Rptr. 2d 335] (B.L.M.),* and that *B.L.M.* [***14] held that defendant attorneys owed no duty of care to the adverse party when they provided an opinion on a material aspect of the transaction at issue. Jones Day misconstrues *B.L.M.,* a case with which we have no quarrel. The defendant lawyers in *B.L.M.* specifically stated an opinion on a material point in the transaction on which third party B.L.M. relied. The court concluded that "it would be inappropriate to hold an attorney liable to a third party for a legal opinion which the third party could not, under the Rules of Professional [*293] Conduct, have contracted to obtain from that attorney." ( *B.L.M., supra,* 55 *Cal.App.4th at p. 839.)* The court therefore held that B.L.M.'s reliance on the legal opinion of another party's lawyers "was not justifiable under the facts alleged ... ." *(Ibid.)* The court specifically stated: "We do not suggest that an attorney should be exempt from liability for negligent misrepresentation under circumstances in which a nonattorney could be held liable; we merely decline to extend professional liability under a negligent misrepresentation theory to individuals who are not clients of the attorney." *(Ibid.,* fn. omitted.)

[***15] *B.L.M.* is entirely inapposite. First, plaintiff B.L.M.'s claims were grounded solely in professional negligence--not fraud. On appeal, B.L.M. argued it should be permitted to proceed against the attorneys under a theory of negligent misrepresentation--not fraud. The court reviewed that contention, and ultimately concluded B.L.M. failed to sufficiently allege that the lawyers had the intent to induce B.L.M.'s reliance on their representations, or that the reliance of B.L.M. was justifiable "under the circumstances of the case." ( *B.L.M., supra,* 55 *Cal.App.4th at p. 835.)* Second, as the court in *B.L.M.* pointed out, third parties may recover against an attorney under a negligent misrepresentation theory, in cases involving misrepresentations of fact rather than legal opinions. ( *Id. at pp. 839-840.)* The case under review involves the lawyers' alleged concealment [**34] of a material fact in a transaction the lawyers undertook to disclose--not the expression of an inaccurate legal opinion as in *B.L.M.* Consequently, Jones Day can take no comfort from *B.L.M.,* which is in no way inconsistent with our conclusion here. Certainly Jones Day had no [***16] professional duty of care to Vega as an adverse party in the merger transaction. However, as in *Shafer,* Jones Day did have the same duty others have " 'not to defraud another, even if that other is an attorney negotiating at arm's length.' " ( *Shafer, supra, 107 Cal.App.4th at p. 71,* quoting *Cicone v. URS Corp., supra, 183 Cal. App. 3d at p. 202.)*

Jones Day contends that *Shafer* is irrelevant, and suggests the result there was due to "the peculiar circumstances." In *Shafer,* the court held that an attorney, who was retained by an insurance company to provide coverage advice in a lawsuit against its insured, could be held liable to the plaintiffs in that lawsuit for making a fraudulent statement about coverage. ( *Shafer, supra, 107 Cal.App.4th at p. 59.)* This case is different, Jones Day says, because Vega has not alleged an affirmative misstatement of fact made to him by Jones Day, and because Vega cannot allege any "special circumstances that would give rise to an independent duty of disclosure owed by Jones Day to him." [8] Neither of these asserted differences assists Jones Day. First, *Shafer* [*294] indeed [***17] involved an affirmative false statement, while this case involves the concealment or suppression of material facts. However, we can deduce no reason why a lawyer may be liable for one form of fraud but not the other. (See *Lovejoy v. AT&T Corp. (2001) 92 Cal.App.4th 85, 97 [111 Cal. Rptr. 2d 711]* [it is established by statute " 'that intentional concealment of a material fact is an alternative form of fraud and deceit equivalent to direct affirmative misrepresentation,' " quoting *Stevens v. Superior Court (1986) 180 Cal. App. 3d 605, 608 [225 Cal. Rptr. 624]*]; 5 Witkin, Cal. Procedure, *supra,* § 678, p. 136 [active concealment or suppression of facts is the equivalent of a false representation].) Second, Jones Day's invocation of the principle that fraud based on nondisclosure requires an "independent duty of disclosure" is erroneous. In some but not all circumstances, an independent duty to disclose is required; active concealment may exist where a party "[w]hile under no duty to speak, nevertheless does so, but does not speak honestly or makes misleading statements or suppresses facts which materially qualify those stated." [9] (*BAJI No. 12.37;* [**35] *Cicone v. URS Corp., supra, 183 Cal. App. 3d at p. 201* [***18] ["[o]ne who is asked for or volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud"].) Providing a disclosure schedule which deliberately omitted material facts seems clearly to fit this category.

8    In *Shafer, supra, 107 Cal.App.4th 54,* the Shafers recovered a judgment against an insured, and asked the insurer to satisfy the judgment. The insurer's lawyer told the Shafers that the insurer had not agreed to provide indemnity for willful acts, while in fact, as the lawyer well knew, the insurer had agreed to such indemnification; the lawyer made the false statement to induce the Shafers to forgo full payment on the judgment. ( *Shafer, supra, 107 Cal.App.4th at p. 66.)* The court observed that the lawyer "owed the Shafers a duty not to make fraudulent statements about

121 Cal. App. 4th 282, *; 17 Cal. Rptr. 3d 26, **;
2004 Cal. App. LEXIS 1263, ***; 2004 Cal. Daily Op. Service 7000

the insurance coverage provided by [the insurer]." ( *Id. at p.* 67.) Jones Day says that in *Shafer*, the applicable provisions of the insurance code gave rise to a "special relationship" and "independent duties" to the plaintiffs since they were third party beneficiaries of the insurance contract. However, *Shafer* nowhere requires, or suggests the need for, a "special relationship" as a predicate to a fraud claim against a lawyer. Indeed, while the facts in *Shafer* are different, the principle it applied was not new. *Shafer* refers to sources citing cases from 28 states holding that an attorney can be liable to a nonclient, even an adversary in litigation, for fraud or deceit. ( *Shafer, supra,* 107 Cal.4th at p. 75.)

[***19]
9    See also· *Pavicich v. Santucci (2000)* 85 Cal.App.4th 382, 398 [102 Cal.Rptr.2d 125] ("[t]his is not a situation where we are required to apply the rule that a 'duty to disclose a material fact normally arises only where there exists a confidential relation between the parties or other special circumstances require disclosure ... .' [Citation.] This .is because of the principle that 'where one does speak he must speak the whole truth to the end that he does not conceal any facts which materially qualify those stated' "), quoting *Cicone v. URS Corp., supra,* 183 Cal.App.3d at page 201.

### 2. Justifiable reliance.

Jones Day argues that publicly available·information cannot form the basis for a concealment claim, and Vega, with reasonable diligence, could have known about the "toxic" stock provisions. Jones Day points out that Vega had notice, in the consent form he signed, that a "Certificate of Designation" regarding the $ 10 million investment and its terms would be filed with the    [*295] Delaware Secretary of State at some time in the future, and that this certificate,    [***20] containing all the financing terms, was in fact filed two weeks before the merger closed. [10]

10    While both parties refer to the consent form, it is not a part of the record in this case.

(5) Jones Day's argument fails on two counts. First, the contention that publicly available information cannot form the basis for a concealment claim is mistaken. The mere fact that information exists somewhere in the public domain is by no means conclusive. (See, e.g., *Seeger v. Odell (1941)* 18 Cal.2d 409, 414-415 [115 P.2d 977] [a plaintiff is not barred by constructive notice of a public record which would reveal the true facts].) Second, the question in a nondisclosure case is whether the de-

fendant knows of material facts, and also knows that those facts are neither known nor readily accessible to the plaintiff. " (See *BAJI, No. 12.36,* ¶ 4.) In this case, Jones Day knew about the "toxic" provisions of the financing, and knew those facts were unknown to Vega unless, and only to the extent that, Jones Day and/or Transmedia [***21] disclosed those terms. Indeed, the point of disclosing material information in a transaction is that it is not otherwise available to the other side. Jones Day stated its desire to disclose the $ 10 million financing transaction, and then allegedly provided a sanitized disclosure, without the "toxic" terms. Questions as to whether Jones Day intentionally concealed that information in order to induce Vega to believe the transaction was "standard," and whether the consent form indicating that a certificate regarding the investment and its terms would be filed in Delaware in the future made the "toxic" terms reasonably [**36] accessible to Vega, are questions of fact to be resolved on the evidence, not as a matter of law on a demurrer.

