# Exhibit A

**APPENDIX OF NON-FEDERAL AND UNPUBLISHED FEDERAL AUTHORITIES CITED IN VISA USA INC.'S OPPOSITION TO DEFENDANT MARITZ INC.'S REQUEST FOR DISCOVERY**

21823\1392810.1

LEXSEE

**ROBERT R. CREAGER, Plaintiff, v. MASUO YOSHIMOTO; M.P. TECHNOLOGIES, INC.; and M2M, INC., Defendants.**

**No. C 05-01985 JSW**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**2007 U.S. Dist. LEXIS 77309**

**October 9, 2007, Decided**
**October 9, 2007, Filed**

**PRIOR HISTORY:** <u>Creager v. Masuo Yoshimoto, 2006 U.S. Dist. LEXIS 14048 (N.D. Cal., Mar. 14, 2006)</u>

**CORE TERMS:** summary judgment, cause of action, unjust enrichment, breach of contract, covenant of good faith, non-moving, matter of law, fair dealing, disputed facts, unfair, implied covenant, business practice, fraudulent, genuine issue, common count, deceived, prong, moving party, produce evidence, wrongful conduct, unclean hands, forbidden, covenant, replete, finder's, pretrial, bonus, stock, entitled to judgment, burden of persuasion

**COUNSEL:** [*1] For Robert R. Creager, an individual, Plaintiff: Niall Padraic McCarthy, LEAD ATTORNEY, Cotchett, Pitre & McCarthy, Burlingame, CA; Laura Elizabeth Schlichtmann, Cotchett Pitre & McCarthy, San Francisco Airport Office Center, Burlingame, CA.

For Masuo Yoshimoto, an individual, M2M, Inc., a corporation, Defendant: Brian Gearinger, LEAD ATTORNEY, Mark Lewis Mosley, LEAD ATTORNEY, Mosley & Gearinger LLP, San Francisco, CA; Robert Bernard Mullen, Schiff Hardin LLP, San Francisco, CA.

For M.P. Technologies, Inc., a corporation, Defendant: Robert Bernard Mullen, LEAD ATTORNEY, Schiff Hardin LLP, San Francisco, CA.

For Masuo Yoshimoto, an individual, Counter-claimant: Brian Gearinger, LEAD ATTORNEY, Mark Lewis Mosley, LEAD ATTORNEY, Mosley & Gearinger LLP, San Francisco, CA; Robert Bernard Mullen, Schiff Hardin LLP, San Francisco, CA.

For Robert R. Creager, an individual, Counter-defendant: Laura Elizabeth Schlichtmann, Cotchett Pitre & McCarthy, San Francisco Airport Office Center, Burlingame, CA.

**JUDGES:** JEFFREY S. WHITE, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** JEFFREY S. WHITE

**OPINION**

**ORDER DENYING IN PART AND GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Now before the Court is the motion for summary judgment [*2] filed by Defendants Masuo Yoshimoto, M.P. Technologies ("MPT") and M2M, Inc. ("M2M"). Having considered the parties' pleadings, relevant legal authority, the Court HEREBY DENIES IN PART AND GRANTS IN PART Defendants' motion.

**BACKGROUND**

Plaintiff, Robert R. Creager, alleges that Defendants, Yoshimoto and the two corporate entities, MPT and M2M, are liable for breach of contract and fraud relating to a written agreement between the two individuals. The written agreement entitled a Memorandum of Understanding ("MOU") created a new company, AMG Media Vision, Inc. ("AMG") whose purpose was to identify potential acquisition candidates in order to





increase MPT's international presence, and then assist in negotiations with the targeted companies.

The Court shall address additional facts as necessary to its analysis in the remainder of this Order.

## ANALYSIS

### A. Standard on Summary Judgment.

A principal purpose of the summary judgment procedure is to identify and dispose of factually unsupported claims. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-24, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, [*3] if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c).*

A party moving for summary judgment who does not have the ultimate burden of persuasion at trial, must produce evidence which either negates an essential element of the non-moving party's claims or show that the non-moving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.,* 210 F.3d 1099, 1102 (9th Cir. 2000). A party who moves for summary judgment who does bear the burden of proof at trial, must produce evidence that would entitle him or her to a directed verdict if the evidence went uncontroverted at trial. *C.A.R. Transp. Brokerage Co., Inc. v. Darden,* 213 F.3d 474, 480 (9th Cir. 2000).

Once the moving party meets his or her initial burden, the non-moving party must go beyond the pleadings and by its own evidence "set forth specific facts showing that there is a genuine issue for trial." *Fed. R. Civ. P. 56(e).* "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there [*4] is no 'genuine issue for trial.'" *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 289, 88 S. Ct. 1575, 20 L. Ed. 2d 569 (1968)); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) ("The mere existence of a scintilla of evidence ... will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party].").

In order to make this showing, the non-moving party must "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan,* 91 F.3d 1275, 1279 (9th Cir. 1996). It is not the Court's task to "scour the record in search of a genuine issue of triable fact." *Id.* (quoting *Richards v. Combined Ins. Co.,* 55 F.3d 247, 251 (7th Cir. 1995)). If the non-moving party fails to make this showing, the moving party is entitled to judgment as a matter of law. *Celotex,* 477 U.S. at 323.

"In considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations, and is required to draw all inferences in a light most favorable to the non-moving party." *Freeman v. Arpaio,* 125 F.3d 732, 735 (9th Cir. 1997).

### B. [*5] Cause of Action for Breach of Contract Against MPT Survives Summary Judgment.

Defendants contend that Creager cannot maintain a cause of action for breach of contract against MPT because the company was not a signatory to the original MOU between Creager and Yoshimoto. However, because there are disputed facts regarding the relationship between Yoshimoto and MPT, Creager may be able to prove that Yoshimoto acted as MPT's agent and therefore that MPT ratified the MOU. *See Van't Rood v. County of Santa Clara,* 113 Cal. App. 4th 549, 571, 6 Cal. Rptr. 3d 746 (2003). Because agency may be created by ratification, and because there may have been an agency relationship between Yoshimoto and MPT based on the evidence in the record, the Court cannot find that there is no possible breach of contract claim against MPT as a matter of law. Accordingly, the Court DENIES Defendants' motion for summary judgment on the first cause of action for breach of contract against MPT.

### C. First Cause of Action for Breach of Contract Survives Summary Judgment.

Defendants contend that the MOU signed by Creager and Yoshimoto was nothing more than "an agreement to agree" and cannot be enforced as a contract. The Court finds that the record [*6] is replete with disputed facts about the parties' intentions and the meaning of the MOU. In addition, the Court finds there is a dispute of fact regarding the intentions of the parties in their various communications regarding whether Creager waived his rights to enforce the MOU. Accordingly, the Court DENIES summary judgment as to the first cause of action for breach of contract.

  

**D. Second Cause of Action for Breach of the Implied Covenant of Good Faith Survives Summary Judgment.**

Defendants move for summary judgment on Creager's cause of action for breach of the implied covenant of good faith and fair dealing on the grounds that it is entirely duplicative of his breach of contract claim. "[U]nder California law, all contracts have an implied covenant of good faith and fair dealing." *In re Vylene Enters.*, 90 F.3d 1472, 1477 (9th Cir. 1996) (citing *Harm v. Frasher*, 181 Cal. App. 2d 405, 417, 5 Cal. Rptr. 367 (1960)). The covenant "exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the benefits of the agreement actually made." *Guz v. Bechtel Nat. Inc.*, 24 Cal. 4th 317, 349, 100 Cal. Rptr. 2d 352, 8 P.3d 1089 (2000). However, the covenant "cannot impose substantive duties or [*7] limits on the contracting parties beyond those incorporated in the specific terms of their agreement." *Id.* Thus, to the extent a plaintiff seek to impose limits "beyond those to which the parties actually agreed, the [implied covenant] claim is invalid. To the extent the implied covenant claim seeks simply to invoke terms to which the parties *did* agree, it is superfluous." *Id.* at 352 (emphasis in original); *see also Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1395, 272 Cal. Rptr. 387 (1990) (holding that if the allegations supporting a claim for breach of the implied covenant of good faith and fair dealing "do not go beyond the statement of a mere contract breach, and, relying on the same alleged acts, simply seek the same damages or other relief already claimed in a companion contract cause of action, they may be disregarded as superfluous as no additional claim is actually stated."). "The central teaching of *Guz* is that in most cases, a claim for breach of the implied covenant can add nothing to a claim for breach of contract." *Lamke v. Sunstate Equipement Co., LLC.*, 387 F. Supp. 2d 1044, 1047 (N.D. Cal. 2004).

Nevertheless, a plaintiff may bring implied covenant claim where the [*8] plaintiff alleges that the defendant acted in bad faith to frustrate the contract's benefits. *See Guz*, 24 Cal. 4th at 353 n.18 (acknowledging that "the covenant might be violated if termination of an at-will employee was a mere pretext to cheat the worker out of another contract benefit to which the employee was clearly entitled...."); *see also McCollum v. XCare.net, Inc.*, 212 F. Supp. 2d 1142, 1153 (N.D. Cal. 2002) (applying California law).

In *McCullum*, the plaintiff alleged that she was hired as a sales manager to consummate an agreement with the defendant company's client. *McCollum*, 212 F. Supp. 2d at 1144. Plaintiff earned a base salary plus commissions. *Id.* According to plaintiff, the client was to sign a two-year contract that would have provided the defendant company approximately $ 10 million in revenue. The agreement was intended to be signed on October 12, 2000 and was actually signed on October 20, 2000. However, the defendant company terminated the plaintiff effective on October 11, 2000. *Id.* at 1144-45. The court found that there was evidence from which a fact finder could find that the defendant company intended to frustrate the plaintiff's legitimate expectations to commissions [*9] by terminating the plaintiff less than two weeks before the agreement with the client was signed, and thus found the defendant was not entitled to summary judgment on the claim for breach of the implied covenant of good faith and fair dealing. *Id.* at 1153.

The Court finds that there remain disputed facts regarding whether Defendants acted in bad faith in allegedly frustrating the purpose of the contract. *See Hicks v. E.T. Legg & Assocs.*, 89 Cal. App. 4th 496, 508-09, 108 Cal. Rptr. 2d 10 (2001) (holding that the question of whether there is a breach of the implied covenant of good faith and fair dealing is a question of fact unless there is only one possible inference from the evidence). Therefore, the Court cannot hold as a matter of law that Creager may not maintain a separate cause of action for breach of the implied covenant of good faith and fair dealing. Accordingly, the Court DENIES Defendants' motion for summary judgment on the second cause of action for breach of the implied covenant of good faith and fair dealing.

**E. Third Cause of Action for Fraud Survives Summary Judgment.**

Defendants contend that the evidence establishes that Creager could never prove a cause of action for fraud. However, again, [*10] the record is replete with evidence of the parties' intentions and the interpretation of those expressed intentions. A jury might find, if presented with the controverted evidence, that there was an intent to mislead and an intent to induce Creager's reliance to his detriment. *See Cicone v. URS Corp.*, 183 Cal. App. 3d 194, 200, 227 Cal. Rptr. 887 (1986) (setting out elements of a cause of action for fraud).

Defendants also contend that because Creager

Page 3

  
LexisNexis™  LexisNexis™  LexisNexis™

received over a million dollars in a finder's fee and salary and bonus, he has incurred no damages as a result of the alleged fraud. However, Creager alleges that he was owed far in excess of this amount.

Accordingly, the Court DENIES Defendants' motion for summary judgment as to the third cause of action for fraud.

**F. Fourth Cause of Action for Violation of California Business and Professions Code Section 17200 Does Not Survive Summary Judgment.**

Defendants claim that Creager's cause of action for violation of California Business and Professions Code Section 17200 fails as a matter of law. In order to bring a Section 17200 claim, "a plaintiff must show either an (1) 'unlawful, unfair, or fraudulent business act or practice,' or (2) 'unfair, deceptive, untrue [*11] or misleading advertising.'" See Lippitt v. Raymond James Fin. Servs., 340 F.3d 1033, 1043 (9th Cir. 2004) (quoting Cal. Bus. & Prof. Code § 17200). To state a claim for unfair competition, a "plaintiff must establish that the practice is either unlawful (i.e., is forbidden by law), unfair (i.e., harm to victim outweighs any benefit) or fraudulent (i.e., is likely to deceive members of the public)." Albillo v. Intermodal Container Services, Inc., 114 Cal. App. 4th 190, 206, 8 Cal. Rptr. 3d 350 (2003). Remedies under Section 17200 generally are limited to injunctive relief and restitution. See, e.g., Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co., 20 Cal. 4th 163, 179, 83 Cal. Rptr. 2d 548, 973 P.2d 527 (1999).

The "unlawful" prong proscribes "anything that can be properly be called a business practice and that at the same time is forbidden by law." Smith v. State Farm Mut. Auto. Ins. Co., 93 Cal. App. 4th 700, 717-18, 113 Cal. Rptr. 2d 399 (2001) (internal quotations omitted). Unlawful practices "are any practices forbidden by law, be it civil or criminal, federal, state, or municipal, statutory, regulatory or court-made." Saunders v. Superior Court, 27 Cal. App. 4th 832, 838-39, 33 Cal. Rptr. 2d 438 (1994). Here, Creager alleges that Defendants' violation of Section 17200 [*12] is based upon their "wrongful conduct." (Complaint at P 63.) In opposition to Defendants' motion for summary judgment, Creager argues that the alleged wrongful conduct constitutes a violation of California Civil Code Sections 1709 and 1710, which define actionable deceit. However, the Court finds that the alleged violations of the California Civil Code definitions of deceitful conduct do

not rise to the level of unlawful conduct as proscribed by Section 17200.

Creager does not contend that his allegations constitute an unfair business practice, but does maintain that the alleged wrongful conduct constitutes fraudulent conduct pursuant to the third prong of Section 17200. However, a fraudulent business practice under Section 17200 "is not based upon proof of the common law tort of deceit or deception, but is instead premised on whether the public is likely to be deceived." Pastoria v. Nationwide Ins., 112 Cal. App. 4th 1490, 1498, 6 Cal. Rptr. 3d 148 (2003). Stated another way, "In order to state a cause of action under the fraud prong of [Section 17200] a plaintiff need not show that he or others were actually deceived or confused by the conduct or business practice in question. The "fraud" prong of [section 17200] [*13] is unlike common law fraud or deception. A violation can be shown even if no one was actually deceived, relied upon the fraudulent practice, or sustained any damage. Instead, it is only necessary to show that members of the public are likely to be deceived.'" Schnall v. Hertz Corp., 78 Cal. App. 4th 1144, 1167, 93 Cal. Rptr. 2d 439 (2000).

Because the Court finds that the allegations in the complaint and the evidence offered by the parties fails to demonstrate the existence of an unlawful, unfair or deceptive business practice, the Court GRANTS summary judgment for the fourth cause of action for violation of California Business and Professions Code Section 17200.

**G. Unjust Enrichment is a Theory of Recovery, Not a Cause of Action.**

Under California law, a plaintiff is only entitled to recover for unjust enrichment "if the circumstances are such as to warrant the inference that it was the expectation of *both parties* during the time the services were rendered that the compensation should be made." Del Del Madera Props. v. Rhodes & Gardner, 820 F.2d 973, 978 (9th Cir. 1987) (citations omitted) (emphasis in original). Although Creager produces evidence of such mutual expectation, unjust enrichment is a theory of [*14] recovery, not an independent legal claim. Melchior v. New Line Productions, Inc., 106 Cal. App. 4th 779, 793, 131 Cal. Rptr. 2d 347 (2003) ("[T]here is no cause of action in California for unjust enrichment."). Therefore, although Creager may be entitled to recovery for unjust enrichment under his other theories of liability,





his claim for unjust enrichment does not constitute a stand-alone cause of action. Accordingly, the Court GRANTS Defendants' motion for summary judgment for the fifth cause of action for unjust enrichment, although it makes no finding as to whether Creager may be entitled to such damages as a matter of law.

## H. Defendants' Unclean Hand Defense is Based on Disputed Facts.

The Court finds that the record before it is replete with disputed facts regarding, among other things, the alleged secret finder's fee from MagiNet, the alleged insider trading with Guest-Tek and the alleged handshake agreement to dismiss this lawsuit. Accordingly, the Court cannot find as a matter of law that Defendants' unclean hands defense is an absolute bar to Creager's equitable causes of action and DENIES Defendants' motion on this ground.

## I. Sixth Cause of Action for Common Counts Survives Summary Judgment.

The [*15] only essential allegations of a common count are "(1) the statement of indebtedness in a certain sum, (2) the consideration, i.e., goods sold, work done, etc., and (3) nonpayment." *Farmers Ins. Exchange v. Zerin,* 53 Cal. App. 4th 445, 460, 61 Cal. Rptr. 2d 707 (1997) (citing 4 Witkin Cal. Procedure (3d ed. 1985) Pleading, § 508). A cause of action for money had and received is stated if it is alleged the defendant "is indebted to the plaintiff in a certain sum 'for money had and received by the defendant for the use of the plaintiff.'" *Schultz v. Harney,* 27 Cal. App. 4th 1611, 1623, 33 Cal. Rptr. 2d 276 (1994).

Creager alleges he is owed the balance of his signing bonus as well as 3% stock at the price the stocks were trading at the date of acquisition. Creager asserts these

amounts are readily valued, and therefore constitute a claim under common counts. There is nothing in the record to determine that the value of the stocks and remaining balance of the bonus is not readily ascertainable. Therefore, the Court DENIES Defendants' motion fur summary judgment as to the sixth cause of action for common counts.

## CONCLUSION

For the reasons set forth in this Order, Defendants' motion is DENIED as to Plaintiff's causes of action for breach [*16] of contract, breach of the implied covenant of good faith and fair dealing, fraud, unjust enrichment and common counts. The Court GRANTS Defendants' motion for summary judgment as to the fourth cause of action for violation of California Business and Professions Code Section 17200 and the fifth cause of action for unjust enrichment. Finally, the Court finds there are disputed facts regarding the defense of unclean hands.

The Court hereby sets the following dates: the pretrial conference shall be held on January 14, 2008 at 2:00 p.m. and the trial shall commence on February 4, 2008 at 8:30 a.m. The parties should refer to the Court's standing order on pretrial submissions for deadlines associated with their pretrial filings.

## IT IS SO ORDERED.

Dated: October 9, 2007

/s/ Jeffrey S. White

JEFFREY S. WHITE

UNITED STATES DISTRICT JUDGE





# Exhibit B

**APPENDIX OF NON-FEDERAL AND UNPUBLISHED FEDERAL AUTHORITIES CITED IN VISA USA INC.'S OPPOSITION TO DEFENDANT MARITZ INC.'S REQUEST FOR DISCOVERY**

LEXSEE

**GARBACZ, Plaintiff, v. A.T. KEARNY, INC., Defendant.**

**No. C 05-05404 JSW**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**2006 U.S. Dist. LEXIS 20135**

**April 3, 2006, Decided**
**April 4, 2006, Filed**

**CORE TERMS:** employment agreement, arbitration, arbitration agreement, agreement to arbitrate, declaration, compel arbitration, binding, document entitled, conduct discovery, enforceable, purported, termination, repudiated, enclosed, evidentiary hearing, proper foundation, undisputed, integrated, signature

**COUNSEL:** [*1] For Rand Garbacz, Plaintiff: Franklin J. Lunding, Attorney at Law, Monterey, CA; Hansen P. Reed, Monterey, CA; Katherine T. Hartmann, Peter B. Carey, Law Offices of Peter B. Carey, Chicago, IL.

