# Exhibit G

**APPENDIX OF NON-FEDERAL AND UNPUBLISHED FEDERAL AUTHORITIES CITED IN VISA USA INC.'S OPPOSITION TO DEFENDANT MARITZ INC.'S REQUEST FOR DISCOVERY**

LEXSEE



Caution
As of: Feb 05, 2008

**THE PEOPLE EX REL. JOSEFINA SEPULVEDA et al., Plaintiffs and Appellants,
v. HIGHLAND FEDERAL SAVINGS AND LOAN et al., Defendants and Respon-
dents.**

**No. B058411**

**COURT OF APPEAL OF CALIFORNIA, SECOND APPELLATE DISTRICT,
DIVISION THREE.**

**14 Cal. App. 4th 1692; 19 Cal. Rptr. 2d 555; 1993 Cal. App. LEXIS 435; 93 Cal.
Daily Op. Service 2989; 93 Daily Journal DAR 5206**

**January 26, 1993, Decided**

**SUBSEQUENT HISTORY:**   [***1]   Review Denied
April 22, 1993, Reported at 1993 Cal. LEXIS 2258.

**PRIOR HISTORY:**   Superior Court of Los Angeles
County, No. C718828, Barnet M. Cooperman, Judge.

**DISPOSITION:**   The judgment is reversed with direc-
tions to the court: (1) to strike the allegation that High-
land charged "points and provided for interest, each of
which was higher than the rates for bona fide loans
transactions"; (2) to strike prayer item (3)(h); (3) to strike
subparagraph (e) of paragraph 151 of the second
amended complaint; and (4) to conduct further proceed-
ings consistent with the views expressed herein.   The
plaintiffs shall recover their costs on appeal.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs, the State of
California and slum tenants, appealed from the judgment
of dismissal of the Superior Court of Los Angeles
County (California), which found that the plaintiffs' state
law claims against defendant federal savings and loan
and its officers were barred by federal preemption and
plaintiffs' Racketeer Influenced and Corrupt Organiza-
tions Act, 18 U.S.C.S. § 1961 et seq., claim failed to
state a cause of action.

**OVERVIEW:** Plaintiffs, the State of California and
slum tenants, appealed a judgment of dismissal wherein
the trial court found a complaint alleging fraudulent non-
compliance with minimum housing standards was barred
by federal preemption. The trial court also held that
plaintiffs' Racketeer Influenced and Corrupt Organiza-
tions Act, 18 U.S.C.S. § 1961 et seq., claim failed to
state a cause of action. On review, the court reversed and
reinstated plaintiffs' case because the trial court had erred
in finding no cause of action and in finding that the doc-
trine of federal preemption barred the state claims pursu-
ant to the Home Owners' Loan Act of 1933 (HOLA), 12
U.S.C.S. § 1461 et seq. The court, in its review of
HOLA, found no statutory provision or regulation which
addressed the subject of minimum housing standards.
The court concluded that neither the intent of Congress
in enacting HOLA nor the purpose of HOLA would have
been served by finding preemption under plaintiffs' alle-
gations. Plaintiffs were seeking to protect traditional
state interests in the safety and welfare of its people
against the alleged wrongful conduct of an entity that by
chance happened to be a federal association.

**OUTCOME:** The court reversed the trial court's judg-
ment of dismissal and reinstated the cause of action of
plaintiffs, the State of California and slum tenants, be-
cause the plaintiffs were merely seeking to protect their
health, safety, and welfare interests, traditionally state
concerns, which were not barred by federal preemption
as no federal banking or savings and loan statute or regu-
lation addressed the subject of minimum housing stan-
dards.

14 Cal. App. 4th 1692, *; 19 Cal. Rptr. 2d 555, **;
1993 Cal. App. LEXIS 435, ***; 93 Cal. Daily Op. Service 2989

**CORE TERMS:** cause of action, preemption, tenant, slum, savings, demurrer, federal savings, substandard, federal preemption, wire, due-on-sale, preempted, notice, record owner, ongoing, entity, beneficial, ownership, federal law, racketeering activity, disclose, mortgage, defraud, guardians ad litem, state law, state law, mail fraud, fraudulent concealment, borrower, mailing

**LexisNexis(R) Headnotes**

*Constitutional Law > Supremacy Clause > General Overview*
*Governments > Legislation > Interpretation*
[HN1]Preemption issues are resolved through the process of statutory interpretation. The court looks to the language of the statute and to the intent of Congress.

*Constitutional Law > Supremacy Clause > Federal Preemption*
[HN2]In determining whether a state statute or a state cause of action is preempted by federal law and thus invalid under the Supremacy Clause of the Constitution, the court's sole task is to ascertain the intent of Congress. First, when acting within constitutional limits, Congress is empowered to preempt state law by so stating in express terms. Second, congressional intent to preempt state law in a particular area may be inferred where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress left no room for supplementary state regulation. As a third alternative, in those areas where Congress has not completely displaced state regulation, federal law may nonetheless preempt state law to the extent it actually conflicts with federal law. Such a conflict occurs either because compliance with both federal and state regulations is a physical impossibility, or because the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

*Administrative Law > Agency Rulemaking > General Overview*
*Administrative Law > Separation of Powers > Constitutional Controls > General Overview*
*Constitutional Law > Supremacy Clause > General Overview*
[HN3]Where Congress has entrusted an agency with the task of promulgating regulations to carry out the purposes of a statute, as part of the preemption analysis the court must consider whether the regulations evidence a desire to occupy a field completely. Preemption should

not be inferred simply because the agency's regulations are comprehensive.

*Banking Law > Depository Institutions > Federal Savings Associations*
[HN4]See 12 C.F.R. § 545.1.

*Banking Law > Depository Institutions > Federal Savings Associations*
*Banking Law > Federal Acts > Home Owners' Loan Act*
[HN5]See 12 C.F.R. § 545.2.

*Constitutional Law > Supremacy Clause > General Overview*
[HN6]Preemption of state law by federal regulation is not favored. The court will not find express preemption unless a regulation clearly so states, and it is the burden of the party claiming preemption to prove it.

*Banking Law > Regulatory Agencies > Federal Home Loan Bank System*
*Constitutional Law > Supremacy Clause > General Overview*
[HN7]The Federal Home Loan Bank Board is capable of saying it means to expressly preempt all state law in an area., but 12 C.F.R. § 545.2 contains no statement that federal law is preemptive of all state common law claims.

*Banking Law > Federal Acts > Home Owners' Loan Act*
*Constitutional Law > Supremacy Clause > General Overview*
*Criminal Law & Procedure > Criminal Offenses > Racketeering > Racketeer Influenced & Corrupt Organizations > General Overview*
[HN8]No provision of Home Owners' Loan Act of 1933, 12 U.S.C.S. § 1461 et seq., nor any particular regulation, expressly preempts statutory actions for unfair business practices and the causes of action for fraud or violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C.S. § 1961 et seq.

*Banking Law > Depository Institutions > Federal Savings Associations*
*Banking Law > Federal Acts > Home Owners' Loan Act*

*Banking Law > Regulatory Agencies > Federal Home Loan Bank System*
[HN9]The broad language of § 5(a) of the Home Owners' Loan Act of 1933, 12 U.S.C.S. § 1461 et seq., expresses no limits on the Federal Home Loan Bank Board's authority to regulate the lending practices of federal savings and loans.

*Banking Law > Federal Acts > Home Owners' Loan Act*
*Constitutional Law > Supremacy Clause > General Overview*
*Governments > Local Governments > Administrative Boards*
[HN10]The authority of the Federal Home Loan Bank Board (Board) to pre-empt state laws is not limitless. Nothing in the language of § 5(a) of Home Owners' Loan Act of 1933, 12 U.S.C.S. § 1461 et seq., which empowers the Board to provide for the organization, incorporation, examination, operation, and regulation of federally chartered savings and loans, remotely suggests that Congress intended to permit the Board to displace local laws, such as tax statutes and zoning ordinances, not directly related to savings and loan practices.

*Constitutional Law > Supremacy Clause > Federal Preemption*
*Governments > Federal Government > Claims By & Against*
[HN11]The comprehensiveness of federal regulation is not sufficient to establish implied preemption. As a result of their specialized functions, agencies normally deal with problems in far more detail than does Congress. To infer pre-emption whenever an agency deals with a problem comprehensively is virtually tantamount to saying that whenever a federal agency decides to step into a field, its regulations will be exclusive. Such a rule would be inconsistent with the federal-state balance embodied in our Supremacy Clause jurisprudence. The court's task is to determine whether the field which has been pre-empted by federal regulation is broad enough to cover plaintiffs' state causes of action.

*Constitutional Law > Supremacy Clause > General Overview*
*Energy & Utilities Law > Nuclear Power Industry > General Overview*
[HN12]No implied preemption is found where the impact on the subject is merely indirect.

*Constitutional Law > Supremacy Clause > General Overview*
*Securities Law > Blue Sky Laws > Federal Preemption*
[HN13]Where the subject matter is an area traditionally regulated by the states, no federal preemption is implied unless there is a clear and manifest intent shown. Thus, there must be a showing of implicit preemption of the whole field strong enough to overcome the presumption that state and local regulation of health and safety matters can constitutionally coexist with federal regulation.

*Constitutional Law > Supremacy Clause > General Overview*
[HN14]Merely because federal provisions are sufficiently comprehensive to meet the need identified by Congress, it does not mean that states and localities are barred from identifying additional needs or imposing further requirements in the field.

*Banking Law > Depository Institutions > Federal Savings Associations*
*Constitutional Law > Supremacy Clause > General Overview*
[HN15]The court must determine whether the subject state causes of action are impliedly barred by federal preemption by scrutinizing them to see if they directly are purporting to address the subject of the operations of a federal savings association. 12 C.F.R. § 545.2.

*Banking Law > Depository Institutions > Federal Savings Associations*
*Banking Law > Federal Acts > Home Owners' Loan Act*
*Constitutional Law > Supremacy Clause > General Overview*
[HN16]The paramount purpose of the Home Owners' Loan Act of 1933 (HOLA), 12 U.S.C.S. § 1461 et seq., is to ensure the solvency of federal associations. That purpose would not be hindered, directly or indirectly, by the prosecution of the subject state claims where the state merely seeks to protect its own interest in public safety and welfare against the wrongful conduct of an entity, which happens to be a federal association. Neither the intent of Congress in enacting HOLA nor the purpose of HOLA would be served by finding preemption under these circumstances.

*Criminal Law & Procedure > Criminal Offenses > Racketeering > Racketeer Influenced & Corrupt Organizations > General Overview*

14 Cal. App. 4th 1692, *; 19 Cal. Rptr. 2d 555, **;
1993 Cal. App. LEXIS 435, ***; 93 Cal. Daily Op. Service 2989

[HN17]To state a cause of action under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C.S. § 1961 et seq., a plaintiff must plead facts to show: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.

*Criminal Law & Procedure > Criminal Offenses > Racketeering > Racketeer Influenced & Corrupt Organizations > Elements*
[HN18]An enterprise includes any union or group of individuals associated in fact although not a legal entity. 18 U.S.C.S. § 1961(4). It is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit.

*Criminal Law & Procedure > Criminal Offenses > Racketeering > Racketeer Influenced & Corrupt Organizations > General Overview*
[HN19]Racketeering activity under the Racketeer Influenced and Corrupt Organizations Act consists of certain specific acts which are expressly enumerated in 18 U.S.C.S. § 1961.

*Criminal Law & Procedure > Criminal Offenses > Racketeering > Racketeer Influenced & Corrupt Organizations > General Overview*
[HN20]In pleading a violation of the mail fraud statute, 18 U.S.C.S. § 1341, or the wire fraud statute, 18 U.S.C.S. § 1342, as a predicate act under a Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C.S. § 1961 et seq., scheme, plaintiffs must allege that (1) defendants devised a scheme or artifice to defraud, (2) defendants used the mails, or wires, in furtherance of the scheme, and (3) defendants did so with the specific intent to deceive or defraud.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > General Overview*
*Criminal Law & Procedure > Criminal Offenses > Racketeering > Racketeer Influenced & Corrupt Organizations > General Overview*
[HN21]See 18 U.S.C.S. § 1962(d).

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > Fraud Claims*
[HN22]The complaint must set forth with ample particularity the identities of the record holders, the identities and capacities of the many plaintiffs, and the time frame in which the representations were made. The allegations of fraud may lack specific detailed minutiae. Those details, however, are properly the subject of discovery, not demurrer.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > General Overview*
*Civil Procedure > Pleading & Practice > Service of Process > General Overview*
*Securities Law > Additional Offerings & the Securities Exchange Act of 1934 > Directors, Officers & Principal Stockholders > General Overview*
[HN23]A plain reading of Cal. Civ. Code § 1962 reveals its disclosure provisions do not give rise to a duty to disclose the name and address of a beneficial owner. All that is required under § 1962 is the disclosure of the name and usual street address at which personal service may be effected of each person who is: (1) Authorized to manage the premises; and (2) An owner of the premises or who is authorized to act for and on behalf of the owner for the purpose of service of process and for the purpose of receiving and receipting for all notices and demands. The reference to an owner of the premises is to the record owner, not the beneficial owner. This is clear from the language of Cal. Civ. Code § 1962(e), which provides that nothing in § 1962(e) limits or excludes the liability of any undisclosed owner.

*Civil Procedure > Pleading & Practice > Pleadings > Heightened Pleading Requirements > General Overview*
[HN24]See Cal. Civil Code § 1962.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

The trial court sustained, without leave to amend, demurrers to a complaint asserting a federally chartered savings and loan institution's wrongful course of conduct enabling slum conditions in certain urban buildings to be perpetuated to the detriment of the health, safety, and welfare of the People of California and, in particular, a class of tenant plaintiffs. In addition to the savings and loan, defendants included the institution's president, its loan coordinator and vice-president, and a wholly owned subsidiary. Plaintiffs sought to hold defendants responsible for continuing slum conditions of certain buildings of which defendants allegedly were the beneficial (non-record) owners. In addition to monetary damages and penalties, plaintiffs sought injunctive relief. The court found the complaint failed to state a cause of action for violations of the Racketeer Influenced and Corrupt Or-

14 Cal. App. 4th 1692, *; 19 Cal. Rptr. 2d 555, **;
1993 Cal. App. LEXIS 435, ***; 93 Cal. Daily Op. Service 2989

ganizations Act (RICO) (18 U.S.C. § 1961 et seq.) for fraud or for fraudulent concealment. The court further found the entire complaint, except the RICO cause, was barred by federal preemption. Based on the sustained demurrers, the court dismissed the action. (Superior Court of Los Angeles County, No. C718828, Barnet M. Cooperman, Judge.)

The Court of Appeal reversed with directions. The court held the various state causes of action were not explicitly or impliedly barred by federal preemption pursuant to the Home Owners' Loan Act (12 U.S.C. § 1461 et seq.) or its concomitant regulations, none of which purport to address the subject of minimum housing standards; allegations of usury and a prayer to enforce due-on-sale clauses, however, were expressly preempted and had to be struck. The court also held a cause based on RICO violations was stated: the requisite facts concerning the existence of an "enterprise" had been alleged, and, although allegations of wire fraud were deficient, the "racketeering activity" element was adequately pleaded by allegations of mail fraud. The court further held the complaint stated a cause of action for fraud, though not for fraudulent concealment. (Opinion by Croskey, J., with Klein, P. J., and Hinz, J., concurring.)

**HEADNOTES**

**CALIFORNIA        OFFICIAL        REPORTS HEADNOTES**
Classified to California Digest of Official Reports

**(1) Pleading § 23--Demurrer to Complaint--Demurrer as Admission--Application of Rule on Appeal.** --All well-pleaded allegations of a complaint are deemed to be true for the purpose of appellate review of a ruling on a demurrer.

**(2) Appellate Review § 109--Briefs--Form and Requisites--Argument--Omission.** --An appellate court is not required to consider matters urged in the briefs where no pertinent argument is made in support thereof.

**(3a) (3b) Constitutional Law § 34--Distribution of Governmental Powers--Between Federal and State Governments--Conflicts Between Federal and State Powers and Their Resolution--Preemption-- Determining Intent of Congress.** --In determining whether a state statute or cause of action is preempted by federal law and so invalid under U.S. Const., art. VI, cl. 2, the court's sole task is to ascertain the intent of Congress. First, within constitutional limits, Congress may preempt state law by so stating in express terms. Second, intent to preempt in a particular area may be inferred where a comprehensive scheme of federal regulation makes reasonable the inference that Congress left no

room for supplementary state regulation. Third, where Congress has not completely displaced state regulation, federal law may yet preempt state law to the extent it actually conflicts with federal law, either because compliance with both federal and state regulations is a physical impossibility, or because state law obstructs accomplishment of the full purposes and objectives of Congress. However, no implied preemption is found where the impact on the subject is merely indirect.

[See 7 **Witkin,** Summary of Cal. Law (9th ed. 1988) Constitutional Law, § 8.]

**(4a) (4b) Constitutional Law § 34--Distribution of Governmental Powers--Between Federal and State Governments--Conflicts Between Federal and State Powers and Their Resolution--Preemption-- Disfavored.** --Preemption of state law by federal regulation is not favored. The court will not find express preemption unless a regulation clearly so states. It is the burden of the party claiming preemption to prove it. Preemption is not to be lightly presumed.

