# EXHIBIT A

## TO APPENDIX OF AUTHORITIES CITED IN VISA'S MOTION TO DISMISS MARITZ'S FRAUD COUNTERCLAIMS

LEXSEE 1996 U.S. DIST. LEXIS 11484



Cited
As of: Feb 21, 2008

**In re Herbalife Securities Litigation; This Document Relates to All Actions**

**CV 95-400 SVW (GHKx)**

**UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA**

*1996 U.S. Dist. LEXIS 11484*

**January 24, 1996, Decided**
**January 25, 1996, FILED; January 26, 1996, ENTERED**

**DISPOSITION:** [*1] Defendants' motion to dismiss plaintiffs' third amended consolidated class action complaint GRANTED. Plaintiffs' TAC DISMISSED WITH PREJUDICE in its entirety as to all defendants.

**COUNSEL:** For RAE ELLEN PLATTUS, on Behalf of Herself and all Others Similarly Situated, plaintiff: Mark C. Rifkin, Greenfield & Rifkin, Ardmore, PA. Eugene Mikolajczk, Kevin M. Prongay, Prongray & Mikolajczyk, Pacific Palisades, CA. John N. Zarian, Perkins Zarian & Duncan, Irvine, CA. MARK RESPLER, ALBERT ZUCKER, SHOSHANA ALTMAN, RONALS STERNBERG, KENNETH BORNSTEIN, On Behalf of themselves and all others similarly situated, plaintiffs: Kevin P. Roddy, Milberg Weiss Bershad Hynes & Lerach, Los Angeles, CA.

For CHRISTOPHER PAIR, DAVID B. KATZIN, NORMAN E. FRIEDMANN, MICHAEL E. ROSEN, plaintiffs; Michael A. Sherman, Marshall B. Grossman, Alschuler Grossman & Pines, Los Angeles, CA. MARK HUGHES, J. MARK HATTENDORFT, HERBALIFE INTERNATIONAL INC.defendants: Howard Schiffman, Dickstein Shapiro & Morin, Washington, DC.

**JUDGES:** STEPHEN V. WILSON, UNITED STATES DISTRICT JUDGE

**OPINION BY:** STEPHEN V. WILSON

**OPINION**

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' THIRD AMENDED COMPLAINT

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

Plaintiffs brought this securities fraud class action on behalf of all persons who purchased Herbalife International, Inc. ("Herbalife") common stock between October 8, 1993 and January 19, 1995 (the "Class Period"). Herbalife markets weight loss and weight management products, health and nutritional supplements, and personal care products worldwide. Defendants Gerrity, Hughes, Pair, Friedmann, Hattendorf, Rosen, and Katzin (collectively the "Individual Defendants") are the Company's officers and directors. Count one of plaintiffs' consolidated third amended class action complaint ("TAC") asserts claims against all defendants under § 10(b) of the Securities Exchange Act and SEC *Rule 10b-5*. Plaintiffs' second count asserts claims against defendants Herbalife and Hughes under § 20(a) of the Securities [*2] Exchange Act. The TAC alleges that defendants violated these antifraud provisions by misrepresenting and/or omitting material information about the Company in public reports, statements, and releases disseminated during the Class Period.

Previously, defendants Herbalife, Hattendorf, and Hughes, joined by the remaining Individual Defendants, filed a motion to dismiss the consolidated second amended class action complaint (the "SAC"). The remaining Individual Defendants also filed their own motion to dismiss. In an Order dated September 7, 1995

("the First Order"), the Court granted and denied in part the motions, and dismissed the SAC without prejudice. The First Order gave plaintiffs leave to file a third amended complaint, and warned quite clearly that the "TAC shall be plaintiffs' last complaint in this case." First Order at 14.

Plaintiffs subsequently filed their TAC, and defendants moved to dismiss. As before, Herbalife, Hattendorf, and Hughes are joined by the remaining Individual Defendants in this motion. The remaining Individual Defendants also filed a second motion to dismiss. The Court held a hearing on this motion on November 6, 1995, and has carefully considered the parties' [*3] submissions. For the reasons stated below, the Court grants defendants' motions and dismisses the TAC with prejudice.

## II. DISCUSSION

Defendants advance two grounds in support of their motion to dismiss plaintiffs' 10b-5 claims: (1) plaintiffs' allegations fail to state a claim upon which relief may be granted; and (2) plaintiffs' allegations fail to comply with the particularity requirement of *Fed. R. Civ. P. 9(b)*.

### A. Failure to State a Claim

*Rule 10b-5* provides that it is unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." *17 C.F.R. § 240.10b-5*. To prevail on a *Rule 10b-5* claim, a plaintiff must prove that the defendant made statements that were misleading as to a material fact and that the defendant had a duty to disclose. *Basic, Inc. v. Levinson, 485 U.S. 224, 239 & n.17, 108 S. Ct. 978, 986, 987 n.17, 99 L. Ed. 2d 194 (1988)*. Defendants argue that certain elements of plaintiffs' complaint, even if accepted as true, still do not state a claim under the securities laws. In deciding a 12(b)(6) [*4] motion, the Court must accept as true all material allegations in the plaintiffs' complaint as well as all reasonable inferences to be drawn therefrom. *See, e.g., NL Industries, Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986)*. The sole issue to be decided on such a motion is whether these allegations would, if proven, support a valid claim for relief. *De La Cruz v. Tormey, 582 F.2d 45, 48 (9th Cir. 1978), cert. denied, 441 U.S. 965, 60 L. Ed. 2d 1072, 99 S. Ct. 2416 (1979)*. If there is any such possibility, the motion must be denied. *Id.*

### 1. Omission of "Risk Factors" Section in Defendants' October 8, 1993 Prospectus

The TAC repeats the SAC's allegation that a stock offering prospectus issued by Herbalife on October 8, 1993 violated SEC Regulation S-K, *17 C.F.R. § 229.503(c)*, by failing to include a "Risk Factors" section. The TAC does not make any substantive changes to this claim (in fact, it omits much of the discussion of this claim that appeared in the SAC). As the Court explained in the First Order, this claim is completely without merit.

The prospectus contains a five-page, detailed discussion of risk factors, under the heading "Investment Considerations." [*5] At the time the prospectus was issued, the applicable regulation required that a discussion of investment risks be included "under an appropriate caption," which "Investment Considerations" certainly is. The omission of the magic words "Risk Factors" is irrelevant. In any event, plaintiffs do not allege how anyone could have been misled by the use of the heading "Investment Considerations" instead of "Risk Factors," and do not allege how this purported defect in the caption could have artificially inflated Herbalife's stock price.

As the Court concluded in the First order, even if proven at trial, these allegations would not constitute fraud under *Rule 10b-5*. The Court therefore grants defendants' motion to dismiss these allegations under *Rule 12(b)(6)*. This claim is hereby DISMISSED WITH PREJUDICE.

### 2. Non-Disclosure Relating to D & F Industries

Plaintiffs repeat the SAC's allegation that defendants' public statements during the class period contained material false statements and/or omissions relating to the existing known trends and risks to Herbalife stemming from certain regulatory problems being encountered by D & F Industries ("D&F"), an independent company that [*6] was the primary supplier of Herbalife products. This claim was defective in the SAC because plaintiffs failed to allege facts indicating that any products sold to Herbalife were under investigation, or that Herbalife was injured by the regulatory inquiry.

Like the SAC, the TAC alleges that Herbalife should have disclosed D&F's regulatory difficulties in the following public statements by Herbalife: its October 8, 1993 prospectus, its quarterly report for the third quarter of FY 1993, its 10-K annual report for FY 1993, and its quarterly reports for the first three quarters of FY 1994. TAC P41. The information which plaintiffs contend Herbalife was under a duty to disclose is the following: (1) in 1992, the Food and Drug Division of the California Department of Health began an investigation (which is

still ongoing) of D&F's manufacturing procedures, and found systematic violations of quality control and record-keeping requirements; (2) on May 31, 1994, the state of California sued D&F in Orange County Superior Court for violation of manufacturing procedures; (3) in June 1992, the federal Food and Drug Administration sent D&F a warning letter regarding quality control and record-keeping, [*7] alleging violations of good manufacturing practices; (4) in December 1993, FDA issued a report to D&F, identifying 18 categories of quality control, inspection, and cleaning violations; and (5) in January 1994, FDA sent D&F a warning letter similar to the June 1992 warning letter, stating in addition that until the violations were corrected, FDA would recommend against the award to D&F of government contracts involving the affected products and would not grant any new drug applications to D&F. TAC P39. Plaintiffs do not allege that D&F ever had any government contracts or that D&F would have had any but for FDA's warning letter. Similarly, plaintiffs do not allege that any new drug application by D&F was ever denied or that D&F would have had more new drug applications approved but for the warning letter. Herbalife is alleged to have been on notice of all of this information by virtue of the fact that one Dr. Dewan, D&F's quality assurance manager and technical director, was also employed as a consultant with Herbalife. *Id.* [1]

> 1 Rather than alleging directly that any of the defendants actually knew of D&F's regulatory problems, the TAC simply implies that such knowledge can be inferred from Dr. Dewan's dual employment. But the TAC does not say anything about what Dr. Dewan's duties with Herbalife were, so it is far from clear that the mere fact of his dual employment would have been sufficient to put Herbalife on notice of all events affecting D&F. Indeed, it could as easily be inferred from the allegation of Dr. Dewan's high position with D&F that he would have attempted to keep his knowledge of problems with D&F secret from Herbalife. However, in view of the Court's obligation to draw all reasonable inferences in favor of the non-moving party when deciding a motion to dismiss, the Court will assume for present purposes that plaintiffs have satisfactorily alleged that Herbalife knew of D&F's regulatory problems.

[*8] The SAC alleged that there was "a material risk that D&F may not be able to serve as an exclusive manufacturer of various Herbalife products." SAC P40. As stated above, the Court held that the SAC failed to state a claim with respect to the allegations regarding D&F because the SAC did not state any basis for plaintiffs' conclusory assertion that there was "a material risk"

that D&F would become unable to supply Herbalife; specifically, the SAC did not allege that D&F's regulatory difficulties involved any Herbalife products. Since the SAC did not state any basis for a showing that D&F's regulatory problems were material to Herbalife, Herbalife's failure to disclose them could not have violated *Rule 10b-5.*

In the TAC, plaintiffs admit that they "arc not aware whether any of the specific products that might have been the subject of the foregoing investigation and enforcement proceedings involved Herbalife products." TAC P40. Plaintiffs thus acknowledge that they cannot establish that D&F's regulatory problems were material to Herbalife by means of a direct link between the investigations and Herbalife products. Because of this inability, plaintiffs attempt to show materiality with [*9] a broader brush: they allege that the "regulatory scrutiny" was "such that there was (and is) a material risk that D&F might be required to cease operations completely," *Id.*

If Herbalife had information that would lead a reasonable person to believe that D&F was likely to be shut down completely in the foreseeable future, that information would be material to persons investing in shares of Herbalife. [2] Unfortunately for plaintiffs, however, they have not alleged any basis for their conclusory assertion that D&F was in danger of being shut down completely. On the Contrary, plaintiffs entirely fail even to allege either that D&F's regulatory problems had any effect whatever on Herbalife or that Herbalife believed or should have believed that D&F was reasonably likely to be forced out of business. Taking as true the TAC's allegations regarding the state and federal investigations of D&F, the TAC fails to show that it would have been reasonable for Herbalife to believe that D&F was likely to be shut down.

> 2 The loss of a supplier is not necessarily material, since a company might be able to obtain its requirements on short notice from a different supplier. Plaintiffs have not actually alleged that if D&F had been shut down completely, Herbalife would have been unable to find another supplier to replace D&F. However, in light of the fact that D&F supplied Herbalife with finished products comprising the majority of the products sold by Herbalife, as well as the necessity of drawing all reasonable inferences in favor of the non-moving party when deciding a motion to dismiss, the Court will assume for present purposes that the loss of D&F would have been material to Herbalife.

[*10] If plaintiffs alleged that at the time it made any of the above-mentioned public statements, Herbalife

Case 3:07-cv-05585-JSW   Document 78-2   Filed 02/21/2008   Page 5 of 60

Page 4
1996 U.S. Dist. LEXIS 11484, *

knew or should have known that the state or FDA was about to file for an injunction shutting down D&F, that would establish--at least for purposes of a *Rule 12(b)(6)* motion--a duty on the part of Herbalife to disclose that information. But there is no allegation that either the state or FDA ever sought or considered seeking an injunction against D&F to force it out of business. If plaintiffs alleged that Herbalife knew or should have known that either regulator believed D&F's noncompliance serious enough to warrant the drastic measure of a total shutdown, that too would be material. But there is no allegation that either the state or FDA ever believed it necessary or appropriate to attempt to close down D&F. [3] If plaintiffs alleged that at the time of any of Herbalife's public statements, D&F's regulatory problems were materially affecting its ability to supply Herbalife, that would support the existence of a duty on the part of Herbalife to disclose that information. But there is no allegation that at any time during the class period, D&F's ability to supply Herbalife was ever [*11] impaired in any manner. Even if plaintiffs only made the legally insufficient fraud-by-hindsight allegation that *after* Herbalife made the allegedly fraudulent public statements, D&F's regulatory problems materially affected Herbalife, their claim would be more plausible. [4] But tellingly, there is no allegation that at any time in the more than three and a half years since D&F came under regulatory scrutiny, D&F's ability to supply Herbalife has ever been impaired in any manner.

3   The closest thing to an indication that either regulator was considering attempting to shut down D&F is the boilerplate language cited by plaintiffs from FDA'S June 2, 1992 warning letter stating that FDA reserved the right to pursue further action, including "seizure and/or injunction," if D&F failed to bring itself into compliance. TAC P39(b). It is commonly known that FDA, like most agencies, issues untold numbers of warning letters and informal communications, but only in extremely rare circumstances takes the drastic step of going to court in order to shut down a business. *See* Peter Barton Hutt & Richard A. Merrill, *Food and Drug Law* 1205 (2d ed. 1991). In other words, under the circumstances as alleged, FDA's warning letters would not reasonably have led Herbalife to believe that D&F was in real danger of being shut down.

[*12]
4   "Fraud by hindsight" denotes the fallacious argument that when a firm "bathes itself in a rosy light" and then later "discloses that things are less than rosy," "the difference *must be* attributed to fraud." *DiLeo v. Ernst & Young, 901 F.2d 624, 627-28 (7th Cir.), cert. denied, 498 U.S. 941, 112*

*L. Ed. 2d 312, 111 S. Ct. 347 (1990)* (emphasis added); *See also In re GlenFed, Inc. Sec. Litig., 42 F.3d 1541, 1548-49 & n.8 (9th Cir. 1994)* (en banc); *Denny v. Barber, 576 F.2d 465, 469 (2d Cir. 1978)* (Friendly, J.); *Greenstone v. Cambex Corp., 975 F.2d 22, 25-26 (1st Cir. 1992)* (Breyer, J.).

   Plaintiffs have not alleged facts sufficient to prove that Herbalife had a duty to disclose its alleged knowledge that D&F was experiencing regulatory problems, because even taking their allegations as true, they cannot prove that D&F's regulatory problems were material to Herbalife. [5] The Court therefore holds that, as in the SAC, plaintiffs' allegations regarding D&F fail to state a claim under *Rule 10b-5*. The Court grants defendants' motion to dismiss these allegations under *Rule [*13] 12(b)(6)*. This claim is hereby DISMISSED WITH PREJUDICE.

5   Plaintiffs contend that Herbalife's omission of information regarding D&F's regulatory troubles from Herbalife's public statements violated Item 303 of SEC Regulation S-K, which provides that a company must disclose "known trends or any known . . . events or uncertainties" that are reasonably likely to have a material affect on the company. *17 C.F.R. § 229.303(a)(1)-(3)* & Instruction 3. As already stated, the Court finds that plaintiffs' allegations do not support their argument that D&F's regulatory troubles were reasonably likely to have a material effect on Herbalife. But in any event, a violation of Item 303 is not necessarily a violation of *Rule 10b-5*, because the two provisions implement different standards for disclosure. *See Alfus v. Pyramid Technology Corp., 764 F. Supp. 598, 608 (N.D. Cal. 1991) (citing SEC Release No. 33-6835, 6Fed. Sec. L. Rep. (CCH) P 73,193, n.13 at 62,843 (May 18, 1989)). Accord In re Caere Corp. Sec. Litig., 837 F. Supp. 1054, 1061-62 n.4 (N.D. Cal. 1993); In re Rasterops Corp. Sec. Litig.,* Fed. Sec. L. Rep. (CCH) P 97,445, at 96,488 (N.D. Cal. 1993). The standard of materiality applicable to the instant case balances the probability of occurrence and magnitude of effect of the contingency whose disclosure is at issue in order to determine whether there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic, Inc.,* 485 U.S. at 231-32, 108 S. Ct. at 983 (*quoting TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S. Ct. 2126, 2132, 48 L. Ed. 2d 757 (1976)).

[*14]

3. Non-Disclosures Regarding Tele-Conferencing, Satellite Education and Training Costs for Distributors During the Fourth Quarter of 1994

In 1994, Herbalife disclosed that it was undertaking a plan to develop educational programs for its distributors. This disclosure was allegedly fraudulent because defendants failed to add that these programs would cost money, and would therefore decrease Herbalife's net income. TAC PP56-60. In the First Order, the Court held that these allegations did not state a claim for fraud, because it was an obvious fact that it would cost money to undertake these programs. The TAC makes no substantive changes to these allegations.

As the Court concluded in the First Order, even if proven at trial, these allegations would not constitute fraud under *Rule 10b-5*. The Court therefore grants defendants' motion to dismiss these allegations under *Rule 12(b)(6)*. This claim is hereby DISMISSED WITH PREJUDICE.

4. Defendants' Alleged Market Manipulation Activities

a. Conference Call

The SAC alleged that on January 14, 1995, unidentified defendants made a statement to unnamed distributors and "stock market professionals" in a conference call that the January [*15] 19, 1995 announcement of Herbalife's 1994 earnings would "blow the doors off anything" that Herbalife had previously issued. SAC P63. In the First Order, the Court held that these allegations did not state a claim for fraud because the alleged statement was not made in public and there was "no allegation that the statement was incorporated into any analyst's report or Otherwise relied upon by the market in pricing Herbalife's stock." First Order at 6.

The only substantive change made by the TAC with respect to these allegations is to name defendant Hughes as the speaker of the alleged statement. *See* TAC PP64-65. This amendment in no way relates to the defects pointed out by the Court in the First Order. There is still no allegation that the alleged statement made its way into the market, so these allegations fail to state a claim for fraud. The Court therefore grants defendants' motion to dismiss these allegations under *Rule 12(b)(6)*. This claim is hereby DISMISSED WITH PREJUDICE.

b. Sale of Put Contracts

The SAC alleged that some unknown person or persons, possibly defendants, purchased 400 put contracts for 40,000 shares of Herbalife stock which became very valuable a few [*16] days later when the share price dropped. Plaintiffs based the allegation on "speculation" by some distributors "as to defendants' involvement." SAC P64. In the First Order, the Court dismissed this claim because plaintiffs failed even to allege that one of the defendants purchased the puts and thus could not possibly prove that a defendant was guilty of market manipulation.

In the TAC, plaintiffs substitute "discussion 'on the street' and In the financial markets regarding defendants' involvement" for the SAC's reference to the distributors' "speculation as to defendants' involvement." TAC 165. This semantic change does not even pretend to address the defect pointed out in the First Order. Plaintiffs have still failed even to allege that a defendant in this case purchased the put contracts, so these allegations fail to state a claim under *Rule 10b-5*. The Court grants defendants' motion to dismiss these allegations under *Rule 12(b)(6)*. This claim is hereby DISMISSED WITH PREJUDICE.

B. Failure to Satisfy Rule 9(b)

As another ground for dismissal, defendants argue that the allegations of fraud contained in the TAC are insufficiently particularized under Fed. R. Civ. P, 9(b). [*17] *Rule 9(b)* requires that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."

In a recent en banc opinion, the Ninth Circuit clarified the requirements of *Rule 9(b)*. *In re GlenFed, Inc. Sec. Litig., 42 F.3d 1541 (9th Cir. 1994)* (en banc). The Court held that in light of the clear language of the rule requiring that "the circumstances constituting fraud" be set forth with particularity, a securities fraud complaint must "set forth an explanation as to why the statement or omission complained of was false or misleading." *Id. at 1548. Rule 9(b)*'s particularity requirement obliges plaintiffs to "set forth *more* than the neutral facts necessary to identify the transaction. The plaintiff must set forth what is false or misleading about a statement, and why it is false." *Id.* (emphasis in original). [6]

[6] The first holding of *GlenFed* is that a securities fraud plaintiff does *not* have to "plead facts giving rise to a strong inference of fraudulent intent, *id. at 1545* (internal quotation marks omitted), in contrast to the Second Circuit's rule that scienter must be pleaded with particularity. *See In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 268-70 (2d Cir. 1993), cert. denied, 114 S. Ct. 1397 (1994); Ross v. A.H. Robins Co., 607 F.2d 545,*

*558 (2d Cir. 1979), cert. denied, 446 U.S. 946, 64 L. Ed. 2d 802, 100 S. Ct. 2175 (1980).* In so holding, the Court relied on the plain language of *Rule 9(b)*: "Malice, intent, knowledge, and other condition of mind may be averred generally." The Court expressly acknowledged that "when a complaint alleges with particularity the circumstances constituting fraud, as required by the rule, then generally it will also have set forth facts from which an inference of scienter could be drawn." *GlenFed, 42 F.3d at 1546.* In other words, *Rule 9(b)* does not contain "an independent requirement"--in addition to its requirement that a plaintiff make particularized allegations of the circumstances constituting fraud--that the plaintiff also "allege with particularity facts giving rise to an inference of scienter." *Id.* Judge Norris, concurring, took the position that in spite of the majority's insistence that it was rejecting the "strong inference" requirement, the majority in reality adopted that requirement indirectly. *Id. at 1554* (Norris, J., concurring) (majority opinion "effectively read[s] into the Rule a requirement that plaintiffs plead facts giving rise to an inference of falsity"). This dispute need not concern the Court in this case, since defendants do not challenge plaintiffs' pleading of scienter.

[*18]

The particularity requirement is designed "to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Neubronner v. Milken, 6 F.3d 666, 671 (9th Cir. 1993).* In order to provide this required notice, "the complaint must specify such facts as the times, dates, places, benefits received, and other details of the alleged fraudulent activity." *Id. at 672* (citations omitted). *Accord DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir.), cert. denied, 498 U.S. 941, 112 L. Ed. 2d 312, 111 S. Ct. 347 (1990)* ("Although states of mind may be pleaded generally, the 'circumstances' must be pleaded in detail. This means the who, what, when, where, and how: the first paragraph of any newspaper story").

The en banc Court in *GlenFed* confirmed that a complaint must "set forth 'specific descriptions of the representations made, [and] *the reasons for their falsity.*'" *42 F.3d at 1548* (quoting *Blake v. Dierdorff, 856 F.2d 1365, 1369 (9th Cir. 1988))* (emphasis and alteration in original). *See also Moore v. Kayport Package Express,* [*19] *Inc., 885 F.2d 531, 540 (9th Cir. 1989)* (cited with approval in *GlenFed, 42 F.3d at 1548*) (complaint must include allegations as to time, place, and nature of fraudulent activities). "*GlenFed* requires a plaintiff to

plead evidentiary facts and the court to consider what inferences these facts will support . . . and whether they are sufficient to satisfy the specificity requirement of *Rule 9(b).*" *Fecht v. Price Co., 70 F.3d 1078, 1082 (9th Cir. 1995).* In the case of corporate fraud and where the matters at issue are within the opposing party's knowledge, the *Rule 9(b)* requirements are relaxed to some extent. *Wool v. Tandem Computers, 818 F.2d 1433, 1439 (9th Cir. 1987).* "In such cases, the particularity requirement may be satisfied if the allegations are accompanied by a statement of facts upon which belief is founded." *Id.*

1. Misrepresentations Relating to the Use of Proceeds From Defendants' October 8, 1993 Stock Offering.

The TAC repeats the SAC's claim that defendants misrepresented in the prospectus for Herbalife's October 1993 stock offering that the proceeds from the offering would be used to develop a catalog business. Plaintiffs' argument was [*20] based on the allegation that the approximately $ 25 million raised by the offering was in fact not used to develop a catalog business. In the First Order, the Court found that this claim failed to comply with *Rule 9(b)* as interpreted by *GlenFed* because "all plaintiffs have is an after-the-fact showing that the money was not used to develop a catalog business," with no explanation as to why the representation was false when made. First Order at 8.

In the TAC, plaintiffs attempt to cure this defect by alleging on information and belief that "defendants had no intention to utilize the $ 25 million that the Company raised from the stock offering to develop a catalog business at the time that the representations in the Prospectus were made. In fact, defendants did not intend to start a catalog business at the time of the October 1993 securities offering because they understood that if they were to start such a business, it would directly compete with and alienate Herbalife's distributors, thereby negatively impacting the Company's overall revenue and earnings." TAC P34.

Unfortunately for plaintiffs, they have alleged no factual basis for their belief that defendants never intended [*21] to use the offering proceeds to develop a catalog business. Even their speculation that such a business would undermine Herbalife's sales through distributors is belied by the fact that Herbalife did, in fact, start a catalog business last year. *See id.* Plaintiffs' simple *post hoc* showing that the proceeds were not (at least not immediately) used to develop a catalog business is insufficient under *Rule 9(b)* because it does not "explain how and why the statement was misleading when made." *GlenFed, 42 F.3d at 1549.* Nor have plaintiffs even pre-

sented any facts to support their bare allegation of contemporaneous falsity. [7]

> 7  As defendants correctly point out, plaintiffs' use-of-proceeds allegations are also legally insufficient because plaintiffs have not alleged how they could have been injured by Herbalife's use of the proceeds for a purpose other than developing a catalog business.

As the Court concluded in the First Order, these allegations do not set forth with particularity the circumstances [*22] constituting the alleged fraud. The Court therefore grants defendants' motion to dismiss these allegations under *Rule 9(b)*. This claim is hereby DISMISSED WITH PREJUDICE.

