IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

VISA USA, INC.,

    Plaintiff,

v.

MARITZ INC., d/b/a MARITZ LOYALTY MARKETING,

    Defendant.

No. C 07-05585 JSW

**ORDER GRANTING PLAINTIFF'S MOTION TO STAY ACTION, DENYING DEFENDANT'S MOTION TO STAY ARBITRATION, DENYING PLAINTIFF'S MOTION FOR DISCOVERY AND DENYING AS MOOT MOTION TO DISMISS**

Now before the Court are several motions: (1) a motion to stay action and to compel arbitration filed by Plaintiff Visa U.S.A., Inc.'s ("Visa"); (2) a motion to stay arbitration pending determination of arbitrability filed by Defendant Maritz Inc., d/b/a Maritz Loyalty Marketing ("Maritz"); (3) a motion for additional discovery filed by Maritz; and (4) Visa's motion to dismiss Maritz's fraud counterclaims. Having carefully considered the motions and the relevant legal authority, the Court hereby GRANTS Visa's motion to stay the action and compel arbitration, DENIES Maritz's motion to stay arbitration, DENIES Maritz's motion for additional discovery, and DENIES Visa's motion to dismiss as moot, without prejudice.

**BACKGROUND**

In April 2006, Maritz and Visa entered into a Master Services Agreement ("MSA") pursuant to which Maritz was obligated to develop, deploy, operate and maintain for Visa and

its member banks a points-based software rewards program for use by Visa's cardholders ("the Rewards Program").  The MSA does not contain an arbitration provision and specifies that "[t]he Parties shall act in good faith and reasonably in interpreting this Agreement and the Related Agreements and resolving any disputes that arise thereunder."  (Declaration of Roderick M. Thompson in support of Opposition ("Thompson Opp. Decl."), Ex. B.)  The MSA also stated that "Time is of the essence of this Agreement," and provides for liquidated damages of $70,000 per day of delay in the launch date of September 30, 2006.  (*Id.*, Ex. B at ¶ R.)  The MSA also stated that "Maritz acknowledges that the successful completion of each Deliverable in accordance with the Milestone Schedule is critical to the commercial viability of the Rewards Program."  (*Id.*, Ex. B at ¶ 3.10.)

By letter dated April 20, 2007, Visa terminated the MSA and expressly "[r]eserved all rights relating to or arising out of the [MSA] and any Related Agreement, including, without limitation, claims Visa has against Maritz for Maritz's breaches of the Agreement (including any Related Agreement), Maritz's non performance or delay in performing any obligations due under the Agreement (including any Related Agreement), and Visa's right to liquidated damages."  (*Id.*, Ex. C.)  Maritz's in-house counsel, Steven Gallant, subjectively considered the 'reservation of rights' language in Visa's termination letter to be "simply standard language to preserve Visa's ability to object to the amount that Visa would have to pay to Maritz." (Declaration of Steve Gallant in support of Motion to Stay Action ("Gallant Decl."), ¶ 6.[1])

On May 7, 2007, Gallant responded to the termination letter, claiming that was itself owed more than $5 million and stating that "[a]s Visa has reserved all of its rights relating to or arising out of the Agreement or any Related Agreement, Maritz does the same."  (Thompson Opp. Decl., Ex. D.)

Visa responded by letter dated June 5, 2007, that it "anticipates providing additional information to Maritz as to the nature and amount of Visa's claims at the appropriate time."

---

[1] The Court notes Visa's evidentiary objections to portions of the Gallant Declaration.  However, even considering all the evidence propounded by Defendant, the Court would still come to the same conclusion.  Therefore, the Court need not rule on the evidentiary objections at this time.

2

(*Id.*, Ex. D.) Visa explained that once the new vendor's transition was complete, "we will be prepared to discuss your letter as part of the process of resolving our claims." (*Id.*, Ex. E.)

On July 2, 2007, Visa wrote another letter, reiterating its commitment to discuss "Maritz's claims, as well as the nature and amount of Visa's claims" and stating that "[i]t is now timely to establish a procedure for efficiently documenting, discussing and resolving all remaining claims." (*Id.*, Ex. F.) The letter proposed a three-stage process whereby the parties would first engage in direct negotiations and then non-binding mediation. If neither method resolved the parties' claims, "the parties will submit the matter to confidential and binding arbitration." (*Id.*) The letter further stated that "[i]t is important to have this agreement on process in place *before* we commence negotiations so that both sides will know the alternative to a negotiated resolution." (*Id.* (emphasis added).)