11    Jones Day cites several cases in connection with its statement that Vega could have discovered, with reasonable diligence, the "toxic" provisions of the financing. These cases reject fraudulent concealment claims where the information in question was readily accessible, or plaintiff was on inquiry notice of the allegedly concealed information. (E.g., *Stevenson v. Baum (1998)* 65 Cal.App.4th 159 [75 Cal.Rptr.2d 904] [affirming summary judgment; the plaintiffs could not state cause of action for fraudulent nondisclosure of a pipeline easement as a matter of law, because the purchase contract put the plaintiffs on notice that they took title subject to easements of record]; *Clayton v. Landsing Pacific Fund, Inc. (N.D.Cal. May 16, 2002)* 2002 U.S. Dist. LEXIS 9446 [no claim for.fraudulent concealment of the decline in value of the plaintiff's investment, where value of shares was publicly available, and in addition letter from the defendants actually disclosed the decrease in the value of the plaintiff's investment].)

[***22] ### 3. Reliance and causation.

(6) Jones Day argues Vega cannot establish that nondisclosure of the "toxic" terms of the $ 10 million third party financing resulted in any damage. This is because (1) Vega agreed to exchange his Monsterbook stock for Transmedia stock on March 8, 2000, before the third party financing transaction arose and before he consented to it, and (2) Vega "concedes" in his complaint that [*296] Transmedia "would have gone out of business" without the $ 10 million investment. This claim is puzzling at best. First, while Vega agreed to exchange his stock on March 8, he may have had good grounds to

121 Cal. App. 4th 282, *; 17 Cal. Rptr. 3d 26, **;
2004 Cal. App. LEXIS 1263, ***; 2004 Cal. Daily Op. Service 7000

rescind the agreement if the "toxic" terms of the financing had been disclosed. This is not a point that can be determined on a demurrer. Second, Jones Day quotes only part of the sentence in which Vega "concedes" Transmedia would have gone out of business without the financing. The complaint alleges that disclosure of the "toxic" terms of the financing "would have killed the acquisition," and that "[w]ithout the acquisition," Transmedia would not have obtained the financing and would have gone out of business. We fail to see how these allegations show Vega was not harmed [***23] by the failure to disclose the "toxic" terms of the financing. Quite the contrary. Vega alleges that had full disclosure been made, he would not have exchanged his valuable Monsterbook stock for the "toxic" Transmedia stock. Those allegations, if true, show the nondisclosure resulted in damage.

### 4. *Requisite particularity.*

(7) The trial court also sustained the demurrer on the ground Vega failed to allege the cause of action "with the requisite degree of specificity." Jones Day argues Vega has not alleged "(1) who, (2) said what, (3) to whom, (4) when, and (5) in what manner," and waived the opportunity to replead. [12] Again we disagree. The pertinent question in a concealment case is not who said what to whom; the question, among others, is whether Jones Day, in undertaking to disclose the $ 10 million financing, intentionally concealed its "toxic" terms from Vega and Monsterbook so that they would proceed with the transaction. The complaint sufficiently apprises Jones Day of the facts of Vega's fraud claim to allow Jones Day to prepare its defense. (See *Committee on Children's Television, Inc. v. General Foods Corp. (1983) 35 Cal.3d 197, 216 [197 Cal. Rptr. 783, 673 P.2d 660].*) [***24]

> [12] The trial court stated it was "willing to sustain [the demurrer] without leave to amend and just get this on the short track up to the court of appeal," although its general practice was to "give the other side a chance to amend if they think they can amend to cure the defect in the complaint. [¶] So it is up to you [Vega]." Vega's counsel responded, "Well, if the reason for the demurrer sustaining it without leave to amend is that the court feels that there is somehow a different duty vis-à-vis Jones, Day as there is with Transmedia." The court replied, "Well, that is one of the reasons." Counsel then said, "All right. Then I think it is better to take it up now. I don't want to fight Gibson, Dunn for a year and then be back here."

### 5. *Standing to sue.*

Jones Day contends Vega has no standing to sue Jones Day for fraud because his claims are "derivative" claims. In a tortuous argument, Jones Day concludes that because Vega agreed to accept Transmedia stock before the [*297] third party financing [***25] transaction arose, the gravamen of his complaint "must be for the diminution in [**37] the value of the Transmedia stock" he acquired, which was caused by Transmedia's entering into the private stock transaction. This, Jones Day asserts, is a classic example of a derivative claim because the harm to Vega is the same harm suffered by every other Transmedia or Monsterbook shareholder.

(8) Jones Day is mistaken. A derivative suit is a suit brought on behalf of a corporation for injury to the corporation, often for breach of fiduciary duty, mismanagement or other wrongdoing by corporate officers or directors, or for wrongs against the corporation by third parties. (See Friedman, Cal. Practice Guide: Corporations (The Rutter Group 2004) ¶¶ 6:602 & 6:603, pp. 6-128.1 to 6-128.2.) An action is derivative " 'if the gravamen of the complaint is injury to the corporation, or to the whole body of its stock and property without any severance or distribution among individual holders, or it seeks to recover assets for the corporation or to prevent the dissipation of its assets.' " ( *Jones v. H.F. Ahmanson & Co. (1969) 1 Cal.3d 93, 106 [81 Cal. Rptr. 592, 460 P.2d 464]*, citing *Gagnon Co., Inc. v. Nevada Desert Inn, Inc. (1955) 45 Cal.2d 448, 453 [289 P.2d 466].*) [***26] This is not such a case. Vega alleges that Jones Day deceived him into exchanging his valuable stock in Monsterbook for worthless stock in Transmedia. As in *Jones*, Vega "does not seek to recover on behalf of the corporation for injury done to the corporation" by Jones Day. ( *Jones v. H.F. Ahmanson & Co., supra, 1 Cal.3d at p. 107.*) Instead, "the gravamen of [his] cause of action is injury to [himself] ... ." (*Ibid.*) [13]

> [13] Jones Day relies on *Nelson v. Anderson (1999) 72 Cal.App.4th 111, 117, 124 [84 Cal. Rptr. 2d 753]*, which held that the plaintiff--the minority shareholder in a two-shareholder corporation--had no standing as an individual to bring an action for breach of fiduciary duty against the majority shareholder. The plaintiff had no standing as an individual because the obligations allegedly violated--which amounted to negligence and misfeasance in managing the corporation's business--were "duties owed directly and immediately to the corporation." ( *Id. at p. 125.*) In this case, by contrast, the "duty"--not to defraud another person--is not a duty owed only to the corporation. Indeed, *Nelson* expressly states that "the same facts regarding injury to the corporation may underlie a personal cause of action, such as ... fraud ... [but] Nelson has not alleged or proved

121 Cal. App. 4th 282, *; 17 Cal. Rptr. 3d 26, **;
2004 Cal. App. LEXIS 1263, ***; 2004 Cal. Daily Op. Service 7000

the elements" of a fraud cause of action. ( *Id.* at pp. 124-125 & fn. 6.)

[***27]

[*298] 6. *Statute of limitations.*

Jones Day argues that Vega's fraud claim is barred by the three-year statute of limitations. [14] Again, we disagree.

> 14    Since Vega's negligent misrepresentation claim has been disposed of on other grounds (see fn. 6, *ante*), we need not consider whether it is governed by and barred by a shorter statute of limitations.

Vega alleged he first discovered the "toxic" terms of the $ 10 million financing transaction on December 14, 2000, when a Transmedia press release revealed that the terms of the financing had included a "toxic" stock provision. He filed suit on May 12, 2003. Jones Day argues the three-year statute expired no later than March 28, 2003, three years after the filing in Delaware of the "Certificate of Designation" containing all the terms of the transaction. Jones Day recognizes that the statute of limitations in a fraud action does not begin to run "until the discovery, by the aggrieved party, of the facts constituting the fraud ... ." (*Code Civ. Proc.*, § 338, [***28] subd. *(d)*.) However, it argues Vega should have discovered the "toxic" terms of the financing on March 28, 2000, since the filing of the certificate in Delaware put him on inquiry notice.