For A.T. Kearny, Inc., a Delaware Corporation, Defendant: Helen Byungson Kim, Baker & Hostetler LLP, Los Angeles, CA; Stephen Sutton, Baker & Hostetler LLP, Cleveland, OH.

**JUDGES:** JEFFREY S. WHITE, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** JEFFREY S. WHITE

**OPINION**

**ORDER DENYING DEFENDANT'S MOTION TO COMPEL ARBITRATION**

Now before the Court is the motion of Defendant A.T. Kearny, Inc. ("ATK") to compel arbitration. Having carefully considered the parties' arguments, the relevant legal authority, and having had the benefit of oral argument, the Court hereby DENIES ATK's motion.

**BACKGROUND**

Plaintiff Rand Garbacz ("Garbacz") filed an action against ATK raising claims related to his employment by ATK. Garbacz asserts claims for breach of his employment agreement, among other employment related claims. ATK contends that Garbacz is subject to a binding arbitration agreement that covers these claims.

It is undisputed that in 2003, ATK and Plaintiff Rand Garbacz ("Garbacz") began negotiating an [*2] agreement for Garbacz to begin employment with ATK. Garbacz contends that ATK made an offer that he accepted in July 2003, but that ATK later repudiated the agreement. At the hearing on the instant motion, ATK characterized the events in July 2003 as an offer that was rejected. Regardless of whether there was a repudiated agreement or rejected offer, it is undisputed that there was not a binding, enforceable agreement between the parties in July 2003.

Garbacz submits a declaration which states that in late July or early August 2003, ATK made another offer of employment, but then informed Garbacz that ATK had not actually approved the terms of the second offer. (Declaration of Rand Garbacz ("Garbacz Decl."), PP 9-10.) [1] In September 2003, ATK made a third offer of employment. Garbacz signed the third offer letter on September 6, 2003. (*Id.*, Ex. B.)

1    ATK objects to much of the Garbacz Declaration. The Court overrules ATK's objections to paragraph 7 for failure to lay a proper foundation and to paragraphs 9 and 10 based on hearsay. To the extent that ATK objects on the ground that Garbacz failed to lay a proper foundation for testifying as to ATK's reasons for





taking certain actions, the Court did not consider the Garbacz Declaration to determine ATK's alleged motivations or intentions, and thus, the Court need not rule on the admissibility of such evidence at this time. ATK further objects to the majority of the Garbacz Declaration on the grounds that it is an attempt to contradict the terms of a valid, integrated contract. However, as the Court discusses below, ATK has not yet demonstrated that a valid, integrated contract exists. Moreover, the Court does not construe the evidence it considered in resolving this motion as an attempt to alter the terms of such purported agreement. Accordingly, such objections are overruled.

[*3] The offer letter sent in September 2003 provides that ATK's offer is contingent upon Garbarcz's execution "of the enclosed A.T. Kearney management consulting Employment Agreement, the enclosed A.T. Kearney Employee Non-Disclosure and Proprietary Information Agreement, and the EDS Code of Business Conduct. (*Id.*, Ex. B.) The offer letter also states that "A.T. Kearney Officer Employment and Arbitration Agreements," as well as other documents, were enclosed with the offer letter. (*Id.*, Ex. B.)

ATK submitted a copy of a document entitled "Employment Agreement." (Declaration of Jennifer M. Schulte ("Schulte Decl."), Ex. A.) The Employment Agreement is signed by Ms. Schulte on behalf of ATK and by Garbacz but is not dated. (*Id.*, Ex. A.) The Employment Agreement provides that it is "effective as of the date (the effective date') set forth on the signature page." (*Id.*, Ex. A at 4.) On the last page of the Employment Agreement, which contains the signature blocks, it provides that "the parties have executed this Agreement as of the Effective Date set forth below." (*Id.*, Ex. A at 12.) Just below this paragraph, the Employment Agreement states "EFFECTIVE DATE:    [*4]   ." (*Id.*) No date is written on this line.

Paragraph 12 of the Employment Agreement provides that "any controversy or dispute between Employee and the Company . . . related to or arising out of Employee's employment or the termination thereof (other than disputes regarding an alleged violation of Paragraphs 6, 7, or 9 . . .) including any claim of wrongful termination, constructive termination, employment discrimination or workplace torts . . . shall

be fully resolved *pursuant to the Dispute Resolution and Arbitration Procedures* attached as Addendum 1 and fully incorporated herein." (*Id.*, Ex. A. at 7 (emphasis added).)

ATK submits a document entitled "Addendum 1, Arbitration Procedures." (*Id.*, Ex. A.) This document was signed by Garbacz on July 12, 2003 and by Ms. Schulte on September 21, 2003. (*Id.*, Ex. A.)

## ANALYSIS

Pursuant to the Federal Arbitration Act ("FAA"), arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds that exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Once the Court has determined that an arbitration agreement involves a transaction involving interstate [*5] commerce, thereby falling under the FAA, the Court's only role is to determine whether a valid arbitration agreement exists and whether the scope of the parties' dispute falls within that agreement. 9 U.S.C. § 4; *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). "Under § 4 of the FAA, a district court must issue an order compelling arbitration if the following two-pronged test is satisfied: (1) a valid agreement to arbitrate exists; and (2) that agreement encompasses the dispute at issue." *United Computer Systems v. AT & T Corp.*, 298 F.3d 756, 766 (9th Cir. 2002).

"When considering a motion to compel arbitration, the court applies a standard similar to the summary judgment standard of Fed. R. Civ. P. 56. . . . If there is doubt as to whether such an agreement exists, the matter should be resolved through an evidentiary hearing or mini-trial. . . . When considering a motion to compel arbitration which is opposed on the ground that there is no binding agreement to arbitrate, the district court should give the opposing party the benefit of all reasonable doubts [*6] and inferences that may arise." *McCarthy v. Providential Corp.*, 1994 U.S. Dist. LEXIS 10122, 1994 WL 387852, *2 (N.D. Cal. July 19, 1994).

Here, the parties in this case do not dispute that the claims at issue would fall within the scope of the purported arbitration agreement. However, they do dispute whether the parties actually entered into an agreement to arbitrate, and if so, whether the agreement is enforceable.



2006 U.S. Dist. LEXIS 20135, *6

Based on the record presently before the Court, the Court finds there are several genuine issue of material fact regarding whether Garbacz consented to an arbitration agreement. ATK presented an agreement to arbitrate that was signed by Garbacz, but he signed it in July in connection with the offer and/or agreement that was either rejected or repudiated. ATK also argues that Garbacz signed an Employment Agreement which incorporates the arbitration agreement, but this argument suffers from several defects. First, it is questionable whether the Employment Agreement was effective. Second, even if the Employment Agreement was effective, it does not specifically provide that Garbacz agrees to binding arbitration. Rather, it incorporates by reference a document entitled "Dispute Resolution [*7] and Arbitration Procedures." Based on the evidence before the Court, the Court cannot find as a matter of law that the document entitled "Arbitration Procedures," signed by Garbacz in July 2003, is the same document that was attached to and incorporated into the Employment Agreement in connection with the September 2003 offer letter. Without a valid agreement to arbitration, Garbacz cannot be compelled to arbitrate. Accordingly, the Court denies ATK's motion to compel.

Pursuant to 9 U.S.C. § 4, "[i]f the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof." If requested, the district court shall refer this issue to a jury. *See* 9 U.S.C. § 4. However, here, both parties confirmed at the hearing on the motion to compel that neither of them are requesting that a jury hear this issue. Thus, if necessary, the Court may hold a bench trial or evidentiary hearing to resolve whether an agreement to arbitrate exists. It is not clear whether ATK seeks an opportunity to conduct discovery and to make a further showing regarding the purported agreement [*8] to arbitrate. Therefore, if ATK does seek an opportunity to conduct discovery and have the Court conduct further proceedings on this issue, ATK shall file a request by no later than April 6, 2006.

## CONCLUSION

For the foregoing reasons the Court DENIES ATK's motion to compel arbitration. The Court FURTHER ORDERS that ATK shall file a request by no later than April 6, 2006 if it seeks to conduct discovery and make a further showing regarding whether an agreement to arbitrate exists.

**IT IS SO ORDERED.**

Dated: April 3, 2006

JEFFREY S. WHITE

UNITED STATES DISTRICT JUDGE

 

<u>Citation #20</u>     (as appears on page 2 of Document)

2007 U.S. Dist. LEXIS 44220

  

# Exhibit C

**APPENDIX OF NON-FEDERAL AND UNPUBLISHED FEDERAL AUTHORITIES
CITED IN VISA USA INC.'S OPPOSITION TO DEFENDANT MARITZ INC.'S
REQUEST FOR DISCOVERY**

LEXSEE

**THE HOUSEHOLDER GROUP LLLP, Plaintiff, v. RANDY S. FUSS, Defendant.**

**No. C 07-573 SI**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**2007 U.S. Dist. LEXIS 44220**

**June 4, 2007, Decided**
**June 4, 2007, Filed**

**CORE TERMS:** conversion, independent contractor, confidential, proprietary, fiduciary relationship, special relationship, fiduciary, leave to amend, consulting, law governs, contractual relationship, causes of action, fair dealing, negligent interference, moves to strike, customer list, transferred, buy-out, choice of law, trade secrets, contract claim, liquidated damages, covenant of good faith, fiduciary duty, tort claim, intangible property, contractual, distributor, expectancy, covenant

**COUNSEL:** [*1] For The Householder Group, LLLP, an Arizona Limited Liability Limited, Plaintiff: William Joseph Acromite , Esq., LEAD ATTORNEY, SCHANZ ACROMITE LLP, San Juan Capistrano, CA.

For Randy S. Fuss, an individual, Defendant: Rick Augustini, LEAD ATTORNEY, Law Office of Rick Augustini, Irvine, CA.

**JUDGES:** SUSAN ILLSTON, United States District Judge.

**OPINION BY:** SUSAN ILLSTON

**OPINION**

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS AND STRIKE; GRANTING PLAINTIFF LEAVE TO AMEND**

On June 1, 2007, the Court heard argument on defendant's motion to dismiss and/or strike. For the reasons set forth below, the Court GRANTS in part and

DENIES in part defendant's motion, and GRANTS plaintiff leave to amend. Plaintiff shall file an amended complaint no later than **June 15, 2007.**

**BACKGROUND**

Plaintiff The Householder Group LLLP ("Householder"), an Arizona Limited Liability Limited Partnership, filed this action on January 29, 2007 against defendant Randy Fuss, an individual who resides in this District. The complaint alleges that Householder is a "financial planning and investment advisory firm, engaged in the business of selling life insurance, securities, mutual funds [*2] and other investment products, and providing related financial, retirement, investment and other advisory and consulting services." Complaint P 6. The complaint alleges that in early 1999, Householder, through its predecessor-in-interest, expended several millions of dollars acquiring assets, proprietary and confidential information and trade secrets from an unrelated California corporation, which included unique and proprietary marketing and consulting methods and practices for use in the financial planning business. *Id.* P 7.

In August 2003, defendant Fuss contacted Householder seeking a contractual engagement with Householder as a financial services manager. *Id.* P 9. In or about September 2003, Fuss and Householder signed a written contract under which the parties agreed that Fuss would work as an independent contractor for Householder, and that Fuss would establish, develop and operate a Householder branch office in Santa Rosa, California. *Id.* P 11 & Ex. A ("The Householder Group Branch Office Agreement"). Under the agreement,

Page 1





Householder agreed to disclose to and license Fuss to use Householder's proprietary methods, The Householder Group trade name, and to provide [*3] training, consulting and support services during the term of the agreement to assist Fuss with the development of the Santa Rosa branch office. *Id.* P 12.

In exchange for the consideration provided by Householder, Fuss agreed to pay Householder a one time consulting fee of $ 150,000; to keep confidential and to not disclose to any third party or use the Householder "proprietary methods" for Fuss' own benefit and to the exclusion of Householder; to transact all Santa Rosa branch business through Householder and its designated broker-dealer; to split all revenues generated through sales and consulting activity generated by the Santa Rosa branch with Householder in accordance with the revenue sharing arrangement provided by the agreement; and to "buy-out" Householder's interest in the Santa Rosa branch upon termination of the agreement. [1] *Id.* P 13.

> 1   The parties dispute whether this provision of the agreement is fairly characterized as a "buy out" or a liquidated damages clause. This issue is discussed *infra.*

[*4] On January 13, 2004, the parties signed an "Addendum to Branch Office Agreement" in which Fuss and Householder agreed that during the term of the agreement, payments toward satisfying a $ 30,000 loan, which Fuss had obtained from Householder's broker-dealer, AIG Financial Advisors ("AIG"), would be deducted from Fuss' share of the revenues generated through the Santa Rosa branch until paid in full. *Id.* P 17 & Ex. B.

On June 30, 2006, prior to completing payment of the $ 150,000 consulting fee and prior to the expiration of the term of the agreement, and without compliance with the "buy-out" provision of the contract, Fuss gave written notice to Householder of his immediate "resignation" from Householder and from his affiliation with AIG. *Id.* P 21. Householder alleges that Fuss "misappropriated some or all of the proprietary and confidential information and trade secrets received from Plaintiff during the contract and caused all of the existing and prospective clients and accounts established through the Santa Rosa branch during the contract to be disclosed and transferred to an unknown third party broker-broker dealer, and to thereafter collect all revenues generated by those [*5] existing and new clients and accounts for his

own benefit, for the benefit of others and to the exclusion and damage of Plaintiff." *Id.* P 22.

Householder has brought twelve causes of action against Fuss: (1) breach of contract; (2) breach of covenant of good faith and fair dealing; (3) breach of fiduciary duty; (4) misappropriation; (5) intentional interference with contracts; (6) negligent interference with contracts; (7) intentional interference with economic relations; (8) negligent interference with economic relations; (9) unfair competition; (10) conversion; (11) accounting and constructive trust; and (12) injunctive relief. Fuss has moved to dismiss a number of the non-contract claims. Fuss also moves to strike various portions of the complaint.

## LEGAL STANDARDS

### I. Motion to dismiss

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. The question presented by a motion to dismiss is not whether the plaintiff will prevail in the action, but whether the plaintiff is entitled to offer evidence in support of the claim. [*6] See *Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974), overruled on other grounds by Davis v. Scherer, 468 U.S. 183, 104 S. Ct. 3012, 82 L. Ed. 2d 139 (1984).*

In answering this question, the Court must assume that the plaintiff's allegations are true and must draw all reasonable inferences in the plaintiff's favor. See *Usher v. City of Los Angeles, 828 F.2d 556, 561 (9th Cir. 1987).* Even if the face of the pleadings suggests that the chance of recovery is remote, the Court must allow the plaintiff to develop the case at this stage of the proceedings. *See United States v. City of Redwood City, 640 F.2d 963, 966 (9th Cir. 1981).*

If the Court dismisses the complaint, it must then decide whether to grant leave to amend. The Ninth Circuit has "repeatedly held that a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith, 203 F.3d 1122, 1130 (9th Cir. 2000)* (citations and internal quotation marks omitted).

### II. Motion to strike

  

Federal Rule of Civil Procedure 12(f) [*7] provides that "the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."

## DISCUSSION

### I. Choice of Law

The parties' contract provides that "[t]his AGREEMENT shall be in all respects interpreted, enforced and governed by and under the laws of the State of Arizona." Agreement § XII.H (attached as Ex. 1 to Complaint). The parties do not dispute that Arizona law governs plaintiff's breach of contract claim. Defendant contends that Arizona law also governs plaintiff's non-contract claims. Plaintiff's position is unclear; plaintiff states that there is no reason to adopt a "bright line rule" applying Arizona law to all of plaintiff's claims, yet plaintiff's opposition also largely analyzes whether plaintiff has stated a claim under Arizona law.

In any event, the Court finds that Arizona law governs all of the parties' claims. This Court applies the choice of law rules of California, the forum state of this action. See *Day & Zimmermann, Inc. v. Challoner,* 423 U.S. 3, 4, 96 S. Ct. 167, 46 L. Ed. 2d 3 (1975); *General Signal Corp. v. MCI Telecommunications Corp.,* 66 F.3d 1500, 1505 (9th Cir. 1995), [*8] *cert. denied,* 516 U.S. 1146, 116 S. Ct. 1017, 134 L. Ed. 2d 97 (1996). In *Nedlloyd Lines B.V. v. Superior Court,* 3 Cal. 4th 459, 11 Cal. Rptr. 2d 330, 834 P.2d 1148 (1992), the California Supreme Court held,

> [A] valid choice-of-law clause, which provides that a specified body of law "governs" the "agreement" between the parties, encompasses all causes of action arising from or related to that agreement, regardless of how they are characterized, including tortious breaches of duties emanating from the agreement or the legal relationships it creates.

*Id.* at 470; *see also General Signal Corp.,* 66 F.3d at 1506 (applying *Nedlloyd* to choice of law analysis). Here, there is no dispute about the validity of the agreement's choice of law clause. Further, plaintiff does not dispute that all of plaintiff's claims arise from or are related to that agreement, or the addendum to the agreement. The Court finds that under *Nedlloyd,* Arizona law governs all of the

claims alleged in the complaint.

### II. Breach of fiduciary duty

Defendant moves to dismiss this claim on the ground that the parties' agreement does not create a fiduciary relationship between Fuss and Householder. [*9] The agreement provides that Fuss "shall operate and have the status of an independent contractor and is expressly prohibited from acting or operating as either an agent, employee or joint venture with [Householder] . . . Nothing in this Agreement shall be interpreted or construed as creating or establishing the relationship of employer and employee between the parties." Complaint Ex. A at P I and X.

In *Urias v. PCS Health Systems,* 211 Ariz. 81, 118 P.3d 29 (Ariz. App. 2005), the court analyzed whether a parties' contract created a fiduciary relationship between a health care services organization and an insurer. Based on the contract's language stating that the parties were "independent contractors" and that "they shall have no other legal relationship under or in connection with this Agreement" the insurer argued that it was not an agent, trustee or fiduciary, and that its obligation to the health care services organization was "a simple contractual one of debt." *Id.* at 85. The court agreed:

> Rather than creating a fiduciary relationship, the Agreement created a contractual arrangement whereby PCS agreed to perform services and Premier agreed to pay [*10] for those services. See *In re Koreag,* 961 F.2d 341, 353 (2nd Cir. 1992) ("Purely commercial transactions do not give rise to a fiduciary relationship."). A commercial contract creates a fiduciary relationship only when one party agrees to serve in a fiduciary capacity. See *Morgan v. Am. Fid. Fire Ins. Co.,* 210 F.2d 53, 54-56 (8th Cir. 1954) (holding that agent of insurer held collected premiums in a fiduciary capacity because agency agreement stated that agent was to receive and hold premiums "in a fiduciary capacity as trustee for" the insurer); *see also Am. Nat'l Bank v. Nat'l Indem. Co.,* 222 F.2d 513, 516-17 (8th Cir. 1955) (finding express trust created when parties used language "[a]ll moneys . . . shall be





held by . . . the agent as a fiduciary trust for and on behalf of the Company"). The Agreement between PCS and Premier specified that the parties were independent contractors and did not purport to create a fiduciary relationship. If Premier had intended to create a fiduciary relationship, it could have negotiated for specific language in the Agreement to that effect. The Agreement does not contain such language.