**(5a) (5b) (5c) Constitutional Law § 34--Distribution of Governmental Powers--Between Federal and State Governments--Conflicts Between Federal and State Powers and Their Resolution--Preemption--Agency Regulation.** --Although federal regulations are not themselves controlling on the preemption issue, where Congress has entrusted an agency with the task of promulgating regulations to carry out the purposes of a statute, as part of the preemption analysis a court must consider whether the regulations evidence a desire to occupy a field completely. Preemption should not be inferred, however, simply because the agency regulations are comprehensive and sufficient to meet the need identified by Congress; the states and localities are not not thereby barred from identifying additional needs or imposing further requirements in the field. No implied preemption is found where the impact on the subject is merely indirect. Also, where the subject matter is an area traditionally regulated by the states, no federal preemption is implied unless there is a clear and manifest intent shown.

**(6a) (6b) (6c) (6d) Savings and Loan Associations § 10--Federal Associations--Regulation--Federal Preemption--Pleadings: Constitutional Law § 34-- Distribution of Governmental Powers--Between Federal and State Governments--Conflicts Between Federal and State Powers and Their Resolution-- Preemption--Federal Savings and Loan Association.** --The paramount purpose of the Home Owners' Loan Act (12 U.S.C. § 1461 et seq.) is to ensure the solvency of federal savings associations. Hence, various state causes of action grounded in a federally chartered savings and loan institution's alleged wrongful course of conduct

enabling slum conditions in certain urban buildings to be perpetuated to the detriment of the health, safety, and welfare of the People of California and, in particular, a class of tenant plaintiffs, were not explicitly or impliedly barred by federal preemption pursuant to the act or its concomitant regulations, none of which purported to address the subject of minimum housing standards. The cause for unfair business practices did not directly affect the institution's operations under the regulations, and the regulations did not pertain to the racketeering charges; the remaining nuisance and other causes would at most only incidentally and remotely touch on the institution's operations. Allegations of usury and a prayer to enforce due-on-sale clauses, however, were expressly preempted and had to be struck.

**(7a) (7b) Conspiracy § 19--Civil--Pleading--RICO-- Elements.** --To state a cause of action under the Racketeer Influenced and Corrupt Organizations Act (RICO) (18 U.S.C. § 1961 et seq.), a plaintiff must plead facts to show (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. The enterprise is an entity, a group of persons associated for a common purpose of engaging in a course of conduct. It is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit.

**(8a) (8b) (8c) Conspiracy § 19--Civil--Pleading-- RICO--Savings and Loan Association.** --In an action asserting a savings and loan institution's wrongful course of conduct enabling slum conditions in certain urban buildings to be perpetuated to the detriment of the health, safety, and welfare of the People of California and, in particular, a class of tenant plaintiffs, the trial court erred in sustaining, without leave to amend, demurrers to a cause of action based on violations of the Racketeer Influenced and Corrupt Organizations Act (RICO) (18 U.S.C. § 1961 et seq.). The requisite "enterprise" facts consisted in allegations of a continuing scheme to defraud the tenant plaintiffs, that defendants were ongoing business entities with an ongoing relationship independent of that fraud scheme, and that an ongoing series of business transactions among defendants regarded each of the subject buildings. Although allegations of wire fraud were deficient, the "racketeering activity" element was adequately pleaded by allegations of mail fraud describing the intent to defraud and facts as to the time, place, and content of alleged mailings. Further, the directly resulting injuries to plaintiffs were pleaded.

**(9) Conspiracy § 19--Civil--Pleading--RICO--Mail Fraud: Post Office § 3--Improper Use of Mails--Mail Fraud--Actions--Pleading.** --In pleading a violation of the mail fraud statute (18 U.S.C. § 1341) as a predicate

act under a scheme in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO) (18 U.S.C. § 1961 et seq.), plaintiffs must allege that (1) the defendants devised a scheme or artifice to defraud, (2) the defendants used the mails in furtherance of the scheme, and (3) the defendants did so with the specific intent to deceive or defraud.

**(10) Fraud and Deceit § 25--Actions--Pleading-- RICO--Wire Fraud: Conspiracy § 19--Civil-- Pleading--RICO--Wire Fraud: Telegraphs and Telephones § 2--Crimes--Wire Fraud--Actions--Pleading.** --In pleading a violation of the wire fraud statute (18 U.S.C. § 1342) as a predicate act under a scheme in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO) (18 U.S.C. § 1961 et seq.), plaintiffs must allege that (1) the defendants devised a scheme or artifice to defraud, (2) the defendants used the wires in furtherance of the scheme, and (3) the defendants did so with the specific intent to deceive or defraud.

**(11) Fraud and Deceit § 25--Actions--Pleading-- Savings and Loan Association.** --A complaint asserting a savings and loan institution's wrongful course of conduct enabling slum conditions in certain urban buildings to be perpetuated to the detriment of the health, safety, and welfare of the People of California and, in particular, a class of tenant plaintiffs, stated a cause of action for fraud. It set forth with ample particularity the identities of the record holders of title to the subject properties, the identities and capacities of the many plaintiffs, and the time frame in which the alleged misrepresentations were made. Specific, detailed minutiae were properly the subject of discovery, not demurrer.

**(12) Fraud and Deceit § 8--Fraudulent Concealment-- Beneficial Ownership of Leased Property--Pleading.** --A complaint asserting a savings and loan institution's wrongful course of conduct enabling slum conditions in certain urban buildings to be perpetuated to the detriment of the health, safety, and welfare of the People of California and, in particular, a class of tenant plaintiffs, stated no cause of action for fraudulent concealment. Plaintiffs sought to compel the beneficial (nonrecord) owners of the subject properties to disclose their ownership to the tenant plaintiffs to enable them to seek civil relief or governmental enforcement of the habitability law, but the disclosure provisions of Civ. Code, § 1962 (information required in multiunit dwelling rental agreement), do not give rise to a duty to disclose the name and address of a beneficial owner. The reference in Civ. Code, § 1962, subd. (a), to an "owner of the premises" is to the record owner, not the beneficial owner.

14 Cal. App. 4th 1692, *; 19 Cal. Rptr. 2d 555, **;
1993 Cal. App. LEXIS 435, ***; 93 Cal. Daily Op. Service 2989

**COUNSEL:** James K. Hahn, City Attorney, Stephanie Sautner and Ronald Low, Deputy City Attorneys, Litt, Marquez & Fajardo, Barrett S. Litt and Ben Margolis for Plaintiffs and Appellants.

McKenna & Fitting, Michael D. Berk, Aaron M. Peck, Theresa A. Kristovich and Carl W. Sonne for Defendants and Respondents.

**JUDGES:** Opinion by Croskey, J., with Klein, P. J., and Hinz, J., concurring.

**OPINION BY:** CROSKEY, J.

**OPINION**

[*1697] [**556] Plaintiffs appeal from the judgment of dismissal following the sustaining without leave to amend demurrers to the second amended complaint of defendants Highland Federal [***2] Bank (Highland), Ben Karmelich (Karmelich), Selina Elizabeth Pratt (Pratt), and H.F.S. Corporation (HFS; collectively, the Highland defendants). The court found the complaint failed to state a cause of action for Racketeer Influenced and Corrupt Organizations Act (RICO) (18 U.S.C. § 1961 et seq.) violations, fraud or fraudulent [*1698] concealment. The court further found the entire complaint, except the RICO cause of action, was barred by federal preemption.

Because the trial court erred in finding no cause of action was stated and the doctrine of federal preemption barred the state claims, we reverse the judgment.

[**557] FACTUAL STATEMENT

1. *THE PARTIES*

Plaintiffs consist of the People of the State of California (People) and numerous individuals in their individual capacity and as guardians ad litem and on behalf of a class who resided in one or more of the subject slum Los Angeles City buildings (tenant plaintiffs). [1]

1 The original individual plaintiffs are: Josefina Sepulveda; Margarita Espinoza; Margarita Bonilla; Raul Cruz Amaya; Jova Corea; Rosa Estela Nevares; Jose Santos Nevares; Rosa Cordova; Maria B. Mergar; Raudel Flores; Haydee Alcantara; Angel Edgardo Flores; Ana Arellano; Jose Roberto Reyes; Concepcion Reyes; Gloria Escobar; Silvia Escobar; Eddy Sanchez; Trinidad Garcia; Ramon Rojas; Josefina Rivera; Manuel Rivera; Salvador Rivera; Leticia Ruiz; Concepcion Garcia; Roman Campos; Ramon Campos; Daisy Villalobos; Maria Rojas; Gregorio Rojas; Amalia Mendoza; Manuel Gil; Maria De La Luz Almaraz; Guadalupe Barragan; Luz Ines Ruiz; Amalia Delgado; Jorge Florez; and Rafael Valtierra, individually, and on behalf of a class composed of all present tenants or residents of the following buildings, all located in the City of Los Angeles: 4020 South San Pedro Street; 5426 Virginia Avenue; 823 South Bonnie Brae Street; 807 South Fedora Avenue; 504 South Bonnie Brae Street; 533 Ceres Avenue; 1000 Echo Park Avenue; 1616 West 11th Street; 526 South Union Avenue; and 2616 Idell Street, and of all persons who were tenants and/or residents of said buildings at material times; Maria De Jesus Rodriguez, Betty Rodriguez, Guadalupe Ibarra, and Esiquio Rodriguez, minors, by their guardian ad litem Josefina Sepulveda; Javier Espinoza, George Michael Espinoza, Yesenia Raquel Espinoza, and Daniel Alejandro Bonilla, Tricia Bonilla, minors, by their guardian ad litem Margarita Espinoza; Alexander Corea Amaya, a minor, by his guardian ad litem Raul Cruz Amaya; Juan Jose Nevares and Carlos F. Nevares, Minors, by their guardian ad litem Rosa Estela Nevares; Yovani Velasquez, Jose Velasquez, Yessica Mergar, minors, by their guardian ad litem Maria B. Mergar; Indira Alcantara, a minor, by her guardian ad litem Haydee Alcantara; Mayra Arellano; Antonio Arellano; Steve Arellano; Eduardo Arellano and Cindy Arellano, minors, by their guardian ad litem Ana Arellano; Patricia Reyes, minor, by her guardian ad litem Jose Roberto Reyes; Karen Rojas, Maria Garcia, Raul Garcia, minors, by their guardian ad litem.

On February 6, 1991, the court dismissed plaintiffs Silvia Escobar, Eddie Sanchez, Ana Arellano, and Guadalupe Barragan in their individual capacity pay for failing to comply with a prior discovery order.

[***3] The defendants who are parties to this appeal are Highland, Karmelich (its president), Pratt (its loan coordinator and vice-president), and HFS (its wholly owned subsidiary).

[*1699] Highland, a federally chartered savings and loan institution, specializes in making loans to owners of residential properties, including slum buildings in the greater Los Angeles area. Eight of the eleven slum properties listed in this complaint were financed by defendant Highland. Karmelich is both its president and chief executive officer. Karmelich also served as secretary of the board of directors of defendant Northeast. Pratt is a vice-president and loan coordinator for defendant Highland. Pratt helped Highland facilitate the rapid transfer of record ownership of slum buildings. She was also actively engaged in soliciting and arranging for uncreditworthy borrowers to assume Highland loans on

those slum buildings without regard to the borrowers' ability to maintain and repair the buildings. HFS is a California corporation and a wholly owned subsidiary of defendant Highland. **(1)** (See fn. 2.) Among its activities is the servicing of loans made by defendant Highland. [2]

> 2   These facts are alleged in the second amended complaint.   All well-pleaded allegations of the complaint are deemed to be true for the purpose of appellate review of a ruling on a demurrer. ( *Shoemaker v. Meyers* (1990) 52 Cal.3d 1, 7 [276 Cal.Rptr. 303, 801 P.2d 1054, A.L.R.4th 1720].)

These defendants are sometimes collectively referred to as the "Highland defendants." A number of other defendants were named in plaintiffs' second amended complaint.  However, these remaining defendants are not parties to this appeal. They consist of other lenders, which are not savings associations, and individuals, including some who at one time or another were owners of the subject 11 buildings.  The action remains pending as to these defendants.

[***4]   2.   *NATURE   OF   CHARGING ALLEGATIONS*

In this action plaintiffs seek to hold the Highland defendants responsible for the continuing slum conditions of certain buildings.  In addition to monetary damages and penalties the complaint seeks injunctive relief. [3]

> 3   Plaintiffs seek to enjoin the Highland defendants from, inter alia:
>
> "(a) Soliciting, engaging or permitting individuals to act as straw buyers or record owners who, in fact, have no genuine ownership interest in the substandard property;
>
> "(b) Recording or causing to be recorded any document containing the name of any record owner who is not the true owner of the substandard property, the legal obligor on the deed of trust, or the party whose assets were relied upon in creating the encumbrance;
>
> "(c) Accepting, notarizing, causing to be notarized, or recording or causing to be recorded any documents that are a part of any financing arrangement concerning any substandard property, which document has been executed by a person other than the person whose name appears on the document;
>
> "(d) Failing to send a copy of the notice set forth in sub-paragraph (g) below to each unit in the substandard property, in both English and Spanish, upon recordation of a trust deed to the

potential borrower secured on the subject property;

> "(e) Recording or causing to be recorded a trust deed secured by substandard property without first providing a copy of the trust deed, title report, and written proof of compliance with sub-paragraph (d) above to the following interested agencies: [P] (i) Office of Thrift Supervision (OTS); [P] (ii) The Housing Enforcement Division of the Los Angeles City Attorney's office; [P] (iii) The Legal Aid Foundation of Los Angeles;
>
> "(f) Selling or assigning Highland's beneficial interest in any note secured by substandard property without first providing to the purchaser or assignee a copy of the trust deed, the recorded substandard order, and the notice described in sub-paragraph (g) below; and without providing notice of such sale to the agencies listed in sub-paragraph (e) above.
>
> "(g) Failing to give written notice to any potential borrower or anyone seeking to assume a note, previously issued by Highland, on substandard property of which the lender has notice by reason of recorded notice or otherwise concerning the potential legal consequences attached to ownership of said property.  Said written notice shall include: [P] (i) An advisement that the subject property or building has been declared substandard; [P] (ii) That the borrower or person assuming the note and taking title to the property may be held criminally responsible if he or she fails to correct the substandard conditions; [P] (iii) That the amount of rent a tenant owes may be subject to reduction by virtue of the uninhabitable conditions; [P] (iv) That tenants may have a cause of action for damages with respect to the conditions in the building, and for injunctive relief requiring repair of said buildings forthwith; [P] (v) That potential rent increases may be denied pursuant to the Los Angeles City Rent Stabilization Ordinance if the Substandard Notice is not lifted; [P] (vi) That if borrower or person assuming the note fails to undertake the necessary repairs within a reasonable time (120 days), the lender will petition the court for the appointment of a receiver to collect the rents and make repairs, pursuant to waste provisions of its deed of trust; [P] (vii) That under California law a borrower may not be able to claim state tax deductions for the interest payments and depreciation on said property until the Substandard Notice is removed.

"(h) Declining to initiate and complete foreclosure as speedily as the law permits on substandard property of which the lender has notice if the substandard conditions are not fully corrected within 120 days, provided that foreclosure proceedings may terminate if correction occurs before foreclosure is completed . . .."

[***5] [*1700] [**558] The thrust of the complaint charges Highland with engaging in unfair business practices and fraud for the purpose of maximizing its profits. Such goal was achieved by creating a situation where rents, which were collectable only if the units complied with the habitability laws, were generated without the expenditure of sums necessary to ensure such compliance. Thus, the slum nature of the buildings was perpetuated and the tenant plaintiffs were defrauded of their right to a habitable dwelling.

Essentially, Highland allegedly committed such illegal activities through fraudulent loan transactions in order to avoid criminal and civil liability. Highland hid and exercised its control over the subject buildings by setting up record owners who had only token or no investment in the buildings, i.e., either such owners had insufficient asserts or lacked bona fide business qualifications to obtain the loans. In general, title to the buildings was worthless since the amount of the loans exceeded the fair market value of the security. The record owners therefore were "strawmen" who were basically managers of the buildings for Highland's benefit.

It is further alleged that Highland [***6] in effect was the true beneficial owner of the buildings because it determined who would be the record owner and when the owner failed to perform, Highland replaced him or her with another whom it could control. Such transfers of record ownership also [*1701] served to complicate and frustrate civil and criminal prosecution for violation of the habitability law.

It was also alleged that Highland routinely facilitated the title transfer of the [**559] buildings without the exercise of the due-on-sale clauses of the loan agreements, without requiring loan assumption by creditworthy individuals, and without scrutiny to ensure necessary repairs were made. Highland charged loan points and interest at a rate higher than those for bona fide loan transactions and utilized the entire or almost entire loan amount from the new record owner to pay off the principal, interest, penalties and arrearages owed by the former record holder. Such loans were often arranged by lender-related defendants controlled by and/or associated with Highland. Highland then allowed or caused the fraudulent documents to be recorded in order to hide their control.

Finally, it was alleged the above pattern of activity [***7] by Highland was outside of and inconsistent with the normal and standard practice of lenders.