### 2.  Misrepresentations Relating to Herbalife's European Operations.

In the SAC, plaintiffs alleged that various public statements made by defendants "throughout 1994" regarding Herbalife's continued success and bright future prospects were false or misleading because of information contemporaneously known by defendants regarding problems in Herbalife's European operations. SAC P42. The public statements alleged to be fraudulent were made between March 15, 1994 and October 28, 1994. SAC P45 Specifically, plaintiffs alleged that Herbalife was losing many of its European distributors as a result of scrutiny by local regulatory and taxing authorities, and that many of its European distributors were refusing to pay for shipped product and were returning unsold product. SAC P43.

In the SAC, plaintiffs alleged that "during 1994, Company officials admitted to private, non-public financial market analysts and investigators that Herbalife was encountering problems in its European operations," as described above. [*23] *Id.* The alleged fraud consists of making optimistic public statements not mentioning these problems while knowing that the problems existed and were material, with such knowledge shown by defendants' private, contemporaneous admissions. *See In re Wells Fargo Sec. Litig., 12 F.3d 922, 930 (9th Cir. 1993), cert. denied, 115 S. Ct. 295 (1994)* (statements of opinion or belief are actionable under *Rule 10b-5* if "the speaker is . . . aware of any undisclosed facts tending to seriously undermine the accuracy of the statement") (citation omitted).

Under *GlenFed*, then, plaintiffs must plead evidentiary facts sufficient to satisfy *Rule 9(b)*'s particularity requirement that could support a jury finding that the maker of any of the public statements enumerated in the complaint was aware of facts tending seriously to undermine their accuracy. The Court dismissed this claim under *Rule 9(b)* because the SAC did not specify the dates, places, or other circumstances of the alleged admissions, the identity of the defendant or defendants who made those admissions, the identity of the individuals to whom the admissions were made, the benefits received by defendants, or any other details [*24] of the allegedly fraudulent activity.

In the TAC, plaintiffs now allege that "in September and October 1994, during meetings and/or telephone conversations, Company officials admitted to private, non-public financial market analysts and investigators that Herbalife had been encountering significant problems in its European operations." TAC P43. Plaintiffs allege that "the Company officials who made these admissions included some but not all of the defendants. Defendants did not indicate in these statements to analysts when they knew that the Company's European problems had arisen." *Id.*

The Court finds that plaintiffs have not cured the deficiencies that required the SAC to be dismissed. Plaintiffs still have not alleged who made the alleged admissions, to whom, when, where, or in what circumstances. The TAC satisfies *GlenFed* in the sense that it alleges why the public statements were fraudulent--in other words, if a defendant made one of the public statements while knowing facts undermining its accuracy, that would constitute actionable fraud. But it utterly fails to meet *GlenFed's* pleading requirement with respect to the circumstances of this alleged fraud--in other [*25] words, to plead evidentiary facts with sufficient particularity under *Rule 9(b)* that tend to establish the fraud. *Fecht, supra. See also Kowal v. MCI Communs. Corp., 305 U.S. App. D.C. 60, 16 F.3d 1271, 1278 (D.C. Cir. 1994)* (plaintiffs must "plead sufficient facts that if true would substantiate the charge that the company lacked a reasonable basis for its projections or issued them in less than good faith") (citation omitted).

Narrowing the time frame of the alleged admissions to September and October 1994 is the only real step [8] plaintiffs have taken in response to the First Order, and it is insufficient because plaintiffs have still failed to plead any evidentiary facts showing that any optimistic public statement was made after the speaker had made or learned of a contrary private admission. In other words, plaintiffs have still failed to allege any basis for their claim that the public statements were false when made.

> 8  The allegation that the admissions were made "during meetings and/or telephone conversations" is not a real step, because it provides no additional particularity regarding the circumstances of the alleged fraud. Most business statements are

made in meetings or phone conversations, so without specifying anything more about the alleged meetings and conversations, this allegation adds nothing.

[*26] Plaintiffs now say that they believe five of the individual defendants were aware of the European problems, based on those defendants' duties and access to information at Herbalife, but plaintiffs still do not say which of these five defendants made which of the alleged admissions. TAC P43. The TAC also provides no additional information as to the content or context of any of the alleged admissions.

Without more particularized allegations, no defendant can know what fraudulent conduct he is being charged with, or indeed, whether he is even being charged with fraud at all. *Rule 9(b)* is designed to avoid such an untenable situation by requiring plaintiffs to make allegations of fraud that are "specific enough to give defendants notice of the particular misconduct charged so that they can defend against the charge and not just deny that they have done anything wrong." *Neubronner, 6 F.3d at 671 (quoting Semegen v. Weidner, 780 F.2d 727, 731 (9th Cir. 1985))*.

As the Ninth Circuit explained in *GlenFed,* "often there is no reason to assume that what is true at the moment plaintiff discovers it was also true at the moment of the alleged misrepresentation, and that therefore [*27] simply because the alleged misrepresentation conflicts with the current state of facts, the charged statement must have been false." *42 F.3d at 1548.* Applied to the instant case, this statement reads as follows: "there is no reason to assume that what was true as of January 1995 when Herbalife announced its disappointing results--that defendants knew Herbalife's European operations were encountering problems--was true between March and October 1994 when defendants made the alleged misrepresentations." Because "it is clearly insufficient for plaintiffs to say that the later, sobering revelations make the earlier, cheerier statement a falsehood," plaintiffs "must set forth, as part of the circumstances constituting fraud, an explanation as to why the disputed statement was untrue or misleading *when made.* This can be done most directly by pointing to inconsistent contemporaneous statements or information (such as internal reports) which were made by or available to the defendants." *Id. at 1548-49* (emphasis in original). Such statements and information would be the "evidentiary facts" that could support an inference of fraud, and *GlenFed* requires that they be set forth in the [*28] complaint "sufficiently to satisfy the specificity requirement of *Rule 9(b)." Fecht, 70 F.3d at 1082.* This is what it means to "state[] with particularity" "the circumstances constituting fraud." *Fed. R. Civ. P. 9(b).*

Plaintiffs have failed to point to any inconsistent contemporaneous statements made by any of the defendants; plaintiffs say that such statements were made, but all they have is that bare allegation. As with certain allegations which the Ninth Circuit found insufficient under *Rule 9(b)* in *GlenFed,* "the statements are identified, and their falseness is alleged, but 'the reasons for their falsity' are not set forth" with the requisite particularity. *42 F.3d at 1552 (quoting Blake v. Dierdorff, 856 F.2d 1365, 1369 (9th Cir. 1988).* Rather than the particularity demanded by *Rule 9(b)*--the "dates, places, benefits received, and other details of the alleged fraudulent activity," *Neubronner, supra*--plaintiffs' complaint offers no more information than that unspecified defendants made unspecified admissions to unspecified others at unspecified times in unspecified circumstances.

In *GlenFed* itself, where the Court only "reluctantly concluded," *42 F.3d at [*29] 1549,* that the complaint complied with *Rule 9(b),* the plaintiffs' allegations were far more particularized than in this case. The plaintiffs claimed that GlenFed's statement that it expected no net loss on the sale of its subsidiaries was fraudulent because GlenFed knew at the time that such favorable dispositions were infeasible. As their exposition of the circumstances of the fraud, the plaintiffs pointed to a specific contemporaneous document--GlenFed's Strategic Plan--that projected a large loss on the sale of those subsidiaries. *Id. at 1550.* In addition, the plaintiffs identified specific statements made at specific board meetings that showed the contemporaneous falsity of GlenFed's optimistic statement. *Id.* The plaintiffs also claimed that GlenFed represented that its internal controls and loan loss reserves were adequate, while at the same time admitting privately that they were not. Again, the plaintiffs pointed to a specific contemporaneous document from GlenFed's Internal Audit Department stating that "both the adequacy of and adherence to internal controls, policies and procedures need improvement, including the monitoring of loans to one borrower . . . [which] [*30] present special risks." *Id.* (alteration in original). The plaintiffs also cited a specifically identified proposal submitted contemporaneously to GlenFed by Deloitte & Touche that expressed similar concerns. *Id. See also Adam v. Silicon Valley Bancshares, 884 F. Supp. 1398, 1403 (N.D. Cal. 1995)* (complaint satisfied *Rule 9(b)* where plaintiffs identified specific loans which should have been classified as non-performing, identified specific internal controls that were allegedly deficient, and stated the amount by which the omissions rendered the reports inaccurate); *Fecht, 70 F.3d at 1083* (plaintiffs complied with *Rule 9(b)* by citing specific problems contemporaneously known to defendants involving specific new stores in support of their claim that defendants' representations regarding the success of the Price Company's retail expansion program were fraudulent). [9]

9    The plaintiffs in *Wells Fargo* alleged that Wells Fargo fraudulently understated its non-performing asset and loan loss reserve levels by failing to take into account specifically identified uncollectible loans that it knew were uncollectible. *12 F.3d at 925.* The Ninth Circuit in *Fecht* cited *Wells Fargo* for the proposition that "allegations of specific problems undermining a defendant's optimistic claims" satisfy *Rule 9(b)*, *70 F.3d at 1083*, but the *Wells Fargo* Court's only mention of *Rule 9(b)* was to note that all parties agreed that the district court had *not* relied on *Rule 9(b)* in dismissing the complaint. *12 F.3d at 924 n.1.* In any event, plaintiffs in this case have not provided nearly as much particularity as the plaintiffs in *Wells Fargo,* who identified specific problem loans and explained how Wells Fargo was on notice of those problems at the time it made the allegedly misleading statements. *Id. at 926.*

[*31]    The Court observes that plaintiffs have pleaded one allegation with particularity, but that allegation does not explain why the public statements were false when made and thus must be dismissed under *GlenFed.* Plaintiffs allege that "defendant Hughes admitted to a group of Herbalife distributors during a Company 'Extravaganza' held in Denver, Colorado, in June 1995 that during 1994 Herbalife's sales in France had declined from an average of $ 9 million per month to just $ 1 million per month as a result of these significant problems being encountered with the Company's distributors. While defendant Hughes admitted in June 1995 that the foregoing conditions were known in 1994, he did not advise the distributors as to when these facts were known to him." TAC P43.

Plaintiffs have alleged plenty of "evidentiary facts" regarding Hughes' alleged statement in Denver, but their allegations do not support an inference of fraud. *Fecht, 70 F.3d at 1082.* In January 1995, five months before Hughes' alleged statement in Denver, Herbalife publicly reported the decline in French sales; there is no dispute that the decline occurred. But in order to prove fraud, plaintiffs have to prove that [*32] a statement was false when made. The allegation of Hughes' statement in Denver in no way explains how or why any public statement was fraudulent, because it does not specify when in 1994 this information was known or by whom.

In other words, if plaintiffs alleged that Hughes made this statement in June *1994*--before many of the public statements were made--that allegation would provide sufficiently particularized evidentiary facts that could support the inference that some of the public statements were false when made. The same would be true if plaintiffs alleged that in June 1995, Hughes stated to the distributors that he had known about the French problems in June 1994. [10]

10    In fact, if plaintiffs provided this level of evidentiary particularity with respect to their fatally vague allegation of admissions in September and October 1994 of European problems, that would bring that allegation into compliance with *Rule 9(b).* Thus, if plaintiffs alleged, for example, that in October 1994, Hughes admitted to a group of Herbalife distributors gathered in Denver at a company "Extravaganza" that "Herbalife had been encountering significant problems in its European operations," TAC P43--as opposed to alleging that unspecified individuals made that admission to unspecified others in unspecified meetings or conversations--then plaintiffs would state a claim for fraud as to the public statements made after such admission.

[*33]    But plaintiffs have not alleged when in 1994 the French problems were known (or by whom). If they only became known in November or December 1994, none of the public statements would have been false when made. (It will be recalled that the latest public statement challenged by plaintiffs was made on October 28, 1994. TAC P45.) If the problems became known in January or February 1994, all of the public statements would have been false when made (at least for purposes of a motion to dismiss). Because plaintiffs provide no factual basis for their assertion that the truth lies closer to the latter scenario, this claim must be dismissed.

The Court concludes that plaintiffs' allegations regarding problems in Herbalife's European operations are woefully inadequate in light of both of *Rule 9(b)*'s purposes; "to prevent the filing of a complaint as a pretext for the discovery of unknown wrongs," and to "give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong," *Semegen, 780 F.2d at 731.*

A further, independent reason for dismissing this claim is that [*34] plaintiffs have failed to allege that the European problems were material to Herbalife's operations as a whole, and thus have failed to allege a basis for their claim that defendants had a duty to disclose the European problems. Simply changing "many" to "a substantial and material number," *see* TAC P43, is insufficient; plaintiffs must allege a basis for their characterization of the problems as material. The TAC contains no information or allegations regarding the actual amount of any injury caused by the European problems. Plaintiffs rely on defendant Hughes' statement in June 1995 that "during 1994 Herbalife's sales in France had declined

from an average of $ 9 million per month to just $ 1 million per month" because of the problems with the European distributors, and they allege on information and belief that as a result of the European problems, "defendants knew that Herbalife's European operations were achieving results that were less than those publicly represented and less than those that had been projected." *Id.* But while the reduction in French sales might be obviously material to Herbalife's French operations, it is not at all obvious whether it is material to Herbalife's [*35] European operations (which apparently grew by 20 percent in 1994 despite the French problems), much less Herbalife's far larger worldwide operations as a whole. *See* Defendants' Brief at 19. And plaintiffs do not even allege, even on information and belief, that defendants knew that Herbalife's European operations were achieving results that were *materially* less than projected.

The Court acknowledges that "whether an omission is 'material' is a determination that 'requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him,' and these assessments are peculiarly ones for the trier of fact," *Fecht, 70 F.3d at 1080 quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 450, 48 L. Ed. 2d 757, 96 S. Ct. 2126 (1976)),* but unlike with scienter, plaintiffs cannot allege materiality "simply by saying that [it] exist[s]." *GlenFed, 42 F.3d at 1547.* Plaintiffs must allege some basis in fact for their asserted legal conclusion that an omission was material, and they have failed to do so. Plaintiffs' failure adequately to allege the materiality of these omissions constitutes [*36] another ground for dismissal of this claim.

For the reasons expressed, the Court finds that plaintiffs' allegations regarding problems with Herbalife's European operations fail to set forth with particularity the circumstances constituting the alleged fraud. The Court therefore grants defendants' motion to dismiss these allegations under *Rule 9(b).* This claim is hereby DISMISSED WITH PREJUDICE.

3. Misrepresentations and Non-Disclosures Relating to Herbalife's Accounts Receivable

The TAC repeats the SAC's allegations that in various public statements made during 1994, defendants fraudulently failed to include reserves for uncollectible accounts receivable and fraudulently overstated Herbalife's sales and accounts receivable. TAC PP48-49. As the basis for their allegation that the public statements should have included such a provision, plaintiffs make practically verbatim the same allegations as in support of their European operations claim, addressed *supra.* Defendants' knowledge of the doubtful collectibility of certain European accounts receivable is alleged to be demonstrated by the same unspecified admissions by unspecified persons to unspecified persons at unspecified [*37] times and in unspecified circumstances. As the Court found with respect to the European operations claim, plaintiffs have failed to set forth with particularity the circumstances constituting the alleged fraud.

The only new wrinkle is plaintiffs' allegation that Herbalife fraudulently recognized certain consignment transfers to German distributors as sales, in violation of generally accepted accounting principles. But as with the other allegations, all plaintiffs say regarding the circumstances of this alleged fraud is that "Defendants knew and admitted to private, non-public market analysts and investigators during meetings and/or telephone conversations occuring [sic] during October 1994 that they were aware of the status of the consignment transfers to its [sic] German distributors." TAC P49 This allegation is insufficient under *Rule 9(b)* because it does not set forth who made the alleged admissions, to whom, where, when, or in what circumstances. Moreover, plaintiffs have failed to allege anything about the consignment transfers, including to whom they were made, when they were made, how many of them were made, or how much revenue was recognized because of them. [11]

> 11  In addition, the Court's observations in the section dealing with the European operations claim with regard to materiality apply with full force here. The TAC provides no clue whatever as to the amount of any uncollectible accounts receivable or of any wrongfully recognized revenue, and thus fails to state a basis for its allegation of materiality.

[*38] Because plaintiffs have failed to set forth with particularity evidentiary facts that "give defendants notice of the particular misconduct charged so that they can defend against the charge and not just deny that they have done anything wrong," *Semegen, 780 F.2d at 731,* and that could support an inference of fraud, *Fecht, 70 F.3d at 1082,* the Court grants defendants' motion to dismiss these allegations under *Rule 9(b).* This claim is hereby DISMISSED WITH PREJUDICE.

4. Misrepresentations and Non-Disclosures Relating to Herbalife's Inventory Valuation

As in the SAC, plaintiffs allege that various public statements made by defendants should have included "reserves for obsolete inventory or the diminished value of inventory being returned by disgruntled distributors."

TAC P52. The TAC does not add anything of substance to the allegations in the SAC, and as with the accounts receivable claim, plaintiffs' inventory claim is entirely dependent on the same vague and conclusory allegations that the Court found insufficient under *Rule 9(b)* for purposes of the European operations claim. [12] Plaintiffs' inventory allegations fail to set forth the circumstances constituting [*39] the alleged fraud with the requisite particularity, so the Court grants defendants' motion to dismiss these allegations under *Rule 9(b)*. This claim is hereby DISMISSED WITH PREJUDICE.

12    Moreover, the court's analysis of plaintiffs' failure adequately to allege materiality applies to this claim as well. Plaintiffs nowhere allege how much the inventory returned by distributors was worth, which distributors returned what inventory, or when any of this occurred. The TAC thus provides absolutely no basis for plaintiffs' allegation that defendants' omission of a returned-inventory reserve was material.

5.    Misrepresentations and Non-Disclosures Relating to Capitalization of Costs of Product and Market Expansion

As in the SAC, plaintiffs allege in the TAC that defendants fraudulently reported Herbalife's income and profits through excessive capitalization of product- and territory- expansion costs. TAC P54. The alleged fraud consists of defendants' failure "to write off such capitalized costs in amounts [*40] and at rates greater than defendants had originally established" in light of the problems developing with the European operations. TAC P55. Yet again, plaintiffs rely on the same vague and conclusory allegations as they first presented in connection with their European operations claim. Plaintiffs' allegations entirely fail to explain how or why the public statements reporting Herbalife's capitalization of costs were misleading when made. The Court's analysis of the European operations, accounts receivable, and inventory claims is equally applicable to plaintiffs' capitalization of costs allegations, [13] so the Court must grant defendants' motion to dismiss these allegations under *Rule 9(b)*. This claim is hereby DISMISSED WITH PREJUDICE.

13    Plaintiffs have also failed to set forth a basis for their allegation that defendants' failure to write off part of the capitalized costs was material. The TAC says nothing whatever about how much should have been written off and when.

6.    Misrepresentations Regarding [*41] the Company's Anticipated Fourth Quarter 1994 Earnings

The TAC repeats the allegation in the SAC that defendants fraudulently represented that Herbalife would report earnings per share of $ 0.45 to $ 0.55 for the fourth quarter of 1994. TAC P61. Plaintiffs allege that these representations were false when made because of knowledge contemporaneously possessed by defendants regarding problems in Herbalife's European operations. This claim, like plaintiffs' accounts receivable, inventory, and capitalization of costs claims, depends upon the same inadequately particularized allegations as plaintiffs' European operations claim. Because the allegations in the TAC fail to set forth with particularity evidentiary facts that could support a finding of contemporaneous falsity, the Court grants defendants' motion to dismiss these allegations under *Rule 9(b)*. This claim is hereby DISMISSED WITH PREJUDICE.

7.    Non-Disclosures Regarding Tele-Conferencing, Satellite Education and Training Costs for Distributors During the Fourth Quarter of 1994

The Court has already concluded that these allegations fail to state a claim for fraud, and thus that they must be dismissed under *Rule 12(b)(6)*, [*42] *see* p. 10, *supra*. The Court further finds that these allegations are insufficient under *Rule 9(b)* because plaintiffs have not set forth an explanation as to why the public statements disclosing Herbalife's training programs for distributors were false when made. Because these allegations fail to set forth with particularity the circumstances constituting the alleged fraud, the Court finds that *Rule 9(b)* provides a second, equally valid ground for dismissing this claim with prejudice.

*C. Control Person Liability*

Count two of the TAC asserts a claim against defendants Herbalife and Hughes for violation of § 20(a) of the Exchange Act, *15 U.S.C. § 78t(a)*. Section 20(a) provides as follows: "Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person. . . ." Any liability of Herbalife or Hughes under § 20(a) would thus be derivative of a finding of liability under § 10(b) and *Rule 10b-5*

on plaintiffs' first cause of action. *E.g., In re Syntex Corp. Sec. Litig., 855 F. Supp. 1086, 1098* [\*43] *(N.D. Cal. 1994).* Since the Court has concluded it must dismiss plaintiffs' underlying *Rule 10b-5* claims against the controlled persons, it must also dismiss plaintiffs' claim under § 20(a) for control person liability. The Court therefore grants defendants' motion to dismiss count two of the TAC. This claim is hereby DISMISSED WITH PREJUDICE.

### D. Individual Defendants' Motion to Dismiss

In view of the Court's disposition of the motion to dismiss filed by defendants Herbalife, Hughes, and Hattendorf, in which the Individual Defendants joined, the Court need not address the Individual Defendants' separate motion to dismiss.

### III. Conclusion

In deciding motions to dismiss securities fraud complaints, courts must attempt to balance two competing policies: deterring fraud and deterring frivolous litigation. *See, e.g., Time Warner, 9 F.3d at 263* (securities fraud cases involve "inevitable tension between two powerful interests"). The "widespread recognition that litigation under *Rule 10b-5* presents a danger of vexatiousness different in degree and in kind from that which accompanies litigation in general," *Blue Chip Stamps v. Manor Drug Stores, 421 U.S.* [\*44] *723, 739, 95 S. Ct. 1917, 1927, 44 L. Ed. 2d 539 (1975),* counsels judicial vigilance against strike suits. Since the danger of "attrition by discovery," *Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1096, 111 S. Ct. 2749, 2760, 115 L. Ed. 2d 929 (1991),* is so great in this field, courts must guard against "the filing of a complaint as a pretext for the discovery of unknown wrongs." *Semegen, 780 F.2d at 731.* [14]

14  *See also Blue Chip Stores, 421 U.S. at 740, 741, 95 S. Ct. at 1927, 1928* ("in the field of federal securities laws governing disclosure of information even a complaint which by objective standards may have very little chance of success at trial has a settlement value to the plaintiff out of any proportion to its prospect of success at trial so long as he may prevent the suit from being resolved against him by dismissal or summary judgment"; "to the extent that [discovery] permits a plaintiff with a largely groundless claim to simply take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value, rather than a

reasonably founded hope that the process will reveal relevant evidence, it is a social cost rather than a benefit"); *GlenFed, 42 F.3d at 1555* (Norris, J., concurring) (referring to "these legitimate concerns about nuisance actions based upon the *in terrorem* effect of discovery coats in complex security fraud cases"); *Time Warner, 9 F.3d at 263* (same).

[\*45]  On the other side of the balance is the unfortunate fact that securities fraud does exist, coupled with the reality that private actions by injured investors are a "necessary supplement" to the SEC's fight against fraud. *E.g., J.I. Case Co. v. Borak, 377 U.S. 426, 432, 84 S. Ct. 1555, 1560, 12 L. Ed. 2d 423 (1964).* These considerations militate against lightly dismissing 10b-5 cases: "the interest in deterring fraud in the securities markets and remedying it when it occurs . . . is served by recognizing that the victims of fraud often are unable to detail their allegations until they have had some opportunity to conduct discovery." *Time Warner, 9 F.3d at 263.*

The Court in this case has attempted to achieve a proper balance between these two rival policies. In January 1995, plaintiffs filed two separate class action complaints in this matter, followed shortly thereafter by a third complaint. Plaintiffs subsequently attempted to cure the deficiencies present in these three pleadings by filing a first amended complaint. When the Court dismissed that complaint in June 1995, it gave plaintiffs leave to replead, and plaintiffs accordingly filed their SAC in July 1995. The Court [\*46] held a hearing at which plaintiffs were given detailed instructions as to how to replead in order to state a claim and comply with *Rule 9(b),* and the Court issued a detailed written Order dismissing the SAC on September 7, 1995 and granting plaintiffs leave to file a third amended complaint. Along with these instructions, the Court expressly and clearly warned plaintiffs that their TAC would be their last.

Now, a year after plaintiffs commenced this action, plaintiffs have cured none of the deficiencies which were present in their initial pleadings. Plaintiffs have enjoyed three opportunities to amend their complaint in order to resolve these problems, as well as extensive guidance as to how to do 50, but the TAC is largely identical to the SAC, and suffers from the same deficiencies that forced the Court to dismiss plaintiffs' previous complaints. The Court has afforded plaintiffs ample opportunity to state a claim and to comply with *Rule 9(b),* and in light of plaintiffs' repeated failure to do so, the Court concludes that allowing this action to continue would serve no constructive purpose and would further disserve the powerful interest of the Court and of the public in discouraging [\*47] and terminating meritless litigation.

1996 U.S. Dist. LEXIS 11484, *

In light of all the foregoing, the Court GRANTS defendants' motion to dismiss plaintiffs' third amended consolidated class action complaint. Plaintiffs' TAC is hereby DISMISSED WITH PREJUDICE in its entirety as to all defendants.

IT IS SO ORDERED.

DATED: 1/24/96

STEPHEN V. WILSON

UNITED STATES DISTRICT JUDGE

# EXHIBIT B

## TO APPENDIX OF AUTHORITIES CITED IN VISA'S MOTION TO DISMISS MARITZ'S FRAUD COUNTERCLAIMS

**Westlaw.**

Slip Copy                                                    Page 1
Slip Copy, 2007 WL 2406885 (N.D.Cal.)
**(Cite as: Slip Copy)**

**C**Optovue Corp. v. Carl Zeiss Meditec, Inc.
N.D.Cal.,2007.
Only the Westlaw citation is currently available.
United States District Court,N.D. California.
OPTOVUE CORPORATION, a California
Corporation, Plaintiff and Counter-Defendant,
v.
CARL ZEISS MEDITEC, INC., a New York
Corporation, Defendant and Counterclaimant.
**No. C 07-3010 CW.**

Aug. 20, 2007.