The executed agreement dated July 9, 2007 ("Letter Agreement"), provided that the parties "agreed that our clients' respective claims for damages resulting from alleged breaches of the Agreement and related claims will all be resolved outside of court." (Declaration of Ryan S. Hilbert ("Hilbert Decl."), Ex. D.) The parties further agreed to "the dispute resolution framework ... [direct negotiations followed by mediation and then] ... [b]inding arbitration pursuant to the AAA Commercial Rules." (*Id.*) The letter also set out that "[t]o the extent [the parties] are unable to agree on any aspect of the [three-tiered dispute resolution] procedure, such disagreement will be resolved by the applicable rules and procedures of the American Arbitration Association." (*Id.*)

On July 10, 2007, Mr. Gallant sent by email the executed agreement setting out the agreed-upon dispute resolution process and stated that "attached is an executed agreement outlining the procedures for resolving any differences that may exist between Visa and Maritz." (*Id.*, Ex. G.) There were a number of conversations and communications between the parties during this time, and, in his declaration submitted to conjunction with these motions, Mr. Gallant states that "[a]t no time during any of these discussion or communications did Mr. Thompson [counsel for Visa] say or indicate that Visa was claiming that Maritz was in default,

3

1  or that Visa would claim that Maritz should pay Visa anything, much less that Visa was owed
2  tens of millions of dollars." (Gallant Decl., ¶ 15.)
3        A few weeks after signing the Letter Agreement, Gallant returned from a planned
4  vacation and, for the first time on July 23, 2007, requested from Visa an estimate as to the size
5  of Visa's claim. Visa's outside counsel responded that Visa's claim was considerable and in the
6  range of tens of millions of dollars. (Declaration of Roderick M. Thompson in support of
7  Motion to Stay ("Roderick Decl."), ¶ 9.) Gallant was surprised by the magnitude of Visa's
8  claim. (*Id.*; *see also* Gallant Decl., ¶¶ 23-26.)
9        Thereafter, on July 23, 2007, Gallant sent an email message to counsel for Visa and
10 stated that "I would like to make reference in here that our previous agreement is null an [sic]
11 void but that the parties will endeavor to reach resolution on ADR procedures it [sic] in the next
12 ten or so days." (Roderick Opp. Decl., Ex. G.) Again, on August 8, 2007, Gallant sent an email
13 message to Visa indicating that "Maritz had originally agreed to arbitrate without **ANY**
14 understanding of the magnitude of Visa's purported claims and as I have said to you repeatedly
15 there was no meeting of the minds between Maritz and Visa with respect to the circumstances
16 surrounding Maritz' agreement to mediate. What we are committed to is seeking to determine
17 if there is a business resolution to this matter that might include arbitration...." (*Id.*, Ex. I
18 (emphasis in original).) Although counsel for Visa responded that he "disagree[d] with Maritz'
19 position that the attached July 9, 2007 [L]etter [A]greement is not enforceable," Maritz
20 maintained the position that "Although I suppose it goes without saying, we do disagree with
21 your view of the binding effect of the [L]etter [Agreement] you attached." (Roderick Decl., Ex.
22 J.)
23       On November 2, 2007, Visa submitted an arbitration demand to the AAA. (*Id.*, Ex. K.)
24 Maritz responded by letter to the AAA stating that the parties did not have a valid agreement to
25 arbitrate and that AAA therefore lacked jurisdiction over the matter. (*Id.*, Ex. L.) Again, on
26 November 26, 2007, Maritz wrote to the AAA contending that the Letter Agreement was
27 invalid and unenforceable and that it was "induced by [Visa's counsel] and Visa's fraudulent
28 conduct." (*Id.*, Ex. M.) By letter dated November 30, 2007, the AAA rejected Maritz's

4

procedural challenge and, in the absence of a Court order to the contrary, directed the arbitration to proceed and provided that any jurisdictional challenge could be raised before the arbitrator. (*Id.*, Ex. N.) Maritz continued to resist efforts to resolve the parties' dispute in arbitration.