[**38] (9) The rule is that the statute commences to run "only after one has knowledge of facts sufficient to make a reasonably prudent person suspicious of fraud, thus putting him on inquiry." ( *Hobart v. Hobart Estate Co.* (1945) 26 Cal.2d 412, 437 [159 P.2d 958].) The means of knowledge are equivalent to knowledge "only where there is a duty to inquire, as where plaintiff is aware of facts which would make a reasonably prudent person suspicious." [15] ( *Hobart v. Hobart Estate Co., supra*, 26 Cal.2d at p. 438.) We cannot say, as a matter of law, that Vega's knowledge that the $ 10 million financing transaction would occur, standing alone, should have made him "suspicious of fraud," or suspicious that the transaction might contain "toxic" terms. Whether other circumstances exist which, in conjunction with knowledge of the existence of the financing transaction, would have made a prudent person suspicious is a question that cannot be resolved on demurrer.

> 15    " 'Where no duty is imposed by law upon a person to make inquiry, and where under the circumstances "a prudent man" would not be put upon inquiry, the mere fact that means of knowl-

edge are open to a plaintiff, and he has not availed himself of them, does not debar him from relief when thereafter he shall make actual discovery. The circumstances must be such that the inquiry becomes a duty, and the failure to make it a negligent omission.' " ( *Hobart v. Hobart Estate Co., supra*, 26 Cal.2d at p. 438, quoting *Tarke v. Bingham (1898) 123 Cal. 163, 166 [55 P. 759],* italics omitted.)

[***29] 7. *Res judicata.*

Finally, Jones Day contends that Vega's claims are barred by the doctrine of res judicata, because Jones Day obtained summary judgment in its favor [*299] on fraud claims in earlier lawsuits brought by three other shareholders, who subsequently waived, abandoned and dismissed their respective appeals. Jones Day argues Vega was in privity with each of those three shareholders, because he is also a former shareholder in Monsterbook, his fraud claim is the same as their claims, he knew about their lawsuits, and he is using the same attorney. This relationship, Jones Day contends, is sufficiently close to justify application of the principle of preclusion. Again, we cannot agree.

(10) The doctrine of res judicata precludes parties or their privies from relitigating issues decided in a prior action in which a final judgment on the merits was entered. While Jones Day obtained summary judgment on fraud claims by three other shareholders, Vega was not a party to those lawsuits. The concept of privity has been expanded to include "a relationship between the party to be estopped and the unsuccessful party in the prior litigation which is 'sufficiently close' so as to justify [***30] application of the doctrine of collateral estoppel." ( *Clemmer v. Hartford Ins. Co.* (1978) 22 Cal.3d 865, 875 [151 Cal. Rptr. 285, 587 P.2d 1098].) However, "[n]otwithstanding expanded notions of privity," due process requirements must be satisfied. (*Ibid.*) The cases uniformly state that, in addition to an identity or community of interest between the party to be estopped and the losing party in the first action, and adequate representation by the latter, "the circumstances must have been such that the party to be estopped should reasonably have expected to be bound by the prior adjudication." ( *Clemmer v. Hartford Ins. Co., supra*, 22 Cal.3d at p. 875.)

(11) We discern no basis for concluding that Vega "should reasonably have expected to be bound by" the adjudication of lawsuits in which he did not participate in any way, in which he had no proprietary or financial interest, and over which he had no control [**39] of any sort. (See *Lynch v. Glass* (1975) 44 Cal. App. 3d 943, 949 [119 Cal. Rptr. 139] ["it cannot be said that appellants should reasonably have expected to be bound by the prior adjudication"; although appellants "were fully

121 Cal. App. 4th 282, *; 17 Cal. Rptr. 3d 26, **;
2004 Cal. App. LEXIS 1263, ***; 2004 Cal. Daily Op. Service 7000

aware of the prior litigation, [***31] the appearance of one of them as a witness gave them no power to control any aspect of the case"]; *Aronow v. LaCroix (1990) 219 Cal. App. 3d 1039, 1052 [268 Cal. Rptr. 866]* [where plaintiff was litigant, attorney and witness at various stages of prior case, but did not participate throughout, her connection with prior case "though falling short of the power to control, was so close that she should reasonably expect to be bound by the result"].) The only relationship between Vega and the prior lawsuit is that he and the plaintiffs in those suits were shareholders in the same company. We are aware of no precedent for finding this to be a "sufficiently close" relationship to justify application of the principle of preclusion, and we decline to create one. [*300]

## DISPOSITION

The order dismissing the complaint, construed as a judgment of dismissal, is reversed and the cause is remanded for further proceedings. Appellant is entitled to recover his costs on appeal.

Cooper, P. J., and Rubin, J., concurred.

A petition for a rehearing was denied August 30, 2004, and respondent's petition for review by the Supreme Court was denied October 27, 2004. Chin, [***32] J., was of the opinion that the petition should be granted.

# Exhibit G

**APPENDIX OF NON-FEDERAL AND UNPUBLISHED FEDERAL AUTHORITIES CITED IN VISA USA INC.'S REPLY IN SUPPORT OF MOTION TO STAY ACTION AND TO COMPEL ARBITRATION**

# DOMKE ON COMMERCIAL ARBITRATION

(The Law and Practice of Commercial Arbitration)

By **MARTIN DOMKE**
Revised Edition by **Gabriel Wilner**

## THIRD EDITION

By **LARRY E. EDMONSON**

**Volume 1**

Issued April 2007

LIBRARY

MAY 1 1 2007

FARELLA, BRAUN + MARTEL



**THOMSON**

**WEST**

*For Customer Assistance Call 1-800-328-4880*

Mat #40482963

afterwards if the court determines that the dispute is governed by an arbitration agreement, to seek an order compelling arbitration. If declaratory relief is sought while the identical issues are before the arbitrators, the court can either dismiss the action or enforce the arbitration agreement.[1]

## § 22:6   —Stay of court action

If a party to a contract containing an arbitration clause brings court action on a subject within the scope of the arbitration provision, the other party may move to stay the action and request that arbitration proceedings be instituted.[1] Such an action may be brought by a nonsignatory if the action is based upon the same operative facts and is inherently inseparable from the claims against a signatory.[2] When the case involves both arbitrable and

---

[Section 22:5]

[1]Necchi Sewing Mach Sales Corp v. Necchi SP a, 383 U.S. 909, 86 S. Ct. 892, 15 L. Ed.2d 664 (1966); Aeronaves De Mexico, S.A. v. Triangle Aviation Services, Inc., 515 F.2d 504 (2d Cir. 1975).

On a request for injunctive relief seeking to block a vessel builder from selling the vessel to a third party rather than to a prospective buyer, the trial court could not go beyond the requested injunctive relief and direct the buyer to provide reasonable proof that it would pay the builder, and could not direct the builder to deliver the vessel to the buyer for payment in full since those orders addressed merits underlying the contractual disputes; therefore, the trial court must stay the proceedings in the case and refer the matter to arbitration. J & J Marine, Inc. v. Bay & Ocean Equipment Co., Inc., 758 So. 2d 549 (Ala. 2000).

[Section 22:6]

[1]Under the FAA, unless it can be said with positive assurance that an arbitration clause is not susceptible of an interpretation that would cover the dispute at issue, then a stay pending arbitration should be granted. IP Timberlands Operating Co., Ltd. v. Denmiss Corp., 726 So. 2d 96 (Miss. 1998); N.V. Maatschappij Voor Industriele Waarden v. A. O. Smith Corp., 532 F.2d 874, 190 U.S.P.Q. (BNA) 385 (2d Cir. 1976); China Union Lines Ltd. v. American Marine Underwriters, Inc., 458 F. Supp. 132, 1978 A.M.C. 2595 (S.D. N.Y. 1978).

With respect to antitrust issues see § 23:17–23:19.

An age discrimination action had to be stayed to permit the Railway Labor Board to determine whether the collective bargaining agreement expressly or implicitly disqualified all flight captains, regardless of age, from being ineligible to become flight officers. Tice v. American Airlines, Inc., 288 F.3d 313, 88 Fair Empl. Prac. Cas. (BNA) 993, 169 L.R.R.M. (BNA) 3148, 82 Empl. Prac. Dec. (CCH) ¶ 41013 (7th Cir. 2002).

Green Tree Financial Corp. of Alabama v. Vintson, 753 So. 2d 497 (Ala. 1999).

Proceedings against the parties and nonparties to an arbitration agreement are stayed pending the outcome of arbitration, when the action against the nonparty is dependant upon the interpretation of the underlying contract. Grigson v. Creative Artists Agency L.L.C., 210 F.3d 524 (5th Cir. 2000), reh'g en banc denied, 218 F.3d 745 (5th Cir. 2000).