[*11] *Id. at 87.*

Here, as in *Urias,* the parties' commercial contract explicitly provides that defendant is an independent contractor, and prohibits defendant from acting in a joint venture or as an agent or employee of Householder. Notwithstanding this language, Householder argues that the contract created a fiduciary duty because Householder entrusted Fuss with confidential and proprietary information. However, the cases cited by Householder are inapposite, and none of them involve the situation presented here where the parties' contract -- which was drafted by plaintiff -- explicitly states that the defendant is an independent contractor, and does not contain any language creating a fiduciary relationship. *See, e.g., Taeger v. Catholic Family and Community Servs., 196 Ariz. 285, 995 P.2d 721 (Ariz. App. 1999)* (adoptive parents brought claim against adoption agency and diocese for failure to disclose medical information about biological mother; existence of fiduciary duty is question of fact for jury); *Rhoads v. Harvey Pubs. Inc., 145 Ariz. 142, 700 P.2d 840 (Ariz. App. 1984)* (finding no confidential relationship between cartoonist and publisher where cartoonist was independent [*12] contractor who thought he was employee; noting that "the doctrine of confidential relations has been applied to husband and wife, parent and child, guardian and ward, attorney and client, partners, and joint adventurers"); *Herz & Lewis, Inc. v. Union Bank, 22 Ariz. App. 437, 439, 528 P.2d 188 (1974)* (no confidential relationship between jeweler and its bank and bank's agent).

Accordingly, the Court dismisses this claim without leave to amend.

### III. Breach of implied covenant of good faith and fair dealing

Defendant moves to dismiss this claim on the ground

that Arizona law only permits a tort claim in limited circumstances involving a "special relationship" between the parties, which defendant contends is not present here. 2 In *Sutter Home Winery v. Vintage Selections,* the Ninth Circuit analyzed Arizona law and stated, "[o]rdinarily, a party claiming breach of an implied covenant is limited to a contract action. In certain situations, however, the breach of the implied covenant may provide the basis for imposing tort damages. Arizona courts allow a plaintiff to bring a tort action only where a special relationship exists between the parties arising from elements [*13] of public interest, adhesion, and fiduciary responsibility." *971 F.2d 401 (9th Cir. 1992)* (internal citations and quotations to Arizona case law omitted). The court continued,

> In *Rawlings v. Apodaca, 151 Ariz. 149, 726 P.2d 565 (1986),* the Arizona Supreme Court identified two situations where this "special relationship" exists. First, tort damages are available where "the type of contract involved is one in which the plaintiff seeks something more than commercial advantage or profit from the defendant." *Id. 726 P.2d at 575.* The paradigm example is an insurance contract in which the insured is contracting primarily for security. *Id.* Second, tort damages are available where restricting recovery to contract damages would "provide[] more of an incentive for breach of the contract than for its performance." *Id. at 576.*

*Id.* In *Sutter Home,* which involved claims between a wine supplier and a distributor for breach of a distributor agreement, the Ninth Circuit found that neither special relationship existed. First, the court found that both parties were sophisticated business entities who entered their relationship [*14] intent on earning profits. *Id.* Second, the court held that there was no reason to believe that restricting a distributor's recovery to contract damages would encourage suppliers to routinely breach distributor agreements. *Id.*

2  At the hearing, plaintiff's counsel stated that although this cause of action is pled as a contract claim, plaintiff could bring this claim in tort. As such, the Court will address the parties' contentions regarding whether plaintiff can plead the elements of such a tort claim.



Defendant argues that there is no special relationship here because Householder structured the agreement to make defendant an independent contractor and not a fiduciary, the parties entered their relationship for purely commercial reasons, and the only damages plaintiff seeks under this claim are the same contract damages alleged under the breach of contract claim. [3]

> 3   Under both causes of action, plaintiff seeks "foreseeable and actual damages in the sum of $ 78,147.20 plus interest on the unpaid portion of the consulting fee; for nonpayment of the buy-out provision . . . in the amount of $ 234,193.80, and for general, special and consequential damages, including but not limited to loss of past and future profits in an amount not yet ascertained but estimated to be $ 500,000.00." Complaint PP 35, 41.

[*15] Plaintiff argues that the "covenant of confidentiality and plaintiff's performance" create the special relationship necessary to maintain this cause of action as a tort claim. Plaintiff does not cite any authority for this proposition, and the fact that Fuss is not a fiduciary undercuts this contention. Plaintiff relies on *Bike Fashion Corporation v. Kramer,* 202 Ariz. 420, 46 P.3d 431 (Ariz. App. 2002), which simply holds that a party can breach the implied covenant of good faith and fair dealing even where there is an express contract term relating to the same subject. *Id.* at 425. *Bike Fashion* does not address what factors are necessary to create a "special relationship," which is the question presented here.

The Court concludes that under *Sutter Home,* there is no "special relationship" between the parties to allow for a tort claim for breach of the implied covenant of good faith and fair dealing. Defendant was an independent contractor, plaintiff is a sophisticated business entity, and the parties entered the relationship to create a profit and not for some non-economic reason. Accordingly, the Court will allow plaintiff's claim to proceed as a contract [*16] claim, but plaintiff may not allege a tort claim for breach of the implied covenant of good faith and fair dealing.

## IV. Intentional interference with contract

"To establish a *prima facie* claim for tortious interference with contract, a plaintiff must show the existence of a valid contractual relationship or business expectancy; the interferer's knowledge of the relationship or expectancy; intentional interference inducing or causing a breach or termination of the relationship or expectancy; and resultant damage to the party whose relationship or expectancy has been disrupted." *Miller v. Hehlen,* 209 Ariz. 462, 471, 104 P.3d 193 (Ariz. App. 2005) (internal citations and quotations omitted).

The complaint alleges that between September 2003 and June 2006, Householder had a valid and existing contractual relationship with numerous clients who purchased insurance, retirement, and investment products and services through the Santa Rosa Branch, that Fuss knew of these relationships, and that Fuss "intentionally caused numerous existing clients and accounts to be transferred from Plaintiff and AIG to a different broker-dealer for the specific purpose of interfering with [*17] Plaintiff's realization of the benefits to which they were entitled under those contractual relationship[s] . . . ." Complaint PP 61-63.

Defendant moves to dismiss this claim because (1) plaintiff has not attached any of the alleged contracts to the complaint; (2) by plaintiff's own admission, the alleged contractual relationship was "terminable" since defendant caused the accounts to be "transferred" from AIG to a different broker-dealer; (3) plaintiff has not alleged that it "gave" any of the underlying customers to defendant; defendant asserts that he obtained all of the underlying clients through his own hard work; and (4) there is nothing in the parties' agreement that states that Householder owns an interest in the customers that Fuss obtained.

The Court finds that there is no requirement that plaintiff attach the contracts at issue to the complaint, and that plaintiff has sufficiently alleged this cause of action. The complaint alleges that Householder had a financial interest in the customers defendant obtained, *see* complaint P 61, and that but for defendant's actions, those customers would have remained with Householder and AIG. Defendant's arguments about the precise [*18] nature of the contracts at issue and about whether defendant acted improperly, are factual matters that go to the merits of plaintiff's claim. *See generally Miller,* 209 Ariz. at 470-71.

## V.   Negligent interference with contract and prospective economic advantage

Defendant moves to dismiss plaintiff's claims for negligent interference with contractual relationships and





prospective economic advantage because these claims are not recognized under Arizona law. *Cf. Phoenix Prof. Hockey Club, Inc. v. Hirmer, 108 Ariz. 482, 483, 502 P.2d 164 (Ariz. 1972)* ("To protect a contractual interest from negligent interference would place an undue burden on freedom of action and could impose a severe penalty on one guilty of mere negligence.").

Plaintiff does not cite any Arizona authority allowing for such negligence claims, and the Court was unable to locate any. Instead, plaintiff asserts that the Court should apply California to these two claims, either solely or as some sort of "blend" with unspecified Arizona law. As discussed *supra,* the Court finds that Arizona law applies to plaintiff's non-contract claims to the extent that those claims arise out of or relate [*19] to the parties' contract; the negligent interference claims clearly arise out of or relate to the parties' contract, and thus Arizona law governs. Because *Phoenix Professional Hockey Corporation* strongly suggests that such claims are not allowed under Arizona law, and because plaintiff has not cited any Arizona authority to the contrary, the Court dismisses these claims without leave to amend. [4]

> 4  *Phoenix* involved a claim by a professional hockey club whose goalie was injured in an automobile accident allegedly caused by the defendant. The club sought its out-of-pocket expenses in hiring and employing a substitute goalie during the remainder of the goalie's contract. The Arizona Supreme Court affirmed the trial court's dismissal of the claim, holding that a complaint for compensatory damages by an employer against a person negligently injuring its employee did not state a cause of action.

## VI. Conversion

The complaint alleges that Householder is the owner of and entitled to possession of [*20] "all monies, funds, client information, prospect information, and accounts and all proprietary information, trade secrets and assets belonging to Plaintiff as provided by the contract, both tangible and intangible, to which Fuss obtained access to during the term of the Contract . . . ." Complaint P 92. The complaint also alleges that in June 2006, Fuss wrongfully transferred and diverted proprietary and confidential information and trade secrets belonging to Householder, and seeks the return of "all confidential and proprietary information, client accounts, monies, funds, and prospect information wrongfully diverted and

transferred" to Fuss and others. *Id.* PP 93-94.

Defendant moves on the ground that Arizona law precludes a claim of conversion of intangible property. Arizona has adopted the following definition of conversion, which is in the *Restatement (Second) of Torts § 222A(1)* (1965): "Conversion is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." *See Focal Point, Inc. v. U-Haul Co. of Ariz., 155 Ariz. 318, 319, 746 P.2d 488 (App. 1986).* [*21] "An action for conversion ordinarily lies only for personal property that is tangible, or to intangible property that is merged in, or identified with, some document." *Miller, 209 Ariz. at 472.* In *Miller,* the appellate court affirmed a trial court's grant of summary judgment on a conversion claim. The court first strongly suggested that a customer list in and of itself is not usually subject to a conversion claim: "Miller did not allege that Hehlen took a customer list in the form of a single, unified document that had value as tangible property. Nor does a customer list constitute intangible property merged with a document in the same sense as a stock certificate or an insurance policy. Thus, neither rationale supports a claim of conversion based on taking a customer list." *Id.* The *Miller* court also held that "the record does not establish that Hehlen exercised intentional dominion or control over the customer list in such a way that he interfered with Miller's rights to the extent that he should be required to pay the full value of the list, whatever that might be."

The Court GRANTS defendant's motion to dismiss this claim with leave to amend. If plaintiff [*22] chooses to amend, plaintiff shall be guided by *Miller* and plead, if able, conversion of tangible property, or "intangible property that is merged in, or identified with, some document." *Miller, 209 Ariz. at 472.*

## VI. Constructive trust and injunctive relief

Defendant moves to strike these claims on the ground that they are not claims, but forms of relief. Plaintiff concedes that these two "claims" are actually remedies, and stated at the hearing that it pled these forms of relief as "claims" in order to put defendant on notice that plaintiff was seeking a constructive trust and injunctive relief. The Court agrees with defendant that, in the interest of maintaining orderly pleadings and properly framing the issues for motion practice, plaintiff should





replead these "claims" in the prayer for relief.

## VII. Liquidated damages

Defendant moves to strike the liquidated damages provision -- referred to as the "buy-out" provision by plaintiff -- from the parties' agreement as unenforceable as a matter of Arizona law. The Court finds that defendant's motion on this point is premature, as Arizona courts have emphasized the factual nature of the inquiry. [*23] *See Larson-Hegstrom & Associates, Inc. v. Jeffries, 145 Ariz. 329, 333-34, 701 P.2d 587 (Ariz. App. 1985)* (reviewing evidence from bench trial to evaluate enforceability of liquidated damages clause). Although defendant's arguments may be well-founded, the Court finds that the question of whether the liquidated damages clause is enforceable is not suitable for resolution on the pleadings. Defendant may renew these arguments, supported by an adequate factual record, in a motion for summary judgment.

Relatedly, defendant moves to strike allegations regarding the "buy-out" provision in the complaint. Defendant simply disputes plaintiff's characterization of this provision; this is a factual matter that should be resolved by the fact finder.

## VIII. Paragraph 10 of the complaint

Defendant moves to strike paragraph 10 of the complaint, which states that when Fuss first contacted Householder, Fuss "represented to plaintiff that he held a series 7 securities license . . . and was seeking affiliation with a larger organization in sales management." Plaintiff responds that these allegations are foundational and goes to defendant's level of sophistication when he entered into the [*24] agreement. The Court agrees with plaintiff that these allegations are not irrelevant, and DENIES defendant's motion to strike this paragraph.

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby GRANTS in part and DENIES in part defendant's motion to dismiss and/or strike. (Docket No. 13).

## IT IS SO ORDERED.

Dated: June 4, 2007

SUSAN ILLSTON

United States District Judge



# Exhibit D

**APPENDIX OF NON-FEDERAL AND UNPUBLISHED FEDERAL AUTHORITIES
CITED IN VISA USA INC.'S OPPOSITION TO DEFENDANT MARITZ INC.'S
REQUEST FOR DISCOVERY**

LEXSEE

**VIRGINIA PEREZ, individually and on behalf of all other similarly situated, Plaintiffs, v. MAID BRIGADE, INC., a Delaware Corporation, and BMJ LLC, a California Limited Liability Company, Defendants.**

**No. C 07-3473 SI**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**2007 U.S. Dist. LEXIS 78412**

**October 11, 2007, Decided**
**October 11, 2007, Filed**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant limited liability company (LLC) filed a motion to compel arbitration and stay litigation pending arbitration in plaintiff employee's class action against the LLC and defendant corporation claiming violations of state and federal labor laws, including the Federal Labor Standards Act.

**OVERVIEW:** The employee worked as a maid and as an office assistant for the LLC. The LLC was a franchisee of the corporation. The employee alleged that she was an employee of both entities. Both defendants admitted that she was an employee of the LLC, but both denied she was an employee of the corporation. The employee alleged that during employment, she sometimes worked in excess of eight hours per day and 40 hours per week, often without rest periods or meal breaks. She alleged that she did not receive the minimum wage or overtime compensation during these periods. The LLC moved the court to stay litigation pending arbitration on the basis of an arbitration agreement allegedly signed by the employee as part of her employment agreement. The court held that the arbitration agreement was entirely one-sided and was imposed by a strong employer on a much weaker employee. Therefore, the court found that the agreement was unconscionable and therefore unenforceable under California law.

**OUTCOME:** The court denied the LLC's motion to stay litigation pending arbitration.

**CORE TERMS:** arbitration agreement, arbitration, unconscionability, maid, unconscionable, arbitration clause, oppression, signature, arbitrate, surprise, genuine, pending arbitration, employment agreement, agreement to arbitrate, interstate commerce, unenforceable, adhesion, declaration, non-compete, Federal Arbitration Act, AAA Employment Rules, state law, compel arbitration, contract of adhesion, unilateral mistake, quotations marks omitted, bargaining power, jurisdictional, substantively, asymmetrical

**LexisNexis(R) Headnotes**

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > Federal Arbitration Act > Arbitration Agreements*
[HN1]Section 4 of the Federal Arbitration Act permits a party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration to petition any United States District Court for an order directing that arbitration proceed in the manner provided for in the arbitration agreement. 9 U.S.C.S. § 4. Upon a showing that a party has failed to comply with a valid arbitration agreement, the district court must issue an order compelling arbitration.

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > Federal Arbitration Act > Arbitration Agreements*

Page 1

  

[HN2]The Federal Arbitration Act espouses a general policy favoring arbitration agreements. Federal courts are required to rigorously enforce an agreement to arbitrate. See In determining whether to issue an order compelling arbitration, the Court may not review the merits of the dispute, but must limit its inquiry to (1) whether the arbitration agreement is governed by Chapter One of the Federal Arbitration Act (rather than Chapter Two or Chapter Three); (2) whether the contract containing the arbitration agreement evidences a transaction involving interstate commerce, (3) whether there exists a valid agreement to arbitrate, and (4) whether the dispute falls within the scope of the agreement to arbitrate. 9 U.S.C.S. §§ 2, 202, and 302.

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > Federal Arbitration Act > Arbitration Agreements*
[HN3]The Federal Arbitration Act provides that arbitration agreements generally shall be valid, irrevocable, and enforceable, but courts may decline to enforce them when grounds exist at law or in equity for the revocation of any contract. 9 U.S.C.S. § 2. Thus, generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening federal law. In interpreting the validity and scope of an arbitration agreement, the courts apply state law principles of contract formation and interpretation. Accordingly, the court reviews the arbitration agreement here in light of the liberal federal policy favoring arbitration agreements, and considers its enforceability according to California's laws of contract formation.

*Civil Procedure > Alternative Dispute Resolution > Arbitrations > Federal Arbitration Act > Arbitration Agreements*
[HN4]9 U.S.C.S. § 4 of the Federal Arbitration Act provides for a summary process in resolving disputes over the existence of an arbitration agreement. Where the disputed arbitration agreement was allegedly executed in California, or where the parties have otherwise agreed, the Court applies California's substantive law in determining its validity. Under California law, the petitioner bears the burden of proving the existence of an arbitration agreement by the preponderance of the evidence. If the party opposing arbitration raises a defense to enforcement such as fraud in the execution of the agreement that party bears the burden of producing

evidence, and proving by a preponderance of the evidence, any fact necessary to the defense.

*Civil Procedure > Summary Judgment > Standards > General Overview*
*Civil Procedure > Alternative Dispute Resolution > Arbitrations > Federal Arbitration Act > Arbitration Agreements*
[HN5]Courts employ a summary judgment approach for hearings to resolve disputes over the existence of an arbitration agreement, ruling as a matter of law when there is no genuine issue of material fact.

**COUNSEL:** [*1] For Virginia Perez, individually, and on behalf of all others similarly situated, Plaintiff: Alan Dale Harris, LEAD ATTORNEY, David S. Harris, David Sohn Zelenski, Harris & Ruble, Los Angeles, CA.

For Maid Brigade, Inc., a Delaware Corporation, Defendant: Daniel M. Shea, Michelle Wilkins Johnson, Paul R. Beshears, Nelson Mullins Riley & Scarborough, LLP, Atlanta, GA; Edward Sean McLoughlin, James A. Bowles, Hill Farrer & Burrill LLP, Los Angeles, CA.

For BMJ LLC, a California Limited Liability Company, Defendant: Patrick M. Macias, LEAD ATTORNEY, Ragghianti Freitas LLP, San Rafael, CA.

**JUDGES:** SUSAN ILLSTON, United States District Judge.

**OPINION BY:** SUSAN ILLSTON

**OPINION**

**ORDER DENYING DEFENDANT BMJ'S MOTION TO COMPEL ARBITRATION AND STAY LITIGATION PENDING ARBITRATION**

Before the Court is BMJ LLC's motion to compel arbitration and stay litigation pending arbitration. Pursuant to Civil Local Rule 7-1(b), the Court determines that the matter is appropriate for resolution without oral argument, and VACATES the October 12, 2007 hearing. Having considered the papers submitted, and for the reasons set forth below, the Court DENIES the motion.