PROCEDURAL STATEMENT

This action was filed on March 28, 1989. On June 7, 1990, a second amended complaint asserting numerous causes of action was filed, including those for RICO violations, fraud and fraudulent concealment. [4]

4    That complaint set forth, respectively, these causes of action:

(1) Unfair business practices ( Bus. & Prof. Code, § 17200) (first cause of action by the People against all defendants);

(2) Violation of 18 United States Code sections 1961-1968 (RICO) (causes of action 81-161 by all plaintiffs against Highland, Karmelich, Pratt, inter alia, but not HFS). Former causes of action 2 through 80 and 81 in the first amended complaint were not realleged in the second amended complaint. There are no causes of action 2 through 80 in the second amended complaint;

(3) Injunctive relief (causes of action 162-242 by all plaintiffs against all defendants);

(4) Breach of warranty of habitability regarding written contract (causes of action 243-323 by all tenant plaintiffs against all defendants);

(5) Breach of warranty of habitability regarding oral contract (causes of action 324-404 by all tenant plaintiffs against all defendants);

(6) Nuisance (causes of action 405-485 by all tenant plaintiffs against all defendants);

(7) Negligence (causes of action 486-566 by all tenant plaintiffs against all defendants);

(8) Strict liability regarding maintenance of slum premises (causes of action 562-647 by all tenant plaintiffs against all defendants);

(9) Intentional infliction of emotional distress (causes of action 648- 728 by all tenant plaintiffs against all defendants);

(10) Violation of Civil Code section 1942.4 (causes of action 729-809 by all tenant plaintiffs against all defendants);

(11) Fraud (causes of action 810 through 890 by all tenant plaintiffs against all defendants);

(12) Fraudulent concealment ( Civ. Code, § 1710, subd. (3)) by all tenant plaintiffs against all defendants; and

(13) Violation of Civil Code section 789.3 (interruption of utility services) (causes of action 972-1,052 by all tenant plaintiffs against all defendants).

For the purpose of this appeal the enumerated groups of causes of actions in (2) through (13) above are referred to as causes of action 2 through 13, respectively.

[***8] [*1702] On August 6, 1990, Highland defendants filed demurrers to that complaint. They also filed a companion motion to strike. On or about October 19, 1990, plaintiffs filed joint opposition. On or about November 13, 1990, Highland defendants filed their reply.

On January 25, 1991, the court sustained certain demurrers without leave to amend. The court sustained demurrers without leave to amend as to all causes of action, except the second for RICO violations, on the ground of failure to state a cause of action ( Code Civ. Proc., § 430.10, subd. (e)) because of federal preemption. As authority it relied on section 545.2 of title 12 of the Code of Federal Regulations; Fidelity Federal Savings and Loan v. De La Cuesta (1982) 458 U.S. 141, 162 [73 L.Ed.2d 664, 680-681, 102 S.Ct. 3014]; and Wisconsin League of Financial Institutions v. Galecki (W.D.Wis. 1989) 707 F.Supp. 401, 405.

The court further sustained demurrers without leave to amend on the ground of failure to state a cause of action ( Code Civ. Proc., § 430.10, subd. (e)) specifically as to the 2d cause of action (RICO), the 11th [***9] cause of action for fraud, and the 12th cause of action for fraudulent concealment. The court also sustained uncertainty demurrers to the entirety of the complaint with leave to amend. ( Code Civ. Proc., § 430.10, subd. (f).) The motion to strike was placed off calendar.

On March 15, 1991, the court entered the order (judgment) of dismissal based on the [**560] sustaining of the demurrers of the Highland defendants, without leave to amend.

## ISSUES PRESENTED

This appeal presents three basic issues: (1) Are the state claims against Highland, a federal savings and loan association, preempted by federal law? (2) If so, does federal preemption also bar the action against Karmelich, Highland's president, Pratt, its loan coordinator and a vice-president, and HFS, its wholly owned subsidiary? (3) Does the complaint state a cause of [*1703] action

against the Highland defendants for RICO violations, fraud, or fraudulent concealment?

## DISCUSSION

1. *ACTION AGAINST HIGHLAND NOT BARRED BY FEDERAL PREEMPTION UNDER HOLA[5]*

(2) (See fn. 5)

5. The Highland defendants concede the trial court's ruling based on federal preemption was grounded only on the Federal Home Owners' Loan Act of 1933 (HOLA) (12 U.S.C. § 1461 et seq.) and its concomitant regulations. Nonetheless, they urge us to uphold that ruling on the additional grounds of federal preemption based on the Federal Fair Housing Act of 1986 (12 U.S.C. § 3601 et seq.) and The Community Reinvestment Act (12 U.S.C. § 2903 et seq.). They assert: " 'If right upon any theory of the law applicable to the case, [a ruling] must be sustained regardless of the considerations which may have moved the trial court to its conclusion.' [Citation.]" ( D'Amico v. Board of Medical Examiners (1974) 11 Cal.3d 1, 19 [112 Cal.Rptr. 786, 520 P.2d 10].)

We have no quarrel with their recitation of law except to find it inapposite since defendants have failed to establish the applicability of those acts to the issues before this court. We observe the above two acts were briefly mentioned at footnote 30 of their demurrer memorandum, and thus, were technically before the trial court.

On appeal they devote several pages to quotations from the Fair Housing Act in their brief but fail to cogently connect the act's requirements with the matters at issue, which are mentioned in some detail in only footnote 19. Similarly, the Highland defendants quote at length from the Community Reinvestment Act but set forth no cognizable connection between its provisions and the subject issues.

Based on the above we reject their position as unsupported. It is well established that as an appellate court we are not required to consider matters urged in the briefs where no pertinent argument is made in support thereof. (See, e.g., Strutt v. Ontario Sav. & Loan Assn. (1972) 28 Cal.App.3d 866, 873 [105 Cal.Rptr. 395].)

[***10] A. *PRINCIPLES APPLICABLE TO DETERMINATION OF PREEMPTION*

(3a) [HN1]"Preemption issues are resolved through the process of statutory interpretation. [Citation.] We

14 Cal. App. 4th 1692, *; 19 Cal. Rptr. 2d 555, **;
1993 Cal. App. LEXIS 435, ***; 93 Cal. Daily Op. Service 2989

look to the language of the statute and to the intent of Congress." ( *Siegel v. American Savings & Loan Assn.* (1989) 210 Cal.App.3d 953, 959 [258 Cal.Rptr. 746].)

[HN2]" 'In determining whether a state statute [or a state cause of action] is pre-empted by federal law and therefore invalid under the Supremacy Clause of the Constitution, our sole task is to ascertain the intent of Congress. . . . First, when acting within constitutional limits, Congress is empowered to pre-empt state law by so stating in express terms. Second, congressional intent to pre-empt state law in a particular area may be inferred where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress "left no room" for supplementary state regulation. . . . [P] As a third alternative, in those areas where Congress has [*1704] not completely displaced state regulation, federal law may nonetheless preempt state law to the extent it actually conflicts with federal [***11] law. Such a conflict occurs either because "compliance with both federal and state regulations is a physical impossibility," or because the state law stands "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." **(4a)** [HN3]Nevertheless, pre-emption is not to be lightly, presumed.' ( *California Federal S. & L. Assn. v. Guerra* (1987) 479 U.S. 272, 280-281 [93 L.Ed.2d 613, 623, 107 S.Ct. 683], citations omitted.) **(5a)** In *R. J. Reynolds Tobacco Co. v. Durham County* (1986) 479 U.S. 130, 149 [93 L.Ed.2d 449, 467, 107 S.Ct. 499], the court stated: 'Although the regulations are not themselves controlling on the pre-emption issue, where, as in this case, Congress has entrusted an agency with the task of promulgating regulations to carry out the purposes of a statute, as part of the pre-emption analysis we must [**561] consider whether the regulations evidence a desire to occupy a field completely. Pre-emption should not be inferred, however, simply because the agency's regulations are comprehensive.' (Citations omitted.)" ( *Siegel v. American Savings & Loan Assn., supra,* 210 Cal.App.3d at pp. 958-959.) [***12]

## B. *NO EXPRESS PREEMPTION UNDER HOLA EXCEPT AS TO TWO ITEMS*

HOLA is the acronym of the federal Home Owners' Loan Act of 1933 (12 U.S.C. § 1461 et seq.). [6] " 'The language of HOLA, as well as the history that lies behind its enactment, demonstrate that there is a strong federal interest in the uniform treatment of the federally chartered savings and loans associations. Congress initially enacted HOLA and its regulatory structure in response to a crisis in the nation's private home financing system. [Citation.] This crisis had developed at least in part as a result of the inconsistent and ill- advised practices of the various states. As noted by the Ninth Circuit, "the states had developed a hodgepodge of savings and loan laws

and regulations, and Congress hoped that [the Federal Home Loan Bank Board's] rules would set an example for uniform and sound savings and loan regulations." [7] ( *Conference of Federal Savings & Loan Ass'ns v. Stein,* 604 F.2d 1256, 1258, (9th Cir. 1979), *summarily affd.,* 445 U.S. 921, 100 S.Ct. 1304, 63 L.Ed.2d 754 (1980), [***13] *citing* T. Marvell, *The Federal Home Loan Bank Board* at 26 (1969).' ( *Eureka Federal Sav. and Loan Ass'n v. Kidwell* (N.D.Cal. 1987) 672 F.Supp. 436, 439.)" ( *Siegel, supra,* 210 Cal.App.3d at p. 959.)

6    All statutory references are to title 12 of the United States Code unless otherwise specified.

7    The board was replaced in 1989 with the Office of Thrift Supervision (OTS) and its director. (§ 1462(1) & (3), 1462a(e).)

[HN4]Part 545 of title 12 of the Code of Federal Regulations (12 C.F.R.) sets forth the regulations covering the operations of a federal association. Section [*1705] 545.1 of 12 C.F.R., which specifies the general parameters of the association's authority, provides: "A Federal savings association may exercise all authority granted it by [HOLA] and its charter and bylaws, whether or not implemented specifically by Office regulations, subject to the limitations and interpretations contained in this part."

[HN5]Section [***14] 545.2 of 12 C.F.R. provides: " 'The regulations in this Part 545 are promulgated pursuant to the plenary and exclusive authority of the Board to regulate all aspects of the operations of Federal associations, as set forth in section 5(a) of the Home Owners' Loan Act of 1933, 12 U.S.C. 1464, as amended. This exercise of the Board's authority is preemptive of any state law purporting to address the subject of the operations of a Federal association.' " ( *Ibid.*)

**(6a)** In their brief the Highland defendants urge the import of the above two regulations is preemption of any state law which would limit or penalize the conduct of a federal association where such conduct is authorized by HOLA and not proscribed by HOLA regulations since such law would thus be in direct conflict with HOLA. [8]

8    In a footnote of their brief the Highland defendants urge "there is even a direct conflict between certain specific HOLA regulations and the state law upon which the subject state law claims are predicated."

Specifically, they refer only to two regulations. The first, 12 C.F.R. section 545.32(d) authorizes an association to make a real estate loan up to 100 percent of the market value of the secured property. They claim a direct conflict ex-

14 Cal. App. 4th 1692, *; 19 Cal. Rptr. 2d 555, **;
1993 Cal. App. LEXIS 435, ***; 93 Cal. Daily Op. Service 2989

ists because plaintiffs seek to proscribe loans where the borrower would have no equity in the property, thus, vesting "control" in Highland. We find no conflict. Defendants have mischaracterized certain language in the complaint. When viewed in context, it is clear plaintiffs were not alleging defendants should be prohibited from making loans up to 100 percent of the market value of the property.

The complaint alleged, "The premises involved were security for indebtedness amounting to approximately 100%% or more of their value, and additional loans on the property were not available in any bona fide business transaction." It was further alleged defendants "with full knowledge of the slum character of these buildings, has made or aided in the making of loans for amounts exceeding the value of the slum buildings at high interest rates and 'points', requiring payments to the lending defendant which absorbed all or virtually all of the rental flow from the buildings. . . . Each . . . defendant reaped financial benefits from the slum buildings' continuing slum character." In context, the thrust of these allegations is merely to explain one reason why the slum condition of the property was perpetuated, namely, since no equity was left no additional loans were available to fix up the property.

The Highland defendants lastly claim a direct conflict exists between the state claims and 12 C.F.R. section 545.34, which permits an association to incorporate into a mortgage loan contract "'a provision . . . whereby the Federal association *may, at its option,* declare immediately due and payable' the secured indebtedness upon an unconsented to transfer of title to the real property." They argue plaintiffs seek to "deprive Highland of the *option* to exercise such provision and, instead, compel it to do so." (Italics in original.) In support, they point to the allegations in the complaint that defendants improperly made frequent transfers of the property "from one uncreditworthy and disreputable borrower to another without exercise of due-on-sale clauses of loan agreements, without requiring loan assumption by creditworthy individuals, and without scrutiny to determine or insure that payments would be made and that the slum buildings would be maintained in accordance with requirements of the law. By making frequent transfers of ownership of the slum buildings, each such defendant's conduct facilitated the ability of the involved record owner to avoid criminal liability for violations of the law . . . [and] each such defendant further effectively avoided or delayed repair of the slum buildings."

We find no conflict in this regard. By such allegations plaintiffs do not seek to deprive defendants of their option to exercise the due-on-sale clauses. Instead, plaintiffs merely seek to preclude defendants from conducting sham transfers of the property. (But see discussion, *post,* regarding a direct conflict as to item (3)(h) of the prayer for injunctive relief.)

[***15] [*1706] [**562] As authority for their claim of preemption the Highland defendants argue "the seminal case on the subject, and a case strikingly parallel in material respects to this case, is *People v. Coast Fed. Sav. & Loan Ass'n* (S.D.Cal. 1951) 98 F.Supp. 311." [9] They also rely heavily on *Fidelity Fed. Sav. & Loan Ass'n v. De La Cuesta* (1982) 458 U.S. 141 [73 L.Ed.2d 664, 680-681, 102 S.Ct. 3014] and *Wisconsin League of Financial Inst. v. Galecki* (W.D.Wis. 1989) 707 F.Supp. 401. [10]

9   As further support, they cite: *Meyers v. Beverly Hills Fed. Sav. & Loan Ass'n* (9th Cir. 1974) 499 F.2d 1145 (prepayment penalties); *Greenwald v. First Fed. Sav. & Loan Ass'n of Boston* (D.C. Mass. 1978) 446 F.Supp. 620 (interest payments on escrow accounts); *First Fed. Sav. & Loan Ass'n of Boston v. Greenwald* (1st Cir. 1979) 591 F.2d 417 (interest payments on escrow accounts); *City Fed. Sav. & Loan Ass'n v. Crowley* (E.D.Wis. 1975) 393 F.Supp. 644 (self-dealing of association officers and directors in violation of board's regulations); *Lyons Sav. & Loan Ass'n v. Federal Home Loan Bank Board* (N.D.Ill. 1974) 377 F.Supp. 11 (branching of association); *Kaski v. First Fed. Sav. & Loan Ass'n of Madison* (1976) 72 Wis.2d 132 [240 N.W.2d 367] (interest rate escalation clauses in mortgage note); *Central Sav. & Loan Ass'n of Chariton v. Federal Home Loan Bank Bd.* (8th Cir. 1970) 422 F.2d 504 (mobile associations); *Murphy v. Colonial Fed. Sav. & Loan Ass'n* (2d Cir. 1967) 388 F.2d 609 (list of eligible voters re association director election); *North Arlington Nat'l Bank v. Kearny Fed. Sav. & Loan Ass'n* (3d Cir. 1951) 187 F.2d 564, cert. den., 342 U.S. 816 [96 L.Ed. 617, 72 S.Ct. 30] (branches); *Glendale Fed. Sav. & Loan Ass'n v. Fox* (C.D.Cal. 1978) 459 F.Supp. 903, 904-912 (due-on-sale clause); *Rettig v. Arlington Heights Fed. Sav. & Loan Ass'n* (N.D.Ill. 1975) 405 F.Supp. 819 (authority of association to sell insurance and internal obligations of directors); *Elwert v. Pacific First Fed. Sav. & Loan Ass'n* (D.Or. 1956) 138 F.Supp. 395 (branches);

*Washington Fed. Sav. & Loan Ass'n v. Balaban* (Fla. 1973) 281 So.2d 15 (branches); *Springfield Inst. v. Worcester Fed. Sav. & Loan Ass'n* (1952) 329 Mass. 184 [107 N.E.2d 315], cert. den. 344 U.S. 884 [97 L.Ed.684, 73 S.Ct. 184] (branches).

Such reliance is patently misplaced. Those cases involved either a direct conflict between state law and specific regulations under HOLA or issues concerning the internal management and direct operation of the federal association itself, and thus, are factually inapposite.

[***16]

10 The Highland defendants cite *Federal Sav. & Loan Ins. Corp. v. Kidwell* (N.D.Cal. 1989) 716 F.Supp. 1315, for the proposition that state law claims for negligence and waste against the federal association were preempted by federal law. Their reliance on that case is unfounded. In addition to the preemption issue the district court also ruled the claim for breach of fiduciary duty under federal common law was governed by a four-year state statute of limitations. In an unpublished decision the appellate court vacated the lower court decision in part without specifying which part was being vacated. ( *Eureka Federal Sav. & Loan Ass'n v. Kidwell* (9th Cir. 1991) 937 F.2d 612.) Accordingly, the district court decision is without persuasive or precedential value.

[*1707] Contrary to their assertion otherwise, *People v. Coast Fed. Sav. & Loan Ass'n* (S.D.Cal. 1951) 98 F.Supp. 311 is not "a case strikingly parallel in material respects to this case." In *Coast* "the gravamen of the complaint is that through [***17] signs and other means of advertising, defendant [federal association] has transacted business in the manner of a [**563] bank and has held itself out as a bank or savings bank, and has led the public to believe that it was such a bank, without authority and in violation of state statutes." ( *People v. Coast Fed. Sav. & Loan Ass'n, supra,* 98 F.Supp at p. 315.) Former section 161.7(e) of title 24 of the Code of Federal Regulations expressly governed the subject of advertising vis-a-vis federal associations. (98 F.Supp. at p. 315, fn. 5.) In view of such regulation the court held the board had primary jurisdiction over the subject matter. ( at p. 317.)