Diana Luo, James Pooley, Larry Scott Oliver,
Morrison & Foerster LLP, Palo Alto, CA, for
Plaintiff and Counter-Defendant.
Bruce E. Copeland, Donald L. Bartels, Laura
Katherine Carter, Nixon Peabody LLP, San
Francisco, CA, Gregg A. Rubenstein, Nixon Peabody
LLP, Boston, MA, for Defendant and
Counterclaimant.

ORDER GRANTING DEFENDANT'S MOTION
TO DISMISS AND MOTION FOR A MORE
DEFINITE STATEMENT

CLAUDIA WILKEN, United States District Judge.
*1 Defendant Carl Zeiss Meditec (CZM) moves
to dismiss the sixth and third claims and for a more
definite statement as to the fourth claim of Plaintiff
Optovue Corp.'s complaint. Optovue opposes the
motion. Having considered all of the papers filed by
the parties and the evidence cited therein, the Court
grants CZM's motions.

BACKGROUND

According to the complaint, Optovue is an
opthalmic device company that develops and
commercializes new imaging technologies for the
diagnosis and treatment of eye diseases. It is a new
company that began selling its product in November,
2006. CZM is an established company specializing in
opthalmic diagnosis. On June 7, 2007, CZM filed a
suit in Massachusetts state court against William
Shields, one of its former employees who left the
company to accept a position with Optovue. *Carl*

*Zeiss Meditec, Inc. v. Shields,* Massachusetts
Superior Court, Suffolk County, Civil Action No. 07-
2453.The Massachusetts suit alleges that Shields
breached his employment agreement with CZM by
failing to return all confidential information when he
departed the company and by disclosing confidential
information to Optovue. Therefore, CZM seeks
injunctive relief preventing Shields from continuing
his employment with Optovue.

On June 11, 2007, Optovue filed this suit,
seeking declaratory relief stating that, among other
things, it may continue to employ William Shields
(Sixth Claim for Relief); it has not engaged in
unlawful, unfair or fraudulent business practices
within the meaning of California Business and
Professions Code § 17200 (Fourth Claim for Relief);
and it has not infringed any of CZM's protectable
copyrights (Third Claim for Relief).

At the same time CZM filed the motions
addressed in this order, it filed an answer,
counterclaims against Optovue and third-party claims
against Jay Wei and Yonghua Zhao, former
employees of CZM who left the company to found
Optovue. CZM alleges that Wei and Zhou are
currently Optovue's chief executive officer and chief
technology officer. CZM brings claims for computer
fraud and abuse and unfair competition under the
Lanham Act against Optovue. CZM also brings
claims for trade secret misappropriation, violation of
California Business and Professions Code § 17200
and unjust enrichment against Optovue, Wei and
Zhou and for breach of contract against Wei and
Zhou.

DISCUSSION

I. Sixth Claim for Relief

Optovue's sixth claim states that CZM's "attempt
to preclude Mr. Shields from working for Optovue is
improper and seeks to deprive Optovue of its right to
free access to a national pool of potential
employees."Complaint ¶ 65. Optovue asserts that a
justiciable controversy currently exists between the
parties regarding Optovue's "and its employees' (and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                Page 2
Slip Copy, 2007 WL 2406885 (N.D.Cal.)
**(Cite as: Slip Copy)**

prospective employees') rights to be free from trade restraints." *Id.* at ¶ 66.Therefore, Optovue seeks a declaration "that it has the right to continue [to] employ Mr. Shields."*Id.* at ¶ 67.

**\*2** To the extent the claim purports to relate only to Optovue's continuing ability to employ Shields, CZM argues that the Court should decline to exercise its discretionary jurisdiction over this claim for declaratory relief because it is substantially similar to the issues in the Massachusetts suit. CZM argues that *Brillhart v. Excess Insurance Company of America,* 316 U.S. 491, 62 S.Ct. 1173, 86 L.Ed. 1620 (1942), controls. In *Brillhart,* the Supreme Court held that "it would be uneconomical as well as vexatious for a federal court to proceed in a declaratory judgment suit where another suit is pending in a state court presenting the same issues, not governed by federal law, between the same parties."*Id.* at 495.

Optovue counters that *Brillhart* is inapplicable because neither the parties nor the issues are identical in the two suits, noting that the Massachusetts suit has been filed against Shields himself and will only resolve the question of whether he can continue to be employed by Optovue. In contrast, Optovue characterizes its claim as concerning "its rights, as a California employer, to be free to hire from a national talent pool under California Business and Professions Code § 16600."Opposition at 6. However, as noted above, the complaint seeks a declaration regarding only Optovue's ability to continue to employ Shields, the exact issue to be determined in the Massachusetts action.

In *Government Employees Insurance Co. v. Dizol,* 133 F.3d 1220 (9th Cir.1998), the Ninth Circuit held, "The district court should avoid needless determination of state law issues; it should discourage litigants from filing declaratory actions as a means of forum shopping; and it should avoid duplicative litigation."*Id.* at 1225.Other concerns include:

whether the declaratory action will settle all aspects of the controversy; whether the declaratory action will serve a useful purpose in clarifying the legal relations at issue; whether the declaratory action is being sought merely for the purposes of procedural fencing or to obtain a 'res judicata' advantage; or whether the use of a declaratory action will result in entanglement between the federal and state court

systems. In addition, the district court might also consider the convenience of the parties, and the availability and relative convenience of other remedies.

*Id.* 1225 n. 5, *quoting American States Ins. Co. v. Kearns,* 15 F.3d 142, 145 (9th Cir.1994) (J. Garth, concurring). To the extent Optovue seeks a declaration of its right to continue to employ Shields, these factors weigh in favor of declining jurisdiction over Optovue's sixth claim for relief. Although the parties are not identical in the two actions, the same issues will be decided. Presumably CZM could move to join or intervene in the Massachusetts case.

Further, to the extent Optovue seeks a declaration of its rights with respect to a national pool of employees, the Court finds that it is seeking an advisory opinion. Optovue has not demonstrated that there is any justiciable question regarding its rights to do so. As CZM notes, the Massachusetts suit against Shields is based on his failure to return confidential information when terminating his employment with CZM and sharing confidential information with Optovue in breach of his termination agreement with CZM. Similarly, CZM's counterclaims against Wei and Zhou are based on specific acts they took after terminating their employment with CZM and CZM does not seek to prohibit their employment with Optovue. Therefore, there is no current question of whether CZM is seeking to prevent Optovue from hiring from a national pool of employees. Optovue may amend its sixth claim to seek a declaration of its rights to hire only persons with respect to whom it can truthfully state, within the constraints of Rule 11 of the Federal Rules of Civil Procedure, it reasonably fears being sued for hiring.

II. Motion for a More Definite Statement of the Fourth Claim

**\*3** "[T]he proper test in evaluating a motion under Rule 12(e) is whether the complaint provides the defendant with a sufficient basis to frame his responsive pleadings."*Federal Sav. and Loan Ins. Corp. v. Musacchio,* 695 F.Supp. 1053, 1060 (N.D.Cal.1988) (citing *Famolare Inc. v. Edison Bros. Stores, Inc.,* 525 F.Supp. 940, 949 (E.D.Cal.1981)).

"Motions for a more definite statement are viewed with disfavor and are rarely granted because

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2007 WL 2406885 (N.D.Cal.)

**(Cite as: Slip Copy)**

of the minimal pleading requirements of the Federal Rules."*Sagan v. Apple Computer, Inc.,* 874 F.Supp. 1072, 1077 (1994)."Rule **12(e)** is designed to correct only unintelligibility in a pleading not merely a claimed lack of detail."*FRA S.p.A. v. Surg-O-Flex of America, Inc.,* 415 F.Supp. 421, 427 (S.D.N.Y.1976). The proper tool for eliciting additional detail is discovery, not a Rule 12(e) motion. *Musacchio,* 695 F.Supp. at 1060 (citing *Kuenzell v. United States,* 20 F.R.D. 96, 98 (N.D.Cal.1957)).

A Rule **12(e)** motion may be granted, however, "where the complaint is so general that ambiguity arises in determining the nature of the claim or the parties against whom it is being made."*Sagan,* 874 F.Supp. at 1077.

CZM moves for a more definite statement of Optovue's fourth claim, which seeks a declaration "that it has not engaged in any unlawful, unfair and/or fraudulent business practices under *California Business and Professions Code* § **17200**."Complaint ¶ 57. Optovue asserts that CZM has alleged that Optovue has done so "by interfering with CZM's contractual relations with third parties."*Id.* ¶ 54.CZM argues that Optovue must identify the contractual relationships with which it believes CZM has accused it of interfering. However, the more appropriate question is on which of CZM's allegations does Optovue seek declaratory relief. Although CZM should be aware of any allegations of interference CZM has made, it is not clear if Optovue seeks a declaration of every allegation CZM has made or only particular allegations. The only third party contractual relationship mentioned in the attachments to the complaints concerns CZM's relationship with a Dr. David Huang.

Further, as currently stated, Optovue seeks a declaration that it has not engaged in any unfair competition as defined by *California Business and Professions Code* § **17200** that CZM might have alleged. In the correspondence attached to the complaints, CZM states various other concerns which could be considered allegations of violations of § **17200** .

The Court grants CZM's motion for a more definite statement. Optovue shall amend its complaint to indicate for which allegations it seeks a declaration of its rights.

III. Motion to Dismiss the Third Claim for Relief

Optovue's third claim notes that CZM has alleged that Optovue "has infringed CZM's copyrights by distributing certain marketing material entitled 'Interpretive Key.' " Complaint ¶ 49. Therefore, Optovue seeks a declaration "that it has not infringed any valid CZM copyrights." *Id.* at ¶ 52.CZM moves to dismiss the claim, arguing that it has not registered any of the material in the Interpretive Key. Therefore, CZM argues that the Court lacks subject matter jurisdiction over the claim because the Copyright Act of 1976 provides that "no action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made in accordance with this title." 17 U.S.C. § 411(a); *see also Zito v. Steeplechase Films, Inc.,* 267 F.Supp.2d 1022, 1025 (N.D.Cal.2003) ( "Registration of a copyrighted work with the Copyright Office is a prerequisite to filing suit under copyright law. Registration is a jurisdictional requirement." (internal citations omitted)); *Jefferson Airplane v. Berkeley Systems, Inc.,* 886 F.Supp. 713, 714-15 (N.D.Cal.1994) (same).

*4 Although CZM clearly cannot bring a suit for infringement of any copyright in its Interpretive Key because it has not registered that material, neither party cites any controlling case law establishing whether registration is required for Optovue's claim for declaratory relief related to the Interpretive Key and the Court is aware of none. The parties cite district court cases from other districts, one of which supports a finding of jurisdiction, *Application Science & Tech., LLC v. Statmon Techs. Corp.,* 2006 U.S. Dist. LEXIS 35885, *1 (N.D.Ill.), and two which do not, *Burns v. Rockwood Dist. Co.,* 481 F.Supp. 841 (N.D.Ill.1979); *Prospect Planet, LLC v. PaychecksforLife.com,* 2003 U.S. Dist. LEXIS 835 (D.N.D.2003).

Optovue argues that even if CZM could not actually bring a suit for infringement, there is a justiciable case or controversy because CZM has stated that Optovue's use of the Interpretive Key material "is a clear infringement of CZM's copyright."Complaint, Exhibit B at 2. Therefore, Optovue argues that it has a reasonable apprehension of litigation.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 4
Slip Copy, 2007 WL 2406885 (N.D.Cal.)
**(Cite as: Slip Copy)**

This appears to be the basis upon which the Northern District of Illinois found jurisdiction over a declaratory relief claim related to non-infringement of an unregistered copyright in *Application Science.* In that case, the party seeking the declaratory relief had been sued for infringement under "common law copyright law" in state court. 2006 U.S. Dist. LEXIS 35885, at *1. The Illinois court noted that there were no cases on point and posed the question, "can a party accuse another of infringement and prevent the alleged infringer from seeking redress by failing to bring a coercive lawsuit?" *Id.* Noting that the Copyright Act preempts any state common law copyright law and citing the policy behind the Declaratory Judgment Act, the *Application Science* court found that the answer to that question must be in the negative "when the accuser seeks to prevent the alleged infringer from seeking redress by failing to register the copyright." *Id.*

Although CZM in this case has voiced its belief that it has rights to its unregistered copyrights, it has not filed any litigation alleging infringement. Further, CZM's failure to register the copyright will prevent it from bringing any suit for infringement. Unlike the defendant in *Application Science,* CZM has not filed a state court suit alleging infringement. Therefore, there are no grounds on which to find that CZM has tried to circumvent Optovue's rights by not registering its copyright. The Court finds that any apprehension of infringement litigation is too remote to support a claim under the declaratory judgment act.

Optovue's third claim seeking a declaration of noninfringement of copyright is dismissed without leave to amend. Optovue may amend its complaint to seek declaratory relief with respect to any valid CZM copyrights on which it has reason to fear litigation.

CONCLUSION

For the foregoing reasons, the Court GRANTS CZM's motion to dismiss Optovue's sixth and third claims with leave to amend and GRANTS CZM's motion for a more definite statement of Optovue's fourth claim. Optovue shall file its amended complaint within two weeks of the date of this order. Any motion to dismiss shall be filed two weeks thereafter and noticed for hearing on October 25,

2007 at 2:00 pm. The case management conference set for September 25, 2007 will be heard on October 25 at 2:00 pm.

**\*5 IT IS SO ORDERED.**

N.D.Cal.,2007.
Optovue Corp. v. Carl Zeiss Meditec, Inc.
Slip Copy, 2007 WL 2406885 (N.D.Cal.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT C

## TO APPENDIX OF AUTHORITIES CITED IN VISA'S MOTION TO DISMISS MARITZ'S FRAUD COUNTERCLAIMS

Westlaw.

235 Cal.App.2d 465
235 Cal.App.2d 465, 45 Cal.Rptr. 458
**(Cite as: 235 Cal.App.2d 465)**

**C**Brownlee v. Vang
Cal.App.5.Dist.
    ROBERT G. BROWNLEE, Plaintiff and
                Respondent,
                    v.
ALFRED VANG et al., Defendants and Appellants.
            **Civ. No. 519.**

District Court of Appeal, Fifth District, California.
            June 28, 1965.

            HEADNOTES

**(1a, 1b, 1c)** Fraud § 77(1)(b)--Actions--Evidence.
The evidence sufficiently supported the finding that
plaintiff relied on defendant's false representations
and that the reliance was justified where it was shown
that defendant falsely represented himself as an
electronics expert, that plaintiff was ignorant
concerning such matters, that through friendship a
relation of trust and confidence existed between
them, and that in securing a loan from plaintiff and
later securing cancellation of the debt in return for
worthless stock, defendant falsely represented the
potential production of and income from his claimed
inventions to allay plaintiff's suspicions.

**(2)** Fraud § 22(1)--Reliance--Necessity.
To make out a case of misrepresentation, plaintiff
must show not only the representation of a material
fact on which he was entitled to rely, but that he did
in fact rely to his damage.
See **Cal.Jur.2d,** Fraud and Deceit, § 29; **Am.Jur.,**
Fraud and Deceit (1st ed § 141).
**(3)** Fraud § 91(8)--Questions of Fact--Reliance.
Whether fraud, including the element of reliance,
exists is ordinarily a question for the fact-finding
entity.

**(4)** Fraud § 77(1)(a)--Actions--Evidence.
The judicial officer who sees and hears the witnesses
in a fraud case has the duty to determine the weight
and effect of their evidence; the trial court's decision
as to whether any substantial showing of fraud
outweighs opposing testimony is ordinarily final, and
appellate courts will not disturb a finding of fraud
supported by any substantial evidence.

**(5)** Fraud § 49(1)--Actions--Defenses.

That plaintiff in a fraud case is too credulous is not
generally a defense; the test of defendant's
representation is its actual effect on the particular
mind, whether it is strong and circumspect, or weak
and too relying.

**(6)** Fraud § 49(1)--Actions--Defenses.
It could not be said that plaintiff was more credulous
than the average person in relying on defendant's
misrepresentations concerning projects to develop
inventions and various corporations formed by
defendant where the record showed that others
invested in the projects and corporations and lost.

            SUMMARY

APPEAL from a judgment of the Superior Court of
San Diego County. Byron F. Lindsley, Judge.
Affirmed.

Action for fraud. Judgment for plaintiff affirmed.

COUNSEL
William F. Reed and Carl Hoppe for Defendants and
Appellants.
James W. Funsten for Plaintiff and Respondent.
BROWN (R. M.), J.
    This is an appeal by the defendant-appellant
from an adverse judgment rendered by the court in an
action based upon the theory of fraud. By the
judgment the plaintiff was awarded $4,500 as
compensatory damages, $3,000 as exemplary
damages, and his costs of suit. The action was
brought against Alfred Vang, Ann Vang and
Magnatron Corporation of America, Inc. The court
found that no liability attached to Ann Vang. It was
stipulated that, for the purpose of this lawsuit, the
defendant Alfred Vang and the defendant Magnatron
Corporation of America, Inc. are one. For
convenience, the word "defendant" as herein used
will be a reference to Alfred Vang.

    The sole question presented by the appeal is
whether the evidence supports the trial court's finding
that the plaintiff relied upon the false representations
made by the defendant and that such reliance was
justified.

                    *The Facts*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

235 Cal.App.2d 465                                                              Page 2
235 Cal.App.2d 465, 45 Cal.Rptr. 458
(Cite as: 235 Cal.App.2d 465)

(1a) The plaintiff met the defendant, Alfred Vang, and the latter's wife, Ann Vang, in the latter part of 1947 or the early part of 1948 in Carmel, California. They became friends. At that time the plaintiff was a merchant seaman. He had recently married and was desirous of obtaining a shore job. Although he had attended the Colorado Junior College for three years and Hastings College of the Law for one year, he had neither training nor experience in engineering, science, or business. He had never made investments in stocks or bonds. His savings amounted to $4,000. The defendant told the plaintiff that he was an engineer and had studied at the University of Copenhagen; that he was an associate of Neils Bohr, a famous scientist, and had worked with Bohr on the Manhattan Project; that he had worked for the Federal Defense Department over a period of years and was called to Washington for *467 consultation from time to time; that he had designed and developed numerous electronic processes and items including the first automobile valve of the type still in use today; that he was a partner in the firm of Stevenson, Jordan and Harrison, one of the biggest of the research and development companies in the United States; that he owned and operated a factory in the east which was producing welding machines; that he had invented an electronic tube which General Electric and other leading manufacturers were very much interested in; that he had invented a panel which he used with the electronic tube the use of which was practically unlimited; that he had a contract with Electrical Products Company of Los Angeles to produce the panels; that he was developing a fog dispersion machine at the Monterey airport; and that he had developed a welding machine which was in production and was being sold in the east. In October 1948, the defendant told the plaintiff that he was negotiating for a plant on the Monterey peninsula for the purpose of putting his electronic tube into production and asked to borrow $6,000. He promised the plaintiff a position with him in his project. On October 23, 1948, the plaintiff loaned the defendant his savings of $4,000 and received a promissory note executed by the defendant promising to repay the sum with interest 60 days thereafter. He relied in part upon the representations of the defendant made directly to him, and in part upon an article which appeared in the October 13, 1947, issue of the Monterey Peninsula Herald, and information therein which originated with the defendant, which spoke in glowing terms of the defendant, his reputed background as an electronic inventor, and of a revolutionary invention which would disperse fog which the defendant was reportedly building and should have ready for testing about two weeks after the article appeared. The plaintiff also testified that he had seen the electronic tube and relied upon its functioning properly before he loaned the defendant the money. Shortly after the loan was made the defendant left the community and went to Berkeley. He failed to repay the loan. When the loan became due the plaintiff telephoned the defendant; the defendant reassured the plaintiff that everything was working out; that he had started a company with one George Hart. The plaintiff testified, "I felt he was a pretty important man and I didn't feel as though I wanted to badger him about the thing, and I felt that it was all right, that I would just-I would go along with *468 it more or less at his convenience, but I would like to have it back." The defendant also told the plaintiff that the panel was being used to drive a vibrator and that people from the University of California were very interested in the invention. About the middle of 1949, the plaintiff was told by George Hart that the defendant had left Berkeley and had removed to Vancouver, Canada. The plaintiff had several conversations with the defendant, who continually assured the plaintiff that his various enterprises were going well. He explained that George Hart had "locked him out" of the Berkeley plant and he had moved to Canada. He invited the plaintiff to come up to Canada and he would show the plaintiff what he was doing. On October 13, 1949, the plaintiff filed an action in the Superior Court of Monterey County in an attempt to collect on the note. Vang was never served. Subsequently the plaintiff asked Dun & Bradstreet to investigate what the defendant was doing in Canada. Dun & Bradstreet collected $500 on the note. The defendant asked the plaintiff to call off Dun & Bradstreet. In June of 1950 the plaintiff went to Canada and spent a "couple" of days with the defendant. The defendant showed him what they were doing, showed him drawings and parts of an electronic hammer, told him that he had a number of contracts for the equipment, told him that the defendant and one Eggleton had formed one company and were forming a second, gave a demonstration with the panel device, and suggested that he take stock in the companies in lieu of the amount of the debt. The plaintiff testified: "I went up there pretty mad at Fred and I went away pretty happy with him. This appeared to me, from what he told me-the thing looked practical and looked as though his panels were a complete

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

235 Cal.App.2d 465
235 Cal.App.2d 465, 45 Cal.Rptr. 458
**(Cite as: 235 Cal.App.2d 465)**

success." On some unspecified date between July 28, 1950, and March 5, 1951, the plaintiff cancelled the note in exchange for shares of stock in Magnatron Hammer Company, Ltd. and Magnatron Panel Company, Ltd., the two Canadian companies. The plaintiff returned for trips to Canada in 1951 and again in 1953, and attended shareholders' meetings. Although no dividends were paid on the stock, he received corporate financial statements showing that the companies were solvent. On some date between April 28, 1953, and January 13, 1954, the plaintiff purchased from one Joe Jordan further shares of stock in the two companies for $400. During the period from 1950 to 1955, the plaintiff also expended time and moneys in attending meetings in *469 Canada and preparing himself for the purpose of participating in projects of the defendant. At intervals during this period of time the defendant gave glowing progress accounts to the plaintiff and assured him that he would have a good position with the projects as soon as they got into production. The plaintiff testified: "Well, we were friendly, and then I felt unfriendly toward Fred; then we would get together, and it would be friendly again, and then it would continue to be that way." As late as 1960, just before this suit was filed, the defendant continued to reassure the plaintiff. In 1955 the plaintiff engaged the law firm of Lawrence, Shaw, McFarlane and Stewart to attend a shareholder's annual meeting and send him a report. The attorneys' report was unfavorable and suggested that stock in the defendant's companies was watered. The trial court found:

"I. Commencing in the year 1947 and continuing through the year 1955 defendant Alfred Vang represented to plaintiff that said defendant was a university educated electronics scientist with experience in electronics research and development and with professional associations with leading scientists. Continuously during said period, Alfred Vang represented to plaintiff that he, Alfred Vang, had perfected several different devices employing a unique electronics tube and circuit system developed by said Alfred Vang which devices were of great commercial value for immediate use in electroplating hard rock drill bits, aluminum smelting, industrial hammers, welding and other uses. Continuously during said period said Alfred Vang represented that he was able to, and intended to, make immediate commercial application of said devices and provide plaintiff employment in connection with said project.

"II. Continuously during said period of time there was a relation of personal trust and confidence between the plaintiff and the defendant Alfred Vang.

"III. Said representations were false. Said Alfred Vang did not have any university or college education. Said Alfred Vang did not have certain electronics research and development experience that he claimed to have. Said Alfred Vang did not have professional associations with leading scientists. Said Alfred Vang knew he was unable to, or had intention [sic] to, make commercial application of his devices and he never had any intention to provide employment for plaintiff. Said Alfred Vang made said representations *470 regarding said projects for the purpose of raising money for his use and to promote his own interests and without any intention to carry out the projects.

"IV. Said representations were made by said Alfred Vang with the intent to deceive plaintiff Robert G. Brownlee. Said plaintiff reasonably relied upon the said representations above set forth, and each of them, and in reliance thereon, gave Alfred Vang $4,000 of which $3,500 remains unreimbursed, and thereafter purchased worthless stock in reliance thereon at a cost of $400, and expended additional time and money for attendance at the corporation meetings of the projects of Alfred Vang and for preparation of himself to participate in the projects of said Alfred Vang, all to the damage of Robert G. Brownlee in the total sum of $4,500.

"V. Before June 27, 1955, said Robert G. Brownlee had neither discovered the fraud nor failed to exercise due diligence to discover the fraud. Before June 27, 1955, Robert G. Brownlee did not have the means of discovering the fraud and could not have discovered it in the exercise of due diligence. On said June 27, 1955, said Robert G. Brownlee must be deemed to have notice of said fraud on account of the continued failure of Alfred Vang to do what he said he intended to do and also on account of the letter received said day from Canadian attorneys stating suspicions of watered stock.

"VI.

. . . . . . . . . . .

"VII. The representations of said Alfred Vang

235 Cal.App.2d 465
235 Cal.App.2d 465, 45 Cal.Rptr. 458
(Cite as: 235 Cal.App.2d 465)

Page 4

were made as part of a continuous fraudulent and malicious course of conduct whereby he obtained money from numerous people as investments in projects which he never had any intention of carrying out."

*Argument and the Law*

The defendant does not challenge the trial court's findings relating to the misrepresentations or damages. The only charge of error is that the trial court erred in finding that the plaintiff reasonably relied upon the representations of the defendant. It is claimed that the evidence is to the contrary. The plaintiff testified at length; the defendant did not testify and apparently was not present at the trial, but portions of a prior deposition he had given were read into the record. That record is voluminous. The reporter's transcript embraces 813 pages; the clerk's, 254 *471 pages; there are 179 interrogatories with answers; and more than 150 exhibits were received in evidence. From this vast record, the defendant has selected isolated items of evidence with which to persuade this court that the plaintiff, rather than relying upon representations of the defendant, took a calculated risk in the projects of the defendant in the hope of ultimate financial gain.