On November 28, 2007, Visa filed a petition to compel arbitration. On December 12, 2007, Maritz filed a cross-motion to stay arbitration pending determination of arbitrability. Because the case had been reassigned to the undersigned, on January 4, 2008, Visa re-noticed their motion to stay the action and to compel arbitration. In addition, Maritz filed an improper administrative request for additional discovery and the Court required further briefing on the motion. Lastly, because an answer to the counterclaims was outstanding, on February 21, 2008, Visa filed a motion to dismiss Maritz's fraud counterclaims.

**ANALYSIS**

**A.    Legal Standards Applicable to Motions to Compel Arbitration.**

Pursuant to the Federal Arbitration Act ("FAA"), arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds that exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Once the Court has determined that an arbitration agreement involves a transaction involving interstate commerce, thereby falling under the FAA, the Court's only role is to determine whether a valid arbitration agreement exists and whether the scope of the parties' dispute falls within that agreement. 9 U.S.C. § 4; *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). "Under § 4 of the FAA, a district court must issue an order compelling arbitration is the following two-pronged test is satisfied: (1) a valid agreement to arbitrate exists; and (2) that agreement encompasses the dispute at issue." *United Computer Systems v. AT&T Corp.*, 298 F.3d 756, 766 (9th Cir. 2002). The parties in this case do not dispute that the claims at issue would fall within the scope of the Letter Agreement; the only issue is whether the agreement to arbitrate is valid and enforceable.

The FAA represents the "liberal federal policy favoring arbitration agreements" and "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1,

5

24-25 (1983).  Under the FAA, "once [the Court] is satisfied that an agreement for arbitration has been made and has not been honored," and the dispute falls within the scope of that agreement, the Court must order arbitration.  *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 400 (1967).  That the Court must order arbitration is true "even where the result would be the possibly inefficient maintenance of separate proceedings in different forums." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 217 (1985).

        Notwithstanding the liberal policy favoring arbitration, by entering into an arbitration agreement, two parties are entering into a contract.  *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior University*, 489 U.S. 468, 479 (1989) (noting that arbitration "is a matter of consent, not coercion").  Thus, as with any contract, an arbitration agreement is "subject to all defenses to enforcement that apply to contracts generally."  *Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1170 (9th Cir. 2003.)  Although the Court can initially determine whether a valid agreement exists, disputes over the meaning of specific terms are matters for the arbitrator to decide.  *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002); *Prima Paint*, 388 U.S. at 403-404 (holding that "a federal court may consider only issues relating to the making and performance of the agreement to arbitrate").

        Here, Maritz contends that the Arbitration Agreement is unenforceable because it was obtained by fraud.  The resolution of a claim that a contract containing an arbitration agreement is unenforceable requires a two-part analysis.  First, the Court must determine whether the alleged fraud induced the party to enter the entire agreement or whether the fraud was directed only at the arbitration provision.  *See Prima Paint*, 388 U.S. at 403-04 ("if the claim is fraud in the inducement of the arbitration clause itself – an issue which goes to the 'making' of the agreement to arbitrate – the federal court may proceed to adjudicate it.  But the statutory language does not permit the federal court to consider claims of fraud in the inducement of the contract generally."); *see also Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 449 (2006).  Next, the Court must consider whether the parties' agreement reserved for the arbitrator questions regarding the validity of the agreement itself.  *Contec Corp. v. Remote Solution, Co.*, 398 F.3d 205, 207 (2d Cir. 2005).  While the Federal Arbitration Act contains the general

6

1  presumption that arbitrability should be decided by the court, both state and federal cases hold
2  that the issue may be referred to the arbitrator if there is clear and unmistakable evidence from
3  the arbitration agreement that the parties intended that the question of arbitrability should be
4  decided by the arbitrator. *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944-45
5  (1995); *see also Contec*, 398 F.3d at 208. Moreover, the cases hold that where the parties'
6  agreement to arbitrate includes an agreement to follow a particular set of arbitration rules – such
7  as the Commercial AAA Rules – that provide for the arbitrator to decide questions of
8  arbitrability, the presumption that courts decide arbitrability falls away, and the issue is decided
9  by the arbitrator. *See, e.g., Poponin v. Virtual Pro, Inc.*, 2006 WL 2691418, *9 (N.D. Cal. Sept.
10 20, 2006); *Anderson v. Pitney Bowes, Inc.*, 2005 WL 1048700, *2-4 (N.D. Cal. May 4, 2005);
11 *Terminix Int'l Co. v. Palmer Ranch Ltd.*, 432 F.3d 1327, 1332 (11th Cir. 2005).