[2]Hill v. G E Power Systems, Inc., 282 F.3d 343 (5th Cir. 2002).

nonarbitrable claims, the court generally will only stay the arbitrable claims.[3] However, a court may stay the litigation of the nonarbitrable claims until after the arbitration of the arbitrable claims,[4] particularly "when the arbitrable claims 'permeate' the case and the nonarbitrable claims are weak or peripheral."[5] Since courts inherently possess the power to stay proceedings when required by the interests of justice, the decision of whether to grant a motion to stay is vested in the discretion of the trial court.[6] In making its decision, the trial court is to balance the competing needs of the parties, taking into account the interest of the courts,[7] the probability that the proceedings will work a constitutional violation on the movant, the presence or absence of hardship or inequity, and the burden of proof.[8]

Similarly, trial courts possess the power to rescind a stay of proceedings.[9]

A motion for a stay of the court action is the only way that a party may effectively stop a suit in favor of arbitration

---

[3]Allied–Bruce Terminix Companies, Inc. v. Dobson, 684 So. 2d 102 (Ala. 1995).

[4]The trial court has discretionary authority to decide whether to stay a nonarbitrable claim pending arbitration of related claims. Terminix Intern. Co. Ltd. Partnership v. Jackson, 669 So. 2d 893 (Ala. 1995).

[5]S.A. Mineracao da Trindade–Samitri v. Utah Intern. Inc., 576 F. Supp. 566, 576, Fed. Sec. L. Rep. (CCH) ¶ 99609 (S.D. N.Y. 1983), order amended, 579 F. Supp. 1049 (S.D. N.Y. 1984) and decision aff'd, 745 F.2d 190, Fed. Sec. L. Rep. (CCH) ¶ 91,682 (2d Cir. 1984).

[6]Kelley v. Benchmark Homes, Inc., 250 Neb. 367, 550 N.W.2d 640 (1996).

The trial court should not have discharged a general contractor's lien claim as prematurely filed before complying with the conditions stated in the retainage clause, but should have stayed the foreclosure proceeding until the arbitrators determined the amount owing under the contract. Thomas Group, Inc. v. Wharton Senior Citizen Housing, Inc., 163 N.J. 507, 750 A.2d 743 (2000).

[7]A court may stay proceedings under its inherent power to control its own docket. A party that seeks to stay court proceedings, under the court's power to control its docket, against a party that is not bound by the arbitration agreement bears the burden of demonstrating that the stay is justified. WorldCrisa Corp. v. Armstrong, 129 F.3d 71 (2d Cir. 1997).

[8]Kelley v. Benchmark Homes, Inc., 250 Neb. 367, 550 N.W.2d 640 (1996).

The interests of a landowner can adequately be protected by staying the contractor's right to enforce its lien until the contractual preconditions for payment are met. Thomas Group, Inc. v. Wharton Senior Citizen Housing, Inc., 163 N.J. 507, 750 A.2d 743 (2000).

[9]Rescinding stay of suit after a party failed to initiate arbitration within the previously ordered 30–day period was within the trial court's discretion to manage its own affairs, even though no prejudice resulted from the additional delay since the prior order clearly stated that the stay would be rescinded if the arbitration were not commenced expeditiously and the party seeking the arbitration was not precluded from pursuing the claims. Eastern Dredging & Const., Inc. v. Parliament House, L.L.C., 698 So. 2d 102 (Ala. 1997).

proceedings.[10] No affirmative defense to the suit, such as an answer pleading the contract or submission to arbitrate, will be sufficient to stay the court action. The court must stay the action once it finds that the dispute is referable to arbitration and no other impediments prevent the effectiveness of the arbitration clause.[11]

In this connection, the United States Supreme Court stated in the *Prima Paint* case:[12]

> In passing upon a § 3 [of the FAA] application for a stay while the parties arbitrate, a federal court may consider only issues relating to the making and performance of the agreement to arbitrate. In so concluding, we not only honor the plain meaning of the statute but also the unmistakably clear congressional purpose that the arbitration procedure, when selected by the parties to a contract, be speedy and not subject to delay and obstruction in the courts.

Even if the participants in the two sets of proceedings are not all the same parties, the court retains its power to stay the court action.[13] The court can defer discovery or other court proceedings, under its inherent power to control its own docket, pending the

---

[10]The district court's authority under § 3 of the FAA to stay a proceeding pending arbitration does not expressly include the authority to compel arbitration; however, the grant of the stay is enough without the power to order that the arbitration proceed, since the plaintiff would be unable to obtain relief unless he or she proceeded to arbitration. M & I Elec. Industries, Inc. v. Rapistan Demag Corp., 814 F. Supp. 545 (E.D. Tex. 1993).

[11]By its own terms, § 10 of the FAA authorized court action only after a final award is made by the arbitrator. When an agreement to arbitrate, and arbitrability under that agreement, were undisputed, a court could not intervene in the dispute until the parties saw arbitration through to a final award, and thus the district court erred in refusing to stay a court action even though arbitration should not have continued for more than three years since the beginning of the arbitration process. Folse v. Richard Wolf Medical Instruments Corp., 56 F.3d 603, 131 Lab. Cas. (CCH) ¶ 58057 (5th Cir. 1995).

A trial court must stay actions referable to arbitration if a party invokes his or her right to arbitrate such actions. Bateman Const., Inc. v. Haitsuka Bros., Ltd., 77 Haw. 481, 889 P.2d 58 (1995); McMahan Securities Co. L.P. v. Forum Capital Markets L.P., 35 F.3d 82, Fed. Sec. L. Rep. (CCH) ¶ 98391 (2d Cir. 1994); Kroll v. Doctor's Associates, Inc., 3 F.3d 1167 (7th Cir. 1993) (implied overruling on other grounds recognized by, Ross v. Health and Retirement Properties Trust, 46 Mass. App. Ct. 82, 703 N.E.2d 734 (1998)).

[12]Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 87 S. Ct. 1801, 18 L. Ed. 2d 1270 (1967).

See also § 7:4.

[13]See American Home Assur. Co. v. Vecco Concrete Const. Co., Inc. of Virginia, 629 F.2d 961 (4th Cir. 1980).

In a case involving litigation of the same dispute, on the one hand between a municipality and contractor and on the other hand between the city and the subcontractor and insurance company, the court stayed the litigation under § 3 of the FAA in favor of arbitration, in the face of the argument by the municipality that it had no arbitration agreement with the subcontractor or insurance company.

completion of the arbitration proceeding.[14] A stay of court action is warranted where the liability of a party subject to arbitration derives from the conduct of a codefendant, since the suit against the codefendant may have a collateral estoppel effect on the arbitration, impairing the arbitrator's ability to consider claims subject to arbitration.[15] However, court proceedings will not be stayed simply because a party claims that an arbitration proceeding involving other parties concerns the same issues and conduct.[16] An owner's suit against a surety, who is not a party to the arbitration agreement, is often subject to a stay of litigation until arbitration of the underlying contractual controversy.[17] However, it remains doubtful whether an order to compel arbitration automatically stays the pending or subsequent action, even in the same court.

Where presented with a motion for stay pending arbitration, in a suit where the dispute is subject to arbitration under the FAA, the proper course for the district court is to grant the motion for stay, rather than dismiss the action and order the parties to proceed to arbitration.[18] A Court of Appeals reviews de novo a district court's order denying the stay of a federal suit pending arbitration under the Federal Arbitration Act.[19]

In a leading state court case it was held that a court's authority to stay court action on issues referable to arbitration is not confined to actions instituted in a court, but includes those instituted before a federal agency, such as the United States Department of

---

The court stated: "This type of procedure makes eminent sense when the third party litigation involves common questions of fact that are within the scope of the arbitration agreement." Contracting Northwest, Inc. v. City of Fredericksburg, Iowa, 713 F.2d 382, 387 (8th Cir. 1983).

A ship mortgagee was held to be subject to a stay pending arbitration between a ship manager and ship owner where the stay was in effect before the mortgagee intervened. Tropical Cruise Lines, S.A. v. Vesta Ins. Co., 805 F. Supp. 409 (S.D. Miss. 1992).

[14]Air Line Pilots Ass'n v. Miller, 523 U.S. 866, 118 S. Ct. 1761, 140 L. Ed. 2d 1070, 158 L.R.R.M. (BNA) 2321, 135 Lab. Cas. (CCH) ¶ 10160 (1998).

[15]Kroll v. Doctor's Associates, Inc., 3 F.3d 1167 (7th Cir. 1993) (implied overruling on other grounds recognized by, Ross v. Health and Retirement Properties Trust, 46 Mass. App. Ct. 82, 703 N.E.2d 734 (1998)).

[16]Where an action was brought against three subsidiaries of a parent corporation, two of which were members of the National Association of Securities Dealers and therefore entitled to arbitration, the court refused to stay the proceedings against the remaining subsidiary, which was not a member of the NASD. IDS Life Ins. Co. v. SunAmerica Life Ins. Co., 136 F.3d 537 (7th Cir. 1998).

[17]Institute of Mission Helpers of Baltimore City v. Reliance Ins. Co., 812 F. Supp. 72 (D. Md. 1992).

[18]Adair Bus Sales, Inc. v. Blue Bird Corp., 25 F.3d 953 (10th Cir. 1994).

[19]Riley Mfg. Co., Inc. v. Anchor Glass Container Corp., 157 F.3d 775 (10th Cir. 1998).

Agriculture.[20] The court based its power on the broad, unqualified language of the New York statute, which contrasts with § 3 of the FAA which sanctions stays only of suits or proceedings brought in the courts of the United States.

Although federal courts are not specifically authorized by § 3 of the FAA to stay proceedings pending in state courts, authority for issuing such stays is found in 28 U.S.C. § 2283.[21] This power is limited by the principle that lower federal courts are not superior to state courts. It has been stated by the federal Court of Appeals for the Eleventh Circuit that: "[W]here a federal court is asked to interfere with pending state court proceedings it must proceed with caution, taking into account general considerations of federalism and in particular, the likelihood of seriously disrupting the legitimate functioning of the state."[22] Furthermore, absent exceptional circumstances, a federal district court has no right to stay federal proceedings brought under the FAA even though a similar action between the parties is pending in the state court, since abstention from the exercise of federal jurisdiction is the exception, not the rule.[23]

A choice of law provision which indicates that a particular state law should apply does not require one federal circuit to apply the case law of another circuit to determine whether to stay court action.[24]

Whether a court has authority to vacate the stay of legal proceedings upon motion of the party that originally sought to compel

---

[20]S. M. Wolff Co. v. Tulkoff, 9 N.Y.2d 356, 214 N.Y.S.2d 374, 174 N.E.2d 478 (1961).

[21]Although as a general rule federal courts are prohibited from enjoining state court proceedings by the Anti–Injunction Statute, 28 U.S.C. § 2283, a federal district court may stay a parallel state proceeding pending arbitration. Such a stay is authorized by the Anti–Injunction Statute as "necessary in aid of jurisdiction." Pervel Industries, Inc. v. TM Wallcovering, Inc., 675 F. Supp. 867 (S.D. N.Y. 1987), order aff'd, 871 F.2d 7 (2d Cir. 1989).

[22]Ultracashmere House, Ltd. v. Meyer, 664 F.2d 1176 (11th Cir. 1981) (overruling on other grounds recognized by, Baltin v. Alaron Trading Corp., 128 F.3d 1466 (11th Cir. 1997)); Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Haydu, 637 F.2d 391 (5th Cir. 1981).

[23]Moses H. Cone Memorial Hosp. v. Mercury Const. Corp., 460 U.S. 1, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983); Whiteside v. Teltech Corp., 940 F.2d 99 (4th Cir. 1991).

[24]Wm. S. Newman Brewing Co., Inc. v. C. Schmidt and Sons, Inc., 115 B.R. 25 (N.D. N.Y. 1990).

arbitration or when one party conducts arbitration in bad faith has been addressed in a court opinion but not directly decided.[25]

## § 22:7   — —Foreign countries

When an arbitration clause provides for arbitration in another country, the agreement will be recognized both by federal and state courts under modern arbitration law. Any court action instituted in the United States in contravention of an arbitration agreement will be stayed in favor of arbitration abroad, as agreed by the parties.[1] On the other hand, an agreement which requires submission to a specific court of a specific country "to the exclusion of any other judge," will not be enforced.[2]

The FAA, which enforces the 1958 Convention on the Recognition and Enforcement of Foreign Arbitral Awards, no longer limits federal courts' authority to a stay of the court action but allows for a court's direction "that arbitration be held in accordance with the [parties'] agreement at any place provided for, whether that place is within or without the United States."[3] A number of cases have dealt with the stays of action in favor of arbitration since this

---

[25]Corpman v. Prudential–Bache Securities, Inc., 907 F.2d 29, Fed. Sec. L. Rep. (CCH) ¶ 95759 (3d Cir. 1990) (error to vacate stay where record contained no evidence of bad faith).

**[Section 22:7]**

[1]Seaboard & Caribbean Transport Corp. v. Hafen–Dampfschiffahrt A. G. Hapag–Hadac Seebaderdienst, 329 F.2d 538 (5th Cir. 1964); Michael v. S S Thanasis, 311 F. Supp. 170 (N.D. Cal. 1970); Mannesmann Rohrleitungsbau, G.m.b.H. v. S. S. Bernhard Howaldt, 254 F. Supp. 278 (S.D. N.Y. 1965); Lowry & Co. v. S. S. Le Moyne D'Iberville, 253 F. Supp. 396 (S.D. N.Y. 1966); Associated Metals & Minerals Corp. v. S. S. Mihalis Angelos, 234 F. Supp. 236 (S.D. N.Y. 1964); Giuffre v. the Magdalene Vinnen, 152 F. Supp. 123 (E.D. N.Y. 1957); Fox v. the Giuseppe Mazzini, 110 F. Supp. 212 (E.D. N.Y. 1953); *Carney Stansfield Co. v. Wickman Mach. Tool Sales*, N.Y.L.J, Aug. 4, 1966, p 8 col 1 (not otherwise reported), aff'd 27 A.D.2d 647, 277 N.Y.S.2d 371 (1966).

Corbin, Enforceability of Contractual Agreements for Dispute Settlement Abroad, in International Trade Arbitration: A Road to World–Wide Cooperation 251 (Domke ed 1958).

[2]Chemical Carriers, Inc v. L Smit & Co's Internationale Sleepdienst, 154 F. Supp. 886 (S.D. N.Y. 1957); *Altshul Stern & Co. v. Mitsui & Co., SD NY 62 Civ 133, Oct. 4, 1962 (not reported)*.

[3]9 U.S.C. § 206 (84 Stat 692 added July 31, 1970).

# Exhibit H

**APPENDIX OF NON-FEDERAL AND UNPUBLISHED FEDERAL AUTHORITIES
CITED IN VISA USA INC.'S REPLY IN SUPPORT OF MOTION TO STAY
ACTION AND TO COMPEL ARBITRATION**

LEXSTAT RESTATEMENT TORTS 551

Restatement of the Law, Second, Torts
Copyright (c) 1977, The American Law Institute

Case Citations

Rules and Principles

Division 4 - Misrepresentation

Chapter 22 - Misrepresentation and Nondisclosure Causing Pecuniary Loss

Topic 2 - Concealment and Nondisclosure

Restat 2d of Torts, § 551

§ 551 Liability for Nondisclosure

(1) One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.

(2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,

(a) matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and

(b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and

(c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and

(d) the falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns that the other is about to act in reliance upon it in a transaction with him; and

(e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that theother, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

**COMMENTS & ILLUSTRATIONS: Comment on Subsection (1):**

*a.* Unless he is under some one of the duties of disclosure stated in Subsection (2), one party to a business transaction is not liable to the other for harm caused by his failure to disclose to the other facts of which he knows the other is ignorant and which he further knows the other, if he knew of them, would regard as material in determining his course of action in the transaction in question. The interest in knowing those facts that are important in determining the advisability of a course of action in a financial or commercial matter is given less protection by the rule stated in this Subsection than is given to the interest in knowing facts that are important in determining the recipient's course of

  

Restatement of the Law, Second, Torts, § 551

action in regard to matters that involve the security of the person, land or chattels of himself or a third person.

*b.* The conditions under which liability is imposed for nondisclosure in an action for deceit differ in one particular from those under which a similar nondisclosure may confer a right to rescind the transaction or to recover back money paid or the value of other benefits conferred. In the absence of a duty of disclosure, under the rule stated in Subsection (2) of this Section, one who is negotiating a business transaction is not liable in deceit because of his failure to disclose a fact that he knows his adversary would regard as material. On the other hand, as is stated in Restatement, Second, Contracts § 303(b) the other is entitled to rescind the transaction if the undisclosed fact is basic; and under Restatement of Restitution, § 8, Comment e, and § 28, he would be entitled to recover back any money paid or benefit conferred in consummation of the transaction.

**Comment on Subsection (2):**

*c.* A person under the duty stated in this Subsection is required to disclose only those matters that he has reason to know will be regarded by the other as important in determining his course of action in the transaction in hand. He is therefore under no duty to disclose matter that the ordinary man would regard as unimportant unless he knows of some peculiarity of the other that is likely to lead him to attach importance to matters that are usually regarded as of no moment.

*d.* Under the rule stated in this Subsection the person under a duty of disclosure is not subject to liability merely because he has failed to bring the required information home to the person entitled to it. His duty is to exercise reasonable care to do so. If reasonable care is exercised, the fact that the information does not reach the person entitled to it does not subject him to liability. Thus a trustee whose distant cestui que trust is contemplating a sale of part of his interest in the trust res to a third person and who writes to his cestui que trust communicating certain information which it is material for the latter to know in the transaction in question, is not subject to liability in an action of deceit, if the letter goes astray and therefore does not reach the cestui until the sale is made. On the other hand, if the trustee knows that the consummation of the transaction is immediately imminent, it may not be reasonable for him to communicate by mail rather than by telegraph. However, in the great majority of cases the person owing the duty has so available an opportunity to make the required disclosure that it is rare that the failure to give it can be other than intentional or negligent.

**Comment on Clause (a):**

*e.* On the duty of a trustee to disclose all material matters to his beneficiary with whom he is dealing on the trustee's own account, see Restatement, Second, Trusts § 170(2). On the duty of a trustee to disclose to his beneficiary matters important for the beneficiary to know in dealing with third persons, see Restatement, Second, Trusts § 173, Comment *d.* On the duty of an agent to disclose to his principal matters important for the principal to know in dealing with the agent or a third person and the similar duty of the principal to the agent, see Restatement, Second, Agency §§ 381 and 435. It is not within the scope of this Restatement to state the rules that determine the duty of disclosure which under the law of business associations the directors of a company owe to its shareholders.

*f.* Other relations of trust and confidence include those of the executor of an estate and its beneficiary, a bank and an investing depositor, and those of physician and patient, attorney and client, priest and parishioner, partners, tenants in common and guardian and ward. Members of the same family normally stand in a fiduciary relation to one another, although it is of course obvious that the fact that two men are brothers does not establish relation of trust and confidence when they have become estranged and have not spoken to one another for many years. In addition, certain types of contracts, such as those of suretyship or guaranty, insurance and joint adventure, are recognized as creating in themselves a confidential relation and hence as requiring the utmost good faith and full and fair disclosure of all material facts.

**Comment on Clause (b):**



Restatement of the Law, Second, Torts, § 551

*g.* A statement that is partial or incomplete may be a misrepresentation because it is misleading, when it purports to tell the whole truth and does not. (See § 529). So also may a statement made so ambiguously that it may have two interpretations, one of which is false. (See §§ 527, 528). When such a statement has been made, there is a duty to disclose the additional information necessary to prevent it from misleading the recipient. In this case there may be recovery either on the basis of the original misleading statement or of the nondisclosure of the additional facts.

**Comment on Clause (c):**

*h.* One who, having made a representation which when made was true or believed to be so, remains silent after he has learned that it is untrue and that the person to whom it is made is relying upon it in a transaction with him, is morally and legally in the same position as if he knew that his statement was false when made.

**Illustrations:**

1. A, a stock breeder, tells B, a prospective buyer, that a thoroughbred mare is in foal to a well-known stallion. The mare miscarries. Immediately afterwards B offers $ 500 for the mare relying, as A knows, upon his statement. A does not inform B of the mare's miscarriage. A is subject to liability to B for the loss that he suffers because the mare is not in foal as originally represented.

2. A, the president of a mercantile corporation, makes a true statement of its financial position to a credit rating company, intending the substance to be published by it to its subscribers. The corporation's financial position becomes seriously impaired, but A does not inform the credit rating company of this fact. The corporation receives goods on credit from B, a subscriber of the rating company, who when the goods are bought is relying, as A knows, on the credit rating based on his statements to the rating company. A is subject to liability in deceit to B.

**Comment on Clause (d):**

*i.* One who knowingly makes a misrepresentation without any expectation that the recipient will act upon it may subsequently discover that the other is relying upon it in a transaction then pending between them. If, in this case, he does not exercise reasonable care to inform the other that his misrepresentation is untrue, he is under the same liability as though he had then made it for the purpose of influencing the other's conduct in the transaction in hand.

The rule stated in Clause (d) is not necessarily limited to "a transaction with him." When, for example, the defendant makes a statement to the plaintiff concerning the credit of a third person not expecting it to be acted upon and then discovers that the plaintiff is about to lend money to the third person in reliance upon the statement, it would appear that the duty of disclosure would arise.

**Comment on Clause (e):**

*j. "Facts basic to the transaction."* The word "basic" is used in this Clause in the same sense in which it is used in Comment *c* under § 16 of the Restatement of Restitution. A basic fact is a fact that is assumed by the parties as a basis for the transaction itself. It is a fact that goes to the basis, or essence, of the transaction, and is an important part of the substance of what is bargained for or dealt with. Other facts may serve as important and persuasive inducements to enter into the transaction, but not go to its essence. These facts may be material, but they are not basic. If the parties expressly or impliedly place the risk as to the existence of a fact on one party or if the law places it there by custom or otherwise the other party has no duty of disclosure. (Compare Restatement, Second, Contracts § 296).

**Illustrations:**

3. A sells to B a dwelling house, without disclosing to B the fact that the house is riddled with termites. This is a fact basic to the transaction.

  

Restatement of the Law, Second, Torts, § 551

4. A sells to B a dwelling house, knowing that B is acting in the mistaken belief that a highway is planned that will pass near the land and enhance its value. A does not disclose to B the fact that no highway is actually planned. This is not a fact basic to the transaction.

5. Having purchased a certain tract of land for $ 25,000, A hears that B may have a claim to it. He goes to B and offers to purchase B's interest. B does not believe he has a valid legal claim but agrees to give A a quit-claim deed for $ 250. B's lack of a valid legal claim is not a fact that he is under a duty to disclose.

**Comment:**

*k. Nondisclosure of basic facts.* The rule stated in Subsection (1) reflects the traditional ethics of bargaining between adversaries, in the absence of any special reason for the application of a different rule. When the facts are patent, or when the plaintiff has equal opportunity for obtaining information that he may be expected to utilize if he cares to do so, or when the defendant has no reason to think that the plaintiff is acting under a misapprehension, there is no obligation to give aid to a bargaining antagonist by disclosing what the defendant has himself discovered. To a considerable extent, sanctioned by the customs and mores of the community, superior information and better business acumen are legitimate advantages, which lead to no liability. The defendant may reasonably expect the plaintiff to make his own investigation, draw his own conclusions and protect himself; and if the plaintiff is indolent, inexperienced or ignorant, or his judgment is bad, or he does not have access to adequate information, the defendant is under no obligation to make good his deficiencies. This is true, in general, when it is the buyer of land or chattels who has the better information and fails to disclose it. Somewhat less frequently, it may be true of the seller.

Illustrations:

6. A is a violin expert. He pays a casual visit to B's shop, where second-hand musical instruments are sold. He finds a violin which, by reason of his expert knowledge and experience, he immediately recognizes as a genuine Stradivarius, in good condition and worth at least $ 50,000. The violin is priced for sale at $ 100. Without disclosing his information or his identity, A buys the violin from B for $ 100. A is not liable to B.

7. The same facts as in Illustration 6, except that the violin is sold at auction and A bids it in for $ 100. The same conclusion.

8. B has a shop in which he sells second-hand musical instruments. In it he offers for sale for $ 100 a violin, which he knows to be an imitation Stradivarius and worth at most $ 50. A enters the shop, looks at the violin and is overheard by B to say to his companion that he is sure that the instrument is a genuine Stradivarius. B says nothing, and A buys the violin for $ 100. B is not liable to A.

*l.* The continuing development of modern business ethics has, however, limited to some extent this privilege to take advantage of ignorance. There are situations in which the defendant not only knows that his bargaining adversary is acting under a mistake basic to the transaction, but also knows that the adversary, by reason of the relation between them, the customs of the trade or other objective circumstances, is reasonably relying upon a disclosure of the unrevealed fact if it exists. In this type of case good faith and fair dealing may require a disclosure.

It is extremely difficult to be specific as to the factors that give rise to this known, and reasonable, expectation of disclosure. In general, the cases in which the rule stated in Clause (e) has been applied have been those in which the advantage taken of the plaintiff's ignorance is so shocking to the ethical sense of the community, and is so extreme and unfair, as to amount to a form of swindling, in which the plaintiff is led by appearances into a bargain that is a trap, of whose essence and substance he is unaware. In such a case, even in a tort action for deceit, the plaintiff is entitled to be compensated for the loss that he has sustained. Thus a seller who knows that his cattle are infected with tick fever or contagious abortion is not free to unload them on the buyer and take his money, when he knows that the buyer is unaware of the fact, could not easily discover it, would not dream of entering into the bargain if he knew and is relying upon the seller's good faith and common honesty to disclose any such fact if it is true.

  

Restatement of the Law, Second, Torts, § 551

There are indications, also, that with changing ethical attitudes in many fields of modern business, the concept of facts basic to the transaction may be expanding and the duty to use reasonable care to disclose the facts may be increasing somewhat. This Subsection is not intended to impede that development.

**Illustrations:**

9. A sells B a dwelling house, without disclosing the fact that drain tile under the house is so constructed that at periodic intervals water accumulates under the house. A knows that B is not aware of this fact, that he could not discover it by an ordinary inspection, and that he would not make the purchase if he knew it. A knows also that B regards him as an honest and fair man and one who would disclose any such fact if he knew it. A is subject to liability to B for his pecuniary loss in an action of deceit.

10. A is engaged in the business of removing gravel from the bed of a navigable stream. He is notified by the United States government that the removal is affecting the channel of the stream, and ordered to stop it under threat of legal proceedings to compel him to do so. Knowing that B is unaware of this notice, could not reasonably be expected to discover it and would not buy if he knew, A sells the business to B without disclosing the fact. A is subject to liability to B for his pecuniary loss in an action of deceit.

11. A, who owns an amusement center, sells it to B without disclosing the fact that it has just been raided by the police, and that A is being prosecuted for maintaining prostitution and the sale of marijuana on the premises. These facts have seriously affected the reputation and patronage of the center, and greatly reduced its monthly income. A knows that B is unaware of these facts, could not be expected to discover them by ordinary investigation and would not buy if he knew them. He also knows that B believes A to be a man of high character, who would disclose any serious defects in the business. A is subject to liability to B for his pecuniary loss in an action of deceit.

12. A sells a summer resort to B, without disclosing the fact that a substantial part of it encroaches on the public highway. A knows that B is unaware of the fact and could not be expected to discover it by ordinary inquiry, and that B trusts him to disclose any such facts. A is subject to liability to B for his pecuniary loss in an action of deceit.

*m. Court and jury.* Whether there is a duty to the other to disclose the fact in question is always a matter for the determination of the court. If there are disputed facts bearing upon the existence of the duty, as for example the defendant's knowledge of the fact, the other's ignorance of it or his opportunity to ascertain it, the customs of the particular trade, or the defendant's knowledge that the plaintiff reasonably expects him to make the disclosure, they are to be determined by the jury under appropriate instructions as to the existence of the duty.

**REPORTERS NOTES:** This Section has been changed by expanding Subsection (2) to include Clauses (b) and (c).

*Comment (a):* No duty to disclose except as indicated in Subsection (1):

See e. g., Vaught v. Satterfield, 260 Ark. 544, 542 S.W.2d 502 (1976); Windram Mfg. Co. v. Boston Blacking Co., 239 Mass. 123, 131 N.E. 454 (1921); Crowell v. Jackson, 53 N.J.L. 656, 23 A. 426 (1891); Klott v. Associates Real Estate, 41 Ohio App. 2d 118, 322 N.E.2d 690 (1974); Goerke v. Vojvodich, 67 Wis.2d 102, 226 N.W.2d 211 (1975).

*Comment f:* This is supported by the following cases:

Principal and agent: McDonough v. Williams, 77 Ark. 261, 92 S.W. 783 (1905).

Prospective partner: Wolf v. Brungardt, 215 Kan. 272, 524 P. 2d 726 (1974).

Executor and beneficiary of an estate: Murphy v. Cartwright, 202 F.2d 71 (5 Cir. 1953); Foreman v. Henry, 87 Okl. 272, 210 P. 1026 (1922).



Bank and investing depositor: Brasher v. First Nat. Bank, 232 Ala. 340, 168 So. 42 (1936); cf. Boonstra v. Stevens-Norton, Inc., 64 Wash.2d 621, 393 P.2d 287 (1964) (loan broker); Tcherepnin v. Franz, 393 F.Supp. 1197 (N.D.Ill.1975).

Majority and minority stockholders: Speed v. Transamerica Corp., 99 F.Supp. 808 (D.Del. 1951) supplemented, 100 F.Supp. 461, petition denied, 100 F.Supp. 463; Manning v. Dial, 271 S.C. 79, 245 S.E.2d 120 (1978).

Old friends: Feist v. Roesler, 86 S.W.2d 787 (Tex.Civ.App. 1935).

Cf. In re Estate of Enyart, 100 Neb. 337, 160 N.W. 120 (1916), overruled in part, in Kingsley v. Noble, 129 Neb. 808, 263 N.W. 222 (1935) (affianced).

*Contra*: Eaton v. Sontag, 387 A.2d 33 (Me.1978).

Contracts of suretyship or guaranty: Cf. Connecticut Gen. Life Ins. Co. v. Chase, 72 Vt. 176, 47 A. 825 (1900); Atlantic Trust & Deposit Co. v. Union Trust & Title Corp., 110 Va. 286, 67 S.E. 182 (1909).

Insurance: State Farm Mutual Ins. Co. v. Ling, 348 So.2d 472 (Ala.1977).

See, generally, Edward Barron Estate Co. v. Woodruff Co., 163 Cal. 561, 126 P. 351 (1912) (attempting a list of similar relations).

*Comment g*:

See Dyke v. Zaiser, 80 Cal. App.2d 639, 182 P.2d 344 (1947); Tucker v. Beazley, 57 A.2d 191 (Mun.App.D.C.1948); St. Joseph Hospital v. Corbetta Constr. Co., 21 Ill.App.3d 925, 316 N.E.2d 51 (1974); Dennis v. Thomson, 240 Ky. 727, 43 S.W.2d 18 (1931); Kidney v. Stoddard, 48 Mass. (7 Metc.) 252 (1843); Consolidated Foods Corp. v. Pearson, 287 Minn. 305, 178 N.W.2d 223 (1970); Smith v. Pope, 103 N.H. 555, 176 A.2d 321 (1961); Junius Const. Co. v. Cohen, 257 N.Y. 393, 178 N.E. 672 (1931); Noved Realty Corp. v. A.A.P. Co., 250 App.Div. 1, 293 N.Y.S. 336 (1937); Berry v. Stevens, 168 Okl. 124, 31 P.2d 950 (1934); Palmiter v. Hackett, 95 Or. 12, 185 P. 1105 (1919), modified, 95 Or. 12, 186 P. 581.

Otherwise if the statement does not purport to tell the whole truth. Potts v. Chapin, 133 Mass. 276 (1882).

*Comment h*: This is supported by With v. O'Flanagan, [1936] 1 Ch. 575; Loewer v. Harris, 57 F. 368 (2 Cir. 1893); Fischer v. Kletz, 266 F.Supp. 180 (S.D.N.Y. 1967); Morykwas v. McKnight, 37 Mich.App. 304, 194 N.W.2d 522 (1971); cf. Equitable Life Ins. Co. of Iowa v. Halsey, Stuart & Co., 312 U.S. 410, 61 S.Ct. 623, 85 L.Ed. 920 (1941); Fox v. Kane-Miller Corp., 542 F.2d 915 (4 Cir. 1976); Hush v. Reaugh, 23 F.Supp. 646 (E.D.Ill.1938); Fruit Dispatch Co. v. Wolman, 124 Me. 355, 128 A. 740 (1925); Bergeron v. Dupont, 116 N.H. 373, 359 A.2d 627 (1976); Bursey v. Clement, 118 N.H. 412, 387 A.2d 346 (1978); Holt v. King, 54 W.Va. 441, 47 S.E. 362 (1903).

*Comment i*: This is supported by Pilmore v. Hood, 5 Bing.N.C. 97, 132 Eng.Rep. 1042 (1838).

See also the cases cited in the preceding paragraph.

*Comment k*: Undisclosed fact known or patent: Schnader v. Brooks, 150 Md. 52, 132 A. 381 (1926); Riley v. White, 231 S. W.2d 291 (Mo.App.1950).

Cf. Kapiloff v. Abington Plaza Corp., 59 A.2d 516 (Mun.App.D. C.1948) (act of congress); Gibson v. Mendenhall, 203 Okl. 558, 224 P.2d 251 (1950) (generally known).

Plaintiff has equal opportunity to obtain information: Phillips v. Homestake Consol. Placer Mines Co., 51 Nev. 226, 273 P. 657 (1929); Oates v. Taylor, 31 Wash.2d 898, 199 P.2d 924 (1948).

  

Restatement of the Law, Second, Torts, § 551

No reason to believe plaintiff acting under misapprehension: Blair v. National Security Ins. Co., 126 F.2d 955 (3 Cir. 1942); Haddad v. Clark, 132 Conn. 229, 43 A.2d 221 (1945); Egan v. Hudson Nut Products, Inc., 142 Conn. 344, 114 A.2d 213 (1955); Industrial Bank of Commerce v. Selling, 203 Misc. 154, 116 N.Y. S.2d 274 (1952); Cf. Lindquist v. Dilkes, 127 F.2d 21 (3 Cir. 1942).

Illustrations 6-8: See generally Laidlaw v. Organ, 15 U.S. (2 Wheat.) 178, 4 L.Ed. 214 (1817); Pratt Land & Imp. Co. v. McClain, 135 Ala. 452, 33 So. 185 (1902); Hays v. Meyers, 139 Ky. 440, 107 S.W. 287 (1908); Neill v. Shamburg, 158 Pa. 263, 27 A. 992 (1893); Holly Hill Lumber Co. v. McCoy, 201 S.C. 427, 23 S. E.2d 372 (1942); James v. Anderson, 149 Va. 113, 140 S.E. 264 (1927); cf. Guyer v. Cities Service Oil Co., 440 F.Supp. 630 (E.D. Wis.1977).

*Comment l*: Illustration 9 is taken from Kaze v. Compton, 283 S.W.2d 204 (Ky.1955).

See also Herzog v. Capital Co., 27 Cal.2d 349, 164 P.2d 8 (1945) (leaky house); Wilhite v. Mays, 140 Ga.App. 816, 232 S.E.2d 141 (1976) (defective septic system); Loghry v. Capel, 257 Iowa 285, 132 N.W.2d 417 (1965) (filled ground); Griffith v. Byers Constr. Co., 212 Kan. 65, 510 P.2d 198 (1973) (landfill in former saltwater reservoir); Weikel v. Sterns, 142 Ky. 513, 134 S.W. 908 (1911) (concealed cesspool); Cutter v. Hamlen, 147 Mass. 471, 18 N.E. 397 (1888) (premises infected with disease); Sullivan v. Ulrich, 326 Mich. 218, 40 N.W.2d 126 (1949) (termites); Mincy v. Crisler, 132 Miss. 223, 96 So. 162 (1923); Dargue v. Chaput, 166 Neb. 69, 88 N.W.2d 148 (1958) (drainage); Neveroski v. Blair, 141 N.J.Super. 365, 358 A.2d 473 (1976) (termites); Brooks v. Ervin Const. Co., 253 N.C. 214, 116 S.E.2d 454 (1960) (house built on filled ground); Crum v. McCoy, 41 Ohio Misc. 34, 322 N.E.2d 161 (1974); Obde v. Schlemeyer, 56 Wash.2d 449, 353 P.2d 672 (1960) (termites); Sorrell v. Young, 6 Wash.App. 220, 491 P.2d 1312 (1971) (landfill);

Illustration 10 is taken from Musgrave v. Lucas, 193 Or. 401, 238 P.2d 780 (1951).

See also McNeill v. Allen, 35 Colo.App. 317, 534 P.2d 813 (1975) (house could not possibly be built at expected price); Edward Malley Co. v. Button, 77 Conn. 571, 60 A. 125 (1905) (married woman obtaining credit when separated from her husband); Fuller v. De Paul University, 293 Ill.App. 261, 12 N.E.2d 213 (1938) (married apostate priest employed at Catholic institution); Highland Motor Transfer Co. v. Heyburn Bldg. Co., 237 Ky. 337, 35 S.W.2d 521 (1931) (swimming pool not disclosed to contractor); Neuman v. Corn Exchange Nat. Bank & Trust Co., 356 Pa. 442, 51 A.2d 759 (1947), supplemented, 52 A.2d 177 (tie-in agreement affecting value of shares sold); Chandler v. Butler, 284 S.W.2d 388 (Tex.Civ.App. 1955) (numerous facts affecting market value of stock); cf. Jewish Center v. Whale, 165 N.J.Super. 84, 397 A.2d 712 (1978) (rabbi with criminal record and disbarment).

Illustration 11 is taken from Dyke v. Zaiser, 80 Cal.App.2d 639, 182 P.2d 344 (1947); cf. Boonstra v. Stevens-Norton, Inc., 64 Wash.2d 621, 393 P.2d 287 (1964).

Illustration 12 is taken from Kallgren v. Steele, 131 Cal.App.2d 43, 279 P.2d 1027 (1955).

See also Service Oil Co. v. White, 218 Kan. 87, 542 P.2d 652 (1975).

See also, as to defects in the title of land sold: Corry v. Sylvia y Cia, 192 Ala. 550, 68 So. 891 (1915); Hall v. Carter, 324 S.W. 2d 410 (Ky.1959); Dirks Trust & Title Co. v. Koch, 32 S.D. 551, 143 N.W. 952 (1913); Newell Bros. v. Hanson, 97 Vt. 297, 123 A. 208 (1924); cf. Curran v. Heslop, 115 Cal.App.2d 476, 252 P.2d 378 (1953) (violation of building code).

As to sale of chattels without disclosure of defects, see French v. Vining, 102 Mass. 132, 3 Am. Rep. 440 (1869) (poisoned hay); Marsh v. Webber, 13 Minn. 109 (1868) (diseased sheep); Grigsby v. Stapleton, 94 Mo. 423, 7 S. W. 421 (1888) (cattle infected with Texas fever); Puls v. Hornbeck, 24 Okl. 288, 103 P. 665 (1909) (diseased cattle); Morriss-Buick Co. v. Huss, 84 S.W.2d 264 (Tex.Civ.App.1935) reversed, 113 S.W.2d 891 (wrecked and repaired automobile); Downing v. Wimble, 97 Vt. 390, 123 A. 433 (1924) (diseased cow).

  

Restatement of the Law, Second, Torts, § 551

*Law Reviews*: Keeton, Fraud -- Concealment and Non-Disclosure, 15 Tex.L.Rev. 1 (1936); Berger & Hirsch, Pennsylvania Tort Liability for Concealment and Nondisclosure in Business Transactions, 21 Temple L.Q. 368 (1948); Goldfarb, Fraud and Nondisclosure in the Vendor-Purchaser Relation, 8 West.Res.L. Rev. (1956); Note, 22 B.U.L. Rev. 607 (1942).

**CROSS REFERENCES:** ALR Annotations:

Practices forbidden by state deceptive trade practice and consumer protection acts.  89 A.L.R.3d 449.
Scope and exemptions of state deceptive trade practice and consumer protection acts.  89 A.L.R.3d 399.
Right to private action under state consumer protection act.  62 A.L.R.3d 169.
Liability of vendor's real-estate broker or agent to purchaser for misrepresentations as to, or nondisclosure of, physical defects of property sold.  8 A.L.R.3d 550.
Liability of real-estate broker or agent to principal for concealing or failing to disclose offer.  7 A.L.R.3d 693.
Duty of real-estate broker to disclose identity of purchaser or lessee.  2 A.L.R.3d 1119.
Duty of real-estate broker to disclose that prospective purchaser is a relative.  26 A.L.R.2d 1307.
Civil remedies of consumer for violations of Truth in Lending Act (15 U.S.C. §§ 1601-1644, 1661-1665).  11 A.L.R.Fed. 815.

Digest System Key Numbers:

Fraud 17

**Legal Topics:**

For related research and practice materials, see the following legal topics:
TortsBusiness TortsFraud & MisrepresentationGeneral Overview

  

10037F

```
********* Print Completed *********

Time of Request: Friday, January 25, 2008  17:46:51 EST

Print Number:    2822:71615283
Number of Lines: 299
Number of Pages: 8
```

```
Send To:  PARKER, JONATHAN
          FARELLA BRAUN & MARTEL
          235 MONTGOMERY ST
          SAN FRANCISCO, CA 94104-2902
```