**BACKGROUND**

**1. Plaintiff's employment and class action allegations**





Plaintiff Virginia [*2] Perez worked as a maid and as an office assistant for defendant BMJ LLC from in or about 2003 until June 1, 2007. [1] BMJ does business in California as Maid Brigade of Marin County, and is a franchisee of defendant Maid Brigade, Inc, a Delaware corporation. Complaint P 2; BMJ's Answer at 4. Plaintiff alleges she was an employee of both BMJ and Maid Brigade. Complaint P 4. Both defendants admit plaintiff was an employee of BMJ, but both deny she was an employee of Maid Brigade. BMJ's Answer at 4; Maid Brigade's Answer at 4. Plaintiff alleges that during employment, she sometimes worked in excess of eight hours per day and forty hours per week, often without rest periods or meal breaks. Complaint P 5. She alleges she did not receive the minimum wage or overtime compensation during these periods. *Id.* P 7. She also alleges that, although her employment ended on June 1, 2007, she did not receive her final check until June 8, 2007. *Id.* PP 8, 11. Furthermore, plaintiff alleges BMJ failed to provide pay stubs displaying certain information required by state law. *Id.* P 22. Based on these allegations, she filed a class action against both defendants claiming various violations of state and federal [*3] labor laws, including the Federal Labor Standards Act.

> 1 Plaintiff's precise date of hire is unclear: BMJ states that plaintiff was "hired" in or around 2002, while the complaint alleges she "worked" in or around June 1, 2003 through June 1, 2007. Motion to Compel Arbitration ("Motion") at 3; Complaint P 4; However, plaintiff's declaration states that she "began working for Maid Brigade in or about June 2002." Perez Decl. P 3.

**2. The arbitration agreement**

BMJ moves the Court to stay litigation pending arbitration on the basis of an arbitration agreement allegedly signed by plaintiff as part of her employment agreement. BMJ contends plaintiff was hired in or around 2002, and that she executed an arbitration agreement in connection with her employment agreement. BMJ submitted to the Court a Spanish version of the agreement, which it claims bears plaintiff's signature. Abbott Decl. Ex. A. BMJ also presented an English translation of the agreement. *Id.* The English version reads, in relevant part:

**H. Alternative Dispute Resolution Agreement**

I. In the event I believe that Maid Brigade has violated any of my legal rights arising out of or relating to my employment, or termination thereof, I agree to submit [*4] any and all such disputes to binding arbitration and not to file a lawsuit alleging a violation of my legal rights. Arbitration will be handled in accordance with the rules and procedures provided in this Agreement and the rules of the American Arbitration Association, where not in conflict with this Agreement.

II. Categories of disputes covered by this policy include, but are not [2] limited to:

A. Claims of employment discrimination . . .;

B. Common law claims, including contract and tort claims; and

C. Worker's compensation claims.

. . .

IV. This policy includes the exclusive forum for dispute resolution and is intended to be final and binding on all parties.

*Id.* The Spanish version is hand dated "12/20/02" and is signed in block letters: "VIRGINIA PEREZ." *Id.* The Spanish version of the arbitration agreement is marked page "60" in the lower right corner of page, and the English version is marked page "53." *Id.*

> 2 The Court has examined the Spanish language version allegedly executed by plaintiff. While the parties have not disputed the accuracy of the translation, and while the translation appears to be accurate in all aspects relevant here, the Court notes that the word "not" is absent from [*5] the first sentence of paragraph II of the Spanish version.

BMJ submitted other portions of a packet of employment forms purportedly bearing plaintiff's





signature, including an English language "non-competition agreement." *Id.* Although there are blanks on that agreement for the employer to fill in its own name and address, those blanks are not filled in. The document also contains a notation at the top that reads, "Because this form must be customized for every state, it was not translated into Spanish." Below that, the header of the form reads, "A. Non-Compete Agreement (must be customized for your State)."

In addition to the non-compete agreement and the arbitration agreement, BMJ's exhibit includes forms relating to a uniform policy, a job description, pay rates, and an employment manual acknowledgment form. *Id.* These forms refer throughout to "Maid Brigade" as the employer. The Court found no reference to "BMJ," "BMJ, Inc.," or "Maid Brigade of Marin."

## LEGAL STANDARD

[HN1]Section 4 of the Federal Arbitration. Act permits "a party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration [to] petition any United States District [*6] Court . . . for an order directing that . . . arbitration proceed in the manner provided for in [the arbitration] agreement." 9 U.S.C. § 4. Upon a showing that a party has failed to comply with a valid arbitration agreement, the district court must issue an order compelling arbitration. *See Cohen v. Wedbush, Noble Cooke, Inc., 841 F.2d 282, 285 (9th Cir. 1988).*

[HN2]The FAA espouses a general policy favoring arbitration agreements. *See Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983).* Federal courts are required to rigorously enforce an agreement to arbitrate. *See id.* In determining whether to issue an order compelling arbitration, the Court may not review the merits of the dispute, but must limit its inquiry to (1) whether the arbitration agreement is governed by Chapter One of the Federal Arbitration Act (rather than Chapter Two or Chapter Three); (2) whether the contract containing the arbitration agreement evidences a transaction involving interstate commerce, (3) whether there exists a valid agreement to arbitrate, and (4) whether the dispute falls within the scope of the agreement to arbitrate. 9 U.S.C. §§ 2, 202, and 302; *see Nicaragua v. Standard Fruit Co., 937 F.2d 469, 477-78 (9th Cir. 1991),* [*7] *cert. denied, 503 U.S. 919, 112 S. Ct. 1294, 117 L. Ed. 2d 516 (1992)* (citing Prima Paint's

clear directive that courts disregard surrounding contract language and "consider only issues relating to the making and performance of the agreement to arbitrate, *Prima Paint v. Flood & Conklin Mfg. Co., 388 U.S. 395, 404, 87 S. Ct. 1801, 18 L. Ed. 2d 1270 (1967)); Ecuador v. Chevron Texaco Corp., 376 F. Supp. 2d 334, 347 (S.D.N.Y. 2005)* (noting the jurisdictional distinctions between Chapters One, Two and Three of the FAA). If the answer to each of these queries is affirmative, then the Court must order the parties to arbitrate in accordance with the terms of their agreement. 9 U.S.C. § 4.

[HN3]The FAA provides that arbitration agreements generally "shall be valid, irrevocable, and enforceable," but courts may decline to enforce them when grounds "exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "Thus, generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening" federal law, *Doctor's Assocs., Inc. v. Casarotto, 517 U.S. 681, 687, 116 S. Ct. 1652, 134 L. Ed. 2d 902 (1996).* In interpreting the validity and scope of an arbitration agreement, the courts apply state law principles of [*8] contract formation and interpretation. *See Wolsey, Ltd. v. Foodmaker, Inc., 144 F.3d 1205, 1210 (9th Cir. 1998).* Accordingly, the Court reviews the arbitration agreement here in light of the "liberal federal policy favoring arbitration agreements," *Moses H. Cone, 460 U.S. at 24,* and considers its enforceability according to California's laws of contract formation, *see First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944, 115 S. Ct. 1920, 131 L. Ed. 2d 985 (1995); Ingle v. Circuit City Stores, 328 F.3d 1165, 1170 (9th Cir. 2003).*

## DISCUSSION

Plaintiff opposes arbitration primarily on two grounds: (1) plaintiff did not sign the arbitration agreement; and (2) the arbitration agreement is unconscionable and therefore unenforceable. [3] Defendant Maid Brigade does not oppose arbitration between BMJ and plaintiff, but does oppose arbitration between itself and plaintiff on the ground that it is not a party to the arbitration agreement.

---

3    Plaintiff also argues that the Federal Arbitration Act does not govern the arbitration agreement because BMJ has not proved it is involved in interstate commerce, thus failing to establish the jurisdictional requirement of 9

Page 4

  

U.S.C. § 2. Plaintiff makes this argument despite the fact that her [*9] complaint alleges that BMJ is an "enterprise" subject to federal jurisdiction under the FLSA, 29 U.S.C. § 203 (implying BMJ is involved in interstate commerce for the purpose of the FLSA's jurisdictional requirements); and that BMJ receives training, "nationwide advertising," software, and access to Ford Focus vehicles from Maid Brigade. Complaint P 2. BMJ contends it does engage in interstate commerce. Reply at 3.

Section 2 of the FAA makes enforceable a written arbitration provision in "a contract *evidencing* a transaction *involving* commerce." 9 U.S.C. § 2 (emphasis added); *see also Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 268, 115 S. Ct. 834, 130 L. Ed. 2d 753 (1995). In *Allied-Bruce,* an arbitration agreement contained in a contract for a termite inspection in Alabama was found to be governed by the FAA because the Alabama Terminix franchisee had a multi-state relationship with its franchisor, and because the materials used by the franchisee came from outside Alabama. 513 U.S. at 282. The situation here is similar to that in *Allied-Bruce*. Accordingly, the Court finds that the arbitration agreement is governed by the FAA.

**I. Execution of the arbitration agreement**

[HN4]Section 4 of the Federal Arbitration Act [*10] provides for a summary process in resolving disputes over the existence of an arbitration agreement. *See* 9 U.S.C. § 4. [4] Where the disputed arbitration agreement was allegedly executed in California, or where the parties have otherwise agreed, the Court applies California's substantive law in determining its validity. *See Circuit City Stores, Inc. v. Mantor*, 335 F.3d 1101, 1105 (9th Cir. 2003). Under California law, the petitioner bears the burden of proving the existence of an arbitration agreement by the preponderance of the evidence. *See Rosenthal v. Great W. Fin. Sec. Corp.*, 14 Cal. 4th 394, 413, 58 Cal. Rptr. 2d 875, 926 P.2d 1061 (1996). If the party opposing arbitration raises a defense to enforcement such as fraud in the execution of the agreement "that party bears the burden of producing evidence, and proving by a preponderance of the evidence, any fact necessary to the defense." *Id.*

4    [HN5]Courts employ "a summary judgment

approach for such hearings, ruling as a matter of law when there is no genuine issue of material fact." *Geoffroy v. Wash. Mut. Bank,* 484 F. Supp. 2d 1115, 1119 (S.D. Cal. 2007); *see also Ferguson v. Countrywide Credit Indus.,* 2001 U.S. Dist. LEXIS 14436, 2001 WL 867103 (C.D. Cal. 2001), *aff'd*, 298 F.3d 778, 782 (9th Cir. 2002); [*11] *Doctor's Assocs., Inc. v. Distajo*, 107 F.3d 126, 129-30 (2d Cir. 1997) (under section 4 of the FAA, a party resisting arbitration and requesting a trial must submit evidence demonstrating a genuine issue of fact, as when opposing a motion for summary judgment).

Plaintiff does not challenge the existence of the arbitration agreement, but asserts in her opposition that she did not sign the arbitration agreement. However, plaintiff's sworn statements in her accompanying declaration are not so categorical. Plaintiff states, in reference to the arbitration agreement, "I did [sic.] not recall signing these documents. I do not recall being presented with any thick package of documents such as Exhibits 1 and 2. When I began working for Maid Brigade in or about June of 2002, I signed some documents, but they differed from those that are attached as Exhibits 1 and 2." Perez Decl. PP 2-3. Plaintiff also notes that the arbitration agreement is dated December 20, 2002, approximately six months after she began working for Maid Brigade (according to her declaration).

The Court finds that plaintiff has not met her burden to prove that she did not sign the agreement. Plaintiff does not unequivocally [*12] deny signing the document. The Court also notes that the signature on plaintiff's sworn declaration appears similar, if not identical, to the signature on the arbitration agreement. *Compare* Abbott Decl. Ex. A *with* Perez Decl. at 1.

*Ferguson v. Countrywide Credit Indus.,* 2001 U.S. Dist. LEXIS 14436, 2001 WL 867103 (C.D. Cal. 2001), *aff'd*, 298 F.3d 778, 782 (9th Cir. 2002), is both instructive and distinguishable. In *Ferguson,* the court found that the plaintiff in that case had "raised a genuine dispute regarding whether an arbitration agreement govern[ed] her claims . . . ." 2001 U.S. Dist. LEXIS 14436, [WL] at *1. There, the plaintiff not only asserted that she had never seen the purported agreement prior to litigation, she pointed out that the signature and printed name on the document "appeared to have been traced over or otherwise altered." *Id.* Here, in contrast, plaintiff's





denial is based solely on her lack of memory of the document. She does not deny that the signature is genuine. That plaintiff does not recall every single document signed in connection with her employment is not surprising.

Plaintiff also contends that, "even if the purported signature of plaintiff is genuine," she is entitled to relief because she did not understand [*13] that by agreeing to arbitration, she was waiving her right to access the courts. Plaintiff relies on California Civil Code section 1577 and *Pacific State Bank v. Greene*, 110 Cal. App. 4th 375, 388-390, 1 Cal. Rptr. 3d 739 (2003), for the proposition that a mistake as to the nature of the document being signed is grounds for relief.

Plaintiff's unilateral mistake defense lacks merit. "California law allows rescission of contract for unilateral mistake only 'when the unilateral mistake is known to the other contracting party and is encouraged or fostered by that party." *Brookwood v. Bank of Am.*, 45 Cal. App. 4th 1667, 1673-74, 53 Cal. Rptr. 2d 515 (1996) (citation omitted). In *Brookwood*, the court held that the employee was "bound by the provisions of the [arbitration] agreement regardless of whether [she] read it or [was] aware of the arbitration clause when [she] signed the document." *Id. at 1674* (citing *Macaulay v. Norlander*, 12 Cal. App. 4th 1, 6, 15 Cal. Rptr. 2d 204 (1992)). "No law requires that parties dealing at arm's length have a duty to explain to each other the terms of a written contract, particularly where, as here, the language of the contract expressly and plainly provides for the arbitration of disputes arising out of the contractual [*14] relationship." *Id.*

## II. Unconscionability

When deciding whether the parties agreed to arbitrate a certain matter, federal courts "should apply ordinary state-law principles that govern Ole formation of contracts." *First Options*, 514 U.S. at 944; *Circuit City Stores, Inc. v. Adams*, 279 F.3d 889, 892 (2002). While "courts may not invalidate arbitration agreements under state laws applicable only to arbitration provisions," general contract defenses such as fraud, duress, or unconscionability, grounded in state contract law, may operate to invalidate arbitration agreements." *Circuit City*, 279 F.3d at 892 (quoting *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687, 116 S. Ct. 1652, 134 L. Ed. 2d 902 (1996)). Because plaintiff was employed in California, the Court looks to California contract law to determine the validity of the arbitration agreement. *See id.* The relevant California law here requires the Court to determine whether the arbitration clause was unconscionable at the time it was made. *See Cal. Civ. Code § 1670.5; Armendariz v. Foundation Health Psychcare Servs.*, 24 Cal. 4th 83, 114, 99 Cal. Rptr. 2d 745, 6 P.3d 669 (2000). If it so finds, "the court may refuse to enforce the contract, or it may so limit the application of any unconscionable [*15] clause as to avoid any unconscionable result." *Id.*

"Unconscionability analysis begins with an inquiry into whether the contract is one of adhesion." *Armendariz*, 24 Cal. 4th at 113. If the contract is adhesive, the Court must then determine whether "other factors are present which, under established legal rules . . . operate to render it unenforceable"; that is, whether the contract is unconscionable. *Id.* (internal citations and quotations marks omitted). Unconscionability has both a procedural and a substantive element, the former focusing on oppression or surprise due to unequal bargaining power, the latter on overly harsh or one sided results. *Id. at 114* (quoting *A & M Produce Co. v. FMC Corp.*, 135 Cal. App. 3d 473, 486-87, 186 Cal. Rptr. 114 (1982)) (internal quotation marks omitted)). Both elements must be present, although not necessarily to the same degree. *Armendariz*, 24 Cal. 4th at 114. Courts apply a sliding scale: "the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required . . . and vice versa." *Id.*

Here, the employment agreement is one of adhesion because it is "a standardized contract, which, imposed and drafted by the party of superior [*16] bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it." *Id. at 113* (defining "adhesion"). Accordingly, the Court must measure the procedural and substantive qualities of the arbitration agreement.

### A. Procedural unconscionability

To evaluate procedural unconscionability, the Court must examine how the parties negotiated their contract and "the circumstances of the parties at the time." *Circuit City Stores, Inc. v. Mantor*, 335 F.3d 1101, 1106 (2003). Courts typically search for signs of surprise and oppression when evaluating procedural unconscionability. *Stirlen v. Supercuts, Inc.*, 51 Cal. App. 4th 1519, 1532, 60 Cal. Rptr. 2d 138 (1997). Surprise refers to "the extent to which the supposedly agreed-upon





terms of the bargain are hidden in the prolix printed form drafted by the party seeking to enforce the disputed terms." *Id.* (internal citations and quotation marks omitted). Oppression springs "from an inequality of bargaining power [that] results in no real negotiation and an absence of meaningful choice." *Id.*

Here, plaintiff has produced evidence showing both surprise and oppression. She states that she does not remember signing the arbitration [*17] agreement, and that she does not know what arbitration means. The arbitration clause is also marked page "60" of what appears to have been a very thick packet of documents she was presented in connection with her employment. As for oppression, the unequal bargaining power of the two parties is significant; plaintiff is a maid who does not speak English, and her employer is a company with access to legal counsel. [5] There can be no doubt about who is the stronger party: plaintiff's choice was to accept the terms of employment as offered, or not at all.

> 5  Plaintiff contends she was hired in June 2002, but points out that the arbitration agreement was signed in December 2002. The alleged six month delay in executing the arbitration agreement also raises an inference of both surprise and oppression.

## B. Substantive unconscionability

Plaintiff relies on *Armendariz, 24 Cal. 4th 83, 99 Cal. Rptr. 2d 745, 6 P.3d 669*, and *Circuit City v. Adams, 279 F.3d 889*, to argue that the arbitration agreement is substantively unconscionable because it is "exclusively one-way." Plaintiff reads the clause to require her to submit to binding arbitration if she believes Maid Brigade has violated any of her rights arising out of the employment agreement, [*18] but contends that it contains no such restriction on the employer. [6]

> 6  Plaintiff makes three other arguments. First, she contends that the agreement's reference to the American Arbitration Association rules is ambiguous because either the AAA's Labor Arbitration Rules or its Employment Arbitration Rules might apply. The rules themselves resolve any such ambiguity in favor of the AAA's Employment Rules. The Labor Rules apply only when reference to the AAA is made "in a collective bargaining agreement." AAA Labor Rules art. 1. Neither party has alleged that a collective

bargaining agreement exists here. In contrast, the Employment Rules apply whenever parties provide for arbitration by the AAA "of an employment dispute." AAA Employment Rules art. I.

> Second, plaintiff contends that the unlawful non-compete agreement in the employment packet presented by BMJ creates "a pervasive aura of oppression and unconscionability." Opp'n at 9. Without deciding whether that agreement is void, the Court notes its concern over the non-compete agreement.

> Third, plaintiff asserts that the AAA Employment Rules do not confer plaintiff with a right to discovery, and they require her to pay administrative fees ranging [*19] from $ 150 to as much as $ 6,000. Plaintiff points out that, under *Armendariz*, a mandatory employment arbitration agreement must meet certain minimum requirements when an employee's statutory civil rights are the subject of the dispute. These include the right to "more than minimal discovery" and the right not to pay fees that wouldn't otherwise be required if the dispute were decided in a court of law. *Armendariz, 24 Cal 4th at 102*. The failure of an arbitration agreement to meet these requirements does not automatically render it unenforceable, however. Instead, the Court may stay litigation on the conditions that the employer consent to discovery, and that the employer cover the employee's share of "all types of costs that are unique to arbitration." *See id. at 106, 113*.

In *Armendariz*, the arbitration clause required only employees to arbitrate their wrongful termination claims against the employer, but did not require the employer to arbitrate claims it may have against the employees. *See Armendariz, 24 Cal. 4th at 115-16*. The court held that, "in the context of an arbitration agreement imposed by the employer on the employee, such a one-sided term is unconscionable." The court [*20] reasoned, "although parties are free to contract for asymmetrical remedies and arbitration clauses of varying scope . . . the doctrine of unconscionability limits the extent to which a stronger party may, through a contract of adhesion, impose the arbitration forum on the weaker party without accepting that forum for itself." *Id. at 118*. "The substantive one-sidedness of the *Armendariz* agreement was

 

compounded by the fact that it did not allow full recovery of damages for which the employees would be eligible under the FEHA." *Circuit City v. Adams*, 279 F.3d at 893.

The court in *Circuit City v. Adams* found the arbitration agreement at issue there to be "virtually indistinguishable" from the agreement in *Armendariz*. *Id.* The court found procedural unconscionability because the arbitration agreement was a contract of adhesion was "a prerequisite to employment, and job applicants are not permitted to modify the agreement's terms--they must take the contract or leave it." 279 F.3d at 893. The court also found substantive unconscionability because the agreement created an "asymmetrical arrangement" that was "compounded by the fact that [the arbitration agreement] did not allow full recovery [*21] of damages for which the employees would be eligible under the FEHA." *Id.*

BMJ does not deny that the arbitration agreement is one-sided. Instead, BMJ relies on an unreported case, *Gray v. Conseco, Inc.*, 2000 U.S. Dist. LEXIS 14821, 2000 WL 148273 (C.D. Cal 2000), to argue that the Court should "reject the holding" of *Armendariz*. The arbitration clause in *Gray* required the plaintiff borrowers to arbitrate any and all disputes arising out of a loan agreement, while allowing the defendant lender to bring a lawsuit in court for certain types of claims. 2000 U.S. Dist. LEXIS 14821, [WL] at *4. The *Gray* court declined to follow *Armendariz* because it found that the holding in that case impermissibly "singles out and imposes a special burden on arbitration agreements." *Id.* The *Gray* court, in characterizing the *Armendariz* holding, stated, "the California Supreme Court has held that a one-sided arbitration clause is unconscionable unless there is a valid business justification for the one-sidedness of the clause." *Id.*

To the extent the *Gray* court reads *Armendariz* to hold that a non-mutual arbitration clause is *per se* unconscionable absent a valid business justification, this Court disagrees and finds that the holding of *Armendariz* is not so broad. The [*22] California Supreme Court took pains to emphasize that the mere lack of mutuality does not render a contract illusory, but "rather, that in the context of an arbitration agreement *imposed by the employer on the employee,* such a one-sided term is unconscionable." *Armendariz,* 24 Cal. 4th at 118 (emphasis added). Rather than focusing merely on the substantive, non-mutual aspect of the arbitration clause,

the court was apparently concerned with the procedural unconscionability often found in adhesive arbitration agreements present in employment contracts. The *Armendariz* court stated that parties may contract for an asymmetrical arbitration agreement, but when one is imposed by the stronger party on the weaker party through a contract of adhesion, courts must step in to limit its unconscionable effects.

Furthermore, *Circuit City* refutes the *Gray* court's holding that *Armendariz* "singles out and imposes a special burden on arbitration agreements." *Gray,* 2000 U.S. Dist. LEXIS 14821, 2000 WL 148273 at *4. The Ninth Circuit held that "unconscionability is a defense to contracts and does not single out arbitration agreements for special scrutiny . . . ." *Circuit City,* 279 F.3d at 895. Because unconscionability is a generally [*23] applicable contract defense, the Court's decision does not "run afoul of the FAA by imposing a heightened burden on arbitration agreements." *Id.* (citing *Doctor's Assocs., 517 U.S. at 687*); *see also Ticknor v. Choice Hotels Int'l, Inc.,* 265 F.3d 931, 935 (9th Cir. 2001) (the FAA does not preempt state law governing the unconscionability of adhesion contracts).

Moreover, the *Gray* case is factually distinguishable from this case, as well as from *Armendariz* and *Circuit City,* for reasons relating to both substantive and procedural unconscionability. First, the arbitration agreement in *Gray* was not entirely unilateral; both parties were generally obligated to arbitrate "all disputes, claims, or controversies arising from or relating to the contract." An exception was carved out for the lender, who would "retain the option to use judicial or non-judicial relief to enforce [certain rights] relating to the real property secured in a transaction underlying [the] arbitration agreement." 2000 U.S. Dist. LEXIS 14821, 2000 WL 1480273 at *2. Thus, the substantive unconscionability was less severe. Furthermore, the *Gray* plaintiffs "allege[d] little procedural unconscionability other than that the notes are form contracts and [*24] they had to sign many papers at once." 2000 U.S. Dist. LEXIS 14821, [WL] at *4. The court found no other signs of procedural unconscionability. In contrast, in this case as in *Armendariz* and *Circuit City,* the arbitration clause is entirely unilateral and thus more substantively unconscionable. Moreover, the oppression faced by a maid seeking a job from a sophisticated employer with the backing of a national franchiser is far greater than that faced by a homeowner seeking a loan.





The Court is unable to distinguish the one-sided arbitration clause here from the ones in *Armendariz* and *Circuit City*. Because the arbitration agreement here was entirely one-sided and was imposed by a strong employer on a much weaker employee, the Court finds it is unconscionable and therefore unenforceable under California law.

**CONCLUSION**

For the foregoing reasons, and for cause shown, the Court DENIES defendant BMJ's motion to stay litigation pending arbitration (Docket No. 32).

**IT IS SO ORDERED.**

Dated: October 11, 2007

SUSAN ILLSTON

United States District Judge





# Exhibit E

**APPENDIX OF NON-FEDERAL AND UNPUBLISHED FEDERAL AUTHORITIES
CITED IN VISA USA INC.'S OPPOSITION TO DEFENDANT MARITZ INC.'S
REQUEST FOR DISCOVERY**

21823\1392810.1

LEXSEE 264 CAL. APP. 2D 667

**CHARLES ACH et al., Plaintiffs and Respondents, v. CHARLES FINKELSTEIN et al., Defendants and Appellants**

**Civ. No. 32137**

**Court of Appeal of California, Second Appellate District, Division One**

*264 Cal. App. 2d 667; 70 Cal. Rptr. 472; 1968 Cal. App. LEXIS 2130*

**August 5, 1968**

**PRIOR HISTORY:**      [***1] APPEAL from a judgment of the Superior Court of Los Angeles County. Bernard S. Selber, Judge.

Action for damages for fraud arising out of the purchase of an apartment house.

**DISPOSITION:**    Affirmed. Judgment for plaintiffs affirmed.

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**

**(1a) (1b) Fraud--Evidence--Sufficiency to Support Findings.** --In an action for damages for fraud arising out of plaintiffs' purchase of an apartment house from defendants, the trial court properly found that plaintiffs were intentionally misled by defendants' representations, where at the time of the sale the building was fully occupied by tenants under written leases which purported to be for 12-month periods from the date of execution at a specified monthly rental and did not show that all of the lessees but one had received two or three months free rental before the beginning dates of the leases, and where the evidence was conflicting as to whether defendants told plaintiffs about these concessions and as to whether plaintiffs knew or should have known that it was the practice in the area to grant such rental concessions.

**(2) Appeal--Consideration of Evidence--Reconciling and Resolving Conflicts--Province of Trier of Facts: Province and Duty of Appellate Court.** --It is for the trier of fact to determine the weight of the evidence and the credibility of the witnesses and resolve all conflicts,

and where disputed facts are presented to and resolved by the trial judge, his findings, unless clearly erroneous, will not be disturbed by the reviewing court; it is not the province of the appellate court to substitute its judgment for that of the trier of fact.

**(3) Id.--Questions of Law and Fact--Consideration of Evidence--Reconciling and Resolving Conflicts in Favor of Findings.** --On appeal the evidence and all reasonable inferences to be drawn therefrom must be viewed in a light most favorable to the findings and judgment of the trial court.

**(4) Id.--Questions of Law and Fact--Consideration of Evidence--Reconciling and Resolving Conflicts in Favor of Findings.** --A judgment, attacked on evidentiary grounds, must be affirmed when there is any evidence, direct or circumstantial, to support the findings of the trial court.

**(5) Fraud--Definition.** --In its broad, general sense, the concept of fraud embraces anything which is intended to deceive, including all statements, acts, concealments and omissions involving a breach of legal or equitable duty, trust or confidence, which results in injury to one who justifiably relies thereon.

**(6) Id.--Elements of Actionable Fraud.** --The elements of actionable fraud are a false representation, actual or implied, or the concealment of a matter of fact, material to the transaction, made falsely, knowledge of the falsity, or statements made with such disregard and recklessness that knowledge is inferred, intent to induce another into relying on the representation, reliance by one who has a right to rely, and resulting damage.

**(7) Id.--Acts Constituting Fraud.** --There is no absolute or fixed rule for determining what facts will constitute fraud; whether or not it is found depends on the particular facts of the case under inquiry.

**(8)        Id.--Evidence--Sufficiency--Circumstantial Evidence.** --Fraud may be proved by direct evidence or it may be inferred from all of the circumstances in the case

**(9) Id.--Persons Liable--Principal and Agent: Acceptance of Fruits of Fraud.** --In an action for damages for fraud arising out of plaintiffs' purchase of an apartment house, the trial court properly found that the two defendants who actually handled the sale were the agents of the other two defendants, where such agency was stipulated in the pretrial order, and where the record showed that the defendants who did not participate in the sale signed the escrow instructions and shared in the proceeds of the sale.

**(10) Id.--Persons Liable--Principal and Agent.** --Where an agent acting within his actual or apparent authority procures a sale of property by means of fraud, the principal is jointly liable with the agent for damages incurred thereby even though the principal is innocent of personally participating in the fraud, when he accepts and retains the benefits which accrue from the transaction.

**(11) Id.--Evidence--Damages--Measure of Damages Recoverable.** --In an action for damages for fraud arising out of plaintiffs' purchase of an apartment house from defendants, the trial court properly assessed plaintiffs' damages as the difference between the amount paid by them for the apartment and the actual value of the apartment building at the time of the sale (*Civ. Code, § 3343*), and a fair result was achieved, where the court selected a figure between the highest and lowest appraisals as the actual value of the building, even though no witness actually testified to that particular figure.

**COUNSEL:** Drabin & Reese and Earl D. Reese for Defendants and Appellants.

Schullman, Selwyn & Coyle and Herbert E. Selwyn for Plaintiffs and Respondents.

**JUDGES:** Lillie, J. Wood, P. J., and Fourt, J., concurred.

**OPINION BY:** LILLIE

**OPINION**

    [*669] [**474] Plaintiffs sued defendants for fraud arising out of the purchase of an apartment house. The cause was heard by the court sitting without a jury. Judgment in the sum of $ 10,000 was entered for plaintiffs against defendants Charles Finkelstein, Swan Imojean Finkelstein, Dale L. Becker and Vivian M. Becker, and against plaintiffs in favor of defendant B & F Development, Inc. Defendants Finkelstein and Becker appeal from the judgment.

    Approximately two years prior to May 7, 1964, plaintiffs, Mr. and Mrs. Ach, had been looking for income property; as the result of a newspaper ad they viewed an apartment building consisting of 27 residential units owned by defendants and located at 8834 Cedros Avenue, Panorama [***2] City. The manager, Mrs. Scott, gave them a paper (prospectus) entitled "B & F Development, Inc.; . . ." (Exh. 1) containing information about the property, i.e., income, taxes, lease of the units, etc.; she told Mrs. Ach the apartment "is all filled up and everybody has a one-year lease." After plaintiffs' second visit to the premises, Mrs. Ach telephoned defendant Vivian Becker stating she wished to make an offer.

    On the morning of May 7, 1964, by appointment with Mrs. Becker, plaintiffs went to the premises and made an offer of $ 350,000 to Mr. Becker; later that afternoon, Mr. Becker drove Mrs. Becker, Mr. and Mrs. Ach, and their daughter Rose, to his bank, and they entered escrow. Plaintiffs purchased the building for a total price of $ 350,000. Part of the [*670] pretrial order are the stipulations that defendants "Charles Finkelstein, Swan Imojean Finkelstein, Dale L. Becker and Vivian M. Becker are the owners of the premises located at 8834 Cedros Avenue, Panorama City, California"; and "That the named defendants through Dale L. Becker and Vivian M. Becker sold the above mentioned property to plaintiffs for $ 350,000.00." Dale Becker gave information concerning the [***3] property to the escrow officer who determined the credit to be given to plaintiffs on cleaning and last month rental deposits under the leases; Mrs. Becker gave the leases to the apartments in the building to the escrow officer who handed them to plaintiffs. Plaintiffs read these leases which set forth on their face that they were executed on the same date as the purported commencement date for the payment of rent. Actually all but one of the tenants had been given two and mostly three months' free rent prior to the date on

264 Cal. App. 2d 667, *670; 70 Cal. Rptr. 472, **474;
1968 Cal. App. LEXIS 2130, ***3

which the leases were allegedly signed; the leases were in fact signed between two and three months prior to their purported dates of signature. [1]

> [1]   At the trial defendant offered the following, and the parties stipulated that ". . . defendants did grant certain concessions prior to the commencement date reflected in these leases, certain free rent concessions to certain tenants in the building that is involved in this litigation, that the records of the defendants do not disclose the length or the amount of these concessions, that they varied, that the longest might have been for 90 days and the shortest, no concession, that their records do not indicate, but further stipulate that on the date that the lease purports that the tenant did pay rent on each and every month as reflected in that lease, that any concessions given by way of free rent were given prior to the commencement date as reflected in any of the leases."

[***4] Concerning the rental concessions given to the tenants and not reflected in the leases, [**475] Mrs. Ach repeatedly testified that at no time prior to buying the property or at escrow did she know of the rental concessions, no one told her about them and she did not learn that rental concessions had been given to the tenants by defendants until two months after the close of escrow; [2] that she found out about the rental concessions "two months after [she] moved in" (August 1964), "for the first time two months after escrow closed"; that the first she knew about them was when the tenants asked her about rental [*671] concessions, "they asked me how much the new rent going to be. I'm not even know what they talking about"; that she bought the apartment building so she could earn a living and analyzed the figures, "the income, the expenses and so on" before she made her offer, at that time believing the figures to be true and relying thereon, she made her offer of $ 350,000 and thought she could make a living from the building, and had the figures been correct she could have done so but the building is operating at a loss. Asked "Did you know that there were up to three [***5] months' rental concessions given at the time you did this figuring as to whether you would make a living?" Mrs. Ach answered, "No"; then, "Did anyone tell you, prior to the close of escrow?", she replied, "No." She further testified that she is not now making a living from the building because when the leases expired the tenants refused to pay the rental set forth in the leases and demanded the same

reduction they had previously received from defendants; that finally on the second re-rent, when she found out defendants had given rental concessions, she discovered it was "very hard" to rent the apartments without them and the manager told her she had to give them, otherwise she would be unable to rent the units.

> [2]   "Q [By Mr. Selwyn]: Now, think very carefully when I ask you this. Did Mr. Becker or Mrs. Becker or the Finkelsteins, or anyone, prior to your going into this escrow, that is, before going into the escrow, tell you that there were rental concessions given by the Beckers to tenants?
>
> "A [Mary Ach]: No. I never know.
>
> "Q Now, at the escrow did anyone ask Mr. or Mrs. Becker or did the discussion about concessions come up?
>
> "A No.
>
> "Q Now, Mrs. Ach, if you had known that there were rental concessions given, would you have paid $ 350,000 for the building?
>
> "A No. I'm not even touch 'em.
>
> "Q When did you first find out about the rental concessions?
>
> "A Two months later.
>
> "Q And did you then consult a Mr. Berry Locke, a lawyer?
>
> "A Yes.
>
> "Q Did you hear from Mr. or Mrs. Becker or Mr. and Mrs. Finkelstein?
>
> "A No."

[***6] Plaintiffs' daughter Rose testified that she was present at the escrow and no mention was made by anyone of the rental concessions, although she asked Becker if they were 12-month leases and he said yes; there was no discussion relative to how long the tenants had in fact lived in the apartments under the leases; and "There was never any mention of rental concessions or any free rent or anything [like] that mentioned -- other

than the 12-month lease. That was all that was stated
'This is a 12-month lease.'"

Defendants Becker and Charles Finkelstein testified
that they knew that rental concessions had been given to
the tenants, in fact, defendants Becker admitted that the
leases not showing the concessions were drawn under
their instructions; and defendant Finkelstein admitted that
he knew the manner in which the leases were drawn.
Mrs. Becker testified that in [*672] escrow Mrs. Ach or
her daughter asked her husband if any concessions had
been given and he said yes, and there "was a very short
conversation" about it; Dale Becker testified that Miss or
Mrs. Ach asked him if there were any concessions and he
replied that yes, concessions were given, but nothing
further was [***7] said about them -- no one asked how
many or how much. (The trial judge rejected Dale and
Vivian Becker's testimony in this connection.) While
[**476] it appears that plaintiffs at various times had
owned rooming houses and old and smaller apartment
houses, first on Alvarado and then on Alexandria, which
had been rented on a month-to-month basis, Mrs. Ach
repeatedly testified that prior to the sale of the Cedros
property they knew nothing about and were never told of
the rental concessions given by defendants to the tenants;
that she had never given rental concessions in any
building she had ever owned; that she had not heard that
rental concessions were given in the Valley before she
purchased the building; that while she was looking "off
and on" for two years for apartments to buy, she did not
look in the Valley; and that before she bought the Cedros
property she did not know that "there were rental
concessions across the street or next door."

The testimony of plaintiffs' witness, Mr. Gee,
Department of Water and Power, established the
"turn-on" dates of service for all tenants of the Cedros
property while defendants owned it; these dates,
compared with those given in the leases, [***8] show
that the tenants took occupancy two and three months
prior to the date of the leases. Plaintiffs' witness, Manuel
Burnstein, at one time a tenant at 8834 Cedros, testified
that prior to renting the apartment he had a conversation
with Mr. Scott, the manager; that Scott told him the rent
for the apartment was $ 200 and "you get three months'
concession, three months' free rent," and when "you
divide the 15 into 12 so that it isn't that much, only comes
out to about $ 165 a month"; that under these conditions
he rented the apartment, but he asked Scott, "Well, how
about at the end of the 15 months?", and Scott replied,

"Well, then you make your own arrangements with the
landlord, whoever owns the building at the time." Valerie
Sego and Owen P. O'Brien, also previous tenants,
testified to the same effect.

The trial court found that with the knowledge of all
defendants, Dale Becker gave or caused to be given to
plaintiff Mary Ach a group of leases of apartments in the
apartment building which set forth on their face they
were executed [*673] on the same date as the purported
commencement date for the payment of rent; in fact, all
but one of the apartments so rented had been [***9]
given two and three months' free rent prior to the date on
which the leases were allegedly signed, and that the
leases were in truth and fact signed between two and
there months prior to the purported date of signature; this
information was not given to plaintiffs although Dale
Becker told them the leases were for twelve months;
defendants knew the rentals set forth in the leases based
upon a yearly rent were false and misleading, as they did
not indicate the fact that rental concessions had been
given and they knew that plaintiffs had no information of
this fact (Finding No. II). Further, the court found that
the representation was made by defendants with the intent
to induce plaintiffs to purchase the property (Finding No.
III); and that plaintiffs reasonably relied upon such
representations and were misled and deceived by them
and by defendants' failure to disclose the material fact of
the rental concessions, plaintiffs were ignorant of the fact
of the rental concessions and had they been informed of
them they would not have purchased the property, and by
reason thereof they were damaged in the sum of $ 10,000,
the difference between $ 350,000 paid to defendants and
the actual [***10] value of the building on the date of
purchase, to wit, $ 340,000 (Finding No. IV).

(1a) Appellants' contention, really a claim that the
evidence is insufficient to support the findings and
judgment, is two-fold -- there was no misrepresentation
because the leases did not mention the rental concessions
given before the term of the leases; and the market value
of the property at the time of the purchase was equal to
the price paid, thus there was no damage.

On the first issue appellants present a factual
argument that (1) plaintiffs were not misled and knew or
should have known of the rental concessions based upon
Mrs. Ach's testimony that she had owned apartment
[**477] and rooming houses before and for two years
had looked for property to purchase, Finkelstein's

264 Cal. App. 2d 667, *673; 70 Cal. Rptr. 472, **477;
1968 Cal. App. LEXIS 2130, ***10

testimony that rent concessions were a common practice in the Valley and the Beckers' testimony that Dale Becker mentioned the rental concessions to plaintiffs; (2) defendants Finkelstein had no knowledge that the leases did not show the rent concessions or that the rent concessions were unknown to plaintiffs, based on the fact that Mrs. Finkelstein "was never called to testify" and while she signed the escrow instructions [***11] she was never present at any [*674] time, and the testimony of Charles Finkelstein conceding that he knew that the rental concessions had been given but denying he knew "whether the leases showed the concessions given"; and (3) there is no showing in the record "that any of the defendants knew that the leases in any way were not proper" based upon their testimony and that of plaintiffs' expert that rental concessions were common to fill up new apartments.

(2) It is for the trier of fact to determine the weight of the evidence and the credibility of the witnesses and resolve all conflicts. Where disputed facts are presented to and resolved by the trial judge, unless clearly erroneous his findings will not be disturbed by the reviewing court; it is not the province of this court to substitute its judgment for that of the trier of fact. (3) On appeal the evidence and all reasonable inferences to be drawn therefrom must be viewed in a light most favorable to the findings and judgment. ( *Crawford v. Southern Pac. Co.*, 3 Cal.2d 427, 429 [45 P.2d 183]; *Primm v. Primm*, 46 Cal.2d 690, 694 [299 P.2d 231]; *Berniker v. Berniker*, 30 Cal.2d 439, 444 [182 P.2d 557].) [***12] (4) "Such a judgment, when attacked on evidentiary grounds, must be affirmed when there is any evidence, direct or circumstantial, to support the findings of the trial court. Stated negatively, such a judgment cannot be reversed unless there is no evidence, direct or circumstantial, to support the findings. These rules are elementary." ( *Seeley v. Combs*, 65 Cal.2d 127, 129 [52 Cal.Rptr. 578, 416 P.2d 810]; *Grainger v. Antoyan*, 48 Cal.2d 805, 807 [313 P.2d 848].)

(5) "In its broad, general sense the concept of fraud embraces anything which is intended to deceive, including all statements, acts, concealments and omissions involving a breach of legal or equitable duty, trust or confidence which results in injury to one who justifiably relies thereon. (6) The elements of actionable fraud are set out in *Zinn v. ExCell-O Corp.*, 148 Cal.App.2d 56, 68 [306 P.2d 1017]. Without quoting exactly, they are: (1) a false representation, actual or

implied, or the concealment of a matter of fact, material to the transaction, made falsely; (2) knowledge of the falsity, or statements made with such disregard and recklessness that knowledge is inferred; (3) intent to induce another [***13] into relying on the representation; (4) reliance by one who has a right to rely; and (5) resulting damage. All of these elements must be present if actionable fraud is found; one element absent is fatal to recovery. (7) There is no absolute or fixed rule for [*675] determining what facts will constitute fraud; whether or not it is found depends upon the particular facts of the case under inquiry. (8) Fraud may be proved by direct evidence or it may be inferred from all of the circumstances in the case. ( *Jorgensen v. Jorgensen*, 32 Cal.2d 13, 18, 21 [193 P.2d 728].) 'Actual fraud is always a question of fact.' (*Civ. Code, § 1574*.)" ( *Pearson v. Norton*, 230 Cal.App.2d 1, 7-8 [40 Cal.Rptr. 634].)

(1b) Of course, appellants' argument that there is no evidence to show that they knew "that the leases in any way were not proper" begs the question for the issue is not whether the leases were improper but whether defendants had a duty to disclose the rental concessions not shown by the leases to plaintiffs and failed to do so. It cannot be denied that in some areas it is common to give such concessions to fill up new buildings but the propriety of this practice does not resolve [***14] the basic issue whether plaintiffs knew of the practice and knew that it had been used by defendants [**478] to fill up vacancies in the Cedros property and whether defendants had a duty to disclose what they had done and did not do so. The trial judge accepted the testimony of Mary Ach and her daughter and found that plaintiffs did not know either about the practice or that defendants had given rental concessions to tenants of the Cedros apartment building; such finding will not be disturbed by this court.

The leases, although drawn and executed in June and July, disclose on their face that they were executed as of the time the tenancy commenced, thus leading one to assume that the tenants moved in and their tenancy commenced on the date of the lease although it was admitted by defendants that in all but one case there was a two and usually three months' rental allowance. And the evidence demonstrates that defendants knew the rentals set forth in the leases based upon a yearly rental were false and misleading, and that the false assumption created by the manner in which the leases were drawn

264 Cal. App. 2d 667, *675; 70 Cal. Rptr. 472, **478;
1968 Cal. App. LEXIS 2130, ***14

was indeed intended by them. Becker testified that the manager drew the leases but [***15] he gave instructions as to how they should be drawn, and that he told the manager not to indicate the rental concessions in the leases and in each to show the lease starting at the end of the concession. Mrs. Becker testified that rental concessions were made; that the leases were executed by the manager under her instruction; that all rental concessions were made with their (Beckers') approval because the manager had no authority to grant them [*676] unless cleared with her and/or Mr. Becker; and that she helped her husband draw up the prospectus. Charles Finkelstein admitted that he knew that the rental concessions were given and, contrary to appellants' representation in their opening brief that "he did not know whether the leases showed the concessions given," conceded that he was aware of the manner in which the leases were drawn which failed to mention the concessions.

We conclude, as did the trial judge, that these leases and the way in which they were drawn reflect a scheme of giving rent concessions to inflate the rentals above their true market value so that a higher price could be obtained for the apartment building. Unquestionably the leases were drawn without [***16] reference to the concessions in order to mislead prospective buyers. Dale Becker admitted he would get a better price if the building were full, and it is obvious that he felt the importance of this should be stressed in the prospectus. The rental concessions did in fact fill the building and gave a false picture of the true rental situation. The manner in which the scheme operated is reflected in the testimony of the Beckers and the former tenants, Mr. Burnstein, Miss Sego and Mr. O'Brien. That knowledge of the fact of the rental concessions was material and important to a buyer and defendants knew this, is reflected in the evidence that the Beckers gave the rental concessions, the manager drew the leases under the Beckers' supervision and at Dale Becker's instructions and with Mrs. Becker's knowledge did not indicate therein the fact of the rental concessions; Dale Becker's testimony that he did tell plaintiffs of the rental concessions at the escrow office (although disbelieved by the trial judge); Mary Ach's testimony that two months after the purchase when she discovered the concessions through the tenants she found that she could not rent the apartments without them, she [***17] relied on the yearly rental set out in each lease in determining whether to buy the property and she would not have bought the

building had she known of them; the testimony of plaintiffs' expert, Mr. Crystal; and Dale Becker's testimony that he would get a better price if the building were full, wanted the building full in order to sell it and instructed that "All Leased Except Owner's Apartment" in Exhibit 1 (prospectus) be printed in capital letters. Without question plaintiffs were misled by the manner in which the apartment leases were drawn, relied upon the leases in figuring the projected income of the property, [**479] and would not have bought the building had they known of the rental concessions.

[*677] (9) Appellants' objection that no agency was established is neither timely nor meritorious. It ignores the pretrial order containing the stipulation "that the named defendants [Swan Imojean Finkelstein and Charles Finkelstein], through Dale L. Becker and Vivian M. Becker sold the above mentioned property to plaintiffs for $ 350,000," and their failure to raise the issue of agency on pretrial. The issue not having been raised at the pretrial conference and not having [***18] been listed in the pretrial order as one remaining in dispute, agency was no longer an issue in the case at the trial. ( *Perry v. Thrifty Drug Co., 186 Cal.App.2d 410, 412 [9 Cal.Rptr. 50].*) Actually there was little or no question of agency in the trial. As to the Finkelsteins, the stipulation established that the Beckers were their agents in the sale of the property and that "through Dale L. Becker and Vivian M. Becker" sold it to plaintiffs for $ 350,000; and the record shows that Charles and his wife signed the escrow instructions and shared in the proceeds of the sale with the Beckers. (10) "[Where] an agent acting within his actual or apparent authority procures a sale of property by means of fraud, the principal is jointly liable with the agent for damages incurred thereby, even though the principal is innocent of personally participating in the fraud, when he accepts and retains the benefits which accrue from the transaction." ( *Crawford v. Nastos, 182 Cal.App.2d 659, 667 [6 Cal.Rptr. 425, 97 A.L.R.2d 840].*)

(11) Finally, appellants argue that the trial court erred in assessing damages because there is not sufficient evidence to support its finding of value of [***19] the property at the time of sale. In accord with *section 3343, Civil Code* [3] the trial court found "that plaintiffs were . . . damaged in the sum of $ 10,000, being the difference between $ 350,000 paid by the defendants and the actual value of the building on the date of purchase, to wit, the sum of $ 340,000." Appellants' real complaint is that the

264 Cal. App. 2d 667, *677; 70 Cal. Rptr. 472, **479;
1968 Cal. App. LEXIS 2130, ***19

evidence shows various appraisals at the time of sale to be from $ 273,500 to $ 374,650 but none $ 340,000, thus the court's finding has no support.

> 3    *Section 3343, Civil Code*, provides: "One defrauded in the purchase, sale or exchange of property is entitled to recover the difference between the actual value of that with which the defrauded person parted and the actual value of that which he received, together with any additional damage arising from the particular transaction.
>
> "Nothing herein contained shall be deemed to deny to any person having a cause of action for fraud or deceit any legal or equitable remedies to which such person may be entitled."

Dale [***20] Becker testified that his opinion of the value of the [*678] property on May 7, 1964, is $ 374,650; defendant Charles Finkelstein testified that it is "in the neighborhood of $ 370,000"; defendants' expert witnesses Strattman and Rice testified to $ 360,000, and $ 346,500 to $ 356,500, respectively. Mr. Rice testified that his appraisal of the value of the property at the time of sale on the cost approach is $ 337,960, on the income

evaluation approach (the giving of 15 months' rent for 12 months' price would make a difference in the value of the building, would make the value lower) the fair market value is $ 344,000, and on the market data and comparative approach the evaluation range is $ 346,500 to $ 356,500. Mr. Crystal, plaintiffs' expert, testified that his appraisal of the value of the property at the time of sale on the market data approach is $ 275,000, on the cost approach $ 278,750, and on the income approach, on which he based his final appraisal, $ 273,500.

We do not understand that in assessing damages the trial court is precluded from balancing and weighing the testimony of the witnesses. Nor do we believe under the evidence in this case, that the court could [***21] not determine the value to be between the lowest appraisal of $ 273,500 [**480] and the highest of $ 374,650 and fix the figure at $ 340,000. The question of damages was one of fact for the trial court ( *Sanfran Co. v. Rees Blow Pipe Mfg. Co., 168 Cal.App.2d 191, 206 [335 P.2d 995]*), and we think on the record before us, it reached a proper and fair result on the issue, as well as on all the other issues presented by the case.

The judgment is affirmed.

# Exhibit F

**APPENDIX OF NON-FEDERAL AND UNPUBLISHED FEDERAL AUTHORITIES CITED IN VISA USA INC.'S OPPOSITION TO DEFENDANT MARITZ INC.'S REQUEST FOR DISCOVERY**

LEXSEE



Positive
As of: Feb 05, 2008

**R. THOMAS FAIR, Plaintiff, Cross-defendant and Appellant, v. KARL E. BAKHTIARI et al., Defendants and Respondents; STONESFAIR FINANCIAL CORPORATION, Defendant, Cross-complainant and Respondent.**

**S129220**

**SUPREME COURT OF CALIFORNIA**

**40 Cal. 4th 189; 147 P.3d 653; 51 Cal. Rptr. 3d 871; 2006 Cal. LEXIS 14727; 2006 Cal. Daily Op. Service 11371; 2006 Daily Journal DAR 16184**

**December 14, 2006, Filed**

**PRIOR HISTORY:** Superior Court of San Mateo County, No. 417058, George A. Miram, Judge. Court of Appeal of California, First Appellate District, Division Two, No. A100240.
Fair v. Bakhtiari, 122 Cal. App. 4th 1457 [19 Cal. Rptr. 3d 591, 2004 Cal. App. LEXIS 1702] (Cal. App. 1st Dist., 2004)

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff and defendants concluded a mediation session by signing a handwritten single-page memorandum captioned "settlement terms." The final provision stated: "Any and all disputes subject to JAMS arbitration rules." The trial court found the memorandum inadmissible and denied plaintiff's motion to compel arbitration. The California Court of Appeal, First District, Division Two, reversed. Defendants petitioned for review.

**OVERVIEW:** The intermediate appellate court concluded that the JAMS provision in the memorandum constituted "words to that effect" under Evid. Code, § 1123, subd. (b), and that the settlement terms were therefore enforceable or binding under § 1123, subd. (b). The court concluded that the intermediate appellate court gave the statute an unduly expansive reading. The intermediate appellate court erred in concluding that the inclusion of the arbitration clause in the parties' list of settlement terms satisfied § 1123, subd. (b), on the ground that the clause could only reflect an intent that the docu-

ment would be "enforceable or binding." A narrower interpretation of the "words to that effect" clause was required. To satisfy § 1123, subd. (b), the writing had to make clear that it reflected an agreement and was not simply a memorandum of terms for inclusion in a future agreement. Although the writing did not need to be in finished form to be admissible under § 1123, subd. (b), it had to include a direct statement to the effect that it was enforceable or binding. The arbitration provision in the memorandum failed to satisfy that standard and was inadmissible.

**OUTCOME:** The intermediate appellate court's judgment was reversed, and the matter was remanded for further proceedings.

**CORE TERMS:** mediation, settlement, settlement agreement, enforceable, binding, arbitration, confidentiality, admissible, disclosure, inadmissible, arbitration clause, admissibility, recommendation, Law Revision Com, arbitration provision, compel arbitration, mutual, enforceability, manifestation, general rule, dispute resolution, material terms, declaration, illegality, inclusion, compelled, mediator, outward, exempt, settle

**LexisNexis(R) Headnotes**

*Civil Procedure > Alternative Dispute Resolution > Mediations*

40 Cal. 4th 189, *; 147 P.3d 653, **;
51 Cal. Rptr. 3d 871, ***; 2006 Cal. LEXIS 14727

*Civil Procedure > Settlements > Settlement Agreements > Enforcement > General Overview*
*Evidence > Documentary Evidence > Writings > General Overview*
*Evidence > Procedural Considerations > General Overview*
[HN1]The aim of Evid. Code, § 1123, subd. (b), is to allow parties in mediation to draft enforceable agreements without requiring the use of a formulaic phrase. However, the writing must make clear that it reflects an agreement and is not simply a memorandum of terms for inclusion in a future agreement. The writing need not be in finished form to be admissible under § 1123, subd. (b), but it must be signed by the parties and include a direct statement to the effect that it is enforceable or binding.

*Civil Procedure > Discovery > Privileged Matters > General Overview*
*Civil Procedure > Alternative Dispute Resolution > Mediations*
*Evidence > Procedural Considerations > General Overview*
[HN2]The mediation confidentiality provisions of the California Evidence Code were enacted to encourage mediation by permitting the parties to frankly exchange views, without fear that disclosures might be used against them in later proceedings. Toward that end, the statutory scheme unqualifiedly bars disclosure of communications made during mediation absent an express statutory exception.

*Civil Procedure > Discovery > Privileged Matters > General Overview*
*Civil Procedure > Alternative Dispute Resolution > Mediations*
*Evidence > Documentary Evidence > Writings > General Overview*
*Evidence > Procedural Considerations > General Overview*
[HN3]See Evid. Code, § 1119, subd. (b).

*Civil Procedure > Discovery > Privileged Matters > General Overview*
*Civil Procedure > Alternative Dispute Resolution > Mediations*
*Civil Procedure > Settlements > Settlement Agreements > Enforcement > General Overview*
*Evidence > Documentary Evidence > Writings > General Overview*
*Evidence > Procedural Considerations > General Overview*
[HN4]See Evid. Code, § 1123.

*Civil Procedure > Alternative Dispute Resolution > Mediations*
*Civil Procedure > Settlements > Settlement Agreements > Enforcement > General Overview*
*Evidence > Documentary Evidence > Writings > General Overview*
*Evidence > Procedural Considerations > General Overview*
[HN5]The phrase "words to that effect" in Evid. Code, § 1123, subd. (b), refers to language that conveys a general meaning or import, in this instance the meanings of "enforceable or binding." Under § 1123, subd. (b), the use of such language will exempt a written settlement agreement from the general rule that documents prepared during mediation are inadmissible in future proceedings. The legislature's goal was to allow parties to express their intent to be bound in words they were likely to use, rather than requiring a legalistic formulation. The legislature also meant to clarify the rules governing admissibility and reduce the likelihood that parties would overlook those rules. To meet these objectives, courts must balance the requirements of flexibility and clarity, without eroding the confidentiality that is essential to effective mediation.

*Civil Procedure > Settlements > Settlement Agreements > Enforcement > General Overview*
*Evidence > Documentary Evidence > Writings > General Overview*
*Evidence > Procedural Considerations > General Overview*
[HN6]To satisfy the "words to that effect" provision of Evid. Code, § 1123, subd. (b), a writing must directly express the parties' agreement to be bound by the document they sign.

*Governments > Legislation > Interpretation*
[HN7]The legislature is not required to employ identical terminology in separate statutes serving similar policy objectives.

*Governments > Legislation > Interpretation*
[HN8]Courts construe related statutes so as to harmonize their requirements and avoid anomaly.

*Civil Procedure > Alternative Dispute Resolution > Mediations*
*Civil Procedure > Settlements > Settlement Agreements > Enforcement > General Overview*

40 Cal. 4th 189, *; 147 P.3d 653, **;
51 Cal. Rptr. 3d 871, ***; 2006 Cal. LEXIS 14727

*Evidence > Documentary Evidence > Writings > General Overview*
*Evidence > Procedural Considerations > General Overview*
[HN9]A settlement agreement drafted during mediation must be admissible before a court can reach the issue of enforceability.

*Civil Procedure > Alternative Dispute Resolution > General Overview*
*Civil Procedure > Settlements > Settlement Agreements > General Overview*
*Evidence > Documentary Evidence > Writings > General Overview*
*Evidence > Procedural Considerations > General Overview*
[HN10]Arbitration clauses, forum selection clauses, choice of law provisions, terms contemplating remedies for breach, and similar commonly employed enforcement provisions typically negotiated in settlement discussions do not qualify an agreement for admission under *Evid. Code, § 1123, subd. (b).*

**SUMMARY:**

CALIFORNIA OFFICIAL REPORTS SUMMARY

Plaintiff sued defendants, alleging that defendants had wrongfully excluded him from real estate syndications, denied him compensation, misappropriated profits, and engaged in other financial misconduct. Plaintiff also accused one of the defendants of physically assaulting him on more than one occasion. The parties concluded a mediation session by signing a handwritten single-page memorandum captioned "settlement terms." The final provision stated: "Any and all disputes subject to JAMS [(Judicial Arbitration and Mediation Services)] arbitration rules." The trial court found the memorandum inadmissible and denied plaintiff's motion to compel arbitration. (Superior Court of San Mateo County, No. 417058, George A. Miram, Judge.) The Court of Appeal, First Dist., Div. Two, No. A100240, reversed the trial court's judgment, holding that the arbitration clause amounted to a provision that the memorandum was enforceable or binding, or "words to that effect" under *Evid. Code, § 1123, subd. (b),* and that the memorandum was therefore admissible.

The Supreme Court reversed the judgment of the Court of Appeal and remanded the matter for further proceedings. The court concluded that the Court of Appeal erred in that the inclusion of the arbitration clause in the parties' list of settlement terms satisfied *Evid. Code, § 1123, subd. (b).* To satisfy *§ 1123, subd. (b),* the writing must make clear that it reflects an agreement and is not

simply a memorandum of terms for inclusion in a future agreement. Although the writing does not need to be in finished form to be admissible under *§ 1123, subd. (b),* it must be signed by the parties and include a direct statement to the effect that it is enforceable or binding. The arbitration provision in the memorandum failed to satisfy this standard and was inadmissible. (Opinion by Corrigan, J., with George, C. J., Baxter, Werdegar, Chin, and Moreno, JJ., concurring. Concurring and dissenting opinion by Kennard, J. (see p. 200).)  [*190]

**HEADNOTES**

CALIFORNIA OFFICIAL REPORTS HEADNOTES
Classified to California Digest of Official Reports

**(1) Compromise, Settlement, and Release § 9-- Construction, Operation, and Effect--Mediation-- Writing--Admissibility.**--The aim of *Evid. Code, § 1123, subd. (b),* is to allow parties in mediation to draft enforceable agreements without requiring the use of a formulaic phrase. However, the writing must make clear that it reflects an agreement and is not simply a memorandum of terms for inclusion in a future agreement. The writing need not be in finished form to be admissible under *§ 1123, subd. (b),* but it must be signed by the parties and include a direct statement to the effect that it is enforceable or binding. Thus, a draft memorandum containing settlement terms that did not include a statement that it was enforceable or binding failed to satisfy this standard and was inadmissible.

[1 Witkin, Cal. Evidence (4th ed. 2000) Circumstantial Evidence, § 155.]

**(2) Evidence § 1--Mediation Confidentiality-- Disclosure of Communications.**--The mediation confidentiality provisions of the Evidence Code were enacted to encourage mediation by permitting the parties to frankly exchange views, without fear that disclosures might be used against them in later proceedings. Toward that end, the statutory scheme unqualifiedly bars disclosure of communications made during mediation absent an express statutory exception.

**(3) Compromise, Settlement, and Release § 9-- Construction, Operation, and Effect--Mediation-- Writing--Admissibility--"Words to That Effect."**-- The phrase "words to that effect" in *Evid. Code, § 1123, subd. (b),* refers to language that conveys a general meaning or import, in this instance the meanings of "enforceable or binding." Under *§ 1123, subd. (b),* the use of such language will exempt a written settlement agreement from the general rule that documents prepared during mediation are inadmissible in future proceedings. The Legislature's goal was to allow parties to express

Page 3

40 Cal. 4th 189, *; 147 P.3d 653, **;
51 Cal. Rptr. 3d 871, ***; 2006 Cal. LEXIS 14727

their intent to be bound in words they were likely to use, rather than requiring a legalistic formulation. The Legislature also meant to clarify the rules governing admissibility and reduce the likelihood that parties would overlook those rules. To meet these objectives, courts must balance the requirements of flexibility and clarity, without eroding the confidentiality that is essential to effective mediation. [*191]

**(4) Compromise, Settlement, and Release § 9--Construction, Operation, and Effect--"Words to That Effect"--Parties' Agreement to be Bound.**--To satisfy the "words to that effect" provision of Evid. Code, § 1123, subd. (b), a writing must directly express the parties' agreement to be bound by the document they sign.

**(5) Statutes § 31--Construction--Language--Words and Phrases--Identical Terminology.**--The Legislature is not required to employ identical terminology in separate statutes serving similar policy objectives.

**(6) Statutes § 20--Construction--Judicial Function.**--Courts construe related statutes so as to harmonize their requirements and avoid anomaly.

**(7) Compromise, Settlement, and Release § 11--Enforceability--Admissibility.**--A settlement agreement drafted during mediation must be admissible before a court can reach the issue of enforceability.

**(8) Compromise, Settlement, and Release § 9--Construction, Operation, and Effect--Admissibility.**--Arbitration clauses, forum selection clauses, choice of law provisions, terms contemplating remedies for breach, and similar commonly employed enforcement provisions typically negotiated in settlement discussions do not qualify an agreement for admission under Evid. Code, § 1123, subd. (b).

**COUNSEL:** Howard Rice Nemerovski Canady Falk & Rabkin, Gilbert R. Serota, Curt Holbreich and Chandra Miller Fienen for Plaintiff, Cross-defendant and Appellant.

Shartsis, Friese & Ginsburg, Shartsis Friese, Arthur J. Shartsis, Mary Jo Shartsis, Erick C. Howard; Horvitz & Levy, Ellis J. Horvitz and Jon B. Eisenberg for Defendants and Respondents and for Defendant, Cross-complainant and Respondent.

**JUDGES:** Corrigan, J., with George, C. J., Baxter, Werdegar, Chin and Moreno, JJ., concurring. Concurring and dissenting opinion by Kennard, J.

**OPINION BY: CORRIGAN**

## OPINION

[**654] [***873] **CORRIGAN, J.**--Documents prepared for purposes of mediation are generally inadmissible in civil proceedings. (Evid. Code, § 1119, subd. (b).) However, a signed settlement agreement reached through mediation is exempt from this general rule if it "provides that it is enforceable or binding or words [*192] to that effect." (Evid. Code, § 1123, subd. (b) (section 1123(b)).) [1] This case turns on whether the document at issue satisfies the requirements of section 1123(b).

   1   Further statutory references are to the Evidence Code, unless otherwise specified.

The parties concluded a mediation session by signing a handwritten single-page memorandum [**655] captioned "Settlement Terms." The final provision stated: "Any and all disputes subject to JAMS [(Judicial Arbitration and Mediation Services)] arbitration rules." The trial court found this "term sheet" inadmissible, and denied a motion to compel arbitration. The Court of Appeal reversed, holding that the memorandum was admissible because the arbitration provision constituted "words to [the] effect" that the settlement terms were "enforceable or binding" under section 1123(b).

**(1)** The Court of Appeal gave section 1123(b) an unduly expansive reading. [HN1]The aim of the provision is to allow parties in mediation to draft enforceable agreements without requiring the use of a formulaic phrase. However, the writing must make clear that it reflects an agreement and is not simply a memorandum of terms for inclusion in a future agreement. The writing need not be in finished form to be admissible under section 1123(b), but it must be signed by the parties and include a direct statement to the effect that it is enforceable or binding. For reasons we explain below, the arbitration clause in the memorandum before us fails to satisfy this standard.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff R. Thomas Fair sued Karl E. Bakhtiari, Maryanne E. Fair, and various business entities (we refer to the businesses as the Stonesfair defendants). Bakhtiari was plaintiff's former business partner and Ms. Fair his former wife. Plaintiff alleged that they had wrongfully excluded him from real estate syndications, denied him compensation, misappropriated profits, and engaged in other financial misconduct. Plaintiff also accused Bakhtiari of physically assaulting him on more than one occasion.

Bakhtiari, Ms. Fair, and the Stonesfair defendants answered separately, and the parties mediated their dis-

putes over the course of two days. At the end of the second day, plaintiff's counsel drafted a handwritten memorandum recording settlement terms, as set forth below. [2] The [***874] memorandum was dated March 21, 2002, and signed by the mediator and the parties.

2   "SETTLEMENT TERMS

"1. Cash payment of $ 5.4 MM to T. Fair w/in 60 days.

"2. Payment treated as purchase of all T. Fair's stock & interests (as capital gain to Fair)[.]

"3. [Defendants] will not look to Fair for reimbursement or indemnification of any phantom income paid by them to date.

"4. This provision relates solely to Fair's right to indemnity and does not preclude other rights of the parties. Fair will be indemnified as a former officer, director & employee by SFC/SMC/SC [the Stonesfair defendants], according to applicable law, against all 3rd party claims, including LPs [limited partners] or IRS, arising from the operation of SFC/SMC. Fair will not make any adverse contacts with IRS [or] LPs re: SFC/SMC, at risk of loss of indemnity and will not suggest, foment or encourage litigation by LPs or any individual against defendants, at risk of loss of indemnity.

"5. Maryanne Fair disclaims any community prop[erty] interest in settlement proceeds.

"6. Parties will sign mutual releases and dismiss with prejudice all claims. Am't of settlement will be confidential with appropriate exceptions.

"7. All sides bear their own attorneys fees and costs, including experts.

"8. If Fair needs to restructure cash payments for tax purposes, defendants will cooperate (at no additional cost to defendants).

"9. Any and all disputes subject to JAMS [Judicial Arbitration and Mediation Services] arbitration rules."

[*193] The parties filed case management reports informing the court that the case had settled in mediation. On April 4, counsel for the Stonesfair defendants circulated a formalized settlement and release agreement, confirming the parties' intent to settle all their disputes "as of and effective March 21, 2002." A few days before the case management conference, counsel for the Stonesfair defendants learned from plaintiff's counsel that plaintiff believed the parties' agreement for the transfer of his assets did not apply to certain business inter-

ests. The attorneys also discussed unresolved tax issues. Counsel for all parties appeared at the case management conference, where Bakhtiari's attorney requested a continuance. He told the court: "We've reached a settlement agreement. We are now in the process of exchanging settlement agreements. And there are some complicated taxation matters involved." The trial court granted the continuance.

[**656] The parties were unable to finalize their settlement. On June 6, 2002, one of the attorneys for the Stonesfair defendants substituted as counsel for all defendants, and filed a case management document informing the court that the parties "were ultimately unable to reach agreement as to the scope and subject matter of the proposed settlement terms." He suggested the case "should be resolved through the regular court process."

On June 10, plaintiff's attorney wrote to defendants' counsel, demanding arbitration under paragraph 9 of the settlement memorandum. (See fn. 2, ante, pp. 192-193.) Defendants' counsel rejected the demand, contending the parties had not entered an enforceable agreement. He claimed the settlement memorandum was inadmissible under section 1119, subdivision (b), which protects the confidentiality of writings "prepared for the purpose of, in the course of, or pursuant to, a mediation."

Plaintiff moved to compel arbitration, contending the parties had agreed to be bound when they signed the March 21 memorandum, and thus any disputes over the meaning or extent of their agreement were subject to [*194] arbitration. Plaintiff noted that counsel for all defendants had told the court the case had settled. Defendants opposed the motion. They objected to the admission of the settlement memorandum and parts of opposing counsel's declarations reciting mediation discussions. In reply, plaintiff contended the March 21 memorandum was admissible on various grounds, including that the presence of an arbitration provision made the parties' agreement "enforceable" as contemplated by section 1123(b).

The trial court excluded the memorandum and the portions of the declaration by plaintiff's counsel describing the settlement reached in mediation. The court [***875] found that the requirements of section 1123 were not met, and concluded "[t]here is insufficient demonstration of an arbitration agreement given the inadmissibility of the term sheet." Accordingly, the court denied the motion to compel arbitration.

The Court of Appeal reversed, deciding that the provision "[a]ny and all disputes subject to JAMS arbitration rules" could only mean the parties intended the settlement terms document to be "enforceable or binding." Therefore, the court held that the memorandum included "words to that effect" and was admissible under section

40 Cal. 4th 189, *; 147 P.3d 653, **;
51 Cal. Rptr. 3d 871, ***; 2006 Cal. LEXIS 14727

1123(b). The court also determined that the memorandum reflected a valid arbitration agreement. We granted defendants' petition for review.

## II. DISCUSSION

(2) We have repeatedly noted that [HN2]the mediation confidentiality provisions of the Evidence Code were enacted to encourage mediation by permitting the parties to frankly exchange views, without fear that disclosures might be used against them in later proceedings. (*Rojas v. Superior Court* (2004) 33 Cal.4th 407, 415-416 [15 Cal. Rptr. 3d 643, 93 P.3d 260]; *Foxgate Homeowners Assn. v. Bramalea California, Inc.* (2001) 26 Cal.4th 1, 14 [108 Cal. Rptr. 2d 642, 25 P.3d 1117].) Toward that end, "the statutory scheme ... unqualifiedly bars disclosure of communications made during mediation absent an express statutory exception." (*Foxgate Homeowners' Assn.*, at p. 15, fn. omitted; see *Rojas*, at p. 416.) In *Foxgate* and *Rojas* we disapproved "judicially crafted exception[s]" to the mediation confidentiality statutes. (*Foxgate Homeowners' Assn.*, at p. 14; see *Rojas*, at p. 424, quoting *Foxgate*.) In this case we construe the exception expressly provided in section 1123(b) for written settlement agreements.

Section 1123(b) was added in 1997, as one of many statutory mediation reforms recommended by the California Law Revision Commission (Commission). (Stats. 1997, ch. 772, § 3; see Recommendation on Mediation Confidentiality (Jan. 1997) 26 Cal. Law Revision Com. Rep. (1996) p. 407.) [*195] The Commission's 1997 recommendation includes an introductory letter to the Governor stating that its revisions were intended "to eliminate ambiguities. In particular, the Commission [**657] recommends clarifying the application of mediation confidentiality to settlements reached through mediation. Clarification is critical to aid disputants in crafting agreements they can enforce." (Recommendation on Mediation Confidentiality, *supra*, 26 Cal. Law Revision Com. Rep., at p. 409; see also p. 414.) In its recommendation, the Commission observed: "These recommended reforms on achieving an effective settlement are the most crucial element of the Commission's recommendation. They should enhance the effectiveness of mediation in promoting durable settlements." (*Id.* at p. 424.) The Commission's official comments are deemed to express the Legislature's intent. (*Rojas v. Superior Court, supra*, 33 Cal.4th at p. 418, fn. 6.)

The Commission noted that a predecessor statute, former section 1152.5, "fails to highlight a critical requirement concerning written settlement agreements reached through mediation. Under section 1152.5(a)(2), unless it is offered to prove fraud, duress, or illegality, a written settlement agreement is admissible only if it so provides. [Fn. omitted.] Parties overlooking this re-

quirement may inadvertently enter into a written settlement agreement that is unenforceable because it is [***876] inadmissible." [3] (Recommendation on Mediation Confidentiality, *supra*, 26 Cal. Law Revision Com. Rep., at p. 422.)

> 3   Former section 1152.5, subdivision (a)(2) provided: "Except as otherwise provided in this section, unless the document otherwise provides, no document prepared for the purpose of, or in the course of, or pursuant to, the mediation, or copy thereof, is admissible in evidence or subject to discovery, and disclosure of such a document shall not be compelled, in any civil action or proceeding in which, pursuant to law, testimony can be compelled to be given." (Stats. 1996, ch. 174, § 1, p. 1366.)
>
> Former section 1152.5, subdivision (a)(4) provided for disclosure of a document upon the consent of all parties, and subdivision (a)(5) permitted a written settlement agreement to be admitted when relevant to show fraud, duress, or illegality. (Stats. 1996, ch. 174, § 1, p. 1366.) Thus, as noted by the Commission, a party resisting enforcement of an agreement that did not include a provision making it "admissible in evidence" could withhold consent to disclosure and thwart the agreement, unless the party seeking enforcement could show fraud, duress, or illegality.

The Commission proposed to remedy this problem by addressing the admissibility of settlement agreements in a separate section. "This will draw attention to the requirements and decrease the likelihood that disputants will inadvertently enter into an unenforceable agreement." (Recommendation on Mediation Confidentiality, *supra*, 26 Cal. Law Revision Com. Rep., at p. 422.) Accordingly, mediation confidentiality and the disclosure of settlement agreements are now treated in separate provisions. Section 1119 states the general rule that writings prepared for, in the course of, or pursuant to [*196] mediation are inadmissible, "[e]xcept as otherwise provided in this chapter." [4] Section 1123 states the exceptions applicable to written settlement agreements, including the requirement at issue here: "The agreement provides that it is enforceable or binding or words to that effect." (§ 1123(b).) [5] The Commission explained: "[t]he proposed section on settlements would explicitly make an executed written settlement agreement admissible if it provides that it is 'enforceable' or 'binding' or words to that effect. Because parties intending [**658] to be bound are likely to use words to that effect, rather than stating that their agreement is 'admissible,' the Commission regards this as an important addition." (Recommen-

40 Cal. 4th 189, *; 147 P.3d 653, **;
51 Cal. Rptr. 3d 871, ***; 2006 Cal. LEXIS 14727

dation on Mediation Confidentiality, *supra*, 26 Cal. Law Revision Com. Rep., at p. 423; see also Cal. Law Revision Com. com., 29B pt. 3 West's Ann. Evid. Code (2006 supp.) foll. § 1123, p. 214.) [6]

4    Section 1119, subdivision (b) provides: [HN3]"No writing, as defined in Section 250, that is prepared for the purpose of, in the course of, or pursuant to, a mediation or a mediation consultation, is admissible or subject to discovery, and disclosure of the writing shall not be compelled, in any arbitration, administrative adjudication, civil action, or other noncriminal proceeding in which, pursuant to law, testimony can be compelled to be given."

5    The full text of section 1123 is as follows:

[HN4]"A written settlement agreement prepared in the course of, or pursuant to, a mediation, is not made inadmissible, or protected from disclosure, by provisions of this chapter if the agreement is signed by the settling parties and any of the following conditions are satisfied:

"(a) The agreement provides that it is admissible or subject to disclosure, or words to that effect.

"(b) The agreement provides that it is enforceable or binding or words to that effect.

"(c) All parties to the agreement expressly agree in writing, or orally in accordance with Section 1118, to its disclosure.

"(d) The agreement is used to show fraud, duress, or illegality that is relevant to an issue in dispute."

The conditions for the admission of oral agreements are addressed in sections 1118 and 1124.

6    The exception stated in section 1123(b) appears to be unique to California. Mediation statutes frequently exempt signed settlement agreements from the scope of confidentiality protection without further qualification. (See, e.g., Colo. Rev. Stat. § 13-22-302(2.5); Fla. Stat. § 44.102(3); Mont. Code Ann. § 26-1-813 (3); N.C. Gen. Stat. § 7A-38.1(*l*); 42 Pa. Cons. Stat. Ann. § 5949(b)(1) & (c); Va. Code Ann. § 8.01-576.10; Wn. Rev. Code § 5.60.070(1)(e) [governing mediation pursuant to referrals or agreements made before 2006].) This is the approach taken in the Uniform Mediation Act, which has been adopted in six states. (U. Mediation Act, § 6(a)(1); 710 Ill.

Comp. Stat. 35/6(a)(1); Iowa Code § 679C.106(1)(a); Neb. Rev. Stat. § 25-2935(a)(1); N.J. Stat. Ann. § 2A:23C-6(a)(1); Ohio Rev. Code Ann. § 2710.05(A)(1); Wn. Rev. Code § 7.07.050(1)(a) [governing mediation pursuant to referrals or agreements made after 2005]; see also *The Uniform Mediation Act* (2002) 22 N. Ill. U. L.Rev. 165, 210-214 [text of act with drafters' notes].)

In Wisconsin, "any written agreement, stipulation or settlement made between 2 or more parties during or pursuant to mediation" is exempted from confidentiality, with no mention of a signature requirement. (Wis. Stat. § 904.085(4)(a).)

Other statutes provide broadly for the disclosure of any communications during mediation if enforcement of a mediated agreement is sought. (See, e.g., Ariz. Rev. Stat. § 12-2238(B)(4); Conn. Gen. Stat. § 52-235d(b)(2) [disclosure permitted if "necessary to enforce a written agreement that came out of the mediation"]; Or. Rev. Stat. § 36.222(4) [disclosure permitted "to the extent necessary to prosecute or defend" enforcement action]; Wyo. Stat. § 1-43-103(c)(v).) The federal Administrative Dispute Resolution Act of 1996 authorizes disclosure if it is "relevant to determining the existence or meaning of an agreement ... that resulted from the dispute resolution proceeding or to the enforcement of such an agreement." (5 U.S.C. § 574(b)(6).)

See generally Deason, *Enforcing Mediated Settlement Agreements: Contract Law Collides With Confidentiality* (2001) 35 U.C. Davis L.Rev. 33, 44-51, 61-66; *The Uniform Mediation Act, supra*, 22 N. Ill. U. L.Rev. at pp. 213-214 (collecting statutes).

[*197]    [***877] The Court of Appeal correctly reasoned that the "words to that effect" clause reflects a legislative concern not with the precise words of a settlement agreement, but with terms unambiguously signifying the parties' intent to be bound. The court erred, however, by concluding that the inclusion of an arbitration clause in the parties' list of settlement terms satisfied section 1123(b), on the ground that the clause could only reflect an intent that the document would be "enforceable or binding." Although the Legislature did not provide the courts with a bright line when it permitted the admission of signed agreements including "words to that effect," we conclude a narrower interpretation of this clause is required. We are guided by the ordinary meaning of the statutory language, its context, and the legislative purposes it was meant to serve. (*Hassan v. Mercy American River Hospital* (2003) 31 Cal.4th 709, 715 [3 Cal. Rptr.

40 Cal. 4th 189, *; 147 P.3d 653, **;
51 Cal. Rptr. 3d 871, ***; 2006 Cal. LEXIS 14727

3d 623, 74 P.3d 726]; see also *Rojas v. Superior Court, supra,* 33 Cal.4th at p. 422.)

[HN5](3) The phrase "words to that effect" in section 1123(b) refers to language that conveys a general meaning or import, in this instance the meanings of "enforceable or binding." (American Heritage Dict. (4th ed. 2000) p. 570.) Under section 1123(b), the use of such language will exempt a written settlement agreement from the general rule that documents prepared during mediation are inadmissible in future proceedings. The Legislature's goal was to allow parties to express their intent to be bound in words they were likely to use, rather than requiring a legalistic formulation. The Legislature also meant to clarify the rules governing admissibility and reduce the likelihood that parties would overlook those rules. To meet these objectives, we must balance the requirements of flexibility and clarity, without eroding the confidentiality that is "essential to effective mediation." (*Foxgate* [***878] *Homeowners' Assn. v. Bramalea California, Inc., supra,* 26 Cal.4th at p. 14; see *Rojas v. Superior Court, supra,* 33 Cal.4th at p. 415.)

(4) In order to preserve the confidentiality required to protect the mediation process [**659] and provide clear drafting guidelines, we hold that [HN6]to satisfy the "words to that effect" provision of section 1123(b), a writing must directly express the parties' agreement to be bound by the document they sign. Plaintiff would have us infer the parties' intent from the mention of arbitration in the settlement terms memorandum. Arbitration is a method of enforcement subject to negotiation, like other settlement terms. A tentative [*198] working document may include an arbitration provision, without reflecting an actual agreement to be bound. If such a typical settlement provision were to trigger admissibility, parties might inadvertently give up the protection of mediation confidentiality during their negotiations over the terms of settlement. Disputes over those terms would then erupt in litigation, escaping the process of resolution through mediation. Durable settlements are more likely to result if the statute is applied to require language directly reflecting the parties' awareness that they are executing an "enforceable or binding" agreement.

Plaintiff claims that in this case, permitting defendants to use the shield of mediation confidentiality to thwart the agreement reflected in the memorandum of settlement terms would undermine the entire purpose of mediation, which is to settle disputes. He points out that after signing the memorandum, defendants told the trial court the case had settled and circulated a formal agreement declaring the settlement terms effective as of the date of the memorandum. Plaintiff contends this conduct proves that an enforceable settlement was intended, and that defendants' subsequent repudiation of the settlement was merely an instance of "settlors' remorse." According

to plaintiff, defendants refused to cooperate with his attempts to bring the parties back before the mediator to discuss the disputes that developed. Defendants, on the other hand, insist they always viewed the memorandum as a nonbinding document similar to a letter of intent regarding a proposed business relationship.

Plaintiff's characterization of defendants' postmediation conduct is one reasonable interpretation of the facts in this case. However, we do not believe the Legislature contemplated that in order to rule on the admissibility of a settlement agreement under section 1123(b), the court would examine extrinsic evidence to resolve competing claims over the parties' intent. As explained above, the statute is designed to produce documents that clearly reflect the parties' agreement that the settlement terms are "enforceable or binding."

Plaintiff seeks support from Business and Professions Code section 467.4, which governs alternative dispute resolution programs administered by the Dispute Resolution Advisory Council (DRAC) of the California Department of Consumer Affairs. There, the Legislature specified that a settlement agreement reached with the assistance of such a program is unenforceable and inadmissible "unless the consent of the parties or the agreement includes a provision that clearly states the intention of the parties that the agreement or any resulting award shall be so enforceable or admissible as evidence." (Bus. & Prof. Code, § 467.4, subd. (a).) Plaintiff reasons that the omission in section 1123(b) of a demand for "a provision that clearly states the intention [*199] of the parties" means the Legislature contemplated a less [***879] specific requirement for settlements reached in mediation proceedings.

(5) We disagree. The "clearly states" provision of Business and Professions Code section 467.4 is not such a critical statutory phrase that its omission from section 1123(b) can be deemed to reflect a different legislative intent. (Cf., e.g., *In re Young* (2004) 32 Cal.4th 900, 907 [12 Cal. Rptr. 3d 48, 87 P.3d 797].) The terms of section 1123(b), particularly when viewed in light of the purposes for which they were framed, are generally consistent with those of Business and Professions Code section 467.4. [HN7]The Legislature is not required to employ identical terminology in separate statutes serving similar policy objectives. It would be anomalous to impose stricter requirements on settlements fostered by DRAC programs than on those reached in mediation proceedings. [HN8](6) We construe related statutes so as to harmonize their requirements and avoid anomaly. (*Coachella Valley Mosquito & Vector Control Dist. v. California Public Employment Relations* [**660] *Bd.* (2005) 35 Cal.4th 1072, 1089 [29 Cal. Rptr. 3d 234, 112 P.3d 623].)

Page 8

40 Cal. 4th 189, *; 147 P.3d 653, **;
51 Cal. Rptr. 3d 871, ***; 2006 Cal. LEXIS 14727

**(7)** Plaintiff also contends that an arbitration clause is severable from the contract in which it appears, and enforceable as a matter of law. He asserts that the strong public policy favoring arbitration supports the enforceability of the arbitration clause in the settlement memorandum signed by the parties. (See, e.g., *St. Agnes Medical Center v. PacifiCare of California* (2003) 31 Cal.4th 1187, 1195 [8 Cal. Rptr. 3d 517, 82 P.3d 727].) However, [HN9]a settlement agreement drafted during mediation must be admissible before a court can reach the issue of enforceability. Under our interpretation of section 1123(b), the parties are free to draft and discuss enforcement terms such as arbitration clauses without worrying that those provisions will destroy the confidentiality that protects mediation discussions. A different rule could hinder the policy favoring arbitration by discouraging parties from including arbitration clauses in draft agreements.

Plaintiff argues alternatively that the settlement memorandum before us must be viewed as a whole and construed by the standard rules of contract interpretation to determine whether it is "enforceable" for purposes of section 1123(b). However, this interpretation would render the statutory exception superfluous and permit the admission of any signed, written agreement meeting the requirements for an enforceable contract. That approach has been taken in other jurisdictions (see fn. 6, *ante*, pp. 196-197), but our Legislature has imposed a different rule. Section 1123(b) requires the parties to affirmatively provide that their agreement is enforceable or binding.

**(8)** Thus, to satisfy section 1123(b), a settlement agreement must include a statement that it is "enforceable" or "binding," or a declaration in other [*200] terms with the same meaning. The statute leaves room for various formulations. However, [HN10]arbitration clauses, forum selection clauses, choice of law provisions, terms contemplating remedies for breach, and similar commonly employed enforcement provisions typically negotiated in settlement discussions do not qualify an agreement for admission under section 1123(b). [7] (See, e.g., Aragaki et al., A Litigator's [***880] Guide to Effective Use of ADR in California (Cont.Ed.Bar 2005) §§ 12.14, 12.19, 12.21, pp. 540, 543-544.)

> 7   Plaintiff raises other arguments that are beyond the scope of our review, some of which he presented in his briefs below. On remand to the Court of Appeal, he may pursue those claims. Of course, the court is not obligated to consider arguments not made in the original briefing.

DISPOSITION

The judgment of the Court of Appeal is reversed. The matter is remanded for further proceedings consistent with our opinion.

George, C. J., Baxter, J., Werdegar, J., Chin, J., and Moreno, J., concurred.

**CONCUR BY:** KENNARD

**DISSENT BY:** KENNARD

**DISSENT**

KENNARD, J., Concurring and Dissenting.--Under subdivision (b) of Evidence Code section 1119 (section 1119(b)), documents prepared during mediation are not admissible in evidence. There is an exception to this rule under subdivision (b) of Evidence Code section 1123 (section 1123(b)), which applies to a "written settlement agreement" when it is signed by parties and "provides that it is enforceable or binding or words to that effect."

Here, the parties signed a document during mediation that contained settlement terms, including a provision for arbitration of "[a]ny and all disputes." I agree with the majority that the mediation document is inadmissible under section 1119(b), and that it is not within the settlement agreement exception under section 1123(b). Unlike the majority, however, I do not reach that conclusion by holding that an arbitration clause can never constitute "words to [the] effect" that a settlement agreement is "enforceable or binding." Rather, I conclude that substantial evidence supports the trial court's implied finding that the mediation document at issue here was not a "written settlement agreement."

**[**661] I**

R. Thomas Fair (plaintiff) sued Maryanne E. Fair (his former wife), Karl E. Bakhtiari, and three corporations, alleging that they had wrongfully excluded him from real estate syndication businesses and engaged in various other misconduct. On March 21, 2002, during the second day of mediation, plaintiff's counsel wrote a document entitled "Settlement Terms," containing [*201] nine provisions. (See maj. opn., *ante*, at pp. 192-193, fn. 2.) The document stated that plaintiff would receive a "[c]ash payment of $ 5.4 [million] ... w/in 60 days" and that the payment would be "treated as purchase of all [plaintiff's] stock & interests (as capital gain to [plaintiff])." The document's final provision stated: "Any and all disputes subject to JAMS arbitration rules." The parties signed the mediation document.

On April 3, 2002, defendants' attorneys submitted case management conference questionnaires to the court in which they stated, in identical language, that "the case has settled" but also that a formal settlement agreement

40 Cal. 4th 189, *; 147 P.3d 653, **;
51 Cal. Rptr. 3d 871, ***; 2006 Cal. LEXIS 14727

"is being circulated for approval." At a hearing on April 17, 2002, defendants' counsel told the court that the parties had "reached a settlement agreement" but also that they were "now in the process of exchanging settlement agreements." At the same hearing, plaintiff's counsel assured the court that "the case *is going to* settle." (Italics added.)

Despite these assurances, a dispute arose concerning the mediation document's provision that the cash payment to plaintiff would be "treated as purchase of all [plaintiff's] stock & interests (as capital gain to [plaintiff])." Plaintiff's attorney asked one of defendants' attorneys whether defendants would be interested in also purchasing plaintiff's interests in certain limited partnerships related to the corporate [***881] defendants. Defendants took the position that those interests, alleged to be worth as much as $ 500,000, were already included. Plaintiff adamantly insisted they were not included.

On June 6, 2002, defendant Bakhtiari's attorney submitted a case management conference questionnaire to the court stating that "[a]though the Case Management Questionnaire submitted on April 3, 2002 by defendant Bakhtiari's former attorney indicated that the dispute had settled after mediation, it in fact, has not" and that "[t]he parties were ultimately unable to reach agreement as to the scope and subject matter of the proposed settlement terms."

On June 20, 2002, plaintiff brought a motion to compel arbitration under the mediation document. Defendants opposed the motion on the ground that there was no admissible evidence of an agreement to arbitrate. Defendants argued that the parties had not intended that the mediation document, which defendants referred to as a "term sheet," would be binding and that they never came to a meeting of the minds on key provisions. Thus, according to defendants, the mediation document was inadmissible under section 1119(b) and not within the settlement agreement exception under section 1123(b). The parties submitted declarations and other documentary evidence in support of their respective positions. The trial court denied the motion to compel arbitration, stating: "There is insufficient demonstration of an arbitration agreement given the inadmissibility of the Term Sheet."

[*202] **II**

The controlling legal principles were stated by the Court of Appeal in *Weddington Productions, Inc. v. Flick* (1998) 60 Cal.App.4th 793 [71 Cal. Rptr. 2d 265] (*Weddington*), as follows: "A settlement agreement is a contract, and the legal principles which apply to contracts generally apply to settlement contracts. [Citation.] An essential element of any contract is 'consent.' [Citations.] The 'consent' must be 'mutual.' [Citations.] 'Consent is

not mutual, unless the parties all agree upon the same thing in the same sense.' [Citations.] [¶] 'The existence of mutual consent is determined by objective rather than subjective criteria, the test being what the outward manifestations of consent would lead a reasonable person to believe.' [Citation.] Outward manifestations thus govern the finding of mutual consent required ... for contract formation. [Citation.] The [**662] parties' outward manifestations must show that the parties all agreed 'upon the same thing in the same sense.' (Civ. Code, § 1580.) If there is no evidence establishing a manifestation of assent to the 'same thing' by both parties, then there is no mutual consent to contract and no contract formation." (*Weddington, supra,* 60 Cal.App.4th at pp. 810-811; accord, *Bustamante v. Intuit, Inc.* (2006) 141 Cal.App.4th 199, 208-209 [45 Cal. Rptr. 3d 692].) "Where the existence of a contract is at issue and the evidence is conflicting or admits of more than one inference, it is for the trier of fact to determine whether the contract actually existed." (*Bustamante v. Intuit, Inc., supra,* at p. 208.)

This case is similar to *Weddington.* There, mediation resulted in a one-page memorandum stating that " '[a]ll parties agree to settle and dismiss on the following terms' " and then providing for a cash payment, the transfer of certain property, and a licensing agreement. (*Weddington, supra,* 60 Cal.App.4th at p. 799.) The mediation memorandum also contained a provision for its enforcement under Code of Civil Procedure section 664.6, which provides for the entry [***882] of judgment under the terms of a stipulated settlement. (*Weddington, supra,* at p. 800.) The Court of Appeal observed: "The reference to enforceability pursuant to section 664.6 suggests that the parties subjectively thought they had formed a settlement contract. Nevertheless, subsequent events illustrate quite vividly that they had never agreed on the same terms for a Licensing Agreement." (*Id.* at pp. 800-801.)

When disputes surfaced about the meaning of the licensing provision, the parties in *Weddington* returned to the mediator, who attempted to impose terms to which one party never agreed. (*Weddington, supra,* 60 Cal.App.4th at pp. 796-797, 804-807.) The Court of Appeal concluded that the parties had never agreed upon the material terms needed for an enforceable license agreement and that the mediator lacked authority to impose material terms to which the parties had never agreed. (*Id.* at pp. 815-816; see also *Terry v.* [*203] *Conlan* (2005) 131 Cal.App.4th 1445, 1460 [33 Cal. Rptr. 3d 603] ["like *Weddington,* the parties left significant ambiguities in ... material terms that demonstrated there was no meeting of the minds"].)

Here, substantial evidence supports the trial court's implied finding that, as in *Weddington, supra,* 60

40 Cal. 4th 189, *; 147 P.3d 653, **;
51 Cal. Rptr. 3d 871, ***; 2006 Cal. LEXIS 14727

Cal.App.4th 793, the parties may have subjectively believed they had reached a settlement agreement, but a key term of the agreement (requiring plaintiff to convey "all [his] stock and interests") was ambiguous, the ambiguity could not be resolved by consideration of the parties' outward manifestations, and later events demonstrated that the parties did not understand the term in the same way. This failure to reach a meeting of the minds prevented the formation of a contract. (See _Weddington, supra,_ at p. 811 ["If ... a supposed 'contract' does not provide a basis for determining what obligations the parties have agreed to, and hence does not make possible a determination of whether those agreed obligations have been breached, there is no contract."].) Accordingly, there was no "written settlement agreement" within the meaning of _Evidence Code section 1123,_ and the trial court properly ruled that the document the parties signed during mediation was inadmissible in evidence.

### III

Instead of relying on the absence of a "written settlement agreement," the majority relies on the absence of a provision in the mediation document "that it is enforceable or binding or words to that effect" (§ 1123(b)). The majority holds that the arbitration clause was not, and could never be, such a provision. I disagree.

Of course, as this case illustrates, an arbitration provision does not necessarily mean that a document prepared during mediation is a binding agreement rather than merely a list of partial or tentative contract terms. But once a court has determined that a document prepared and signed by the parties during mediation is actually a "written settlement agreement"--that it embodies a meeting of the minds on all material terms needed [**663] for settlement--the inclusion in that settlement agreement of a provision for arbitration--which is an enforcement mechanism--may properly be viewed as an acknowledgement by the parties that their settlement agreement is binding and enforceable. A statement that any dispute over a settlement agreement's terms will be subject to arbitration means that the agreement is "enforceable" through the arbitration process.

[***883] To be sure, the wording of the arbitration provision will make a difference. The wording of the provision must be consistent with the conclusion that the document is actually a settlement agreement and that it is to be enforced by [*204] arbitration. When these requirements are satisfied, however, an arbitration provision should, in my view, satisfy the statutory requirement that the "written settlement agreement" expressly provide "that it is enforceable or binding or words to that effect."

Although I do not agree with the majority's holding that an arbitration clause can never satisfy the requirement of section 1123(b) that a written settlement agreement "provide[] that it is enforceable or binding or words to that effect," I agree with the majority that the trial court here properly ruled the mediation document inadmissible under section 1119(b). Accordingly, I join in the reversal of the Court of Appeal's judgment, which reversed the trial court's order denying the motion to compel arbitration.