In contrast, this case does not involve a direct conflict between a specific regulation and state law. Reliance by the Highland defendants on *Fidelity Fed. Sav. & Loan Ass'n v. De La Cuesta* and *Wisconsin League of Financial Inst. v. Galecki* is misplaced for that same reason.

In *De La Cuesta* the United States Supreme Court held the board's regulation of due-on-sale clauses preempted state law as embodied in *Wellenkamp v. Bank of America* (1978) 21 Cal.3d 943 [582 P.2d 970]. [***18] ( *Fidelity Fed. Sav. & Loan Ass'n v. De La Cuesta, supra,* 458 U.S. 141, 159 [73 L.Ed.2d 664, 678-679].) The *De La Cuesta* court reasoned:

"The Board's intent to pre-empt the *Wellenkamp* doctrine is unambiguous. The due-on-sale regulation plainly provides that a federal savings and loan 'continues to have the power' to include a due-on- sale clause in a loan instrument and to enforce that clause 'at its option.' 12 CFR § 545.8-3(f) (1982). The California courts, in contrast, have limited a federal association's right to exercise a due-on-sale provision to those cases where the lender can demonstrate that the transfer has impaired its security. [P] The conflict does not evaporate because the Board's regulation simply permits, but does not compel, federal savings and loans to include due-on-sale clauses in their contracts and to enforce those provisions when the security property is transferred. ... In addition, *Wellenkamp* explicitly bars a federal savings and loan from exercising a due-on-sale clause to adjust a long-term mortgage's interest rate toward current market rates--a due-on-sale practice the Board [***19] has approved . . .." (458 U.S. at pp. 155-156 [73 L.Ed.2d 676-677], italics in original.)

In *Wisconsin League of Financial Inst. v. Galecki, supra,* the court held the "Board has expressly preempted state regulation in the area of mortgage escrow accounts and loan disclosures." (707 F.Supp. at p. 405.) The court [*1708] expressly limited its holding the facts of that case by announcing: "The court need not determine the full breadth of the term 'operations of a federal Association' [as provided in section 545.2] because there can be no dispute that such phrase extends at least to the regulation of mortgage escrow accounts and mortgage loan disclosures. *Fidelity Federal,* 458 U.S. at 167 . . . *Kaski v. First Federal Savings & Loan Association,* 72 Wis.2d 132, 240 N.W.2d 367 (1976)." [11] (707 F.Supp. at p. 405.)

11 In addition to direct preemption the *Galecki* court also found implicit preemption based on the finding state regulation of escrow accounts would be "a direct obstacle" to "the Board's express purpose to permit the parties to negotiate terms of an escrow agreement between themselves without intervention by substantive law." ( *Wisconsin League of Financial Institutions v. Galecki, supra,* 707 F.Supp. at p. 406.) In contrast, the state claims at issue here do not present "a direct obstacle" to any announced OTS policy.

[***20] It is undisputed that this case involves neither the regulation by state law of advertising, enforceability of due-on-sale clauses, or mortgage escrow accounts and mortgage loan disclosures. Accordingly, the *Coast, De La Cuesta,* and *Galecki* cases are of no mo-

ment with regard to whether the subject state causes of action are expressly preempted by HOLA and its concomitant regulations.

**(4b)** [HN6]"Preemption of state law by federal regulation is not favored. We will not find express preemption unless a regulation clearly so states. ( *Chicago & N. W. Tr. Co. v. Kalo Brick & Tile Co.* (1981) 450 U.S. 311, 317 [67 L.Ed.2d 258, 265, 101 S.Ct. 1124].) It is the burden of the party claiming preemption to prove it. ( *Elsworth v. Beech Aircraft Corp.* (1984) 37 Cal.3d 540, 548 [208 Cal.Rptr. 874, 691 P.2d 630]; *Perdue v. Crocker National Bank* (1985) [**564] 38 Cal.3d 913, 937 [216 Cal.Rptr. 345, 702 P.2d 503].)" ( *Siegel v. American Savings & Loan Assn., supra,* 210 Cal.App.3d at p. 960.) [***21]

**(6b)** [HN7]As pointed out in *Siegel,* "the Board is capable of saying it means to expressly preempt all state law in an area. . . . Section 545.2 [of 12 C.F.R.] contains no such statement that federal law is preemptive of all state common law claims." (210 Cal.App.3d at pp. 960-961.)

[HN8]Similarly, we have found no provision of HOLA nor any particular regulation, and none have been cited to us, which expressly preempt the statutory action by the People for unfair business practices and the causes of action by the tenant plaintiffs for fraud, RICO violations, etc. We therefore hold the subject action is not explicitly barred by federal preemption pursuant to HOLA. [12]

    12    At oral argument the Highland defendants conceded no express statutory preemption exists here.

Nonetheless, we do find federal preemption with regard to two matters. First, the allegation that Highland charged loan "points and provided for [*1709] interest, each of which was higher than the rates for bona [***22] fide loan[] transactions" impinges on the specific intent of Congress to preempt state usury laws, [13] and thus, improperly delves into an area expressly preempted by HOLA. (See, e.g., § 1463(g).)

    13    Section 1463(g) as to preemption of state usury laws, provides:

    "(1) Notwithstanding any State law, a savings association may charge interest on any extension of credit at a rate of not more than 1 percent in excess of the discount rate on 90-day commercial paper in effect at the Federal Reserve bank in the Federal Reserve district in which such savings association is located or at the rate allowed by the laws of the State in which such savings association is located, whichever is greater.

    "(2) If the rate prescribed in paragraph (1) exceeds the rate such savings association would be permitted to charge in the absence of this subsection, the receiving or charging a greater rate of interest than that prescribed by paragraph (1), when knowingly done, shall be deemed a forfeiture of the entire interest which the extension of credit carries with it, or which has been agreed to be paid thereon. If such greater rate of interest has been paid, the person who paid it may recover, in a civil action commenced in a court of appropriate jurisdiction not later than 2 years after the date of such payment, an amount equal to twice the amount of the interest paid from the savings association taking or receiving such interest."

[***23] The second matter concerns item (3)(h) of the complaint's prayer which seeks to enjoin the Highland defendants from "declining to initiate and complete foreclosure as speedily as the law permits on substandard property of which the lender has notice if the substandard conditions are not fully corrected within 120 days, provided that foreclosure proceedings may terminate if correction occurs before foreclosure is completed." This requested relief is in direct conflict with 12 C.F.R. section 545.34 which permits a federal association "at its option [to] declare immediately due and payable" the secured indebtedness upon an unconsented to transfer of title to the real property.

On remand, the court is therefore directed to strike such allegations and prayer requests. ( Code Civ. Proc., § 436.)

## C. *NO IMPLIED PREEMPTION UNDER HOLA*

Alternatively, the Highland defendants assert the subject action is barred by the doctrine of implied preemption. They urge federal law has impliedly "occupied the field" of federal savings and loan associations with regard to their operations and functions.

We acknowledge HOLA and the regulations promulgated thereunder have created both a comprehensive [***24] and uniform thrift system which is federally regulated and that in exercising its broad authority the former board has issued specific, detailed regulations governing those associations. Nonetheless, we observe the United States Supreme Court has declined to conclude [*1710] the board has preempted all lending practices or that the Board's discretion is limitless.

In *De La Cuesta* the court construed the board's powers to be plenary over federal associations: [HN9]"The broad language of § 5(a) [of HOLA] expresses no limits on [**565] the Board's authority to regulate the lending practices of federal savings and

loans. . . . [Thus,] 'it would have been difficult for Congress to give the Bank Board a broader mandate.' [Citation.]" ( *Fidelity Federal Savings and Loan v. De La Cuesta, supra,* 458 U.S. at p. 161 [73 L.Ed.2d at p. 680].)

[HN10]However, the court expressly declined to find the board had preempted state law as to all lending practices and cautioned: "Because we find an actual conflict between federal and state law, we need not decide whether the HOLA or the Board's regulations occupy the field of due-on-sale law or the [***25] entire field of federal savings and loan regulation." ( *De La Cuesta, supra,* 458 U.S. at p. 159, fn. 14 [73 L.Ed.2d at p. 679].) The court went on to qualify its holding in that case as follows: "Although the Board's power to promulgate regulations exempting federal savings and loans from the requirements of state law may not be boundless, in this case we need not explore the outer limits of the Board's discretion." [14] ( at p. 167 [73 L.Ed.2d at p. 684].)

> 14    Justice O'Connor wrote separately "to emphasize that the authority of the . . . Board to preempt state laws is not limitless. . . . Nothing in the language of § 5(a) of HOLA, which empowers the Board to 'provide for the organization, incorporation, examination, operation, and regulation' of federally chartered savings and loans, remotely suggests that Congress intended to permit the Board to displace local laws, such as tax statutes and zoning ordinances, not directly related to savings and loan practices." ( at pp. 171-172 [73 L.Ed.2d at pp. 686-687].)

> In his dissent, joined by Justice Stevens, Justice Rehnquist reasoned: "In § 545.8-3(f), the Board has gone beyond regulating how, when, and in what manner a federal savings and loan may lend mortgage money. . . . In this case, the Board is not regulating the operation of federal savings and loan associations, but the operation of due-on-sale clauses. Without a congressional authorization more explicit than that relied upon by the Court, I conclude that the Board has entered a domain in which it is not authorized to override state laws. . . . Discharge of its mission to ensure the soundness of federal savings and loans does not authorize the . . . Board to intrude into the domain of state property and contract law that Congress has left to the States." ( at pp. 174-175 [73 L.Ed.2d at pp. 688- 689].)

[***26] [HN11]

**(5b)** Moreover, "comprehensiveness of federal regulation alone, is not sufficient to establish implied preemption. Again, the United States Supreme Court has said: 'We are even more reluctant to infer pre-emption

from the comprehensiveness of regulations than from the comprehensiveness of statutes. As a result of their specialized functions, agencies normally deal with problems in far more detail than does Congress. To infer preemption whenever an agency deals with a problem comprehensively is virtually tantamount to saying that whenever a federal agency decides to step into a [*1711] field, its regulations will be exclusive. Such a rule, of course, would be inconsistent with the federal-state balance embodied in our Supremacy Clause jurisprudence.' ( *Hillsborough County v. Automated Medical Labs.* (1985) 471 U.S. 707, 717 [85 L.Ed.2d 714, 724, 105 S.Ct. 2371].) Our task is to determine whether the field which has been preempted by federal regulation is broad enough to cover plaintiffs' state causes of action." ( *Siegel, supra,* 210 Cal.App.3d 953, 961-962.)

**(6c)** We conclude it [***27] does not. The cause of action for unfair business practices as alleged by the People does not directly affect the operations of Highland, and therefore, is not covered by the subject regulations. Similarly, the regulations promulgated under HOLA do not pertain to racketeering charges under a RICO action. The remaining causes of action, e.g., nuisance, breach of warranty of habitability, intentional infliction of emotional distress, fraud, and interruptions of utilities would, at most, only incidentally and remotely touch upon the operations of Highland in its capacity as a federal savings association. Thus, those also do not impinge on the ambit of HOLA.

**(3b)** [HN12]No implied preemption is found where the impact on the subject is merely indirect. (See, e.g., *English v. General Electric Co.* (1990) 496 U.S. 72 [110 L.Ed.2d 65, 110 S.Ct. 2270].) In *English,* the court held the emotional distress claims of a whistle blower were not preempted by the federal government's exclusive authority to regulate the safety of nuclear power because such [**566] claims only indirectly affected the issue of nuclear safety. "Instead, for a state law [***28] to fall within the pre-empted zone, it must have some direct and substantial effect on the decisions made by those who build or operate nuclear facilities concerning radiological safety levels." ( at p. 85 [110 L.Ed.2d at pp. 78-79].) The court reasoned: "For example, if an employer were to retaliate against a nuclear whistle-blower by hiring thugs to assault the employee on the job (conduct literally covered by § 210 [of the Energy Reorganization Act of 1972]), respondent's position would imply that the state criminal law prohibiting such conduct is within the pre-empted field. We simply cannot believe that Congress intended that result." ( at p. 83 [110 L.Ed.2d at p. 77]; see also, at pp. 75-76 [110 L.Ed.2d at pp. 71-72].)

**(5c)** [HN13]Also, where the subject matter is an area traditionally regulated by the states, no federal preemption is implied unless there is a clear and manifest

14 Cal. App. 4th 1692, *; 19 Cal. Rptr. 2d 555, **;
1993 Cal. App. LEXIS 435, ***; 93 Cal. Daily Op. Service 2989

intent shown. Thus, there must be "a showing of implicit preemption of the whole field . . . strong enough to overcome the presumption that [***29] state and local regulation of health and safety matters can constitutionally coexist with federal regulation." ( *Hillsborough County v. Automated Medical Labs., supra,* 471 U.S. at p. 716 [85 L.Ed.2d at p. 723]; see also, [*1712] *Merrill Lynch, Pierce, Fenner & Smith v. Ware* (1973) 414 U.S. 117, 139-140 [38 L.Ed.2d 348, 366-367, 94 S.Ct. 383] [no preemption by the Security Exchange Act of 1934 of action for profit sharing rights of terminated employee since California has strong policy of protecting wage earners].)

[HN14]Moreover, "merely because the federal provisions were sufficiently comprehensive to meet the need identified by Congress [it does] not mean that States and localities [are] barred from identifying additional needs or imposing further requirements in the field." ( *Hillsborough County v. Automated Medical Labs., Inc., supra,* 471 U.S. at p. 717 [85 L.Ed.2d at pp. 723-724].)

**(6d)** [HN15]Accordingly, we determine whether the subject state causes of action are impliedly barred by federal preemption by scrutinizing [***30] them to see if they directly are "purporting to address the subject of the operations" of Highland, a federal savings association. (See 12 C.F.R. § 545.2.)

The state causes of action at issue are grounded in Highland's wrongful course of conduct which enables slum conditions in the subject buildings to be perpetuated to the detriment of the health, safety and welfare of the People of California and, in particular, the tenant plaintiffs. The essence of those causes of action concerns the right of the state to prohibit, and punish Highland for its part in, the conspiracy to maintain dwellings in an uninhabitable condition.

From our review of HOLA and its concomitant regulations we have found no statutory provision or regulation which even purports to address the subject of minimum housing standards. Also, any impact or intrusion on the "operations" of Highland is minimal and indirect.

[HN16]Additionally, we conclude neither the intent of Congress in enacting HOLA nor the purpose of HOLA would be served by finding preemption under these circumstances. The paramount purpose of HOLA is to ensure the solvency of federal associations. (See, e.g., § 1463(a)(1)-(3), and § 1464(d)(2).) That [***31] purpose would not be hindered, directly or indirectly, by the prosecution of the subject state claims. This is not the situation where the state seeks to regulate the conduct of all federal associations in California. Rather, the state merely seeks to protect its own interest in public safety

and welfare against the wrongful conduct of an entity, inter alia, which just happens to be a federal association.

**D.** *ACTION AGAINST KARMELICH, PRATT, AND HFS NOT BARRED BY FEDERAL PREEMPTION UNDER HOLA*

Since this action is not preempted under HOLA as to Highland, a fortiori no preemption bars the action against Karmelich, its president and chief [*1713] executive officer, or Pratt, its loan coordinator and vice- president. Moreover, the action is also not preempted against HFS, which is Highland's wholly owned subsidiary but not a federal savings association.

[**567]    **2.** *CAUSES OF ACTION STATED AGAINST HIGHLAND DEFENDANTS FOR RICO VIOLATIONS, AND FRAUD, BUT NOT FRAUDULENT CONCEALMENT*

**A.** *RICO ACTION PROPERLY PLEADED AS TO MAIL FRAUD*

**(7a)** [HN17]To state a cause of action under RICO (18 U.S.C. § 1961 et seq.) a plaintiff must plead facts to show: "(1) conduct [***32]  (2) of an enterprise (3) through a pattern (4) of racketeering activity." ( *Sedima, S.P.R.L. v. Imrex Co.* (1985) 473 U.S. 479, 496 [87 L.Ed.2d 346, 358-359, 105 S.Ct. 3275], fn. omitted.) **(8a)** In their demurrer, the Highland defendants attack the above "enterprise" and "racketeering activity" components.

**(1)    *EXISTENCE    OF    RICO    ENTERPRISE PLEADED***

The Highland defendants argue plaintiffs have failed to plead the existence and identity of an "enterprise," i.e., a group of defendants associated in fact for a common purpose although not a legal entity. We disagree.

[HN18]An "enterprise" includes "any union or group of individuals associated in fact although not a legal entity." (18 U.S.C. § 1961(4).)

**(7b)** The existence of an enterprise is an essential element of a RICO claim. "The enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct. . . . [It] is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." ( *United States v. Turkette* (1981) 452 U.S. 576, 583 [69 L.Ed.2d 246, 254-255, 101 S.Ct. 2524]; [***33]  see also, *Shaffer v. Williams* (5th Cir. 1986) 794 F.2d 1030, 1032.)

**(8b)** The facts setting forth the existence and identity of the requisite enterprise are not alleged at a single location. Instead, such facts, because of the complexity

of the scheme involved, are necessarily gleaned from various portions of the subject complaint.

At paragraph 150 of the complaint it was alleged: "The following associations constitute an enterprise within the meaning of RICO generally and 18 U.S.C. § 1961(4) specifically:

"a. The association in fact of defendants Highland, Northeast, and HFS (the Highland Enterprise).

[*1714] "

"c. The association in fact of defendants Karmelich, Highland, Northeast, HFS, Leyton, Interreal, Interwest, PHC, and Fitzpatrick (the Highland- Leyton-Fitzpatrick Enterprise)."

Although subparagraph a of paragraph 150 refers to Highland, Northeast, and HFS, as "the Highland Enterprises" it is clear such enterprise is but a component of the "enterprise" which comprises this element of a RICO action. Similarly, the reference to "the Highland-Leyton-Fitzpatrick Enterprise" in subparagraph d of paragraph [***34] 150 is to the component of the "enterprise" consisting of the members of the Highland Enterprise, defendants Leyton, Interreal, Interwest, PHC and Fitzpatrick. From a review of the factual allegations concerning these components of such "enterprise" it is clear the requisite facts concerning the existence of an informal ongoing organization consisting of a group of entities associated together for a common purpose of engaging in a course of conduct and functioning as a continuing unit have been alleged.

The complaint essentially alleges the above defendants engaged in a continuing scheme to defraud the tenant plaintiffs by secretly manipulating the record owner defendants and by actively assisting such owners to perpetuate the buildings in an uninhabitable condition in violation of the law. That the Highland, HFS and Northeast defendants were ongoing business entities which had an ongoing relationship with each other independent of that fraud scheme is shown by the following facts: It was alleged Highland was a federal savings and loan association specializing in loans on residential property; Northeast, an investment corporation located at Highland's offices, was engaged in the [***35] business of handling insurance; and HFS, a wholly owned subsidiary of Highland, serviced [**568] loans made by Highland. The complaint further alleged that the association of defendant Highland, Northeast and HFS constituted an association in fact within the meaning of RICO. The above factual allegations thus evidence an interlocking independent business relationship among those three entities.

Moreover, it was also alleged that defendants Interreal, Interwest and PHC, all of which were entities in

which defendant Leyton had an interest, along with the above Highland entities and the individual defendants, Karmelich, as the secretary of Northeast's board of directors, Leyton and Fitzpatrick constituted an association of fact, and thus, an enterprise. The specifics of such association are set forth in the complaint and demonstrate an ongoing series of business transactions among these various defendants with regard to each of the subject buildings. (See, e.g., *Temple University v.* [*1715] *Salla Bros., Inc.* (E.D.Pa 1986) 656 F.Supp. 97, 102 [sufficient ongoing organization shown]; cf. *Calcasieu Marine Nat. Bank v. Grant* (5th Cir. 1991) 943 F.2d 1453, 1461-1463 [***36] [no ongoing association shown]; *Martin v. Brown* (W.D.Pa. 1990) 758 F.Supp. 313, 322 [insufficient ongoing unit shown]; *Uniroyal Goodrich Tire Co. v. Mutual Trading Corp.* (N.D.Ill. 1990) 749 F.Supp. 869, 876-877 [insufficient "association-in-fact" shown].)

(2) *"RACKETEERING ACTIVITY" BASED ON MAIL FRAUD PROPERLY PLEADED*

[HN19]"Racketeering activity" under RICO consists of certain specific acts which are expressly enumerated in title 18 United States Code, section 1961. The activity underlying the subject RICO claim is mail fraud and wire fraud.(9) (10) [HN20]"In pleading a violation of the mail fraud statute (18 U.S.C. § 1341) [or the wire fraud statute (18 U.S.C. § 1342)] as a predicate act under a RICO scheme, plaintiffs must allege that (1) defendants devised a scheme or artifice to defraud, (2) defendants used the mails [or wires] in furtherance of the scheme, and (3) defendants did so with the specific intent to deceive or defraud. [Citation.]" ( *McMartin v. Children's Institute International* (1989) 212 Cal.App.3d 1393, 1407 [261 Cal.Rptr. 437]; [***37] accord, *Schreiber Distributing v. Serv- Well Furniture Co.* (9th Cir. 1986) 806 F.2d 1393, 1399-1400 [mail and wire fraud]; see also, *United States v. Gordon* (5th Cir. 1986) 780 F.2d 1165, 1171 [wire fraud].)

(8c) The Highland defendants also challenge the allegations of mailing and wire fraud as inadequate. They argue plaintiffs are required to but have failed to "specifically plead the time, place or nature of the alleged communications constituting racketeering activity. [Citation.]" ( *McMartin v. Children's Institute Int'l, supra,* 212 Cal.App.3d at p. 1407; see also, *Alan Neuman Productions, Inc. v. Albright* (9th Cir. 1988) 862 F.2d 1388, 1392; *Rosenthal v. Vogt* (1991) 229 Cal.App.3d 69, 77 [280 Cal.Rptr. 1].)

We agree the allegation of "wire fraud" is totally deficient in the above regard. Subparagraph e of paragraph 151 merely alleges: "Interstate telephone conversations relating to the slum buildings with lenders, persons attempting to locate various of the defendants, the Federal

14 Cal. App. 4th 1692, *; 19 Cal. Rptr. 2d 555, **;
1993 Cal. App. LEXIS 435, ***; 93 Cal. Daily Op. Service 2989

Home Loan Bank [***38] Board, and others." No facts are alleged to show the nature of such conversations or the place and time thereof. Accordingly, since plaintiffs have failed to show how such defects would be remedied if leave to amend were granted, we conclude the trial court was correct in impliedly finding the predicate act of "wire fraud" was inadequate to support a RICO action. (See, e.g., _Goodman v. Kennedy_ (1976) 18 Cal.3d 335, 349 [134 Cal.Rptr. 375, 556 P.2d 737].) The court is thus directed to strike subparagraph e of paragraph 151. ( _Code Civ. Proc._, § 436.)

[*1716] We further conclude, however, the court erred in sustaining the demurrer to that cause of action since the plaintiffs have adequately pleaded facts to support the predicate act of "mail fraud." The specific factual allegations of the mailings in the subject complaint are both qualitatively and quantitatively superior to the bare conclusionary allegation found to be inadequate in _Schreiber Distributing Co. v. Serv-Well Furniture Co., supra,_ 806 F.2d 1393. [**569] In _Schreiber,_ the sole allegation was "on two or more occasions [defendants [***39] used] the United States mail . . . for the purpose of executing or attempting to execute the aforesaid fraudulent scheme . . .." ( at p. 1401; cf. also, _Alan Neuman Productions, Inc. v. Albright, supra,_ 862 F.2d 1388, 1393, "The allegation of [the] complaint concerning predicate acts of fraud are similarly general referring to 'many acts of mail fraud,' 'many acts of wire fraud,' and 'many victims.' ")

In contrast, the complaint here described the nature of the mailings as consisting "of [the] documents, deeds, deeds of trust and similar matters relating to the slum buildings." They were further delineated as the mailings were described as "mailing of rent checks, mortgage and loan payments, payment for services rendered, and similar commercial transactions relating to slum buildings." The mailings of various materials were also described as relating to code violations regarding slum buildings. Moreover, the place of mailing was reflected in the allegation of "mailing of materials to various governmental entities, and recordation of real estate documents requested by mail and directed to the Los Angeles County Recorder. Every recorded document [***40] pertaining to the real estate transactions described in this complaint was sent through the mails to the County Recorder in furtherance of their conspiracy."

The intent to defraud element was supplied through the allegations concerning their effort to achieve the fraudulent objectives. Additional facts as to the time, place, and content of the fraud are set forth with particularity at paragraphs 87 through 98 of the complaint.

The allegations of the subject complaint as to time, place, etc., sufficiently comport with the requirement of pleading fraud with particularity. As one court explained: "Plaintiffs cannot be expected to specify the exact time and particular place of each factual omission and misrepresentation. The complaint adequately specifies the transactions and the approximate time frame, the contents of the alleged misrepresentations and the essence of omitted information, and the identities of those involved." ( _Onesti v. Thomson McKinnon Securities, Inc._ (D.C.Ill. 1985) 619 F.Supp. 1262, 1265.)

As to other specific dates and details, we point out such matters are properly addressed during discovery, not on demurrer. Also, when a particular [***41] document or matter was mailed is within the peculiar knowledge of the [*1717] defendants. (See, e.g., _Committee on Children's Television, Inc. v. General Foods Corp._ (1983) 35 Cal.3d 197, 214, 217 [197 Cal.Rptr. 783, 673 P.2d 660].)

(3)    _NEXUS    BETWEEN    RACKETEERING ACTIVITY AND INJURY PLEADED_

The Highland defendants next attack plaintiffs' RICO claim on the ground no facts are alleged to show any direct injury to the tenant plaintiffs as the proximate result of the racketeering activity. ( _Sedima, S.P.R.L. v. Imrex Co., supra,_ 473 U.S. at p. 496 [87 L.Ed.2d at pp. 358-359]; _McMartin v. Children's Institute, supra,_ 212 Cal.App.3d at p. 1407.)

We reject their contention as meritless. The injury suffered by each tenant plaintiff was the deprivation of a habitable dwelling and the loss of the money he or she had paid in rent, which was excessive because the dwellings were uninhabitable. Such injury flowed directly from the racketeering activity committed by defendants.

(4)    _VIOLATION OF 18 UNITED STATES CODE_ [***42] _SECTION 1962(D) PLEADED_

In a related argument defendants assert the lack of a legally cognizable injury flowing from the racketeering activity also demonstrates the failure of plaintiffs to allege a violation of title 18 of the United States Code, section 1962(d). [15] (See [**570] _Medallion TV Enterprise v. SelecTV of California_ (C.D.Cal. 1986) 627 F.Supp. 1290, 1297-1301.)

15    [HN21]Subdivision (d) of section 1962 provides: "It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section."

The relevant subdivision is (c), which provides in pertinent part: "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the con-

14 Cal. App. 4th 1692, *; 19 Cal. Rptr. 2d 555, **;
1993 Cal. App. LEXIS 435, ***; 93 Cal. Daily Op. Service 2989

duct of such enterprise's affairs through a pattern of racketeering activity."

We disagree. As discussed, above, the requisite injury was properly alleged, [***43] and thus, defendants' assertion is untenable.

### B. *CAUSE OF ACTION STATED FOR FRAUD*

(11) The Highland defendants contend no cause of action for fraud is stated because there are insufficient facts alleged to " 'show how, when, where, to whom, and by what means the misrepresentations were tendered.' *Stansfield v. Starkey* (1990) 220 Cal.App.3d 59, 73, . . . quoting *Hills Transp. Co. v. Southwest Forest Indus., Inc.* (1968) 266 Cal.App.2d 702, 707 . . .." They complain "the People and the tenants [plaintiffs] allege . . . 'each record owner', without any further identification or limitation, made the allegedly fraudulent representations; that they were made to [*1718] 'plaintiffs', without any further identification; and that they were made 'at the time of each respective record owner's ownership', without any further limitation as to time. The complaint is silent as to how the alleged representations were communicated." They contend the "above allegations are, of course, calculated to avoid communicating meaningful information about the alleged fraud either to the Highland defendants or to the Court. . . ." (*Ibid.* [***44] )

Defendant's contentions are meritless. [HN22]The complaint sets forth with ample particularity the identities of the record holders, the identities and capacities of the many plaintiffs, and the time frame in which the representations were made. We acknowledge the allegations of fraud lack the specific detailed minutiae desired by the Highland defendants. Those details, however, are properly the subject of discovery, not demurrer. The magnitude of the fraudulent scheme alleged and the number of plaintiffs involved invoke the analogy to the fact situation in *Committee on Children's Television, Inc. v. General Foods Corp., supra,* 35 Cal.3d 197, 214.)

In that case, the court rejected a lack of specificity argument based on the following reasoning, which we find instructive here: "Plaintiffs allege that defendants carried out a large scale program of deceptive advertising in which the specific advertisements change constantly, but all follow a pattern of making, in one form or another, certain misleading and deceptive representations. If such is the case, to require plaintiffs to plead the specifics of each advertisement would [***45] render a suit challenging the overall program impractical. The complaint would have to include thousands of pages setting out specifics which are largely within defendants' knowledge. The cost and difficulty of compiling, organizing, and setting down the information would seriously deter the filing of such complaint. The effect of such a pleading requirement, moreover, would not be limited to dis-

couraging private suits; it would also seriously hamper suits by public officials seeking to enjoin schemes of unfair competition and deceptive advertising." ( *Committee on Children's Television, Inc. v. General Foods Corp., supra,* 35 Cal.3d 197, 214.)

### C. *NO FRAUDULENT CONCEALMENT CAUSE OF ACTION STATED*

(12) Defendants claim no cause of action is stated for fraudulent concealment because (1) the Highland defendants were under no legal duty to disclose the concealed facts at issue; and (2) in any event, the cause of action erroneously assumes someone who lends money on the security of real property may, by virtue of that activity, assume the obligations of ownership. They point out unless the defendant is under a duty [***46] to disclose, concealment of a fact is not actionable. ( *Civ. Code, § 1710, subd. (3).)* Defendants argue there is no duty to disclose here because *section 1962 of the Civil Code* does not require the disclosure of the name and address of the [*1719] owner of certain real property. Such a requirement, according to defendants, is based on the assumption "that Section 1962 [**571] imposes on an owner of real property a duty to disclose his or her name and address *even when the name and address of an agent for the owner, such as a property manager, is disclosed.* That assumption is fallacious."

They further argue "someone that lends money on the security of, but does not have possession and control of, real property may [not], by virtue of that activity, become the 'beneficial' or 'responsible' owner of such property and thereby assume the obligations of ownership [and thus, the duty to disclose under *Civil Code section 1962*] to [the] tenants."

We agree no cause of action for fraudulent concealment is stated but not for the reasons given by defendants. The thrust of this cause of action is to compel the beneficial owners to disclose such beneficial ownership to the tenant plaintiffs to [***47] enable the latter to seek "civil relief or governmental enforcement of the law from the responsible non-record owner defendants." Plaintiffs concede as much in their reply brief: "If the tenants had known that the one in control of the property was a bank, they would be far more likely to bring an action to have the property repaired than they would were the owner a person having substantially no assets."

[HN23]A plain reading of *section 1962 of the Civil Code* [16] reveals its disclosure provisions do not give rise to a duty to disclose the name and address of a beneficial owner. All that is required under section 1962 is the disclosure of "the name and usual street address at which personal service may be effected [*1720] of each person who is: (1) Authorized to manage the premises[; and] (2) An owner of the premises or who is authorized to act

Page 19

for and on behalf of the owner for the purpose of service of process and for the purpose of receiving and receipting for all notices and demands." ( Civ. Code, § 1962.) The reference to "an owner of the premises" is to the record owner, not the beneficial owner. This is clear from the language of subdivision (e) of Civil Code section 1962, [***48] which provides: "Nothing in this section limits or excludes the liability of any undisclosed owner."

16 [HN24] Civil Code section 1962 provides:

"(a) Any owner of a dwelling structure specified in Section 1961 or a party signing a rental agreement or lease on behalf of the owner shall disclose therein the name and usual street address at which personal service may be effected of each person who is:

"(1) Authorized to manage the premises.

"(2) An owner of the premises or who is authorized to act for and on behalf of the owner for the purpose of service of process and for the purpose of receiving and receipting for all notices and demands.

"(b) In the case of an oral rental agreement the owner or a person acting on behalf of the owner for the receipt of rent or otherwise, on written demand, shall furnish the tenant with a written statement containing the information required by subdivision (a).

"(c) The information required by this section shall be kept current and this section shall extend to and be enforceable against any successor owner or manager, who shall comply with this section within 15 days of succeeding the previous owner or manager.

"(d) A party who enters into a rental agreement on behalf of the owner who fails to comply with this section is deemed an agent of each person who is an owner:

"(1) For the purpose of service of process and receiving and receipting for notices and demands.

"(2) For the purpose of performing the obligations of the owner under law and under the rental agreement.

"(e) Nothing in this section limits or excludes the liability of any undisclosed owner."

[***49] DISPOSITION

The judgment is reversed with directions to the court: (1) to strike the allegation that Highland charged "points and provided for interest, each of which was higher than the rates for bona fide loans transactions"; (2) to strike prayer item (3)(h); (3) to strike subparagraph (e) of paragraph 151 of the second amended complaint; and (4) to conduct further proceedings consistent with the views expressed herein. The plaintiffs shall recover their costs on appeal.

Klein, P. J., and Hinz, J., concurred.

A petition for a rehearing was denied February 25, 1993, and respondents' petition for review by the Supreme Court was denied April 22, 1993.

# Exhibit H

**APPENDIX OF NON-FEDERAL AND UNPUBLISHED FEDERAL AUTHORITIES CITED IN VISA USA INC.'S OPPOSITION TO DEFENDANT MARITZ INC.'S REQUEST FOR DISCOVERY**

LEXSTAT CAL. EVID. CODE 1119

DEERING'S CALIFORNIA CODES ANNOTATED
Copyright (c) 2008 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group.
All rights reserved.

*** THIS SECTION IS CURRENT THROUGH THE 2008 SUPPLEMENT ***
(ALL 2007 LEGISLATION)

EVIDENCE CODE
Division 9.  Evidence Affected or Excluded by Extrinsic Policies
Chapter 2.  Mediation

**GO TO CALIFORNIA CODES ARCHIVE DIRECTORY**

*Cal Evid Code § 1119* (2007)

**§ 1119.  Admissibility, discovery, or disclosure of evidence; Confidentiality**

Except as otherwise provided in this chapter:

   **(a)** No evidence of anything said or any admission made for the purpose of, in the course of, or pursuant to, a mediation or a mediation consultation is admissible or subject to discovery, and disclosure of the evidence shall not be compelled, in any arbitration, administrative adjudication, civil action, or other noncriminal proceeding in which, pursuant to law, testimony can be compelled to be given.

   **(b)** No writing, as defined in Section 250, that is prepared for the purpose of, in the course of, or pursuant to, a mediation or a mediation consultation, is admissible or subject to discovery, and disclosure of the writing shall not be compelled, in any arbitration, administrative adjudication, civil action, or other noncriminal proceeding in which, pursuant to law, testimony can be compelled to be given.

   **(c)** All communications, negotiations, or settlement discussions by and between participants in the course of a mediation or a mediation consultation shall remain confidential.

**HISTORY:**

   Added Stats 1997 ch 772 § 3 (AB 939).

**NOTES:**

**Historical Derivation:**

   Former Ev C § 1152.5, as added Stats 1985 ch 731 § 1, amended Stats 1992 ch 163 § 73, Stats 1993 ch 219 § 77.7, ch 1261 § 6, Stats 1994 ch 1269 § 8, Stats 1996 ch 174 § 1.

**Law Revision Commission Comments:**

**1997**

   Subdivision (a) of Section 1119 continues without substantive change former Section 1152.5(a)(1), except that its protection explicitly applies in a subsequent arbitration or administrative adjudication, as well as in any civil action or

proceeding. See Section 120 ("civil action" includes civil proceedings). In addition, the protection of Section 1119(a) extends to oral communications made for the purpose of or pursuant to a mediation, not just oral communications made in the course of the mediation.

Subdivision (b) continues without substantive change former Section 1152.5(a)(2), except that its protection explicitly applies in a subsequent arbitration or administrative adjudication, as well as in any civil action or proceeding. See Section 120 ("civil action" includes civil proceedings). In addition, subdivision (b) expressly encompasses any type of "writing" as defined in Section 250, regardless of whether the representations are on paper or on some other medium.

Subdivision (c) continues former Section 1152.5(a)(3) without substantive change. A mediation is confidential notwithstanding the presence of an observer, such as a person evaluating or training the mediator or studying the mediation process.

See Sections 1115(a) ("mediation" defined), 1115(c) ("mediation consultation" defined). See also Section 703.5 (testimony by a judge, arbitrator, or mediator).

For examples of specialized mediation confidentiality provisions, see *Bus. & Prof. Code §§ 467.4-467.5* (community dispute resolution programs), 6200 (attorney-client fee disputes); *Code Civ. Proc. §§ 1297.371* (international commercial disputes), 1775.10 (civil action mediation in participating courts); *Fam. Code §§ 1818* (family conciliation court), 3177 (child custody); *Food & Agric. Code § 54453* (agricultural cooperative bargaining associations); *Gov't Code §§ 11420.20-11420.30* (administrative adjudication), 12984-12985 (housing discrimination), 66032-66033 (land use); *Ins. Code § 10089.80* (earthquake insurance); *Lab. Code § 65* (labor disputes); *Welf. & Inst. Code § 350* (dependency mediation). See also *Cal. Const. art. I, § 1* (right to privacy); *Garstang v. Superior Court, 39 Cal. App. 4th 526, 46 Cal. Rptr. 2d 84, 88 (1995)* (constitutional right of privacy protected communications made during mediation sessions before an ombudsperson).

**Cross References:**

Applicability of this section to statements made in court-ordered mediation: *CCP § 1775.10.*

Confidentiality of hearings, conferences, and papers: CCP § 1818.

Mediation and arbitration of labor disputes; confidentiality: *Lab C § 65.*

Setting contested issues for mediation: *Fam § 3170.*

Confidentiality of proceedings *Fam § 3177.*

**Collateral References:**

1 Witkin Cal. Evidence (4th ed) Circumstantial Evidence §§ 153, 154.

*Cotchett, California Courtroom Evidence, § 20.05* (Matthew Bender).

Matthew Bender (R) Practice Guide: Cal. Trial and Post Trial Civil Procedure §§ 4.22[1], 11.80, 11.87, 11.89.

Matthew Bender(R) Practice Guide: *California Contract Litigation, 5.10, 5.12*

Matthew Bender(R) Practice Guide: *Federal Pretrial Civil Procedure in California, 24.20, 31.11*

Matthew Bender (R) Practice Guide: *California Civil Discovery, ch 2, "Scope of Discovery", § 2.45* [2].

Rutter Cal Prac Guide, Alternative Dispute Resolution §§ 3:100 et seq.; Civil Trials and Evidence §§ 8:2831 et seq.

**Law Review Articles:**

Cal Evid Code § 1119

Ethics Opinion: Los Angeles County Bar Association Professional Responsibility and Ethics Committee: Formal Opinion No. 512: Confidentiality of Fact and Amount of Settlement in Settlement Agreement. *27 Los Angeles Lawyer 26.*

Mediation of marital disputes before it is too late: A proposal for premarital contract provisions for mediation of disputes within the intact family and at separation. 15 Pepperdine LR 51.

Legislation Protecting Confidentiality in Mediation: Armor of Steel or Eggshells? *41 Santa Clara LR 1093.*

Lasting Agreement. *30 LA Law 28* (September, 2007).

**Hierarchy Notes:**

Div. 9 Note

Div. 9, Ch. 2 Note

NOTES OF DECISIONS 1. In General 2. Admissible Evidence 3. Inadmissible Evidence 4. Evidence of Settlement Agreement

**1. In General**

In an action for negligent construction and fraud, the trial court erred in admitting into evidence, over defendant's objection, an oral settlement agreement made in mediation proceedings between the parties to prove the existence and terms of the agreement. Former Ev C § 1152.5, provides that evidence of anything said or of any admission made in the course of a mediation is not admissible in evidence, and the statute must be interpreted broadly to serve its purpose to encourage the use of mediation by ensuring confidentiality. By using the broad phrase "in the course of the mediation," the Legislature intended to protect a broad range of statements from later use as Evidence in litigation. Accordingly, the statements made among the parties and the mediator, at the time and in the place set for mediation, were well within "the course of mediation," and, therefore, evidence of those statements was inadmissible in a later proceeding under former § 1152.5. *Ryan v. Garcia (1994, Cal App 3d Dist) 27 Cal App 4th 1006, 33 Cal Rptr 2d 158, 1994 Cal App LEXIS 856.*

Former Ev C § 1152.5, provides a simple means by which settlement agreements executed during mediation can be made admissible in later proceedings. The parties may consent, as part of a writing, to subsequent admissibility of the agreement. A document prepared at mediation is inadmissible in later judicial proceedings "unless the document otherwise provides." Enforcement of the procedural condition of consenting in writing to subsequent admissibility protects the confidentiality of mediation while emphasizing what the law requires of parties and mediators who wish to produce an enforceable settlement agreement. *Ryan v. Garcia (1994, Cal App 3d Dist) 27 Cal App 4th 1006, 33 Cal Rptr 2d 158, 1994 Cal App LEXIS 856.*

California's mediation privilege, *Ev C § 1119*, applied in a federal action as a matter of comity because it was consistent with federal interests. *Folb v. Motion Picture Indus. Pension & Health Plans (1998, CD Cal) 16 F Supp 2d 1164, 1998 US Dist LEXIS 18094,* aff'd (2000, CA9 Cal) *216 F3d 1082, 2000 US App LEXIS 20337.*

Neither the witness nor the mediator had a reasonable expectation of privacy in inconsistent statements made by the witness during confidential mediation because it has long been established that, when balanced against the competing goals of preventing perjury and preserving the integrity of the truth-seeking process of a juvenile delinquency proceeding, the interest in promoting settlements must yield to the minors' constitutional right to effective impeachment. *Folb v. Motion Picture Indus. Pension & Health Plans (1998, CD Cal) 16 F Supp 2d 1164, 1998 US Dist LEXIS 18094,* aff'd (2000, CA9 Cal) *216 F3d 1082, 2000 US App LEXIS 20337.*

There are no exceptions to the confidentiality of mediation communications or to the statutory limits on the content of mediator's reports (*Ev C §§ 1119, 1121*). Neither a mediator nor a party may reveal communications made during mediation. While a party may do so, a mediator may not report to the court about the conduct of participants in a mediation session. A judicially created exception permitting a mediator to report to the court a party's failure to comply with an order of the mediator and to participate in good faith in the mediation process was inconsistent with the language and

legislative intent underlying §§ 1119, 1121. *Foxgate Homeowners Assn. v. Bramalea California, Inc. (2001) 26 Cal 4th 1, 108 Cal Rptr 2d 642, 25 P3d 1117, 2001 Cal LEXIS 4233.*

Confidentiality rule in *Ev C § 1119* encompasses communications by participants at the end of mediation that are materially related to the purpose of the mediation, regardless of whether these communications are made in the mediator's presence; this conclusion is corroborated by *Ev C § 1122. Eisendrath v. Superior Court (2003, Cal App 2d Dist) 109 Cal App 4th 351, 134 Cal Rptr 2d 716, 2003 Cal App LEXIS 798.*

Considering the provisions of former Ev C § 1152.5, and the comment to *Ev C § 1119(a)* that the section extended protection to oral communications made for the purpose of or pursuant to a mediation, the appellate court's narrowing of the protection under § 1119 was inconsistent with the legislative efforts to expand protection. *Rojas v. Superior Court (2004) 33 Cal 4th 407, 15 Cal Rptr 3d 643, 93 P3d 260, 2004 Cal LEXIS 6281.*

Given the language of *CCP § 2018(b)*, the legislature clearly knows how to establish a good cause exception to a protection or privilege if it so desires, and the legislature did not enact such an exception when it passed *Ev C § 1119* and the other mediation confidentiality provisions; the legislature enacted other exceptions to *§ 1119, including Ev C §§ 1122-1124,* and there was no evidence of a legislative intent supporting a "good cause" exception that an appellate court read into the statute. *Rojas v. Superior Court (2004) 33 Cal 4th 407, 15 Cal Rptr 3d 643, 93 P3d 260, 2004 Cal LEXIS 6281.*

Given the purpose of encouraging mediation by ensuring confidentiality, and the fact that a judicially crafted exception to *Ev C § 1119* was not necessary to carry out the legislative intent or avoid an absurd result in a particular case, the court held that an appellate court erred in holding that so-called derivative material that is prepared for the purpose of, in the course of, or pursuant to, a mediation, *Ev C § 1119(b),* is discoverable upon a showing of good cause. *Rojas v. Superior Court (2004) 33 Cal 4th 407, 15 Cal Rptr 3d 643, 93 P3d 260, 2004 Cal LEXIS 6281.*

Read together, *Ev C §§ 1119, 1120* establish that a writing-which qualifies as evidence (*Ev C § 140*)-is not protected solely by reason of its introduction or use in a mediation (*Ev C § 1120(a)*), but is protected only if it was prepared for the purpose of, in the course of, or pursuant to, a mediation (*Ev C § 1119(b)*), and in other words, under *Ev C § 1120,* a party cannot secure protection for a writing-including a photograph, a witness statement, or an analysis of a test sample-that was not prepared for the purpose of, in the course of, or pursuant to, a mediation simply by using or introducing it in a mediation or even including it as part of a writing-such as a brief or a declaration or a consultant's report-that was prepared for the purpose of, in the course of, or pursuant to, a mediation; this construction does not render *Ev C § 1120* surplusage or permit parties to use mediation as a shield to hide evidence, but consistent with the legislature's intent, it applies § 1120 as a limit on the scope of *Ev C § 1119* that prevents parties from using a mediation as a pretext to shield materials from disclosure, and this conclusion is consistent with *Fed. R. Evid. 408. Rojas v. Superior Court (2004) 33 Cal 4th 407, 15 Cal Rptr 3d 643, 93 P3d 260, 2004 Cal LEXIS 6281.*

Because the language of *Ev C §§ 1119* and *1121* is clear and unambiguous, judicial construction of the statutes is not permitted unless they cannot be applied according to their terms or doing so would lead to absurd results, thereby violating the presumed intent of the legislature. A judicially crafted exception to the confidentiality requirements of *Ev C §§ 1119* and *1121* is not necessary either to carry out the legislative intent or to avoid an absurd result. *Fair v. Bakhtiari (2004, Cal App 1st Dist) 122 Cal App 4th 1457, 19 Cal Rptr 3d 591, 2004 Cal App LEXIS 1702,* review gr, depublished *(2005) 23 Cal. Rptr. 3d 295, 104 P.3d 98, 2005 Cal. LEXIS 116, 2005 Cal. Daily Op. Service 402,* 2005 D.A.R. 493, rev'd, superseded *(2006) 40 Cal 4th 189, 51 Cal Rptr 3d 871, 147 P3d 653, 2006 Cal LEXIS 14727.*

In a case in which a church diocese had been sued by numerous persons claiming to be victims of childhood sexual abuse by various priests, although it was premature to reach a decision as to whether a settlement judge's valuation order should be disclosed or barred from some unknown future use, the order remained confidential for the time being and could not be used without the church's consent. *Travelers Casualty & Surety Co. v. Superior Court (2005, Cal App 2d Dist) 126 Cal App 4th 1131, 24 Cal Rptr 3d 751, 2005 Cal App LEXIS 232,* review denied *(6688) 2005 Cal. LEXIS 6688.*

## 2. Admissible Evidence

In an action for slander and intentional infliction of emotional distress brought by a secretary against her former employer, a private educational institution, and three coworkers, the trial court did not err in denying plaintiff's motion to compel further answers to deposition questions posed to three other employees about informal mediation sessions conducted by the employer's ombudsperson. Although the mediation privilege of former Ev C § 1152.5, did not apply,

since none of the parties participating in the sessions had executed the written agreement required by former Ev C § 1152.5(c), communications disclosed during the mediation sessions were protected by the qualified privilege set forth in *Cal Const Art I, § 1* (right to privacy). A proper balancing of the competing values weighed in favor of the right to privacy of the deponents, since the communications related to private affairs and were kept in confidence by the institution. All of the institution's employees were made aware of the ombudsman's status, of the pledge of confidentiality of communications made during ombudsman sessions, and of the guaranty of independence of the ombudsman office. Thus, the trial court properly found that the ombudsman was acting in her official capacity at the time she attempted to resolve the workplace dispute, that the individuals participating in the sessions did so believing that their communications would not be disclosed, and that the ombudsman's office was independent of all of the institution's structures. *Garstang v. Superior Court (1995, Cal App 2d Dist) 39 Cal App 4th 526, 46 Cal Rptr 2d 84, 1995 Cal App LEXIS 1024.*

A juvenile delinquency proceeding pursuant to *W & I C § 602* is a "civil action" within the meaning of *Ev C § 1119*, and thus, the confidentiality provisions of *Ev C § 1119* apply to such a proceeding. However, the public policy served by the confidentiality provisions of *Ev C § 1119* must yield when necessary to ensure the minors' constitutional right to effective cross-examination and impeachment of an adverse witness in a juvenile delinquency proceeding. Thus, in a proceeding under *W & I C § 602* charging two minors with civil harassment, the minors were not barred from requiring a volunteer mediator to testify as to inconsistent statements made by the subject of the alleged harassment during the mediation session. *Rinaker v. Superior Court (1998, Cal App 3d Dist) 62 Cal App 4th 155, 74 Cal Rptr 2d 464, 1998 Cal App LEXIS 210.*

In a proceeding under *W & I C § 602* charging two minors with civil harassment, the trial court properly ordered a volunteer mediator to testify on behalf of the minors as to inconsistent statements made by the subject of the alleged harassment during the mediation session. Such order did not violate the mediator's right to privacy under *Cal Const Art I § 1*, in that neither the mediator nor the subject of the alleged harassment had a reasonable expectation of privacy regarding any statements made in the mediation session, given that the confidentiality provisions of *Ev C § 1119* must yield to the constitutional right of effective impeachment of an adverse witness. *Rinaker v. Superior Court (1998, Cal App 3d Dist) 62 Cal App 4th 155, 74 Cal Rptr 2d 464, 1998 Cal App LEXIS 210.*

That witness statements prepared for the purpose of, in the course of, or pursuant to, a mediation are protected from discovery under *Ev C § 1119* does not mean that the facts set forth in those statements are so protected; under *Ev C § 1120(a)*, because facts known to percipient witnesses constitute evidence otherwise admissible or subject to discovery outside of a mediation, those facts do not become inadmissible or protected from disclosure solely by reason of their introduction or use in a mediation through witness statements prepared for the purpose of, in the course of, or pursuant to, the mediation, and otherwise, contrary to the legislature's intent, parties could use mediation as a pretext to shield materials from disclosure. *Rojas v. Superior Court (2004) 33 Cal 4th 407, 15 Cal Rptr 3d 643, 93 P3d 260, 2004 Cal LEXIS 6281.*

Where a retired judge was appointed by a former employee's representative and an employer's representative to sit as one of three members on an employer's review board, which at the employee's request held a hearing on the propriety of the employee's termination and made a recommendation to the employer as to whether the termination decision should be upheld, the hearing was not a mediation because the board did not assist the employee and the employer in reaching a mutually agreeable, binding decision; hence, the board member could not claim a privilege under *Ev C § 1119* in refusing to disclose information about the hearing through discovery in subsequent litigation to which the board member was not a party. *Saeta v. Superior Court (2004, Cal App 2d Dist) 117 Cal App 4th 261, 11 Cal Rptr 3d 610, 2004 Cal App LEXIS 414.*

In asbestos litigation, factual information concerning plaintiff's work history and his medical condition was discoverable to the extent that such information was contained in documents prepared by others, such as personnel records or medical reports. Under *Ev C §§ 1119* and *1120*, the use of a writing in a mediation did not preclude that document from being admitted or produced in discovery unless it was specifically prepared for use in the mediation. *Volkswagen of America, Inc. v. Superior Court (2006, Cal App 1st Dist) 139 Cal App 4th 1481, 43 Cal Rptr 3d 723, 2006 Cal App LEXIS 803.*

## 3. Inadmissible Evidence

Because an ex-husband's motion to correct a judgment rested exclusively or substantially on conversations that constituted confidential communications, evidence of these conversations was inadmissible under *Ev C § 1119, 1121* absent suitable express waivers from the ex-husband and the ex-wife pursuant to *Ev C 1122*; the confidentiality rule did

not encompass conversations between the parties that (1) occurred after the end of mediation, pursuant to *Ev C 1125*, and (2) did not implicate confidential communications made prior to the end of mediation, pursuant to *Ev C § 1126*. *Eisendrath v. Superior Court (2003, Cal App 2d Dist) 109 Cal App 4th 351, 134 Cal Rptr 2d 716, 2003 Cal App LEXIS 798*.

Under *Ev C § 1119*, because both photographs and written witness statements qualify as writings, as defined in *Ev C § 250*, if they are prepared for the purpose of, in the course of, or pursuant to, a mediation, then they are not admissible or subject to discovery, and their disclosure shall not be compelled; thus, the appellate court erred in holding that *Ev C § 1119* never applies to photographs and witness statements. *Rojas v. Superior Court (2004) 33 Cal 4th 407, 15 Cal Rptr 3d 643, 93 P3d 260, 2004 Cal LEXIS 6281*.

Because *Ev C § 1122* facilitated admissibility and disclosure of unilaterally prepared materials, but it only applied so long as those materials may be produced in a manner revealing nothing about the mediation discussion, the appellate court's conclusion that photographs and videotapes taken for purposes of mediation were not protected under *Ev C § 1119* was inconsistent with the legislative history. *Rojas v. Superior Court (2004) 33 Cal 4th 407, 15 Cal Rptr 3d 643, 93 P3d 260, 2004 Cal LEXIS 6281*.

Given the change from former *Ev C § 1152.5* and the legislative history of *Ev C § 1119*, in passing § 1119(b), the legislature specifically intended to extend protection to all types of writings under *Ev C § 250*, including photographs. *Rojas v. Superior Court (2004) 33 Cal 4th 407, 15 Cal Rptr 3d 643, 93 P3d 260, 2004 Cal LEXIS 6281*.

Given the legislative history and that adopting the appellate court's narrow construction of *Ev C § 1119* would have undercut the legislative efforts to ensure the confidentiality necessary to effective mediation, the appellate court erred in holding that photographs, videotapes, witness statements, and "raw test data" from physical samples collected at an apartment complex-such as reports describing the existence or amount of mold spores in a sample-that were prepared for the purpose of, in the course of, or pursuant to, a mediation in an underlying action were not protected under *Ev C § 1119*. *Rojas v. Superior Court (2004) 33 Cal 4th 407, 15 Cal Rptr 3d 643, 93 P3d 260, 2004 Cal LEXIS 6281*.

Insofar as the appellate court was referring to actual physical samples collected at an apartment complex, the appellate court was correct that such physical objects were not "writings" as defined in *Ev C § 250* for purposes of *Ev C § 1119(b)*; however, insofar as the appellate court was referring to recorded analyses of those samples, the appellate court erred because such analyses were "writings," and under § 1119, if they were prepared for the purpose of, in the course of, or pursuant to mediation, they were not subject to disclosure. *Rojas v. Superior Court (2004) 33 Cal 4th 407, 15 Cal Rptr 3d 643, 93 P3d 260, 2004 Cal LEXIS 6281*.

Because a writing constitutes evidence (*Ev C § 140*), any writing that discloses what has been characterized as "the substance of mediation" -negotiations, communications, admissions, and discussions designed to reach a resolution of the dispute-necessarily qualifies as evidence of anything said or any admission made for the purpose of, in the course of, or pursuant to, a mediation, and is undiscoverable under *Ev C § 1119(a)*; the appellate court erred in holding otherwise. *Rojas v. Superior Court (2004) 33 Cal 4th 407, 15 Cal Rptr 3d 643, 93 P3d 260, 2004 Cal LEXIS 6281*.

District court properly remanded appellees' class action to state court because a letter from appellees' counsel regarding the parties' mediation constituted *28 U.S.C.S. § 1446(b)* notice as the estimate of damages that was contained in the letter put appellant on notice that the amount in controversy exceeded the jurisdictional amount required under *28 U.S.C.S. § 1332(d)(2)*, and appellant did not remove action until more than 30 days after receipt of letter; the California privilege law, *Ev C § 1119 (2006)*, did not apply under *Fed. R. Evid. 501* because federal law governed whether an amount in controversy exceeded the amount required for federal jurisdiction. *Babasa v. LensCrafters, Inc. (2007, CA9 Cal) 2007 US App LEXIS 19452*.

## 4. Evidence of Settlement Agreement

In a sexual harassment action, the trial court did not err in considering the transcript of the parties' dictated oral settlement as evidence of their settlement agreement. Although *Ev C § 1152.5*, bars evidence of a settlement reached during the course of mediation sessions, the parties had concluded their mediation sessions, and then created a transcript of the settlement they had reached in order to memorialize their agreement. Once a compromise is reached, the mediation process is over. An oral agreement cannot be crafted until after the compromise has been reached. *Regents of University of California v. Sumner (1996, Cal App 1st Dist) 42 Cal App 4th 1209, 50 Cal Rptr 2d 200, 1996 Cal App LEXIS 154*, review denied (1996, Cal) *1996 Cal LEXIS 2601*.

Cal Evid Code § 1119

In an action revolving around the relationship between court-sponsored voluntary mediation and subsequent proceedings, the purpose of which was to determine whether the parties entered an enforceable agreement at the close of the mediation session, the court noted that the parties participated in mediation hosted by the court's alternative dispute resolution program counsel; and at the end of the mediation, the parties signed a "Memorandum of Understanding." As to whether evidence about what occurred during the mediation proceedings, including testimony from the mediator, could be used to help resolve a later dispute, the court concluded that the mediator's testimony was sufficiently likely to make substantial contributions to justify compelling an exploration, under seal, of what his testimony would be. The mediator was the only source of presumptively disinterested, neutral evidence. The only other witnesses with personal knowledge of plaintiff's condition at the mediation were the parties and their lawyers, none of whom were disinterested. *Olam v. Congress Mortg. Co. (1999, ND Cal) 68 F Supp 2d 1110, 1999 US Dist LEXIS 17538,* dismissed (1999, ND Cal) *1999 US Dist LEXIS 17508.*

Trial court erred in denying plaintiff's motion to compel arbitration; *Ev C § 1123(b)*'s exception to *Ev C § 1119*'s confidentiality requirements was applicable to the case. While it was true that the settlement terms document did not contain the words "enforceable" or "binding," there was language in the document that made plain the parties' intent to be bound; the final provision of document stated that any and all disputes were subject to the Judicial Arbitration and Mediation Services arbitration rules, and the inclusion of this term showed that the parties contemplated that an arbitrator would consider and resolve disputes related to the document. *Fair v. Bakhtiari (2004, Cal App 1st Dist) 122 Cal App 4th 1457, 19 Cal Rptr 3d 591, 2004 Cal App LEXIS 1702,* review gr, depublished *(2005) 23 Cal. Rptr. 3d 295, 104 P.3d 98, 2005 Cal. LEXIS 116, 2005 Cal. Daily Op. Service 402,* 2005 D.A.R. 493, rev'd, superseded *(2006) 40 Cal 4th 189, 51 Cal Rptr 3d 871, 147 P3d 653, 2006 Cal LEXIS 14727.*

Presumption of undue influence did not apply to a marital settlement agreement that favored the husband but that was achieved through mediation. In reaching that conclusion, the court cited the legislative and judicial policies favoring mediation, as evidenced in *Ev C § 1119. In re Marriage of Kieturakis (2006, Cal App 1st Dist) 138 Cal App 4th 56, 41 Cal Rptr 3d 119, 2006 Cal App LEXIS 448,* review denied (2006, Cal) *2006 Cal LEXIS 8865.*

# Exhibit I

**APPENDIX OF NON-FEDERAL AND UNPUBLISHED FEDERAL AUTHORITIES CITED IN VISA USA INC.'S OPPOSITION TO DEFENDANT MARITZ INC.'S REQUEST FOR DISCOVERY**

LEXSTAT TORTS SECOND 551

Restatement of the Law, Second, Torts
Copyright (c) 1977, The American Law Institute

Case Citations

Rules and Principles

Division 4 - Misrepresentation

Chapter 22 - Misrepresentation and Nondisclosure Causing Pecuniary Loss

Topic 2 - Concealment and Nondisclosure

Restat 2d of Torts, § 551

§ 551 Liability for Nondisclosure

(1) **One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.**
(2) **One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,**

(a) **matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and**

(b) **matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and**

(c) **subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and**

(d) **the falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns that the other is about to act in reliance upon it in a transaction with him; and**

(e) **facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that theother, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.**

## COMMENTS & ILLUSTRATIONS: Comment on Subsection (1):

*a.* Unless he is under some one of the duties of disclosure stated in Subsection (2), one party to a business transaction is not liable to the other for harm caused by his failure to disclose to the other facts of which he knows the other is ignorant and which he further knows the other, if he knew of them, would regard as material in determining his course of action in the transaction in question. The interest in knowing those facts that are important in determining the advisability of a course of action in a financial or commercial matter is given less protection by the rule stated in this Subsection than is given to the interest in knowing facts that are important in determining the recipient's course of action in regard to matters that involve the security of the person, land or chattels of himself or a third person.

*b.* The conditions under which liability is imposed for nondisclosure in an action for deceit differ in one particular from those under which a similar nondisclosure may confer a right to rescind the transaction or to recover back money paid or the value of other benefits conferred. In the absence of a duty of disclosure, under the rule stated in Subsection (2) of this Section, one who is negotiating a business transaction is not liable in deceit because of his failure to disclose a fact that he knows his adversary would regard as material. On the other hand, as is stated in *Restatement, Second,*

*Contracts § 303(b)* the other is entitled to rescind the transaction if the undisclosed fact is basic; and under *Restatement of Restitution, § 8,* Comment e, and § 28, he would be entitled to recover back any money paid or benefit conferred in consummation of the transaction.

**Comment on Subsection (2):**

*c.* A person under the duty stated in this Subsection is required to disclose only those matters that he has reason to know will be regarded by the other as important in determining his course of action in the transaction in hand. He is therefore under no duty to disclose matter that the ordinary man would regard as unimportant unless he knows of some peculiarity of the other that is likely to lead him to attach importance to matters that are usually regarded as of no moment.

*d.* Under the rule stated in this Subsection the person under a duty of disclosure is not subject to liability merely because he has failed to bring the required information home to the person entitled to it. His duty is to exercise reasonable care to do so. If reasonable care is exercised, the fact that the information does not reach the person entitled to it does not subject him to liability. Thus a trustee whose distant cestui que trust is contemplating a sale of part of his interest in the trust res to a third person and who writes to his cestui que trust communicating certain information which it is material for the latter to know in the transaction in question, is not subject to liability in an action of deceit, if the letter goes astray and therefore does not reach the cestui until the sale is made. On the other hand, if the trustee knows that the consummation of the transaction is immediately imminent, it may not be reasonable for him to communicate by mail rather than by telegraph. However, in the great majority of cases the person owing the duty has so available an opportunity to make the required disclosure that it is rare that the failure to give it can be other than intentional or negligent.

**Comment on Clause (a):**

*e.* On the duty of a trustee to disclose all material matters to his beneficiary with whom he is dealing on the trustee's own account, see *Restatement, Second, Trusts § 170(2).* On the duty of a trustee to disclose to his beneficiary matters important for the beneficiary to know in dealing with third persons, see *Restatement, Second, Trusts § 173,* Comment *d.* On the duty of an agent to disclose to his principal matters important for the principal to know in dealing with the agent or a third person and the similar duty of the principal to the agent, see *Restatement, Second, Agency §§ 381* and 435. It is not within the scope of this Restatement to state the rules that determine the duty of disclosure which under the law of business associations the directors of a company owe to its shareholders.

*f.* Other relations of trust and confidence include those of the executor of an estate and its beneficiary, a bank and an investing depositor, and those of physician and patient, attorney and client, priest and parishioner, partners, tenants in common and guardian and ward. Members of the same family normally stand in a fiduciary relation to one another, although it is of course obvious that the fact that two men are brothers does not establish relation of trust and confidence when they have become estranged and have not spoken to one another for many years. In addition, certain types of contracts, such as those of suretyship or guaranty, insurance and joint adventure, are recognized as creating in themselves a confidential relation and hence as requiring the utmost good faith and full and fair disclosure of all material facts.

**Comment on Clause (b):**

*g.* A statement that is partial or incomplete may be a misrepresentation because it is misleading, when it purports to tell the whole truth and does not. (See § 529). So also may a statement made so ambiguously that it may have two interpretations, one of which is false. (See §§ 527, 528). When such a statement has been made, there is a duty to disclose the additional information necessary to prevent it from misleading the recipient. In this case there may be recovery either on the basis of the original misleading statement or of the nondisclosure of the additional facts.

**Comment on Clause (c):**

*h.* One who, having made a representation which when made was true or believed to be so, remains silent after he has learned that it is untrue and that the person to whom it is made is relying upon it in a transaction with him, is morally and legally in the same position as if he knew that his statement was false when made.

**Illustrations:**

1. A, a stock breeder, tells B, a prospective buyer, that a thoroughbred mare is in foal to a well-known stallion. The mare miscarries. Immediately afterwards B offers $ 500 for the mare relying, as A knows, upon his statement. A does not inform B of the mare's miscarriage. A is subject to liability to B for the loss that he suffers because the mare is not in foal as originally represented.

2. A, the president of a mercantile corporation, makes a true statement of its financial position to a credit rating company, intending the substance to be published by it to its subscribers. The corporation's financial position becomes seriously impaired, but A does not inform the credit rating company of this fact. The corporation receives goods on credit from B, a subscriber of the ratingcompany, who when the goods are bought is relying, as A knows, on the credit rating based on his statements to the rating company. A is subject to liability in deceit to B.

**Comment on Clause (d):**

*i.* One who knowingly makes a misrepresentation without any expectation that the recipient will act upon it may subsequently discover that the other is relying upon it in a transaction then pending between them. If, in this case, he does not exercise reasonable care to inform the other that his misrepresentation is untrue, he is under the same liability as though he had then made it for the purpose of influencing the other's conduct in the transaction in hand.

The rule stated in Clause (d) is not necessarily limited to "a transaction with him." When, for example, the defendant makes a statement to the plaintiff concerning the credit of a third person not expecting it to be acted upon and then discovers that the plaintiff is about to lend money to the third person in reliance upon the statement, it would appear that the duty of disclosure would arise.

**Comment on Clause (e):**

*j. "Facts basic to the transaction."* The word "basic" is used in this Clause in the same sense in which it is used in Comment *c* under *§ 16 of the Restatement of Restitution.* A basic fact is a fact that is assumed by the parties as a basis for the transaction itself. It is a fact that goes to the basis, or essence, of the transaction, and is an important part of the substance of what is bargained for or dealt with. Other facts may serve as important and persuasive inducements to enter into the transaction, but not go to its essence. These facts may be material, but they are not basic. If the parties expressly or impliedly place the risk as to the existence of a fact on one party or if the law places it there by custom or otherwise the other party has no duty of disclosure. (Compare *Restatement, Second, Contracts § 296*).

**Illustrations:**

3. A sells to B a dwelling house, without disclosing to B the fact that the house is riddled with termites. This is a fact basic to the transaction.

4. A sells to B a dwelling house, knowing that B is acting in the mistaken belief that a highway is planned that will pass near the land and enhance its value. A does not disclose to B the fact that no highway is actually planned. This is not a fact basic to the transaction.

5. Having purchased a certain tract of land for $ 25,000, A hears that B may have a claim to it. He goes to B and offers to purchase B's interest. B does not believe he has a valid legal claim but agrees to give A a quit-claim deed for $ 250. B's lack of a valid legal claim is not a fact that he is under a duty to disclose.

**Comment:**

*k. Nondisclosure of basic facts.* The rule stated in Subsection (1) reflects the traditional ethics of bargaining between adversaries, in the absence of any special reason for the application of a different rule. When the facts are patent, or when the plaintiff has equal opportunity for obtaining information that he may be expected to utilize if he cares to do so, or when the defendant has no reason to think that the plaintiff is acting under a misapprehension, there is no obligation to give aid to a bargaining antagonist by disclosing what the defendant has himself discovered. To a considerable extent, sanctioned by the customs and mores of the community, superior information and better business acumen are legitimate advantages, which lead to no liability. The defendant may reasonably expect the plaintiff to make his own investigation, draw his own conclusions and protect himself; and if the plaintiff is indolent, inexperienced or ignorant, or his judgment is bad, or he does not have access to adequate information, the defendant is under no obligation to make good his deficiencies. This is true, in general, when it is the buyer of land or chattels who has the better information and fails to disclose it. Somewhat less frequently, it may be true of the seller.

**Illustrations:**

6. A is a violin expert. He pays a casual visit to B's shop, where second-hand musical instruments are sold. He finds a violin which, by reason of his expert knowledge and experience, he immediately recognizes as a genuine Stradivarius, in good condition and worth at least $ 50,000. The violin is priced for sale at $ 100. Without disclosing his information or his identity, A buys the violin from B for $ 100. A is not liable to B.

7. The same facts as in Illustration 6, except that the violin is sold at auction and A bids it in for $ 100. The same conclusion.

8. B has a shop in which he sells second-hand musical instruments. In it he offers for sale for $ 100 a violin, which he knows to be an imitation Stradivarius and worth at most $ 50. A enters the shop, looks at the violin and is overheard by B to say to his companion that he is sure that the instrument is a genuine Stradivarius. B says nothing, and A buys the violin for $ 100. B is not liable to A.

*l.* The continuing development of modern business ethics has, however, limited to some extent this privilege to take advantage of ignorance. There are situations in which the defendant not only knows that his bargaining adversary is acting under a mistake basic to the transaction, but also knows that the adversary, by reason of the relation between them, the customs of the trade or other objective circumstances, is reasonably relying upon a disclosure of the unre-vealed fact if it exists. In this type of case good faith and fair dealing may require a disclosure.

It is extremely difficult to be specific as to the factors that give rise to this known, and reasonable, expectation of disclosure. In general, the cases in which the rule stated in Clause (e) has been applied have been those in which the advantage taken of the plaintiff's ignorance is so shocking to the ethical sense of the community, and is so extreme and unfair, as to amount to a form of swindling, in which the plaintiff is led by appearances into a bargain that is a trap, of whose essence and substance he is unaware. In such a case, even in a tort action for deceit, the plaintiff is entitled to be compensated for the loss that he has sustained. Thus a seller who knows that his cattle are infected with tick fever or contagious abortion is not free to unload them on the buyer and take his money, when he knows that the buyer is un-aware of the fact, could not easily discover it, would not dream of entering into the bargain if he knew and is relying upon the seller's good faith and common honesty to disclose any such fact if it is true.

There are indications, also, that with changing ethical attitudes in many fields of modern business, the concept of facts basic to the transaction may be expanding and the duty to use reasonable care to disclose the facts may be increas-ing somewhat. This Subsection is not intended to impede that development.

**Illustrations:**

9. A sells B a dwelling house, without disclosing the fact that drain tile under the house is so constructed that at pe-riodic intervals water accumulates under the house. A knows that B is not aware of this fact, that he could not discover it by an ordinary inspection, and that he would not make the purchase if he knew it. A knows also that B regards him as an honest and fair man and one who would disclose any such fact if he knew it. A is subject to liability to B for his pe-cuniary loss in an action of deceit.

10. A is engaged in the business of removing gravel from the bed of a navigable stream. He is notified by the United States government that the removal is affecting the channel of the stream, and ordered to stop it under threat of legal proceedings to compel him to do so. Knowing that B is unaware of this notice, could not reasonably be expected to discover it and would not buy if he knew, A sells the business to B without disclosing the fact. A is subject to liabil-ity to B for his pecuniary loss in an action of deceit.

11. A, who owns an amusement center, sells it to B without disclosing the fact that it has just been raided by the police, and that A is being prosecuted for maintaining prostitution and the sale of marijuana on the premises. These facts have seriously affected the reputation and patronage of the center, and greatly reduced its monthly income. A knows that B is unaware of these facts, could not be expected to discover them by ordinary investigation and would not buy if he knew them. He also knows that B believes A to be a man of high character, who would disclose any serious defects in the business. A is subject to liability to B for his pecuniary loss in an action of deceit.

12. A sells a summer resort to B, without disclosing the fact that a substantial part of it encroaches on the public highway. A knows that B is unaware of the fact and could not be expected to discover it by ordinary inquiry, and that B trusts him to disclose any such facts. A is subject to liability to B for his pecuniary loss in an action of deceit.

*m. Court and jury.* Whether there is a duty to the other to disclose the fact in question is always a matter for the determination of the court. If there are disputed facts bearing upon the existence of the duty, as for example the defen-dant's knowledge of the fact, the other's ignorance of it or his opportunity to ascertain it, the customs of the particular trade, or the defendant's knowledge that the plaintiff reasonably expects him to make the disclosure, they are to be de-termined by the jury under appropriate instructions as to the existence of the duty.

**REPORTERS NOTES:** This Section has been changed by expanding Subsection (2) to include Clauses (b) and (c).

Restatement of the Law, Second, Torts, § 551

Comment (a):  No duty to disclose except as indicated in Subsection (1):

See e. g., *Vaught v. Satterfield, 260 Ark. 544, 542 S.W.2d 502 (1976); Windram Mfg. Co. v. Boston Blacking Co., 239 Mass. 123, 131 N.E. 454 (1921); Crowell v. Jackson, 53 N.J.L. 656, 23 A. 426 (1891); Klott v. Associates Real Estate, 41 Ohio App. 2d 118, 322 N.E.2d 690 (1974); Goerke v. Vojvodich, 67 Wis.2d 102, 226 N.W.2d 211 (1975).*

Comment f:  This is supported by the following cases:

Principal and agent: *McDonough v. Williams, 77 Ark. 261, 92 S.W. 783 (1905).*

Prospective partner: *Wolf v. Brungardt, 215 Kan. 272, 524 P. 2d 726 (1974).*

Executor and beneficiary of an estate: *Murphy v. Cartwright, 202 F.2d 71 (5 Cir. 1953); Foreman v. Henry, 87 Okl. 272, 210 P. 1026 (1922).*

Bank and investing depositor: *Brasher v. First Nat. Bank, 232 Ala. 340, 168 So. 42 (1936);* cf. *Boonstra v. Stevens-Norton, Inc., 64 Wash.2d 621, 393 P.2d 287 (1964)* (loan broker); *Tcherepnin v. Franz, 393 F.Supp. 1197 (N.D.Ill.1975).*

Majority and minority stockholders: *Speed v. Transamerica Corp., 99 F.Supp. 808 (D.Del. 1951)* supplemented, *100 F.Supp. 461,* petition denied, *100 F.Supp. 463; Manning v. Dial, 271 S.C. 79, 245 S.E.2d 120 (1978).*

Old friends: *Feist v. Roesler, 86 S.W.2d 787 (Tex.Civ.App. 1935).*

Cf. *In re Estate of Enyart, 100 Neb. 337, 160 N.W. 120 (1916),* overruled in part, in *Kingsley v. Noble, 129 Neb. 808, 263 N.W. 222 (1935)* (affianced).

Contra:  *Eaton v. Sontag, 387 A.2d 33 (Me.1978).*

Contracts of suretyship or guaranty: Cf. *Connecticut Gen. Life Ins. Co. v. Chase, 72 Vt. 176, 47 A. 825 (1900); Atlantic Trust & Deposit Co. v. Union Trust & Title Corp., 110 Va. 286, 67 S.E. 182 (1909).*

Insurance: *State Farm Mutual Ins. Co. v. Ling, 348 So.2d 472 (Ala.1977).*

See, generally, *Edward Barron Estate Co. v. Woodruff Co., 163 Cal. 561, 126 P. 351 (1912)* (attempting a list of similar relations).

Comment g:

See *Dyke v. Zaiser, 80 Cal. App.2d 639, 182 P.2d 344 (1947); Tucker v. Beazley, 57 A.2d 191 (Mun.App.D.C.1948); St. Joseph Hospital v. Corbetta Constr. Co., 21 Ill.App.3d 925, 316 N.E.2d 51 (1974); Dennis v. Thomson, 240 Ky. 727, 43 S.W.2d 18 (1931); Kidney v. Stoddard, 48 Mass. (7 Metc.) 252 (1843); Consolidated Foods Corp. v. Pearson, 287 Minn. 305, 178 N.W.2d 223 (1970); Smith v. Pope, 103 N.H. 555, 176 A.2d 321 (1961); Junius Const. Co. v. Cohen, 257 N.Y. 393, 178 N.E. 672 (1931); Noved Realty Corp. v. A.A.P. Co., 250 App.Div. 1, 293 N.Y.S. 336 (1937); Berry v. Stevens, 168 Okl. 124, 31 P.2d 950 (1934); Palmiter v. Hackett, 95 Or. 12, 185 P. 1105 (1919),* modified, *95 Or. 12, 186 P. 581.*

Otherwise if the statement does not purport to tell the whole truth. *Potts v. Chapin, 133 Mass. 276 (1882).*

Comment h:  This is supported by *With v. O'Flanagan, [1936] 1 Ch. 575; Loewer v. Harris, 57 F. 368 (2 Cir. 1893); Fischer v. Kletz, 266 F.Supp. 180 (S.D.N.Y. 1967); Morykwas v. McKnight, 37 Mich.App. 304, 194 N.W.2d 522 (1971);* cf. *Equitable Life Ins. Co. of Iowa v. Halsey, Stuart & Co., 312 U.S. 410, 61 S.Ct. 623, 85 L.Ed. 920 (1941); Fox v. Kane-Miller Corp., 542 F.2d 915 (4 Cir. 1976); Hush v. Reaugh, 23 F.Supp. 646 (E.D.Ill.1938); Fruit Dispatch Co. v. Wolman, 124 Me. 355, 128 A. 740 (1925); Bergeron v. Dupont, 116 N.H. 373, 359 A.2d 627 (1976); Bursey v. Clement, 118 N.H. 412, 387 A.2d 346 (1978); Holt v. King, 54 W.Va. 441, 47 S.E. 362 (1903).*

Comment i:  This is supported by *Pilmore v. Hood, 5 Bing.N.C. 97, 132 Eng.Rep. 1042 (1838).*

See also the cases cited in the preceding paragraph.

Comment k:  Undisclosed fact known or patent: *Schnader v. Brooks, 150 Md. 52, 132 A. 381 (1926); Riley v. White, 231 S. W.2d 291 (Mo.App.1950).*

Cf. *Kapiloff v. Abington Plaza Corp., 59 A.2d 516 (Mun.App.D. C.1948)* (act of Congress); *Gibson v. Mendenhall, 203 Okl. 558, 224 P.2d 251 (1950)* (generally known).

Plaintiff has equal opportunity to obtain information: *Phillips v. Homestake Consol. Placer Mines Co., 51 Nev. 226, 273 P. 657 (1929); Oates v. Taylor, 31 Wash.2d 898, 199 P.2d 924 (1948).*

No reason to believe plaintiff acting under misapprehension: *Blair v. National Security Ins. Co., 126 F.2d 955 (3 Cir. 1942); Haddad v. Clark, 132 Conn. 229, 43 A.2d 221 (1945); Egan v. Hudson Nut Products, Inc., 142 Conn. 344, 114 A.2d 213 (1955); Industrial Bank of Commerce v. Selling, 203 Misc. 154, 116 N.Y. S.2d 274 (1952); Cf. Lindquist v. Dilkes, 127 F.2d 21 (3 Cir. 1942).*

Illustrations 6-8: See generally *Laidlaw v. Organ, 15 U.S. (2 Wheat.) 178, 4 L.Ed. 214 (1817); Pratt Land & Imp. Co. v. McClain, 135 Ala. 452, 33 So. 185 (1902); Hays v. Meyers, 139 Ky. 440, 107 S.W. 287 (1908); Neill v. Shamburg, 158 Pa. 263, 27 A. 992 (1893); Holly Hill Lumber Co. v. McCoy, 201 S.C. 427, 23 S. E.2d 372 (1942); James v. Anderson, 149 Va. 113, 140 S.E. 264 (1927);* cf. *Guyer v. Cities Service Oil Co., 440 F.Supp. 630 (E.D. Wis.1977).*

*Comment l*: Illustration 9 is taken from *Kaze v. Compton, 283 S.W.2d 204 (Ky.1955).*

See also *Herzog v. Capital Co., 27 Cal.2d 349, 164 P.2d 8 (1945)* (leaky house); *Wilhite v. Mays, 140 Ga.App. 816, 232 S.E.2d 141 (1976)* (defective septic system); *Loghry v. Capel, 257 Iowa 285, 132 N.W.2d 417 (1965)* (filled ground); *Griffith v. Byers Constr. Co., 212 Kan. 65, 510 P.2d 198 (1973)* (landfill in former saltwater reservoir); *Weikel v. Sterns, 142 Ky. 513, 134 S.W. 908 (1911)* (concealed cesspool); *Cutter v. Hamlen, 147 Mass. 471, 18 N.E. 397 (1888)* (premises infected with disease); *Sullivan v. Ulrich, 326 Mich. 218, 40 N.W.2d 126 (1949)* (termites); *Mincy v. Crisler, 132 Miss. 223, 96 So. 162 (1923); Dargue v. Chaput, 166 Neb. 69, 88 N.W.2d 148 (1958)* (drainage); *Neveroski v. Blair, 141 N.J.Super. 365, 358 A.2d 473 (1976)* (termites); *Brooks v. Ervin Const. Co., 253 N.C. 214, 116 S.E.2d 454 (1960)* (house built on filled ground); *Crum v. McCoy, 41 Ohio Misc. 34, 322 N.E.2d 161 (1974); Obde v. Schlemeyer, 56 Wash.2d 449, 353 P.2d 672 (1960)* (termites); *Sorrell v. Young, 6 Wash.App. 220, 491 P.2d 1312 (1971)* (landfill);

Illustration 10 is taken from *Musgrave v. Lucas, 193 Or. 401, 238 P.2d 780 (1951).*

See also *McNeill v. Allen, 35 Colo.App. 317, 534 P.2d 813 (1975)* (house could not possibly be built at expected price); *Edward Malley Co. v. Button, 77 Conn. 571, 60 A. 125 (1905)* (married woman obtaining credit when separated from her husband); *Fuller v. De Paul University, 293 Ill.App. 261, 12 N.E.2d 213 (1938)* (married apostate priest employed at Catholic institution); *Highland Motor Transfer Co. v. Heyburn Bldg. Co., 237 Ky. 337, 35 S.W.2d 521 (1931)* (swimming pool not disclosed to contractor); *Neuman v. Corn Exchange Nat. Bank & Trust Co., 356 Pa. 442, 51 A.2d 759 (1947),* supplemented, *52 A.2d 177 (1947)* (tie-in agreement affecting value of shares sold); *Chandler v. Butler, 284 S.W.2d 388 (Tex.Civ.App. 1955)* (numerous facts affecting market value of stock); cf. *Jewish Center v. Whale, 165 N.J.Super. 84, 397 A.2d 712 (1978)* (rabbi with criminal record and disbarment).

Illustration 11 is taken from *Dyke v. Zaiser, 80 Cal.App.2d 639, 182 P.2d 344 (1947);* cf. *Boonstra v. Stevens-Norton, Inc., 64 Wash.2d 621, 393 P.2d 287 (1964).*

Illustration 12 is taken from *Kallgren v. Steele, 131 Cal.App.2d 43, 279 P.2d 1027 (1955).*

See also *Service Oil Co. v. White, 218 Kan. 87, 542 P.2d 652 (1975).*

See also, as to defects in the title of land sold: *Corry v. Sylvia y Cia, 192 Ala. 550, 68 So. 891 (1915); Hall v. Carter, 324 S.W. 2d 410 (Ky.1959); Dirks Trust & Title Co. v. Koch, 32 S.D. 551, 143 N.W. 952 (1913); Newell Bros. v. Hanson, 97 Vt. 297, 123 A. 208 (1924);* cf. *Curran v. Heslop, 115 Cal.App.2d 476, 252 P.2d 378 (1953)* (violation of building code).

As to sale of chattels without disclosure of defects, see *French v. Vining, 102 Mass. 132, 3 Am. Rep. 440 (1869)* (poisoned hay); *Marsh v. Webber, 13 Minn. 109 (1868)* (diseased sheep); *Grigsby v. Stapleton, 94 Mo. 423, 7 S. W. 421 (1888)* (cattle infected with Texas fever); *Puls v. Hornbeck, 24 Okl. 288, 103 P. 665 (1909)* (diseased cattle); *Morriss-Buick Co. v. Huss, 84 S.W.2d 264 (Tex.Civ.App.1935)* reversed, *113 S.W.2d 891* (wrecked and repaired automobile); *Downing v. Wimble, 97 Vt. 390, 123 A. 433 (1924)* (diseased cow).

*Law Reviews*: Keeton, Fraud -- Concealment and Non-Disclosure, *15 Tex.L.Rev. 1 (1936);* Berger & Hirsch, Pennsylvania Tort Liability for Concealment and Nondisclosure in Business Transactions, *21 Temple L.Q. 368 (1948);* Goldfarb, Fraud and Nondisclosure in the Vendor-Purchaser Relation, 8 West.Res.L. Rev. (1956); Note, *22 B.U.L. Rev. 607 (1942).*

**CROSS REFERENCES:** ALR Annotations:

Restatement of the Law, Second, Torts, § 551

Practices forbidden by state deceptive trade practice and consumer protection acts. *89 A.L.R.3d 449.*
Scope and exemptions of state deceptive trade practice and consumer protection acts. *89 A.L.R.3d 399.*
Right to private action under state consumer protection act. *62 A.L.R.3d 169.*
Liability of vendor's real-estate broker or agent to purchaser for misrepresentations as to, or nondisclosure of, physical defects of property sold. *8 A.L.R.3d 550.*
Liability of real-estate broker or agent to principal for concealing or failing to disclose offer. *7 A.L.R.3d 693.*
Duty of real-estate broker to disclose identity of purchaser or lessee. *2 A.L.R.3d 1119.*
Duty of real-estate broker to disclose that prospective purchaser is a relative. *26 A.L.R.2d 1307.*
Civil remedies of consumer for violations of Truth in Lending Act *(15 U.S.C. §§ 1601-1644, 1661-1665). 11 A.L.R.Fed. 815.*

Digest System Key Numbers:

Fraud 17

**Legal Topics:**

For related research and practice materials, see the following legal topics:
TortsBusiness TortsFraud & MisrepresentationGeneral Overview