The defendant argues that, at the outset, the defendant promised to repay to the plaintiff the sum of $4,000 within 60 days; that he defaulted and left the community. The plaintiff testified that the first statement made by the defendant that he thought was false was the promise to pay the money, which promise was not kept; that the next statement was when the defendant told the plaintiff that the defendant was going to remain in the Monterey area, but did not do so and left the community; that he discovered the falsity of that statement in the fall of 1949. The plaintiff also testified that the defendant represented he was going to build a fog dispersal machine in Monterey, which he did not do. This the plaintiff learned in 1949. The plaintiff testified that he relied in part on the newspaper article that the fog dispersing machine would be ready for testing in late October 1949; but made no investigation to determine whether or not the machine had been completed. The plaintiff further testified that prior to the exchange of the note for the stock, he had a conversation with George Hart in San Francisco and Hart told the plaintiff that the defendant never finished any of his work. On July 4, 1949, the plaintiff wrote to the defendant and stated, in part, "...

On October 23 of this year your 60 day note for the $4,000 loan I made you will be 10 months overdue." The defendant also points to the lawsuit which the plaintiff filed in Monterey County in an attempt to collect on the note, and the fact that he had Dun & Bradstreet investigate the defendant's activities in Canada and attempt collection. On March 31, 1950, the plaintiff wrote to the defendant stating in part: "Got your latest promise the other day through Dun and Bradstreet. If you have plans for skipping out of Canada without notice with the idea of raising a little money and losing me at the same time-don't do it."

When questioned concerning this letter, the plaintiff testified: "As far as keeping his promise to pay the money to me my confidence had dropped to a rather low ebb ..." The defendant contends that the plaintiff's testimony summarized *472 above shows that he did not rely upon representations made by the defendant. Nevertheless, with knowledge of the many promises which had been unfulfilled, the plaintiff negotiated his first five shares of stock in Magnatron Hammer, Ltd. on July 25, 1950. About six months later, on January 5, 1951, the plaintiff complained by letter to the defendant, "... as you will recall, in 1948 when I made you the loan it was made with the understanding that I was to be given a chance to work for you." In a subsequent letter of February 8, 1951, the plaintiff admitted: "... When I suggested in my last letter that I was willing to take a final chance by accepting a transfer of stock I meant just that. I had no idea at that time, nor do I have any idea now, when you will get into production, or if you ever will."

Shortly after writing that letter and on March 5, 1951, the plaintiff obtained 15 shares in Magnatron Panel Company, Ltd., and 24 shares in Magnatron Hammer Company, Ltd., and cancelled the note.

In April 1953, the plaintiff purchased stock from Joe Jordan; at that time he knew that he had not received any dividends on the stock which he had acquired in 1950 and 1951. Also at this time he knew that there had been no commercial production in any of the defendant's ventures up to that date.

If the testimony on which the defendant relies was the sole evidence on the subject, it would be difficult to say that the plaintiff placed any reliance on the representations made by the defendant after the note was in default and the defendant had moved from the Monterey area. But it is not. The record is

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

235 Cal.App.2d 465                                                                                              Page 5
235 Cal.App.2d 465, 45 Cal.Rptr. 458
**(Cite as: 235 Cal.App.2d 465)**

replete with testimony concerning telephone calls over the interval from 1949 through 1954 in which the defendant constantly explained difficulties he was encountering, soothed away the plaintiff's fears, gave glowing accounts of his various inventions, their marketability, desirability to manufacturers, and their potential worth. The defendant's wife, Ann Vang, wrote several letters to the plaintiff. One such letter, written on December 2, 1949, and authorized by the defendant, thanks the plaintiff for his patience; states that certain panels and electric hammers were being built to be shipped to California and would be in San Francisco no later than January 15th; that an attorney had been appointed to form a company for the immediate production of hammers; and that as soon as the hammers arrived in San Francisco the plaintiff could be paid in money or stock. The letter extolled the efficiency and low cost of *473 the hammers and their usefulness and salability. Mr. George Hart, who had been associated with the defendant in Berkeley, told the plaintiff that the equipment was good and that it would do the things the defendant claimed it would do. It was not until August 24, 1957, that the plaintiff learned for the first time that the electronic tube, which was claimed by the defendant to be a basis of his various inventions, did not work. It was not until after this suit was filed that plaintiff learned the hammer and panel were not inventions of the defendant. After 1957, plaintiff reached the conclusion that Vang's promises were made without the intention to perform, and this was after he had the opportunity of discovering that the defendant had a long history of promotional companies. Even as late as 1960, about a month before this suit was filed, the defendant again stated to the plaintiff that the projects in Canada were being successfully completed, and he furnished the plaintiff with what purported to be a financial statement and again attempted to allay the plaintiff's suspicions of fraud and assure him that defendant would protect his interests.

(2) It is elementary that to make out a case of misrepresentation, the plaintiff must show not only a representation of a material fact upon which he was entitled to rely, but that he did in fact rely to his damage. (_Edwards v. Lang_, 198 Cal.App.2d 5 [18 Cal.Rptr. 60]; _Eck v. McMichael_, 176 Cal.App.2d 368 [1 Cal.Rptr. 369].) (3) Whether or not fraud exists, including the element of reliance, is ordinarily a question of fact for the fact-finding entity. (4) As this court said in _Vogelsang v. Wolpert_, 227 Cal.App.2d 102, 110-111 [38 Cal.Rptr. 440]:

"Because of the diversity of factors and the differing intelligence of those guilty of fraud and their victims, the function of the trial judge in fraud cases is particularly significant. It is the duty of the judicial officer who sees and hears the witnesses to determine the weight and effect of their evidence; if there is any substantial showing of fraud the trial court must determine whether it outweighs the testimony presented by the opposing side; and his decision is ordinarily final in matters of this kind; appellate courts will not disturb a finding of fraud if there is any substantial evidence to support the lower court's decision. [Citations.]

"As a determination of the existence of fraud is particularly within the decisional field of the trial judge, the *474 appellants are attempting to swim upstream against a strong current of authority when they maintain that there was no such showing in the long record, and in effect that this court should pass again upon the factors which the trial court found to be indicative of fraud."

(5) And at pages 111-112: "As is observed in _Feckenscher v. Gamble, supra_, 12 Cal.2d 482, 496-497 [85 P.2d 885]: ' "That plaintiff is too credulous is not generally a defense. 'The test of the representation is its actual effect on the particular mind, whether it is a strong and circumspect mind, or one weak and too relying.' " (_Neff v. Engler_, 205 Cal. 484, 489 [271 P. 744].)' "

Plaintiff points to the case of _Blackman v. Howes_, 82 Cal.App.2d 275, where the court, in considering the issue of justifiable reliance, said at pages 278-279 [185 P.2d 1019, 174 A.L.R. 1004]: "When the facts are susceptible to opposing inferences, whether a party relied upon a false representation, notwithstanding prior information which, if investigated, might have led to discovery of the falsity of the representation, is itself a question of fact to be determined by the trier of fact. [Citation.] Where one is justified in relying, and in fact does rely, upon false representations, his right of action is not destroyed because means of knowledge were open to him. In such a case, no duty in law is devolved upon him to employ such means of knowledge. [Citation.]

" 'The mere circumstance that one makes an independent investigation or consults with others does not necessarily show that he relied upon his own judgment rather than upon the representations of the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

other party, nor does it give rise to a presumption of law to that effect.' [Citation.] A buyer · is not chargeable with knowledge of conditions which he fails to discover because of some deception of the seller. [Citations.] When, as here, the buyer has only a suspicion of fraud and the seller lulls the buyer into inaction by a false representation, the seller will not be permitted to assert that the buyer lost his rights by accepting the assurance of the seller that there was no fraud. [Citation.]"

In *Bank of America v. Greenbach,* 98 Cal.App.2d 220, at page 233 [219 P.2d 814], the court said: "It is, of course, the law that a party has a duty to investigate where he has notice of facts which indicate fraud. [Citations.] But this duty to investigate is a relative matter. The creditor has a legal right to rely upon the statements made by the debtor. If the debtor is guilty of deliberate fraud, it is not *475 good morals, nor does it make good sense or good law, to say that the creditor was too credulous because he placed too much ·reliance on the statements made by the fraudulent debtor, and is therefore barred."

At page 234, the court said: "It is also well settled that when a fact is peculiarly within the knowledge of the person making the representation and not within the knowledge of the person to whom it is made, the latter has the right to rely upon the representations of the former respecting such fact."

The trial court found that during the period here involved there was a relation of personal trust and confidence between the plaintiff and the defendant, and that finding stands unquestioned.

In volume 23, California Jurisprudence, Second Edition, Fraud and Deceit, section 31, pages 75-76, it is said: "A person has a right to rely on statements of material facts essentially connected with the substance of the transaction where there is a confidential relation existing between the parties, and such reliance cannot be charged as negligence. ... A similar situation exists where one of the parties is ignorant and inexperienced in regard to the matters concerning which the material representations are made, and such ignorance is known to the other party, who is also aware that reliance is being placed on his representations and that the facts are not, and cannot be expected to be, within the ·first party's knowledge."

The court, in *Bank of America v. Greenbach, supra,* 98 Cal.App.2d 220, said at page 235: "[T]he question as to whether the known facts were sufficient to put the defrauded person on inquiry is one of fact for the trial court. ... '... Whether or not the plaintiff was negligent in relying upon the truth of the defendant's representations seems to be immaterial. If under the facts, because of the relation of the parties, involving trust and confidence, or because the representor was in a position to know the facts which was definitely superior to that of the representee, or where an investigation by the representee could not be easily made, the courts hold that he was justified in relying on the truth of the false statements.' "

In *Garrett v. Perry,* 53 Cal.2d 178 [346 P.2d 758], the issue of justifiable reliance on the part of the person defrauded was raised. Mr. Chief Justice Gibson, speaking for the Supreme Court, made brief disposition of the contention. *476 At pages 181-182, he stated: "The fact that a buyer makes an independent investigation does not preclude him from relying on· representations made by the seller where, as here, the seller has a superior knowledge. [Citation.] Nor did the receipt of some unfavorable information preclude plaintiff from such reliance as a matter of law. [Citation.] The trial court could properly conclude that any suspicions of plaintiff arising from the·information he had obtained upon his investigations were allayed by defendant's subsequent reassurances and that under the circumstances of this case plaintiff was not precluded from relying upon what defendant told him."

In volume 23 of California Jurisprudence, Second Edition, Fraud and Deceit, section 39, at page 97, it is said: "..., a party's suspicions may have been reasonably allayed by the other party's positive reassurances or representations."

In *Kalkruth v. Resort Properties, Ltd.,* 57 Cal.App.2d 146, at page 150 [134 P.2d 513], the court said: "We believe that when, as here, the buyer has only a suspicion of the fraud, and the seller who has defrauded the buyer, lulls the buyer into a sense of security by both words and conduct, the seller should not be permitted to assert that the buyer had lost his rights by waiving the suspicion and accepting the reassurance of the seller that no fraud had been perpetrated."

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

235 Cal.App.2d 465                                                                                                    Page 7
235 Cal.App.2d 465, 45 Cal.Rptr. 458
(Cite as: 235 Cal.App.2d 465)

(1b) In this case the defendant purported to be an expert in the field of electronics; the plaintiff was ignorant concerning such matters. Through friendship a relation of trust and confidence existed between them. The misrepresentations made relative to a subject matter of which the plaintiff had no knowledge were not such that their falsity must have been so obvious to the plaintiff as to preclude any justifiable reliance thereon by him. Further representations, made as statements of fact and not of opinion, dealing with contracts which the defendant had entered into with other firms, the potential production of and income from his claimed inventions, designed to allay the suspicions of the plaintiff, were themselves misrepresentations calculated to deceive. That they accomplished their purpose should not now redound to the benefit of the defendant. (6) It cannot be said that the plaintiff was more credulous than the average person would have been. The record shows that others invested in the projects and various corporations formed by the defendant and lost. It was said in the case of _Sanfran Co. v. Rees Blow Pipe Mfg. Co._, 168 Cal.App.2d 191, at pages 202-203 [335 P.2d 995]:*477

"In _De Spirito v. Andrews_, 151 Cal.App.2d 126, the court said at page 130 [311 P.2d 173]:

" 'It is a general rule that a vendor not in a confidential relation to the buyer is not under a duty to make full disclosure concerning the object which he would sell. However, it is a universally recognized exception that if he undertakes to do so he is bound not only to tell the truth but he is equally obligated not to suppress or conceal facts within his knowledge which materially qualify those stated. If he speaks at all, he must make a complete and fair disclosure. [Citations.]'

"As pointed out in _Kuhn v. Gottfried_, 103 Cal.App.2d 80, 81 [229 P.2d 137], any facts which affect the desirability of the property to be sold, are facts 'which materially qualify these stated.' Defendant admitted that the double lines on the plot plan could be interpreted to mean walls.

"... 'Where material facts are accessible to the vendor only and he knows them not to be within the reach of the diligent attention and observation of the vendee, the vendor is bound to disclose such facts to the vendee.' (_Rothstein v. Janss Investment Corp._, 45 Cal.App.2d 64 [113 P.2d 465]; _Dyke v. Zaiser_, 80 Cal.App.2d 639 [182 P.2d 344].) ...

"... Whether the investigation made by the plaintiff was a properly full one after his discovery that the building was not Class 'C,' was an issue of fact for the trial court."

The cases upon which the defendant relies are not in point. In the case of _Ruhl v. Mott_, 120 Cal. 668 [53 P. 304], the plaintiff entered upon the land, discovered the fraud, expressed dissatisfaction, and notwithstanding this knowledge, thereafter affirmed the contract by including the unpaid interest in a new note and giving the defendant a new mortgage upon the land. It was held that the second transaction was free from fraud and the plaintiff's conduct constituted a waiver of all rights of rescission. In _Gratz v. Schuler_, 25 Cal.App. 117 [142 P. 899], the plaintiff purchased a panorama on defendant's representations that he could earn so much a day, and notwithstanding that after the plaintiff had operated the panorama for a few days to see what it was earning and thus knew the real earning capacity of the panorama, he completed the payment of the balance of the purchase price, and he could not be heard to say that he was deceived by the representations. In _Carpenter v. Hamilton_, 18 Cal.App.2d 69 [62 P.2d 1397], the plaintiffs, before parting with value, inspected a portion of the premises where there were patent defects contrary to representations which had been made by the *478 defendant. The reviewing court held that knowledge of the plaintiffs of the defendant's misrepresentations relating to the portion inspected, precluded reliance by them upon misrepresentations as to the condition of the premises which they did not visit. This case has never been overruled, but its broad language has been undercut by subsequent cases, such as _Sanfran Co. v. Rees Blow Pipe Mfg. Co._, supra, 168 Cal.App.2d 191, 203, and _Hefferan v. Freebairn_, 34 Cal.2d 715, 720 [214 P.2d 386], where its holding has been held applicable only to visible defects.

(1c) In the case before us the plaintiff was constantly reassured by the defendant, and under the circumstances he was not precluded from relying on what the defendant told him or showed him.

The defendant questions the sufficiency of the evidence to support the finding, but we think that the evidence is ample to support such, and will not belabor the well-settled law that this court is bound thereby. (_Overton v. Vita-Food Corp._, 94 Cal.App.2d 367 [210 P.2d 757]; _Berniker v. Berniker_, 30 Cal.2d

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

235 Cal.App.2d 465
235 Cal.App.2d 465, 45 Cal.Rptr. 458
**(Cite as: 235 Cal.App.2d 465)**

439 [182 P.2d 557].)

    The judgment is affirmed.

Conley, P. J., and Stone, J., concurred. **\*479**
Cal.App.5.Dist.
Brownlee v. Vang
235 Cal.App.2d 465, 45 Cal.Rptr. 458

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT D

## TO APPENDIX OF AUTHORITIES CITED IN VISA'S MOTION TO DISMISS MARITZ'S FRAUD COUNTERCLAIMS

Westlaw.

21 Cal.App.3d 289
21 Cal.App.3d 289, 98 Cal.Rptr. 547
**(Cite as: 21 Cal.App.3d 289)**

Page 1

▷Moe v. Transamerica Title Ins. Co.
Cal.App.1.Dist.
   DEBRA MOE et al., Plaintiffs and Respondents,
v.
TRANSAMERICA TITLE INSURANCE
COMPANY et al., Defendants and Appellants
**Civ. No. 27900.**

Court of Appeal, First District, Division 2, California.
November 17, 1971.

### SUMMARY

A title company issued an assignment of a policy on business property subject to a deed of trust that had been assigned to plaintiffs to secure a note purchased by the plaintiffs. Although the property was involved in a bankruptcy proceeding when the assignment of the policy was issued, the policy made no mention thereof or of certain other pertinent matters. Thereafter, the title company was taken over by another title company in a consolidation. Subsequently, the property was sold in the bankruptcy proceeding free and clear of the deed of trust, and plaintiffs brought suit against both the title companies and had judgments for compensatory and punitive damages and attorney fees, under a complaint alleging fraud and a contractual claim on the policy. (Superior Court of the City and County of San Francisco, No. 557243, Clayton W. Horn, Judge.)

The Court of Appeal affirmed, rejecting contentions as to the usurious nature of the transaction, as to plaintiffs' alleged breach of the "notice clause" of the policy, as to the surviving corporation's non-liability for punitive damages for torts of the "defunct" corporation, and as to inapplicability of the policy to plaintiffs' loss. The court noted that the policy, when read with an included indorsement, clearly covered plaintiffs' loss, and that the evidence of fraud in deliberately omitting mention of the bankruptcy proceeding and other pertinent matters was so overwhelming that no reasonable jury could have returned a verdict for defendants on the issue of fraud. (Opinion by David, J., [FN*] with Taylor, P. J., and Kane, J., concurring.)

FN* Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

### HEADNOTES

Classified to California Digest of Official Reports

**(1)** Interest § 4(0.5)--When Interest Is Recoverable or Allowable--Damage Award Based on Fraud.
An award of prejudgment interest on a damage award was not subject to attack on the theory that the transaction out of which the damages arose constituted a usurious loan, where the damage award was based on a fraud count arising out of the sale of a promissory note, and not on any loan transaction.

**(2)** Interest § 40--Usury--When Defense Not Arguable to Jury.
Where defendants' liability was not based on an allegedly usurious note, it would have been improper for them to argue the defense of usury to the jury.

**(3)** Interest § 37--Usury--Defense as Personal to Borrower.
Usury is a defense personal to the borrower and may not be asserted by a person who is not a party to the allegedly usurious contract.

**(4)** Interest § 30(5)--Usury--Transactions Embraced by Usury Law--Sale of Note or Obligation.
The mere purchase of a note at a discount is not affected by the usury law.

**(5)** Interest § 33--Usury--Construction of Contracts-- As Favoring Lawfulness.
In the absence of evidence pointing clearly to the usurious nature of a transaction which is subject to being construed as either usurious or lawful, it is the court's duty to adopt a construction in favor of lawfulness.

**(6)** Interest § 44(5)--Usury--Burden of Proof-- Usurious Intent.
The burden of showing evasion of the usury law must be met by evidence clearly showing usurious intent.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

21 Cal.App.3d 289                                                              Page 2
21 Cal.App.3d 289, 98 Cal.Rptr. 547
**(Cite as: 21 Cal.App.3d 289)**

**(7)** Insurance § 187(4)--Risks and Causes of Loss--Title Insurance-- Coverage.
Recovery under a policy insuring the title of business property subject to a deed of trust assigned to plaintiffs as security for a note purchased by them was proper, where it appeared that the issuer knowingly and deliberately omitted from the policy certain pertinent matters and any reference to the fact that the property was, at time of issuance, involved in a bankruptcy proceeding, and that the bankruptcy, in and of itself, ultimately rendered plaintiffs' security valueless.

**(8a, 8b)** Insurance § 187(6)--Title Insurance--Notice Requirements.
In an action on a title policy to recover for losses resulting from the sale, in a bankruptcy proceeding, of business property covered by the policy, free and clear of a deed of trust thereon securing a note purchased by plaintiffs, the title company failed to sustain its contention that plaintiffs waived their rights under the policy by failure to "promptly notify" the company of the loss, where plaintiffs did, in fact, satisfy the requirement of prompt notice, and where the company was charged with constructive notice of the bankruptcy proceeding, but made no inquiries as to its progress, and demonstrated no prejudice from the alleged lack of notice.

**(9)** Insurance § 120--Avoidance of Policy for Fraud, Breach of Warranty or Condition--Duty to Communicate--Effect of Breach of Notice Clause.
Breach of a notice clause by an insured may not be asserted by an insurer unless the insurer was substantially prejudiced thereby.

**()** Insurance § 120--Avoidance of Policy for Fraud, Breach of Warranty or Condition--Duty to Communicate--Effect of Breach of Notice Clause.
Prejudice is not presumed as a matter of law from breach of a notice clause by an insured.

**(11)** Insurance § 120--Avoidance of Policy for Fraud, Breach of Warranty or Condition--Duty to Communciate--Breach of Notice Clause as Defense--Insurer's Burden.
An insurer who defends on the basis of an alleged breach of a notice clause by the insured has the burden of proving actual prejudice, and not merely a possibility of prejudice.

**(12a, 12b)** Insurance § 187(8)--Risks and Causes of Loss--Title Insurance--Actions on or Relating to Policy--Attorney Fees.
In an action on a title policy on property subject to a deed of trust assigned to plaintiffs to secure a note purchased by them, an award of attorney fees incurred not only in that action but also in bankruptcy proceeding involving the property was proper under evidence that the award was based both on the policy contract and on fraud, and that plaintiffs' appearance in the bankruptcy proceeding was a natural and probable result of the title company's fraud.

**(13)** Damages § 49--Recovery of Attorneys' Fees.
A person who is required through the tort of another person to act in protection of his interest by suing, or defending against, a third person is entitled to recover compensation for the reasonably necessary attorney's fees incurred.

**(14a, 14b)** Corporations § 77--Liabilities of Consolidated Corporation-- Tort Liability--Punitive Damages.
An award of punitive damages against defendant-title insurance corporation for the tort of another corporation, named as codefendant, committed before being taken over by defendant was proper where, in its pleadings, defendant, in effect, admitted that the two corporations were one and the same, and, at trial, did not contend otherwise.

**(15)** Corporations § 77--Liabilities of Consolidated Corporation.
Generally, a corporation formed by consolidation or merger is answerable for the debts and liabilities of the constituent corporations, whether arising ex contractu or ex delicto.
[See **Cal.Jur.2d,** Corporations, § 408.]
**(16)** Corporations § 76--Effect of Consolidation.
The corporate entities of the constituent corporations are preserved, following consolidation, to the end that they may be served with process and called on to defend any contract or tort action which may be brought against them.

**(17)** Corporations § 76--Effect of Consolidation.
Consolidation of corporations does not create an entirely new entity but merely directs the blood of the old corporation into the veins of the new, the old living in the new.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

21 Cal.App.3d 289
21 Cal.App.3d 289, 98 Cal.Rptr. 547
**(Cite as: 21 Cal.App.3d 289)**

Page 3

**(18a, 18b)** Insurance § 187(8)--Risks and Causes of Loss--Title Insurance--Actions on or Relating to Policy--Direction of Verdict.

In an action against a title company under a complaint charging fraud in two counts, and a contractual claim on the title policy in a third count, defendant could not successfully contend that directing a verdict for plaintiffs on the contractual count was erroneous as being bound to influence the jurors against defendant with respect to the fraud counts, where the jury was clearly instructed not to be so influenced, and where the evidence of fraud was so overwhelming as to preclude a reasonable jury from finding for defendants on the issue of fraud.

**(19)** Fraud and Deceit § 13(2)(a)--False Representations--Concealment--Duty to Speak.

The intentional failure to disclose a material fact is actionable fraud if there is a fiduciary relationship giving rise to a duty to disclose the fact.

**(20)** Insurance § 187(8)--Risks and Causes of Loss--Title Insurance--Actions on or Relating to Policy--Evidence.

In a fraud action against a title company, defendant was not entitled to complain of the admission of evidence pertaining to another action filed against it, where a letter written by defendant's counsel and read into evidence referred to that action as being "predicated on fraud," where the evidence was admissible under Evid. Code, § 1101, subd. (b), as relevant to prove motive, opportunity, intent, preparation, plan, knowledge, identity and the absence of mistake or accident, and where the evidence could not conceivably have prejudiced defendant.

**(21)** Courts § 153--Courts of Appeal--Award of Attorney Fees on Appeal.

The Court of Appeals may, under appropriate circumstances, award attorney fees for services rendered on appeal.

COUNSEL

Fields, Roos & McBride and Donald W. Rees for Defendants and Appellants.
William E. Ferriter, Louis F. Hawkins and Herbert Hawkins for Plaintiffs and Respondents.
**DAVID, J.**[FN*]

FN* Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

This is an appeal by defendants Transamerica Title Insurance Company (hereafter Transamerica) and City Title Insurance Company (hereafter City Title) from a judgment on verdict awarding plaintiffs Debra Moe and David Baer compensatory damages in the amount of $80,000 and punitive damages in the amount of $50,000. Defendant title companies also appeal from a supplemental judgment awarding plaintiffs 7 percent interest on the sum of $80,000 to the date of entry of judgment and attorney's fees in the amount of $35,000.

The complexities of this fraud case regrettably require an extensive recital of the evidence supporting the judgments. *294

Plaintiffs' complaint contained three counts. In the first count, plaintiffs sought payment of a $102,400 note against defendants Joseph Ballarin, Gordon Anderson, Andrew Vranich and their *alter ego*, insolvent Dockins, Schmidt-Von Wanger & Co., Inc. (hereafter Dockins Corporation).

The second count of the complaint alleged that all of the individual defendants named in the first count, plus defendant City Title and its agent and employee, Ralph Olsen, had conspired to defraud plaintiffs; whereby their false representations persuaded plaintiffs to pay $80,000 for the purchase of a valueless note which was falsely represented to be secured collaterally by a note and deed of trust, equally valueless.

The third count of the complaint stated a cause of action against defendants City Title and Transamerica on a title policy issued to plaintiffs. It was alleged that the policy insured plaintiffs against any loss or damage not exceeding $100,000 by reason of unmarketability or defects in the instruments purportedly securing plaintiffs, as of the date of the issuance of the policy and endorsement; and that the statement of liens and encumbrances in said insurance policy as exceptions were known to be and were false and untrue as of the date the policy was issued and endorsed.

Plaintiffs prayed for compensatory damages in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

21 Cal.App.3d 289
21 Cal.App.3d 289, 98 Cal.Rptr. 547
(Cite as: 21 Cal.App.3d 289)

Page 4

the sum of $102,400, plus interest thereon, and punitive damages in the sum of $50,000.

Defendants Anderson, City Title and Transamerica answered, but Ballarin, Vranich and Dockins Corporation defaulted. City Title Insurance executive Olsen disappeared prior to trial and was never served. It was agreed by plaintiffs that the liability of the defaulting defendants would be determined by the court upon the evidence introduced at the jury trial against all defendants.

The defendants did not offer any evidence.

The evidence produced at the trial may be summarized as follows: Brookdale Lodge was a California corporation (hereafter Brookdale), which owed $104,718.91 to the County Bank of Santa Cruz. The debt was in the form of a note secured by a first deed of trust on the Brookdale Lodge property. The bank had originally loaned the lodge $75,000, but by reason of additional advances, the debt had increased to $104,718.91. Brookdale was also indebted to Austen Zelmer, as trustee for mechanics' lienholders, in the amount of $46,415.62. This obligation was secured by a second deed of trust on the Brookdale property. In addition, Brookdale owed $100,000 to defendant Anderson, who was a shareholder and officer of the Brookdale Lodge corporation. Anderson had originally loaned the *295 corporation $107,294.86, which obligation was evidenced by a note secured by a third deed of trust. Brookdale had subsequently paid this debt down to a $100,000 balance.

Anderson was personally obligated to pay the $46,415.62 debt to Austen Zelmer, trustee, and to pay another debt which Brookdale owed to the Alpha Liquor Company.

On September 18, 1962, the Brookdale Lodge corporation filed its petition in bankruptcy pursuant to the provisions of Chapter X of the bankruptcy Act. A trustee was appointed to operate the lodge.

Defendant Ballarin, doing business as the Home Investment Company, met defendant Anderson in October 1962. He represented he was a financial expert and indicated to Anderson that he could obtain a $300,000 loan so that Brookdale could avoid bankruptcy, and pay off the debts secured by the first

and second deeds of trust on the property. During the course of several conversations between the two men, Ballarin told Anderson that it would be necessary for him to assign his note and deed of trust to Ballarin, and to execute a flat note in blank. Ballarin also suggested that an escrow should be opened with defendant Ralph Olsen, escrow officer at City Title, and that Anderson should order a preliminary title report on the Brookdale Lodge property.

Anderson did contact Olsen, as an officer of City Title, to order the title report; and Olsen, in turn, requested this of the Penniman Title Company in Santa Cruz. In December 1962, Olsen and Ballarin received a preliminary report from that company showing the various liens and encumbrances against Brookdale Lodge and disclosing that Brookdale had filed a petition in bankruptcy.

In January 1963, Anderson assigned his note and deed of trust to Ballarin. He also signed in blank a flat note in the amount of $102,400. Olsen forwarded the assignment of the Anderson deed of trust to the Penniman Title Company and asked that it be recorded and that the Penniman Title Company issue a $100,000 title policy insuring City Title. Olsen specifically requested that the Penniman Title Company delete from the title policy and closing report certain items which were contained in the preliminary report and which referred to the bankruptcy proceedings and certain other liens and encumbrances. The Penniman Title Company declined to comply with this request and its closing report omitted nothing.

Olsen had in the meantime contacted the County Bank of Santa Cruz and ascertained the exact amount of the debt owed by it by Brookdale. Ballarin had also procured from one Charles Frye a written appraisal *296 showing Brookdale Lodge to be worth in excess of $1,000,000. There was no mention in the appraisal of liens, encumbrances or bankruptcy. Olsen and Ballarin had also obtained a letter from Anderson's attorney stating that the deed of trust represented adequate security for payment of the obligation. This letter likewise made no mention of the bankruptcy or of other liens and encumbrances.

City Title, acting by Olsen, issued a title insurance policy on January 25, 1963, insuring Ballarin in the sum of $100,000, subject to the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

21 Cal.App.3d 289
21 Cal.App.3d 289, 98 Cal.Rptr. 547
(Cite as: 21 Cal.App.3d 289)

Page 5

defects, liens and encumbrances contained in said policy. The City Title insurance policy omitted any reference to the bankruptcy proceedings and the other liens and encumbrances which Olsen had sought to have omitted from the Penniman closing report. Olsen also wrote a letter to Ballarin explaining the liens and encumbrances mentioned in the policy, and omitting any reference to the bankruptcy proceedings or to any liens and encumbrances not mentioned in the policy.

Sometime in 1962, Ballarin had deposited $35,000 into the escrow at City Title. However, City Title then refunded this amount to Ballarin and the escrow became defunct.

In January 1963, Ballarin arranged for Olsen to open a new escrow at City Title. This escrow, like the first, was for the purpose of selling the Anderson note through Pioneer Title Insurance Company of Nevada. In connection with the second escrow, Olsen prepared a receipt indicating that a check in the amount of $24,738 had been received from Home Investment Company. On the same day, Olsen prepared a check request form disbursing $24,138 to Ballarin and $600 to the Pioneer Title Insurance Company of Nevada. The check supposedly received from Home Investment Company was returned as uncollectible and was found to be Ballarin's personal check and not a check drawn by Home Investment Company, as indicated on the receipt. The check was also postdated January 31, 1963.

On February 5, 1963, Ballarin executed an unsecured note in the amount of $24,738 at 10 percent interest. Representatives of City Title subsequently managed to obtain security from Ballarin in the form of a deed of trust on certain Amador County property. However, in April 1964, Ballarin still owed an outstanding balance in excess of $23,000.

By April 1963, Anderson had begun to lose confidence in Ballarin, and he made certain inquiries of various individuals who had known Ballarin. Anderson became even more disillusioned as a result of his investigation, but on April 25, Olsen wrote him an extremely encouraging letter indicating that Ballarin was having great success in his efforts to obtain financing for the Brookdale Lodge. Olsen wrote the letter in his capacity as assistant *297

secretary of City Title, and he advised Anderson that an escrow had been established to obtain a new loan commitment for Brookdale Lodge. Olsen stated that a loan in the amount of $650,000 would be forthcoming from the San Francisco Financial Corporation and that an additional $100,000 would be furnished by Home Investment Company. Olsen further stated that Ballarin was negotiating directly with the San Francisco Financial Corporation and that Anderson would immediately be advised upon completion of the details.

In May or June 1963, Ballarin advertised in a newspaper of general circulation that the Anderson note and deed of trust in the amount of $100,000 was for sale at the price of $80,000. Kenneth Baer, the father of the two plaintiffs, Debra Moe and David Baer, saw the advertisement and contacted the MacWickers, two real estate brokers with whom he had done business in the past. Baer asked the MacWickers to check into the advertisement for him, and they agreed to do so. The MacWickers called the telephone number listed in the advertisement and left a message. They were then contacted by Ballarin, who came to their home to discuss the transaction with them.

Ballarin told the MacWickers that he was in the process of negotiating a new loan for the Brookdale Lodge and had a $500,000 commitment from some unidentified source. He stated that he needed $80,000 in working capital in the meantime and had therefore decided to sell the $100,000 note and deed of trust. Ballarin showed the MacWickers the Frye appraisal of Brookdale Lodge and the letter from Anderson's attorney stating that the deed of trust represented adequate security for payment of the obligation. He also showed them the January 25 letter from Olsen to Ballarin explaining the liens and encumbrances specified in the City Title policy. The MacWickers told Ballarin that they would like to see the lodge, and Ballarin agreed to show it to them on June 16.

The MacWickers went to Brookdale Lodge on June 16 and asked the clerk at the desk for Ballarin. Ballarin met them in the bar shortly thereafter, but indicated that they should hold their discussion elsewhere because there were "too many ears around." They then drove to a restaurant where they discussed further details of a purchase of the note for $80,000. Ballarin stated that he wanted an option to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

21 Cal.App.3d 289
21 Cal.App.3d 289, 98 Cal.Rptr. 547
**(Cite as: 21 Cal.App.3d 289)**

Page 6

repurchase the $100,000 note in nine months for $102,400.

On the same day as their visit to Brookdale Lodge, the MacWickers went to see Kenneth Baer and told him that they were favorably impressed with the lodge and with the transaction proposed by Ballarin. The MacWickers had brought with them all of the documents shown to them by *298 Ballarin, and Baer examined them. He then decided to go ahead with the purchase.

Mrs. MacWicker went to City Title on June 17, at Ballarin's request, and deposited $5,000 furnished by Baer. She was shown a receipt and escrow instructions indicating that in addition to the $100,000 Anderson note, Baer was also to receive as security a flat note in the amount of $102,400 executed by Dockins Corporation. Mrs. MacWicker asked Olsen about the flat note, and he told her that it represented additional collateral security for her client and that the Dockins Corporation was a big property owner with good assets. She relayed this information to Baer, who then paid the full $80,000 purchase price. Pursuant to his instructions, title to the notes and deed of trust was placed in the names of his children, plaintiffs Debra Moe and David Baer, with each of them taking an undivided one-half interest.

The upshot of the transaction was that plaintiffs received as security a $102,400 flat note executed by Dockins Corporation and collateral security consisting of the Anderson $100,000 note and deed of trust, which had been assigned by Anderson to Ballarin, by Ballarin to Dockins Corporation, and by Dockins Corporation to plaintiffs.

Mrs. MacWicker had requested that a title insurance policy be issued covering the plaintiffs' interest. Instead, she received an assignment of the title policy which had been issued to Ballarin in January 1963. Mrs. MacWicker thought this unusual, and she called Olsen and asked why he had issued an assignment of Ballarin's policy rather than a new policy. He assured her that the assignment was just as good as a new policy and furnished equally complete protection for her clients.

In fact, the Ballarin title insurance policy, as noted above, omitted reference to the pending bankruptcy proceeding, indicated that the first deed of trust on Brookdale Lodge secured a debt of $75,000 rather than $104,718.91, and indicated that the Anderson note and deed of trust were subject to encumbrances totaling $206,061.68 rather than $264,637.26.

Dockins Corporation ultimately defaulted on the flat note, and plaintiffs never received any portion of the $102,400. The bankruptcy proceedings resulted in the sale of Brookdale Lodge free and clear of all liens and encumbrances, including plaintiffs'. Thus, plaintiffs received nothing whatever for their $80,000.

At the conclusion of the trial, the court rendered judgment in favor of plaintiffs and against the defaulting defendants Ballarin and Dockins Corporation in the sum of $80,000 compensatory damages, $50,000 punitive *299 damages and $35,000 in attorney's fees. The court held that plaintiffs should take nothing against defendant Vranich.

Plaintiffs moved for a directed verdict against defendant Anderson on the flat note, stipulating that the judgment should be in the amount of $80,000 and that no award of attorneys' fees would be made. The court granted the motion.

Defendant Anderson then moved for nonsuit on the fraudulent conspiracy count and plaintiffs concurred in the motion. The court granted the motion.

Plaintiffs moved for a directed verdict against City Title and Transamerica on the title insurance policy. The court granted the motion and directed the jury to return a verdict on the policy in favor of plaintiffs and against defendant title insurance companies in the amount of $80,000. This was proper. (Cf. _E. A. Robey & Co._ v. _City Title Ins. Co._ (1968) 261 Cal.App.2d 517, 521 [68 Cal.Rptr. 38].)

On the fraudulent conspiracy count, the jury returned a verdict in the amount of $80,000 compensatory damages; and after appropriate instructions and deliberation, awarded $50,000 punitive damages against defendants City Title and Transamerica.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

21 Cal.App.3d 289                                    Page 7
21 Cal.App.3d 289, 98 Cal.Rptr. 547
**(Cite as: 21 Cal.App.3d 289)**

On March 6, 1969, judgment was entered in favor of plaintiffs and against defendants City Title and Transamerica in the amount of $80,000 compensatory damages and $50,000 punitive damages.

On May 1, 1969, a supplemental judgment was entered against defendants City Title and Transamerica awarding plaintiffs 7 percent interest on the sum of $80,000 from June 18, 1963, to the date of entry of judgment, and attorney's fees in the amount of $35,000.

Defendants City Title and Transamerica filed notice of appeal from both the March 6 judgment and the May 1 judgment.

Appellants' first contention on appeal is that respondents' allegedly usurious conduct precluded any award of interest on their loss. Appellants also contend that the court should have permitted them to inform the jury that respondents were guilty of usury.

(1) Appellants assert that respondents' claim arises out of their loan of $80,000 in return for a flat note for $102,400, with interest included, payable nine months after its execution. Appellants contend that the only reasonable interpretation of the interest provision is that the interest was to be $22,400 or approximately 34 percent per annum. Appellants concede that respondents took the position at the trial that there was no loan but ***300** merely a purchase of the $107,294.86 Anderson note secured by a deed of trust. However, appellants assert that in fact the transaction can only be characterized as a loan and that plaintiffs admitted this to be the case when they based their claim against Anderson on the flat note. Appellants' position is without merit.

Respondents' recovery against appellants was not on the note alleged to be usurious. Compensatory damages in the amount of $80,000 were awarded to respondents on the title insurance contract and also as damages for appellants' fraudulent conduct. The trial court's findings show that the award of interest on the $80,000 was based upon the fraud count and ran from the date of the conspiracy to defraud respondents. It is clear that whether appellants' liability be treated as arising in contract or in tort, the award of interest was proper. Appellants' contention to the contrary was

rejected in _Ruth v. Lytton Sav. & Loan Assn._ (1969) 272 Cal.App.2d 24 [76 Cal.Rptr. 926].

(2) Since appellants' liability was not based upon the allegedly usurious note, it would have been totally improper for appellants to argue the defense of usury to the jury. (3) Usury is a defense personal to the borrower and may not be asserted by one who is not a party to the usurious contract. (_Sosin v. Richardson_ (1962) 210 Cal.App.2d 258, 266 [26 Cal.Rptr. 610]; _Domarad v. Fisher & Burke, Inc._ (1969) 270 Cal.App.2d 543, 560-561 [76 Cal.Rptr. 529].) Appellant title companies were clearly not parties to the transaction claimed to be usurious.

Further, the evidence shows that the transaction was not in fact usurious and that respondents intended only to purchase a note at a discount. (4) It is settled that the mere purchase of a note at a discount is not affected by the usury law. (_Milana v. Credit Discount Co._ (1945) 27 Cal.2d 335, 340 [163 P.2d 869, 165 A.L.R. 621]; _Limpert v. Walker_ (1937) 19 Cal.App.2d 500, 503 [65 P.2d 955]; _Harris v. Pollack_ (1950) 101 Cal.App.2d 26, 28-29 [224 P.2d 824].) (5) The presumptions of law are in favor of legality and if a transaction is open to two constructions, then in the absence of evidence pointing clearly to usury, it is the duty of the court to adopt the construction in favor of lawfulness. (_Garrick v. J.M.P., Inc._ (1957) 150 Cal.App.2d 232, 236 [309 P.2d 896].) (6) It is also the rule that the burden of showing evasion of the usury law must be met by evidence clearly showing usurious intent. (_Milana v. Credit Discount Co., supra,_ at p. 341.) The evidence in the instant case falls far short of establishing that respondents were guilty of usury.

Appellants next contend that there was no evidence that the assurances made by City Title in the endorsement to the policy assigned to respondents ***301** were incorrect. Appellants reason that respondents were therefore precluded from recovering on the insurance contract.

As for the validity of the argument, appellants have chosen to overlook the fact that the endorsement contains the following language: "This indorsement is made a part of said policy and is subject to the schedules, conditions and stipulations therein, except as modified by the provisions hereof." The policy insures against loss or a damage not exceeding

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

21 Cal.App.3d 289
21 Cal.App.3d 289, 98 Cal.Rptr. 547
(Cite as: 21 Cal.App.3d 289)

Page 8

$100,000 which the insured shall sustain as a result of "1. Any defect in or lien or encumbrance on the title to the estate or interest covered hereby in the land described or referred to in Schedule C, *existing at the date hereof* [emphasis added], not shown or referred to in Schedule B or excluded from coverage in Schedule B or in the Conditions and Stipulations; or ... 4. Priority over said mortgage, at the date hereof, of any lien or encumbrance not shown or referred to in Schedule B, or excluded from coverage in the Conditions and Stipulations, said mortgage being shown in Schedule B in the order of its priority; ..."

(7) An examination of the title insurance policy originally issued to Ballarin and subsequently assigned to respondents shows that it omitted any reference to the pending bankruptcy proceeding and to certain other existing liens and encumbrances against the Brookdale Lodge property. The uncontradicted evidence establishes that this omission was knowing and deliberate, since the title reports which appellant City Title had previously ordered from the Penniman Title Company listed each and every lien and encumbrance against the property and also listed the bankruptcy proceeding. Inasmuch as the bankruptcy, in and of itself, ultimately rendered respondents' security totally valueless, respondents were clearly entitled to recover against appellants on the title insurance contract.

(8a) Appellants next contend that even if respondents were entitled to recover on the title insurance contract, they waived such right to recover by failing to comply with certain provisions which were contained in the policy and which required respondents to "promptly notify" appellants of their loss and to give written notice within 60 days after the loss or damage was determined. Appellants assert that although respondents learned of the bankruptcy proceeding in October or November 1963, they presented no claim against appellants until July 1965, when the instant action was commenced.

The record reveals that respondents' actual loss did not occur until July 2, 1965, when the Brookdale Lodge was sold by order of the federal court free and clear of respondents' deed of trust. Until such time, respondents' loss or damage was not determined. Respondents acted promptly when their loss occurred

and commenced this action on July 21, 1965. *302

Prior to the actual sale of the lodge, appellants were at all times well aware of the pendency of the bankruptcy proceeding, having intentionally omitted it from their title insurance policy. Appellants were therefore also charged with constructive notice of any facts which they might have learned had they acted prudently and made inquiries as to the progress of the bankruptcy proceeding. (Civ. Code, § 19.) Appellants obviously made no attempt to do so.

The most glaring weakness in appellants' position is that they made no attempt whatever to demonstrate at the trial that they were prejudiced by the alleged lack of notice. Indeed, appellants failed to call a single witness.

(9-11) It is settled that breach of a notice clause by an insured may not be asserted by an insurer unless the insurer was substantially prejudiced thereby; that prejudice is not presumed as a matter of law from such breach; and that the insurer has the burden of proving actual prejudice and not just a mere possibility of prejudice. (*Northwestern Title Security Co. v. Flack* (1970) 6 Cal.App.3d 134, 141 [85 Cal.Rptr. 693]; *Billington v. Interinsurance Exchange* (1969) 71 Cal.2d 728, 737 [79 Cal.Rptr. 326, 456 P.2d 982]; *Hanover Insurance Co. v. Carroll* (1966) 241 Cal.App.2d 558 [50 Cal.Rptr. 704]; *Campbell v. Allstate Ins. Co.* (1963) 60 Cal.2d 303, 305-307 [32 Cal.Rptr. 827, 384 P.2d 155].)

(8b) Moreover, the facts of the case are such that prejudice could not possibly have resulted. The bankruptcy proceeding was pending when respondents purchased the deed of trust on Brookdale Lodge, and appellants have failed to suggest any way in which they could have prevented the ultimate sale of the lodge, free and clear of respondents' security interest. Respondents' attorney participated in the bankruptcy proceeding and made every attempt to protect his clients' interest.

Appellants next contend that the award of attorney's fee to respondents was improper. Appellants contend that respondents were not entitled to recover the attorney's fees incurred in connection with the bankruptcy proceeding because respondents failed to comply with the notice provisions of the title insurance policy and thereby deprived appellants of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the right to employ an attorney of their own choosing to participate in the bankruptcy proceeding. Appellants also deny that respondents were entitled to recover the attorney's fees incurred in prosecuting the instant action.

(12a) The findings in support of the supplemental judgment awarding respondents attorney's fees shows that said award was based both upon the contract of title insurance and upon appellants' fraudulent conduct. The court specifically found that appellant title companies had fraudulently and proximately caused respondents to reasonably protect their interests by *303 suing third parties and that respondents were entitled to the reasonable value of the attorney's fees incurred.

(13) It is settled that a person who is required through the tort of another to act in protection of his interest by bringing or defending an action against a third person is entitled to recover compensation for the reasonably necessary attorney's fees incurred. (*Prentice* v. *North Amer. Title Guar. Corp.* (1963) 59 Cal.2d 618, 620 [30 Cal.Rptr. 821, 381 P.2d 645]; *Glass* v. *Gulf Oil Corp.* (1970) 12 Cal.App.3d 412, 437-438 [96 Cal.Rptr. 902].) This rule has been held applicable where the plaintiff, as a result of an escrow holders' tortious conduct, is compelled to bring suit against third persons *and* the escrow holder. (*Ruth* v. *Lytton Sav. & Loan Assn.* (1968) 266 Cal.App.2d 831, 844-846 [72 Cal.Rptr. 521]; *Northwestern Title Security Co.* v. *Flack, supra,* 6 Cal.App.3d at pp. 145-146.)

(12b) For respondents to appear and take part in the bankruptcy proceeding was a natural and probable result of appellant title companies' tortious conduct and we deem it of no legal importance that respondents' efforts to preserve their security proved unsuccessful. When the Brookdale Lodge was sold free and clear of respondents' deed of trust, it became necessary for respondents to bring the instant action against third persons and appellant title companies. The award of attorney's fees was unquestionably proper.

(14a) Appellants contend that respondents should not have been allowed to recover punitive damages against Transamerica because City Title alone was guilty of fraud and City Title ceased to exist in 1964, when it was taken over by Transamerica. Appellants do not quarrel with the amount of the damages or the court's power to award same in a fraud case, but they contend that even as punitive damages may not be awarded after the death of an individual defendant (*Evans* v. *Gibson* (1934) 220 Cal. 476 [31 P.2d 389]), they may not now be awarded against the corporate successor in interest of an allegedly "defunct corporation." Appellants cite no authority for this unique proposition.

The record shows that in its answer to the complaint appellant Transamerica designated itself as "Transamerica Title Insurance Company, a corporation, formerly known as City Title Insurance Company." Elsewhere in the answer, it was admitted that defendant Olsen was an employee and assistant secretary of "City Title Insurance Company, also known as Transamerica Title Insurance Company." Clearly, appellant Transamerica made no attempt in the trial court to contend that it was a corporation separate and distinct from City Title or that it was subject to *304 a different standard of liability. To the contrary, the above-quoted portions of the answer are, in effect, admissions that the two corporations are one and the same.

(15) It is the general rule that a corporation formed by consolidation or merger is answerable for the debts and liabilities of the constituent corporations, whether they arise ex contractu or ex delicto. (19 C.J.S., Corporations, § 1630, pp. 1392-1393.) (16) The corporate entities of the constituent corporations are preserved, following consolidation, to the end that they may be served with process and called upon to defend any contract or tort action which may be brought against them. (*Isom* v. *Rex Crude Oil Co.* (1905) 147 Cal. 663, 666-667 [82 P. 319].) (17) Consolidation does not create an entirely new entity but "'merely directs the blood of the old corporation into the veins of the new, the old living in the new.' [Citation.]" (*Mutual B. & L. Assn.* v. *Wiborg* (1943) 59 Cal.App.2d 325, 329 [139 P.2d 73]; to the same effect, see *Jackson* v. *Continental Telephone Co.* (1963) 212 Cal.App.2d 510, 513-514 [28 Cal.Rptr. 1]; *J. C. Peacock, Inc.* v. *Hasko* (1961) 196 Cal.App.2d 363, 369 [16 Cal.Rptr. 525].)

Corporations Code section 4116 provides in pertinent part that upon merger or consolidation, the consolidated or surviving corporation shall be subject to all the debts and liabilities of the constituent

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

21 Cal.App.3d 289

21 Cal.App.3d 289, 98 Cal.Rptr. 547

**(Cite as: 21 Cal.App.3d 289)**

corporations "in the same manner as if the consolidated or surviving corporation had itself incurred them."

Corporations Code section 4124 similarly provides that, following a merger, the parent corporation shall be deemed to have assumed all the liabilities and obligations of the merged corporation and shall be liable "in the same manner as if it had itself incurred such liabilities and obligations."

Corporations Code section 5400 provides that a dissolved corporation nevertheless continues to exist for the purpose of "prosecuting and defending actions by or against it, and enabling it to ... discharge obligations. ..."

In the instant case, as noted above, appellant Transamerica took the position at the trial that it was "formerly known as" City Title and that City Title was "also known as Transamerica. ..." Further, in the recent case of *Paramount Properties Co. v. Transamerica Title Ins. Co.* (1970) 1 Cal.3d 562, 565, footnote 1 [83 Cal.Rptr. 394, 463 P.2d 746], our Supreme Court resolved the question of corporate identity without any difficulty whatever, stating, "Defendant Transamerica Title Insurance Company is the successor in interest to City Title Insurance Company and both **\*305** are referred to hereafter interchangeably as 'defendant' or 'the title insurance company.'"

(14b) Under the circumstances here present, we find nothing in the least improper in the award of punitive damages running jointly against City Title, which continued to exist for the purpose of tort liability, and Transamerica, which succeeded to the tort liability of City Title. Punitive damages are a portion of such tort liability.

(18a) Appellants contend that the trial court erred in directing a verdict against them on the policy of title insurance because it was bound to influence the jurors and to induce them to determine the fraud issue in a manner adverse to appellants.

In support of this argument, appellants cite an inapropos case, *Guerbadot v. Sneckner* (1960) 185 Cal.App.2d 173 [8 Cal.Rptr. 141], which involved a totally dissimilar situation.

In the case at bar, it is apparent that by directing a verdict on the insurance contract, the trial court was in no way suggesting to the jury that appellants were guilty of fraud. In fact, the court instructed the jury as follows: "Now, the fact that I have instructed you to bring in directed verdicts against - a directed verdict against Transamerica Title Insurance Company on its contractual obligation in the amount of $80,000 and to bring in a directed verdict against Dr. Anderson on his contractual obligation in that same amount, should not be considered - shall not be considered by you in any way on the question of which party is entitled to a verdict on the issue of fraud, on the Second Cause of Action, nor does such direction intimate any view of my own on this issue of liability or as to which party is entitled to your verdict or as to whether or not punitive damages should be awarded."

After giving this instruction, the court asked if it was clear, and appellant's counsel replied in the affirmative.

In view of the court's clarifying instruction, it would seem clear beyond a doubt that the directed verdict on the insurance contract could not have influenced the verdict on the fraud count. Moreover, the evidence of appellants' fraud was so overwhelming that no reasonable jury could have returned a verdict in favor of appellants. The uncontradicted evidence established that defendant Olsen, who was an agent and employee of appellant City Title, was well aware of the bankruptcy proceeding pending against Brookdale Lodge but that he conspired with defendant Ballarin to conceal this fact from Kenneth Baer in order to induce the latter into paying $80,000 for a worthless security interest. Thus, the evidence shows that Olsen and Ballarin obtained an appraisal of the Brookdale Lodge and a letter from **\*306** Anderson's attorney, both containing no reference to the bankruptcy proceeding. In addition to these letters, Kenneth Baer was also shown a letter which was written by Olsen himself and which purportedly explained the liens and encumbrances against the lodge but again omitted all reference to the bankruptcy proceeding. Finally, Olsen issued a policy of title insurance which omitted all reference to the bankruptcy proceeding. He then undertook to assign it to respondents and affirmatively represented that the assignment afforded as complete protection as a new policy.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

21 Cal.App.3d 289
21 Cal.App.3d 289, 98 Cal.Rptr. 547
(Cite as: 21 Cal.App.3d 289)

There was expert testimony in the instant case that a title insurance company is a trustee as to all principals to an escrow and that an escrow officer has a duty to each of the principals to act fairly and to disclose any facts which might materially affect their interests. The escrow officer should make a preliminary report available to the principals and should accurately describe the condition of the title. It is obvious that City Title, acting by and through its agent, Olsen, fulfilled none of these duties.

Deceit may consist of the suppression of a fact by one who is bound to disclose it or who gives information of other facts which are likely to mislead for want of communication of that fact. (Civ. Code, § 1710, subd. 3.) (19) The intentional failure to disclose a material fact is actionable fraud if there is a fiduciary relationship giving rise to a duty to disclose it. (Black v. Shearson, Hammill & Co. (1968) 266 Cal.App.2d 362, 367 [72 Cal.Rptr. 157].) (18b) The evidence in the instant case is susceptible of no other interpretation but that appellant City Title was guilty of actionable fraud.

(20) Appellants' final contention is that the trial court erred in erroneously admitting evidence pertaining to another action filed against City Title.

Appellants' position is wholly without merit, since a letter which was read into evidence at the trial and which was written by appellants' associate counsel specifically refers to the action in question as being "predicated on fraud." Admission of the evidence pertaining to this action was clearly proper under Evidence Code section 1101, subdivision (b), since the evidence was relevant to prove motive, opportunity, intent preparation, plan, knowledge, identity and the absence of mistake or accident. Further, for the reasons pointed out above, admission of the evidence complained of could not conceivably have been prejudicial to appellants.

One further point requires discussion. Respondents have asked this court to award them attorney's fees on appeal and have filed the declaration of their attorney, William Ferriter, averring that he has devoted approximately 400 hours to the preparation of respondents' brief and feels that the reasonable *307 value of his services on appeal is $20,000. Appellants filed an opening brief which

contained numerous assignments of error but with an extremely scanty reference to the lengthy reporter's transcript, and appellants thereby shifted to respondents the burden of adequately summarizing the evidence. Respondents' brief contains a fair, accurate and thorough review of the evidence, and it also contains a competent, clear and well-written analysis of the arguments raised and the law pertaining thereto. (21) This court properly could award respondents an appropriate sum on appeal as attorney's fees. (Wilson v. Wilson (1960) 54 Cal.2d 264, 272 [5 Cal.Rptr. 317, 352 P.2d 725]; Beverly Hills Nat. Bank v. Glynn (1971) 16 Cal.App.3d 274, 289 [93 Cal.Rptr. 907].)

However, it would seem that the judgments herein affirmed are sufficient to reimburse the successful respondents.

The judgments are affirmed. Respondents will have their costs on appeal.

Taylor, P. J., and Kane, J., concurred. *308
Cal.App.1.Dist.
Moe v. Transamerica Title Ins. Co.
21 Cal.App.3d 289, 98 Cal.Rptr. 547

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT E

## TO APPENDIX OF AUTHORITIES CITED IN VISA'S MOTION TO DISMISS MARITZ'S FRAUD COUNTERCLAIMS

14 Cal.App.4th 1692                                                      Page 1
14 Cal.App.4th 1692, 19 Cal.Rptr.2d 555
**(Cite as: 14 Cal.App.4th 1692)**

▷People ex rel. Sepulveda v. Highland Federal Sav. and Loan
Cal.App.2.Dist.
THE PEOPLE EX REL. JOSEFINA SEPULVEDA et al., Plaintiffs and Appellants,
v.
HIGHLAND FEDERAL SAVINGS AND LOAN et al., Defendants and Respondents.
**No. B058411.**

Court of Appeal, Second District, Division 3, California.
Jan. 26, 1993.

SUMMARY

The trial court sustained, without leave to amend, demurrers to a complaint asserting a federally chartered savings and loan institution's wrongful course of conduct enabling slum conditions in certain urban buildings to be perpetuated to the detriment of the health, safety, and welfare of the People of California and, in particular, a class of tenant plaintiffs. In addition to the savings and loan, defendants included the institution's president, its loan coordinator and vice-president, and a wholly owned subsidiary. Plaintiffs sought to hold defendants responsible for continuing slum conditions of certain buildings of which defendants allegedly were the beneficial (non-record) owners. In addition to monetary damages and penalties, plaintiffs sought injunctive relief. The court found the complaint failed to state a cause of action for violations of the Racketeer Influenced and Corrupt Organizations Act (RICO) (18 U.S.C. § 1961 et seq.) for fraud or for fraudulent concealment. The court further found the entire complaint, except the RICO cause, was barred by federal preemption. Based on the sustained demurrers, the court dismissed the action. (Superior Court of Los Angeles County, No. C718828, Barnet M. Cooperman, Judge.)

The Court of Appeal reversed with directions. The court held the various state causes of action were not explicitly or impliedly barred by federal preemption pursuant to the Home Owners' Loan Act (12 U.S.C. § 1461 et seq.) or its concomitant regulations, none of which purport to address the subject of minimum housing standards; allegations of usury and a prayer to enforce due-on-sale clauses, however, were expressly preempted and had to be struck. The court also held a cause based on RICO violations was stated: the requisite facts concerning the existence of an "enterprise" had been alleged, and, although allegations of wire fraud were deficient, the "racketeering activity" element was adequately pleaded by allegations of mail fraud. The court further held the complaint stated a cause of action for fraud, though not for fraudulent concealment. (Opinion by Croskey, J., with Klein, P. J., and Hinz, J., concurring.)

HEADNOTES

Classified to California Digest of Official Reports

**(1)** Pleading § 23--Demurrer to Complaint--Demurrer as Admission-- Application of Rule on Appeal.
All well-pleaded allegations of a complaint are deemed to be true for the purpose of appellate review of a ruling on a demurrer.

**(2)** Appellate Review § 109--Briefs--Form and Requisites--Argument-- Omission.
An appellate court is not required to consider matters urged in the briefs where no pertinent argument is made in support thereof.

**(3a, 3b)** Constitutional Law § 34--Distribution of Governmental Powers-- Between Federal and State Governments--Conflicts Between Federal and State Powers and Their Resolution--Preemption-- Determining Intent of Congress.
In determining whether a state statute or cause of action is preempted by federal law and so invalid under U.S. Const., art. VI, cl. 2, the court's sole task is to ascertain the intent of Congress. First, within constitutional limits, Congress may preempt state law by so stating in express terms. Second, intent to preempt in a particular area may be inferred where a comprehensive scheme of federal regulation makes reasonable the inference that Congress left no room for supplementary state regulation. Third, where Congress has not completely displaced state regulation, federal law may yet preempt state law to the extent it actually conflicts with federal law, either because compliance with both federal and state regulations is a physical impossibility, or because

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

14 Cal.App.4th 1692                                                      Page 2
14 Cal.App.4th 1692, 19 Cal.Rptr.2d 555
**(Cite as: 14 Cal.App.4th 1692)**

state law obstructs accomplishment of the full purposes and objectives of Congress. However, no implied preemption is found where the impact on the subject is merely indirect.
[See 7 **Witkin**, Summary of Cal. Law (9th ed. 1988) Constitutional Law, § 8.]
(**4a**, **4b**) Constitutional Law § 34--Distribution of Governmental Powers-- Between Federal and State Governments--Conflicts Between Federal and State Powers and Their Resolution--Preemption-- Disfavored.
Preemption of state law by federal regulation is not favored. The court will not find express preemption unless a regulation clearly so states. It is the burden of the party claiming preemption to prove it. Preemption is not to be lightly presumed.

(**5a**, **5b**, **5c**) Constitutional Law § 34--Distribution of Governmental Powers--Between Federal and State Governments--Conflicts Between Federal and State Powers and Their Resolution--Preemption--Agency Regulation.
Although federal regulations are not themselves controlling on the preemption issue, where Congress has entrusted an agency with the task of promulgating regulations to carry out the purposes of a statute, as part of the preemption analysis a court must consider whether the regulations evidence a desire to occupy a field completely. Preemption should not be inferred, however, simply because the agency regulations are comprehensive and sufficient to meet the need identified by Congress; the states and localities are not thereby barred from identifying additional needs or imposing further requirements in the field. No implied preemption is found where the impact on the subject is merely indirect. Also, where the subject matter is an area traditionally regulated by the states, no federal preemption is implied unless there is a clear and manifest intent shown.

(**6a**, **6b**, **6c**, **6d**) Savings and Loan Associations § 10- -Federal Associations--Regulation--Federal Preemption--Pleadings:Constitutional Law § 34-- Distribution of Governmental Powers--Between Federal and State Governments--Conflicts Between Federal and State Powers and Their Resolution-- Preemption--Federal Savings and Loan Association.
The paramount purpose of the Home Owners' Loan Act (12 U.S.C. § 1461 et seq.) is to ensure the solvency of federal savings associations. Hence, various state causes of action grounded in a federally chartered savings and loan institution's alleged wrongful course of conduct enabling slum conditions

in certain urban buildings to be perpetuated to the detriment of the health, safety, and welfare of the People of California and, in particular, a class of tenant plaintiffs, were not explicitly or impliedly barred by federal preemption pursuant to the act or its concomitant regulations, none of which purported to address the subject of minimum housing standards. The cause for unfair business practices did not directly affect the institution's operations under the regulations, and the regulations did not pertain to the racketeering charges; the remaining nuisance and other causes would at most only incidentally and remotely touch on the institution's operations. Allegations of usury and a prayer to enforce due-on-sale clauses, however, were expressly preempted and had to be struck.

(**7a**, **7b**) Conspiracy § 19--Civil--Pleading--RICO-- Elements.
To state a cause of action under the Racketeer Influenced and Corrupt Organizations Act (RICO) (18 U.S.C. § 1961 et seq.), a plaintiff must plead facts to show (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. The enterprise is an entity, a group of persons associated for a common purpose of engaging in a course of conduct. It is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit.
[What is an enterprise, as defined at 18 USCS § 1961(4), for purposes of the Racketeer Influenced and Corrupt Organizations (RICO) statute (18 USCS §§ 1961 et seq.), note, 52 A.L.R. Fed. 818.]
(**8a**, **8b**, **8c**) Conspiracy § 19--Civil--Pleading-- RICO--Savings and Loan Association.
In an action asserting a savings and loan institution's wrongful course of conduct enabling slum conditions in certain urban buildings to be perpetuated to the detriment of the health, safety, and welfare of the People of California and, in particular, a class of tenant plaintiffs, the trial court erred in sustaining, without leave to amend, demurrers to a cause of action based on violations of the Racketeer Influenced and Corrupt Organizations Act (RICO) ( 18 U.S.C. § 1961 et seq.). The requisite "enterprise" facts consisted in allegations of a continuing scheme to defraud the tenant plaintiffs, that defendants were ongoing business entities with an ongoing relationship independent of that fraud scheme, and that an ongoing series of business transactions among defendants regarded each of the subject buildings. Although allegations of wire fraud were deficient, the "racketeering activity" element was adequately

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

pleaded by allegations of mail fraud describing the intent to defraud and facts as to the time, place, and content of alleged mailings. Further, the directly resulting injuries to plaintiffs were pleaded.

**(9)** Conspiracy § 19--Civil--Pleading--RICO--Mail Fraud:Post Office § 3-- Improper Use of Mails--Mail Fraud--Actions--Pleading.

In pleading a violation of the mail fraud statute (18 U.S.C. § 1341) as a predicate act under a scheme in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO) (18 U.S.C. § 1961 et seq.), plaintiffs must allege that (1) the defendants devised a scheme or artifice to defraud, (2) the defendants used the mails in furtherance of the scheme, and (3) the defendants did so with the specific intent to deceive or defraud.

[Validity, construction, and application of federal mail fraud statute (18 USCS § 1341, and similar predecessor provisions)-Supreme Court cases, note, 97 L.Ed.2d 863.]

**(10)** Fraud and Deceit § 25--Actions--Pleading--RICO--Wire Fraud:Conspiracy § 19--Civil--Pleading--RICO--Wire Fraud:Telegraphs and Telephones § 2--Crimes-- Wire Fraud--Actions--Pleading.

In pleading a violation of the wire fraud statute (18 U.S.C. § 1342) as a predicate act under a scheme in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO) (18 U.S.C. § 1961 et seq.), plaintiffs must allege that (1) the defendants devised a scheme or artifice to defraud, (2) the defendants used the wires in furtherance of the scheme, and (3) the defendants did so with the specific intent to deceive or defraud.

**(11)** Fraud and Deceit § 25--Actions--Pleading--Savings and Loan Association.

A complaint asserting a savings and loan institution's wrongful course of conduct enabling slum conditions in certain urban buildings to be perpetuated to the detriment of the health, safety, and welfare of the People of California and, in particular, a class of tenant plaintiffs, stated a cause of action for fraud. It set forth with ample particularity the identities of the record holders of title to the subject properties, the identities and capacities of the many plaintiffs, and the time frame in which the alleged misrepresentations were made. Specific, detailed minutiae were properly the subject of discovery, not demurrer.

**(12)** Fraud and Deceit § 8--Fraudulent Concealment--

Beneficial Ownership of Leased Property--Pleading.

A complaint asserting a savings and loan institution's wrongful course of conduct enabling slum conditions in certain urban buildings to be perpetuated to the detriment of the health, safety, and welfare of the People of California and, in particular, a class of tenant plaintiffs, stated no cause of action for fraudulent concealment. Plaintiffs sought to compel the beneficial (nonrecord) owners of the subject properties to disclose their ownership to the tenant plaintiffs to enable them to seek civil relief or governmental enforcement of the habitability law, but the disclosure provisions of Civ. Code, § 1962 (information required in multiunit dwelling rental agreement), do not give rise to a duty to disclose the name and address of a beneficial owner. The reference in Civ. Code, § 1962, subd. (a), to an "owner of the premises" is to the record owner, not the beneficial owner.

COUNSEL

James K. Hahn, City Attorney, Stephanie Sautner and Ronald Low, Deputy City Attorneys, Litt, Marquez & Fajardo, Barrett S. Litt and Ben Margolis for Plaintiffs and Appellants.

McKenna & Fitting, Michael D. Berk, Aaron M. Peck, Theresa A. Kristovich and Carl W. Sonne for Defendants and Respondents.

**CROSKEY, J.**

Plaintiffs appeal from the judgment of dismissal following the sustaining without leave to amend demurrers to the second amended complaint of defendants Highland Federal Bank (Highland), Ben Karmelich (Karmelich), Selina Elizabeth Pratt (Pratt), and H.F.S. Corporation (HFS; collectively, the Highland defendants). The court found the complaint failed to state a cause of action for Racketeer Influenced and Corrupt Organizations Act (RICO) (18 U.S.C. § 1961 et seq.) violations, fraud and fraudulent *1698 concealment. The court further found the entire complaint, except the RICO cause of action, was barred by federal preemption.

Because the trial court erred in finding no cause of action was stated and the doctrine of federal preemption barred the state claims, we reverse the judgment.

Factual Statement

1. *The Parties*

14 Cal.App.4th 1692                                                    Page 4
14 Cal.App.4th 1692, 19 Cal.Rptr.2d 555
**(Cite as: 14 Cal.App.4th 1692)**

Plaintiffs consist of the People of the State of California (People) and numerous individuals in their individual capacity and as guardians ad litem and on behalf of a class who resided in one or more of the subject slum Los Angeles City buildings (tenant plaintiffs). [FN1]

FN1 The original individual plaintiffs are: Josefina Sepulveda; Margarita Espinoza; Margarita Bonilla; Raul Cruz Amaya; Jova Corea; Rosa Estela Nevares; Jose Santos Nevares; Rosa Cordova; Maria B. Mergar; Raudel Flores; Haydee Alcantara; Angel Edgardo Flores; Ana Arellano; Jose Roberto Reyes; Concepcion Reyes; Gloria Escobar; Silvia Escobar; Eddy Sanchez; Trinidad Garcia; Ramon Rojas; Josefina Rivera; Manuel Rivera; Salvador Rivera; Leticia Ruiz; Concepcion Garcia; Roman Campos; Ramon Campos; Daisy Villalobos; Maria Rojas; Gregorio Rojas; Amalia Mendoza; Manuel Gil; Maria De La Luz Almaraz; Guadalupe Barragan; Luz Ines Ruiz; Amalia Delgado; Jorge Florez; and Rafael Valtierra, individually, and on behalf of a class composed of all present tenants or residents of the following buildings, all located in the City of Los Angeles: 4020 South San Pedro Street; 5426 Virginia Avenue; 823 South Bonnie Brae Street; 807 South Fedora Avenue; 504 South Bonnie Brae Street; 533 Ceres Avenue; 1000 Echo Park Avenue; 1616 West 11th Street; 526 South Union Avenue; and 2616 Idell Street, and of all persons who were tenants and/or residents of said buildings at material times; Maria De Jesus Rodriguez, Betty Rodriguez, Guadalupe Ibarra, and Esiquio Rodriguez, minors, by their guardian ad litem Josefina Sepulveda; Javier Espinoza, George Michael Espinoza, Yesenia Raquel Espinoza, and Daniel Alejandro Bonilla, Tricia Bonilla, minors, by their guardian ad litem Margarita Espinoza; Alexander Corea Amaya, a minor, by his guardian ad litem Raul Cruz Amaya; Juan Jose Nevares and Carlos F. Nevares, Minors, by their guardian ad litem Rosa Estela Nevares; Yovani Velasquez, Jose Velasquez, Yessica Mergar, minors, by their guardian ad litem Maria B. Mergar; Indira Alcantara, a minor, by her guardian ad litem Haydee Alcantara; Mayra Arellano; Antonio Arellano; Steve Arellano; Eduardo Arellano

and Cindy Arellano, minors, by their guardian ad litem Ana Arellano; Patricia Reyes, minor, by her guardian ad litem Jose Roberto Reyes; Karen Rojas, Maria Garcia, Raul Garcia, minors, by their guardian ad litem.
On February 6, 1991, the court dismissed plaintiffs Silvia Escobar, Eddie Sanchez, Ana Arellano, and Guadalupe Barragan in their individual capacity pay for failing to comply with a prior discovery order.

The defendants who are parties to this appeal are Highland, Karmelich (its president), Pratt (its loan coordinator and vice-president), and HFS (its wholly owned subsidiary).*1699

Highland, a federally chartered savings and loan institution, specializes in making loans to owners of residential properties, including slum buildings in the greater Los Angeles area. Eight of the eleven slum properties listed in this complaint were financed by defendant Highland. Karmelich is both its president and chief executive officer. Karmelich also served as secretary of the board of directors of defendant Northeast. Pratt is a vice-president and loan coordinator for defendant Highland. Pratt helped Highland facilitate the rapid transfer of record ownership of slum buildings. She was also actively engaged in soliciting and arranging for uncreditworthy borrowers to assume Highland loans on those slum buildings without regard to the borrowers' ability to maintain and repair the buildings. HFS is a California corporation and a wholly owned subsidiary of defendant Highland. (1)(See fn. 2.) Among its activities is the servicing of loans made by defendant Highland. [FN2]

FN2 These facts are alleged in the second amended complaint. All well-pleaded allegations of the complaint are deemed to be true for the purpose of appellate review of a ruling on a demurrer. (*Shoemaker v. Meyers* (1990) 52 Cal.3d 1, 7 [276 Cal.Rptr. 303, 801 P.2d 1054, A.L.R.4th 1720].)
These defendants are sometimes collectively referred to as the "Highland defendants." A number of other defendants were named in plaintiffs' second amended complaint. However, these remaining defendants are not parties to this appeal. They consist of other lenders, which are not savings associations, and individuals, including

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

14 Cal.App.4th 1692                                                              Page 5
14 Cal.App.4th 1692, 19 Cal.Rptr.2d 555
**(Cite as: 14 Cal.App.4th 1692)**

some who at one time or another were owners of the subject 11 buildings. The action remains pending as to these defendants.

### 2. Nature of Charging Allegations

In this action plaintiffs seek to hold the Highland defendants responsible for the continuing slum conditions of certain buildings. In addition to monetary damages and penalties the complaint seeks injunctive relief. [FN3] **\*1700**

FN3 Plaintiffs seek to enjoin the Highland defendants from, inter alia:

"(a) Soliciting, engaging or permitting individuals to act as straw buyers or record owners who, in fact, have no genuine ownership interest in the substandard property;

"(b) Recording or causing to be recorded any document containing the name of any record owner who is not the true owner of the substandard property, the legal obligor on the deed of trust, or the party whose assets were relied upon in creating the encumbrance;

"(c) Accepting, notarizing, causing to be notarized, or recording or causing to be recorded any documents that are a part of any financing arrangement concerning any substandard property, which document has been executed by a person other than the person whose name appears on the document;

"(d) Failing to send a copy of the notice set forth in sub-paragraph (g) below to each unit in the substandard property, in both English and Spanish, upon recordation of a trust deed to the potential borrower secured on the subject property;

"(e) Recording or causing to be recorded a trust deed secured by substandard property without first providing a copy of the trust deed, title report, and written proof of compliance with sub-paragraph (d) above to the following interested agencies: [¶] (i) Office of Thrift Supervision (OTS); [¶] (ii) The Housing Enforcement Division of the Los Angeles City Attorney's office; [¶] (iii) The Legal Aid Foundation of Los Angeles;

"(f) Selling or assigning Highland's beneficial interest in any note secured by substandard property without first providing to the purchaser or assignee a copy of the trust deed, the recorded substandard order, and the notice described in sub-paragraph (g) below; and without providing notice of such sale to the agencies listed in sub-paragraph (e) above.

"(g) Failing to give written notice to any potential borrower or anyone seeking to assume a note, previously issued by Highland, on substandard property of which the lender has notice by reason of recorded notice or otherwise concerning the potential legal consequences attached to ownership of said property. Said written notice shall include: [¶] (i) An advisement that the subject property or building has been declared substandard; [¶] (ii) That the borrower or person assuming the note and taking title to the property may be held criminally responsible if he or she fails to correct the substandard conditions; [¶] (iii) That the amount of rent a tenant owes may be subject to reduction by virtue of the uninhabitable conditions; [¶] (iv) That tenants may have a cause of action for damages with respect to the conditions in the building, and for injunctive relief requiring repair of said buildings forthwith; [¶] (v) That potential rent increases may be denied pursuant to the Los Angeles City Rent Stabilization Ordinance if the Substandard Notice is not lifted; [¶] (vi) That if borrower or person assuming the note fails to undertake the necessary repairs within a reasonable time (120 days), the lender will petition the court for the appointment of a receiver to collect the rents and make repairs, pursuant to waste provisions of its deed of trust; [¶] (vii) That under California law a borrower may not be able to claim state tax deductions for the interest payments and depreciation on said property until the Substandard Notice is removed.

"(h) Declining to initiate and complete foreclosure as speedily as the law permits on substandard property of which the lender has notice if the substandard conditions are not fully corrected within 120 days, provided that foreclosure proceedings may terminate if correction occurs before foreclosure is completed ...."

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

14 Cal.App.4th 1692                                                    Page 6
14 Cal.App.4th 1692, 19 Cal.Rptr.2d 555
**(Cite as: 14 Cal.App.4th 1692)**

The thrust of the complaint charges Highland with engaging in unfair business practices and fraud for the purpose of maximizing its profits. Such goal was achieved by creating a situation where rents, which were collectable only if the units complied with the habitability laws, were generated without the expenditure of sums necessary to ensure such compliance. Thus, the slum nature of the buildings was perpetuated and the tenant plaintiffs were defrauded of their right to a habitable dwelling.

Essentially, Highland allegedly committed such illegal activities through fraudulent loan transactions in order to avoid criminal and civil liability. Highland hid and exercised its control over the subject buildings by setting up record owners who had only token or no investment in the buildings, i.e., either such owners had insufficient asserts or lacked bona fide business qualifications to obtain the loans. In general, title to the buildings was worthless since the amount of the loans exceeded the fair market value of the security. The record owners therefore were "strawmen" who were basically managers of the buildings for Highland's benefit.

It is further alleged that Highland in effect was the true beneficial owner of the buildings because it determined who would be the record owner and when the owner failed to perform, Highland replaced him or her with another whom it could control. Such transfers of record ownership also *1701 served to complicate and frustrate civil and criminal prosecution for violation of the habitability law.

It was also alleged that Highland routinely facilitated the title transfer of the buildings without the exercise of the due-on-sale clauses of the loan agreements, without requiring loan assumption by creditworthy individuals, and without scrutiny to ensure necessary repairs were made. Highland charged loan points and interest at a rate higher than those for bona fide loan transactions and utilized the entire or almost entire loan amount from the new record owner to pay off the principal, interest, penalties and arrearages owed by the former record holder. Such loans were often arranged by lender-related defendants controlled by and/or associated with Highland. Highland then allowed or caused the fraudulent documents to be recorded in order to hide their control.

Finally, it was alleged the above pattern of activity by Highland was outside of and inconsistent with the normal and standard practice of lenders.

Procedural Statement

This action was filed on March 28, 1989. On June 7, 1990, a second amended complaint asserting numerous causes of action was filed, including those for RICO violations, fraud and fraudulent concealment. [FN4] *1702

FN4 That complaint set forth, respectively, these causes of action:
(1) Unfair business practices (Bus. & Prof. Code, § 17200) (first cause of action by the People against all defendants);
(2) Violation of 18 United States Code sections 1961-1968 (RICO) (causes of action 81-161 by all plaintiffs against Highland, Karmelich, Pratt, inter alia, but not HFS). Former causes of action 2 through 80 and 81 in the first amended complaint were not realleged in the second amended complaint. There are no causes of action 2 through 80 in the second amended complaint;
(3) Injunctive relief (causes of action 162-242 by all plaintiffs against all defendants);
(4) Breach of warranty of habitability regarding written contract (causes of action 243-323 by all tenant plaintiffs against all defendants);
(5) Breach of warranty of habitability regarding oral contract (causes of action 324-404 by all tenant plaintiffs against all defendants);
(6) Nuisance (causes of action 405-485 by all tenant plaintiffs against all defendants);
(7) Negligence (causes of action 486-566 by all tenant plaintiffs against all defendants);
(8) Strict liability regarding maintenance of slum premises (causes of action 562-647 by all tenant plaintiffs against all defendants);
(9) Intentional infliction of emotional distress (causes of action 648- 728 by all tenant plaintiffs against all defendants);
(10) Violation of Civil Code section 1942.4 (causes of action 729-809 by all tenant plaintiffs against all defendants);
(11) Fraud (causes of action 810 through 890 by all tenant plaintiffs against all defendants);

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

14 Cal.App.4th 1692                                                                 Page 7
14 Cal.App.4th 1692, 19 Cal.Rptr.2d 555
**(Cite as: 14 Cal.App.4th 1692)**

(12) Fraudulent concealment (<u>Civ. Code, §</u> <u>1710</u>, subd. (3)) by all tenant plaintiffs against all defendants; and
(13) Violation of <u>Civil Code section 789.3</u> (interruption of utility services) (causes of action 972-1,052 by all tenant plaintiffs against all defendants).
For the purpose of this appeal the enumerated groups of causes of actions in (2) through (13) above are referred to as causes of action 2 through 13, respectively.

On August 6, 1990, Highland defendants filed demurrers to that complaint. They also filed a companion motion to strike. On or about October 19, 1990, plaintiffs filed joint opposition. On or about November 13, 1990, Highland defendants filed their reply.

On January 25, 1991, the court sustained certain demurrers without leave to amend. The court sustained demurrers without leave to amend as to all causes of action, except the second for RICO violations, on the ground of failure to state a cause of action (<u>Code Civ. Proc., § 430.10</u>, subd. (e)) because of federal preemption. As authority it relied on <u>section 545.2 of title 12 of the Code of Federal Regulations; *Fidelity Federal Savings and Loan v. De La Cuesta* (1982) 458 U.S. 141, 162 [73 L.Ed.2d 664, 680-681, 102 S.Ct. 3014];</u> and *Wisconsin League of Financial Institutions v. Galecki* (W.D.Wis. 1989) <u>707 F.Supp. 401, 405.</u>

The court further sustained demurrers without leave to amend on the ground of failure to state a cause of action (<u>Code Civ. Proc., § 430.10</u>, subd. (e)) specifically as to the 2d cause of action (RICO), the 11th cause of action for fraud, and the 12th cause of action for fraudulent concealment. The court also sustained uncertainty demurrers to the entirety of the complaint with leave to amend. (<u>Code Civ. Proc., § 430.10</u>, subd. (f).) The motion to strike was placed off calendar.

On March 15, 1991, the court entered the order (judgment) of dismissal based on the sustaining of the demurrers of the Highland defendants, without leave to amend.

Issues Presented

This appeal presents three basic issues: (1) Are

the state claims against Highland, a federal savings and loan association, preempted by federal law? (2) If so, does federal preemption also bar the action against Karmelich, Highland's president, Pratt, its loan coordinator and a vice-president, and HFS, its wholly owned subsidiary? (3) Does the complaint state a cause of*1703 action against the Highland defendants for RICO violations, fraud, or fraudulent concealment?

Discussion

1. *Action Against Highland Not Barred by Federal Preemption Under HOLA*[FN5] *(2)(See fn. 5)*

a. *Principles Applicable to Determination of Preemption*

(3a) "Preemption issues are resolved through the process of statutory interpretation. [Citation.] We look to the language of the statute and to the intent of Congress." (<u>*Siegel v. American Savings & Loan Assn.* (1989) 210 Cal.App.3d 953, 959 [258 Cal.Rptr. 746].</u>)

> FN5 The Highland defendants concede the trial court's ruling based on federal preemption was grounded only on the Federal Home Owners' Loan Act of 1933 (HOLA) (<u>12 U.S.C. § 1461</u> et seq.) and its concomitant regulations. Nonetheless, they urge us to uphold that ruling on the additional grounds of federal preemption based on the Federal Fair Housing Act of 1986 (<u>12 U.S.C. § 3601</u> et seq.) and The Community Reinvestment Act (<u>12 U.S.C. § 2903</u> et seq.). They assert: " 'If right upon any theory of the law applicable to the case, [a ruling] must be sustained regardless of the considerations which may have moved the trial court to its conclusion.' [Citation.]" (<u>*D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 19 [112 Cal.Rptr. 786, 520 P.2d 10].</u>)
> We have no quarrel with their recitation of law except to find it inapposite since defendants have failed to establish the applicability of those acts to the issues before this court. We observe the above two acts were briefly mentioned at footnote 30 of their demurrer memorandum, and thus, were technically before the trial court.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

14 Cal.App.4th 1692
14 Cal.App.4th 1692, 19 Cal.Rptr.2d 555
**(Cite as: 14 Cal.App.4th 1692)**

Page 8

On appeal they devote several pages to quotations from the Fair Housing Act in their brief but fail to cogently connect the act's requirements with the matters at issue, which are mentioned in some detail in only footnote 19. Similarly, the Highland defendants quote at length from the Community Reinvestment Act but set forth no cognizable connection between its provisions and the subject issues.

Based on the above we reject their position as unsupported. It is well established that as an appellate court we are not required to consider matters urged in the briefs where no pertinent argument is made in support thereof. (See, e.g., _Strutt v. Ontario Sav. & Loan Assn._ (1972) 28 Cal.App.3d 866, 873 [105 Cal.Rptr. 395].)

" 'In determining whether a state statute [or a state cause of action] is pre-empted by federal law and therefore invalid under the Supremacy Clause of the Constitution, our sole task is to ascertain the intent of Congress. ... First, when acting within constitutional limits, Congress is empowered to pre-empt state law by so stating in express terms. Second, congressional intent to pre-empt state law in a particular area may be inferred where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress "left no room" for supplementary state regulation. ... [¶] As a third alternative, in those areas where Congress has **\*1704** not completely displaced state regulation, federal law may nonetheless preempt state law to the extent it actually conflicts with federal law. Such a conflict occurs either because "compliance with both federal and state regulations is a physical impossibility," or because the state law stands "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. " (4a) Nevertheless, pre-emption is not to be lightly, presumed.' (_California Federal S. & L. Assn. v. Guerra_ (1987) 479 U.S. 272, 280-281 [93 L.Ed.2d 613, 623, 107 S.Ct. 683], citations omitted.) (5a) In _R. J. Reynolds Tobacco Co. v. Durham County_ (1986) 479 U.S. 130, 149 [93 L.Ed.2d 449, 467, 107 S.Ct. 499], the court stated: 'Although the regulations are not themselves controlling on the pre-emption issue, where, as in this case, Congress has entrusted an agency with the task of promulgating regulations to carry out the purposes of a statute, as part of the pre-emption analysis we must consider whether the regulations evidence a desire to occupy a field

completely. Pre-emption should not be inferred, however, simply because the agency's regulations are comprehensive.' (Citations omitted.)" (_Siegel v. American Savings & Loan Assn., supra_, 210 Cal.App.3d at pp. 958-959.)

b. _No Express Preemption Under HOLA Except as to Two Items_

HOLA is the acronym of the federal Home Owners' Loan Act of 1933 (12 U.S.C. § 1461 et seq.). [FN6] " 'The language of HOLA, as well as the history that lies behind its enactment, demonstrate that there is a strong federal interest in the uniform treatment of the federally chartered savings and loans associations. Congress initially enacted HOLA and its regulatory structure in response to a crisis in the nation's private home financing system. [Citation.] This crisis had developed at least in part as a result of the inconsistent and ill- advised practices of the various states. As noted by the Ninth Circuit, " the states had developed a hodgepodge of savings and loan laws and regulations, and Congress hoped that [the Federal Home Loan Bank Board's] rules would set an example for uniform and sound savings and loan regulations." [FN7] (_Conference of Federal Savings & Loan Ass'ns v. Stein_, 604 F.2d 1256, 1258, (9th Cir. 1979), summarily affd., 445 U.S. 921, 100 S.Ct. 1304, 63 L.Ed.2d 754 (1980), citing T. Marvell, _The Federal Home Loan Bank Board_ at 26 (1969).' (_Eureka Federal Sav. and Loan Ass'n v. Kidwell_ (N.D.Cal. 1987) 672 F.Supp. 436, 439.)" (_Siegel, supra_, 210 Cal.App.3d at p. 959.)

> FN6 All statutory references are to title 12 of the United States Code unless otherwise specified.

> FN[7] The board was replaced in 1989 with the Office of Thrift Supervision (OTS) and its director. (§§ 1462(1) & (3), 1462a(e).)

Part 545 of title 12 of the Code of Federal Regulations (12 C.F.R.) sets forth the regulations covering the operations of a federal association. **\*1705** Section 545.1 of 12 C.F.R., which specifies the general parameters of the association's authority, provides: "A Federal savings association may exercise all authority granted it by [HOLA] and its charter and bylaws, whether or not implemented specifically by Office regulations, subject to the limitations and interpretations contained in this part."

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

14 Cal.App.4th 1692                                    Page 9
14 Cal.App.4th 1692, 19 Cal.Rptr.2d 555
**(Cite as: 14 Cal.App.4th 1692)**

Section 545.2 of 12 C.F.R. provides: " 'The regulations in this Part 545 are promulgated pursuant to the plenary and exclusive authority of the Board to regulate all aspects of the operations of Federal associations, as set forth in section 5(a) of the Home Owners' Loan Act of 1933, 12 U.S.C. 1464, as amended. This exercise of the Board's authority is preemptive of any state law purporting to address the subject of the operations of a Federal association.' " (Ibid.)

(6a) In their brief the Highland defendants urge the import of the above two regulations is preemption of any state law which would limit or penalize the conduct of a federal association where such conduct is authorized by HOLA and not proscribed by HOLA regulations since such law would thus be in direct conflict with HOLA. [FN8] *1706

FN8 In a footnote of their brief the Highland defendants urge "[t]here is even a direct conflict between certain specific HOLA regulations and the state law upon which the subject state law claims are predicated." Specifically, they refer only to two regulations. The first, 12 C.F.R. section 545.32(d) authorizes an association to make a real estate loan up to 100 percent of the market value of the secured property. They claim a direct conflict exists because plaintiffs seek to proscribe loans where the borrower would have no equity in the property, thus vesting "control" in Highland. We find no conflict. Defendants have mischaracterized certain language in the complaint. When viewed in context, it is clear plaintiffs were not alleging defendants should be prohibited from making loans up to 100 percent of the market value of the property. The complaint alleged, "The · premises involved were security for indebtedness amounting to approximately 100% or more of their value, and additional loans on the property were not available in any bona fide business transaction." It was further alleged defendants "with full knowledge of the slum character of these buildings, has made or aided in the making of loans for amounts exceeding the value of the slum buildings at high interest rates and 'points', requiring payments to the lending defendant which absorbed all or virtually all of the rental flow from the buildings. ... Each ... defendant reaped financial benefits from the slum buildings' continuing slum character." In context, the thrust of these allegations is merely to explain one reason why the slum condition of the property was perpetuated, namely, since no equity was left no additional loans were available to fix up the property.

The Highland defendants lastly claim a direct conflict exists between the state claims and 12 C.F.R. section 545.34, which permits an association to incorporate into a mortgage loan contract " 'a provision ... whereby the Federal association may, at its option, declare immediately due and payable' the secured indebtedness upon an unconsented to transfer of title to the real property." They argue· plaintiffs seek to "deprive Highland of the option to exercise such provision and, instead, compel it to do so." (Italics in original.) In support, they point to the allegations in the complaint that defendants improperly made frequent transfers of the property "from one uncreditworthy and disreputable borrower to another without exercise of due-on-sale clauses of loan agreements, without requiring loan assumption by creditworthy individuals, and without scrutiny to determine or insure that payments would be made and that the slum buildings would be maintained in accordance with requirements of the law. By making frequent transfers of ownership of the slum buildings, each such defendant's conduct facilitated the ability of the involved record owner to avoid criminal liability for violations of the law ... [and] each such defendant further effectively avoided or delayed repair of the slum buildings."

We find no conflict in this regard. By such allegations plaintiffs do not seek to deprive defendants of their option to exercise the due-on-sale clauses. Instead, plaintiffs merely seek to preclude defendants from conducting sham transfers of the property. (But see discussion, post, regarding a direct conflict as to item (3)(h) of the prayer for injunctive relief.)

As authority for their claim of preemption the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

14 Cal.App.4th 1692                                    Page 10
14 Cal.App.4th 1692, 19 Cal.Rptr.2d 555
**(Cite as: 14 Cal.App.4th 1692)**

Highland defendants argue "[t]he seminal case on the subject, and a case strikingly parallel in material respects to this case, is *People v. Coast Fed. Sav. & Loan Ass'n* (S.D.Cal. 1951) 98 F.Supp. 311." [FN9] They also rely heavily on *Fidelity Fed. Sav. & Loan Ass'n v. De La Cuesta* (1982) 458 U.S. 141 [73 L.Ed.2d 664, 680-681, 102 S.Ct. 3014] and *Wisconsin League of Financial Inst. v. Galecki* (W.D.Wis. 1989) 707 F.Supp. 401.[FN10] *1707

FN9 As further support, they cite: *Meyers v. Beverly Hills Fed. Sav. & Loan Ass'n* (9th Cir. 1974) 499 F.2d 1145 (prepayment penalties); *Greenwald v. First Fed. Sav. & Loan Ass'n of Boston* (D.C. Mass. 1978) 446 F.Supp. 620 (interest payments on escrow accounts); *First Fed. Sav. & Loan Ass'n of Boston v. Greenwald* (1st Cir. 1979) 591 F.2d 417 (interest payments on escrow accounts); *City Fed. Sav. & Loan Ass'n v. Crowley* (E.D.Wis. 1975) 393 F.Supp. 644 (self-dealing of association officers and directors in violation of board's regulations); *Lyons Sav. & Loan Ass'n v. Federal Home Loan Bank Board* (N.D.Ill. 1974) 377 F.Supp. 11 (branching of association); *Kaski v. First Fed. Sav. & Loan Ass'n of Madison* (1976) 72 Wis.2d 132 [240 N.W.2d 367] (interest rate escalation clauses in mortgage note); *Central Sav. & Loan Ass'n of Chariton v. Federal Home Loan Bank Bd.* (8th Cir. 1970) 422 F.2d 504 (mobile associations); *Murphy v. Colonial Fed. Sav. & Loan Ass'n* (2d Cir. 1967) 388 F.2d 609 (list of eligible voters re association director election); *North Arlington Nat'l Bank v. Kearny Fed. Sav. & Loan Ass'n* (3d Cir. 1951) 187 F.2d 564, cert. den., 342 U.S. 816 [96 L.Ed. 617, 72 S.Ct. 30] (branches); *Glendale Fed. Sav. & Loan Ass'n v. Fox* (C.D.Cal. 1978) 459 F.Supp. 903, 904-912 (due-on-sale clause); *Rettig v. Arlington Heights Fed. Sav. & Loan Ass'n* (N.D.Ill. 1975) 405 F.Supp. 819 (authority of association to sell insurance and internal obligations of directors); *Elwert v. Pacific First Fed. Sav. & Loan Ass'n* (D.Or. 1956) 138 F.Supp. 395 (branches); *Washington Fed. Sav. & Loan Ass'n v. Balaban* (Fla. 1973) 281 So.2d 15 (branches); *Springfield Inst. v. Worcester Fed. Sav. & Loan Ass'n* (1952) 329 Mass. 184 [107 N.E.2d 315], cert. den. 344 U.S. 884 [97 L.Ed.684,73

S.Ct. 184] (branches).
   Such reliance is patently misplaced. Those cases involved either a direct conflict between state law and specific regulations under HOLA or issues concerning the internal management and direct operation of the federal association itself, and thus, are factually inapposite.

FN10 The Highland defendants cite *Federal Sav. & Loan Ins. Corp. v. Kidwell* (N.D.Cal. 1989) 716 F.Supp. 1315, for the proposition that state law claims for negligence and waste against the federal association were preempted by federal law. Their reliance on that case is unfounded. In addition to the preemption issue the district court also ruled the claim for breach of fiduciary duty under federal common law was governed by a four-year state statute of limitations. In an unpublished decision the appellate court vacated the lower court decision in part without specifying which part was being vacated. (*Eureka Federal Sav. & Loan Ass'n v. Kidwell* (9th Cir. 1991) 937 F.2d 612.) Accordingly, the district court decision is without persuasive or precedential value.

   Contrary to their assertion otherwise, *People v. Coast Fed. Sav. & Loan Ass'n* (S.D.Cal. 1951) 98 F.Supp. 311 is not "a case strikingly parallel in material respects to this case." In *Coast* "[t]he gravamen of the complaint is that through signs and other means of advertising, defendant [federal association] has transacted business in the manner of a bank and has held itself out as a bank or savings bank, and has led the public to believe that it was such a bank, without authority and in violation of state statutes." (*People v. Coast Fed. Sav. & Loan Ass'n, supra,* 98 F.Supp at p. 315.) Former section 161.7(e) of title 24 of the Code of Federal Regulations expressly governed the subject of advertising vis-a-vis federal associations. (98 F.Supp. at p. 315, fn. 5.) In view of such regulation the court held the board had primary jurisdiction over the subject matter. (*Id.* at p. 317.)

   In contrast, this case does not involve a direct conflict between a specific regulation and state law. Reliance by the Highland defendants on *Fidelity Fed. Sav. & Loan Ass'n v. De La Cuesta* and *Wisconsin League of Financial Inst. v. Galecki* is misplaced for that same reason.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

14 Cal.App.4th 1692
14 Cal.App.4th 1692, 19 Cal.Rptr.2d 555
**(Cite as: 14 Cal.App.4th 1692)**

In *De La Cuesta* the United States Supreme Court held the board's regulation of due-on-sale clauses preempted state law as embodied in *Wellenkamp v. Bank of America* (1978) 21 Cal.3d 943 [582 P.2d 970]. (*Fidelity Fed. Sav. & Loan Ass'n v. De La Cuesta, supra,* 458 U.S. 141, 159 [73 L.Ed.2d 664, 678-679].) The *De La Cuesta* court reasoned:

"[T]he Board's intent to pre-empt the *Wellenkamp* doctrine is unambiguous. The due-on-sale regulation plainly provides that a federal savings and loan 'continues to have the power' to include a due-on-sale clause in a loan instrument and to enforce that clause 'at its option.' 12 CFR § 545.8-3(f) (1982). The California courts, in contrast, have limited a federal association's right to exercise a due-on-sale provision to those cases where the lender can demonstrate that the transfer has impaired its security. [¶] The conflict does not evaporate because the Board's regulation simply permits, but does not compel, federal savings and loans to include due-on-sale clauses in their contracts and to enforce those provisions when the security property is transferred. ... In addition, *Wellenkamp* explicitly bars a federal savings and loan from exercising a due-on-sale clause to adjust a long-term mortgage's interest rate toward current market rates-a due-on-sale practice the Board has approved ...." (*458 U.S. at pp. 155-156* [73 L.Ed.2d 676-677], italics in original.)

In *Wisconsin League of Financial Inst. v. Galecki, supra,* the court held the "Board has expressly preempted state regulation in the area of mortgage escrow accounts and loan disclosures." (707 F.Supp. at p. 405.)The court **\*1708** expressly limited its holding the facts of that case by announcing: "The court need not determine the full breadth of the term 'operations of a federal Association' [as provided in section 545.2] because there can be no dispute that such phrase extends at least to the regulation of mortgage escrow accounts and mortgage loan disclosures. *Fidelity Federal, 458 U.S. at 167 ...Kaski v. First Federal Savings & Loan Association, 72 Wis.2d 132, 240 N.W.2d 367 (1976).*" [FN11] (707 F.Supp. at p. 405.)

FN11 In addition to direct preemption the *Galecki* court also found implicit preemption based on the finding state regulation of escrow accounts would be "a direct obstacle" to "the Board's express

purpose to permit the parties to negotiate terms of an escrow agreement between themselves without intervention by substantive law." (*Wisconsin League of Financial Institutions v. Galecki, supra,* 707 F.Supp. at p. 406.)In contrast, the state claims at issue here do not present "a direct obstacle" to any announced OTS policy.

It is undisputed that this case involves neither the regulation by state law of advertising, enforceability of due-on-sale clauses, or mortgage escrow accounts and mortgage loan disclosures. Accordingly, the *Coast, De La Cuesta,* and *Galecki* cases are of no moment with regard to whether the subject state causes of action are expressly preempted by HOLA and its concomitant regulations.

(4b) "Preemption of state law by federal regulation is not favored. We will not find express preemption unless a regulation clearly so states. (*Chicago & N. W. Tr. Co. v. Kalo Brick & Tile Co.* (1981) 450 U.S. 311, 317 [67 L.Ed.2d 258, 265, 101 S.Ct. 1124].) It is the burden of the party claiming preemption to prove it. (*Elsworth v. Beech Aircraft Corp.* (1984) 37 Cal.3d 540, 548 [208 Cal.Rptr. 874, 691 P.2d 630]; *Perdue v. Crocker National Bank* (1985) 38 Cal.3d 913, 937 [216 Cal.Rptr. 345, 702 P.2d 503].)" (*Siegel v. American Savings & Loan Assn., supra,* 210 Cal.App.3d at p. 960.)

(6b) As pointed out in *Siegel,* "[t]he Board is capable of saying it means to expressly preempt all state law in an area. ... Section 545.2 [of 12 C.F.R.] contains no such statement that federal law is preemptive of all state common law claims." (210 Cal.App.3d at pp. 960-961.)

Similarly, we have found no provision of HOLA nor any particular regulation, and none have been cited to us, which expressly preempt the statutory action by the People for unfair business practices and the causes of action by the tenant plaintiffs for fraud, RICO violations, etc. We therefore hold the subject action is not explicitly barred by federal preemption pursuant to HOLA. [FN12]

FN12 At oral argument the Highland defendants conceded no express statutory preemption exists here.

Nonetheless, we do find federal preemption with

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

14 Cal.App.4th 1692
14 Cal.App.4th 1692, 19 Cal.Rptr.2d 555
**(Cite as: 14 Cal.App.4th 1692)**

regard to two matters. First, the allegation that Highland charged loan "points and interest at *1709 interest, each of which was higher than the rates for bona fide loan [ ] transactions" impinges on the specific intent of Congress to preempt state usury laws, [FN13] and thus, improperly delves into an area expressly preempted by HOLA. (See, e.g., § 1463(g).)

> FN13 Section 1463(g) as to preemption of state usury laws, provides:
> "(1) Notwithstanding any State law, a savings association may charge interest on any extension of credit at a rate of not more than 1 percent in excess of the discount rate on 90-day commercial paper in effect at the Federal Reserve bank in the Federal Reserve district in which such savings association is located or at the rate allowed by the laws of the State in which such savings association is located, whichever is greater.
> "(2) If the rate prescribed in paragraph (1) exceeds the rate such savings association would be permitted to charge in the absence of this subsection, the receiving or charging a greater rate of interest than that prescribed by paragraph (1), when knowingly done, shall be deemed a forfeiture of the entire interest which the extension of credit carries with it, or which has been agreed to be paid thereon. If such greater rate of interest has been paid, the person who paid it may recover, in a civil action commenced in a court of appropriate jurisdiction not later than 2 years after the date of such payment, an amount equal to twice the amount of the interest paid from the savings association taking or receiving such interest."

The second matter concerns item (3)(h) of the complaint's prayer which seeks to enjoin the Highland defendants from "[d]eclining to initiate and complete foreclosure as speedily as the law permits on substandard property of which the lender has notice if the substandard conditions are not fully corrected within 120 days, provided that foreclosure proceedings may terminate if correction occurs before foreclosure is completed." This requested relief is in direct conflict with 12 C.F.R. section 545.34 which permits a federal association "at its option [to] declare immediately due and payable" the secured indebtedness upon an unconsented to transfer of title to the real property.

On remand, the court is therefore directed to strike such allegations and prayer requests. (Code Civ. Proc., § 436.)

### c. No Implied Preemption Under HOLA

Alternatively, the Highland defendants assert the subject action is barred by the doctrine of implied preemption. They urge federal law has impliedly "occupied the field" of federal savings and loan associations with regard to their operations and functions.

We acknowledge HOLA and the regulations promulgated thereunder have created both a comprehensive and uniform thrift system which is federally regulated and that in exercising its broad authority the former board has issued specific, detailed regulations governing those associations. Nonetheless, we observe the United States Supreme Court has declined to conclude *1710 the board has preempted all lending practices or that the Board's discretion is limitless.

In *De La Cuesta* the court construed the board's powers to be plenary over federal associations: "The broad language of § 5(a) [of HOLA] expresses no limits on the Board's authority to regulate the lending practices of federal savings and loans. ... [Thus,] '[i]t would have been difficult for Congress to give the Bank Board a broader mandate.' [Citation.]" (*Fidelity Federal Savings and Loan v. De La Cuesta, supra,* 458 U.S. at p. 161 [73 L.Ed.2d at p. 680].)

However, the court expressly declined to find the board had preempted state law as to all lending practices and cautioned: "Because we find an actual conflict between federal and state law, we need not decide whether the HOLA or the Board's regulations occupy the field of due-on-sale law or the entire field of federal savings and loan regulation." (*De La Cuesta, supra,* 458 U.S. at p. 159, fn. 14 [73 L.Ed.2d at p. 679].) The court went on to qualify its holding in that case as follows: "Although the Board's power to promulgate regulations exempting federal savings and loans from the requirements of state law may not be boundless, in this case we need not explore the outer limits of the Board's discretion." [FN14] (*Id.* at p. 167 [73 L.Ed.2d at p. 684].)

> FN14 Justice O'Connor wrote separately "to

emphasize that the authority of the ... Board to pre-empt state laws is not limitless. ... Nothing in the language of § 5(a) of HOLA, which empowers the Board to 'provide for the organization, incorporation, examination, operation, and regulation' of federally chartered savings and loans, remotely suggests that Congress intended to permit the Board to displace local laws, such as tax statutes and zoning ordinances, not directly related to savings and loan practices." (*Id.* at pp. 171-172 [73 L.Ed.2d at pp. 686-687].)

In his dissent, joined by Justice Stevens, Justice Rehnquist reasoned: "In § 545.8-3(f), the Board has gone beyond regulating how, when, and in what manner a federal savings and loan may lend mortgage money. ... In this case, the Board is not regulating the operation of federal savings and loan associations, but the operation of due-on-sale clauses. Without a congressional authorization more explicit than that relied upon by the Court, I conclude that the Board has entered a domain in which it is not authorized to override state laws. ... Discharge of its mission to ensure the soundness of federal savings and loans does not authorize the ... Board to intrude into the domain of state property and contract law that Congress has left to the States." (*Id.* at pp. 174-175 [73 L.Ed.2d at pp. 688-689].)

(5b) Moreover, "[c]omprehensiveness of federal regulation alone, is not sufficient to establish implied preemption. Again, the United States Supreme Court has said: 'We are even more reluctant to infer pre-emption from the comprehensiveness of regulations than from the comprehensiveness of statutes. As a result of their specialized functions, agencies normally deal with problems in far more detail than does Congress. To infer pre-emption whenever an agency deals with a problem comprehensively is virtually tantamount to saying that whenever a federal agency decides to step into a *1711 field, its regulations will be exclusive. Such a rule, of course, would be inconsistent with the federal-state balance embodied in our Supremacy Clause jurisprudence.' (*Hillsborough County v. Automated Medical Labs.*(1985) 471 U.S. 707, 717 [85 L.Ed.2d 714, 724, 105 S.Ct. 2371].) Our task is to determine whether the field which has been preempted by federal regulation is broad enough to cover plaintiffs' state

causes of action." (*Siegel, supra,* 210 Cal.App.3d 953, 961-962.)

(6c) We conclude it does not. The cause of action for unfair business practices as alleged by the People does not directly affect the operations of Highland, and therefore, is not covered by the subject regulations. Similarly, the regulations promulgated under HOLA do not pertain to racketeering charges under a RICO action. The remaining causes of action, e.g., nuisance, breach of warranty of habitability, intentional infliction of emotional distress, fraud, and interruptions of utilities would, at most, only incidentally and remotely touch upon the operations of Highland in its capacity as a federal savings association. Thus, those also do not impinge on the ambit of HOLA.

(3b) No implied preemption is found where the impact on the subject is merely indirect. (See, e.g., *English v. General Electric Co.* (1990) 496 U.S. 72 [110 L.Ed.2d 65, 110 S.Ct. 2270].) In *English,* the court held the emotional distress claims of a whistle blower were not preempted by the federal government's exclusive authority to regulate the safety of nuclear power because such claims only indirectly affected the issue of nuclear safety. "Instead, for a state law to fall within the pre-empted zone, it must have some direct and substantial effect on the decisions made by those who build or operate nuclear facilities concerning radiological safety levels." (*Id.* at p. 85 [110 L.Ed.2d at pp. 78-79].) The court reasoned: "For example, if an employer were to retaliate against a nuclear whistle-blower by hiring thugs to assault the employee on the job (conduct literally covered by § 210 [of the Energy Reorganization Act of 1972]), respondent's position would imply that the state criminal law prohibiting such conduct is within the pre-empted field. We simply cannot believe that Congress intended that result." (*Id.* at p. 83 [110 L.Ed.2d at p. 77]; see also, *id.* at pp. 75-76 [110 L.Ed.2d at pp. 71-72].)

(5c) Also, where the subject matter is an area traditionally regulated by the states, no federal preemption is implied unless there is a clear and manifest intent shown. Thus, there must be "a showing of implicit preemption of the whole field ... strong enough to overcome the presumption that state and local regulation of health and safety matters can constitutionally coexist with federal regulation." (*Hillsborough County v. Automated Medical Labs., supra,* 471 U.S. at p. 716 [85 L.Ed.2d at p. 723]; see

14 Cal.App.4th 1692
14 Cal.App.4th 1692, 19 Cal.Rptr.2d 555
**(Cite as: 14 Cal.App.4th 1692)**

Page 14

also, *1712*Merrill Lynch, Pierce, Fenner & Smith v. Ware* (1973) 414 U.S. 117, 139-140 [38 L.Ed.2d 348, 366-367, 94 S.Ct. 383] [no preemption by the Security Exchange Act of 1934 of action for profit sharing rights of terminated employee since California has strong policy of protecting wage earners].)

Moreover, "merely because the federal provisions were sufficiently comprehensive to meet the need identified by Congress [it does] not mean that States and localities [are] barred from identifying additional needs or imposing further requirements in the field." (*Hillsborough County v. Automated Medical Labs, Inc., supra,* 471 U.S. at p. 717 [85 L.Ed.2d at pp. 723-724].)

(6d) Accordingly, we determine whether the subject state causes of action are impliedly barred by federal preemption by scrutinizing them to see if they directly are "purporting to address the subject of the operations" of Highland, a federal savings association. (See 12 C.F.R. § 545.2.)

The state causes of action at issue are grounded in Highland's wrongful course of conduct which enables slum conditions in the subject buildings to be perpetuated to the detriment of the health, safety and welfare of the People of California and, in particular, the tenant plaintiffs. The essence of those causes of action concerns the right of the state to prohibit, and punish Highland for its part in, the conspiracy to maintain dwellings in an uninhabitable condition.

From our review of HOLA and its concomitant regulations we have found no statutory provision or regulation which even purports to address the subject of minimum housing standards. Also, any impact or intrusion on the "operations" of Highland is minimal and indirect.

Additionally, we conclude neither the intent of Congress in enacting HOLA nor the purpose of HOLA would be served by finding preemption under these circumstances. The paramount purpose of HOLA is to ensure the solvency of federal associations. (See, e.g., § 1463(a)(1)-(3), and § 1464(d)(2).) That purpose would not be hindered, directly or indirectly, by the prosecution of the subject state claims. This is not the situation where the state seeks to regulate the conduct of all federal associations in California. Rather, the state merely

seeks to protect its own interest in public safety and welfare against the wrongful conduct of an entity, inter alia, which just happens to be a federal association.

*d. Action Against Karmelich, Pratt, and HFS Not Barred by Federal Preemption Under HOLA*

Since this action is not preempted under HOLA as to Highland, a fortiori no preemption bars the action against Karmelich, its president and chief *1713 executive officer, or Pratt, its loan coordinator and vice-president. Moreover, the action is also not preempted against HFS, which is Highland's wholly owned subsidiary but not a federal savings association.

*2. Causes of Action Stated Against Highland Defendants for RICO Violations, and Fraud, but Not Fraudulent Concealment*

*a. RICO Action Properly Pleaded as to Mail Fraud*

(7a) To state a cause of action under RICO (18 U.S.C. § 1961 et seq.) a plaintiff must plead facts to show: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." (*Sedima, S.P.R.L. v. Imrex Co.* (1985) 473 U.S. 479, 496 [87 L.Ed.2d 346, 358-359, 105 S.Ct. 3275], fn. omitted.) (8a) In their demurrer, the Highland defendants attack the above "enterprise" and "racketeering activity" components.

*(1) Existence of RICO Enterprise Pleaded*

The Highland defendants argue plaintiffs have failed to plead the existence and identity of an "enterprise," i.e., a group of defendants associated in fact for a common purpose although not a legal entity. We disagree.

An "enterprise" includes "any union or group of individuals associated in fact although not a legal entity." (18 U.S.C. § 1961(4).)

(7b) The existence of an enterprise is an essential element of a RICO claim. "The enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct. ... [It] is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

14 Cal.App.4th 1692                                                              Page 15
14 Cal.App.4th 1692, 19 Cal.Rptr.2d 555
**(Cite as: 14 Cal.App.4th 1692)**

function as a continuing unit." (*United States v. Turkette* (1981) 452 U.S. 576, 583 [69 L.Ed.2d 246, 254-255, 101 S.Ct. 2524]; see also, *Shaffer v. Williams* (5th Cir. 1986) 794 F.2d 1030, 1032.)

(8b) The facts setting forth the existence and identity of the requisite enterprise are not alleged at a single location. Instead, such facts, because of the complexity of the scheme involved, are necessarily gleaned from various portions of the subject complaint.

At paragraph 150 of the complaint it was alleged: "The following associations constitute an enterprise within the meaning of RICO generally and 18 U.S.C. § 1961(4) specifically:

"a. The association in fact of defendants Highland, Northeast, and HFS (the Highland Enterprise).**1714

"

. . . . . . . . . .

"c. The association in fact of defendants Karmelich, Highland, Northeast, HFS, Leyton, Interreal, Interwest, PHC, and Fitzpatrick (the Highland- Leyton-Fitzpatrick Enterprise)."

Although subparagraph a of paragraph 150 refers to Highland, Northeast, and HFS, as "the Highland Enterprises" it is clear such enterprise is but a component of the "enterprise" which comprises this element of a RICO action. Similarly, the reference to "the Highland-Leyton-Fitzpatrick Enterprise" in subparagraph d of paragraph 150 is to the component of the "enterprise" consisting of the members of the Highland Enterprise, defendants Leyton, Interreal, Interwest, PHC and Fitzpatrick. From a review of the factual allegations concerning these components of such "enterprise" it is clear the requisite facts concerning the existence of an informal ongoing organization consisting of a group of entities associated together for a common purpose of engaging in a course of conduct and functioning as a continuing unit have been alleged.

The complaint essentially alleges the above defendants engaged in a continuing scheme to defraud the tenant plaintiffs by secretly manipulating the record owner defendants and by actively assisting

such owners to perpetuate the buildings in an uninhabitable condition in violation of the law. That the Highland, HFS and Northeast defendants were ongoing business entities which had an ongoing relationship with each other independent of that fraud scheme is shown by the following facts: It was alleged Highland was a federal savings and loan association specializing in loans on residential property; Northeast, an investment corporation located at Highland's offices, was engaged in the business of handling insurance; and HFS, a wholly owned subsidiary of Highland, serviced loans made by Highland. The complaint further alleged that the association of defendant Highland, Northeast and HFS constituted an association in fact within the meaning of RICO. The above factual allegations thus evidence an interlocking independent business relationship among those three entities.

Moreover, it was also alleged that defendants Interreal, Interwest and PHC, all of which were entities in which defendant Leyton had an interest, along with the above Highland entities and the individual defendants, Karmelich, as the secretary of Northeast's board of directors, Leyton and Fitzpatrick constituted an association of fact, and thus, an enterprise. The specifics of such association are set forth in the complaint and demonstrate an ongoing series of business transactions among these various defendants with regard to each of the subject buildings. (See, e.g., *Temple University v. *1715 Salla Bros., Inc.* (E.D.Pa 1986) 656 F.Supp. 97, 102 [sufficient ongoing organization shown]; cf. *Calcasieu Marine Nat. Bank v. Grant* (5th Cir. 1991) 943 F.2d 1453, 1461-1463 [no ongoing association shown]; *Martin v. Brown* (W.D.Pa. 1990) 758 F.Supp. 313, 322 [insufficient ongoing unit shown]; *Uniroyal Goodrich Tire Co. v. Mutual Trading Corp.* (N.D.Ill. 1990) 749 F.Supp. 869, 876-877 [insufficient "association-in-fact" shown].)

### (2) *"Racketeering Activity" Based on Mail Fraud Properly Pleaded*

"Racketeering activity" under RICO consists of certain specific acts which are expressly enumerated in title 18 United States Code, section 1961. The activity underlying the subject RICO claim is mail fraud and wire fraud. (9), (10) "In pleading a violation of the mail fraud statute (18 U.S.C. § 1341) [or the wire fraud statute (18 U.S.C. § 1342)] as a predicate act under a RICO scheme, plaintiffs must allege that (1) defendants devised a scheme or artifice

14 Cal.App.4th 1692

Page 16

14 Cal.App.4th 1692, 19 Cal.Rptr.2d 555

**(Cite as: 14 Cal.App.4th 1692)**

to defraud, (2) defendants used the mails [or wires] in furtherance of the scheme, and (3) defendants did so with the specific intent to deceive or defraud. [Citation.]" (*McMartin v. Children's Institute International* (1989) 212 Cal.App.3d 1393, 1407 [261 Cal.Rptr. 437]; accord, *Schreiber Distributing v. Serv- Well Furniture Co.* (9th Cir. 1986) 806 F.2d 1393, 1399-1400 [mail and wire fraud]; see also, *United States v. Gordon* (5th Cir. 1986) 780 F.2d 1165, 1171 [wire fraud].)

(8c) The Highland defendants also challenge the allegations of mailing and wire fraud as inadequate. They argue plaintiffs are required to but have failed to "specifically plead the time, place or nature of the alleged communications constituting racketeering activity. [Citation.]" (*McMartin v. Children's Institute Int'l, supra,* 212 Cal.App.3d at p. 1407; see also, *Alan Neuman Productions, Inc. v. Albright* (9th Cir. 1988) 862 F.2d 1388, 1392; *Rosenthal v. Vogt* (1991) 229 Cal.App.3d 69, 77 [280 Cal.Rptr. 1].)

We agree the allegation of "wire fraud" is totally deficient in the above regard. Subparagraph e of paragraph 151 merely alleges: "Interstate telephone conversations relating to the slum buildings with lenders, persons attempting to locate various of the defendants, the Federal Home Loan Bank Board, and others." No facts are alleged to show the nature of such conversations or the place and time thereof. Accordingly, since plaintiffs have failed to show how such defects would be remedied if leave to amend were granted, we conclude the trial court was correct in impliedly finding the predicate act of "wire fraud" was inadequate to support a RICO action. (See, e.g., *Goodman v. Kennedy* (1976) 18 Cal.3d 335, 349 [134 Cal.Rptr. 375, 556 P.2d 737].) The court is thus directed to strike subparagraph e of paragraph 151. (Code Civ. Proc., § 436.)*1716

We further conclude, however, the court erred in sustaining the demurrer to that cause of action since the plaintiffs have adequately pleaded facts to support the predicate act of "mail fraud." The specific factual allegations of the mailings in the subject complaint are both qualitatively and quantitatively superior to the bare conclusionary allegation found to be inadequate in *Schreiber Distributing Co. v. Serv-Well Furniture Co., supra,* 806 F.2d 1393. In *Schreiber,* the sole allegation was "on two or more occasions [defendants used] the United States mail ... for the purpose of executing or attempting to execute the aforesaid fraudulent scheme ...." (*Id.* at p. 1401; cf.

also, *Alan Neuman Productions, Inc. v. Albright, supra,* 862 F.2d 1388, 1393, "The allegation of [the] complaint concerning predicate acts of fraud are similarly general referring to 'many acts of mail fraud,' 'many acts of wire fraud,' and 'many victims.'")

In contrast, the complaint here described the nature of the mailings as consisting "of [the] documents, deeds, deeds of trust and similar matters relating to the slum buildings." They were further delineated as the mailings were described as "[m]ailing of rent checks, mortgage and loan payments, payment for services rendered, and similar commercial transactions relating to slum buildings." The mailings of various materials were also described as relating to code violations regarding slum buildings. Moreover, the place of mailing was reflected in the allegation of "[m]ailing of materials to various governmental entities, and recordation of real estate documents requested by mail and directed to the Los Angeles County Recorder. Every recorded document pertaining to the real estate transactions described in this complaint was sent through the mails to the County Recorder in furtherance of their conspiracy."

The intent to defraud element was supplied through the allegations concerning their effort to achieve the fraudulent objectives. Additional facts as to the time, place, and content of the fraud are set forth with particularity at paragraphs 87 through 98 of the complaint.

The allegations of the subject complaint as to time, place, etc., sufficiently comport with the requirement of pleading fraud with particularity. As one court explained: "Plaintiffs cannot be expected to specify the exact time and particular place of each factual omission and misrepresentation. The complaint adequately specifies the transactions and the approximate time frame, the contents of the alleged misrepresentations and the essence of omitted information, and the identities of those involved." (*Onesti v. Thomson McKinnon Securities, Inc.* (D.C.Ill. 1985) 619 F.Supp. 1262, 1265.)

As to other specific dates and details, we point out such matters are properly addressed during discovery, not on demurrer. Also, when a particular document or matter was mailed is within the peculiar knowledge of the *1717 defendants. (See, e.g., *Committee on Children's Television, Inc. v. General*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

14 Cal.App.4th 1692
14 Cal.App.4th 1692, 19 Cal.Rptr.2d 555
**(Cite as: 14 Cal.App.4th 1692)**

*Foods Corp.* (1983) 35 Cal.3d 197, 214, 217 [197 Cal.Rptr. 783, 673 P.2d 660].)

### (3) *Nexus Between Racketeering Activity and Injury Pleaded*

The Highland defendants next attack plaintiffs' RICO claim on the ground no facts are alleged to show any direct injury to the tenant plaintiffs as the proximate result of the racketeering activity. (*Sedima, S.P.R.L. v. Imrex Co., supra,* 473 U.S. at p. 496 [87 L.Ed.2d at pp. 358-359]; *McMartin v. Children's Institute, supra,* 212 Cal.App.3d at p. 1407.)

We reject their contention as meritless. The injury suffered by each tenant plaintiff was the deprivation of a habitable dwelling and the loss of the money he or she had paid in rent, which was excessive because the dwellings were uninhabitable. Such injury flowed directly from the racketeering activity committed by defendants.

### (4) *Violation of 18 United States Code Section 1962(d) Pleaded*

In a related argument defendants assert the lack of a legally cognizable injury flowing from the racketeering activity also demonstrates the failure of plaintiffs to allege a violation of title 18 of the United States Code, section 1962(d). [FN15] (See *Medallion TV Enterprise v. SelecTV of California* (C.D.Cal. 1986) 627 F.Supp. 1290, 1297-1301.)

FN15 Subdivision (d) of section 1962 provides: "It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section."
The relevant subdivision is (c), which provides in pertinent part: "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."

We disagree. As discussed, above, the requisite injury was properly alleged, and thus, defendants' assertion is untenable.

### b. *Cause of Action Stated for Fraud*

(11) The Highland defendants contend no cause of action for fraud is stated because there are insufficient facts alleged to " 'show how, when, where, to whom, and by what means the [mis]representations were tendered.' *Stansfield v. Starkey* (1990) 220 Cal.App.3d 59, 73, ... quoting *Hills Transp. Co. v. Southwest Forest Indus., Inc.* (1968) 266 Cal.App.2d 702, 707 ...." They complain "the People and the tenants [plaintiffs] allege ... 'each record owner', without any further identification or limitation, made the allegedly fraudulent representations; that they were made to *1718 'plaintiffs', without any further identification; and that they were made 'at the time of each respective record owner's ownership', without any further limitation as to time. The complaint is silent as to how the alleged representations were communicated." They contend the "above allegations are, of course, calculated to avoid communicating meaningful information about the alleged fraud either to the Highland defendants or to the Court. ..." (*Ibid.*)

Defendant's contentions are meritless. The complaint sets forth with ample particularity the identities of the record holders, the identities and capacities of the many plaintiffs, and the time frame in which the representations were made. We acknowledge the allegations of fraud lack the specific detailed minutiae desired by the Highland defendants. Those details, however, are properly the subject of discovery, not demurrer. The magnitude of the fraudulent scheme alleged and the number of plaintiffs involved invoke the analogy to the fact situation in *Committee on Children's Television, Inc. v. General Foods Corp., supra,* 35 Cal.3d 197, 214.)

In that case, the court rejected a lack of specificity argument based on the following reasoning, which we find instructive here: "Plaintiffs allege that defendants carried out a large scale program of deceptive advertising in which the specific advertisements change constantly, but all follow a pattern of making, in one form or another, certain misleading and deceptive representations. If such is the case, to require plaintiffs to plead the specifics of each advertisement would render a suit challenging the overall program impractical. The complaint would have to include thousands of pages setting out specifics which are largely within defendants' knowledge. The cost and difficulty of compiling, organizing, and setting down the

14 Cal.App.4th 1692                                                       Page 18
14 Cal.App.4th 1692, 19 Cal.Rptr.2d 555
**(Cite as: 14 Cal.App.4th 1692)**

information would seriously deter the filing of such complaint. The effect of such a pleading requirement, moreover, would not be limited to discouraging private suits; it would also seriously hamper suits by public officials seeking to enjoin schemes of unfair competition and deceptive advertising." (*Committee on Children's Television, Inc. v. General Foods Corp., supra,* 35 Cal.3d 197, 214.)

*c. No Fraudulent Concealment Cause of Action Stated*

(12) Defendants claim no cause of action is stated for fraudulent concealment for two reasons: (1) the Highland defendants were under no legal duty to disclose the concealed facts at issue; and (2) in any event, the cause of action erroneously assumes someone who lends money on the security of real property may, by virtue of that activity, assume the obligations of ownership. They point out unless the defendant is under a duty to disclose, concealment of a fact is not actionable. (Civ. Code, § 1710, subd. (3).) Defendants argue there is no duty to disclose here because section 1962 of the Civil Code does not require the disclosure of the name and address of the **\*1719** owner of certain real property. Such a requirement, according to defendants, is based on the assumption "that Section 1962 imposes on an owner of real property a duty to disclose his or her name and address *even when the name and address of an agent for the owner, such as a property manager, is disclosed.* That assumption is fallacious."

They further argue "someone that lends money on the security of, but does not have possession and control of, real property may [not], by virtue of that activity, become the 'beneficial' or 'responsible' owner of such property and thereby assume the obligations of ownership [and thus, the duty to disclose under Civil Code section 1962] to [the] tenants."

We agree no cause of action for fraudulent concealment is stated but not for the reasons given by defendants. The thrust of this cause of action is to compel the beneficial owners to disclose such beneficial ownership to the tenant plaintiffs to enable the latter to seek "civil relief or governmental enforcement of the law from the responsible non-record owner defendants." Plaintiffs concede as much in their reply brief: "If the tenants had known that the one in control of the property was a bank, they would be far more likely to bring an action to have the property repaired than they would were the owner a person having substantially no assets."

A plain reading of section 1962 of the Civil Code[FN16] reveals its disclosure provisions do not give rise to a duty to disclose the name and address of a beneficial owner. All that is required under section 1962 is the disclosure of "the name and usual street address at which personal service may be effected **\*1720** of each person who is: (1) Authorized to manage the premises[; and] (2) An owner of the premises or who is authorized to act for and on behalf of the owner for the purpose of service of process and for the purpose of receiving and receipting for all notices and demands." (Civ. Code, § 1962.) The reference to "[a]n owner of the premises" is to the record owner, not the beneficial owner. This is clear from the language of subdivision (e) of Civil Code section 1962, which provides: "Nothing in this section limits or excludes the liability of any undisclosed owner."

FN16 Civil Code section 1962 provides:
"(a) Any owner of a dwelling structure specified in Section 1961 or a party signing a rental agreement or lease on behalf of the owner shall disclose therein the name and usual street address at which personal service may be effected of each person who is:
"(1) Authorized to manage the premises.
"(2) An owner of the premises or who is authorized to act for and on behalf of the owner for the purpose of service of process and for the purpose of receiving and receipting for all notices and demands.
"(b) In the case of an oral rental agreement the owner or a person acting on behalf of the owner for the receipt of rent or otherwise, on written demand, shall furnish the tenant with a written statement containing the information required by subdivision (a).
"(c) The information required by this section shall be kept current and this section shall extend to and be enforceable against any successor owner or manager, who shall comply with this section within 15 days of succeeding the previous owner or manager.
"(d) A party who enters into a rental agreement on behalf of the owner who fails to comply with this section is deemed an agent of each person who is an owner:
"(1) For the purpose of service of process

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and receiving and receipting for notices and demands.

"(2) For the purpose of performing the obligations of the owner under law and under the rental agreement.

"(e) Nothing in this section limits or excludes the liability of any undisclosed owner."

### Disposition

The judgment is reversed with directions to the court: (1) to strike the allegation that Highland charged "points and provided for interest, each of which was higher than the rates for bona fide loans transactions"; (2) to strike prayer item (3)(h); (3) to strike subparagraph (e) of paragraph 151 of the second amended complaint; and (4) to conduct further proceedings consistent with the views expressed herein. The plaintiffs shall recover their costs on appeal.

Klein, P. J., and Hinz, J., concurred.

A petition for a rehearing was denied February 25, 1993, and respondents' petition for review by the Supreme Court was denied April 22, 1993.

Cal.App.2.Dist.
People ex rel. Sepulveda v. Highland Fed. Savings & Loan
14 Cal.App.4th 1692, 19 Cal.Rptr.2d 555

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.