12 Visa contends that Maritz, upon disclosure of the amount actually at stake challenged
13 the Letter Agreement as a whole. Based upon this contention, Visa argues that the issue of
14 fraud in the inducement must be determined by the arbitrator. *See Buckeye Cashing*, 546 U.S.
15 at 449 (reiterating that "a challenge to the validity of the contract as a whole, and not
16 specifically to the arbitration clause, must go to the arbitrator.") Although the contemporaneous
17 correspondence from Maritz's general counsel does indeed suggest that Maritz objected to the
18 entire Letter Agreement, there is no authority for the argument that Maritz's original objections
19 have any estoppel effect on their current position. Maritz now maintains that it objects merely
20 to the provision in the Letter Agreement relating to arbitration, and has in fact, carried out its
21 obligations under the Agreement to participate in the first two stages of the alternative dispute
22 resolution procedures – negotiation and mediation – both of which were unsuccessful. Because
23 the Court does not find the early representations of Maritz's objections to the Letter Agreement
24 as a whole binding on Defendant, the Court does not find that, on this basis, the issue of fraud in
25 the inducement must be determined by the arbitrator.

26 However, the Letter Agreement clearly and unequivocally reserved for the arbitrator all
27 questions regarding its validity. The Letter Agreement specifically provides that "[t]o the
28 extent [the parties] are unable to agree on any aspect of the [dispute resolution] procedure, such

7

disagreement will be resolved by the applicable rules and procedures of the American Arbitration Association. ('AAA').' (Hilbert Decl., Ex. D.) The AAA Commercial Rules provide that "The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." AAA Commercial Rule R-7(a). By the explicit incorporation of the AAA rules, the parties clearly and unmistakenly agreed that questions of arbitrability would be submitted to arbitration for resolution. *See, e.g., Poponin*, 2006 WL 2691418 at \*9 (where the arbitration agreement incorporated ICC Rules that provide for the arbitrator to decide arbitrability, the presumption that courts decide arbitrability falls away, and the issue of validity of agreement to arbitrate is decided by the arbitrator); *Anderson*, 2005 WL 1048700 at \*2-4 (court conducts facial and limited review of the contract to determine only whether the parties have in fact clearly and unmistakenly agreed to commit the question of arbitrability to the arbitrator); *see also Terminix*, 432 F.3d at 1332 (holding that by incorporating the AAA rules, including [Rule 7], into their agreement, the parties clearly and unmistakably agreed that the arbitrator should decide whether the arbitration clause is valid.") Here, the Court finds the two references to the AAA Rules and the explicit agreement to arbitrate disagreements on any aspect of the dispute resolution procedure mandates the conclusion that the issue of the inducement to enter the agreement must be submitted to the arbitrator for determination. *See Contec*, 398 F.3d at 208 (holding that where "parties explicitly incorporate rules that empower the arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator.")

Accordingly, the Court GRANTS Visa's motion to stay the action and to compel arbitration and DENIES Maritz's motion to stay arbitration pending determination of arbitrability. In addition, because the Court has determined that arbitration is the correct forum to resolve arbitrability, the Court finds that Maritz's request for additional discovery is improper and DENIES it as well. Lastly, the Court DENIES Visa's motion to dismiss the fraud counterclaims, without prejudice to refiling should the arbitration panel determine that the parties' dispute are not properly subject to arbitration.

**CONCLUSION**

For the foregoing reasons, the Court Court GRANTS Visa's motion to stay the action and compel arbitration, DENIES Maritz's motion to stay arbitration, DENIES Maritz's motion for additional discovery, and DENIES Visa's motion to dismiss as moot, without prejudice.

**IT IS SO ORDERED.**

Dated: March 18, 2008

JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE